# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

**Case No.:**

Pierce Robertson, Rachel Gold, Sanford Gold,
Rahil Sayed, Christopher Ehrentraut, Todd
Manganiello, Dan Newsom, William Ayer,
Anthony Dorn, Dameco Gates, Marshall Peters,
and Edwin Garrison, on behalf of themselves and
all others similarly situated,

        Plaintiffs,

v.

Mark Cuban, Dallas Basketball Limited, d/b/a
Dallas Mavericks, and Stephen Ehrlich,

        Defendants.

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

_____/

## <u>CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

*"I gotta add, I am a [Voyager] customer and I've been a customer for several months now. I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a perfect fit for our Mavs fans and reaching Mavs fans of all ages."*

    —Mark Cuban

*"In stocks and crypto, you will see companies that were **sustained by cheap, easy money** — but didn't have valid business prospects — will disappear. Like [Warren] Buffett says, 'When the tide goes out, you get to see who is swimming naked.'"*

    —Mark Cuban

*"**Mark is a tremendous advisor to me and we have a great relationship**. He is a big believer in crypto. Sometimes the value someone brings is **not what the public sees** but where they give you guidance and **help behind the scenes**."*

    —Stephen Ehrlich

Plaintiffs Pierce Robertson, Rachel Gold, Sanford Gold, Rahil Sayed, Christopher Ehrentraut, Todd Manganiello, Dan Newsom, William Ayer, Anthony Dorn, Dameco Gates, Marshall, and Edwin Garrison file this class action complaint on behalf of themselves, and all others similarly situated, against Mark Cuban ("Cuban"), Dallas Basketball Limited, d/b/a Dallas Mavericks (the "Mavericks"), and Stephen Ehrlich ("Ehrlich").

## <u>INTRODUCTION</u>

1.      On December 24, 2021, counsel for Plaintiffs and the class members brought a class action complaint styled *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the Deceptive Voyager Platform owned and operated by Voyager Digital Ltd. ("Voyager") and Voyager Digital LLC ("VDL") was an unregulated and unsustainable fraud, similar to other Ponzi schemes. It was specifically alleged in detail in that complaint how Defendants Mark Cuban and Stephen Ehrlich were key players who personally reached out to investors, individually and through the Dallas Mavericks, to induce them to invest in the Deceptive Voyager Platform.

2.      Cuban and Ehrlich, as will be explained, went to great lengths to use their experience as investors to dupe millions of Americans into investing—in many cases, their life savings—into the Deceptive Voyager Platform and purchasing Voyager Earn Program Accounts ("EPAs"),[1] which are unregistered securities. As a result, over 3.5 million Americans have now all but lost over ***5 billion dollars*** in cryptocurrency assets. This action seeks to hold Ehrlich, Cuban, and his Dallas Mavericks responsible for paying them back.



---

[1] https://currency.com/crypto-brokerage-scores-dallas-mavericks-sponsorship (accessed August 10, 2022).

3.      As alleged in paragraphs 1–8 of the *Cassidy* Complaint:

Voyager has quickly become one of the most utilized avenues for nascent investors to purchase cryptocurrency, and thus has already reaped hundreds of millions of dollars in revenue since 2019, which is increasing exponentially every week. The Voyager Defendants operate a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive Voyager Platform") that places cryptocurrency trade orders on behalf of users like Plaintiff and Class Members. The Voyager Defendants specifically target young and inexperienced investors, who are certainly new to cryptocurrency trading and mainly utilize mobile apps (rather than any sophisticated software) for trading, through the use of youth-forward marketing, promises of interest payments on cryptocurrency holdings (if a minimum balance is met), and uniform representations that the Deceptive Voyager Platform is "100% Commission-Free," while also assuring customers that they will receive the best possible price on cryptocurrency trades. As will be explained with extensive expert support, the Voyager Defendants' statements and representations are false, misleading and certainly violate numerous state and federal consumer statutes.

The Deceptive Voyager Platform is based upon false pretenses, false representations, and is specifically designed to take advantage of investors that utilize mobile apps to make their investments, in an unfair, unsavory, and deceptive manner. Simply put, Plaintiffs will prove that the Deceptive Voyager Platform is a house of cards, built on false promises and factually impossible representations that were specifically designed to take advantage of the cryptocurrency craze to the direct detriment of any ordinary investor.

The Voyager Defendants offer what they misleadingly claim to be "100% Commission-Free" cryptocurrency trading services, in order to unfairly obtain an edge over their competition, such as Coinbase, Gemini, Kraken, or Binance, who openly disclose the commissions and fees they charge on cryptocurrency trades. This tactic directly evolved from the alleged "no commission" alternatives offered by numerous brokerage houses in the 1980s.

In reality and unbeknownst to the Voyager Defendants' unsuspecting and largely unsophisticated consumers (especially considering that cryptocurrency is an emerging and innovative market with differences from traditional stock exchanges not appreciated by the average retail consumer), the Voyager Defendants **never** disclose that they intentionally set the pricing on their Voyager Platform high enough that they do, in fact, collect exorbitant hidden commissions on every cryptocurrency trade.

Capitalizing on their customers' naivete by using their proprietary systems to throw up smoke screens, including "Smart Order Routing," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm," numerous experts explain that the Voyager Defendants place their own financial interests at the forefront, and are able to collect on average what is likely to be *more* in hidden commissions than their competition collect from their disclosed commissions.

The very public support from the Dallas Mavericks and their owner, Mark Cuban, including their recent massive investment in the Deceptive Voyager Platform, gives a great illustration of how the Voyager Defendants are targeting unsophisticated investors with false and misleading promises of reaping large profits in the cryptocurrency market.

Mark Cuban recently spoke at a Dallas Mavericks press conference, conducted over the internet, where he strongly supported and touted the partnership between his company and the Voyager Defendants. Mr. Cuban proudly described how he would personally help significantly increase scope and presence of the Deceptive Voyager Platform for those with limited funds and experience:

> You know, there's a lot of hype, there's a lot of discussion, but most people don't understand the fundamentals behind it. We're going to try to bring that level of education to our fans and to our joint customers."

> To put it simply: there's untapped potential in the future of digital currencies and it's an attractive investment for novice investors who might only have $100 to start. That's where Voyager enters the picture.

> In other words, it's a way to earn high returns while also getting skin in the game and the Voyager platform makes the process easy and simplified for

fans of all ages. The 60+ crypto assets allows you to build a diverse portfolio from a single account.

You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started. My now 12-year-old son got me in Dogecoin when it was less than a penny. I was like "let's do this" because it's a cheap way for him to learn how all of this works. While you have to put in a $100 to get the $100 bonus the next two days, if you don't have a hundred dollars and you just want to download the app and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.[2]

Voyager's President and Chief Officer, Steve Ehrlich agreed with Mr. Cuban and added as follows:

That's one of the advantages of Voyager. You can actually download the app and fund your account and trade in three minutes or less. We make it really simple. We have a very easy-to-use and integrative platform that allows you to get engaged in the crypto market very quickly. That's one of the values of Voyager. You'll be trading in three minutes or less.

About 220 million people have crypto right now and we (anticipate) a billion in four years. So that shows you where we can actually go with crypto and crypto adoption. Now the comparison there is the internet. It took the internet eight years, for the same time frame, for the internet to grow that fast. So it's a great time to enter the space and learn more.[3]

4.      The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting the Deceptive Voyager Platform—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Dallas Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

5.      After the *Cassidy* Complaint was filed, the following important actions took place:

---

[2] https://www.mavs.com/mavsvoyager/
[3] *Id*.

(a) the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b) seven state Attorney Generals (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPAs, like the one Plaintiff Mark Cassidy was offered and sold by Voyager, was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022 (thousands of these EPAs were Florida-based);

(c) On March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the Earn Program is not exempt from registration under the law, and instead that it must be registered— and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year;[4]

(d) On February 14, 2022, crypto trader Block-Fi entered into a $50 million dollar settlement with the state regulators and $50 million dollar settlement with the SEC and agreed to stop selling its interest-bearing cryptocurrency accounts until they were registered with state and federal securities regulators;

(e) In September 2021, the New Jersey Bureau issued a Summary Cease and Desist Order against Celsius Network LLC, whose unlawful unregistered securities had raised at least $14 billion nationwide;[5] and,

(f) the largest cypto exchange, COINBASE, dropped all plans to offer the same lending rewards program after the SEC threated to sue them.[6]

6.     Voyager's CEO, Steve Ehrlich, told his investors, and the public, on his last investor call, that Voyager is now determining what to do in regards to all of these state and federal investigations: "… that's a conversation between myself, out internal GC, our advisors. And we have a very, very deep team, and we're evaluating all that at this point in time."[7]

---

[4]     https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why   (accessed August 10, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed August 10, 2022)

[5]     https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-company-voyager-digital-to-stop-offering-and-selling-interest-bearing-accounts/ (accessed August 10, 2022)

[6]     https://www.coindesk.com/policy/2022/01/26/sec-scrutinizing-crypto-firms-over-interest-paying-services-report/ (accessed August 10, 2022)

[7] Transcript of Voyager Digital FY2Q 2022 Earnings Call dated February 15, 2022, **Exhibit A**.

7.      As the *Cassidy* action proceeded through discovery and motion practice on issues relating to arbitration and personal jurisdiction over the Voyager entities, and just before class counsel was able to serve third party discovery on Cuban (who, discovery in the *Cassidy* action showed, personally asked Ehrlich whether he should be worried about the *Cassidy* action), the news broke that Voyager's irresponsible lending activities drove them to lose hundreds of millions of dollars of customer cryptocurrency assets, and Voyager quickly filed Chapter 11 bankruptcy.[8] As a result, the *Cassidy* action is currently stayed by virtue of the automatic stay.

8.      Before filing for Chapter 11 bankruptcy, just like Scott Rothstein did in his infamous Ponzi scheme, it was a necessary element, to continue to persuade, influence and convince the common investor, as cash was getting scarce, to continue to put their earned money (sometimes life savings) into specifically the Deceptive Voyager Platform. To do this, Stephen Ehrlich, CEO and founder of Voyager, made a plethora of false and misleading public statements that were broadcast around the country through the internet, and enlisted the help of Mark Cuban to do the same, who also invested his own money into the Deceptive Voyager Platform for this purpose.



https://www.mavs.com/photos/voyager-press-conference/ (accessed August 10, 2022).

9.      Importantly, although Cuban disclosed the partnership between Voyager and the Dallas Mavericks, he has never disclosed the nature, scope, and amount of compensation he has

---

[8]      https://www.cnbc.com/2022/07/06/crypto-firm-voyager-digital-files-for-chapter-11-bankruptcy-protection.html (accessed August 10, 2022).

personally received in exchange for the promotion of the Deceptive Voyager Platform, which the SEC has explained that a failure to disclose this information would be a violation of the anti-touting provisions of the federal securities laws.[9]

10.     The SEC took action against boxing champ Floyd Mayweather and music producer DJ Khaled after they were paid by cryptocurrency issuers to tweet promotional statements about investing in Initial Coin Offerings (ICOs), ordering them both to pay disgorgement, penalties and interest for promoting investments in ICOs, including one from cryptocurrency issuer Centra Tech, Inc, for a combined total of $767,500 because they failed to disclose that their promotional efforts on Twitter were paid endorsements.[10]

11.     Other celebrities similarly accused and prosecuted for failing to disclose their paid endorsements include Kim Kardashian and basketball player Paul Pierce.[11] According to the Federal Trade Commission, cryptocurrency scams have increased more than ten-fold year-over-year with consumers losing more than $80 million since October 2020, due in large part to the use of such celebrity endorsements.[12]

12.     Cuban's enthusiasm over the Voyager/Mavericks partnership was shared by Steve Erhlich, CEO and co-founder of Voyager, who said the company "could not be more excited" about partnering with the Mavs.[13] "This partnership gives us the opportunity to educate people all over the world on ways to use crypto in their everyday lives. We want to help people learn alternate ways to grow their wealth to achieve true financial freedom and build intergenerational wealth through crypto," he added.[14]

13.     Ehrlich made it clear that Cuban was integral to his plan to push the Deceptive Voyager Platform on retail investors around the country: "What we think that we'll be able to

---

[9]     https://www.ubergizmo.com/2017/11/sec-celebrities-disclose-payment-cryptocurrency-endorsements/#:~:text=It%20has%20issued%20a%20statement%20warning%20celebrities%20that,without%20disclosing%20that%20they%E2%80%99ve%20been%20paid%20for%20it (accessed August 10, 2022).
[10]     https://news.bloomberglaw.com/us-law-week/insights-celebrity-endorsements-and-cryptocurrency-a-cautionary-tale (accessed August 10, 2022).
[11]     https://blockbulletin.com/news/altcoins/kim-kardashian-among-other-celebrities-sued-for-promoting-cryptocurrencies/ (accessed August 10, 2022).
[12]     https://florida.foolproofme.org/articles/770-celebrity-cryptocurrency-scam (accessed August 10, 2022).
[13]     https://decrypt.co/84639/crypto-broker-voyager-digital-partner-mark-cubans-dallas-mavericks (accessed August 10, 2022).
[14]     https://decrypt.co/84639/crypto-broker-voyager-digital-partner-mark-cubans-dallas-mavericks (accessed August 10, 2022).

deliver—and it starts here, it starts in Dallas—is teaching people about decentralized finance, cryptocurrencies and nonrefundable tokens," Voyager Digital CEO and Co-founder Steve Ehrlich said. "We really want to bring that to the community. We'll start that now. And some say, 'Why the Mavs?' ***Because of Mark*** and the leadership he brings to the NBA when it comes to cryptocurrencies."[15]

14.     Mark Cuban, in turn, went on record calling the Deceptive Voyager Platform "as close to risk free as you're gonna get in the crypto universe." [16]

15.     Cuban even hyped up the fact that he was investing his own money into the Deceptive Voyager Platform to further induce retail investors to follow in his footsteps:[17]

> I gotta add, I am a customer and I've been a customer for several months now, I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a perfect fit for our Mavs fans and reaching Mavs fans of all ages.

16.     Cuban went so far in his promotion of Voyager that he had even staged a press conference with Voyager CEO Steve Ehrlich, where newly signed New York Knick Jalen Brunson, then a Maverick, asked, "If this is my first time getting into crypto, what are some key things I need to know?"



---

[15] https://www.forbes.com/sites/doylerader/2021/10/28/dallas-mavericks-announce-five-year-partnership-with-cryptocurrency-brokerage-voyager-digital/?sh=64aacae92e99
[16] https://www.proactiveinvestors.com/companies/amp/news/987495
[17] https://www.youtube.com/watch?v=aB9GpBOroIw (accessed August 10, 2022)

17.      "Yeah, you're spending your money, so always be careful," Cuban responded at the time. "But the other thing, look, there's investments, things like Shiba Inu and Dogecoin, those aren't investments. But Voyager … this is a good way to learn and it's something you can do on your smart phone. You can start getting into this and saving your money and that's just a unique opportunity."[18] Ironically, Cuban concluded that "[i]n stocks and crypto, you will see companies that were sustained by cheap, easy money — but didn't have valid business prospects — will disappear," Cuban said. "Like [Warren] Buffett says, 'When the tide goes out, you get to see who is swimming naked.'"[19]

18.      As the Texas regulators explain in their recent filing in the Voyager Chapter 11 bankruptcy, misrepresentations regarding Voyager were made on a regular basis:[20]

> Voyager claims it is a "fully compliant and licensed crypto broker" and touts its status as a public company, its listing on the Toronto Stock Exchange, and the "trust and transparency" resulting from its being a public company in Canada. These statements are materially misleading or otherwise likely to deceive the public because:
> • Respondents are not licensed as money service businesses in Texas to conduct currency exchange or money transmission activities defined by Chapter 151 of the Texas Finance Code;
> • Respondents are not registered with the Commodity Futures Trading Commission or the National Futures Association;
> • Respondents are not licensed, registered, or qualified, nor are their securities notice filed, with the United States Securities and Exchange Commission;
> • Respondents are not registered with the Texas State Securities Board to offer or sell securities in Texas, as required by Section 4004.051 of the Securities Act, and the Voyager Interest Accounts are not registered or permitted for sale in Texas, as required by Section 4003.001 of the Securities Act;
> • The Voyager Interest Accounts are not protected by the Securities Investor Protection Corporation, otherwise known as the SIPC, a federally mandated, non-profit, member funded United States corporation created under the Securities Investor Protection Act of 1970 that mandates membership of most US-registered broker-dealers;
> • The Voyager Interest Accounts are not insured by the Federal Deposit Insurance

---

[18]        https://nypost.com/2022/07/06/dallas-mavericks-fans-fume-at-mark-cuban-over-voyager-crypto-bankruptcy/ ;  https://www.thestreet.com/investing/cryptocurrency/mark-cuban-caught-in-bankruptcy-of-crypto-lender-voyager

[19]        https://nypost.com/2022/07/06/dallas-mavericks-fans-fume-at-mark-cuban-over-voyager-crypto-bankruptcy/ ;  https://www.thestreet.com/investing/cryptocurrency/mark-cuban-caught-in-bankruptcy-of-crypto-lender-voyager

[20]        https://www.ssb.texas.gov/sites/default/files/2022-04/20220412_FINAL_Voyager_NOH_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.pdf (accessed August 10, 2022).

Corporation, otherwise known as the FDIC, an agency that provides deposit insurance to depositors in the United States, or the National Credit Union Administration, otherwise known as the NCUA, an agency that regulates and insures credit unions;

• Although Voyager's stock is listed on the Toronto Stock Exchange, the Voyager Interest Accounts are not registered, qualified, or permitted in Canada and Voyager represents Canadian investors cannot invest in the Voyager Interest Accounts;

• The Canadian laws that apply to Voyager's securities listed on the Toronto Stock Exchange do not provide the same regulation or protection as domestic laws that apply to Voyager Interest Accounts Voyager sells exclusively to United States residents; and

• Voyager is not disclosing material risks relevant to these statements, material information including the amount of principal used to fund subsequent transactions, the identity, nature, and creditworthiness of borrowers, the type, nature, and counterparties for transactions involving digital asset exchanges, digital assets, staking, arranging for staking, or proprietary trading, the risks associated with digital asset exchanges, individual digital assets, staking protocols, or proprietarily traded assets, and the profits and/or losses derived from transactions.

19.     Voyager Digital LTD ("Voyager") and Voyager Digital LLC ("VDL") operate a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive Voyager Platform") that places cryptocurrency trade orders on behalf of users like Plaintiff and Class Members. These companies promise young, inexperienced investors interest payments on cryptocurrency holdings (if a minimum balance is met) and represent that the Deceptive Voyager Platform is "100% Commission-Free," while also assuring customers that they will receive the best possible price on cryptocurrency trades.

20.     The Deceptive Voyager Platform is based upon false pretenses, false representations, and is specifically designed to take advantage of investors that utilize mobile apps to make their investments, in an unfair, unsavory, and deceptive manner. Simply put, Plaintiffs will prove that the Deceptive Voyager Platform is a house of cards, built on false promises and factually impossible representations that were specifically designed to take advantage of the cryptocurrency craze to the direct detriment of any ordinary investor.

21.     Put differently, the Deceptive Voyager Platform was a massive Ponzi scheme, and it relied on Cuban's and the Dallas Maverick's vocal support and Cuban's monetary investment in order to continue to sustain itself until its implosion and Voyager's subsequent bankruptcy.

22.     In reality and unbeknownst to unsuspecting and largely unsophisticated consumers (especially considering that cryptocurrency is an emerging and innovative market with differences from traditional stock exchanges not appreciated by the average retail consumer), VDL ***never***

discloses that they intentionally set the pricing on the Voyager Platform high enough that they do, in fact, collect exorbitant hidden commissions on every cryptocurrency trade.

23.   Ehrlich also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform are as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured. Ehrlich even misrepresented the extent of the FDIC insurance on USD holdings, misleading customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed. This is similar to the official stance of the Voyager entities, which was representing that "Your USD is held by our banking partner, Metropolitan Commercial Bank, which is FDIC insured, so the cash you hold with Voyager is protected," Voyager's website said, claiming deposits are "FDIC insured on USD $250,000."[21] Voyager had also tweeted (@investvoyager, on November 12, 2020): Have you heard? USD held with Voyager is FDIC insured up to $250K. Our customers' security is our top priority. Start growing your crypto portfolio today.[22] Similar misrepresentations were present on the Voyager website:



24.   But those claims "are false and misleading," officials from the FDIC and the Federal Reserve said in a letter to Voyager Thursday. Voyager's claims "likely misled and were

---

[21] https://www.cbsnews.com/news/voyager-fdic-insurance-federal-reserve/ (accessed August 10, 2022).
[22] *Id*.

relied upon by customers who placed their funds with Voyager and do not have immediate access to their funds," the letter said. The officials demanded that the company scrub those claims from its website and social media, and give written confirmation by Monday that they've done so. [23]

25.     The FDIC is a government agency tasked with guarding the public's bank accounts — such as checking, savings and CDs — against unforeseen losses. Having a FDIC insured account means that anyone who has up $250,000 deposited into a bank would have their money reimbursed if the bank unexpectedly fails. However, speculative investments such as stocks and cryptocurrencies typically aren't FDIC insured. [24]

26.     Ehrlich, Cuban, and the Dallas Mavericks pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform.

27.     As will be explained with extensive expert support, these statements and representations are false, misleading and certainly violate numerous state and federal consumer statutes.

28.     Voyager also markets and offers for sale unregistered securities in the form of cryptocurrency interest-earning accounts. Since Voyager first introduced these unregistered securities to consumers in the United States in November 2019, it has referred to them by various names, including the "Voyager Interest Program" or the "Voyager Earn Program Account" (collectively, the "EPA").

29.     Voyager never registered the EPAs with the United States Securities and Exchange Commission ("SEC") or with the financial regulators of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana.

30.     Defendants, who are seen and acknowledged by the general public as "experts" in cryptocurrency, have publicly supported and endorsed Voyager and have encouraged and even incentivized consumers into investing in Voyager.

31.     Defendants, individually and through Voyager, engaged in and/or participated in an illegal offering and sale of unregistered securities and, in connection with the offering, engaged in fraudulent conduct and made material misstatements designed to deceive investors. By doing so, Defendants aided and abetted Voyager's securities laws violations.

---

[23] *Id*.
[24] *Id*.

32.     Defendants have also misrepresented the reality behind Voyager's Deceptive Platform and how it operates. Defendants' representations regarding the "100% Commission-Free" Voyager Platform are false, deceptive, and are objectively very likely to deceive average consumers acting reasonably under the circumstances. Accordingly, Defendants' conduct violates multiple consumer and securities statutes, including those in Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana.

33.     Plaintiffs thus seek damages and restitution on behalf of themselves and the Class members.

## PARTIES

34.     Plaintiff Pierce Robertson is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Robertson purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Robertson did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Robertson has sustained damages for which Cuban and Ehrlich are liable.

35.     Plaintiff Rachel Gold is a citizen and resident of the State of Florida. She is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ms. Gold purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on her holdings. Plaintiff Ms. Gold did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Ms. Gold has sustained damages for which Cuban and Ehrlich are liable.

36.     Plaintiff Sanford Gold is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Mr. Gold purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Mr. Gold did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in

reliance on those misrepresentations and omissions. As a result, Plaintiff Mr. Gold has sustained damages for which Cuban and Ehrlich are liable.

37.     Plaintiff Rahil Sayed is a citizen and resident of the State of New Jersey. He is a natural person and is otherwise *sui juris*. Plaintiff Sayed purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Sayed did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Sayed has sustained damages for which Cuban and Ehrlich are liable.

38.     Plaintiff Christopher Ehrentraut is a citizen and resident of the State of Tennessee. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ehrentraut purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Ehrentraut did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Ehrentraut has sustained damages for which Cuban and Ehrlich are liable.

39.     Plaintiff Todd Manganiello is a citizen and resident of the State of Louisiana. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Manganiello purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Manganiello did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Manganiello has sustained damages for which Cuban and Ehrlich are liable.

40.     Plaintiff Dan Newsom is a citizen and resident of the State of Alabama. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Newsom purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Newsom did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the

Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Newsom has sustained damages for which Cuban and Ehrlich are liable.

41.     Plaintiff William Ayer is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ayer purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Ayer did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Ayer has sustained damages for which Cuban and Ehrlich are liable.

42.     Plaintiff Anthony Dorn is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Dorn purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Dorn did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Dorn has sustained damages for which Cuban and Ehrlich are liable.

43.     Plaintiff Dameco Gates is a citizen and resident of the State of California residing. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Gates purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Gates did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Gates has sustained damages for which Cuban and Ehrlich are liable.

44.     Plaintiff Marshall Peters is a citizen and resident of the State of Pennsylvania. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Peters purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Peters did so after being exposed

to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Peters has sustained damages for which Cuban and Ehrlich are liable.

45.     Plaintiff Edwin Garrison is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Garrison did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Garrison has sustained damages for which Cuban and Ehrlich are liable.

46.     Defendant Stephen Ehrlich is a citizen of the State of Connecticut. He is the Chief Executive Officer at Voyager Digital LTD.

47.     Defendant Mark Cuban is a citizen of the State of Texas. Cuban is the well-known businessman, investor, television and media personality, and the team owner of the American professional basketball team, the Dallas Mavericks.

48.     Defendant Dallas Basketball Limited, d/b/a Dallas Mavericks is a Texas limited partnership doing business in the United States.

## JURISDICTION AND VENUE

49.     This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. § 78aa and §1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367. Further, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

50.     This Court has personal jurisdiction against Defendants because they conduct business in Florida, and/or has otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of Voyager's EPAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of Voyager's unregistered securities to consumers in

Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

51.     Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members either reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District. Venue is further proper pursuant to 15 U.S.C. § 78aa.

52.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

**FACTUAL ALLEGATIONS**

**A.  Background on Voyager and VDL**

53.     Voyager has quickly become one of the most utilized avenues for nascent investors to purchase cryptocurrency, and has already reaped hundreds of millions of dollars in revenue since 2019, which is increasing exponentially every week.

54.     Voyager was first listed on the Toronto Venture Exchange (TSX.V) under the symbol VYGR.V in February of 2019.[25] In September 2019, Voyager Digital Ltd was listed on the Canadian Stock Exchange (CSE) under the symbol VYGR.CN. In 2021, Voyager announced its approval to trade on the Toronto Stock Exchange (TSX) under the new ticker symbol VOYG and de-list from the CSE. Voyager stock is also available Over-the-Counter (OTC) through many US brokerages and can be purchased in the state of Florida and throughout the United States via the symbol VYGVF. Voyager has quickly become one of the most utilized avenues for nascent investors to purchase cryptocurrency, and thus has already reaped hundreds of millions of dollars in revenue since 2019, which is increasing exponentially every week.

**B.  Voyager's offer and sale of EPAs, which are unregistered securities.**

55.     On October 23, 2019, Voyager began offering EPAs for sale to consumers throughout the United States, including the state of Florida. Voyager initially launched the EPAs for customers holding Bitcoin, but thereafter extended them periodically to include dozens of other crypto assets, including USDC and Ethereum through end of fiscal year 2021.

---

[25]     *See*  https://www.investvoyager.com/blog/why-voyager-is-a-public-company/  (accessed  August  10, 2022)

56.     According to Voyager's Annual Information Form filed with Canadian regulators, "Rewards earned on crypto assets are variable, and reward rates are determined by Voyager at its sole discretion."[26]

57.     For fiscal year 2021, Voyager generated approximately $21 million in fees on crypto assets loaned.[27] Voyager earned during Q2 of fiscal year 2022 "approximately $57 million in lending and staking activities."[28] To generate this revenue, Voyager independently negotiates with institutional borrowers the terms of each unsecured institutional loan agreement, and selects which and how much of its crypto assets are available for such lending activity. In the event of bankruptcy or insolvency of an institutional borrower under a loan, Voyager bears the credit risk of lending crypto assets under the loan.[29]

58.     Voyager has maintained that it does not support, custody, intermediate, or facilitate any transaction or activities with respect to any product that constitutes a "security," and, therefore, believes that it is not required to be registered in *any capacity* under applicable United States securities laws.[30] Voyager's conclusion is apparently drawn from its position that although the SEC had previously communicated to industry participants that it will apply existing securities laws, including the *Howey* Test, a four-part test developed by the U.S. Supreme Court to determine whether a particular "investment contract" is a security, to digital assets, the *Howey* Test is almost 75 years old, was not designed with digital assets in mind, and its application is fact-based.[31] At the same time, Voyager acknowledges that "it is possible that the SEC could come to a different conclusion" than Voyager, which "could result in [Voyager] being required to become registered, removing certain digital assets from its platform, or being required to cease certain of its operations."[32]

59.     As Plaintiffs' expert, Rich Sanders, explains in his report, Voyager's Earn program is functionally nearly entirely identical to similar programs offered by firms such as Celsius and

---

[26] *see* Annual Information Form dated October 27, 2021, attached as **Exhibit B**.
[27] *see* Ex. B.
[28] *see* Ex. A.
[29] *see* Ex. B.
[30] *see* Ex. B.
[31] *see* Ex. B.
[32] *see* Ex. B.

BlockFi.[33] The differences between these companies and their respective programs are extremely minimal; as some examples, differences come down to phrasing (use of words like "interest" versus "rewards"), how frequently rewards are paid out (daily, weekly, or monthly, most commonly) or specific cryptocurrencies that are offered as part of the program.[34]

60.     Just like BlockFi settled with regulators, as explained above, Celsius, another Voyager competitor with a nearly identical "earn" program, quickly followed suit by revising their "earn" program by introducing "Celsius' Custody Solution," which only allows accredited U.S. investors to earn rewards on their crypto asset holdings.[35] To-date, Sanders explains, Voyager has not taken any similar actions, noting that "it is possible that Voyager instead opts to (continue to) benefit from the influx of users from BlockFi and Celsius, opting to take this action at a future date – whether voluntarily or by being compelled to do so." [36]

61.     In further describing the risks that stem from Voyager's offering and sale of the EPAs as unregistered securities, Sanders goes on to explain: [37]

> There have been extensive releases, statements, and actions from government agencies related to cryptocurrency in recent history. Secretary Yellen's remarks on digital assets leave no room for mystery. The *first* priority includes consumer protection; this is not accidental. The fifth priority states equitable access to *safe* and affordable financial services. To state the obvious, it is the opposite of safe to invest a significant portion of your net worth (let alone your life's savings) into activity such as DeFi staking. To invest a significant portion of someone else's net worth into activity such as DeFi staking, while painting a picture of far different asset use, adds a layer of dishonesty on top of risk.

> Customers of firms like BlockFi and Voyager are led to believe that their assets are being utilized largely by reputable institutions, not that their assets are being day-traded on platforms like Binance or utilized for extremely high-risk DeFi activity. In simpler terms, the risk and reward of loaning Ethereum to a reputable and audited western institution, as opposed to rehypothecation of that Ethereum into DeFi yield farming, are on entirely different ends of the spectrum. The risk associated with this reality transcends not just risk for the misled customers of firms

---

[33] Attached as **Exhibit C** is a supplemental report from Mr. Sanders that was proffered in the *Cassidy* Action, which goes into further detail regarding how the EPAs function, how they generate revenue, and whether Voyager properly represents their risk ("Sanders Supp."), ¶ 4

[34] *Id*.

[35] Sanders Supp. ¶ 6 (citing https://blog.celsius.network/important-celsius-update-to-our-us-clients-6df471420cc7) (accessed August 10, 2022).

[36] Sanders Supp. ¶ 6

[37] Sanders Supp. ¶¶ 9–10.

like Voyager and BlockFi that stand to lose significant portions of their net worth, but would be something I would categorize as an item of national security interest: an increased likelihood of a hack means an increased likelihood of siphoning of hundreds of millions or even billions of dollars' worth of value out of the western economy and into the hands of, for example, North Korea.[38] While true a western institution using loaned Bitcoin for arbitrage trading could be hacked, this is generally a less likely threat than the risk of a DeFi hack. In short, companies like Voyager and BlockFi misrepresent the risk of utilizing their interest/earn programs since they misrepresent what customer assets are used for, disregarding and concealing risk, for the sake of making a risky quick buck.

62.     Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others. Voyager's EPAs offered and sold to Plaintiffs and similarly situated consumers were a "security" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC.

63.     The Securities Act and the Exchange Act were designed to "eliminate serious abuses in a largely unregulated securities market." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975). They are focused, among other things, "on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes . . . and the need for regulation to prevent fraud and to protect the interest of investors. *Id.* Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes any "note." *See* 15 U.S.C. §§ 77b & 78c. A note is presumed to be a security unless it falls into certain judicially-created categories of financial instruments that are not securities, or if the note in question bears a "family resemblance" to notes in those categories based on a four-part test. *See Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990), and its progeny. Applying the *Reves* four-part analysis, the EPAs were notes and thus securities. First, Voyager offered and sold EPAs to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and purchasers bought EPAs to receive interest on the loaned crypto assets. Second, EPAs were offered and sold to a broad segment of the general public. Third, Voyager

---

[38]     https://techcrunch.com/2022/04/15/us-officials-link-north-korean-lazarus-hackers-to-625m-axie-infinity-crypto-theft/ (accessed August 10, 2022)

promoted EPAs as an investment, specifically as a way to earn a consistent return on crypto assets. Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to EPAs.

64.     Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract." *See* 15 U.S.C. §§ 77b, 78c. Based on the facts and circumstances set forth herein, the EPAs were securities because they were notes under *Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990) and its progeny, and also because Voyager offered and sold the EPAs as investment contracts, under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases discussed by the SEC in its Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO.[39] Voyager promised EPA investors a variable interest rate, determined by Voyager on a periodic basis, in exchange for crypto assets loaned by the investors, who could demand that Voyager return their loaned assets at any time. Voyager thus borrowed the crypto assets in exchange for a promise to repay with interest. Investors in the EPAs had a reasonable expectation of obtaining a future profit from Voyager's efforts in managing the EPAs based on Voyager's statements about how it would generate the yield to pay EPA investors interest. Investors also had a reasonable expectation that Voyager would use the invested crypto assets in Voyager's lending and principal investing activity, and that investors would share profits in the form of interest payments resulting from Voyager's efforts. Further, as Rich Sanders demonstrates in his report, once an investor purchases an EPA from Voyager and invests assets into it, Voyager customer assets are consolidated into accounts operated by a common enterprise.[40] "Blockchains don't lie, and the tracing of Voyager customer deposits to common enterprise accounts is very clear." [41] Voyager offered and sold the EPAs to the general public to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and promoted the EPAs as an investment. Voyager offered and sold securities without a registration statement filed or in effect with the Commission and without qualifying for an exemption from registration; as a result, Voyager violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act").

65.     As explained more fully in this Complaint, Ehrlich's and Cuban's misrepresentations and omissions made and broadcast around the country through the internet

---

[39] https://www.sec.gov/litigation/investreport/34-81207.pdf (accessed August 10, 2022)
[40] Sanders Supp. ¶ 11.
[41] *Id*.

render them liable to Plaintiffs and class members for soliciting their purchases of the unregistered EPAs. *Wildes v. Bitconnect Int'l PLC*, No. 20-11675 (11th Cir. Feb. 18, 2022) (holding that promoters of cryptocurrency through online videos could be liable for soliciting the purchase of unregistered securities through mass communication, and no "personal solicitation" was necessary for solicitation to be actionable).

**C. The Deceptive Voyager Platform and Related Ponzi Scheme**

66.    The Deceptive Voyager Platform offers investors, developers and platform providers a fully functional suite of APIs and mobile apps to allow anyone who is legally able to do so the ability to trade, invest, earn and secure digital assets across multiple types of digital assets.[42] According to its creators, "The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace."[43]

67.    VDL, one of Voyager's subsidiaries, acts as a "crypto broker," being a digital agent broker that facilitates users buying and selling of cryptocurrencies delivering deep pools of liquidity.[44] It also offers a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.[45] Some of the services offered by VDL include:

(a) users can open an account in three minutes or less. VDL utilizes third party service providers for know-your-client and anti-money-laundering checks to ensure fast and secure account openings;

(b) users are able to trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies;

(c) execution of trade orders across a spectrum of exchanges to give Voyager the deepest pool of liquidity;

---

[42] Voyager Digital LTD' Management's Discussion and Analysis for the Three and Six Months Ended December 31, 2020 (**Exhibit D**).
[43] *See* "Voyager Digital and Market Rebellion to Form Online Broker Platform for Equities, Options, and Futures Trading," dated May 5, 2021, attached as **Exhibit E.**
[44] *See* Ex. D.
[45] *Id*.

(d) minimizing transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing VDL's patented smart router technology;

(e) providing users with data in order for them to manage and track their crypto investments, including delivering news, social feeds and real-time alerts to keep users connected to the market, and providing portfolio tools to track performance, balances and transactions; and

(f) storing crypto assets in a secure wallet and in a "cold" facility, with 24/7 security. (fiat currency is stored at custodial banks).[46]

68.     Further, during the months of January, February, and March 2021, 65,000, 70,000, and 95,000 new funded accounts were onboarded onto the Voyager Platform with net deposits of $170M, $400M, and $650M, respectively:[47]

|  | March 2021 | February 2021 | January 2021 |
|---|---|---|---|
| Net Deposits | $650M | $400M | $170M |
| New Funded Accounts | 95,000 | 70,000 | 65,000 |
| New Verified Users | 395,000 | 190,000 | 250,000 |
| Principal Value traded | $2.5B | $1.6B | $840M |

As of March 31, 2021, Voyager's Assets Under Management exceeded $2.4 billion, with total funded accounts exceeding 270,000 and over 1 million total verified users on the Platform.[48] Moreover, during the month of April 2021 alone, new users were onboarded "at a record rate with over 130,000 new funded accounts added to the platform."[49]

69.     Included prominently throughout VDL's uniform marketing representations to its customers is that the Voyager Platform offers trades that are "100% Commission-Free."

70.     These representations enabled VDL to obtain an edge over its competitors, including but not limited to Coinbase, Gemini, Kraken, and Binance, who openly display the applicable fees and commissions they charge on each trade.

---

[46] *Id.*
[47] *See* "Voyager Digital Provides Business Update and March 2021 Metrics," dated April 6, 2021, attached as **Exhibit F**.
[48] *Id.*
[49] *See* "Voyager Digital Provides Business Update for April," dated May 3, 2021, attached as **Exhibit G**.

71.     These "100% Commission-Free" representations, however, are false and are reasonably likely to mislead objective consumers acting reasonably under the circumstances. While VDL does not openly display the commissions it charges on each cryptocurrency trade, it utilizes various methods to secrete the exorbitant commissions it retains from every trade.

72.     For example, the "spread" (i.e., the difference between the "Bid Price" and "Ask Price" on a given cryptocurrency) is kept intentionally wide on all cryptocurrencies listed throughout the Voyager Platform. Voyager explains in its most recent Management's Discussion and Analysis that the spread is a main source of revenue:[50]

> Fee revenue for the three and nine months ended March 31, 2021 was $53.7 million and $57.4, an increase of $53.5 and $57.1 compared to the same periods in 2020. The increase in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 was primarily due to an increase of $5.0 billion in trade volumes, and an increase in average spread of 70.1 bps. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31, 2020 was primarily due to an increase of $5.5 billion in trade volumes, and an increase in average spread of 60.6 bps.

73.     Although the Voyager Platform will display a "Fair Market Price" for each cryptocurrency, which falls somewhere in the middle of the spread, the Voyager Platform's systems will automatically execute market orders at the highest end of the spread, from which they pocket secret commissions. Moreover, once a user submits a market buy order, the "Estimated Price" for the trade displayed on the Voyager Platform automatically defaults to an amount higher than the quoted "Ask Price" at the top end of the spread, so that an order can execute at an amount that is "less" than the "Estimated Price," but still at the very top end of the spread. Similarly, for market sell orders, the trade will automatically default to an amount lower than the quoted "Bid Price" at the bottom end of the spread so that the order can execute at an amount that is "more" than the "Estimated Price," but still at the bottom end of the spread.

74.     To effectuate these unfair and deceptive business practices, VDL claims to use proprietary systems, which they refer to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm."[51]

---

[50] *See* Voyager Digital Ltd. Management's Discussion and Analysis for the Three and Nine Months Ended March 31, 2021, dated May 25, 2021, attached as **Exhibit H.**

[51] *See* "Passion for Product: Voyager Trading System," published Jan 23, 2020 at https://www.investvoyager.com/blog/passion-for-product-trading/ (accessed August 10, 2022)

75.     In describing the Smart Order Router, VDL maintains that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills them in the market for the customer using its proprietary order routing algorithm."[52] The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across our liquidity sources and streams this price to its users."[53]

76.     To obscure this overarching scheme, VDL utilizes vague and opaque representations that VDL will only "share" in "price improvement" where they can fill a user's order at a price better than that which was quoted to the user (which is not in the bid/ask spread or fair market price, but rather in the jacked up estimated price that is only shown after the customer submits the market order).[54] "By example, if the user is quoted $10,040 and the router is able to fill at $10,030, Voyager may price improve the user's order to $10,035 (note: share of price improvement is variable and is determined by Voyager's proprietary fills algorithm)."[55]

77.     In reality, and unbeknownst to customers, the "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" are designed to be intentionally obscure and to provide VDL with hidden commissions on every trade that in most cases exceed the disclosed fees and commissions charged by its competitors. VDL unfairly gains an edge on its competition and overcharges customers by collecting these secret commissions to the detriment of its unknowing customers.

78.     In support of these allegations, Plaintiffs attach from the *Cassidy* Action the expert reports of (a) Richard A. Sanders, the Co-Founder and Lead Investigator of CipherBlade, a blockchain forensics and cybercrime investigative firm which consults on some of the most renowned blockchain projects, as well as numerous law enforcement and regulatory investigations, and provides advisory services to cryptocurrency exchanges and other organizations;[56] and (b) Dr. Stephen Peter Castell, a Chartered IT Professional, independent consultant in computer and telecommunications systems and software development, and the Chairman of the United Kingdom

---

[52] *Id*.
[53] *Id*.
[54] *Id*.
[55] *Id*.
[56] *See* **Exhibit I** ("Sanders Report")

company CASTELL Computer and Systems Telecommunications Limited, a professional firm of Management and Financial Consultants in Information Technology of over 40 years' standing.[57]

79.    Richard Sanders utilized a blockchain visualization tool called Chainalysis Reactor in forming the opinions set forth in his report. Mr. Sanders explains that Chainalysis Reactor provides a visualization of the same data that would be viewable on a block explorer, but unlike block explorer, Chainalysis Reactor has what is known as "attribution." Attribution is simply the labeling of wallet addresses.[58] "Chainalysis Reactor (as well as similar tools) will have a baseline amount of what is known as attribution: the labeling of wallet addresses. Addresses will be unknown/pseudonymous until Chainalysis updates/labels the addresses in their system. A combination of automated analysis and manual investigation is utilized to continually add attribution.[59]

80.    Mr. Sanders found through his analysis that Voyager had an alarmingly low number of addresses attributed, far below the expected industry standard. "While it is true that no services (not even the most voluminous exchanges, such as Coinbase or Binance) will ever have all addresses attributed, services that have a lower amount of addresses attributed oftentimes lack such attribution as a result of the entity not utilizing a compliance tool such as Chainalysis KYT (the compliance equivalent of Chainalysis Reactor), and/or not submitting address data to such providers. VDL currently has 1 Bitcoin address attributed in Chainalysis Reactor, a figure far lower than industry standard.

81.    For example, Voyager competitor Celsius has 277,287 attributed addresses for Bitcoin in Chainalysis Reactor. A service with such aggressive marketing as VDL, according to Sanders, should have more address attribution. VDL's lack of attribution may at least partially have to do with how VDL processes customer deposits and withdrawals, which is distinctly different (perhaps deliberately) from their competitors and obfuscates potential attribution efforts.[60] Further, attribution for VDL wallet addresses for other blockchains was scarce and in some cases non-existent. While attribution for some more less-utilized assets (say, LTC or the ERC-20 tokens) may often have gaps, for attribution on widely-utilized assets (such as Ethereum)

---

[57] See **Exhibit J** ("Castell Report")
[58] Sanders report at ¶ 18
[59] Id. at ¶ 20
[60] Id. at ¶ 22

to be lacking immediately stands out. Sanders therefore performed manual attribution for VDL addresses."[61]

82.     Mr. Sanders found through his analysis that VDL lacks necessary transparency on their platform and programs, and that opacity materially affects a customer's ability to make an informed decision with their money. "Voyager is not transparent. As described in the preceding paragraph regarding the Voyager Interest Program, it is impossible for consumers to make an informed decision regarding whether to deposit funds to Voyager or not. Further, even if an individual opts out of the Voyager Interest Program, nothing evidences customer funds are not rehypothecated, rendering Voyager customers susceptible to the risk of this rehypothecation whether or not they have the risk appetite and/or desire to sign up for such activity."[62]

83.     According to Mr. Sanders, VDL fails to communicate to its users exactly what extra fees apply to their transactions, how exactly transactions are being executed, and employs misleading advertising to lure in customers:

> Voyager is deliberately misleading, and often refuses to substantiate information that is essential for a consumer to make an informed decision. As one prominent example, Voyager strongly advertises "Commission-free" trading on their landing page, but no such fees are ever clearly outlined. In the absence of any specificity regarding "the marketplace," it is impossible for a consumer — or anyone for that matter — to determine which "marketplaces" (exchanges?) Voyager is determining to provide the "best execution." There would, indeed, presumably be a set price for a market order, which would be derived from an aggregate of the exchanges Voyager is sourcing liquidity from. In the simplest terms possible, ***it is entirely a black box as to what Voyager is doing with orders purportedly directed to their Smart Order Router***, where (which exchanges) the Voyager Pricing Engine "calculates the fair market price" from, and how the Proprietary Fills Algorithm functions — and in the absence of such information, as well as demonstrable discrepancies between what Voyager says should happen and what happens, these systems are either improperly configured, or to varying degrees may not even exist or exist as described by Voyager. Phrasing such as "evaluation of multiple factors" is, per my experience regarding *all* companies that were suspected of, and subsequently confirmed to be, misleading consumers, extremely concerning. ***The utilization of seemingly-technical jargon, and/or otherwise unspecified yet critical information, often result in tragedy for consumers***.[63] In the absence of any information whatsoever regarding how Voyager is processing customer orders, it is functionally impossible to verify that Voyager is even performing the steps

---

[61] *Id*. at ¶ 23
[62] *Id*. at ¶ 27
[63]     https://www.makeuseof.com/the-rise-and-fall-of-bitconnect-an-internet-famous-ponzi-scheme/ (accessed August 10, 2022)

described on their own FAQ. ***Voyager, in essence, is expecting the same degree of trust from users that Bitconnect expected from their users regarding a 'trading bot' that turned out to <u>never exist</u>.*** Voyager is undoubtedly profiting off of customers utilizing the trade functionality of the Voyager platform, and is irrefutably *not* providing best execution. Voyager cannot both claim to provide best execution *and* be commission-free when it is easily evidenced that numerous other exchanges provide better rates.[64]

84.      Mr. Sanders further explains that VDL's advertising claim that their platform provides the best execution of trades for users is plainly and demonstrably false:

> The exchange rates provided by Voyager are consistently worse than the rates provided by cryptocurrency exchanges -- regardless of whether the exchange is centralized or decentralized, US-based or not US-based, etc. For Voyager to suggest they are providing any form of 'best execution' across the marketplace is demonstrably false. What makes Voyager's representations even more egregious is that, in the course of my analysis, I had performed extensive cryptocurrency deposits and withdrawals in order to discover cryptocurrency wallet addresses that Voyager utilizes for customer funds. Customer assets are sent to/from either Binance or HTC Trading wallets. Comparing exchange rates on Voyager to those on Binance resulted in Binance having better exchange rates on *every* occasion. Said differently, the *one* exchange that it is possible to assess Voyager would be including across their marketplace comparison (and thus should reflect the same price in Voyager app) provided a better deal than Voyager.[65]

85.      Mr. Sanders also obtained comparison data from VDL's competitors, such as Celsius, which further demonstrates the Deceptive Voyager Platform's vast deviation in number of attributed addresses from the expected industry standard. Mr. Sanders explained that "[u]pon a search of Celsius, a core Voyager competitor, their addresses are well-attributed; note the requirement to scroll down to see the full depth of cryptocurrencies that Celsius wallets are attributed in. Upon a search for Voyager, **only four cryptocurrencies are attributed**, and of those, **the attribution is partial**."[66]

86.      This lack of attribution indicates, in Mr. Sanders' view, that VDL demonstrates a possibility of noncompliance and lack of responsibly managed services on their platform

> While a service not being attributed in Chainalysis does not confirm the service is suspicious, it is generally typical for compliant and responsibly-managed services to have attribution in a tool like Chainalysis Reactor for several reasons: Companies will sometimes provide their wallet addresses to companies like Chainalysis in order to be helpful to law enforcement and/or decrease the overhead associated with

---

[64] *Id*. at ¶ 29 (emphasis in original and added)
[65] *Id*. at ¶ 30
[66] *Id*. at ¶ 34

false positives and inquiries that would otherwise stem from a lack of attributed wallet addresses.[67]

87.     This lack of compliance is further illustrated in Voyager's heavy utilization of non-U.S. based fund-receiving addresses which do not reflect the targeted customer demographic:

> While proportionality and focus at this time preclude me from providing a deeper review into Voyager's AML practices, observations regarding Voyager addresses (and the nature of the entities they send and receive cryptocurrencies from) while conducting my attribution work did prompt concerns. As just one example, Voyager's known Bitcoin address sends funds to exchanges that are not US-based or even preclude US residents from signing up (KuCoin, Binance, Byibit, and FTX would all be strong examples.) In essence, where Voyager customers withdraw funds to does not reflect what I'd expect a US-based company soliciting US-based users[68] to send funds to. In my experience, when I see sending exposure that does not reflect the targeted demographic, the company attributed to the wallet(s) has an (often intentional) porous approach to compliance; said differently, I find it very unlikely that the quantity of Source of Wealth inquiries Voyager sent to customers due to these observations (assets going to US-restricted exchanges) would match the statistics shown above.[69]

88.     Not only does VDL fail to deliver on their advertising promise of "Better Pricing On Trades," **they charge their users the highest premium on trades across all competitors**. According to Mr. Sanders, "On all but one occasion (which was for a less liquid cryptocurrency, ZRX, in a small amount, on FTX), Voyager's prices were worse than whichever exchange they were compared to. Voyager does not offer better pricing on trades. In fact, the rates Voyager offers would result in a plainly worse deal, often to the tune of nearly or more than 1% higher than competitors, even on highly liquid pairs such as BTC/USD."[70] "Consequently, VDL's representation of offering "Better Pricing on Trades" is, under the most generous of terms, deliberately misleading (it is *obvious* that would lead most people to conclude "across exchanges"), and I'd opine deliberately misleading in a way that is plainly to enrich themselves at the expense of that very misconception Voyager instills."[71]

89.     Upon further testing, Mr. Sanders also found it probable that VDL is not basing their market quotes off exchanges:

---

[67] *Id*. at ¶ 35 (emphasis added)
[68] https://www.investvoyager.com/blog/where-is-voyager-available/ (accessed August 10, 2022)
[69] *Id*. at ¶ 43
[70] *Id*. at ¶ 47
[71] *Id*. at ¶ 48

Baffled as to how Voyager may be generating the quotes for market buy/sell orders, I decided to run one more test on Voyager regarding USD/USDC. USDC is a cryptocurrency known as a stablecoin, which should be close to the value of the USD; however, these assets are never *entirely* 100%-pegged.[72] Consequently, if one goes onto a cryptocurrency exchange (with legitimate liquidity -- so Coinbase or Kraken would be good choices, whereas an exchange known for fake volume, which is also likely to have fake order books, such as HitBTC[73] might not be), and seeks to trade between a stablecoin and fiat, the exchange will not be an exact 1:1 match. Note that when entering tens or hundreds of millions of dollars into a USDC buy order on Kraken, the peg noticeably is lost, as it should be. Note that on Voyager it does not. *See*: Exhibit E – Infinite Stability.mp4 [accessible at https://youtu.be/zF5nHhLhpaM].[74] In the absence of any indication Voyager is sourcing funds from exchanges, as well as the alarming revelation that Voyager purports to effectively have infinite USDC stores at peg, I am thus left to conclude that it is possible, if not probable, Voyager is not basing their market quotes off exchanges. The explanation may simply be that Voyager sources liquidity from Binance at a markup."[75] "Notably, with Binance's known AML issues, even *if* Voyager were transparently providing Binance's rates on cryptocurrency trades (which they are not) to US users, Voyager is effectively a workaround for Binance being restricted to US residents *and* Voyager cannot know, with confidence, what their ultimate source of funds is. Such activity would be, from a value transfer/blockchain analysis standpoint, described as a workaround to US regulatory requirements and cryptocurrency exchange terms of use.[76]

90.     This probability is further bolstered by the questionability of VDL's business activity with Binance. Mr. Sanders states:

I can evidence, and have evidenced, that Voyager sends funds to HTC Trading and Binance. What happens with those funds when sent to HTC Trading is a black box (until/unless records are provided), but what one *can* conclude is Voyager, or the company they own/act through, HTC Trading, has one or more Binance accounts. If Voyager were, in fact, being honest about providing the best rates to their users, it would only be sensible to include in the hypothetical set of exchanges they are getting these alleged best rates from: namely Binance. Said differently: **why does Voyager send customer funds to Binance where they presumably hold account(s) yet a Voyager customer will consistently get a better deal on Binance than is shown on Voyager?** As far as the blockchain is concerned, the *one* place I can *definitively* assess Voyager receiving liquidity from is Binance, yet Voyager's rates were *worse* than Binance every time.[77]

---

[72] https://invao.org/how-stable-are-stablecoins/ (accessed August 10, 2022)
[73]      https://cointelegraph.com/news/bitwise-calls-out-to-sec-95-of-bitcoin-trade-volume-is-fake-real-market-is-or (accessed August 10, 2022)
[74] *Id*. at ¶ 50
[75] *Id*. at ¶ 51
[76] *Id*. at ¶ 53
[77] *Id*. at ¶ 55

91.     Mr. Sanders lastly concludes, in line with what Plaintiffs allege:

Voyager has fraudulently conducted business by making false claims, utilizing misleading marketing, and obscuring the truth behind what Voyager does with customer's funds, and what fees users are charged. "Voyager's aggressive expansion in the late 2020/2021 bull market is, in my estimation, plainly targeting inexperienced cryptocurrency users/investors that would not have the experience to know better. New cryptocurrency users rely on active industry participants (companies such as Voyager, and "educators/influencers") to provide them with good-faith insight and not mislead them. Voyager's representations, namely those about commission-free and best price trading, would undoubtedly be understood to mean what they say they mean whether by a cryptocurrency novice or a deeply experienced expert."[78]

92.     As to the widespread use of individuals like Ehrlich and promoters like Cuban and the Dallas Mavericks to continue to push the Deceptive Voyager Platform and related Ponzi Scheme and their importance in keeping the scheme afloat, Mr. Sanders provides his report dated August 10, 2022, a copy of which is attached as **Exhibit K** ("Sanders Report 2"). In his report, Mr. Sanders details how Ehrlich and Cuban knowingly and intentionally misrepresented the Deceptive Voyager Platform and related Ponzi Scheme to the unsuspecting public:

Voyager's APY was called into question early, including in a 2021 podcast with Decrypt[79] (which, despite being recorded by someone that openly admitted to being a Voyager customer, aged like milk) titled "9% APY Too Good to be True" in which [Ehrlich] is questioned why Voyager can do this, but banks can't: "It's sustainable for us, yeah." [Ehrlich] never evidenced how this yield was sustainable: because it wasn't, and because he lied. "We're sending coins to really secure, billion dollar companies" can not be an accurate risk representation with what (still little) we now know Voyager customer assets were utilized for. [Ehrlich] also lied about having "hack insurance" in this podcast, or at least Voyager has not evidenced any such "hack insurance" protecting against a hack of Voyager itself, nor would hack insurance be at the top of the list of concerns whereas solvency would be; a solvency audit would be a higher priority than hack insurance for an organization like Voyager if legitimately and competently managed. In just one approximately 23 minute podcast, Ehrlich lies about a variety of critical issues that, in and of itself, is sufficient to outline the issues of Voyager's misrepresentations; suffice to say, outlining all examples of Voyager's representations would make this report potentially hundreds of pages in length. The Decrypt podcast with Ehrlich, however provides what I assess to be an extremely accurate indicator of the problems with Voyager's representations in a 23 minute segment.

---

[78] *Id*. at ¶ 67
[79]   https://soundcloud.com/user-792539118-188863837/oct-4-is-9-apy-too-good-to-be-true   (accessed August 10, 2022).

Ehrlich lying about the sustainability of their 'Earn' program is one of dozens, if not hundreds, of examples of Voyager deliberately lying and misleading the public, and fostered the culture and conditions for the "educators" and "influencers" to do the same.

Understanding the issues with promoting Voyager via professional sports teams requires understanding the audience. The average NASCAR viewer, or generally, the average professional sports viewer, is likely to be a lower to middle class individual with below average to average technical expertise. Certainly, an individual that has never been engaged with cryptocurrency and is exposed to digital assets for the first time via something like NASCAR is not only a new investor, but a naive one. By definition, this is a vulnerable demographic: for investment in general, and especially for investment in digital assets[80]. Representing to this demographic that investment in digital assets *at all* is low risk was and is wrong. Representing to this demographic that it is appropriate to keep one's "rainy day fund", let alone their life's savings, in digital assets, was and is wrong. Representing to brand new cryptocurrency investors an array of things regarding Voyager, such as that the APY was "sustainable" and low risk, was egregiously predatory and, in my opinion, more maliciously cunning than the activity of "direct scammers" such as those behind Bitconnect.

Put simply, Mark Cuban is no more qualified to provide digital asset investment advice than most laypeople. Experience in other investments makes not for an honest cryptocurrency "influencer", and, in fact, only increases the likelihood that they're being paid for their social media following. Mark Cuban may know some things about finance and business, but he is in no way, shape, or form experienced with blockchain technology. While Mark Cuban has an array of companies under his portfolio (including generally successful startups such as OpenSea, Zapper, and Polygon[81]), investment in a company does not mean expertise in the industry, and as has been the case with digital assets especially since the 2017 market, if you "throw enough darts", eventually something will stick – especially if you're getting undisclosed/non-public deals with more beneficial investment terms than offered publicly. Mark Cuban is not far removed from other "influencers" that focus on price discussion and have experience largely limited to trading the altcoin/NFT flavor of the week to try to catch a profit.

In the simplest terms possible, "influencers" like Mark Cuban were utilized purely for their reach. Ironically, the area Mark Cuban would have more knowledge business knowledge should have made plain that Voyager's APY was not

---

[80] Investment in digital assets is widely accepted to be higher risk than "traditional" investments for a plethora of reasons, including but not limited to less regulatory protection and irreversible nature of transactions.

[81] https://markcubancompanies.com/blockchain/ (accessed August 10, 2022).

sustainable. Despite this, Mark Cuban opted to promote Voyager aggressively, including via the Dallas Mavericks[82].

*"In stocks and crypto, you will see companies that were sustained by cheap, easy money — but didn't have valid business prospects — will disappear," Cuban said. "Like [Warren] Buffett says, 'When the tide goes out, you get to see who is swimming naked." - Mark Cuban*[83]

Voyager didn't simply lack "valid business prospects" – it was doomed from the onset. "Educators" and "influencers" continue to push Voyager's false narrative that the reasons for their collapse were somehow outside of their control, citing "market conditions" and other external factors. It's also worth pointing out that despite Mark Cuban's purported sharp acumen, he didn't see risks with Voyager during the earlier stages of the recent crypto bear market, such as when interviewed in May of 2022[84]. Put simply, Mark Cuban knew better both when he was promoting Voyager early, and all the way through the endgame of Voyager collapsing shortly after his May 2022 interview.

. . .



Mark Cuban suggested that it would be safe to save only four month of expenses in the form of USDC and to live off of 7% "on DeFi". The average salary of a full time employee in the US in 2021 was approximately $5,854 per month[85]. This would be a savings of $23,416. To state the obvious, a 7% yield on that figure will not pay one's bills. There would be no point in putting assets you'd need for expenses into a yield program (especially if it was subject to lock), and it would be insanely risky to put money one will need to pay the bills into something (that Mark Cuban knew was) risky. Regardless of whether Mark Cuban was alluding to

---

[82]         https://nypost.com/2022/07/06/dallas-mavericks-fans-fume-at-mark-cuban-over-voyager-crypto-bankruptcy/
[83] *Id*.
[84]         https://www.cnbc.com/2022/05/12/mark-cuban-crypto-is-going-through-a-similar-lull-to-early-web.html
[85] https://www.ziprecruiter.com/Salaries/Average-Salary-per-Month (accessed August 10, 2022).

Voyager and not DeFi here, this Tweet is an example of what led many Voyager customers into false confidence.

Sanders Report 2, ¶¶ 30–37.

93.    Dr. Castell similarly conducted a careful preliminary analysis to demonstrate the potential scope of damages resulting from VDL's overcharges. This analysis, "relying on Voyager's own reported figures," reflected that VDL's conduct has likely resulted or will result in over **1.08 billion dollars** in damages to its users.[86]

94.    Dr. Castell agrees with Mr. Sanders in that VDL does not actually execute trades at the "best market price" as they advertise. "In summary, it is my firm preliminary opinion that the Voyager App does not materially provide the user functionality as represented by Voyager Digital as regards achieving the 'best market price' for the user/trader."[87]

95.    The Voyager app was likely deliberately designed to not provide the actual functionality aspects represented to users. Dr. Castell states:

> Furthermore, in my preliminary opinion the failure of the Voyager App to provide the represented functionality is likely to be centered principally within elements of the coding or programmed behavior of the "Smart Order Router," and/or the "Voyager Pricing Engine," and/or the "Proprietary Fills Algorithm", either acting alone, amongst themselves, or in conjunction with the Voyager Digital corporate software and systems with which these modules connect and inter-operate.[88]

> In my preliminary view it is clear that the available technical evidence shows that the Voyager App does not materially provide the user functionality as represented by Voyager Digital as regards achieving the "best market price" or "fair market price" for the user/trader.[89]

96.    This obscurity leading to charging customers extra hidden fees is most likely known to VDL at least at this time, or earlier. Dr. Castell explains,

> …whether through an unintentional failure, or deliberate act, in my view such overcharge provisionally appears to be a definite *software material defect*, and it seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.[90]

---

[86] Castell report at ¶ 43
[87] *Id*. at ¶ 45
[88] *Id*. at ¶ 46
[89] *Id*. at ¶ 40
[90] *Id*. at ¶ 41

97.     According to Dr. Castell, each time a user was overcharged on their purportedly "commission free" trades, that overcharge amounted to no less than 0.5% of the total value of that user's trade. "In my view this overcharge to the Voyager User may be characterized or thought of as essentially an undisclosed commission levied by Voyager Limited. The overcharge/ undisclosed commission varied somewhat per individual trade, between approximately 0.5% and 1% of the value of the trade, across all trades in the sample, i.e., the overcharge was never less than 0.5% of the value of the trade."[91]

98.     According to Dr. Castell, it is a fact that there is a definite material defect in the design of the Voyager Platform software, either deliberately or negligently:

> In the meantime, whether the overcharge is as a result, on the part of Voyager Digital's management, of a fault in Voyager Digital's software development management, i.e. the company's software design, build, testing, deployment and operational processes, or arises from a deliberate intent of the company to deceive and overcharge the users of its Voyager App, or some combination of both, in my view and experience, and dependent, as noted herein, on due inspection and examination of the software development, management and operational documentation to be disclosed by Voyager Digital, such overcharge provisionally appears to me to be a definite *software material defect*. I naturally defer to the court to make that finding legally in due course, and, if so, determine what restitution and compensation falls to be provided by Voyager Digital for the financial consequences of such a software material defect.[92]

99.     That said, Dr. Castell believes this material defect, which led to hundreds of millions of dollars in user overcharges, ***was not an accident, and was indeed deliberate in design***:

> However, and subject to the Discovery that will be necessary to analyze definitively whether what the Voyager Digital company's management is doing is intentional, in my preliminary view, since the overcharge/undisclosed commission appears to be present in every trade, it is highly likely that the Voyager App is deliberately conceived and designed by the company's management to function that way, or, equally, the company's management has grossly failed to discharge its requisite IT and corporate governance duties, and has failed to correct this software material defect, perhaps because it is to their company's benefit. It seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.[93]

---

[91] *Id*. at ¶ 26
[92] *Id*. at ¶ 29(b)
[93] *Id*. at ¶ 29(c)

100.    VDL has failed to meet acceptable professional and transactional standards in the market segment they belong to. Dr. Castell concludes, based on his experience, that:

> Based on the evident material failure of Voyager Digital to provide its promised Voyager App "best market price," and "100% Commission Free," user functionalities, whether those failures be through deliberate policy and systems design, or through faults in software construction and operation, I am of the preliminary opinion that the technical governance of Voyager Digital in the management, operation, integrity, representations and security of its Voyager App and of its other management and customer systems are likely not to meet, in whole or in part, accepted professional standards for, and/or custom and practice in, the consumer electronic financial services and/or online trading sectors, but cannot arrive at a final considered view prior to Defendants' discovery and disclosure.[94]

### D. Defendants lure consumers into Voyager

101.    Cuban is also no stranger to the cryptocurrency market. Earlier this year, in a podcast he did with Jon Stewart, he stated that 80% of the investments he makes outside of those on Shark Tank "are in or around cryptocurrencies"[95] because "[t]hat is really where I look to invest."[96]

102.    On October 28, 2021, at a Mavericks press conference, Defendants announced that the Mavericks had entered into a 5-year "exclusive, integrated partnership" with Voyager.[97]



---

[94] *Id*. at ¶ 50
[95] https://www.cnbc.com/2022/01/14/mark-cuban-says-80percent-of-his-non-shark-tank-investments-are-in-crypto.html (accessed August 10, 2022).
[96] *Id*.
[97] https://www.mavs.com/mavsvoyager/ (accessed August 10, 2022).

103.     Defendant Cuban proudly described how he would personally help significantly increase the scope and presence of the Deceptive Voyager Platform for those with limited funds and experience:

You know, there's a lot of hype, there's a lot of discussion, but most people don't understand the fundamentals behind it. We're going to try to bring that level of education to our fans and to our joint customers."

To put it simply: there's untapped potential in the future of digital currencies and it's an attractive investment for novice investors who might only have $100 to start. That's where Voyager enters the picture.

In other words, it's a way to earn high returns while also getting skin in the game and the Voyager platform makes the process easy and simplified for fans of all ages. The 60+ crypto assets allows you to build a diverse portfolio from a single account.

You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started. My now 12-year-old son got me in Dogecoin when it was less than a penny. I was like "let's do this" because it's a cheap way for him to learn how all of this works. While you have to put in a $100 to get the $100 bonus the next two days, if you don't have a hundred dollars and you just want to download the app and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.[98]

104.     Defendant Ehrlich agreed with Cuban and added as follows:

That's one of the advantages of Voyager. You can actually download the app and fund your account and trade in three minutes or less. We make it really simple. We have a very easy-to-use and integrative platform that allows you to get engaged in the crypto market very quickly. That's one of the values of Voyager. You'll be trading in three minutes or less.

About 220 million people have crypto right now and we (anticipate) a billion in four years. So that shows you where we can actually go with crypto and crypto adoption. Now the comparison there is the internet. It took the internet eight years, for the same time frame, for the internet to grow that fast. So it's a great time to enter the space and learn more. [99]

105.     Cuban even hyped up the fact that he was investing his own money into the Deceptive Voyager Platform to further induce retail investors to follow in his footsteps:[100]

---

[98] https://www.mavs.com/mavsvoyager/ (accessed August 10, 2022)
[99] Id.
[100] https://www.youtube.com/watch?v=aB9GpBOroIw (accessed August 10, 2022)

38

I gotta add, I am a customer and I've been a customer for several months now, I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a perfect fit for our Mavs fans and reaching Mavs fans of all ages.

. . .

And, of course, the Mavs being a leader I think we are going to extend this far deeper than just Mavs fans, I think Voyager is going to be a leader amongst sports fans and crypto fans around the country.

106.    Throughout the press conference, Cuban continuously represented that Voyager was an easy to use platform that offered the best pricing in the market:

And so for those of you who already use crypto, I know for me it was really easy, I took some of my MATIC tokens that I own and transferred it over because Voyager paid a higher interest rate or return rate than the application I was using before, Aave. So it was really easy to give you a wallet address, you just go into your metamask or whatever you're using, you just send it to that destination address, it shows up an hour later, you start earning more money, and so right immediately I was earning more when I went over to Voyager, and it's the same with USDC, a stablecoin. And the other thing about it is for those of you who use DeFi, the pricing is always higher on DeFi as they try to look through all the decentralized financing platforms to try to get the best—not even the best, but *a* price— and so with Voyager, the pricing has been far, far better, so if you're paying attention and want to get the best price, Voyager is a great platform for it.

107.    Ehrlich, in turn, continuously touted the Voyager rewards program, posing it as a way to "educate" investors while they "create wealth," and particularly that he wanted to get people as young as possible investing in the Deceptive Voyager Platform: [101]

You know, we have an extensive rewards program. As you hold a certain amount or level of assets you even get more rewards on the program, so we're trying to engage you and bring you in the platform and teach and educate and create that wealth through our extensive rewards program.

. . .

It's never too late. I think actually it's the right time. Because as I've said, I still think it's the first half of the first quarter on crypto adoption. . . . It's a great time to enter the space, learn more, and I think that's the key. You've got to come in, you've got to learn, educate yourself. We help, we help educate, but you've got to learn more. And I think that's the key.

. . .

Financial literacy, we need to teach the youth, that's part of what we want to bring, too, is the education when we build out the education, we're in the middle of

---

[101] *Id.*

building that out, crypto 101 is the first thing that we do to teach people. Teach the youth, go to the community and teach the youth about financial literacy, I think that's important because most young kids don't get the opportunity to learn about financial literacy and they wind up going to college and now they're on their own and don't know how to manage their money and they're out in the real world earning salaries and they don't even know what FICA is . . . but that's what happens, and so we need to teach financial literacy and it's gotta start at the young ages, you know we gotta get out there and it's part of the plan.

108.    Cuban also shamelessly pushed investors to invest heavily into USDC and other assets on the Deceptive Voyager Platform, claiming that investing in the Deceptive Voyager Platform was "***as close to risk free as you're going to get in the crypto universe***," that it was good for small businesses, and even that it was "a lot easier" than opening a savings account at a bank for young children:[102]

> One of the reasons we want to do the education program is there's a big opportunity for small businesses. One of the challenges of small businesses is if you have any cash in the bank, you're making .025%. You can convert to put it into a USDC stablecoin on Voyager, and I thought it was 7% but now it's 9%. And so I've taken a lot of my cash and made it available on USDC. I'm not here trying to sell you it's 100% risk free, but it's as close to risk free as you're going to get in the crypto universe. And so just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.

> . . .

> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's impossible except on a few platforms to spend $10 and get started. You know, my now 12-year-old son got me into Dogecoin when it was less than a penny.

> . . .

> So there's a lot of ways to inexpensively start to get an understanding. And it's a lot easier than even opening up a savings account. It's a pain in the ass to open up a savings account, particularly for your kids these days. There's so much paperwork, and whether it's yourself personally, someone you're trying to teach— you're trying to teach your kids about personal finance, believe it or not, this is actually a better way, and so that's one of the unique opportunities and why it's not too late.

> . . .

> It's also something you can do on your phone. You don't have to have a bank account. So, people who are unbanked, trying to learn about financing, but have a

---

[102] *Id.*

smart phone and can download the app, you can start getting into this and saving your money and that's just a unique opportunity.

109.    Further, Ehrlich, contrary to the position he is now taking in the Voyager bankruptcy, claimed that the rewards program is based on "staking" assets that customers own (as opposed to lending them out to institutional investors like 3AC), and falsely stated that he was prioritizing security *and insurance* on customer's cryptocurrency holdings: [103]

> We're connected to about a dozen different market makers, exchanges around the globe, and so we bring a best price back to consumers for that. . . . We run a rewards program, so when you bring your assets over, we're going to reward you with earnings on those assets based upon your balances, based upon tokens you hold and so forth. And so it's a whole rewards program that we've built together and it's really probably state of the art when it comes to crypto with rewards programs, and that's how we like to operate, to give consumers rewards back for using and holding assets on the platform.
>
> . . .
>
> Our rewards are generated through staking, you know it's a lot staking these days, we have 30-something coins that we offer rewards on and a bunch of them are on the staking side, yep.
>
> . . .
>
> I was waiting for that question on security, it's a really important aspect. Security starts with you as an individual. What we recommend to every individual that buys and sells cryptocurrency is to use two-factor authorization when you actually hold your cryptocurrency. Do not use an SMS text message, there are a lot of scammers out there, there are a lot of people who try to SIM-swap you, it almost happened to me a month ago, on a Friday night my phone was trying to be SIM-swapped and I caught it quick enough and called the phone company, but I use two-factor authentication and I think everybody should start there. That means using a Google authenticator, authy, duo, or any of the other products you can use for 2fa. Outside of that, after from you to us is we use multiple custodians. We do not keep all our coins in one place, we keep them across multiple custodians, we've built a really detailed infrastructure for that, to make sure that we're spreading that risk and the insurance we get on all of that across multiple custodians, so it starts with the individual and making sure you have proper security and then it's also us as well.

110.    Finally, Cuban went to great lengths to cast investing in the Deceptive Voyager Platform as a "fun" opportunity with a low cost of entry: [104]

> Access, first and foremost. The simplicity of access, The fact that you don't have to rush into it and put all your money into it so patience is a big part of it. And then

---

[103] *Id.*
[104] *Id.*

experimentation, right? Be curious. . . . Because there's such a low cost of introduction and you know obviously the people who need the most education hopefully are spending the least amount of money, there's a lot of programs and educational programs that we can do that guide people through the process. And that's really the key. . . . One of the greatest values of the lower cost crypto isn't so much "hey it could be an investment," it's more the community. . . . It's a low cost entry to fun.

111.   As an incentive, Defendants Cuban and the Mavericks even ran a promotion shortly after the press conference where individuals who downloaded the Voyager app to invest during a certain time would receive $100 in Bitcoin.[105]

112.   Although it is unclear without discovery to what extent Cuban was invested in the Deceptive Voyager Platform, how much he profited from his involvement in soliciting purchases of EPAs from investors around the country, or whether he was able to get his investment into the Deceptive Voyager Platform out before Voyager filed Chapter 11 bankruptcy, it would not be the first time he led investors to ruin while he was able to enrich himself at their expense.

113.   Cuban previously endorsed the cryptocurrency Titan by Iron Finance, a coin he publicly endorsed that was trading at $65 promising over 200% APY which then crashed to $0.000000024 within a few days of his endorsement.[106] Cuban reported via Twitter (@mcuban) that "I got hit like everyone else. Crazy part is I got out, thought they were increasing their TVL enough. Than [sic] Bam." Cuban never publicly disclosed whether he lost money in that transaction.[107] What was clear, though, is that Cuban's public endorsement of Titan caused the price to double in a matter of days: "Many crypto investors follow the lead of crypto-friendly billionaires' comments—and that could have contributed to the surge. At the start of June 13, the day of Cubans' blog post, Titan was trading at $29. Three days later, it hit its peak." [108] Thus, Cuban's public statements clearly carry tremendous weight with the public.

114.   As intended by Cuban, Ehrlich, and the Dallas Mavericks, their promotion worked. Hundreds of investors, including Class Member Anand Bhatt, who resides in Wyoming, joined Voyager. Anand recalls that "the only reason I signed up is because of Mark Cuban offering the free Bitcoin/Dallas Mavericks deal."

---

[105]   https://markets.businessinsider.com/news/currencies/mark-cuban-dallas-mavericks-free-bitcoin-100-voyager-digital-app-2021-10 (accessed August 10, 2022).

[106]   https://www.publish0x.com/at-scottcbusiness/celebrity-crypto-endorsements-gone-wrong-xznzyqd (accessed August 10, 2022).

[107]   https://fortune.com/2021/06/17/crypto-titan-token-crash-mark-cuban/ (accessed August 10, 2022).

[108]   Id.

115.    As Plaintiff Pierce Robinson explained:

So, I first heard about Voyager from Mark Cuban. The dogecoin hype was at its peak and I was thinking about investing in crypto. This was back in the summer of 2021. I saw Mark promoting dogecoin and then Voyager and thought "he's a sound investor," so I downloaded the app and began to play around with a very small amount of money in June 2021. Later in the year, I remember the news was on Voyager and all over the TV and internet that there was a partnership with Mark and the Mavericks, so I trusted that it was legitimate started putting more and more money into the app. I invested even more because of the interest opportunities on Voyager that Mark loudly promoted the second half of last year.

116.    Another Class Member, Katie Damore, states:

I opened my Voyager account . . . after hearing Mark Cuban's partnership and support with Voyager I felt overly confident in the platform and I made 3 more deposits . . . I am an inexperienced investor and crypto person and I got caught up in the hype.

117.    Others have similarly pointed to Defendants for their decision to join Voyager:

"[I] saw many statements from Mark Cuban stating that Voyager was "100% Risk Free, and it's as close to risk free as you are going to get in the crypto universe . . . [Mark Cuban's] trust in Voyager [] made me purchase the coin from Voyager . . ."

        Class Member, Nikhila Beesetti

"I was aware that Mark Cuban and others . . . had become investors . . . so I felt comfortable to move the bulk of my holdings to Voyager . . . These gave me comfort."

        Plaintiff, Marshall Peters

118.    A further reason for the necessity of taking in as many customers as possible to use their funds to perpetuate the Deceptive Voyager Platform and related Ponzi scheme, Founder and President, Steve Ehrlich, explains the importance of "spread revenue" to his investors at the earnings call for Voyager's Second Quarter for Fiscal Year 2021:[109]

With the growth of assets under management, we remind investors of our 2 main revenue sources, spread revenue and interest revenue. Estimated spread revenue is derived by the trading velocity of our assets while interest revenue was driven by the gross interest earned on the overall assets under management. Historically, the company has earned between 10 to 12% annualized revenue on assets under management.

At this point, I would also like to remind investors of certain drivers of our business. As in agency brokerage business, market volatility can often act as our friend.

---

[109] *See* Transcript of Voyager Digital FY2Q 2021 Earnings Call dated March 1, 2021, attached as **Exhibit L.**

Voyager executes trades and captures spread revenue in both up and down markets. One example of the powerful agency model happened on Tuesday, February 23rd when Bitcoin decreased from a high of $56,000 to $45,000. That day, Voyager experienced a record day for trading volume, revenue and net deposits. Investors were very active buying the dips across all of the coins Voyager offers.

119.    Defendants also relied on social media to promote Voyager. On May 3, 2021, Ehrlich made a number of misrepresentations to induce people to invest in Voyager, including that he and Voyager are "really trying to create wealth for retail investors," and, citing his 25 years of experience in finance, he is "looking out for best interests of consumers." https://www.youtube.com/watch?v=nKevUsTGN3I (accessed August 10, 2022).

120.    On October 13, 2021, when asked in an interview by Dan Weiskopf, "is it true the customers own the crypto, specifically Bitcoin and Ethereum on your platform, where that's not necessarily the case on other platforms," Ehrlich unequivocally stated that customers "absolutely" own all of their crypto on the platform and can remove it at any time:[110]

> Yes, ***they absolutely own it***. ***They can take it off the platform any time they want*** and bring it into their own personal wallets. You know, a lot of customers want us to hold it for them and everyone who brings crypto into us has a specified wallet address for them. But if you want to take it out to your own personal wallet, say you have a Trezor or a Ledger or you were using some other wallet app – ***yes, you can take it any time you want***. Now we have limits on withdrawals and that's for customer safety and protection but ***you can take anything off whenever you want, you know, no questions asked.***

He also stated that this ownership of the cryptocurrency assets is "a differentiator" from other wallet apps.

121.    Ehrlich also made a number of misleading representations at an October 23, 2019 interview broadcast on the internet,[111] including:

> We aren't an exchange. We are a broker. We are a regulated agency broker so our job is to do nothing but find the best price and execution for the consumers. So we don't have a horse in the race. We don't have proprietary trading, we don't need to get people to put orders off the bid and the ask, we are trying to find the best execution for the consumer on every single trade. We are a traditional online service provider, but in the crypto space.

---

[110] https://twitter.com/mrstevensteele/status/1549665655275884545?s=11&t=aeo96ASWA8K8FMOgVdpqQA (accessed August 10, 2022).

[111] https://www.youtube.com/watch?v=NwVA1wiDr5E (accessed August 10, 2022)

122.    Ehrlich even personally took to Reddit to host an "AMA" (Ask-Me-Anything) session on the r/Invest_Voyager subreddit, in order to communicate directly with Voyager customers and potential Voyager customers in order to induce them to invest or to continue investing in the Deceptive Voyager Platform:[112]





---

[112]

https://www.reddit.com/r/Invest_Voyager/comments/tbyp2w/ama_hi_reddit_im_steve_ehrlich_voyagers_cofounder/?utm_source=share&utm_medium=ios_app&utm_name=iossmf (accessed August 10, 2022)

123.    During that AMA, Ehrlich played up Cuban's involvement as his advisor:



124.    He also played up Voyager's "transparency":



125.     He even advocated for customers to *ditch their bank accounts* in favor of investing in Voyager:



126.     Ehrlich also falsely represented that he and Voyager sought to "ensure the safety and security of all customer assets at all points in time," that customers could earn rewards with "no lockup on your token," and that Voyager "eat[s the] risk on our end to ensure you get a consistent monthly return on your end":

*How does voyager plan to increase staking revenues to maintain their yield payment.*

Our main strategy is to add more staking coins, where we can bring value to our consumers. Over the past 40 days, we've added 20 new coins–10 of which are staking tokens. As you may know, we work with at least 8 custodians and we're looking to add more. We have multiple execution providers and exchanges and multiple node providers delivering new coins with competitive rewards as fast as we can. The key to this is ensuring everything meets our security standards so that we can ensure the safety and security of all customer assets at all points in time

Apart from that, some of our non-staking rewards are based on market demand. We'll always aim to offer competitive rates on as many tokens as we can. Some key benefits outside of the rewards number alone is the ability to earn with no lockup on your token, and the reward rate staying consistent on a monthly basis. The market demand can shift on a daily basis, but we eat that risk on our end to ensure you get a consistent monthly return on your end.

127.   When specifically asked whether he anticipated any "major fines like BlockFi," Ehrlich sought to reassure his customers:

> *Does voyager anticipate any major fines like BlockFi?*
>
> I believe our rewards program is different from BlockFi's program and complies with current law. I've been in the financial services industry, working with regulators for 28 years now. Since the start of Voyager, we've been in communication with regulators to ensure we operate not only within the rules but we are also planning for any potential necessary changes.

128.   Although Ehrlich claims that one of the major benefits of Voyager is its transparency, his own dealings in connection with Voyager have been extremely opaque. According to a report from CNBC, Ehrlich made millions of dollars selling Voyager shares in February and March 2021 when shares were near their peak, financial records show, in an apparent insider trading move.[113] What is evident, based on corporate insider disclosures and Voyager filings, is that Ehrlich made over $30 million disposing of Voyager equity as the crypto lender's shares neared an all-time high.[114] Ehrlich and his Delaware LLCs sold nearly 1.9 million shares from February 9, 2021, to March 31, 2021**,** in 11 separate sales which totaled $31 million, according to data from the Canadian Securities Administration. [115] The three largest of Ehrlich's transactions – totaling 1.4 million shares worth nearly $19 million – were connected to a $50,000,000 secondary offering by Stifel Nicolaus in February 2021.[116] Voyager shares would peak at $29.86 ***a week after Ehrlich's final sale*** on April 5, 2021. [117] Three weeks later, VOYG shares had lost 41% of their value. By November 2021 — as the crypto market overall was peaking —Voyager was down 69% from its peak. [118]

---

[113]   https://www.cnbc.com/2022/08/03/voyager-ceo-made-millions-in-stock-sales-in-2021.html   (accessed August 10, 2022).
[114] *Id*.
[115] *Id*.
[116] *Id*.
[117] *Id*.
[118] *Id*.

## CLASS ACTION ALLEGATIONS

129.     As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.  Class Definitions

130.     Plaintiffs seek to represent the following Nationwide Classes and State Subclasses (collectively, "the Classes"):

(1) **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in an EPA.

(2) **Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in an EPA.

(3) **New Jersey Subclass:** All persons in the state of New Jersey who, within the applicable limitations period, purchased or enrolled in an EPA.

(4) **Virginia Subclass:** All persons in the state of Virginia who, within the applicable limitations period, purchased or enrolled in an EPA.

(5) **Alabama Subclass:** All persons in the state of Alabama who, within the applicable limitations period, purchased or enrolled in an EPA.

(6) **Louisiana Subclass:** All persons in the state of Louisiana who, within the applicable limitations period, purchased or enrolled in an EPA.

(7) **California Subclass:** All persons in the state of California who, within the applicable limitations period, purchased or enrolled in an EPA.

(8) **Oklahoma Subclass:** All persons in the state of Oklahoma who, within the applicable limitations period, purchased or enrolled in an EPA.

**(9) Pennsylvania Subclass:** All persons in the state of Pennsylvania who, within the applicable limitations period, purchased or enrolled in an EPA.

**(10)   Tennessee Subclass:** All persons in the state of Tennessee who, within the applicable limitations period, purchased or enrolled in an EPA.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff. Plaintiffs reserve the right to modify or amend the definition of the proposed Nationwide, Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana Subclasses, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

**B.   Numerosity**

131.    The Classes are comprised of thousands, if not millions, of consumers nationwide and throughout the states of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana, to whom Voyager offered and/or sold EPAs. Moreover, thousands, if not millions, of consumers nationwide and throughout these states have executed trades on the Voyager Platform within the applicable limitations period. Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through Voyager's corporate records. Undersigned Counsel currently represents dozens of Voyager customers who all have collectively sustained millions of dollars in damages proximately caused by the Deceptive Voyager Platform and related Ponzi scheme.

**C.   Commonality/Predominance**

132.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether the EPAs were unregistered securities under federal, Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana law;

(b) whether Defendants' participation and/or actions in Voyager's offerings and sales of EPAs violate the provisions of the Securities Act and Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana securities law.

(c) the type and measure of damages suffered by Plaintiffs and the Classes.

(a) whether Defendants' description of the Voyager Platform as being "100% commission free" is deceptive, unfair, false and misleading;

(b) whether Defendants' representations are objectively likely to mislead reasonable consumers to believe that their trading platform operates as "100% commission free";

(c) whether Defendants' practices violate the UDAP statutes of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana;

(d) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(e) whether Plaintiffs and Class members are entitled to injunctive relief;

(f) whether Plaintiffs and Class members are entitled to declaratory relief; and

(g) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

**D.  Typicality**

133.    Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold Voyager's EPAs as a result of Defendants' actions and/or participation in the offering and sale of these unregistered securities, or that Plaintiffs and all members were exposed to Defendants' misrepresentations and omissions regarding the Voyager Platform being "100% commission free," and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to either Defendant that are unique to Plaintiffs.

**E.  Adequacy of Representation**

134.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation,

and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firm, which has the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### F.   Requirements of Fed. R. Civ. P. 23(b)(3)

135.   The questions of law or fact common to Plaintiffs' and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling the EPAs, which are unregistered securities, (2) in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive Voyager Platform, and/or (3) in receiving secret undisclosed compensation for their promotion of the Deceptive Voyager Platform and related Ponzi Scheme.

136.   Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

137.   As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

### G.   Superiority

138.   A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

    (a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

    (b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

    (c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.  Requirements of Fed. R. Civ. P. 23(b)(2)**

139.     Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the EPAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

140.     Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive Voyager Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive Voyager Platform and related Ponzi Scheme, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.  Requirements of Fed. R. Civ. P. 23(c)(4)**

141.     As it is clear that one of the predominant issues regarding Defendants' liability is whether the EPAs Voyager offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the "EPA" Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

142.     As it is clear that another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive Voyager Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive Voyager Platform and related Ponzi Scheme, utilizing Rule 23(c)(4) to certify the "Platform" Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.   Nature of Notice to the Proposed Classes.**

143.    The names and addresses of all Class Members are contained in the business records maintained by Voyager and are readily available to Voyager. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

| THE NATIONWIDE AND NEW JERSEY CLAIMS |
| --- |

**COUNT ONE**

**Aiding and Abetting Fraud**

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

144.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

145.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

146.    Voyager made these misrepresentations and/or omitted material facts to the Plaintiffs via its misconduct.

147.    Defendants substantially assisted or encouraged the wrongdoing done by Voyager to Plaintiffs by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

148.     Further, Defendants had knowledge of such fraud because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

149.     Defendants substantively participated in the fraud by pushing these false representations, knowing full well they were false, and lending their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

150.     Defendants' aiding and abetting the fraud done by Voyager caused damages to Plaintiffs in the amount of their lost investments.

## COUNT TWO

### Aiding and Abetting Breach of Fiduciary Duty

### (Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)

151.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

152.     As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

153.     Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

154.     Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

155.    Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THREE

### Civil Conspiracy

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

156.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

157.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

158.    Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

159.    Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

160.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

161.    Plaintiffs allege that Defendants had actual knowledge, which can be inferred from the totality of the circumstances of the events plead in this complaint. Plaintiffs lack access to the very discovery materials which would illuminate the Defendants' state of mind. But participants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a

fraud. Intent to commit fraud is to be divined from surrounding circumstances, and in this case, Plaintiffs plead that Defendants participated in the fraud by participating in the creation of Voyager's marketing strategy which contained clear misstatements and omit material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

162.     Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT FOUR

**For Violations of the New Jersey Consumer Fraud Act,**

**§§ 56:8-1 *et seq.***

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

163.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

164.     The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*, prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

165.     Defendants have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade and/or commerce in the State of New Jersey, as described more fully hereinabove.

166.     Defendants' statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because Voyager in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

167.     Defendant's acts and omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiff and Class members, into investing in the Comp any's falsely touted business and are immoral, unethical, oppressive, unscrupulous,

or substantially injurious to consumers. Those acts and omissions include, among other things as more fully alleged above:

a. knowingly and intentionally concealing the Defendant's specific roles and interests in Voyager;

b. knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in Voyager, in an effort to induce them to purchase Voyager EPAs;

c. Making statements, either knowingly and intentionally, negligently, or with reckless disregard for their veracity, that the Voyager Platform is "100% Commission-Free" although Voyager did in fact did charge Plaintiff and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

d. Making statements, either knowingly and intentionally, negligently, or with reckless disregard for their veracity, that funds or assets held in the Voyager Platform are FDIC insured.

168.    The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. N.J.S.A. 56:8-19.

169.    Plaintiffs and the Class are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

170.    Plaintiffs and the Class have suffered an ascertainable loss of moneys or property as a direct and proximate result of VDL's unconscionable practices.

171.    Plaintiffs and the Class have a private right of action against Defendants and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

172.    Plaintiffs and the Class have suffered, and will continue to suffer, irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

## COUNT FIVE

**Violations of New Jersey Statute Section 49:3-60,**

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

173.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

174.    N.J.S.A. 49:3-60 provides that it is unlawful for any person to sell or offer to sell a security within the State of New Jersey unless the security is exempt under N.J.S.A. 49:3-50, is a federally covered security, or is registered pursuant to Section 49.

175.    N.J.S.A. 49:3-52 also makes it unlawful "for any person, in connection with the offer, sale, or purchase of any security," to either directly or indirectly:

a.    employ any device, scheme, or artifice to defraud;

b.    make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

c.    engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

176.    The Voyager Earn Program Account is a security pursuant to N.J.S.A. 49:3-49(m).

177.    The Voyager Earn Program Account was and is required to be registered with the Bureau pursuant to N.J.S.A. 49:3-60.

178.    The Voyager EPAs offered for sale to Plaintiffs and Class members have not been registered with the Bureau, are not exempt from registration, and are not federally covered.

179.    In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest in Voyager, Defendants made untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning the Voyager EPAs and the Voyager Platform, as described above.

180.    Defendants assisted in and actively participated in Voyager's offer and sale of the unregistered Voyager EPAs to Plaintiffs and the members of the Class.

181.    As a result of these actions, Defendants violated N.J.S.A. 49:3-60.

## COUNT SIX

### Unjust Enrichment
**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

182.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–143 as if fully set forth herein.

183.     Plaintiffs and Class members conferred upon the Defendants non-gratuitous payments of undisclosed commissions on cryptocurrency trades made on the Voyager Platform. Defendants appreciated, accepted and/or retained, in whole or in part, the non-gratuitous benefits conferred by Plaintiffs and Class members.

184.     Defendants profited from their unlawful collection and retention of undisclosed commissions at the expense of Plaintiff and Class members, under circumstances in which it would be unjust for the Defendants to be permitted to retain the benefit. Under common law principles of unjust enrichment, the Defendants should not be permitted to retain the benefits of this unjust enrichment, as they were obtained through deceptive representations and omissions, as more fully described above.

185.     Because the Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs and Class members is unjust and inequitable, Plaintiffs and Class members suffered damages as a result of the Defendants' unjust enrichment, and are entitled to, and hereby seek disgorgement and restitution of the Defendants' wrongful profits, revenue, and benefits in a manner established by the Court.

## COUNT SEVEN

### Declaratory Judgment

**(Declaratory Judgment Act, N. J. S. A. 2A:16-51 *et seq.*)**

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

184.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–143 as if fully set forth herein.

185.     This Count is asserted against Defendants under Section 2A:16-59 of the New Jersey Revised Statutes.

186.     The Declaratory Judgments Act, N.J. Stat. Ann. § 2A:16-51 et seq. (West), authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity. *Chamber of Com. of U. S. v. State*, 89 N.J. 131, 140 (1982). To

maintain such an action, there must be a "justiciable controversy" between adverse parties, and plaintiff must have an interest in the suit.

187.    Plaintiffs and the members of the Class have an obvious and significant interest in this lawsuit.

188.    Plaintiffs and members of the Class purchased EPAs, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the Deceptive Voyager Platform as further described hereinabove.

189.    If the true facts had been known, including but not limited to that the EPAs are unregistered securities, the Deceptive Voyager Platform does not work as represented, Voyager operated as a Ponzi scheme, and Mark Cuban was paid exorbitant sums of money to peddle Voyager to the nation, Plaintiffs and the Class would not have purchased EPAs in the first place.

190.    Thus, there is a justiciable controversy over whether the EPAs were sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiffs and the Class.

191.    Plaintiffs and the Class seek an order declaring that the EPAs were securities required to be registered with the SEC and state regulatory authorities, that the Deceptive Voyager Platform did not work as represented, Voyager operated as a Ponzi scheme, and Mark Cuban was paid exorbitant sums of money to peddle Voyager to the nation.

## THE FLORIDA CLAIMS

### COUNT EIGHT

**Aiding and Abetting Fraud**

**(Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)**

192.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

193.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if

they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

194.    Voyager made these misrepresentations and/or omitted material facts to the Plaintiffs via its misconduct.

195.    Defendants substantially assisted or encouraged the wrongdoing done by Voyager to Plaintiffs by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

196.    Further, Defendants had knowledge of such fraud because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

197.    Defendants substantively participated in the fraud by pushing these false representations, knowing full well they were false, and lending their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

198.    Defendants' aiding and abetting the fraud done by Voyager caused damages to Plaintiffs in the amount of their lost investments.

## COUNT NINE

### Aiding and Abetting Breach of Fiduciary Duty

### (Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)

199.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

200.    As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

201.    Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and

encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

202.    Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

203.    Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

<u>**COUNT TEN**</u>

**Civil Conspiracy**

**(Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)**

204.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

205.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

206.    Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

207.    Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

208.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

209.    Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT ELEVEN

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**§ 501.201, Florida Statutes, *et seq.***

**(Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)**

210.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

211.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq*. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

212.    Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

213.    Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

214.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

215.    Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

216.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform and in the amount of their lost investments.

217.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

218.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

219.    Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Class to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## COUNT TWELVE

### Violations of the Florida Statute Section 517.07,
### The Florida Securities and Investor Protection Act
### (Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)

220.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

221.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

222.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

223.    The Voyager Earn Program Account is a security pursuant to Fla. Stat. § 517.021(22)(a).

224.    The EPAs sold and offered for sale to Plaintiffs and Class members were not:

    a.   exempt from registration under Fla. Stat. § 517.051;

    b.   a federal covered security;

    c.   registered with the Office of Financial Regulations (OFR); or

    d.   sold in a transaction exempt under Fla. Stat. § 517.061.

225.    Voyager sold and offered to sell the unregistered EPAs to Plaintiffs and the members of the Class.

226.    Defendants are directors, officers, partners and/or agents of Voyager pursuant to Fla. Stat. § 517.211.

227.    Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq.

---

## THE LOUISIANA CLAIMS

### COUNT THIRTEEN

**For Violations of the Unfair Trade Practices and Consumer Protection Law,**

**R.S. 51:1401, et seq.,**

**(Individually by Plaintiff Manganiello against Defendants)**

228.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

229.    This cause of action is brought pursuant to Louisiana's Unfair Trade Practices and Consumer Protection Law ("LUTPA").

230.    Plaintiff is a consumer as defined by section 1402(1). Defendants are engaged in trade or commerce as defined by section 1402(10).

231.    Section 1405(A) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

232.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

233.    Defendants have violated the LUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

234.    Plaintiff has been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising in the amount of their lost investments.

235.    The harm suffered by Plaintiff was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

236.    Pursuant to section 1409, Plaintiff brings this action and makes claims for actual damages, attorneys' fees and costs.

## COUNT FOURTEEN

### Violations of the Louisiana Section 51:705 et seq,
### (Plaintiff Manganiello Individually and on behalf of the Louisiana Class)

237.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

238.    RS 51:705 provides that it is unlawful for any person to offer for sale or sell a security within the State of Louisiana unless the security or transaction is exempt under RS 51:708 or 709, is a federally covered security, or is registered.

239.    The Voyager Earn Program Account is a security pursuant to RS 51:702 (15)(a).

240.    The EPAs sold and offered for sale to Plaintiffs and Class members were not exempt from registration under RS 51:708 or 709, federal covered securities, or registered.

241.    Voyager sold and offered to sell the unregistered EPAs to Plaintiffs and the members of the Class.

242.    Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated RS 51:705 et seq.

| THE ALABAMA CLAIMS |
|---|

**COUNT FIFTEEN**

**Civil Conspiracy**

**(Plaintiff Newsom Individually and on behalf of the Alabama Class)**

243.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

244.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

245.    Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

246.    Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

247.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

248.    Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT SIXTEEN

### For Violations of the Alabama Deceptive Trade Practices Act,

### (Plaintiff Newsom Individually and on behalf of the Alabama Class)

249.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

250.    This cause of action is brought pursuant to the Alabama Trade Practices Act, section 8-19-1 *et seq*. ("Alabama DTPA"). The stated purpose of the Alabama DTPA is to "protect the interest of both the consuming public and the legitimate businessperson." § 8-19-2.

251.    Plaintiffs and Class members are consumers as defined by section 8-19-3(2). Defendants are engaged in trade or commerce within the meaning of the Alabama DTPA.

252.    Section 8-19-5(27) declares unlawful "[e]ngaging in any [] unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

253.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

254.    Defendants have violated the Alabama DTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

255.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform.

256.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

257.    Pursuant to Section 8-19-10, Plaintiffs and consumers in the Class bring this cause of action for actual damages, attorneys' fees and costs.

258.    Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 8-19-10entitles Plaintiffs and the Class to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## COUNT SEVENTEEN

### Violations of the Code of Alabama 1975, Chapter 6

### (Plaintiff Newsom Individually and on behalf of the Alabama Class)

259.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

260.     Section 8-6-17 provides that it is unlawful for any person to sell or offer to sell a security within the State of Alabama unless the security is registered pursuant to Ch. 6, exempt from registration under § 8-6-10, or the transaction is exempt under § 8-6-11.

261.     Section 8-6-17 also provides prohibited acts regarding the offer, sale or purchase of securities, including, for example:

   a.   Employing any device, scheme, or artifice to defraud;

   b.   Making untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

   c.   Engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

262.     The Voyager Earn Program Account is a security pursuant to § 8-6-2(10).

263.     The EPAs sold and offered for sale to Plaintiffs and Class members were not:

   a.   registered;

   b.   exempt from registration under § 8-6-10; or

   c.   part of a transaction exempt under § 8-6-11.

264.     Voyager sold and offered to sell the unregistered EPAs to Plaintiffs and the members of the Class.

265.     Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Chapter 6.

| THE VIRGINIA CLAIMS |
|---|

### COUNT EIGHTEEN

### Aiding and Abetting Breach of Fiduciary Duty

### (Plaintiff Ayer Individually and on behalf of the Virginia Class)

266.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

267.    As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

268.    Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

269.    Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

270.    Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

### COUNT NINETEEN

### Civil Conspiracy

### (Plaintiff Ayer Individually and on behalf of the Virginia Class)

271.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

272.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge

Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

273.    Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

274.    Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

275.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

276.    Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

**COUNT TWENTY**

**For Violations of the Virginia Consumer Protective Act,**

**§ 59.1-196 et seq, Code of Virginia**

**(Plaintiff Ayer Individually and on behalf of the Virginia Class)**

277.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

278.    This cause of action is brought pursuant to the Virginia Consumer Protection Act of 1977 ("VCPA"). The stated purpose of the VCPA is to "promote fair and ethical standards of dealings between suppliers and the consuming public." § 59.1-197.

279.    Plaintiffs and Class members are consumers as defined by § 59.1-198. Defendants are "supplier(s)" and engage in "consumer transaction(s)" as defined by the Act.

280.    Section 59.1-200 declares unlawful "[u]sing any [] deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

281.    Defendants have violated the VCPA by engaging in the unfair, fraudulent, and deceptive practices as described herein.

282.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair, fraudulent, and deceptive practices and acts in the amount of their lost investments.

283.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the unfair, fraudulent, and deceptive practices of Defendants, as more fully described herein.

284.    Pursuant to section 59.1-204, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT TWENTY-ONE

### Violations of Section 13.1-501 et seq, Code of Virginia

### (Plaintiff Ayer Individually and on behalf of the Virginia Class)

285.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

286.    Section 13.1-507 provides that it is unlawful for any person to sell or offer to sell a security "unless (i) the security is registered under this chapter, (ii) the security or transaction is exempted by this chapter, or (iii) the security is a federal covered security."

287.    Section 13.1-502 makes it unlawful "for any person in the offer or sale of any securities, directly or indirectly,"

    a. "employ any device, scheme or artifice to defraud";

    b. "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or

    c. "engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser."

288.    The Voyager Earn Program Account is a security pursuant to Section 13.1-501.

289.    The Voyager EPAs offered for sale to Plaintiffs and Class members have not been registered, are not exempt from registration, and are not federal securities.

290.    In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest in Voyager, Defendants made untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, concerning the Voyager EPAs and the Voyager Platform, as described above.

291.    Defendants assisted in and actively participated in Voyager's offer and sale of the unregistered Voyager EPAs to Plaintiffs and the members of the Class.

292.    As a result of these actions, Defendants violated Sections 13.1-501 et seq.

| THE CALIFORNIA CLAIMS |
|---|

## COUNT TWENTY-TWO

### Aiding and Abetting Breach of Fiduciary Duty

### (Plaintiffs Dorn and Gates Individually and on behalf of the California Class)

293.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

294.    As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

295.    Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

296.    Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

297.    Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

## COUNT TWENTY-THREE

**For Violations of the Unfair Competition Law Business & Professions Code § 17200, et seq.**
**(Plaintiffs Dorn and Gates Individually and on behalf of the California Class)**

298.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

299.    California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq*. (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

300.    Defendants have committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct and unlawful conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

301.    The conduct of Defendants as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

302.    Defendants' conduct was a proximate cause of the injuries to Plaintiffs and the California Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the California Class. By reason of the foregoing, Defendants should be required to pay restitution to Plaintiffs and members of the California Class.

## COUNT TWENTY-FOUR

### Violations of the CSL

### (Plaintiffs Dorn and Gates Individually and on behalf of the California Class)

303. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

304. California Corp. Code § 25110 prohibits the offer or sale by any person in California of securities that are not qualified through registration. California Corp. Code § 25503 affords a statutory cause of action to victimized investors for violations of Section 25110. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25110 and makes them jointly and severally liable with any other person liable under Section 25503.

305. Voyager, with Defendants' material assistance, offered and sold the EPAs **Securities** in California without being properly registered or qualified for offer or sale either with any federal or California regulator.

306. Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of Section 25110 does not require proof that Defendants intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendants' knowledge of and participation in Voyager's non-compliance with the CSL establishes their intent to deceive investors regarding the EPAs.

307. California Corp. Code § 25210(b) provides: No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

308. Defendants breached Section 25210(b) by encouraging Voyager to offer and sell the EPAs **Securities** despite the fact that such securities were not qualified under the CSL.

309. California Corp. Code § 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

310. California Corp. Code § 25401 prohibits fraud in the offer or sale by any person in California of securities. California Corp. Code § 25501 affords a statutory cause of action to victimized investors for violations of Section 25401. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section

25401 with the intent to deceive or defraud, and makes them jointly and severally liable with any other person liable under Section 25503.

311.   Voyager, with Defendants' material assistance, offered and sold the EPAs Securities in California by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

312.   Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under Cal. Corp. Code. § 25504.1.

313.   Plaintiffs hereby conditionally tender their Voyager Securities in accordance with Cal. Corp. Code § 25503.

---

**THE PENNSYLVANIA CLAIMS**

**COUNT TWENTY-FIVE**

**Aiding and Abetting Fraud**

**(Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)**

314.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

315.   Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

316.   Voyager made these misrepresentations and/or omitted material facts to the Plaintiffs via its misconduct.

317.   Defendants substantially assisted or encouraged the wrongdoing done by Voyager to Plaintiffs by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich

misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

318.    Further, Defendants had knowledge of such fraud because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

319.    Defendants substantively participated in the fraud by pushing these false representations, knowing full well they were false, and lending their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

320.    Defendants' aiding and abetting the fraud done by Voyager caused damages to Plaintiffs in the amount of their lost investments.

<u>**COUNT TWENTY-SIX**</u>

**Aiding and Abetting Breach of Fiduciary Duty**

**(Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)**

321.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

322.    As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

323.    Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

324.    Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the

Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

325.     Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

## COUNT TWENTY-SEVEN

### Civil Conspiracy

### (Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)

326.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

327.     Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

328.     Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

329.     Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

330.     Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

331.     Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT TWENTY-EIGHT

**For Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law,**

**73 Pa. Stat. §§ 201-1 et seq**

**(Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)**

332.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

333.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201-1 et seq, prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of Section 201-2(4).

334.    Defendants have engaged in, and continue to engage in, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the State of Pennsylvania, as described more fully hereinabove.

335.    Defendants' statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because Voyager in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform. Defendants' representations regarding Voyager's FDIC insured status were also false.

336.    Defendant's acts and omissions constitute unfair trade practices because they are fraudulent or deceptive and create a likelihood of misunderstanding. *See* 73 Pa. Stat. § 201-2(4)(xxi).

337.    Plaintiffs and the Class are "person(s)" as that term is defined in 73 Pa. Stat. § 201-2(2).

338.    Plaintiffs and the Class have suffered an ascertainable loss of moneys or property as a direct and proximate result of Defendants' unconscionable practices described above. Plaintiffs and the Class have a private right of action against Defendants and they are entitled to recover, in addition to their actual damages, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. 73 Pa. Stat. § 201-9.2(a).

339.    Plaintiffs and the Class have suffered, and will continue to suffer, irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

### COUNT TWENTY-NINE

**Violations of the Pennsylvania Securities Act of 1972,**

**70 Penn. Stat. §§ 1-102 *et seq***

**(Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)**

340.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

341.    70 Penn. Stat. § 1-201 provides that it is unlawful for any person to sell or offer to sell a security within the State of Pennsylvania unless the security is exempt under the act, is a federally covered security, or is registered pursuant to the act.

342.    70 Penn. Stat. § 1-401 makes it unlawful "for any person, in connection with the offer, sale or purchase of any security in this State, directly or indirectly: (a) To employ any device, scheme or artifice to defraud; (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

343.    70 Penn. Stat. § 1-503 extends liability to any person who "materially aids" in a violation of the Pennsylvania Securities Act and makes them jointly and severally liable with any other person liable under the Act.

344.    The Voyager EPA is a security pursuant to 70 Penn. Stat. § 1-102(t).

345.    The Voyager EPAs offered for sale to Plaintiffs and Class members were not registered, were not exempt from registration, and were not federally securities.

346.    In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest, Defendants made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning Voyager EPAs, including but not limited to, that the Voyager Platform was "100% Commission-free" and that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured, as described above.

347.    As a result of these actions, Defendants violated 70 Penn. Stat. § 1-201 and § 1-401 and are liable to Plaintiffs pursuant to 70 Penn. Stat. § 1-501.

| THE TENNESSEE CLAIMS |
|---|

## COUNT THIRTY

### Aiding and Abetting Fraud

**(Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)**

348.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

349.     Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

350.     Voyager made these misrepresentations and/or omitted material facts to the Plaintiffs via its misconduct.

351.     Defendants substantially assisted or encouraged the wrongdoing done by Voyager to Plaintiffs by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

352.     Further, Defendants had knowledge of such fraud because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

353.     Defendants substantively participated in the fraud by pushing these false representations, knowing full well they were false, and lending their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press

conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

354. Defendants' aiding and abetting the fraud done by Voyager caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THIRTY-ONE

### Aiding and Abetting Breach of Fiduciary Duty

### (Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)

355. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

356. As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

357. Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

358. Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

359. Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THIRTY-TWO

### Civil Conspiracy

**(Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)**

360.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

361.     Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

362.     Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

363.     Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

364.     Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

365.     Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THIRTY-THREE

### For Violations of the Tennessee Consumer Protection Act,

### Tenn. Code § 47-18-101 et seq

### (Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)

366.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

367.     This cause of action is brought pursuant to the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code § 47-18-101 et seq.

368.     The stated purpose of the TCPA is to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within th[e] state." Tenn. Code § 47-18-102(2).

369.     Plaintiffs and Class members are consumers as defined by Tenn. Code § 47-18-103(2). Defendants are engaged in trade or commerce as defined by Tenn. Code § 47-18-103(19).

370.     The TCPA declares unlawful "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104(a). This includes actions which cause "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods" and cause "likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another." Tenn. Code § 47-18-104(2)-(3).

371.     Defendants' unfair and deceptive practices as described herein are objectively likely to cause—and have caused— confusion and misunderstanding to consumers acting reasonably in the circumstances.

372.     Defendants have violated the TCPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

373.     Plaintiffs allege that the unfair and deceptive acts and practices described herein are distinct from the marketing or sale of a security, which is expressly excluded by Tenn. Code § 47-18-109(h).

374.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments.

375. The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

376. Pursuant to Tenn. Code § 47-18-109, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

**COUNT THIRTY-FOUR**

**Violations of Tennessee Securities Act of 1980,**

**Tenn. Code § 48-1-122**

**(Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)**

377. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

378. Tenn. Code § 48-1-104(a) makes it unlawful to sell a security in Tennessee unless the security is registered, exempted, or the security is a covered security as defined in the act.

379. Tenn. Code § 48-1-121 makes it unlawful "for any person, in connection with the offer, sale or purchase of any security in this state, directly or indirectly, to: (1) Employ any device, scheme, or artifice to defraud; (2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

380. The Voyager EPA is a security pursuant to Tenn. Code § 4-1-102(20)(A).

381. The Voyager EPAs offered for sale to Plaintiffs and Class members were not registered, were not exempt from registration, and were not covered.

382. In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest, Defendants made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning Voyager EPAs, including but not limited to, that the Voyager Platform was "100% Commission-free" and that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured, as described above.

383.    As a result of these actions, Defendants violated Tenn. Code § 48-1-104(a) and § 48-1-121 and are liable to Plaintiffs pursuant to Tenn. Code § 48-1-122.

---

**THE OKLAHOMA CLAIMS**

**COUNT THIRTY-FIVE**

**Aiding and Abetting Fraud**

**(Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)**

384.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

385.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

386.    Voyager made these misrepresentations and/or omitted material facts to the Plaintiffs via its misconduct.

387.    Defendants substantially assisted or encouraged the wrongdoing done by Voyager to Plaintiffs by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

388.    Further, Defendants had knowledge of such fraud because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

389.    Defendants substantively participated in the fraud by pushing these false representations, knowing full well they were false, and lending their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

390.    Defendants' aiding and abetting the fraud done by Voyager caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THIRTY-SIX

### Aiding and Abetting Breach of Fiduciary Duty

### (Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)

391.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

392.    As alleged above, Voyager breached its fiduciary duties to Plaintiffs.

393.    Defendants substantially assisted or encouraged the wrongdoing that constituted the breach of fiduciary duty owed by Voyager by publicly supporting and endorsing Voyager and encouraging Plaintiffs to invest in Voyager; in doing so, Defendants made material misrepresentations and/or omitted material facts concerning Voyager to Plaintiffs, as described above. For example, Defendant Ehrlich misrepresented the extent of the FDIC insurance on USD holdings and misled customers with the false impression that each Voyager customer could hold up to $250,000 in their individual Voyager account wallets and avail themselves of that important federal protection in the event Voyager failed.

394.    Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

395.    Defendants' aiding and abetting the breach of fiduciary duty caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THIRTY-SEVEN

### Civil Conspiracy

### (Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)

396.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

397.    Voyager and VDL represented to Plaintiffs that the Voyager Platform was "100% Commission-free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager and VDL also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

398.    Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

399.    Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform and Voyager's FDIC insured status.

400.    Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such fraud and/or wrongdoing, because of their experience and relationship with Voyager, as described above and as such, knew that the representations made to Plaintiffs were deceitful and fraudulent.

401.    Defendants' conspiracy with Voyager to commit fraud caused damages to Plaintiffs in the amount of their lost investments.

## COUNT THIRTY-EIGHT

**For Violations of the Oklahoma Consumer Protection Act, *Stat. Tit. 15, Section 751 et seq***

**(Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)**

402.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

403.     This cause of action is brought pursuant to the Oklahoma Consumer Protection Act, *Okla. Stat. tit. 15, § 751 et seq*.

404.     The Oklahoma Consumer Protection Act provides that an "unfair trade practice" is "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *See* § 752(14). It declares unlawful any unfair or deceptive trade practice "as defined in Section 752." § 753(20).

405.     Plaintiffs and Class members are persons as defined by section 752(1). Defendants are engaged in a "consumer transaction" as defined by section 752(2).

406.     Defendants have violated the Oklahoma Consumer Protection Act by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

407.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments.

408.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

409.     Pursuant to section 761.1 of the Act, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT THIRTY-NINE

**Violations of the Oklahoma Uniform Securities Act of 1980,**

**Okla. Stat. Tit. 71, §§ 1-101 *et seq***

**(Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)**

410.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–143 above, as if fully set forth herein.

411.    71 Okla. Stat. § 1-102(32) makes it unlawful "for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly":

    a.  "employ a device, scheme, or artifice to defraud";

    b.  "make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading"; or

    c.  "engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person."

412.    The Voyager EPA is a security pursuant to 71 Okla. Stat. § 1-102(32).

413.    In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest with Voyager, Defendants made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning the Voyager EPAs, including but not limited to, that the Voyager Platform was "100% Commission-free" and that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured, as described above.

414.    As a result of these actions, Defendants violated 71 Okla. Stat. § 1-102(32) and are liable to Plaintiffs pursuant to 71 Okla. Stat. § 1-509.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

    a.  Certifying the Classes as requested herein;

    b.  Awarding actual, direct and compensatory damages;

    c.  Awarding restitution and disgorgement of revenues if warranted;

    d.  Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

    e.  Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

    f.  Awarding statutory and multiple damages, as appropriate;

    g.  Awarding attorneys' fees and costs; and

    h.  Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: August 10, 2022

Respectfully submitted,

By: */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
Barbara C. Lewis
barbara@moskowitz-law.com
Florida Bar No. 118114
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

*Counsel for Plaintiffs and the Class*