Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
    **INTERNATIONAL LLP**
601 Lexington Avenue
New York, NY 10022
Telephone:  (212) 446-4800
Facsimile:   (212) 446-4900

*Counsel to the Debtors and*
*Debtors in Possession*

Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
    **INTERNATIONAL LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>VOYAGER DIGITAL HOLDINGS, INC. *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 22-10943 (MEW)<br>(Jointly Administered) |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PIERCE ROBERTSON *et al.*,<br><br>Defendants. | Adv. Pro. No. 22-01138 (MEW) |

**THE DEBTORS' MOTION TO EXTEND THE AUTOMATIC STAY OR,**
**IN THE ALTERNATIVE, FOR INJUNCTIVE RELIEF ENJOINING**
**PROSECUTION OF CERTAIN PENDING LITIGATION**

**EXHIBIT "B"**

## TABLE OF CONTENTS

                                                                                           **Page**

TABLE OF AUTHORITIES..................................................................................................i

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ..................................................................................................3

  A.  Voyager Overview...............................................................................4

  B.  The *Cassidy* and *Robertson* Actions.......................................................6

  C.  The D&O Insurance Coverage ............................................................8

  D.  The Debtors' Indemnification Obligations............................................9

ARGUMENT....................................................................................................................10

I.  The Automatic Stay of Section 362 Should Be Extended to Stay *Robertson*. .................11

  A.  *Robertson* Should Be Stayed Under Section 362(a)(1) Given Mr. Ehrlich's
    and the Other Defendants' Identity of Interest with the Debtors..........................11

    1.  Continuation of *Robertson* Would Inevitably Effect the Debtors. ............12

    2.  Continuation of *Robertson* Could Create Significant
      Indemnification Obligations for the Debtors' Estate................................15

  B.  *Robertson* Should Be Stayed Under Section 362(a)(3)
    in Order to Preserve and Protect the Estate's Property........................................16

II.  The Continued Prosecution of *Robertson* Should Be Enjoined Under Section 105..........18

  A.  Continuation of *Robertson* Will Irreparably Harm the Debtors. ..........................20

  B.  There Is a Reasonable Likelihood the Debtors Will Successfully
    Restructure. .....................................................................................................23

  C.  The Balance of Harms Favors an Injunction. .......................................................24

  D.  An Injunction Serves the Public Interest. .............................................................24

CONCLUSION.................................................................................................................25

**EXHIBIT "B"**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.H. Robins Co. v. Piccinin*,
    788 F.2d 994 (4th Cir. 1986) ....................................................................passim

*E. Refractories Co. v. Forty Eight Insulations Inc.*,
    157 F.3d 169 (2d Cir. 1998) .............................................................................10

*Haw. Structural Ironworkers Pension Trust Fund v.*
    *Calpine Corp. Inc.*,
    2006 WL 3755175 (S.D.N.Y. Dec. 20, 2006) ..................................19, 20, 22, 24

*In re 1031 Tax Grp., LLC*,
    397 B.R. 670 (Bankr. S.D.N.Y. 2008)...........................................................passim

*In re 48th St. Steakhouse, Inc.*,
    835 F.2d 427 (2d Cir. 1987) .......................................................................11, 16

*In re Adelphia Commc'ns Corp.*,
    298 B.R. 49 (S.D.N.Y. 2003) .....................................................................19, 25

*In re Adelphia Commc'ns Corp.*,
    345 B.R. 69 (Bankr. S.D.N.Y. 2006)................................................................16

*In re Allied Digital Techs. Corp.*,
    306 B.R. 505 (Bankr. D. Del. 2004).................................................................17

*In re Am. Film Techs.*,
    175 B.R. 847 (Bankr. D. Del. 1994).................................................................24

*In re Barney's Inc.*,
    200 B.R. 527 (Bankr. S.D.N.Y. 1996)..............................................................22

*In re Calpine Corp.*,
    354 B.R. 45 (Bankr. S.D.N.Y. 2006)...........................................................passim

*In re Calpine Corp.*,
    365 B.R. 401 (S.D.N.Y. 2007) .....................................................10, 19, 20, 24

*In re Calpine*,
    2007 WL 1302604 (Bankr. S.D.N.Y. Apr. 30, 2007)..........................14, 19, 20

*In re Chateaugay Corp.*,
    93 B.R. 26 (S.D.N.Y. 1988) ............................................................................19

i

**EXHIBIT "B"**

*In re Chateaugay*,
   201 B.R. 48 (Bankr. S.D.N.Y. 1996) ............................................................. 19

*In re Downey Fin. Corp.*,
   428 B.R. 595 (Bankr. D. Del. 2010) .............................................................. 17

*In re Durr Mechanical Const., Inc.*,
   604 B.R. 131 (S.D.N.Y. Bankr. 2019) ........................................................... 16

*In re First Cent. Fin. Corp.*,
   238 B.R. 9 (Bankr. E.D.N.Y. 1999) .............................................................. 18

*In re Ionosphere Clubs, Inc.*,
   111 B.R. 423 (Bankr. S.D.N.Y. 1990) ........................................... 12, 14, 19, 22

*In re Ionosphere Clubs, Inc.*,
   922 F.2d 984 (2d Cir. 1990) ...................................................................... 10

*In re Johns-Manville Corp.*,
   26 B.R. 420 (Bankr. S.D.N.Y. 1983) ................................................. 10, 14, 24

*In re Johns-Manville Corp.*,
   40 B.R. 219 (S.D.N.Y. 1984) ...................................................................... 15

*In re Johns-Manville Corp.*,
   600 F.3d 135 (2d Cir. 2010) ....................................................................... 17

*In re Lion Capital Grp.*,
   44 B.R. 690 (Bankr. S.D.N.Y. 1984) ............................................................ 15

*In re Lomas Fin. Corp.*,
   117 B.R. 64 (S.D.N.Y. 1990) ........................................................... 12, 20, 22

*In re LTL Management, LLC*,
   638 B.R. 291 (Bankr. D.N.J. 2022) ............................................................. 15

*In re Lyondell Chem. Co.*,
   402 B.R. 571 (Bankr. S.D.N.Y. 2009) ................................................. 19, 20, 23

*In re Madoff*,
   2012 WL 990829 (S.D.N.Y. Mar. 26, 2012) ................................................... 10

*In re MF Global Holdings Ltd.*,
   469 B.R. 177 (Bankr. S.D.N.Y. 2012) .......................................................17, 18

*In re N. Star Contracting Corp.*,
   125 B.R. 368 (S.D.N.Y. 1991) ................................................................11, 19

**EXHIBIT "B"**

*In re OMC, Inc.*,
    2010 WL 4026097 (Bankr. S.D.N.Y. Oct. 13, 2010) ......................................................24

*In re Quigley Co., Inc.*,
    676 F.3d 45 (2d Cir. 2012) ............................................................................................17

*In re Residential Capital, LLC*,
    2014 WL 3798622 (Bankr. S.D.N.Y. July 31, 2014) ......................................................10

*In re S.W. Bach. & Co.*,
    425 B.R. 78 (Bankr. S.D.N.Y. 2010) ..............................................................................22

*In re Soundview Elite Ltd.*,
    543 B.R. 78 (S.D.N.Y. 2016) ..........................................................................................23

*In re United Health Care Org.*,
    210 B.R. 228 (S.D.N.Y. 1997) ...............................................................11, 15, 20, 21

*In re W.R. Grace & Co.*,
    2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ...........................................................15

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988) ............................................................................................17

*Malm v. Goldin*,
    1993 WL 330489 (S.D.N.Y. Aug. 27, 1993)...................................................................20

*Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*,
    474 U.S. 494 (1986) ........................................................................................................10

*Queenie, Ltd. v. Nygard Int'l*,
    321 F.3d 282 (2d Cir. 2003) ..................................................................................passim

*Raudonis as trustee for Walter J. Raudonis 2016 Revocable Tr. v.*
    *RealtyShares, Inc.*,
    507 F. Supp. 3d 378 (D. Mass. 2020) .............................................................................18

*Teachers Ins. & Annuity Ass'n of Am. v. Butler*,
    803 F.2d 61 (2d Cir. 1986) ............................................................................................10

*Tenas-Reynard v. Palermo Taxi, Inc.*,
    2016 WL 1276451 (S.D.N.Y Mar. 30, 2016)...................................................................12

**Statutes**

11 U.S.C. § 105...……………………………………………………………………………passim

11 U.S.C. § 362 ..............................................................................................................passim

**EXHIBIT "B"**

The Debtors[1] seek an extension of the automatic stay to the continued prosecution of a lawsuit against the Debtors' chief executive officer, Stephen Ehrlich, and two other parties, based on allegations regarding the Debtors' business. Without an extension of the stay pursuant to section 362(a) or an injunction under section 105(a) of the Bankruptcy Code, the litigation would nullify the protections provided by the stay and threaten the Debtors' restructuring efforts.

## PRELIMINARY STATEMENT

Stephen Ehrlich, the Debtors' CEO and co-founder, along with Mark Cuban and Dallas Basketball Limited, have been named as defendants in a putative class-action lawsuit, filed in the U.S. District Court for the Southern District of Florida, arising from the Debtor's cryptocurrency business. *See* Decl. of Michael Slade, Exhibit A (*Robertson* Complaint). The *Robertson* suit was filed August 10. It alleges state law claims for aiding and abetting fraud and breach of fiduciary duty,[2] as well as state securities law, consumer-protection law, and civil-conspiracy claims.

*Robertson* is dependent on, and inextricably intertwined with, the Debtors' alleged conduct. The thrust of the complaint is that the defendants aided and abetted the Debtors' alleged fraud. In fact, *Robertson* **began as a lawsuit against two debtors**, filed by the same plaintiffs' law firm, that was stayed and administratively closed by the District Court upon the filing of these chapter 11 cases (the "*Cassidy*" suit). *See* Slade Decl. Ex. B (*Cassidy* Amended Complaint). The plaintiffs responded to the stay of their original case by re-packaging and re-filing essentially the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (7224); and Voyager Digital, LLC (8013). The location of Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2] The aiding and abetting breach of fiduciary duty claims are not clearly articulated in the *Robertson* complaint. If plaintiffs are alleging that any defendants breached fiduciary duties to Voyager, or that any defendant aided and abetted a breach of fiduciary duty to Voyager, then—putting aside their viability—any such claims are property of the estate and their inclusion was a clear violation of the stay already in effect.

1

**EXHIBIT "B"**

same lawsuit, naming the Debtors' CEO instead of the Debtors, and adding a high-profile individual and the professional basketball team he owns for additional media appeal.

Like its predecessor, the *Robertson* suit alleges that the Debtors engaged in a fraudulent scheme to deprive the plaintiffs of money through use of the Debtors' services, and repeatedly ties Mr. Ehrlich's alleged actions to the allegations made against the Debtors in the administratively stayed *Cassidy* case. *Robertson* is a clear and obvious attempt to circumvent the automatic stay. Further, *Robertson* may also require a determination of whether of cryptocurrencies are securities at all—an unsettled legal issue that is of great importance to the Debtors' future business.

This Court should extend the automatic stay pursuant to section 362, or issue an injunction pursuant to section 105 to enjoin the continuation of the *Robertson* for the following reasons:

***First***, the Debtors will be exposed to a risk of collateral estoppel, *stare decisis*, and evidentiary prejudice if *Robertson* is allowed to continue. Mr. Ehrlich's alleged conduct as the Debtors' CEO, and the Debtors' relationship with the other *Robertson* defendants, are foundational to *Robertson* and the currently-stayed *Cassidy* action, and any decision potentially adverse to Mr. Ehrlich or the other defendants in *Robertson* would inevitably be used against all the Debtors, likely in both currently-filed proceedings and future litigation.

***Second***, Mr. Ehrlich is critical to the restructuring efforts of the Debtors, and the Debtors' efforts to move this bankruptcy case forward as quickly as possible would be impaired if *Robertson* proceeds. The Debtors possess much of the information necessary to defend against *Robertson*'s claims against both Mr. Ehrlich and the other defendants (and for the *Robertson* plaintiffs to attempt to prosecute those claims); that the *Robertson* plaintiffs will seek discovery from the Debtors is inevitable. Such discovery would consume significant time and resources, distract the Debtors' management, and effectively eliminate the benefits of the automatic stay.

**EXHIBIT "B"**

**Third**, the Debtors will face indemnification claims if *Robertson* is allowed to continue. The Articles of both Voyager Digital, LLC and Voyager Digital Holdings, Inc. require indemnification of its officers, like Mr. Ehrlich, for liabilities incurred in the course of their business as officers, and those two Debtors could be required to pay for such indemnification. As such, the Debtors could be directly affected should *Robertson* go forward.[3]

**Fourth**, property of the Debtors' estate will be depleted if *Robertson* is allowed to continue. The Debtors, Mr. Ehrlich, and the Debtors' other directors and officers share insurance coverage for litigation such as *Robertson*. If *Robertson* is allowed to continue against Mr. Ehrlich, he and the Debtors will incur defense costs and losses that could draw down these insurance policies, depleting an asset that the Debtors contend is property of the estate.

For these reasons, the Debtors request that the Court extend the automatic stay pursuant to section 362 or issue an injunction pursuant to section 105 to stay or enjoin the prosecution of *Robertson* until the effective date of a restructuring plan in these chapter 11 cases.

## STATEMENT OF FACTS

The Debtors and certain non-Debtor affiliates (collectively, "Voyager" or "the Company") provide cryptocurrency trading services and cryptocurrency custodial services. *See* Decl. of Stephen Ehrlich, Chief Executive Officer of the Debtors, in Support of Chapter 11 Petitions and First Day Motions ¶¶ 2, 4 (July 6, 2022) (ECF No. 15) (the "Ehrlich Decl."). Voyager's mobile application has been downloaded millions of times, had over 3.5 million active users in early 2022, and was one of the top ten most downloaded cryptocurrency mobile applications in the world in 2021. *Id.* ¶ 2.

---

[3]  The Debtors also face indemnity claims from Mr. Cuban and Dallas Basketball Limited, if *Robertson* is allowed to continue.

**EXHIBIT "B"**

### A. Voyager Overview

Voyager was founded in 2018 by a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors. It was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and designed to be "accessible to all" by focusing on the needs of retail investors. *Id.* ¶ 18. Between 2020 and 2022, the number of users on Voyager's platform grew from over 120,000 to over 3.5 million. *Id.* ¶ 20.

While Voyager experienced rapid growth and success, it also faced challenges. The onset of the COVID-19 pandemic was followed by a sharp drop in cryptocurrency prices, including a fall in the price of Bitcoin of over 50% from February to March 2020. *Id.* ¶ 38. Unanticipated global events in 2022 also contributed to a widespread selloff in cryptocurrency. *Id.* ¶¶ 42–43. And distressed situations faced by two industry participants—Terraform Labs and Three Arrows Capital—exacerbated this "cryptocurrency winter." *Id.* ¶ 44.

Terraform Labs created Terra, an open-source blockchain protocol, and issued two cryptocurrencies, Luna and TerraUSD ("UST"), for use on Terra. UST is an algorithmic stablecoin that was designed to trade at $1 by being "pegged" to Luna via an arbitrage mechanism whereby one UST could be traded for $1 worth of Luna. If UST traded above $1, arbitrageurs bought $1 of Luna and exchanged it for one UST, netting the difference in profit, and vice versa if UST traded below $1. Arbitrage trading was intended to keep the price of UST at $1. *Id.* ¶ 46.

On May 7, 2022, $2 billion of UST was immediately sold, moving UST's price down to $0.91. Traders entered the market to arbitrage UST back to $1 but found that only $100 million of UST could be burned in exchange for Luna per day, which was insufficient to "re-peg" UST to $1. *Id.* ¶ 47. When UST failed to re-peg, further selloffs pushed the price of UST even lower. Failed arbitrage efforts also created an oversupply of Luna that led to a sharp drop in the price of Luna.

**EXHIBIT "B"**

Ultimately, in just one week's time, the price of Luna dropped from $82.55 to $0.000001, erasing over $18 billion of value and leading to further selloffs in the sector. *Id.* ¶ 48–49.

In March 2022, Voyager had entered into a master loan agreement (the "3AC Loan") with Three Arrows Capital ("3AC"), pursuant to which Voyager agreed to lend 15,250 Bitcoins and 350 million USD Coin ("USDC") that were callable at any time by Voyager. 3AC fully drew down on the loan. *Id.* ¶ 55. In June 2022, Voyager became concerned that 3AC's ability to repay the 3AC loan might be compromised, leading to Voyager making an initial request for a repayment of $25 million of USDC by June 24, 2022, and subsequently requesting repayment of the entire outstanding balance of Bitcoin and USDC by June 27, 2022 *Id.* ¶ 56. 3AC did not repay any amount of the 3AC Loan, and on June 27, 2022, Voyager issued a notice of default to 3AC. *Id.*

Additionally, Voyager saw a significant uptick in customer withdrawals, putting additional strain on the Company's business, after Celsius Network, a cryptocurrency lender with over $11 billion of assets under management, announced it was pausing all account withdrawals. Celsius's announcement precipitated a 30% decline in the price of Bitcoin in the following days. *Id.* ¶ 62. Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day, which was necessary to ensure the Company could effectuate trades for customers and stabilize the Company's business while it engaged in discussions with potential third-party sponsors. *Id.* ¶ 63.

But as cryptocurrency markets continued to trend down, the Company realized that further steps were required to preserve customer investments, avoid irreparable damage to the Debtors' business, and ensure that its trading platform operated smoothly for all customers. Accordingly, on July 1, 2022, the Company froze all withdrawals and trading activity on its platform.

**EXHIBIT "B"**

On June 22, 2022, Voyager Digital Holdings, Inc. entered into an agreement for a revolving credit facility with Alameda Ventures Ltd. ("Alameda"), under which Alameda provided Voyager with $200 million cash and USDC and 15,000 Bitcoin subject to certain restrictions. *Id.* ¶¶ 33, 57–58. The Alameda loan facility, however, was only a partial solution to the Company's liquidity issues. Several weeks later, having sought investor interest outside of court in a sale of the Debtors' entire business or a capital raise whereby a third party would provide a capital infusion into the Company's e, *id.* ¶¶ 59–60, the Debtors initiated these chapter 11 cases.

## B. The *Cassidy* and *Robertson* Actions

On December 24, 2021, a putative class-action complaint was filed against two of the Debtors, Voyager Digital Ltd. and Voyager Digital, LLC, in the United States District Court for the Southern District of Florida, captioned *Cassidy et al. v. Voyager Digital Ltd. et al*. That action alleges that "Voyager's practices were deceptive, illegal and were the sale of unregistered securities," Am. Compl. ¶ 5, *Cassidy v. Voyager*, 1:21-cv-24441-CMA (S.D. Fla. Apr. 28, 2022) (ECF No. 46) ("*Cassidy* Am. Compl.," included as Exhibit B to the Declaration of Michael B. Slade), quoting and citing alleged statements of Stephen Ehrlich, the Debtors' CEO, *e.g.*, *id.* ¶¶ 4, 7, 10, 31, 33, 41, 77. *Cassidy* asserted causes of action under federal and state securities law, and violations of consumer-protection claims under New Jersey and Florida law. *Id.* ¶¶ 128–61.

*Cassidy* was litigated for six months prior to the Petition Date. *See* Slade Decl. Ex. C (docket of *Cassidy* litigation). Upon the filing of these cases, the Debtors filed a suggestion of bankruptcy on the docket in *Cassidy*, *see* Slade Decl. Ex. D (July 7, 2022 filing), and the District Court administratively closed the case, *see* Slade Decl. Ex. E (July 8, 2022 order).

A month later, the same lawyers who represent the *Cassidy* plaintiffs filed another putative-class-action proceeding in the United States District Court for the Southern District of Florida, this time including Debtors' CEO and co-founder, Mr. Ehrlich, as a defendant. This action is captioned

6

**EXHIBIT "B"**

*Robertson et al. v. Cuban et al.*, No. 1:22-cv-22538-RKA (S.D. Fla. Aug. 10, 2022). The plaintiffs, as proposed class representatives, assert claims against Mr. Ehrlich, Mark Cuban (the owner of the Dallas Mavericks), and Dallas Basketball Limited (d/b/a Dallas Mavericks, a non-affiliated entity with which Voyager has a commercial relationship) for allegedly aiding and abetting Voyager's alleged fraud claimed in the *Cassidy* action; aiding and abetting breach of fiduciary duty; civil conspiracy; and alleged violation of several states' consumer-protection and securities laws. Slade Decl. Ex. A (*Robertson* Compl.) ¶¶ 145–413. The efforts to circumvent the automatic stay effectuated in *Cassidy* are obvious and brazen; indeed, the *Robertson* Complaint liberally cuts and pastes from allegations made in *Cassidy* and explicitly claims that *Cassidy* "specifically alleged in detail … how Defendants Mark Cuban and Stephen Ehrlich were key players who personally reached out to investors, individually and through [defendant] Dallas Mavericks, to induce them to invest in the Deceptive Voyager Platform." *Robertson* Compl. ¶ 1.

The *Cassidy* Amended Complaint and *Robertson* Complaint share many of the same allegations even aside from the block quote of paragraphs 1–8 of the original *Cassidy* complaint included as paragraph 3 of the *Robertson* Complaint. *Compare, e.g.*, Slade Decl. Ex. B (*Cassidy* Am. Compl.) ¶ 7 *with* Slade Decl. Ex. A (*Robertson* Compl.) ¶ 6 (identically alleging that "Voyager's CEO, Steve Ehrlich, told his investors, and the public, on his last investor call, that Voyager is now determining what to do in regards to all of these state and federal investigations," then identically quoting the same statement), *Cassidy* Am. Compl. ¶¶ 34–35 & 37 *with Robertson* Compl. ¶¶ 19–20 & 22 (describing Voyager's platform and services), *and Cassidy* Am. Compl. ¶¶ 40–41 *with Robertson* Compl. ¶¶ 103–107 (discussing and quoting Mr. Ehrlich's statements from an October 28, 2021 press conference held with the other defendants, with additional quotes added for the *Robertson* Complaint). The *Robertson* Complaint even attaches two expert reports

**EXHIBIT "B"**

prepared for the *Cassidy* litigation. *Robertson* Compl. ¶¶ 56 ("In support of these allegations, Plaintiffs attach from the *Cassidy* Action the [following] two expert reports:…").[4]

*Cassidy* was stayed and administratively closed following the defendants' filing of a suggestion of bankruptcy. *See* Slade Decl. Exs. D & E. As for *Robertson*, summonses have been issued by the Clerk of Court (*Robertson* ECF No. 3), but to the Debtors' knowledge, Mr. Ehrlich has not been served, and no response to the recently-filed complaint has been filed.

### C.    The D&O Insurance Coverage

The Debtors and their directors and officers share a common primary Executive and Corporate Securities Liability Insurance Policy and a common excess insurance policy. The policy provides coverage for claims made against directors and officers of both Voyager Digital Ltd. and its subsidiaries—thereby encompassing all three of the Debtors—including, but not limited to, non-indemnified losses of officers and directors under Insuring Agreement (A); losses of the Company or those of its directors and officers that the Company indemnifies, under Insuring Agreement (B); and the Company's losses from securities claims, under Insuring Agreement (C).[5] The Company and its officers and directors are entitled to use the proceeds of that policy for damages, judgments, settlements, pre-judgment and post-judgment interest or other amounts. If made, those payments would deplete proceeds available to all the Debtors in these cases.

---

[4]    Copies of these reports are not included with the Slade Declaration submitted herewith, but are available on the public docket for *Robertson* at ECF Nos. 1-14 and 1-15.

[5]    The Debtors will be filing a motion seeking to file their insurance policies under seal.

**EXHIBIT "B"**

## D. The Debtors' Indemnification Obligations

The governing corporate documents of two of the Debtors, Voyager Digital Holdings, Inc. and Voyager Digital, LLC, require indemnification of Voyager's officers for litigation-related claims, such as those that would be incurred by *Robertson*:

| Document and Section | Relevant Provisions |
|---|---|
| Second Amended and Restated Bylaws of Voyager Digital Holdings, Inc. § 10.01 | "<u>Third Party Actions</u>. The corporation shall indemnify any director of officer of the corporation … who was or is a party … to any threatened, pending, or completed action, suit, or proceeding … by reason of the fact that he or she is or was a director, officer, employee, or agent of the corporation … against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by him or her … if he or she acted in good faith and in a manner he or she reasonably believe to be in or not opposed to the best interests of the corporation…." |
| Second Amended and Restated Bylaws of Voyager Digital Holdings, Inc. § 10.03 | "<u>Mandatory Indemnification</u>. To the extent that a present former director or officer of the corporation has been successful on the merits or otherwise in defense of any action, suite or proceeding … or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith." |
| Amended and Restated Limited Liability Company Agreement of Voyager Digital, LLC § 4.7 (incorporating definitions contained in the document) | "The Company, its receiver or its trustee shall indemnify, defend and hold [Voyager Digital Holdings, Inc.] (and its [members, managers, directors, Officers, employees and agents]) harmless from and against any expense, loss, damage or liability incurred or connected with, or any claim, suit, demand, loss, judgment, liability, cost or expense (including reasonable attorneys' fees) arising from or related to, the Company or any act or omission of such Person on behalf of the Company, and amounts paid in settlement of any of the foregoing, provided that the same were not the result of fraud, willful misconduct or gross negligence on the part of the Person against whom a claim is asserted." |

Copies of these documents are included as Exhibits F and G to the Slade Declaration.[6]

---

[6] As noted above, the Debtors also face indemnity claims from Mr. Cuban and Dallas Basketball Limited if *Robertson* is allowed to continue.

**EXHIBIT "B"**

# ARGUMENT

Section 362(a)(1) of the Bankruptcy Code prohibits "the commencement or continuation … of a judicial … action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). Section 362(a)(3) similarly prevents "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986); *accord E. Refractories Co. v. Forty Eight Insulations Inc.*, 157 F.3d 169, 172 (2d Cir. 1998); *In re Residential Capital, LLC*, 2014 WL 3798622, at *8 (Bankr. S.D.N.Y. July 31, 2014); *In re Madoff*, 2012 WL 990829, at *7 (S.D.N.Y. Mar. 26, 2012); *In re Johns-Manville Corp.*, 26 B.R. 420, 425 (Bankr. S.D.N.Y. 1983). A primary purpose of the stay is to "provide[] the debtor with 'a breathing spell from his creditors'" so that its restructuring efforts can proceed in an efficient, coordinated manner. *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 64 (2d Cir. 1986) (quoting S. Rep. No. 989, 95th Cong. 2d Sess. 54-55 (1978)); *accord In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990); *In re Calpine Corp.*, 354 B.R. 45, 49 (Bankr. S.D.N.Y. 2006).

Courts have extended the automatic stay pursuant to Bankruptcy Code sections 362 and 105 in order to stay the continued prosecution of claims against non-debtors where failure to do so would have an adverse economic impact on the debtors or would impair their restructuring efforts. *See, e.g., Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287-88 (2d Cir. 2003); *In re Calpine Corp.*, 365 B.R. 401, 410 (S.D.N.Y. 2007); *In re 1031 Tax Grp., LLC*, 397 B.R. 670, 686 (Bankr. S.D.N.Y. 2008). Courts extend the automatic stay in such circumstances because permitting such

**EXHIBIT "B"**

claims to go forward would effectively eviscerate the protections that the automatic stay affords debtors. *See, e.g.*, *In re United Health Care Org.*, 210 B.R. 228, 233 (S.D.N.Y. 1997).

In order to effectuate the purpose of the automatic stay and provide the Debtors the protections it affords, this Court should stay or enjoin the continuation of *Robertson* pursuant to sections 362 and 105 of the Bankruptcy Code.

**I.      THE AUTOMATIC STAY OF SECTION 362
          SHOULD BE EXTENDED TO STAY *ROBERTSON*.**

Pursuant to section 362(a)(1), the Second Circuit has affirmed the extension of the automatic stay in order to stay actions against non-debtors where there is such an identity of interest that the action against the non-debtor would have an adverse impact on the debtor's estate or its efforts to restructure. *See Queenie*, 321 F.3d at 287-88. The Second Circuit has also affirmed the extension of the automatic stay pursuant to section 362(a)(3) to stay actions against non-debtors that would otherwise "obtain possession … or … exercise control" of the estate's property. *See In re 48th St. Steakhouse, Inc.*, 835 F.2d 427, 430–31 (2d Cir. 1987).

This Court should extend the automatic stay *Robertson* pursuant to both 362(a)(1) and 362(a)(3) for the reasons that follow.

**A.      *Robertson* Should Be Stayed Under Section 362(a)(1) Given Mr. Ehrlich's
          and the Other Defendants' Identity of Interest with the Debtors.**

The automatic stay of section 362(a)(1) should be extended to stay actions against non-debtors "where 'there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant.'" *Queenie*, 321 F.3d at 287-88 (quoting *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)); *accord In re Durr Mechanical Const., Inc.*, 604 B.R. 131, 137 (2019); *In re N. Star Contracting Corp.*, 125 B.R. 368, 370 (S.D.N.Y. 1991) ("[I]n circumstances where the debtor and the non-bankrupt party can be considered … as having a unitary interest, a section 362(a)(1) stay may suspend an action against a non-bankrupt

**EXHIBIT "B"**

party."); *In re Lomas Fin. Corp.*, 117 B.R. 64, 67-68 (S.D.N.Y. 1990); *In re Calpine*, 354 B.R. at 49. The rule prevents "a claim against the non-debtor [that] will have an immediate adverse economic consequence for the debtor's estate." *Queenie*, 321 F.3d at 287; *Tenas-Reynard v. Palermo Taxi, Inc.*, 2016 WL 1276451, at *6 (S.D.N.Y Mar. 30, 2016) (extending stay where claim against non-debtor will "constitute a claim (and hence, an 'immediate adverse economic consequence')" against debtor's estate).

There is a clear identity of interest here between the Debtors, Mr. Ehrlich, and the other defendants in *Robertson*. The claims in *Robertson* are inextricably intertwined with issues that will be raised in the bankruptcy proceeding, and bear on the Debtors' alleged conduct. Indeed, *Robertson* asserts liability against Mr. Ehrlich solely for actions allegedly taken in connection with his role as an officer of Voyager, and against the other defendants based on their statements made as part of their commercial relationship with the Debtors. *Robertson* effectively equates the relief being sought against Mr. Ehrlich and the other defendants with the relief previously sought in *Cassidy* against the Debtors; it will inevitably lead to burdensome discovery from the Debtors; and it will create significant indemnification obligations for the Debtors.

### 1. Continuation of *Robertson* Would Inevitably Effect the Debtors.

The automatic stay should be extended to non-debtors where "there is such identity between the debtor and the third-party defendant" that a finding or "judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *A.H. Robins*, 788 F.2d at 999; *accord Queenie*, 321 F.3d at 288. This Court has confirmed that "a stay should be provided to codefendants when the claims against them and the claims against the debtor are inextricably interwoven, presenting common questions of law and fact, which can be resolved in one proceeding." *In re Ionosphere Clubs, Inc.*, 111 B.R. 423, 434 (Bankr. S.D.N.Y. 1990).

12

**EXHIBIT "B"**

The same is clearly true here. Among other things, *Robertson* may tee up adjudication of a legal question that is unsettled in ***any*** jurisdiction: Whether crypto-based financial products on Voyager's platform are securities under each jurisdiction's relevant securities laws. If so, if *Robertson* goes forward, the Debtors would be forced to either watch from the sidelines at great risk of prejudice to their interests on this issue, or jettison one of the principal benefits of the stay and involve themselves in *Robertson* to protect those interests at great cost to the restructuring efforts. Decisions from the *Robertson* (or any other) court on that issue could also have significant regulatory ramifications, to the Debtors and others. The centrality of this important legal question to both the Debtors in the regulation of their (and other cryptocurrency companies') activities and in the resolution of *Robertson* is reason enough on its own to extend the stay.

Beyond this legal question, the theories and factual allegations underlying the claims against Mr. Ehrlich in *Robertson* are "inextricably interwoven" with the theories and factual allegations underlying the claims against the Debtors in *Cassidy*. Mr. Ehrlich is the Debtors' CEO and *Cassidy* predicates its claims against Voyager Digital Ltd. and Voyager Digital, LLC on Mr. Ehrlich's (and others') allegedly wrongful conduct. Meanwhile, the *Robertson* plaintiffs' primary theory of liability against Mr. Ehrlich is that he and the other defendants "pushed … false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the Deceptive Voyager Platform. … [T]hese statements and representations are false, misleading and certainly violate numerous state and federal consumer statutes." *Robertson* Compl. ¶¶ 26–27.

The theories and factual allegations underlying the claims against the other defendants in *Robertson* are likewise inextricable from the allegations against the Debtors in *Cassidy*. *Robertson* alleges that the Dallas Mavericks "had entered into a 5-year 'exclusive, integrated partnership'

13

**EXHIBIT "B"**

with Voyager," *Robertson* Compl. ¶ 102. The *Robertson* complaint then quotes at length from the press conference announcing that relationship, including statements by both Mr. Cuban and Mr. Ehrlich—including statements also quoted in the *Cassidy* amended complaint. *Compare, e.g.*, *Robertson* Compl. ¶¶ 103–04 *with Cassidy* Am. Compl. ¶¶ 40–41 (including verbatim copies of the same allegation and quotes from the press conference). *Robertson* focuses heavily on this press conference. *Robertson* Compl. ¶¶ 105–110 (alleging, *e.g.*, that "Cuban even hyped up the fact that he was investing his own money into … Voyager" and "continuously represented that Voyager was an easy to use platform that offered the best pricing in the market," while "Ehrlich, in turn, continuously touted the Voyager rewards program" and "Cuban also shamelessly pushed investors," and "Ehrlich, contrary to the position he is now taking in the Voyager bankruptcy, claimed that the rewards program is based on 'staking' assets that customers own").

Given the identity of interests between all the Debtors and Mr. Ehrlich, any decision against Mr. Ehrlich could potentially amount to a decision against all the Debtors. Courts have extended the automatic stay to cover claims against non-debtors because of the risk that a decision against the non-debtors will be given collateral estoppel effect and applied against the debtors. *See, e.g.*, *In re Calpine*, 354 B.R. at 50 (extending the automatic stay to claims against non-debtor where not doing so would "expos[e] Calpine to a significant risk of collateral estoppel"); *In re Calpine*, 2007 WL 1302604, at *3 (Bankr. S.D.N.Y. Apr. 30, 2007) (same); *In re Ionosphere Clubs*, 111 B.R. at 434-35 (extending stay to action against debtor's chairman); *In re Johns-Manville*, 26 B.R. at 429 (noting that debtor "could be collaterally estopped in subsequent suits from relitigating issues determined against its officers and directors"). The overlapping nature of any claims against the Debtors and the related claims against the Debtors' CEO clearly warrant an extension of the automatic stay. *See, e.g.*, *In re Calpine*, 354 B.R. at 50. And if *Robertson* is allowed to proceed,

EXHIBIT "B"

any evidence generated in that case would inevitably be used later against the Debtors. That risk of evidentiary prejudice alone is sufficient to warrant extending the automatic stay to non-debtors. *See In re Johns-Manville Corp.*, 40 B.R. 219, 225 (S.D.N.Y. 1984) (noting risk of evidentiary prejudice in related matters); *In re Lion Capital Grp.*, 44 B.R. 690, 703 (Bankr. S.D.N.Y. 1984) ("[T]he risk that testimony by employees or agents might be subsequently employed against the debtor … warranted the issuance of a stay.").

The *Cassidy* defendants' alleged liability is based on, and derivative of, Mr. Ehrlich's and others' alleged conduct, as now pursued in *Robertson*. These facts clearly warrant extending the automatic stay to prohibit the continuation of *Robertson*.

### 2. Continuation of *Robertson* Could Create Significant Indemnification Obligations for the Debtors' Estate.

Courts have extended the automatic stay pursuant to section 362(a)(1) "where an action against one party is essentially an action against the bankruptcy debtor, as in the case where a third-party is entitled to indemnification by the debtor for any judgment taken against it." *In re W.R. Grace & Co.*, 2004 WL 954772, at *2 (Bankr. D. Del. Apr. 29, 2004); *accord A.H. Robins*, 788 F.2d at 999 (extension of automatic stay to non-debtors appropriate where "there is such identity between the debtor and the third-party defendant" that a finding or "judgment against the third-party defendant will in effect be a judgment or finding against the debtor"); *Queenie*, 321 F.3d at 288; *see also In re Calpine*, 354 B.R. at 50; *In re United Health*, 210 B.R. at 232. Courts analyzing this issue have indicated that even the "mere possibility of indemnification obligations warrants extension of the automatic stay." *In re LTL Management, LLC*, 638 B.R. 291, 312 (Bankr. D.N.J. 2022) (emphasis added) (citations omitted).

There exists more than the "mere possibility" of indemnification here. Mr. Ehrlich has the right to contractual indemnity in, among other places, the operative articles of incorporation and

**EXHIBIT "B"**

LLC agreement. The Debtors would also face indemnity claims from the other defendants, arising from the commercial relationship between them. Allowing *Robertson* to proceed would clearly thus create indemnification claims against the estate.

These indemnification obligations warrant an extension of the stay in this case. *See, e.g., In re Durr Mechanical Const., Inc.*, 604 B.R. 131, 137–38 (S.D.N.Y. Bankr. 2019). Where indemnification obligations are implicated and cover items such as "costs" and "charges," continuing the lawsuit would risk an "immediate, adverse economic impact on the estate and its unsecured creditors." *Id.* at 137. Refusing to extend the stay "would defeat the very purpose and intent" of the statute. *A.H. Robins*, 788 F.2d at 999; *see also Queenie*, 321 F.3d at 287; *In re Calpine*, 354 B.R. at 50.

### B. *Robertson* Should Be Stayed Under Section 362(a)(3) in Order to Preserve and Protect the Estate's Property.

Section 362(a)(3) protects the bankruptcy estate's assets by automatically staying "any act to obtain possession … or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). This provision "prohibits interference with the disposition of the assets that are under the Court's wing—*whether or not the Debtor is named as a defendant as part of the effort*." *In re Adelphia Commc'ns Corp.*, 345 B.R. 69, 76 (Bankr. S.D.N.Y. 2006) (emphasis added). Thus, section 362(a)(3) directs the stay of any action whether against the debtor or non-debtors that would have an adverse impact on the property of the bankruptcy estate. *See In re 48th St. Steakhouse*, 835 F.2d at 431 ("If action taken against the non-bankrupt party would inevitably have an adverse impact on property of the bankrupt estate, then such action should be barred by the automatic stay."); *see also Queenie*, 321 F.3d at 287 (automatic stay applies to non-debtors when claim against non-debtor will have "adverse economic consequence for the debtor's estate").

**EXHIBIT "B"**

*Robertson* could adversely impact property that the Debtors submit is part of their estate, and thus should be stayed pursuant to section 362(a)(3). As discussed above, the Debtors share a common director-and-officer liability policy. The policy provides independent director insurance to the Debtors' directors and officers, on the one hand, and indemnity coverage related to indemnity claims by their directors and officers, and securities coverage to the Debtors, on the other hand. Where, like here, liability insurance policies provide direct coverage to both the Debtors *and* their directors and officers, courts have held that "the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution." *In re Downey Fin. Corp.*, 428 B.R. 595, 603 (Bankr. D. Del. 2010) (quoting *In re Allied Digital Techs. Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004)).

In *In re Quigley Co., Inc.*, 676 F.3d 45 (2d Cir. 2012), the Second Circuit confirmed that insurance policies and proceeds that cover debtors and their non-debtor affiliates are property of the estate. *Id.* at 57; *see also In re Johns-Manville Corp.*, 600 F.3d 135, 152 (2d Cir. 2010) ("[T]he insurance policies that Travelers issued to Manville are the estate's most valuable asset."); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92 (2d Cir. 1988) (agreeing with "[n]umerous courts [that] have determined that a debtor's insurance policies are property of the estate"); *In re MF Global Holdings Ltd.*, 469 B.R. 177, 190 (Bankr. S.D.N.Y. 2012) (same); *In re 1031 Tax Grp.*, 397 B.R. at 677–78 (shared insurance policy was property of estate). The proceeds of such shared insurance policies are "property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution." *In re Downey Fin. Corp.*, 428 B.R. 595, 603 (Bankr. D. Del. 2010) (quoting *In re Allied Digital Techs. Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004)); *accord In re*

**EXHIBIT "B"**

*Quigley*, 676 F.3d at 52; *In re MF Global*, 2012 WL 1191892 at *10; *In re First Cent. Fin. Corp.*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999) ("[T]he estate's property interest in the proceeds of a typical liability policy is an unstated given," particularly where "the debtor is also the beneficiary of the liability insurance coverage.").

Courts have thus extended the automatic stay in situations to claims against the non-debtor where a debtor and non-debtor share a joint insurance policy; failure to do so would allow access to the estate's assets by the non-debtor. *See A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1001–02 (4th Cir. 1986) (proceedings against non-debtors "who qualify as additional insureds under the [insurance] policy are to be stayed under section 362(a)(3)"); *see also Raudonis as trustee for Walter J. Raudonis 2016 Revocable Tr. v. RealtyShares, Inc.*, 507 F. Supp. 3d 378 (D. Mass. 2020) ("Because courts generally recognize insurance policy as 'property' under 11 U.S.C. § 541(a)(1)— and thus find such policies subject to an automatic stay pursuant to 11 U.S.C. § 362(a)(3)—the defendants' shared insurance contract arguably sweeps [non-debtors] into the reach of the automatic stay."). The result should be the same here. The policy in this case allows the Mr. Ehrlich and other D&Os to draw down the shared insurance proceeds to pay for their defense costs and any settlements or judgments. The shared insurance proceeds are paid on a first billed, first paid basis, such that payments on behalf of the D&Os would deplete the proceeds available to the Debtors. As such, every insurance dollar paid on behalf of the Mr. Ehrlich leaves one fewer dollar of insurance coverage available to the Debtors' estate. *See Quigley*, 676 F.3d at 53-58; *see also In re First Cent. Fin.*, 238 B.R. at 16-17; *In re 1031 Tax Group*, 397 B.R. at 684-85. That alone warrants extending the stay pursuant to section 362(a)(3) to stop prosecution of *Robertson*.

II.     **THE CONTINUED PROSECUTION OF *ROBERTSON*
SHOULD BE ENJOINED UNDER SECTION 105.**

This Court should also enjoin *Robertson* under section 105(a) of the Bankruptcy Code.

**EXHIBIT "B"**

Section 105(a), which authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]," gives this Court authority to enjoin actions against non-debtors. *See In re Chateaugay Corp.*, 93 B.R. 26, 29 (S.D.N.Y. 1988) ("[T]he Bankruptcy Court has authority under § 105 broader than the automatic stay provisions of § 362 and may use its equitable powers to assure the orderly conduct of the reorganization proceedings."); *Haw. Structural Ironworkers Pension Trust Fund v. Calpine Corp. Inc.*, 2006 WL 3755175, at *4 (S.D.N.Y. Dec. 20, 2006) (same); *In re 1031 Tax Grp.*, 397 B.R. at 684 ("Section 105 authorizes a bankruptcy court to exercise power outside the bounds of the automatic stay."). "[T]he Second Circuit, courts in this District, and courts in other circuits have 'construed [section 105] liberally to enjoin suits that might impede the reorganization process,'" including actions against non-debtors. *In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 54 (S.D.N.Y. 2003); *see In re Calpine Corp.*, 365 B.R. at 413-14; *Haw. Structural*, 2006 WL 3755175, at *6; *In re Lyondell Chem. Co.*, 402 B.R. 571, 588-89 (Bankr. S.D.N.Y. 2009); *In re 1031 Tax Grp.*, 397 B.R. at 684-86; *In re Calpine Corp.*, 354 B.R. at 50; *In re Calpine Corp.*, 2007 WL 1302604, at *4; *In re N. Star Contracting*, 125 B.R. at 370 n.1; *In re Ionosphere Clubs*, 111 B.R. at 434.

A debtor's request for an injunction pursuant to section 105 is treated as a request for a preliminary injunction. *See In re Calpine Corp.*, 365 B.R. at 409. But a debtor "need not satisfy the more rigorous requirements for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure" to obtain an injunction pursuant to section 105. *In re Chateaugay*, 201 B.R. 48, 71 (Bankr. S.D.N.Y. 1996). Instead, courts in this district apply the "traditional preliminary injunction standard as modified to fit the bankruptcy context." *In re Calpine*, 365 B.R. at 409. That standard involves evaluating four factors, none of which is determinative:

1. whether there is an imminent irreparable harm to the estate without an injunction;

2. whether there is a likelihood of a successful restructuring;

**EXHIBIT "B"**

    3.    whether the balance of harms tips in favor of the moving party; and

    4.    whether the public interest weighs in favor of an injunction.

*See id.*; *In re United Health Care Org.*, 210 B.R. at 233; *Haw. Structural*, 2006 WL 3755175, at *4. As outlined below, the Debtors satisfy all four of these factors.

    **A.**    **Continuation of *Robertson* Will Irreparably Harm the Debtors.**

    The Debtors will suffer irreparable harm to both their estate and their ability to successfully restructure if *Robertson* is not stayed, as continuation of *Robertson* will "burden, delay or otherwise impede the reorganization proceedings." *In re Lyondell Chem.*, 402 B.R. at 590. In assessing whether an injunction is necessary to preserve the estate or protect the restructuring efforts, courts in this district have focused on three factors: (1) whether the debtors' estate would be harmed in the absence of an injunction; (2) whether the debtors face a risk of binding rulings or evidentiary prejudice if the cases proceed against the non-debtors; and (3) whether the litigation against the non-debtors would distract the debtors' key personnel and frustrate their efforts to restructure. *See In re Calpine Corp.*, 354 B.R. at 50; *In re Calpine Corp.*, 2007 WL 1302604 at *3–4; *In re Lomas Fin.*, 117 B.R. at 66-67; *Malm v. Goldin*, 1993 WL 330489, at *2 (S.D.N.Y. Aug. 27, 1993); *see also In re 1031 Tax Grp.*, 397 B.R. at 684-85. Absent an injunction here, the Debtors would be irreparably harmed in each of these respects.

    *First*, enjoining *Robertson* is necessary to preserve the property of the Debtors' estate. As set forth above, the shared insurance policy, and its proceeds, are assets of the estate. If *Robertson* is allowed to proceed, the proceeds of the policy will be depleted, causing irreparable harm to the estate. *See In re 1031 Tax Grp.*, 397 B.R. at 685 (finding irreparable harm because "[i]f the Colorado Lawsuits go forward, insurance proceeds recoverable by the estate from these wasting policies may be diminished by defense costs of the [non-debtor]").

**EXHIBIT "B"**

In addition, the Debtors could face indemnification obligations for any attorneys' fees/expenses and losses that Mr. Ehrlich, and/or the other named Defendants, incurs in *Robertson*. These potential indemnification claims also constitute irreparable harm. *See In re 1031 Tax Grp.*, 397 B.R. at 685 (finding irreparable harm where "there is a substantial risk that the Debtors face liability for indemnification if the Colorado Lawsuits are permitted to continue"); *In re Calpine*, 354 B.R. at 50; *In re United Health*, 210 B.R. at 232 ("One example of a situation where such an injunction would be permitted would be a suit against a third party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against it in the case.").

*Second*, the risk of collateral estoppel, *stare decisis*, and evidentiary prejudice to the Debtors also warrants an injunction. As detailed above, the claims in *Robertson* are inextricably tied to the operations of the Debtors. In fact, the claims in *Robertson* are based on identical theories that the same plaintiffs pursued against the Debtors in *Cassidy*. Thus, there is little question that the results of continuing *Robertson* could have an impact on the Debtors. Further, the claims against Mr. Cuban and Dallas Basketball Ltd. are clearly derivative of a determination as to Debtors' alleged liability for the now-stayed claims in *Cassidy*. Prosecution of the state law claims against Mr. Cuban and Dallas Basketball Ltd. would require a full adjudication of all the underlying claims against the Debtors—which have been stayed.

The truth is that the Debtors would be in a difficult position if *Robertson* is allowed to proceed: either take advantage of the protections of the automatic stay and be saddled with any evidence generated, findings made, and decisions rendered; or participate in the defense of the case to protect their litigation interests and lose the benefits of the automatic stay. This Hobson's choice constitutes irreparable harm. *In re Calpine Corp.*, 354 B.R. at 50 ("In light of the identity of interest between [the debtor] and [the non-debtor], [the debtor] will suffer irreparable harm if

**EXHIBIT "B"**

the Nevada Litigation continues through the risk of collateral estoppel and evidentiary prejudice….”); *In re Barney’s Inc.*, 200 B.R. 527, 531 (Bankr. S.D.N.Y. 1996) (same); *In re Lomas Fin.*, 117 B.R. at 67 (same); *In re Ionosphere Clubs*, 111 B.R. at 435 (same); *see also In re S.W. Bach. & Co.*, 425 B.R. 78, 102 (Bankr. S.D.N.Y. 2010).

 *Finally*, even if the Debtors chose not to participate actively in the litigation of *Robertson*, they may face substantial burdens. As set forth above, plaintiffs will need discovery from the Debtors to prove their claims in *Robertson*, and in turn Mr. Ehrlich and the other *Robertson* defendants would likely have to obtain discovery from the Debtors to defend against the claims. *See, e.g.*, *Robertson* Compl. ¶¶ 7 (noting that in *Cassidy*, “just before class counsel was able to serve third party discovery on Cuban,” “the news broke” of the circumstances leading to the Debtors filing their chapter 11 petitions) & 112 (“Although it is unclear *without discovery* to what extent Cuban was invested in the Deceptive Voyager platform…” (emphasis added)). It bears noting that these chapter 11 cases anticipate an extremely fast timetable to benefit all stakeholders. The Debtors need Mr. Ehrlich (and their other D&Os) to be focused 100% on their restructuring efforts—not on defending a class action lawsuit in Miami.

 Courts have found that debtors would suffer irreparable harm where the failure to stay an action against a non-debtor would result in material obligations on the debtors that would frustrate their efforts to restructure successfully. *Haw. Structural*, 2006 WL 3755175, at *5 (affirming extension of stay to halt claims against non-debtors where “the logistical stress on Calpine from attempting to simultaneously undertake a massive reorganization while monitoring and producing documents in the State Court Action threatened to irreparably impair the company’s reorganization process”); *In re Lomas Fin. Corp.*, 117 B.R. at 67 (upholding extension of automatic stay where “key personnel would be distracted from participating in the reorganization process”).

**EXHIBIT "B"**

**B.      There Is a Reasonable Likelihood the Debtors Will Successfully Restructure.**

Courts in this district have found a reasonable likelihood of a successful reorganization where "the Debtors are proceeding on track, and there is no reason to believe or suspect that their reorganization will fail—unless, of course, the acts sought to be enjoined cause it to fail." *In re Lyondell Chem.*, 402 B.R. at 590. In evaluating this factor "in the earliest weeks" of the complex reorganization of Lyondell Chemical Company, a court in this district found that "the Debtors have so far been successful in doing everything they've needed to do to date," and because they "have met the challenges they have faced so far, that is sufficient." *Id.*; *see also In re Soundview Elite Ltd.*, 543 B.R. 78, 119 (S.D.N.Y. 2016) ("Courts do not demand certainty of a successful reorganization; they expect only reasonable prospects of such.").

The Debtors here are similarly "proceeding on track" toward a successful restructuring and resolution of their chapter 11 cases. Despite the challenges and complexities of restructuring one of the largest cryptocurrency trading platforms in the world, the Debtors are proceeding swiftly through their restructuring efforts. To date, this Court has granted first- and second-day relief (*see, e.g.*, various orders, ECF Nos. 53–60, 233, 235, 236–39) and approved bidding procedures on August 5, 2022 (ECF No. 248)—a marketing process that has already yielded multiple indications of interest from third-party investors. The Debtors also filed a "stand-alone" plan of reorganization that will allow the Debtors to successfully emerge from chapter 11 without the need for a transaction partner or additional financing, and are prepared to commence solicitation on the plan if, ultimately, the plan represents the most value-maximizing transaction available to the Debtors. *See* ECF Nos. 1, 288–289. The Debtors are "proceeding on track and have met the challenges they have faced" thus far, so there is a reasonable likelihood they will successfully restructure. *See In re Lyondell Chem.*, 402 B.R. at 590.

23

**EXHIBIT "B"**

C.    **The Balance of Harms Favors an Injunction.**

The balance of harms weighs in favor of issuing an injunction. As described above, the harm to the Debtors would be irreparable if this Court does not enjoin *Robertson*. The Debtors would risk rulings that could be used against them; the estate's resources would be depleted; and the Debtors' efforts to restructure would be harmed.

By contrast, if *Robertson* is enjoined, there would be only *de minimis* harm to the plaintiffs. *Robertson* is in its very early stages—the Complaint was just filed on August 10, 2022 and, to the best of the Debtors' knowledge, Mr. Ehrlich has not been served, and no response to the Complaint has been filed by the other defendants. And the Debtors do not anticipate these chapter 11 cases dragging on, so the stay sought here is temporary. Thus, even if an injunction were to delay a final decision on the merits in *Robertson*, a modest delay is insufficient to overcome the potential harm to the Debtors: "The inability of [the defendant] to obtain a hypothetical recovery sooner … is not a harm—and is certainly not an irreparable harm sufficient to outweigh the irreparable harm that [the debtors] will suffer if the … litigation were permitted to proceed." *In re Calpine Corp.*, 365 B.R. at 413; *accord In re Am. Film Techs.*, 175 B.R. 847, 849 (Bankr. D. Del. 1994) (same); *In re Johns-Manville Corp.*, 26 B.R. at 430-31.

D.    **An Injunction Serves the Public Interest.**

Finally, an injunction would serve the public interest. "[I]n the context of bankruptcy proceedings, the 'public interest' element means the promoting of a successful reorganization." *In re OMC, Inc.*, 2010 WL 4026097, at *5 (Bankr. S.D.N.Y. Oct. 13, 2010); *accord In re Calpine Corp.*, 365 B.R. at 413; *Haw. Structural*, 2006 WL 3755175, at *6. Enjoining *Robertson* to avoid harm to the Debtors and allow them to restructure successfully is a far greater public interest than allowing the *Robertson* plaintiffs to continue pursuing claims against the Mr. Ehrlich and the other defendants that are in the earliest stages of litigation. *See Haw. Structural*, 2006 WL 3755175, at

**EXHIBIT "B"**

*4 ("If an action against a non-debtor would frustrate the goal of debtor reorganization, section 105(a) provides the statutory authority for an injunction staying the action against the non-debtor."); *In re Adelphia Commc'ns*, 298 B.R. at 54 ("It is well settled that bankruptcy courts, under [section 105], may extend the automatic stay to enjoin suits by third parties against third parties if they threaten to thwart or frustrate the debtor's reorganization efforts.").

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that this Court enter an order extending the automatic stay to *Robertson* pursuant to section 362, or, in the alternative, enjoining the continuation of *Robertson* pursuant to Section 105, until the effective date of a plan of reorganization in these chapter 11 cases, and grant such other and further relief as this Court deems just and proper.

# EXHIBIT "B"

Dated: August 22, 2022
New York, New York

*/s/ Joshua A. Sussberg*
_____

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900
Email:      jsussberg@kirkland.com
            cmarcus@kirkland.com
            christine.okike@kirkland.com
            allyson.smith@kirkland.com

Michael B. Slade (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS**
   **INTERNATIONAL LLP**
300 North LaSalle
Chicago, IL 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:      mslade@kirkland.com

*Counsel to the Debtors and Debtors in Possession*

**EXHIBIT "B"**

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of August, 2022, I caused a true and correct

copy of the foregoing to be served by e-mail upon the following:

Adam M. Moskowitz (adam@moskowitz-law.com)
Joseph M. Kaye (joseph@moskowitz-law.com)
Barbara C. Lewis (barbara@moskowitz-law.com)
THE MOSKOWITZ LAW FIRM, PLLC
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134


*/s/ Michael Slade*
Michael Slade

**EXHIBIT "B"**