**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 22-cv-22538-ALTMAN/Reid**

**PIERCE ROBERTSON**, *et al.,* on behalf of
themselves and all others similarly situated,

|  |  |
|---|---|
| *Plaintiffs,* | **AMENDED CLASS ACTION COMPLAINT** |
| *v.* | **JURY DEMAND** |
| **MARK CUBAN**, *et al.*, | |
| *Defendants.* | |

_____/

## AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

*I … am a [Voyager and Steve Ehrlich] customer and I've been a customer for several months now I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as **a perfect fit for our Mavs fans and reaching Mavs fans of all ages…** it's **as close to risk free** as you're going to get … just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.*

**– Defendant Mark Cuban (Governor, Dallas Mavericks)**



Plaintiffs Pierce Robertson, Rachel Gold, Sanford Gold, Rahil Sayed, Christopher Ehrentraut, Todd Manganiello, Dan Newsom, William Ayer, Anthony Dorn, Dameco Gates, Marshall, and Edwin Garrison ("Plaintiffs") file this class action complaint on behalf of themselves, and all others similarly situated, against Mark Cuban ("Cuban") and Dallas Basketball Limited, d/b/a Dallas Mavericks (the "Mavericks").[1]

## INTRODUCTION

1.      On December 24, 2021, counsel for Plaintiffs and the class members brought the first (and only) putative nationwide class action complaint styled *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the Deceptive Voyager Platform owned and operated by Voyager Digital Ltd. ("Voyager") and Voyager Digital LLC ("VDL") was an unregulated and unsustainable fraud. The operative complaint in the *Cassidy* Action found at ECF No. 46 is attached hereto as **Exhibit A** (the "*Cassidy* Complaint"). In that complaint, Plaintiffs also alleged that Defendant Ehrlich, Voyager's CEO, teamed up with Defendants Cuban and the Dallas Mavericks to promote Voyager and VDL by making false representations and employing other means of deception. As a result, Plaintiff and the class members have sustained losses in excess of $5 billion.

2.      The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting the Deceptive Voyager Platform—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Dallas Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

---

[1]   Undersigned Counsel represents hundreds of injured Voyager investors, and these select Plaintiff investors agreed to serve as class representatives at this stage. Moreover, discovery has yet to commence, but Plaintiffs' counsel anticipates adding additional responsible parties as Defendants.

3.      After the *Cassidy* Complaint was filed, the following important actions took place:

(a)      the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b)      seven state Attorney Generals (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPAs, like the one Plaintiff Mark Cassidy was offered and sold by Voyager, was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022 (thousands of these EPAs were Florida-based); and

(c)      on March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the Earn Program is not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[2]

4.      On July 5, 2022, Voyager Digital Holdings, Inc. and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases (the "Bankruptcy Cases") are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

5.      On September 28, 2022, Voyager filed a motion in the Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii)

---

[2]      https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed October 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed October 28, 2022)

additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

6.      In the Bankruptcy Cases, Voyager has reported that it has in excess of 3.5 million investors. This action seeks to hold Ehrlich, Cuban, and the Dallas Mavericks (and possibly other soon-to-be-named defendants) responsible for making Voyager's investors whole.

## PARTIES

7.      Plaintiff Pierce Robertson is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Robertson purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Robertson did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Robertson has sustained damages for which Cuban and Ehrlich are liable.

8.      Plaintiff Rachel Gold is a citizen and resident of the State of Florida. She is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ms. Gold purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on her holdings. Plaintiff Ms. Gold did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Ms. Gold has sustained damages for which Cuban and Ehrlich are liable.

9.      Plaintiff Sanford Gold is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Mr. Gold purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Mr. Gold did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Mr. Gold has sustained damages for which Cuban and Ehrlich are liable.

10.    Plaintiff Rahil Sayed is a citizen and resident of the State of New Jersey. He is a natural person and is otherwise *sui juris*. Plaintiff Sayed purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Sayed did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Sayed has sustained damages for which Cuban and Ehrlich are liable.

11.    Plaintiff Christopher Ehrentraut is a citizen and resident of the State of Tennessee. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ehrentraut purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Ehrentraut did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Ehrentraut has sustained damages for which Cuban and Ehrlich are liable.

12.    Plaintiff Todd Manganiello is a citizen and resident of the State of Louisiana. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Manganiello purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Manganiello did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Manganiello has sustained damages for which Cuban and Ehrlich are liable.

13.    Plaintiff Dan Newsom is a citizen and resident of the State of Alabama. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Newsom purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Newsom did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive

Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Newsom has sustained damages for which Cuban and Ehrlich are liable.

14.     Plaintiff William Ayer is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ayer purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Ayer did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Ayer has sustained damages for which Cuban and Ehrlich are liable.

15.     Plaintiff Anthony Dorn is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Dorn purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Dorn did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Dorn has sustained damages for which Cuban and Ehrlich are liable.

16.     Plaintiff Dameco Gates is a citizen and resident of the State of California residing. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Gates purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Gates did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Gates has sustained damages for which Cuban and Ehrlich are liable.

17.     Plaintiff Marshall Peters is a citizen and resident of the State of Pennsylvania. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Peters purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Peters did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive

Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Peters has sustained damages for which Cuban and Ehrlich are liable.

18.    Plaintiff Edwin Garrison is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Garrison did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Garrison has sustained damages for which Cuban and Ehrlich are liable.

19.    Defendant Mark Cuban is a citizen of the State of Texas. Cuban is the well-known businessman, investor, television and media personality, and the team owner of the American professional basketball team, the Dallas Mavericks.

20.    Defendant Dallas Basketball Limited, d/b/a Dallas Mavericks is a Texas limited partnership doing business in the United States.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

22.    This Court has personal jurisdiction against Defendants because they conduct business in Florida, and/or have otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of Voyager's EPAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of Voyager's unregistered securities to consumers in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

23.    Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members either reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and

because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

24.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

### A.     Background on Voyager and VDL.

25.     Until seeking the protection of the Bankruptcy Court, Voyager Digital LTD ("Voyager") and Voyager Digital LLC ("VDL") operated a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive Voyager Platform") that placed cryptocurrency trade orders on behalf of users like Plaintiff and Class Members and offered interest bearing cryptocurrency accounts.

26.     Voyager was first listed on the Toronto Venture Exchange (TSX.V) under the symbol VYGR.V in February of 2019.[3] In September 2019, Voyager Digital Ltd was listed on the Canadian Stock Exchange (CSE) under the symbol VYGR.CN. In 2021, Voyager announced its approval to trade on the Toronto Stock Exchange (TSX) under the new ticker symbol VOYG and de-list from the CSE. Voyager stock was also available Over-the-Counter (OTC) through many US brokerages and could be purchased in the state of Florida and throughout the United States via the symbol VYGVF.

27.     Voyager quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency.  By the time Voyager filed for Bankruptcy protection, customers had entrusted over $5 billion to it.

28.     The Deceptive Voyager Platform was based upon false representations and other deceptive conduct.  In this case, the scheme was specifically designed to take advantage of unsophisticated investors who utilize mobile apps to make their investments.

### B.     Voyager's offer and sale of EPAs, which are unregistered securities.

29.     On October 23, 2019, Voyager began offering interest-bearing cryptocurrency accounts to public investors. Since then, it has referred to these accounts by various names,

---

[3]     *See*   https://www.investvoyager.com/blog/why-voyager-is-a-public-company/   (accessed October 28, 2022)

including the "Voyager Interest Program" or the "Voyager Earn Program Account." ("EPAs"). Voyager initially launched the EPAs for customers holding Bitcoin, but thereafter extended them periodically to include dozens of other crypto assets, including USDC and Ethereum through end of fiscal year 2021.  Plaintiffs and other similarly situated individuals invested in Voyager's EPAs.

30.     Voyager maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

31.     The EPAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. Although Voyager promised its investors a fixed return for their EPA investments, Voyager's Annual Information Form filed with Canadian regulators stated, "Rewards earned on crypto assets are variable, and reward rates are determined by voyager at its sole discretion."  In order to generate revenue to fund the promised interest, Voyager pooled the EPA assets to engage in lending and staking activities from which it derived revenue to pay interest on the EPA accounts. These activities make the EPAs a "security" under state and federal law.

**C.     The Deceptive Voyager Platform**

32.     The Deceptive Voyager Platform offered investors a fully functional suite of APIs and mobile apps to allow anyone who legally able to do so the ability to trade, invest, earn and secure digital assets across multiple types of digital assets.[4] According to its creators, "The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace."[5]

---

[4]     Voyager Digital LTD Management's Discussion and Analysis for the Three and Six Months Ended December 31, 2020 (attached to the Cassidy Complaint as Exhibit H).

[5]     *See* "Voyager Digital and Market Rebellion to Form Online Broker Platform for Equities, Options, and Futures Trading," dated May 5, 2021 (attached to the Cassidy Complaint as Exhibit J)

33.     VDL, one of Voyager's subsidiaries, acted as Voyager's "crypto-broker."  VDL and Voyager represented prominently and consistently to the investing public that the Voyager Platform offered trades that were "100% Commission-Free."

34.     VDL also claimed to provide users buying and selling of cryptocurrencies with the execution of trades across a spectrum of exchanges to give Voyager "deep pools of liquidity."[6] It also offered a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.[7] Some of the services offered by VDL included:

(a)     users could open an account in three minutes or less. VDL utilizes third party service providers for know-your-client and anti-money-laundering checks to ensure fast and secure account openings;

(b)     users could trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies;

(c)     minimizing transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing VDL's patented "Smart Router" technology;

(d)     providing users with data in order for them to manage and track their crypto investments, including delivering news, social feeds and real-time alerts to keep users connected to the market, and providing portfolio tools to track performance, balances and transactions; and

(e)     storing crypto assets in a secure wallet and in a "cold" facility, with 24/7 security. (fiat currency is stored at custodial banks).[8]

35.     These representations enabled VDL to obtain an edge over its competitors, including but not limited to Coinbase, Gemini, Kraken, and Binance, who openly display the applicable fees and commissions they charge on each trade.

36.     These "100% Commission-Free" representations, however, were false and mislead objective consumers acting reasonably under the circumstances.  In fact, VDL secretly charged exorbitant commissions on each trade.

37.     VDL perpetrated the scheme by, among other means, maintaining the "spread" (i.e., the difference between the "Bid Price" and "Ask Price" on a given cryptocurrency) intentionally

---

[6]     *See Cassidy* Complaint, Ex. H.

[7]     *Id*.

[8]     *Id*.

wide on all cryptocurrencies listed throughout the Voyager Platform. Voyager explained in its most recent Management's Discussion and Analysis that the spread was a main source of revenue:[9]

> Fee revenue for the three and nine months ended March 31, 2021 was $53.7 million and $57.4, an increase of $53.5 and $57.1 compared to the same periods in 2020. The increase in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 was primarily due to an increase of $5.0 billion in trade volumes, and an increase in average spread of 70.1 bps. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31, 2020 was primarily due to an increase of $5.5 billion in trade volumes, and an increase in average spread of 60.6 bps.

38.     Although the Voyager Platform displayed a "Fair Market Price" for each cryptocurrency, which fell somewhere in the middle of the spread, the Voyager Platform's systems automatically executed market orders at the highest end of the spread, from which they pocketed secret commissions. Moreover, once a user submitted a market buy order, the "Estimated Price" for the trade displayed on the Voyager Platform automatically defaulted to an amount higher than the quoted "Ask Price" at the top end of the spread, so that an order could be executed at an amount "less" than the "Estimated Price," but still at the very top end of the spread. Similarly, for market sell orders, the trade automatically defaulted to an amount lower than the quoted "Bid Price" at the bottom end of the spread so that the order could be executed at an amount "more" than the "Estimated Price," but still at the bottom end of the spread.

39.     To effectuate and conceal this deception, VDL claimed to use proprietary systems, which they referred to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm."[10]

40.     In describing the Smart Order Router, VDL maintained that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills

---

[9]   *See* Voyager Digital Ltd. Management's Discussion and Analysis for the Three and Nine Months Ended March 31, 2021, dated May 25, 2021, (attached to the *Cassidy* Complaint as Exhibit M).

[10]  *See* "Passion for Product: Voyager Trading System," published Jan 23, 2020 at https://www.investvoyager.com/blog/passion-for-product-trading/ (accessed October 28, 2022)

them in the market for the customer using its proprietary order routing algorithm."[11] The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across our liquidity sources and streams this price to its users."[12]

41.     VDL also utilized vague and opaque representations to represent that VDL would only "share" in "price improvement" where it could fill a user's order at a price better than that which was quoted to the user (which is not in the bid/ask spread or fair market price, but rather in the jacked up estimated price that is only shown after the customer submits the market order).[13] "By example, if the user is quoted $10,040 and the router is able to fill at $10,030, Voyager may price improve the user's order to $10,035 (note: share of price improvement is variable and is determined by Voyager's proprietary fills algorithm)."[14]

42.     In reality, and unknown to customers, the "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" were designed to be intentionally obscure and to provide VDL with hidden commissions on every trade that in most cases exceed the disclosed fees and commissions charged by its competitors. VDL unfairly gains an edge on its competition and overcharges customers by collecting these secret commissions to the detriment of its unknowing customers.

43.     Attached to the *Cassidy* Complaint as Exhibits "N" and "O", respectively, are  the expert reports of Richard A. Sanders, the Co-Founder and Lead Investigator of CipherBlade, a blockchain forensics and cybercrime investigative firm[15] and Dr. Stephen Peter Castell, a Chartered IT Professional, independent consultant in computer and telecommunications systems and software development, and the Chairman of the United Kingdom company CASTELL Computer and Systems Telecommunications Limited, a professional firm of Management and Financial Consultants in Information Technology of over 40 years' standing.[16]  These experts have

---

[11]   *Id*.

[12]   *Id*.

[13]   *Id*.

[14]   *Id*.

[15]   *See Cassidy* Complaint at Exhibit N ("Sanders Report")

[16]   *See Cassidy* Complaint at Exhibit O ("Castell Report")

concluded that Voyager fraudulently conducted business by making false claims by, among other false representations, claiming that its trades were commission-free. Dr. Castell, in particular, concluded that each time a user made a "commission free" trade, an overcharge occurred that amounted to no less than 0.5% of the total value of the trade.

**D.  The Defendants Aggressively Marketed the Voyager Platform**

**(i)    Defendants Cuban and the Dallas Mavericks Team Up with Ehrlich to Lure Investors to the Voyager Platform**

44.    The National Basketball Association ("NBA") encourages teams to negotiate international sponsorship arrangements and shares in the revenue derived from such partnerships. In the 2021-22 season, the NBA's second largest category of sponsorships came from the crypto industry. NBA teams partnered with, among others, Crypto.com, Webull, Coinbase, FTX and Socios.

45.    Cuban is a proponent of investment in the cryptocurrency and Non-Fungible Token ("NFT") markets. In 2020, Cuban began advocating for investments in NFTs, created his own store and began speaking publicly of the benefits of investing in Bitcoin and Ethereum. Earlier this year, in a podcast he did with Jon Stewart, he stated that 80% of the investments he makes outside of those on Shark Tank "are in or around cryptocurrencies"[17] because "[t]hat is really where I look to invest."[18]

46.    On October 28, 2021, at a Mavericks press conference, Cuban announced that the Mavericks had entered into a 5-year "exclusive, integrated partnership" with Voyager.[19] Defendants explained in the press release that "[t]his partnership makes Voyager the first international partner of the Dallas Mavericks, enabling both parties to reach a wider, global audience to raise brand awareness and drive cryptocurrency adoption around the world."

---

[17]    https://www.cnbc.com/2022/01/14/mark-cuban-says-80percent-of-his-non-shark-tank-investments-are-in-crypto.html (accessed October 28, 2022).

[18]    *Id*.

[19]    https://www.mavs.com/mavsvoyager/ (accessed October 28, 2022).



**(a) They Made Public Appearances and Held Press Conferences**

47.     Defendant Cuban proudly described how he would significantly increase the scope

and presence of the Deceptive Voyager Platform for those with limited funds and experience:

> You know, there's a lot of hype, there's a lot of discussion, but most people don't
> understand the fundamentals behind it. We're going to try to bring that level of
> education to our fans and to our joint customers."

> To put it simply: there's untapped potential in the future of digital currencies and
> it's an attractive investment for novice investors who might only have $100 to start.
> That's where Voyager enters the picture.

> In other words, it's a way to earn high returns while also getting skin in the game
> and the Voyager platform makes the process easy and simplified for fans of all ages.
> The 60+ crypto assets allows you to build a diverse portfolio from a single account.

> You don't have to spend a lot of money in order to learn. It's not like the stock
> market where it's almost impossible, except on a few platforms, to spend $10 and
> get started. My now 12-year-old son got me in Dogecoin when it was less than a
> penny. I was like "let's do this" because it's a cheap way for him to learn how all
> of this works. While you have to put in a $100 to get the $100 bonus the next two
> days, if you don't have a hundred dollars and you just want to download the app

and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.[20]

48.     Defendant Ehrlich agreed with Cuban and added as follows:

That's one of the advantages of Voyager. You can actually download the app and fund your account and trade in three minutes or less. We make it really simple. We have a very easy-to-use and integrative platform that allows you to get engaged in the crypto market very quickly. That's one of the values of Voyager. You'll be trading in three minutes or less.

About 220 million people have crypto right now and we (anticipate) a billion in four years. So that shows you where we can actually go with crypto and crypto adoption. Now the comparison there is the internet. It took the internet eight years, for the same time frame, for the internet to grow that fast. So it's a great time to enter the space and learn more.[21]

49.     Cuban even hyped up the fact that he was investing his own money into the Deceptive Voyager Platform to further induce retail investors to follow in his footsteps:[22]

I gotta add, I am a customer and I've been a customer for several months now, I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a perfect fit for our Mavs fans and reaching Mavs fans of all ages.

. . .

And, of course, the Mavs being a leader I think we are going to extend this far deeper than just Mavs fans, I think Voyager is going to be a leader amongst sports fans and crypto fans around the country.

50.     While Cuban claimed to be a Voyager customer, he has never disclosed the nature, scope and amount of compensation that he has personally received in exchange for promoting the Voyager digital platform.  Other celebrities who have failed to disclose compensation in exchange for promoting crypto investments, including Kim Kardashian, Floyd Mayweather and DJ Khaled, have been fined millions of dollars for violating the anti-touting provisions of the federal securities laws.

---

[20]   https://www.mavs.com/mavsvoyager/ (accessed October 28, 2022)

[21]   *Id*.

[22]   https://www.youtube.com/watch?v=aB9GpBOroIw (accessed October 28, 2022)

51.     Throughout the October 28, 2021 press conference, Cuban continuously represented that Voyager was an easy to use platform that offered the best pricing in the market:

> And so for those of you who already use crypto, I know for me it was really easy, I took some of my MATIC tokens that I own and transferred it over because Voyager paid a higher interest rate or return rate than the application I was using before, Aave. So it was really easy to give you a wallet address, you just go into your metamask or whatever you're using, you just send it to that destination address, it shows up an hour later, you start earning more money, and so right immediately I was earning more when I went over to Voyager, and it's the same with USDC, a stablecoin. And the other thing about it is for those of you who use DeFi, the pricing is always higher on DeFi as they try to look through all the decentralized financing platforms to try to get the best—not even the best, but *a* price— and so with Voyager, the pricing has been far, far better, so if you're paying attention and want to get the best price, Voyager is a great platform for it.

52.     Ehrlich, in turn, continuously touted the Voyager rewards program, characterizing it as a way to "educate" investors while they "create wealth," and particularly that he wanted to get people as young as possible investing in the Deceptive Voyager Platform: [23]

> You know, we have an extensive rewards program. As you hold a certain amount or level of assets you even get more rewards on the program, so we're trying to engage you and bring you in the platform and teach and educate and create that wealth through our extensive rewards program.
>
> . . .
>
> It's never too late. I think actually it's the right time. Because as I've said, I still think it's the first half of the first quarter on crypto adoption. . . . It's a great time to enter the space, learn more, and I think that's the key. You've got to come in, you've got to learn, educate yourself. We help, we help educate, but you've got to learn more. And I think that's the key.
>
> . . .
>
> Financial literacy, we need to teach the youth, that's part of what we want to bring, too, is the education when we build out the education, we're in the middle of building that out, crypto 101 is the first thing that we do to teach people. Teach the youth, go to the community and teach the youth about financial literacy, I think that's important because most young kids don't get the opportunity to learn about financial literacy and they wind up going to college and now they're on their own and don't know how to manage their money and they're out in the real world earning salaries and they don't even know what FICA is . . . but that's what happens,

---

[23]     *Id.*

and so we need to teach financial literacy and it's gotta start at the young ages, you know we gotta get out there and it's part of the plan.

53.   Cuban also shamelessly pushed investors to invest heavily into USDC and other assets on the Deceptive Voyager Platform, claiming that investing in the Deceptive Voyager Platform was "***as close to risk free as you're going to get in the crypto universe***," that it was good for small businesses, and even that it was "a lot easier" than opening a savings account at a bank for young children:[24]

> One of the reasons we want to do the education program is there's a big opportunity for small businesses. One of the challenges of small businesses is if you have any cash in the bank, you're making .025%. You can convert to put it into a USDC stablecoin on Voyager, and I thought it was 7% but now it's 9%. And so I've taken a lot of my cash and made it available on USDC. I'm not here trying to sell you it's 100% risk free, but it's as close to risk free as you're going to get in the crypto universe. And so just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.
>
> . . .
>
> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's impossible except on a few platforms to spend $10 and get started. You know, my now 12-year-old son got me into Dogecoin when it was less than a penny.
>
> . . .
>
> So there's a lot of ways to inexpensively start to get an understanding. And it's a lot easier than even opening up a savings account. It's a pain in the ass to open up a savings account, particularly for your kids these days. There's so much paperwork, and whether it's yourself personally, someone you're trying to teach— you're trying to teach your kids about personal finance, believe it or not, this is actually a better way, and so that's one of the unique opportunities and why it's not too late.
>
> . . .
>
> It's also something you can do on your phone. You don't have to have a bank account. So, people who are unbanked, trying to learn about financing, but have a smart phone and can download the app, you can start getting into this and saving your money and that's just a unique opportunity.

54.   Further, Ehrlich, contrary to the position he is now taking in the Voyager bankruptcy, claimed that the rewards program is based on "staking" assets that customers own (as

---

[24]   *Id.*

opposed to lending them out to institutional investors like 3AC), and falsely stated that he was prioritizing security *and insurance* on customer's cryptocurrency holdings: [25]

> We're connected to about a dozen different market makers, exchanges around the globe, and so we bring a best price back to consumers for that. . . . We run a rewards program, so when you bring your assets over, we're going to reward you with earnings on those assets based upon your balances, based upon tokens you hold and so forth. And so it's a whole rewards program that we've built together and it's really probably state of the art when it comes to crypto with rewards programs, and that's how we like to operate, to give consumers rewards back for using and holding assets on the platform.
>
> . . .
>
> Our rewards are generated through staking, you know it's a lot staking these days, we have 30-something coins that we offer rewards on and a bunch of them are on the staking side, yep.
>
> . . .
>
> I was waiting for that question on security, it's a really important aspect. Security starts with you as an individual. What we recommend to every individual that buys and sells cryptocurrency is to use two-factor authorization when you actually hold your cryptocurrency. Do not use an SMS text message, there are a lot of scammers out there, there are a lot of people who try to SIM-swap you, it almost happened to me a month ago, on a Friday night my phone was trying to be SIM-swapped and I caught it quick enough and called the phone company, but I use two-factor authentication and I think everybody should start there. That means using a Google authenticator, authy, duo, or any of the other products you can use for 2fa. Outside of that, after from you to us is we use multiple custodians. We do not keep all our coins in one place, we keep them across multiple custodians, we've built a really detailed infrastructure for that, to make sure that we're spreading that risk and the insurance we get on all of that across multiple custodians, so it starts with the individual and making sure you have proper security and then it's also us as well.

55.     Finally, Cuban went to great lengths to cast investing in the Deceptive Voyager Platform as a "fun" opportunity with a low cost of entry: [26]

> Access, first and foremost. The simplicity of access, The fact that you don't have to rush into it and put all your money into it so patience is a big part of it. And then experimentation, right? Be curious. . . . Because there's such a low cost of introduction and you know obviously the people who need the most education hopefully are spending the least amount of money, there's a lot of programs and educational programs that we can do that guide people through the process. And

---

[25]   *Id*.

[26]   *Id*.

that's really the key. . . . One of the greatest values of the lower cost crypto isn't so much "hey it could be an investment," it's more the community. . . . It's a low cost entry to fun.

56.     As an incentive, Defendants Cuban and the Mavericks even ran a promotion shortly after the press conference where individuals who downloaded the Voyager app to invest during a certain time would receive $100 in Bitcoin.[27]

57.     In a press release, Cuban stated that "[w]e believe our partnership with Voyager will allow Mavs and NBA fans to learn more about Voyager and how they can earn more from Voyagers' platform than from traditional financial applications."[28] Ehrlich, in turn, emphasizing the "educational" nature of the partnership, said "[t]his partnership gives us the opportunity to educate people all over the world on ways to use crypto in their everyday lives. We want to help people learn alternate ways to grow their wealth to achieve true financial freedom and build intergenerational wealth through crypto. We found a great partner to do this with in the Mavs and their owner, Mark Cuban, who is already deeply involved in the space."[29]

### (b)  They Used Social Media.

58.     Defendants also relied on social media to promote Voyager. On May 3, 2021, Ehrlich made a number of misrepresentations to induce people to invest in Voyager, including that he and Voyager are "really trying to create wealth for retail investors," and, citing his 25 years of experience in finance, he is "looking out for best interests of consumers." https://www.youtube.com/watch?v=nKevUsTGN3I (accessed September 30, 2022).

59.     On October 13, 2021, when asked in an interview by Dan Weiskopf, "is it true the customers own the crypto, specifically Bitcoin and Ethereum on your platform, where that's not necessarily the case on other platforms," Ehrlich unequivocally stated that customers "absolutely" own all of their crypto on the platform and can remove it at any time:[30]

> Yes, _**they absolutely own it**_. _**They can take it off the platform any time they want**_ and bring it into their own personal wallets. You know, a lot of customers want us

---

[27]      https://markets.businessinsider.com/news/currencies/mark-cuban-dallas-mavericks-free-bitcoin-100-voyager-digital-app-2021-10 (accessed October 28, 2022).

[28] _Id._

[29] _Id._

[30]

https://twitter.com/mrstevensteele/status/1549665655275884545?s=11&t=aeo96ASWA8 K8FMOgVdpqOA (accessed October 28, 2022).

> to hold it for them and everyone who brings crypto into us has a specified wallet address for them. But if you want to take it out to your own personal wallet, say you have a Trezor or a Ledger or you were using some other wallet app – **_yes, you can take it any time you want_**. Now we have limits on withdrawals and that's for customer safety and protection but **_you can take anything off whenever you want, you know, no questions asked._**

He also stated that this ownership of the cryptocurrency assets is "a differentiator" from other wallet apps.

60.     Ehrlich also made a number of misleading representations at an October 23, 2019 interview broadcast on the internet,[31] including:

> We aren't an exchange. We are a broker. We are a regulated agency broker so our job is to do nothing but find the best price and execution for the consumers. So we don't have a horse in the race. We don't have proprietary trading, we don't need to get people to put orders off the bid and the ask, we are trying to find the best execution for the consumer on every single trade. We are a traditional online service provider, but in the crypto space.

61.     Ehrlich even personally took to Reddit to host an "AMA" (Ask-Me-Anything) session on the r/Invest_Voyager subreddit, in order to communicate directly with Voyager customers and potential Voyager customers in order to induce them to invest or to continue investing in the Deceptive Voyager Platform:[32]

---

[31] https://www.youtube.com/watch?v=NwVA1wiDr5E (accessed October 28, 2022)

[32]

https://www.reddit.com/r/Invest_Voyager/comments/tbyp2w/ama_hi_reddit_im_steve_ehrlich_v oyagers_cofounder/?utm_source=share&utm_medium=ios_app&utm_name=iossmf    (accessed October 28, 2022)



62.     During that AMA, Ehrlich played up Cuban's involvement as his advisor:



63.     He also played up Voyager's "transparency":



64.     He even advocated for customers to *ditch their bank accounts* in favor of investing in Voyager:



65.     Ehrlich also falsely represented that he and Voyager sought to "ensure the safety and security of all customer assets at all points in time," that customers could earn rewards with "no lockup on your token," and that Voyager "eat[s the] risk on our end to ensure you get a consistent monthly return on your end":

*How does voyager plan to increase staking revenues to maintain their yield payment.*

*Our main strategy is to add more staking coins, where we can bring value to our consumers. Over the past 40 days, we've added 20 new coins–10 of which are staking tokens. As you may know, we work with at least 8 custodians and we're looking to add more. We have multiple execution providers and exchanges and multiple node providers delivering new coins with competitive rewards as fast as we can. The key to this is ensuring everything meets our security standards so that we can ensure the safety and security of all customer assets at all points in time*

*Apart from that, some of our non-staking rewards are based on market demand. We'll always aim to offer competitive rates on as many tokens as we can. Some key benefits outside of the rewards number alone is the ability to earn with no lockup on your token, and the reward rate staying consistent on a monthly basis. The market demand can shift on a daily basis, but we eat that risk on our end to ensure you get a consistent monthly return on your end.*

66.    When specifically asked whether he anticipated any "major fines like BlockFi," Ehrlich sought to reassure his customers:

*Does voyager anticipate any major fines like BlockFi?*

*I believe our rewards program is different from BlockFi's program and complies with current law. I've been in the financial services industry, working with regulators for 28 years now. Since the start of Voyager, we've been in communication with regulators to ensure we operate not only within the rules but we are also planning for any potential necessary changes.*

67.    Although Ehrlich claims that one of the major benefits of Voyager is its transparency, his own dealings in connection with Voyager have been extremely opaque. According to a report from CNBC, Ehrlich made millions of dollars selling Voyager shares in February and March 2021 when shares were near their peak, financial records show, in an apparent insider trading move.[33] What is evident, based on corporate insider disclosures and Voyager filings, is that Ehrlich made over $30 million disposing of Voyager equity as the crypto lender's shares neared an all-time high.[34] Ehrlich and his Delaware LLCs sold nearly 1.9 million shares

---

[33]    https://www.cnbc.com/2022/08/03/voyager-ceo-made-millions-in-stock-sales-in-2021.html (accessed October 28, 2022).

[34]    *Id.*

from February 9, 2021, to March 31, 2021**,** in 11 separate sales which totaled $31 million, according to data from the Canadian Securities Administration.[35] The three largest of Ehrlich's transactions – totaling 1.4 million shares worth nearly $19 million – were connected to a $50,000,000 secondary offering by Stifel Nicolaus in February 2021.[36] Voyager shares would peak at $29.86 *__a week after Ehrlich's final sale__* on April 5, 2021.[37] Three weeks later, VOYG shares had lost 41% of their value. By November 2021 — as the crypto market overall was peaking — Voyager was down 69% from its peak.[38]

### (c)    Investors Were Lured by the Defendants Cuban's and Dallas Mavericks' Participation

68.    As intended, the Defendants' aggressive promotion of the Voyager Digital Platform worked. Hundreds of investors, including Class Member Anand Bhatt, who resides in Wyoming, joined Voyager. Anand recalls that "the only reason I signed up is because of Mark Cuban offering the free Bitcoin/Dallas Mavericks deal."

69.    As Plaintiff Pierce Robinson explained:

So, I first heard about Voyager from Mark Cuban. The dogecoin hype was at its peak and I was thinking about investing in crypto. This was back in the summer of 2021. I saw Mark promoting dogecoin and then Voyager and thought "he's a sound investor," so I downloaded the app and began to play around with a very small amount of money in June 2021. Later in the year, I remember the news was on Voyager and all over the TV and internet that there was a partnership with Mark and the Mavericks, so I trusted that it was legitimate started putting more and more money into the app. I invested even more because of the interest opportunities on Voyager that Mark loudly promoted the second half of last year.

70.    Another Class Member, Katie Damore, states:

I opened my Voyager account . . . after hearing Mark Cuban's partnership and support with Voyager I felt overly confident in the platform and I made 3 more deposits . . . I am an inexperienced investor and crypto person and I got caught up in the hype.

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

71.     Others have similarly pointed to Defendants for their decision to join Voyager:

"[I] saw many statements from Mark Cuban stating that Voyager was "100% Risk Free, and it's as close to risk free as you are going to get in the crypto universe . . . [Mark Cuban's] trust in Voyager [] made me purchase the coin from Voyager . . ."

        Class Member, Nikhila Beesetti

"I was aware that Mark Cuban and others . . . had become investors . . . so I felt comfortable to move the bulk of my holdings to Voyager . . . These gave me comfort."

72.     A further reason for the necessity of taking in as many customers as possible to use their funds to perpetuate the Deceptive Voyager Platform, Founder and President, Steve Ehrlich, explains the importance of "spread revenue" to his investors at the earnings call for Voyager's Second Quarter for Fiscal Year 2021:[39]

With the growth of assets under management, we remind investors of our 2 main revenue sources, spread revenue and interest revenue. Estimated spread revenue is derived by the trading velocity of our assets while interest revenue was driven by the gross interest earned on the overall assets under management. Historically, the company has earned between 10 to 12% annualized revenue on assets under management.

At this point, I would also like to remind investors of certain drivers of our business. As in agency brokerage business, market volatility can often act as our friend. Voyager executes trades and captures spread revenue in both up and down markets. One example of the powerful agency model happened on Tuesday, February 23rd when Bitcoin decreased from a high of $56,000 to $45,000. That day, Voyager experienced a record day for trading volume, revenue and net deposits. Investors were very active buying the dips across all of the coins Voyager offers.

---

[39] *See* Transcript of Voyager Digital FY2Q 2021 Earnings Call dated March 1, 2021, attached to the *Cassidy* Complaint as Exhibit B.

## CLASS ACTION ALLEGATIONS

73.     As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

**A.      Class Definitions**

74.     Plaintiffs seek to represent the following Nationwide Classes and State Subclasses (collectively, "the Classes").  If the Court agrees with Undersigned Counsel that the NJ Statue will apply to all class members, the Court may only have to certify the Nationwide Class and the New Jersey Subclass):

(1) **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in an EPA.

(2) **Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in an EPA.

(3) **New Jersey Subclass:** All persons in the state of New Jersey who, within the applicable limitations period, purchased or enrolled in an EPA.

(4) **Virginia Subclass:** All persons in the state of Virginia who, within the applicable limitations period, purchased or enrolled in an EPA.

(5) **Alabama Subclass:** All persons in the state of Alabama who, within the applicable limitations period, purchased or enrolled in an EPA.

(6) **Louisiana Subclass:** All persons in the state of Louisiana who, within the applicable limitations period, purchased or enrolled in an EPA.

(7) **California Subclass:** All persons in the state of California who, within the applicable limitations period, purchased or enrolled in an EPA.

(8) **<u>Oklahoma Subclass</u>:** All persons in the state of Oklahoma who, within the applicable limitations period, purchased or enrolled in an EPA.

(9) **<u>Pennsylvania Subclass</u>:** All persons in the state of Pennsylvania who, within the applicable limitations period, purchased or enrolled in an EPA.

(10) **<u>Tennessee Subclass</u>:** All persons in the state of Tennessee who, within the applicable limitations period, purchased or enrolled in an EPA.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

75.    Plaintiffs reserve the right to modify or amend the definition of the proposed Nationwide, Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana Subclasses, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Nationwide Class in part because all offers of Voyager EPAs to Plaintiffs and the Class Members (in which Ehrlich, Cuban, and The Mavericks each substantially participated) were made by Voyager Digital LLC from their principal place of business in New Jersey, and thus every single offer to sell a Voyager EPA stems from a transactional occurrence that emanated from the State of New Jersey. Plaintiffs seek certification of the State Subclasses in the alternative. Plaintiffs' Counsel further represent clients from the states of Arizona, Colorado, Connecticut, Georgia, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Ohio, Puerto Rico, South Carolina, South Dakota, Texas, Utah, Washington, Wisconsin, and Wyoming, who are all necessarily putative Class Members of the Nationwide Class. Plaintiffs may seek leave of Court to assert claims for these Class Members on behalf of each of these states and territories to the extent necessary to seek certification of subclasses on their behalf, also in the alternative to the Nationwide Class.

**B.      Numerosity**

76.      The Classes are comprised of thousands, if not millions, of consumers nationwide and throughout the states of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana, to whom Voyager offered and/or sold EPAs. Moreover, thousands, if not millions, of consumers nationwide and throughout these states have executed trades on the Voyager Platform within the applicable limitations period. Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through Voyager's corporate records. Undersigned Counsel currently represents dozens of Voyager customers who all have collectively sustained millions of dollars in damages proximately caused by the Deceptive Voyager Platform.

**C.      Commonality/Predominance**

77.      This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether the EPAs were unregistered securities under federal, Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana law;

(b) whether Defendants' participation and/or actions in Voyager's offerings and sales of EPAs violate the provisions of the Securities Act and Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana securities law.

(c) the type and measure of damages suffered by Plaintiffs and the Classes.

(a) whether Defendants' description of the Voyager Platform as being "100% commission free" is deceptive, unfair, false and misleading;

(b) whether Defendants' representations are objectively likely to mislead reasonable consumers to believe that their trading platform operates as "100% commission free";

(c) whether Defendants' practices violate the UDAP statutes of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana;

(d)  whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(e)  whether Plaintiffs and Class members are entitled to injunctive relief;

(f)  whether Plaintiffs and Class members are entitled to declaratory relief; and

(g)  whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

**D.      Typicality**

78.      Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold Voyager's EPAs as a result of Defendants' actions and/or participation in the offering and sale of these unregistered securities, or that Plaintiffs and all members were exposed to Defendants' misrepresentations and omissions regarding the Voyager Platform being "100% commission free," and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to either Defendant that are unique to Plaintiffs.

**E.      Adequacy of Representation**

79.      Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firm, which has the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

**F.      Requirements of Fed. R. Civ. P. 23(b)(3)**

80.      The questions of law or fact common to Plaintiffs' and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling the EPAs, which are unregistered securities, (2) in making identical and uniform misrepresentations and

omissions regarding the functionality of the Deceptive Voyager Platform, and/or (3) in receiving secret undisclosed compensation for their promotion of the Deceptive Voyager Platform.

81.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

82.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**G.     Superiority**

83.     A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

> (a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;
>
> (b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;
>
> (d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;
>
> (e) Individual suits would not be cost effective or economically maintainable as individual actions; and
>
> (f) The action is manageable as a class action.

**H.     Requirements of Fed. R. Civ. P. 23(b)(2)**

84.     Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the EPAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

85.     Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive Voyager Platform,

and/or in receiving secret undisclosed compensation for their promotion of the Deceptive Voyager Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.      Requirements of Fed. R. Civ. P. 23(c)(4)**

86.     As it is clear that one of the predominant issues regarding Defendants' liability is whether the EPAs Voyager offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the "EPA" Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

87.     As it is clear that another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive Voyager Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive Voyager Platform, utilizing Rule 23(c)(4) to certify the "Platform" Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.      Nature of Notice to the Proposed Classes.**

88.     The names and addresses of all Class Members are contained in the business records maintained by Voyager and are readily available to Voyager. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

| THE NATIONWIDE AND NEW JERSEY CLAIMS |
|---|

## COUNT ONE

**For Violations of the New Jersey Consumer Fraud Act,**

**§§ 56:8-1 *et seq.***

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

89. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

90. The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*, prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

91. Defendants have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade and/or commerce in the State of New Jersey, as described more fully hereinabove.

92. Defendants' statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because Voyager in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

93. Defendant's acts and omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiff and Class members, into investing in the Comp any's falsely touted business and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Those acts and omissions include, among other things as more fully alleged above:

    a. knowingly and intentionally concealing the Defendant's specific roles and interests in Voyager;

    b. knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial

benefits of a highly speculative and risky investment in Voyager, in an effort to induce them to purchase Voyager EPAs;

c. Making statements, either knowingly and intentionally, negligently, or with reckless disregard for their veracity, that the Voyager Platform is "100% Commission-Free" although Voyager did in fact did charge Plaintiff and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

d. Making statements, either knowingly and intentionally, negligently, or with reckless disregard for their veracity, that funds or assets held in the Voyager Platform are FDIC insured.

94.     The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. N.J.S.A. 56:8-19.

95.     Plaintiffs and the Class are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

96.     Plaintiffs and the Class have suffered an ascertainable loss of moneys or property as a direct and proximate result of VDL's unconscionable practices.

97.     Plaintiffs and the Class have a private right of action against Defendants and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

98.     Plaintiffs and the Class have suffered, and will continue to suffer, irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

**COUNT TWO**

**Violations of New Jersey Statute Section 49:3-60,**

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

99.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

100.     N.J.S.A. 49:3-60 provides that it is unlawful for any person to sell or offer to sell a security within the State of New Jersey unless the security is exempt under N.J.S.A. 49:3-50, is a federally covered security, or is registered pursuant to Section 49.

101.     N.J.S.A. 49:3-52 also makes it unlawful "for any person, in connection with the offer, sale, or purchase of any security," to either directly or indirectly:

    a.   employ any device, scheme, or artifice to defraud;

    b.   make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

    c.   engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

102.     The Voyager Earn Program Account is a security pursuant to N.J.S.A. 49:3-49(m).

103.     The Voyager Earn Program Account was and is required to be registered with the Bureau pursuant to N.J.S.A. 49:3-60.

104.     The Voyager EPAs offered for sale to Plaintiffs and Class members have not been registered with the Bureau, are not exempt from registration, and are not federally covered.

105.     In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest in Voyager, Defendants made untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning the Voyager EPAs and the Voyager Platform, as described above.

106.     Defendants assisted in and actively participated in Voyager's offer and sale of the unregistered Voyager EPAs to Plaintiffs and the members of the Class.

107.     As a result of these actions, Defendants violated N.J.S.A. 49:3-60.

## COUNT THREE

### Declaratory Judgment

### (Declaratory Judgment Act, N. J. S. A. 2A:16-51 *et seq.*)

### (Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)

108.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–87 as if fully set forth herein.

109.    This Count is asserted against Defendants under Section 2A:16-59 of the New Jersey Revised Statutes.

110.    The Declaratory Judgments Act, N.J. Stat. Ann. § 2A:16-51 et seq. (West), authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity. *Chamber of Com. of U. S. v. State*, 89 N.J. 131, 140 (1982). To maintain such an action, there must be a "justiciable controversy" between adverse parties, and plaintiff must have an interest in the suit.

111.    Plaintiffs and the members of the Class have an obvious and significant interest in this lawsuit.

112.    Plaintiffs and members of the Class purchased EPAs, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the Deceptive Voyager Platform as further described hereinabove.

113.    If the true facts had been known, including but not limited to that the EPAs are unregistered securities, the Deceptive Voyager Platform does not work as represented, and Mark Cuban was paid exorbitant sums of money to peddle Voyager to the nation, Plaintiffs and the Class would not have purchased EPAs in the first place.

114.    Thus, there is a justiciable controversy over whether the EPAs were sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiffs and the Class. Plaintiffs and the Class seek an order declaring that the EPAs were securities required to be registered with the SEC and state regulatory authorities, that the Deceptive Voyager Platform did not work as represented, and Mark Cuban was paid exorbitant sums of money to peddle Voyager to the nation.

| THE FLORIDA CLAIMS |
|---|

<u>**COUNT FOUR**</u>

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**

**§ 501.201, Florida Statutes,** *et seq.*

**(Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)**

115.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

116.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

117.    Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

118.    Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

119.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

120.    Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

121.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform and in the amount of their lost investments.

122.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

123.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

124.    Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Class to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

**COUNT FIVE**

**Violations of the Florida Statute Section 517.07,**

**The Florida Securities and Investor Protection Act**

**(Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)**

125.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

126.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

127.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

128.    The Voyager Earn Program Account is a security pursuant to Fla. Stat. § 517.021(22)(a).

129.    The EPAs sold and offered for sale to Plaintiffs and Class members were not:

    a.  exempt from registration under Fla. Stat. § 517.051;

    b.  a federal covered security;

    c.  registered with the Office of Financial Regulations (OFR); or

    d.  sold in a transaction exempt under Fla. Stat. § 517.061.

130.    Voyager sold and offered to sell the unregistered EPAs to Plaintiffs and the members of the Class.

131.     Defendants are directors, officers, partners and/or agents of Voyager pursuant to Fla. Stat. § 517.211.

132.     Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq.

---

**THE LOUISIANA CLAIMS**

---

**<u>COUNT SIX</u>**

**For Violations of the Unfair Trade Practices and Consumer Protection Law,**

**R.S. 51:1401, et seq.,**

**(Individually by Plaintiff Manganiello against Defendants)**

133.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

134.     This cause of action is brought pursuant to Louisiana's Unfair Trade Practices and Consumer Protection Law ("LUTPA").

135.     Plaintiff is a consumer as defined by section 1402(1). Defendants are engaged in trade or commerce as defined by section 1402(10).

136.     Section 1405(A) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

137.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

138.     Defendants have violated the LUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

139.     Plaintiff has been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising in the amount of their lost investments.

140.     The harm suffered by Plaintiff was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

141.     Pursuant to section 1409, Plaintiff brings this action and makes claims for actual damages, attorneys' fees and costs.

## COUNT SEVEN

### Violations of the Louisiana Section 51:705 et seq,
### (Plaintiff Manganiello Individually and on behalf of the Louisiana Class)

142.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

143.    RS 51:705 provides that it is unlawful for any person to offer for sale or sell a security within the State of Louisiana unless the security or transaction is exempt under RS 51:708 or 709, is a federally covered security, or is registered.

144.    The Voyager Earn Program Account is a security pursuant to RS 51:702 (15)(a).

145.    The EPAs sold and offered for sale to Plaintiffs and Class members were not exempt from registration under RS 51:708 or 709, federal covered securities, or registered.

146.    Voyager sold and offered to sell the unregistered EPAs to Plaintiffs and the members of the Class.

147.    Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated RS 51:705 et seq.

---

## THE ALABAMA CLAIMS

---

## COUNT EIGHT

### For Violations of the Alabama Deceptive Trade Practices Act,
### (Plaintiff Newsom Individually and on behalf of the Alabama Class)

148.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

149.    This cause of action is brought pursuant to the Alabama Trade Practices Act, section 8-19-1 *et seq*. ("Alabama DTPA"). The stated purpose of the Alabama DTPA is to "protect the interest of both the consuming public and the legitimate businessperson." § 8-19-2.

150.    Plaintiffs and Class members are consumers as defined by section 8-19-3(2). Defendants are engaged in trade or commerce within the meaning of the Alabama DTPA.

151.     Section 8-19-5(27) declares unlawful "[e]ngaging in any [] unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

152.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

153.     Defendants have violated the Alabama DTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

154.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform.

155.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

156.     Pursuant to Section 8-19-10, Plaintiffs and consumers in the Class bring this cause of action for actual damages, attorneys' fees and costs.

157.     Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 8-19-10entitles Plaintiffs and the Class to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## COUNT NINE

### Violations of the Code of Alabama 1975, Chapter 6

### (Plaintiff Newsom Individually and on behalf of the Alabama Class)

158.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

159.     Section 8-6-17 provides that it is unlawful for any person to sell or offer to sell a security within the State of Alabama unless the security is registered pursuant to Ch. 6, exempt from registration under § 8-6-10, or the transaction is exempt under § 8-6-11.

160.     Section 8-6-17 also provides prohibited acts regarding the offer, sale or purchase of securities, including, for example:

     a.   Employing any device, scheme, or artifice to defraud;

b.  Making untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

c.  Engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

161.  The Voyager Earn Program Account is a security pursuant to § 8-6-2(10).

162.  The EPAs sold and offered for sale to Plaintiffs and Class members were not:

a.  registered;

b.  exempt from registration under § 8-6-10; or

c.  part of a transaction exempt under § 8-6-11.

163.  Voyager sold and offered to sell the unregistered EPAs to Plaintiffs and the members of the Class.

164.  Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Chapter 6.

---

**THE VIRGINIA CLAIMS**

---

## COUNT TEN

**For Violations of the Virginia Consumer Protective Act,**

**§ 59.1-196 et seq, Code of Virginia**

**(Plaintiff Ayer Individually and on behalf of the Virginia Class)**

165.  Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

166.  This cause of action is brought pursuant to the Virginia Consumer Protection Act of 1977 ("VCPA"). The stated purpose of the VCPA is to "promote fair and ethical standards of dealings between suppliers and the consuming public." § 59.1-197.

167.  Plaintiffs and Class members are consumers as defined by § 59.1-198. Defendants are "supplier(s)" and engage in "consumer transaction(s)" as defined by the Act.

168.  Section 59.1-200 declares unlawful "[u]sing any [] deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

169.     Defendants have violated the VCPA by engaging in the unfair, fraudulent, and deceptive practices as described herein.

170.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair, fraudulent, and deceptive practices and acts in the amount of their lost investments.

171.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the unfair, fraudulent, and deceptive practices of Defendants, as more fully described herein.

172.     Pursuant to section 59.1-204, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT ELEVEN

### Violations of Section 13.1-501 et seq, Code of Virginia

### (Plaintiff Ayer Individually and on behalf of the Virginia Class)

173.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

174.     Section 13.1-507 provides that it is unlawful for any person to sell or offer to sell a security "unless (i) the security is registered under this chapter, (ii) the security or transaction is exempted by this chapter, or (iii) the security is a federal covered security."

175.     Section 13.1-502 makes it unlawful "for any person in the offer or sale of any securities, directly or indirectly,"

   a.   "employ any device, scheme or artifice to defraud";

   b.   "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or

   c.   "engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser."

176.     The Voyager Earn Program Account is a security pursuant to Section 13.1-501.

177.     The Voyager EPAs offered for sale to Plaintiffs and Class members have not been registered, are not exempt from registration, and are not federal securities.

178.   In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest in Voyager, Defendants made untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, concerning the Voyager EPAs and the Voyager Platform, as described above.

179.   Defendants assisted in and actively participated in Voyager's offer and sale of the unregistered Voyager EPAs to Plaintiffs and the members of the Class.

180.   As a result of these actions, Defendants violated Sections 13.1-501 et seq.

---

**THE CALIFORNIA CLAIMS**

<u>COUNT TWELVE</u>

**For Violations of the Unfair Competition Law Business & Professions Code § 17200, et seq.**
**(Plaintiffs Dorn and Gates Individually and on behalf of the California Class)**

181.   Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

182.   California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq*. (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

183.   Defendants have committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct and unlawful conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

184.   The conduct of Defendants as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

185.     Defendants' conduct was a proximate cause of the injuries to Plaintiffs and the California Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the California Class. By reason of the foregoing, Defendants should be required to pay restitution to Plaintiffs and members of the California Class.

## COUNT THIRTEEN

### Violations of the CSL

### (Plaintiffs Dorn and Gates Individually and on behalf of the California Class)

186.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

187.     California Corp. Code § 25110 prohibits the offer or sale by any person in California of securities that are not qualified through registration. California Corp. Code § 25503 affords a statutory cause of action to victimized investors for violations of Section 25110. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25110 and makes them jointly and severally liable with any other person liable under Section 25503.

188.     Voyager, with Defendants' material assistance, offered and sold the EPAs **Securities** in California without being properly registered or qualified for offer or sale either with any federal or California regulator.

189.     Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of Section 25110 does not require proof that Defendants intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendants' knowledge of and participation in Voyager's non-compliance with the CSL establishes their intent to deceive investors regarding the EPAs.

190.     California Corp. Code § 25210(b) provides: No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

191.     Defendants breached Section 25210(b) by encouraging Voyager to offer and sell the EPAs **Securities** despite the fact that such securities were not qualified under the CSL.

192.    California Corp. Code § 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

193.    California Corp. Code § 25401 prohibits fraud in the offer or sale by any person in California of securities. California Corp. Code § 25501 affords a statutory cause of action to victimized investors for violations of Section 25401. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25401 with the intent to deceive or defraud, and makes them jointly and severally liable with any other person liable under Section 25503.

194.    Voyager, with Defendants' material assistance, offered and sold the EPAs Securities in California by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

195.    Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under Cal. Corp. Code § 25504.1.

196.    Plaintiffs hereby conditionally tender their Voyager Securities in accordance with Cal. Corp. Code § 25503.

| **THE PENNSYLVANIA CLAIMS** |
| --- |

## COUNT FOURTEEN

**For Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201-1 et seq**

**(Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)**

197.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

198.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201-1 et seq, prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of Section 201-2(4).

199.    Defendants have engaged in, and continue to engage in, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the State of Pennsylvania, as described more fully hereinabove.

200.    Defendants' statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because Voyager in fact did charge Plaintiffs and Class members

undisclosed commissions on cryptocurrency trades made on the Voyager Platform. Defendants' representations regarding Voyager's FDIC insured status were also false.

201.    Defendant's acts and omissions constitute unfair trade practices because they are fraudulent or deceptive and create a likelihood of misunderstanding. *See* 73 Pa. Stat. § 201-2(4)(xxi).

202.    Plaintiffs and the Class are "person(s)" as that term is defined in 73 Pa. Stat. § 201-2(2).

203.    Plaintiffs and the Class have suffered an ascertainable loss of moneys or property as a direct and proximate result of Defendants' unconscionable practices described above. Plaintiffs and the Class have a private right of action against Defendants and they are entitled to recover, in addition to their actual damages, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. 73 Pa. Stat. § 201-9.2(a).

204.    Plaintiffs and the Class have suffered, and will continue to suffer, irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

## COUNT FIFTEEN

### Violations of the Pennsylvania Securities Act of 1972,

### 70 Penn. Stat. §§ 1-102 *et seq*

### (Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)

205.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

206.    70 Penn. Stat. § 1-201 provides that it is unlawful for any person to sell or offer to sell a security within the State of Pennsylvania unless the security is exempt under the act, is a federally covered security, or is registered pursuant to the act.

207.    70 Penn. Stat. § 1-401 makes it unlawful "for any person, in connection with the offer, sale or purchase of any security in this State, directly or indirectly: (a) To employ any device, scheme or artifice to defraud; (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

208.    70 Penn. Stat. § 1-503 extends liability to any person who "materially aids" in a violation of the Pennsylvania Securities Act and makes them jointly and severally liable with any other person liable under the Act.

209.    The Voyager EPA is a security pursuant to 70 Penn. Stat. § 1-102(t).

210.    The Voyager EPAs offered for sale to Plaintiffs and Class members were not registered, were not exempt from registration, and were not federally securities.

211.    In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest, Defendants made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning Voyager EPAs, including but not limited to, that the Voyager Platform was "100% Commission-free" and that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured, as described above.

212.    As a result of these actions, Defendants violated 70 Penn. Stat. § 1-201 and § 1-401 and are liable to Plaintiffs pursuant to 70 Penn. Stat. § 1-501.

| THE TENNESSEE CLAIMS |
| --- |

## COUNT SIXTEEN

### For Violations of the Tennessee Consumer Protection Act,
### Tenn. Code § 47-18-101 et seq
### (Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)

213.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

214.    This cause of action is brought pursuant to the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code § 47-18-101 et seq.

215.    The stated purpose of the TCPA is to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within th[e] state." Tenn. Code § 47-18-102(2).

216.    Plaintiffs and Class members are consumers as defined by Tenn. Code § 47-18-103(2). Defendants are engaged in trade or commerce as defined by Tenn. Code § 47-18-103(19).

217.    The TCPA declares unlawful "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104(a). This includes actions which cause "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods" and cause "likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another." Tenn. Code § 47-18-104(2)-(3).

218.    Defendants' unfair and deceptive practices as described herein are objectively likely to cause—and have caused— confusion and misunderstanding to consumers acting reasonably in the circumstances.

219.    Defendants have violated the TCPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

220.    Plaintiffs allege that the unfair and deceptive acts and practices described herein are distinct from the marketing or sale of a security, which is expressly excluded by Tenn. Code § 47-18-109(h).

221.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments.

222.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

223.    Pursuant to Tenn. Code § 47-18-109, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT SEVENTEEN

### Violations of Tennessee Securities Act of 1980,

### Tenn. Code § 48-1-122

### (Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)

224.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

225.    Tenn. Code § 48-1-104(a) makes it unlawful to sell a security in Tennessee unless the security is registered, exempted, or the security is a covered security as defined in the act.

226.     Tenn. Code § 48-1-121 makes it unlawful "for any person, in connection with the offer, sale or purchase of any security in this state, directly or indirectly, to: (1) Employ any device, scheme, or artifice to defraud; (2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

227.     The Voyager EPA is a security pursuant to Tenn. Code § 4-1-102(20)(A).

228.     The Voyager EPAs offered for sale to Plaintiffs and Class members were not registered, were not exempt from registration, and were not covered.

229.     In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest, Defendants made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning Voyager EPAs, including but not limited to, that the Voyager Platform was "100% Commission-free" and that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured, as described above.

230.     As a result of these actions, Defendants violated Tenn. Code § 48-1-104(a) and § 48-1-121 and are liable to Plaintiffs pursuant to Tenn. Code § 48-1-122.

## THE OKLAHOMA CLAIMS

## COUNT EIGHTEEN

**For Violations of the Oklahoma Consumer Protection Act, *Stat. Tit. 15, Section 751 et seq***
**(Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)**

231.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

232.     This cause of action is brought pursuant to the Oklahoma Consumer Protection Act, *Okla. Stat. tit. 15, § 751 et seq*.

233.     The Oklahoma Consumer Protection Act provides that an "unfair trade practice" is "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *See* § 752(14). It declares unlawful any unfair or deceptive trade practice "as defined in Section 752." § 753(20).

234.     Plaintiffs and Class members are persons as defined by section 752(1). Defendants are engaged in a "consumer transaction" as defined by section 752(2).

235.    Defendants have violated the Oklahoma Consumer Protection Act by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

236.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments.

237.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

238.    Pursuant to section 761.1 of the Act, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT NINETEEN

**Violations of the Oklahoma Uniform Securities Act of 1980,**

**Okla. Stat. Tit. 71, §§ 1-101 *et seq***

**(Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)**

239.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

240.    71 Okla. Stat. § 1-102(32) makes it unlawful "for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly":

   a.  "employ a device, scheme, or artifice to defraud";

   b.  "make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading"; or

   c.  "engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person."

241.    The Voyager EPA is a security pursuant to 71 Okla. Stat. § 1-102(32).

242.    In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest with Voyager, Defendants made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning the Voyager EPAs, including but not

limited to, that the Voyager Platform was "100% Commission-free" and that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured, as described above.

As a result of these actions, Defendants violated 71 Okla. Stat. § 1-102(32) and are liable to Plaintiffs pursuant to 71 Okla. Stat. § 1-509.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

    a.      Certifying the Classes as requested herein;

    b.      Awarding actual, direct and compensatory damages;

    c.      Awarding restitution and disgorgement of revenues if warranted;

    d.      Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

    e.      Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

    f.      Awarding statutory and multiple damages, as appropriate;

    g.      Awarding attorneys' fees and costs; and

    h.      Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated:  October 28, 2022                    Respectfully submitted,

By: **/s/ Adam M. Moskowitz**              By: **/s/ Stephen Neal Zack**
Adam M. Moskowitz                          Stephen Neal Zack
Florida Bar No. 984280                     Florida Bar No. 145215
adam@moskowitz-law.com                     Hon. Ursula Ungaro (Ret.)
Joseph M. Kaye                             Florida Bar No. 200883
Florida Bar No. 117520                     **BOIES SCHILLER FLEXNER LLP**
joseph@moskowitz-law.com                   100 SE 2nd St., Suite 2800
Barbara C. Lewis                           Miami, FL 33131
barbara@moskowitz-law.com                  Office: 305-539-8400
Florida Bar No. 118114                     Fax: 305-539-1307
**THE MOSKOWITZ LAW FIRM, PLLC**           szack@bsfllp.com
2 Alhambra Plaza, Suite 601                uungaro@bsfllp.com
Coral Gables, FL 33134
Telephone: (305) 740-1423                  David Boies
                                           (*Pro Hac Vice Application Pending*)
*Co-Counsel for Plaintiffs and the Class*  **BOIES SCHILLER FLEXNER LLP**
                                           333 Main Street
                                           Armonk, NY 10504
                                           Phone: (914) 749–8200
                                           dboies@bsfllp.com

                                           *Co-Counsel for Plaintiffs and the Class*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the forgoing was filed on October 28, 2022, with the Court via CM/ECF system, which will send notification of such filing to all attorneys of record.

By: */s/ Adam M. Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280

# Exhibit A

AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Robertson, et al., v. Cuban, et al.*
No. 22-cv-22538-ALTMAN/Reid

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No.: 21-24441-CIV-ALTONAGA/Torres

MARK CASSIDY, on behalf of himself
and all others similarly situated,

       Plaintiff,                    **CLASS ACTION COMPLAINT**

v.                               **JURY DEMAND**

VOYAGER DIGITAL LTD, and VOYAGER
DIGITAL LLC

       Defendants.

_____/

## AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff Mark Cassidy files this class action complaint on behalf of himself, and all others similarly situated, against VOYAGER DIGITAL LTD. ("Voyager") and VOYAGER DIGITAL LLC ("VDL") (Voyager and VDL shall at times together be referred to as "the Voyager Defendants").

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

## <u>INTRODUCTION</u>

1.      The Crypto Currency market is expected to reach US over $ 32 Trillion by 2027, exhibiting a compound annual growth rate (CAGR) of 58.4% during 2022–2027.[1] Accordingly, there is fierce competition within the crypto currency market to obtain as many customers and capital as quickly as possible. One of the largest, and most well attended crypto investor conferences, is the Bitcoin 2022 Miami that was held just weeks ago here in Miami. Voyager was not only a Main Sponsor for the Event, but also sent a large contingent to speak and participate, including Voyager's CEO, Steven Ehrlich and Chief Marketing Officer, Pam Kramer.

2.      Voyager has been very successful in quickly growing into the crypto currency market. As Voyager's CEO Steve Ehrlich proudly announced on Voyager's investor earnings call on February 15, 2022: "As volume and funded accounts grew, so did our assets om platform, increasing from $4.4 billion in the September quarter to $5.9 billion at the end of the December quarter with approximately $1 billion in net new deposits, making up the majority of the $1.4 billion increase."[2]

3.      Mr. Ehrlich's unorthodox cryptocurrency growth strategy was simple: (1) making his company, Voyager, open to the public and for sale on the Toronto and OTC public stock exchanges, so that his company (unlike almost all other cryptocurrency competitors) would appear to the public to be "regulated," and so those that might be hesitant to buy cryptocurrency directly, could be sucked into the market by simply buying Voyager stock,[3] and (2) deceptively designing and marketing Voyager's Platform, which is operated by VDL, a company that has the same CEO, CFO, COO and General Counsel, in order to "put a lot of energy into pushing people down the funnel and incentivize them,"[4] to attract the most investors.

---

[1] https://www.imarcgroup.com/cryptocurrency-market (last accessed April 28, 2022).

[2] Transcript of Voyager Digital FY2Q 2022 Earnings Call dated February 15, 2022, attached as **Exhibit A**.

[3] "Voyager is extremely excited by the new symbol as it reflects our global brand", said Stephen Ehrlich, CEO of Voyager. "The Stock symbol change makes it clear to all of our customers and investors that they can purchase Voyager stock through U.S. Brokers and is the next step in our growth."
https://www.businesswire.com/news/home/20190325005091/en/Voyager-Changes-OTC-Pink-Symbol-to-VYGVF (last accessed April 28, 2022) (last accessed April 28, 2022)

[4] *See* Transcript of Voyager Digital FY2Q 2021 Earnings Call dated March 1, 2021, attached as **Exhibit B**.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

4.    Voyager's CEO Steve Ehrlich proudly touts that "[w]e're already self-regulating ourselves when it comes to bringing products to retail investors." [5] "Ehrlich adds that there is a limited number of cryptocurrency companies abiding by this extra set of rules as a publicly traded company."[6]

5.    The original Complaint filed in this action, specifically detailed with Expert Reports, how Voyager's practices were deceptive, illegal and were the sale of unregistered securities.

6.    ***After this Complaint*** was filed, the following important actions took place:

(a) the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b) seven state Attorney Generals (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPAs, like the one Plaintiff Mark Cassidy was offered and sold by Voyager, was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022 (thousands of these EPAs were Florida-based);

(c) On March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the Earn Program is not exempt from registration under the law, and instead that it must be registered— and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year;[7]

(d) On February 14, 2022, crypto trader Block-Fi entered into a $50 million dollar settlement with the state regulators and $50 million dollar settlement with the

---

[5]    https://www.msn.com/en-us/money/news/sec-regulations-and-the-cryptocurrency-market-voyager-digital-grayscale-bitcoin-executives-weigh-in/ar-AANZDZc (last accessed April 28, 2022)
[6] *Id.*
[7]    https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (last accessed April 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (last accessed April 28, 2022)

SEC and agreed to stop selling its interest-bearing cryptocurrency accounts until they were registered with state and federal securities regulators;

(e) In September 2021, the New Jersey Bureau issued a Summary Cease and Desist Order against Celsius Network LLC, whose unlawful unregistered securities had raised at least $14 billion nationwide;[8] and,

(f) the largest cypto exchange, COINBASE, dropped all plans to offer the same lending rewards program after the SEC threatened to sue them.[9]

7.     Voyager's CEO, Steve Ehrlich, told his investors, and the public, on his last investor call, that Voyager is now determining what to do in regards to all of these state and federal investigations: "… that's a conversation between myself, out internal GC, our advisors. And we have a very, very deep team, and we're evaluating all that at this point in time."[10]

## **FACTUAL BACKGROUND**

8.     Voyager describes itself as "a fast-growing, publicly traded cryptocurrency platform in the United States founded in 2018 to bring choice, transparency, and cost efficiency to the marketplace."[11] Voyager was first listed on the Toronto Venture Exchange (TSX.V) under the symbol VYGR.V in February of 2019.[12] In September 2019, Voyager Digital Ltd was listed on the Canadian Stock Exchange (CSE) under the symbol VYGR.CN. In 2021, Voyager announced its approval to trade on the Toronto Stock Exchange (TSX) under the new ticker symbol VOYG and de-list from the CSE.

9.     Voyager stock is also available Over-the-Counter (OTC) through many US brokerages and can be purchased in the state of Florida and throughout the United States via the symbol VYGVF. Voyager has quickly become one of the most utilized avenues for nascent

---

[8]      https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-company-voyager-digital-to-stop-offering-and-selling-interest-bearing-accounts/ (last accessed April 28, 2022)

[9]      https://www.coindesk.com/policy/2022/01/26/sec-scrutinizing-crypto-firms-over-interest-paying-services-report/ (last accessed April 28, 2022)

[10] Ex. A.

[11] https://www.investvoyager.com/investorrelations/overview/ (last accessed April 28, 2022)

[12] *See* https://www.investvoyager.com/blog/why-voyager-is-a-public-company/ (last accessed April 28, 2022)

investors to purchase cryptocurrency, and thus has already reaped hundreds of millions of dollars in revenue since 2019, which is increasing exponentially every week.

10.    Voyager's founder and CEO, Stephen Ehrlich, who is also the CEO of nearly every other Voyager wholly-owned subsidiary, including VDL, explains that Voyager "made the decision to go public early in our company history. This was an unconventional choice for a crypto-company in 2019 but proved beneficial for our customers and our platform."[13] Ehrlich goes on to explain:

> Here are three reasons why Voyager and our customers benefit from a public structure.
>
> **1) Transparency**
>
> We believe that our users deserve transparency when it comes to their finances.
>
> As a public company, we are held to the highest standards. We are legally required to disclose both quarterly and annual reports as well as conduct public filings for mergers, acquisitions, insider trading, securities transactions by company insiders, and ownership changes. We also have an obligation to act in the best interest of our shareholders and drive value to their investments. Furthermore, our shareholders have a voice in our future, and a vested interest in our success.
>
> **2) Bridging the gap between traditional finance and crypto**
>
> A public structure enables us to create opportunities for investors who want exposure to the crypto markets by investing in companies like Voyager through stock offerings.
>
> Equities traders have the opportunity to invest in the crypto industry by buying shares of Voyager, even if they do not directly invest in crypto. We believe that this type of exposure will help more people become comfortable with the crypto market and ultimately increase widespread adoption.
>
> **3) Opportunity for growth**
>
> We decided to go public early in our growth trajectory, which gave Voyager an alternate avenue for company growth while also empowering everyday equities traders the opportunity to back an emerging crypto company.

---

[13] *Id.*

By going public, we keep our doors open to all who see the potential for growth at Voyager and the crypto economy.

11.    What Ehrlich does not disclose in his blog, however, is that he intentionally structured Voyager to siphon as much profit off American consumers as possible while simultaneously preventing them from ever being able to effectively vindicate their rights when Voyager wrongs them, as Plaintiff is attempting to do here on behalf of himself and all others similarly situated. As Voyager explains in its Annual Information Form for Fiscal Year 2021:[14]

> [Voyager] is a corporation formed under the laws of British Columbia, Canada; however its principal place of business is in the United States. Most of [Voyager's] directors and officers, [Voyager's] auditors, and the majority of [Voyager's] assets, are located in the United States.
>
> It may be difficult for customers in the United States to effect service of process within the United States upon those directors who are not residents of the United States or to enforce against them judgments of the United States courts based upon civil liability under the United States federal securities laws or the securities laws of any state within the United States. There is doubt as to the enforceability in Canada against [Voyager] or against any of its non-United States directors, in original actions or in actions for enforcement of judgments of United States courts of liabilities based solely upon the United States federal securities laws or securities laws of any state within the United States.

12.    Voyager's disdain for being held accountable for its actions by the legal system and its penchant for gamesmanship continue throughout this litigation. Initially, Plaintiff's counsel were contacted approximately one year ago by numerous aggrieved consumers who had serious concerns about Voyager's business practices. Essentially, these consumers and experts concluded that Voyager was conducting an inherently rigged game, fueled by specific misrepresentations and lies.

13.    Counsel spent the following months focusing on two main projects:

a.    investigating and researching, along with some of the top cryptocurrency experts in the United States and Europe, to not only prepare allegations regarding Voyager's unlawful actions, but to generate preliminary expert reports with supporting evidence as to these allegations and a set plan for managing discovery of the disputed issues to confirm the allegations, and

---

[14] *See* Ex. I

      b.  researching and concluding that there was no enforceable arbitration clause and/or class action waiver executed by Plaintiff Mark Cassidy that precluded him from filing this action before this Court.[15]

      14.  When Plaintiff first filed his 29-page complaint, along with over two hundred pages of exhibits, including two comprehensive preliminary Expert Reports, however, Voyager's then Chief Communications Officer, Michael Legg (since this Complaint was filed and his deposition was specifically noticed, Voyager "immediately" took him off of the Voyager Website and he was given a different position), within barely an hour after receiving a copy of the pleading, wrote on behalf of Voyager to the press that "This action is absolutely spurious and without any merit whatsoever. We look forward to dealing with this matter through the appropriate legal channels." Legg Tr. 38:19–39:20.

      15.  As a result of some initial, nefarious conduct by Voyager, Plaintiff was required to file a Motion for Order to Show Cause and noticed Voyager Digital LLC for deposition on three topics. *See* ECF No. 25. Voyager Digital LLC refused to produce any deponent and instead filed a Motion to Stay, [ECF No. 29], along with Defendants' Motion to Compel Arbitration and to Dismiss this case [ECF No. 28]. Defendants included in their Motion to Compel Arbitration, for the first time, arguments that, as a factual matter were beyond the four corners of Plaintiff's complaint, such as that the Court does not have personal jurisdiction over Defendant Voyager Digital LTD.

      16.  While Defendants had exclusive access to all materials relevant to the Court's determination of whether Plaintiff and either Defendant entered into an enforceable arbitration agreement, they selectively produced some cherry-picked information in their Motion and asked this Court to refuse to allow Plaintiff to take even limited discovery necessary to uncover all of the relevant facts to test Defendants' assertions. For instance, Defendants claimed that Plaintiff is specifically bound by a January 2021 User Agreement with VDL to arbitrate all claims, but then confusingly attaches four additional revised versions and claim that "notice was sent to customers" regarding one of the revisions, two days after the revision was implemented, though asserts that

---

[15] At this early pleading stage of the litigation, the Court initially will only need to find that Plaintiff has standing to assert his claims and is not bound by an arbitration clause, and not whether all, or even any, other class members may be bound by such revised agreements.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

they are all materially the same [ECF No. 28, 10–11; ECF No. 28-1 ¶¶ 14–21]. Defendants stipulate that Voyager is not a party or signatory to VDL's User Agreement but maintain that Voyager should still be entitled to enforce its arbitration provision against Plaintiff, assuming any such agreement with VDL was formed [ECF No. 28 at 16–21]. Defendants also claimed that Voyager is "a foreign holding company with no operations or employees," and that VDL "operates" the Voyager Platform. *Id*. 8; [ECF No. 28-1 ¶ 5].

17.     This Court, through careful analysis, saw through the Defendants' ruse, calling their arguments "nonsense," and afforded Plaintiff the opportunity to take limited discovery before filing this amended complaint. [ECF No. 36]. In conducting its analysis, the Court noted, among other things, that the evidence Plaintiff attached to his original complaint showed that In Voyager Ltd.'s March 2021 earnings call, one of its representatives stated, "We're at 49 states today. We offer our services in 49 states. It's only New York that we're not —we don't offer this service." *Id*. (citing Compl., Ex. G, March 3, 2021 Earnings Call [ECF No. 1-8] 17; *see id*. 2 ("[W]elcome to Voyager Digital Limited earnings call." (alteration added)). The Court noted that "[i]t is possible that the representative meant to reference Voyager Digital, LLC, when he used 'we,' but this ambiguity only accentuates the need for jurisdictional discovery." *Id*.

18.     Discovery, however, only further reinforced that Voyager does, in fact, conduct business throughout the United States, including Florida. In response to the question, "[w]as Voyager doing business in 49 states except for the State of New York when you were there?" Voyager's former Chief Communications Officer, Michael Legg, testified "Here is my answer to this. We do business in New York. We don't have customers in New York. **We do business in every state**. We do business internationally, okay." Legg Tr. 26:5–21 (emphasis added).

19.     Why did Defendants fight so vociferously against submitting to even limited discovery? Because they did not want to afford Plaintiff the opportunity to reveal the illusory nature of the VDL User Agreement, or that their claims that Voyager is merely a holding company with no operations or employees were false.

20.     The corporate representative for VDL confirmed in deposition testimony that VDL's regular practice is that it not only unilaterally "makes continuous revisions" to the User Agreement, but it also undertakes a conscious effort to ensure that its customers are not notified of the changes—VDL does not even have *a phone number* to contact customer support—so that

customers can actually decide whether they agree to them before VDL attempts to bind them, as was the case with Plaintiff:

> Q. I'm asking you do you know why, when Voyager makes continuous revisions to the User Agreement -- and you're aware of that, right? Every couple –
>
> A. Yeah.
>
> Q. -- months or years there's changes to this agreement?
>
> . . .
>
> THE WITNESS: Yes.
>
> Q. Okay. Why -- for those subsequent changes that are made why doesn't Voyager just follow the same easy process of having this "click this button," and if you click it, then you could go back, type in the user ID, and you can see, simply, if they clicked it and read it or even received it. Why don't you do that?
>
> A. I don't know.
>
> Q. Have you ever asked anybody?
>
> A. No.
>
> Q. Do you know of any reason, sitting here today as the director of operations that's in charge of the Voyager Platform User Agreement, why Voyager can't do this same process for subsequent amendments?
>
> . . .
>
> THE WITNESS: No.

LLC Tr. (**Exhibit C**) 48:11–49:9

> THE WITNESS: In reviewing the -- the terms he agreed to it's discussed that as the -- that they may change and that they're where they're available and that he can go look at them and make sure that he's still in agreement with them.
>
> Q. But how would he know that those changes have been made?
>
> . . .
>
> THE WITNESS: That would be his responsibility.

LLC Tr. 53:20–54:6

> Q. Okay. And just so I'm perfectly clear, regardless of whether Voyager lets Mr. Cassidy know that there's been an amendment, it's Mr. Cassidy's responsibility on his own to go find out and monitor the site to make sure there's no changes made?
>
> . . .

THE WITNESS: Yes. The user, after they've agreed to it, is -- that is part of what they are agreeing to.

LLC Tr. 56:16–24

Q. Okay. So Pam [Kramer, Voyager's Chief Marketing Officer] writes "Also, based on the specific updates, do you think this warrants an email to customers? This summary is very helpful in that regard. So what we just looked at in the email, the form email, that was sent out that you testified about dated April 16th [sic], that didn't provide a summary to any of the customers. It just said your user agreement has been updated, correct?

A. Yes.

Q. Do you know why the internal summary that Voyager was aware of isn't provided to the customers of Voyager?

. . .

THE WITNESS: No.

Q. Okay. As the corporate rep today with the person with the most knowledge about the unifor- -- the User Agreements, including any revisions thereto, have you ever spoke to anybody about providing your customers with a summary of the changes?

A. No.

. . .

Q. I mean, wouldn't you think that would be helpful if somebody wanted to know?

A. I suppose it could be helpful for some people.

LLC Tr. 75:4–76:16

Q. [Plaintiff] says under oath he reviewed your declaration in support of the motion and he said "I did not receive the April 18th email notifying of the April 16th update to the Customer Agreement," that you had testified went out to this mass mailing of 1.2 million.

My question is very simple. Do you have any shred of evidence, anything, to indicate that he is wrong and that he did receive that email, not that the mass marketing email went out, but that he, in fact, received it?

. . .

THE WITNESS: I -- I personally do not, no.

. . .

Q. Okay. Number 9, he says "I did not receive any email, notifications, or any other form of actual notice of any other versions of the Customer Agreement referenced in Shannon Casey's declaration."

You have no evidence, standing here today, that he did, in fact, receive any of those other notices, correct?

A. What other notices?

Q. Any other notices.

A. I'm just not sure what you're referring to.

Q. Mr. Cassidy says: I didn't receive any emails, any notifications, or any other form of actual notice of any other versions of the Customer Agreement referred to in Shannon Casey's declaration.

You talked about six different modifications that were done over time. Mr. Cassidy under oath is saying I never received any of those.

Do you, sitting here today, have any evidence to show that Mr. Cassidy received any of these other updates or emails?

A. No. We only sent the update on the April 18th email.

LLC Tr. 94:7–96:25

Q.  Okay.  Paragraph 10 says after he – Users apparently can't contact Defendants by phone regarding the questions of their account. Is that correct?  Is there a number that I can call and say, hey, I'm having a problem logging in to my account, can you help me, Voyager LLC?

A.  That's correct, there's -- we do not have phone support.

LLC Tr. 99:4–11

21.     Discovery further revealed deficiencies in the January 2021 version of the User Agreement. Janice Barrillueax, Voyager's Chief Administrative Officer, in reviewing the January 2021 version of the User Agreement, advised that "I just think that we need to be aware that things [sic] grossly outdated" and that customers "need to be put in their little corner." VOYAGER_001890. Later, David Brosgol, Voyager's General Counsel, agreed with Janice and stated that, rather than simply revise the January 2021 User Agreement in effect when Plaintiff created his Voyager account, "it seems that it might be best to do a significant overhaul." VOYAGER_001894.

22.     Further, discovery revealed that, prior to July 26, 2021, not only did VDL *never* submit any version of its arbitration provision to the AAA for review, but when it finally did, the AAA determined that the requirements that "the arbitration will occur in New Jersey and will be conducted confidentially by a single, neutral arbitrator" constituted "a material or substantial

deviation from the Consumer Rules and/or Protocol" and requested that VDL waive those requirements for all future consumer arbitrations under the User Agreement.[16]

23.     Under these circumstances, especially where VDL fully retains the unfettered right to unilaterally modify the User Agreement at will without providing advance notice to its customers, applicable law holds that no agreement has been formed. Thus, not only was Plaintiff not bound by any amendments to the VDL User Agreement, he did not enter into any agreement to arbitrate (or delegate issues of arbitrability) with VDL.

24.     Discovery also revealed that Defendants' sworn statement that Voyager Digital LTD has "no operations or employees" and "does not . . . market the Voyager Platform," [ECF No. 28-1 ¶ 5], was a false statement. For instance, Voyager explained during its Q2 2022 earnings call that "[b]y the end of calendar 2021, we had 250 employees, 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets on the platform. This level of growth makes Voyager one of the fastest-growing cryptocurrency platforms in the industry and one of the largest in the United States. Based on data obtained from one of our investment banking partners, Voyager was third on the list of fastest-growing public companies listed on any U.S. exchange including the OTC markets, based on revenue growth in calendar 2021 with $416 million of revenue, up from just $6.6 million for the calendar year 2020."[17]

25.     Moreover, Voyager markets and offers for sale unregistered securities in the form of cryptocurrency interest-earning accounts. Since Voyager first introduced these unregistered securities to consumers in Florida and throughout the United States in November 2019, it has referred to them by various names, including the "Voyager Interest Program" or the "Voyager Earn Program Account" (collectively, the "EPA"). As Voyager LTD's former Chief Communications Officer, Michael Legg, explained in his deposition taken in this case, "[t]here's always been a program in place to earn yield. How the terminology has been around it has evolved." Legg 43:24–44:1.

---

[16] *See* VOYAGER_001951–52.

[17] Ex. A. Moreover, Legg confirmed in his testimony that (1) every press release was cleared by Stephen Ehrlich as CEO of Voyager Digital Ltd.; and (2) every statement made during the earnings calls was "100 percent accurate at that time." Legg Tr. excerpts (**Exhibit D**), 15:2–12; 17:14–18:2

26.     As explained below, the reasoning for that change in terminology has been to avoid the reality—that the EPAs are, in fact, securities that must be registered with the SEC and state analogs.

27.     Voyager never registered the EPAs with the United States Securities and Exchange Commission ("SEC") or with the Florida Office of Financial Regulation (the "OFR").

28.     Not only that, but Voyager has spent tens of millions of dollars from capital raises to fund marketing efforts throughout the United States, including in the state of Florida, to market, offer and sell EPAs through various internet and social media campaigns across state lines to consumers, including Plaintiff. The results have been for Voyager to earn, in turn, tens of millions of dollars in revenue from the EPA investments.

29.     Plaintiff's original complaint, including the extensive preliminary expert report of Rich Sanders of CipherBlade, went into great detail regarding the inherent risks and issues with the fact that Voyager was offering for sale the EPAs without the necessary registration with federal and state regulatory entities or the oversight that follows that registered status.[18]

30.     After Plaintiff filed the original complaint, in February 2022, the SEC charged Voyager's competitor, BlockFi, with failing to register the offers and sales of its retail crypto lending product—a nearly identical offering to Voyager's EPA, called the BlockFi Interest Account.[19] BlockFi settled those claims with the SEC and paid $100 million in fines and agreed to cease its unregistered offers and sales of the BlockFi Interest Accounts, to bring its business within the provisions of the Investment Company Act, and to register under the Securities Act of 1933 the offer and sale of a new lending product.[20]

31.     Shortly after the BlockFi settlement was announced, Stephen Ehrlich, CEO and co-founder of Voyager, explained during the Q2 2022 earnings call for Voyager Digital Ltd, that:[21]

> Lastly, we want to address the recent news about the SEC order in the matter of BlockFi lending LLC. We recognize that this is a significant development in the industry and will provide a potential regulatory path for market participants. We

---

[18] Attached as **Exhibit E** is a supplemental report from Mr. Sanders, which goes into further detail regarding how the EPAs function, how they generate revenue, and whether Voyager properly represents their risk ("Sanders Supp.").

[19] https://www.sec.gov/news/press-release/2022-26 (last accessed April 28, 2022).

[20] *Id.*

[21] Ex. A.

also understand that some may view Voyager's rewards program to be similar to BlockFi interest accounts. While we understand the temptation to bucket them together, we think there are important differences between Voyager's program and BlockFi's that we think have legal significance.

That said, we are in ongoing discussions with regulators about the rewards program, and it is, of course, possible that regulators may have a different view. Under the circumstances, we think it's important to confirm that Voyager has received requests and subpoenas from the SEC and certain states in connection with the rewards program as part of nonpublic fact-finding inquiries. Of course, we believe that Voyager accounts that earn rewards comply with existing U.S. law and look forward to demonstrating that as necessary. We think it is normal and appropriate for financial service firms, especially in the crypto industry with these evolving regulatory frameworks to receive inquiries from regulators and law enforcement. When Voyager received such requests, our policy is to cooperate fully, but we limit public discussion as these matters are always evolving and as a public company, Voyager is subject to important rules regarding disclosures about its business.

32.     Two weeks after Voyager made these statements to its investors, on March 30, 2022, Voyager issued a press release revealing that it was served with orders from various state securities divisions, including New Jersey and Alabama, ordering Voyager to cease and desist its offer and sale of the EPAs as they constitute unregistered securities.[22] As Voyager admits, "The Voyager Earn Program is the only Voyager product subject to the Orders. No other products and services offered by the Company are noted in the Orders."[23]

33.     As Stephen Ehrlich, CEO and co-founder of Voyager, also explained, "I want to emphasize to our shareholders and customers that only one of our products is noted in the Orders. Voyager has always recognized that the US regulatory framework must evolve, and in some cases completely transform, to address the needs of the rapidly expanding crypto sector. Historically, Voyager has advocated for thoughtful regulation, which is a natural progression for this asset class. We believe tailored regulation will spur increased confidence and adoption of crypto assets. Nonetheless, Voyager continues to pursue its strategy to innovate and grow the business and position the Company as a leader in the crypto asset market."[24] As explained more fully, below,

---

[22] A copy of the New Jersey Cease and Desist Order is attached as **Exhibit F**.

[23]     https://www.investvoyager.com/pressreleases/voyager-provides-update-on-state-orders   (last accessed April 28, 2022)

[24] *Id.*

Voyager's offering and selling the EPAs, which are unregistered securities, violates federal and state securities laws.

34.     VDL, on the other hand, operates the multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive Voyager Platform"), owned by Voyager, that places cryptocurrency trade orders on behalf of users like Plaintiff and Class Members. Specifically targeted to young and inexperienced investors, who are certainly new to cryptocurrency trading and mainly utilize mobile apps (rather than any sophisticated software) for trading, through the use of youth-forward marketing are uniform representations that the Deceptive Voyager Platform is "100% Commission-Free," while also assuring customers that they will receive the best possible price on cryptocurrency trades. As will be explained with extensive expert support, these statements and representations are false, misleading and certainly violate numerous state and federal consumer statutes.

35.     The Deceptive Voyager Platform is based upon false pretenses, false representations, and is specifically designed to take advantage of investors that utilize mobile apps to make their investments, in an unfair, unsavory, and deceptive manner. Simply put, Plaintiffs will prove that the Deceptive Voyager Platform is a house of cards, built on false promises and factually impossible representations that were specifically designed to take advantage of the cryptocurrency craze to the direct detriment of any ordinary investor.

36.     VDL offers what it misleadingly claims to be "100% Commission-Free" cryptocurrency trading services, in order to unfairly obtain an edge over their competition, such as Coinbase, Gemini, Kraken, or Binance, who openly disclose the commissions and fees they charge on cryptocurrency trades. This tactic directly evolved from the alleged "no commission" alternatives offered by numerous brokerage houses in the 1980s.

37.     In reality and unbeknownst to unsuspecting and largely unsophisticated consumers (especially considering that cryptocurrency is an emerging and innovative market with differences from traditional stock exchanges not appreciated by the average retail consumer), VDL ***never*** discloses that they intentionally set the pricing on the Voyager Platform high enough that they do, in fact, collect exorbitant hidden commissions on every cryptocurrency trade.

38.     Capitalizing on their customers' naivete by using their proprietary systems to throw up smoke screens, including "Smart Order Routing," the "Voyager Pricing Engine," and the

"Proprietary Fills Algorithm," numerous experts explain that VDL places their own financial interests at the forefront, and are able to collect on average what is likely to be *more* in hidden commissions than their competition collect from their disclosed commissions.

39.     The very public support from the Dallas Mavericks and their owner, Mark Cuban, including their recent massive investment in the Deceptive Voyager Platform, gives a great illustration of how this marketing is targeting unsophisticated investors with false and misleading promises of reaping large profits in the cryptocurrency market.

40.     Mark Cuban recently spoke at a Dallas Mavericks press conference, conducted over the internet, where he strongly supported and touted the partnership between his company and Voyager. Mr. Cuban proudly described how he would personally help significantly increase scope and presence of the Deceptive Voyager Platform for those with limited funds and experience:

> You know, there's a lot of hype, there's a lot of discussion, but most people don't understand the fundamentals behind it. We're going to try to bring that level of education to our fans and to our joint customers."

> To put it simply: there's untapped potential in the future of digital currencies and it's an attractive investment for novice investors who might only have $100 to start. That's where Voyager enters the picture.

> In other words, it's a way to earn high returns while also getting skin in the game and the Voyager platform makes the process easy and simplified for fans of all ages. The 60+ crypto assets allows you to build a diverse portfolio from a single account.

> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started. My now 12-year-old son got me in Dogecoin when it was less than a penny. I was like "let's do this" because it's a cheap way for him to learn how all of this works. While you have to put in a $100 to get the $100 bonus the next two days, if you don't have a hundred dollars and you just want to download the app and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.[25]

41.     Voyager's President and Chief Officer, Steve Ehrlich agreed with Mr. Cuban and added as follows:

> That's one of the advantages of Voyager. You can actually download the app and fund your account and trade in three minutes or less. We make it really simple. We have a very easy-to-use and integrative platform that allows you to get engaged in

---

[25] https://www.mavs.com/mavsvoyager/ (last accessed April 28, 2022)

the crypto market very quickly. That's one of the values of Voyager. You'll be trading in three minutes or less.

About 220 million people have crypto right now and we (anticipate) a billion in four years. So that shows you where we can actually go with crypto and crypto adoption. Now the comparison there is the internet. It took the internet eight years, for the same time frame, for the internet to grow that fast. So it's a great time to enter the space and learn more. [26]

42.    VDL's representations and marketing materials regarding the "100% Commission-Free" Voyager Platform are false, deceptive, and are objectively very likely to deceive average consumers acting reasonably under the circumstances. Accordingly, VDL's conduct violates the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*., ("NJCFA") and the Florida Deceptive and Unfair Trade Practices Act, §§ 501.201, *et seq.*, Florida Statutes ("FDUTPA").

43.    Plaintiff thus seeks damages and restitution on behalf of himself and the Class members, as well as declaratory and injunctive relief to put an end to VDL's unfair and deceptive marketing and sales practices.

## PARTIES

44.    Plaintiff is a citizen of the State of Florida residing in Broward County, Florida. He is a natural person over the age of 21 and is otherwise *sui juris*.

45.    Defendant Voyager is an entity existing and incorporated pursuant to the laws of British Columbia, Canada, is regulated by the Securities and Exchange Commission, and maintains a principal place of business in 33 Irving Place, 3rd Floor, New York, New York 10003. Defendant Voyager, for purposes of this action, is therefore a citizen of New York.

46.    Defendant VDL is an entity existing and incorporated pursuant to the laws of Delaware, with its principal place of business in Jersey City, New Jersey. Defendant VDL is therefore a citizen of Delaware and New Jersey.

## JURISDICTION AND VENUE

47.    This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. § 78aa and §1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367. Further, this Court has subject matter jurisdiction over this action pursuant to

---

[26] *Id.*

28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Voyager Defendants. Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) as Plaintiff, a Florida citizen, brings his individual claims against Delaware, New Jersey, or New York citizens, and given the nature of the claims and the declaratory and injunctive relief sought, the amount in controversy is greater than $75,000.00, exclusive of interest and costs.

48.     This Court has jurisdiction over Voyager because it is a foreign corporation authorized to conduct business in Florida, is doing business in Florida, has registered with the State of Florida, or does sufficient business in Florida, has sufficient minimum contacts with Florida, or otherwise intentionally avails itself of the Florida consumer market through the promotion, marketing, and sale of its EPAs in Florida, to Plaintiff and all those similarly situated, which constitutes committing a tortious act within the state of Florida.

49.     For example, Voyager sells its stock OTC throughout the United States, including specifically in the state of Florida to Florida residents. As another example, in November 2020, Voyager hired Natalie Jaeger as the Head of Digital Marketing, and promptly began "a more aggressive marketing strategy which included digital advertising, increased social marketing, and increased influencer marketing using crypto centric influencers and professional athletes."[27] Part of this aggressive marketing strategy, in addition to increased direct targeted marketing to consumers, has been to introduce an "interest rate hike campaign" known as "March Interest Mania," where Voyager increased the rates of interest it would pay to customers to whom it had offered and sold EPAs.[28]

50.     As a result of this increased marketing, Voyager enjoyed explosive growth throughout the ongoing COVID-19 pandemic. In January 2021, Voyager closed on a private placement offering of 8,363,637 shares of common stock for gross proceeds of approximately $46.0 million.[29] In February 2021, Voyager closed on a private placement offering of 7,633,588

---

[27] *Id*.
[28] *See* "Voyager Digital Announces March Interest Mania Rate Increases" dated March 10, 2021, attached as **Exhibit G**.
[29] *See* Voyager Digital LTD' Management's Discussion and Analysis for the Three and Six Months Ended December 31, 2020 (**Exhibit H**), 8.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

shares of common stock for gross proceeds of approximately $100.0 million.[30] Unsurprisingly, Voyager allocated 50% of this increased budget towards marketing EPAs so it could "get that market share that we're grabbing from everybody else right now and keeping accelerating the land grab."[31]

51.    In addition to marketing and offering the EPAs for sale to U.S. consumers, including those in Florida, Voyager Digital LTD received revenue from lending and staking activities as a result of receiving investments in the EPAs from consumers like Plaintiff and similarly situated Florida residents. For fiscal year 2021, Voyager generated approximately $21 million in fees on crypto assets loaned.[32] As Voyager's CFO, Evan Psaropoulos, explained in Voyager's latest earnings call, Voyager earned during Q2 of fiscal year 2022 "approximately $57 million in lending and staking activities."[33]

52.    This purposeful availment renders the exercise of jurisdiction by this Court over Voyager permissible under traditional notions of fair play and substantial justice.

53.    Further, and alternatively, jurisdiction over Voyager is proper in that Voyager and VDL (1) have common stock ownership; (2) have common business departments; (3) file consolidated financial statements and tax returns; (4) do not keep separate their daily operations; and (5) share at least the following Executive Officers in common, who have the following overlapping duties and responsibilities across Voyager and its subsidiaries, including VDL:

| Name, province or state and country of residence | Tenure with the Company | Principal occupation |
|---|---|---|
| **Stephen Ehrlich** Connecticut, USA | CEO & Director | Chief Executive Officer of Voyager and its US subsidiaries. |
| **Evan Psaropoulos** New York, USA | Chief Financial Officer | Chief Financial Officer of Voyager and certain subsidiaries. Mr. Psaropoulos leads the finance, accounting and treasury functions for Voyager. |
| **Gerard Hanshe** New York, USA | Chief Operating Officer | Chief Operating Officer of Voyager and its US subsidiaries. Mr. Hanshe is responsible |

---

[30] *Id.*
[31] *See* Ex B.
[32] *see* Annual Information Form dated October 27, 2021, attached as **Exhibit I**.
[33] Ex. A.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

| | | |
|---|---|---|
| | | for overseeing the customer experience, the business process and strategy, and treasury and trading operations teams, and works closely on coordinating their work with the product, engineering, data analysis, finance and marketing teams. |
| **Lewis Bateman**<br>Ontario, Canada | Chief International Officer | Chief International Officer of Voyager and its US subsidiaries. Mr. Bateman is the executive leader for Voyager's Canadian, European and Cayman based subsidiaries, and heads all the Voyager strategic corporate acquisitions and international expansion. |
| **Daniel Constantino**<br>Pennsylvania, USA | Chief Information Security Officer | Chief Information Security Officer of Voyager and its US subsidiaries. Mr. Costantino leads all technical and administrative cybersecurity programs for Voyager. |
| **David Brosgol**<br>New York, USA | General Counsel | General Counsel and Secretary of Voyager and General Counsel of its US subsidiaries. Mr. Brosgol is responsible for the legal and compliance functions of Voyager. |
| **Pam Kramer**<br>California, USA | Chief Marketing Officer | Chief Marketing Officer of Voyager and its US subsidiaries. Ms. Kramer oversees the brand, advertising, marketing, social media, customer insights and more. |
| **Rakesh Gidwani**<br>New Jersey, USA | Chief Technology Officer | Chief Technology Officer at Voyager and its US subsidiaries. Rakesh leads the evolution of the Platform and systems as Voyager continues its plans for international expansion. |

54.     For example, discovery has demonstrated that for the calendar year 2021 alone, Voyager received nearly $29 million in trading revenue from VDL—which is separate from Voyager's interest revenue from the EPAs. Further, Voyager allocated funds from its approximately $200 million in capital raises to finance VDL's marketing of the Voyager Platform, Moreover, discovery has uncovered evidence that Voyager finances VDL's operations, provides compensation to VDL's employees in the form of, among other things, various stock options and

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

other monetary compensation and incentives, and treats VDL's property as its own, such has when both utilize the investvoyager website for marketing and selling their various products and communicating with Voyager's investors. For these alternative reasons, too, then, jurisdiction over Voyager is proper.

55.     This Court has jurisdiction over VDL because it is a foreign corporation authorized to conduct business in Florida, is doing business in Florida, has registered with the State of Florida, or does sufficient business in Florida, has sufficient minimum contacts with Florida, or otherwise intentionally avails itself of the Florida consumer market through the promotion, marketing, and sale of the Voyager Platform in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over VDL permissible under traditional notions of fair play and substantial justice. Notably, Defendants have not contested and have instead admitted that this Court has personal jurisdiction over VDL throughout this litigation.

56.     Venue is proper in this District under 28 U.S.C. § 1391 because the Voyager Defendants each maintain substantial operations in this District; thousands of Class Members either reside or did business with the Voyager Defendants in this District; the Voyager Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because the Voyager Defendants entered into transactions and received substantial profits from Class Members who reside in this District. Venue is further proper pursuant to 15 U.S.C. § 78aa.

57.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

**A. Voyager's Offer and Sale of EPAs Extensively in the State of Florida and Throughout the United States**

58.     On October 23, 2019, Voyager began offering EPAs for sale to consumers throughout the United States, including the state of Florida. Voyager initially launched the EPAs for customers holding Bitcoin, but thereafter extended them periodically to include dozens of other crypto assets, including USDC and Ethereum through end of fiscal year 2021.

59.     According to Voyager's Annual Information Form filed with Canadian regulators, "Rewards earned on crypto assets are variable, and reward rates are determined by Voyager at its sole discretion."[34]

60.     For fiscal year 2021, Voyager generated approximately $21 million in fees on crypto assets loaned.[35] Voyager earned during Q2 of fiscal year 2022 "approximately $57 million in lending and staking activities."[36] To generate this revenue, Voyager independently negotiates with institutional borrowers the terms of each unsecured institutional loan agreement, and selects which and how much of its crypto assets are available for such lending activity. In the event of bankruptcy or insolvency of an institutional borrower under a loan, Voyager bears the credit risk of lending crypto assets under the loan.[37]

61.     Voyager maintains that it does not support, custody, intermediate, or facilitate any transaction or activities with respect to any product that constitutes a "security," and, therefore, believes that it is not required to be registered in *any capacity* under applicable United States securities laws.[38] Voyager's conclusion is apparently drawn from its position that although the SEC had previously communicated to industry participants that it will apply existing securities laws, including the *Howey* Test, a four-part test developed by the U.S. Supreme Court to determine whether a particular "investment contract" is a security, to digital assets, the *Howey* Test is almost 75 years old, was not designed with digital assets in mind, and its application is fact-based.[39]

62.     At the same time, Voyager acknowledges that "it is possible that the SEC could come to a different conclusion" than Voyager, which "could result in [Voyager] being required to become registered, removing certain digital assets from its platform, or being required to cease certain of its operations."[40]

63.     As Plaintiff's expert, Rich Sanders, explains in his supplemental report Voyager's Earn program is functionally nearly entirely identical to similar programs offered by firms such as

---

[34] *see* Ex. I.
[35] *see* Ex. I.
[36] *see* Ex. A.
[37] *see* Ex. I.
[38] *see* Ex. I.
[39] *see* Ex. I.
[40] *see* Ex. I.

Celsius and BlockFi.[41] The differences between these companies and their respective programs are extremely minimal; as some examples, differences come down to phrasing (use of words like "interest" versus "rewards"), how frequently rewards are paid out (daily, weekly, or monthly, most commonly) or specific cryptocurrencies that are offered as part of the program.[42]

64.    Just like BlockFi settled with regulators, as explained above, Celsius, another Voyager competitor with a nearly identical "earn" program, quickly followed suit by revising their "earn" program by introducing "Celsius' Custody Solution," which only allows accredited U.S. investors to earn rewards on their crypto asset holdings.[43] To-date, Sanders explains, Voyager has not taken any similar actions, noting that "it is possible that Voyager instead opts to (continue to) benefit from the influx of users from BlockFi and Celsius, opting to take this action at a future date – whether voluntarily or by being compelled to do so."[44]

65.    In further describing the risks that stem from Voyager's offering and sale of the EPAs as unregistered securities, Sanders goes on to explain:[45]

There have been extensive releases, statements, and actions from government agencies related to cryptocurrency in recent history. Secretary Yellen's remarks on digital assets leave no room for mystery. The *first* priority includes consumer protection; this is not accidental. The fifth priority states equitable access to *safe* and affordable financial services. To state the obvious, it is the opposite of safe to invest a significant portion of your net worth (let alone your life's savings) into activity such as DeFi staking. To invest a significant portion of someone else's net worth into activity such as DeFi staking, while painting a picture of far different asset use, adds a layer of dishonesty on top of risk.

Customers of firms like BlockFi and Voyager are led to believe that their assets are being utilized largely by reputable institutions, not that their assets are being day-traded on platforms like Binance or utilized for extremely high-risk DeFi activity. In simpler terms, the risk and reward of loaning Ethereum to a reputable and audited western institution, as opposed to rehypothecation of that Ethereum into DeFi yield farming, are on entirely different ends of the spectrum. The risk associated with this reality transcends not just risk for the misled customers of firms

---

[41] Sanders Supp. ¶ 4
[42] *Id.*
[43] Sanders Supp. ¶ 6 (citing https://blog.celsius.network/important-celsius-update-to-our-us-clients-6df471420cc7) (last accessed April 28, 2022).
[44] Sanders Supp. ¶ 6
[45] Sanders Supp. ¶¶ 9–10.

like Voyager and BlockFi that stand to lose significant portions of their net worth, but would be something I would categorize as an item of national security interest: an increased likelihood of a hack means an increased likelihood of siphoning of hundreds of millions or even billions of dollars' worth of value out of the western economy and into the hands of, for example, North Korea.[46] While true a western institution using loaned Bitcoin for arbitrage trading could be hacked, this is generally a less likely threat than the risk of a DeFi hack. In short, companies like Voyager and BlockFi misrepresent the risk of utilizing their interest/earn programs since they misrepresent what customer assets are used for, disregarding and concealing risk, for the sake of making a risky quick buck.

66.     Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others. Voyager's EPAs offered and sold to Plaintiff and similarly situated consumers were a "security" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC.

67.     The Securities Act and the Exchange Act were designed to "eliminate serious abuses in a largely unregulated securities market." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975). They are focused, among other things, "on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes . . . and the need for regulation to prevent fraud and to protect the interest of investors. *Id.* Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes any "note." *See* 15 U.S.C. §§ 77b & 78c. A note is presumed to be a security unless it falls into certain judicially-created categories of financial instruments that are not securities, or if the note in question bears a "family resemblance" to notes in those categories based on a four-part test. *See Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990), and its progeny. Applying the *Reves* four-part analysis, the EPAs were notes and thus securities. First, Voyager offered and sold EPAs to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and purchasers bought EPAs to receive interest on the loaned crypto assets.

---

[46]     https://techcrunch.com/2022/04/15/us-officials-link-north-korean-lazarus-hackers-to-625m-axie-infinity-crypto-theft/ (last accessed April 28, 2022)

Second, EPAs were offered and sold to a broad segment of the general public. Third, Voyager promoted EPAs as an investment, specifically as a way to earn a consistent return on crypto assets. Fourth, no alternative regulatory scheme or other risk reducing factors exist with respect to EPAs.

68.     Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes "an investment contract." *See* 15 U.S.C. §§ 77b, 78c. Based on the facts and circumstances set forth herein, the EPAs were securities because they were notes under *Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990) and its progeny, and also because Voyager offered and sold the EPAs as investment contracts, under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases discussed by the SEC in its Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO.[47] Voyager promised EPA investors a variable interest rate, determined by Voyager on a periodic basis, in exchange for crypto assets loaned by the investors, who could demand that Voyager return their loaned assets at any time. Voyager thus borrowed the crypto assets in exchange for a promise to repay with interest. Investors in the EPAs had a reasonable expectation of obtaining a future profit from Voyager's efforts in managing the EPAs based on Voyager's statements about how it would generate the yield to pay EPA investors interest. Investors also had a reasonable expectation that Voyager would use the invested crypto assets in Voyager's lending and principal investing activity, and that investors would share profits in the form of interest payments resulting from Voyager's efforts. Further, as Rich Sanders demonstrates in his Preliminary Report, once an investor purchases a EPA from Voyager and invests assets into it, Voyager customer assets are consolidated into accounts operated by a common enterprise.[48] "Blockchains don't lie, and the tracing of Voyager customer deposits to common enterprise accounts is very clear." [49] Voyager offered and sold the EPAs to the general public to obtain crypto assets for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and promoted the EPAs as an investment. Voyager offered and sold securities without a registration statement filed or in effect with the Commission and without qualifying for an exemption from

---

[47] https://www.sec.gov/litigation/investreport/34-81207.pdf (last accessed April 28, 2022)
[48] Sanders Supp. ¶ 11.
[49] *Id.*

registration; as a result, Voyager violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act").

**B. The Deceptive Voyager Platform**

69.     The Deceptive Voyager Platform offers investors, developers and platform providers a fully functional suite of APIs and mobile apps to allow anyone who is legally able to do so the ability to trade, invest, earn and secure digital assets across multiple types of digital assets.[50] According to its creators, "The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace."[51]

70.     VDL, one of Voyager's subsidiaries, acts as a "crypto broker," being a digital agent broker that facilitates users buying and selling of cryptocurrencies delivering deep pools of liquidity.[52] It also offers a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.[53] Some of the services offered by VDL include:

(a) users can open an account in three minutes or less. VDL utilizes third party service providers for know-your-client and anti-money-laundering checks to ensure fast and secure account openings;

(b) users are able to trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies;

(c) execution of trade orders across a spectrum of exchanges to give Voyager the deepest pool of liquidity;

(d) minimizing transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing VDL's patented smart router technology;

---

[50] *See* Ex. H.
[51] *See* "Voyager Digital and Market Rebellion to Form Online Broker Platform for Equities, Options, and Futures Trading," dated May 5, 2021, attached as **Exhibit J**.
[52] *See* Ex. H.
[53] *Id.*

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

    (e) providing users with data in order for them to manage and track their crypto investments, including delivering news, social feeds and real-time alerts to keep users connected to the market, and providing portfolio tools to track performance, balances and transactions; and

    (f) storing crypto assets in a secure wallet and in a "cold" facility, with 24/7 security. (fiat currency is stored at custodial banks).[54]

    71.    Further, during the months of January, February, and March 2021, 65,000, 70,000, and 95,000 new funded accounts were onboarded onto the Voyager Platform with net deposits of $170M, $400M, and $650M, respectively:[55]

|  | March 2021 | February 2021 | January 2021 |
|---|---|---|---|
| Net Deposits | $650M | $400M | $170M |
| New Funded Accounts | 95,000 | 70,000 | 65,000 |
| New Verified Users | 395,000 | 190,000 | 250,000 |
| Principal Value traded | $2.5B | $1.6B | $840M |

As of March 31, 2021, Voyager's Assets Under Management exceeded $2.4 billion, with total funded accounts exceeding 270,000 and over 1 million total verified users on the Platform.[56]

    72.    Moreover, during the month of April 2021 alone, new users were onboarded "at a record rate with over 130,000 new funded accounts added to the platform."[57]

**C.  VDL's Uniform "100% Commission-Free" Misrepresentations**

    73.    Included prominently throughout VDL's uniform marketing representations to its customers is that the Voyager Platform offers trades that are "100% Commission-Free."

---

[54] *Id.*

[55] *See* "Voyager Digital Provides Business Update and March 2021 Metrics," dated April 6, 2021, attached as **Exhibit K**.

[56] *Id.*

[57] *See* "Voyager Digital Provides Business Update for April," dated May 3, 2021, attached as **Exhibit L**.

74.     These representations enable VDL to obtain an edge over its competitors, including but not limited to Coinbase, Gemini, Kraken, and Binance, who openly display the applicable fees and commissions they charge on each trade.

75.     These "100% Commission-Free" representations, however, are false and are reasonably likely to mislead objective consumers acting reasonably under the circumstances. While VDL does not openly display the commissions it charges on each cryptocurrency trade, it utilizes various methods to secrete the exorbitant commissions it retains from every trade.

76.     For example, the "spread" (i.e., the difference between the "Bid Price" and "Ask Price" on a given cryptocurrency) is kept intentionally wide on all cryptocurrencies listed throughout the Voyager Platform. Voyager explains in its most recent Management's Discussion and Analysis that the spread is a main source of revenue:[58]

> Fee revenue for the three and nine months ended March 31, 2021 was $53.7 million and $57.4, an increase of $53.5 and $57.1 compared to the same periods in 2020. The increase in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 was primarily due to an increase of $5.0 billion in trade volumes, and an increase in average spread of 70.1 bps. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31, 2020 was primarily due to an increase of $5.5 billion in trade volumes, and an increase in average spread of 60.6 bps.

77.     Similarly, Founder and President, Steve Ehrlich, explains the importance of "spread revenue" to his investors at the earnings call for Voyager's Second Quarter for Fiscal Year 2021:[59]

> With the growth of assets under management, we remind investors of our 2 main revenue sources, spread revenue and interest revenue. Estimated spread revenue is derived by the trading velocity of our assets while interest revenue was driven by the gross interest earned on the overall assets under management. Historically, the company has earned between 10 to 12% annualized revenue on assets under management.
>
> At this point, I would also like to remind investors of certain drivers of our business. As in agency brokerage business, market volatility can often act as our friend. Voyager executes trades and captures spread revenue in both up and down markets. One example of the powerful agency model happened on Tuesday, February 23rd when Bitcoin decreased from a high of $56,000 to $45,000. That day, Voyager

---

[58] *See* Voyager Digital Ltd. Management's Discussion and Analysis for the Three and Nine Months Ended March 31, 2021, dated May 25, 2021, attached as **Exhibit M.**

[59] *See* Ex. B.

experienced a record day for trading volume, revenue and net deposits. Investors were very active buying the dips across all of the coins Voyager offers.

78.     Although the Voyager Platform will display a "Fair Market Price" for each cryptocurrency, which falls somewhere in the middle of the spread, the Voyager Platform's systems will automatically execute market orders at the highest end of the spread, from which they pocket secret commissions. Moreover, once a user submits a market buy order, the "Estimated Price" for the trade displayed on the Voyager Platform automatically defaults to an amount higher than the quoted "Ask Price" at the top end of the spread, so that an order can execute at an amount that is "less" than the "Estimated Price," but still at the very top end of the spread. Similarly, for market sell orders, the trade will automatically default to an amount lower than the quoted "Bid Price" at the bottom end of the spread so that the order can execute at an amount that is "more" than the "Estimated Price," but still at the bottom end of the spread.

79.     To effectuate these unfair and deceptive business practices, VDL claims to use proprietary systems, which they refer to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm."[60]

80.     In describing the Smart Order Router, VDL maintains that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills them in the market for the customer using its proprietary order routing algorithm."[61] The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across our liquidity sources and streams this price to its users."[62]

81.     To obscure this overarching scheme, VDL utilizes vague and opaque representations that VDL will only "share" in "price improvement" where they can fill a user's order at a price better than that which was quoted to the user (which is not in the bid/ask spread or fair market price, but rather in the jacked up estimated price that is only shown after the customer

---

[60] *See* "Passion for Product: Voyager Trading System," published Jan 23, 2020 at https://www.investvoyager.com/blog/passion-for-product-trading/ (last accessed April 28, 2022)
[61] *Id*.
[62] *Id*.

submits the market order).[63] "By example, if the user is quoted $10,040 and the router is able to fill at $10,030, Voyager may price improve the user's order to $10,035 (note: share of price improvement is variable and is determined by Voyager's proprietary fills algorithm)."[64]

82.     In reality, and unbeknownst to customers, the "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" are designed to be intentionally obscure and to provide VDL with hidden commissions on every trade that in most cases exceed the disclosed fees and commissions charged by its competitors. VDL unfairly gains an edge on its competition and overcharges customers by collecting these secret commissions to the detriment of its unknowing customers.

83.     In support of these allegations, Plaintiff attaches the preliminary expert reports of (a) Richard A. Sanders, the Co-Founder and Lead Investigator of CipherBlade, a blockchain forensics and cybercrime investigative firm which consults on some of the most renowned blockchain projects, as well as numerous law enforcement and regulatory investigations, and provides advisory services to cryptocurrency exchanges and other organizations;[65] and (b) Dr. Stephen Peter Castell, a Chartered IT Professional, independent consultant in computer and telecommunications systems and software development, and the Chairman of the United Kingdom company CASTELL Computer and Systems Telecommunications Limited, a professional firm of Management and Financial Consultants in Information Technology of over 40 years' standing.[66]

84.     Richard Sanders utilized a blockchain visualization tool called Chainalysis Reactor in forming the opinions set forth in his report. Mr. Sanders explains that Chainalysis Reactor provides a visualization of the same data that would be viewable on a block explorer, but unlike block explorer, Chainalysis Reactor has what is known as "attribution." Attribution is simply the labeling of wallet addresses.[67] "Chainalysis Reactor (as well as similar tools) will have a baseline amount of what is known as attribution: the labeling of wallet addresses. Addresses will be unknown/pseudonymous until Chainalysis updates/labels the addresses in their system. A

---

[63] *Id.*
[64] *Id.*
[65] *See* **Exhibit N**
[66] *See* **Exhibit O**
[67] Sanders report at ¶ 18

combination of automated analysis and manual investigation is utilized to continually add attribution.[68]

85.    Mr. Sanders found through his analysis that Voyager had an alarmingly low number of addresses attributed, far below the expected industry standard. "While it is true that no services (not even the most voluminous exchanges, such as Coinbase or Binance) will ever have all addresses attributed, services that have a lower amount of addresses attributed oftentimes lack such attribution as a result of the entity not utilizing a compliance tool such as Chainalysis KYT (the compliance equivalent of Chainalysis Reactor), and/or not submitting address data to such providers. VDL currently has 1 Bitcoin address attributed in Chainalysis Reactor, a figure far lower than industry standard.

86.    For example, Voyager competitor Celsius has 277,287 attributed addresses for Bitcoin in Chainalysis Reactor. A service with such aggressive marketing as VDL, according to Sanders, should have more address attribution. VDL's lack of attribution may at least partially have to do with how VDL processes customer deposits and withdrawals, which is distinctly different (perhaps deliberately) from their competitors and obfuscates potential attribution efforts.[69] Further, attribution for VDL wallet addresses for other blockchains was scarce and in some cases non-existent. While attribution for some more less-utilized assets (say, LTC or the ERC-20 tokens) may often have gaps, for attribution on widely-utilized assets (such as Ethereum) to be lacking immediately stands out. Sanders therefore performed manual attribution for VDL addresses."[70]

87.    Mr. Sanders found through his analysis that VDL lacks necessary transparency on their platform and programs, and that opacity materially affects a customer's ability to make an informed decision with their money. "Voyager is not transparent. As described in the preceding paragraph regarding the Voyager Interest Program, it is impossible for consumers to make an informed decision regarding whether to deposit funds to Voyager or not. Further, even if an individual opts out of the Voyager Interest Program, nothing evidences customer funds are not

---

[68] *Id.* at ¶ 20
[69] *Id.* at ¶ 22
[70] *Id.* at ¶ 23

rehypothecated, rendering Voyager customers susceptible to the risk of this rehypothecation whether or not they have the risk appetite and/or desire to sign up for such activity."[71]

88.     According to Mr. Sanders, VDL fails to communicate to its users exactly what extra fees apply to their transactions, how exactly transactions are being executed, and employs misleading advertising to lure in customers:

> Voyager is deliberately misleading, and often refuses to substantiate information that is essential for a consumer to make an informed decision. As one prominent example, Voyager strongly advertises "Commission-free" trading on their landing page, but no such fees are ever clearly outlined. In the absence of any specificity regarding "the marketplace," it is impossible for a consumer — or anyone for that matter — to determine which "marketplaces" (exchanges?) Voyager is determining to provide the "best execution." There would, indeed, presumably be a set price for a market order, which would be derived from an aggregate of the exchanges Voyager is sourcing liquidity from. In the simplest terms possible, *it is entirely a black box as to what Voyager is doing with orders purportedly directed to their Smart Order Router*, where (which exchanges) the Voyager Pricing Engine "calculates the fair market price" from, and how the Proprietary Fills Algorithm functions — and in the absence of such information, as well as demonstrable discrepancies between what Voyager says should happen and what happens, these systems are either improperly configured, or to varying degrees may not even exist or exist as described by Voyager. Phrasing such as "evaluation of multiple factors" is, per my experience regarding *all* companies that were suspected of, and subsequently confirmed to be, misleading consumers, extremely concerning. *The utilization of seemingly-technical jargon, and/or otherwise unspecified yet critical information, often result in tragedy for consumers*.[72] In the absence of any information whatsoever regarding how Voyager is processing customer orders, it is functionally impossible to verify that Voyager is even performing the steps described on their own FAQ. *Voyager, in essence, is expecting the same degree of trust from users that Bitconnect expected from their users regarding a 'trading bot' that turned out to <u>never exist</u>.* Voyager is undoubtedly profiting off of customers utilizing the trade functionality of the Voyager platform, and is irrefutably *not* providing best execution. Voyager cannot both claim to provide best execution *and* be commission-free when it is easily evidenced that numerous other exchanges provide better rates.[73]

89.     Mr. Sanders further explains that VDL's advertising claim that their platform provides the best execution of trades for users is plainly and demonstrably false:

---

[71] *Id*. at ¶ 27

[72] https://www.makeuseof.com/the-rise-and-fall-of-bitconnect-an-internet-famous-ponzi-scheme/ (last accessed April 28, 2022)

[73] *Id*. at ¶ 29 (emphasis in original and added)

The exchange rates provided by Voyager are consistently worse than the rates provided by cryptocurrency exchanges -- regardless of whether the exchange is centralized or decentralized, US-based or not US-based, etc. For Voyager to suggest they are providing any form of 'best execution' across the marketplace is demonstrably false. What makes Voyager's representations even more egregious is that, in the course of my analysis, I had performed extensive cryptocurrency deposits and withdrawals in order to discover cryptocurrency wallet addresses that Voyager utilizes for customer funds. Customer assets are sent to/from either Binance or HTC Trading wallets. Comparing exchange rates on Voyager to those on Binance resulted in Binance having better exchange rates on *every* occasion. Said differently, the *one* exchange that it is possible to assess Voyager would be including across their marketplace comparison (and thus should reflect the same price in Voyager app) provided a better deal than Voyager.[74]

90.     Mr. Sanders also obtained comparison data from VDL's competitors, such as Celsius, which further demonstrates the Deceptive Voyager Platform's vast deviation in number of attributed addresses from the expected industry standard. Mr. Sanders explained that "[u]pon a search of Celsius, a core Voyager competitor, their addresses are well-attributed; note the requirement to scroll down to see the full depth of cryptocurrencies that Celsius wallets are attributed in. Upon a search for Voyager, **only four cryptocurrencies are attributed**, and of those, **the attribution is partial**."[75]

91.     This lack of attribution indicates, in Mr. Sanders' view, that VDL demonstrates a possibility of noncompliance and lack of responsibly managed services on their platform

While a service not being attributed in Chainalysis does not confirm the service is suspicious, it is generally typical for compliant and responsibly-managed services to have attribution in a tool like Chainalysis Reactor for several reasons: Companies will sometimes provide their wallet addresses to companies like Chainalysis in order to be helpful to law enforcement and/or decrease the overhead associated with false positives and inquiries that would otherwise stem from a lack of attributed wallet addresses.[76]

92.     This lack of compliance is further illustrated in Voyager's heavy utilization of non-U.S. based fund-receiving addresses which do not reflect the targeted customer demographic:

While proportionality and focus at this time preclude me from providing a deeper review into Voyager's AML practices, observations regarding Voyager addresses (and the nature of the entities they send and receive cryptocurrencies from) while

---

[74] *Id.* at ¶ 30
[75] *Id.* at ¶ 34
[76] *Id.* at ¶ 35 (emphasis added)

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

conducting my attribution work did prompt concerns. As just one example, Voyager's known Bitcoin address sends funds to exchanges that are not US-based or even preclude US residents from signing up (KuCoin, Binance, Byibit, and FTX would all be strong examples.) In essence, where Voyager customers withdraw funds to does not reflect what I'd expect a US-based company soliciting US-based users[77] to send funds to. In my experience, when I see sending exposure that does not reflect the targeted demographic, the company attributed to the wallet(s) has an (often intentional) porous approach to compliance; said differently, I find it very unlikely that the quantity of Source of Wealth inquiries Voyager sent to customers due to these observations (assets going to US-restricted exchanges) would match the statistics shown above.[78]

93.    Not only does VDL fail to deliver on their advertising promise of "Better Pricing On Trades," ***they charge their users the highest premium on trades across all competitors***. According to Mr. Sanders, "On all but one occasion (which was for a less liquid cryptocurrency, ZRX, in a small amount, on FTX), Voyager's prices were worse than whichever exchange they were compared to. Voyager does not offer better pricing on trades. In fact, the rates Voyager offers would result in a plainly worse deal, often to the tune of nearly or more than 1% higher than competitors, even on highly liquid pairs such as BTC/USD."[79] "Consequently, VDL's representation of offering "Better Pricing on Trades" is, under the most generous of terms, deliberately misleading (it is *obvious* that would lead most people to conclude "across exchanges"), and I'd opine deliberately misleading in a way that is plainly to enrich themselves at the expense of that very misconception Voyager instills."[80]

94.    Upon further testing, Mr. Sanders also found it probable that VDL is not basing their market quotes off exchanges:

Baffled as to how Voyager may be generating the quotes for market buy/sell orders, I decided to run one more test on Voyager regarding USD/USDC. USDC is a cryptocurrency known as a stablecoin, which should be close to the value of the USD; however, these assets are never *entirely* 100%-pegged.[81] Consequently, if one goes onto a cryptocurrency exchange (with legitimate liquidity -- so Coinbase or Kraken would be good choices, whereas an exchange known for fake volume,

---

[77]    https://www.investvoyager.com/blog/where-is-voyager-available/ (last accessed April 28, 2022)
[78]    *Id.* at ¶ 43
[79]    *Id.* at ¶ 47
[80]    *Id.* at ¶ 48
[81]    https://invao.org/how-stable-are-stablecoins/

which is also likely to have fake order books, such as HitBTC[82] might not be), and seeks to trade between a stablecoin and fiat, the exchange will not be an exact 1:1 match. Note that when entering tens or hundreds of millions of dollars into a USDC buy order on Kraken, the peg noticeably is lost, as it should be. Note that on Voyager it does not. *See*: Exhibit E – Infinite Stability.mp4 [accessible at https://youtu.be/zF5nHhLhpaM].[83] In the absence of any indication Voyager is sourcing funds from exchanges, as well as the alarming revelation that Voyager purports to effectively have infinite USDC stores at peg, I am thus left to conclude that it is possible, if not probable, Voyager is not basing their market quotes off exchanges. The explanation may simply be that Voyager sources liquidity from Binance at a markup."[84] "Notably, with Binance's known AML issues, even *if* Voyager were transparently providing Binance's rates on cryptocurrency trades (which they are not) to US users, Voyager is effectively a workaround for Binance being restricted to US residents *and* Voyager cannot know, with confidence, what their ultimate source of funds is. Such activity would be, from a value transfer/blockchain analysis standpoint, described as a workaround to US regulatory requirements and cryptocurrency exchange terms of use.[85]

95.    This probability is further bolstered by the questionability of VDL's business activity with Binance. Mr. Sanders states:

I can evidence, and have evidenced, that Voyager sends funds to HTC Trading[86] and Binance. What happens with those funds when sent to HTC Trading is a black box (until/unless records are provided), but what one *can* conclude is Voyager, or the company they own/act through, HTC Trading, has one or more Binance accounts. If Voyager were, in fact, being honest about providing the best rates to their users, it would only be sensible to include in the hypothetical set of exchanges they are getting these alleged best rates from: namely Binance. Said differently: **why does Voyager send customer funds to Binance where they presumably hold account(s) yet a Voyager customer will consistently get a better deal on Binance than is shown on Voyager?** As far as the blockchain is concerned, the *one* place I can *definitively* assess Voyager receiving liquidity from is Binance, yet Voyager's rates were *worse* than Binance every time.[87]

---

[82]    https://cointelegraph.com/news/bitwise-calls-out-to-sec-95-of-bitcoin-trade-volume-is-fake-real-market-is-or (last accessed April 28, 2022)

[83] *Id*. at ¶ 50

[84] *Id*. at ¶ 51

[85] *Id*. at ¶ 53

[86] Notably, when asked at deposition about Voyager's wholly-owned subsidiary, HTC Trading, Inc., even when shown Sanders' analysis and chart from Chainalysis indicating that VDL is routing trades through HTC Trading, Voyager's corporate representative claimed that HTC Trading holds no accounts and conducts no operations. *See* LTD Tr. excerpts (**Exhibit P**), 37:7–38:15, 44:3–45:19.

[87] *Id*. at ¶ 55

96. Mr. Sanders lastly concludes, in line with what Plaintiff alleges:

Voyager has fraudulently conducted business by making false claims, utilizing misleading marketing, and obscuring the truth behind what Voyager does with customer's funds, and what fees users are charged. "Voyager's aggressive expansion in the late 2020/2021 bull market is, in my estimation, plainly targeting inexperienced cryptocurrency users/investors that would not have the experience to know better. New cryptocurrency users rely on active industry participants (companies such as Voyager, and "educators/influencers") to provide them with good-faith insight and not mislead them. Voyager's representations, namely those about commission-free and best price trading, would undoubtedly be understood to mean what they say they mean whether by a cryptocurrency novice or a deeply experienced expert."[88]

97. Dr. Castell similarly conducted a careful preliminary analysis to demonstrate the potential scope of damages resulting from VDL's overcharges. This analysis, "relying on Voyager's own reported figures," reflected that VDL's conduct has likely resulted or will result in over **1.08 billion dollars** in damages to its users.[89]

98. Dr. Castell agrees with Mr. Sanders in that VDL does not actually execute trades at the "best market price" as they advertise. "In summary, it is my firm preliminary opinion that the Voyager App does not materially provide the user functionality as represented by Voyager Digital as regards achieving the 'best market price' for the user/trader."[90]

99. The Voyager app was likely deliberately designed to not provide the actual functionality aspects represented to users. Dr. Castell states:

Furthermore, in my preliminary opinion the failure of the Voyager App to provide the represented functionality is likely to be centered principally within elements of the coding or programmed behavior of the "Smart Order Router," and/or the "Voyager Pricing Engine," and/or the "Proprietary Fills Algorithm", either acting alone, amongst themselves, or in conjunction with the Voyager Digital corporate software and systems with which these modules connect and inter-operate.[91]

In my preliminary view it is clear that the available technical evidence shows that the Voyager App does not materially provide the user functionality as represented by Voyager Digital as regards achieving the "best market price" or "fair market price" for the user/trader.[92]

---

[88] *Id*. at ¶ 67
[89] Castell report at ¶ 43
[90] *Id*. at ¶ 45
[91] *Id*. at ¶ 46
[92] *Id*. at ¶ 40

100.    This obscurity leading to charging customers extra hidden fees is most likely known to VDL at least at this time, or earlier. Dr. Castell explains,

> …whether through an unintentional failure, or deliberate act, in my view such overcharge provisionally appears to be a definite *software material defect*, and it seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.[93]

101.    According to Dr. Castell, each time a user was overcharged on their purportedly "commission free" trades, that overcharge amounted to no less than 0.5% of the total value of that user's trade. "In my view this overcharge to the Voyager User may be characterized or thought of as essentially an undisclosed commission levied by Voyager Limited. The overcharge/ undisclosed commission varied somewhat per individual trade, between approximately 0.5% and 1% of the value of the trade, across all trades in the sample, i.e. the overcharge was never less than 0.5% of the value of the trade."[94]

102.    According to Dr. Castell, it is a fact that there is a definite material defect in the design of the Voyager Platform software, either deliberately or negligently:

> In the meantime, whether the overcharge is as a result, on the part of Voyager Digital's management, of a fault in Voyager Digital's software development management, i.e. the company's software design, build, testing, deployment and operational processes, or arises from a deliberate intent of the company to deceive and overcharge the users of its Voyager App, or some combination of both, in my view and experience, and dependent, as noted herein, on due inspection and examination of the software development, management and operational documentation to be disclosed by Voyager Digital, such overcharge provisionally appears to me to be a definite *software material defect*. I naturally defer to the court to make that finding legally in due course, and, if so, determine what restitution and compensation falls to be provided by Voyager Digital for the financial consequences of such a software material defect.[95]

103.    That said, Dr. Castell believes this material defect, which led to hundreds of millions of dollars in user overcharges, ***was not an accident, and was indeed deliberate in design***:

> However, and subject to the Discovery that will be necessary to analyze definitively whether what the Voyager Digital company's management is doing is intentional,

---

[93] *Id*. at ¶ 41
[94] *Id*. at ¶ 26
[95] *Id*. at ¶ 29(b)

in my preliminary view, since the overcharge/undisclosed commission appears to be present in every trade, it is highly likely that the Voyager App is deliberately conceived and designed by the company's management to function that way, or, equally, the company's management has grossly failed to discharge its requisite IT and corporate governance duties, and has failed to correct this software material defect, perhaps because it is to their company's benefit. It seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.[96]

104.    VDL has failed to meet acceptable professional and transactional standards in the market segment they belong to. Dr. Castell concludes, based on his experience, that:

Based on the evident material failure of Voyager Digital to provide its promised Voyager App "best market price," and "100% Commission Free," user functionalities, whether those failures be through deliberate policy and systems design, or through faults in software construction and operation, I am of the preliminary opinion that the technical governance of Voyager Digital in the management, operation, integrity, representations and security of its Voyager App and of its other management and customer systems are likely not to meet, in whole or in part, accepted professional standards for, and/or custom and practice in, the consumer electronic financial services and/or online trading sectors, but cannot arrive at a final considered view prior to Defendants' discovery and disclosure.[97]

## PLAINTIFF-SPECIFIC ALLEGATIONS

105.    Plaintiff purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings.

106.    In exchange for receiving Plaintiff's crypto assets for use in its clandestine lending activities, Plaintiff was paid the following interest payments, as revealed from Voyager's business records:

| TRANSACTIO NUMBER | SYMBOL | TYPE | DATE | QUANTITY | NET | PRICE |
|---|---|---|---|---|---|---|
| 01FC0C0YT1ZX NAYYZG61TC28 WG | BTC | INTEREST | 2021-08-01 08:06:59.6 48 +0000 | 7.42E-05 | 3.098 3844 09 | 41745.95 |
| 01F9GM2K4E5C NCTPK6Q4P4B52 5 | BTC | INTEREST | 2021-07-01 08:48:27.2 78 +0000 | 8.03E-05 | 2.690 6442 66 | 33524.1 |

---

[96] *Id.* at ¶ 29(c)
[97] *Id.* at ¶ 50

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

| 01F73D8TSKKKF06QAW20XT56NJ5 | BTC | INTEREST | 2021-06-01 09:08:00.436 +0000 | 7.98E-05 | 2.948955325 | 36940.44 |
| 01F4MFHB79ZVMTGBKJKHJ64FK9 | USDC | INTEREST | 2021-05-01 17:27:36.426 +0000 | 1.6041 | 1.6041 | 1 |
| 01F4KQDDQXSM1XF5ZBYEV688W4 | BTC | INTEREST | 2021-05-01 10:26:02.110 +0000 | 6.07E-05 | 3.515016492 | 57946.2 |

107.     Moreover, after being exposed to VDL's uniform misrepresentations that the Voyager Platform is "100% Commission-Free," Plaintiff registered for an account on the Voyager Platform on March 17, 2021. Further, in reliance on VDL's foregoing misrepresentations and omissions, Plaintiff executed the following trades on the Voyager Platform:

| Date | Order | Cryptocurrency | Amount (USD) | Order ID |
|------|-------|----------------|--------------|----------|
| March 18, 2021 | Market Buy | +0.008588 BTC | $500.00 | ZSSEDN |
| March 18, 2021 | Market Buy | +0.11627 ETH | $300.00 | YJTZRN |
| March 18, 2021 | Market Buy | +0.000838 BTC | $50.00 | R9QFBS |
| March 18, 2021 | Market Sell | -0.16627 ETH | $301.06 | Q6G4VX |
| March 18, 2021 | Market Buy | +0.005028 BTC | $301.06 | E13RAS |
| March 18, 2021 | Market Sell | -0.004455 BTC | $263.32 | HK8RCB |
| March 18, 2021 | Market Buy | +0.14357 ETH | $263.31 | 3VHERZ |
| March 31, 2021 | Market Sell | -0.14358 ETH | $263.88 | 5M8EVR |
| March 31, 2021 | Market Buy | +263.88 USDC | $263.88 | GGXZYW |
| April 3, 2021 | Market Sell | -100.00 USDC | $100.00 | 3VFR9Z |
| April 6, 2021 | Market Buy | +100.00 USDC | $100.00 | E07N9M |
| April 18, 2021 | Market Sell | -100.00 USDC | $100.00 | 5A1XVM |
| April 18, 2021 | Market Buy | +0.001788 BTC | $99.99 | EB7CF5 |
| April 25, 2021 | Market Buy | +0.003061 BTC | $150.00 | J57N9H |
| May 1, 2021 | Market Sell | -163.88 USDC | $163.88 | 32VX48 |
| May 1, 2021 | Market Buy | +0.05729 ETH | $163.87 | 3K6TA6 |
| May 4, 2021 | Market Buy | +55.3 ADA | $74.99 | BWY5H0 |

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

| May 4, 2021 | Market Sell | -1.60 USDC | $1.60 | G9HV8H |
| May 11, 2021 | Market Buy | +0.00248 ETH | $10.00 | DX65EW |
| May 11, 2021 | Limit Buy | +0.00250 ETH | $10.11 | 5J3F4Q |
| May 20, 2021 | Market Sell | -55.3 ADA | $95.30 | FJGHVA |
| July 31, 2021 | Market Buy | +0.00229645 BTC | $96.79 | 2HVC4R |
| August 17, 2021 | Market Sell | -0.06227 ETH | $197.01 | M7JWCA |
| August 17, 2021 | Market Sell | -0.017862 BTC | $821.30 | 2N96YH |

108.    To illustrate the deceptive nature of the Platform and how VDL secretly charges exorbitant commissions on each trade for Plaintiff and all putative class members despite their misrepresentations that the Platform is "100% Commission-Free," Plaintiff includes the following screenshots of his May 11, 2021 Market Buy trade at Order ID Dx65EW.

109.    At 11:17am EST, the cryptocurrency Ethereum (ETH) was displayed on the Platform with a "Fair Market Price" of $3,997.83 a coin.



*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

110.    On the "trade" page for Ethereum in the Platform at 11:17am EST, the "Bid Price" displayed at $3,969.44, and the "Ask Price" displayed at $4,025.44.



111.    At 11:17am EST, Plaintiff submitted a Market Buy order for $10.00 USD worth of Ethereum. On execution of the trade, however, the "Estimated Price" for Ethereum suddenly reflected at $4,027.36 a coin, higher than the maximum quoted "Ask Price" on the immediately preceding page. Plaintiff's order filled at $4,025.28 per coin, at the top end of the bid/ask spread.



112.    At no point during Plaintiff's relationship with VDL did VDL ever disclose, contrary to its representations that the Platform operates "100% Commission-Free," that the "Smart Order Routing," "Voyager Pricing Engine," and "Proprietary Fills algorithm" systems are intentionally designed to provide VDL with secret commissions built into the pricing of every trade.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

## CLASS ACTION ALLEGATIONS

113.     As detailed below in the individual counts, Plaintiff brings this lawsuit on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

### A.     <u>Class Definitions</u>

114.     Plaintiff seeks to represent the following Nationwide Classes and Florida Subclasses (collectively, "the Classes"):

   (1) **<u>Nationwide Voyager Class</u>:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in a EPA.

   (2) **<u>Florida Voyager Subclass</u>:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in a EPA.

   (3) **<u>Nationwide VDL Class</u>:** All persons in the United States who, within the applicable limitations period, used the Voyager Platform to place cryptocurrency investment orders.

   (4) **<u>Florida VDL Subclass</u>:** All persons in the state of Florida who, within the applicable limitations period, used the Voyager Platform to place cryptocurrency investment orders.

Excluded from the Classes are the Voyager Defendants and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff. Plaintiff reserves the right to modify or amend the definition of the proposed Nationwide Class or Florida Subclass, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses.

### B.     <u>Numerosity</u>

115.     The Classes are comprised of thousands, if not millions, of consumers nationwide and throughout the state of Florida to whom Voyager offered and/or sold EPAs. Moreover, thousands, if not millions, of consumers nationwide and throughout the state of Florida have executed trades on the Voyager Platform within the applicable limitations period. Membership in

the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiff, but is easily identifiable through the Voyager Defendants' corporate records.

### C. Commonality/Predominance

116.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

As to Voyager:

(a) whether the EPAs were unregistered securities under federal and Florida law;

(b) whether Voyager's offerings and sales of EPAs violate the provisions of the Securities Act and Florida law; and

(c) the type and measure of damages suffered by Plaintiff and the Class.

As to VDL:

(a) whether VDL's description of the Voyager Platform as being "100% commission free" is deceptive, unfair, false and misleading;

(b) whether VDL's representations are objectively likely to mislead reasonable consumers to believe that their trading platform operates as "100% commission free";

(c) whether VDL's practices violate the NJCFA;

(d) whether VDL's practices violate the FDUTPA;

(e) whether Plaintiff and Class members have sustained monetary loss and the proper measure of that loss;

(f) whether Plaintiff and Class members are entitled to injunctive relief;

(g) whether Plaintiff and Class members are entitled to declaratory relief; and

(h) whether Plaintiff and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of VDL's conduct.

### D. Typicality

117.    Plaintiff's claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiff

and all class members were offered and/or sold EPAs by Voyager, or that Plaintiff and all members were exposed to VDL's identical and uniform misrepresentations and omissions regarding the Voyager Platform being "100% commission free," and Plaintiff is advancing the same claims and legal theories on behalf of himself and all such members. Further, there are no defenses available to either Voyager or VDL that are unique to Plaintiff.

### E.  Adequacy of Representation

118.    Plaintiff will fairly and adequately protect the interests of the members of the Classes. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Classes. Plaintiff anticipates no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiff has chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### F.  Requirements of Fed. R. Civ. P. 23(b)(3)

119.    The questions of law or fact common to Plaintiff's and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiff and the unnamed members of the Classes are based on the common course of conduct (1) by Voyager in marketing, offering, and/or selling the EPAs, which are unregistered securities, or (2) by VDL in making identical and uniform misrepresentations and omissions regarding the Voyager Platform being "100% commission free," while secretly charging exorbitant and secret commissions to Plaintiff and the unnamed members of the Classes for every trade made on the Voyager Platform.

120.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

121.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

### G.  Superiority

122.    A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

(a)  Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;

(b)  Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

(c)  There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

(d)  The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

(e)  Individual suits would not be cost effective or economically maintainable as individual actions; and

(f)  The action is manageable as a class action.

**H.  Requirements of Fed. R. Civ. P. 23(b)(2)**

123.    Voyager has acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of offering and/or selling the EPAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

124.    VDL has acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly making identical and uniform misrepresentations and omissions regarding the Voyager Platform being "100% Commission-free," while secretly charging exorbitant and secret commissions to Plaintiff and the unnamed members of the Classes for every trade made on the Voyager Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.  Requirements of Fed. R. Civ. P. 23(c)(4)**

125.    As it is clear that the predominant issue regarding Voyager's liability is whether the EPAs it has offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify either or both of the Classes against Voyager for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

126.    As it is clear that the predominant issue regarding VDL's liability is whether it has violated the NJCFA or the FDUTPA in making identical and uniform misrepresentations and omissions regarding their trading platform being "100% commission free," while secretly charging exorbitant and secret commissions to Plaintiff and the unnamed members of the Classes for every trade made on the Voyager Platform, utilizing Rule 23(c)(4) to certify either or both of the Classes against VDL for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

### J.    Nature of Notice to the Proposed Classes.

127.    The names and addresses of all Class Members are contained in the business records maintained by the Voyager Defendants and are readily available to the Voyager Defendants. The Class Members are readily and objectively identifiable. Plaintiff contemplates that notice will be provided to Class Members by e-mail, mail, and published notice.

### COUNT ONE

### Offer and Sale of Unregistered Securities

### in Violation of Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a)

### (on behalf of Plaintiff and Members of the Nationwide Class against Voyager)

128.    Plaintiff re-alleges and incorporates paragraphs 1–19, 24–33, 44–45, 47–54, 56–68, 105–106, 113–123, 125, 127 above as if fully set forth herein and further alleges as follows.

129.    Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Voyager.

130.    Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a), states:

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

131.    The Voyager Earn Program Account ("EPA") is a security within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1) because it is a "note" and an "investment contract."

132.    The EPAs were not registered with the SEC.

133.    Voyager sold and offered to sell the unregistered EPAs to Plaintiff and Nationwide Class members, in violation of 15 U.S.C. §§ 77e(a).

134.    Plaintiff and members of the Nationwide Class suffered damages as a result of their purchase of the unregistered EPAs securities through Defendants' website and/or application.

135.    As a result of Voyager's unregistered sale of the EPAs securities, Voyager is liable to Plaintiff and the members of the Nationwide Class. 15 U.S.C. § 77l(a).

WHEREFORE, Plaintiff, on behalf of himself and the Nationwide Class members, demands judgment for rescission and/or compensatory damages, in addition to prejudgment interest, reasonable attorneys' fees, costs, post-judgment interest, and any and all further relief deemed just, equitable, and proper.

## COUNT TWO
### Offer and Sale of Unregistered Securities
### in Violation of Florida Statute Section 517.07,
### The Florida Securities and Investor Protection Act
### (on behalf of Plaintiff and Members of the Florida Sub-Class against Voyager)

136.    Plaintiff re-alleges and incorporates paragraphs 1–19, 24–33, 44–45, 47–54, 56–68, 105–106, 113–123, 125, 127 above as if fully set forth herein and further alleges as follows.

137.    Plaintiff brings this claim individually and on behalf of the members of the Florida Sub-Class against Voyager.

138.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

139.    The Voyager Earn Program Account is a security pursuant to Fla. Stat. § 517.021(22)(a).

140.   The EPAs sold and offered for sale to Plaintiffs and members of the Florida Sub-Class were not:

    a.     exempt from registration under Fla. Stat. § 517.051;

    b.     a federal covered security;

    c.     registered with the Office of Financial Regulations (OFR); or

    d.     sold in a transaction exempt under Fla. Stat. § 517.061.

141.   Through its actions described above, Voyager sold and offered to sell the unregistered EPAs to Plaintiff and the members of the Class.

142.   As a result of Voyager's sale and offer to sell the EPAs, Voyager violated Fla. Stat. § 517.07.

WHEREFORE, Plaintiff, on behalf of himself and the Florida Sub-Class members, demands judgment for rescission and/or damages pursuant to Fla. Stat. § 517.211, together with prejudgment interest, reasonable attorneys' fees, costs, post-judgment interest, and any and all further relief deemed just, equitable, and proper.

## COUNT THREE

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (<u>Against VDL</u> on behalf of Plaintiff and Members of the Nationwide Class)

143.   Plaintiff re-alleges and incorporates paragraphs 1–3, 10–23, 34–44, 46–47, 55–57, 69–104, 107–112, 113–122, 124, and 126–127 above as if fully set forth herein and further alleges as follows.

144.   The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*., prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

145.     VDL has engaged in, and continues to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade and/or commerce in the State of New Jersey, as described more fully hereinabove.

146.     VDL's statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because VDL in fact did charge Plaintiff and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

147.     The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. N.J.S.A. 56:8-19.

148.     Plaintiff and the Class are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

149.     Plaintiff and the Class have suffered an ascertainable loss of moneys or property as a direct and proximate result of VDL's unconscionable practices.

150.     Plaintiff and the Class have a private right of action against VDL and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

151.     Plaintiff and the Class have suffered, and will continue to suffer, irreparable harm if VDL continues to engage in such deceptive, unfair, and unreasonable practices.

## COUNT FOUR
**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**
**§ 501.201, Florida Statutes, *et seq.***
**(Against VDL on behalf of Plaintiff and Members of the Florida Subclass)**

152.     Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–3, 10–23, 34–44, 46–47, 55–57, 69–104, 107–112, 113–122, 124, and 126–127 as if fully set forth herein.

153.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq*. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

154. Plaintiff and Class members are consumers as defined by section 501.203, Fla. Stat. VDL is engaged in trade or commerce within the meaning of the FDUTPA.

155. Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

156. VDL's unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

157. VDL has violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

158. Plaintiff and consumers in the Class have been aggrieved by VDL's unfair and deceptive practices and acts of false advertising by paying VDL undisclosed commissions on cryptocurrency trades on the Voyager Platform, having parted with money under false pretenses.

159. The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of VDL, as more fully described herein.

160. Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiff and consumers in the Class make claims for actual damages, attorneys' fees and costs.

161. VDL still utilizes many of the deceptive acts and practices described above and is still secretly retaining money from every cryptocurrency trade made on the Voyager Platform. Plaintiff and the other members of the Class have suffered and will continue to suffer irreparable harm if VDL continues to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiff and the Class to obtain both declaratory or injunctive relief to put an end to VDL's unfair and deceptive scheme.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for a judgment on behalf of himself and the Classes:

    a.  Certifying the Classes as requested herein;

    b.  Awarding actual, direct and compensatory damages;

    c.  Awarding restitution and disgorgement of revenues if warranted;

    d.  Awarding declaratory relief as permitted by law or equity, including declaring the Voyager Defendants' practices as set forth herein to be unlawful;

    e.  Awarding injunctive relief as permitted by law or equity, including enjoining the Voyager Defendants from continuing those unlawful practices as set forth herein, and directing the Voyager Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

    f.  Awarding statutory and multiple damages, as appropriate;

    g.  Awarding attorneys' fees and costs; and

    h.  Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as to all claims so triable.

*Mark Cassidy v. Voyager Digital Ltd., et al.*
*Case No.: 21-24441-CIV-ALTONAGA/Torres*
*First Amended Complaint*

Dated: April 28, 2022

Respectfully submitted,

By: */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
Barbara C. Lewis
barbara@moskowitz-law.com
Florida Bar No. 118114
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

By: */s/ Stuart Z. Grossman*
Stuart Z. Grossman
Florida Bar No. 156113
szg@grossmanroth.com
Rachel W. Furst
Florida Bar No. 45155
rwf@grossmanroth.com
Ryan J. Yaffa
Florida Bar No. 1026131
rjy@grossmanroth.com
**GROSSMAN ROTH YAFFA COHEN, P.A.**
2525 Ponce de Leon Blvd Ste 1150
Coral Gables, FL 33134
Office: 305-442-8666

*Co-Counsel for Plaintiff and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed on April 28, 2022, with the Court via CM/ECF system, which will send notification of such filing to all attorneys of record.

By: */s/ Adam M. Moskowitz*
ADAM M. MOSKOWITZ
Florida Bar No. 984280

# Exhibit A

# Voyager Digital Ltd. (VYGVF) CEO Steve Ehrlich on Q2 2022 Results

Voyager Digital Ltd. (OTCQX:VYGVF) Q2 2022 Earnings Conference Call February 15, 2022 8:00 AM ET

## Company Participants

Mike Legg - Chief Communications Officer

Steve Ehrlich - Chief Executive Officer

Evan Psaropoulos - Chief Financial Officer

## Conference Call Participants

Chris Allen - Compass Point

Adhir Kadve - Eight Capital

George Sutton - Craig-Hallum

Joe Gomes - Noble Capital

Kevin Dede - H.C. Wainwright

Chris Sakai - Singular Research

Kyle Voigt - KBW

Mark Palmer - BTIG

## Operator

Good day and welcome to this Voyager Digital Fiscal Year Second Quarter 2022 Earnings Conference Call. At this time, all participants are in a listen-only mode. After the prepared remarks, we will conduct a question-and-answer session. [Operator Instructions].

At this time, I'd like to turn the call over to Mike Legg, Chief Communications Officer at Voyager. Please go ahead, sir.

## Mike Legg

Thank you, Operator. I'd like to welcome everyone to Voyager Digital Ltd.'s Earnings Call. Today, we'll be discussing our first fiscal year 2022 second quarter results, which we announced prior to the market open this morning.

On the call today with me are Steve Ehrlich, our Chief Executive Officer, and Evan Psaropoulos, our Chief Financial Officer. I would like to take a moment to direct investors to the Investor Relations section of our website at investvoyager.com, where we have posted our investor presentation and upcoming events schedule.

Before we get started, I want to remind everyone that certain statements discussed on this call are based on information as of today, February 15th, that may contain forward-looking statements which are subject to risks and uncertainties, and given our limited operating history, market volatility and unprecedented industry growth, trends could materially deviate from today's levels.

Actual results could differ material from our forward-looking statements if any of our key assumptions discussed in today's earnings press release and the comments made during this conference call or in our latest reports and SEDAR filings, each of which can be found on our website, www. investvoyager.com or under our profile at www.sedar.com are incorrect. The Company has made assumptions that no significant events occur outside of the Company's normal course of business and that current trends in the adoption of crypto assets continue.

Listeners are cautioned that assets on platform, revenues, and trading volumes fluctuate and may increase and decrease from time to time, and that such fluctuations are beyond the Company's control. We do not undertake any duty to update any forward-looking statements, except where required by law.

Today's release also includes references to non-IFRS financial measures. You should refer to the information contained in the disclosures found in today's release, including definitional information and reconciliations of historical non-IFRS measures to the comparable IFRS financial measures. This call will touch on some guidance provided in our earnings press release issued today. I would encourage each of you to review the forward-looking statement respect to disclosure and similar disclosure in today's press release. Please note that dollar amounts referenced are in US dollars unless otherwise noted.

With that, let me turn the call over to Steve Ehrlich, Voyager's Co-Founder and CEO.

**Steve Ehrlich**

Thank you, Mike, and good morning, everyone. I'm excited to report our best quarter ever, doubling our revenue from the previous quarter and highlighting Voyager's positioning and revenue opportunity in active markets. More importantly, during the quarter, we delivered significant revenue growth while scaling our systems to more seamlessly support a significant increase in customer activity, highlighting the steps we've taken to build out the scale and security of the Voyager platform in 2021, as we position Voyager for substantial product rollouts in calendar 2022.

First, I want to take a moment and focus on the notable accomplishments in calendar 2021 and then discuss our plan for 2022. We started the 2021 calendar year with an innovative platform embraced by early adopters, fueled by word of mouth from people seeking a trusted app for easily trading a large selection of all coins. At the time, Voyager had 38 employees, 43,000 funded accounts and approximately $230 million of assets on platform. But we had the goal of becoming one of the leading crypto platforms in the United States. As the industry grew and Voyager was discovered by more crypto market participants, we raised the capital to scale our platform and fuel our growth.

By the end of calendar 2021, we had 250 employees, 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets on platform. This level of growth makes Voyager one of the fastest-growing cryptocurrency platforms in the industry and one of the largest in the United States. Based on data obtained from one of our investment banking partners, Voyager was third on the list of fastest-growing public companies listed on any U.S. exchange including the OTC markets, based on revenue growth in calendar 2021 with $416 million of revenue, up from just $6.6 million for the calendar year 2020.

To keep pace with our rapid growth, we spent 2021 scaling our system. From the initial influx of

customers in January 2021, the decisions we made focused on scaling to handle the increases in volume. In the December quarter, we reached new heights of activity that tested the system, and I am happy to report that we had no delays or outages. Our significant scaling in 2021 included notable growth of our engineering and product departments, positioning us to execute and deliver what we believe to be both innovative and customer-focused product enhancement and features for 2022.

Before I review our business strategy for 2022, I would like to address the industry cycles we witnessed in 2021 and our viewpoints on industry growth going forward as mainstream adoption and blockchain efficiency proliferate in the coming years. The crypto industry is one in which there are tremendous ebbs and flows.

But as revealed by our recent survey, 66% of Americans believe that crypto will be widely accepted and growing value over the next 5 years. We are therefore excited about the future and fueled by investment in our marketing efforts, we will continue to grow Voyager as one of the major players in digital assets in the blockchain industry.

We're investing heavily in revenue diversification as we look to reduce our reliance on trading volumes. Voyager's goal is to build a business with multiple revenue streams through its current trading products, yield and staking products, payment and spending products and future NFT and lending products.

To accomplish our goals, we have organized our product and engineering teams into pods working on specific products and product enhancements. Focusing on product development, the expanded leadership team studied data to better align business goals with customer needs. We are a product delivery organization and have taken the necessary steps towards matching the needs of our customers with our product delivery goals.

Transactional revenue is a key driver of the business. We recently added 10 new coins with crypto wallets for trading and crypto transfers, bringing our total up to 85 coins, of which we have 52 of them with crypto wallets. The large number of crypto wallets is significant as well as other notable players in the industry have no or very limited wallets, we allow our customers to hold their own assets and transfer them. We have plans to trade over 100 coins in the near future and add even more crypto wallets. Adding more wallets is a key area of development for us as the crypto ecosystem continues to grow. The ability to transfer these tokens, especially in the gaming space is becoming necessary. When we add new coins, we tend to see an increase in customer engagement and an increase in trading.

In addition to new coins and wallets, we are working on trading features and enhancements. Our near-term road map includes a desktop version of the app, a dark moon mode to the mobile app, stock orders, dynamic and tiered pricing and swap functionality with the expectation that desktop and dark mode will be rolled out in the March quarter.

Voyager continues to focus on staking enhancements. We added additional custodians, which are necessary to expand the coins for staking. As the number of points available for staking increases, staking revenue will continue to grow and the expectation that it will become a larger and larger part of our overall revenue.

On the lending side, the addition of automated research, along with a few other borrowers, has increased our capacity and capabilities. Based on current market prices, we continue to target a minimum of $40 million in yield and staking revenue per quarter and, subject to the crypto markets, expect that to grow as we add more points. We recently rolled out the debit card to a small group of employees for real-world testing. So far, the results are very exciting, and we expect to increase the number of users in the March quarter.

The debit card is unique in nature by providing up to 9% annual rewards and is based on holding USDC, not fiat currency. The card has a bank routing number and an account number, so individuals can direct deposit their paycheck and utilize it in place of a bank account. We also anticipate allowing consumers early access to their paycheck similar to many of the neo banks. We have yet to fully execute our marketing plans for the debit card, but we already have a waiting list of approximately 200,000 people.

The product will also be connected to the Voyager loyalty program, which is also in the process of being expanded. And we envision adding broader consumer awards from popular merchants as well. The plan is for Voyager to earn revenue from the interchange and rewards from merchants.

As we mentioned in the last earnings call, we received our fit and proper license from the AMF, the authority of financial markets in France. We are progressing and delivering a crypto solution to French citizens as well as other parts of Europe in 2022.

As the AMF approved Voyager to deliver the product as it looks today in the US, we can bring the benefits of the Voyager platform to the European audience. There is a waitlist for Europe already. And by utilizing the recently acquired Coinify and their KYC and money movement features, we intend to make an impact in the second half of 2022.

In Canada, we are working closely with the Ontario Securities Commission to deliver the Voyager offering to Canadian residents as well. We will keep investors updated as we learn more from the OSC.

Our partnership with Market Rebellion to build an equity broker dealer is progressing nicely. Not only do we have FINRA approval, we have a signed clearing agreement. The clearing agreement is a necessary step in building the brokerage of the future as we leverage the clearing firm technology to deliver an equity trading offering.

Voyager will earn revenue on this partnership by keeping a piece of the revenue from customer balances and transactions. We will structure this offering so consumers will access the trading of equities from their existing Voyager app and will utilize USTC as a base currency for trading. We believe these innovative features are advantageous and the delivery of the debit card is a key step forward for this product. The Coinify payment business is an area of focus as we recently hired enterprise sales veteran Tim Mund to lead our US sales team. We believe that the payment business is a long tail business, but we are growing that -- growing the use of our rails and systems as these rails allow businesses and individuals to make payments within the Voyager ecosystem without any blockchain fees.

Additionally, the payment system allows any payment service system or vendor to receive crypto as payments outside of the Voyager ecosystem, which has lower rates than the traditional system.

Lastly, watching how the NFT business continues to grow, we hired a team to develop Voyager's NFT strategy. In line with our overall value proposition, Voyager plans to make it easier to access the NFT ecosystem by helping customers interact with, organize and extract value from their NFT portfolio. Our goal is to simplify NFT participation today and in the future, regardless of how the culture and ecosystem evolves. We plan to design products that will enable consumers to react quickly to market changes and safely manage their portfolio.

We will continue to focus on user growth as our primary marketing objective and to educate users about the benefits of digital assets and use cases where investors can participate in the wealth-building opportunities available on the Voyager platform. We are really excited about the launch of our latest campaign, Crypto for All, as it expands upon the growth we saw in the December quarter when we added the Dallas Mavericks, NCA Basketball and the National Women's Soccer League to

our NASCAR partnership with Land in Castle in both the Cup and Xfinity series.

We continue to be the third highest ranked pure crypto app in the Apple App Store and strive to gain traction versus the two larger companies ahead of us. We will continue to focus on differentiation and value creation to our existing and future marketing channels. We are striving to scale and improve customer support and continue to add personnel to the team. We have also focused on engineering teams on how to better support our customers and anticipate adding live chat to our existing chat by the end of the March quarter.

One of Voyager's organizational objectives is maintaining transparency and accountability with customers, constituents, investors and employees. To support this objective, Voyager will begin its first SOC2 audit in June 2022 and will continue annually thereafter. The SOC2 is a critical element to Voyager's continued achievement of best-in-class service and product offerings as SOC2 provides assurance that a mature, sustainable security program has been implemented, protecting all stakeholders' assets from unauthorized access.

Additionally, completing a SOC2 audit will differentiate Voyager from competitors by clearing a path to increase partnership opportunities and additional highly accredited organizations.

Lastly, we want to address the recent news about the SEC order in the matter of BlockFi lending LLC. We recognize that this is a significant development in the industry and will provide a potential regulatory path for market participants. We also understand that some may view Voyager's rewards program to be similar to BlockFi interest accounts. While we understand the temptation to bucket them together, we think there are important differences between Voyager's program and BlockFi's that we think have legal significance.

That said, we are in ongoing discussions with regulators about the rewards program, and it is, of course, possible that regulators may have a different view. Under the circumstances, we think it's important to confirm that Voyager has received requests and subpoenas from the SEC and certain states in connection with the rewards program as part of nonpublic fact-finding inquiries. Of course, we believe that Voyager accounts that earn rewards comply with existing U.S. law and look forward to demonstrating that as necessary. We think it is normal and appropriate for financial service firms, especially in the crypto industry with these evolving regulatory frameworks to receive inquiries from regulators and law enforcement. When Voyager received such requests, our policy is to cooperate fully, but we limit public discussion as these matters are always evolving and as a public company, Voyager is subject to important rules regarding disclosures about its business.

I want to make it clear that Voyager strives for overall compliance and has team of legal and compliance professionals and outside advisers working hard to help us operate within the rules that they exist today. In closing, we continue to believe that we're in the early stages of crypto adoption, and there is significant opportunity for Voyager to grow users and revenue as we execute our game plan. We have a group of industry veterans who, having seen 20-plus years of market activity, understand the volatility that markets have.

We think that leadership experience positions us to execute and build an industry leader. The crypto market will continue to have its ups and downs, and our revenue and volume will reflect those moments, but we take pride in creating the third largest retail platform in the US based on retail assets on platform and number of funded accounts. I am truly excited about where we are and where we are going. Voyager's business continues to grow every day and the company is well positioned to become a leading brand in the digital asset space. This truly is an exciting time in the industry.

With that, I'll turn the call over to Evan to review the quarterly financial results in more detail.

### Evan Psaropoulos

Thank you, Steve, and thank you all for joining us today. As a reminder, all figures discussed in today's call are in US dollars under IFRS. Our fiscal 2022 second quarter ended December 31, 2021. As Steve highlighted, our second quarter was our strongest ever as our business grew across almost all our key metrics, including volume, customer accounts, net deposits and all distinct revenue lines. As volume and funded accounts grew, so did our assets on platform, increasing from $4.4 billion in the September quarter to $5.9 billion at the end of the December quarter with approximately $1 billion in net new deposits, making up the majority of the $1.4 billion increase.

Total revenue for the quarter was $164.8 million, including approximately $86.5 million in transaction revenue and approximately $57 million in lending and staking activities. As I discussed on our last call, revenue from lending and staking activities was a priority for us and exceeded the target of $50 million we previously provided. Despite some of the rates decreasing overall, we were able to surpass our expectations with an overall increase in assets available to earn yields on, due to our increased net deposits as well as an increase in our staking activities as we are now earning staking revenue across 11 coins.

Looking at some of our unit economics. Average revenue per user was particularly strong at $57 for the December quarter. While our [Technical Difficulty ] increase to approximately 160 for the quarter, we believe that payback period continues to be very compelling at just under 3 months. On expenses, we continue to invest heavily in marketing, as evidenced by our higher customer acquisition costs. Marketing expenses more than doubled from approximately $17 million in the September quarter to more than $35 million -- sorry, $17 million in the September quarter to more than $35 million in the December quarter. We continue to invest more heavily in our digital advertising spend as a top 50 app and also established several long-term sponsorship programs such as the Dallas Mavericks and the National Women's Soccer League.

Additionally, our rewards program continues to be a driving factor of success. And while the overall cost has increased, we have actively managed this cost against our lending and staking activities with a future focus on turning this to a profitable business line. On an adjusted EBITDA basis, we reported $17.4 million for the quarter, a margin of approximately 10.5%.

Again, as previously discussed, we are comfortable with this current level of profitability as we look to prioritize accelerating growth in funded accounts and deposits. The beginning of 2022 has led to lower market volumes, although we have recently seen a slight uptick in volume. The diversification of our revenue is leading us to believe that even in times of lower market activity and lower crypto prices, our minimum quarterly revenue will exceed $100 million. The increased revenue diversification strategy and product road map will only increase the minimum floor as well increase volumes and market prices.

This concludes our prepared remarks. With that, I will now turn it over to our operator, who will open the line for questions.

### Question-and-Answer Session

Operator: [Operator Instructions] We'll take our first question from Chris Allen with Compass Point. Please go ahead. Your line is open.

### Q - Chris Allen

Good morning, everyone. Thanks for taking my questions. Just -- maybe you could just start off just on the rewards paid to customers. You noted that lending and staking revenues have been increasing, some positive trends there and I can kind of close that gap. Maybe any color in terms of

the time frame in terms of when you can close the gap and turn that profitable and whether there's further opportunities to build out staking from here moving forward?

### Steve Ehrlich

Yeah. Thanks for the question, Chris, and thanks for joining us this morning. The -- we don't have a time frame on it. It's part of an ongoing effort to increase the staking. There are certain coins, I'll take Avalanche for one, and we have a deep partnership with Avalanche that we're building to their notes and working with our custodians to make sure that we can stake. Hopefully, that comes -- we finish that sooner rather than later, and that will be a substantial increase in revenue for us on that, too. So it's just a matter of as we keep increasing the custodians we have and working on with them on the nodes, increasing it, there's no set time frame, but we're -- we believe, in 2022 at some point.

### Chris Allen

Got it. And maybe just some additional color on the current environment. Helpful that you provided the minimum revenue base moving forward on expectations around that. Account growth, obviously, was very strong in the December quarter, and conversion to funded accounts seemed pretty solid. How account growth trends have been so far in 2022 and what's a bit of a more challenging backdrop? And have you seen consistency in converting verified accounts to funded accounts in the current environment?

### Steve Ehrlich

We have seen consistent account growth in the quarter. So we will continue to see that as the marketing, and it is becoming a little bit more challenging. I think you can -- market volumes are lower in the quarter, as Evan noted. But we're still seeing those accounts open. And we believe that with the debit card coming, we will increase the conversion ratio from verified users to fund it as well.

There's a lot of interest in people using digital assets in USTC and the way we've structured the debit card. So continued account growth, we think we'll increase that percentage between funded as a verified and continue to grow the business even in a market that's a little bit challenging.

### Chris Allen

Thanks, guys. I'll get back in the queue.

### Operator

And we'll take our next question from Adhir Kadve with Eight Capital. Please go ahead.

### Adhir Kadve

Good morning, guys. Thanks for taking my questions here. Just in terms of the debit card program, I know you said you rolled it out to a select few employees, and then there's a chance to grow it past that. But from those select few employees, maybe can you talk about some of the learnings from that. I think the reason I asked is because I think Visa reported that they saw $2.5 billion in transaction volumes with crypto-linked cards. So clearly, very strong demand for that type of product. But I was wondering if you can just touch on what you've learned from these employees and what you can -- what enhancements you're going to make prior to the broader rollout.

### Steve Ehrlich

Yes. The early adoption, and I was one of them, and we did a Twitter social posting on that and got

a tremendous amount of views that shows the excitement that we have for it, it's all about what we're working on, on the back end of it, like make sure everything goes through, everything flows through, the proper reporting is necessary, canceling things. It's -- those are all the testing we're going through with all the employees, and everything seems to be going great.

And as that continues to be tested, we'll continue to roll it out to that 200,000 group. And it will just take some time to do that. We're not going to be foolish and roll 200,000 out in a week. We're going to do that over time to make sure that we could support those customers as they come on. So specific learnings I'm not going to disclose, but I'll tell you the back end of what we're working on has been very, very good, better than anticipated.

### Adhir Kadve

Perfect. Thank you. And then just maybe from a user characteristics point of view, the new users that you are getting on the platform, do you see that they've kind of changed from six months ago? Are they depositing more on the platform, bringing in more funds from other platform? Any color you can provide on maybe the cohort of these new users versus past users?

### Steve Ehrlich

Yes. I'll tell you this, that I've always said this, the first 500,000 users won't equal and won't look like the next 500,000, which won't look like the next 500,000. We're getting continued deposits from existing customers, and they always start small. They always come in and they put a little bit in. And remember, our initial funding limit for every customer is only $10,000. And when they get comfortable, they see they can use their money right away, they can get it out, they start increasing more. But it's a longer time frame here that we expect is that people will start coming in with a couple of thousand and keep building on top of that. And that's what we're seeing is continued deposits from consumers over time. And so we -- it's just a trend. I think people want to get comfortable expecting when you're getting some new people into crypto, they want to make sure that they can access the funds, and then they'll add more.

### Adhir Kadve

Perfect. And then maybe just one last one for me, and then I'll pass the line. I saw that you appointed a new Head of Development. Can you maybe tell us, do you think you'll be more active on M&A or continue to be active on M&A and maybe in what capacity?

### Steve Ehrlich

Yes, we hired Marshall Jensen as our Head of Corporate Development. We see a lot of things across our desk. A lot of bankers bring us a lot of opportunities. We're also -- we believe we'll be more active. We've got to find the right fit from a number of customers from culture of that company, growth and what opportunities. So, there's a lot of things we can look at and we're going to continue to look at. And when we find the right fit, we'll acquire.

But that said, we've been pretty active in four years. I think we've done four acquisitions. That's pretty good for a really young company, and we fill gaps, right? I mean I think when -- with the acquisitions we have done, whether it was the Ethos acquisition and we got all our IP that allows us to do the crypto transfers to the latest being Coinify, where now we have payment rails that are helping us accelerate the European expansion, we're going to find things that fit us and fit us from a cultural perspective. So, -- and thanks, Adhir, for joining us this morning.

### Adhir Kadve

Thank you guys. Appreciate all the color. I'll pass the line.

**Operator**

We'll take our next question from George Sutton with Craig-Hallum. Please go ahead, your line is open.

**George Sutton**

Thank you. I was just wondering if you could discuss your willingness to let the CAC grow over time relative to payback periods. I'd say that obviously in the context of larger competitors out there. But I'm wondering how this might change with a broadened portfolio including the debit card?

**Steve Ehrlich**

Well, thanks, George. Thanks again for us today. Look, I think CAC will grow over time here, especially to what you referred to in the competitive landscape. It is getting more competitive, so you'll see it grow. And the timeframe will probably expand for us, too. And we're fine with that, we think it will definitely grow.

**Evan Psaropoulos**

And the other thing just to add to that, George, as we deliver more products and add to it, our average revenue per user should expand, too. So the payback will work in that favor as well.

**Steve Ehrlich**

Yes, that's part of the strategy of debit card, to your question. On the debit card, bringing that we'll bring more assets that consumers will hold with us. We're seeing a lot of people already saying they're going to eliminate their bank and come use Voyager or as their bank. And so that's one product, then the equity trading, then the credit products, we're going to add the NFT products.

We'll expand the ARPU and therefore, allow us to get more value out of each customer and bring them more value actually. Even more importantly, it's not just us getting the value out of it is bringing the value back to the consumer, where they look at out they want to go to, to handle their financial world through digital currencies and digital assets.

**George Sutton**

Just one other thing. You had mentioned early that you were pursuing the NFT opportunity. You've given us a little bit of detail. I just wondered if we could get a state of the state relative to your NFT opportunity as you see it.

**Steve Ehrlich**

Yes, we've hired a team strategy and development resources and building it out. Similar to the way we execute our business for trading in that we connect to multiple places, we believe that there are so many marketplaces out there. Consumers want to be able to access them all. And how we deliver that entire environment to them is what we believe is the future of NFTs. It's not just one marketplace, and so we're looking at a solution that encompasses a larger scale all off the Voyager platform.

**George Sutton**

Super. Well, your results were good enough this morning you get the whole crypto market going

this morning, so congratulations.

### Steve Ehrlich

Thank you, George. Appreciate it.

### Operator

And we'll take the next question from Joe Gomes with Noble Capital. Please go ahead. Your line is open.

### Joe Gomes

Good morning. Thanks for taking my questions.

### Steve Ehrlich

Thanks Joe.

### Joe Gomes

I don't know if I missed this, but did you mention what the spread was this morning?

### Evan Psaropoulos

Hi, Joe, thanks for joining us. It's Evan here. No, we didn't touch on it, but I'm happy to update you on it. I'll give it to you in two ways. Average spreads without stable coins affect in our volume was 110 basis points, similar to what we reported in Q1. And then if you remember, we don't take a fee on stable coins. If I include stable coins in that calculation, the spread was 90 basis points, compared to 82 in the prior quarter.

### Joe Gomes

Okay. Thanks for that. And then, Steve, I wonder if you might be able to touch. You had the great Dallas Mavericks program last quarter. Maybe give us a little color on what kind of tail is that showing. I mean was it won and done, or are we still seeing interest from that program moving over into Voyager, even adding more accounts?

### Steve Ehrlich

Yeah. We're seeing a tail on that as we continue to do more things and with them as well, and we have some other programs that are coming out shortly related to that as well. But what also gets us really excited at this point in time is the NWSL season starts -- kicks off in about a month. And the fan base and what we're doing there and some of the partners that we're doing that sponsorship with will give us another opportunity to reach more consumers with our whole mantra of Crypto for All and bringing the crypto products and digital assets to a wider group of customers. That gets us really excited as well. So we're seeing the tail on Dallas. And then in about a month, the NWSL kicks off, and we're excited about that, too.

### Joe Gomes

Great. And then one more, if I may. It's been a tough market in terms of the stock price. Anything -- any plans for maybe looking at accelerating stock buyback? I know you're investing heavily in the company, but just seeing as to where the stock price is these days?

### Steve Ehrlich

I prefer not to comment on what we're going to plan on the stock buyback at this point in time. We have our program. It's been filed, as you know, and it's out there. And if we believe it's the right time to buy stock back, we will. But the program is out there for us to execute when we feel it's the right time.

### Joe Gomes

Great. I'll pass the line. Thanks guys. I appreciate it.

### Operator

We'll take our next question from Kevin Dede with H.C. Wainwright. Please go ahead.

### Kevin Dede

Hi, Steve, Kevin Dede. Could you just peel the onion back a little bit on your digital marketing initiative? I know you've got a new person on Board and have had for a while. Can you just talk a little bit about where you're taking that and some of the results you've seen increased CAC?

### Steve Ehrlich

Yes. Look, I think – and thanks for joining us, Kevin. I appreciate it. Look, I think Pam Kramer is still our CMO, and she's running our programs. And I believe even though the CAC has increased, we've been quite effective in what we've been doing, and the payback has been effective. We did bring in a person to run our partnership marketing. I'm not going to give her name because she'll get 1,000 e-mails from every NFL and Major League Baseball and NHL and etcetera, reaching out to her along with everything else.

But we're expanding our marketing reach. Digital has been effective. We're looking at other opportunities. And to the previous question, CAC will probably expand a bit here. But as we bring more products on it, we're going to get the return back on the customers as well. So it's about expanding it. We've been extremely effective in the digital channels and looking at other opportunities where we don't think others are and to spend and be active in those places.

### Kevin Dede

So just to make sure I understand. You had your comments straight. Steve, you thought -- or you mentioned that you think you'll open in Europe sometime this year, this calendar year on the license in France?

### Steve Ehrlich

Yes. We're opening in Europe sometime in 2022. We're working hard with the quantified folks in getting it up and running there. I don't want to set a time table on it, but it's definitely in 2022 is our target.

### Kevin Dede

Great. All right. Thanks. Appreciate, taking the questions.

### Steve Ehrlich

Thanks Kev.

**Operator**

We'll take our next question from Chris Sakai with Singular Research.

**Chris Sakai**

Hi good morning. Just a question on, I guess, cost per account acquisition and the payback period on that, how has that been this quarter?

**Evan Psaropoulos**

Yes. Thanks, Chris. We reported we had customer acquisition costs at about $160 per month on average for the quarter and average revenue per user around $57, so less than 3-month payback period.

**Chris Sakai**

Okay. Great. And I know Steve mentioned a bunch about marketing programs. Is there any -- can you shed any light on any new ones like Dallas Mavericks going forward?

**Steve Ehrlich**

Nothing I could report right now. Obviously, there's conversations going on across various sports teams, individuals, etcetera, but nothing I'm free to report on right now.

**Chris Sakai**

Okay. And then last one for me. I mean was -- for Dallas Mavericks, was it a worthwhile program?

**Steve Ehrlich**

Yes. I mean we -- it's been very successful for us. And as the previous question about the long tail on it, we're still getting accounts off of that. There is a lot of promotional things we do with the Maves. Most recently, I was down there and speaking to a group of sponsors of the Texas Legends and partners of the [indiscernible] team there. And there's a whole bunch of things going on that we continue to get a tail on the Mavs.

**Chris Sakai**

Okay. All right, great. Thanks.

**Steve Ehrlich**

Thanks, Chris.

**Operator**

[Operator Instructions] And we'll take our next question from Kyle Voigt with KBW. Please go ahead.

**Kyle Voigt**

Hey, Good morning. Sorry, I joined a little bit late, so I might have missed this. But I just wanted to follow up regarding the commentary on BlockFi. And in the full report that was released from the SEC yesterday, it does lay out a structure for BlockFi to offer a yield product in the US. I guess I'm

just wondering if you actually view that development as a positive for the space despite the fine that was levied on them.

And I just want to clarify, do you think you would have to go down a similar path as BlockFi in terms of filing an S-1 with the SEC, or do you believe that the current structure you have sufficiently would protect you from having to go down that path?

### Steve Ehrlich

Yes. So thanks for taking the time, Kyle. Appreciate it. Look, I think, and we've been saying this for a while, that we believe thoughtful regulation is important for the growth of the industry. And I think by reading the order, there is a path to regulation. And so that gets us looking at that and examining it.

But as we've always said, there will be a path to regulation in crypto, and this is probably one of the first steps. How it relates to us is being evaluated, and I can't really share anything more because that's conversations between myself, our internal GC, our advisers. And we have a very, very deep team, and we're evaluating all that at this point in time.

### Kyle Voigt

Got it. That's helpful. And then just on Europe, as we get closer to the launch there at some point in this calendar year, just wondering if you could give any more details regarding what you're thinking in terms of launching in specific countries there. Obviously, there's France that will launch. But just curious, if we should think about more of a staggered launch across Europe and kind of how that will play out. Should we expect most countries and running across Europe by this calendar year, or will that be staggered into 2023? Thank you.

### Steve Ehrlich

Yes. It's definitely a staggered approach. It's the same thing is bringing the debit card to market. We wouldn't want to bring 20 countries on at one time. We want to do it really

structured and stagger to make sure we get the learnings and just grow from there. So obviously, France is a very high priority for us having the license there. And we already have an existing business in Denmark. So two countries that we're excited about right off the get-go. But we will stagger it to make sure that we do it properly and give the customers. And again, it always comes back to the customers with us, how are we going to give them the best experience in using Voyager, and we want to make sure we do that right for them right from the get-go.

### Kyle Voigt

Helpful. Thanks, Steve.

### Steve Ehrlich

Thank you, Kyle.

### Operator

We will take our next question from Mark Palmer with BTIG. Please go ahead.

### Mark Palmer

Yes, good morning. I just wanted to follow up on some of the comments you made earlier with

regard to the staking program, and thanks for the color on Avalanche in particular. What percentage of Voyager's rewards program is currently being funded out of staking versus lending? And how do you see those percentages shifting over time? Thank you.

**Steve Ehrlich**

Yeah. Thanks, Mark. Thanks for taking the time this morning. I think on the face of our financials, on the P&L, we talked about what the staking revenue is versus the lending revenue. And our goal is to state more and more. Let's take E for an example. We just started staking E, and we'll continue to move that out of lending into staking. Then you add Avalanche and some of the other coins we're working on. Our goal is to really get it top heavy on the staking side more so than the lending side.

**Mark Palmer**

Thanks very much.

**Steve Ehrlich**

Thanks Mark.

**Operator**

And there are no further questions at this time. I'll turn the call back over to Mr. Stephen Ehrlich for any additional remarks.

**Steve Ehrlich**

I just want to say thanks to everyone who joined the call today, who's going to listen to the replay on it. We really appreciate your interest in Voyager. We're extremely excited about our product path for 2022. There's a lot on our plate, but we know with the team we have and the growth and the additions we've made to our leadership team and our entire staff, we're excited about executing on that plan. We think we're -- we're an execution-based company, and we're going to continue to grow our business. And so thank you again for taking the time, exciting time to be in crypto. I look forward to speaking to everyone soon.

**Operator**

Thank you. And this does conclude today's program. Thank you for your participation. You may disconnect at any time.

# Exhibit B

**KCSA**

**Moderator: Willis, Joshua**

**March 1, 2021**

**05:00 PM ET**

OPERATOR:          This is Conference # 2567844

Operator:          Good day and welcome to the Voyager Digital fiscal year 2nd quarter 2021 earnings conference call. At this time, all participants are in a listen-only mode.  After the speaker's prepared remarks, we will conduct a question-and-answer session. In order to ask a question or make a comment, please press the star key followed by the number 1 on your touch tone phone.

Questions will be taken in the order they are received.  At this time, I'd like to turn the call over to Mike Legg, Chief Communications Officer at Voyager. Please go-ahead sir.

Mike Legg:          Thank you, Operator. I'd like to welcome everyone to the Voyager Digital Limited earnings call. Today, we will be discussing our fiscal 2021 second quarter results which we announced earlier this morning. With me on the call is Steve Ehrlich, our Chief Executive officer and Evan Psaropoulos, CFO.

I would like to take a moment to direct investors to the investor relations section of our website and investvoyager.com while we have posted our investor presentation as well as our latest announcements on selected unordered operating metrics and activities.

Additionally, you can find our recently announced upcoming investor conference schedule. Before we get started, I want to remind everyone that certain statements discussed on this call are based on information as of

today, March 1st and contain forward looking statements which are subject to risks and uncertainties and given our operating history, market volatility, and unprecedented industry growth.

Trends could materially deviate from today's level. Actual results could differ materially from our forward-looking statements at any of our key assumption discussed in today's earnings press release. The comments made during this conference call were in the latest reports and sedar filings, each of which can be found on our website www.investvoyager.com or under our profile at www.seder.com are incorrect.

The Company has made assumptions that no significant events occur outside the company's normal course of business, and the current trends in respect of digital assets continue. Listeners are cautioned that assets under management, trading volumes and other metrics of Voyager's business fluctuate and may increase and decrease from time to time and such fluctuations are beyond the company's control.

We do not undertake any duty to update any forward-looking statements except where required by law. We also want to caution listeners that past performance is not indicative of future performance and current trends in the business and demand for digital assets may not continue and listeners should not put undue reliance on past performance and current trends.

This call will touch on certain unaudited performance metrics of the business to the month ended February 28th, 2021 provided in our earnings press release issued today. I would encourage each of you to review the forward-looking statements, risk factor disclosure and similar disclosures in today's press release.

With that, let me turn the call over to Steve Ehrlich, Voyagers co-founder and CEO.

Steve Ehrlich:    Thanks, Mike, and good afternoon everyone. I'll briefly review Voyager's positioning within the rapidly growing digital asset industry, the December quarter and update some key metrics. Please note, the dollar amounts referenced are in US dollars unless otherwise noted.

Afterwards, Evan will walk us through the financial highlights for the period and then we will open up the call for your questions. The December

quarter was an important period for us. During the quarter, acceptance of digital assets and crypto currencies continued to accelerate as mainstream players embraced bitcoin and stated their intentions to convert major parts of their treasury into bitcoin.

Benefiting from these trends, Voyager started to become a major player in the space, capturing significant market share with our customer friendly, easy to use, zero commission agency brokerage platform for trading crypto currencies. These industry trends have continued during calendar 2021 and now the company is better positioned than ever to grow its business and reach a broader audience of mainstream investors by helping to educate them about potential investment opportunities with digital assets and their increasing global acceptance.

We have come a long way since we started. Today, Voyager's platform offers over 50-digital assets, with more than 20 of them bearing interest with no lockups. The interest rates very over the various coins with a rate as high as 9.5% on the rapidly growing USDC coin.

For the December quarter, Voyager reported revenues of $3.6 million and ended the quarter with approximately 43,000 customer funded accounts. We ended the December quarter on the strong footing with over $230 million of assets under management as we head into the new calendar year.

Our strong momentum has continued into 2021 and Voyager is quickly becoming the platform of choice for retail investors as evidenced by our unprecedented year-to-date growth.

Previously, the company announced January trading revenue of approximately $8.5 million and just over 1 million trades. Additionally, in January, Voyager reported funded account growth of over 150% as we opened 65,000 newly funded accounts during that month.

This rapid acceleration of account growth and trading volume continued into February as verified users grew to over 605,000 accounts and trading volume continued to grow to over 2 million trades in the month.

At February end, Voyager had over 175,000 funded accounts, which executed an average 70,000 trades per today, a significant increase compared to the 30,000 per day in January. This increase in funded account

and trades per day led to February revenue of over $20 million dollars and assets under management of over $1.7 billion.

The increase in AUM was due to net deposits of over $400 million, plus the appreciation of many crypto assets under management. This $1.7 billion of assets represent another substantial increase compared to the $230 million at December 31st, 2020.

We were extremely pleased with our growth today. In January, we saw an unprecedented 250,000 app downloads over a 3-day period, causing the company to initiate a waitlist to judiciously onboard new users. We have already worked through the bulk of this backlog and our goal is to eliminate the waitlist in the coming days. Based on these learnings, we are expeditiously scaling our technology platform for the growth we anticipate in 2021. The continued growth will come from additional market adoption of digital assets, new product offerings, and international expansion. To support this anticipated growth, we expect to triple our workforce in 2021.

With the growth of assets under management, we remind investors of our 2 main revenue sources, spread revenue and interest revenue. Estimated spread revenue is derived by the trading velocity of our assets while interest revenue was driven by the gross interest earned on the overall assets under management. Historically, the company has earned between 10 to 12% annualized revenue on assets under management.

At this point, I would also like to remind investors of certain drivers of our business. As in agency brokerage business, market volatility can often act as our friend. Voyager executes trades and captures spread revenue in both up and down markets. One example of the powerful agency model happened on Tuesday, February 23rd when Bitcoin decreased from a high of $56,000 to $45,000. That day, Voyager experienced a record day for trading volume, revenue and net deposits. Investors were very active buying the dips across all of the coins Voyager offers.

With our recently completed capital raise is of a $146 million, our balance sheet is stronger than ever. We are excited to see an ever-growing number of investors utilizing our platform and as we continue to execute, we look forward to delivering value to all our stakeholders. With our strong balance sheet, we tend to deploy capital to accelerate our grow through strategic marketing initiatives, further development of our technology infrastructure,

building staff across all departments to support our rapid growth and position Voyager as a digital financial services firm of the future.

As part of the scaling of our management team. We recently added David Brosgol as Voyager's General Counsel, Dan Costantino as Chief Information Security Officer and Jamie Cabezas to lead our HR effort. We expect to continue building out our team throughout the course of the year.

In addition, in February, Voyager welcomed Krisztian Toth, a partner at the law firm of Fasken Martineau DuMoulin LLP, to the Company's Board of Directors. With his extensive background in corporate finance, securities regulations and corporate governance, Krisztian is a welcome addition to Voyager as we continue to strengthen our corporate governance efforts.

Going forward, Voyager will continue to bring new products to our platform even as we expand geographically. In 2021 and beyond, we expect to add debit cards, credit cards, stock trading, and the ability to trade on margin to our suite of offerings. Complementing this, we will look to grow internationally by expanding our operations into both Canada and Europe.

As part of our international growth strategy, in December, Voyager required French regulated broker LGO.  This positions Voyager with a fully regulated platform to support future expansion into Europe. Voyager has also applied to the Ontario Securities Commission, so we can offer our platform in Canada.  We are very proud of the steps we've already taken in this focus area and look forward to our geographic expansion in 2021.

In conclusion, as our dramatic growth has demonstrated, our strategy is clearly working. Voyager's focus on the retail investor is becoming more and more popular and a loyal community's social media outreach combined with our own increased marketing activities, is helping to drive user signing up in record numbers on Voyager.

By offering a zero commission product with high interest payouts on the largest selection of digital assets to trade and invest in, Voyager is attracting a broad group of investors who value the Voyager proposition. We offer our customers deep liquidity and multiple trading partners by providing them with a safe and secure diversified custodial solution. With all we have to offer,  it's easy to see why Voyager has quickly become a premier digital financial services firm.

|   | With that, I'll turn the call over to Evan to review the quarter and our financial positioning in more detail. |
|---|---|
| Evan Psaropoulos: | Thank you, Steve, and thank you all for joining us today. As a reminder, all figures discussed on today's call are in U.S. dollars under IFRS. I will speak to our fiscal 2021 second quarter ended December 31, 2020, as well as selected unaudited metrics and activities from January and February of our fiscal 2021 third quarter, which have been previously disclosed in our press releases and available on our website. |

We had a strong second quarter with a very strong finish in December, closing the period with $230 million AUM, a 200% increase from the end of Q1, with net deposits accounting for more than 40% of this increase.

Total revenue in the second quarter increased nearly 4,000% to $3.6 million.  Fee Revenue grew 2,200% to $2.1 million. Interest revenue for the second quarter was $1.5 million and was not included in our product offering last year. We saw increased performance across all of our top line operating metrics during the second quarter.

Compared to the first quarter, which was previously our strongest quarter to date, we increased funded accounts more than 40% to nearly 43,000, our trading throughput increased with more than 450,000 trades and $340 million of volume, compared 356,000 trades and $215 million of volume in the first quarter.

For the second quarter and continuing into the 2021 calendar year, we have seen strong and consistent month over month top-line growth. Having exited December at a $20 million annualized run rate, we previously announced we exited January 2021 at a $100 million annualized run rate and with today's announcement of February results we finished the month at an annualized run rate in excess of $240 million.

Turning to expenses, total operating expenses for the second quarter increased $3.6 million from the prior year. This was driven by increased variable costs associated with our higher trading volumes, the addition of interest expense associated with our interest product offering, increased headcount as we continue to scale, and increased marketing spend during the quarter.

As of December 31, 2020, our cash, and cash equivalents, including restricted cash, as well as corporate investments in digital assets exceeded $18 million. The corporate investments in digital assets includes more than $7.5 million of corporate funds that were invested in USDC.

Having completed private placements in both January and February, the Company enters the second half of the fiscal year with a significantly stronger balance sheet and as of today, 2020, the company had an overall cash and liquid investments position in excess of $200 million

This concludes our prepared remarks. With that, I will now turn it over to our operator who will open the line for questions.

Operator:               If you would like to ask a question or make a comment at this time, please press the star key followed by number one on your touch tone phone. We will pause for just a moment to compile the Q&A roster.

                        Your first question is from the line of Deepak Kaushal with Stifel. Please go ahead.

Deepak Kaushal:         Hi guys, good evening. Thanks for taking my questions and I guess this is your first conference call.

Male Speaker:           Hey Deepak, I think it is our first formal call. So, yeah. Thanks for joining.

Deepak Kaushal:         Congrats on that. Happy to ask the first question on your first call. It's pretty impressive results for February, $20 million on average AUM for the month, I calculated an average of $1.2 billion through the month of Feb. Looks like a 20% annualized monetization. That seems significantly higher than the 10 to 12%, you're talking about earlier.

                        Can you talk about what's going on there, what maybe is happening on the spread of interest slide that you're seeing today?

Male Speaker:           Yeah. Look, I think in the month of February as it started in January, we started to see our customers are active customers. I think one thing that gets missed in all this is we focus on engaged users. I think one of the metrics we'd like to see after seeing some other information in the market over the

last week is something like we had 75% of our customers with funded accounts actually made a trade in the month of February.

So, we have a really engaged active customer base that comes back and looks at the app multiple times a day, trades multiple times a month. So, we're getting more velocity and the trades from customers. At the same time, our strategy of being in alt coins as well as bitcoin and Etherum, the top 4 to 5 coins, which we always talk about they were a little bit higher spreads on that, has increased our spreads as well.

So, when you couple the engagement and activity of our customers with the coins they are trading, you see higher numbers and obviously that 10 or 12% goes to 15 to 20% because of the engagement of our users. We have a very loyal community, people love our app, and they love to trade on our app.

Deepak Kaushal:    Got it. So just in terms of the interest rates in general, every day I read about more companies offering some kind of lending product in crypto. What do you think in terms of rates, you're still mentioning that you're at 9.5% for you USDC? Any kind of directional trends you are seeing on rates or any kind of indication you can give us on your comfort on how stable those are.

Male Speaker:       Yeah. Actually, we're starting to see them spike a little bit upward with us and started to gather more, but I think the other interesting thing on that is there more and more coins becoming staking coins like Ethereum 2.0. We get to take part in that for our customers in the near future too, and be able to stake and I think the staking rewards on Ethereum is 7.2% or something of that nature as a staking rewards.

So not only are we seeing more coins being able to be staked including the eventual Voyager token which are the 7% staking. We will also see -- we're also seeing higher rates paid by borrowers for coins, specially USDC.

Deepak Kaushal:    Okay, that's helpful, thank you and then just going to your account growth, is it 65,000 account last month, and some another 70,000 accounts in February, is that the speed limit?  Like what's the fastest you mentioned that your clearing most of the waitlist, what have you done to kind of help clear that log jam and how quickly can you onboard accounts?

Male Speaker:        Yeah. I think the account growth would have been even greater this month
                     if we didn't have the waitlist and we're going to have as I mentioned in the
                     prepared statement, we're through the waitlist and over the next few days
                     we won't have to waitlist anymore. So, we expect actually the account
                     growth to continue at a faster pace.

                     I think the combination of our community and the organic side of our
                     customer acquisition with what we're doing now with the marketing budget
                     that we have now assigned for the coming months with the fund raise. We
                     believe that will -- we haven't hit any ceiling on that 65 to 70, I think it's
                     going to continue to grow.

Deepak Kaushal:      Okay and then and I noticed the conversion rate from verified users to
                     funded account went up to 30%, what's the strategy for doing conversion,
                     anything changed there in the way bringing money into the platform.

Male Speaker:        We have a couple of tricks up our sleeves in the future here to accelerate
                     that and continue with. One of our main areas of focus and I think its really
                     an important area of focus compared to some of the competitors that the
                     trading and funded accounts for a much lower percentage than we are.

                     We put a lot of energy into pushing people down the funnel and incentivize
                     them in the program and things we do, and we haven't used up all of our
                     tricks yeah. I've got a few still up my sleeve that we're ready to unveil over
                     the next 60 to 90 days.

Deepak Kaushal:      Okay, looking for that. I got one more question and I'll jump back in the
                     queue to give others a chance. You mentioned the capital raise, you got
                     quite a bit of it, you talked about a big one in March, maybe you can give
                     us a sense of how you break it down into chunks and what the priorities of
                     the chunks are and can you give us a sense of cost structure that you're
                     targeting in terms of OpEx spend rate over the next 12 to 24 months, you.

Male Speaker:        Got it. So, can you repeat the first part. I heard it broke up there for a second.

Deepak Kaushal:      Yeah. Just in terms of a capital raise, you know you got a lot of capital on
                     the balance sheet, how do you break it down into various priorities and what
                     do you spend on that. You mentioned marketing budget earlier. Can you

just give us a big percentage, you can break it down and how you plan to spend it?

Male Speaker:      Yeah. Look I think our key focus on the spending of money is the three parts. One is keep accelerating marketing. Do the direct to consumer that we've been doing it super effective in doing that and keep driving that home, but on top of that, you'll see us start doing some more branding on that to build the brand as we get more and more brand recognition in the market place and we take a leadership position in that.

So, we're going to spend a good chunk of that money, have it determined exactly the amount on the marketing side, but then building out the team right and as we've always talked about and we hired leadership positions in Dan Costantino, David Brosgol. We're going to add some more leadership positions to place where we think we need it such as marketing and then we're going to just keep in the team all together and deep in our service team, but the lion share, 50% of our increased budget is going to be in a marketing.

We're really good and effective at it and we're going to continue to spend money on the marketing side to keep growing the account and get that market share that we're grabbing from everybody else right now and keeping accelerating the land grab.

Deepak Kaushal:   Okay, great. And then follow-up from that have been any kind of spend rate we should be thinking of like 40 million bucks over the next 12-months or 50-year or quarterly run rate you guys are targeting.

Male Speaker:      From a burn rate perspective we're just not coming out with that guidance just yet, we do look at it. You'll see our financials later today. I think we have about a $5.5 million of G&A expense and $800,000 of product development. I think the business model is that it is grown quite a bit from there, I think from a head count perspective.

It could be -- we could be looking at tripling our head count from there across the board from salaries and compensation expense and then marketing is the other big component in there. Again, you'll see in the financial, we spent about $1 million for the 3 months in marketing spend. I think obviously as Steve alluded, there's plenty of room there for us to grow

and then the other big expense you'll see is interest expense associated with our interest product offering and that will continue to grow proportionally as we grow interest revenue, so those are the kind of the three big expenses.

Deepak Kaushal:   Okay, thanks for that. I will pause the line now and maybe jump back in the queue.

Operator:         Your next question is from the line of Kevin Dede with HCW. Please go ahead.

Kevin Dede:       Good afternoon, guys. Kevin Dede with HCW. Thanks for taking my questions. Big one for me Steve is just I guess sort of a 20,000-foot view. So, can you talk to sort of the dynamics of the industry in general and the correlation perhaps between customer growth and bitcoin price and trading velocity.

Male Speaker:     Yeah, it is a great question and thanks for participating Kevin. Look, I think we're seeing customer growth and we have seen bitcoin go down into $44,000 range over the last few days to and hasn't slowed our customer growth and in fact it's bringing more people in because it's a lower point to buy the bitcoin at and some of the alt coins, but our model from day one was set out to be not just a bitcoin and Ethereum broker because we look at that and say it's almost like an online broker just offering FANG stocks.

                  We need to have more good projects that are being done like DOT is one of them that we see a lot of activity, LINK is another one with customers are buying quite a bit and investing there. So our model and strategy is always been to have multiple coins, give people that access to a bigger pool, then  they get anywhere else, make it easy for them when there's dips  in the market, our customers buy and then they get the interest on it.

                  So we're seeing more and more, what's surprising to me and with what we laid out when we put together and went ahead and bought Ethos 18 months ago for the crypto transfers, we see a more deposits, not only we are seeing an increase in the Fiat deposits, we are seeing a tremendous increase on the crypto deposits on our platform now too.

                  So, we're seeing it from both ends. We are the place for agency growth, for agency customers to get that trading opportunity and investing.

Kevin Dede:          Alright. Would you peel the onion back just little bit further Steve. So, we
                     get a better handle on the agency and your interaction with, I guess the
                     exchanges, have you made progress and sort of expanding your web and
                     accessing the opportunity to exploit other exchanges. And can you kind of
                     talk to how that's developed, and how you've expanded sort of the backend
                     I guess of your platform.

Male Speaker:        Yeah, we're constantly looking to add exchanges and market makers and
                     liquidity providers and we get calls from all the exchanges all the time
                     wanting liquidity from us as we start gathering at $1.6 billion of trading
                     volume in month, that's quite a bit of volume that these guys wants. So
                     we're always constantly, we don't really put out a list of exchanges we work
                     with.

                     We keep that very close to the vest, but we're constantly looking at
                     expanding and adding them to the mix all the time.

Kevin Dede:          How integral is that functionality to your growth trajectory you think?

Male Speaker:        Look, I think we set ourselves apart from all the others because of the depth
                     of liquidity we bring. So, is it integral to have a certain level of market
                     makers and exchanges? We have in our mind what we think is the right
                     allocation between all of them as exchanges to drive the best pricing engine
                     we can put together.

                     Obviously, we're not in exchange. So its integral to us to have as many
                     exchanges and market centers provide liquidity that we're comfortable with
                     because I think one of the key things about how we choose the partners is
                     understanding who their customers are and how they operate the liquidity,
                     can we move coins on and off.

                     So, there's a whole checklist of items that we look at to make sure that we're
                     connecting to the right exchanges and partners.

Kevin Dede:          Okay, thanks for adding that color. It was an aspect of your business, I just
                     haven't become familiar with yet. So, I appreciate the hand holding. Would
                     you mind talking about the New York bit license, where you are there, and
                     maybe dialing in a little bit more in terms of the timing on your international
                     expansion plans.

Male Speaker:        Yeah. Look on the bit license side, we've been working with the New York state DFS for sometime now. For those who don't know, they've only given out one-bit license in the entire year of 2020, but we're working down the path. We've forwarded all the information they requested for us. We are in line for their review.

I think there are very limited staff, but I'm hopeful and believe that we'll get that over the next few months. It's just they have a backlog of stuff, in this COVID world, I don't think it's tough, it's not prime to giving out the extra licenses I can tell you that and so we expect to be there and have that through in the next few months.

On the international front, we were working very closely with the AMF in France dotting all the I's crossing all the T's to make sure that our KYC and money movements all satisfy all the requirements. So far everything is good on that front and working with the OSC up in Canada to make sure that we operate as a regulated entity up in Canada because our theory and our business models all based upon working with the regulators and working in regulated environment under the rules of that jurisdiction.

Kevin Dede:          Okay. I know you alluded your prepared remarks that you hope to get both of those moves done this calendar year. Is that sort of the way we should think about it?

Male Speaker:        That's our plan. Our plan is to get that done. As soon as we can dot the I's and cross the t's with all the regulators and get their approval, we're moving fast and furious on that front.

Kevin Dede:          Okay, last question from me, Steve. I'm just curious about how you're managing your digital marketing campaign. Is a lot of that driven inhouse or you working with agents. How's that sort of come into the market.

Male Speaker:        Back in November, we are Nat Jaeger to run our digital marketing and Nat's done an especially good job with us. Cleaning up our tech stack and putting a lot of good platforms in place for us to use, we do it all internally right now. We do have a little bit of one or two outside that just help us manage it, but all the decisions we make are internal.

And so we've done a real nice job, but we're expanding that team too, and adding to the marketing team to add more vertical upside of digital

advertising. We are also really effective in social media and influencers whether they're pro athletes or they're crypto influencers that really help us spread the word about Voyager, Matt Barkley, Marshall Faulk are too big influencers and Stephen Piscotty of the A's. Some really big influencers with us to spread the word, but digital we do pretty much in house and we're going to continue expanding our team.

Kevin Dede:           Okay. So the increase in expense there, will that go to continue to build in house or do you think you're going to be leverage outside, no services to bolster your get to market on marketing.

Male Speaker:         A little of both  now because of the budget we have and from the fund range, we think that we can efficiently do both in house and some outside expertise to help us expand upon that.

Kevin Dede:           Great, great, great. Okay, well thank you so much for entertaining with questions, Steve, really appreciate it.

Steve Ehrlich:        Thank you.

Operator:             Your next question is from the line of Chris Sakai with Singular Research. Please go ahead.

Chris Sakai:          Hi everyone, thanks for taking my question. Just had a question on I guess the new funded account growing from 65,000 to 70,000 from January to February. And then your net deposits growing from $170 to $400. Wanted to see, are you guys seeing a different type of investor now and I wanted to get some color as a backlog that you mentioned runs out, I mean how are these new funded accounts, where do you see them ending in the quarter -- next quarter.

Male Speaker:         Well. So let me give some clarity to the 400-million net deposits that we don't, we haven't put out to the market what that break down is between new funded accounts, first time funders, and returning funders. We see tremendous amount of engagement and so one of the reasons you see it go from 170 to 400 is existing customer bringing more assets on the platform.

                      As we get a larger share of wallet from those customers, whether they're moving from your traditional bank and moving more cash on the platform

to earn 9.5% USDC interest or moving bitcoin in from one of the other places to earn 5.5% percent interest and have the ability to trade. So our customers tend to fund $3 to 5000 dollars and then they keep adding from there.

So that is back to the engagement of our customers, which is a really important thing to keep reminding people. Our customers are really engaged where they bring more and more assets to the platform. So that $400 million should continue to grow because our customers are bringing in more assets on the platform.

So, as we grow new customers, existing guys put more money on the platform as well. So to the next part of where we're going to get more customers, we're going to continue our marketing, and keep going and expand our budget. So we can keep attracting more and more customers to our platform whether we do that through the digital adds or our relationships with the influencers or some other techniques that we have, all this stuff is going to help us get more customers on the platform.

Chris Sakai:     Okay, great. And then my next question I guess for the month -- I mean for the quarter ending in December, your G&A was $5.5 million and now in for 2021, you guys are forecasting tripling your workforce. Wanted to get some idea and color on where you see G&A when the work force is triple?

Evan            Yeah, this is Evan Psaropoulos here. So, of the $5.5 million, for G&A, the
Psaropoulos:    salaries and share comp was probably call it $700,000. So that would give you some idea of the proportion head count relative to G&A. And then in the product development side, the other category in our P&L, there is head count component in there, that is probably another $700,000 in there as well.

Chris Sakai:     Okay. Alright, well thanks a lot.

Male Speaker:    Oh no problem, thanks Chris.

Operator:        Your next question is from the line of Dan Weiskopf with Toroso. Please go ahead.

Dan Weiskopf:    Thank you for taking my question. I've got to say you guys are really phenomenal as far as managing the business. Congratulations on a great

quarter and keeping up with the demand. My question is can you give some kind of breakdown or further guidance on who your customers are, is it any sense of age or geography or they must US. Where are they by state, anything I mean just give me some kind of sense of that. I know it's an open call, so you got to be careful what you say, but.

Male Speaker:     Yes. So Dan, thanks for being on the call. Thanks for the question. Look, we are only in the US today. So, all of our customers are in the US. Our average are of customer, we go for a sweet spot of customer, that tends to be probably in their mid-to-early 30s, and they're engaged in the market and engaged in crypto.

                  And I think one of the phenomenon that I'd like to point out to at this point is the fact that over the last month with what's going on in the equity market with the reddit chat boards and all that, we're seeing more and more adoption of crypto by that group of customers because what they believe is a free and fair market of crypto and the retail consumers can have a much more impact into the market.

                  And so we're seeing more and more of that group of customers come on board, but today it's only US. We're looking to expand into Canada and Europe, but we're US based business with US customers today.

Dan Weiskopf:     And are there, besides I guess New York or other states that you would love to get into?

Male Speaker:     We're at 49 states today. We offer our services in 49 states. It's only New York that we're not -- we don't offer this service.

Dan Weiskopf:     Awesome. Okay, thank you.

Male Speaker:     Thanks, Dan.

Operator:         Your next question is from the line of Deepak Kaushal with Stifel. Please go ahead.

Deepak Kaushal:  Hey guys, thanks for taking my call, other people on the call in crypto, I guess that means that people are paying attention. Steve, I want to go back to that 20,000 foot view maybe from a regulatory perspective. We had a

new head of treasury, SEC etcetera, large competitor files to go public, and And we've had New York Attorney General settle with Tether.

Can you kind of give us an assessment your view of where we are with the regulators and your interpretation of these kind of changes that happened last couple of months and the outlook from a regulatory perspective.

Male Speaker:    Yeah, look I think those changes seem to have some positive impact on the crypto market. I think there is, look that people that are now in place in a lot of those roles understand blockchain, understand crypto. I think that will lead to thoughtful regulation, which is a boon for crypto.

I think when that comes, a thoughtful regulation about market structure, about custody, about how you reserve customer balances, and account form, all those things are good. And so I think the new administration will be good for crypto because of their openness to think about it and how to put regulations in place.

And you did mention previously last week filed S1 from one of our competitors, but also one of our exchanges that we use. We're excited by that. That gave us a lot of document to read, 300 plus pages of documents to read, and gives us a good road map.

Biggest guy banged on the door and get through and go to the Nasdaq. I think it gives us a path to get the Nasdaq now too as a company. So once we can get through reading 320 pages, we'll get, but I think that it's good for the industry too, we're excited by their filing and what it could mean for us is we want to graduate from the CSE to the Toronto stock exchange which is in our road map and then from there to the Nasdaq, that is all part of our road map.

Deepak Kaushal:    Excellent. So, you've got a more accommodating regulatory environment and you guys pretty much knocked down a security risk earlier, the technology risk seems to be well in hand. So, what kind of keeps you up at night and how should we think that risk of the business going forward.

Male Speaker:    Just want to grow the business, so I never sleep. I don't really have stuff that really keeps me up at night. To me, it's just thinking about how we can continue to grow our business, adding the products, growing the customers, making sure our customers are happy and satisfied because I think I've been

doing retail businesses now for 22 years, and the most important aspect of a retail business is listening to your customer and understanding their needs and trying to solve problems for them and trying to listen to them and respond to them.

They are our business, we talked about internally, 1 and 1A is customers and security. And do I stay up at night trying to think how I can satisfy all the customers and their demands, that's what really keeps me up at night because I want 100% customer satisfaction which is nearly impossible task, but that's what I strive for.

Deepak Kaushal:     Great, that's really helpful. I appreciate that. Glad you're not staying up reading 300 page S1's.

Male Speaker:        I am waiting for someone to give me the cliff note version.

Deepak Kaushal:     I appreciate you taking my questions, thanks.

Male Speaker:        Thank you, keep up.

Operator:            And I'm showing no further questions at this time. I would like to turn the call back to management for closing remarks.

Male Speaker:        Well. I just want to say thank you to everyone for listening to the call today. Voyager itself is extremely excited about our business prospects, where we are going, the growth of customers we've had, and where the industry is going and we look forward to finishing up the quarter strong and speaking to everybody again in the near future.

So, thank you very much again and have a great night.

Operator:            Ladies and gentlemen, this concludes today's conference call. Thank you for your participation. You may now disconnect your line.

VoyagerCorpRepShannonCaseyRough_Rough

1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                    CASE NO:  21-24441-CIV-ALTONAGA/Torres
 3                    2009-CA-212-O

 4   MARK CASSIDY, on behalf of himself
     and others similarly situated,
 5
             Plaintiff,
 6
     vs.
 7
     VOYAGER DIGITAL LTD, and
 8   VOYAGER DIGITAL LLC,

 9           Defendants.
     _____/
10
     * * * * * * * * * * * * * * * * * * * * * * * *
11   The following transcript of proceedings, or any portion
     thereof, in the above entitled matter, taken on April
12   26, 2022, is being delivered unedited and uncertified by
     the official court reporter.
13
     The purchaser agrees not to disclose this unedited
14   transcript in any form (written or electronic) to anyone
     who has no connection to this case.  This is an
15   unofficial transcript which should not be relied upon
     for purposes of verbatim citation of testimony.
16   This transcript has not been checked, proofread, or
     corrected.  It is a draft transcript, not a certified
17   transcript.  As such, it may contain computer-generated
     mistranslations or stenotype code or electronic
18   transmission errors, resulting in inaccurate or
     nonsensical word combinations or untranslated stenotype
19   symbols which cannot be deciphered by non-stenotypists.
     Corrections will be made in the preparation of the
20   certified transcript (which must be purchased in
     addition to the disk) resulting in differences in
21   content, page and line numbers, punctuation, and
     formatting.
22   * * * * * * * * * * * * * * * * * * * * * * * *
```

Page 1

VoyagerCorpRepShannonCaseyRough_Rough

7       Q.    And it's kept in Voyager's name, not in his

8   name?

9       A.    I don't know.

10      Q.    Okay.  So what does it matter you say that

11   Voyager buys it on his behalf?

12      A.    Well, I don't know if it's kept in Voyager's

13   name or another name, I guess I should say.

14      Q.    Okay.  So, going back to this interest, is

15   there anything unique that you can see here or tell us

16   about Mr. Cassidy that makes it different from anyone

17   else that was registered in the Voyager Earning Program

18   in terms of how this interest is paid?

19      A.    Not looking at this, no.

20      Q.    Okay.  And I don't want to -- I don't want to

21   spend hours on this.  I mean, if Mr. Cassidy was in

22   Texas or if he was in California, would there be any

23   different that you would look at in this chart in terms

24   of how he was paid interest every month if both people

25   met the minimum amount that was necessary each month?

                   UNCERTIFIED ROUGH DRAFT

                                              42

1            MR. SADEGHI:  Objection to form.

2            THE WITNESS:  No.  His earn would be the same,

                   Page 48

VoyagerCorpRepShannonCaseyRough_Rough

3      as far as I know, in those state -- in those

4      states.

5  BY MR. MOSKOWITZ:

6      Q.   So there's no distinction for the Voyager Earn

7  Program by state.

8           Is there any difference in terms of how much

9  besides just their percentage would be higher?  You

10  don't, like, get treated completely different if you

11  have $100,000 versus whatever the minimum amount is; you

12  would just get more -- more interest at that month,

13  correct?

14           MR. SADEGHI:  Objection to form.

15           THE WITNESS:  Yes, as far as I'm aware.

16  BY MR. MOSKOWITZ:

17      Q.   Okay.  And sitting here today as the corporate

18  rep -- representative, do you know if anything from

19  Mr. Cassidy's account, looking at his account, that

20  makes him unique or different from any other investor

21  with Voyager Digital, LLC, on the platform?

22      A.   No.

23           (Defendants' Exhibit Number 4 was marked for

24           identification.)

25

UNCERTIFIED ROUGH DRAFT

Page 49

VoyagerCorpRepShannonCaseyRough_Rough

15      Q.   Do you see there's a little mark after the

16   true; it says up and down?

17           If you went into this database and you took

18   the screenshot, what else can you change true to?

19           MR. SADEGHI:  Objection to form.

20           THE WITNESS:  You can't chain -- I don't have

21       right -- access to the database, so I can't change

22       anything.

23   BY MR. MOSKOWITZ:

24      Q.   You can just view this.  You can't actually go

25   into the database?

                    UNCERTIFIED ROUGH DRAFT

                                                46

1            MR. SADEGHI:  Objection, form.

2            THE WITNESS:  I can view it and I can't change

3       it.  I have read access only.

4   BY MR. MOSKOWITZ:

5       Q.   Okay.  Did you -- so somebody asked you to

6   find out if Mr. Cassidy clicked the box.  You knew he

7   did before you even started because you said you can't

8   trade on the account unless you click the box, right?

9   There's no exceptions?

10      A.   Not that I'm aware of you can't create an

                    Page 53

VoyagerCorpRepShannonCaseyRough_Rough

11   account.

12        Q.   Did you click in here "Mr. Cassidy's user_ID

13   redacted for privilege [sic]"?  Did you enter that in

14   the program?

15        A.   I'm sorry, enter what?

16        Q.   When you have the screenshot here it says

17   under the "user_id" box "Mr. Cassidy's user_id redacted

18   for privacy," right?  We have his user ID because we

19   just looked at the prior document, which showed what his

20   ID was.

21             But who typed in his user ID in order to find

22   this information?

23        A.   I did.

24        Q.   Okay.  Is there any other time in the Voyager

25   process where a consumer needs to actually click a box

                    UNCERTIFIED ROUGH DRAFT

♀

                                               47


 1   to accept any revisions or changes to the User

 2   Agreement?

 3        A.   Not that I'm aware of, no.

 4        Q.   Do you know why?

 5        A.   No.

 6        Q.   Would that show you, then, that they actually

                          Page 54

VoyagerCorpRepShannonCaseyRough_Rough

 3          THE WITNESS:  I can always know they have

 4      clicked the box and that they have said that they

 5      have read it, but I don't know if they've actually

 6      read it.

 7  BY MR. MOSKOWITZ:

 8      Q.   But at least they're clicking a box and

 9  telling you that they say they read it, right?

10      A.   Yes.

11      Q.   I'm asking you do you know why, when Voyager

12  makes continuous revisions to the User Agreement -- and

13  you're aware of that, right?  Every couple --

14      A.   Yeah.

15      Q.   -- months or years there's changes to this

16  agreement?

17          MR. SADEGHI:  Objection to form.

18          THE WITNESS:  Yes.

19  BY MR. MOSKOWITZ:

20      Q.   Okay.  Why -- for those subsequent changes

21  that are made why doesn't Voyager just follow the same

22  easy process of having this "click this button," and if

23  you click it, then you could go back, type in the user

24  ID, and you can see, simply, if they clicked it and read

25  it or even received it.  Why don't you do that?

VoyagerCorpRepShannonCaseyRough_Rough

11          THE WITNESS:  What's the exact question?

12  BY MR. MOSKOWITZ:

13      Q.    Yeah.

14          As of April 18 this email change -- this --

15  this User Agreement change that you made on April 16th

16  was already binding on Mark Cassidy regardless if he got

17  this marking master email or not, according to your

18  testimony all morning?

19      A.    Yes.

20      Q.    Okay.  So this document just shows that there

21  was a mass email -- that we see on the right -- sent to

22  a Marketing Master 2021.  What is that list?

23      A.    I understand that to be the list of the

24  recipients of this email.

25      Q.    Okay.  But I don't have -- you already

                    UNCERTIFIED ROUGH DRAFT

♀

                                                        65

1  produced the whole thing.  Are these people that are

2  just under a marketing email for Voyager or are they all

3  customers of Voyager or do you know?

4      A.    I don't know.

5      Q.    So you don't know who comprises this list,

6  whether they're customers or not?

                    Page 75

VoyagerCorpRepShannonCaseyRough_Rough

7       A.   No.

8       Q.   Did you discuss this document with your

9   counsel?

10      A.   Yes.

11      Q.   And did you ask any questions that you didn't

12  know?

13      A.   No.

14      Q.   Okay.  So -- so walk me through it.  When it

15  says here Marketing Master 2021, did you ask her, well,

16  who actually got this email?

17          MR. SADEGHI:  Objection to form.

18          THE WITNESS:  We just discussed that

19      Mr. Cassidy's name was on the list to receive the

20      email.

21  BY MR. MOSKOWITZ:

22      Q.   Okay.  We'll get back to the next exhibit.

23  But on this exhibit, it shows that it was mailed out to

24  1 million 279 people 869; is that correct?

25      A.   Yes.  That's what it says.

                    UNCERTIFIED ROUGH DRAFT

♀

                                                    66


1       Q.   And it took 6 hours to send out this email?

2           MR. SADEGHI:  Objection to form.

VoyagerCorpRepShannonCaseyRough_Rough

19          MR. SADEGHI:  Objection to form.

20          THE WITNESS:  I just knew this and that this

21     one took place over Zoom.

22 BY MR. MOSKOWITZ:

23     Q.   I'm sorry, you just knew this; what does that

24 mean?

25     A.   That the setting -- the arbitration occurring

                    UNCERTIFIED ROUGH DRAFT

♀

                                              81


 1 in New Jersey was not -- wasn't -- not part of their

 2 rules, so it had to be changed.

 3     Q.   So you had to change the Voyager Standard

 4 Agreement at that time?

 5     A.   I don't know.

 6     Q.   Well, that's what you just said.  So how do

 7 you know that?

 8     A.   I don't know the results.  I don't know what

 9 the res- -- the result of this would be.

10     Q.   You knew that at least this arbitration had to

11 take place by Zoom and not in person in New Jersey?

12          MR. SADEGHI:  Objection to form.

13          THE WITNESS:  I don't know why it took place

14     in New Jer- -- in -- by Zoom.

VoyagerCorpRepShannonCaseyRough_Rough

15  BY MR. MOSKOWITZ:

16      Q.    Okay.  Well, reading this, it says "The above

17  provision violates Principle 7:  Reasonably convenient

18  location."  So were you aware of that, sitting here

19  today?

20      A.    Aware of what?

21      Q.    That the Voyager standard arbitration

22  provision as of this date, June 26, 2021, violated the

23  AAA's regulations.

24      A.    I just knew it was changed.

25      Q.    What do you mean by changed?

                    UNCERTIFIED ROUGH DRAFT

♀

                                             82

1      A.    The -- that the arbitration agreement was

2  changed.

3      Q.    By who?

4      A.    The legal team.

5      Q.    And how was it changed?

6      A.    What do you mean how?

7      Q.    You said that it was by Zoom so they didn't

8  have to go to New Jersey, but how else was it changed?

9      A.    I don't know specifics.

10     Q.    Do you know if it was conducted confidentially

                    Page 95

VoyagerCorpRepShannonCaseyRough_Rough

11 before a single neutral arbitrator?

12    A.   I don't know.

13    Q.   Well, you're here as the person with the most

14 knowledge about the Voyager Platform User Agreement

15 including revisions thereto.  Is there somebody that

16 would have more knowledge than you about how this

17 agreement was changed?

18    A.   The legal team.

19        MR. SADEGHI:  Objection, form.

20 BY MR. MOSKOWITZ:

21    Q.   I'm sorry?

22    A.   The legal team.

23    Q.   But you're the one who's the corporate

24 representative today.  I can't ask Kayvan.  I can't put

25 him under oath and ask him questions.  You've been

                  UNCERTIFIED ROUGH DRAFT

                                              83

1 designated by the company to answer my questions.  So

2 I'm trying to figure out as much as I can because you're

3 supposed to be prepared today on all of the revisions.

4        So if there's only one arbitration that ever

5 existed and that changed, can you -- can you help me out

6 a little bit and kind of tell me a little bit how you

                      Page 96

VoyagerCorpRepShannonCaseyRough_Rough

1  New Jersey and it no longer required it to be under

2  confidentiality by a single new -- neutral arbitrator.

3  You know those two changes --

4           MR. SADEGHI:  Form.

5           MR. MOSKOWITZ:  Let me just finish the

6      question.

7  BY MR. MOSKOWITZ:

8      Q.   You just -- you just may not know other

9  changes?

10          MR. SADEGHI:  Objection to form.  Misstates

11      the testimony.

12          THE WITNESS:  I know the New Jersey change.  I

13      do not know about the other change.

14  BY MR. MOSKOWITZ:

15     Q.   Okay.  And you say the New Jersey change.  I

16  just want to be clear on the record, what is the

17  New Jersey change?

18     A.   That the arbitration must occur in New Jersey,

19  and now that has been -- that's not part of it.

20     Q.   Okay.  And what about you don't have any

21  knowledge on this second part, that will be conducted

22  confidentially, or today the arbitration's required to

Page 99

# Exhibit 3

| EMAIL | USER_ID | TRANSACTI | SYMBOL | TRANSACTI | TRANSACTI | TRANSACTI | QUANTITY | TRANSACTI | NET | PRICE |
|---|---|---|---|---|---|---|---|---|---|---|
| markcassid | 9d0c832a-( | 01FD9AGS | USD | withdrawa | BANK | 2021-08-17 | 1018.29 | N/A | 1018.29 | 1 |
| markcassid | 9d0c832a-( | 01FD9AE7I | BTC | Sell | TRADE | 2021-08-17 | 0.017862 | USD | 821.2948 | 45980 |
| markcassid | 9d0c832a-( | 01FD9AEV | ETH | Sell | TRADE | 2021-08-17 | 0.06227 | USD | 197.0011 | 3163.66 |
| markcassid | 9d0c832a-( | 01FC0C0YT | BTC | deposit | INTEREST | 2021-08-01 | 7.42E-05 | N/A | 3.098384 | 41745.95 |
| markcassid | 9d0c832a-( | 01FBZ931S | BTC | Buy | TRADE | 2021-07-31 | 0.002296 | USD | 96.78982 | 42147.58 |
| markcassid | 9d0c832a-( | 01F9GM2K | BTC | deposit | INTEREST | 2021-07-01 | 8.03E-05 | N/A | 2.690644 | 33524.1 |
| markcassid | 9d0c832a-( | 01F73D8TS | BTC | deposit | INTEREST | 2021-06-01 | 7.98E-05 | N/A | 2.948955 | 36940.44 |
| markcassid | 9d0c832a-( | 01F659C8F | ADA | Sell | TRADE | 2021-05-20 | 55.3 | USD | 95.29462 | 1.72323 |
| markcassid | 9d0c832a-( | 01F5E1BXY | ETH | Buy | TRADE | 2021-05-11 | 0.0025 | USD | 10.11425 | 4045.7 |
| markcassid | 9d0c832a-( | 01F5E1751 | USD | deposit | BANK | 2021-05-11 | 10 | N/A | 10 | 1 |
| markcassid | 9d0c832a-( | 01F5E02FC | ETH | Buy | TRADE | 2021-05-11 | 0.002484 | USD | 10 | 4025.286 |
| markcassid | 9d0c832a-( | 01F5E01FZ | USD | deposit | BANK | 2021-05-11 | 10 | N/A | 10 | 1 |
| markcassid | 9d0c832a-( | 01F4VVZQ( | USDC | Sell | TRADE | 2021-05-04 | 1.6 | USD | 1.6 | 1 |
| markcassid | 9d0c832a-( | 01F4VPP8E | ADA | Buy | TRADE | 2021-05-04 | 55.34034 | USD | 75 | 1.35525 |
| markcassid | 9d0c832a-( | 01F4VPNS) | USD | deposit | BANK | 2021-05-04 | 75 | N/A | 75 | 1 |
| markcassid | 9d0c832a-( | 01F4MFHB | USDC | deposit | INTEREST | 2021-05-01 | 1.6041 | N/A | 1.6041 | 1 |
| markcassid | 9d0c832a-( | 01F4KQDD | BTC | deposit | INTEREST | 2021-05-01 | 6.07E-05 | N/A | 3.515016 | 57946.2 |
| markcassid | 9d0c832a-( | 01F4K4F9I | ETH | Buy | TRADE | 2021-05-01 | 0.057291 | USD | 163.88 | 2860.484 |
| markcassid | 9d0c832a-( | 01F4K4ERY | USDC | Sell | TRADE | 2021-05-01 | 163.88 | USD | 163.88 | 1 |
| markcassid | 9d0c832a-( | 01F45NFR\ | BTC | Buy | TRADE | 2021-04-25 | 0.003062 | USD | 150.0002 | 48993.43 |
| markcassid | 9d0c832a-( | 01F45NEA( | USD | deposit | BANK | 2021-04-25 | 150 | N/A | 150 | 1 |
| markcassid | 9d0c832a-( | 01F3JZA5A | BTC | Buy | TRADE | 2021-04-18 | 0.001788 | USD | 99.99973 | 55927.63 |
| markcassid | 9d0c832a-( | 01F3JZ9S9 | USDC | Sell | TRADE | 2021-04-18 | 100 | USD | 100 | 1 |
| markcassid | 9d0c832a-( | 01F2MBMI | USDC | Buy | TRADE | 2021-04-06 | 100 | USD | 100 | 1 |
| markcassid | 9d0c832a-( | 01F2C3HVI | USDC | Sell | TRADE | 2021-04-06 | 100 | USD | 100 | 1 |
| markcassid | 9d0c832a-( | 01F24G155 | USDC | Buy | TRADE | 2021-03-31 | 263.88 | USD | 263.88 | 1 |
| markcassid | 9d0c832a-( | 01F24FZAN | ETH | Sell | TRADE | 2021-03-31 | 0.14358 | USD | 263.8865 | 1837.906 |
| markcassid | 9d0c832a-( | 01F1370X4 | BTC | deposit | REWARD | 2021-03-18 | 0.000421 | N/A | 25.00013 | 59355.95 |
| markcassid | 9d0c832a-( | 01F130MK | ETH | Buy | TRADE | 2021-03-18 | 0.143577 | USD | 263.32 | 1834.003 |
| markcassid | 9d0c832a-( | 01F130M1 | BTC | Sell | TRADE | 2021-03-18 | 0.004455 | USD | 263.3225 | 59107.19 |
| markcassid | 9d0c832a-( | 01F130JDV | BTC | Buy | TRADE | 2021-03-18 | 0.005029 | USD | 301.0602 | 59866.49 |
| markcassid | 9d0c832a-( | 01F130HW | ETH | Sell | TRADE | 2021-03-18 | 0.16627 | USD | 301.0606 | 1810.673 |
| markcassid | 9d0c832a-( | 01F130D7; | BTC | Buy | TRADE | 2021-03-18 | 0.000839 | USD | 50.00011 | 59630.43 |
| markcassid | 9d0c832a-( | 01F12XH3! | ETH | Buy | TRADE | 2021-03-18 | 0.166276 | USD | 300 | 1804.233 |
| markcassid | 9d0c832a-( | 01F12XGQ | BTC | Buy | TRADE | 2021-03-18 | 0.008588 | USD | 500.0003 | 58220.67 |
| markcassid | 9d0c832a-( | 01F12X8PV | USD | deposit | BANK | 2021-03-18 | 850 | N/A | 850 | 1 |

# Exhibit 4

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 21-24441-CIV-ALTONAGA/Torres

MARK CASSIDY, on behalf of himself
and others similarly situated,

Plaintiff,

v.

VOYAGER DIGITAL LTD., and
VOYAGER DIGITAL LLC

Defendants.
_____/

## <u>DECLARATION OF SHANNON CASEY</u>

I, Shannon Casey, declare that:

1.      I am employed by Voyager Digital LLC ("Voyager LLC") as a Director of Operations.  I have served in that role since February 2021. As part of my responsibilities, I am familiar with Voyager LLC's records with respect to the Voyager LLC User Agreement and communications with customers with respect thereto.

2.      I am also familiar with the lawsuit filed against Voyager Digital Ltd ("Voyager Ltd") and Voyager LLC by Mark Cassidy. I submit this declaration in support of the Motion to Compel Arbitration and to Dismiss to be filed on behalf of Voyager LLC and Voyager Ltd.

3.      This declaration is based upon my personal knowledge, including knowledge gained through my review of company records and confirmed with other experienced Voyager employees, and I would testify to the following facts if called as a witness in a court of law. I am also familiar with Voyager LLC's business practices, and understand the records referenced herein to have been created and maintained in the course of Voyager LLC's regularly conducted activity.

4.      Voyager LLC operates the Voyager Platform accessible through Voyager's mobile phone application and website.

5.      Voyager Ltd is a foreign holding company parent of Voyager LLC with no operations or employees.  Voyager Ltd does not operate or market the Voyager Platform.

6.      Users of the Voyager Platform must agree to Voyager LLC's User Agreement to access and use the Voyager Platform.  Voyager LLC publishes its User Agreement through its App and on its website. Voyager LLC's User Agreement can be viewed on the company's website via a hyperlink on the website's landing page (https://www.investvoyager.com/), which directs the user to the User Agreement at https://www.investvoyager.com/useragreement/.

7.      Voyager LLC also directs users to its User Agreement via a bold, purple hyperlink as part of the account opening process in its App, as shown below:



2

8.      To open an account and use the Voyager Platform, each user is required to first check the box confirming that "By creating an account, you agree to our **Terms**."  No user would have been able to proceed with opening a Voyager account without first checking the box confirming their agreement to the terms of the User Agreement.

9.      Clicking on the word "Terms" on the account opening screen takes the user to the version of Voyager's User Agreement that is in place at the time the user clicks on the link. When Plaintiff signed up for a Voyager account on March 17, 2021, the "Terms" link directed the user to the Voyager User Agreement last revised January 2021.

10.     Voyager LLC's records confirm that Mr. Cassidy did check the box confirming his agreement to the User Agreement when he opened his account on March 17, 2021.

11.     Voyager LLC assigns a unique user_id to each user, and keeps records of user's account registration, including the time of registration and that the user manifested assent to the User Agreement. I have reviewed records reflecting Mr. Cassidy's unique user_id.

12.     Voyager's user registration records, maintained in the ordinary course of business, reflect that Mr. Cassidy registered for an account through the App on March 17, 2021 at 4:28 pm U.T.C.  An excerpt of that record appears in Voyager's internal database as follows:

| user_id | created_at | did_agree | agreement_text |
|---|---|---|---|
| [Mr. Cassidy's user_id redacted for privacy] | 2021-03-17 16:28:55.159006... | TRUE | By creating an account, you agree to our Terms |

The "did_agree" field in the database reflected in the above image is set to true when the user clicks "Continue" after having checked the box confirming that "By creating an account, you agree to our Terms."

13.     Voyager LLC's records also indicate that all of Mr. Cassidy's transactions on the App took place between March 18, 2021 and August 17, 2021.

14.     From March 18, 2021 to present, Voyager LLC has updated its User Agreement multiple times.  I have attached as exhibits to this declaration each version of the User Agreement in place during that time period.

15.     Attached as **Exhibit A** is a true and correct copy of the User Agreement as revised in January 2021, which remained in place until April 16, 2021.

16.     Attached as **Exhibit B** is a true and correct copy of the User Agreement as revised on April 16, 2021, which remained in place until August 20, 2021.

17.     Attached as **Exhibit C** is a true and correct copy of the User Agreement as revised on August 20, 2021, which remained in place until November 23, 2021.

18.     Attached as **Exhibit D** is a true and correct copy of the User Agreement as revised on November 23, 2021, which remained in place until January 7, 2022.

19.     Attached as **Exhibit E** is a true and correct copy of the current User Agreement as revised on January 7, 2022.

20.     The only update to the User Agreement that occurred during the time period in which Mr. Cassidy traded on the Voyager Platform was the April 16, 2021 update.

21.     Customers, including Mr. Cassidy, were notified of that update by email on April 18, 2021.  Attached as **Exhibit F** is a printout of a record maintained by Voyager LLC in the ordinary course of business, depicting the email sent on April 18, 2021 notifying customers of the update to the User Agreement, and recording the date, time and distribution list. Voyager LLC's records also reflect that Mr. Cassidy was included in the distribution list to which the update was sent.

22.   I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2022.

SHANNON CASEY

# Exhibit 5



Click to apply labels to campaign

| Campaign ID | 2234649 |
|---|---|
| Created | Sun, Apr 18, 2021 10:52 AM |
| Launch time | Sun, Apr 18, 2021 11:19 AM EDT |
| End time | Sun, Apr 18, 2021 5:05 PM EDT |
| | |
| Medium | Email |
| List | Marketing Master 2021 |
| | |
| List Size at Send Time | 1,279,869 |
| Send Time Optimization | Enabled |
| STO Window | 6 hours |
| Campaign state | Finished |
| utm_campaign | None |
| | |
| Template | Support - Update to Customer Agreement |
| From | Voyager <no-reply@investvoyager.com> |
| Subject | Update to Customer Agreement |
| Preheader Text | None (email client default will be used) |
| Message Type | Transactional Email |
| Message Channel | Email Transactional Channel (Transactional) |

Email preview

VOYAGER

Dear Voyagers,

We want to let you know that we recently updated our Customer Agreement, as of April 16, 2021.

In addition, we encourage you to review our Privacy Policy and our Risk Disclosure.

Thank you, as always, for being a loyal Voyager customer.

Best,
The Voyager Team

1

# Exhibit 5a

| | |
|---|---|
| **Date:** | Wednesday, December 1 2021 04:26 PM |
| **Subject:** | Re: Customer Agreement changes summary. |
| **From:** | Pam Kramer <pkramer@investvoyager.com> |
| **To:** | Julia Hyman <jhyman@investvoyager.com>; |

Great work, THX!

On Wed, Dec 1, 2021 at 1:23 PM Julia Hyman <jhyman@investvoyager.com> wrote:
Hi All,

Confirming this has been updated and is currently in deployment.

Thanks!



Julia

*Senior Marketing Program Manager*

On Wed, Dec 1, 2021 at 12:52 PM Brian Nistler <bnistler@investvoyager.com> wrote:
For convenience, I have also attached a clean word and PDF copy of the updated agreement.

Thanks,
Brian

On Wed, Dec 1, 2021 at 12:48 PM Pam Kramer <pkramer@investvoyager.com> wrote:
Thank you very much, this is very helpful. Will let you know when it has been updated.
Pam

On Wed, Dec 1, 2021 at 9:47 AM Brian Nistler <bnistler@investvoyager.com> wrote:
Attached Pam.

On Wed, Dec 1, 2021 at 12:08 PM Pam Kramer <pkramer@investvoyager.com> wrote:
Yes, if possible, thanks.
Pam

On Wed, Dec 1, 2021 at 9:04 AM Brian Nistler <bnistler@investvoyager.com> wrote:
Hi Pam,


Do you mean that you want a redline of the original agreement as compared to the updated version?

- Brian

On Wed, Dec 1, 2021 at 11:50 AM Pam Kramer <pkramer@investvoyager.com> wrote:
Hi Brian et al,
Thank you for the update.

Adding Dan and Julia to this thread because they are in charge of ensuring the updates to the Customer
Agreement happen on the website. **Would be great to have a mark up of the currently posted agreement**

so that Dan knows which pieces to update and Julia knows what to QA, etc.

Also, based on these specific updates--do you think this warrants an email to customers? This summary is very helpful in that regard.

Thanks,
Pam K

On Tue, Nov 30, 2021 at 2:47 PM Brian Nistler <bnistler@investvoyager.com> wrote:
**Privileged and Confidential**



--

Brian Nistler
Associate Counsel

investvoyager.com

--

Brian Nistler
Associate Counsel

investvoyager.com

--

VOYAGER_001962

Brian Nistler
Associate Counsel

investvoyager.com

--

Brian Nistler
Associate Counsel

investvoyager.com

CONFIDENTIAL

VOYAGER_001963

# Exhibit 6

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | eventName | predictionId | email | catalogLookupCount | templateId | messageBusId | messageId | createdAt | catalogCollectionCount | campaignId | channelId | messageTypeId | transactionalData | productRecommendationCount | contentId |
| 802357 | | 000100000114222cdc06348-8132-4b6b-bed7-54d7c8ce779f | joebeutts@gmail.com | 0 | 3062892 | 01000178e5f15b01-9529dad1-8ce2-494f-801f-ec0daee11982-000000 | 109a17d8cb0740da855571432e434616 | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802358 | | 0001000001142206101056-f621-4150-a860-44ceda810ceb | nick.birnbaum@gmail.com | 0 | 3062892 | 01000178e5f15c04-09bd1df2-5897-46f4-a614-de5aba0db39b-000000 | 9a4bf7fc03c643ddba02194a71f57124 | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802359 | | 000100000114222d3d9dc82-62c9-462b-b4b8-5ac190f98fe6 | sdh.liberty@gmail.com | 0 | 3062892 | 01000178e5f15c34-d2daf69e-2a51-48ce-85e4-c16236bb7596-000000 | 4303736e4223400286cc8d1d49074f7f | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802360 | | 000100000114222 7d17ac15-6cdf-408f-9d46-a655172494d8 | bgoldin22@yahoo.com | 0 | 3062892 | 01000178e5f15c84-653b8e9f-32af-46b1-a5dd-1b3d0b0fc36d-000000 | 1a0c799112184d91910c31c0fc369c5d | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802361 | | 0001000001142229bfe74f4-102c-4315-b62b-244f7747ce51 | optimus9696@gmail.com | 0 | 3062892 | 01000178e5f15e13-2a450593-a014-40c7-a766-a121ce0d74ae-000000 | ee1614c6eabc420da72262a37a66eff7 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802362 | | 0001000001142229532fdf4-52aa-4ee6-9ed5-af1732f40c96 | sheltoncgraham@gmail.com | 0 | 3062892 | 01000178e5f15a3b-c7f14d63-6906-4e11-9a0c-2d3fa919d8d9-000000 | b10dfcf4b6d447908a8bb879777a00f6 | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802363 | | 0001000001142226d861d31-dc80-4cf5-b805-34d6c978ddcf | ryanlapietra@yahoo.com | 0 | 3062892 | 01000178e5f15bd5-4809ccdc-72da-4159-a88b-dfe2e2181bba-000000 | 23e8df0779c14d078dbc6edbb14054cf | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802364 | | 000100000114222d3d5a18d-78a2-4ec2-9609-eda1e68db83f | johnsouthall56@gmail.com | 0 | 3062892 | 01000178e5f15f96-f7a29c28-f8c4-4e5d-a308-b769ccb83563-000000 | a6f70461c2bf4511be6ec64b2e05649e | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802365 | | 0001000001142221540e819-9f87-4230-b734-8d010be888fc | steffiebrennan@aol.com | 0 | 3062892 | 01000178e5f15c8f-9f3e3e75-5063-4c64-813a-b25c34eda641-000000 | 10f973b253f24326b512924458cd8f4d | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802366 | | 0001000001142223472508 6-a988-404d-9c55-03a7a82cc2bf | johnjoe.braxton@yahoo.com | 0 | 3062892 | 01000178e5f15c0e-d74a760d-7d67-4afc-bcec-16f0690525e5-000000 | a3f9e69ba9f64f78bc331ebefa50cc7b | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802367 | | 00010000011422 2691f01bc-2877-4dcf-9c3b-554d13c63e39 | salpad62@gmail.com | 0 | 3062892 | 01000178e5f15c70-d9d6b576-75eb-40dc-86c9-1f74b7d1a3d5-000000 | ecabbd92ab9d47a0b7cc1332c3a463ce | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802368 | | 000100000114222fa222838-e897-4b1e-8400-3f42d780c143 | michosarkisian@icloud.com | 0 | 3062892 | 01000178e5f15be6-0de57e97-d232-4804-9f11-23debed3f03e-000000 | 7a57dfe8888844dca6eef5d4f47c3534 | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802369 | | 0001000001142221a7d4682-5c36-4fe2-adf2-373828916aee | markcassidy528@gmail.com | 0 | 3062892 | 01000178e5f1541a-cc877c4b-814d-4fc8-8df6-28c2282a236d-000000 | c170d90ad26749c8801a95665dbb1a00 | 2021-04-18 17:05:01 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802370 | | 0001000001142228 4df769a-1c87-46dc-8af6-3c79b2d7af91 | camcast51@yahoo.com | 0 | 3062892 | 01000178e5f15b6b-afb60c53-9529-4678-b5f8-808955ec7f86-000000 | 933f41969ffd4601bd5ac2d5d7faa8ab | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802371 | | 000100000114222012b6fb1-fa9f-49d7-852c-9a567dcf95bc | slawrence434@gmail.com | 0 | 3062892 | 01000178e5f15808-e3b4a872-95ba-4d74-8c39-a47ef677d9a9-000000 | 4a330045082645399a3c73a6bde61662 | 2021-04-18 17:05:02 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802372 | | 000100000114222e3143941-602e-43db-a107-3cf825d97fea | sparkie909shiloh3@gmail.com | 0 | 3062892 | 01000178e5f15bed-efe8c377-fa5d-4ba3-bac1-2a7dbb6756fd-000000 | 814a7dba67294bd592548a8005c57f74 | 2021-04-18 17:05:03 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802373 | | 000100000114222d042e3f4-621a-4c81-a7b7-58b1dfb28a43 | christam_office@yahoo.com | 0 | 3062892 | 01000178e5f1614e-911fc1f3-5515-40c4-961d-3fac1aebde55-000000 | 684d3908a04d45088ec4e061f92adfd7 | 2021-04-18 17:05:05 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802374 | | 0001000001142226a6c60c7-b3ac-4c82-8f47-4738d812621a | jliketheltr@gmail.com | 0 | 3062892 | 01000178e5f15eff-d5f389c3-bd9a-4647-8904-782c340ca822-000000 | 3b0f702e5d5d4d568f14894cba2107a3 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802375 | | 00010000011422 2772ff65a-d77a-4a5e-b556-ba4a47eb6f96 | jaimeahluwalia@gmail.com | 0 | 3062892 | 01000178e5f15ed1-c4c2eec8-f5ae-4f86-87b6-836b50a101d3-000000 | 3a7c282740394822b9011d0ed6830fff | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802376 | | 000100000114222b51bf810-26c7-4fc2-902f-28cd15384f97 | garrettauby@gmail.com | 0 | 3062892 | 01000178e5f15f70-deb09ece-3bb6-4390-ad29-e87bb0c60635-000000 | 1d9dc88ea5f34d038224fadb1cee233f | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802377 | | 000100000114222a428bdda-e203-424d-8378-2c8ac00d1330 | briana.lark@comcast.net | 0 | 3062892 | 01000178e5f15f28-d1aae84b-2b0c-42d5-ae33-0f3c38e62aed-000000 | 3187e93dd68b49fba83e45d8180550b1 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802378 | | 0001000001142223f871483-4348-4c8b-b93d-8341e80289ff | nsdoc78@gmail.com | 0 | 3062892 | 01000178e5f15e1d-1e37b7cf-bb20-4389-9af8-e65ab7813c0e-000000 | 23cfef83fcf245cc89bc67198edc8ea5 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802379 | | 000100000114222eb1f213d-39cc-4381-bd17-e9a6e2ba3479 | guidoterry@gmail.com | 0 | 3062892 | 01000178e5f160a7-63af07e7-9d42-4d77-b9af-ce89e9d9064a-000000 | 1d99e50e6c2b453aa5d4a714542e871c | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802380 | | 0001000001142223e3316e8-a6cc-479c-b33d-1aa80000b244 | jgrado@okstate.edu | 0 | 3062892 | 01000178e5f15f4c-8d99ffa0-4c09-4da9-9f0d-6341e04a3f5f-000000 | 7838924a5a394ae6a370b8b135a5cc6e | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802381 | | 00010000011422 2478c5615-c7f1-4153-904b-344338eca32e | guillermo.llamas@ymail.com | 0 | 3062892 | 01000178e5f16103-251645a9-d5bd-49ae-ac0e-b1dfaf0dc199-000000 | fb028f4f3d164489bb1aa41b8b8d2cdd | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802382 | | 000100000114222d878d0e5-fcfc-44d5-a777-c81775333f7b | tom.catalanotto@gmail.com | 0 | 3062892 | 01000178e5f15f2e-abbdf9a7-c43e-470b-91ef-83a5b464bacf-000000 | 739c067d4c394e37aa8555df7af865f2 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802383 | | 0001000001142223 3a60102-c099-4217-b208-dd7fe596d5fe | raycooljay12@gmail.com | 0 | 3062892 | 01000178e5f15e81-92ec8640-160c-469a-ad96-ccf2cc088494-000000 | 7ed34480c4ea458ba5015eaa9cabdb2c | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802384 | | 000100000114222db8c7581-1ac2-4ec0-9c05-2ae1ac4abff2 | hushmypretty@gmail.com | 0 | 3062892 | 01000178e5f15e4b-2b76cac2-36d8-4de7-8106-f5966e511bd6-000000 | 78ad762a427d412081fe04b0b2311068 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802385 | | 000100000114222f1659fed-0b36-4b6d-b6fb-2ded44b1c4b2 | dlogsdon3@gmail.com | 0 | 3062892 | 01000178e5f160ba-f4915e4d-be90-4fd1-a3b9-00943bf10b89-000000 | 4311d8aa0ec54159922cf83e15c06cf6 | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802386 | | 0001000001142228792d411-a41d-4613-b3d1-606b215097a3 | john.j.farrell611@gmail.com | 0 | 3062892 | 01000178e5f161b3-1fc4fac7-d8cd-422f-becb-0eb8d1acc734-000000 | a7bb330a151c40f6813f38a496ff8e59 | 2021-04-18 17:05:05 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802387 | | 0001000001142224140056 6-502e-4b09-93bd-12e1029567a5 | derrick.fuqua@gmail.com | 0 | 3062892 | 01000178e5f16228-2687b0dd-f8b0-40a1-bb05-4cd5a0e22113-000000 | 51b24148f9b84a7088bca880a9c1aea8 | 2021-04-18 17:05:05 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802388 | | 00010000011422 2525ea59a-7368-4da2-b376-6af43fac976a | clightford1@gmail.com | 0 | 3062892 | 01000178e5f1623e-9d37f52c-a507-4080-ab85-f2fad8979d62-000000 | c5505369c7b5464cb97a9e16232b05da | 2021-04-18 17:05:05 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802389 | | 0001000001142226 1172f67-3c50-40fd-8078-1f6fb64ad789 | artwhkg@knology.net | 0 | 3062892 | 01000178e5f15f34-8ddcc783-94b7-4cc4-aae1-7fd4045e937a-000000 | b42dbe9ab631482eba2171306874f0fc | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802390 | | 0001000001142221 9cfce64-0347-4aba-a077-b0c0872433c7 | david.zhu5@gmail.com | 0 | 3062892 | 01000178e5f16178-bf912343-f58e-4104-aa28-2a42a5741de5-000000 | 511ad4227efb41109a2f25f53c9a2dba | 2021-04-18 17:05:04 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |
| 802391 | | 0001000001142224025d55a-fad2-4703-b77c-1f2d39a2cc64 | robinballengee1965@gmail.com | 0 | 3062892 | 01000178e5f161c4-dd404630-6dd8-4bcf-bfaa-6ca4f0918713-000000 | 892808ce184f4931a9cd76e7106dcb6f | 2021-04-18 17:05:05 +00:00 | 0 | 2234649 | 15590 | 17024 | | 0 | 12108973 |

# Exhibit 7



AMERICAN
ARBITRATION
ASSOCIATION

INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION

1101 Laurel Oak Road
Voorhees, NJ 08043

July 26, 2021

Voyager Digital LLC
185 Hudson Street, Suite 2500
Jersey City, NJ 07311
Via Mail

**Case Number: 01-21-0003-9886**

Daniel Schaefer
-vs-
Voyager Digital LLC

Dear Parties:

The claimant has filed with us a demand for arbitration. The American Arbitration Association ("AAA") has determined that this arbitration arises out of a consumer agreement and, as such, the Consumer Arbitration Rules ("Consumer Rules") apply to this dispute. The Consumer Rules may be found on our website at www.adr.org.

Under R-12 of the Consumer Rules, businesses that provide for AAA arbitration in a consumer contract are obligated to submit their current or proposed consumer agreements to the AAA for review and inclusion on the Consumer Clause Registry ("Registry"). The AAA reviews the agreement for material compliance with the due process standards of the Consumer Due Process Protocol ("Protocol") and the Consumer Rules. The AAA's review is administrative; it is not an opinion on whether the arbitration agreement, the contract, or any part of the contract is legally enforceable, nor is it a determination regarding the arbitrability of the dispute.

This business has not previously submitted its consumer arbitration clause for review. As such, the AAA will review the clause for this matter on an expedited basis. The additional fee for this expedited review is $250, payable by the business.

**The business is also directed to submit its current consumer arbitration clause for inclusion on the Registry at** https://www.adr.org/Consumer at which time the business will also incur a $500 Registry fee. Once the business' clause is registered, it will no longer be assessed the $250 additional expedited review fee on each consumer case filed.

For cases proceeding under the Consumer Rules, the AAA reviews the relevant arbitration agreement for material compliance with the due process standards of the Consumer Due Process Protocol ("Protocol") and the Consumer Rules. The AAA's review is administrative; it is not an opinion on whether the arbitration agreement, the contract, or any part of the contract is legally enforceable, nor is it a determination regarding the arbitrability of the dispute. **We note that the arbitration provision has a material or substantial deviation from the Consumer Rules and/or Protocol. Specifically, the provision states:**

> *THE ARBITRATION WILL OCCUR IN NEW JERSEY AND WILL BE CONDUCTED*
> *CONFIDENTIALLY BY A SINGLE, NEUTRAL ARBITRATOR*

**The above provision violates Principle 7: Reasonably Convenient Location.** If a party believes that there are additional conflicts with the Protocol and/or Consumer Rules, those issues may be brought before the arbitrator once one has been appointed.

VOYAGER_001951

However, so that we may commence administration of this matter, **we are requesting that the business waive the above provision(s) and agree to have this matter and any future consumer arbitrations filed under this agreement administered under the Consumer Rules and in compliance with the Protocol**. Please confirm your agreement to waive the above-quoted provision by signing and dating below and returning a copy of this letter. Absent receipt of the requested waiver, the AAA will decline to administer this dispute and possibly any future consumer arbitrations involving this business. Please note that pursuant to the R-1(d) of the Consumer Rules, should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution. In addition, Rule R-9 states either party may choose to take the claim to small claims court if the claim is within the jurisdiction of that court.

_____          _____
Business (authorized representative)                                Date

Pursuant to New Jersey Statutes § 2A:23B-1 et seq, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the New Jersey Arbitration Act, and to all consumer arbitrations conducted in New Jersey. If you believe that you meet these requirements, you must submit a completed Affidavit for Waiver of Fees, available on our website.

Under the Consumer Rules, the consumer pays a filing fee of $200 and the business pays a filing fee of $300. We have received the consumer's $200 portion of the filing fee. So that the filing requirements are complete, **the business is requested to submit filing fees of $300, the expedited consumer clause review fee of $250 and its arbitrator's compensation deposit of $2,500, totaling $3,050**.

**Please note payment should be submitted by credit card or electronic check. Please confirm the email address AAA may send a secured paylink with instructions to submit payment via either method**. In the event that payment is being made by a third party, such as an insurance company, please request that payment be sent directly to the business' representative. The business' representative should then forward payment to the AAA in accordance with the foregoing instructions.

**The requested payment and waiver should be received no later than August 9, 2021** and the AAA may decline to administer this dispute if the business does not timely respond. It should be noted that the consumer's satisfaction of the filing requirements triggers the business' obligation to promptly pay its share of the filing fees under the rules and the business may owe all or a portion of the filing fees even if the matter is settled or withdrawn. The AAA will refund any overpayments received from the consumer with the filing.

No answering statement or counterclaim is due at this time and the parties will be notified of the applicable deadlines upon satisfaction of all the filing requirements.

Please note all communication for this matter will be in writing, if you have any questions please feel free to send us an e-mail.

Sincerely,
Consumer Filing
Email: ConsumerFiling@adr.org
Fax: (877)304-8457

cc:      Daniel Schaefer
         3578 232nd Court NW
         Saint Francis, MN 55070
         Via Email to: d11schae@gmail.com

CONFIDENTIAL                                                                                    VOYAGER_001952

# Exhibit 8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 21-24441-CIV-ALTONAGA/Torres**

MARK CASSIDY, on behalf of himself
and others similarly situated,

      Plaintiff,

v.

VOYAGER DIGITAL LTD, and
VOYAGER DIGITAL LLC

      Defendants.

_____/

**DECLARATION OF MARK CASSIDY IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' EXPEDITED MOTION TO STAY**

I, Mark Cassidy, hereby declare as follows:

1.     I have personal knowledge of the facts stated herein, and if called upon as a witness, I would and could testify competently to the matters set forth herein.

2.     I am a citizen and resident of the State of Florida and am 30 years old.

3.     I created my Voyager account on March 17, 2021.

4.     I placed the trade orders identified in the complaint, *see* Compl. ¶ 58, and an additional purchase of bitcoin (BTC) on July 31, 2021.

5.     On August 17, 2021, I sold all of my holdings in my Voyager account and transferred the funds out.

6.     Since then, I have not conducted trades on the Voyager platform, but did not cancel my Voyager account.

7.     I only have one email account associated with my Voyager account. Since opening my Voyager account through February 15, 2022, I have received the following emails from no-reply@investvoyager.com to that email account:

1





CASE NO.: 21-24441-CIV-ALTONAGA/Torres



8.      I reviewed the Declaration of Shannon Casey in support of Defendants' Motion to Compel Arbitration. I did not receive the April 18, 2021, email notifying of the April 16, 2021 update to the Customer Agreement. It was not marked as SPAM or delivered to a SPAM folder, nor was it in the trash folder.

9.      I did not receive any email, notification, or any other form of actual notice of any of the other versions of the Customer Agreement referenced in Shannon Casey's declaration. Further, I have never received any form of explanation regarding what revisions were made to the Customer Agreement at any time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate to the best of my knowledge and belief.

Executed February 23, 2022.

By: *Mark Cassidy*
    Mark Cassidy
    *Plaintiff*

# Exhibit 9

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 21-24441-CIV-ALTONAGA/Torres

MARK CASSIDY, on behalf of himself
and others similarly situated,

       Plaintiff,

v.

VOYAGER DIGITAL LTD, and
VOYAGER DIGITAL LLC

       Defendants.

_____/

## DECLARATION OF MARK CASSIDY IN SUPPORT OF
## PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE

       I, Mark Cassidy, hereby declare as follows:

       1.     I have personal knowledge of the facts stated herein, and if called upon as a witness, I would and could testify competently to the matters set forth herein.

       2.     I am a citizen and resident of the State of Florida and am 30 years old.

       3.     I created my Voyager account on March 17, 2021.

       4.     I placed the trade orders identified in the complaint, *see* Compl. ¶ 58, and an additional purchase of bitcoin (BTC) on July 31, 2021.

       5.     On August 17, 2021, I sold all of my holdings in my Voyager account and transferred the funds out.

       6.     Since then, I have not conducted trades on the Voyager platform, but did not cancel my Voyager account.

7.      On January 31, 2022, I attempted to log in to the Voyager account to obtain information regarding my account activity for this lawsuit, but my account was inaccessible.

8.      I submitted a "forgot my password" request, received a link, and reset my password. Upon attempting to log in to my account with the new password, I received a notification that now my email was invalid and/or not associated with a Voyager account.

9.      I repeated the process a second time with a new password, and I received the same notification.

10.     Users apparently cannot contact Defendants by phone with questions about their account—the only available number I found is for "Investor Relations." I placed several calls and left at least one voicemail to the Investor Relations number to get an answer regarding the apparent deactivation of my account, but to date have received no response.

11.     My only other avenue to contact Voyager was through a written request submitted on a fillable form on Voyager's website provided by Zendesk. So, unable to reach anyone on the phone and unable to access my account through the App, at 10:29pm on January 31st, I submitted a request in writing through the investvoyager.com website and requested "Details of account including transactions and date of opening/closing."

12.     On February 1st at 8:04 AM, I received an email response from Zendesk giving me a link to a "tax/transaction report request form," but was given no explanation about the status of my account.

13.     As of the time of this declaration, I still have not accessed my account through the Voyager App, and I am waiting for a response to my phone calls and voicemail left on Defendants' Investor Relations line.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate to the best of my knowledge and belief.

Executed February 9, 2022.

By: _*Mark Cassidy*_____

Mark Cassidy
*Plaintiff*

# Exhibit 10

# VOYAGER

## CRYPTO FOR ALL™

**APRIL 2022**

© 2022 Voyager Digital Ltd. All rights reserved.

## LEGAL DISCLAIMERS

The information contained in this presentation ("Presentation") is being offered by Voyager Digital (Canada) Ltd. (the "Company") for information purposes only. This Presentation is not for release, distribution or publication into or in any jurisdiction where applicable laws prohibit its release, distribution or publication. This Presentation is not a prospectus, offering memorandum, advertisement, or solicitation and does not constitute or form part of, and should not be construed as, an offer or invitation to sell or any solicitation of any offer to purchase or subscribe for any securities of the Company in Canada, the United States or any other jurisdiction. Neither this Presentation, nor any part of it nor anything contained or referred to in it, nor the fact of its distribution, should form the basis of or be relied on in connection with or act as an inducement in relation to a decision to purchase or subscribe for or enter into any contract or make any other commitment whatsoever in relation to any securities of the Company. No representation or warranty, expressed or implied, is given by or on behalf of the Company, its directors and affiliates or any other person as to the accuracy or completeness of the information or opinions contained in this Presentation; and no liability whatsoever is accepted by the Company, its directors and affiliates or any other person for any loss howsoever arising, directly or indirectly, from any use of such information or opinions or otherwise arising in connection therewith.  No representation or warranty is given as to the achievement or reasonableness of, and no reliance should be placed on, any projections, targets, estimates or forecasts contained in this presentation. Estimates, projections, targets, statistics, opinions and forecasts contained in this document are based on information available to the Company and its advisors. All estimates, statistics, opinions and forecasts by their nature are based on a number of assumptions which may not prove to be correct, and are inherently subjective. In addition, past performance may not be repeated or indicative of future performance. No investment advice is offered or deemed to be offered under the Presentation, and any prospective investor should consult with his own legal, investment, accounting and tax advisors for determination of, among other things, suitability of investing in securities of the Company.

Purchasing securities of the Company should be considered a risky investment as the securities are speculative in nature and are appropriate only for investors who are prepared to have their money invested for a long period of time and have the capacity to absorb a loss of some or all of their investment. No reliance may be placed for any purpose whatsoever on the information or opinions contained in this Presentation or on its completeness, accuracy or fairness. The business of the Company is subject to a number of risks and readers are encouraged to read the Risk Factors contained in the Company's public filings, including its Management Discussion & Analysis and its Annual Information Form filed and available on SEDAR at www.sedar.com. Readers should not treat the contents of this Presentation as advice relating to legal, taxation or investment matters, and must make their own assessments concerning these and other consequences of the various investments, including the merits of investing and the risks. Readers are advised to consult their own personal legal, tax and accounting advisors and to conduct their own due diligence and agree to be bound by the limitations of this disclaimer. This corporate presentation includes market and industry data and forecasts that were obtained from third-party sources, industry publications and publicly available information. Third-party sources generally state that the information contained therein has been obtained from sources believed to be reliable, but there can be no assurance as to the accuracy or completeness of included information. Although management believes it to be reliable, management has not independently verified any of the data from third-party sources referred to in this presentation or analyzed or verified the underlying studies or surveys relied upon or referred to by such sources, or ascertained the underlying economic assumptions relied upon by such sources. Except where otherwise indicated, the information contained in this presentation speaks as of the date hereof or as of the date at which such information is expressed to be stated, as applicable. In giving this presentation, the Company does not undertake and disavows any obligation to provide any additional information or to update this presentation or any additional information or to correct any inaccuracies which may become apparent.

# FORWARD-LOOKING STATEMENTS

Certain statements contained in this presentation constitute "forward-looking information" or "forward-looking statements" (collectively, "forward-looking statements") within the meaning of applicable securities laws relating to, without limitation, expectations, intentions, plans and beliefs, including information as to the future events, results of operations and the Company's future performance (both operational and financial) and business prospects. In certain cases, forward-looking statements can be identified by the use of words such as "expects", "estimates", "forecasts", "intends", "anticipates", "believes", "plans", "seeks", "projects" or variations of such words and phrases, or state that certain actions, events or results "may" or "will" be taken, occur or be achieved. Such forward-looking statements reflect the Company's beliefs, estimates and opinions regarding its future growth, results of operations, future performance (both operational and financial), and business prospects and opportunities at the time such statements are made, and the Company undertakes no obligation to update forward-looking statements if these beliefs, estimates and opinions or circumstances should change. Forward-looking statements are necessarily based upon a number of estimates and assumptions made by the Company that are inherently subject to significant business, economic, competitive, political and social risks, uncertainties and contingencies. Readers are encouraged to read the Risk Factors contained in the Company's public filings, including its Management Discussion & Analysis and its Annual Information Form filed and available on SEDAR at www.sedar.com. Forward-looking statements are not guarantees of future performance. By their nature, forward-looking statements involve numerous current assumptions, known and unknown risks uncertainties and other factors which may cause the actual results, performance or achievements of the Company to differ materially from those anticipated by the Company and described in the forward-looking statements.

With respect to the forward-looking statements contained in this presentation, assumptions have been made regarding, among other things: current and future prices of cryptocurrencies; future global economic and financial conditions; trading volumes; the accuracy and veracity of information and projections sourced from third parties respecting, among other things, future industry conditions and demand for cryptocurrencies; and, where applicable, each of those assumptions set forth in the footnotes provided herein in respect of particular forward-looking statements. Although the Company has attempted to identify important factors that could cause actual actions, events or results to differ materially from those described in its forward-looking statements, there may be other factors that cause actions, events or results not to be as anticipated, estimated or intended. There can be no assurance that forward-looking statements will materialize or prove to be accurate, as actual results and future events could differ materially from those anticipated in such statements. The forward-looking statements contained in this presentation are expressly qualified by this cautionary statement. Readers should not place undue reliance on forward-looking statements. These statements speak only as of the date of this presentation. Except as may be required by law, the Company expressly disclaims any intention or obligation to revise or update any forward-looking statements or information whether as a result of new information, future events or otherwise.



Voyager's mission is to **replace traditional banking and financial services** with digital assets and **make crypto for all a reality.**

Company Highlights

# The Voyager Difference

Bringing Crypto to All

## The first consumer-focused, crypto native platform designed to help individuals create wealth and to empower them to become financially self sufficient.

▶ Consumer Brand

▶ Broad Choice of Assets

▶ Annualized Rewards

▶ Seamless Payments

▶ Industry-Leading Loyalty

▶ Engaged Community

© 2022 Voyager Digital Ltd. All rights reserved.

6



# Our customers represent the future of finance

**And they are here for the long haul**

## 63%
are Millennials and Gen Z.

## 87%
of Voyagers say they plan to hold their crypto for the medium or long term.

## ~90
Average number of days for a new Voyager customer account to become profitable

*\* Percentage stats from Voyager's first annual 2022 Crypto Confidence Survey dated January 20, 2022, that included over 4,000 responses from customers and the general population and is publicly available at www.investvoyager.com/blog/crypto-confidence-survey-2022/. Profitability is defined as transactional revenue exceeding the marketing costs to acquire such new customers and is based on our public financial statements*

© 2022 Voyager Digital Ltd. All rights reserved.





Breakout momentum across users,
assets, transactions and revenue growth

# Company Highlights
## Business Snapshot

## Outstanding User Growth

+2 million new verified users, +1 million
new funded accounts for calendar 2021

## Continuously Growing AUM
## to December 21, 2021

Current run-rate +$1 billion net new deposits
for quarter ended December 31, 2021

## Breakout Revenue Growth
## Calendar 2021 vs 2020

$415 million in calendar 2021 up from
$6.6 million in calendar 2020

© 2022 Voyager Digital Ltd. All rights reserved.

9

Successful entrepreneurs with significant finance and tech expertise.

# Proven Leadership in Finance & Technology



**Steve Ehrlich**
Co-Founder & CEO

*ETRADE*



**Gerard Hanshe**
COO

*ETRADE*



**Rakesh Gidwani**
CTO

*Two Sigma*



**Evan Psaropoulos**
CFO

*PwC, Credit Suisse*



**Marshal Jensen**
Head of Corporate Development

*Digital Asset Custody Company*



**Lewis Bateman**
Chief International Officer

*CoinSquare*



**Pam Kramer**
CMO

*ETRADE*



**Dan Constantino**
Chief Administration Officer

*Penn Medicine, US Marines*



**David Brosgol**
General Counsel

*Digital Asset Custody Company, Maverick Capital*

© 2022 Voyager Digital Ltd. All rights reserved.

**VOYAGER** 10

**Company formed in 2018**

# Experienced, Engaged Board of Directors and Advisor



**Steve Ehrlich**
Co-Founder & CEO

*ETRADE*



**Philip Eytan**
Co-founder & Chairman

*Morgan Stanley,
Cerberus Capital*



**Brian Brooks**
Board Member

*Bitfury, Former
Commissioner of OCC*



**Glenn Stevens**
Board Member

*Former CEO,
Gain Capital*



**Jennifer Ackart**
Board Member

*Former CFO,
Raymond James*



**Krisztian Toth**
Board Member

*Partner, Fasken*



**Oscar Salazar**
Co-founder & Advisor

*Uber*

© 2022 Voyager Digital Ltd. All rights reserved.

**VOYAGER**  11



## Investment Highlights

**Significant Potential Market Opportunity**

Opportunities across crypto, blockchain, banking, brokerage and payments

**Differentiated Growth Engine**

Leader in ease of use, access, choice, trust and transparency for crypto consumers

**Scalable Multi-Product Platform**

Proprietary and scalable global technology platform with integrated operations infrastructure

**Powerful Business Model**

Diversified revenue streams, powerful unit economics



Significant
potential
market
opportunity

**Significant Potential Market Opportunity: Still Early Days**

# Crypto market share growth outpaces all other asset classes and is disrupting the financial markets.

The global crypto market cap, now worth approximately $2 trillion, has grown fourfold since November 2020, when it stood at $578 billion.

Growth in crypto adoption is expected to reach 1 billion users by 2024, almost 2x faster than the internet did.



The internet reached 1 billion users in **7 years**

Crypto is projected to reach a billion users in **4.5 years**

Crypto

200 Million Users

2021

Internet

1997

© 2022 Voyager Digital Ltd. All rights reserved.

*Source: https://cryptoslate.com/internet-vs-crypto-adoption-chart-predicts-1-billion-users-by-2027/*

**VOYAGER** 14

**Significant Potential Market Opportunity**

# Opportunity & growth created by powerful shifts in the financial markets and in consumers

Most Americans (55%) want to learn more about crypto today, including two-thirds (67%) of millennials*

*Crypto Confidence Survey, December 2021 available at www.investvoyager.com/blog/crypto-confidence-survey-2022/*



**Expensive and Slow Traditional Systems**

Legacy financial systems no longer meet the needs of digital, mobile consumers who want real-time, direct access



**Changing Needs & Attitudes, Loss of Trust**

Financial crisis of 2008 triggered an increased loss of trust in the financial markets that persists today



**Wealth Inequality, Barriers to Entry**

Average college graduate in US has $30,000 in debt. Home ownership and wealth creation seem out of reach through traditional markets for many.*

© 2022 Voyager Digital Ltd. All rights reserved.

*Source: https://educationdata.org/average-student-loan-debt-by-year*

**VOYAGER** 15



**Differentiated growth engine**



**Focus on Ease, Accessibility**

Making the crypto market easier to navigate and more accessible to the average consumer

**Data-driven Go to Market**

Building marketing channels and brand partnerships through data and metrics to reach our ideal consumer base

**Crypto-Led, Proprietary Technology**

Scalable system built to support many types of cryptocurrencies. Scaled to support $6 billion in crypto assets on the Voyager Platform in 2021

**Loyalty, Network Effects**

A growing and engaged community of consumers act as strong advocates for the platform and the brand

**Differentiated Growth Engine**

Increasingly diversified, multiple revenue streams. Investing aggressively for growth, global expansion.

# Meeting the Needs of the Crypto Consumer
## with Technology, Innovation & Scale

© 2022 Voyager Digital Ltd. All rights reserved.

**VOYAGER** 17

**Sept 1, 2021 – March 1, 2022**

# Competitive Apple App Store Rankings: Finance

**Voyager consistently ranked third among crypto-first apps**, after Coinbase and Crypto.com



*\* Source: App Annie*

© 2022 Voyager Digital Ltd. All rights reserved.

**VOYAGER** 18

# What sets Voyager apart:
## Outstanding funded-account economics

**Adding products will increase the ARPU of our customers**

Profitability on new customer acquisitions: Within 30 days to 180 days



**Example: July 2021 Cohort Economics**
Cost, Transaction Revenue $ in Millions

CUMULATIVE TRANSACTIONAL REVENUE

ACQUISITION COSTS
To acquire new customers
that add to Voyager Revenue

$0.4 — MONTH 1
$1.3 — MONTH 2
$2.0 — MONTH 3
$3.4 — MONTH 4
$4.7 — MONTH 5

$4.5

*ARPU means average revenue per user.*

*Profitability is defined as transactional revenue exceeding the marketing costs to acquire such new customers.*

© 2022 Voyager Digital Ltd. All rights reserved.

**VOYAGER** 19

**What sets Voyager apart: The Voyager experience**



Simplicity        Speed        Rewards        Loyalty

© 2022 Voyager Digital Ltd. All rights reserved.

**VOYAGER**  20



# Catalysts
# for growth

Product Expansion, Global
Scale, Consumer Brand

**Coming Soon:** Growing with the emerging, global crypto consumer

# Crypto Payments Ecosystem

### For Voyager Account Holders

▶ Instantly spend crypto (USDC) on everyday purchases

▶ Full transactional capabilities, including personal routing and account numbers for direct deposit, bill pay

### For Businesses & Consumers

▶ Global payment processing via Coinify acquisition

▶ Wallet-free system supports 25+ coins, pays in fiat of choice

▶ Focus on PSPs and direct to merchants



Allowing consumers to hold and earn rewards on their crypto until the swipe

© 2022 Voyager Digital Ltd. All rights reserved.

22

**Coming Soon:** Growing with the emerging, global crypto consumer

# Product Expansion: More Coins, NFTs, Equity Trading

**Bringing the Voyager experience to NFTs**

▶ Transcend marketplace silos and give customers choice and control over their NFTs

▶ Reduce complexity

▶ Allow customers to interact with, organize, and extract value from NFTs

**Fully-Integrated, Crypto-Based Equity Trading**

▶ Joint-venture with Market Rebellion

▶ Based on the digital dollar (USDC)

▶ Proprietary, market-leading, funding and settlement

© 2022 Voyager Digital Ltd. All rights reserved.

23



**Coming Soon:** Growing with the
emerging, global crypto consumer

# International Expansion

### Canada

Working with the Ontario Securities Commission to
bring the Voyager app to Canada in 2022

### France, European Union

Received a Digital Asset Service Provider license from
the AMF (Authority of Financial Markets) in France which
required AMF to verify our senior management as "fit and
proper" for such license We are already building a waiting
list for a 2022 rollout in France.

### Global Payments

Leveraging the Coinify acquisition to expand crypto payment
solutions globally



© 2022 Voyager Digital Ltd. All rights reserved.

**VOYAGER** 24



**Powerful business model**

# 8 Quarters of Strong Metrics & Outstanding Growth

* Quarters presented based on Company's fiscal calendar ending June 30. Verified Users refers to customers that have downloaded the Voyager app and verified their email. Funded Accounts refers to customer accounts that have completed the KYC process and have been funded with an initial deposit or money transfer of any amount during the relevant period.



### Verified Users
Numbers in Millions

### Funded Accounts
Numbers in Millions



© 2022 Voyager Digital Ltd. All rights reserved.

**VOYAGER** 26

# 8 Quarters of Strong Metrics & Outstanding Growth

*Quarters presented based on Company's fiscal calendar ending June 30. Assets on Platform include crypto assets held, crypto assets loaned and crypto assets collateral received.

### $ Value in Assets on Platform

Dollars in Millions at End of Quarter



### Net $ Value in Quarterly Crypto and Cash Deposits

Total Net Deposits in Quarter, Dollars in Millions



© 2022 Voyager Digital Ltd. All rights reserved.

**VOYAGER**  27

# 8 Quarters of Strong Metrics & Outstanding Growth

* Quarters presented based on Company's fiscal calendar ending June 30

**$ Volume Traded**
Dollars in Millions, in Quarter



**Revenue Growth**
Dollars in Millions, in Quarter



© 2022 Voyager Digital Ltd. All rights reserved.

VOYAGER  28

# VOYAGER

Voyager Digital Ltd.
33 Irving Place, 3rd Floor
New York, NY 10003 USA

+1 212.547.8807
investor.relations@investvoyager.com

| VOYG |
|---|
| TORONTO STOCK EXCHANGE |

© 2022 Voyager Digital Ltd. All rights reserved. Privileged and confidential.

# Exhibit 11

|   | A | B | C |
|---|---|---|---|
| 1 | State | Month | Revenue |
| 2 | FL | 1/1/2021 | $ 701,401.53 |
| 3 | FL | 2/1/2021 | $ 1,796,226.95 |
| 4 | FL | 3/1/2021 | $ 2,359,232.44 |
| 5 | FL | 4/1/2021 | $ 3,873,860.41 |
| 6 | FL | 5/1/2021 | $ 4,371,145.88 |
| 7 | FL | 6/1/2021 | $ 1,368,414.67 |
| 8 | FL | 7/1/2021 | $ 699,620.81 |
| 9 | FL | 8/1/2021 | $ 1,647,511.83 |
| 10 | FL | 9/1/2021 | $ 1,960,430.87 |
| 11 | FL | 10/1/2021 | $ 4,012,972.77 |
| 12 | FL | 11/1/2021 | $ 3,906,962.62 |
| 13 | FL | 12/1/2021 | $ 2,050,824.97 |
| 14 | FL | 2021 Total | $ 28,748,605.75 |

CONFIDENTIAL

VOYAGER_001885

# Exhibit 13

# New Jersey Bureau of Securities Orders Cryptocurrency Company 'Voyager Digital' to Stop Offering and Selling Interest-Bearing Accounts - New Jersey Office of Attorney General

*NJOAG Communications*

[View Summary Cease and Desist Order](#)

**NEWARK —** Acting Attorney General Matthew J. Platkin today announced that the New Jersey Bureau of Securities has issued a Summary Cease and Desist Order to stop a Jersey City-based financial services company from selling unregistered securities in the form of interest-earning cryptocurrency accounts that have raised at least $5 billion nationwide.

Voyager Digital Ltd., Voyager Digital, LLC, and Voyager Digital Holdings, Inc. (Voyager) have allegedly been funding Voyager's income generating activities —including lending operations, digital asset staking, and proprietary trading—at least in part through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts in violation of the Securities Law, according to the Order the Bureau issued today.

"Today's action says loud and clear that the cryptocurrency securities market is not the Wild West, and investor-protection laws absolutely apply," said Acting Attorney General Platkin. "Through efforts like this one, we continue to hold accountable all those who threaten the integrity of our financial industry and place investors at risk."

The Bureau's action against Voyager marks the third time it has acted to stop a New Jersey-based cryptocurrency firm from offering and selling unregistered securities in the form of interest-bearing accounts.

In July 2021, the Bureau [announced](#) a Summary Cease and Desist Order against BlockFi Lending, LLC (BlockFi), which raised at least $14.7 billion from the unlawful sale of unregistered securities worldwide. In February 2022, the Bureau entered a [settlement](#) with BlockFi that required the company to, among other things, stop the offer and sale of its interest-bearing cryptocurrency accounts until they were registered with state and federal securities regulators. The settlement also required BlockFi to pay regulators a total of $100 million, including $943,396.22 to New Jersey.

In September 2021, the Bureau [announced](#) a Summary Cease and Desist Order against Celsius Network LLC, whose unlawful sale of unregistered securities had raised at least $14 billion nationwide.

"The rules are clear: anyone selling securities in New Jersey must comply with the

State's securities laws," said Sean P. Neafsey, Acting Director of the Division of Consumer Affairs. "Our Bureau of Securities will continue to protect investors by monitoring the marketplace to ensure everyone is following the rules, especially when it comes to the ever-evolving cryptocurrency market."

Unregistered securities offerings pose significant risk to investors because the issuers do not make the same types of disclosures, including, for example, providing detailed financial statements that typically accompany registered offerings.

Investors in unregistered offerings, like the "Voyager Earn Program Accounts" addressed by the Bureau's Order today, may not receive any information about the specific investment strategies used by the issuer to generate investment returns, may not be advised about the creditworthiness of counterparties with whom the issuer does business, and may not be apprised of the use of leverage, or other risky investment strategies employed by the issuer to generate a return.  In contrast, registered offerings typically provide detailed information for investors to make reasonably informed decisions about the level of risk a particular investment entails.

According to the Bureau's findings, Voyager solicits investors to invest in the Voyager Earn Program Accounts by depositing certain eligible cryptocurrencies into the investors' Voyager account. Voyager then pools these cryptocurrencies together to fund its various income generating activities, including lending operations, digital asset staking, proprietary trading, and investments in other cryptocurrency trading platforms, such as Celsius Network. In exchange for investing in the Voyager Earn Program Accounts, investors are promised an attractive interest rate that is paid monthly in the same type of cryptocurrency as originally invested.

As of March 1, 2022, Voyager had approximately 1,530,000 Voyager Earn Program Accounts representing approximately $5 billion in assets, of which approximately 52,800 were New Jersey-based accounts representing approximately $197 million in assets.

The Voyager Earn Program Accounts are not registered with the Bureau or any other securities regulatory authority, nor are they otherwise exempt from registration. Digital assets contained in Voyager Earn Program Accounts are not protected by the Securities Investor Protection Corporation ("SIPC"), insured by the Federal Deposit Insurance Corporation ("FDIC"), or insured by the National Credit Union Administration ("NCUA").

"Platforms like Voyager that offer interest-bearing financial products may mirror the traditional financial structures we know and trust, but their lack of a protective scheme or regulatory oversight subjects investors to additional risks not borne by those who maintain assets with most SIPC member broker-dealers, or with banks, savings associations, or credit unions," said Acting Bureau Chief Amy G. Kopleton. "This adds a layer of risk to these cryptocurrency products and makes it all the more important for individuals to do their homework and fully understand the offerings before investing in them."

The Bureau's investigation was handled by Investigator Delfin Rodriguez of the Bureau of Securities, within the Division of Consumer Affairs. The Bureau is represented by Assistant Attorney General Brian F. McDonough and Deputy Attorneys General Victoria A. Manning and Evan A. Showell, Section Chief and

New Jersey Bureau of Securities Orders Cryptocurrency Company 'Voya...      https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocur...

Assistant Section Chief, respectively, of the Securities Fraud Prosecution Section of the Division of Law within the Division of Law's Affirmative Civil Enforcement Practice Group.

The Bureau is charged with protecting investors from investment fraud and regulating the securities industry in New Jersey. It is critical that investors "Check Before You Invest." Investors can obtain information, including the registration status and disciplinary history, of any financial professional doing business to or from New Jersey, by contacting the Bureau toll-free within New Jersey at 1-866-I-Invest (1-866-446-8378) or from outside New Jersey at (973) 504-3600, or by visiting the Bureau's website at www.NJSecurities.gov. Investors can also contact the Bureau for assistance or to raise issues or complaints about New Jersey-based financial professionals or investments.

###

# Exhibit 14

| Date: | Monday, March 8 2021 02:04 PM |
|---|---|
| Subject: | FW: User Agreement Update |
| From: | <jbarrilleaux@investvoyager.com> |
| To: | <breynolds@investvoyager.com>; |
| Attachments: | Return Report Automation Logic as of Feb 2021.docx |

-----Original Message-----
From: jbarrilleaux@investvoyager.com  <jbarrilleaux@investvoyager.com>
Sent: Friday, March 5, 2021 2:24 PM
To: 'David Brosgol' <dbrosgol@investvoyager.com>
Cc: ghanshe@investvoyager.com;  jbarrilleaux@investvoyager.com
Subject: RE: User Agreement Update

Here are some things we need to address:

1 - Hypothetical training complaints during spikes or tech outages - we
will not reimburse or entertain

2 - ACH Return Account Handling – we restrict accounts in many situations.
- attached.

3 - Account Restrictions for the above mentioned ACH transactions or for
Blockchain transaction investigations/issues

4 - PII mismatch on bank accounts vs account

5 - Additional verification requests may occur that might include bank
statements, SSN validation, Videos, Liveness check or "other" for purpose
of due diligence

6 - Firm standard of no longer going back and forth with individuals who
threaten legal action

7 - Missing or delayed deposits for blockchain that require investigation

8 - Blockchain deposits and withdrawals where client sent to wrong
address. Recovery request can be made but is rarely possible and even if
possible, the investigation, timing and recovery are at the firm's
discretion and are not guaranteed. We also charge a fee for the work and
attempt

9 - client locks themselves out for 2FA (changed number, switched or lost
device). We will work with the client to restore access but this will
take some time as we go through a due diligence process and process of
verification that is discretionary.

There is probably more but that's a good start.

-----Original Message-----
From: David Brosgol <dbrosgol@investvoyager.com>
Sent: Friday, March 5, 2021 8:15 AM
To: Janice Barrilleaux <jbarrilleaux@investvoyager.com>
Cc: ghanshe@investvoyager.com

CONFIDENTIAL

Subject: Re: User Agreement Update

Got it. Yeah. would be great to get Gerard's input.

Idea: instead of filtering it all through me to Ethan, maybe it's most efficient to arrange a call with Ethan next week with the 3 of us to discuss it?

Which do you both prefer?

Dave


> On Mar 5, 2021, at 10:20 AM, <jbarrilleaux@investvoyager.com >
<jbarrilleaux@investvoyager.com > wrote:
>
> I am free at 4 pm your time today.
>
> I think Gerard would likely want to have some input as well.
>
> He doesn't read email, although I cc'd him here so maybe, but if you
slack him he will let you know.
>
> If today doesn't work, my calendar is up to date for next week!
>
> Look forward to it.
>
> -----Original Message-----
> From: David Brosgol <dbrosgol@investvoyager.com >
> Sent: Friday, March 5, 2021 6:03 AM
> To: Janice Barrilleaux <jbarrilleaux@investvoyager.com >
> Subject: User Agreement Update
>
> Hi Janice,
>
> Thanks for sending me the current User Agreement and the redline for the
January changes. I've reviewed and will be working with Lowenstein to
update it. Having discussed it with Ethan, it seems that it might be best
to do a significant overhaul. That said, I know you are the person with
most knowledge of the Voyager specific issues that need to be considered
and reflected so Ethan and I would love to get your input and help.
>
> I'd like to schedule some time to sync up and discuss issues/process.
Today or early next week would work if you are amenable.
>
> Best,
>
> Dave
>
>
>

CONFIDENTIAL

| Date: | Monday, March 15 2021 06:55 PM |
|---|---|
| **Subject:** | Re: [EXT] OSC Comment Letter (Feb 2021) - Draft Response v.3.0 |
| **From:** | Evan Psaropoulos <epsaropoulos@investvoyager.com> |
| **To:** | Bechold, Edward <Edward.Bechold@marcumllp.com>; |
| **CC:** | Steve Ehrlich <sehrlich@investvoyager.com>; Peltzman, Zachary <Zachary.Peltzman@marcumllp.com>; |

In response to your question - the OSC asked to point specifically to the User agreement. The sentence you highlighted is paragraph 2 of the User agreement and needs to be read together with the next sentence that the client bears sole responsibility for transaction losses and the Company reserves the right to pass on any fees charged by exchanges, market-makers, liquidity providers, or other types of cryptocurrency counterparties.

Here is the language from the user agreement:

> Voyager is not a broker-dealer and is not a member of the Financial Industry Regulatory Authority ("**FINRA**") or the Securities Investor Protection Corporation ("**SIPC**"). I understand that my Cryptocurrency investments are not protected by either FDIC or SIPC insurance.
>
> I understand that Voyager reserves the right to pass on any fees charged by any Cryptocurrency exchanges, market-makers, liquidity providers, or other types of Cryptocurrency counterparties (each such counterparty, a "**Counterparty**"), including in connection with the withdrawal of Cryptocurrencies to an external wallet or any fees related to any enhanced due diligence related to my Voyager Account.

On Mon, Mar 15, 2021 at 6:44 PM Bechold, Edward <Edward.Bechold@marcumllp.com> wrote:

One question

**CONFIDENTIALITY NOTICE:**

The information transmitted, including this message and any attachments, is intended only for the individual or entity to which it is addressed and may contain information that is privileged, confidential or exempt from disclosure under applicable law. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by individuals or entities other than the intended recipient is strictly prohibited, and all liability arising therefrom is disclaimed. If you have received this in error, please notify Marcum immediately by telephone at (631) 414-4000 or (212) 485-5500 and delete the information. Marcum LLP is a New York limited liability partnership. This communication may come from Marcum LLP or any of its subsidiaries.

**DISCLAIMER:**

This communication has been prepared for informational purposes only and is not intended to constitute advertising or solicitation and should not be used or interpreted as tax or professional advice, unless otherwise stated. The content of this communication is limited to the matters specifically addressed herein and is not intended to address other potential tax consequences or the potential application of tax penalties to this or any other matter. Those seeking tax or professional advice should contact a member of our firm. Transmission of this information is not intended to create, and receipt does not constitute, any client-firm relationship. Personal or confidential information should not be sent to Marcum without first communicating directly with a member of our firm about establishing a client relationship.

--

VOYAGER_001903

Evan Psaropoulos
Chief Financial Officer
917.455.8927

VOYAGER_001904

# Exhibit D

Page 1

1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA

2

3              Case No. 21-24441-CIV-ALTONAGA/Torres

4    MARK CASSIDY, on behalf of
     himself and others similarly

5    situated,

6                        Plaintiff,

7    v.

8    VOYAGER DIGITAL LTD, and
     VOYAGER DIGITAL LLC

9                        Defendants.

10   _____/

11                            Remote Proceeding
                              April 20, 2022

12                            3:04 p.m. - 4:03 p.m.

13

14          VIDEO DEPOSITION OF MICHAEL LEGG

15

16       Taken before SUZANNE VITALE, R.P.R., F.P.R.

17   and Notary Public for the State of Florida at Large,

18   pursuant to Notice of Taking Deposition filed in the

19   above cause.

20

21

22

23

24

25

Page 15

1    August 2020.  And it was never communicated to me

2    when the official date of my seizing to be an

3    executive of the company was.

4         Q.   Are you no longer a corporate officer at

5    Voyager?

6         A.   I am no longer a corporate officer at

7    Voyager.

8         Q.   When you were conducting calls to

9    shareholders or giving out information about

10   Voyager, were you always doing that as the CCO?

11        A.   No.

12        Q.   What capacity were you doing it in?

13        A.   The head of IR.

14        Q.   IR means investor relations?

15        A.   Yes.

16        Q.   Were you filling both the investor

17   relations job and the CCO job?

18        A.   Again, you have to tell me the time

19   periods.  There were transitions involved and you're

20   just stating it as one blank period.

21        Q.   During the time that you were at Voyager,

22   were you ever involved in investor relations?

23        A.   Yes.

24        Q.   During what time period, please?

25        A.   The entire time period.

Page 17

1          Q.    Prior to submitting or publishing

2     information about the company, would you clear it

3     with Mr. Ehrlich?

4          A.    What do you mean publish it?

5          Q.    Did you put out papers or conduct -- let's

6     deal with papers first.

7                Did you put out any paperwork discussing

8     the company itself and its operation?

9                MR. SADEGHI:   Objection.

10    BY MR. KAYE:

11         Q.    Did you ever publish it?

12         A.    Please define publishing.

13         Q.    Please define the word publishing?

14         A.    Yes.

15         Q.    It means to print and circulate.

16         A.    Circulate to who?

17         Q.    To anyone on earth.

18         A.    Okay.  Well, then every e-mail I did was

19    published.

20         Q.    Published as a matter of public record?

21         A.    No, I was asking you that.  You did not

22    say that previously.

23         Q.    Published to shareholders?

24         A.    You're talking press releases?

25         Q.    Yes, let's take those.

Page 18

```
 1        A.    Okay, yes.

 2        Q.    When you published press releases, were

 3   you doing so in your CCO capacity?

 4        A.    For the time period I believe I was CCO,

 5   yes.

 6        Q.    Thank you.

 7              And did you clear those press releases

 8   with CEO Ehrlich?

 9        A.    Every one of them.

10        Q.    Did you endeavor to make certain that they

11   were truthful?

12        A.    A hundred percent.

13        Q.    I'd like to talk to you, if we can, about

14   some quotes from the second quarter 2021 that --

15        A.    Can you please clarify that second quarter

16   as being physical or calendar?

17        Q.    Let me show it to you.

18              MR. GROSSMAN:  Would you mind referring to

19        Exhibit Number 4, please, Joe?

20              MR. KAYE:  We'll mark it as 2.  It's

21        fiscal year.

22              (Thereupon, the referred-to document was

23   marked for Identification as Plaintiff's Exhibit 2.)

24              MR. SADEGHI:  I'm sorry.  Did you say

25        you're marking this as 2?
```

```
 1   platform.
 2        Q.   Well, would you mind telling me how do you
 3   incentivize them in the program?  What does it mean
 4   to incentivize them?
 5        A.   In what program?  Are you talking about --
 6   again --
 7        Q.   I'm reading these words with you and I'm
 8   following up on what you just said.
 9        A.   You're asking me to explain the words of
10   someone else and what they were thinking.  I
11   understand what I believe they're saying but you're
12   asking me --
13        Q.   That's all I'm asking you.  Tell me what
14   you believe it means.  What do you believe it means?
15   You were there and incentivized them in the program
16   and --
17        A.   I told you what I believe it means.  It
18   means to let them know about all the benefits of
19   being on the Voyager platform.
20        Q.   Okay.  When this male speaker says "And we
21   haven't used up all our tricks, yeah, I've got a few
22   still up my sleeve that we're ready to unveil over
23   the next 60 to 90 days," do you know what that
24   refers to, please?
25             MR. SADEGHI:  Object to the form.
```

Page 38

```
 1          Did you ever read the lawsuit itself?  Was
 2    it placed on your desk or wherever it was you worked
 3    and said read this?
 4          MR. SADEGHI:  Objection to form.
 5          THE WITNESS:  First of all, it says
 6       alleging secret trading fees.  It does not say
 7       there were secret trading fees.  So let's be
 8       honest here and phrase things right in the
 9       question.
10          Second -- what was the second part of your
11       question, please?  I forgot it.
12    BY MR. GROSSMAN:
13       Q.   I'm not talking about what Bloomberg said.
14    I'm talking about what you said.
15          Did you ever read the lawsuit -- as you
16    sit here today, have you read it and plowed through
17    the exhibits?
18       A.   I am not a lawyer.  I did my job as a
19    traditional analyst would have, and I read something
20    online that gave me a summary of the case that
21    looked like it was a legal document.  I believe it
22    was somewhere in the 20-page range that I read.
23       Q.   And when did you conclude as a nonlawyer,
24    the allegations were not -- were without any merit
25    whatsoever and you wrote that in an e-mail to
```

1  Bloomberg?

2         MR. SADEGHI:  Objection to form.

3         THE WITNESS:  When did I conclude that?

4  BY MR. GROSSMAN:

5      Q.   Yeah.

6      A.   After I did my personal -- after I did my

7  analysis.

8      Q.   Your analysis was what?  You told me you

9  never read the lawsuit and the exhibits attached to

10  it.

11     A.   No.  I told you I read what I needed to

12  understand what the lawsuit was alleging.

13     Q.   Do you know who Richard Sanders is?

14     A.   No.

15     Q.   Do you know who Steven Castille is?

16     A.   No.

17     Q.   Do you recall receiving an e-mail from a

18  journalist named Michael Mora about your comments?

19     A.   I don't recall.

20     Q.   Would you mind displaying to our witness

21  what we had marked as 7?

22         MR. KAYE:  Now Exhibit 5.

23         (Thereupon, the referred-to document was

24  marked for Identification as Plaintiff's Exhibit 5.)

25  BY MR. GROSSMAN:

# Exhibit E



# CipherBlade

## Blockchain Investigation Agency

# SUPPLEMENTAL EXPERT REPORT

**Matter:** Mark Cassidy and all others similarly situated v. Voyager Digital LTD and Voyager Digital LLC

**Date:** 20220426

This **Supplemental Expert's Report** has been prepared in connection with the matter of *CASSIDY -v- VOYAGER*. It is not intended, and should not be used, for any other purpose. Any opinions expressed by the author herein are presented for this purpose alone, and may be subject to modification or deletion in the light of further information and investigation. These opinions are based solely on reviews of people, documentation, systems and other information as supplied or made available to CipherBlade.

**THIS IS A SUPPLEMENTAL REPORT TO A PRELIMINARY REPORT. IT HAS BEEN PREPARED BASED ON PRELIMINARY INFORMATION AND ASSUMPTIONS. NO ONE MAY RELY ON THIS DRAFT. IT IS SUBJECT TO CHANGE AS ADDITIONAL INFORMATION BECOMES AVAILABLE OR IS CLARIFIED.**

## I. ASSIGNMENT AND SUBSTANTIATING RECORDS

1. I have been asked by The Moskowitz Law Firm, PLLC on behalf of Plaintiffs to provide a Supplemental Report providing insight on:
   a. Voyager's 'Earn' program and how it functions generally, such as on the blockchain and in the Voyager application
   b. Voyager's Earn program and how it is (or due to a lack of transparency from Voyager, how it is most likely) generating the revenue to provide interest payouts
   c. Whether or not the activity central to Voyager's Earn program has properly represented risk
2. In order to execute this assignment, I reviewed the same relevant documentation per my Preliminary Report.

## II. VOYAGER'S EARN PROGRAM, COMPETITORS, RISK, AND SECURITIES FACTORS

3. Voyager's Earn program is a means in which Voyager customers can make deposits of cryptocurrency to their Voyager accounts (providing Voyager with custody of those assets) and receive in-kind rewards on a prescribed (monthly) basis[1].



4. Voyager's Earn program is functionally nearly entirely identical to similar programs offered by firms such as Celsius and BlockFi. The differences between these

---

[1] https://www.investvoyager.com/earn/

1

companies and their respective programs are extremely minimal; as some examples, differences come down to phrasing (use of words like "interest" versus "rewards"), how frequently rewards are paid out (daily, weekly, or monthly, most commonly) or specific cryptocurrencies that are offered as part of the program.

*"BlockFi makes money via interest fees, withdrawal fees, spreads, sponsorship fees, crypto mining, as well as premiums collected from investments into other trusts."*[2]

*"BlockFi engages in two activities to generate return: (1) purchasing, as principal, SEC-regulated equities and predominately CFTC- regulated futures; and (2) lending crypto assets in the institutional market. See "What are the risks of holding my crypto at BlockFi?" for more details."*[3]

5. How BlockFi was described as making money[4] (interest fees on loans offered to customers, withdrawal fees paid by customers, etc.) is notably different from specific phrasing of "SEC-regulated equities and predominantly CFTC-regulated futures; and (2) lending crypto assets in the institutional market." The most concerning shared attribute of BlockFi and Voyager is use of vague (and in my opinion deliberately misleading) phrasing that enabled BlockFi to have the "out" of "well, technically, investments into trusts or lending to institutions could mean the money goes into DeFi." The most likely reality behind companies like Voyager and BlockFi being able to offer such high interest or "reward" rates is that a *substantially* lower amount of revenue from on-platform activity, such as customer trades/loans/withdrawals, as well as a *substantially* lower portion of their revenue from safer activity (loans to reputable, audited institutions), and that they're making a significantly *higher* portion of their revenue from higher-risk, higher-reward activity, such as DeFi.

*"There have also been questions about how the company uses funds from its depositors. News of its involvement in BadgerDAO will likely add to those questions."*[5]

6. Another competitor, Celsius, admitted to losing millions of dollars worth of customer assets due to a DeFi hack just last December. It should serve as no mystery as to why there has been an increase in scrutiny on these interest/reward programs by

---

[2] https://productmint.com/blockfi-business-model-how-does-blockfi-make-money/#:~:text=BlockFi%20makes%20money%20via%20interest,million%20in%20funding%20to%20date.

[3] https://help.blockfi.com/hc/en-us/articles/360048863692-How-is-BlockFi-able-to-pay-interest-on-crypto-held-on-the-platform-

[4] https://moneymodels.org/business-models/how-does-blockfi-make-money/

[5] https://www.coindesk.com/markets/2021/12/03/crypto-lender-celsius-admits-losses-in-120m-badgerdao-hack/

2

government agencies since that time: these companies are but a few poor decisions or unfortunate circumstances away from becoming insolvent. BlockFi recently paid a large fine to the SEC and stopped accepting US customers[6] for their interest program. Celsius quickly followed BlockFi in offboarding the same category of customers[7]. To-date, Voyager has not taken any similar actions; it is possible that Voyager replicates what BlockFi and Celsius did with restricting non-accredited US investors from the rewards/interest program, or it is possible that Voyager instead opts to (continue to) benefit from the influx of users from BlockFi and Celsius, opting to take this action at a future date – whether voluntarily or by being compelled to do so.

7.  Voyager's Earn program, as well as their competitor's programs, generally make similar (vague, and most likely highly misleading) representations regarding their use of customer funds and how they generate the revenue that pays out the interest/rewards for their respective programs. I could perform the exact same deposit/withdrawal tracing for Voyager competitors and come up with similar findings: assets are sent to only a handful of destinations, rendering it impossible to trace further unless those companies produce records or the respective exchange accounts are subpoenaed. This is by design: neither Voyager, nor BlockFi (nor, as a rule, any company offering a similar offering of 'Earn') want it to be public knowledge that they are using rehypothecation customer assets in a way that no reasonable person would say reflects the public representations these companies make about how they use customer assets. Simplified, it's effectively certain both BlockFi and Voyager deliberately mislead the public about how customer assets are utilized, and I am confident that records produced from cryptocurrency exchanges would prove this.

8.  Companies like Voyager and BlockFi have notorious reputations for leveraging "influencers"[8] to promote their platforms. Such "influencers" are, unfortunately, often seen as credible by new and naive cryptocurrency investors that may invest significant portions of their net worth, or even their life's savings, in platforms such as Voyager or BlockFi. The logic is seemingly simple: "this top cryptocurrency influencer says they use this platform, and where else can I generate 9% interest on dollars?" Neither these companies, nor these influencers, appropriately represent the risk to these new

---

[6] https://www.sec.gov/news/press-release/2022-26

[7] https://blog.celsius.network/important-celsius-update-to-our-us-clients-6df471420cc7

[8] Many cryptocurrency "influencers" are not sophisticated or savvy cryptocurrency users and make a living largely off of their social media following, namely, in their ability to generate income via referral links.

cryptocurrency investors, and instead offer vague and broad risk descriptions in their terms.

*"President Biden's Executive Order tasked experts across the federal government with conducting in-depth analysis to balance the responsible development of digital assets with the risks they present. These tasks will be guided by six policy objectives: **<u>first</u>, protect consumers, investors, and businesses**; second, safeguard financial stability from systemic risk; third, mitigate national security risks; fourth, promote US leadership and economic competitiveness; fifth, **promote equitable access to <u>safe</u> and affordable financial services**; and, finally, support responsible technological advances, which take account of important design considerations like those related to privacy, human rights, and climate change. Over approximately the next six months, Treasury will work with colleagues in the White House and other agencies to produce foundational reports and recommendations related to these objectives. In many cases, the work tasked by the Executive Order builds upon ongoing efforts at Treasury."[9]*

9. There have been extensive releases, statements, and actions from government agencies related to cryptocurrency in recent history. Secretary Yellen's remarks on digital assets leave no room for mystery. The *first* priority includes consumer protection; this is not accidental. The fifth priority states equitable access to *safe* and affordable financial services. To state the obvious, it is the opposite of safe to invest a significant portion of your net worth (let alone your life's savings) into activity such as DeFi staking. To invest a significant portion of someone else's net worth into activity such as DeFi staking, while painting a picture of far different asset use, adds a layer of dishonesty on top of risk.

10. Customers of firms like BlockFi and Voyager are led to believe that their assets are being utilized largely by reputable institutions, not that their assets are being day-traded on platforms like Binance or utilized for extremely high-risk DeFi activity. In simpler terms, the risk and reward of loaning Ethereum to a reputable and audited western institution, as opposed to rehypothecation of that Ethereum into DeFi yield farming, are on entirely different ends of the spectrum. The risk associated with this reality transcends not just risk for the misled customers of firms like Voyager and BlockFi that stand to lose significant portions of their net worth, but would be something I would categorize as an item of national security interest: an increased likelihood of a hack means an increased likelihood of siphoning of hundreds of

---

[9] https://home.treasury.gov/news/press-releases/jy0706

millions or even billions of dollars worth of value out of the western economy and into the hands of, for example, North Korea[10]. While true a western institution using loaned Bitcoin for arbitrage trading could be hacked, this is generally a less likely threat than the risk of a DeFi hack. In short, companies like Voyager and BlockFi misrepresent the risk of utilizing their interest/earn programs since they misrepresent what customer assets are used for, disregarding and concealing risk, for the sake of making a risky quick buck.

11. Beyond the misrepresentations regarding risk, from a securities perspective, the Howey Test defines an investment contract as follows:

    a.  An investment of money

        i.  Whether or not cryptocurrency is defined as money is a contentious issue[11] with different interpretations and parlance factors, however, it is broadly accepted that cryptocurrency is a means of transferring value. Cryptocurrencies can and often are utilized as a means of payment. Above all, cryptocurrencies are most widely utilized as a speculative investment at this stage.

    b.  In a common enterprise

        i.  As demonstrated in my Preliminary Report, Voyager customer assets are consolidated into accounts operated by a common enterprise. Blockchains don't lie, and the tracing of Voyager customer deposits to common enterprise accounts is very clear.

    c.  With the expectation of profit

        i.  Customers of Voyager are promised rewards when they participate in the Earn program. Voyager would have extremely few customers that retain assets on their platform otherwise, as their primary draw is the Earn program. Further, any assets utilized by the Voyager 'Earn' program are deliberately selected by the customer, which means the customer opts-in expecting profit.

    d.  To be derived from the efforts of others

        i.  In order for Voyager to generate revenue for the Earn program, efforts to generate revenue must be made by Voyager. These efforts include utilization of customer assets (the investment of money). Even the act

---

[10] https://techcrunch.com/2022/04/15/us-officials-link-north-korean-lazarus-hackers-to-625m-axie-infinity-crypto-theft/

[11] https://www.forbes.com/sites/rmiller/2021/03/23/bitcoin-is-a-cryptocurrency-but-is-it-money/?sh=269fa811dda0

of transferring Voyager customer's assets from a deposit address to a subsequent wallet or account where Voyager consolidates assets requires an effort, as it requires a transaction to be initiated.

12. Even under a hypothetical situation where there was a 100% risk-free way to generate profit off of an investment (which has never existed) of cryptocurrency (which would sound preposterous to anyone with even rudimentary understanding of cryptocurrency risk), it would still require an action – a transaction.

## III. SUMMARY

13. While I am not a securities attorney, relying upon my expertise in the blockchain industry and knowledge of how digital assets function, Voyager's Earn program fits the criteria of the *Howey* Test.

14. While I am not a securities attorney, I am an expert in issues such as solvency, dishonest representation from cryptocurrency companies, hack risk and investigations, government understanding of and approach to digital assets, the spectrum of sophistication of industry participants, and other topics. This combination of experience makes it plain to me that Voyager's representation of risk is fundamentally dishonest.

15. It is my opinion that Voyager continuing to offer this Earn program (in addition to what should be a fairly obvious choice to offboard non-accredited US investors in light of the recent BlockFi and Celsius actions, as Voyager's program is fundamentally the same thing) is functionally equivalent to Voyager *continuing* to knowingly misleading naive investors in a highly predatory fashion – despite Celsius and BlockFi taking actions that should prompt an obvious action from a competitor offering functionally the same thing. In essence, Voyager appears to have made a choice to obtain short-term financial benefit from an influx of Celsius and BlockFi users that they may end up offboarding in the near future (should Voyager elect to take a similar offboarding measure), perhaps after having such customers "locked in" with promotions.

16. Alternatively, if Voyager simply waits for a US Government agency to tell them to modify or halt the program, this would reflect extremely poorly on the blockchain industry and only serve as an example for naysayers of cryptocurrency that refer to the industry as immature. Semantics regarding securities aside, from a consumer protection standpoint, there are clear reasons government agencies have taken action on Celsius and BlockFi, and Voyager's Earn program is *not* fundamentally different from the programs of their competitors.

// ENDS

Richard A. Sanders
Lead Investigator, Principal
CipherBlade

# Exhibit F

STATE OF NEW JERSEY
BUREAU OF SECURITIES
P.O. Box 47029
Newark, New Jersey 07101
(973) 504-3600

---

**IN THE MATTER OF:**

Voyager Digital Ltd., Voyager Digital
Holdings, Inc. and Voyager Digital, LLC,

Respondents.

**SUMMARY CEASE
AND DESIST ORDER**

---

Pursuant to the authority granted to Amy G. Kopleton, Acting Chief of the New Jersey

Bureau of Securities ("Bureau Chief"), under the Uniform Securities Law (1997), N.J.S.A. 49:3-

47 to -89 ("Securities Law") and certain regulations thereunder, and based upon documents and

information obtained during the investigation by the New Jersey Bureau of Securities ("Bureau"),

the Bureau Chief hereby finds that there is good cause and it is in the public interest to enter this

Summary Cease and Desist Order ("Order") against Voyager Digital Ltd., Voyager Holdings, Inc.

and Voyager Digital, LLC (collectively, "Voyager").

The Bureau Chief makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.      Voyager Digital, LLC is a financial services company that generates revenue

through trading, borrowing, staking, and lending cryptocurrency.  Since November 1, 2019,

Voyager has been, at least in part, funding its income generating activities, including lending

operations, digital asset staking,  and proprietary trading, through the sale of unregistered securities

in the form of cryptocurrency interest-earning accounts.  Voyager refers to these unregistered

securities as its "Earn Program,"[1] which is a feature of all Voyager cryptocurrency trading accounts ("Voyager Earn Program Accounts,") unless the account holder opts out.

2. Voyager solicits investors to invest in the Voyager Earn Program Accounts by depositing certain eligible cryptocurrencies into the investors' Voyager Earn Program Account. After obtaining transfers of cryptocurrencies from retail investors, Voyager then pools these cryptocurrencies together to fund its various income generating activities, including lending operations, proprietary trading, cryptocurrency staking, and investments in other cryptocurrency trading platforms, such as Celsius Network. In exchange for investing in the Voyager Earn Program Accounts, investors are promised an attractive interest rate that is paid monthly in the same type of cryptocurrency as originally invested.

3. The Voyager Earn Program Accounts are not registered with the Bureau or any other securities regulatory authority; nor are they otherwise exempt from registration. Digital assets contained in Voyager Earn Program Accounts are not protected by the Securities Investor Protection Corporation ("SIPC"), insured by the Federal Deposit Insurance Corporation ("FDIC"), or insured by the National Credit Union Administration ("NCUA"). This lack of a protective scheme or regulatory oversight subjects Voyager Earn Program Account investors to additional risks not borne by investors who maintain assets with most SIPC member broker-dealers, or with banks, savings associations, or credit unions, although Voyager does disclose the lack of insurance of digital assets to Voyager Earn Program Account investors.

4. As of March 1, 2022, Voyager had approximately 1,530,000 Voyager Earn Program Accounts representing approximately $5 billion in assets, of which approximately 52,800 were New Jersey-based accounts representing approximately $197 million in assets.

---

[1] At various times, Voyager has referred to its cryptocurrency interest account product as the Voyager Interest Program and Voyager Rewards.

2

5. Despite the Voyager Earn Program Accounts lacking the safeguards that the SIPC, FDIC, and NCUA would offer, and lacking the regulatory oversight of securities registration, by March 1, 2022, Voyager's holdings had mushroomed to the equivalent of approximately $5 billion in cryptocurrency assets from the sale of these unregistered securities in violation of the Securities Law.

6. The Bureau Chief enters this Order to protect the investing public by halting the offer and sale of these unregistered securities, and the contribution of additional assets to existing Voyager Earn Program Accounts. Nothing in this order shall preclude Voyager, or any of its affiliates, from paying interest, also known as "Rewards," on the existing Voyager Earn Program Accounts or refunding principal to the Voyager Earn Program Account investors consistent with Voyager's Customer Agreement.

## A.    The Respondents

7. Voyager Digital Ltd. is incorporated in British Columbia, Canada and is the parent company for Voyager's subsidiaries, including Voyager Digital Holdings, Inc.

8. Voyager Digital Holdings, Inc. is incorporated in Delaware and is the holding company for Voyager Digital Ltd.'s subsidiaries in the United States, including Voyager Digital, LLC.

9. Voyager Digital, LLC, is a Delaware limited liability company, that effected a foreign entity filing in New Jersey on March 2, 2018, with offices at 185 Hudson Street, Jersey City, New Jersey. Voyager conducts its business on the internet, through a website accessible to the general public at https://www.investvoyager.com/ (the "Voyager Website"), which is also accessible through Voyager's own proprietary app via smartphone.

10. Voyager is not presently registered, and has never been registered, in any capacity with the Bureau; nor have the Voyager Earn Program Accounts ever been registered with the

3

Bureau.

## B.    The Voyager Earn Program Account Securities

### a.    Voyager Earn Program

11.    Voyager offers and sells its Voyager Earn Program Account unregistered securities in the form of individual and corporate accounts. Investors in these accounts ("Earn Program Investors") deposit certain popular cryptocurrencies with Voyager to earn "up to 12% Rewards." The Voyager Earn Program Account "Rewards" rates Voyager advertises are well in excess of the rates currently being offered on short-term investment grade fixed income securities, or on bank savings accounts.

12.    Voyager offers its Voyager Earn Program Accounts to all U.S. residents over the age of eighteen, except residents of New York state.

13.    When an investor signs up with Voyager, they complete a KYC (Know Your Customer) protocol in which they input certain identifying personal information, including name, age and address, and provide verification using an identification document such as a driver's license. To create an account, a user must check a box next to the statement, "By creating an account, you agree to our Terms," with the word "terms" hyperlinking to Voyager's Customer Agreement (the "Voyager Terms"). Links to the Voyager Terms also appear elsewhere on the Voyager Website.

14.    The Voyager Website states that Voyager requires Earn Program Investors to maintain a specified minimum average monthly cryptocurrency balance for an Earn Program Investor to earn interest on Voyager Earn Program Account balances. Specific minimum balances for particular coins are listed on the Voyager app information page for that coin.

15.    Voyager only accepts certain types of cryptocurrencies for deposit in the Voyager Earn Program Accounts. Although Voyager refers to its payments to Earn Program Investors as

4

"Rewards," the term "Rewards" is a substitute for interest.

16.    Voyager Earn Program Investors earn a variable interest rate on their investment and may withdraw their digital assets at any time, subject to certain restrictions, including discretionary decisions by Voyager to "delay, modify or prohibit, in whole or in part, any requested Withdrawal," and withdrawals within sixty days of a cryptocurrency or cash deposit.

17.    The currently monthly interest rates for Earn Program Investors are posted on the Voyager Website. Voyager's interest rates for deposits of certain cryptocurrencies in its Earn Program Accounts may be "tiered" with specified rates in effect at any time only applied to specified portions of cryptocurrency held in the account, according to the Voyager Terms. Annual interest rates on eligible cryptocurrencies posted on the Voyager Website for March 2022 ranged from 12% for Polkadot to 0.5% for OMG:

**THIS AREA INTENTIONALLY LEFT BLANK**

| DOT POLKADOT | 12% | USDC USD COIN | 9% |
| Min. monthly balance: 20 DOT | | Min. monthly balance: 100 USDC | |
| VGX VOYAGER TOKEN | 7% | MATIC POLYGON | 5.25% |
| Min. monthly balance: 100 VGX | | Min. monthly balance: 100 MATIC | |
| ETH ETHEREUM* | 4.25% | BTC BITCOIN* | 4.05% |
| Min. monthly balance: 0.5 ETH | | Min. monthly balance: 0.01 BTC | |
| ADA CARDANO | 4% | LUNA TERRA LUNA | 4% |
| Min. monthly balance: 100 ADA | | Min. monthly balance: 10 LUNA | |
| AAVE AAVE | 3% | CELO CELO | 3% |
| Min. monthly balance: 1 AAVE | | Min. monthly balance: 50 CELO | |
| COMP COMPOUND | 3% | DASH DASH | 3% |
| Min. monthly balance: 1 COMP | | Min. monthly balance: 1.5 DASH | |
| SOL SOLANA | 3% | LINK CHAINLINK | 2.5% |
| Min. monthly balance: 3 SOL | | Min. monthly balance: 10 LINK | |
| LTC LITECOIN | 2.5% | BCH BITCOIN CASH | 2% |
| Min. monthly balance: 2 LTC | | Min. monthly balance: 0.5 BCH | |
| ATOM COSMOS | 2% | XTZ TEZOS | 2% |
| Min. monthly balance: 20 ATOM | | Min. monthly balance: 50 XTZ | |
| UNI UNISWAP | 2% | FIL FILECOIN | 2% |
| Min. monthly balance: 10 UNI | | Min. monthly balance: 3 FIL | |
| STMX STORMX | 2% | GRT THE GRAPH | 2% |
| Min. monthly balance: 5000 STMX | | Min. monthly balance: 200 GRT | |
| ALGO ALGORAND | 2% | ZRX 0X | 1.5% |
| Min. monthly balance: 200 ALGO | | Min. monthly balance: 200 ZRX | |

Search coins

Sort by:   Highest rates

| UMA UMA | 1% | BAT BASIC ATTENTION TOKEN | 1% |
| Min. monthly balance: 25 UMA | | Min. monthly balance: 300 BAT | |
| EOS EOS | 1% | OXT ORCHID | 1% |
| Min. monthly balance: 50 EOS | | Min. monthly balance: 500 OXT | |
| XLM STELLAR LUMENS | 1% | ZEC ZCASH | 1% |
| Min. monthly balance: 1000 XLM | | Min. monthly balance: 2 ZEC | |
| MANA DECENTRALAND | 0.5% | DOGE DOGECOIN | 0.50% |
| Min. monthly balance: 1000 MANA | | Min. monthly balance: 1000 DOGE | |
| KNC KYBER NETWORK | 0.5% | OMG OMG NETWORK | 0.5% |
| Min. monthly balance: 100 KNC | | Min. monthly balance: 80 OMG | |

*Rewards are paid up to 100 Bitcoin and 500 Ethereum

6

18.     Voyager also pays interest for deposits of certain stablecoins, which are

cryptocurrencies pegged to an external measure of value such as the U.S. dollar, in its Voyager

Earn Program Accounts, as explained on the Voyager Website. For example, Voyager currently

pays 9% annual interest on deposits of USDC with a minimum balance of 100 USDC.

19.     Voyager's Customer Agreement describes the interest calculation and payment

methodology:

> 10. Rewards Program. By entering into this Customer Agreement, and
> subject to clause (F) of this Section 10, Customer understands,
> acknowledges and agrees that Customer is opting into the Voyager Earn
> Program (the "Rewards Program").     The Rewards Program allows
> Customer to earn additional Cryptocurrency of the same kind of
> Cryptocurrency held in Customer's Account (the "Rewards"). The terms
> and conditions governing the Rewards Program are as follows:

<center>*   *   *</center>

> (B)  How Rewards Are Calculated. Rewards earned on Cryptocurrency are
> variable. Voyager will typically publish anticipated Rewards rates once per
> month on or before the first business day of each month. Reward rates may
> be tiered, with specified rates in effect at any time only applied to specified
> portions of amounts of Cryptocurrency held in the Account. Rewards will
> be payable in arrears and added to the Account on or before the fifth
> business day of each calendar month for the prior calendar month. Voyager
> uses the daily balance method to calculate the Rewards on the Account. This
> method applies a daily periodic rate to the specified principal in the Account
> each day. The daily periodic rate is calculated by dividing the applicable
> interest rate by three hundred sixty-five (365) days, even in leap years.
> Voyager will determine the Reward rates and tiers for each month in
> Voyager's sole discretion, and Customer acknowledges that such Rewards
> may not be equivalent to benchmark interest rates observed in the market
> for bank deposit accounts.

### b.     Voyager's Promotion of Earn Program Accounts as Investment Products

20.     Voyager encourages its Earn Program Investors to think of their Voyager Earn

Program Accounts as investments as evidenced by Voyager's own homepage address:

https://www.investvoyager.com/ and certain investment-related statements on Voyager's website,

<center>7</center>

such as "Grow your crypto portfolio" and "journey to the new frontier of investing," as illustrated

in the following:

With advanced market data, interactive charts, news, and professional research, Voyager gives you the powerful tools you need to gain a competitive edge in the crypto market. Let Voyager be your guide towards the future of investing.

**Grow your crypto portfolio**

and



and

8

**We believe that crypto assets are the future of finance and investing. Together, we are creating the broker that the crypto market deserves.**

We are a team of finance and technology industry veterans dedicated to empowering and servicing investors in the most exciting asset class to date – crypto. Our founders have combined their decades worth of experience from leading organizations like E*TRADE, Uber, TradeIt, Lightspeed Financial and more, to bring you Voyager.

Our mission is to provide every investor with a trusted and secure access point to crypto asset trading. We offer best-in-class customer service, incomparable access to the most popular assets and commission-free trading.

Let us be your guide on this journey to the new frontier of investing. Please email contact@investvoyager.com with any inquiries.

### c. Voyager's Use of the Earn Program Account Deposit Funds

21.     The Voyager Customer Agreement provides that an Earn Program Investor relinquishes control over the deposited cryptocurrency to Voyager and that Voyager is free to use those assets as it sees fit, including commingling the Earn Program Investor's cryptocurrency with those of other Earn Program Investors, investing those pooled assets, and staking them, or lending them to various third parties, including custodians and other financial institutions. Having relinquished control over the deposited cryptocurrency in their Voyager Earn Program Accounts, the Earn Program Investors are passive investors.

22.     Specifically, Paragraph 10. A. "Rewards Program - Overview" of the Voyager Customer Agreement provides:

> (A) Overview. Each Customer participating in the Rewards Program acknowledges and agrees that Voyager may rely on the consent to rehypothecate granted by each customer pursuant to **Section 5(D) – Consent to Rehypothecate** with respect to Cryptocurrency held in

9

such Customer Account. Such consent to rehypothecate expressly includes allowing Voyager to (1) stake Cryptocurrency held in an omnibus fashion through various blockchain protocols (either by delegating Cryptocurrencies to the financial institutions which, in return, stake such Cryptocurrencies or using staking service providers to stake Cryptocurrencies); and (2) lend such Cryptocurrency to various institutional third parties (each, a "Borrower") determined at Voyager's sole discretion (each, a "Loan"). Voyager enters into these Loans as principal and independently negotiates with each Borrower the terms of a Loan, but these Loans are generally unsecured, for a fixed term of less than one year or can be repaid on a demand basis, and provide a fee payable in Cryptocurrency based on the percentage and denominated in the Cryptocurrency lent. Voyager selects which and how much Cryptocurrencies are available for such staking and lending.

23.     In a response to an August 6, 2021 inquiry from the Bureau to Voyager, Voyager

noted that "[a]s of the date of the request, all of the outstanding institutional lending activities

represent uncollateralized loans."

24.     Paragraph 5.D. of Voyager's Customer Agreement, "Consent to Rehypothecate,"

further details the status of cryptocurrency deposited with Voyager by Earn Program Investors:

> (D) Consent to Rehypothecate. Customer grants Voyager the right, subject to applicable law, without further notice to Customer, to hold Cryptocurrency held in Customer's Account in Voyager's name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, stake, arrange for staking, or otherwise transfer or use any amount of such Cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of Cryptocurrency, and to use or invest such Cryptocurrency at Customer's sole risk.

25.     Voyager then pools the deposited cryptocurrencies together with Voyager's other

assets in order to, among other income-generating activities, stake them or, invest those pooled

assets by making loans to various third parties, including custodians and other financial

institutions.

10

26.     Voyager does not disclose certain material information to Earn Program Investors that issuers of registered securities must include in a registration statement and provide to prospective investors in the form of a prospectus pursuant to section 52(d) of the Securities Law.

### d.     The Voyager Earn Program Accounts are Unregistered Securities

27.     While certain of Voyager's loan products appear to be licensed under various state licensing requirements for money services businesses or money transmitters, and Voyager Digital Ltd. is a registered public company in Canada, the Voyager Earn Program Account is not currently registered with any federal or state securities regulator, nor is it exempt from registration as required by law, even though the Voyager Earn Program Account is a "security" and subject to such requirements.

28.     Voyager fails to disclose to Earn Program Investors that its Earn Program Account is not currently registered by federal or state securities regulatory authorities, even though the Voyager Earn Program Account is a "security" and required to be registered.

### e.     Misrepresentations and Omissions in the Marketing of the Voyager Earn Program Accounts

29.     Voyager represents to the public on its website that it is "publicly traded, licensed, and regulated." What Voyager fails to disclose in proximity to its advertising claim that it is "publicly traded," however, is that Voyager Digital, LLC's parent company, Voyager Digital Ltd., is publicly traded *in Canada*, not the U.S., by virtue of its equity securities being listed on the Toronto Stock Exchange. Thus, Voyager's advertising claim that it is "publicly traded" is inaccurate with respect to Voyager Digital, LLC, which is not a publicly-traded entity, and creates a misleading impression with respect to Voyager Digital, LLC's regulatory status, particularly because Voyager's website notes that "[a]ll services [are] provided by Voyager Digital, LLC. . . .".

11

30. Voyager's claim to be "licensed" stems from state licensing in far fewer than all U.S. states as a money transmitter, or money services business, which is unrelated to Voyager's offering and selling of unregistered securities, and may convey the misleading impression to unsophisticated investors that Voyager is "licensed" to offer and sell such securities, when it is not.

31. Notwithstanding its claims to be licensed and regulated, Voyager's Earn Program Accounts are neither licensed nor regulated by the Bureau, and Voyager has not sought to register its Earn Program Account with the Bureau, notwithstanding that it is a security required to be registered with the Bureau.

## CONCLUSIONS OF LAW

### VOYAGER OFFERED AND SOLD UNREGISTERED SECURITIES
### N.J.S.A. 49:3-60

32. The preceding paragraphs are incorporated by reference as though set forth verbatim herein.

33. The Voyager Earn Program Account is a security as defined in N.J.S.A. 49:3-49(m).

34. The Voyager Earn Program Account was and is required to be registered with the Bureau pursuant to N.J.S.A. 49:3-60.

35. The Voyager Earn Program Account has not been registered with the Bureau, is not exempt from registration, and is not federally covered.

36. Voyager has offered and sold unregistered securities in violation of N.J.S.A. 49:3-60 and continues to do so.

37. Each violation of N.J.S.A. 49:3-60 is a separate violation of the Securities Law and is cause for the denial of certain exemptions.

12

38.  N.J.S.A. 49:3-69(a)(1) empowers the Bureau Chief to issue a cease and desist order against persons engaged in prohibited activities, directing them to cease and desist from further illegal activity or doing acts in furtherance thereof.

## CONCLUSION

**THEREFORE,** it is on this 29th day of March 2022, **ORDERED** that:

39.  Effective on April 29, 2022, Voyager and any person, agent, employee, broker, partner, officer, director, affiliate, successor, or stockholder thereof, under any of their direction or control shall CEASE AND DESIST from:

a.  offering for sale any security, including any Voyager Earn Program Account, to or from New Jersey unless the security is registered with the Bureau, is a covered security, or is exempt from registration under the Securities Law;

b.  accepting any additional assets into an existing Voyager Earn Program Account; and

c.  violating any other provisions of the Securities Law and any rules promulgated thereunder for the sale of any security in New Jersey.

40.  Nothing in this order shall preclude Voyager from paying interest, also known as "Rewards," on existing Voyager Earn Program Accounts or refunding principal to Earn Program Account Investors consistent with the Voyager Terms.

41.  All exemptions contained in N.J.S.A. 49:3-50 subsection (a) paragraph 9, 10, and 11 and subsection (b) are hereby DENIED as to Voyager.

13

42.     All exemptions to the registration requirements provided by N.J.S.A. 49:3-56(b),

N.J.S.A. 49:3-56(c), and N.J.S.A. 49:3-56(g) are hereby DENIED as to Voyager.

Amy G. Kopleton
Acting Chief, New Jersey Bureau of Securities

## NOTICE OF RIGHT TO HEARING

Pursuant to N.J.S.A. 49:3-69(a)(1)(i), the Bureau Chief shall entertain on no less than three days' notice a written application to lift the Order to Cease and Desist on written application of the person subject thereto and in connection therewith may, but need not, hold a hearing and hear testimony, but shall provide to the person subject thereto a written statement of the reasons for the Order to Cease and Desist.

Pursuant to N.J.S.A. 49:3-69(a)(l)(ii), upon service of notice of the Order to Cease and Desist issued by the Bureau Chief, the person subject thereto shall have up to 15 days to respond to the Bureau in the form of a written answer and written request for a hearing. The Bureau Chief shall, within five days of receiving the answer and request for a hearing, either transmit the matter to the Office of Administrative Law for a hearing or schedule a hearing at the Bureau of Securities. Orders issued pursuant to N.J.S.A. 49:3-69 shall be subject to an application to vacate upon 10 days' notice, and a preliminary hearing on the Order shall be held in any event within 20 days after it is requested, and the filing of a motion to vacate the Order shall toll the time for filing an answer and written request for a hearing.

Pursuant to N.J.S.A. 49:3-69(a)(l)(iii), if any person subject to the Order fails to respond by filing a written answer and written request for a hearing with the Bureau or moving to vacate the order within the 15-day prescribed period, that person shall have waived the opportunity to be heard. The Order will be a Final Order and shall remain in effect until modified or vacated.

## NOTICE OF OTHER ENFORCEMENT REMEDIES

You are advised that the Uniform Securities Law provides several enforcement remedies, which are available to be exercised by the Bureau Chief, either alone or in combination. These remedies include, in addition to this action, the right to seek and obtain injunctive and ancillary relief in a civil enforcement action, N.J.S.A. 49:3-69, and the right to seek and obtain civil penalties in an administrative or civil action, N.J.S.A. 49:3-70.1.

You are further advised that the entry of the relief requested does not preclude the Bureau Chief from seeking and obtaining other enforcement remedies against you in connection with the claims made against you in this action.

16

# Exhibit G

VOYAGER

# Voyager Digital Announces March Interest Mania Rate Increases

*- Earn up to 10% on USDC, 7.25% on BTC, and 8% on DOT -*

CSE: VYGR
OTCQB: VYGVF
Borse Frankfurt: UCD2

NEW YORK, March 10, 2021 /CNW/ - Voyager Digital Ltd. ("Voyager" or the "Company") (CSE: VYGR) (OTCQB: VYGVF) (FRA: UCD2), a publicly-traded, licensed crypto-asset broker that provides investors with a turnkey solution to invest in and trade crypto assets, today announced Voyager's interest rate hike campaign - **March Interest Mania**. Voyager customers will now earn increased APRs on the respective assets as follows:*

- USDC      9.00%
- BTC       6.25%
- ETH       5.25%
- DOT       8.00%
- ADA       5.25%
- LINK      5.50%
- LTC       6.50%

"At Voyager, we put our community first, as evidenced by our industry leading rates that empower our users to build wealth by investing in digital assets and earning significant interest on the Voyager platform," said Steve Ehrlich, Co-founder and CEO of Voyager. "Our focus on the retail investor, with our zero-commission platform and extensive interest program, positions Voyager as the platform of choice for investing in and earning interest on digital assets. These new rates are retroactive to the beginning of March, rewarding our loyal users for their continued support."

Voyager offers interest on a total of 24 digital assets (see the full interest offering here: Interest Program), and through the VGX incentive program, offers interest boosts of 1 percentage point on BTC and USDC, allowing investors to earn up to 10% on USDC, 7.25% on BTC, and 6.25% on Ethereum when holding at least 10,000 VGX tokens. Voyager also recently unveiled its new loyalty program which will take effect once the official Voyager Token swap takes place later in 2021. Interested investors can find out about the new program here: VGX Loyalty Program.

*Additional terms and restrictions apply, including account balance minimums. APRs are subject to change. Actual rate of return will vary based upon account activity. Customer digital assets in the Interest Program are not subject to FDIC or SIPC protections. Please see the Interest Program Terms and Conditions for further details. For more information on Voyager, please visit https://www.investvoyager.com. The Voyager app is available for Android and iPhone.

**About Voyager Digital Ltd.**

Voyager Digital Ltd. is a crypto-asset broker that provides retail and institutional investors with a turnkey solution to trade crypto assets. Voyager offers customers best execution and safe custody on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace. Please visit us at https://www.investvoyager.com for more information and to review the latest Corporate Presentation.

Neither the Canadian Securities Exchange nor its Market Regulator (as that term is defined in the policies of the Canadian Securities Exchange) accepts responsibility for the adequacy or accuracy of this release. No securities regulatory authority has either approved or disapproved of the contents of this press release.

**Forward Looking Statements**

Certain information in this press release, including, but not limited to, statements regarding future growth and performance of the business, momentum in the businesses, future adoption of digital assets, and the Company's anticipated results may constitute forward looking information (collectively, forward-looking statements), which can be identified by the use of terms such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," "continue" or "believe" (or the negatives) or other similar variations. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Voyager's actual results, performance or achievements to be materially different from any of its future results, performance or achievements expressed or implied by forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in

this press release may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. Forward looking statements are subject to the risk that the global economy, industry, or the Company's businesses and investments do not perform as anticipated, that revenue or expenses estimates may not be met or may be materially less or more than those anticipated, that trading momentum does not continue or the demand for trading solutions declines, customer acquisition does not increase as planned, product and international expansion do not occur as planned, risks of compliance with laws and regulations that currently apply or become applicable to the business and those other risks contained in the Company's public filings, including in its Management Discussion and Analysis and its Annual Information Form (AIF). Factors that could cause actual results of the Company and its businesses to differ materially from those described in such forward-looking statements include, but are not limited to, a decline in the digital asset market or general economic conditions; changes in laws or approaches to regulation, the failure or delay in the adoption of digital assets and the blockchain ecosystem by institutions; changes in the volatility of crypto currency, changes in demand for Bitcoin and Ethereum, changes in the status or classification of cryptocurrency assets, cybersecurity breaches, a delay or failure in developing infrastructure for the trading businesses or achieving mandates and gaining traction; failure to grow assets under management, an adverse development with respect to an issuer or party to the transaction or failure to obtain a required regulatory approval. In connection with the forward-looking statements contained in this press release, the Company has made assumptions that no significant events occur outside of the Company's normal course of business and that current trends in respect of digital assets continue. Readers are cautioned that Assets Under Management, trading volumes and other metrics of Voyager's business fluctuate and may increase and decrease from time to time and that such fluctuations are beyond the Company's control. Forward-looking statements, past and present performance and trends are not guarantees of future performance, accordingly, you should not put undue reliance on forward-looking statements, current or past performance, or current or past trends. Information identifying assumptions, risks, and uncertainties relating to the Company are contained in its filings with the Canadian securities regulators available at www.sedar.com. The forward-looking statements in this press release are applicable only as of the date of this release or as of the date specified in the relevant forward-looking statement and the Company undertakes no obligation to update any forward-looking statement to reflect events or circumstances after that date or to reflect the occurrence of unanticipated events. The Company assumes no obligation to provide operational updates, except as required by law. If the Company does update one or more forward-looking statements, no inference should be drawn that it will make additional updates with respect to those or other forward-looking statements, unless required by law. Readers are cautioned that past performance is not indicative of future performance and current trends in the business and demand for digital assets may not continue and readers should not put undue reliance on past performance and current trends. All figures are in U.S. dollars unless otherwise noted.

¢ View original content to download multimedia:
http://www.prnewswire.com/news-releases/voyager-digital-announces-march-interest-mania-rate-increases-301244577.html

SOURCE Voyager Digital (Canada) Ltd.

¢ View original content to download multimedia: http://www.newswire.ca/en/releases/archive/March2021/10/c5710.html

%SEDAR: 00005648E

**For further information:** Voyager Digital Ltd. Contacts, Investor Relations: Michael Legg, (212) 547-8807, mlegg@investvoyager.com, Phil Carlson / Scott Eckstein, (212) 896-1233 / (212) 896-1210, pcarlson@kcsa.com / seckstein@kcsa.com; Media: Anthony Feldman / Raquel Cona, (617) 921-0984 / (212) 682-6300, afeldman@kcsa.com / rcona@kcsa.com; Angus Campbell, 44 7881 625098, angus@nominis.co

CO: Voyager Digital (Canada) Ltd.

CNW 08:17e 10-MAR-21

# Exhibit H



# VOYAGER DIGITAL LTD.

**(formerly VOYAGER DIGITAL (CANADA) LTD.)**

## MANAGEMENT'S DISCUSSION AND ANALYSIS

## FOR THE THREE AND SIX MONTHS
## ENDED DECEMBER 31, 2020

## DATED: March 1, 2021

## Introduction

The following Management's Discussion & Analysis ("MD&A") of the financial condition and results of the operations of Voyager Digital Ltd. (formerly Voyager Digital (Canada) Ltd.) (the "Company" or "Voyager") constitutes management's review of the factors that affected the Company's financial and operating performance for the three and six months ended December 31, 2020.

This MD&A has been prepared in compliance with the requirements of Form 51-102F1, in accordance with National Instrument 51-102 – *Continuous Disclosure Obligations*. This MD&A should be read in conjunction with the unaudited interim consolidated financial statements for the three and six months ended December 31, 2020 and the audited annual consolidated financial statements of the Company for the fiscal years ended June 30, 2020, and June 30, 2019, together with the notes thereto. Results are reported in United States dollars unless otherwise noted. In the opinion of management, all adjustments (which consist only of normal recurring adjustments) considered necessary for a fair presentation have been included. The results for the three and six months ended December 31, 2020, are not necessarily indicative of the results that may be expected for any future period. Information contained herein is presented as of March 1, 2021, unless otherwise indicated.

The consolidated financial statements have been prepared using accounting policies consistent with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board and interpretations of the IFRS Interpretations Committee. This MD&A contains forward-looking statements that involve risks, uncertainties and assumptions, including statements regarding anticipated developments in future financial periods and our future plans and objectives. There can be no assurance that such information will prove to be accurate, and readers are cautioned not to place undue reliance on such forward-looking statements. See "Caution Regarding Forward-Looking Statements".

For the purposes of preparing this MD&A, management, in conjunction with the Board of Directors, considers the materiality of information. Information is considered material if: (i) such information results in, or would reasonably be expected to result in, a significant change in the market price or value of Voyager's common shares; or (ii) there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision; or (iii) it would significantly alter the total mix of information available to investors. Management, in conjunction with the Board of Directors, evaluates materiality with reference to all relevant circumstances, including potential market sensitivity.

## Caution Regarding Forward-Looking Statements

This MD&A contains certain forward-looking information and forward-looking statements, as defined in applicable securities laws (collectively referred to herein as "forward-looking statements"). These statements relate to future events or the Company's future performance. All statements other than statements of historical fact are forward-looking statements. Often, but not always, forward-looking statements can be identified by the use of words such as "plans," "expects," "is expected," "budget," "scheduled," "estimates," "continues," "forecasts," "projects," "predicts," "intends," "anticipates" or "believes", or variations of, or the negatives of, such words and phrases, or state that certain actions, events or results "may," "could," "would," "should," "might" or "will" be taken, occur or be achieved. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results to differ materially from those anticipated in such forward-looking statements. The forward-looking statements in this MD&A speak only as of the date of this MD&A or as of the date specified in such statement. These forward-looking statements may include, but are not limited to, statements relating to:

- Our expectations regarding our revenue, expenses, operations and future operational and financial performance;
- Our cash flows;
- Popularity of cryptocurrencies;

- Our plans for and timing of geographic expansion or new offerings;
- Our future growth plans;
- Our ability to stay in compliance with laws and regulations that currently apply or become applicable to our business both in the United States and internationally;
- Trends in operating expenses, including technology and development expenses, sales and marketing expenses, and general and administrative expenses, and expectations regarding these expenses as a percentage of revenue;
- The reliability, stability, performance and scalability of our infrastructure and technology;
- Our ability to attract new customers and maintain or develop existing customers;
- Our ability to attract and retain personnel;
- Our expectations with respect to advancement in our technologies;
- Our competitive position and our expectations regarding competition;
- Regulatory developments and the regulatory environments in which we operate; and
- Expected impact of COVID-19 on the Company's future operations and performance.

Forward-looking statements are based on certain assumptions and analysis made by us in light of our experience and perception of historical trends, current conditions and expected future developments and other factors we believe are appropriate. Forward-looking statements are also subject to risks and uncertainties which include:

- Decline in the cryptocurrency market or general economic conditions;
- Risks related to managing our growth;
- Our dependence on customer growth, including new customers and growth in the number and value of transactions and deposits;
- Our operating results have and will significantly fluctuate due to the highly volatile nature of crypto;
- A majority of our net revenue is derived from transactions in Bitcoin and Ethereum. If demand for these crypto assets declines and is not replaced by new crypto asset demand, our business, operating results, and financial condition could be adversely affected;
- The future development and growth of crypto is subject to a variety of factors that are difficult to predict and evaluate. If crypto does not grow as we expect, our business, operating results, and financial condition could be adversely affected;
- We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition;
- A particular crypto asset's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty and if we are unable to properly characterize a crypto asset, we may be subject to regulatory scrutiny, investigations, fines, and other penalties, and our business, operating results, and financial condition may be adversely affected;
- Loss of a critical banking or insurance relationship could adversely impact our business, operating results, and financial condition;
- Any significant disruption in our products and services, in our information technology systems, or in any of the blockchain networks we support, could result in a loss of customers or funds and adversely impact our brand and reputation and business, operating results, and financial condition;
- Regulatory risk, including changes in laws or the interpretation or application thereof and the obtaining of regulatory approvals;
- Counterparty risk and Credit risk;
- Lending risks;
- Technology and infrastructure risks, including their ability to meet surges in demand;
- Cybersecurity risks;
- Fluctuations in quarterly operating results;
- Risks related to the security of customer information;
- Competition in our industry and markets;
- Our reliance on key personnel;

- Our reliance on third party service providers;
- Exchange rate fluctuations;
- Risks related to expanding our marketing and sales;
- Risks related to our ability to adapt to rapid technological change;
- Risks related to terrorism, geopolitical crisis, or widespread outbreak of an illness or other health issue;
- Risks associated with acquisitions and the integration of the acquired businesses; and
- Risks related to international expansion.

Inherent in forward-looking statements are risks, uncertainties and other factors beyond Voyager's ability to predict or control. Readers are cautioned that the above does not contain an exhaustive list of the factors or assumptions that may affect the forward-looking statements and that the assumptions underlying such statements may prove to be incorrect. Actual results and developments are likely to differ, and may differ materially, from those expressed or implied by the forward-looking statements contained in this MD&A. Readers should refer to those risk factors referenced in the "Risks and Uncertainties" section below.

Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Voyager's actual results, performance or achievements to be materially different from any of its future results, performance or achievements expressed or implied by forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in this document may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. All forward-looking statements herein are qualified by this cautionary statement. Accordingly, readers should not place undue reliance on forward-looking statements. Readers are cautioned that past performance is not indicative of future performance and current trends in the business and demand for digital assets may not continue and readers should not put undue reliance on past performance and current trends. The Company undertakes no obligation to update publicly or otherwise revise any forward-looking statements whether as a result of new information or future events or otherwise, except as may be required by law. If the Company does update one or more forward-looking statements, no inference should be drawn that it will make additional updates with respect to those or other forward-looking statements, unless required by law.

## Description of Business

The Company operates in a regulated environment, and through its Voyager Platform (the "Platform") offers investors, developers and platform providers a fully functional suite of APIs and mobile apps to allow anyone who is legally able to do so the ability to trade, invest, earn and secure digital assets across multiple types of digital assets.

The Company wholly owns HTC Trading, Inc (HTC), a Cayman Island company and Voyager Digital Holdings, Inc. (VDH), a Delaware corporation, which in turn wholly owns each of Voyager Digital, LLC. (VDL), a Delaware limited liability corporation, Voyager IP, LLC (VIP), a Delaware limited liability corporation and VYGR Digital Securities, LLC, a California limited liability corporation. The Company also wholly owns Voyager Digital Brokerage Ltd. and Voyager Digital Brokerage Canada Ltd., both companies having been incorporated under the laws of Canada. The Company also owns LGO SAS and LGO Europe SAS, both companies are incorporated under the laws of France.

The registered office of the Company is Suite 2900 – 595 Burrard Street, Vancouver, BC, V7X 1J5, Canada; and its head office is 33 Irving Place, 3rd Floor, New York, New York 10003.

The Company has two unique distribution models, direct to consumer and business-to-business driven by corporate partners which allow Voyager to reach millions of customers at very low customer acquisition costs.

VDL acts as a "crypto broker," being a digital agent broker that facilitates users buying and selling of cryptocurrencies delivering deep pools of liquidity. It also offers a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors. Some of the services offered by VDL include:

- users can open an account in three minutes or less.  VDL utilizes third party service providers for know-your-client and anti-money-laundering checks to ensure fast and secure account openings;

- users are able to trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies;

- execution of trade orders across a spectrum of exchanges to give Voyager the deepest pool of liquidity;

- minimizing transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing VDL's patented smart router technology;

- providing users with data in order for them to manage and track their crypto investments, including delivering news, social feeds and real-time alerts to keep users connected to the market, and providing portfolio tools to track performance, balances and transactions; and

- storing crypto assets in a secure wallet and in a "cold" facility, with 24/7 security. (fiat currency is stored at custodial banks).

VDL has registered as a Money Services Business (MSB) pursuant to the *Bank Secrecy Act* regulations as administered by the Financial Crimes Enforcement Network (FinCEN). VDH entered in the Account Services Agreement with Metropolitan Commercial Bank (the "Bank"), whereby the Bank provides deposit and payment systems for VDL's customers using a custodial "for the benefit of" account. The Bank is (i) a New York registered bank, overseen by the New York State Department of Financial Services and is (ii) listed on the New York Stock Exchange (symbol: MCB).

On December 10, 2020, the Company acquired the issued and outstanding share capital of LGO SAS, an AMF regulated entity based in France, and LGO Europe SAS, in exchange for 200,000 shares of the Company's common stock, to be issued upon demand and subject to the terms of the escrow agreement. In addition, the sellers are entitled to 1,000,000 shares of the Company's common stock after one-year, contingent upon the AMF's approval of the license application.

Voyager's common shares are currently listed for trading on the Canadian Securities Exchange ("CSE") under the symbol "VYGR". It was previously listed on the TSX Venture Exchange, but moved to the CSE on September 23, 2019. The Company's common shares are also traded on the OTCQB under the symbol "VYGVF" and on the Borse in Frankfurt under the symbol "UCD2".

## Quarterly Highlights and Results

| | December 31, 2020 | June 30, 2020 |
|---|---|---|
| Cash and Cash Equivalents | $    2,987,003 | $    3,628,861 |
| Cash held for customers | 8,396,732 | 1,581,132 |
| Current Assets | 275,107,609 | 37,853,282 |
| Current Liabilities | 274,541,247 | 37,604,941 |
| Working Capital | 566,362 | 248,341 |
| Shareholder's Equity | 693,065 | 550,962 |

| | 3 months ended | | 6 months ended | |
|---|---|---|---|---|
| | 12/31/20 | 12/31/19 | 12/31/20 | 12/31/19 |
| **Revenue** | | | | |
| Fees | $    2,056,305 | $    88,146 | $    3,681,817 | $    160,376 |
| Interest Revenue | 1,512,993 | - | 1,888,218 | - |
| **Total Revenue** | $    3,569,298 | $    88,146 | $    5,570,035 | $    160,376 |
| | | | | |
| **Operating Expenses** | | | | |
| G&A | 5,503,539 | 2,170,494 | 9,742,281 | 3,687,502 |
| Product Development | 805,770 | 569,898 | 1,232,287 | 1,676,959 |
| Total Operating Expenses | (6,309,309) | (2,740,392) | (10,974,568) | (5,364,461) |
| | | | | |
| Total Other Income/ (Loss) | (6,256,547) | 1,672,116 | (7,566,924) | 1,705,674 |
| | | | | |
| **Net and comprehensive loss** | $    (8,996,558) | $    (980,130) | $    (12,971,457) | $    (3,498,411) |

Total Other Income / (Loss) includes: (a) $5.2 million and $5.5 million of gains on digital asset exchange for the three and six months ended December 31, 2020, respectively and $0.2 million and $0.1 million of losses of digital asset exchange for the three and six months ended December 31, 2019; (b) $10.6 million for change in fair value of investment for both the three and six months ended December 31, 2020; (c) ($6.2) million for change in fair value of digital currency loan payable for both the three and six months ended December 31, 2020; and (d) ($15.6 million) and ($17.1 million) for change in fair value of warrant liability for the three and six months ended December 31, 2020, respectively and ($0.2) million for both the three and six months ended December 31, 2020.

## Outlook and Overall Performance

**Revenue**. Total revenue for the three months ended December 31, 2020, was $3,569,298, an increase of $3,481,152 compared to the same period in 2019. The increase was due to a $1,968,159 increase in Fees and $1,512,993 increase in interest revenue. Total revenue for the six months ended December 31, 2020 was $5,570,035, an increase of $5,409,659. The increase was due to a $3,521,441 increase in Fees and $1,888,218 increase in interest revenue.

*Fee Revenue*

Fee revenue for the three and six months ended December 31, 2020 was $2,056,305 and $3,681,817, an increase of $1,968,159 and $3,521,441 compared to the same periods in 2019. The increase in the three months ended December 31, 2020 compared to the three months ended December 31, 2019 was primarily due to an increase of $326 million in trade volumes, and an average spread of 60.5 bps. The increase in

the six months ended December 31, 2020 compared to the six months ended December 31, 2019 was primarily due to an increase of $521 million in trade volumes, and an average spread of 66.3 bps.

*Interest income from custodians*

Interest revenue from custodians for the three and six months ended December 31, 2020 was $1,512,993 and $1,888,218. The Company did not offer this product in the prior period.

**Operating expenses.** Total operating expenses for the three months and six months ended December 31, 2020, were $6,309,309 and $10,974,568, an increase of $3,568,917 and $5,610,107, respectively. The increase in the three months ended December 31, 2020 compared to the three months ended December 31, 2019 was due to an increase in $3,333,045 general and administrative expenses and $235,872 in product development. The increase in the six months ended December 31, 2020 compared to the six months ended December 31, 2019 was due to a $6,054,779 increase in general and administrative expenses offset by a $444,672 decrease in product development.

*General and administrative expenses*

General and administrative expenses increased by 154% and 164% for the three and six months ended December 31, 2020 to $5,503,539 and $9,742,281, respectively. This increase is primarily due to increased headcount and underlying infrastructure as well as increased marketing costs and interest paid to customers.

*Product and development expenses*

Product and development expenses increased by 41% and decreased by 27% for the three and six months ended December 31, 2020 to $805,770 and $1,232,287, respectively. The increase for the three months ended December 31, 2020 is due to increase in development headcount while the decrease for the six months ended December 31, 2020 is attributed to the increase in headcount offset by a reduction in required other development costs following the successful launch of the platform including the wallet, bedrock and technology acquired from Ethos.

At December 31, 2020, the Company had cash and cash equivalents, including cash held for customers, of $11,383,735, an increase from $5,209,993 at June 30, 2020. The $6,173,742 increase was primarily due to approximately $6 million in negative operating cash offset by $9.5 million from the issuance of special warrants from the September 2020 and December 2020 private placements and $1.8 million from proceeds from the exercise of warrants. In addition to cash on hand, the Company has invested approximately $7.5 million of USDC deposits included in "Digital currencies and fiat" on the statement of financial position as of December 31, 2020. Furthermore, the Company closed on a $46.0 million private placement in January 2021 and a $100.0 million private placement in February 2021 (see discussion in "Subsequent Events").

The Company has sufficient capital to meet its ongoing operating expenses and continue to meet its obligations on its current project for the 12-month period ending December 31, 2021. Management may increase or decrease budgeted expenditures depending on results and ongoing volatility in the crypto market.

Over the next few years, the Company plans on pursuing the below products in order to expand the Company's market opportunity:

- Debit Cards
- Credit Cards
- Desktop (in Beta)
- Loan Programs
- Asset Management and Basket Trading

- Crypto to Stock Trading
- Insurance and Wealth Creation Products

Voyager is focused on the delivery of wealth creation products using digital assets and the blockchain to allow customers to establish and control their own financial freedom.

## Significant Milestones since September 30, 2020

Since September 30, 2020, the Company has been very active in adding customer facing products, raising capital to enhance the liquidity of the Company, making strategic acquisitions to scale the Company, adding additional products to improve the exposure of the Company and building the management team to position the Company for expansion.

### Acquisitions

In December 2020, the Company acquired the issued and outstanding share capital of LGO SAS, an AMF regulated entity based in France, and LGO Europe SAS, in exchange for 200,000 shares of the Company's common stock, to be issued upon demand and subject to the terms of an escrow agreement (the "LGO Acquisition"). In addition, the sellers are entitled to 1,000,000 shares of the Company's common stock after one-year, contingent upon the AMF's approval of the change of control, (the "Earn-out Shares").

### Exchange Listings

The Company is listed on the Canadian Securities Exchange, on the Borse in Frankfurt, and also on the OTCQB market. The Company continuously reviews its exchange listings to evaluate what markets can bring additional exposure to the business. The Company is preparing itself for potential uplistings as its business continues to grow.

### Capital Raising

Through the date of this MD&A the Company was able to raise significant capital. Most of the capital raises were completed through non-brokered private placements with warrants attached. In December 2020, the Company completed a brokered private placement offering for the issuance of special warrants at a price of CDN$1.50 per special warrant, for aggregate gross proceeds of approximately $8.2 million. Each special warrant, subject to adjustment in accordance with the terms of the special warrants, is convertible into one unit of the Company without payment of any additional consideration upon certain conditions being met. Each unit will consist of one common share of the Company and one-half common share purchase warrant, with each common share warrant being exercisable to acquire one common share of the Company at an exercise price of CDN$2.50 per share for a term of two years.

### Subsequent events

In January 2021, the Company closed on a private placement offering of 8,363,637 shares of common stock for gross proceeds of approximately $46.0 million. In exchange for their services, the agent for the offering received a 7% cash commission and compensation warrants entitled it to purchase 585,455 shares of common stock, at a price of $5.50 per share for a period of 18 months following the closing of the offering.

In February 2021, the Company closed on a private placement offering of 7,633,588 shares of common stock for gross proceeds of approximately $100.0 million. In exchange for their services, the agent for the offering received a 7% cash commission.

## API Partners

Voyager has entered into multiple relationships with partners who write their trading systems to the Voyager APIs. The largest of these relationships are Market Rebellion, LLC, which has over 10,000 users, and Sterling Trading Technologies, which also has over 10,000 global users. Another significant API partner, RoundlyX helps drive significant customers to the Platform although they have fewer assets per account then the other two partners.

## Interest Program

In November 2019, the Company brought to market its interest program for consumers. Customers were able to trade Bitcoin and earn interest at the same time, becoming in effect an interest-bearing checking account. As of March 1, 2021, the Company offered interest on 24 coins with more being planned for the future.

## Presenting at Various Conferences

The Company attended and presented at various conferences, including the Benzinga Small-cap Conference, Singular Research's Best of the Uncovered 2020 Webinar, and the LD Micro Main Event in December 2020.  The Company also presented at the SNN Network Canada Virtual Conference and the Noble Capital Markets Seventeenth Annual Small & Microcap Investor Conference in January.  In February, the Company Presented at Adelaide Capital's Crypto Day, the A.G.P. Emerging Growth Technology Conference, KBW's Virtual Panel, The Rise of Retail Crypto Investing and Trading, the Diamond Equity Emerging Growth Invitational, and the Singular Research Alpha Leaders Conference.   The Company is scheduled to present in March at LD Micro's Zooming with LD event, the Sidoti Spring 2021 Virtual Conference, and Lytham Partners Spring 2021 Investor Conference.

## Listing of Stablecoins and additional Defi Coins

As part of Voyager's product expansion, the Company now lists over 50 coins, including three Stablecoins and 10 Decentralized Finance Coins. The Company anticipates adding more coins in the near future to continually grow out its product offering.

## Management Team Expansion

As Voyager continues to grow, the Company continues to add industry leading executives to the day-to-day management team. As of the date of this filing, the management team now includes:

Stephen Ehrlich, Chief Executive Officer
Gerard Hanshe, Chief Operating Officer
Evan Psaropoulos, Chief Financial Officer
Janice Barrilleaux, Chief Administrative Officer
Brandi Reynolds, Chief Compliance Officer
Michael Legg, Chief Communications Officer
Lewis Bateman, Chief International Officer
Dan Costantino, Chief Information Security Officer
David Brosgol, General Counsel

## Global Expansion

The Company announced that it is working with regulators in both Canada and France to bring the Voyager products to the Canadian and European marketplaces. In July 2020, the Company announced its proposed expansion into Canada, and in December 2020, closed on the acquisition of LGO, SAS, a French regulated crypto broker. Any expansion is subject to the Company obtaining all regulatory approvals.

## Marketing

In November 2020, Voyager hired Natalie Jaeger as the Head of Digital Marketing. The Company began a more aggressive marketing strategy which included digital advertising, increased social marketing, and

increased influencer marketing using crypto centric influencers and professional athletes. The Company will continue to expand its marketing channels in 2021.

**FUTURE MILESTONES**

The Company expects to accomplish the following in the next 12 months:

- add additional exchanges to which VDL is a member, so as to expand the depth of liquidity;

- expand the business into the European and Canadian marketplaces;

- increase the number of businesses using the Voyager Institutional, thereby increasing the number of customers using the Platform;

- continue to develop, refine and expand the functionality of the Platform, including but not limited to bank accounts, basket trades, debit cards, margin trading and shorting transactions;

- engage in strategic acquisitions and ventures whereby the Company increases its customer base, products and addressable market; and

- obtain New York State Bit License.

## Trends

In the cryptocurrency industry, there exist multiple exchanges offering online trading and wallets and multiple online/mobile players providing components of the cryptocurrency ecosystem. The largest US exchanges are Coinbase, Kraken, Gemini and Binance (US). Their models offer platforms that only send trades singularly to their wholly owned exchange with little or no information available on the platform. VDH differs from the exchanges as it delivers a mobile friendly experience with an ease of use that is unmatched by the exchanges. Additionally, exchanges focus on Institutional volume and not the retail consumer and experience. Voyager's agency brokerage platform searches multiple exchanges for best execution.

The competitive landscape also includes traditional payment and online brokers such as Robinhood, Sofi Invest, Square, and most recently Paypal, which announced a basic cryptocurrency offering. The Company has a competitive advantage versus the traditional players as the Company delivers 50+ coins while the traditional players offer five or less, interest on 24 coins where the traditional players offer no interest, and the Company offers customers the ability to transfer coins to their own wallet which the traditional players do not offer.

**Trading of Cryptocurrencies**

The demand for cryptocurrencies has increased over the past year as cryptocurrencies have become more widely accepted. Customers expect to be able to utilize more efficient and better infrastructures to support the trading of cryptocurrencies. Voyager's platform solves many of the problems facing people or institutions that trade cryptocurrencies, including that:

- the market is highly fragmented, with more than 200 exchanges facilitating trading of cryptocurrencies;

- there is no centralized place or service in which to trade, which means that users often have to open accounts with multiple exchanges in order to make the trades they desire on coins they desire; and

- many of the top tier retail customer exchanges lack a cost-effective fiat on-ramp and off-ramp for customers to turn dollars into digital assets via a secure banking provider.

Customers are demanding a one stop shop where they can trade, earn interest and invest in cryptocurrencies. Voyager provides consumers with the platform to fill this gap and create wealth for consumers.

## Capital Resources, Liquidity, Financial Instruments and Other Risks

**Capital Resources**

As of December 31, 2020, the Company had cash of $3.0 million compared with $3.6 million at June 30, 2020. Additionally, the Company had approximately $22.7 million of USDC deposits included in "Digital currencies and fiat" on the statement of financial position as of December 31, 2020.

The unaudited condensed consolidated financial statements have been prepared on a going concern basis, which presumes realization of assets and discharge of liabilities in the normal course of business for the foreseeable future. These unaudited condensed consolidated financial statements do not give effect to adjustments or disclosures that would be necessary should the Company be unable to continue as a going concern and therefore be required to realize its assets and liquidate its liabilities and commitments in other than the normal course of business and at amounts different from those presented in these unaudited condensed consolidated financial statements.

The Company has historically funded its operations through the issuance of common stock. The Company does not currently generate sufficient revenue to sustain operations without outside third-party financing.

The Company expects to continue to incur operating losses for the foreseeable future as it expands its product offering and invests in expanding its customer account base, which would require additional third party financing. Management believes that it has sufficient working capital on hand to fund operations through at least the next twelve months from the date these consolidated financial statements were available to be issued.

The Company's future liquidity and capital funding requirements will depend on numerous factors including its ability to raise additional funds to finance its growth and operations, planned development and expenditures through additional equity offerings and through revenue generated from ongoing operations. Failure to implement the Company's business plan could have a material adverse effect on the Company's financial condition and/or financial performance. There can be no assurance that the Company will be successful in generating sufficient revenue from operations, acquiring additional funding, that the Company's projections of its future working capital needs will prove accurate, or that any additional funding would be sufficient to continue operations in future years.

The recent outbreak of the coronavirus, also known as COVID-19, has resulted in governments worldwide enacting emergency measures to combat the spread of the virus. These measures, which include the implementation of travel bans, self-imposed quarantine periods and social distancing, have affected economies and financial markets around the world resulting in an economic slowdown. The extent to which COVID-19 may impact the Company's business activities will depend on future developments, such as duration of the outbreak, travel restrictions, business disruptions and the effectiveness of actions taken to contain and treat the disease. The duration and impact of the COVID-19 outbreak is unknown at this time and it is not possible to reliably estimate the length and severity of these developments as well as the impact on the Company's ability to raise capital or financial results and condition of the Company in future periods.

**Working Capital**

As of December 31, 2020, the Company had net working capital of approximately $ 0.6 million compared to $0.2 million at June 30, 2020. Management has funded operations through a mix of revenue growth, cost management, equity raises, and U.S. Payment Protection Loans ("PPP").

Cash used in operating activities for the six months ended December 31, 2020 was $6.1 million compared to cash used for operating activities of $2.7 million for the six months ended December 31, 2019. The $3.4 million increase was due to a $4.2 million change in working capital, primarily due to net changes between Payables to customers and Digital currencies and fiat as a result of higher volume of activity and assets under management from growth in the business. The Company recorded cash provided from investing activities of $87,960 for the six months ended December 31, 2020 compared to cash used in investing activities of $90,824 in the six months ended December 31, 2019.

Net cash provided by financing activities was $12.1 million for the six months ended December 31, 2020 compared with $2.3 million for the six months ended December 31, 2019. The primary sources of cash for the six months ended December 31, 2020 were the September 2020 private placement, the December 2020 private placement and the exercising of warrants. In the three months ended September 30, 2019, the primary source of cash provided by financing activities was the issuance of common stock and warrants of $1.8 million.

**Liquidity risk**

Liquidity risk is the risk that the Company will not be able to meet its obligations as they become due. The Company generally relies on cash reserves, funds generated from operations and external financing to provide sufficient liquidity to meet budgeted operating requirements.

To the extent that the Company does not believe it has sufficient liquidity to meet these obligations, management will consider securing additional funds through equity. The Company's ability to continue as a going concern is dependent on the Company's ability to generate future profitable operations and cash flows and/or management's ability to raise additional financing.

While the Company has been successful in raising capital in the past, and management has a high degree of confidence that this trend of capital raising will continue, there is no assurance that it will be successful in closing further financings in the future. These interim financial statements do not give effect to any adjustments to the carrying value of recorded assets and liabilities, revenue and expenses, the statement of financial position classifications used, and disclosures that might be necessary should the Company be unable to continue as a going concern.

The Company manages its liquidity risk by forecasting cash flows from operations and anticipating any investing and financing activities, as applicable. Management and the Board are actively involved in the review, planning and approval of significant expenditures and commitments. Currently, the Company is not exposed to significant liquidity risk.

**Credit risk**

Credit risk is the risk that one party to a financial instrument will fail to discharge an obligation and cause the other party to incur a financial loss. The Company's primary exposure to credit risk is on digital currencies held or loaned out to custodians and on its cash held in bank accounts, if applicable. For digital currencies held or loaned out to custodians, the risk is managed through a management review and approval process for each counterparty, where such factors as collateral monitoring, loan history, credit worthiness, internal control processes and security measures, and management assessments. For cash held in bank accounts, this risk is managed by using a major bank that is a high credit quality financial institution as determined by rating agencies. As of December 31, 2020, the Company is not exposed to significant credit risk.

**Interest rate risk**

The Company is not currently exposed to significant interest rate risk.

**Foreign exchange risk**

The Company's functional currency and the reporting currency is the US dollar. Periodically the Company incurs charges on its operations for settlement in currencies other than its functional currency and any gain or loss arising on such transactions is recorded in operations for the period. The Company is not currently exposed to significant foreign exchange risk.

**Digital assets and market risks**

The Company invests in digital assets which may be subject to significant changes in value. The Company monitors this risk on a daily, weekly and monthly basis. The amount of investment in digital assets is small and thus the Company is not currently exposed to significant Digital Asset risk.

## Off Balance Sheet Arrangements

As of December 31, 2020, the Company did not have any off-balance sheet arrangements.

## Commitments and Contingencies

There were no commitments or contingencies, expected or unexpected events, or uncertainties that materially affected the Company's operations, liquidity or capital resources in the interim period ended December 31, 2020, or that are reasonably likely to have a material effect going forward; save and except for the uncertainty pertaining to the Company being able to raise any financing on terms acceptable to it, or at all.

## Use of Funds

There are no significant changes from disclosure previously made about how the Company was going to use proceeds from any financing.

## Related Party Transactions

There are no significant transactions between the Company and related parties that occurred in the interim period ended December 31, 2020, or that were materially different from the related party transactions that occurred during the fiscal year ended June 30, 2020. There was no material change in the amount of remuneration paid to directors and senior officers from that disclosed in the Annual MD&A. For the six months ended December 31, 2020, the Company expensed:

- $17,139 (six months ended December 31, 2019 - $21,287) to Marrelli Support Services Inc. for providing accounting services and services of Vic Hugo as the previous Chief Financial Officer of the Company.

- $35,576 (six months ended December 31, 2019 - $38,422) to Owen Bird Law Corporation for legal services. Jeff Lightfoot, a director of the Company, is a shareholder in the law firm.

# Exhibit I

**VOYAGER DIGITAL LTD.**

**ANNUAL INFORMATION FORM**

**FOR THE FISCAL YEAR ENDED JUNE 30, 2021**

**October 27, 2021**

# TABLE OF CONTENTS

GLOSSARY OF DEFINED TERMS ..................................................................................................... 1

GENERAL ............................................................................................................................................. 4

STATEMENT REGARDING FORWARD LOOKING STATEMENTS ............................................. 4

CURRENCY AND EXCHANGE RATES ............................................................................................ 7

CORPORATE STRUCTURE ................................................................................................................ 7

GENERAL DEVELOPMENT OF THE BUSINESS ........................................................................... 8

RISK FACTORS ................................................................................................................................. 20

PRIOR SALES .................................................................................................................................... 37

DIVIDENDS ....................................................................................................................................... 41

DESCRIPTION OF CAPITAL STRUCTURE ................................................................................... 41

MARKET FOR SECURITIES ............................................................................................................ 42

ESCROWED SECURITIES AND SECURITIES SUBJECT TO CONTRACTUAL RESTRICTION ON
TRANSFER ......................................................................................................................................... 43

DIRECTORS AND OFFICERS .......................................................................................................... 43

PROMOTERS ..................................................................................................................................... 50

INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS ................... 50

LEGAL PROCEEDINGS .................................................................................................................... 50

AUDITORS, TRANSFER AGENT AND REGISTRAR .................................................................... 50

MATERIAL CONTRACTS ................................................................................................................ 50

EXPERTS ............................................................................................................................................ 51

ADDITIONAL INFORMATION ........................................................................................................ 51

APPENDIX "A" ................................................................................................................................... 52

## GLOSSARY OF DEFINED TERMS

In this Annual Information Form, the following capitalized words and terms shall have the following meanings:

| | |
|---|---|
| **$** | Unless otherwise indicated, United States dollars. |
| **Account Services Agreement** | Account Services Agreement dated June 3, 2019 between VDH and the MC Bank. |
| **AIF** | This Annual Information Form of the Company for the fiscal year ended June 30, 2020. |
| **Anchorage** | Such term has the meaning ascribed to it under the heading "General Development of the Business - General - Narrative Description of the Business" in this AIF. |
| **API** | Such term has the meaning ascribed to it under the heading "General Development of the Business - General - Narrative Description of the Business" in this AIF. |
| **Audit Committee** | The audit committee of the Board. |
| **BCBCA** | *Business Corporations Act* (British Columbia) including the regulations thereunder, as amended. |
| **BCSC** | British Columbia Securities Commission. |
| **Bitcoin or BTC** | The peer-to-peer payment system and the digital currency of the same name which uses open source cryptography to control the creation and transfer of such digital currency. |
| **Board** | The board of directors of the Company. |
| **CARES Act** | The *Coronavirus Aid, Relief, and Economic Security Act*. |
| **CEO** | Chief Executive Officer. |
| **CFO** | Chief Financial Officer. |
| **Coinify** | Coinify ApS, a wholly owned subsidiary of the Company and, as applicable, its subsidiary companies. |
| **Common Shares or Shares** | Common shares without par value in the capital of the Company. |
| **Computershare** | Computershare Trust Company of Canada. |
| **COVID-19** | The illness caused by the coronavirus disease, also known as the 2019 novel coronavirus. |
| **Crypto Trading Platform** | A centralized or decentralized marketplace that unites and matches buyers and sellers of cryptocurrencies. |
| **Cryptocurrency, crypto asset or crypto** | A digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority. |
| **CSA** | Canadian Securities Administrators. |
| **CSE** | Canadian Securities Exchange. |

| | |
|---|---|
| **Ethos** | Ethos.io PTE Ltd., a private Singapore-based company. |
| **Ethos IP** | Such term has the meaning ascribed to it under the heading "General Development of the Business - Three Year History" in this AIF. |
| **Exchange Act** | Securities Exchange Act of 1934. |
| **Financial Statements** | Audited consolidated financial statements for the years ended June 30, 2021 and June 30, 2020. |
| **FinCEN** | Financial Crimes Enforcement Network. |
| **FINRA** | Financial Industry Regulatory Authority, Inc. |
| **Fiscal 2019** | The fiscal year of the Company ended June 30, 2019. |
| **Fiscal 2020** | The fiscal year of the Company ended June 30, 2020. |
| **Fiscal 2021** | The fiscal year of the Company ended June 30, 2021. |
| **Fiscal 2022** | The fiscal year of the Company ended June 30, 2022. |
| **Governmental Authority** | Any (i) international, multinational, national, federal, provincial, state, municipal, local or other governmental or public department, central bank, court, arbitral body, commission, board, bureau, agency or instrumentality, domestic or foreign, (ii) subdivision or authority of any of the above, (iii) quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing, or (iv) stock exchange or securities authorities. |
| **IFRS** | The International Financial Reporting Standards. |
| **Insider** | Means, in relation to the Company: |
| | (a) a director or senior officer of the Company; |
| | (b) a director or senior officer of a corporation that is an Insider or subsidiary of the Company; |
| | (c) a Person that beneficially owns or controls, directly or indirectly, voting shares carrying more than 10% of the voting rights attached to all outstanding voting shares of the Company; or |
| | (d) the Company itself if it holds any of its own securities. |
| **IIROC** | Investment Industry Regulatory Organization of Canada. |
| **January 2018 PP** | Such term has the meaning ascribed to it under the heading "General Development of the Business – Three Year History" in this AIF. |
| **MC Bank** | Metropolitan Commercial Bank. |
| **MD&A** | The management discussion and analysis for the year ended June 30, 2021. |
| **person** | Any individual, firm, partnership, joint venture, venture capital fund, association, trust, trustee, executor, administrator, legal personal representative, estate group, body corporate, corporation, unincorporated association or organization, Governmental Authority, syndicate or other entity, whether or not having legal status. |

| | |
|---|---|
| **Platform** | Such term has the meaning ascribed to it under the heading "Description of Business – Three Year History" in this AIF. |
| **PPP** | Paycheck Protection Program. |
| **Promoter** | A person who: |

|  | (a) | acting alone or in concert with one or more other persons, directly or indirectly, takes the initiative in founding, organizing or substantially reorganizing the business of the Company; or |
|---|---|---|
|  | (b) | in connection with the founding, organization or substantial reorganization of the business of the Company, directly or indirectly receives, in consideration of services or property or both, 10% or more of a class of the Company's own securities or 10% or more of the proceeds from the sale of a class of the Company's own securities of a particular issue, |

but does not include a person who:

|  | (c) | receives securities or proceeds referred to in paragraph (b) solely |
|---|---|---|
|  |  | i)   as underwriting commissions, or |
|  |  | ii)  in consideration for property, and |
|  | (d) | does not otherwise take part in founding, organizing or substantially reorganizing the business. |

| | |
|---|---|
| **Rewards Program** | Such term has the meaning ascribed to it under the heading "General Development of the Business - Three Year History" in this AIF. |
| **RTO** | The reverse takeover transaction completed by the Company on February 6, 2019, whereby the Company acquired all of the shares of VDH from VHI pursuant to the VDH SPA. |
| **SBA** | U.S. Small Business Administration. |
| **SEC** | U.S. Securities and Exchange Commission. |
| **Shareholders** | Holders of Common Shares. |
| **Stock Option Plan** | The stock option plan of the Company. |
| **TSX** | Toronto Stock Exchange. |
| **TSXV** | TSX Venture Exchange. |
| **US Patent Office** | The United States Patent and Trademark Office. |
| **US Subsidiaries** | Such term has the meaning ascribed to it under the heading "Corporate Structure - Intercorporate Relationships" in this AIF. |
| **VDH** | Voyager Digital Holdings, Inc., formerly "CryptoTrading Holdings Inc.", a Delaware corporation and a wholly owned subsidiary of the Company. |
| **VDH SPA** | The share purchase agreement dated June 4, 2018 between the Company and VHI, pursuant to which (i) the Company acquired all of the outstanding shares of VDH, (ii) all of the holders of subscription receipts in VDH became Shareholders of the |

Company, (iii) the Company granted replacement options to the holders of stock options in VDH, and (iv) VDH became a wholly-owned subsidiary of the Company.

| | |
|---|---|
| **VDL** | Voyager Digital, LLC, a Delaware corporation and a wholly owned subsidiary of VDH. |
| **VDN** | Voyager Digital NY, LLC, a Delaware corporation and a wholly owned subsidiary of VDH. |
| **VHI** | VHI Holdings, Inc., formerly the sole shareholder of VDH prior to the RTO. |
| **VIP** | Voyager IP, LLC, a wholly owned Delaware subsidiary of VDH. |
| **Voyager or the Company or us/we/our** | Voyager Digital Ltd. |
| **VYGR** | VYGR Digital Securities, LLC, a California corporation owned 50% by VYGR Holdings, LLC and 50% by Market Rebellion, LLC. |
| **Wallets** | Software and hardware platforms that securely store crypto assets by guarding secure keys used for private access. |

## GENERAL

Reference is made in this AIF to the Financial Statements and MD&A of Voyager for Fiscal 2021, together with the auditor's report thereon. The Financial Statements and MD&A are available for review on the SEDAR website located at www.sedar.com.

All financial information in this AIF for Fiscal 2021 has been prepared in accordance with IFRS.

Unless otherwise noted herein, information in this AIF is presented as at October 1, 2021.

## STATEMENT REGARDING FORWARD LOOKING STATEMENTS

This AIF contains certain forward-looking information and forward-looking statements, as defined in applicable securities laws (collectively referred to herein as "forward-looking statements"). These statements relate to future events or the Company's future performance. All statements other than statements of historical fact are forward-looking statements. Often, but not always, forward-looking statements can be identified by the use of words such as "plans," "expects," "is expected," "budget," "scheduled," "estimates", "continues", "forecasts", "projects", "predicts", "intends", "anticipates" or "believes", or variations of, or the negatives of, such words and phrases, or state that certain actions, events or results "may," "could," "would," "should," "might" or "will" be taken, occur or be achieved. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results to differ materially from those anticipated in such forward-looking statements. The forward-looking statements in this AIF speak only as of the date of this AIF or as of the date specified in such statement. These forward-looking statements may include, but are not limited to, statements relating to:

- Our expectations regarding our revenue, expenses, operations and future operational and financial performance;
- Our cash flows;
- Popularity of cryptocurrencies;
- Our plans for and timing of geographic expansion or new offerings;
- Our future growth plans;
- Our ability to stay in compliance with laws and regulations or the interpretation or application thereof that currently apply or may become applicable to our business both in the United States and internationally;
- Our expectations with respect to the application of laws and regulations and the interpretation or enforcement thereof and our ability to continue to carry on our business as presently conducted or proposed to be conducted;

- Trends in operating expenses, including technology and development expenses, sales and marketing expenses, and general and administrative expenses, and expectations regarding these expenses as a percentage of revenue;
- The reliability, stability, performance and scalability of our infrastructure and technology;
- Our ability to attract new customers and maintain or develop existing customers;
- Our ability to attract and retain personnel;
- Our expectations with respect to advancement in our technologies;
- Our competitive position and our expectations regarding competition;
- Regulatory developments and the regulatory environments in which we operate; and
- Expected impact of COVID-19 on the Company's future operations and performance.

Forward-looking statements are based on certain assumptions and analysis made by us in light of our experience and perception of historical trends, current conditions and expected future developments and other factors we believe are appropriate. Forward-looking statements are also subject to risks and uncertainties which include:

- Uncertainty that an active trading market for the Shares will be sustained;
- Uncertainty that the Company's funds will be adequate to sustain operations or for further expansion and regarding its ability to obtain required financing;
- Uncertainty regarding maintaining positive cash flow status into the future;
- Risks related to changes in financial accounting and reporting standards;
- Risks related to service on foreign directors and officers;
- Foreign exchange risks;
- Risks related to the ability of the Company to integrate acquired businesses;
- Additional taxation applied to dividends paid to non-residents;
- Regulatory uncertainty and risk, including changes in laws or the interpretation or application or enforcement thereof and the obtaining of regulatory approvals;
- We are subject to an extensive and highly-evolving and uncertain regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations, or regulatory interpretation of such laws and regulations, could adversely affect our brand, reputation, business, operating results, and financial condition;
- In connection with such laws and regulations or regulatory interpretation thereof, a particular crypto asset's or product offering's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty and if we are unable to properly characterize a crypto asset or product offering, we may be subject to regulatory scrutiny, investigations, fines, and other penalties, and our business, operating results, and financial condition may be adversely affected;
- If the Company were determined to be deemed to be an "investment company" under U.S. law or comparable laws, the Company might be required to significantly restructure its businesses or cease operations altogether;
- Risks and costs associated with the Company being required to conduct activities through regulated subsidiaries;
- Risks related to the ability of the Company to obtain all necessary licenses and permits, and related to international expansion;
- Risks related to expanding our marketing and sales;
- Costs imposed on the Company due to financial services businesses being heavily regulated;
- Risks related to the Company ability to establish and maintain compliance, review and reporting systems and attract and retain qualified personnel;
- Risks of operation errors which could cause material reputational and financial harm;
- Risks related to our ability to adapt to rapid technological change;
- Failure to develop and maintain an active and liquid trading market in the Shares;
- Failure to prevent illegal activity from occurring on or through the Company's platforms;
- Litigation and investigation risks;
- Competition in our industry and markets;

- Changes in the value of cryptocurrencies which may affect trading;
- Fraud or security failures which could result in trading by the public;
- Risks related to the crypto assets supported by the Company;
- Risks related to reliance on proprietary and non-proprietary software, data and intellectual property of the Company and third parties;
- Cybersecurity risks and risks related to the security of customer information;
- Hacking of the Platform or digital wallets;
- Loss or destruction of a private key required to access certain cryptocurrencies or crypto assets;
- Risks related to terrorism, geopolitical crisis, pandemics, COVID-19 or other widespread outbreak of an illness or other health issue;
- The future development and growth of crypto is subject to a variety of factors that are difficult to predict and evaluate. If crypto does not grow as we expect, our business, operating results, and financial condition could be adversely affected;
- Uncertainty related to the acceptance and/or widespread use of cryptocurrency;
- Misuse of cryptocurrencies and malicious actors;
- Cryptocurrency is not covered by deposit insurance;
- Our reliance on key personnel, employees and third party providers;
- A significant portion of our revenue is derived from transactions in Bitcoin and Ethereum. If demand for these crypto assets declines and is not replaced by new crypto asset demand, our business, operating results, and financial condition could be adversely affected;
- Our dependence on customer growth, including new customers and growth in the number and value of transactions and deposits;
- Our dependence upon MC Bank pursuant to the Account Services Agreement;
- Risks related to the unavailability of insurance regarding the Company's operations;
- Uncertainty related to limited operating history and fluctuations in quarterly operating results;
- Dividend risk;
- Risks related to continuing development and acceptance of cryptocurrencies, crypto assets and distributed ledger technology;
- Decline in the cryptocurrency market or general economic conditions;
- Risks related to banks declining to provide banking services to companies engaged in cryptocurrency or crypto asset-related businesses;
- Our operating results have and will significantly fluctuate due to the highly volatile nature of crypto;
- Risks associated with custodians of crypto assets;
- Risks associated with a loss in confidence of the marketplace in Crypto Trading Platforms;
- Any significant disruption in our products and services, in our information technology systems, or in any of the blockchain networks we support, could result in a loss of customers or funds and adversely impact our brand and reputation and business, operating results, and financial condition;
- Risks related to its bitcoins being lost, stolen or destroyed;
- Lending risks, counterparty risk and credit risk;
- Technology and infrastructure risks, including their ability to meet surges in demand;
- Market disruptions; and
- Trade errors.

Inherent in forward-looking statements are risks, uncertainties and other factors beyond Voyager's ability to predict or control. Readers are cautioned that the above does not contain an exhaustive list of the factors or assumptions that may affect the forward-looking statements and that the assumptions underlying such statements may prove to be incorrect. Actual results and developments are likely to differ, and may differ materially, from those expressed or implied by the forward-looking statements contained in this AIF.

Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Voyager's actual results, performance or achievements to be materially different from any of its future results, performance or achievements expressed or implied by forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in this document may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. All forward-looking statements herein are qualified by this cautionary statement. Accordingly, readers should not place undue reliance on forward-looking statements. Readers are cautioned that past performance is not indicative of future performance and current trends in the business and demand for crypto assets may not continue and readers should not put undue reliance on past performance and current trends. The Company undertakes no obligation to update publicly or otherwise revise any forward-looking statements whether as a result of new information or future events or otherwise, except as may be required by law. If the Company does update one or more forward-looking statements, no inference should be drawn that it will make additional updates with respect to those or other forward-looking statements, unless required by law.

## CURRENCY AND EXCHANGE RATES

Unless otherwise specified, all dollar references are to United States dollars.

## CORPORATE STRUCTURE

### Name, Address and Incorporation

Voyager was incorporated pursuant to the BCBCA on June 25, 1993 under the name "392838 B.C. Ltd.". The Company changed its name to "UC Resources Ltd." on October 31, 2001; to Voyager Digital (Canada) Ltd. on February 6, 2019; and to Voyager Digital Ltd. on July 16, 2020.

The registered office of the Company is located at Suite 2900 – 595 Burrard Street, Vancouver, BC, V7X 1J5, Canada and its head office is located at 33 Irving Place, 3rd Floor, New York, New York 10003.

The Company is a reporting issuer in each of the provinces and territories of Canada. The Common Shares are listed under the symbol "VOYG" on the TSX, "VYGVF" on the OTCQB Market, and "UCD2" on the Frankfurt Stock Exchange.

### Intercorporate Relationships

The Company wholly owns Voyager Digital Holdings, Inc., a Delaware corporation, which in turn wholly owns each of Voyager IP, LLC, Voyager Digital, LLC and Voyager Digital NY, LLC, each of which is a Delaware limited liability company, VYGR Holding LLC, a Delaware limited liability company which in turn wholly owns 50% of VYGR Digital Securities, LLC, a California corporation, and VYGR Management LLC, a Delaware limited liability company (collectively, the "**US Subsidiaries**").

The Company also wholly owns LGO SAS, Voyager European Holdings ApS, a Danish holding company of Coinify ApS and its subsidiaries, HTC Trading, Inc., a Cayman Island company, Voyager Digital Brokerage Ltd. (Canada) and Voyager Digital Brokerage Canada Ltd., corporations existing under the federal laws of Canada.

The Company's current corporate structure is as follows:



**Voyager Organizational Chart**

50% ownership with remaining 50% owned by Market Rebellion

## GENERAL DEVELOPMENT OF THE BUSINESS

**Three Year History**

Voyager, through its United States operating subsidiaries, operates as a crypto asset brokerage that provides retail and institutional customers with access to its digital platform to buy and sell crypto assets in one account across multiple centralized marketplaces. Voyager offers customers trade execution, market data, wallet, and custody services through its proprietary platform (the "**Platform**"). Through its subsidiary, Coinify, Voyager provides crypto payment solutions for both consumers and merchants around the globe. Voyager also offers individual custody wallets through Ethos Wallets, available through the Ethos app.

The Platform was launched in the United States in 2019. As of June 30, 2021, the Company had approximately 665,000 funded customer accounts in the United States, holding an aggregate of approximately $2.7 billion in cryptocurrencies and cash on the Platform. For the six months ended June 30, 2021, approximately 89,000 trades involving approximately $72 million of cryptocurrencies and cash were being effected on the Platform on a daily basis. As of June 30, 2021, the Company had 141 full-time employees including management, located in the United States, France and Canada.

In January 2018, the Company completed a non-brokered private placement of 25,950,000 units of the Company at a price of C$0.05 per unit for gross proceeds of C$1,297,500 (the "**January 2018 PP**"). The funds derived from the January 2018 PP were used to pay certain debts of the Company and the costs associated with the acquisition of CryptoTrading Holdings Inc. (now VDH), as further described below, and for general working capital purposes.

Following completion of the January 2018 PP, the Company incorporated CryptoTrading Technologies, Inc. (later known as CryptoTrading Holdings Inc. and now VDH), and certain participants to the January 2018 PP contributed the intellectual property underlying the business of VDH, being the development of a cryptocurrency trading platform using a proprietary execution and routing system.

In Fiscal 2019, the Company completed the development of the basic Platform by:

- *Mobile Application* – Developing the mobile application.

- *Dynamic Smart Router* - Developing the "Dynamic Smart Router" to seek efficient pricing.

- *Custody and Customer Accounts* - Developing the omnibus custody solution, customer accounts and related security features.

The Company received TSXV acceptance to the SEDAR filing of its filing statement dated January 16, 2019, in connection with its change of business and acquisition of VDH. On February 5, 2019, the Company obtained TSXV approval for the change of business, which involved:

- changing its name to Voyager Digital (Canada) Ltd.;
- closing the acquisition of VDH (and thereby its subsidiaries and business) and issuing (i) 18,041,248 Common Shares to the holders of subscription receipts of VDH, and (ii) 4,133,000 stock options in replacement of the stock options outstanding in VDH, each exercisable at a price of $0.30; and
- commencing trading.

On February 13, 2019, the Company launched the Platform as an app on the Apple IOS operating system, enabling customers to buy and sell the first 18 cryptocurrencies supported by the Platform.

On April 17, 2019, the Company completed the listing of the Company's shares on the Frankfurt Stock Exchange.

In May 2019, the Company entered into the Account Services Agreement with MC Bank, whereby MC Bank provides deposit and payment systems for VDL's customers using a custodial "for the benefit of" account. MC Bank acts as agent for VDL and assumes the money services obligations on its behalf, such that VDL does not need to register as a Money Service Business in most states.

In June 2019, the Company entered into agreements to settle $15,625 of debt owed to two creditors by issuing an aggregate of 60,386 Common Shares at a deemed price of C$0.40 per Common Share. After the end of Fiscal 2019, the Company received TSXV approval and issued the Common Shares.

In Fiscal 2020, the Company:

- completed integration of the Ethos software into the Platform to expand the scope and breadth of the product and service that the Company can offer to customers, including allowing customers to have self-storage (their own crypto wallets) within the Ethos Universal Wallet available on the Ethos app;

- increased cryptocurrencies supported by the Platform to 50 crypto assets;

- added additional liquidity providers to VDL to expand the depth of liquidity and quality of execution;

- expanded its customer base from the United States to certain international jurisdictions through the Ethos acquisition; and

- continued to develop and expand the functionality of the Platform.

On July 25, 2019, the Company granted 75,000 options to certain employees, vesting monthly over four years with a one-year cliff at an exercise price of C$0.68, and with an expiry date of up to 10 years from the date of grant.

On July 29, 2019, the Company closed a non-brokered private placement for 3,045,397 units of the Company at a price of C$0.80 per unit for gross proceeds of $1,853,139. Each unit was comprised of one Common Share and one-half Common Share purchase warrant, with each whole warrant entitling the holder to subscribe for one additional Common Share at a price of C$1.05 for a period of 30 months from the date of issuance. On May 4, 2020, the holders of the 1,522,699 warrants agreed to change the exercise price of the warrants from C$1.05 to C$0.195 per Common Share; provided that if, for any 10 consecutive trading days, the closing price of the Common Shares exceeds C$0.24, the term of the warrants will be accelerated to a 30-day exercise period.

On September 20, 2019, the Common Shares ceased trading on the TSXV as of the close of trading and began trading

on the CSE at the opening of trading on September 23, 2019.

On October 1, 2019, the Company acquired certain of Ethos' assets, including the Ethos Universal Wallet, Ethos Bedrock, certain blockchain technology and related intellectual property (collectively the "**Ethos IP**"), and a percentage of the Ethos tokens held by it for 7,250,000 Common Shares.

In October 2019, the Company issued 7,638,414 warrants to Jump Digital Currencies LLC ("**Jump**") in exchange for $10,000.  Each warrant issued entitles Jump, a proprietary cryptocurrency trading firm, to acquire one Common Share for an exercise price of C$0.80 per Share.  These warrants expire in August 2022.

On October 7, 2019, the Company granted 1,000,000 options to certain members of the Board, vesting monthly over three years at an exercise price of C$0.56, and with an expiry date of up to 10 years from the date of grant.  The Company also issued 300,000 options to certain advisors vesting one year from the grant date at an exercise price of C$0.56 and 1,000,000 options vesting monthly over 3 years at an exercise price of C$0.80 with an expiry date of up to 10 years from the date of grant.

On October 23, 2019, the Company launched its rewards program (the "**Rewards Program**"), which rewards customers with certain monthly pay-in-kind crypto assets held by participating customers in their Voyager account. The Company initially launched its Rewards Program for customers holding Bitcoin, but thereafter extended the Rewards Program periodically to include 34 crypto assets, including Bitcoin, USDC and Ethereum through end of Fiscal 2021.

On October 28, 2019, the Voyager app was released on the Android operating system.

On November 6, 2019, the Company's Shares began trading on the OTCQB Market.

On December 5, 2019, the Company granted 190,000 options to certain employees with 150,000 options vesting immediately at an exercise price of C$0.30 and 40,000 options vesting monthly over four years with a one-year cliff at an exercise price of C$0.30, and with an expiry date of up to 10 years from the date of grant.

On December 6, 2019, the Company closed a first tranche of a private placement with Thrust Capital through the issuance of 743,294 Common Shares at a price of C$0.80 per Share for total proceeds of approximately $450,000.

On January 15, 2020, the Company completed the acquisition of VYGR, following VYGR receiving approval from FINRA for a change in ownership, which solidified VYGR's position as a broker-dealer on the Platform.

On February 5, 2020, the Company granted 300,000 options to certain employees, vesting monthly over three years at an exercise price of C$0.30, and with an expiry date of up to 10 years from the date of grant.

On February 14, 2020, the Company completed a non-brokered private placement to raise $830,814 through the sale and distribution of 4,416,276 Common Shares at a price of C$0.25 per Common Share. The Company also settled outstanding debts through the issuance of 648,484 Common Shares at a deemed price of C$0.25 per share. Philip Eytan and Guy Elliott, directors of the Company, participated in the private placement for a total of 465,780 Shares; and Steve Ehrlich, Philip Eytan, and Gaspard de Dreuzy, directors and/or officers of the Company, participated in the debt settlement for a total of 427,355 Shares.

On March 23, 2020, the Company announced a non-brokered private placement to raise $100,000 through the sale and distribution of 966,180 Common Shares at a price of C$0.15 per Common Share.

On March 27, 2020, the Company acquired Circle Invest, a retail crypto asset business, from Circle Internet Financial, Inc., adding over 40,000 retail accounts to Voyager's customer base, a majority of which were migrated onto the Platform.

On April 16, 2020, the Company granted 1,000,000 options to certain employees, vesting monthly over one year at an exercise price of C$0.19, and with an expiry date of up to 10 years from the date of grant.

On April 21, 2020, the Company settled outstanding debts through the issuance of 300,000 Common Shares at a deemed price of C$0.25 per Common Share.

On April 29, 2020, VDH entered into a $425,000 unsecured loan and promissory note agreement with Signature Bank, pursuant to the PPP under the CARES Act administered by the SBA. Similarly, on May 5, 2020, VDL entered into a $619,400 unsecured PPP loan with BNB Bank pursuant to the PPP. The VDH and VDL PPP loans are scheduled to mature on April 29, 2022 and May 2, 2022, respectively, have an interest rate of 1.00%, and are subject to the terms and conditions applicable to loans administered by the SBA under the CARES Act. The PPP loans may be prepaid by the Company at any time prior to maturity with no prepayment penalties.

On May 1, 2020, the Company granted 80,000 options to certain employees, vesting monthly over four years with a one-year cliff at an exercise price of C$0.30, and with an expiry date of up to 10 years from the date of grant.

On June 1, 2020, the Company granted 40,000 options to certain employees, vesting monthly over four years with a one-year cliff at an exercise price of C$0.30, and with an expiry date of up to 10 years from the date of grant.

On June 11, 2020, the Company issued 515,560 units, at a deemed price of C$0.20 per unit, to settle $75,264 of outstanding payables with certain employees and directors. Each unit is comprised of one Common Share of the Company and one-half share purchase warrant, with each whole warrant entitling the holder to subscribe for one additional Common Share at a price of C$0.30 per Common Share.  All of these warrants were executed on August 19, 2020.

On June 15, 2020, the Company completed a private placement for gross proceeds of $2.1 million through the sale and distribution of 14,484,440 units of the Company at a price of C$0.20 per unit. Each unit is comprised of one Common Share and one-half Common Share purchase warrant, with each whole warrant entitling the holder to subscribe for one additional Common Share at a price of C$0.30 per Common Share. On August 19, 2020, all of these warrants were exercised.

In Fiscal 2021, the Company:

- partnered with third party service providers to provide regulatory cost basis processing solutions and provide year-end gain/loss statements to customers; and

- began the process to have its Common Shares listed on the TSX.

On July 15, 2020, the Company entered into a debt settlement agreement with certain employees to settle up to $103,112 of outstanding payables through the issuance of 515,560 Common Shares at a deemed price of C$0.20 per Common Share.

In July 2020, the Company added a 2-Factor Authentication to further enhance its security feature, and extended its deposit, transfer and withdrawal functionality to four of its crypto assets.

On August 14, 2020, the Company (1) granted certain of its directors and officers with an aggregate of 1,750,000 options, exercisable at a price of C$0.90 per Common Share for a period of five years, and (2) settled certain outstanding debts with a related party totaling $31,635 through the issuance of 35,807 Common Shares at a deemed average price of C$0.8835 per Common Share.

On August 31, 2020, Evan Psaropoulos joined the Company as CFO and Michael Legg joined the Company as Chief Communications Officer. The Company granted 250,000 incentive stock options to each executive.

In September 2020, the Company (1) integrated the Fireblocks network into the Voyager operational infrastructure, by bringing liquidity partners and custodians onto one platform; and (2) expanded its crypto asset offering and listed its 50th crypto asset on the Voyager app.

On September 10, 2020, the Company issued 6,266,600 special warrants (the "**September Special Warrants**") for units, at a price of C$0.85 per special warrant, for gross proceeds of $4.0 million. Each September Special Warrant is convertible into one unit of the Company without payment of any additional consideration upon certain conditions being met. Each unit consisted of one Common Share and one-half of one Common Share purchase warrant, with each whole warrant being exercisable to acquire one Common Share at an exercise price of C$1.15 per Share for a term of three years following closing. Due to certain conversion conditions not being met, the holders of the September

Special Warrants were entitled to receive 1.1 units upon the exercise or deemed exercise of the September Special Warrants, resulting in each September Special Warrant being exercisable for 1.1 units. Additionally, in connection with this transaction, the company granted 473,662 compensation warrants, with an exercise price of C$0.85 per unit for a period of three years.

On December 10, 2020, the Company acquired LGO SAS, an Autorité des arches financiers regulated entity based in France and LGO Europe SAS, in exchange for 200,000 Common Shares to be issued upon demand in accordance with the terms of the escrow agreement. In addition, the sellers are entitled to 1,000,000 Common Shares after one-year, contingent upon the Autorité des arches financiers' approval of the Company's license application and change of control.

On December 15, 2020, the Company issued 5,470,676 special warrants (the "**December Special Warrants**") for units, at a price of C$1.50 per special warrant, for gross proceeds of $8.3 million. Each December Special Warrant is convertible into one unit of the Company without payment of any additional consideration upon certain conditions being met. Each unit consisted of one Common Share and one-half Common Share purchase warrant, with each whole warrant being exercisable to acquire one Common Share at an exercise price of C$2.50 per Share for a term of two years following closing. Due to certain conversion conditions not being met, the holders of the December Special Warrants were entitled to receive 1.1 units. In accordance with the terms of the December Special Warrant offering, 547,067 units were issued in April 2021 pursuant to the penalty provision. Additionally, in connection with this transaction, the company granted 387,404 compensation warrants, with an exercise price of $1.50 per unit for a period of two years.

On January 21, 2021, the Company completed a private placement offering of 8,363,637 Common Shares at a price of $5.50 per Common Share, for gross proceeds of $46 million. In exchange for their services, the agent for the offering received a 7% cash commission and compensation warrants entitling it to purchase 585,455 Common Shares at a price of $5.50 per Common Share for a period of 18 months following the closing of the offering.

On February 12, 2021, the Company completed a private placement offering of 7,633,588 Common Shares at a price of $13.10 per Common Share, for gross proceeds of $100 million. In exchange for their services, the agent for the offering received a 7% cash commission.

In February 2021, Daniel Costantino joined the Company as Chief Information and Security Officer and David Brosgol joined the Company as General Counsel. The Company granted 300,000 incentive stock options to each executive.

On April 18, 2021, the Company partnered with Victor Oladipo, two-time NBA All-Star Victor player from Miami Heat, on a referral program that awards the charity of an athlete's choice with crypto assets each time a new account is opened and traded with a special referral code.

In May 2021, Akbar Ladhani joined the Company as Chief Global Data Officer and Pam Kramer joined the Company as Chief Marketing Officer. The Company granted 300,000 incentive stock options to each executive.

On June 1, 2021, Voyager entered into an agreement with NASCAR driver Landon Cassill to be the first primary sponsorship of a NASCAR race car paid fully in a portfolio of cryptocurrency.

On July 20, 2021, the Company partnered with four-time Super Bowl champion Rob Gronkowski to become a brand ambassador for Voyager.

In August 2021, the Company completed a token swap as part of the LGO SAS merger with the Company. The token swap and merger combined the original Voyager token, VGX, with the LGO token. To complete the token swap, the VGX and LGO tokens were converted to a single new token under the ticker VGX.

On August 2, 2021, the Company completed the acquisition of Coinify, a leading cryptocurrency payment platform existing under the laws of Denmark, for 5,100,000 of newly issued Common Shares, which are subject to a lockup agreement, and $15 million in cash (subject to working capital adjustments). Under the share purchase agreement, Voyager retained substantially all current Coinify employees, entering into employment agreements with key members of the management team.

- 13 -

On August 12, 2021, FINRA approved a 50% investment by Market Rebellion, a leading provider of trading education, content, and tools for independent investors, in VYGR to provide brokerage for equities, options, and futures trading through the Platform. Voyager and Market Rebellion intend to jointly operate a broker-dealer focused on providing online brokerage services for equities, options, and futures. VYGR plans to execute equity trades on behalf of Voyager customers, and Market Rebellion intends to introduce its large and active trading community to the capabilities of this new platform.

On August 17, 2021, the Company filed and obtained a receipt for its final short form base shelf prospectus (the "**Base Shelf Prospectus**") with the securities regulatory authorities in each of the provinces and territories of Canada. The Base Shelf Prospectus allows the Company to offer an aggregate total of $300 million Shares, warrants, units, debt securities, and subscription receipts, or any combination thereof, for up to during the 25-month period that the Base Shelf Prospectus is effective.

On September 1, 2021, the Company launched the Voyager Loyalty Program (the "**VLP**"). The VLP gives Voyager token holders a full suite of incentives and rewards. To participate in the VLP, customers must hold a certain number of VGX tokens to unlock various tiers which offer token utility rewards, including VGX staking rewards, earnings reward boost, crypto back rewards, as well as refer-a friend cash back rewards.

On September 7, 2021, the Common Shares commenced trading on the TSX under the trading symbol of "VOYG". Voyager became a "non-venture" upon the effective date of its TSX listing for the purposed of certain Canadian securities laws. Prior to trading on the TSX, the Company's common shares were listed on the CSE where Voyager was considered a "venture issuer" for purposes of certain Canadian securities laws. The Shares remain listed for trading under the symbol "VYGVF" on the OTCQB market and "UCD2" on the Frankfurt Stock Exchange.

On September 29, 2021, Rakesh Gidwani joined the Company as Chief Technology Officer.

On October 1, 2021, Voyager Digital Brokerage Ltd., a wholly owned affiliate of the Company incorporated on October 7, 2020, applied for registration as a restricted dealer in each of the provinces and territories of Canada. Following the approval of such registration by the Ontario Securities Commission, Voyager Digital Brokerage Canada Ltd. intends to seek registration as an investment dealer and become a member of the Investment Industry Regulatory Organization of Canada.

## DESCRIPTION OF BUSINESS

### General - Narrative Description of the Business

Voyager, through its US Subsidiaries, operates as a crypto asset broker that provides retail and institutional customers with access to its digital platform to buy and sell crypto assets in one account across multiple centralized marketplaces. Voyager offers customers trade execution, market data, wallet, and custody services through the Platform. Through its subsidiary, Coinify, Voyager provides crypto payment solutions for both consumers and merchants around the globe.

VIP has filed a provisional patent application with the US Patent Office for a "cryptocurrency trading system" that includes a smart order routing system and execution management system for trading crypto assets. The system according to the application is intended to find the best available trade execution across various Crypto Trading Platforms. Specifically, the system described allows retail and/or institutional customers to place and route trade orders to one or several Crypto Trading Platforms to efficiently buy or sell cryptocurrency assets. VIP anticipates filing a utility patent application, based on its provisional patent application, which will be updated to reflect recently added features and functions.

Some of the services offered by the Platform to account holders include:

- quickly open an account; the Company utilizes third party service providers for know-your-customer and anti-money-laundering checks to ensure fast and secure account openings;

- trade "spot" between fiat 60+ crypto assets from a single account (Voyager does not offer leverage, margin or financing of such transactions);

- an opportunity to earn rewards on certain crypto assets held in their account by participating in the Rewards Program[1];

- execution of trade orders across a spectrum of liquidity providers gives customers access to a deep pool of liquidity and offers reliability of trade execution;

- lowering transaction costs by aggregating orders and routing the order flow through the optimal mix of Crypto Trading Platforms and market makers by utilizing Voyager's proprietary smart router technology;

- advanced market data to enable customers to manage and track their crypto asset holdings, including delivering news to keep customers connected to the market, and providing portfolio tools to track performance, balances and transactions; and

- storing crypto assets through multiple storage solutions while putting together the right blend of security and availability, including though Voyager's own self-custody solution, Ethos Bedrock.

The Platform uses a dynamic router and customized algorithms to execute customer orders to one or several Crypto Trading Platforms, market makers or liquidity providers to efficiently buy or sell cryptocurrencies on behalf of its customers. The Platform is configured to (1) quote the average price for a crypto asset in the market, as delivered by a proprietary quoting service that aggregates Voyager's available liquidity and computes a price, and (2) use the smart order routing to search all open liquidity providers to find a better rate than the quoted price.  The Platform configuration provides customers with high quality trade execution (usually defined by the best prices, certainty of execution, reliability of the trading venue, and speed of execution).  The Platform is designed to be a single access point to market data, wallet, and custody services for crypto assets.

Voyager is registered as a Money Services Business pursuant to the Bank Secrecy Act regulations as administered by FinCEN and is licensed to operate as a money transmitter or its equivalent in states where such requirements are applicable[2]. Voyager entered into an Account Services Agreement with MC Bank, whereby MC Bank provides deposit and payment systems for Voyager customers using a custodial "for the benefit of" account. MC Bank is (i) a New York registered bank, overseen by the New York State Department of Financial Services and (ii) listed on the New York Stock Exchange (symbol: MCB).

The Company generates revenue through its primary business activities related to the Platform, comprising of the following sources.

- <u>Transaction Revenue</u>: The majority of Voyager's revenue is derived from providing execution for customer-initiated crypto asset orders to buy or sell crypto assets on the Platform.

- <u>Fees on Crypto Assets Loaned</u>: Voyager also generates some revenue from its lending activities with institutional borrowers. Voyager independently negotiates with each institutional borrower the terms of each unsecured institutional loan agreement, but these lending agreements are generally for a fixed term of less than one year or can be repaid on a demand basis and provide a crypto fee based on the percentage of crypto assets lent and denominated in the related crypto asset.  Voyager selects which and how much of its crypto assets are available for such lending activity.  Further, in the event of bankruptcy or insolvency of an

---

[1] The Rewards Program allows customers to earn in-kind payments of crypto assets for maintaining minimum crypto asset balances of the same type of crypto asset in their account. Rewards earned on crypto assets are variable, and reward rates are determined by Voyager at its sole discretion.  Customers may opt-out of the Rewards Program.

[2] Trading is currently available to all U.S. residents, excluding New York state. Voyager is actively working with NY regulators to obtain a BitLicense to operate in New York and with various regulators to operate internationally.

institutional borrower under a loan, Voyager bears the credit risk of lending crypto assets under the loan. As of Fiscal 2021, there have been no defaults on loans made by Voyager to institutional borrowers.

For Fiscal 2019, transaction revenue was $0.1 million and there were no fees on crypto assets loaned, while in Fiscal 2020, the Company generated approximately $0.9 million in transaction revenue and approximately $0.3 million in fees on crypto assets loaned, which accounted for 75% and 25% of the Company's overall revenue, respectively. For Fiscal 2021, the Company generated approximately $154 million in transaction revenue and approximately $21 million in fees on crypto assets loaned, which accounted for 88% and 12% of the Company's overall revenue, respectively.

Voyager utilizes the functional authority granted by customers in the user agreement to move, transfer, store, control and rehypothecate crypto assets held in customer accounts. Voyager prioritizes the use of secure self-custody solutions through the Fireblocks platform and cold storage custody with Anchorage as described below. However, Voyager also seeks to maximize liquidity and efficient trading by holding certain amounts of crypto assets in warm solutions in Company accounts on Crypto Trading Platforms to settle with trading partners or facilitate trading activity on exchanges on behalf of customers. Additionally, Voyager maintains some crypto assets in hot wallets to quickly process customer requested withdrawals and transfers. Finally, Voyager uses its functional authority to enter into lending agreements with institutional borrowers and other similar revenue generating agreements with institutions. The Company's custody strategy is designed to maximize liquidity and efficient trading, by making those assets readily available to deploy in customer-requested trades. The Company constantly monitors its cash and the balances it maintains with crypto asset exchanges and institutional borrowers against deposits and withdrawals requested by customers and, where the Company believes it to be necessary, will monetize crypto assets into fiat currency.

The Company manages crypto assets held internally through the Fireblocks platform. Fireblocks, based in the United States and Israel, provides a multi-party computation ("**MPC**") solution to store, manage and transfer crypto assets between the Company's wallets, Crypto Trading Platforms, market makers, institutional borrowers and other counterparties. Through MPC technology, private keys are distributed across multiple locations to ensure security is not concentrated to a single device at any point in time. The Company also utilizes the Fireblocks network as a settlement layer to transact and settle with pre-approved counterparties or entities. The Fireblocks network utilizes secure enclave technology and data-in-motion encryption to prevent traditional vulnerabilities associated with authenticating wallet addresses. As such, the Company settles with counterparties or entities without the risk of losing funds due to deposit address attacks or errors.

Fireblocks is SOC 2 Type II certified for 2021 and undergoes a SOC 2 review on an annual basis. The Company reviews the Fireblocks SOC 2 report to ensure they maintain a secure technology infrastructure and that their systems are designed and operating effectively. Additionally, the Company reviews its own complementary customer entity controls in conjunction with the Fireblocks controls to ensure that applicable trust services criteria can be met. Fireblocks maintains an insurance policy which has coverage for technology, cyber, and professional liability and is rated "A" by A.M. Best based on the strength of the policy and has had no known security breaches or incidents. The Company is not aware of any other limitations on Fireblocks' insurance.

The Company also custodies customer crypto assets with Anchorage Digital Bank N.A. ("**Anchorage**"), a federally chartered crypto asset bank regulated by the Office of the Comptroller of the Currency. Anchorage stores private keys in geographically distributed data centers throughout the United States, using hardware security modules. Anchorage maintains a crime insurance policy to cover losses from events like theft, destruction of property, and compromised key generation or transaction processes and has had no known security breaches or incidents. The Company is not aware of any other limitations on Anchorage's insurance. The Company is not aware of any other limitations on Anchorage's insurance.

The Company prioritizes using Anchorage or Fireblocks' secure self-custody, but to maintain liquidity for trade execution, the Company also connects to and maintains crypto asset balances with several Crypto Trading Platforms. These trading partners are domiciled across multiple geographies including the United States, Cayman Islands, and Hong Kong. They generally hold insurance that would protect against theft or loss of client assets. However, the Company cannot ensure that the limits of any such insurance policies will be available to the Company or, if available, sufficient to make the Company whole for any of its balance that are stolen or lost from such a platform. The Company does not maintain any insurance coverage over its customers' assets.

Insurance policies held by the Company's custodians are between the applicable custodian and the insurer, and accordingly the custodians' clients are not generally named payees on such policies. The Company is not always able to obtain and review copies of the insurance policies of its custodians. The Company cannot ensure that the limits of any such insurance policies will be available to the Company or, if available, sufficient to make the Company whole for any of its balance that are stolen or lost from such a custodian.

The Company has a due diligence program for all trading partners and conducts security reviews. Additionally, the Company assesses security, reputation, liquidity levels in applicable crypto assets, capitalization, management, internal control practices and operational risks in its determination of utilizing any trading partner, including holding in person meetings. Once onboarded, each trading partner is monitored on an ongoing basis to ensure they maintain compliance with required legal and regulatory standings. The Company also operates certain IT security protocols to ensure privileged and secure access to application programming interface ("**API**") connections with all trading platforms. These procedures are in place to maintain approval processes for the movement of crypto assets held with trading partners.

At present, the Company generally expects that, of its customer assets, approximately 20-50% will be held in Company accounts on Crypto Trading Platforms to facilitate liquidity and efficient trading, approximately 30-50% will be either self-custodied through the Fireblocks platform or held in storage with Anchorage, approximately 15-30% will be held by institutional borrowers through lending agreements, and approximately 1% will be held internally in "hot" wallets. However, the Company reserves the right to change the above noted allocations from time to time as it sees fit. As of Fiscal 2021, the Company had less than 5% of assets held in cold storage.

The Company is not aware of any security breaches or other similar incidents involving self-custodied assets or customer assets held with any third-party custodians, Crypto Trading Platforms or institutional borrowers or anything that would affect its ability to obtain an unqualified audit opinion in respect of its audited financial statements. None of the third-party custodians, Crypto Trading Platforms, or institutional borrowers holding Voyager's crypto assets is a "Canadian financial institution" (as defined in NI 45-106) or, other than Anchorage, a foreign equivalent, a related party of the Company, and none provide services to the Company other than custody, trade execution, and borrowing transactions. Neither Fireblocks nor Anchorage have appointed sub-custodians to hold customer assets, though the Company understands that certain of the Crypto Trading Platforms on which the Company maintains balances may from time to time employ sub-custodians. In the event of bankruptcy or insolvency of third-party Crypto Trading Platforms, custodians or institutional borrowers, the Company expects that it would be treated as an unsecured creditor.

The Company also from time to time makes strategic investments in venture-stage companies across the digital asset, cryptocurrency and blockchain technology, as well as other relevant, sectors. The Company generally invests in companies that are customers, vendors or suppliers of the Company or that the Company believes may be strategically important to the future business of the Company. From time to time, members of executive management (including members of the Board) may have existing positions with or may also participate in or otherwise hold such investments. In such circumstances, the Company may seek independent Board approval or ratification of its participation in such transactions that also involve such investments. As of the date of this AIF, such investments are not, either individually or in the aggregate, material to the operations of the Company.

**Specialized Skill and Knowledge**

The Company's success is largely dependent on the performance of its management and key employees, as well as directors, many of whom have specialized experience relating to the Company's industry, products, regulatory environment, customers and business. The Company believes that it has adequate personnel with the specialized skills and knowledge to successfully carry out the Company's business and operations. See "Risk Factors - Risks Related to the Company's Business" in this AIF for the risks in connection with the Company's reliance on key personnel for its continued success.

**Competition and Market Participants**

In the cryptocurrency industry, there exist multiple Crypto Trading Platforms offering online trading and wallets and multiple online/mobile players providing components of the cryptocurrency ecosystem. The largest US Crypto Trading Platforms are Coinbase, Kraken, Bittrex and Binance (US). Their models offer platforms that only send trades singularly to their wholly owned Crypto Trading Platforms with little or no information available on the platform. Voyager's agency Crypto Trading Platform uses smart order routing to search multiple Crypto Trading Platforms,

market makers and liquidity providers to strategically fill customer orders often at better prices than those offered by such Crypto Trading Platforms directly.

The competitive landscape also includes traditional payment and online brokers such as Robinhood, Sofi Invest, Square, and most recently Paypal, which announced a basic cryptocurrency offering. The Voyager Platform supports self-directed trading of more than 60 crypto assets, with the ability for customers to transfer certain of their crypto assets to their own wallet or custody with Voyager.

**Intangible Properties**

As described above under the heading "Description of Business General – Narrative Description of the Business", VIP holds a provisional patent application with the US Patent Office for the development of the Platform. In addition, the Company has over 20 key domain names, including "investvoyager.ca", "voyagerdigital.com" and "vygrdigital.com", which expire in 2021, with several of them renewing automatically. The Company also has a trademark application filed in the United States.

**Cycles**

The Company's business is not cyclical or seasonal.

**Economic Dependence**

The Company is dependent upon MC Bank pursuant to the Account Services Agreement in order for VDL to carry on its business in the majority of states in the United States. VDH entered into the Account Services Agreement with MC Bank, pursuant to which MC Bank provides deposit and payment systems for VDL's customers using a custodial "for the benefit of" account. MC Bank receives fees for wire transactions and account transactions, subject to a minimum $10,000 monthly fee. See "General Development of the Business - Three Year History" and "Risk Factors - Risks Related to the Company's Business - Arrangement with Metropolitan Commercial Bank" in this AIF for further information.

**U.S. Regulatory Matters**

The Company has considered whether it is required to register, in any capacity, under the relevant securities, commodity futures or derivatives legislation of the United States and specifically whether the Company is an "investment company" under the laws of the United States.

Registration as either a broker or dealer under Section 3(a)(4)(A) of the Exchange Act or as an investment company under the Investment Company Act of 1940 turns, as an initial matter, on whether or not the Company supports, custody's, intermediates, or facilitates, in any fashion, transactions involving "securities" as defined in section 2(a)(1) of the Securities Act of 1933. As further described below, the Company has taken reasonable measures to ensure that it does not support, custody, intermediate, or facilitate any transactions or activities with respect to any product that constitutes a "security". Accordingly, the Company has, after obtaining legal advice, determined that it is not required to be registered in any capacity under applicable U.S. securities laws.

For the avoidance of doubt, due to the fact that the Company does not support or facilitate securities on its Platform, the Company is not required to register as a broker-dealer or exchange with the SEC as indicated above. The Company's conclusion that it is not required to be so registered under U.S. securities laws is based on the due diligence and risk-based analysis it performs on all digital assets supported, or proposed for inclusion, on its platform. The Company performs ongoing due diligence and risk-based analysis to ensure that supported digital assets do not constitute securities under U.S. securities laws.

In particular, the Company performs internal due diligence reviews of all supported digital assets, as well as digital assets that have been proposed for inclusion on the Company's platform to determine the likely regulatory treatment of such digital asset, these procedures may include:

1. **Industry Review**. The Company's operations team (comprised of product, business development, technology, internal and/or external legal, compliance, finance and marketing personnel) will review the digital asset's functional purpose, its competitive position in the industry, the digital asset exchanges on

which it is supported, and its liquidity across markets, including digital asset exchanges, market makers and OTC desks. The Company will also seek information from the digital asset's sponsor (such as the issuer, associated foundation or affiliates thereof).

2. **Technological Review**. The Company's technology team will, to the extent feasible, review the technology underlying the digital asset, including seeking to ensure that the digital asset functions as described in its white paper.

3. **Legal Review**. Given the ongoing development of the law with respect to whether particular digital assets qualify as securities under U.S. securities laws, obtaining a formal legal opinion form external counsel as to the likely regulatory treatment of a particular digital asset may not feasible, and the Company will generally not seek to obtain such a legal opinion. Notwithstanding the foregoing, in an effort to determine the likely regulatory treatment of a digital asset, the Company will (i) seek to engage with legal counsel to the digital asset issuer or associated foundation, and (ii) when appropriate, work with U.S. securities counsel to apply applicable U.S. laws and regulations to the digital asset to determine whether it is reasonably likely to be deemed a security under the existing U.S. laws.

4. **Audit Committee**. Assuming that, after undertaking the above steps, the Company's operations team recommends that the Company support the applicable digital asset, it will summarize its findings for the Company's Audit Committee or such other committee as may be formed for this purpose, for their review and to confirm satisfactory compliance with the above noted procedures.

5. **Ongoing Monitoring**. The Company will on a consistent basis monitor all relevant formal or informal guidance provided by the SEC (and other applicable regulators) with respect to the regulatory treatment of digital assets generally, and the digital assets supported by the Company, specifically. In the event that the Company (i) determines that any of the digital assets it supports have been removed for regulatory reasons from any digital asset exchanges, market makers or OTC desks, (ii) becomes aware that any of its key competitors announced that, for regulatory reasons, it would no longer support digital assets listed on the Platform, or (iii) becomes aware of any information, including adverse media, regulatory disclosures, filings, statements, or other communications that would materially alter the regulatory treatment of a particular digital asset, then the Company will undertake a further review and determination focusing on steps 3 and 4 above. The Company will provide quarterly updates to the board of directors as to any material developments in the treatment of digital assets or legal developments in the process to be applied to the determination of whether a digital asset is a security.

6. **Removal of Digital Assets**. In the event that the Company's operations team, with the advice of the Company's general counsel and U.S. securities counsel (as necessary), determines that a particular digital asset likely will be deemed a security under U.S. securities laws, it will advise the Audit Committee or such other committee as may be formed for this purpose that the digital asset should be removed from the Platform, and will also make determinations regarding the date on which trading should cease and whether such digital assets then held by clients must be removed from the platform in order to ensure an orderly wind down of such digital asset.

The above noted procedures may be subject to change based on, among other things, changes in laws, regulations or the interpretation thereof or changes in industry practices.

The Company has also considered whether it is subject to additional registration requirements pursuant to the Commodity Exchange Act ("**CEA**"). Specifically, Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "**Dodd-Frank Act**") provides the Commodity Futures Trading Commission ("**CFTC**"), among other things, authority over any agreement, contract, or transaction in any commodity that is entered into or offered to a retail customer on a leveraged, margined or financed basis (a "**Retail Commodity Transaction**"). The CFTC has provided guidance that certain digital assets, including but not limited to Bitcoin and Ethereum, are commodities. Retail Commodity Transactions must generally be conducted on or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market or derivatives transaction execution facility. Further, all persons that accept orders for Retail Commodity Transactions as well as accept funds in connection therewith, must generally register with the CFTC as a futures commission merchant ("**FCM**").

The Company's platform currently only facilitates 'spot' transactions in digital assets. The Company does not provide any digital asset transactions on a leveraged, margined, or financed basis. Spot transactions are not considered Retail Commodity Transactions, and therefore the Company is not subject to the registration and CFTC oversight considerations outlined above.

The Company's conclusion that it is not subject to the aforementioned additional CFTC oversight and registration provisions is based upon (a) the plain language of the CEA, (b) the Company's ongoing review and analysis of relevant CFTC guidance, (c) review and evaluation of legal advice provided by outside, qualified legal counsel, as well as (d) ongoing analysis of its operational and business activities.

Notwithstanding these due diligence efforts, the Company recognizes that the legal regime surrounding digital assets in the U.S. is still evolving. Digital assets are a relatively new asset class, and the SEC and CFTC have not developed definitive and comprehensive regulatory regimes targeted specifically to digital assets. Rather, the SEC has communicated to industry participants that it will apply existing securities laws, including the Howey Test, a four-part test developed by the U.S. Supreme Court to determine whether a particular "investment contract" is a security, to digital assets.

Given that the Howey Test is almost 75 years old, was not designed with digital assets in mind, and its application is fact-based, it is possible that the SEC could come to a different conclusion than the Company in respect of a particular digital asset. In addition, it is possible that the SEC, CFTC, or other state or federal regulator could publish additional regulatory guidance that dramatically or substantially alters the Company's regulatory obligations, or that the U.S. implements a comprehensive regulatory regime in respect of digital asset businesses. In either case, those developments could result in the Company being required to become registered, removing certain digital assets from its platform, or being required to cease certain of its operations. See "*The Company's performance will be highly dependent on the future regulatory environment in the United States and elsewhere, which is challenging and unpredictable.*" and the other risk factors under "Risk Factors".

**Employees**

As of Fiscal 2021 year-end, the Company had 141 full-time employees, including management, located in the United States, Canada and France, of which over 60% were dedicated to customer support, engineering/technology and marketing roles.

**Foreign Operations**

The Company is substantially dependent on foreign operations as all of the Company's operating subsidiaries are in the United States. See "Corporate Structure - Intercorporate Relationships" and "General Development of the Business - Three Year History" in this AIF for further information.

The Company intends to expand its business to include Canadians. In order to effect such an expansion, the Company has applied to the CSA for exemptive relief from certain prospectus and registration requirements it believes are necessary to operate its business in Canada. In addition, either directly or through one or more affiliates, the Company intends to apply for registration with the CSA as a "restricted dealer" and to CSA and IIROC for registration as an investment dealer and a member of IIROC, in each case in accordance with the guidance set out by CSA and IIROC from time to time, including Joint CSA/IIROC Staff Notice 21-329 – *Guidance for Crypto-Asset Trading Platforms: Compliance with Regulatory Requirements* as it may relate to those platforms.

On August 2, 2021, the Company completed the acquisition of Coinify, a leading cryptocurrency payment platform with a global customer base in over 150 countries. The acquisition accelerates Voyager's international expansion, and provides Voyager with an established and effective gateway to the crypto payment industry through its virtual currency payment platform available in Europe, Asia, North America and South America.

On October 13, 2021, the Company secured final approval to begin onboarding customers in France and the European Union through its wholly owned subsidiary, LGO Europe SAS, following a standard review by the Autorité des marchés financiers (AMF) and the Autorité de contrôle prudentiel et de résolution (ACPR).

**Reorganizations**

The Company completed the RTO in February 2019 upon closing its change of business and acquiring all of the shares of VDH.  See "General Development of the Business - Three Year History".

**New Products**

The Company is developing a debit card through MC Bank. The debit card has been designed internally, and FiCentive, Inc., a subsidiary of Usio Inc. is the program manager. The components required for the finished product have not yet been finalized.

## RISK FACTORS

The following discussion summarizes the principal risk factors that apply to the Company's business and that may have a material adverse effect on the Company's business and financial condition and results of operations, or the trading price of the Common Shares. Due to the nature of Voyager's business, the legal and economic climate in which it operates and its present stage of development and proposed operations, the Company is subject to significant risks.

The risks and uncertainties outlined below are not the only ones facing the Company. Additional risks and uncertainties not currently known to the Company, or that the Company currently deems immaterial, may also impair the operations of the Company.  If any such risks actually occur, the financial condition, liquidity and results of operations of the Company could be materially adversely affected and the ability of the Company to implement its growth plans could be adversely affected.

An investment in the Company's Shares is speculative and will be subject to material risks, and investors should not invest in securities of the Company unless they can afford to lose their entire investment.

*Market Risk for Securities.*

There can be no assurance that an active trading market for the Shares will be sustained.  The market price for the Shares may be subject to wide fluctuations. Factors such as government regulation, cryptocurrency price fluctuations, share price movements of peer companies and competitors, as well as overall market movements, may have a significant impact on the market price of the Company's securities.  The stock market has from time to time experienced extreme price and volume fluctuations, which have often been unrelated to the operating performance of particular companies.

*Additional Funding Requirements.*

Further expansion of the Company's business, in the United States, Canada and internationally, may require additional capital; and the ongoing costs of operations may not generate positive cash flow for the near or long term.  Although the Company believes it has adequate funds to operate for the next 12 months, there is no assurance that such funds will be adequate or that it will be successful in obtaining the required financing for these or other purposes, including for general working capital.  The Company's ability to secure any required financing to sustain operations may depend in part upon prevailing capital market conditions and business success.  There can be no assurance that the Company will be successful in its efforts to secure any additional financing or additional financing on terms satisfactory to management.  If additional financing is raised by issuance of additional Shares from treasury, control may change and Shareholders may suffer dilution.  If adequate funds are not available, or are not available on acceptable terms, the Company may be required to scale back its business plan or cease operating.

*Negative Cash Flow from Operations.*

The Company had negative operating cash flow for Fiscal 2020. Although the Company had positive operating cash flow for Fiscal 2021 and anticipates it will have positive cash flow from operating activities in future periods, the Company cannot guarantee that it will attain or maintain positive cash flow status into the future.

The Company launched its iOS mobile app in February 2019 in the Apple store and later launched the Android version in October 2019. The growth in the trading platform is driven by the increase in funded accounts on the Platform. Additionally, the Company has more recently significantly strengthened its liquidity position in Fiscal 2021 to support the significant increase in revenues and corresponding spend in new customer acquisition costs to drive growth in

funded accounts.

In Fiscal 2021, the Company had approximately 652,000 new funded accounts added, as compared with approximately 13,000 new funded accounts added in Fiscal 2020. Increased interest in personal finance and investing, a positive market environment, especially in the U.S., encouraged an unprecedented number of first-time retail customers to download the Company's app and begin trading on the Platform.

***Changes in, or the development of guidance relating to, accounting standards governing the preparation of the Company's financial statements and future events could have a material impact on the Company's financial condition, results of operations, cash flows and other financial data.***

From time to time, regulators change the financial accounting and reporting standards governing the preparation of the Company's financial statements or the interpretation of those standards. These changes are difficult to predict and can materially impact how the Company records and reports its financial condition, results of operations, cash flows and other financial data. In some cases, the Company may be required to apply a new or revised standard retroactively or to apply an existing standard differently, also retroactively, in each case potentially resulting in the restatement of prior period financial statements and related disclosures. Additionally, the Company accounting policies and methods are fundamental to how it records and reports its financial condition and results of operations. The preparation of financial statements in conformity with IFRS requires management to make estimates based upon assumptions about future economic and market conditions which affect reported amounts and related disclosures in our financial statements. If subsequent events occur that are materially different than the assumptions and estimates we used, its reported financial condition, results of operation and cash flows may be materially negatively impacted.

In addition, the accounting for, and audit standards relating to, crypto assets remain subject to further guidance. To the extent that such guidance imposes obligations on audit firms that they are not able to meet with respect to the review of crypto assets, the Company could have difficulty in obtaining an audit opinion, filing audited financial statements in a timely manner or obtaining an unqualified opinion.

***Service on Foreign Directors and Officers.***

The Company is a corporation formed under the laws of British Columbia, Canada; however its principal place of business is in the United States. Most of the Company's directors and officers, the Company's auditors, and the majority of the Company's assets, are located in the United States.

It may be difficult for customers in the United States to effect service of process within the United States upon those directors who are not residents of the United States or to enforce against them judgments of the United States courts based upon civil liability under the United States federal securities laws or the securities laws of any state within the United States. There is doubt as to the enforceability in Canada against the Company or against any of its non-United States directors, in original actions or in actions for enforcement of judgments of United States courts of liabilities based solely upon the United States federal securities laws or securities laws of any state within the United States.

Similarly, it may be difficult for customers in Canada to effect service of process within Canada upon those directors, officers and experts who are residents of the United States, or to enforce against them judgments of the Canadian courts based upon civil liability under Canadian securities laws. There is doubt as to the enforceability in the United States against any of the Company's non-Canadian directors, in original actions or in actions for enforcement of judgments of Canadian courts of liabilities based solely upon Canadian law.

***Foreign Exchange Risk.***

The Company is a corporation formed under the laws of British Columbia, Canada, and certain expenses are incurred and fund raising undertaken in Canadian dollars. Most of its expenses and fund raising is done in Canadian dollars. Most of the expenses and revenues of the Company's subsidiaries are denominated in United States dollars. As a result, the Company is subject to foreign exchange risks relating to the relative value of the United States dollar as compared to the Canadian dollar. A decline in the United States dollar would result in a decrease in the real value of the Company's revenues and adversely impact financial performance.

***Integration of Acquired Businesses.***

The Company may from time to time merge with or acquire other companies or businesses both locally and globally. The integration of the operations and financial systems of any such companies or businesses may require substantial time and resources from the Company's personnel, in particular where such companies or businesses operate under different regulatory regimes or prepare their financial records in accordance with accounting regimes other than IFRS. To the extent that any such companies or businesses are in a net operating loss position at the time of acquisition, it may have a negative impact on the Company's overall financial position.

***Additional Taxation May Apply to Dividends Paid to Non-Residents.***

Any dividends paid (or deemed for tax purposes to be paid) on Shares to a non-resident of Canada will be subject to Canadian withholding tax at a rate of 25% unless the rate is reduced under the provisions of an applicable double taxation treaty. Where a non-resident is a United States resident entitled to benefits of the Canada – United States Income Tax Convention (1980) and is the beneficial recipient of the dividends, then the rate of Canadian withholding tax is generally reduced to 15%.

***Foreign Exchange Risk to Non-Resident Shareholders***.

Any future dividends may be declared in Canadian dollars and converted to foreign denominated currencies at the spot exchange rate at the time of payment.  As a consequence, customers are subject to foreign exchange risk.  To the extent that the Canadian dollar strengthens with respect to their currency, the amount of the dividend will be reduced when converted to their home currency.

## Legal and Regulatory Risks of Businesses Based on Cryptocurrencies and Crypto Assets

***The regulation of cryptocurrencies and crypto assets continues to evolve in every jurisdiction, and governmental, regulatory and other changes or actions may restrict the use of cryptocurrencies and crypto assets, the operation of distributed ledger technologies that support such cryptocurrencies and platforms that facilitate the trading of such assets and provide certain services in connection with such assets.***

As cryptocurrencies and crypto assets have grown in popularity and in market size, governments, regulators and self-regulators (including law enforcement and national security agencies) around the world are examining the operations of crypto asset issuers, customers and platforms. To the extent that any Canadian, U.S. or other government or quasi-governmental agency imposes additional substantial regulation on any part of the cryptocurrency industry in general, the issuance of crypto assets, and trading and ownership of and transactions involving the purchase and sale or pledge of such assets, may be adversely affected, which could adversely affect the Company's businesses and investments. The effect of any future regulatory change on crypto asset issuers and participants in general is impossible to predict, but such change could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

The legal status of cryptocurrency and crypto assets varies substantially from jurisdiction to jurisdiction and is still undefined and changing in many of them. Likewise, various government agencies, departments, and courts have classified and continue to classify cryptocurrencies and crypto assets differently. Changes in laws, regulations, policies and practices could have an adverse effect on the Company, its strategies, business and investments. For example, regulatory agencies could shut down or restrict the use of Crypto Trading Platforms using cryptocurrencies, crypto assets or blockchain-based technologies, providing certain services with respect to the foregoing, or otherwise limit the use of cryptocurrencies. This, and any other changes in laws, regulations, policies and practices, could lead to a loss of any investment made by or in the Company, and may trigger regulatory action by securities or other regulators, and result in a material impact to the Company's business operations and revenue streams. Furthermore, various jurisdictions may, in the near future, adopt laws, regulations or directives that affect cryptocurrencies, the related markets and Crypto Trading Platforms and the ability to use, trade and hold cryptocurrencies. Such laws, regulations or directives may conflict with one another and may negatively affect the acceptance of cryptocurrencies by customers, merchants and service providers and may therefore impede the growth or sustainability of the bitcoin economy in Canada, the United States, the European Union, China, Japan, Russia or other locations and globally, or otherwise negatively affect the value of cryptocurrencies. Although there continues to be uncertainty about the full impact of these and other regulatory changes, the Company may become subject to a more complex regulatory framework in the near future and incur additional costs to comply with new requirements as well as to monitor for compliance with any new requirements in the future.

*The Company's performance will be highly dependent on the future regulatory environment in the United States and elsewhere, which is challenging and unpredictable.*

The Company is headquartered in the United States and currently accepts only U.S. customers on the Platform. Therefore, although the Company intends to extend its operations and customer bases to other countries, it is likely that the ability to conduct business in the United States and with U.S. customers will remain critical to the Company's results and prospects.

For businesses that involve cryptocurrencies or other crypto assets, the regulatory environment in the United States has been mixed. Notwithstanding that U.S. legislators and regulators generally express support for innovation in financial markets and products, they have arguably not moved quickly to clarify the status of cryptocurrencies and other crypto assets (and associated financial services) under U.S. laws, especially securities, commodities, banking and money-transmitter laws, or to accommodate proposals for new businesses or offerings. In recent years, the SEC has taken noteworthy actions to, among other things, sanction many issuers of digital tokens, reject applications for crypto-related exchange-traded funds and suggest that bitcoin and other crypto assets are not suitable holdings for traditional investment funds. It is impossible to predict what directions U.S. regulation might take in the future, which depend among other things on agency priorities and budgets, agency personnel turnover and appointments following presidential elections, legislation, judicial decisions, public perception, and economic conditions. There can be no assurance that U.S. regulation will advance in a way that is favorable for the Company.

Furthermore, in comparison to traditional securities or commodities markets, U.S. law and regulation remains thinly developed with respect to financial services provided to the cryptocurrency and crypto asset markets. Although recent years have seen some guidance emerge with respect to the question of whether a crypto asset constitutes a security for certain purposes under U.S. law, there remains little or no clear legal authority or established practice with respect to the application to crypto assets of concepts like fungibility, settlement, trade execution and reporting, collateralization, rehypothecation, custody, repo, margin, restricted securities, short sales, bankruptcy and insolvency and many others. Some or all of these concepts may be needed for crypto-related marketplaces to continue to grow, mature and attract institutional participants; there can be no assurances that rules and practices for such concepts will develop in the United States in a manner that is timely, clear, favorable to the Company or compatible with other jurisdictions' regimes. Furthermore, to the extent the Company offers any of these financial services, emerging regulation or enforcement activity may have a material impact on the Company's ability to continue providing such service thereby affecting the Company's revenues and profitability as well as its reputation and resources.

More recently, the SEC and state securities regulators have expressed their position that certain lines of cryptocurrency businesses, including "interest programs" and "staking" may involve the offering and sale of securities. While no new legislation has been passed or regulatory guidance published, regulators have expressed their position by issuing subpoenas and "Wells Notices" indicating an intention to commence regulatory enforcement proceedings. There is a risk that the SEC or state securities regulators could challenge the Rewards Program through such actions, which could be determined regardless of whether the regulators' positions have been established as correct in law. If litigation was threatened by a securities regulator or the Company were otherwise required to terminate its Rewards Program, it could have a materially negative affect on the Company's ability to attract customers and successfully operate its business.

In the event that the Company accepts customers from jurisdictions other than the U.S., it will be required to comply with applicable regulatory requirements in those jurisdictions which could be as onerous or more onerous than those of the U.S.

*A particular crypto asset's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty and if the Company is unable to properly characterize a crypto asset, the Company may be subject to regulatory scrutiny, investigations, fines, and other penalties, which may adversely affect the Company's business, operating results, and financial condition.*

The SEC and its staff have taken the position that certain crypto assets fall within the definition of a "security" under the U.S. federal securities laws. The legal test for determining whether any given crypto asset is a security is a highly complex, fact-driven analysis that evolves over time, and the outcome is difficult to predict. The SEC generally does not provide advance guidance or confirmation on the status of any particular crypto asset as a security. Furthermore, the SEC's views in this area have evolved over time and it is difficult to predict the direction or timing of any

continuing evolution. It is also possible that a change in the governing administration or the appointment of new SEC commissioners could substantially impact the views of the SEC and its staff. Public statements by senior officials at the SEC indicate that the SEC does not intend to take the position that Bitcoin or Ethereum are securities (in their current form). Bitcoin and Ethereum are the only crypto assets as to which senior officials at the SEC have publicly expressed such a view. Moreover, such statements are not official policy statements by the SEC and reflect only the speakers' views, which are not binding on the SEC or any other agency or court and cannot be generalized to any other crypto asset. With respect to all other crypto assets, there is currently no certainty under the applicable legal test that such assets are not securities, notwithstanding the conclusions the Company may draw based on its risk-based assessment regarding the likelihood that a particular crypto asset could be deemed a "security" under applicable laws. Similarly, though the SEC's Strategic Hub for Innovation and Financial Technology published a framework for analyzing whether any given crypto asset is a security in April 2019, this framework is also not a rule, regulation or statement of the SEC and is not binding on the SEC.

Several foreign jurisdictions have taken a broad-based approach to classifying crypto assets as "securities," while other foreign jurisdictions, such as Switzerland, Malta, and Singapore, have adopted a narrower approach. As a result, certain crypto assets may be deemed to be a "security" under the laws of some jurisdictions but not others. Various foreign jurisdictions may, in the future, adopt additional laws, regulations, or directives that affect the characterization of crypto assets as "securities."

The classification of a crypto asset as a security under applicable law has wide-ranging implications for the regulatory obligations that flow from the offer, sale, trading, and settlement of such crypto assets. For example, a crypto asset that is a security in the United States may generally only be offered or sold in the United States pursuant to a registration statement filed with the SEC or in an offering that qualifies for an exemption from registration. Persons that effect transactions in crypto assets that are securities in the United States may be subject to registration with the SEC as a "broker" or "dealer." Platforms that bring together purchasers and sellers to trade crypto assets that are securities in the United States are generally subject to registration as national securities exchanges, or must qualify for an exemption, such as by being operated by a registered broker-dealer as an alternative trading system, in compliance with rules for alternative trading systems. Persons facilitating clearing and settlement of securities may be subject to registration with the SEC as a clearing agency. Foreign jurisdictions may have similar licensing, registration, and qualification requirements.

A determination by the SEC, a foreign regulatory authority, or a court that an asset that the Company currently supports for trading on the Platform constitutes a security may also result in the Company determining that it is advisable to remove assets from the Platform that have similar characteristics to the asset that was determined to be a security. In addition, the Company could be subject to judicial or administrative sanctions for failing to offer or sell the crypto asset in compliance with the registration requirements, or for acting as a broker, dealer, or national securities exchange without appropriate registration. Such an action could result in injunctions, cease and desist orders, as well as civil monetary penalties, fines, and disgorgement, criminal liability, and reputational harm. Customers that traded such supported crypto asset on the Company's platform and suffered trading losses could also seek to rescind a transaction that the Company facilitated as the basis that it was conducted in violation of applicable law, which could subject the Company to significant liability. The Company may also be required to cease facilitating transactions in the supported crypto asset other than via any licensed subsidiaries, which could negatively impact the business, operating results, and financial condition. Furthermore, if the Company removes any asset from trading on Platform, such decision may be unpopular with customers and may reduce the Company's ability to attract and retain customers, especially if such assets remain listed on unregulated Crypto Trading Platforms, which includes many of the Company's competitors.

Further, if Bitcoin, Ethereum, or any other supported crypto asset is deemed to be a security under any U.S. federal, state, or foreign jurisdiction, or in a proceeding in a court of law or otherwise, it may have adverse consequences for such supported crypto asset and would have a material and adverse effect on the Company and its business and prospectus. For instance, all offerings in such supported crypto asset would have to be registered with the SEC or other foreign authority, or conducted in accordance with an exemption from registration, which could severely limit its liquidity, usability and transactability. Moreover, the networks and platforms such as the Company's on which such supported crypto assets are utilized may be required to be regulated as securities intermediaries, and subject to applicable rules, which could effectively render the network impracticable for its existing purposes. Further, it could draw negative publicity and a decline in the general acceptance of the crypto asset. Also, it may make it difficult for such supported crypto asset to be traded, cleared, and custodied as compared to other crypto asset that are not considered to be securities.

***The Company will be required to avoid "investment company" status under U.S. law or comparable laws in other jurisdictions.***

In general, under the *U.S. Investment Company Act of 1940*, a company that has many U.S. securityholders and conducts businesses relating to securities could, depending on complex factors relating to its activities and holdings of investment securities, be deemed to be an "investment company." Investment company status is broadly incompatible with the Company's business plans (and with its status as a non-U.S. issuer). If the Company were determined to be deemed to be an investment company, the Company might be required to significantly restructure its businesses or cease operations altogether.

The Company intends that its current and future activities not cause the Company to be deemed to be an investment company. To the extent that the Company and its subsidiaries hold and transact in cryptocurrencies that do not constitute securities, the Company believes that such holdings and transactions will not cause the Company to be deemed to be an investment company. Furthermore, to the extent that holding and transacting security tokens or security derivatives takes place in broker-dealer subsidiaries of the Company, the Company believes that such holdings and transactions could qualify for an *Investment Company Act* exception and therefore likewise not cause the Company to be deemed to be an investment company. There is currently little or no guidance or legal authority, however, with respect to the application of *Investment Company Act* principles and tests to crypto-related businesses, and there can be no assurance that such guidance or authority, if forthcoming, would be favorable to the Company. The Company could face a similar situation in other, non-U.S. jurisdictions.

***In the United States and in other jurisdictions, the Company may be required to, or may choose to, conduct certain activities through regulated subsidiaries. This will increase the direct and indirect costs of the Company's compliance with law and regulation and is not guaranteed to be successful as a business matter.***

Some of the Company's current and planned activities, such as with respect to digital tokens that constitute securities under U.S. law, may need to be conducted through an entity that holds certain regulatory registrations or qualifications or meets other standards. As one prominent example, in the United States, a business of acting as a broker or dealer in securities must generally be conducted by an entity that is registered with the SEC as a broker-dealer and is a member of FINRA. In addition, several U.S. states have adopted some level of licensing and regulation of crypto-related businesses, including businesses that generally do not implicate the U.S. federal securities, commodities or banking laws. For example, New York State's primary financial regulator in 2015 promulgated a "BitLicense" regime for so-called "virtual currency business activities," which include a wide range of crypto-related activities, including custody and dealing, if they involve New York State or a resident of New York State.

The Company's philosophy has been to prepare for cryptocurrencies and crypto assets to exist within a progressively more complex regulatory landscape. The Company currently has a subsidiary, VYGR Digital Securities, LLC, that is a member of FINRA and of the U.S. National Futures Association and is authorized to conduct certain activities in securities and commodities. The Company and its subsidiaries also hold money-transmitter or similar licenses in almost all U.S. states. To the extent that the Company launches an asset-management business—and depending in significant part on future legal interpretations and the development of the regulatory landscape in the United States and elsewhere—the Company could, for example, be required to have a subsidiary that is registered as an investment adviser with the SEC or one or more U.S. states, or as a commodity trading advisor or commodity pool operator with the U.S. Commodity Futures Trading Commission.

In general, holding regulatory registrations and qualifications may enable the Company to conduct lawfully certain activities, particularly client- or customer-facing ones, in certain jurisdictions, such as the United States, that the Company believes will be profitable or otherwise desirable in the context of the Company's business plan. On the other hand, regulated businesses typically have much higher costs of compliance, including recordkeeping, auditing and training; must comply with customer protection rules and business practice codes that may be constraining, and with valuation and accounting policies that may be difficult to adapt and apply to crypto assets; may be regularly examined by organizations such as FINRA; and may have to meet regulatory capital or similar requirements beyond what the Company would otherwise view as optimal. For example, broker-dealers are generally subject to regulatory capital requirements promulgated by the applicable regulatory and exchange authorities in the United States or in other jurisdictions where they operate, and the failure to maintain required regulatory capital may lead to suspension or revocation of a broker-dealer registration and suspension or expulsion by a regulatory body.

At the same time, regulatory registrations and qualifications typically provide no assurance that the Company will ultimately be permitted to conduct any particular business or activity; such permission typically remains subject to broad regulatory discretion to approve, deny or condition based upon sometimes nebulous concepts of customer protection or market integrity. This factor could be particularly problematic in the case of novel markets and products, including not only existing cryptocurrencies and other crypto assets but also new and innovative assets or technologies hoped to be developed in the future.

If, overall, the various direct and indirect legal and compliance costs referred to in the foregoing are greater than the net business or product access provided by qualification under applicable regulatory regimes, it is likely to, among other things, materially and adversely affect the Company's reputation, financial condition, trading execution and asset value and the value of any investment in the Company.

## Risks Related to the Company's Business

### *Permits and licenses.*

Certain operations of VDH require licenses and permits from various governmental authorities in the United States and elsewhere. Presently, to operate as a crypto broker supporting a Crypto Trading Platform in each state of the United States, VDH requires individual state approval to transmit money (fiat and digital). State applications may require significant surety bonds be posted, which may require additional funds be raised by the Company. Should VDH seek to expand its business model to include additional regulated products or services, there will be significant federal and state regulations to be complied with. There can be no assurance that VDH will be able to obtain all necessary licenses and permits that may be required, including money transmitter licenses in the United States. Furthermore, failure or delays in obtaining necessary approvals for licenses and permits could have a materially adverse effect on the Company's financial condition and results of operations. As VDH seeks to expand its business outside of the United States, it will need to comply with the laws and regulations of each jurisdiction in which it carries on such business. There is no assurance that VDH will be able to comply with the laws and regulations of each jurisdiction in which it seeks to expand.

### *Financial services businesses, including the Company's, are heavily regulated, which imposes costs on the Company in many ways.*

Financial services businesses, including businesses that invest or trade in financial assets (or enable others to do so), are heavily regulated in virtually every developed jurisdiction in the world. This regulation is often costly to comply with for a number of reasons, from costs of a compliance infrastructure to explicit margin or regulatory capital charges; extraordinarily technical, subject to interpretive uncertainty or both; and subject to unpredictable, potentially material change upon the exercise of discretion by a range of legislative, executive, judicial, multinational, self-regulatory and other bodies. As only a few examples, holding or transmitting funds, and trading, brokering or operating certain trading platforms with respect to transactions in securities and commodity interests, are activities that are generally subject to extensive and complex regulation. Alternatively, exemptions from such regulation, when they are available, are often themselves complex and technical and may cause a company to avoid otherwise desirable and profitable business activities as well as to bear increased compliance costs.

All of the foregoing is true for businesses that transact only in traditional, well understood instruments such as fiat currencies and listed equity securities. In other words, operating a financial services or financial technology business typically involves a significant amount of regulatory costs, risks and uncertainty even before introducing the additional complications of cryptocurrencies and other crypto assets. These factors, individually and together, may, among other things, materially and adversely affect the Company's reputation, financial condition, trading execution and asset value and the value of any investment in the Company.

### *The Company's compliance and risk management programs may not be effective and may result in outcomes that could materially and adversely affect the Company's reputation, financial condition and operating results, among other things.*

The Company's ability to comply with applicable laws and rules is largely dependent on the establishment and maintenance of compliance, review and reporting systems, as well as the ability to attract and retain qualified compliance and other risk management personnel. The Company cannot provide any assurance that its compliance

policies and procedures will always be effective or that the Company will always be successful in monitoring or evaluating its risks. In the case of alleged non-compliance with applicable laws or regulations, the Company could be subject to investigations and judicial or administrative proceedings that may result in substantial penalties or civil lawsuits, including by customers, for damages, restitution or other remedies, which could be significant. Any of these outcomes, individually or together, may among other things, materially and adversely affect the Company's reputation, financial condition, trading execution, and asset value and the value of any investment in the Company.

***Operational risks, such as misconduct and errors of employees or entities with which the Company does business, are difficult to detect and deter and could cause material reputational and financial harm to the Company.***

The Company's employees and agents could engage in misconduct, which may include conducting and concealing unauthorized activities or improper use or unauthorized disclosure of confidential information. It is not always possible to deter misconduct by employees or others, and the precautions that the Company takes to prevent and detect this activity may not be effective in all cases. The Company could be at risk, for example, that its employees could engage in prohibited personal trading of a cryptocurrency or crypto asset supported by one of the Company's platforms, which could lead to actions such as trading suspensions, fines and costs or other regulatory actions, which, in each case, could have a material and adverse effect on the Company.

Furthermore, the Company's employees could make errors in recording or executing transactions for clients, customers or counterparties, which would likely result in additional and potentially material costs to the Company.

***The Company may fail to anticipate or adapt to technology innovations in a timely manner, or at all.***

The blockchain and telecommunications markets are experiencing rapid technological changes. Failure to anticipate technological innovations or adapt to such innovations in a timely manner, or at all, may result in the Company's products becoming obsolete at sudden and unpredictable intervals. To maintain the relevancy of the Company's products, the Company has actively invested in product planning and research and development. The process of developing and marketing new products is inherently complex and involves significant uncertainties. There are a number of risks, including the following:

    a.    the Company's product planning efforts may fail in resulting in the development or commercialization of new technologies or ideas;

    b.    the Company's research and development efforts may fail to translate new product plans into commercially feasible products;

    c.    the Company's new technologies or new products may not be well received by consumers;

    d.    the Company may not have adequate funding and resources necessary for continual investments in product planning and research and development;

    e.    the Company's products may become obsolete due to rapid advancements in technology and changes in consumer preferences; and

    f.    the Company's newly developed technologies may not be protected as proprietary intellectual property rights.

Any failure to anticipate the next-generation technology roadmap or changes in customer preferences or to timely develop new or enhanced products in response could result in decreased revenue and market share. In particular, the Company may experience difficulties with product design, product development, marketing or certification, which could result in excessive research and development expenses and capital expenditure, delays or prevent the Company's introduction of new or enhanced products. Furthermore, the Company's research and development efforts may not yield the expected results, or may prove to be futile due to the lack of market demand.

***An active and liquid trading market in the Common Shares may fail to develop.***

There can be no assurance that an active and liquid trading market in the Common Shares will develop or, if such a

market develops, whether it will be maintained. Furthermore, market-makers in the Common Shares, if any, will be under no obligation to make a market for the Common Shares and will have the ability to discontinue any market-making activities undertaken by them at any time. The Company cannot predict the effect on the market price of the Common Shares if a liquid and active trading market fails to develop or to be maintained. In the absence of an active trading market, relatively small sales may result in a significant negative effect on the price of the Common Shares, increasing volatility.

***There are material risks and uncertainties associated with the Company's anti-money-laundering ("AML"), "know your customer" ("KYC") and other protocols to detect and deter illegal activity on the Company's platforms.***

The Company seeks to implement and maintain anti-money-laundering, "know your customer" and other policies and procedures that are consistent with applicable U.S. and non-U.S. law and regulation and with financial services industry best practices. Nonetheless, the Company may not be able to prevent illegal activity from occurring on or through its platforms, including the unauthorized use of a validly opened account.

The use of cryptocurrencies or other crypto assets for illegal purposes on or through the Company's platforms, or allegations or investigations with respect to potential such use, could result in significant legal and financial exposure to the Company and damage to the Company's reputation. Similarly, failure to meet applicable AML/KYC legal and regulatory requirements could result in regulatory fines, sanctions or restrictions, which in each case could materially and adversely affect the Company's reputation, financial condition, trading execution, and asset value and the value of any investment in the Company.

Furthermore, the Company will use and rely on third-party service providers to complete key aspects of AML/KYC screenings. Although the Company will perform due diligence on such providers, there can be no assurance that in all events such providers will detect all potential illegal activity or comply with all aspects of applicable law and regulation. If such a provider were to fail to perform to agreed standards or maintain full compliance, it could have a material and adverse effect on the Company's business and operations.

***Financial services companies face substantial litigation and investigation risks.***

As an enterprise whose material planned business lines include financial services, the Company will depend to a significant extent on its relationships with its clients and its reputation for integrity and high caliber professional services. As a result, if a client is not satisfied with the Company's services or if there are allegations of improper conduct by private litigants or regulators, whether the ultimate outcome is favorable or unfavorable to the Company, or if there is negative publicity and press speculation about the Company, whether or not valid, that may harm the Company's reputation and may be more damaging to the Company's businesses than to businesses in other non-financial industries.

Furthermore, any regulatory investigation or examination to which the Company becomes subject could result in significant fines or penalties and could result in consent decrees or other regulatory directives that limit the way the Company conducts its business or that require a third-party monitor to assist in overseeing compliance. Any litigation to which the Company becomes party may result in onerous or unfavorable judgments that may not be reversed upon appeal or in payments of substantial monetary damages or fines, or the Company may decide to settle lawsuits on similarly unfavorable terms. Responding to regulatory investigations and lawsuits of the nature described above is costly and time-consuming to management, can generate negative publicity and could materially and adversely affect the Company.

***Competition from other cryptocurrency companies.***

The Company competes with other cryptocurrency and distributed ledger technology businesses and other potential financial vehicles. Market and financial conditions, and other conditions beyond the Company's control, may make it more attractive for customers to invest in other financial vehicles, or to invest in cryptocurrencies directly which could adversely impact the Company's business.

***Changes in the value of cryptocurrencies may affect trading.***

The markets for cryptocurrencies have experienced much larger fluctuations than other markets, and there can be no

assurances that volatile swings in price will slow in the future. In the event that the price of cryptocurrency declines, the value of an investment in the Company will likely decline. Several factors may affect the price and volatility of cryptocurrency, which include, but are not limited to: (i) global cryptocurrency demand, depending on the acceptance of cryptocurrency by retail merchants and commercial businesses; (ii) the perception that the use and holding of cryptocurrency is safe and secure, and the related lack of or inconsistency in regulatory restrictions, particularly across various jurisdictions; (iii) conversely, heightened regulatory measures restricting the use of cryptocurrency as a form of payment or the purchase of cryptocurrency; (iv) customers' expectations with respect to the rate of inflation; (v) interest rates; (vi) currency exchange rates, including exchange rates between cryptocurrency and fiat currency; (vii) fiat currency withdrawal and deposit policies on Crypto Trading Platforms and liquidity on such Crypto Trading Platforms; (viii) interruption of services or failures of major Crypto Trading Platforms; (ix) general governmental monetary policies, including trade restrictions, currency revaluations; (x) global or regional political, economic or financial events and situations, including increased threat or terrorist activities; and/or (xi) self-fulfilling expectations of changes in the cryptocurrency market. As well, momentum pricing is typically associated with assets whose valuation, as determined by the investing public, accounts for anticipated future appreciation in value. Momentum pricing of cryptocurrency may result in speculation regarding future appreciation in the value of cryptocurrency. As a result, changing customer confidence could adversely affect an investment in the Company.

***Crypto Trading Platforms and other trading venues are relatively new and, in most cases, largely unregulated and may therefore be more exposed to fraud and failure.***

To the extent that Crypto Trading Platforms or other trading venues are involved in fraud or experience security failures or other operational issues, this could result in a reduction in trading by the public.

Cryptocurrency market prices depend, directly or indirectly, on the prices set on Crypto Trading Platforms and other trading venues, which are new and, in most cases, largely unregulated as compared to established, regulated exchanges for securities, derivatives and other currencies. For example, during the past few years, a number of BTC Crypto Trading Platforms have been closed due to fraud, business failure or security breaches. In many of these instances, the customers of the closed BTC Crypto Trading Platforms were not compensated or made whole for the partial or complete losses of their account balances in such BTC Crypto Trading Platforms. While smaller Crypto Trading Platforms are less likely to have the infrastructure and capitalization that provide larger Crypto Trading Platforms with additional stability, larger Crypto Trading Platforms may be more likely to be appealing targets for hackers and "malware" (i.e., software used or programmed by attackers to disrupt computer operation, gather sensitive information or gain access to private computer systems) and may be more likely to be targets of regulatory enforcement action.

***Risks related to the crypto assets supported by the Company.***

The Company's operations and financial condition may also be impacted by the operations and financial condition of the projects underlying the crypto assets supported for trading by the Company. Many such projects have limited operating histories and may not be able to sustain their current trajectory, and many are led by key individuals whose departure from the project could have a material adverse effect. In addition, many such projects utilize rapidly developing technology that may be susceptible to security breaches or fraudulent activities. To the extent that any such events occur, trading in such crypto assets, or crypto assets generally, on the Platform could be reduced, which could have a negative impact on the financial condition of the Company and the value of its securities.

***The Company's use of proprietary and non-proprietary software, data and intellectual property may be subject to substantial risk.***

The Company's investment strategy may rely heavily on the use of proprietary and non-proprietary software, data and intellectual property of the Company and third parties in the crypto asset sector. The reliance on this technology and data is subject to a number of important risks. First, the operation of any element of the cryptocurrencies or crypto assets network or any other electronic platform may be severely and adversely affected by the malfunction of its technology and the technology of third parties. For example, an unforeseen software or hardware malfunction could occur as a result of a virus or other outside force, or as result of a design flaw in the design and operation of the network or platform. Furthermore, if the Company's software, hardware, data or other intellectual property is found to infringe on the rights of any third party, the underlying value of the assets of the Company could be materially and adversely affected. The Company also depends for effective distribution of its software products on "app store" platforms, which, if they were disrupted or discontinued for any reason, or if their terms of use or other features were

developed in a manner adverse to the Company, could materially and adversely affect the Company.

Third parties may assert intellectual property claims relating to the holding and transfer of cryptocurrency and their source code, or claims against any of VIP's patents or intellectual property rights associated with the Platform. Regardless of the merit of any intellectual property claim or other legal action, any threatened action that reduces confidence in the cryptocurrency network's long-term viability or the ability of end-users to hold and transfer cryptocurrency may adversely affect an investment in the Company. As a result, an intellectual property claim could adversely affect the business and affairs of the Company.

***Cybersecurity breaches and other systems and technology problems may materially and adversely affect the Company.***

The information and technology systems used by the Company and other service providers may be vulnerable to damage or interruption from, among other things: computer viruses; network failures; computer and telecommunication failures; infiltration by unauthorized persons; security breaches; usage errors by their respective professionals; power outages; terrorism; and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. If these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Company or a service provider may have to make a significant investment to fix or replace them. The failure of these systems or of disaster recovery plans for any reason could cause significant interruptions in operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to customers (and the beneficial owners of customers). Such a failure could harm the Company's reputation, subject it to legal claims and otherwise materially and adversely affect the Company.

***Crypto Trading Platforms and digital wallets may be hacked.***

VDL's Platform or digital wallets may be hacked. Access to VDL's coins, maintained in a hosted online wallet, could also be restricted by cybercrime (such as a denial of service attack). Any of these events may adversely affect the operations of VDL and, consequently, its business and profitability.

***The loss or destruction of a private key required to access certain cryptocurrencies or crypto assets may be irreversible. The Company's loss of access to its private keys or its experience of a data loss relating to its cryptocurrency or crypto asset investments could adversely affect the Company.***

Certain cryptocurrencies and crypto assets are controllable only by the possessor of both the unique public key and private key relating to the local or online digital wallet in which that cryptocurrency or crypto asset is held. Private keys typically must be safeguarded and kept private to prevent a third party from accessing the relevant cryptocurrencies and crypto assets held in the wallet. If a private key is lost, destroyed or otherwise compromised and no backup of the private key is accessible, the Company will be unable to access the cryptocurrencies and crypto assets held in the wallet. Any loss of private keys relating to digital wallets used to store the Company's cryptocurrencies and crypto assets could materially and adversely affect the Company's trading execution.

***Pandemics and COVID-19.***

The Company cautions that current global uncertainty with respect to the spread of COVID-19 and its effect on the broader global economy may have a significant negative effect on the Company. While the precise impact of the COVID-19 virus on the Company remains unknown, rapid spread of COVID-19 may have a material adverse effect on global economic activity, and can result in volatility and disruption to global supply chains, operations, mobility of people and the financial markets, which could affect interest rates, credit ratings, credit risk, inflation, business, financial conditions, results of operations and other factors relevant to the Company.

***The further development and acceptance of the cryptographic and algorithmic protocols governing the issuance of and transactions in cryptocurrencies is subject to a variety of factors that are difficult to evaluate.***

The use of cryptocurrencies to, among other things, buy and sell goods and services and complete other transactions, is part of a new and rapidly evolving industry that employs crypto assets based upon a computer-generated mathematical and/or cryptographic protocol. The growth of this industry in general, and the use of cryptocurrencies in particular, is subject to a high degree of uncertainty, and the slowing, or stopping of the development or acceptance

of developing protocols may adversely affect the Company's operations. The factors affecting the further development of the industry, include, but are not limited to:

- Continued worldwide growth in the adoption and use of cryptocurrencies;

- Governmental and quasi-governmental regulation of cryptocurrencies and their use, or restrictions on or regulation of access to and operation of the network or similar cryptocurrency systems;

- Changes in consumer demographics and public tastes and preferences;

- The maintenance and development of the open-source software protocol of the network;

- The availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies;

- General economic conditions and the regulatory environment relating to crypto assets; and

- Negative consumer sentiment and perception of cryptocurrencies generally.

### *Acceptance and/or widespread use of cryptocurrency is uncertain.*

Currently, there is relatively small use of cryptocurrencies in the retail and commercial marketplace in comparison to relatively large use by speculators, thus contributing to price volatility that could adversely affect the Company's operations, investment strategies, and profitability.

As relatively new products and technologies, cryptocurrency has not been widely adopted as a means of payment for goods and services by major retail and commercial outlets.  Conversely, a significant portion of cryptocurrency demand is generated by speculators and customers seeking to profit from the short-term or long-term holding of cryptocurrencies.

The relative lack of acceptance of cryptocurrencies in the retail and commercial marketplace limits the ability of end-users to use them to pay for goods and services.  A lack of expansion by cryptocurrencies into retail and commercial markets, or a contraction of such use, may result in increased volatility or a reduction in their market prices, either of which could adversely impact the Company's business.

### *Misuse of cryptocurrencies and malicious actors.*

Since the existence of cryptocurrencies, there have been attempts to use them for speculation or malicious purposes. Although lawmakers increasingly regulate the use and applications of cryptocurrencies, and software is being developed to curtail speculative and malicious activities, there can be no assurances that those measures will sufficiently deter those and other illicit activities in the future.  Advances in technology, such as quantum computing, could lead to a malicious actor or botnet (a voluntary or hacked collection of computers controlled by networked software coordinating the actions of the computers) being able to alter the blockchain on which cryptocurrency transactions rely.  In such circumstances, the malicious actor or botnet could control, exclude or modify the ordering of transactions, or generate new cryptocurrency or transactions using such control. The malicious actor or botnet could double spend its own cryptocurrency and prevent the confirmation of other customers' transactions for so long as it maintains control.  Such changes could adversely affect an investment in the Company.

### *Cryptocurrency is not covered by deposit insurance.*

Transactions using cryptocurrency are not covered by deposit insurance, unlike banks and credit unions that provide guarantees or safeguards.

### *Management experience and dependence on key personnel, employees and third party providers.*

The Company's success is currently largely dependent on the performance of its directors and officers. The management team has specialized expertise within the cryptocurrency industry.  The experience of these individuals is a factor which will contribute to the Company's continued success and growth.  The Company is currently relying on its board members and executive officers, as well as independent consultants, for most aspects of the Company's business.  The amount of time and expertise expended on the Company's affairs by each of its management team and

the directors will vary according to the Company's needs. The loss of any of these individuals could have a material detrimental impact on the Company's business. The Company does not intend to acquire any key man insurance policies for any of its current executives, and therefore there is a risk that the death or departure of any key member of management, a director, or employee or consultant could have a material adverse effect on the Company's future. Investors who are not prepared to rely on the Company's management team and Board should not invest in the Company's securities.

*Arrangement with Metropolitan Commercial Bank.*

The Company is dependent upon the MC Bank pursuant to the Account Services Agreement in order for VDL to carry on its business in the majority of states in the United States. The MC Bank acts as agent for VDL and assumes the money services obligations on behalf of VDL. However, should the Account Services Agreement be terminated for any reason, VDL may be unable to carry on business in most states of the United States unless its current applications were accepted or an alternative service arrangement could be arranged.

*Uninsured or Uninsurable Risks.*

The Company intends to insure its operations in accordance with technology industry practice. However, given the novelty of the business, such insurance may not be available, uneconomical for the Company, or the nature or level may be insufficient to provide adequate insurance cover. The Company may become subject to liability for hazards against which it cannot insure or against which it may elect not to insure because of high premium costs or for other reasons. The payment of any such liabilities would reduce or eliminate the funds available for operations. Payments of liabilities for which the Company does not carry insurance may have a material adverse effect on its financial position.

*Limited operating history.*

VDH has a relatively limited history of operations in the cryptocurrency sector. VDH will be subject to many risks common to start-up enterprises and its viability must be viewed against the background of the risks, expenses and problems frequently encountered by companies in the early stages of development in new and rapidly evolving markets such as the cryptocurrency market. This includes, without limitation, under-capitalization, cash shortages, limitations with respect to personnel, and lack of revenues and/or other resources (financial or otherwise). The Company does not generate material revenue from operations, and there is no assurance that VDH will develop its business profitably, and the likelihood of success of the Company must be considered in light of VDH's early stage of operations. There is no assurance that the Company will be successful in achieving a return on Shareholders' investment.

*Investment Risk.*

There is no assurance that any of the strategic investments made by the Company will generate positive returns, and the Company may lose the entirety of such investments. The companies in which the Company invests are expected to be at an early-stage of development and may not achieve their business objectives. Each of the companies in which the Company invests will be subject to their own particular risks, as well as those risks applicable to companies operating in the digital asset, cryptocurrency and blockchain technology sector. Certain of such industry risks are described under the headings "Legal and Regulatory Risks of Businesses Based on Cryptocurrencies and Crypto Assets" and "Investment, Operational and Other Risks of Holding and Otherwise Transacting in Cryptocurrencies and Crypto assets" in this AIF. In addition, the directors and officers of the Company may be directors, officers, or shareholders of one or more companies in which the Company may invest from time to time.

*Dividend Risk.*

The Company has not paid dividends in the past and does not anticipate paying dividends in the near future. The Company expects to retain earnings to finance further growth and, where appropriate, retire debt.

**Investment, Operational and Other Risks of Holding and Otherwise Transacting in Cryptocurrencies and Crypto assets**

***The continuing development and acceptance of cryptocurrencies, crypto assets and distributed ledger technology are subject to a variety of risks.***

Cryptocurrencies, such as bitcoin, and the other types of crypto assets in which the Company will invest and trade involve a new and rapidly evolving industry of which blockchain technology is a prominent, but not unique, part. The growth of the cryptocurrency industry in general, and distributed ledger technology that supports such cryptocurrencies in particular, is subject to a high degree of uncertainty. The factors affecting the further development of the cryptocurrency industry, as well as distributed ledger technology, include: continued worldwide growth in the adoption and use of cryptocurrencies; government and quasi-government regulation of crypto assets and their use, or restrictions on or regulation of access to and operation of applicable distributed ledger technology or systems that facilitate their issuance and secondary trading; the maintenance and development of the open-source software protocol of certain blockchain networks used to support cryptocurrencies; changes in consumer demographics and public tastes and preferences; the availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies; and general economic conditions and the regulatory environment relating to cryptocurrencies.

The Company's planned business and operations includes the collection of fees from issuers of new cryptocurrencies to offer the ability for the Company's customers to interact (buy, sell, trade) with such new cryptocurrency on the Company's platform. The Company may be exposed to increased business and litigation risk as a result. For example, the Company may be subject to claims from its customers who may have relied on the Company to conduct, or have a process to conduct, due diligence on new cryptocurrencies listed on the Company's platform. In addition, a reduction in the adoption of cryptocurrency may result in the Company's inability to generate revenue from the listing of new cryptocurrencies.

***A decline in the adoption and use of cryptocurrencies would materially and adversely affect the performance of the Company.***

Because cryptocurrency is a relatively new asset class and a technological innovation, it is subject to a high degree of uncertainty. As a related but separate issue from that of the regulatory environment, the adoption, growth and longevity of any cryptocurrency will require growth in its usage and in the blockchain for various applications. A lack of expansion in use of cryptocurrencies and blockchain technologies would adversely affect the technological performance of the Company. In addition, there is no assurance that any cryptocurrency or cryptocurrencies generally will maintain their value over the long term. The value of any cryptocurrency is subject to risks related to its use. Even if growth in the use of any cryptocurrency or of cryptocurrencies generally occurs in the near or medium term, there is no assurance that such use will continue to grow over the long term. A contraction in use of any cryptocurrency or cryptocurrencies generally may result in increased volatility or a reduction in prices, which would materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

***Banks may decline to provide banking services, or may cut off banking services, to companies engaged in cryptocurrency or crypto asset-related businesses, including the Company.***

A number of companies that provide cryptocurrency or crypto asset-related services have been unable to find banks that are willing to provide them with bank accounts and banking services. Similarly, a number of such companies have had their existing bank accounts closed by their banks. Banks may refuse to provide bank accounts and other banking services to cryptocurrency or crypto asset-related companies, including the Company, for a number of reasons, such as perceived compliance risks or costs. The Company's inability to procure or keep banking services would have a material and adverse effect on the Company. Similarly, continued general banking difficulties may decrease the utility or value of cryptocurrencies and crypto assets or harm public perception of those assets. Any of these occurrences could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company. While VDH has established an omnibus account with a third party, federally regulated bank in the United States, there is no assurance that it will be able to maintain such account, and its inability to do so could have a negative impact on its business.

***The prices of cryptocurrencies and crypto assets are extraordinarily and unprecedentedly volatile.***

A significant portion of demand for cryptocurrencies and other crypto assets is generated by speculators and customers seeking to profit from the short-term or long-term holding of these cryptocurrencies or crypto assets. Speculation regarding future appreciation in the value of a cryptocurrency or crypto asset may inflate and make more volatile the

price of that cryptocurrency or crypto asset. Conversely, only a limited number of cryptocurrencies, including bitcoin, have recently become sometimes accepted as a means of payment for some goods and services, and use of cryptocurrencies by consumers to pay at retail and commercial outlets remains very limited. A lack of expansion by cryptocurrencies into retail and commercial markets, or a contraction of such limited use as has developed to date, may result in increased volatility or a reduction in the value of that cryptocurrency or cryptocurrencies generally, either of which could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

Several factors affect the price and the volatility of cryptocurrencies, including global cryptocurrency demand depending on the acceptance of cryptocurrency by retail merchants and commercial businesses; customers' expectations with respect to the rate of inflation; interest rates; currency exchange rates, including exchange rates between cryptocurrency and fiat currency; fiat currency withdrawal and deposit policies on Crypto Trading Platforms and liquidity on such Crypto Trading Platforms; interruption of services or failures of major Crypto Trading Platforms; large investment and trading activities in cryptocurrency; monetary policies of governments, trade restrictions and currency de- and revaluations; regulatory measures restricting the use of cryptocurrency as a form of payment or the purchase of cryptocurrency; global and regional political, economic and financial events and situations, including increased threat of terrorist activities; and hacking of Crypto Trading Platforms or custodians.

Fluctuation in the prices of cryptocurrencies may significantly affect the Company's results of operations and financial condition; in particular, a significant drop in bitcoin price may have a material adverse effect on the Company's results of operations. The recent market uncertainty over the global outbreak of COVID-19 caused a drastic drop in the price of bitcoin in March 2020. The Company's business and results of operations may be materially and adversely affected by the global market uncertainties in the near term. More broadly, cryptocurrencies are subject to supply and demand forces based upon, among other things, the desirability of alternative, decentralized means of buying and selling goods and services. It is unclear how such supply and demand will be affected by geopolitical events; political or economic crises could motivate large-scale sales or purchases of cryptocurrencies and crypto assets either globally or in particular markets.

The prices of cryptocurrencies have fluctuated significantly in the past few years, which resulted in a corresponding fluctuation in the Company's results of operations. The Company expects that the prices of cryptocurrencies may continue to fluctuate in the future, and as such, the Company would expect to continue to experience a significant corresponding fluctuation in the Company's results of operations.

***There are material risks and uncertainties associated with custodians of crypto assets.***

The Company may use one or more custodians (or third-party "wallet providers") to hold crypto assets that it holds on behalf of itself or of clients, customers and counterparties. Such custodians may or may not be subject to regulation by U.S. state or federal or non-U.S. governmental agencies or other regulatory or self-regulatory organizations. The Company could have a high concentration of its crypto assets in one location or with one custodian, which may be prone to losses arising out of hacking, loss of passwords, compromised access credentials, malware or cyberattacks. Custodians may not indemnify the Company against any losses of crypto assets. Crypto assets held by certain custodians may be transferred into "cold storage" or "deep storage," in which case there could be a delay in retrieving such crypto assets. The Company may also incur costs related to the third-party custody and storage of its crypto assets. Any security breach, incurred cost or loss of crypto assets associated with the use of a custodian could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

Furthermore, there is, and is likely to continue to be, uncertainty as to how U.S. and non-U.S. laws will be applied with respect to custody of cryptocurrencies and other crypto assets held on behalf of clients. For example, U.S.-regulated investment advisers may be required to keep client "funds and securities" with a "qualified custodian"; there remain numerous questions about how to interpret and apply this rule, and how to identify a "qualified custodian" of, crypto assets, which are obviously kept in a different way from the traditional securities with respect to which such rules were written. The uncertainty and potential difficulties associated with this question and related questions could materially and adversely affect the Company's ability to develop and launch an asset management business.

The Company from time to time, may include a small amount of its own assets with the segregated assets of clients to facilitate efficient trading. In so doing, the Company is exposed to trade, settlement, market and counterparty risk,

which may expose the Company to financial loss.

The Company's assets deposited with third party custodians and Crypto Trading Platforms are generally held in one account for each type of digital currency for each custodian/Crypto Trading Platform. The assets are segregated from those of other customers of those custodians and Crypto Trading Platforms but are not then further segregated on a Company client level. Accordingly, any losses of the type described herein could affect customers on a pro rata basis. The Company may also incur costs related to the third-party custody and storage of its crypto assets. Any security breach, incurred cost or loss of crypto assets associated with the use of a custodian could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

***The unregulated nature and lack of transparency surrounding the operations of Crypto Trading Platforms may cause the marketplace to lose confidence in such Crypto Trading Platforms.***

Crypto Trading Platforms on which cryptocurrencies and other crypto assets trade are relatively new and, in some cases, unregulated. Furthermore, while some Crypto Trading Platforms provide information regarding their ownership structure, management teams, corporate practices and regulatory compliance, many other Crypto Trading Platforms do not. As a result, the marketplace may lose confidence in these Crypto Trading Platforms, including prominent Crypto Trading Platforms that handle a significant volume of trading in these assets. In recent years, there have been a number of Crypto Trading Platforms that have closed because of fraud, business failure or security breaches. Additionally, larger cryptocurrency and crypto asset Crypto Trading Platforms have been targets for hackers and malware and may be targets of regulatory enforcement actions. A lack of stability in these Crypto Trading Platforms and the temporary or permanent closure of such Crypto Trading Platforms may reduce confidence in the crypto asset marketplace in general and result in greater volatility in the price of crypto assets. These potential consequences could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

The Company relies on partnerships with third party Crypto Trading Platforms to fill customers' trade orders. The dependence of the Company on third party Crypto Trading Platforms to fulfill such orders may present material risks. For example, a third party Crypto Trading Platform may not return cryptocurrency deposited by the Company to execute a specific order, or such Crypto Trading Platforms may become insolvent prior to processing the Company's applicable withdrawal. The Company is also exposed to the inherent risks faced by such third party Crypto Trading Platforms for fraudulent activity, liquidity, regulatory and other operational and business risks.

***It is possible that actors could manipulate the blockchain networks and smart contract technology upon which cryptocurrencies and crypto assets rely.***

If a malicious actor is able to hack or otherwise exert unilateral control over a particular blockchain network, or the cryptocurrencies or crypto assets on such a network, that actor could attempt to divert assets from that blockchain or otherwise prevent the confirmation of transactions recorded in that cryptocurrency or crypto asset on that blockchain. Such an event could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

***The Company may not have adequate sources of recovery if its bitcoins are lost, stolen or destroyed.***

If the Company's bitcoins or other cryptocurrency or other crypto assets are lost, stolen or destroyed under circumstances rendering a party liable to the Company, the responsible party may not have the financial resources sufficient to satisfy the Company's claims, which could lead to a material and adverse effect on the Company.

***Lending of cryptocurrencies or other crypto assets may be especially risky.***

The Company may lend crypto assets to third parties, including affiliates. On termination of the loan, the borrower is required to return the crypto assets to the Company; any gains or loss in the market price during the loan would inure to the Company. In the event of the bankruptcy of the borrower, the Company could experience delays in recovering its crypto assets. In addition, to the extent that the value of the crypto assets increases during the term of the loan, the value of the crypto assets may exceed the value of collateral provided to the Company, exposing the Company to credit risks with respect to the borrower and potentially exposing the Company to a loss of the difference between the value of the crypto assets and the value of the collateral. If a borrower defaults under its obligations with respect to a loan of crypto assets, including by failing to deliver additional collateral when required or by failing to return the

crypto assets upon the termination of the loan, the Company may expend significant resources and incur significant expenses in connection with efforts to enforce the loan agreement, which may ultimately be unsuccessful.

The crypto assets that are loaned to third parties by the Company include crypto assets deposited by customers of the Platform, which may be withdrawn by a customer at any time. The Company is exposed to a potentially significant liquidity risk if, for example, the aggregate withdrawals by customers exceed the quantum of uncommitted cryptocurrency available to the Company to satisfy such withdrawal requests. A similar risk applies with respect to individual reserves of each type of cryptocurrency should the withdrawals of such type of cryptocurrency exceed the Company's available reserves.

***The Company's trading orders may not be timely executed.***

The Company's trading execution depends on the ability to establish and maintain an overall market position in a combination of financial instruments. The Company's trading orders may not be executed in a timely and efficient manner because of various circumstances, including, for example, trading volume surges or systems failures attributable to the Company or its counterparties, brokers, dealers, agents or other service providers. In such an event, the Company might only be able to acquire or dispose of some, but not all, of the components of its positions, or if the overall positions were to need adjustments, the Company might not be able to make such adjustments. As a result, the Company would not be able to achieve its desired market position, which may result in a loss. In addition, the Company can be expected to rely heavily on electronic execution systems (and may rely on new systems and technology in the future), which may be subject to certain systemic limitations or mistakes, causing the interruption of trading orders made by the Company.

***Unexpected market disruptions may cause major losses for the Company.***

The Company may incur major losses in the event of disrupted markets and other extraordinary events in which market behavior diverges significantly from historically recognized patterns. The risk of loss in such events may be compounded by the fact that in disrupted markets, many positions become illiquid, making it difficult or impossible to close out positions against which markets are moving. Market disruptions caused by unexpected political, military and terrorist events may from time to time cause dramatic losses for the Company. Any such disruptions and events may have a material and adverse effect on the Company's trading execution and on any investment in the Company.

***The Company may make, or otherwise be subject to, trade errors.***

Errors may occur with respect to trades executed on behalf of the Company. Trade errors can result from a variety of situations, including, for example, when the wrong investment is purchased or sold or when the wrong quantity is purchased or sold. Trade errors frequently result in losses, which could be material. To the extent that an error is caused by a third party, the Company may seek to recover any losses associated with the error, although there may be contractual limitations on any third party's liability with respect to such error.

## PRIOR SALES

During Fiscal 2021, the Company issued the following securities exercisable into Common Shares:

| Date of Issuance | Number of Securities Issued or Granted | Type of Security | Exercise Price Per Security |
|---|---|---|---|
| July 7, 2020 | 100,000[1] | Options | C$0.85 |
| July 15, 2020 | 7,242,220[2] | Warrants | $0.30 |
| July 28, 2020 | 200,000[3] | Options | C$0.94 |
| August 11, 2020 | 250,000[4] | Options | C$0.85 |
| August 11, 2020 | 35,000[3] | Options | C$0.85 |
| August 14, 2020 | 1,750,000[5] | Options | C$0.90 |
| August 20, 2020 | 150,000[1] | Options | C$0.90 |
| August 24, 2020 | 35,000[6] | Options | C$0.94 |
| August 28, 2020 | 60,000[7] | Options | C$0.94 |
| August 31, 2020 | 250,000[4] | Options | C$0.89 |
| September 10, 2020 | 3,133,300[8] | Warrants | C$1.15 |
| September 10, 2020 | 473,662[9] | Compensation Warrants | C$0.85 |
| October 1, 2020 | 250,000[4] | Options | C$0.75 |
| October 29, 2020 | 150,000[4] | Options | C$0.72 |
| November 2, 2020 | 35,000[4] | Options | C$1.05 |
| November 23, 2020 | 635,000[4] | Options | C$1.10 |
| November 23, 2020 | 55,000[1] | Options | C$1.10 |
| November 23, 2020 | 140,000[10] | Options | C$1.10 |
| December 15, 2020 | 2,735,338[11] | Warrants | C$2.50 |
| December 15, 2020 | 387,404[12] | Compensation Warrants | C$1.50 |
| January 1, 2021 | 35,000[4] | Options | C$4.96 |
| January 11, 2021 | 35,000[4] | Options | C$5.80 |
| January 11, 2021 | 313,300[13] | Warrants | $1.15 |
| January 16, 2021 | 75,000[4] | Options | C$7.59 |
| January 18, 2021 | 35,000[4] | Options | C$8.14 |
| January 19, 2021 | 10,000[4] | Options | C$8.39 |

| | | | |
|---|---|---|---|
| January 20, 2021 | 80,000[4] | Options | C$7.66 |
| January 21, 2021 | 25,000[4] | Options | C$7.07 |
| January 21, 2021 | 585,455[14] | Compensation Warrants | $5.50 |
| January 22, 2021 | 50,000[4] | Options | C$6.84 |
| January 27, 2021 | 300,000[15] | Options | C$5.80 |
| January 28, 2021 | 40,000[4] | Options | C$6.90 |
| January 29, 2021 | 100,000[4] | Options | C$8.26 |
| February 2, 2021 | 10,000[4] | Options | C$11.24 |
| February 10, 2021 | 80,000[4] | Options | C$16.65 |
| February 13, 2021 | 30,000[4] | Options | C$19.73 |
| February 15, 2021 | 500,000[16] | Options | C$17.59 |
| February 16, 2021 | 300,000[17] | Options | C$16.65 |
| February 19, 2021 | 60,000[17] | Options | C$18.91 |
| February 26, 2021 | 10,000[17] | Options | C$19.63 |
| February 28, 2021 | 60,000[18] | Options | $15.40 |
| March 5, 2021 | 40,000[17] | Options | C$17.70 |
| March 8, 2021 | 20,000[17] | Options | C$18.24 |
| March 16, 2021 | 30,000[17] | Options | C$25.51 |
| March 17, 2021 | 5,000[17] | Options | C$28.94 |
| March 18, 2021 | 40,000[17] | Options | C$27.85 |
| March 22, 2021 | 50,000[17] | Options | C$31.00 |
| March 25, 2021 | 50,000[17] | Options | C$27.50 |
| March 26, 2021 | 25,000[17] | Options | C$28.89 |
| March 29, 2021 | 100,000[17] | Options | C$32.11 |
| March 29, 2021 | 75,000[19] | Options | C$32.11 |
| March 30, 2021 | 50,000[17] | Options | C$30.40 |
| April 6, 2021 | 5,000[17] | Options | C$34.50 |
| April 16, 2021 | 273,533[20] | Warrants | $2.50 |
| April 19, 2021 | 30,000[17] | Options | C$24.10 |

| | | | |
|---|---|---|---|
| April 20, 2021 | 5,000[17] | Options | C$21.34 |
| April 21, 2021 | 10,000[17] | Options | C$24.99 |
| April 22, 2021 | 25,000[17] | Options | C$22.18 |
| April 23, 2021 | 20,000[17] | Options | C$23.07 |
| April 27, 2021 | 45,000[17] | Options | C$25.25 |
| April 29, 2021 | 25,000[17] | Options | C$23.09 |
| April 29, 2021 | 300,000[19] | Options | C$23.09 |
| May 4, 2021 | 5,000[17] | Options | C$27.02 |
| May 6, 2021 | 25,000[17] | Options | C$26.00 |
| May 7, 2021 | 5,000[17] | Options | C$25.53 |
| May 10, 2021 | 10,000[17] | Options | C$24.13 |
| May 11, 2021 | 20,000[17] | Options | C$24.18 |
| May 13, 2021 | 5,000[17] | Options | C$19.80 |
| May 19, 2021 | 60,000[17] | Options | C$20.08 |
| May 19, 2021 | 300,000[19] | Options | C$20.08 |
| May 21, 2021 | 120,000[21] | Options | C$20.23 |
| May 21, 2021 | 30,000[19] | Options | C$20.23 |
| May 24, 2021 | 10,000[17] | Options | C$23.10 |
| May 25, 2021 | 15,000[17] | Options | C$23.10 |
| May 26, 2021 | 10,000[17] | Options | C$24.43 |
| May 28, 2021 | 10,000[17] | Options | C$23.35 |
| June 1, 2021 | 10,000[17] | Options | C$23.47 |
| June 14, 2021 | 10,000[17] | Options | C$20.58 |
| June 18, 2021 | 30,000[17] | Options | C$19.72 |
| June 23, 2021 | 5,000[17] | Options | C$19.10 |
| June 25, 2021 | 10,000[17] | Options | C$19.55 |
| June 26, 2021 | 10,000[17] | Options | C$19.55 |
| June 28, 2021 | 25,000[17] | Options | C$19.74 |
| June 29, 2021 | 25,000[17] | Options | C$20.56 |

Notes:

(1) Granted to certain employees, with an expiry date of up to 10 years from the date of grant. These options will vest monthly over one year.

(2) Issued in connection with a private placement of 14,484,440 units of the Company at a price of $0.20 per unit, for gross proceeds to the Company of $2,896,888. Each unit was comprised of one Share and one-half Share purchase warrant, with each whole warrant entitling the holder to subscribe for one additional Share at a price of $0.30 per Share for a period of 24 months from the date of issuance, with an option to accelerate the warrant expiry date in the event that the closing trading price of the Shares on the CSE is $0.30 or greater for 10 consecutive trading days. On August 19, 2020, all of the warrants that were subject to the acceleration option were exercised.

(3) Granted to certain employees, with an expiry date of up to 10 years from the date of grant. These options will vest monthly over three years.

(4) Granted to certain employees, with an expiry date of up to 10 years from the date of grant. These options will vest over four years with 25% on a one-year cliff and monthly thereafter for 36 months.

(5) Granted to certain board of directors, with an expiry date of up to 5 years from the date of grant. These options will vest immediately.

(6) Granted to certain employees, with an expiry date of up to 10 years from the date of grant. These options will vest over 31 months with 25% on a one-year cliff and monthly thereafter for 30 months.

(7) Granted to certain consultants, with an expiry date of up to 3 years from the date of grant. These options will vest over four years with 25% on a one-year cliff and monthly thereafter for 36 months.

(8) Issued in connection with the September Special Warrant offering for aggregate gross proceeds to the Company of approximately $4.0 million. Each September Special Warrant was convertible into one unit of the Company, which consisted of one Share and one-half Share purchase warrant, with each warrant being exercisable to acquire one Share at an exercise price of C$1.15 for a term of three years.

(9) Granted in connection with the September Special Warrant offering referenced in note 8 above. The compensation warrants have an exercise price of C$0.85 per unit for a period of three years.

(10) Granted to certain consultants, with an expiry date of up to 10 years from the date of grant. These options will vest monthly over 2 years.

(11) Issued in connection with the December Special Warrant offering for aggregate gross proceeds to the Company of $8,050,014. Each December Special Warrant was convertible into one unit of the Company, which consisted of one Share and one-half Share purchase warrant, with each warrant being exercisable to acquire one Share at an exercise price of C$2.50 for a term of two years.

(12) Granted in connection with the December Special Warrant offering referenced in note 11 above. The compensation warrants have an exercise price of C$1.50 per unit for a period of two years.

(13) Pursuant to the September Special Warrant offering referenced in note 8 above, in the event the conversion conditions were not met by December 9, 2020, the holders of the September Special Warrants were entitled to receive 1.1 units upon the exercise or deemed exercise of the September Special Warrants, resulting in each special warrant being exercisable for 1.1 units. In accordance with the terms of the September Special Warrant offering, 626,600 units were issued in January 2021 pursuant to the penalty provision.

(14) Granted in connection with a private placement offering of 8,363,637 Shares for gross proceeds to the Company of approximately $46.0 million. The agent for the offering received compensation warrants entitling it to purchase 585,455 Shares at a price of $5.50 per Share for a period of 18 months following closing of the offering.

(15) Granted to certain employees, with an expiry date of up to 10 years from the date of grant. These options will vest with 25% on date of grant and monthly thereafter for 36 months.

(16) Granted to certain consultants or the Board, with an expiry date of up to 1 year from the date of grant. These options will be fully vested on date of grant.

(17) Granted to certain employees, with an expiry date of up to 5 years from the date of grant. These options will vest over four

years with 25% on a one-year cliff and monthly thereafter for 36 months.

(18) Granted to certain consultants, with an expiry date of up to 2 years from the date of grant. These options will vest monthly over 24 periods with 25% vested on grant date.

(19) Granted to certain employees, with an expiry date of up to 5 years from the date of grant. These options will vest with 25% on date of grant and monthly thereafter for 36 months.

(20) Pursuant to the December Special Warrant offering referenced in note 11 above, in the event the conversion conditions were not met by March 15, 2021, the holders of the December Special Warrants were entitled to receive 1.1 units upon the exercise or deemed exercise of the December Special Warrants, resulting in each December Special Warrant being exercisable for 1.1 units. In accordance with the terms of the December Special Warrant offering, 547,067 units were issued in April 2021 pursuant to the penalty provision.

(21) Granted to certain employees, with an expiry date of up to 5 years from the date of grant. These options will vest with 10% on date of grant and monthly thereafter for 36 months.

## DIVIDENDS

There are no restrictions in the Company's corporate articles on its ability to pay dividends. However, (i) the Company has never paid a dividend nor made a distribution on any of its securities, (ii) the Company has no history of income or sources of funds from which to pay dividends, and (iii) the Company does not anticipate paying dividends in the near future.

The payment of future dividends, if any, by the Company will be at the sole discretion of the Board. In this regard, the Company expects it will retain any earnings to finance further growth of the Company.

## DESCRIPTION OF CAPITAL STRUCTURE

### Common Shares

The Company is authorized to issue an unlimited number of Common Shares, of which there are 161,763,432 issued and outstanding as of the date of this AIF.

Each holder of a Common Share is entitled to: (i) one vote at all meetings of Shareholders; (ii) a pro rata share of any dividends or other distributions declared payable by the Board; and (iii) a pro rata share of any distribution of the Company's assets on any winding up or dissolution of the Company. There are no pre-emptive rights; conversion or exchange rights; redemption, retraction, purchase for cancellation or surrender provisions; sinking or purchase fund provisions; provisions permitting or restricting the issuance of additional securities; or any other material restrictions or provisions requiring a security holder to contribute additional capital, which are applicable to the Common Shares.

The Company may, if authorized by its directors, purchase, redeem or otherwise acquire any of its issued and outstanding Shares at such price and upon such terms as determined by the Board.

### Warrants

As of the date of this AIF, the Company has 5,299,109 Common Share purchase warrants outstanding, exercisable to purchase Common Shares prior to the applicable exercise date. See "General Development of the Business - Three Year History" and "Prior Sales" in this AIF for further information regarding the Company's issuances of warrants.

### Options

As of the date of this AIF, the Company has 11,914,437 options outstanding under the Stock Option Plan.

The Stock Option Plan is a 10% rolling stock option plan, which provides that the Board may from time to time, in its discretion, grant to directors, officers, employees, technical consultants and other participants to the Company, non-transferrable stock options to purchase Common Shares, provided that the number of Common Shares reserved for issuance will not exceed 10% of the Company's issued and outstanding Common Shares. Such options will be exercisable for a period of up to 10 years from the date of grant.

In addition, the number of Common Shares which may be issuable under the Stock Option Plan within a one-year period: (i) to any one individual shall not exceed 5% of the issued and outstanding Common Shares; and (ii) to a consultant or an employee performing investor relations activities, shall not exceed 1% of the issued and outstanding Common Shares.

As of the date of this AIF, 4,261,906 options remain available for grant under the Stock Option Plan.

## MARKET FOR SECURITIES

**Trading Price and Volume**

The Common Shares are listed and posted for trading on (i) the TSX under the symbol "VOYG"; (ii) the OTCQB Market under the symbol "VYGVF"; and (iii) the Frankfurt Stock Exchange under the symbol "UCD2". The Common Shares were listed and posted for trading on the CSE under the symbol VYGR until September 6, 2021.

The following table sets out the price range and aggregate volumes traded or quoted on the CSE on a monthly basis for each of the months listed below.

| Date | High | Low | Average Daily Volume |
|---|---|---|---|
| September 2020 | 1.00 | 0.65 | 70,721 |
| October 2020 | 0.96 | 0.63 | 80,567 |
| November 2020 | 1.83 | 0.97 | 217,440 |
| December 2020 | 5.73 | 1.52 | 502,609 |
| January 2021 | 9.49 | 4.16 | 563,932 |
| February 2021 | 21.07 | 8.35 | 1,103,873 |
| March 2021 | 33.48 | 13.74 | 985,466 |
| April 2021 | 37.95 | 19.12 | 820,464 |
| May 2021 | 30.29 | 18.36 | 485,564 |
| June 2021 | 24.80 | 17.33 | 384,085 |
| July 2021 | 21.19 | 12.80 | 467,587 |
| August 2021 | 22.22 | 16.91 | 299,577 |
| September 1-3, 2021 | 19.99 | 18.56 | 258,001 |

Notes:

(1)     The Shares ceased trading on the CSE on September 6, 2021, making September 2021 a partial month.

The following table sets out the price range and aggregate volumes traded or quoted on the TSX on a monthly basis for each of the months listed below.

| Date | High | Low | Average Daily Volume |
|---|---|---|---|
| September 7-30, 2021 | 20.28 | 12.11 | 310,104 |

(1)     The Shares started trading on the TSX on September 7, 2021, making September 2021 a partial month.

## ESCROWED SECURITIES AND SECURITIES SUBJECT TO CONTRACTUAL RESTRICTION ON TRANSFER

The following table summarizes details of the Company's securities of each class held, to the Company's knowledge, in escrow or that were subject to a contractual restriction on transfer as of the Fiscal 2021 year end:

| Designation of Class | Number of securities held in escrow or that are subject to a contractual restriction on transfer | Percentage of class |
|---|---|---|
| Common Shares | 4,763,484[1] | 3.04%[2] |

<u>Note</u>:

(1) Subject to an escrow agreement dated January 31, 2019, among the Company, Computershare and various Shareholders. The depository for the Shares held in escrow is Computershare. Such Shares are expected to be released from escrow on February 11, 2022.

(2) Based on 156,522,803 Common Shares issued and outstanding as of June 30, 2021.

## DIRECTORS AND OFFICERS

**Shareholdings of Directors and Executive Officers**

To the knowledge of the Company, as at the date of this AIF, the directors and executive officers of the Company as a group beneficially own, directly or indirectly, or exercise control or direction over an aggregate of 10,629,302 Shares, representing approximately 6.6% of the issued and outstanding Shares on that date.

**Non-Executive Directors**

The following table sets out the name, city, state/province and country of residence of each of the Company's non-executive directors as at the date of this AIF. The table also sets out the principal occupation of each non-executive director of the Company for the five preceding years.

| Name, province or state and country of residence | Tenure with the Company | Principal occupation during the past five years |
|---|---|---|
| **Philip Eytan** New York, USA[1] | Non-Executive Chairman & Director (February 6, 2019 to present) [2] | Founding investor in Livestream, and Socure; and an early investor in Uber.  In 2014, he co-founded Pager, where he is currently its Chief Strategy Officer and a director. |
| **Krisztián Tóth** Ontario, Canada | Director (February 16, 2021 to present) [2] | Partner at Fasken Martineau DuMoulin LLP. |
| **Glenn Stevens**[1] New Jersey, USA | Director (May 20, 2021 to present) [2] | Former Managing Director and Chief Executive Officer at Gain Capital Inc. In August 2020, he joined StoneX where he is currently its Chief Executive Officer, Retail Division. |
| **Jennifer Ackart**[1] Florida, USA | Director (May 20, 2021 to present) [2] | Former Chief Accounting Officer and Senior VP & Controller at Raymond James Financial Inc, from 1994 to 2020. She also previously served as the Chief Financial Officer at Raymond James and Associates, Inc. from March 2019 to September 2020. |

Notes:

(1)     Member of the Audit Committee.

(2)     The current term of each director will continue until the next annual and general meeting of the Shareholders.

**Biographies**

The following are brief profiles of the non-executive directors of the Company.

*Philip Eytan, Non-Executive Chairman and Director*

Mr. Eytan started his career at Morgan Stanley in 2000 as an analyst in Telecom M&A. From 2002 to 2007, he helped manage a large distressed debt book at Cerberus Capital Management. After leaving Cerberus, Mr. Eytan started his own hedge fund. Mr. Eytan has been an avid tech investor since 2007. He was a founding investor in Livestream (sold to IAC in 2017); a founding investor in Socure (cyber fraud prevention company); and an early investor in Uber. In 2014 Mr. Eytan co-founded Pager, a digital health startup at which he is currently the Chief Strategy Officer and a director. Mr. Eytan holds a Bachelor and Masters degree in Finance and Management from HEC Geneva (University of Geneva). In his capacities as Chairman and a director of the Company, Mr. Eytan will devote approximately 25% of his working time to the Company's business.

*Krisztián Tóth, Director*

Krisztián Tóth is an experienced M&A lawyer and partner at the law firm of Fasken Martineau DuMoulin LLP, which is a leading international business law and litigation firm with eight offices with more than 700 lawyers across Canada and in the UK and South Africa. Krisztián began his career at Fasken in 2002, and eventually became a partner of the firm in 2009. He currently focuses on mergers and acquisitions and corporate finance with an emphasis on international and cross-border transactions, proxy contests and other contested matters, public and private financings, securities regulations and corporate governance. He has been recognized by the Canadian Legal Lexpert Directory for his mining experience and the IFLR1000 for his capital markets work. Krisztián is also currently the Chairman of Pasofino Gold Limited (TSX-V:VEIN), which is developing gold projects in Canada and West Africa; a director of Trillium Gold Mines Inc. (TSX-V:TGM), which is developing gold projects in Canada; a director of Leviathan Gold Ltd (TSX-V:LVX), which is developing gold projects in Australia; and a director of DeFi Technologies Inc. (NEO: DEFI), which is a digital asset investment firm.

*Glenn Stevens, Director*

Glenn Stevens is currently CEO of the Gain Retail Division at StoneX Group, Inc. (Nasdaq: SNEX). He is a financial industry veteran with more than 30 years experience in financial markets focusing on trading and foreign exchange (FX) products. Prior to StoneX, Glenn was a Founder and CEO of GAIN Capital and for over twenty years built a business offering retail traders the ability to trade various financial products in all the major regulated financial markets globally. Gain Capital was a NYSE listed Company purchased in August 2020 by StoneX. Previously, Glenn was Managing Director and head of FX North American sales and trading at NatWest Bank. He served as a member of NatWest's North American Management Committee. He held various other senior roles for large financial institutions including Bank of America (Merrill Lynch) and Bankers Trust. Glenn is the Senior Adviser to New City Kids, a non-profit serving school aged children in various locations around New Jersey and Michigan. He received his BS in Business from Bucknell University and his MBA from Columbia University.

*Jennifer Ackart, Director*

Jennifer Ackart is a qualified financial expert with over 30 years of experience. She has expertise in financial reporting, compensation, finance transformation, M&A, investor relations, and public company filings and offerings. She spent the last 25 years in the C-suite at Raymond James Financial, Inc. (NYSE: RJF), a Fortune 500 financial services firm, where she served as the Chief Accounting Officer, CFO of Raymond James and Associates (a regulated full service broker-dealer and the primary operating entity), and board member of Raymond James Limited, the Canadian broker-dealer. Jennifer began her career with over seven years at Price Waterhouse serving clients in a wide variety of industries and was then the controller of HSW Engineering, Inc. She is a CPA and earned her BBA in Accounting from the College of William and Mary. She serves on the United Way Suncoast Cabinet and the Advisory Board for the USF School of Accountancy, is a member of AICPA and Women Executive Leadership (WEL), completed the Deloitte CFO Academy, and holds her Series 99 license (brokerage operations) and CGMA designation.

## Executive Officers

The following table sets out the name, city, state/province and country of residence, and position with the Company of each of the Company's executive officers as at the date of this AIF. The table also sets out the principal occupation of each executive officer of the Company for the five preceding years.

| Name, province or state and country of residence | Tenure with the Company | Principal occupation during the past five years |
|---|---|---|
| **Stephen Ehrlich** Connecticut, USA | CEO & Director (January 25, 2018 to present) | Chief Executive Officer of the Company and its US subsidiaries. Formerly, (i) CEO of Tradier, Inc.; (ii) CEO of Lightspeed Financial, LLC; (iii) CEO of ETRADE Professional Trading, LLC; and (iv) Director of Brokerage, ETRADE Financial, Inc. |
| **Evan Psaropoulos** New York, USA | Chief Financial Officer | Chief Financial Officer of the Company and certain subsidiaries. Formerly, CFO of Global Debt Registry and Director of LeEco North America. |
| **Gerard Hanshe** New York, USA | Chief Operating Officer | Chief Operating Officer of the Company and its US subsidiaries. Formerly, (i) Director of Product Management Garden City Group; (ii) Principal Attorney at Hanshe Law, PLLC; and (iii) Vice President of Corporate Cash Management at Deutsche Bank. |
| **Lewis Bateman** Ontario, Canada | Chief International Officer | Chief International Officer of the Company and its US subsidiaries. Formerly, (i) Chief Business Officer of Coinsquare; (ii) CEO of CoinCapital Investment Management; and (iii) founder & CEO of Sphere Investment Management. |
| **Daniel Costantino** Pennsylvania, USA | Chief Information Security Officer | Chief Information Security Officer of the Company and its US subsidiaries. Formerly, Associate Chief Information officer and Chief Information Security Officer at Penn Medicine University of Pennsylvania Health System; and Director of Security Consulting Services at Layer 8 Security, LLC. |
| **David Brosgol** New York, USA | General Counsel | General Counsel and Secretary of the Company and General Counsel of its US subsidiaries. Previously, (i) an Advisor at Anchor Labs, Inc.; (ii) a Founder, Board Member, General Counsel and Chief Compliance Officer at Digital Asset Custody Company, Inc.; and (iii) General Counsel and Managing Director at Maverick Capital. |
| **Pam Kramer** California, USA | Chief Marketing Officer | Chief Marketing Officer of the Company and its US subsidiaries. Formerly, a self-employed Principal/Marketing Consultant and the Chief Marketing Officer at Cadence13. |
| **Rakesh Gidwani** New Jersey, USA | Chief Technology Officer | Chief Technology Officer at the Company and its US subsidiaries. Formerly, the Senior Vice President of Engineering at Two Sigma Investments. |

## Biographies

The following are brief profiles of the executive officers of the Company.

### *Stephen Ehrlich, CEO & Director*

Mr. Ehrlich is currently Chief Executive Officer of the Company and the US Subsidiaries.

Mr. Ehrlich's last position was as CEO of Tradier, Inc., a Charlotte, North Carolina based financial technology firm. Prior to Tradier, Inc, Mr. Ehrlich was a founder and the CEO of Lightspeed Financial, LLC – a US based retail broker-dealer. Mr. Ehrlich was responsible for eight major acquisitions for Lightspeed over a seven-year period. Previously, Mr. Ehrlich was CEO of E*TRADE Professional Trading LLC, the professional trading arm of E*TRADE FINANCIAL which was purchased by Lightspeed in July 2006. Prior to his executive position, Mr. Ehrlich was a Vice President at E*TRADE responsible for brokerage strategy. Mr. Ehrlich was also responsible for the planning and execution of three major business acquisitions for E*TRADE FINANCIAL including E*TRADE Canada, the Dempsey/GVRC market-making business, and the Tradescape professional trading business. Mr. Ehrlich graduated from Franklin & Marshall College with a Bachelor's degree in Accounting. He holds a CPA and is a member of the AICPA and New York State Society of Certified Public Accountants. Mr. Ehrlich also holds certain licenses with FINRA. In his capacities as CEO and a director of the Company, Mr. Ehrlich will spend 100% of his working time on the Company's business.

### Evan Psaropoulos, CFO

As Chief Financial Officer, Mr. Psaropoulos leads the finance, accounting and treasury functions for the Company. Mr. Psaropoulos joined Voyager in September 2020, bringing more than 20 years of experience across a diverse background including finance, strategy, investment banking, and accounting. Mr. Psaropoulos began his career in public accounting at PricewaterhouseCoopers LLP where he was a Manager in the audit practice. He then transitioned to investment banking, performing M&A and corporate finance advisory at Credit Suisse in the Technology, Media and Telecom Group, where he was a Vice President. Mr. Psaropoulos has also held several senior finance leadership roles across both public and private companies. Mr. Psaropoulos earned his B.S.B.A. in Accountancy from John Carroll University and M.B.A. from Cornell University at the Johnson Graduate School of Management. Mr. Psaropoulos is also a CPA.

### Gerard Hanshe, COO

As the Chief Operating Officer of the Company and the US Subsidiaries, Mr. Hanshe is responsible for overseeing the customer experience, the business process and strategy, and treasury and trading operations teams, and works closely on coordinating their work with the product, engineering, data analysis, finance and marketing teams. Mr. Hanshe joined Voyager as product manager shortly after its founding and led the team's efforts in building the system and processes to support its product launch in early 2019. Later that year, he was promoted to Chief Operating Officer and has since been charged with leading the team as it expands its reach geographically, through strategic partnerships and acquisitions and with additional product feature releases. Prior to joining Voyager, Mr. Hanshe had experience as a practicing attorney, product manager, data and business analyst for a large public legal services firm, professional equities and options trader and the registered principal of a direct access equities broker. He earned his Juris Doctorate from St. John's University School of Law and his BBA in Finance and MBA in IT Management from Hofstra University. With his diverse experience and education, Mr. Hanshe brings to Voyager a multi-faceted approach to managing the organization's operations, analyzing issues and handling challenges with a measured and practical approach to operations management.

### Lewis Bateman, Chief International Officer

As the Chief International Officer, Mr. Bateman is the executive leader for the Company's Canadian, European and Cayman based subsidiaries, and heads all the Voyager strategic corporate acquisitions and international expansion. During his career, Bateman has strategically structured and implemented business groups and acted as a regulatory lead. He holds over two decades of direct financial services experience with senior executive positions at traditional capital market firms and crypto asset management companies. Before establishing two asset management firms as CEO, he was Vice President of ETF Operations & Business Development at First Asset (CI Financial) and Managing Director, Business Development & Executive Vice President Institutional Sales at Horizons ETFs Management Inc. He held senior roles with the Toronto Stock Exchange (TMX), where he was responsible for introducing new global participants to the Canadian marketplace, as well as providing coverage to large domestic and international accounts and Structured Products Providers. He also has experience as a sales equity trader for Merrill Lynch (Midland Walwyn) in Edmonton, Calgary, Toronto and New York. Lewis holds a degree from the University of Toronto - Bachelor of Arts (B.A.) Field Of Study Economics and Political Science.

*Daniel Constantino, Chief Information Security Officer*

As the Chief Information Security Officer, Mr. Costantino leads all technical and administrative cybersecurity programs for Voyager. Mr. Costantino joined Voyager in 2021, bringing more than fifteen years of industry experience to the business with a mission focused on the protection of assets and enablement of safe customer trading. During his career, Mr. Costantino developed and led a number of industry-recognized and award-winning cybersecurity programs and teams. A highly decorated United States Marine, Mr. Costantino served in both combat and humanitarian operations, responsible for the scalability, resilience, and security of mission-critical infrastructure. Mr. Costantino transitioned from the military into consulting, where he partnered with some of the largest organizations in the U.S. to advise on the development of highly secure environments and sustainable technology and cybersecurity programs. In his most recent role as the Chief Information Security Officer and Associate CIO of Penn Medicine, he led the IT Infrastructure and Information Security departments, supporting one of the United States' largest and most recognized academic medical centers, including the complete development and staffing of a 24/7 security operations center (SOC) and a highly mature governance, risk, and compliance program. Mr. Costantino received an Executive Master of Business Administration from the Jack Welch Management Institute and a Bachelor of Science from the American Military University. He holds the Certified Information Systems Security Professional (CISSP), Certified Information Security Manager (CISM), and Certified Ethical Hacker (C|EH) designations.

*David Brosgol, General Counsel*

As the General Counsel, Mr. Brosgol is responsible for the legal and compliance functions of Voyager. He is a financial services professional with over 25 years of experience and has been deeply involved in crypto assets since 2017, when he was among the founders of Digital Asset Custody Company (DACC). DACC was a pioneer in the crypto asset space that sought to become industry standard for institutional custody of crypto assets. DACC was acquired by Bakkt (a subsidiary of the Intercontinental Exchange) in April 2019. In his role as General Counsel and Chief Compliance Officer at DACC, Mr. Brosgol was responsible for the management of the regulatory build, recruitment, and development of the management and operations team and preparation and advancement of service offerings and corresponding customer documentation. Since the sale, he has been an adviser and project manager to several companies in crypto asset financial services, notably Anchor Labs and BlockTower Capital. Earlier in his career, Mr. Brosgol held senior legal positions at asset managers and broker dealers, most recently as General Counsel of Maverick Capital and, prior to that, General Counsel and Managing Director of Solus Alternative Asset Management. Mr. Brosgol graduated Phi Beta Kappa and with Honors in Economics from Trinity College in Connecticut. He also holds an MA in Philosophy from University of Essex in Colchester, England, and a JD from the University of Virginia School of Law. Mr. Brosgol is admitted to the New York State Bar.

*Pam Kramer, Chief Marketing Officer*

As Chief Marketing Officer, Ms. Kramer oversees the brand, advertising, marketing, social media, customer insights and more. She is a Silicon Valley marketing and product veteran, with a career focused on working with leading innovators that go from nowhere to mainstream. Ms. Kramer spent nine years at E*TRADE, rising to become E*TRADE's Chief Product Officer and then Chief Marketing Officer. After E*TRADE, Ms. Kramer became CMO and General Manager of MarketTools/Zoomerang (now part of SurveyMonkey). She then moved on to become LendingClub's first CMO, creating their brand identity and building out their marketing operations. She then co-led a start up from 2012-2014 with an innovative video app called Lightt that predated Vine, Instagram video, and Snapchat. Most recently, Ms. Kramer focused on growing the leading premium podcast network, Cadence13, to over 1.5 billion downloads/year. She has an M.A. in East Asian Studies from Cornell University and a B.A. in English Literature and Political Science from the University at Buffalo. She currently serves on the boards of several non-profits, including the Bay Area Ridge Trail and is an advisor to Just Human Productions.

*Rakesh Gidwani, Chief Technology Officer*

As Chief Technology Officer, Rakesh leads the evolution of the Platform and systems as the Company continues its plans for international expansion. Previously, Rakesh served as Senior Vice President of Engineering at Two Sigma Investments, a technology and data-driven financial services company applying artificial intelligence, machine learning, and distributed computing to investing. He led the engineering strategy, planning, and technical program management for Two Sigma Investment Management. Rakesh has experience building and scaling high-calibre teams in hyper-growth environments. Over his career, he successfully led engineering teams to deliver eCommerce solutions,

high-performance trading systems, financial compliance and risk management systems, and customer-facing websites.

**Audit Committee**

The Audit Committee consists of individuals who are "financially literate" within the meaning of National Instrument 52-110 — *Audit Committees*. The Company's Audit Committee is comprised of Philip Eytan, Glenn Stevens and Jennifer Ackart. Glenn Stevens and Jennifer Ackart are "independent" within the meaning of National Instrument 52-110 — *Audit Committees*. Philip Eytan is not "independent" within the meaning of National Instrument 52-110 — *Audit Committees*. Each member of the Audit Committee has an understanding of the accounting principles used to prepare financial statements and varied experience as to the general application of such accounting principles, as well as an understanding of the internal controls and procedures necessary for financial reporting. For additional details regarding the relevant education and experience of each member of the Audit Committee, see the relevant biographical experiences for each member under the heading "Directors and Officers" in this AIF.

The Board has adopted a written charter for the Audit Committee which sets out the Audit Committee's role of providing oversight of the Company's financial management and of the design and implementation of an effective system of internal financial controls as well as to review and report to the Board on the integrity of the financial statements of the Company, its subsidiaries and associated companies. This includes helping directors meet their responsibilities, facilitating better communication between directors and the external auditor, enhancing the independence of the external auditor, increasing the credibility and objectivity of financial reports and strengthening the role of the directors by facilitating in-depth discussions among directors, management and the external auditor.

The mandate of the Audit Committee is set out in the written charter of the Audit Committee. A copy of the Audit Committee charter is included as Appendix "A" hereto.

*Reliance on Certain Exemptions*

At no time since the commencement of the Company's most recently completed financial year has the Company relied on the exemptions in Section 2.4 of National Instrument 52-110 — *Audit Committees* (*De Minimis Non-audit Services*) or an exemption from National Instrument 52-110 — *Audit Committees*, in whole or in part, granted under Part 8 of National Instrument 52-110 — *Audit Committees* (*Exemption*). As a venture issuer as at June 30, 2021, the Company relied on the exemption under section 6.1 of NI 52-110 — *Audit Committees*.

*Audit Committee Oversight*

At no time since the commencement of the Company's most recently completed financial year was a recommendation of the Audit Committee to nominate or compensate an external auditor not adopted by the Board.

*Pre-Approval Policies and Procedures*

The Audit Committee has adopted specific policies and procedures for the engagement of non-audit services as set out in the Audit Committee charter of the Company. The full text of the Company's Audit Committee charter is disclosed in Appendix "A" to this AIF.

*External Auditor Service Fees*

The aggregate fees recognized by the Company in each of the last two fiscal years for audit, tax and related accounting fees are as follows:

| Fiscal Year | Audit Fees | Audit-Related Fees[1] | Tax Fees[2] | All Other Fees[3] | Total |
|---|---|---|---|---|---|
| 2021 | $833.805 | nil | $98.138 | $175.703 | $1.107.646. |
| 2020 | $398696 | nil | nil | $185,389 | $584,085 |

Notes:

(1)    Fees charged for assurance and related services reasonably related to the performance of an audit, and not included under "Audit Fees".

(2)   Fees charged for tax compliance, tax advice and tax planning services.

(3)   Fees for services other than disclosed in any other column.

**Cease Trade Orders, Bankruptcies, Penalties or Sanctions**

*Cease Trade Orders or Bankruptcies*

Stephen Ehrlich was subject to a management cease trade order related to the Company's financial statements. The Company announced on October 30, 2019 that it had applied for and received a management cease trade order effective at the opening of October 30, 2019, in anticipation that the Company would not meet the filing deadline for its annual audited financial statements, management discussion and analysis and executive certificates for the fiscal year ended June 30, 2019. The management cease trade order affected only the Insiders of the Company, and remained in effect until December 29, 2019.

Other than as described above, to the knowledge of the Company, no director or executive officer of the Company is, or within 10 years prior to the date hereof has been, a director, chief executive officer or chief financial officer of any company (including the Company) that, (i) was subject to a cease trade order, an order similar to a cease trade order or an order that denied the relevant company access to any exemption under securities legislation, that was in effect for a period of more than 30 consecutive days, that was issued while the director or executive officer was acting in the capacity as director, chief executive officer or chief financial officer; or (ii) was subject to a cease trade order, an order similar to a cease trade order or an order that denied the relevant company access to any exemption under securities legislation, that was in effect for a period of more than 30 consecutive days, that was issued after the director or executive officer ceased to be a director, chief executive officer or chief financial officer and which resulted from an event that occurred while that person was acting in their capacity as director, chief executive officer or chief financial officer.

To the knowledge of the Company, no director or executive officer of the Company, or a Shareholder holding a sufficient number of securities of the Company to materially affect control of the Company, is, or within 10 years prior to the date hereof has been, a director or executive officer of any company (including the Company) that, while that person was acting in that capacity, or within a year of that person ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold its assets.

*Penalties or Sanctions*

To the knowledge of the Company, none of the directors, executive officers, or a Shareholder holding a sufficient number of securities of the Company to affect materially the control of the Company has been subject to any penalties or sanctions imposed by a court relating to securities legislation or by any securities regulatory authority or has entered into a settlement agreement with a securities regulatory authority; or has been subject to any other penalties or sanctions imposed by a court or regulatory body or self-regulatory authority that would be likely to be considered important to a reasonable investor making an investment decision.

*Personal Bankruptcies*

None of the directors, officers, Insiders or Promoters of the Company or a Shareholder holding a sufficient number of securities of the Company to affect materially the control of the Company is, or within the 10 years before the date of this AIF, has been declared bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, or has been subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold their assets.

**Conflicts of Interest**

There may from time to time be potential conflicts of interest to which some of the directors, officers, Insiders and Promoters of the Company will be subject in connection with the operations of the Company. Some of the individuals who are directors or officers of the Company are also directors and/or officers of other reporting and non-reporting issuers and may be shareholders of companies in which the Company makes strategic investments, and therefore it is

possible that a conflict may arise between their duties to the Company and their duties as a director or officer of such other companies, or their interests as shareholders of such investee companies. Conflicts, if any, will be subject to the procedures and remedies provided under applicable laws. In particular, in the event that such a conflict of interest arises at a meeting of the Company's directors, a director who has such a conflict will abstain from voting for or against the approval of such participation or such terms, unless otherwise permitted by applicable laws. In accordance with applicable laws, the directors of the Company are required to act honestly, in good faith and in the best interests of the Company.

Krisztián Tóth, a director of the Company, is a Partner at Fasken Martineau DuMoulin LLP, which acts as Canadian legal counsel to the Company. Brandi Reynolds, Chief Compliance Officer of the Company and is also the Managing Director of the Bates Group, LLC, which, in October 2021, acquired CorCom, LLC, a consulting company that was founded by Ms. Reynolds. Through Ms. Reynolds, the Bates Group, LLC provides a variety of day-to-day outsourced compliance support, regulatory state money transmitter license acquisition and maintenance support, compliance training programs and related consulting services to the Company. Although the Company is not currently aware of any, there may be circumstances in which such dual roles may place Mr. Toth or Ms. Reynolds into a conflict of interest.

Other than as disclosed above and otherwise in this AIF, to the best of the Company's knowledge, there are no known existing or potential conflicts of interest among the Company, its Promoters, directors and officers or other members of management of the Company or of any proposed Promoter, director, officer or other member of management as a result of their outside business interests.

## PROMOTERS

Stephen Ehrlich may be considered to be a Promoter of the Company. He beneficially holds 3,943,269 Shares (representing approximately 5.13% of the current issued and outstanding Shares), and 2,900,000 incentive stock options under the Stock Option Plan. The Company acquired VDH from Mr. Ehrlich in February 2019 (see under the heading "Interest of Management and Others in Material Transactions" below). No other assets have been acquired or are to be acquired by the Company from Mr. Ehrlich.

## INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS

Mr. Ehrlich, the Company's CEO, was the beneficial owner of all of the shares of VDH prior to the acquisition by the Company of VDH pursuant to the VDH SPA, as a result of his ownership and control of VHI (see "General Development of the Business - Three Year History" in this AIF). In consideration therefor, Mr. Ehrlich received the sum of $100, and received Shares in the capital of the Company upon it settling all of the VDH subscription receipts then outstanding.

Other than as disclosed above, no director or executive officer of the Company, or any person who has direct or indirect beneficial ownership of, or who exercises control or direction over, more than 10% of the Company's outstanding Shares, nor any associate or affiliate of any of such persons or companies, has had any interest in any transaction within the three years most recently completed financial years or during the current financial year, or in any proposed transaction, that has materially affected or will materially affect the Company.

## LEGAL PROCEEDINGS

As of the date of this AIF, to the knowledge of the Company, the Company is not a party to any material legal proceedings. No legal proceedings are contemplated by the Company, and the Company is not aware of any material legal proceedings being contemplated against it.

## AUDITORS, TRANSFER AGENT AND REGISTRAR

The auditors of the Company and its subsidiaries are Marcum LLP, Accountants, located at 750 Third Avenue, 11th Floor, New York, New York 10017.

The Company's register and transfer agent is Computershare, located at 510 Burrard Street, 3rd Floor, Vancouver, British Columbia V6C 3B9.

## MATERIAL CONTRACTS

Voyager has not entered into any material contracts, outside of the ordinary course of business, prior to the date hereof, other than the:

<div></div>

(a)     Stock Option Plan;

(b)     Escrow agreement dated January 31, 2019 among the Company, Computershare and various Shareholders regarding 4,763,484 Shares (as of the date of this AIF);

(c)     Account Services Agreement;

(d)     Agreement dated March 6, 2019 between, among others, the Company and Ethos, pursuant to which the Company acquired the Ethos IP, as amended on March 28, 2019, July 31, 2019 and September 30, 2019;

(e)     Definitive agreement dated January 29, 2020 between the Company and Circle Internet Financial, Inc., pursuant to which the Company acquired Circle Invest, the retail crypto asset business of Circle; and

(f)     Coinify SPA dated August 1, 2021 between the Company and Coinify ApS, pursuant to which the Company acquired 100% of the share capital of Coinify ApS.

## EXPERTS

**Names of Experts**

The following are persons or companies whose profession or business gives authority to a statement made in this AIF as having prepared or certified a part of that document or report described in this AIF:

Marcum LLP is the external auditor of the Company and reported on the Financial Statements, which are filed on SEDAR.

To the knowledge of management of the Company, as of the date hereof, no expert, nor any associate or affiliate of such person has any beneficial interest, direct or indirect, in the securities or property of the Company or of an associate or affiliate of any of them, and no such person is or is expected to be elected, appointed or employed as a director, officer or employee of the Company or of an associate or affiliate thereof.

**Interests of Experts**

There is no interest, direct or indirect, in any securities or property of Voyager, or of an associate or affiliate of Voyager, received or to be received by an expert.

## ADDITIONAL INFORMATION

Additional information relating to the Company, including financial information in the Financial Statements and MD&A, is available on SEDAR at www.sedar.com. Additional information, including directors' and officers' remuneration and indebtedness, the principal Shareholders, and securities authorized for issuance under equity compensation plans, if applicable, is contained in the Company's most recently filed management information circular available on SEDAR at www.sedar.com.

APPENDIX "A"

**AUDIT COMMITTEE CHARTER**

(*SEE ATTACHED*)

# VOYAGER DIGITAL LTD.
(the "Company")

## AUDIT COMMITTEE CHARTER

The Audit Committee (the "Committee") is a committee of the board of directors (the "Board") of the Company. The role of the Committee is to provide oversight of the Company's financial management and of the design and implementation of an effective system of internal financial controls as well as to review and report to the Board on the integrity of the financial statements of the Company, its subsidiaries and associated companies. This includes helping directors meet their responsibilities, facilitating better communication between directors and the external auditor, enhancing the independence of the external auditor, increasing the credibility and objectivity of financial reports and strengthening the role of the directors by facilitating in-depth discussions among directors, management and the external auditor.

Management is responsible for establishing and maintaining those controls, procedures and processes and the Committee is appointed by the Board to review and monitor them. The Company's external auditor is ultimately accountable to the Board and the Committee as representatives of the Company's shareholders.

**Duties and Responsibilities**

*External Auditor*

(a)     To recommend to the Board, for shareholder approval, an external auditor to examine the Company's accounts, controls and financial statements on the basis that the external auditor is accountable to the Board and the Committee as representatives of the shareholders of the Company.

(b)     To oversee the work of the external auditor engaged for the purpose of preparing or issuing an auditor's report or performing other audit, review or attest services for the Company, including the resolution of disagreements between management and the external auditor regarding financial reporting.

(c)     To evaluate the audit services provided by the external auditor, pre-approve all audit fees and recommend to the Board, if necessary, the replacement of the external auditor.

(d)     To pre-approve any non-audit services to be provided to the Company by the external auditor and the fees for those services.

(e)     To obtain and review, at least annually, a written report by the external auditor setting out the auditor's internal quality-control procedures, any material issues raised by the auditor's internal quality-control reviews and the steps taken to resolve those issues.

(f)     To review and approve the Company's hiring policies regarding partners, employees and former partners and employees of the present and former external auditor of the Company. The Committee has adopted the following guidelines regarding the hiring of any partner, employee, reviewing tax professional or other person providing audit assurance to the external auditor of the Company on any aspect of its certification of the Company's financial statements:

(i)     no member of the audit team that is auditing a business of the Company can be hired into that business or into a position to which that business reports for a period of three years after the audit;

(ii)     no former partner or employee of the external auditor may be made an officer of the Company or any of its subsidiaries for three years following the end of the individual's association with the external auditor;

(iii)     the Chief Financial Officer ("CFO") must approve all office hires from the external auditor; and

(iv)     the CFO must report annually to the Committee on any hires within these guidelines during the preceding year.

(g)     To review, at least annually, the relationships between the Company and the external auditor in order to establish the independence of the external auditor.

*Financial Information and Reporting*

(a)     To review the Company's annual audited financial statements with the Chief Executive Officer ("**CEO**") and CFO and then the full Board. The Committee will review the interim financial statements with the CEO and CFO.

(b)     To review and discuss with management and the external auditor, as appropriate:

(i)     the annual audited financial statements and the interim financial statements, including the accompanying management discussion and analysis; and

(ii)    earnings guidance and other releases containing information taken from the Company's financial statements prior to their release.

(c)     To review the quality and not just the acceptability of the Company's financial reporting and accounting standards and principles and any proposed material changes to them or their application.

(d)     To review with the CFO any earnings guidance to be issued by the Company and any news release containing financial information taken from the Company's financial statements prior to the release of the financial statements to the public. In addition, the CFO must review with the Committee the substance of any presentations to analysts or rating agencies that contain a change in strategy or outlook.

*Oversight*

(a)     To review the internal audit staff functions, including:

(i)     the purpose, authority and organizational reporting lines;

(ii)    the annual audit plan, budget and staffing; and

(iii)   the appointment and compensation of the controller, if any.

(b)     To review, with the CFO and others, as appropriate, the Company's internal system of audit controls and the results of internal audits.

(c)     To review and monitor the Company's major financial risks and risk management policies and the steps taken by management to mitigate those risks.

(d)     To meet at least annually with management (including the CFO), the internal audit staff, and the external auditor in separate executive sessions and review issues and matters of concern respecting audits and financial reporting.

(e)     In connection with its review of the annual audited financial statements and interim financial statements, the Committee will also review the process for the CEO and CFO certifications (if required by law or regulation) with respect to the financial statements and the Company's disclosure and internal controls, including any material deficiencies or changes in those controls.

**Membership**

(a)     The Committee shall consist solely of three or more members of the Board, the majority of which the Board has determined has no material relationship with the Company and is otherwise "unrelated" or "independent" as required under applicable securities rules or applicable stock exchange rules.

(b)     Any member may be removed from office or replaced at any time by the Board and shall cease to be a member upon ceasing to be a director. Each member of the Committee shall hold office until the close of the next annual meeting of shareholders of the Company or until the member ceases to be a director, resigns or is replaced, whichever first occurs.

(c)     The members of the Committee shall be entitled to receive such remuneration for acting as members of the Committee as the Board may from time to time determine.

(d)     All members of the Committee must be "financially literate" (i.e., have the ability to read and understand a set of financial statements such as a balance sheet, an income statement and a cash flow statement).

## Procedures

(a)     The Board shall appoint one of the directors elected to the Committee as the Chair of the Committee (the "**Chair**"). In the absence of the appointed Chair from any meeting of the Committee, the members shall elect a Chair from those in attendance to act as Chair of the meeting.

(b)     The Chair will appoint a secretary (the "**Secretary**") who will keep minutes of all meetings. The Secretary does not have to be a member of the Committee or a director and can be changed by simple notice from the Chair.

(c)     No business may be transacted by the Committee except at a meeting of its members at which a quorum of the Committee is present or by resolution in writing signed by all the members of the Committee. A majority of the members of the Committee shall constitute a quorum, provided that if the number of members of the Committee is an even number, one-half of the number of members plus one shall constitute a quorum, and provided that a majority of the members must be "independent" or "unrelated".

(d)     The Committee will meet as many times as is necessary to carry out its responsibilities.  Any member of the Committee or the external auditor may call meetings.

(e)     The time and place of the meetings of the Committee, the calling of meetings and the procedure in all respects of such meetings shall be determined by the Committee, unless otherwise provided for in the articles of the Company or otherwise determined by resolution of the Board.

(f)     The Committee shall have the resources and authority necessary to discharge its duties and responsibilities, including the authority to select, retain, terminate, and approve the fees and other retention terms (including termination) of special counsel, advisors or other experts or consultants, as it deems appropriate.

(g)     The Committee shall have access to any and all books and records of the Company necessary for the execution of the Committee's obligations and shall discuss with the CEO or the CFO such records and other matters considered appropriate.

(h)     The Committee has the authority to communicate directly with the internal and external auditors.

## Reports

(a)     The Committee shall produce the following reports and provide them to the Board:

(i)     an annual performance evaluation of the Committee, which evaluation must compare the performance of the Committee with the requirements of this Charter. The performance evaluation should also recommend to the Board any improvements to this Charter deemed necessary or desirable by the Committee.  The performance evaluation by the Committee shall be conducted in such manner as the Committee deems appropriate. The report to the Board may take the form of an oral report by the Chair or any other member of the Committee designated by the Committee to make this report.

(ii)    a summary of the actions taken at each Committee meeting, which shall be presented to the Board at the next Board meeting.

# Exhibit J

# Voyager Digital and Market Rebellion to Form Online Broker Platform for Equities, Options, and Futures Trading

CSE: VYGR
OTCQB: VYGVF
Borse Frankfurt: UCD2

*Registered Broker-Dealer to Provide Brokerage for Equities, Options, and Futures Trading Capabilities*

NEW YORK, May 5, 2021 /CNW/ - Voyager Digital Ltd. ("Voyager" or the "Company") (CSE: VYGR) (OTC: VYGVF) (FSE: UCD2), a publicly-traded holding company whose subsidiaries operate licensed crypto-asset trading and investing brokerages, and Market Rebellion, LLC, a leading provider of trading education, content and tools for independent investors, today announced an agreement to operate a new entity focused on providing online brokerage services for equities, options, and futures.

The new entity, operating through its wholly owned subsidiary VYGR Digital Securities, LLC (a FINRA registered broker-dealer) will execute equity trades on behalf of Voyager's US based crypto-asset licensed brokerage as Voyager brings crypto to equities trading to its customer base through its highly acclaimed platforms. Additionally, Market Rebellion will introduce its large active trading community to the new entity. The business expands on the existing relationship between the companies whereby Market Rebellion, an investor in Voyager, already introduces its crypto trading community to Voyager Digital, LLC.

"Since our beginning, Voyager has always envisioned bringing multiple trading and investing products to our platforms to allow our valuable customers the ability to participate in global markets," said Stephen Ehrlich, CEO and Co-Founder of Voyager. "The development of VYGR Digital Securities, LLC supports our shared vision of making all assets interchangeable. Through the Voyager App, consumers will be empowered to trade equities, and in the future, options and futures contracts, using cryptocurrencies as their base currency."

Jon Najarian, Market Rebellion Co-Founder, said, "Our mission is to empower the independent investors we serve with the best trading tools and insights available. This alliance with Voyager is doing just that - giving our members the ability to take advantage of the same cross-trading opportunities as Wall Street professionals."

The business, which is funded equally by both parties, will bring together, as co-founders, several well-known industry veterans who have been instrumental in shaping the online brokerage industry for the last decades. Said Dirk Mueller-Ingrand, Co-Founder of Market Rebellion, "By applying technologies, which haven't been utilized in this industry, the new brokerage platform will fundamentally change how millions of independent traders can take control of their own financial destiny."

Voyager and Market Rebellion will jointly operate the business and expect to scale the business aggressively. The transaction requires FINRA approval.

**About Voyager Digital Ltd.**
Voyager Digital Ltd. is a publicly traded holding company whose subsidiaries operate a crypto-asset platform that provides retail and institutional investors with a turnkey solution to trade crypto assets. The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace. Please visit us at https://www.investvoyager.com for more information.

**About Market Rebellion, LLC**
The co-founders of optionMONSTER and tradeMONSTER — Jon Najarian, Pete Najarian, and Dirk Mueller-Ingrand — launched Market Rebellion, LLC to challenge the status quo of trading and investing by sharing their extensive experience as professional traders to put independent traders on the same footing as large institutional investors for equities, options, cryptocurrencies and more. Drawing on their team's extensive experience as professional traders and analysts, Market Rebellion provides independent traders with trading ideas, education, content and tools — covering unusual options activity, technical and fundamental analysis, options theory and strategy, trading discipline, investor psychology and more — so that they can take control of their own financial destiny rather than having to rely on big institutions. More info at https://marketrebellion.com.

Neither the Canadian Securities Exchange nor its Market Regulator (as that term is defined in the policies of the Canadian Securities Exchange) accepts responsibility for the adequacy or accuracy of this release. No securities regulatory authority has either approved or disapproved of the contents of this press release.

**Forward Looking Statements**
Certain information in this press release, including, but not limited to, statements regarding future growth and performance of the business, momentum in the businesses, future adoption of digital assets, and the Company's anticipated results may constitute forward looking information (collectively, forward-looking statements), which can be identified by the use of terms such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," "continue" or "believe" (or the negatives) or other similar variations. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Voyager's actual results, performance or achievements to be materially different from any of its future results, performance or achievements expressed or implied by forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in this press release may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. Forward looking statements are subject to the risk that the global economy, industry, or the Company's businesses and investments do not perform as anticipated, that revenue or expenses estimates may not be met or may be materially less or more than those anticipated, that trading momentum does not continue or the demand for trading solutions declines, customer acquisition does not increase as planned, product and international expansion do not occur as planned, risks of compliance with laws and regulations that currently apply or become applicable to the business and those other risks contained in the Company's public filings, including in its Management Discussion and Analysis and its Annual Information Form (AIF). Factors that could cause actual results of the Company and its businesses to differ materially from those described in such forward-looking statements include, but are not limited to, a decline in the digital asset market or general economic conditions; changes in laws or approaches to regulation, the failure or delay in the adoption of digital assets and the blockchain ecosystem by institutions; changes in the volatility of crypto currency, changes in demand for Bitcoin and Ethereum, changes in the status or classification of cryptocurrency assets, cybersecurity breaches, a delay or failure in developing infrastructure for the trading businesses or achieving mandates and gaining traction; failure to grow assets under management, an adverse development with respect to an issuer or party to the transaction or failure to obtain a required regulatory approval. In connection with the forward-looking statements contained in this press release, the Company has made assumptions that no significant events occur outside of the Company's normal course of business and that current trends in respect of digital assets continue. Readers are cautioned that Assets Under Management and trading volumes fluctuate and may increase and decrease from time to time and that such fluctuations are beyond the Company's control. Forward-looking statements, past and present performance and trends are not guarantees of future performance, accordingly, you should not put undue reliance on forward-looking statements, current or past performance, or current or past trends. Information identifying assumptions, risks, and uncertainties relating to the Company are contained in its filings with the Canadian securities regulators available at www.sedar.com. The forward-looking statements in this press release are applicable only as of the date of this release or as of the date specified in the relevant forward-looking statement and the Company undertakes no obligation to update any forward-looking statement to reflect events or circumstances after that date or to reflect the occurrence of unanticipated events. The Company assumes no obligation to provide operational updates, except as required by law. If the Company does update one or more forward-looking statements, no inference should be drawn that it will make additional updates with respect to those or other forward-looking statements, unless

required by law. Readers are cautioned that past performance is not indicative of future performance and current trends in the business and demand for digital assets may not continue and readers should not put undue reliance on past performance and current trends. All figures are in U.S. dollars unless otherwise noted.

↪ View original content to download multimedia:
http://www.prnewswire.com/news-releases/voyager-digital-and-market-rebellion-to-form-online-broker-platform-for-equities-options-and-futures-trading-301284461

SOURCE Voyager Digital (Canada) Ltd.

↪ View original content to download multimedia: http://www.newswire.ca/en/releases/archive/May2021/05/c9212.html

%SEDAR: 00005648E

**For further information:** Voyager Digital Ltd. Contacts, Investor Relations: Michael Legg, (212) 547-8807, mlegg@investvoyager.com; Phil Carlson / Scott Eckstein, (212) 896-1233 / (212) 896-1210, pcarlson@kcsa.com / seckstein@kcsa.com; Media: Anthony Feldman / Raquel Cona, (617) 921-0984 / (212) 682-6300, afeldman@kcsa.com / rcona@kcsa.com; Angus Campbell, 44 7881 625098, angus@nominis.co; Market Rebellion, LLC Contacts, Media: Chris Tsiolis, (312) 332-7667, media@marketrebellion.com

CO: Voyager Digital (Canada) Ltd.

CNW 09:00e 05-MAY-21

# Exhibit K

# Voyager Digital Provides Business Update and March 2021 Metrics

CSE: VYGR
OTCQB: VYGVF
Borse Frankfurt: UCD2

*- Announces AUM Over US$2.4 Billion at March-End -*
*- Announces Over 1 Million Verified Users -*
*- Key Metrics Grew in Excess of 35% from February to March -*

NEW YORK, April 6, 2021 /CNW/ - Voyager Digital Ltd. ("Voyager" or the "Company") (CSE: VYGR) (OTCQB: VYGVF) (FRA: UCD2), a publicly-traded holding company, whose subsidiaries operate a licensed crypto-asset platform that provides investors with a turnkey solution to invest in and trade crypto assets, is pleased to provide stakeholders with a business update for the month ended March 31, 2021.

The Company has the following key metrics as of March 31, 2021:

- Assets Under Management (AUM) exceeded US$2.4 billion
- Total Funded Accounts at the end of March 2021 were over 270,000
- Total Verified Users on the platform were over 1 million

Key monthly operating metrics for January through March 2021 are as follows:

|  | March 2021 | February 2021 | January 2021 |
|---|---|---|---|
| Net Deposits | $650M | $400M | $170M |
| New Funded Accounts | 95,000 | 70,000 | 65,000 |
| New Verified Users | 395,000 | 190,000 | 250,000 |
| Principal Value traded | $2.5B | $1.6B | $840M |

*All figures are preliminary and unaudited and subject to final adjustment. All amounts are in U.S. dollars, unless otherwise indicated.*

"March was another record-setting month for Voyager as our retail-focused, zero-commission platform continued to attract an active community for both Bitcoin and our industry leading offering of over 50 altcoins," said Stephen Ehrlich, Co-Founder and CEO of Voyager. "All of our significant revenue-driving metrics increased in excess of 35% during the month of March from the previous month. As demand continues to accelerate for the Voyager Platform, we are enhancing our infrastructure to meet this swiftly growing demand and accommodate anticipated future growth as we expand our suite of offerings in the coming years."

Mr. Ehrlich concluded, "Our management team is focused on the long-term opportunity to capture significant market-share within this rapidly expanding industry. The initiatives we are embarking on, such as adding new products to our platform and further geographic expansion, are designed to competitively position Voyager for long-term success. We will continue to execute on these initiatives and look forward to providing our investors another update on our next quarterly conference call."

The Company also announced that going forward, it expects to provide updates for key operating metrics on a quarterly basis. Voyager believes this is consistent with industry best practices and will more closely align with the Company's long-term focus. The Company expects to provide its next financial and operational update to investors on its next quarterly conference call, expected to occur in late May.

Voyager continues to actively engage with investors and expects to participate in the following upcoming events in April 2021:

| 15-Apr | Global Chinese Financial Forum | Info |
|---|---|---|
| 21-Apr | Stifel Canada 2021 Cross Sector Insight Conference | Info |
| 22-Apr | SNN - Planet Microcap Showcase | Info |
| 27-Apr | H.C. Wainwright & Co. Cryptocurrency, Blockchain & FinTech Conference | Info |

Voyager remains committed to advancing its trusted, secure, and compliant platform to serve the needs of its loyal community by offering a broad selection of digital assets, with industry leading interest rates, on a simple to use app for trading and investing in cryptocurrencies. For more information and to view the latest company presentation about Voyager Digital, please visit https://www.investvoyager.com.

**About Voyager Digital Ltd.**
Voyager Digital Ltd. is a publicly traded holding company whose subsidiaries operate a crypto-asset platform that provides retail and institutional investors with a turnkey solution to trade crypto assets. The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace. Please visit us at https://www.investvoyager.com for more information.

Neither the Canadian Securities Exchange nor its Market Regulator (as that term is defined in the policies of the Canadian Securities Exchange) accepts responsibility for the adequacy or accuracy of this release. No securities regulatory authority

has either approved or disapproved of the contents of this press release.

**Other**

The links to the investor events above are provided for convenience only. Voyager makes no representation or warranty as to the content of such links or as to the suitability of such investor events for any particular investor. Voyager disclaims all responsibility and liability in respect of such investor events and the links provided herein (and the content contained therein) do not form part of this press release and do not form part of Voyager's public disclosure record.

**Forward Looking Statements**

Certain information in this press release, including, but not limited to, statements regarding future growth and performance of the business, momentum in the businesses, future adoption of digital assets, and the Company's anticipated results may constitute forward looking information (collectively, forward-looking statements), which can be identified by the use of terms such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," "continue" or "believe" (or the negatives) or other similar variations. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Voyager's actual results, performance or achievements to be materially different from any of its future results, performance or achievements expressed or implied by forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in this press release may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. Forward looking statements are subject to the risk that the global economy, industry, or the Company's businesses and investments do not perform as anticipated, that revenue or expenses estimates may not be met or may be materially less or more than those anticipated, that trading momentum does not continue or the demand for trading solutions declines, customer acquisition does not increase as planned, product and international expansion do not occur as planned, risks of compliance with laws and regulations that currently apply or become applicable to the business and those other risks contained in the Company's public filings, including in its Management Discussion and Analysis and its Annual Information Form (AIF). Factors that could cause actual results of the Company and its businesses to differ materially from those described in such forward-looking statements include, but are not limited to, a decline in the digital asset market or general economic conditions; changes in laws or approaches to regulation, the failure or delay in the adoption of digital assets and the blockchain ecosystem by institutions; changes in the volatility of crypto currency, changes in demand for Bitcoin and Ethereum, changes in the status or classification of cryptocurrency assets, cybersecurity breaches, a delay or failure in developing infrastructure for the trading businesses or achieving mandates and gaining traction; failure to grow assets under management, an adverse development with respect to an issuer or party to the transaction or failure to obtain a required regulatory approval. In connection with the forward-looking statements contained in this press release, the Company has made assumptions that no significant events occur outside of the Company's normal course of business and that current trends in respect of digital assets continue. Readers are cautioned that Assets Under Management and trading volumes fluctuate and may increase and decrease from time to time and that such fluctuations are beyond the Company's control. Forward-looking statements, past and present performance and trends are not guarantees of future performance, accordingly, you should not put undue reliance on forward-looking statements, current or past performance, or current or past trends. Information identifying assumptions, risks, and uncertainties relating to the Company are contained in its filings with the Canadian securities regulators available at www.sedar.com. The forward-looking statements in this press release are applicable only as of the date of this release or as of the date specified in the relevant forward-looking statement and the Company undertakes no obligation to update any forward-looking statement to reflect events or circumstances after that date or to reflect the occurrence of unanticipated events. The Company assumes no obligation to provide operational updates, except as required by law. If the Company does update one or more forward-looking statements, no inference should be drawn that it will make additional updates with respect to those or other forward-looking statements, unless required by law. Readers are cautioned that past performance is not indicative of future performance and current trends in the business and demand for digital assets may not continue and readers should not put undue reliance on past performance and current trends. All figures are in U.S. dollars unless otherwise noted.

View original content to download multimedia:
http://www.prnewswire.com/news-releases/voyager-digital-provides-business-update-and-march-2021-metrics-301262690.html

SOURCE Voyager Digital (Canada) Ltd.


View original content to download multimedia: http://www.newswire.ca/en/releases/archive/April2021/06/c8023.html

%SEDAR: 00005648E

**For further information:** Voyager Digital Ltd. Contacts: Investor Relations: Michael Legg, (212) 547-8807, mlegg@investvoyager.com; Phil Carlson / Scott Eckstein, (212) 896-1233 / (212) 896-1210, pcarlson@kcsa.com / seckstein@kcsa.com; Media: Anthony Feldman / Raquel Cona, (617) 921-0984 / (212) 682-6300, afeldman@kcsa.com / rcona@kcsa.com; Angus Campbell, 44 7881 625098, angus@nominis.co

CO: Voyager Digital (Canada) Ltd.

CNW 08:00e 06-APR-21

# Exhibit L

**VOYAGER**

# Voyager Digital Provides Business Update for April

*Funded Accounts and Principal Value Traded Grow Significantly Over Previous Month*

*Assets Under Management Exceed US$3.3 Billion*

CSE: VYGR
OTCQB: VYGVF
Borse Frankfurt: UCD2

NEW YORK, May 3, 2021 /CNW/ - Voyager Digital Ltd. ("Voyager" or the "Company") (CSE: VYGR) (OTCQB: VYGVF) (FRA: UCD2), a publicly-traded holding company, whose subsidiaries operate a licensed crypto-asset platform that provides investors with a turnkey solution to invest in and trade crypto assets, is pleased to provide stakeholders with a business update for the month ended April 30, 2021.

"For April we continued our 2021 monthly trend of very strong account and principal value traded growth as Voyager onboarded new users at a record rate with over 130,000 new funded accounts added to the platform. The Voyager model has always been about offering the widest range of coins for retail consumers and consistent with that, we have seen increased trading volume in the alternative coins. To continue the trend, the Company plans on adding additional coins over the next 60 days as the increased alternative coin volume has driven an increase of over 45% in average basis points earned per trade," said Steve Ehrlich, CEO and Co-founder. "We continue to scale our infrastructure with a 2021 goal to accommodate 10 million users.  We have made significant increases in technology and support staff as we strive to provide retail investors with the most trusted, secure and user-friendly platform for investing and trading the largest selection of digital assets."

## About Voyager Digital Ltd.
Voyager Digital Ltd. is a publicly traded holding company whose subsidiaries operate a crypto-asset platform that provides retail and institutional investors with a turnkey solution to trade crypto assets. The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace. Please visit us at https://www.investvoyager.com for more information.

Neither the Canadian Securities Exchange nor its Market Regulator (as that term is defined in the policies of the Canadian Securities Exchange) accepts responsibility for the adequacy or accuracy of this release. No securities regulatory authority has either approved or disapproved of the contents of this press release.

## Forward Looking Statements
Certain information in this press release, including, but not limited to, statements regarding future growth and performance of the business, momentum in the businesses, future adoption of digital assets, and the Company's anticipated results may constitute forward looking information (collectively, forward-looking statements), which can be identified by the use of terms such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," "continue" or "believe" (or the negatives) or other similar variations. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Voyager's actual results, performance or achievements to be materially different from any of its future results, performance or achievements expressed or implied by forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in this press release may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. Forward looking statements are subject to the risk that the global economy, industry, or the Company's

businesses and investments do not perform as anticipated, that revenue or expenses estimates may not be met or may be materially less or more than those anticipated, that trading momentum does not continue or the demand for trading solutions declines, customer acquisition does not increase as planned, product and international expansion do not occur as planned, risks of compliance with laws and regulations that currently apply or become applicable to the business and those other risks contained in the Company's public filings, including in its Management Discussion and Analysis and its Annual Information Form (AIF). Factors that could cause actual results of the Company and its businesses to differ materially from those described in such forward-looking statements include, but are not limited to, a decline in the digital asset market or general economic conditions; changes in laws or approaches to regulation, the failure or delay in the adoption of digital assets and the blockchain ecosystem by institutions; changes in the volatility of crypto currency, changes in demand for Bitcoin and Ethereum, changes in the status or classification of cryptocurrency assets, cybersecurity breaches, a delay or failure in developing infrastructure for the trading businesses or achieving mandates and gaining traction; failure to grow assets under management, an adverse development with respect to an issuer or party to the transaction or failure to obtain a required regulatory approval. In connection with the forward-looking statements contained in this press release, the Company has made assumptions that no significant events occur outside of the Company's normal course of business and that current trends in respect of digital assets continue. Readers are cautioned that Assets Under Management and trading volumes fluctuate and may increase and decrease from time to time and that such fluctuations are beyond the Company's control. Forward-looking statements, past and present performance and trends are not guarantees of future performance, accordingly, you should not put undue reliance on forward-looking statements, current or past performance, or current or past trends. Information identifying assumptions, risks, and uncertainties relating to the Company are contained in its filings with the Canadian securities regulators available at www.sedar.com. The forward-looking statements in this press release are applicable only as of the date of this release or as of the date specified in the relevant forward-looking statement and the Company undertakes no obligation to update any forward-looking statement to reflect events or circumstances after that date or to reflect the occurrence of unanticipated events. The Company assumes no obligation to provide operational updates, except as required by law. If the Company does update one or more forward-looking statements, no inference should be drawn that it will make additional updates with respect to those or other forward-looking statements, unless required by law. Readers are cautioned that past performance is not indicative of future performance and current trends in the business and demand for digital assets may not continue and readers should not put undue reliance on past performance and current trends. All figures are in U.S. dollars unless otherwise noted.

View original content to download multimedia:
http://www.prnewswire.com/news-releases/voyager-digital-provides-business-update-for-april-301282010.html

SOURCE Voyager Digital (Canada) Ltd.

View original content to download multimedia:
http://www.newswire.ca/en/releases/archive/May2021/03/c8796.html

%SEDAR: 00005648E

**For further information:** Voyager Digital Ltd. Contacts: Investor Relations: Michael Legg, (212) 547-8807, mlegg@investvoyager.com; Phil Carlson / Scott Eckstein, (212) 896-1233 / (212) 896-1210, pcarlson@kcsa.com / seckstein@kcsa.com; Media: Anthony Feldman / Raquel Cona, (617) 921-0984 / (212) 682-6300, afeldman@kcsa.com / rcona@kcsa.com; Angus Campbell, 44 7881 625098, angus@nominis.co

CO: Voyager Digital (Canada) Ltd.

CNW 08:00e 03-MAY-21

# Exhibit M

# VOYAGER

## VOYAGER DIGITAL LTD.

**(formerly VOYAGER DIGITAL (CANADA) LTD.)**

## MANAGEMENT'S DISCUSSION AND ANALYSIS

## FOR THE THREE AND NINE MONTHS
## ENDED MARCH 31, 2021

## DATED: May 25, 2021

## Introduction

The following Management's Discussion & Analysis ("MD&A") of the financial condition and results of the operations of Voyager Digital Ltd. (formerly Voyager Digital (Canada) Ltd.) (the "Company" or "Voyager") constitutes management's review of the factors that affected the Company's financial and operating performance for the three and nine months ended March 31, 2021.

This MD&A has been prepared in compliance with the requirements of Form 51-102F1, in accordance with National Instrument 51-102 – *Continuous Disclosure Obligations*. This MD&A should be read in conjunction with the unaudited interim consolidated financial statements for the three and nine months ended March 31, 2021 and the audited annual consolidated financial statements of the Company for the fiscal years ended June 30, 2020, and June 30, 2019, together with the notes thereto. Results are reported in United States dollars unless otherwise noted. In the opinion of management, all adjustments (which consist only of normal recurring adjustments) considered necessary for a fair presentation have been included. The results for the three and nine months ended March 31, 2021, are not necessarily indicative of the results that may be expected for any future period. Information contained herein is presented as of May 25, 2021, unless otherwise indicated.

The consolidated financial statements have been prepared using accounting policies consistent with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board and interpretations of the IFRS Interpretations Committee. This MD&A contains forward-looking statements that involve risks, uncertainties and assumptions, including statements regarding anticipated developments in future financial periods and our future plans and objectives. There can be no assurance that such information will prove to be accurate, and readers are cautioned not to place undue reliance on such forward-looking statements. See "Caution Regarding Forward-Looking Statements".

For the purposes of preparing this MD&A, management, in conjunction with the Board of Directors, considers the materiality of information. Information is considered material if: (i) such information results in, or would reasonably be expected to result in, a significant change in the market price or value of Voyager's common shares; or (ii) there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision; or (iii) it would significantly alter the total mix of information available to investors. Management, in conjunction with the Board of Directors, evaluates materiality with reference to all relevant circumstances, including potential market sensitivity.

## Caution Regarding Forward-Looking Statements

This MD&A contains certain forward-looking information and forward-looking statements, as defined in applicable securities laws (collectively referred to herein as "forward-looking statements"). These statements relate to future events or the Company's future performance. All statements other than statements of historical fact are forward-looking statements. Often, but not always, forward-looking statements can be identified by the use of words such as "plans," "expects," "is expected," "budget," "scheduled," "estimates", "continues", "forecasts", "projects", "predicts", "intends", "anticipates" or "believes", or variations of, or the negatives of, such words and phrases, or state that certain actions, events or results "may," "could," "would," "should," "might" or "will" be taken, occur or be achieved. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results to differ materially from those anticipated in such forward-looking statements. The forward-looking statements in this MD&A speak only as of the date of this MD&A or as of the date specified in such statement. These forward-looking statements may include, but are not limited to, statements relating to:

- Our expectations regarding our revenue, expenses, operations and future operational and financial performance;
- Our cash flows;

- Popularity of cryptocurrencies;
- Our plans for and timing of geographic expansion or new offerings;
- Our future growth plans;
- Our ability to stay in compliance with laws and regulations that currently apply or become applicable to our business both in the United States and internationally;
- Trends in operating expenses, including technology and development expenses, sales and marketing expenses, and general and administrative expenses, and expectations regarding these expenses as a percentage of revenue;
- The reliability, stability, performance and scalability of our infrastructure and technology;
- Our ability to attract new customers and maintain or develop existing customers;
- Our ability to attract and retain personnel;
- Our expectations with respect to advancement in our technologies;
- Our competitive position and our expectations regarding competition;
- Regulatory developments and the regulatory environments in which we operate; and
- Expected impact of COVID-19 on the Company's future operations and performance.

Forward-looking statements are based on certain assumptions and analysis made by us in light of our experience and perception of historical trends, current conditions and expected future developments and other factors we believe are appropriate. Forward-looking statements are also subject to risks and uncertainties which include:

- Decline in the cryptocurrency market or general economic conditions;
- Risks related to managing our growth;
- Our dependence on customer growth, including new customers and growth in the number and value of transactions and deposits;
- Our operating results have and will significantly fluctuate due to the highly volatile nature of crypto;
- A significant portion of our revenue is derived from transactions in Bitcoin and Ethereum. If demand for these crypto assets declines and is not replaced by new crypto asset demand, our business, operating results, and financial condition could be adversely affected;
- The future development and growth of crypto is subject to a variety of factors that are difficult to predict and evaluate. If crypto does not grow as we expect, our business, operating results, and financial condition could be adversely affected;
- We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition;
- A particular crypto asset's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty and if we are unable to properly characterize a crypto asset, we may be subject to regulatory scrutiny, investigations, fines, and other penalties, and our business, operating results, and financial condition may be adversely affected;
- Loss of a critical banking or insurance relationship could adversely impact our business, operating results, and financial condition;
- Any significant disruption in our products and services, in our information technology systems, or in any of the blockchain networks we support, could result in a loss of customers or funds and adversely impact our brand and reputation and business, operating results, and financial condition;
- Regulatory risk, including changes in laws or the interpretation or application thereof and the obtaining of regulatory approvals;
- Counterparty risk and Credit risk;
- Lending risks;
- Technology and infrastructure risks, including their ability to meet surges in demand;
- Cybersecurity risks;
- Fluctuations in quarterly operating results;
- Risks related to the security of customer information;
- Competition in our industry and markets;

- Our reliance on key personnel;
- Our reliance on third party service providers;
- Exchange rate fluctuations;
- Risks related to expanding our marketing and sales;
- Risks related to our ability to adapt to rapid technological change;
- Risks related to terrorism, geopolitical crisis, or widespread outbreak of an illness or other health issue;
- Risks associated with acquisitions and the integration of the acquired businesses; and
- Risks related to international expansion.

Inherent in forward-looking statements are risks, uncertainties and other factors beyond Voyager's ability to predict or control. Readers are cautioned that the above does not contain an exhaustive list of the factors or assumptions that may affect the forward-looking statements and that the assumptions underlying such statements may prove to be incorrect. Actual results and developments are likely to differ, and may differ materially, from those expressed or implied by the forward-looking statements contained in this MD&A. Readers should refer to those risk factors referenced in the "Risks and Uncertainties" section below.

Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Voyager's actual results, performance or achievements to be materially different from any of its future results, performance or achievements expressed or implied by forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in this document may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. All forward-looking statements herein are qualified by this cautionary statement. Accordingly, readers should not place undue reliance on forward-looking statements. Readers are cautioned that past performance is not indicative of future performance and current trends in the business and demand for digital assets may not continue and readers should not put undue reliance on past performance and current trends. The Company undertakes no obligation to update publicly or otherwise revise any forward-looking statements whether as a result of new information or future events or otherwise, except as may be required by law. If the Company does update one or more forward-looking statements, no inference should be drawn that it will make additional updates with respect to those or other forward-looking statements, unless required by law.

## Description of Business

The Company operates in a regulated environment, and through its Voyager Platform (the "Platform") offers investors, developers and platform providers a fully functional suite of APIs and mobile apps to allow anyone who is legally able to do so the ability to trade, invest, earn and secure digital assets across multiple types of digital assets.

The Company wholly owns HTC Trading, Inc (HTC), a Cayman Island company and Voyager Digital Holdings, Inc. (VDH), a Delaware corporation, which in turn wholly owns each of Voyager Digital, LLC. (VDL), a Delaware limited liability corporation, Voyager IP, LLC (VIP), a Delaware limited liability corporation and VYGR Holding, LLC, a Delaware limited liability corporation which in turn wholly owns VYGR Digital Securities, LLC, a California limited liability corporation. The Company also wholly owns Voyager Digital Brokerage Ltd. and Voyager Digital Brokerage Canada Ltd., both companies having been incorporated under the laws of Canada. The Company also owns LGO SAS and LGO Europe SAS, both companies are incorporated under the laws of France.

The registered office of the Company is Suite 2900 – 550 Burrard Street, Vancouver, BC, V7X 1J5, Canada; and its head office is 33 Irving Place, 3rd Floor, New York, New York 10003.

The Company has two unique distribution models, direct to consumer and business-to-business driven by corporate partners which allow Voyager to reach millions of customers at very low customer acquisition costs.

VDL acts as a "crypto broker," being a digital agent broker that facilitates users buying and selling of cryptocurrencies delivering deep pools of liquidity. It also offers a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors. Some of the services offered by VDL include:

- users can open an account in three minutes or less.  VDL utilizes third party service providers for know-your-client and anti-money-laundering checks to ensure fast and secure account openings;

- users are able to trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies;

- execution of trade orders across a spectrum of exchanges to give Voyager the deepest pool of liquidity;

- minimizing transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing VDL's patented smart router technology;

- providing users with data in order for them to manage and track their crypto investments, including delivering news, social feeds and real-time alerts to keep users connected to the market, and providing portfolio tools to track performance, balances and transactions; and

- storing crypto assets in a secure wallet and in a "cold" facility, with 24/7 security. (fiat currency is stored at custodial banks).

VDL has registered as a Money Services Business (MSB) pursuant to the *Bank Secrecy Act* regulations as administered by the Financial Crimes Enforcement Network (FinCEN). VDH entered in the Account Services Agreement with Metropolitan Commercial Bank (the "Bank"), whereby the Bank provides deposit and payment systems for VDL's customers using a custodial "for the benefit of" account. The Bank is (i) a New York registered bank, overseen by the New York State Department of Financial Services and is (ii) listed on the New York Stock Exchange (symbol: MCB).

On December 10, 2020, the Company acquired the issued and outstanding share capital of LGO SAS, an Autorité des marchés financiers ("AMF") regulated entity based in France, and LGO Europe SAS, in exchange for 200,000 shares of the Company's common stock, to be issued in stages in accordance with the terms of the escrow agreement. In addition, the sellers are entitled to 1,000,000 shares of the Company's common stock after one-year, contingent upon the AMF's approval of the license application.

Voyager's common shares are currently listed for trading on the Canadian Securities Exchange ("CSE") under the symbol "VYGR". It was previously listed on the TSX Venture Exchange, but moved to the CSE on September 23, 2019. The Company's common shares are also traded on the OTCQB under the symbol "VYGVF" and on the Borse in Frankfurt under the symbol "UCD2".

## Quarterly Highlights and Results

|  | March 31, 2021 | June 30, 2020 |
|---|---|---|
| Cash and Cash Equivalents | $ 72,583,687 | $ 3,628,861 |
| Cash held for customers | 77,746,750 | 1,581,132 |
| Current Assets | 2,684,093,600 | 37,853,282 |
| Current Liabilities | 2,585,269,357 | 37,604,941 |
| Working Capital | 98,824,243 | 248,341 |
| Adjusted Working Capital (1) | 197,060,014 | 2,445,343 |
| Warrant Liability | 98,235,771 | 2,197,002 |
| Shareholder's Equity | 98,282,944 | 550,962 |

(1) Adjusted Working Capital defined as Working Capital excluding Warrant Liability, which represents a non-cash fair value measured liability.

- As of March 31, 2021, the Company had total cash and cash equivalents, including cash held for customers of $150.3 million, an increase of $145.1 million from June 30, 2020.

- Total Current Assets increased to $2.7 billion, primarily a result of $2.4 billion increase in digital currencies and fiat and digital currencies and fiat on loan.

- Adjusted Working Capital increased $194.6 million primarily due to $145.1 million from the issuance of common stock and special warrants, $5.4 million from the exercise of warrants, and a $57.0 million increase in net digital currencies and fiat position, which represents digital currencies and fiat, as well as, digital currencies and fiat on loan, less digital currency loan payable.

|  | 3 months ended | | 9 months ended | |
|---|---|---|---|---|
|  | 3/31/21 | 3/31/20 | 3/31/21 | 3/31/20 |
| **Revenue** |  |  |  |  |
| Fees | $53,735,624 | $214,826 | $57,417,441 | $362,863 |
| Interest Revenue | 6,701,777 | 67,252 | 8,589,995 | 79,591 |
| **Total Revenue** | **60,437,401** | **282,078** | **66,007,436** | **442,454** |
| **Operating Expenses** |  |  |  |  |
| G&A | 28,747,942 | 1,611,967 | 38,490,223 | 5,299,469 |
| Product Development | 1,638,555 | 454,476 | 2,870,842 | 2,131,435 |
| Total Operating Expenses | (30,386,497) | (2,066,443) | (41,361,065) | (7,430,904) |
| Operating Income | 30,050,904 | (1,784,365) | 24,646,371 | (6,988,450) |
| Total Other Income/ (Loss) | (98,613,531) | 85,816 | (106,180,455) | 1,791,490 |
| **Net and comprehensive loss** | **($68,562,627)** | **($1,698,549)** | **($81,534,084)** | **($5,196,960)** |

|  | 3 months ended | | 9 months ended | |
|---|---|---|---|---|
| **Key Stats** | 3/31/21 | 3/31/20 | 3/31/21 | 3/31/20 |
| Principal Traded Volume | $5,008,728,395 | $57,743,091 | $5,566,297,843 | $85,292,383 |
| Net Deposits | 1,258,565,122 | 7,445,054 | $1,377,688,766 | $14,590,582 |
| Funded Accounts | 274,165 | 11,264 | 274,165 | 11,264 |
| Verified Accounts | 1,007,641 | 78,032 | 1,007,641 | 78,032 |
| Trades | 5,829,201 | 82,802 | 6,639,653 | 127,132 |

Total Other Income / (Loss) includes: (a) $13.0 million and $18.4 million of gains on digital asset exchange for the three and nine months ended March 31, 2021, respectively and $0.2 million and $0.4 million of losses of digital asset exchange for the three and nine months ended March 31, 2020; (b) $19.0 million and $29.6 million increase in change of fair value of investment for both the three and nine months ended March 31, 2021, respectively; (c) ($29.8) million and ($36.1) million for change in fair value of digital currency loan payable for both the three and nine months ended March 31, 2021, respectively; and (d) ($99.0 million) and ($116.1 million) for change in fair value of warrant liability for the three and nine months ended March 31, 2021, and ($0.4) and ($0.2) million for the three and nine months ended March 31, 2020, respectively.

## Outlook and Overall Performance

**Revenue**. Total revenue for the three months ended March 31, 2021, was $60.4 million, an increase of $60.2 compared to the same period in 2020. The increase was due to a $53.5 million increase in Fees and $6.6 million increase in interest revenue. Total revenue for the nine months ended March 31, 2021 was $66.0 million, an increase of $65.6 million. The increase was due to a $57.1million increase in Fees and $8.5 million increase in interest revenue.

*Fee Revenue*

Fee revenue for the three and nine months ended March 31, 2021 was $53.7 million and $57.4, an increase of $53.5 and $57.1 compared to the same periods in 2020. The increase in the three months ended March

31, 2021 compared to the three months ended March 31, 2020 was primarily due to an increase of $5.0 billion in trade volumes, and an increase in average spread of 70.1 bps. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31, 2020 was primarily due to an increase of $5.5 billion in trade volumes, and an increase in average spread of 60.6 bps.

*Interest income from custodians*

Interest revenue from custodians for the three and nine months ended March 31, 2021 was $6.7 million and $8.6 million. The increase in the both the three and nine months ended March 31, 2021 compared to the three and nine months ended March 31, 2020 was due to an increase in overall AUM to $2.45 billion from $230 million at December 31, 2020 and $35 million at June 30, 2020, as well as an increase in the overall number of coins earning interest.

**Operating expenses.** Total operating expenses for the three months and nine months ended March 31, 2021, were $30.4 million and $41.4 million, an increase of $28.3 million and $33.9, respectively. The increase in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 was due to an increase in $27.1 million general and administrative expenses and $1.2 million in product development. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31, 2020 was due to a $33.2 million increase in general and administrative expenses and a $0.7 million increase in product development.

*General and administrative expenses*

General and administrative expenses increased by $27.1 million and $33.2 million for the three and nine months ended March 31, 2021 to $28.7 million and $38.5 million, respectively. This increase is primarily due to increased marketing costs, interest paid to customers, headcount, customer onboarding costs, , and underlying infrastructure.

*Product and development expenses*

Product and development expenses increased by 261% and 35% for the three and nine months ended March 31, 2021 to $1.6 million and $2.9 million, respectively. The increase for the three and nine months ended March 31, 2021 is due to increase in development headcount.


Over the next few years, the Company plans on pursuing the below products in order to expand the Company's market opportunity:

- Debit Cards
- Credit Cards
- Desktop (in Beta)
- Loan Programs
- Asset Management and Basket Trading
- Crypto to Stock Trading
- Insurance and Wealth Creation Products

Voyager is focused on the delivery of wealth creation products using digital assets and the blockchain to allow customers to establish and control their own financial freedom.

## Significant Milestones since December 31, 2020-

Since December 31, 2020, the Company has been very active in adding customer facing products, raising capital to enhance the liquidity of the Company, creating value-added partnerships and building the management team to position the Company for expansion.

### Exchange Listings

The Company is listed on the Canadian Securities Exchange, on the Borse in Frankfurt, and also on the OTCQB market. The Company continuously reviews its exchange listings to evaluate what markets can bring additional exposure to the business.

### Capital Raising

Through the date of this MD&A the Company was able to raise significant capital.

In January 2021, the Company closed on a private placement offering of 8,363,637 shares of common stock for gross proceeds of approximately $46.0 million. In exchange for their services, the agent for the offering received a 7% cash commission and compensation warrants entitled it to purchase 585,455 shares of common stock, at a price of $5.50 per share for a period of 18 months following the closing of the offering.

In February 2021, the Company closed on a private placement offering of 7,633,588 shares of common stock for gross proceeds of approximately $100.0 million. In exchange for their services, the agent for the offering received a 7% cash commission.

### Marketing

In March 2021, Voyager announced an interest rate hike campaign, "March Interest Mania", allowing customers to earn increased APRs on a select offering of coins. The Company also announced the purchase of a suite at the Oakland A's Coliseum for the 2021 season, becoming the first purchase of a ticket offering in cryptocurrency in Major League Baseball.

### Subsequent events

In April 2021, the Company recently announced the following partnerships:

- Partnered with Blockdaemon, a leading blockchain node infrastructure platform with enterprise-grade security and monitoring, to integrate validator nodes on Ethereum, Polkadot and Tezos on the Voyager Platform, with plans to expand the offering to include more digital assets later this year.
- Formed a joint venture with Market Rebellion, a leading provider of trading education, content and tools for independent investors, to operate a new entity focused on providing online brokerage services for equities, options, and futures.
- Pursuing a partnership with Lottery.com, an online platform that provides users with a safe and secure platform to play official lottery games from their mobile phones, through a Memorandum of Understanding pursuant to which both parties will work together towards enabling Lottery.com users to generate payment transactions using the Voyager platform.

## Presenting at Various Conferences

The Company attended and presented at various conferences, including the SNN Network Canada Virtual Conference and the Noble Capital Markets Seventeenth Annual Small & Microcap Investor Conference in January. In February, the Company presented at Adelaide Capital's Crypto Day, the A.G.P. Emerging Growth Technology Conference, KBW's Virtual Panel: The Rise of Retail Crypto Investing and Trading, the Diamond Equity Emerging Growth Invitational, and the Singular Research Alpha Leaders Conference. In March, the Company presented at the Sidoti Spring 2021 Virtual Conference, the Q1 Virtual Investor Summit, and the Lytham Partners Spring 2021 Investor Conference. In April, the Company presented at the Global Chinese Financial Forum, H.C. Wainwright & Co.'s Cryptocurrency, Blockchain & FinTech Conference, the Stifel Canada 2021 Cross Sector Insight Conference, the SNN Network Canada Virtual Event, and the Forbes Crypto Webinar. The Company is scheduled to present at CoinDesk's Consensus 2021 in May, as well as the following in June: the 18th Annual Craig-Hallum Institutional Investor Conference, Oppenheimer's Digital Assets Day, 2021 LD Micro Invitational XI, the Piper Sandler Global Exchange and FinTech Conference, the Lytham Partners Summer 2021 Investor Conference, RBC Capital Markets FinTech Conference, and Compass Point's Crypto Conference.

## Management Team Expansion

As Voyager continues to grow, the Company continues to add industry leading executives to the day-to-day management team. As of the date of this MD&A, the management team now includes:

Stephen Ehrlich, Chief Executive Officer
Gerard Hanshe, Chief Operating Officer
Janice Barrilleaux, Chief Administrative Officer
Evan Psaropoulos, Chief Financial Officer
Michael Legg, Chief Communications Officer
Lewis Bateman, Chief International Officer
Dan Costantino, Chief Information Security Officer
David Brosgol, General Counsel
Akbar Ladhani, Chief Global Data Officer
Pam Kramer, Chief Marketing Officer

## FUTURE MILESTONES

The Company expects to accomplish the following in the next 12 months:

- add additional liquidity providers and exchanges to increase the depth of liquidity;

- expand the business into the European and Canadian marketplaces;

- continue to develop, refine and expand the functionality of the Platform, including but not limited to bank accounts, basket trades, debit cards, margin trading and stock transactions;

- engage in strategic acquisitions and ventures whereby the Company increases its customer base, products and addressable market; and

- obtain New York State Bit License.

9

## Trends

In the cryptocurrency industry, there exist multiple exchanges offering online trading and wallets and multiple online/mobile players providing components of the cryptocurrency ecosystem. The largest US exchanges are Coinbase, Kraken, Gemini and Binance (US). Their models offer platforms that only send trades singularly to their wholly owned exchange with little or no information available on the platform. VDH differs from the exchanges as it delivers a mobile friendly experience with an ease of use that is unmatched by the exchanges. Additionally, exchanges focus on Institutional volume and not the retail consumer and experience.  Voyager's agency brokerage platform searches multiple exchanges for best execution.

The competitive landscape also includes traditional payment and online brokers such as Robinhood, Sofi Invest, Square, and most recently Paypal, which announced a basic cryptocurrency offering. The Company has a competitive advantage versus the traditional players as the Company delivers 50+ coins while the traditional players offer ten or less, interest on 24 coins where the traditional players offer no interest, and the Company offers customers the ability to transfer coins to their own wallet which the traditional players do not offer.

**Trading of Cryptocurrencies**

The demand for cryptocurrencies has increased over the past year as cryptocurrencies have become more widely accepted. Customers expect to be able to utilize more efficient and better infrastructures to support the trading of cryptocurrencies. Voyager's platform solves many of the problems facing people or institutions that trade cryptocurrencies, including that:

- the market is highly fragmented, with more than 200 exchanges facilitating trading of cryptocurrencies;

- there is no centralized place or service in which to trade, which means that users often have to open accounts with multiple exchanges in order to make the trades they desire on coins they desire; and

- many of the top tier retail customer exchanges lack a cost-effective fiat on-ramp and off-ramp for customers to turn dollars into digital assets via a secure banking provider.

Customers are demanding a one stop shop where they can trade, earn interest and invest in cryptocurrencies.  Voyager provides consumers with the platform to fill this gap and create wealth for consumers.

## Capital Resources, Liquidity, Financial Instruments and Other Risks

**Capital Resources**

At March 31, 2021, the Company had cash and cash equivalents, including cash held for customers, of $150 million, an increase of $145 million from June 30, 2020. Additionally, due to timing differences related to customer cash deposits in transit, the Company had approximately $46 million in advances due from customers which customers use to purchase digital assets. The Company holds the customers digital assets until advances due from customers have been received. The $145 million increase was primarily due to $132 million from cash from financing activities, including approximately $145 million raised from the net proceeds of special warrants issued  in September 2020 and December 2020, and common stock issued in January 2021 and February 2021, as well as, cash generated from operations of $13 million

Additionally, the Company held a net digital currencies and fiat position of $55.6 million, which represents digital currencies and fiat, as well as, digital currencies and fiat on loan, less digital currency loan payable.

This together, with a cash position of $72.5 million and cash advances from customers of $46 million, the Company maintained an overall liquidity position of $174 million.

The unaudited condensed consolidated financial statements have been prepared on a going concern basis, which presumes realization of assets and discharge of liabilities in the normal course of business for the foreseeable future. These unaudited condensed consolidated financial statements do not give effect to adjustments or disclosures that would be necessary should the Company be unable to continue as a going concern and therefore be required to realize its assets and liquidate its liabilities and commitments in other than the normal course of business and at amounts different from those presented in these unaudited condensed consolidated financial statements.

The Company has historically funded its operations through the issuance of common stock.

The Company may incur operating losses as it expands its product offering and invests in expanding its customer account base, which could require additional third party financing. Management believes that it has sufficient working capital on hand to fund operations through at least the next twelve months from the date these consolidated financial statements were available to be issued.

The Company's future liquidity and capital funding requirements will depend on numerous factors including its ability to access additional funds to finance its growth and operations, planned development and expenditures through additional equity offerings and through revenue generated from ongoing operations. Failure to implement the Company's business plan could have a material adverse effect on the Company's financial condition and/or financial performance. There can be no assurance that the Company will be successful in generating sufficient revenue from operations, acquiring additional funding, that the Company's projections of its future working capital needs will prove accurate, or that any additional funding would be sufficient to continue operations in future years.

The recent outbreak of the coronavirus, also known as COVID-19, has resulted in governments worldwide enacting emergency measures to combat the spread of the virus. These measures, which include the implementation of travel bans, self-imposed quarantine periods and social distancing, have affected economies and financial markets around the world resulting in an economic slowdown. The extent to which COVID-19 may impact the Company's business activities will depend on future developments, such as duration of the outbreak, travel restrictions, business disruptions and the effectiveness of actions taken to contain and treat the disease. The duration and impact of the COVID-19 outbreak is unknown at this time and it is not possible to reliably estimate the length and severity of these developments as well as the impact on the Company's ability to raise capital or financial results and condition of the Company in future periods.

## Working Capital

As of March 31, 2021, the Company had net working capital of approximately $98.8 million compared to $0.2 million at June 30, 2020. Management has funded operations through a mix of revenue growth, cost management and equity raises.

Cash from operating activities for the nine months ended March 31, 2021 was $13.3 million compared to cash used for operating activities of $2.8 million for the nine months ended March 31, 2020. The $16.2 million increase was due to a $30.5 million increase in operating income offset by change in working capital, primarily due to net changes between Payables to customers and Digital currencies and fiat as a result of higher volume of activity and assets under management from growth in the business.

The Company recorded cash provided from investing activities of $87,960 for the nine months ended March 31, 2021 compared to cash used in investing activities of $112,833 in the nine months ended March 31, 2020.

Net cash provided by financing activities was $131.7 million for the nine months ended March 31, 2021 compared with $3.2 million for the nine months ended March 31, 2020. The primary sources of cash for the nine months ended March 31, 2021 were from the issuance of common stock from the January 2021 and February 2021 with net proceeds of $135 million, the issuance of special warrants from the September 2020 private placement and the December 2020 private placement with net proceeds of $9.6 million, and the exercising of warrants with proceeds of $5.4 million, offset by the $20.0 repayment of digital loan payable.

### Liquidity risk

Liquidity risk is the risk that the Company will not be able to meet its obligations as they become due. The Company generally relies on cash reserves, funds generated from operations and external financing to provide sufficient liquidity to meet budgeted operating requirements.

To the extent that the Company does not believe it has sufficient liquidity to meet these obligations, management will consider securing additional funds through equity. The Company's ability to continue as a going concern is dependent on the Company's ability to generate future profitable operations and cash flows and/or management's ability to raise additional financing.

While the Company has been successful in raising capital in the past, and management has a high degree of confidence that this trend of capital raising will continue, there is no assurance that it will be successful in closing further financings in the future. These interim financial statements do not give effect to any adjustments to the carrying value of recorded assets and liabilities, revenue and expenses, the statement of financial position classifications used, and disclosures that might be necessary should the Company be unable to continue as a going concern.

The Company manages its liquidity risk by forecasting cash flows from operations and anticipating any investing and financing activities, as applicable. Management and the Board are actively involved in the review, planning and approval of significant expenditures and commitments. Currently, the Company is not exposed to significant liquidity risk.

### Credit and market risk

The Company's digital currencies and fiat on loan are exposed to credit risk. The Company limits its credit risk by placing its digital currencies and fiat on loan with high credit quality financial institutions that are believed to have sufficient capital to meet their obligations as they come due and on which the Company has performed internal due diligence procedures. The Company's due diligence procedures may include, but are not limited to, review of the financial position of the borrower, review of the internal control practices and procedures of the borrower, review of market information, and monitoring the Company's risk exposure thresholds. As of March 31, 2021 and as at the date of this MD&A, the Company does not expect a material loss on any of its digital currencies and fiat on loan. As of each reporting period, the Company assesses if there are significant increases in credit risk requiring recognition of a loss or write-down. Such loss or write-down would be reflected in the fair value of the digital currencies and fiat on loan. While the Company intends to only transact with counterparties that it believes to be creditworthy, there can be no assurance

that a counterparty will not default and that the Company will not sustain a material loss on a transaction as a result.

The Company is also exposed to credit and market risk related to customer funding. When customers open an account, they are given a level of instant credit while their funding moves through the US banking system. Customer deposits usually take up to 5 business days for the Company to receive the funds transferred from the Customers Bank through the automated clearing house (ACH) process. Until the funds are actually received by the Company, the Company owns any inventory purchased by the Company at the Customers request. Although the historical risk of failed ACH deposits has been limited the Company has exposure to the failed deposits and thus the related market risks of the coins. The Company attempts to close any open positions as soon as practical when notified of any failed deposits.

**Interest rate risk**

The Company is not currently exposed to significant interest rate risk.

**Foreign exchange risk**

The Company's functional currency and the reporting currency is the US dollar. Periodically the Company incurs charges on its operations for settlement in currencies other than its functional currency and any gain or loss arising on such transactions is recorded in operations for the period. The Company is not currently exposed to significant foreign exchange risk.

**Digital assets and market risks**

In order to ensure an orderly market and to have liquidity on global exchanges, the Company has investments in digital assets which may be subject to significant changes in value and therefore exposed to market risk with the fluctuation in market prices. The Company monitors this risk on a daily, weekly and monthly basis. While the Company intends to have limited direct investment in digital assets, the business model is such that the company earns fees in digital assets and at times may accumulate positions that are subject to market risk.

## Off Balance Sheet Arrangements

As of March 31, 2021, the Company did not have any off-balance sheet arrangements.

## Commitments and Contingencies

There were no commitments or contingencies, expected or unexpected events, or uncertainties that materially affected the Company's operations, liquidity or capital resources in the interim period ended March 31, 2021, or that are reasonably likely to have a material effect going forward; save and except for the uncertainty pertaining to the Company being able to raise any financing on terms acceptable to it, or at all.

## Use of Funds

There are no significant changes from disclosure previously made about how the Company was going to use proceeds from any financing.

## Related Party Transactions

There are no significant transactions between the Company and related parties that occurred in the interim period ended March 31, 2021, or that were materially different from the related party transactions that occurred during the fiscal year ended June 30, 2020. There was no material change in the amount of remuneration paid to directors and senior officers from that disclosed in the Annual MD&A. For the nine months ended March 31, 2021, the Company expensed.

- $0 (nine months ended March 31, 2020 - $17,139) to Marrelli Support Services Inc. for providing accounting services and services of Vic Hugo as the previous Chief Financial Officer of the Company.
- $15,921 (nine months ended March 31, 2020 - $51,497) to Owen Bird Law Corporation for legal services. Jeff Lightfoot, a director of the Company, is a shareholder in the law firm.
- $106,745 (nine months ended March 31, 2020 - $407,121) to Fasken for legal services. Krisztian Toth, a director of the Company, is a partner in the law firm.

## Change in Accounting Policy

As of March 31, 2021, the Company adopted a voluntary change in its accounting policy for the accounting of Digital currencies and fiat on loan. Previously, Digital currencies and fiat on loan were included in Digital currencies and fiat on the statement of financial position and the Company has reclassified Digital currencies and fiat on loan as a separate line item on the statement of financial position. The Company continues to measure both Digital currencies and fiat, as well as, Digital currencies and fiat on loan at fair value. As such, there is no impact to the statement of loss and comprehensive loss.

Management believes this change in accounting policy results in more prominent and relevant information pursuant to IAS 8. The Company has reclassified prior period balances for comparative purposes.

# Exhibit N



# CipherBlade
## Blockchain Investigation Agency

# PRELIMINARY EXPERT REPORT

_____

**Matter:**   Mark Cassidy and all others similarly situated v.
Voyager Digital LTD and Voyager Digital LLC

**Date:**   20211219

This **Preliminary Expert's Report** has been prepared in connection with the matter of *CASSIDY -v- VOYAGER*.
It is not intended, and should not be used, for any other purpose.  Any opinions expressed by the author herein
are presented for this purpose alone, and may be subject to modification or deletion in the light of further
information and investigation.  These opinions are based solely on reviews of people, documentation, systems
and other information as supplied or made available to CipherBlade.

**THIS IS A PRELIMINARY REPORT.  IT HAS BEEN PREPARED BASED ON PRELIMINARY
INFORMATION AND ASSUMPTIONS.  NO ONE MAY RELY ON THIS DRAFT.  IT IS SUBJECT TO
CHANGE AS ADDITIONAL INFORMATION BECOMES AVAILABLE OR IS CLARIFIED.**

## I. BACKGROUND AND EXPERIENCE

1. My name is Richard A. Sanders. I am a Co-Founder and Lead Investigator of CipherBlade, a blockchain forensics and cybercrime investigative firm which consults on some of the most renowned blockchain projects, as well as numerous law enforcement and regulatory investigations, and provides advisory services to cryptocurrency exchanges and other organizations. Prior to co-founding CipherBlade, I was in the United States Army, where I attained the rank of a Staff Sergeant and spent 12 years as a forward observer and PSYOP specialist. A copy of my C.V. is annexed as Exhibit A.

2. CipherBlade and the CipherBlade staff have experience in some of the most well-known cryptocurrency investigations, including hacks of prominent individuals and major cryptocurrency exchanges, and provide services which include blockchain forensics, cryptocurrency AML, and cryptocurrency cybercrime investigation. As the blockchain industry gradually matures, there has been a notable increase in our preventative services (compared to reactionary scam/hack investigations) from, for example, investors and firms desiring diligence on blockchain startups.

3. In addition to my duties with CipherBlade, I serve as a volunteer with Crypto Defenders Alliance[1] ("CDA") where I was selected as one of their four administrators due to my demonstrated expertise as a blockchain forensics expert, cybercrime investigation knowledge, and leadership. CDA is an organization with representatives from nearly all major cryptocurrency exchanges and services, with the purpose of combating laundering of illicitly obtained funds.

4. I have provided solvency, security and AML consulting for cryptocurrency exchanges. My firm is one of the only firms that provides such services. Some of the top exchanges in the industry, such as Coinbase, request my insight into highly complex issues that require niche expertise and experience. Exchanges have relied and continue to rely on CipherBlade's and my expertise.[2] In the course of my experience with exchanges, I have become familiar with what industry norms are risk representations, solvency, and transparency.

5. I also serve as a volunteer with the Anti-Human Trafficking Intelligence Initiative[3] (ATII) where I provide critically needed blockchain analysis and other insight in some of the most severe crime typologies.

---

[1] https://cryptodefendersalliance.com/
[2] https://bitbuy.ca/assets/documents/Bitbuy-Proof-of-Reserve-and-Security-Audit-Report.pdf
[3] https://followmoneyfightsslavery.org/

6.  I routinely consult with and am retained by government agencies for investigations and insight on regulatory issues. I have provided security and compliance advice to numerous companies in the space, and understand that I am seen as a top thought leader in this field. I provide training to law enforcement on tactical site exploitation cryptocurrency considerations, such as identifying what cryptocurrency-related paraphernalia looks like and why it is important. I routinely provide insight to organizations such as the SEC, CFTC, and FinCEN on issues related to digital assets. My experience is digital and operational. This precise hybrid of experience is extremely valuable for my niche. United States Attorneys have leaned on my support for proffer sessions involving digital assets and described my work as essential. I have served as an expert for both Plaintiffs and Defendants in both Civil and Criminal courts and arbitrations.

7.  As a result of my involvement in a significant quantity of investigations involving individuals or companies suspected of providing misleading or incorrect information, I have become known as a subject matter expert in strategies that potentially dishonest parties may demonstrate. These often include downplay or nondisclosure of risk, deliberately misleading phrasing, and non-transparency on issues that are readily made transparent via the utilization of blockchain technology.

8.  I have been asked to partake in a multitude of podcasts, other speaking engagements, and press interviews from topics ranging from insolvent/AML-lacking exchanges to cryptocurrency security/thefts, including the topic of aggressively-promoted platforms that are not transparent regarding risk[4] and how to prevent cryptocurrency losses[5].

## II. ASSIGNMENT AND SUBSTANTIATING RECORDS

9.  I have been asked by The Moskowitz Law Firm, PLLC on behalf of Plaintiffs to perform an analysis of Voyager, including but not limited to the following:

    a.  An analysis of Voyager trades, relative to other cryptocurrency exchanges, in order to determine how trades executed on Voyager compare to trades executed on other platforms.

    b.  A review of publicly available information regarding Voyager, such as content from Voyager's website and social media platforms.

---

[4] https://youtu.be/0HHZnFBTESw
[5] https://unchainedpodcast.com/how-to-keep-your-crypto-from-being-stolen-via-your-phone/

      c.   Whether or not the activity (with an emphasis on use of customer deposits) or risk represented by Voyager regarding same is proportionate to what would be reasonably expected.

10. In order to execute this assignment, I reviewed relevant documentation, which includes a Complaint and my Letter of Instruction[6].

## III. BACKGROUND ON CRYPTOCURRENCY AND FUNDAMENTAL TECHNICAL INFORMATION

**Cryptocurrency and Blockchains**

11. Cryptocurrencies are digital representations of value that are secured through cryptography – the encryption and decryption of messages in secret code or cipher. Many of them rely on blockchain technology—a distributed ledger of all transactions that is decentralized and unable to be changed under most circumstances. The most well-known form of cryptocurrency is Bitcoin, but there are a number of cryptocurrencies that have been introduced in the past several years, more than 2,000 by some counts. Cryptocurrency is sent and received from or to so-called "wallets," which are locations identified by a combination of letters and numbers called a "hash" (e.g., 17XiVVooLcdCUCMf9s4t4jTExacxwFS5uh) that is unique to the holder of the "key" for that wallet address. Wallets are roughly analogous to an email address or bank account. They are a unique and secure identifier that allows for the transmission of cryptocurrency from one user to another.

12. Bitcoins are completely fungible and are not serialized or labeled like, for example, individual dollar bills. As a result, it is not possible to state that any particular Bitcoin is the subject of any specific transaction at any specific time. Instead, a Bitcoin transaction is best understood as a unit of value being transferred from one wallet to another. The blockchain is the record of all such transactions over time. For that reason, as explained more below, to "follow the money" one has to follow the value

---

[6] *See*: Exhibit B - Letter of Instruction

being transmitted from wallet to wallet, rather than attempting to focus on any "specific" Bitcoin.

**Blockchain Analysis**

13. With the rise in popularity of cryptocurrencies, there have inevitably been a number of misuses of cryptocurrency, much of which is via fraud, misappropriation, or laundering. Indeed, as noted above, I and my firm CipherBlade have been retained by private parties and government authorities to assist and investigate in the aftermath of many of these hacks and thefts.

14. Blockchain analysis is a subject which requires highly specialized expertise and tools to perform accurately and effectively. While blockchain data itself is a public record and that data (which is the basis for the blockchain analysis) can be verified by anyone with free and available tools, performing an analysis of transactional flows and tracing destinations of assets is a matter that requires sophisticated tools, and most importantly, experience. In adherence with expert norms, this report identifies the tools and data relevant for the foundation of my opinion, however, it is critical to note that it would be impractical to write out every step of such an analysis, as this would include thousands of potential transactions.

15. Blockchain analysis entails taking information from an immutable public ledger, which, when reviewed by a qualified expert, enables that expert to provide what are in essence fact-based findings which can then be used subsequently, for example in litigation.

16. The process of analysis utilized in this report (especially the blockchain analysis) is the same process utilized in similar investigations that I have conducted in partnership with compliance teams, regulators, and others, spanning numerous jurisdictions. I have been the sole expert responsible for reviewing the blockchain data (which is a matter of public record and is the basis for my analysis) and the graphs in Chainalysis Reactor. Nobody else can access this account, but it is possible to export this graph much like it is possible to export, for example, a PowerPoint presentation. If another

expert wished to review my work, they could do so via utilizing the same blockchain data made available to me to generate this graph, or if they have Chainalysis Reactor access, they may contact me for a copy of the native file.

17. I have carried out a proportionate initial assessment of the relevant blockchain data. The nature of blockchain analysis particularly in a case of this nature where the objective is to obtain high-level overview of what happens to customer assets (as opposed to, for example, sorting through thousands of transactions in order to trace specific stolen assets) is relatively lower in time, and bearing in mind these are early-stage findings, as well as that further records could be produced, further analysis is possible and I reserve the right to update this report accordingly.

18. I set out below some remarks on the material that I have relied upon in forming my analysis:

    a.  The nature of blockchain transactions means that all of this information is in the public domain and can be accessed via free tools known as block explorers. For example, to review a Bitcoin transaction, one only needs to visit a website such as Blockchain.info and paste in the Bitcoin transaction.

    b.  The tool I utilize to perform blockchain analysis in this report (for the supported blockchains) is Chainalysis Reactor. Chainalysis Reactor provides a visualization of blockchains; put more plainly, this is providing visualizations of the same data that would be viewable on a block explorer. The core difference between Chainalysis Reactor and a block explorer, insofar as is relevant for the purposes of this Report, is that Chainalysis Reactor has what is known as attribution (labeling of wallet addresses), which will not exist for most addresses in free block explorers.

19. Clustering is the means of grouping 2 or more individual Bitcoin addresses into a group of addresses which are believed to be controlled by the same entity. There are numerous heuristics for clustering, some examples of which would be co-spending and change address analysis. As shown in the below figure, the two addresses on the

left can be presumed to be controlled by the same entity, as they both are inputs in the transaction (rendering it extremely likely that one entity holds the private keys for, and thus owns, both wallets.) There are two outputs, one of which is for 12 BTC -- an amount a user is likely to send another user, where the other output is 2.9 BTC, a less likely number to be purposefully selected[7]. Upon this simplified example, Addresses A, B, and D would be clustered.



20. Chainalysis Reactor (as well as similar tools) will have a baseline amount of what is known as attribution: the labeling of wallet addresses. Addresses will be unknown/pseudonymous until Chainalysis updates/labels the addresses in their system. A combination of automated analysis and manual investigation is utilized to continually add attribution.

21. Attribution is the "oil" of the blockchain analysis world and constantly sought. Consequently, attribution for well-known services tends to be quite exceptional in Chainalysis Reactor.



22.

While it is true that no services (not even the most voluminous exchanges, such as Coinbase or Binance) will ever have all addresses attributed, services that have a

---

[7] Note most often when using this type of heuristic, the amount is likely to be an even less likely manually selected number, such as 2.99757208 due to miner fees, rendering this heuristic quite reliable.
[8] https://www.cs.princeton.edu/~arvindn/teaching/spring-2014-privacy-technologies/btctrackr.pdf

lower amount of addresses attributed oftentimes lack such attribution as a result of the entity not utilizing a compliance tool such as Chainalysis KYT (the compliance equivalent of Chainalysis Reactor), and/or not submitting address data to such providers. Voyager currently has 1 Bitcoin addresses attributed in Chainalysis Reactor, a figure far lower than I expected. Voyager competitor Celsius has 277,287 attributed addresses for Bitcoin in Chainalysis Reactor; while also not high, I'd expect Voyager (a service with more aggressive marketing) to have more address attribution. I came to find out that Voyager's lack of attribution may at least partially have to do with how Voyager processes customer deposits and withdrawals, which is distinctly different (perhaps deliberately) from their competitors and obfuscates potential attribution efforts.

23. Further, attribution for Voyager wallet addresses for other blockchains was scarce and in some cases non-existent. While attribution for some more less-utilized assets (say, LTC or the ERC-20 tokens) may often have gaps, for attribution on widely-utilized assets (such as Ethereum) to be lacking immediately stood out to me, and made necessary my efforts to perform manual attribution for Voyager addresses.

24. Consequently, in order to determine what Voyager does with customer deposits, how Voyager processes customer withdrawals, and to the extent possible[9] potentially identify what Voyager does with customer assets, I made numerous deposits and withdrawals of varied cryptocurrencies with an account on Voyager . This enabled me to obtain blockchain data to analyze for a better data set and more recent history.

25. In order to perform this analysis, I utilized Chainalysis Reactor. Available as supporting records are full resolution graphs and native .grf files for any and all blockchain analysis cited in this report, as well as Voyager account history evidencing the transactions relied upon in order to supplement any pre-existing attribution in Chainalysis Reactor.

---

[9] Once cryptocurrency is traced to an exchange/service, analysis stops. This is because records from the service would need to be produced in order to continue analysis. This is functionally equivalent to determining what happened to a $100 bill once an individual brings it to the bank: you may see them bring it to the bank, but they deposit it for an IOU and lose custody of it: you would need the individual's bank records to determine what happened with the value of that asset.

## IV. SUMMARY OF OPINIONS

*"We will lend, sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of funds and cryptocurrency assets to counterparties, and we will use our commercial best efforts to prevent losses."[10]*

*"In consideration for the interest earned on your account, you grant the right, subject to applicable law, without further notice to you, to hold the cryptocurrency held in your account in the firm name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of cryptocurrency, and to use or invest such cryptocurrency at its own risk."*

26. Voyager does not accurately convey the risk associated with the interest-bearing offering (the "Voyager Interest Program") of their service.

    a. The general risk disclosures included in Voyager's consumer-facing materials is insufficient to allow consumers to make an informed decision that reflects their risk appetite. There is an immense range of risk/reward (from relatively low risk to extremely high-risk) that is possible depending upon what, exactly, Voyager does with customer deposits.

    b. Voyager publicly provides no meaningful specifics about how customer assets are utilized. Voyager offers interest rates that exceed competitors such as Celsius[11] and BlockFi, companies that also suggest they earn interest in a similar way.

    c. Celsius has been audited[12]. Similar companies that were not audited are undoubtedly immediately able to be considered high-risk for consumers. For example, Cred, a company similar to Voyager and Celsius (which also lacked transparency) elected to take high-risk investments that did not end happily[13].

27. Voyager is not transparent.

---

[10] https://rewards.investvoyager.com/interest/
[11] While true Celsius and Voyager are partnered in some capacity, they are still competitors in other capacities; namely, customers depositing assets.
[12] https://www.prnewswire.com/news-releases/celsius-network-partners-with-chainalysis-to-confirm-audit-of-3-31-billion-in-assets-301189705.html
[13] https://guidehouse.com/insights/financial-crimes/2021/cryptocurrency-lending-lessons-cred-bankruptcy

a.   As described in the preceding paragraph regarding the Voyager Interest Program, it is impossible for consumers to make an informed decision regarding whether to deposit funds to Voyager or not. Further, even if an individual opts out of the Voyager Interest Program, nothing evidences customer funds are not rehypothecated, rendering Voyager customers susceptible to the risk of this rehypothecation whether or not they have the risk appetite and/or desire to sign up for such activity.

b.   Voyager's responses to public inquiries are unresponsive. For example, I doubt that what customers intended when asked "is Voyager regulated?"[14] (if that was, indeed, what was asked multiple times, and Voyager didn't basket broader questions into this FAQ) is whether or not Voyager is subject to FinCEN regulation. Voyager is registered and operates within and solicits the business of customers within the applicable jurisdiction. Said differently, Voyager being regulated by FinCEN is no different from stating I breathe air. Notably absent from Voyager's FAQ (or anywhere else for that matter) is any information evidencing Voyager's efforts to be a compliant organization: as some examples, Voyager is one of the very few companies of their scale not represented in Crypto Defender's Alliance, nor am I aware of any transaction analysis tool Voyager is utilizing[15].

c.   Voyager has provided no verification they are solvent nor any substantive information about how they utilize customer funds (which increases the risk of insolvency immensely.) It is possible for Voyager to verify they are solvent[16]. While Voyager might suggest that they do not want to reveal particulars about what they do with customer funds as to protect trade secrets, at a minimum, they could easily retain a reputable third party to perform an (ideally recurring) audit.

28.  Voyager engages in extremely aggressive promotional activities, often via influencers that receive financial incentive, that target primarily new or less knowledgeable cryptocurrency users. An additional risk Voyager and Voyager customers face, in light

---

[14] https://support.investvoyager.com/support/solutions/articles/43000458812-is-voyager-regulated-

[15] To be clear, it is distinctly possible, even probable, that Voyager has acquired a blockchain analysis tool -- I just typically know which tools most companies use as I have interacted with their compliance/investigations team in the course of my duties. Said differently, the fact I have not experienced this with Voyager is, from experience, likely due to improper use of a blockchain analysis tool/inadequately trained staff.

[16] https://www.kraken.com/en-us/proof-of-reserves-audit

of such activity, is regulatory scrutiny, whether for market manipulation or potentially Securities Act 17(b)[17] violations depending upon particulars.



*"Voyager works to obtain the best execution available in the marketplace for our clients. There is no set price for a market order. Best execution is a concept combining the evaluation of multiple factors, including opportunity to obtain a better price than what is currently quoted, the speed of execution, size of trade, settlement period and the likelihood the trade will be executed."[18]*

29. Voyager is deliberately misleading, and often refuses to substantiate information that is essential for a consumer to make an informed decision. As one prominent example, Voyager strongly advertises "Commission-free" trading on their landing page, but no such fees are ever clearly outlined.

    a.  In the absence of any specificity regarding "the marketplace", it is impossible for a consumer -- or anyone for that matter -- to determine which

---

[17] https://www.expertservices.com/insight/sec-penalizes-celebrities-for-violating-the-securities-act/
[18] https://support.investvoyager.com/support/solutions/articles/43000458765-how-is-the-price-for-market-orders-determined-

"marketplaces" (exchanges?) Voyager is determining to provide the "best
execution."

b. There would, indeed, presumably be a set price for a market order, which
would be derived from an aggregate of the exchanges Voyager is sourcing
liquidity from. In the simplest terms possible, it is entirely a black box as to
what Voyager is doing with orders purportedly directed to their Smart Order
Router, where (which exchanges) the Voyager Pricing Engine "calculates the
fair market price" from, and how the Proprietary Fills Algorithm functions --
and in the absence of such information, as well as demonstrable discrepancies
between what Voyager says should happen and what happens, these systems
are either improperly configured, or to varying degrees may not even exist or
exist as described by Voyager.

c. Phrasing such as "evaluation of multiple factors" is, per my experience
regarding *all* companies that were suspected of, and subsequently confirmed to
be, misleading consumers, extremely concerning. The utilization of
seemingly-technical jargon, and/or otherwise unspecified yet critical
information, often result in tragedy for consumers[19]. In the absence of any
information whatsoever regarding how Voyager is processing customer orders,
it is functionally impossible to verify that Voyager is even performing the steps
described on their own FAQ. Voyager, in essence, is expecting the same degree
of trust from users that Bitconnect expected from their users regarding a
"trading bot" that turned out to never exist.

d. Not even the fine print of Voyager's customer agreements show that they are in
fact not 100% commission free. Voyager is undoubtedly profiting off of
customers utilizing the trade functionality of the Voyager platform, and is
irrefutably *not* providing best execution. Voyager can not both claim to provide
best execution *and* be commission-free when it is easily evidenced that
numerous other exchanges provide better rates.

30. The exchange rates provided by Voyager are consistently worse than the rates
provided by cryptocurrency exchanges -- regardless of whether the exchange is
centralized or decentralized, US-based or not US-based, etc. For Voyager to suggest
they are providing any form of "best execution" across the marketplace is
demonstrably false.

---

[19] https://www.makeuseof.com/the-rise-and-fall-of-bitconnect-an-internet-famous-ponzi-scheme/

a.  What makes Voyager's representations even more egregious is that, in the
course of my analysis, I had performed extensive cryptocurrency deposits and
withdrawals in order to discover cryptocurrency wallet addresses that Voyager
utilizes for customer funds. Customer assets are sent to/from either Binance or
HTC Trading wallets. Comparing exchange rates on Voyager to those on
Binance resulted in Binance having better exchange rates on *every* occasion.
Said differently, the *one* exchange that it is possible to assess Voyager would
be including across their marketplace comparison (and thus should reflect the
same price in Voyager app) provided a better deal than Voyager.

31. Voyager does not publicly disclose any liquidity or trading relationship with Binance,
an exchange restricted to US residents. The absence of any information regarding the
nature of Voyager routinely sending funds to what I presume are Binance account(s)
they control is immensely concerning. While possible a company like Voyager could
onboard to an exchange like Binance with a corporate account in a legitimate way,
Voyager customers would assess a different level of risk if they knew their assets were
diverted to an solvency-audited US-based exchange and an exchange that has not been
hacked, such as Kraken, as opposed to a foreign exchange with more known[20] AML
issues and hacks. In my estimation, if Voyager customers were polled on-the-spot and
told their assets were diverted to Binance (let alone what the assets are utilized for
afterwards), many would find this unsettling and many may not have utilized Voyager
if they had this knowledge.

## V. BLOCKCHAIN ANALYSIS

32. In order to perform this analysis, I utilized Chainalysis Reactor. Available as
supporting records are full resolution graphs and native .grf files for any and all
blockchain analysis cited in this report.

33. Chainalysis Reactor is considered to be the industry standard for blockchain analysis
for many reasons, the most significant one being attribution, which is the labeling of
wallet addresses. Chainalysis has better attribution, by a multiplier, than any of their
competitors. Said differently, of any blockchain analysis tool provider, the one most

---

[20]

https://www.bloomberg.com/news/articles/2021-05-13/binance-probed-by-u-s-as-money-laundering-tax-sleuths-bore-in

likely to have pre-existing wallet address identification for Voyager wallets would be Chainalysis.



34. Upon a search of Celsius, a core Voyager competitor, their addresses are well-attributed; note the requirement to scroll down to see the full depth of cryptocurrencies that Celsius wallets are attributed in. Upon a search for Voyager, only four cryptocurrencies are attributed, and of those, the attribution is partial.

35. While a service not being attributed in Chainalysis does not confirm the service is suspicious, it is generally typical for compliant and responsibly-managed services to have attribution in a tool like Chainalysis Reactor for several reasons:

a. Companies will sometimes provide their wallet addresses to companies like Chainalysis in order to be helpful to law enforcement and/or decrease the

overhead associated with false positives and inquiries that would otherwise stem from a lack of attributed wallet addresses.

b. It is expected that companies such as Voyager have effective compliance program.

    i. A preliminary review of Voyager's LinkedIn page does not suggest they have sufficient compliance staff[21]. The few employees I do see with roles that would be applicable do not appear to have relevant industry experience nor certifications in any blockchain analysis tool.

        1. I note that Muhammad Darr obtained a certification from Blockchain Intelligence Group around the time he joined Voyager[22]. BIG would not be a sufficient tool for a firm such as Voyager to effectively be compliant. Mr. Darr would know this, as his time at Gemini (which utilizes Chainalysis) would easily evidence the significant difference in capabilities between Chainalysis and BIG.

    ii. Voyager is one of the few larger western-focused services not represented in Crypto Defender's Alliance[23], which is free to join and significantly bolsters AML efficiency.

    iii. Most importantly, in order to have an effective compliance program, a blockchain business *must* have a transaction monitoring/analysis tool, such as one from Chainalysis, Elliptic, or Crystal. Without such a tool, it is impossible to have the baseline information needed to assess AML risk; or in simpler terms, it is impossible to be compliant without such a tool. These tools range significantly in terms of cost, however, a company the scale of Voyager can undeniably afford the most potent tool (Chainalysis KYT.)

        1. I further note that it is possible, even probable, Voyager does, indeed, have a transaction analysis tool. However, it is also common that companies will simply acquire such a tool for "compliance theatre". The mere acquisition of such a tool does not make a company any more compliant than being in the garage makes a person a car.

---

[21] https://www.linkedin.com/company/investvoyager/people/?keywords=compliance
[22] https://www.linkedin.com/in/muhammad-darr-cams-cci-79912315b/
[23] https://cryptodefendersalliance.com/

      iv.    The very nature of a blockchain startup utilizing a blockchain analysis tool would typically entail their wallets being attributed in the tool provider's system. More simply: if Voyager utilized Chainalysis KYT, it is likely that Chainalysis would have Voyager wallets attributed.

    c.   Besides companies voluntarily providing wallet address attribution to firms such as Chainalysis (or being themselves customers), another way addresses sometimes are attributed is via utilization. For example, while Coinbase does not utilization Chainalysis (as they have their own transaction analysis tool from a company they acquired[24]), Chainalysis has extremely strong Coinbase attribution.

    d.   I note it is my experience that blockchain companies that are not easily evidenced as compliant often do not desire for their wallet addresses to be attributed out of concern of wrong-doing[25].

36. Consequently, in order to determine what Voyager does with customer deposits, how Voyager processes customer withdrawals, and potentially identify some exchanges Voyager may have included in their alleged marketplace comparisons, I made numerous deposits and withdrawals of varied cryptocurrencies with an account on Voyager. Full resolution copies of all of these graphs are attached as Exhibit D.

---

[24]

https://cointelegraph.com/news/coinbase-bought-neutrino-for-135-million-acquisition-contract-allegedly-shows

[25]

https://www.coindesk.com/policy/2021/03/04/blockchain-sleuth-says-okex-huobi-stonewalled-him-in-child-porn-investigation/



37. As shown above, my Bitcoin deposit to Voyager was sent to HTC Trading. Voyager "wholly owns" HTC Trading[26]. It is impossible to determine exactly what Voyager and/or HTC Trading utilized my BTC for after this deposit.

38. Also shown above, when I initiated a withdrawal transaction from Voyager, it was processed from attributed Voyager BTC wallets.

---

[26] https://sec.report/otc/financial-report/285133



39. In the above example, when I made an XRP deposit to Voyager, it was sent to a Binance deposit address. It is impossible to know what Voyager did with my XRP after this deposit without records from the associated Binance account.



40. In the above example, when making a LTC deposit to Voyager, funds are promptly "swept" to Binance. When requesting a LTC withdrawal from the Voyager account, the withdrawal is processed from Voyager wallets.



41. In the above example, the USDC deposit I made to Voyager is promptly swept to Binance. The withdrawal is processed from an unattributed address that belongs to either HTC Trading or Voyager, and unsurprisingly evidences further heavy utilization of Binance as the sole exchange with any observable and significant direct connection.

42. Analysis of Voyager across other assets presented similar findings: funds would be swept to or withdrawn from either a Binance or HTC trading address or an unattributed address with a strong relationship to those two entities. It would be disproportionate/repetitive to detail each asset, however, graphs for each asset are attached to this report.



43. While proportionality and focus at this time preclude me from providing a deeper review into Voyager's AML practices, observations regarding Voyager addresses (and the nature of the entities they send and receive cryptocurrencies from) while conducting my attribution work did prompt concerns. As just one example, Voyager's known Bitcoin address sends funds to exchanges that are not US-based or even preclude US residents from signing up (KuCoin, Binance, Byibit, and FTX would all be strong examples.) In essence, where Voyager customer's withdraw funds to does not reflect what I'd expect a US-based company soliciting US-based users[27] to send funds to. In my experience, when I see sending exposure[28] that does not reflect the targeted demographic, the company attributed to the wallet(s) has an (often intentional) porous approach to compliance; said differently, I find it very unlikely that the quantity of Source of Wealth inquiries Voyager sent to customers due to these observations (assets going to US-restricted exchanges) would match the statistics shown above.

---

[27] https://www.investvoyager.com/blog/where-is-voyager-available/
[28] Exhibit C - Cluster_exposure_of_Voyager_BTC

44. My blockchain analysis did *not* enable me to determine anything insofar as Voyager's purported trade processing practices. This is what I expected, as trades are executed by (centralized) exchanges in a means that does not involve a blockchain transaction.

**VI. TRADING ON VOYAGER & COMPARISON TO OTHER PLATFORMS**





[29]

---

[29] https://www.investvoyager.com/blog/the-top-five-reasons-to-use-voyager-to-invest-in-crypto/

45. In order to compare Voyager's rates to the general cryptocurrency marketplace, I
executed the following process:

   a. Voyager was opened on my left display. The exchange I am comparing
Voyager was opened on my right display.

   b. I would enter the same market order on Voyager and the exchange I would be
comparing Voyager to. For example, if I was comparing how much BTC I
would receive in a market buy order for Voyager and Coinbase, I would have
the same order ($100 in exchange for BTC) opened on Voyager and Coinbase.

   c. I would Windows-Shift-S (which freezes your screen) and note the time, jot
down the relevant data from Voyager and the compared exchange. I would
save the screenshot, and enter the data into the spreadsheet[30]. Consequently, I
have substantiating records for all of the entries in a spreadsheet that can't be
refuted on potentially being done at different times.

   d. I note this comparison is quite simple to do, and anybody with a Voyager
account can follow the above steps to compare quotes in the same way. In my
estimation, the only reason Voyager customers do *not* do this is because they
are told -- whether by Voyager or an (uncorrected) member of the public (often
an "influencer") that the trades are commission-free.

46. As part of this analysis, I selected the following exchanges to compare Voyager's
rates:

   a. Coinbase and Kraken, as they are exchanges heavily utilized by US customers
with high liquidity.

   b. Binance, as Binance has some of the highest liquidity/quantity of trading pairs
in the industry. Further, the *only* exchange Voyager is presently evidenced as
potentially sourcing liquidity from is Binance.

   c. FTX, as this is an exchange more focused to advanced traders -- certainly, the
type of platform that Voyager (or whoever Voyager is purportedly lending
assets to) would be extremely likely to utilize.

   d. Uniswap and Sushiswap, as these are decentralized exchanges with highly
transparent and verifiably accurate order books that would also be sensible
routes for a "best marketplace" rate.

---

[30] *See*: Exhibit F - Voyager trade comparison

21



47. On all but one occasion (which was for a less liquid cryptocurrency, ZRX, in a small amount, on FTX), Voyager's prices were worse than whichever exchange they were compared to. Voyager does not offer better pricing on trades. In fact, the rates Voyager offers would result in a plainly worse deal, often to the tune of nearly or more than 1% higher than competitors, even on highly liquid pairs such as BTC/USD:

| Date/Time Captured | Trading Pair | Voyager | Coinbase |
|---|---|---|---|
| 8/19/2021 4:14 PM EST | ZRX/USD | $7.56 | $7.65 |
| 8/19/2021 4:16 PM EST | ZRX/USD | $7.58 | |
| 8/19/2021 4:19 PM EST | MANA/USD | $22.55 | |
| 8/19/2021 5:18 PM EST | BTC/USD | $102.45 | $103.05 |

48. Consequently, Voyager's representation of offering "Better Pricing on Trades" is, under the most generous of terms, deliberately misleading (it is *obvious* that would lead most people to conclude "across exchanges"), and I'd opine deliberately misleading in a way that is plainly to enrich themselves at the expense of that very misconception Voyager instills.

49. Voyager represents they are referencing several exchanges to leverage their "smart order router." Unless Voyager is utilizing 3 or more exchanges which provide rates that are far above industry standards (which I not only find incredibly unlikely, but if it

22

were somehow true, would mean Voyager is grossly incompetent in selecting the
exchanges they use), they either are not utilizing three or more exchanges or are
tacking exuberant fees on top.

50. Baffled as to how Voyager may be generating the quotes for market buy/sell orders, I
decided to run one more test on Voyager regarding USD/USDC. USDC is a
cryptocurrency known as a stablecoin, which should be close to the value of the USD;
however, these assets are never *entirely* 100%-pegged[31]. Consequently, if one goes
onto a cryptocurrency exchange (with legitimate liquidity -- so Coinbase or Kraken
would be good choices, whereas an exchange known for fake volume, which is also
likely to have fake order books, such as HitBTC[32] might not be), and seeks to trade
between a stablecoin and fiat, the exchange will not be an exact 1:1 match. Note that
when entering tens or hundreds of millions of dollars into a USDC buy order on
Kraken, the peg noticeably is lost, as it should be. Note that on Voyager it does not.



51. In the absence of any indication Voyager is sourcing funds from exchanges, as well as
the alarming revelation that Voyager's system purports to effectively have infinite
USDC stores at peg, I am thus left to conclude that it is possible, if not probable,
Voyager is not basing their market quotes off exchanges. The explanation may simply
be that Voyager sources liquidity from Binance at a markup.


## VII. OTHER OBSERVATIONS REGARDING VOYAGER

52. Voyager's withdrawal fees are high compared to competing services. Interestingly, one
of their core partners/competitors, Celsius, seems to have no issues providing free
withdrawals. And while I'm aware Celsius requires a minimum $10 equivalent
withdrawal, Voyager has withdrawal minimums as well, and Voyager's withdrawal
fees oftentimes exceed $10.

53. Binance is restricted to US residents. While that does not preclude a business from
using them if, say, they are registered overseas, I'd be curious how this is legally
structured. If, in reality, Voyager is taking US customer funds, and just giving them to

---

[31] https://invao.org/how-stable-are-stablecoins/
[32] https://cointelegraph.com/news/bitwise-calls-out-to-sec-95-of-bitcoin-trade-volume-is-fake-real-market-is-or
[33] *See*: Exhibit E - Infinite Stability.mp4

HTC Trading, and/or trading them themselves on Binance, I am especially curious how this is handled insofar as company structure. Notably, with Binance's known AML issues, even *if* Voyager were transparently providing Binance's rates on cryptocurrency trades (which they are not) to US users, Voyager is effectively a workaround for Binance being restricted to US residents *and* Voyager can not know, with confidence, what their ultimate source of funds is. Such activity would be, from a value transfer/blockchain analysis standpoint, described as a workaround to US regulatory requirements and cryptocurrency exchange terms of use.

54. HTC Trading has heavy Bitstamp exposure; Bitstamp is known for AML issues. The quantity of Bitcoin HTC Trading has received from Bitstamp alarms me, and heavily. This very well could be part of how Voyager can offer such generous interest: a steady stream of "clean" money from Voyager customers is exchanged for (what was) "dirty" money from shady OTCs[34]. Shady OTCs routinely launder for criminals. Taking even a 30% cut in the laundering process is common; offering, say, 10% interest to Voyager customers is thus sustained.

55. I can evidence, and have evidenced, that Voyager sends funds to HTC Trading and Binance. What happens with those funds when sent to HTC Trading is a black box (until/unless records are provided), but what one *can* conclude is Voyager, or the company they own/act through, HTC Trading, has one or more Binance accounts. If Voyager were, in fact, being honest about providing the best rates to their customers, it would only be sensible to include in the hypothetical set of exchanges they are getting these alleged best rates from: namely Binance. Said differently: **why does Voyager send customer funds to Binance where they presumably hold account(s) yet a Voyager customer will consistently get a better deal on Binance than is shown on Voyager?** As far as the blockchain is concerned, the *one* place I can *definitively* assess Voyager receiving liquidity from is Binance, yet Voyager's rates were *worse* than Binance every time.

*"All investments involve risk and the past performance of a digital asset or other financial product does not guarantee future results or returns. Cryptocurrencies are highly speculative in nature, involve a high degree of risk and can rapidly and significantly decrease in value. It is reasonably possible for the value of Cryptocurrencies to decrease to zero or near zero. While diversification may help spread risk, it does not assure a profit or protect against loss. Investors should consider their investment objectives and risks carefully before investing. Previous gains may not be representative of the experience of other customers and are not guarantees of future performance or success."[35]*

56. The above risk disclosure suggests a core risk that Voyager customers face is the volatility of cryptocurrencies. A cryptocurrency investor may have a diversified portfolio as part of efforts to mitigate this risk. However, Voyager's suggestion that

---

[34] https://blog.chainalysis.com/reports/money-laundering-cryptocurrency-2019
[35] https://www.investvoyager.com/blog/voyager-where-smart-order-routing-meets-crypto/

users themselves can mitigate this risk by diversifying on Voyager is neither verifiable nor likely to be true. This is because Voyager rehypothecates customer assets. If a user deposits a less liquid cryptocurrency (relative to BTC or ETH), such as LINK, I doubt and doubt strongly Voyager is keeping that asset in-kind; instead, it is typical that companies like Voyager will sell that digital asset for something else. Consequently, if LINK crashed over 90%, this would impact Voyager and their liabilities to all customers across all assets, whereas if a non-Voyager-using cryptocurrency investor simply held BTC and LINK themselves, that cryptocurrency investor's BTC holdings would not be impacted. In essence, volatility of cryptocurrencies (at least insofar as the particular types Voyager users deposit or purchase) is not the additional risk Voyager users take on by using Voyager: Voyager's management of those assets is the risk that would be proper to address, yet Voyager, bizarrely, does not do so in such a prominent way.



57. When attempting to Google "how does Voyager pay interest", what is discovered are vague statements ("loaning," "arbitrage", etc.) that do not provide any proof of such activity, nor any particulars thereof.

---

https://www.reddit.com/r/Invest_Voyager/comments/o06ce1/how_is_voyager_able_to_offer_such_high_interest/h1th580/



37

58. Generally, a common public interpretation of what Voyager does with customer assets to generate income is that they provide loans -- whether to their customers or to institutions. I find it incredibly unlikely that these loans support the interest rates Voyager offers and that such interest rates are supported by other means, including undisclosed higher-risk activity Voyager performs with customer assets.


38

59. Commentary I reviewed defending Voyager was often ripe with presumed facts that do not reflect what I discovered in my analysis. Per my analysis of Voyager trades, I find

---

https://www.reddit.com/r/Invest_Voyager/comments/o6tgnf/how_does_voyager_support_a_9_interest_rate_on_u sdc/
https://www.reddit.com/r/Invest_Voyager/comments/mv3ke6/voyager_shill_re_evaluates_his_thoughts_on/gvj4f ml/

it very unlikely that Voyager is conducting trades "with all those exchanges in the process". In essence, Voyager's representations have misled (deliberately or otherwise) the public. Voyager frequents and moderates (and even replies to) their own social media platforms, such as Twitter or Reddit; in my estimation, this would be one (of an undetermined yet large amount of occasions) appropriate time for Voyager to have clarified how their system actually works.



39

60. The fact that the public relies on Voyager's representations regarding best price for trades is evidenced in posts such as the one screenshotted above: this Voyager user is plainly under the impression that the rate they receive on Voyager would be the same used on Binance or elsewhere, which is simply not true.

---

39 https://www.reddit.com/r/Invest_Voyager/comments/ls44qy/trading_with_voyager_tradingview/

> **Posted by u/opteryx907 7 months ago**
>
> ## USDC transfer cleared in 10 minutes! See ya Voyager!
>
> Over the past few weeks, I've done three USDC transfers from Voyager to Binance. The first two took about 24 hours, but today, it cleared in under 10 minutes. Hopefully this means Voyager's scaling problems are behind them.
>
> That said, I probably won't be using voyager anymore, as their no commission marketing promises are deceptive, and they more than make up for their lack of commission through ridiculous bid-ask spreads and excessive transfer fees. It's an effective tactic for drawing in newbies to the crypto space, but try a real exchange like Binance, Kraken, or KuCoin, for a while, and you'll quickly see how Voyager is charging a hidden premium on its users.
>
> Couple that with the inability to transfer altcoins like AVAX and DOT, and I just don't see any compelling reason to stay on this brokerage platform.
>
> I'll probably get downvoted for this, but I wish I had learned this earlier. If it weren't for their scaling problems, I might not have (well, that, and a desire to use PancakeSwap). Good luck to all!
>
> 💬 16 Comments    ↗ Share    🔖 Save    👁 Hide    ⚑ Report                    79% Upvoted

40

---

40

https://www.reddit.com/r/VoyagerExchange/comments/myhi1e/usdc_transfer_cleared_in_10_minutes_see_ya_voyager/



**TrypZBTC** · 7m

I noticed exactly what you said about the bid ask prices last week and was just absolutely amazed..

Voyager claims to utilize multiple exchanges for buy and sell orders and even if they only used one
your Buy/Sell order spread would NEVER be that spaced out.

It makes no sense what so ever and you are spot on with the luring of new users with the no fee
advertising.

I really want voyager to be a massive success, I really do. I was heavily impressed with the CEO
doing regular live streams and listening to customer feedback that I believed I was investing in
good people with honorable and good business practice.

Yet the more I use Voyager the more suspicious I am of that not being the case what so ever.. and
that is really unfortunate.

Am currently STILL awaiting a response to my customer support ticket I sent in over a month and a
half ago.. that should be one of the top priorities to their business moving forward



⬆ 6 ⬇   💬 Reply   Share   Report   Save



**bpmccaff** · 7m

I agree. The spreads are crazy. It took me a couple trades to really notice. Now i have a bit there
earning interest but thats it



⬆ 2 ⬇   💬 Reply   Share   Report   Save



**BITethADAdotLINK** · 6m

Blockfi, Celsius and Nexo have been dropping rates (amounts that can earn the highest rates),
increasing loan rate at Nexo for their platinum level...

Voyager is looking better than all three for Bitcoin and Litecoin, ada... Especially if you own enough
VGX:

"Get a 1% APR Interest boost on USDC, BTC, & ETH when you hold 10,000 VGX in your portfolio.

Earn up to 10% on USDC, 7.25% on BTC, & 6.25% on ETH."



⬆ 1 ⬇   💬 Reply   Share   Report   Save

61. The above provides further examples of the public:

    a.   Observing the disparity with how Voyager trades execute

     b.  Observing Voyager preying upon new users

     c.  Observing market trends related to their competitors; namely, that the interest rates would compel more users (providing further incentive, if not necessity, for Voyager to take higher-risk, higher-yield activity)

62. These examples of the public misunderstanding, or being led to misunderstand (if even via a lack of easily-provided clarity) continue to the very day of writing of this report[41].

---

[41]

https://www.reddit.com/r/VoyagerExchange/comments/qotgkh/voyager_seems_to_use_a_spread_to_calculate_fees/

 

**V** r/Invest_Voyager · Posted by u/GringoExpress 5 days ago 🔥 🎖️ 🎖️ 2

91

## Voyager Constructive Criticism

I want to preface this critique of Voyager by stating I am a Voyager user. An avid one. I've used Coinbase, CB Pro, Kraken, Celsius, KuCoin, Binance when it was available in the US, and even the horrible Robinhood (albeit briefly just to swing trade Doge when it blew up earlier this year). Voyager won. I now use them exclusively for all of my crypto hodls. Their interest rates are typically at or near the top across the board. The user experience of the app is excellent. Super easy to use, very visually appealing. They are the only regulated exchange besides Coinbase. This is very important to me. Their instant deposits work flawlessly. Their KYC process is reasonably quick and their security appears to be some of the best. I love $VYGVF as a stock. I think it offers immense upside with very little downside risk based on its current valuation. The recent partnership with Mark Cuban combined with Voyager's recent talk of 8 million+ share buyback, I'm more convinced than ever this company is an absolute juggernaut in the making. Despite holding several thousand dollars of VGX tokens, I'm not nearly as confident in VGX. I'll get into that below.

I know Voyager has lofty goals of becoming the preeminent "financial lifestyle" app, but they need to focus on becoming a better crypto app in the interim. Here's where, I believe, Voyager MUST improve in order to become the most popular crypto platform right now.

1. Voyager should just remove its limit orders altogether. They are a farce. Both of Voyager's orders options, market AND limit, are both simply market buys. According to Voyager, users' buy orders are filled at the very best price available after being shopped across numerous exchanges, but it's a market order nonetheless. I've never encountered a single instance of a Voyager limit order executing a single cent below the ask price. All limit orders only execute at the ask, period, without exception. Placing a limit order in between the bid and ask is just a waste of time. This is one of the most disappointing features of Voyager in my opinion. I'm not trying to knock Voyager too much. I think they're in an amazing position to become what SoFi is trying to become in the U.S. if they execute correctly, but Voyager needs to fix (or remove altogether) their farcical limit orders. They do not at all work like limit orders we are used to in the stock market.

EDIT: it's been mentioned a couple times that leaving limit orders in place is a good idea just for the sake of catching a dip in price without having to watch for it. Definitely a fair point, but the spread between the bid and ask are still irrelevant when it comes to a Voyager limit order.

2. Voyager needs to offer a self insurance opt-in program similar to that which Celsius is offering whereby the user sacrifices a portion of their monthly earned interest (Celsius will be 0.5% - 1%, for example) so that Voyager users actually feel comfortable allowing their coins to sit on Voyager's platform. Yes, Voyager's security appears to be great, however, currently only $USD on their platform is FDIC insured. Voyager NEEDS to offer a self-insurance opt-in program since users are forced to keep (stake) their coins on Voyager to earn interest. Besides, if their security is as impregnable as they claim, then this self-insurance program would actually benefit Voyager by allowing them to pay slightly less interest to users. I, for one, would immediately sacrifice 1% interest to know my holdings were all completely insured.

3. Voyager needs to release its debit card as soon as possible. I would be first in line to get it. If I could



4. Voyager should offer a Voyager Pro (a la Coinbase Pro) whereby day traders pay slightly more for access to reduced spreads. This is a NECESSITY if Voyager wants to capture the ever-growing crypto day-trading audience. I've done many tests of Voyager's spreads compared to other platforms. Voyager's certainly aren't the best, but they aren't the worst. It ends up costing about as much to trade on Voyager as it does on Coinbase after you factor in Coinbase's fees. It's really about a wash. If you are a very active trader I unfortunately would recommend Coinbase Pro over Voyager. But Voyager is still absolutely the best for folks who just want to hodl their crypto and not trade, and just earn interest on Voyager all day long. Even for those who swing trade, holding coins over multiple days or weeks and then selling, Voyager is perfectly adequate. But if you're day-trading crypto, Voyager is not your platform, plain and simple. You'll get eaten alive by the spreads.

42

63. Even self-professed supporters of Voyager are unable to provide an explanation for Voyager enticing users to their platform suggesting to trade. If it was possible to explain away the reality of Voyager's trades (such as how what Voyager does with customer assets being "explained away" as "loans" or other vague terms), in my experience, those with an interest in defending Voyager would likely rely on such statements: but the math precludes such explaining way.

43

---

[42] https://www.reddit.com/r/Invest_Voyager/comments/ql9p7w/voyager_constructive_criticism/
[43]

https://www.reddit.com/r/VoyagerExchange/comments/myhi1e/usdc_transfer_cleared_in_10_minutes_see_ya_voyager/gvvohb0/

64. These paid YouTubers, often described as "educators", should have the wherewithal to know that Voyager's representations regarding trades are not accurate. Surely, had these educators utilized Voyager for day to day trades, they would have the experience to know it was to their own disadvantage to execute such trades on Voyager as opposed to a quantity of other platforms. Despite this, these "influencers" aggressively promote Voyager -- because there is financial incentive to do so in the form of affiliate links. The general public relies upon both representations from Voyager as well as from the "crypto influencers" promoting them as their form of second-source verification of Voyager's credibility. These "influencers" would not have as much of a lavish livelihood without Voyager affiliate links, and Voyager would not have near as many (plainly misled) users without the (incentivized) vouch to use a platform in a way that would ultimately be to their financial detriment.

## VIII. SUMMARY

65. Voyager's representations, particularly those about commission-free trading, best prices, and risk, are misleading and inaccurate, as demonstrated in this report and substantiated with the attachments to this report.

66. Anybody eligible to sign up for Voyager would be able to perform the same style of trade analysis I performed. There are examples of Reddit users performing similar steps already.

67. The blockchain industry often attracts "new blood" every bull market. Voyager's aggressive expansion in the late 2020/2021 bull market is, in my estimation, plainly targeting inexperienced cryptocurrency users/investors that would not have the experience to know better. New cryptocurrency users rely on active industry participants (companies such as Voyager, and "educators/influencers") to provide them with good-faith insight and not mislead them. Voyager's representations, namely those about commission-free and best price trading, would undoubtedly be understood to mean what they say they mean whether by a cryptocurrency novice or a deeply experienced expert.

68. It is only after trusting companies like Voyager (or the less than integral "educators" with paid incentive to promote them) and learning "the hard way" that Voyager users learn they lose money trading with Voyager. The same applies for any Voyager users

that learn of the realities of the risk of entrusting Voyager with their assets. It is practices such as these that have been a prominent barrier to mass adoption of digital assets: the general public will not trust the blockchain industry until companies in that industry conduct themselves to higher standards.

**// ENDS**

Richard A. Sanders
Lead Investigator, Principal
CipherBlade

# Exhibit A

(CipherBlade Preliminary Expert Report)



## CipherBlade
### Blockchain Investigation Agency

+1 (732) 890-7874
rich@cipherblade.com
www.cipherblade.com

Curriculum Vitae of **Richard Sanders, CRC**

*Forensics reports, Declarations, and other work samples available upon request and NDA signing.*

**Summary:** Combat veteran continuing a sense of mission as a blockchain forensics expert and cryptocurrency cybercrime investigator with experience in dozens of cases. Seen as subject matter expert by legal, law enforcement, and regulatory professionals. Experience working with top law firms performing forensics work and other expertise-based supportive efforts. Experience testifying and writing reports for a diverse array of cases involving cryptocurrency, including OTC deals, theft (as one example, SIM-swaps), and suspect ICO (misappropriation/embezzlement/etc.) disputes. Strong leadership, investigative, and analytical skills foster results.

## CipherBlade: Lead Investigator, Co-Founder

- Launched first-of-kind cryptocurrency investigative agency
- Leads team of 8 staff dedicated to uprooting fraud and discovering the truth via the blockchain
- Renowned expert in blockchain forensics (utilizing tools such as Chainalysis, Crystal, or tools developed internally by need,) briefing law enforcement, legal professionals, and senior level exchange executives/compliance staff on complex blockchain transactions, security vulnerabilities, and other rapidly evolving elements of new waves of crime
  - First Certified Investigative Partner with Chainalysis
- Expert witness with experience leveraging deep knowledge of cryptocurrency criminal methodologies and networks
  - Maintains active infiltration in underground hacker/scammer communities to maintain cutting edge threat intelligence leveraged by AML professionals and law enforcement
  - Developed and maintains list of common tendencies/observations of suspicious blockchain companies, which have provided 100% accuracy in data points upon reviewing ICOs/equivalent for mismanagement, embezzlement, and other crime
  - Serves as trainer and mentor for professionals in the public and private sector regarding fusion of on-chain and off-chain intelligence, leveraging OSINT and other techniques with blockchain forensics expertise to foster an environment in which "they can't hide"
  - Has a 100% success rate in unveiling undisclosed cryptocurrencies in divorce cases
- Lead investigator for dozens of cryptocurrency scams and hacks, most notably the 'OGUsers' ring with many arrests in 2018
  - As a lead investigator, is involved throughout full case lifecycle, from the time of incident through prosecution
  - Assists affected parties with stabilizing upon breach and gathering initial forensics data
  - Generates law enforcement reports in a renowned "pretty box with a ribbon" format, greatly enhancing likelihood that reports are actionable and serving as a catalyst for law enforcement action on highly complex cases that often lack past "playbook precedent"

- ○ Conducts investigation of person(s) of interest for such incidents, including social engineering of social engineers, and feeding identifying data to law enforcement which led to the arrests of many simswappers via REACT and the FBI
- ○ Assists prosecutors by feeding evidence and opinion in order to ensure person(s) responsible for these incidents are held appropriately accountable
- ○ Assists victims and legal counsel by generating Declarations, often enabling and expediting asset recovery after arrests and asset seizure
- Advisor for top-tier blockchain projects, such as Dusk and ChromaWay
- Leverages blockchain, regulatory, and cyber knowledge to serve exchange clients such as Bitbuy with solvency audits
- Provides public-facing expert research and opinion on controversial matters in the blockchain industry, such as the Coinomi vulnerability and ShapeShift/WSJ dispute
- Speaks at events and panels such as Blockchain In The Burgh to raise awareness about the importance of preventative security, AML, and public safety considerations
- Provides insight and training to numerous LEAs on complex issues such as BECs, elder abuse/fraud, romance scams, money mules, and other typologies that require additional external expertise

## Crypto Defender's Alliance: Leadership Team

- Selected to be one of five administrators of Crypto Defenders Alliance (CDA), an organization comprised of executives and AML/Compliance/Legal staff from nearly all cryptocurrency exchanges which seeks to thwart fraud involving cryptocurrency
- Observes best practices from work with CipherBlade clients and/or in the course of CipherBlade investigations and fields requests for bleeding-edge insight on complex topics such as mixers beneficial to even well-known, compliant exchanges such as Coinbase
- Led initiative to significantly bolster representation of member organizations in CDA based upon observing a need for representation from a particular continent (Africa), resulting in adding the majority of cryptocurrency exchanges focused in that region and uprooting untold millions in scam laundering
- Manages intra-exchange communication to combat ML and share best practices in the premiere industry self-regulatory organization

## Anti-Human Trafficking Intelligence Initiative: Blockchain Forensics and Industry/Law Enforcement Liaison

- Led initiative to significantly bolster representation of member organizations in ATII based upon observing a need for representation from particular cryptocurrency exchange and service typologies, with a special emphasis on P2P trading platforms and exchanges identified in the course of CSEM investigations
- On numerous occasions, acted upon intelligence provided within ATII that included Bitcoin wallet addresses pulled from dark websites soliciting and distributing CSEM. As just one example of efficacy and efficiency, coordinated dusting attack targeting 46 different child exploitation sites (at a $36 self-funded cost and with 15 minutes of effort) which resulted in data able to unveil thousands of CSEM purchasers and identify where the CSEM distributors were laundering funds
- Upon unprecedented results, was asked within months of membership to join ATII's Advisory team
- Participated in Follow Money Fight Slavery 2021 Summit on the Cryptocurrency Kiosk and Bitcoin ATM Panel

## Educational Qualifications and Professional Certifications

Mr. Sanders earned a Bachelor of Science degree in Homeland Security while on active duty with the US Army. Despite maintaining a work schedule that far exceeded the typical "9 to 5," he devoted almost the entirety of his off duty hours to utilizing the educational benefits provided to him as a service member to exceed the standard with a 3.7 GPA. He holds numerous

awards, affiliations, and memberships in a variety of functional areas, mostly within military and security work as well as philanthropic undertakings. The most notable of these is a CORe credential from Harvard Business School extension. Mr. Sanders holds a Certified Blockchain and Law Professional with the Blockchain Council as well as Certified Bitcoin Professional certification.

Mr. Sanders also holds a Chainalysis Reactor Certification, a course ran by the firm which provides the forensics tool most frequently utilized in blockchain forensics. During this course, Chainalysis staff shared that Reactor is a tool that presents data; analysis is still up to the analyst, and referenced Mr. Sanders as one of the top analysts. Mr. Sanders attended the first Chainalysis CISC course by request and provided immense helpful feedback. Minimal formal training exists for blockchain forensics, and *zero* training exists that covers the full spectrum, marrying on-chain and off-chain observations into a comprehensive skillset. Mr. Sanders has been requested to develop training for CDA, and is in discussions to begin guest lecturing. In short, Mr. Sanders is creating the educational qualifications.

- Certified Blockchain and Law Professional, Blockchain Council
- Chainalysis Investigation Specialist Certification, Chainalysis
- Certified Bitcoin Professional, CryptoCurrency Certification Consortium (C4)
- Chainalysis Reactor Certified Professional, Chainalysis
- HBX CORe, Harvard Business School

*Other experience and education available on* [LinkedIn](LinkedIn)

## Mr. Sanders in Press/Media

Mr. Sanders is in increasing high-demand for quotes for articles, podcasts, and interviews. Below are some of a continually growing list of the aforementioned:

- https://www.coindesk.com/cipherblade-okex-huobi-csem-morphtoken
- https://bravenewcoin/insights/podcasts/the-blockchain-detective-taking-on-elite-cybercriminals-and-owning-them
- https://thenews.asia/interview-with-rich-sanders-okex-and-market-transparency/
- https://decrypt.co/29865/meet-the-forensics-expert-who-tracks-stolen-bitcoin
- https://www.coindesk.com/crypto-scam-apps-in-app-stores
- https://decrypt.co/17103/forensic-investigator-sudden-shut-down-of-the-coss-exchange-looks-suspicious
- https://cryptobriefing.com/hitbtc-insolvent-scams-users-cybercrime/
- https://anchor.fm/scottcbusiness/episodes/Discussing-Cipherblade-With-Richard-Sanders-ebi2ot
- https://mondovisione.com/media-and-resources/news/chainalysis-launches-certified-investigative-partnership-program-to-meet-demand
- https://www.financemagnates.com/cryptocurrency/news/bitbuy-conducts-third-party-audit-launches-otc-desk/
- https://unchainedpodcast.com/how-to-keep-your-crypto-from-being-stolen-via-your-phone/

## Summary of Expert Witness Experience

Mr. Sanders has served as an expert for either or both Plaintiff and Defendants in cases involving, as some examples:

- Divorce
- ICO disputes against "soft exits" or other mismanagement
- Cases against ICOs (including Enforcement actions) and VCs/funds
- SIM swapping and other theft
- Cryptocurrency exchange account compromises
- OTC disputes
- Cryptocurrency taxes

- Immigration
- Source of funds
- Misappropriation/embezzlement
- Cryptocurrency exchanges
- Fraud
- Hacks
- AML/Compliance

Detailed case experience is available upon request.

# Exhibit B

(CipherBlade Preliminary Expert Report)

DocuSign Envelope ID: 18C4FE5B-FD70-422C-821C-18C8C18E51C9



**The Moskowitz Law Firm, PLLC**

2 Alhambra Plaza
Suite 601
Coral Gables, FL 33134
Office: (305) 740-1423
Direct: (786) 309-9585

**Partner in charge and of record: Adam M. Moskowitz**

Mr Richard Sanders
*CipherBlade LLC*
301 Grant Street, Office 270
Pittsburgh, Pennsylvania 15219
United States of America                          By email to:  rich@cipherblade.com

**July 16, 2021**

Dear Mr. Sanders:

**<u>Letter of Instruction Re: Mark Cassidy v. Voyager Digital Ltd., et al.</u>**

Thank you for agreeing to act as an expert in this matter.

This Letter of Instruction appoints and instructs you to carry out such investigations and inspections as are currently feasible, prior to disclosure of Defendants' documents, data, software and systems, and availability of other evidence, to produce an independent preliminary expert's report on behalf of our client, the Plaintiff, CASSIDY, in respect of the Complaint to be filed in due course by The Moskowitz Law Firm, PLLC, as captioned above. Any written reports or other documents that you may prepare are to be used only for the purpose of this Litigation and may not be published or used or disseminated in whole or in part for any other purpose without our prior written consent.

**1. The Parties**

This letter constitutes a retainer agreement ("Agreement") between The Moskowitz Law Firm, PLLC ("Counsel" or "Clients") as counsel for the class action plaintiffs ("Plaintiffs") in the subject litigation, and Richard Sanders and CipherBlade, LLC (collectively, "CipherBlade"), under which you will provide litigation consulting and expert testimony services in connection with the above-referenced matter. At time of writing, it is not yet known which attorneys will act for VOYAGER in this matter, but we will advise you as soon as known.

**2. Background and Allegations**

In regard to the issues upon which we request and instruct you to opine, in the field of your expertise, the background to and the allegations in this case are in summary as follows:

- Voyager, through its Voyager Platform, offers investors, developers and platform providers a fully functional suite of APIs and mobile apps to allow anyone who is legally able to do so the ability to trade, invest, earn and secure digital assets across multiple types of digital assets. According to its creators, Voyager "is a publicly traded holding company whose subsidiaries operate a crypto-asset platform that provides retail and institutional investors with a turnkey solution to trade crypto assets. The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace."

- VDL, one of Voyager's subsidiaries, acts as a "crypto broker," being a digital agent broker that facilitates users buying and selling of cryptocurrencies delivering deep pools of liquidity. It also offers a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.

- Included prominently throughout Voyager's uniform marketing representations to its customers is that the Voyager Platform offers trades that are "100% Commission-Free."

- Voyager's "100% Commission-Free" representations, however, are false and are reasonably likely to mislead objective consumers acting reasonably under the circumstances. While Voyager does not openly display the commissions it charges on each cryptocurrency trade, Voyagers utilizes various methods to secrete the exorbitant commissions it retains from every trade.

- To effectuate these unfair and deceptive business practices, the Voyager Defendants use proprietary systems they have developed, which they refer to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm."

- In describing the Smart Order Router, the Voyager Defendants maintain that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills them in the market for the customer using its proprietary order routing algorithm." The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across [Voyager's] liquidity sources and streams this price to its users.

- In reality, and unbeknownst to customers, the Voyager Defendants' "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" are designed to be intentionally obscure and to provide Voyager with hidden commissions on every trade that in most cases exceed the disclosed fees and commissions charged by its competitors. Voyager unfairly gains an edge on its competition and overcharges customers by collecting these secret commissions to the detriment of its unknowing customers.

- After being exposed to the Voyager Defendants' representations that their Platform is "100% Commission-Free," the Plaintiff registered for an account on the Voyager Platform on March 17, 2021, and in reliance on the Voyager Defendants'

representations, the Plaintiff executed a number of trades on the Voyager Platform, some of which are to be exhibited within the Complaint, for example as screenshots of the Plaintiff's May 11, 2021 'Market Buy trade at Order ID Dx65EW', enclosed herewith at Annex A.

Given that the Complaint has yet to be filed, please bear in mind that the expression of the allegations and claims in the case are provisional at this stage, and are highly likely to evolve in due course, with attendant likelihood of development of issues for you as an expert potentially to address.

## 3. Issues for you to address

We anticipate and request that you will work as a blockchain forensics expert in consultation and co-ordination with Dr Stephen Castell CITP, of *Castell Consulting*, the computer evidence, software and systems procurement, development, performance and quality expert whom we are also retaining, with instructions *inter alia* to work with, but independently of, you, to monitor, record, write-up and analyse the concurrent test trades that you will carry out using and operating the Voyager App and certain other cryptocurrency trading platforms.

We request and instruct you to

- Review the Complaint, in particular the screenshots enclosed herewith at Annex A, together with consideration of initial case documentation that we provide to you.

- Carry out and record a representative series of concurrent test trades using and operating the Voyager App and certain other cryptocurrency trading platforms. We will discuss and agree with you appropriate arrangements to achieve this, for example as regards setting-up identities, subscriptions, logons, and funds to carry out these representative test trades.

- Produce blockchain forensic examinations by way of provisional analyses, findings, conclusions and opinions, giving such insights as may be sensibly achievable based on both the restricted documentation available prior to discovery and disclosure and relying on the data obtained from the concurrent test trades that you will carry out.

Notwithstanding the above, if having read this Letter of Instruction, you feel that you may not have the appropriate experience or expertise to deal with these matters, please let us know immediately.

## 4. Expert's Duties

It is understood that (i) you will make reasonable effort to be available upon reasonable advance notice; (ii) you will keep confidential all information obtained, or analyses developed, in connection with this or any related litigation with respect to which we may seek your advice and counsel; (iii) you will use such confidential information solely in connection with this engagement on behalf of the Clients; (iv) you will preserve any written materials, including emails, generated or received in connection with this engagement; (v) you will not in the future consult for, or otherwise represent, any other person or entity with an interest adverse to the Clients' interests in or concerning the pending Litigation, or the events or occurrences out of which the pending Litigation arises; and (vi) you will keep confidential your retention in this

matter, unless and until you are identified in court papers as a testifying expert, or Counsel otherwise authorizes you to breach this confidentiality.

It is specifically understood that communications with Counsel that identify facts or data that have been provided to you, and which you considered in forming your opinions, as well as communications that identify assumptions provided by Counsel and upon which you relied in forming the opinions in your report, may become discoverable.

You agree that: (i) you will not prepare any draft opinion or report without Counsel's consent (regardless of whether the draft is for internal purposes or to share with others); (ii) you will not share any draft opinion or report, or any notes, with any other person without Counsel's consents; and (iii) every draft opinion or report will bear the following legend: "THIS IS A PRELIMINARY DRAFT. IT HAS BEEN PREPARED BASED ON PRELIMINARY INFORMATION AND ASSUMPTIONS. NO ONE MAY RELY ON THIS DRAFT. IT IS SUBJECT TO CHANGE AS ADDITIONAL INFORMATION BECOMES AVAILABLE OR IS CLARIFIED".

It is further understood that, if called upon to provide a written report of your procedures and findings and to supply expert testimony at deposition, trial, or other hearings, your report will need to comply with federal and local court rules or procedures, if any, regarding expert reports, and, in connection with preparation of a report, opinion, or testimony on a matter, you will need to perform those procedures that you consider necessary to express a professional conclusion. Counsel may revise the scope of your work at any time during the course of our engagement. You agree to provide copies of all your working papers and work product to Counsel and the conclusion of your services.

## 5. Your report

As emphasised above, you are appointed and instructed to carry out such investigations and inspections as are currently feasible, including the concurrent test trades that you will carry out, prior to disclosure of Defendants' documents, data, software and systems, and availability of other evidence. We therefore instruct, acknowledge and accept that the independent expert's report that we wish you to produce will at this stage be of a preliminary nature.

Notwithstanding its provisional status, the report provided by you must comply with the applicable requirements of the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the best practices and guidelines developed by the US National Institute of Justice's Scientific Working Group on Digital Evidence. You acknowledge that the opinions you render in this matter shall be made in good faith and supported by a reasonable amount of research and analysis. Prior to the release of any opinions to the opposition, and the rendering of any testimony, the parties will review the facts and circumstances surrounding your work and opinions. Further, the parties will review and agree, prior to the release of any expert opinion and the rendering of any expert testimony, that the anticipated testimony has a basis in fact and such testimony is both relevant and reliable. Please let us know immediately if, at any time after producing your report, you change your views.

It is also important to let us know promptly if you need to update your report after it has been filed with the court (whether that be the preliminary expert's report envisaged in these instructions, or any future report that may be produced by you for this matter), for example

because new evidence has come to light, so that we may consider whether an amended version of your report or a supplemental report should be served.

**6. Timetable**

As the Complaint has not yet been filed, there are at this time no court proceedings and therefore there are no court directions in relation, for example, as to when expert reports must be ready. However, it would be helpful if you could proceed immediately with your work, with a target to produce a draft of your preliminary expert's report within the next two months. Please let us know immediately if this target at any time appears to you to become unworkable for any reason.

The term of this retention is from the Effective Date to (i) termination of this retention by either party by giving written notice to the other (such termination shall be effective on the date that the party receives the notice in fact); (ii) the completion of the services; or (iii) Client's receipt of the final invoice for professional fees.

**7. Next steps, and Fees**

If you accept these instructions, please let us know:

(a) That you confirm that you have had no prior dealings with any of the parties which could cause a conflict of interest.

(b) When you anticipate completing your report, and if you envisage any difficulty with the target to produce a draft of your preliminary expert's report within the next two weeks.

(c) That you confirm your earlier budgetary estimate that the likely costs of providing your preliminary expert's report will be a maximum of $7,500 (seven thousand five hundred US Dollars). Please say at the earliest opportunity if it appears at any time that your fees in the event and in the out-turn of the work that you undertake pursuant to these instructions are likely to exceed your budgetary estimate of $7,500.

Subject to these confirmations, we will immediately disburse to you, as you have requested, 25% x $7,500 = $ 1,875 as an up-front good faith payment on account; and we agree that beyond that we will pay your Invoices to us within 30 calendar days of receipt.

We understand that your fee is not contingent upon the final results and you do not warrant or predict results or final developments in this matter.

We look forward to hearing from you.

| Yours faithfully, | ACCEPTED BY: |
|---|---|
| ....................................................... | Richard Sanders, CipherBlade LLC |
| **Adam M. Moskowitz, Partner,** | By _Richard Sanders_ _____ |
| **The Moskowitz Law Firm, PLLC.** | 36FA655E3FB545F... |
| | Date: 7/19/2021 _____ |

Enclosures: - Annex A: Plaintiff's screenshots, May 11, 2021 'Market Buy trade at Order ID Dx65EW'.

# Exhibit C

(CipherBlade Preliminary Expert Report)

This file contains a list of all cluster exposures of the cluster identified by the following root address:

1A5PFH8NdhLy1raKXKxFoqUgMAPUaqivqp

This cluster is also known by the following name:

InvestVoyager.com

Each row represents the exposure that this cluster has with a particular counterparty.

Counterparty Root Address: The counterparty cluster root address.

Counterparty Name: The name of the counterparty if known.

Counterparty Org Name: The organization's name for the counterparty if any.

Counterparty Category: The category of the counterparty if known.

Directly Sent: Value sent directly to a counterparty.

Directly Received: Value received directly from a counterparty.

Indirectly Sent: Value sent indirectly to a counterparty.

Indirectly Received: Value received indirectly from a counterparty.

| Counterparty | Counterparty | Counterparty | Counterparty | Directly Sent | Directly Received | Indirectly Sent | Indirectly Received |
|---|---|---|---|---|---|---|---|
| 3KSggJwfH2uy21Y6SrTboUcxgDd6 | | unnamed s | | 0.002531 | 0.002531 | | |
| 3MxXs3Z3TtRQZotq3oE5Vp2n4hH | | unnamed s | | 0.004181 | 0.004181 | | |
| 13i3hvDAALJWtxKL5S9SocdyaWN | | unnamed s | | 0.008139 | 0.008139 | | |
| 1PykLeAtdXu9tzWjN4B1y93nnNiG | | unnamed s | | 0.001722 | 0.001722 | | |
| 3LgybuU6fwZay74qhvJzY4feKQqx | | unnamed service | | | 0.005 | | |
| 1JD8a6jqkiesiAkoGUAMB7FxDqqs | | unnamed s | | 0.00409 | 0.00409 | | |
| 3BrtXDkq7YysMs9SivgSoP4EN6vG | | unnamed s | | 0.019302 | 0.024302 | | |
| 36ybwtbpYhfRrkEfaPpUnxrSYsXoA | | unnamed s | | 0.061631 | 0.061631 | | |
| 1FgkypgnEqHjrViw6m2Myv7S62m | | unnamed s | | 0.0005 | 0.0005 | | |
| 1BYrY696S | BitFin-Profit.com | | scam | 0.005684 | 0.005684 | | |
| 162a8SgmShEdh6seVP1hSh6oY1y | | unnamed s | | 0.001738 | 0.001738 | | |
| 3AdZb32ZCdqtWvwTKbeHmLZiykr | | unnamed s | | 0.013127 | 0.013127 | | |
| 32D3o5Q3JVZ3qWAtjB665Sqt54R | | unnamed service | | | 0.015 | | |
| 3KVoVaPEdZLJFCzz9dyF2nw7rSapj | | unnamed service | | | 0.155 | | |
| 3Ea6vw9XPLg6jLaFRFPQUxB2djXo | | unnamed service | | | 0.005 | | |
| 1FiMEvYs5zXqjzwBVNwArz1Hnrith | | unnamed s | | 0.000863 | 0.000863 | | |
| 3CbyFS9xij | Beurax.com | | scam | 0.206399 | 0.281399 | | |
| 1Jb54NRHcA17ZhAWb4EEiNTeMN | | unnamed s | | 0.002406 | 0.117406 | | |
| 3Lcb5Cxpt | Vinex.network | | exchange | 0.043072 | 0.043072 | | |
| 3K1hRk3K4DsDDRFVSAxDZSUTqfT | | unnamed s | | 1.300505 | 2.045505 | | |
| 1KK6MhmvHWftd3BAvJPgDyHqCs | | unnamed service | | | 0.01 | | |
| 385FJC2fQDHANwrB18X745poKw | | unnamed s | | 0.133792 | 0.143792 | | |
| 3EguRmvKEELoypUBzq9cKfX7pRe | | unnamed s | | 0.021141 | 0.021141 | | |
| 394HMw5ZnfqgoDD2PhEPhgKy5t | | unnamed s | | 0.125 | 0.135 | | |
| 11eeMB2t | Bitnuvem.com | | exchange | | 0.26 | | |
| 3HkevfL5iYNRsiyESQASoGmE3isF6 | | unnamed s | | 0.049117 | 0.074117 | | |
| 14dr13aqq | Coinmotion.com | | exchange | 0.028076 | 0.103076 | | |
| 3Femjk716ctbFKmFcoErA2skw9D | | unnamed service | | | | | 0.005 |
| 1EjbxKiFf2FmUtVKD7XFvXLxpw8P | | unnamed s | | 0.01045 | 0.01045 | | |
| 19rHumBr | Midland City Market | | darknet ma | 0.001278 | 0.001278 | | |
| 3Ag6VSUcWvPDJ6Cz82TexMFS8tE | | unnamed s | | 0.00621 | 0.01121 | | |

| Address | Entity | Type | Amount | Total | Extra |
|---|---|---|---|---|---|
| 19vRqiFxF\ | MercadoBitcoin.com.b | exchange | 0.001264 | 0.246264 | |
| bc1qxg08npzk9wt5yddvtxsgrhqv9 | | unnamed s | 0.001696 | 0.001696 | |
| 1DQoyyxYyK1fyjmEw9LFi81NSKh4 | | unnamed s | 0.011891 | 0.146891 | |
| 31oYFVAkc2TZHfrwXwjmXNf8zbD | | unnamed s | 0.047222 | 0.052222 | |
| 18XtLeuQmWMq3XgekzDD7F3fYjl | | unnamed s | 0.012919 | 0.012919 | |
| 1Hf4X1wv› | Bitflyer.com | exchange | 0.008497 | 0.573497 | 0.365 |
| bc1qq6z7gpa37r7m60u7nye494c7 | | unnamed s | | 0.005 | |
| 1HmRBNkikqjm9AqmHgVSQ8qtnF | | unnamed service | | 0.005 | |
| 14UpoWT2fAzGqR9EoJc9LnUtinyz | | unnamed s | 0.002728 | 0.002728 | |
| 16omr5mMRbCM5U4PXfgp3ttsdX | | unnamed s | 0.147442 | 0.157442 | |
| 36pGw6RKDajFYoo2CVtd3ffLyoQy | | unnamed s | 0.005012 | 0.005012 | |
| 1PuxTMpMTp4PfaP3z59mHGb5u\ | | unnamed s | 0.006358 | 0.006358 | |
| 17dPYT2J8 | Bitkan.cc | exchange | | 0.045 | 0.035 |
| 1NvbUHhN | SpectroCoin.com | exchange | 0.001296 | 0.011296 | |
| 1CGeoGj1mhdMpYSvwotnpDof9N | | unnamed service | | 0.03 | |
| bc1qjjcjgrygxhqzvlls396e5xrav0v3 | | unnamed s | 0.046391 | 0.061391 | |
| 34Q9x8PpgZs4xNJyX1HTvpUuM5F | | unnamed s | 0.002314 | 0.002314 | |
| 121JKycF49azRNydoTqZ9p6Widbx | | unnamed service | | 0.12 | |
| 3Qse8seS95csJzZwVk9paJBSqgL2v | | unnamed service | | 0.005 | |
| bc1qetf3cdykuwvucrnw0209e6nfj | | unnamed s | 0.001109 | 0.001109 | |
| 38jZQHdF9iRJpUzNq18y3FdbCz3d· | | unnamed service | | 0.01 | 0.015 |
| 15fUHLdSf4foBayDAFVcj73scK3Nt | | unnamed service | | 0.115 | |
| 1HYtksnVuYR8KsKrtDcobG25NmV | | unnamed s | 0.004183 | 0.004183 | |
| 1JojQz1Dat5LgJCXRrwsqqtpMhvQ | | unnamed s | 0.00264 | 0.00264 | |
| 1GvgBV9QMeuoRq2iiaEf3gNB6CU | | unnamed s | 0.0536 | 0.0536 | |
| 1JpA8hRECiAxLzBdaM8uiW16K2D | | unnamed s | 0.041222 | 0.941222 | |
| 1NB194ABEPPUF4UYMGoeii1Koid | | unnamed service | | 0.225 | |
| 12Qb2WT4DFN7JZsBQ8apGo5fwZ | | unnamed s | 0.000871 | 0.000871 | |
| 1DEi9qTAa | ArlingtonLtd.com | scam | 0.001855 | 0.001855 | |
| 179Ns3Bb; | 1xBit.com | gambling | 0.024512 | 0.294512 | |
| 1MRT5rtUkEKWoXNhiUtTWYSniV‹ | | unnamed s | 0.003143 | 0.003143 | |
| 3EFwE3irdqRTFsoHgLcCmUhkgbd; | | unnamed s | 1.161047 | 1.371047 | |
| 1DsjMt736 | CardPay.com | merchant services | | 0.005 | |
| 3Na9V3JGiwWRGeCmowj3EJFD7S | | | | | 0.05 |
| 35j4WzbtSdpRtMnTsieoZC68wYRI | | unnamed service | | 0.1 | |
| 13bqM6Ty | YoBit.net | exchange | 0.733491 | 1.038491 | 0.025 |
| bc1q2kl0g5 | Safir.com | scam | | 0.035 | |
| 19NVo5Tq\ | Alameda-Research.cor | exchange | | 0.05 | 8.41 |
| 14f1TYhojqojBamqJ9eNCzdpSNZb | | unnamed s | 0.012489 | 0.012489 | |
| 1EzCcTzpc; | Unknown - OTC relate‹ | exchange | | 0.225 | 1.345 |
| 1ESX1mWXE2ghv4rfyzstXmFqkVr; | | unnamed s | 0.001674 | 0.001674 | |
| 32K9jnJXsh9wGhojJC1BxHFKmcyn | | unnamed s | 0.001771 | 0.001771 | |
| 1EAMFGeZ | CoinPal.eu | high risk ex | 0.000118 | 0.000118 | |
| 1HEbhxYWPgFm6PaQFQ4sgYSQ3t | | unnamed s | 0.0031 | 0.0031 | |
| 33sQnQkQtRg82EXuA5d6azdR6bT | | unnamed s | 0.027537 | 0.027537 | |
| 3DB9tbpvWaAZ22gDEGeMfaopnS | | unnamed s | 0.002869 | 0.002869 | |
| 1JCt5NyXebnHvUA2KZRqk8FzJmK; | | unnamed service | | 0.045 | |

| Address | Type | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|
| 1DrMUEjYWtMpUJ9X68oqwvGpw | unnamed s | 0.000847 | 0.000847 | |
| 14gWr1it6VfLBym4zcZ2SeGr2Nn9 | unnamed s | | 0.005 | |
| bc1qn0ctl6sv544xnzdkwjsk6nxwfh | unnamed service | | | 0.045 |
| 1NvSP3Lhq | Treddr.org | high risk exchange | | 0.195 |
| 1MjSJWvZL | Remitano.com | p2p exchan | 21.01353 | 46.31353 | 0.015 |
| 1EcvtByUf6 | Elon-Start.com | scam | 0.0506 | 0.0506 | |
| 1Ka7wHST( | Alfa.cash | exchange | | 0.005 | |
| 1JzLdPwKy | Bit2Me.com | exchange | 0.259631 | 0.294631 | |
| 3Mk2v3SZkmeEJRAG8pNSk1Nfqp4 | unnamed s | 0.002931 | 0.002931 | |
| 14CoNVrdf | Capitalist.net | high risk exchange | | 0.025 | |
| 35wTyBhuI | Blockchain.com | exchange | 4.04469 | 11.72969 | 20.355 |
| 1JhXJcY99oJY37gH1JWBTsKGsred | unnamed s | 0.001556 | 0.001556 | |
| 3CpaqEr89dMUasjj6m4kpPWxW6 | unnamed s | 0.016784 | 0.016784 | |
| bc1qcrpkv7z80pxqaf205yp5x4xrw | unnamed s | 0.001168 | 0.001168 | |
| 3CktP3eTZGeV9zMatyCv5cDhVjFf | unnamed service | | 0.075 | |
| 1BPX2UncW7FnyE2Nf8CqFyop26c | unnamed s | 0.006139 | 0.006139 | |
| 12Cxiy4zoLhv3hr8fw872h6UJJUxP | unnamed service | | 0.02 | |
| 1F42xewV( | FreiExchange.com | exchange | 0.209862 | 0.209862 | |
| 353fQtFZ48MqyXKDW17FpAzXXQ | unnamed s | 0.000995 | 0.000995 | |
| 3Q2FY263h7XgXiWrHSx576ySJXM | unnamed s | 0.004036 | 0.034036 | |
| 36jhhQoCXNH1nvZmTp8LVSurh6L | unnamed service | | 0.335 | |
| 3MohFRDvH92Mw9PFcFVX1SJ961 | unnamed service | | 0.03 | |
| 31kzrYKYUYrBkDLbpXaerZniVSykG | unnamed s | 0.006418 | 0.006418 | |
| bc1q063ywyc4mcwpuye4jvfp65j5 | unnamed s | 0.051299 | 0.056299 | |
| 1M6jZJ8jjW | Coineal.com | exchange | 0.513422 | 0.518422 | |
| 3HHmT56SkXfpTEUmyPncf39soPr | unnamed s | 0.002887 | 0.002887 | |
| 124i2uNuo | Bybit.com | exchange | 173.4272 | 196.2372 | 0.29 |
| 1GwcJAbjpJdtBevo1C4tKtyfGyhuh | unnamed s | 0.00863 | 0.00863 | |
| 37s8wLdup | AuraeLifestyle.com | exchange | 0.06416 | 0.24416 | |
| 39G3BQiA\ | StakedWallet.io | exchange | 0.261438 | 0.551438 | |
| 3JK79Yk4Yi | BTSE.com | exchange | 3.649873 | 3.774873 | 5.605 |
| 1DZUvCjcY | Daily Stormer | other | 0.003055 | 0.023055 | |
| 1KjGN7dkJ8mjg3PuvBCtjecYDb9tg | unnamed s | 0.00255 | 0.03255 | |
| 1CpCfv26F | 777Coin.com | gambling | | 0.005 | |
| 3Dmq4aQcmAeixKBG1badoG7b29 | unnamed service | | 0.005 | |
| 37eY2X5gn7JrSw3QfzxtV195FLpq | unnamed service | | | 0.015 |
| 3Gf7Ubuh\ | CloudTokenWallet.con | scam | 0.008277 | 0.008277 | |
| 19m2wcW9S6ma5mdSDFGf5V3Sf | unnamed service | | 0.015 | |
| 113Ax5HTxdGFyFwdWw4EmYTwNff4WFRdZ3 | 3.288658 | 3.468658 | |
| 3MY9zybuwu7WcnZRjPxWZVbyG( | unnamed s | 0.000862 | 0.000862 | |
| 3FvWRe38 | MyPatricia.co | exchange | 1.117689 | 3.652689 | 0.04 |
| 39z4gP1YPi6SkVmTixmeue9bET64 | unnamed service | | 0.005 | |
| 3AJNpmW | Zrobank.com.br | exchange | | 0.015 | |
| 1KcqeqiEsWM3cs7Rdsq8JoLwXrK | unnamed service | | 0.015 | |
| 33yfoJZS9xa2TYCXgeByhiXHYHQ4. | unnamed s | 0.494846 | 0.544846 | |
| 3E5MLYpK: | Vauld.com | exchange | 8.387635 | 8.402635 | 0.005 |
| 31wJ8Ytxm7MXWroAybXBmT8GS | unnamed s | 0.00087 | 0.00087 | |

| Address | Type | | | |
|---|---|---|---|---|
| 1FKhtSjNzzMz9ATDmEuX2GN3Cn | unnamed s | 0.04617 | 0.04617 | |
| 15cffdyM4UHBMR47CJkkpM2LGG | unnamed s | 0.001815 | 0.001815 | |
| 12RUHxG4 StarFXTrade.com | scam | 0.064944 | 0.064944 | |
| 1APtUkdCYFwMMCmPhxUADn49 | unnamed s | 0.002571 | 0.002571 | |
| 1MmSy2RGLgXUYwKWwFD2x8f38 | unnamed service | | 0.125 | |
| 16f5J7mUPaRzJh9sbrSbCPUYn4rS | unnamed service | | 0.005 | |
| 1HJu4LBAp71bUdsXDVEPq7JXjsVj | unnamed s | 0.002013 | 0.002013 | |
| 1CCCMgxC Betcoin.ag | gambling | 0.252799 | 0.272799 | |
| 1Q1So4svzrDU96HdZkT2RDeUYNI | unnamed service | | 0.015 | |
| 3HmLXhZvBaz9hFQ3tpneBbD776 | unnamed s | 0.044826 | 0.044826 | |
| 16JnQtUUV17LPsM5RKo6gdG2Yw | unnamed s | 0.003119 | 0.003119 | |
| 1FW2RPc4iAQMgqEu6rs2tEEwz9z | unnamed s | 0.086391 | 0.086391 | |
| 3BzfahFcTH722WBiATxFzvqxjstwq | unnamed s | 0.388395 | 0.403395 | |
| 3CaKmrN9tXha3axGLuZJuoSmu5D | unnamed s | 0.002997 | 0.002997 | |
| 1GF7tb3TeSNZg2Xz8dGMszhT5sg | unnamed s | 0.00265 | 0.00265 | |
| bc1qfn2dralqzvl9kycxkkdqzcwegv | unnamed s | 0.000545 | 0.090545 | |
| 15hTqNp3B9CjQkLWS7eyKshpHtJ | unnamed s | 0.002782 | 0.002782 | |
| 38Tti9yCQvQzPYSKmx1AcfBA4adc | unnamed s | 0.000172 | 0.000172 | |
| 397TTqd2hWFwqXoyfEz7KRTXHJB | unnamed s | 0.000526 | 0.000526 | |
| 1CWLNzV2JBbXGiAyG42AayK3gyg | unnamed s | 0.05 | 0.05 | |
| 16NRbcfeif Wisenex.com | exchange | 0.042321 | 0.047321 | |
| 3463GtcgsC1P2DpUdAqBSpzFV48 | unnamed service | | | 0.005 |
| 3HKgjiJtCyyKwm5Xoybeabk66FE9 | unnamed s | 0.001362 | 0.001362 | |
| 33gD2hQPNE8qrMwJZdpHZqXjmc | unnamed s | 0.002725 | 0.002725 | |
| 1LjsdpqBi8KwysRjGP8DaewZa2UL | unnamed s | 0.005737 | 0.005737 | |
| 1LQkopHckYPeznXDE7tDZp9Le73 | unnamed s | 0.012105 | 0.012105 | |
| 1MPxhNkS Eobot.com | mining poo | 0.002004 | 0.002004 | |
| 12zbMvivw AltCoinTrader.co.za | exchange | 0.0832 | 0.1682 | |
| 3Ho76w8DEptVVDp5cgBKrSvkYW | unnamed s | 0.002009 | 0.002009 | |
| 35UpZeJjPNbmB5118iu6NtVdG4w | unnamed service | | | 0.005 |
| 35iz9SjxQ13H1FtJF114hsi7tVCuQy | unnamed s | 0.003545 | 0.003545 | |
| 1NiSnhVnhM6JX4QrsiijbaSzTNNzv | unnamed s | 0.00602 | 0.00602 | |
| 3PATJ4VW Wiseling.com | scam | 0.063717 | 0.118717 | |
| bc1q007ktfwu0uvgqp4h2gngsnwe | unnamed s | 0.300137 | 0.300137 | |
| 1159gPPkk Binance.co.ug | exchange | | 0.005 | |
| 3L5TN7azjJ UpStake.com | scam | 0.479642 | 0.479642 | |
| 17irZp3osl Graviex.net | high risk ex | 0.280841 | 0.400841 | |
| 12SF14zCj8F2PNgRRTZUsheBy4tu | unnamed service | | 0.005 | |
| 3EpWQ9nC Bestcoin.cc | high risk ex | 0.002183 | 0.072183 | |
| 12TxTR4H/ CoinsPaid.com | merchant s | 22.84716 | 29.14716 | 0.205 |
| 35cyEo8vs8E5Bm4VbVf4ehzTsq4s | unnamed s | 0.109282 | 0.109282 | |
| 19mNAKRWCDNoGgbYzo9nfvvdp! | unnamed s | 0.09291 | 0.09291 | |
| 3DxoHKwrnpS1rwRYhcxH3tBZDtz! | unnamed s | 0.019963 | 0.019963 | |
| 34CjiGcV152AmqfKbwrSk2J8LnNj; | unnamed service | | 0.005 | |
| 3F7LMHvdCCT4jrq9vy5oksZ3nnv6 | unnamed s | 2.727284 | 4.417284 | 0.005 |
| 15vvtAvb5xZnmLu8yXsxTjtEwBKo | unnamed s | 0.000877 | 0.000877 | |
| 1NZuJQoKWCuHKag8N3Aykv7jjxSj | unnamed service | | 0.015 | |

| Address | Name | Category | | | | |
|---|---|---|---|---|---|---|
| 36VrhWLeNJw43tfMNho7jYoikcQl | unnamed s | | 0.0019 | | 0.0019 | |
| 1GqJY68iniK9VZY6j2xoEYqgsdyUu | unnamed s | | 0.000968 | | 0.000968 | |
| 1J2WpKBXiBqJrqnFCF6bAh8oCbFv | unnamed service | | | | 0.05 | |
| bc1q5cglx06z560gefkfwyn590ngs: | unnamed s | | 0.000742 | | 0.000742 | |
| 14LdcGmSQwBKhczviDxxoUZB8Bc | unnamed s | | 0.059223 | | 0.094223 | |
| 1GSnEH7JMjA62SeJjxBPEDEBdpEV | unnamed s | | 0.00323 | | 0.00323 | |
| 1iLS92j87aZX3DGUtmLD9rbGqqyc | unnamed s | | 0.011938 | | 0.011938 | |
| 1PiFCa4SVYtR9t82XSnSn58ZGRdg\ | unnamed s | | 0.001576 | | 0.001576 | |
| 3LLCW2mN KriptoFuture.com | | scam | 0.007081 | | 0.017081 | |
| 372g49ypSjfU47RK1AFqgiFBNhUJ; | unnamed s | | 0.004467 | | 0.004467 | |
| 1N3sdjZLtbH73f7xMotgDAHD1RG | unnamed service | | | | 0.025 | |
| 1EcKjT5yFzjkdx93FStzDC5M5ke4E | unnamed s | | 0.003145 | | 0.003145 | |
| 1PyVpYaghynxVqtYBKAZk8Bh4yez | unnamed s | | 0.001969 | | 0.001969 | |
| 1EBxfTS1tokmeucXtFCU7JG1jWvg | unnamed service | | | | | 0.005 |
| 121SexEkuGG6uYCnaBeJXb8Gzy3) | unnamed s | | 0.017478 | | 0.017478 | |
| 3EpAoixkwcQFQWWfZndvFZL9AFi | unnamed service | | | | | 0.01 |
| 1NeQRg5N Swiped | | fraud shop | 0.001413 | | 0.066413 | |
| 3ErJs869cBoqZNpd3RHAfcn9y9r8J | unnamed s | | 0.00245 | | 0.00245 | |
| 1MPtV8XHfJ7MBfXyq7JVuyEyxLHt | unnamed s | | 0.001759 | | 0.001759 | |
| 17TJ2fV6xagrE2YyyTqkXbvPLn1bd | unnamed service | | | | 0.19 | |
| 3M8a8f27BNsCM7XcFA313DEzf11 | unnamed s | | 0.001487 | | 0.001487 | |
| 1LA9YnPw2pkUgz11EoYKTMxsQXl | unnamed service | | | | 0.005 | |
| 1Ccb4vrC5; GateHub.net | | exchange | 0.853197 | | 0.853197 | |
| 37Mx5f2WgGYG97TWRKyFe8kRK( | unnamed s | | 0.000719 | | 0.000719 | |
| 1D8kq4k2F7Rzu17iHmcQBMmfRj{ | unnamed s | | 0.001795 | | 0.001795 | |
| 1F3snS9Lj1sYXtt77fghA3kz5fV9Mi | unnamed s | | 0.076521 | | 0.076521 | |
| 15xKBrKaZLsKgnYpMwrvhKsVAdE( | unnamed service | | | | 0.035 | |
| 1CidQFc4t5numHZbbXHg3bWKBj¢ | unnamed s | | 0.011573 | | 0.011573 | |
| 12yWf6kiPrqU48C6j5KecxJJrjjdAx( | unnamed s | | 0.018229 | | 0.208229 | |
| 3MoMhpEmP2mnP4SpV1qsAR1Fs | unnamed s | | 0.027049 | | 0.027049 | |
| 1GyYQm63G7dxMQANFQ3cqHort | unnamed s | | 0.013877 | | 0.013877 | |
| 1Aag81N7: VideForex.com | | exchange | 2.869833 | | 3.209833 | |
| 1CLVSiUM( 999Dice.com | | gambling | 0.003904 | | 0.003904 | |
| 1Je3RohZT Coinbase.c Coinbase | | exchange | 889.8902 | 1287.124 | 1230.555 | 1523.434 |
| 1DMY9SDrFQ3fAosybLL3XpwUjy2 | unnamed service | | | | 0.005 | |
| 1JpHqujvjHRV5JGJdjYKAr4pTpu2c( | unnamed s | | 0.021226 | | 0.021226 | |
| 3AXFz8QSg3Qi1fWvfAMguLWrUY( | unnamed service | | | | 0.045 | |
| 1DAUV4wFZ63DWKVSLaugrWVLsi | unnamed s | | 0.001304 | | 0.001304 | |
| 3C7c5D6Hchm81vusE2qJvieVA1Lh | unnamed service | | | | 0.025 | |
| 1HKbWwkSCMmthA2Fp8FM4Wg{ | unnamed service | | | | 0.005 | |
| 12joBw5YEPtMWfWit2pvgZqPDyk | unnamed service | | | | 0.08 | |
| 3NM4R4pM3t5Yviy3FJGNbKwGYg | unnamed s | | 0.0008 | | 0.0008 | |
| 113aGtCDKfWK6wXvPMjUXxV8Lci | unnamed s | | 56.26341 | | 60.98841 | |
| 19zMaBnCUyAAMvdBjXTmVeKFh( | unnamed s | | 0.014935 | | 0.014935 | |
| 1DYagqyovQdSqhRbKUFQT8hb6sc | unnamed s | | 0.004912 | | 0.004912 | |
| 17zDJLqWRRJskCrD8sNCjiZyBqner | unnamed s | | 0.015278 | | 0.015278 | |
| 3NeU66QEdLDd1ikdXYgehWA55n | unnamed service | | | | 0.005 | |

| Address | Type | Amount 1 | Amount 2 | Amount 3 |
|---|---|---|---|---|
| 1HSeAdHcHmRxTkZGfaJntpf7Zjb2 | unnamed s | 0.003285 | 0.003285 | |
| 1odKLv7nxvR6shxCG26gWLsTtUS | unnamed s | 0.067272 | 0.067272 | |
| 122iCR477 Elite-Trade.ltd | scam | 0.003155 | 0.003155 | |
| 1Liw1Ds2U Coinbene.com | exchange | 2.882543 | 3.367543 | 3.065 |
| 18vLNrPFiDGPb8yqLw83AbAbMB | unnamed s | 0.0066 | 0.0066 | |
| 1MuskEzLh BTCLive.top | scam | 0.005304 | 0.005304 | |
| 1H7GC7BB AmazonToken.Pre-Sale | scam | 0.049065 | 0.049065 | |
| 14t53P6ED9YXdBUHE9qXxmdku3 | unnamed s | 0.0029 | 0.0029 | |
| 3A3mecxQcTCVjbKve9SwuY9GNQ | unnamed service | | | 0.005 |
| 3DLFqkBZ41GTpWpSJvyFY3U7piFl | unnamed s | 0.086425 | 0.106425 | |
| 3H45wmkc Bitkub.com | exchange | 0.024966 | 0.094966 | 0.01 |
| bc1q8d9vatp6mtmjudz80gw9fu9z | unnamed service | | | 0.14 |
| bc1q6dzys BC.Game | gambling | 0.157601 | 0.262601 | |
| bc1q8jel57nw3rv5qrnvp6h7mn99 | unnamed service | | 0.01 | |
| 38FjsVydcz1GkWt7iuwnNwYAi13a | unnamed s | 0.002004 | 0.002004 | |
| 168R1FXVqf2TzkeoMJhp1JmucH8 | unnamed s | 0.00049 | 0.00049 | |
| 18NPK9bY; Livecoin.net | high risk ex | 0.256741 | 0.261741 | |
| 12omJJvXH Bleutrade.com | exchange | | 0.005 | |
| 19th5ZHDL CloudBet.com | gambling | 0.114411 | 2.399411 | |
| 1QJq6ijdJG Empire Market | darknet ma | 0.781639 | 1.281639 | |
| 3Dbm1wfXfAFDGAYBhc7jSUQWvl | unnamed service | | 0.01 | 0.23 |
| 19escNLnnxu79UwWstvK8SzJ6cm | unnamed s | 0.031885 | 0.031885 | |
| 17ZRfRZWhVp3u3HwQTRaWMfH9 | unnamed service | | 0.39 | |
| 15hWy4Nyh8bBXawCV4QzwRzN7 | unnamed service | | 0.005 | |
| 1J2YZZSXtg Cryptology.com | exchange | | 0.07 | |
| 3LguepyPyQE7833KFGnV9pzpeVD | unnamed s | 0.117519 | 0.117519 | |
| 14WiqWGMvU4H32WeYjp3AiUfw | unnamed service | | 0.01 | |
| 1CTFTyyneq9ofLne9xcezhiy8KDEb | unnamed service | | 0.02 | |
| 1HBZRbfjel HitBtc.com | exchange | 11.64504 | 31.11504 | 1.155 |
| 37BLgCy5V98kGpqe6ci1ed92KQN | unnamed s | 0.003369 | 0.003369 | |
| 3AHNxn6JjquVC8rt9UZpwzM8aQ9 | unnamed s | 0.000906 | 0.000906 | |
| 15qJAUM6 Cex.io | exchange | 1.427466 | 2.022466 | 0.005 |
| 398qEvFVdtDtwQQfdb2ptYxeVvl | unnamed s | 0.00817 | 0.00817 | |
| 1CjHmWuL ElonPromo.site | scam | 0.4385 | 0.4385 | |
| 1CXYZfSWAtCSfrKFs8eU1m84QLKl | unnamed s | 0.026093 | 0.026093 | |
| 1B2wJ1SzBAXyckeePp1VNNbT5VZ | unnamed s | 0.001776 | 0.001776 | |
| 3LEzCADJy3X6WXm5tj6HFzzX7iEq | unnamed s | 0.000857 | 0.000857 | |
| 3BPn61WgCmm2JJLem2p1eaC26l | unnamed s | 0.025787 | 0.025787 | |
| 16JUCv6zyvS78aHLAFEsa1oSMrdt | unnamed s | 0.004378 | 0.004378 | |
| 1KqeeAVt7HcSK4ocKqGA64to1ru/ | unnamed service | | 0.035 | |
| 1HuYfoEws Hydra Marketplace | darknet ma | 0.034837 | 1.029837 | 0.01 |
| 3B7F7REEhyGtPRsS8zdYzRq66zAQ | unnamed service | | 0.015 | |
| 1Bsdb4iBSt FoxBit.com.br | exchange | 0.013074 | 0.098074 | 0.01 |
| 3H7i6icC4ua2or1a32AU5msdBG6l | unnamed service | | | 0.01 |
| 1698egyYuADhAtt7Kcsz47oCPteP | unnamed service | | | 0.22 |
| 39DrcLmxdEfVWS86Tvpyisqq3hzC | unnamed service | | | 0.255 |
| 37WyieV5LbEEMiWHp8Sm4xr1XK | unnamed s | 0.0011 | 0.0011 | |

| Address | Service | Type | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|---|
| 3AsRcRph2ANSMBFZbe3iruvhHBn | unnamed service | | | | 0.005 |
| 32R2m6rtqnKvfMZKCRi1cVSZMKE | unnamed s | | 0.06574 | 0.06574 | |
| 3Q1yv3FPwidMsuekuDjoGFSSFy6 | unnamed s | | 0.0067 | 0.0067 | |
| 3BHgHKMYToRReZ Market | darknet ma | | 0.003491 | 0.003491 | |
| 1G5ZVFw9Ak6ts44XiArmsqd78Jm | unnamed s | | 0.095065 | 0.095065 | |
| 1KNFUJjZwyqrCqJxMA75oEmassF! | unnamed service | | | 0.03 | |
| 36Z3Cd1qFFEshop | fraud shop | | 0.092424 | 0.692424 | |
| 1KWpsFjwr EconexFinance.com | scam | | | 0.01 | |
| 18Y3ffhhMS5rkDZQwMZ2aN8ACz | unnamed service | | | 0.01 | |
| 1GKiFE916n3mU1RyqWenoGQUn | unnamed service | | | 0.015 | |
| 355JdiX5QQBNW2jiokjT1xxk3YP1 | unnamed service | | | | 0.005 |
| 1NPSDjysK8nm68mQKJ7AhGxPtk\ | unnamed s | | 0.017427 | 0.017427 | |
| 38KjUnGi8\ Coinsbit.io | exchange | | 0.004891 | 0.004891 | |
| 1G7937WrZ4KHa3AhvvrYkBKdW1 | unnamed s | | 0.060997 | 0.095997 | |
| 1NDCSqdKPERcdxYGKsNvtDVsU2r | unnamed s | | 0.001079 | 0.001079 | |
| 1Nx3oh3jT WestWallet.info | exchange | | | 0.06 | |
| 35GVxD3jF OptionsFXTrading.vip | scam | | 0.892395 | 1.392395 | |
| 3BL9PC94T SFOX.com | exchange | | | 0.2 | 18.95 |
| 1HNfamjXpMLnxTfr8J1Q1VAjx7Z3 | unnamed s | | 0.002172 | 0.022172 | |
| 1D16KGTvvECtc4gKgVs1TAJN8Gqt | unnamed s | | 0.000655 | 0.000655 | |
| bc1qng0keqn7cq6p8qdt4rjnzdxry | unnamed service | | | 0.09 | |
| 14WpM654m9j2eh1arN6Upjh5eb | unnamed service | | | 0.7 | |
| 14gr6v7DG BitoEX.com | exchange | | | 0.055 | |
| 1KEWFoWl Paxful.com | p2p exchar | | 57.74189 | 129.2519 | 0.175 |
| 3KbYbsN1WwT4jkbQ2RY8aUZPPy | unnamed s | | | 0.005 | |
| 1C4FLuYdMqESCbpkiwczVKbAX18 | unnamed service | | | 0.01 | |
| 17vBPpPvXBCGDRfH2oGCdZDNhe | unnamed service | | | 1.06 | |
| 3B7iKViieG8DPmAuXvf8ZWfDiWy | unnamed s | | 0.005906 | 0.005906 | |
| 3GgsGDPJLeuMM6Zt4JzYyEEpAe6 | unnamed service | | | 0.015 | |
| 17eze6HytVVsqM7C2B49ATVwzol | unnamed s | | 0.916947 | 0.916947 | |
| 1CXie74CX SeawestInvestment.co | scam | | 0.002796 | 0.002796 | |
| 37G4fC53K78D7sgRxLeN6KFND41 | unnamed s | | 0.0006 | 0.0006 | |
| 1CzFdBA2J8QiMGoPAMesy4rdZ2F | unnamed s | | 0.00214 | 0.00214 | |
| 1B6zrz4M\ CryptoMKT.com | exchange | | 0.001324 | 0.006324 | |
| 19L7WYjGE7jETXxwJVGPd9cGWm | unnamed service | | | 0.105 | |
| 19TFfjaD7WthoUz7BGTsLvLoPZtD | unnamed s | | 0.000833 | 0.000833 | |
| 1BhrNoLRT Bithumb.com | exchange | | 0.1059 | 0.9859 | 0.035 |
| 3KBLNCwkzNpmC8XxbkZTrijZ33Q | unnamed s | | 0.024501 | 0.024501 | |
| 1NRg2fKop Tidebit.com | exchange | | | 0.005 | |
| 3Qxf62B71sAqgDyDc79mgPR8nJ2 | unnamed service | | | | 0.045 |
| 3AECszbNdqQwzz1wDZNuub5CF7 | unnamed s | | 0.0041 | 0.0041 | |
| 15uEE1xAKNxNZPYgHNEJxTDzan9 | unnamed service | | | 0.005 | |
| 3EQ1xgW2foofBUp2gJkwMVuLrLy | unnamed service | | | 0.03 | |
| 3G6Wz3i77pQtxwBkFnmwUB8kjB | unnamed service | | | 0.005 | |
| 38Pfhwyo8hw2vg1eVqnMXM9DLl | unnamed s | | 0.000323 | 0.000323 | 0.015 |
| 3Dn7BUBo GoMiner.co | scam | | 0.001442 | 0.001442 | |
| 1KwtFvKNmGHNX5aWfH6ogPAyq | unnamed s | | 0.487161 | 0.487161 | |

| | | | | |
|---|---|---|---|---|
| 1BdAqLhjjc Musk-Club.com | scam | 0.40104 | 0.40104 | |
| bc1qxqhthp20s4j4ua29qv6masyjc | unnamed s | 0.008559 | 0.008559 | |
| 1442itHWUtp9FbE5VeUVyvQzv8b | unnamed s | 0.003286 | 0.003286 | |
| 3GcQ42tBDCDmaG2MKNmSStmxl | unnamed service | | 0.005 | |
| 1BAigaKGG468tsUJBJLETJbSNH3P\ | unnamed s | 0.003442 | 0.003442 | |
| 13TgM433kFgBehJa5Hw9fVKyogj; | unnamed s | 0.000977 | 0.000977 | |
| 1BKUDP7P3BANXKvepZZpHmTe8z | unnamed s | 0.003137 | 0.003137 | |
| 14DEd7DgI OctaFx-Plus.com | scam | 0.000933 | 0.020933 | |
| 14odDnBY\ ExpertOptionsTrade.cc | scam | 2.015765 | 2.015765 | |
| 1JK55ZVPo7WJH8PAWD8aTuaAb) | unnamed service | | 0.02 | |
| 13GPxKdmoP3Tq1ZeJSgAgnMyjRJ | unnamed s | 0.003498 | 0.003498 | |
| 3LLAzeRnwEqiX17Dyrbd2iyjF9Sghj | unnamed service | | | 0.045 |
| 18BfibyUk7qS4dMFZg9Cf3wgRtqc | unnamed s | 0.001801 | 0.031801 | |
| 1MwhHrm9LMvSkNodh9CYySbKit | unnamed service | | | 0.01 |
| 183WYfYQdd4mAF21S82vC1SDDr | unnamed s | 0.004783 | 0.004783 | |
| bc1q4rrcw0gw6y84w6uqxacqn0v; | unnamed service | | | 0.01 |
| 12CFVXKJJK99gW4vZ6wAqmeLb6l | unnamed s | 0.000926 | 0.000926 | |
| 3GiZBFW6t Teqra.com | scam | 0.002671 | 0.002671 | |
| 3KtcLbsqgEgUubmnXLhZ8CropGp; | unnamed s | 0.018211 | 0.163211 | |
| 1PiKBAfcw6xKkqYAaertGKab8zF7F | unnamed s | 0.002888 | 0.002888 | |
| bc1qtn3tuc5ewtcg5zl79aq4rz3szn | unnamed s | 0.023361 | 0.023361 | |
| 3LMcPvssJkYFstCT8MTJzVPea2KF) | unnamed service | | 0.04 | |
| 15nwSE3WcHmLK6K3ktiPfwS1zoV | unnamed service | | 0.035 | |
| 14se6sTpkI WebMoney | merchant s | 0.000111 | 0.145111 | |
| 1Etg6EySY\ Bibox.com | exchange | 0.185269 | 0.190269 | |
| bc1qg5332 Bitaroo.com.au | exchange | | 0.01 | |
| bc1qxswl0w3ze7y88qvd36kql6l4t; | unnamed s | 0.040956 | 0.040956 | |
| 1P1jSNXCFW9Sh7h1aoKGgbGcz3P | unnamed s | 0.00219 | 0.00219 | |
| 1Pc9Us837mned5bUJMwyscQ1H; | unnamed service | | 0.01 | |
| 32MAnDY8 Bitpick.co | gambling | 0.003 | 0.003 | |
| 19jiKT196vokPdpD5DzUfEvmQ7o! | unnamed s | 0.003908 | 0.003908 | |
| 19FoUSdvz7ndkpezcPoumiHkHyF; | unnamed service | | 0.005 | |
| 1GFktGPAF6dMaQg12vDfdhXLWV | unnamed service | | 0.005 | |
| 1GgPJQMx6xU4evFXfswMCmmiN. | unnamed s | 0.00338 | 0.00338 | |
| 38S2uvBetbaPUavyaqWHXeEFbDl | unnamed s | 2.049369 | 2.484369 | |
| 3EjZJ3fpxql Rekeningku.com | exchange | 0.05 | 0.055 | |
| 1Pwf9exMbhAA4KzBYrXGZyLAKek | unnamed service | | 0.02 | |
| 18eSmT2YFHyas5x8jkLtQyk5YJ5Fv | unnamed service | | 0.035 | |
| 16sPQKdVwnxEvxsKFLFNR5e7mDI | unnamed s | 0.008855 | 0.008855 | |
| 3Cgy1PnwtFmD4LXLXPzt9782Y4v | unnamed service | | 0.01 | |
| 12cF3wQSYx37ee79X7qiFQ5wmS\ | unnamed service | | 0.015 | |
| 1BC9mgLN CleoFXHub.com | scam | | 0.005 | |
| 17RSWTeHeFWCXGPHAydsFLvCG: | unnamed s | 0.001165 | 0.001165 | |
| bc1q7j4xayw77ft8njlp3tsfvpw48t; | unnamed s | 0.00959 | 0.00959 | |
| bc1q2fnvqlw9s4flmwk7vzr4v9wfn | unnamed s | 0.049562 | 0.049562 | |
| 346n5U6aKz5JWrVK6A671Rpn8o! | unnamed s | 0.002365 | 0.002365 | |
| 15ZxC2mNTUB4E22zCAJMpcvNR4 | unnamed s | 0.022672 | 0.022672 | |

| Address | Name | Type | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|---|
| 3NMnsWR | CoinLoan.io | other | 14.28964 | 15.01964 | |
| 36p7DWCxpZp3dYRHSgqhmtSsWł | unnamed s | 0.018147 | 0.018147 | |
| 1Jz1ANtnN | BitcoinVideoCasino.co | gambling | 2.007878 | 3.197878 | |
| 1GranReBz | GlobalCryptoKing.com | scam | | 0.015 | |
| 12goKPWLVNJhce9qDEAWevd324 | unnamed service | | 0.015 | |
| 1ER1ESxi6X9Bv7VQD5RFwTvhPhw | unnamed s | 0.006589 | 0.006589 | |
| 1NguZ5YEEHjMUTNpTvKtCHZJHSK | unnamed s | 0.171811 | 0.171811 | |
| 1MbXnacj5 | FXTradeProfit.vip | scam | 0.000436 | 0.000436 | |
| 17gHFWmBUrBixLNjpqEbCYVfMH | unnamed s | 0.049218 | 0.049218 | |
| 33oNWczvUPgDuqo3NyS96Hyqbi | unnamed s | 0.040931 | 0.045931 | |
| 3P6Dd2gQ | ByWare.net | high risk exchange | | 0.005 | |
| 1La5QRou4JZFyrBVBmqkuoD5bvjł | unnamed s | 0.004146 | 0.074146 | |
| 1DCJ7t8ysYB92juX8VqVaJa7BFEtK | unnamed s | 0.005312 | 0.005312 | |
| 3321qzvP2 | BTCFlash.me | scam | 0.187652 | 0.212652 | |
| 3MYCaHPXKw8YHweBfmjBgLMhD | unnamed s | 0.055756 | 0.055756 | |
| 1Ajd4m1Nb6iGiX588M2qCFV4RUj | unnamed s | 0.022087 | 0.142087 | |
| 3CPiT9VLGK9X7Kc41AKYyWT5H8c | unnamed service | | 0.01 | |
| 3LCoLHNYcsKoAVLEzibka9Lvmjn3. | unnamed service | | 0.01 | |
| 1ENJDG6MoBRfHXB19Yn5eCZzoXl | unnamed service | | 0.005 | |
| 1RgeNNGZ8m4n1hRAi3iAjpQjnoG | unnamed s | 0.001041 | 0.001041 | |
| 3NdZd7chx | Giottus.com | exchange | | 0.11 | |
| 12B2ppiXfrTRk13QAr35cVySi4tUo | unnamed s | 0.004198 | 0.094198 | |
| 3N4m5ioB | YellowCard.io | exchange | 0.067575 | 0.322575 | |
| 12hoyPobzEmj8rxF8skn5H3ek3Fkj | unnamed s | 0.069264 | 0.079264 | |
| 3QLHTaBBkrKrS5Tt85kd2iQUP183 | unnamed s | 0.003743 | 0.003743 | |
| 197LrsSZcHMQ2wukiuAosEEK48Ll | unnamed service | | 0.005 | |
| 3JQTLLBLX | BitQuick.co | exchange | 7.072577 | 19.07258 | |
| bc1qfe8pp | DropBit.app Lightning | other | | 0.01 | |
| 121HHsacn | Cryptocom.pw | high risk ex | 0.005 | 0.005 | |
| 1JGRTExZRxAZHt7QZCZdSukBqM5 | unnamed s | 0.064818 | 0.069818 | |
| 1DRvxdFU5DLQv6MYkzzkB7t4J8L> | unnamed s | 0.008215 | 0.008215 | |
| 1NE1xVxuzSJASoBRU8CaNgoqqXrl | unnamed service | | 0.01 | |
| 13JtX4h7G | Exchange.Cryptex.net | high risk exchange | | 0.005 | |
| 1MSTasGFc9XPN36TssLozSwRW1 | unnamed s | 0.004296 | 0.004296 | |
| 19iqYbeAT | RenProject.io - RenVM | other | 12.45032 | 59.42532 | 0.08 |
| 3ABepmW | CopyProTraders.com | scam | 0.044105 | 0.044105 | |
| 1Go5qmPz4pzCTEL5H4UH5gkCnD | unnamed service | | 0.005 | |
| 1L7hZ7ncM3onMs6oty5ohbFfPUg | unnamed s | 0.006576 | 0.006576 | |
| 3NtJc6yRD1DBfsxrC5VP73Fa5fuN; | unnamed s | 0.208615 | 0.548615 | |
| 35q3fryhJpUmoeZaXvQEtd7dHbH | unnamed s | 0.016479 | 0.016479 | |
| 1Jqmh33Pf6po1HTM5peEgj6QAx: | unnamed s | 0.0097 | 0.0097 | |
| 1CEBcvRrGcCThW7MHbqXRgYoxH | unnamed s | 0.007382 | 0.007382 | |
| 17MdDBu93j7bCJKhj9FWrXP5Sw1 | unnamed service | | 0.245 | |
| 16SgvDKfVwRitqF2wv4NSAftBgoj1 | unnamed s | 0.001776 | 0.001776 | |
| 1Je8kGRrvLSYtpw3Zoz1kgMn6J1k | unnamed s | 0.000286 | 0.000286 | |
| 36hLx7Hjs\ | BitcoinDepot.com | atm | 0.00801 | 0.41301 | 0.005 |
| 3Db6zpH6z2ZFVqvGZKF3vnhXuV2 | unnamed s | 0.002486 | 0.002486 | |

| Address | Service | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|
| 1PdM15nA3qg6RbxoTCVxPT1XQ5 | unnamed s | 0.11647 | 0.25147 | |
| 3Je2ok8WUpgPPZdbKUoFUmsntm | unnamed s | 0.376403 | 0.396403 | |
| 1DcyocHCP9nMgcn145U9BHSfb6g | unnamed service | | 0.16 | |
| 1AMjD1Yw CoinPayU.com | scam | | 0.005 | |
| 1N2ormmr Koinim.com | exchange | 0.006184 | 0.016184 | |
| 17tm9ypqyLPUnk13d7y2ZgP6WEr | unnamed s | 0.001735 | 0.001735 | |
| 34r3oYgabuykUhcnHMRMiVad4G | unnamed s | 0.055 | 0.055 | |
| 1NiYwTUA VinDAX.cor VinDAX | exchange | 0.006615 | 0.011615 | |
| bc1qwx59ace0vaehtfsnp0ye5zd7y | unnamed s | 0.002927 | 0.002927 | |
| 13SfTc3XLfRWLnYmYgo29GB2oVt | unnamed s | 0.00496 | 0.00496 | |
| 191PjzSym Xapo.com | hosted wal | 0.00286 | 0.07286 | 1.62 |
| 36EmADcN BitBuy.ca | exchange | | 0.06 | |
| bc1qrusa3x3mwujpdqwev4x2vujn | unnamed s | 5.680528 | 5.705528 | 0.855 |
| 1B5mJUCwTUgMFZXbnCfaLdvns9 | unnamed s | 0.001986 | 0.001986 | |
| 1zua5BePTtiaWGvtvvCzUtq3Mmy | unnamed s | 0.284678 | 0.284678 | |
| 3Berf76Bc TrustDice.win | gambling | 0.008136 | 0.008136 | |
| 39T11aHoj5iwXWTWJJrQTTEKrurJ | unnamed s | 0.001656 | 0.001656 | |
| 1Ki8bhQKWLQAbdtxZJqE2kj6mGX | unnamed service | | 0.01 | |
| 31rfNmts4 FMACrypto.com | exchange | | 0.05 | |
| 3PyzSbFj3t Blender.io | mixing | | 1.08 | |
| 16pQuacyc Evonax.com | high risk ex | 0.00237 | 0.00237 | |
| 1BNoSbJ9Ne2aDKhSwFFP2ENbcg( | unnamed s | 0.00674 | 0.00674 | |
| 3AGtKhGqffg538CMh8qhV6hFJdr1 | unnamed service | | 0.005 | |
| 1743dgZzH Cocaine Market | darknet market | | 0.01 | |
| 19qupF6m GOPAX.co.kr | exchange | | 0.335 | 0.22 |
| 1KeqXqJ95GiDEpmtrKzQF8abmEw | unnamed s | 0.0938 | 0.0938 | |
| 3QFMCkmyycEJA5y82zRrCpNtEN5 | unnamed s | 0.004108 | 0.004108 | |
| 3CJVvCG4d5hZu1RC9ycFKYiYwAut | unnamed s | 0.020408 | 0.020408 | |
| bc1qp4m3wg6qny88v0teh8p3j7sz | unnamed s | 0.055201 | 0.055201 | |
| 18ZNfUjeYN5Fh92hNYwjvtMzFBK\ | unnamed service | | 0.005 | |
| 12Hebgk7> 24PayBank.net | high risk exchange | | 0.01 | |
| 1ChBJMSW Yalelodge | fraud shop | 0.023184 | 0.063184 | |
| 1PVz2FTQkjkAexJqqSie3i2X1N1KN | unnamed service | | 0.005 | |
| 1F1GTNnrmGLQ3bBxoYijVm4eFAS | unnamed s | 0.041384 | 0.041384 | |
| 3JHJAewVUJhTRYF6HytSs8odsqG9 | unnamed service | | 0.02 | 0.245 |
| 3FZ3DqMNDMTZcgjex7pkP5Adpo | unnamed s | 0.005857 | 0.005857 | |
| 37ws6CJFbmUqdc5UdjAxevdwad9 | unnamed s | 0.081616 | 0.081616 | |
| 17vMaz8pnddW6wUxfy7CVpr8tQ | unnamed s | 0.038423 | 0.038423 | |
| 3FigERo2iqUdY7c3nY9a6x9YaPSsn | unnamed service | | | 0.015 |
| 3B6q4bvFQtoR84X1yyxi74aMMsz | unnamed s | 0.002505 | 0.002505 | |
| 36KDkXo55P3WzfvryQCRA6pRDdl | unnamed service | | 0.005 | |
| 38QH828LzsVMRWHkcP5mf4wuy | unnamed s | 0.105612 | 0.150612 | |
| 3B25Uifra6BxPN6yj6LYQjNDe2KZr | unnamed s | 0.015 | 0.015 | |
| bc1q4azldze0n0htde0jkym8zs7dp | unnamed service | | 0.005 | |
| 37CA6TPbcikkRGVpBBfBxXsxmZH | unnamed s | 0.011477 | 0.011477 | |
| 3HSZJiZF2+ BitcoinSuisse.com | exchange | | 0.165 | |
| 13NECGLY6duFHdoCqbzpWRjMgV | unnamed service | | 0.02 | |

| Address | Type | | | |
|---|---|---|---|---|
| 36P5ngZze CoinBurp.com | exchange | | | 0.6 |
| 39XRvESytI GreenGoldOrg.com | scam | 0.001689 | 0.001689 | |
| 3HqMYtDCGTbgKyaP9DogqpN1Xfl | unnamed s | 0.001849 | 0.001849 | |
| 1FhnVJi2V1 Globee.com | merchant s | 0.029823 | 0.059823 | |
| 1P22TqPn2yhV4Tk7K3tTytNQECR\ | unnamed s | 0.000954 | 0.000954 | |
| 1HCNB24vmD5B2RGDuZP9rSTq4N | unnamed s | 0.002032 | 0.002032 | |
| bc1q5hkq58anwmw2zxg33zx4c7v | unnamed s | 0.008025 | 0.018025 | |
| 1CoP3Dqm Liquid.com | exchange | 0.825054 | 1.885054 | 0.19 |
| 1GyGRHHt: BitAccelerate Bot - Tel( | scam | 0.060063 | 0.065063 | |
| 15XhTzpongsw1kdma9Dt3cwYLAc | unnamed service | | 0.055 | |
| 3Qr7HXHLXmkMDZSgRJ3aEcMu2s | unnamed s | 0.011144 | 0.011144 | |
| 17MQEgrJdAMovN3AQHR1Bg32c! | unnamed service | | 0.055 | |
| bc1qazjlwl02y365tey9njs9y52jd6j | unnamed s | 0.224906 | 0.254906 | 1.11 |
| 13XetodHE OXcoinTrade.com | scam | 0.11903 | 0.11903 | |
| 18oXDgtU( BTCPop.co | other | | 0.025 | |
| 16dg3u7sg AEX.plus | exchange | 0.000719 | 0.000719 | 0.095 |
| 3J7BigJrEyCaVnjvYr1kj7x7sqastDT: | unnamed s | 0.007999 | 0.007999 | |
| 1KYpxfYhHkRteo6UAhQuZTfiSmV8 | unnamed s | 0.008294 | 0.008294 | |
| 1PfPgv1Ctw9qcDbLqVY4dvEvi7RJE | unnamed service | | 0.04 | |
| 3PPLyoz9RrcQwF9a5z7TMVHBvU( | unnamed service | | | 0.01 |
| 32H56MzPqwcFxbUhbeZLnw8PFL | unnamed s | 0.005656 | 0.030656 | |
| 128cK6pbRvUvcs2rKiN44hpmqhm | unnamed service | | 0.01 | |
| 3FxqMkXrfG5Zvq8AMZFYfTVAeizE | unnamed service | | | 0.01 |
| 37gu9tx2R: PayKassa.pro | merchant s | 0.410001 | 1.005001 | |
| bc1qu20xvkafqnmp4yquu5ep40te | unnamed service | | 0.005 | |
| 3JUWNcHsC4pMt2gWVojXJZdr4Hj | unnamed s | 0.00207 | 0.00707 | |
| 1PzKM3mqSrFs2i3VwrSyJKrhxHVu | unnamed service | | 0.01 | |
| bc1quctdcx7r2wdc8n2y5fsu7k5qa | unnamed s | 0.001595 | 0.001595 | |
| 3LBECoiLA: MEXC.com | exchange | 1.90721 | 2.22721 | |
| bc1qpujlnc Simpledice.com | gambling | 0.005368 | 0.005368 | |
| 1DyRGJQZZMr9LxRFXHq5AZ4gopc | unnamed service | | 0.045 | |
| 1L46MWS; Coinbase-Invest.com | scam | 0.004049 | 0.004049 | |
| 3BmqiQW( ASAP Market (former | darknet ma | 0.066238 | 0.066238 | |
| 1FzuVAnLatnLTVWKwST56EH9ML | unnamed service | | 0.08 | |
| 3CagMKWWAL24418SLt2m7R5d2 | unnamed s | 0.000559 | 0.000559 | |
| 3NX38yr5Z2yK8umhQF1T6EZsx37 | unnamed s | 0.007532 | 0.007532 | |
| 1E9xCCVtp4YYs1k2TZpfZoHwCj9r2 | unnamed s | 0.008592 | 0.008592 | |
| 13r2KrPtx3 BinaryCapitalnvestmer | scam | 0.096472 | 0.096472 | |
| 16Mgc5qcmN6cXo2W8DfoGUFuC | unnamed s | 0.000828 | 0.000828 | |
| 1LoPpzxjYi\ Latoken.com | exchange | | 0.01 | |
| bc1qn8sydrt2d0fnjus92806z8cgq9 | unnamed s | 0.0006 | 0.0006 | |
| 32yLGhuPbNLHHeVZxL69gmmK7N | unnamed s | 0.002588 | 0.002588 | |
| 1Jh2n4mN4GMEZeWymWPktvm7 | unnamed s | 0.00509 | 0.00509 | |
| 1yDV7xr8J6RmW9fjMPcGDhfZWG | unnamed service | | 0.565 | |
| 34ajCErvsK6h97mFhJsFskvdaRssG: | unnamed s | 0.004479 | 0.014479 | |
| 12ofW4F4r Foundry USA Pool | mining pool | | | 3.32 |
| 14goASnR/ PrimeDice.com | gambling | | 0.005 | |

| Address | Type | | | |
|---|---|---|---|---|
| 13k1etwVrkWYN35ueX66ss3ivKZA | unnamed s | 0.040148 | 0.045148 | |
| 3P7uhN448wjWU5fZic7AANUhfVy | unnamed service | | 0.005 | |
| 1M1M2HaDBF2PVwMbJukKJFtDf6 | unnamed service | | 0.025 | |
| 36o6d2iHEQdJxpzqjGcij2SQJWLKY | unnamed s | 2.141481 | 4.771481 | |
| 1JaLcWmap1HnLMTpwWkG1f7Qg | unnamed service | | 0.005 | 4.12 |
| 1JSJRkGnfR BullionCaste.com | scam | 0.318903 | 0.668903 | |
| 3Duw4T3geYq1frTuXbBiEfw1UNN | unnamed s | 0.002644 | 0.002644 | |
| 14U8A9yGJDmpByS9kWvk82no4h | unnamed s | 0.058952 | 0.058952 | |
| 3Fnc7eTX96qjw4YzLsMJFsU9fxLqk | unnamed service | | 0.005 | |
| 1HP8zxMcHpJra2fb6Ddzkrosg3tcs | unnamed s | 0.39492 | 0.39492 | |
| 3GCLkEZrh The Bitcoin Car Donati | other | 0.0058 | 0.0058 | |
| 12tFuSuKDk1CR7XkvgyPwAiTd17s | unnamed s | 0.109802 | 0.124802 | |
| 1P47mpmKKj67vCpgib7tJivTz9udF | unnamed s | 0.005273 | 0.005273 | |
| 1BZ4USfEerEuLHqwVKuwzMorVTz | unnamed s | 0.03147 | 0.03147 | |
| 3CKsPQ1Er Godex.io | high risk ex | 0.23113 | 0.23113 | |
| bc1q9enrza20zjqr302df4agevxljqr | unnamed service | | 0.135 | |
| 3FxfEtKfYKgz61QNNx4DMnYEyzj5 | unnamed s | 0.013043 | 0.013043 | |
| 1K89utgSq SquareUp.com | exchange | 120.7871 | 154.3921 | 0.17 |
| 341W5WrcDa1M8RLyb7DUwsQnT | unnamed s | 0.006144 | 0.006144 | |
| 3K2iuM5PQMgM2ianMLDBZ2oSq | unnamed s | 0.748761 | 0.778761 | |
| 38eCSZwRXeghcaJEY1BhaQEaHm | unnamed s | 0.011354 | 0.011354 | |
| bc1q8dqdyfud5na8ryty4q6280346 | unnamed s | 2.850031 | 2.955031 | |
| 1zJRsuq5jXyX5fCbqLC5DjZys9Hj5B | unnamed service | | 0.385 | |
| bc1qsa6gyj9psa3v707j7tphud3z6r | unnamed s | 0.000481 | 0.000481 | |
| 36Z1K39LTaZaC6XHQbhM92Z5pB | unnamed s | 0.000362 | 0.000362 | |
| 3Ab4cehZYKhx5r4vbi6v4fWoTvvh | unnamed service | | 0.005 | |
| 3Misi976Ud8faCrU5SfoMC8Wq84 | unnamed s | 0.003059 | 0.003059 | |
| 1Czvo2Gkb FreeBitco.in | gambling | 1.741254 | 1.806254 | 0.005 |
| 1LYXP48FWgFvmQqFgpkfCtzmdCl | unnamed s | 0.047481 | 0.062481 | |
| bc1qhttdmq9v3d6ywg8nfqkrsan0 | unnamed s | 0.018729 | 0.018729 | |
| 3HzHfCBRN ChangeInvest.com | exchange | | 0.07 | |
| 3DzNFQR7 Tradefada.com | exchange | 0.002629 | 0.002629 | |
| 3PxYm8wPutj7KEubsSebDLAoe4s | unnamed s | 0.423321 | 0.768321 | |
| 1NRUeiLZujLqPSMQ1WzgpKCPzgg | unnamed s | 0.004829 | 0.004829 | |
| 33D2jUTYToowhpw2hTre8syTYQs | unnamed service | | 0.005 | 0.11 |
| 14Hqh9kNl Nobitex.ir | high risk jurisdiction | | 0.08 | |
| 3CnA4MRA1fqdpCgZE1APYtFfvRy | unnamed s | 0.000399 | 0.000399 | |
| 375SdyH2umuw8EZHf8ABu1HsFr | unnamed s | 0.045703 | 0.045703 | |
| 1Dh2CgsWPhzeXRZMy2sHi5s7qTC | unnamed service | | 0.025 | |
| 1CNC3CmRuGqzE9hgGWT9jCrYkN | unnamed s | 0.004752 | 0.004752 | |
| 12FWooxN CoinFalcon.com | exchange | 0.013262 | 0.048262 | |
| 39zvdGPD1hCU8UNAQp7nvQAES | unnamed s | 0.002945 | 0.002945 | |
| 1JT5jdLVi1 TheRockTrading.com | exchange | | 0.085 | |
| 17Y3DemnjrwbPAX97buo7Rpbtt2 | unnamed service | | 0.005 | |
| 3HCK56Quf8CPNTLsW1GVRQAAK | unnamed s | 0.008325 | 0.008325 | |
| 1N8GfnsvPNEyPDNRdQBDWcdipV | unnamed service | | 1.52 | |
| 1BPt1bzaRe3V6XwNv9z8tXXz8Qal | unnamed service | | 0.045 | |

| Address | Type | | | |
|---|---|---|---|---|
| 1ETc54xRn CoinJar.com | exchange | 0.039164 | 0.234164 | 0.005 |
| 3KGC8KcRh Flugsvamp Market 3.0 | darknet market | | 0.02 | |
| 3K2o1qtdHyyD4AaqMG3otAm9Vt | unnamed s | 0.004161 | 0.004161 | |
| 1GCWCC5QT75NSMkSfiGFpsJzQw | unnamed s | 0.003807 | 0.003807 | |
| 3N7XVinYzKsjhRvMXSVn4fnACkkh | unnamed service | | 0.015 | |
| 1FcWT5Sol CryptoMixer.io | mixing | | | 0.005 |
| 129Yjpo2p63JBM1s6us1jAnzWWA | unnamed s | 0.008061 | 0.008061 | |
| 19HYmB7upgUaxnapD8DmKx6Wc | unnamed s | 0.066793 | 0.066793 | |
| 373RbApztVg9igMmfFNnmmBptr! | unnamed s | 0.052227 | 0.062227 | |
| 17v65tNqx LiteBit.eu | exchange | | 0.045 | |
| 1EsdA8KaFBGqohcCjTcB3M5a9dh | unnamed service | | 0.12 | |
| bc1qjutl44yrhe6wqfrc52jp7w3sdy | unnamed service | | | 0.01 |
| 1GuMujAB AntPool.com | mining pool | | | 2.115 |
| 1ArHiMPZ\ SSNDOB Club | darknet market | | 0.065 | |
| 3MZFP5Hqbij8CR5AKbLmvRuz83C | unnamed s | 0.00508 | 0.01508 | |
| 1Ec2JU8ToPXeX1vGoEkR4ejpWgc\ | unnamed service | | 0.01 | |
| 1126fkM4t Binance.je | exchange | | 0.065 | |
| 1Ejsa8U4jjuNgMS9qb9JAM7qeWt | unnamed s | 0.006941 | 0.006941 | |
| bc1qzqlpxg9due6phjt5upvy9qkp7l | unnamed service | | 0.005 | |
| 1PRg4bUMB3QdARD9N1qfG3iq5X | unnamed s | 0.003077 | 0.003077 | |
| 3BqMbaCYarXvhrVi28FBZseY3hBL | unnamed s | 0.005139 | 0.005139 | |
| 1P6MeMrJUhcQphbeQT7uTbkbY/ | unnamed s | 0.000802 | 0.000802 | |
| 13ncBFc7EhyNnT5AYyXouwNzUe( | unnamed service | | 0.105 | |
| 13nCMaHE GSPartners.global | scam | 0.79746 | 0.82746 | |
| 31tBiuZ6WcjrdCYg11mcBPMVutW | unnamed service | | 0.005 | |
| bc1qwwkc4nw63nzek3wr4x6j99w | unnamed s | 0.009416 | 0.014416 | |
| 1JHTsnS7zyMyChDV1XvVoL1HabJ( | unnamed s | 0.001342 | 0.001342 | |
| 3HAmBUql Unknown - OTC relate( | exchange | | 0.025 | 52.19 |
| 3MqUnpfPpAmvWZyd3BycWphjyl | unnamed service | | | 0.005 |
| 34KQjDo5EoP1SSCk8UNbdbqpUH' | unnamed s | 0.001052 | 0.001052 | |
| 1U7nVxh1wGCTD4xQgJXTny7AEpl | unnamed service | | 0.16 | |
| 1DHTu3YHi8ZphihaYuxWTGt2Wpł | unnamed s | 0.002034 | 0.002034 | |
| 3NNGadtjjł BitOasis.net | exchange | 0.000169 | 0.000169 | |
| 3K1zFnQjAVdtJyGBjVkiUqThwR71! | unnamed s | 0.007191 | 0.007191 | |
| 3Dhk8F6K\ Bitcoin.DMM.com | exchange | | 0.005 | |
| 122bzJbCvł BitcoinPay.com | merchant | 0.221439 | 0.346439 | |
| 1DXgw2BJxFarAMvbpfoMJKechan | unnamed s | 0.005201 | 0.005201 | |
| 1MW6eDvcZFmoD4FM8mBGU3T§ | unnamed service | | 0.01 | |
| 15kM2RpP EXMO.com | exchange | | 0.035 | |
| 3Qjmwe3r\ eToro.com | hosted wal | 0.635284 | 0.640284 | |
| 1KZsuMNtG6mkAMDUzNaitmim5 | unnamed service | | 0.355 | |
| 33pZruiqn795WbpwMmMdpSRLP | unnamed service | | 0.005 | |
| 3GknBr2Y7TKnNkMPhV4eHfDKd6. | unnamed service | | 0.115 | |
| 17voRCsbm7vngQJuCeZAY3gfVtHl | unnamed service | | 0.14 | |
| 1MRC51rt4r7F1uQ8zXt4sPtkf1Ns( | unnamed service | | 0.01 | |
| 3MCiYiEWUmgaWUEZ1sxn7adUC\ | unnamed service | | | 0.06 |
| 16scbXMRBs7MFJt5ZyVxTQNwpp: | unnamed service | | 0.005 | |

| Address / Name | Type | | | |
|---|---|---|---|---|
| 3JVyPcMT7NFZjCRxXZrVSR3sWiw9 | unnamed s | 0.052273 | 0.092273 | |
| 3FoEM5qfwSbRkLcZQ16CshGjtP4: | unnamed service | | 0.005 | |
| 35y3qXew Bilaxy.com | exchange | 0.818507 | 0.938507 | |
| 3JVKAbGtFTE9E9eLEpMKQZxmtes | unnamed s | 0.01327 | 0.01327 | |
| 3Nh187pggjvx2UBYWzAr3YZvP2y | unnamed service | | 0.005 | |
| 1PmXNZp75eTAerJNjU8DRSwS1p | unnamed service | | 0.055 | |
| 12T1ztSkedFUJXBfwd9cFn6iPrRFb | unnamed s | 0.0091 | 0.0091 | |
| 3PdvYtuss Yellow Brick Market | darknet market | | 0.02 | |
| 1Hu6aPHxAFRwFxMEN19u67vNag | unnamed s | 0.019644 | 0.019644 | |
| 12o8XbGRj LocalCoinSwap.com | p2p exchange | | 0.065 | |
| 31kTJiJNqP2c83pKnYRSR6fTGf28C | unnamed s | 0.001943 | 0.001943 | |
| 115HncxqknNDanbB2wPsiL7sHGr: | unnamed s | 58.32932 | 62.54432 | |
| 3A4Ekdg9i DoveWallet.com | hosted wallet | | 0.03 | |
| 1Nf6LTXP85tSsyedQNqFXwyLFA2: | unnamed s | 0.085103 | 0.085103 | |
| 1CDH228B48m1nW4BtWiu22XSYt | unnamed s | 0.00561 | 0.00561 | |
| 359oy2A8zU8xAGJgDMyuK7itKPN | unnamed service | | | 0.025 |
| 18dT2ZHrRk64dBQK82VezgHc2bS | unnamed service | | 0.325 | |
| 3MLDYQzH5DuM3X8ps6PHag6ww | unnamed service | | | 0.085 |
| 3PjbniKMSAjxb8Ef4HoomfMJKMC | unnamed s | 0.000706 | 0.000706 | |
| 15ctsuNS18SJXWLyaGVvaAnQ1cj7 | unnamed service | | 0.015 | |
| bc1qgl8ad002vlcajqu63me5kp6sv | unnamed service | | 0.045 | |
| 17SheUYn Paxos.com | exchange | | 0.215 | 0.065 |
| 3JFhfdb9yym9LhR2ecVCSP5qDszn | unnamed service | | | 0.035 |
| 19ednbi65 MyMTIClub.com | scam | 4.41563 | 4.59563 | |
| 33UAekxLe3rptNXEWGPLj4m2Em | unnamed service | | 0.125 | |
| 17Erz7qymV6Ncimk1GFiZeutNrhb | unnamed s | 0.004506 | 0.004506 | |
| 139Bger9oSf6be2H7KwR1BdzqCA | unnamed s | 0.002798 | 0.012798 | |
| 3JXs1hsYZigDQvkbxnaQ5SHX8LLg | unnamed s | 1.197583 | 1.512583 | 0.005 |
| 144dqPY5 Fairlay.com | gambling | 0.112366 | 0.247366 | |
| 3AE61dbffihyzLYRHrEAidA9xG6T5 | unnamed s | 0.000529 | 0.000529 | |
| 3F6RL5X4iq8fhkc3WzPSKXQBD4q: | unnamed s | 0.008933 | 0.008933 | |
| 17at4JpQEvJNNvADu27cvPbJ2ZTa | unnamed service | | 0.025 | |
| 14t3HcTv5WS7zvjiovEcswnhpegJa | unnamed s | 0.045223 | 0.065223 | |
| 3M991pHr7kgY7t9xiApBFE177pw | unnamed s | 0.002312 | 0.002312 | |
| 1HDUJnK9 DuckDice.io | gambling | 0.04378 | 0.04378 | |
| 16FGRrU1a1TFuHsGt72CLNcjkJ5H | unnamed service | | 0.12 | 0.055 |
| 3Cq4n7uywRe5rWXCZ88CAttfpBn | unnamed s | 0.003702 | 0.003702 | |
| 387yftfhBn Celsius.network | other | 1299.666 | 1438.516 | 38.375 |
| 1HneGmpAg38UpkoSnfboZjzER7n | unnamed service | | 0.43 | |
| 1vQ439Zib6fsXCrPFzX21w7ZEUXF | unnamed s | 0.001954 | 0.001954 | |
| (coinbase) Coin Generation | mining | | | 0.18 |
| 1PchPNfqo SendWyre.com | exchange | 1.997184 | 4.157184 | 0.035 |
| 3D3MYt9a; AscendEX.com | exchange | 4.50689 | 5.34189 | 0.01 |
| 33QX2r96frhrmFBpNSD4gaGpUyc | unnamed s | 0.352889 | 0.552889 | |
| 3GgSvD1m MorphToken.com | high risk ex | 0.0275 | 1.0075 | |
| bc1qtx8lev EggChange.net | high risk exchange | | 0.075 | |
| 3DkuqZpGeDHCmrL29qhRcneXJ4r | unnamed service | | 0.005 | |

| Address | Type | Col1 | Col2 | Col3 |
|---|---|---|---|---|
| 1BUVqay2) NiceHash.com | mining pool | 0.108541 | 0.223541 | 0.12 |
| 13FChtNzwz38gCNgFvNnhsHwy8L | unnamed s | 0.027852 | 0.032852 | |
| 3DbFJdykqq9XhCHWNuiJmivXcSw | unnamed s | 0.001901 | 0.001901 | |
| 3F2NBWMM8iqX41VSYnjb9CDT9l | unnamed s | 0.019379 | 0.064379 | |
| 1BibMv4h: TexcoinFX.com | scam | | 0.13 | |
| 1KwmCS1J2b6dCTq8aikZFK4jQDp | unnamed s | 0.0087 | 0.0087 | |
| 1M9zLVE7v8zZo74bkknLJhxWEzbi | unnamed s | 0.006551 | 0.006551 | |
| 3Bq4eVMrRA8vra26HLTfA7mw2E: | unnamed service | | 0.005 | |
| bc1qg4n8ku658q8n5vu4guw2lxxv | unnamed s | 0.005876 | 0.005876 | |
| 15uJvFAkxl CoinGaming.io | gambling | 0.119871 | 0.459871 | 0.01 |
| 3HS7mCzMcfmPopRjgZHB4F8x81r | unnamed s | 0.001836 | 0.001836 | |
| 16kRU4rhSNyUqT8gqPGJpxPJWYr | unnamed service | | 0.055 | |
| 1GWnCP7rGkYeKiwqaaPNc7No2tl | unnamed service | | 0.015 | |
| 3DnaXr32VQP3h8bnSH3RRRxE1U | unnamed service | | 0.59 | |
| 37Rv9LMcaSPCh6LqVpnkfoFKXmy | unnamed service | | 0.015 | |
| 3Hib5Bicjpp2HbyjHVePsSoXE82NF | unnamed service | | 0.005 | |
| 3QCRtaRDpHvV619QwyqF2w8bf1 | unnamed s | 0.002024 | 0.002024 | |
| 1HoCaMJX Elon-Musk.life | scam | 0.030351 | 0.030351 | |
| 12rCywPD4RPW3P83hegc6LBGC9 | unnamed s | 0.00025 | 0.00025 | |
| 3D66pHnmETQKTQ7uKVzbBBCCm | unnamed s | 0.0004 | 0.0004 | |
| 12zr7gegAema5BeApdPCiDsFsZek | unnamed s | 0.00725 | 0.00725 | |
| 12yY6PmG1E3wp6P5hrQmAPnH1 | unnamed s | 0.006388 | 0.006388 | |
| 15NLJvbaVv3zDhRd68CpbqMeJbT | unnamed service | | 0.005 | |
| 1DGYXxifqk7YGEmsibVrDpcwai6h | unnamed service | | 0.075 | |
| 3K2FXu11C4MWSq5E7PxhnEELqn | unnamed s | 2.588007 | 2.808007 | |
| 1AKaRxCSLDVcbtiSztXYXLLKYyNVL | unnamed s | 0.0055 | 0.0055 | |
| 1B2fB1MtLryhyEg67VUcQGikCsJqj | unnamed s | 0.003707 | 0.003707 | |
| 1Kh2za1VeF4ZkWUdAJnbjMKGurE | unnamed s | 0.008455 | 0.008455 | |
| 132gfLpZFt BlockTrades.us | exchange | 0.005786 | 0.005786 | |
| 1GzwigadvXc1cuV7rXpQM7axHuN | unnamed s | 0.004059 | 0.004059 | |
| 1FPQi7Sw\ UAS-Shop.ru | fraud shop | 0.003745 | 0.003745 | |
| 3JMx21TsHeZtfKbxuxEGd3HvYUiN | unnamed service | | 0.005 | |
| 3GQ4nrGzrxMpFx4zTGxpAeMAZa` | unnamed s | 0.003928 | 1.828928 | |
| 1KHVJTbfcz6U8bc4chSsZJhYk7xXG | unnamed service | | 0.01 | |
| 32ZLK9iJk6 SouAlter.com.br | exchange | | 0.005 | |
| 3HMdy1PeAEvo8TduEjdN6U4YXm | unnamed s | 0.00528 | 0.00528 | |
| 1birsVpaBbTWN9kbDLtQ7v4xZkQi | unnamed s | 0.055201 | 0.440201 | |
| 1CCkVZHCVayvLMHHbnKgnVsKnQ | unnamed s | 0.002414 | 0.002414 | |
| 32oAtiAtPw4cRyB5p7x1U4bnmRN | unnamed service | | 0.005 | |
| 37y8213N81WusoHjSN5nFVWMd | unnamed service | | 0.015 | |
| 14iKknFxaN SafeDice.com | gambling | | | 0.005 |
| 3QHMgf2LDCKPj8y72tW4MBVuZs | unnamed service | | 0.025 | |
| 1Geminir1l GeminiBTC.net | scam | 0.402948 | 0.402948 | |
| 3BpFcyFimZC4GPWvwGQznhPhFr | unnamed s | 0.009869 | 0.009869 | |
| 33XHz31VdnVuHP8ZGiRznMGzcaf | unnamed service | | 0.005 | |
| 3DoMvFAbow7oJ273Kr7bQNNvq7 | unnamed service | | 0.01 | |
| 382HXfJsxpN9vYrkfUo9jFCDxJir7n | unnamed service | | 0.01 | |

| Address | Name | Type | | | |
|---|---|---|---|---|---|
| 1NEy1n8Je | Bitrue.com Bitrue.com | exchange | 41.16319 | 42.91819 | |
| 1Lx99bYhr1qHEEgjqwjZy3ec4kD5ul | unnamed s | | 0.031571 | 0.031571 | |
| 1F9htujdqhrFQ3ZEmzndHt24CN4z | unnamed s | | 0.025174 | 0.025174 | |
| 3EtY7rGMi55LPkrMd8hLC2UXh42 | unnamed s | | 0.001613 | 0.001613 | |
| 32j7FesbH) | Abcc.com | exchange | 0.004858 | 0.014858 | |
| 3HWEyTjfR7t7iAS7BpNekzddqWr2 | unnamed service | | | 0.05 | |
| 3AMejYJ7uoh2BgkveqEN7kzXSbkc | unnamed s | | 0.00063 | 0.00063 | |
| 3QvbH4BnkPXoZRtXxaedSA7u4D6 | unnamed service | | | 0.055 | |
| 3NBwo2JEfFcUYCfzXUoYvcZ1wf5Y | unnamed s | | 15.18653 | 15.45653 | |
| 19bddsEiBnyXhzj4wVDE764maFN | unnamed s | | 0.001835 | 0.001835 | |
| 1E1mRpC8WiRuwkkjZCj9G7GrhDe | unnamed service | | | 0.1 | |
| 18zKea2Tuiiw4uND47MjGYwvrCB | unnamed s | | 0.003089 | 0.003089 | |
| 1MLgaxVM | Bitpanda.com | exchange | 0.672349 | 1.432349 | 0.015 |
| 1B7Q7rm3JWf5cs4srrpLfyRcHsTQ | unnamed s | | 0.002636 | 0.002636 | |
| 3LK9um6pD9Nd5YjwQiwfQhFPRh | unnamed service | | | 0.74 | |
| 33HmcsseA3kMHoBxG7eAoZFSx9 | unnamed s | | 0.002981 | 0.002981 | |
| 3Nb6bjjoJLv4GvF3TzCJZ9zEDVf7D | unnamed service | | | 0.005 | |
| 12zvEDMqJr6iYgLCFPKGdyZMzVrz | unnamed service | | | 0.005 | |
| 3HJ6Fwjyyl | BullBitcoin.com | exchange | | 0.065 | 0.01 |
| 13Vp8xBW | Freewallet.org | hosted wal | 0.839738 | 1.574738 | 0.06 |
| 1JdJ4vcNrb3y6uVRPxjPRprP2FP9a | unnamed s | | 0.010439 | 0.010439 | |
| 1D7ns7Q3l | HBTC.com | exchange | 3.969631 | 4.934631 | |
| 1Nuw3TAJ\ | smtp | illicit actor-org | | 0.01 | |
| 1GTu7LWU | ProBit.com | exchange | 7.290407 | 7.555407 | |
| 1Juirjo1K59TpxvZYnd43yrxfqT21C | unnamed s | | 0.023971 | 0.023971 | |
| 1DKC5Ynm | OnlineFXPro.com | scam | | 0.005 | |
| 3ASwHRkqYX4VZmrvo1Qf1HfcKC9 | unnamed service | | | 0.005 | |
| 3LzUEghjDzmHk2bV4etmJjXYeyRS | unnamed s | | 0.023363 | 0.108363 | |
| 3PhYpUSb1qUZuNF5muoGM4KJ6l | unnamed s | | 0.0216 | 0.0216 | |
| 1HQbBBihareH8SKyirkbQ68N3eJK | unnamed s | | 0.020364 | 0.020364 | |
| 1MFbhKJAzb7jhWQb8tcAAhonDY | unnamed s | | 0.08547 | 0.08547 | |
| 12am2Sk12Y9kMWbzCZwixgpLmF | unnamed service | | | 0.005 | |
| 3Gzedv8nGXVcUzk3aZjMY84C4yD | unnamed service | | | 0.1 | |
| 3Nr6E66UVAHBuJJBYMX9PX5VJh | unnamed service | | | 0.01 | |
| 3M4LBN5K | CoinToCard.org | high risk exchange | | 0.01 | 0.01 |
| 1AoEQ9kLjFqNnt15nwDfXLoW3o | unnamed s | | 0.018388 | 0.018388 | |
| 1L4Y5W4ivV6TN65FdGjY79tPWcn | unnamed s | | 0.00347 | 0.00347 | |
| 17JkTqjozhjGcYGkK6gioyv7DU2sw | unnamed s | | 0.00118 | 0.00118 | |
| 189jxoxMS | CryptoCoin-World.com | scam | | 0.01 | |
| 13CWDDMKDrShRPXeVx8x5isS4Cl | unnamed service | | | 0.01 | |
| bc1qgywgr | SNLElon.com | scam | 0.001627 | 0.001627 | |
| 1GUZH5A1DLgbAG6anQB7vA6mj | unnamed s | | 0.000869 | 0.000869 | |
| bc1qx4mffl3gl4vsvtyzztkn06vhphz | unnamed service | | | 0.005 | |
| 1913owvL5 | Stacks.co - Miners | other | | 0.015 | |
| 13NKhvvYa7iaKLcdCKaHUqz3wwp | unnamed service | | | 0.03 | 0.01 |
| 3CB1mHN4enkM2fd2wbcuSRZJcU | unnamed service | | | | 0.005 |
| bc1qdhmnft5lk76ll5uxqjcqsvg6w5 | unnamed s | | 0.023625 | 0.023625 | |

| Address | Service | | | |
|---|---|---|---|---|
| 15mxWLTl: Triple-A.io | merchant s | 0.005345 | 0.015345 | |
| 35GKWXRzWnQEr91WRm47KHF9 | unnamed service | | | 0.01 |
| 32nZ7sAfVJW7rM3zUq1GSwBtrFT | unnamed service | | | 0.01 |
| 193QoMo9aiYaFuAjmsHFQpH1VT | unnamed s | 0.009705 | 0.009705 | |
| 14cWq5RwpyxCkofREhF5bXoyVfG | unnamed service | 0.095 | | |
| 1AKgYVZbcHBp7ozpg2dPyqstggQc | unnamed service | 0.025 | | |
| 3PUwkhTB AdvCash.com | exchange | 0.605 | | |
| 14B5vTz4bvStXiFnZUYp6DTazvkJW | unnamed s | 0.002219 | 0.002219 | |
| 1NheV8eQfHuVHLd25ggoMy5dbL | unnamed service | 0.06 | | |
| 1CtxqMekGmrNgJ2ZYwxj1kC7Kn2 | unnamed s | 0.000357 | 0.000357 | |
| 3CfPvSy7MebAw8LniJbAmG2sFD6 | unnamed s | 0.000833 | 0.000833 | |
| 1DKT5qg8yuDSdrRU8CGio1FMWt | unnamed s | 0.029455 | 0.029455 | |
| 1iqpWQf8DTm3mKYjKZ4jf1N1bsn | unnamed s | 0.002449 | 0.002449 | |
| 17PbpKDSoEcu1CCsKxtrzpdVARRF | unnamed service | 0.55 | | |
| 3EuB4VMPTWL12hNnV3wMs8BFJ | unnamed service | 0.005 | | |
| 1EQTtXWNnCbuc6BCvmcRQXYZux | unnamed service | 0.02 | | |
| bc1q48ez32meggwdy64c739dxe8 | unnamed s | 0.016681 | 0.016681 | |
| 3NFB72usnVZYfyNTGemgSXDDaw | unnamed s | 0.002681 | 0.042681 | |
| 33WF5LPQ9Rs8f8eTAxUpcmWp9p | unnamed s | 0.039515 | 0.039515 | |
| 16Vetk8NYCtwLCM7ugcd7dbtzM2 | unnamed s | 0.00761 | 0.00761 | |
| 346rYqUkpjBB1DcX1iTqds5zUQoC | unnamed s | 0.000176 | 0.000176 | |
| 1HyY4X4hDirYufEU62eKxsKhoj8y1 | unnamed s | 0.002599 | 0.002599 | |
| 38ZuWkTPWF7ncTQy63p8aNVBKz | unnamed s | 0.122702 | 0.122702 | |
| 1Dmykqzttg6wmLnM8TAJDxST68g | unnamed s | 0.108741 | 0.198741 | |
| 1MCWgUoUmhegA1g5hAFA9K9uI | unnamed s | 0.030721 | 0.040721 | |
| 18utbB4NKpoEC2vZND53vXtPP1t4 | unnamed s | 0.002078 | 0.002078 | |
| 3NCXopYdGv6uQ3KKNrtyMcEMR4 | unnamed s | 0.005613 | 0.005613 | |
| bc1q77m0qqgxffh6dthjfjv06nwwc | unnamed service | 0.045 | | |
| 18LCuKuFC BitBay.net | exchange | 0.261014 | 0.496014 | 0.01 |
| 1KbVTKajrcP1RaWwfqB4kkuNN4K | unnamed s | 0.001159 | 0.001159 | |
| 346N6RKAl BitBits.org | high risk exchange | 0.01 | | |
| 1MSdLZnkMBW83FLcqi18tDVmvu | unnamed s | 0.00335 | 0.00335 | |
| 3BCrc9Snpyy62VwjUjhK3efoZwT7 | unnamed service | 0.005 | | |
| bc1qles82dxrlvrhrw9u6znxn2qrwy | unnamed service | 0.005 | | |
| 3P8LUNMs5we5SCcL5TxiYGW3Vd | unnamed s | 0.66968 | 0.68968 | |
| 14NSLcvM: Waves.exchange | exchange | 1.763108 | 1.983108 | |
| 1M2ygw9utZ69BTDM8XR3aLbqi2l | unnamed s | 0.008899 | 0.028899 | |
| 322QudMe1w29qiXoU2Wu6XE56 | unnamed s | 0.001893 | 0.001893 | |
| 1BdzCCsAF9zM3BnsDLwm2L7EMu | unnamed service | | | 0.18 |
| 1NrJ7NzDFPmmEvk2ZbXxpUTMck | unnamed s | 0.00775 | 0.00775 | |
| 1F1XS2Rw5 Coinsource.net | atm | | | 0.005 |
| 1AwHFAM95ZE1JU1YS5kTh9Pu7b | unnamed s | 0.02455 | 0.02455 | |
| 19m2oUqXQjNBypSxn5Rg41kb1pf | unnamed service | 0.015 | | |
| 3QiqwzxFbfHw9DJ4Vkk9u2LK4tNv | unnamed service | 0.005 | | |
| 1Ab2vJFiQmHU5yYSvwBTKvQKWj | unnamed s | 0.000711 | 0.000711 | |
| 34PaMUYZFSxcf3XPmz8UUYScBJV | unnamed s | 0.003019 | 0.003019 | |
| 33UWzKr19sCzHZnMbgSWmf8YCl | unnamed service | 0.005 | | |

| Address | Name | Type | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|---|
| 1BdKSMTb | World Market | darknet ma | 0.395756 | 0.575756 | |
| 38K9S5Yn5QohCX5jCasbZPAvciWł | unnamed s | | 0.026139 | 0.041139 | |
| 38V9vCschie3EixYaFaoXN7S35C3L | unnamed service | | | 0.005 | |
| 18H43RTXDx5BQLLNqc3VrV4T15C | unnamed service | | | 0.015 | |
| 13UfRUkms6n39dnM6DDmXwPbł | unnamed service | | | 0.025 | |
| 397fjJJqW3 | WalletofSatoshi.com | hosted wal | 0.184975 | 0.204975 | |
| 3EUR96rVł | SIGEN.pro | high risk ex | 0.015042 | 0.020042 | |
| 3Ek3MprgE | Crypto-Mining.biz | scam | | 0.005 | |
| 1LrgAHUysnUandv3hAeqAgx76JHt | unnamed service | | | 0.555 | |
| 32TLB8rfrjN2Unez4RUZuNVDLz1G | unnamed s | | 0.019809 | 0.024809 | |
| 3FVfDfH18w6gZ2F45nF6SvNRFurz | unnamed s | | 1.934783 | 2.059783 | |
| 15K36ZfiPWy3ycFD3KXKEWBR6uc | unnamed s | | 0.683678 | 0.728678 | |
| 19tEci2HK4fe72v5s8dQ1Dq3LuZs\ | unnamed service | | | 0.19 | |
| 342Cc14eł | FalconX.io | exchange | | 0.04 | 0.255 |
| 3N3YMjDUDW72Cq1rjq1m4Eph3s | unnamed s | | 0.00128 | 0.00628 | |
| 31mRcuDTNXwdfjeyECvkQbYbQxc | unnamed s | | 0.001281 | 0.081281 | |
| 3K9kMMBXnDyotz1QkgBJDbguC1 | unnamed s | | 0.001573 | 0.001573 | |
| 3Pn7piZMonWJmr7k19cW8ysZU1 | unnamed s | | 0.007345 | 0.007345 | |
| 3JEfkrrcTffl | NovaBTM.com | atm | 0.026688 | 0.041688 | |
| 19XhybFeqQXcFkc6DZpR5zoXpwz | unnamed service | | | 0.005 | |
| bc1q2jp7yg5elnx6x943pwsftxhm0 | unnamed service | | | 0.02 | |
| 17xBsjELkVKBCvuSKJvYSDNwEHvo | unnamed s | | 0.010738 | 0.010738 | |
| 3Mnm1Qgj | Reported as Mespinoz | ransomware | | 0.005 | |
| 34geKw5J3J2VwdpRmWqMFnmkx | unnamed service | | | 0.06 | |
| 1L51UvTCpGiJ168ztQ18JqVH7V3Z | unnamed service | | | 0.05 | |
| 1LWh2ZR4 | Bittylicious.com | exchange | | | 0.005 |
| 3BuVq8mzsSTjTUPYKrarKj2T1yKcn | unnamed s | | 0.0075 | 0.0075 | |
| 3KwKhHR3zxor7PSfiv6WvDawyKj7 | unnamed s | | 0.00087 | 0.00087 | |
| 3QXTmXFi( | Icarus Market | darknet ma | 0.078418 | 0.113418 | |
| 3PzH6r5kf\ | BITMAX.me | exchange | | 0.02 | |
| 35mUX58xNWDNTnjGxCkUq7iGrL | unnamed service | | | 0.11 | |
| 13KACerBFXmS6xZCkqgkM5vifWp | unnamed service | | | 0.02 | |
| 3GFrQUh89srVqJzp1fVaLgE13QXh | unnamed s | | 0.014504 | 0.014504 | |
| 36UDq4TYLz82LYazpn6aoJ1Ygv32 | unnamed service | | | 0.005 | |
| 1AJg49P8Z | AKRossiInvestmentsPt | scam | 1.806059 | 1.806059 | |
| 1AyBwf11R8cvEyy1Sds7Yqdr1639 | unnamed s | | 0.013 | 0.013 | |
| 1FtFM85A23xKtDngv8WpqG5i8KF | unnamed service | | | 0.035 | |
| 1Pb8bV5vł | Coinify.com | merchant s | 0.002491 | 0.027491 | |
| 3Eo4JkhkBAV4RFaCe2TSskkUh9d( | unnamed s | | 0.021343 | 0.036343 | |
| 36fkECbKnWCsxDuPfz5t52NxkQ6c | unnamed s | | 0.00072 | 0.00072 | |
| 14UraxzVWnZ22ZTQofcqYxcFnzp8 | unnamed service | | | 0.23 | |
| 1HKen77oSutvdo67JShtPGfpR1Mł | unnamed s | | 0.0057 | 0.0057 | |
| 1G5ASwHtW6RAbksMVm2nVBgKł | unnamed s | | 0.086857 | 0.086857 | |
| 33ydwQB8i5Z3fbBAzSAKZw3fZLvE | unnamed service | | | | 0.005 |
| 1ENngQ41 | Bitcoin.de | exchange | | 0.025 | 0.005 |
| 3EhaXxqCGBikBBxJN3c54xZuJfRtc | unnamed s | | 0.019687 | 0.019687 | |
| 39LVmyt1T3UH4M76zsTkHMHz5L | unnamed service | | | 0.05 | |

| Address | Entity | Category | | | |
|---|---|---|---|---|---|
| 1LKDx6siuL | Cointree.com | exchange | | | 0.005 |
| 3KSB5dENc | Birake.com | exchange | 0.034905 | 0.034905 | |
| 1BrC4UoG/ | Xcoins.io | exchange | 0.005 | 0.01 | |
| 39ZaWyG9gvtdGMDUgaAKSEoMC | | unnamed s | 0.003657 | 0.003657 | |
| 1GnQguKA | ChipMixer.com | mixing | | 7.595 | 0.12 |
| 1Q4WgnM | Investrix.io | scam | 0.0173 | 0.0523 | |
| 3LV4Ae8sW5xFRpd3TgdDq5aUeN | | unnamed service | | | 0.005 |
| 3DVGGfKGUrkBtzEm2BgwLgWp2p | | unnamed s | 0.194188 | 0.194188 | |
| 18zAZmF1sb8Ro7K8shin17RUnZn | | unnamed s | 0.05489 | 0.05489 | |
| 3CM9pUhvFXG7KRjcCuXUcJbFqcN | | unnamed service | | 0.005 | |
| 38tiZqQv1V8RoMEdE8umiCJ7yEu | | unnamed service | | 0.005 | |
| 38ENmTr2/ | CoinCloud/ | atm | | 1.15 | |
| 3PyK7Haz1Q7ec4uW7LWnLrcVro | | unnamed service | | 0.005 | 0.14 |
| 1AYCfA4Sy | TorqueBot.net Cold St | scam | 0.355706 | 0.360706 | |
| 1AFNStV4F | Tidex.com | exchange | | 0.04 | |
| 3H3QmkwI | CoinDeal.com | exchange | 1.682187 | 1.682187 | |
| 1L8qDTuVkPHqNg4yfFpqrnFqYKzJ | | unnamed s | 0.000405 | 0.000405 | |
| 33MJK7MHrVz7A5VqZRj2t87DBDI | | unnamed s | 0.005852 | 0.005852 | |
| 13zsn5AVYQTBQYKAFbfcV5cao1d | | unnamed service | | 0.01 | |
| 3LB3b9aAbDyL4zkigEVvbu8AVJm | | unnamed service | | 0.01 | |
| 1GiABtEAjZsH7E1BjhjaWqUvTC81 | | unnamed s | 0.025492 | 0.025492 | |
| 1CZJQN2ajCu9FJY8RdTTnoKrkfgqZ | | unnamed s | 0.011292 | 0.011292 | |
| 1C1sKb6bugGBXq9o4urCAnsAKg8 | | unnamed service | | 0.045 | |
| 1HTNnLYvxdRxSC32W6z634umRc | | unnamed s | 0.008092 | 0.008092 | |
| 3CkK4tKfB61h59TcXCW1ryebJ6Ux | | unnamed s | 0.005004 | 0.005004 | |
| 36Ca1C1FRCKArs9HJbxbN7eKW28 | | unnamed s | 0.122716 | 0.192716 | |
| 334tNWFR | Rain.bh | exchange | | 0.01 | |
| 1cY5jP5dq! | Vendetta.cc | fraud shop | 0.00222 | 0.00222 | |
| 3MuJW6GNmfnDmJXq5R5mXRrpI | | unnamed s | 0.001942 | 0.001942 | |
| 16Xuvss4tw716VuBxhSYUoHfQzoI | | unnamed s | 0.033505 | 0.093505 | |
| 3M5TQFV1XQ71TY1vbxoH1gKx7T | | unnamed s | 0.009458 | 0.009458 | |
| 3DguCsDwJWwYMJwwjoLdyr3hc5 | | unnamed s | 0.0004 | 0.0004 | |
| 1Gk8S3GsI | CoinSpot.com.au | exchange | 0.018005 | 0.318005 | 0.015 |
| 1LnMMkHZLbL7pBckmBjBDMdASl | | unnamed service | | 0.53 | |
| 39d9s51RTN6Bxt4okfaRKpgDEzrV | | unnamed service | | | 0.01 |
| 3F1hWdd5nu3aakFY1Gaci5neBUB | | unnamed s | 0.00211 | 0.00211 | |
| 3ATYdbHtuEvazUpKU7bj5d9pA9y | | unnamed s | 0.002255 | 0.002255 | |
| 1Niwg196g1bMKuAtvTTX8EmmSu | | unnamed s | 0.003418 | 0.003418 | |
| 18mW6Yft8E5kXAQCCFc6EcM63S | | unnamed s | 0.038239 | 0.038239 | |
| 17jjkkwuqRttq7g57HcfaDcmXMfN | | unnamed s | 0.080726 | 0.080726 | |
| 1KgrTYEwC | SealsWithClubs.eu | gambling | 0.011709 | 0.011709 | |
| 1MfFkLn1xepdcmN6k8rmkjM4nrk | | unnamed s | 0.017273 | 0.042273 | |
| 33Pze5yeqb588dSkSRGV64qiVtDB | | unnamed service | | | 0.005 |
| bc1qxy2kg( | Twitter Scam Hack: Ac | scam | 0.001498 | 0.001498 | |
| 3DNPJeDk6ZKxKQFC58QwiDYqeJo | | unnamed s | 1.286432 | 1.286432 | |
| 3BwwUiGHNZFwrCg8mg73wxAdY | | unnamed s | 0.001528 | 0.001528 | |
| 3PkzyZfzc4 | NDAX.io | NDAX | exchange | | 0.055 |

| | | | | | |
|---|---|---|---|---|---|
| 16ATn9DD| | HTC Trading | exchange | 7540.329 | 179.655 | 7551.189 |
| bc1q93zmp4tzt8qf2rgufzpnr0lhfp| | unnamed s | | 0.000617 | 0.010617 | |
| 36cFrFfQwikQVF9GZodxkzf1B62d| | unnamed service | | | | 0.01 |
| 14PJWCBy| | LocalBitcoins.com | p2p exchar | 4.628155 | 21.51816 | 0.115 |
| 1EPjDNTELf5c767KKQzzNHexJsGN | unnamed service | | | 0.1 | |
| 3QumxEWsxYEmh3e7t4AzKTDVkx | unnamed s | | 0.006 | 0.006 | |
| 1MQ1XhWmimrRNHhanLLtzcJSCP | unnamed service | | | 0.25 | |
| 191uexYDAuLgpRrdvvgzqN9AzkW | unnamed s | | 0.005897 | 0.005897 | |
| 1Bgbxwarrh2YBgsqmwkfKui3fhbP | unnamed service | | | 0.035 | |
| 12jFPtsynhfz6aydHPy1ZXo1cRDJD | unnamed s | | 0.003782 | 0.003782 | |
| 3AP6HRD| | CanadianBitcoins.com | atm | | 0.005 | |
| 16eNCyhDs4VsNwqvndWYR59gW | unnamed s | | 0.000967 | 0.000967 | |
| 1HG1w84| | EXXA.net | scam | | 0.01 | |
| 1PUTaa4ARLZwSkDcND4XNzC41y | unnamed service | | | 0.005 | |
| 34v4LN4c2 | DHF.tk | scam | 1.577946 | 1.757946 | |
| 14VwRHoXhgYaZgHCJ1s5L6GtHNp | unnamed s | | 0.006899 | 0.016899 | |
| 1KeTW57W59ZtoMZoQRPt3H6eR | unnamed s | | 0.001839 | 0.001839 | |
| bc1q0nlqj9qmeclf9dm5kqj8j2g6p| | unnamed s | | 0.018207 | 0.018207 | |
| 1Woodmx| | Ark-BTC.net | scam | 0.450103 | 0.450103 | |
| 3FaBSDmCNPGbmBthdCgvLFqi4uS | unnamed s | | 0.074476 | 0.074476 | |
| 16V5Jy5AAmrHc3Ci35jPx8EdJE4e | unnamed service | | | 0.03 | |
| 3KfTuRH9bD2VR7qvdKPB4mgvYxa | unnamed s | | 0.002 | 0.002 | |
| 3MJQwKFe | Tradeogre.com | high risk ex | 13.60329 | 16.72329 | 0.015 |
| 1AbjmH7hHyZRyUmbhDAZFGxNK | unnamed service | | | 0.07 | |
| 3Adgpxypc1D4HAZkWRFLFKLxhU | unnamed service | | | 0.1 | |
| 16uhiDxSQaYW1SczAuoATzPY87F | unnamed s | | 0.038446 | 0.038446 | |
| 1FRR1kQQrqMAaXwttKG1cUKF9e | unnamed service | | | 0.02 | |
| 36LYUo3V| | OSL.com | exchange | | 0.34 | 48.41 |
| 1Ly3RRZnvUELAFuomcRr7n7Rz3r | unnamed service | | | 0.06 | |
| 19cpTqckxFZ4RkuzrmXd4LQR7jk | unnamed service | | | 0.1 | |
| 3AtzBeoAr| | MiningCity.com | scam | 0.00075 | 0.00075 | |
| 38ukfvZKpmvjhMCi36j363Mh8dd | unnamed s | | 0.216689 | 0.216689 | |
| 1EgQ1z9YWCwok2fErMJCdAkE5tu | unnamed service | | | 0.03 | |
| 1F6zSKDcFZssSouBVScKrZizSP8fCy | unnamed service | | | 21.925 | |
| 1ETwFgCtd6cJTS176b8E37j1F3bzN | unnamed service | | | 0.065 | |
| 34zFM26jKkFKVYrQrYD5fWe6PN9 | unnamed service | | | | 0.01 |
| 3EgvyQgo| | GiftOff.com | other | 0.621885 | 0.871885 | |
| 19n1Kba8HEpGs4henUxVZutFg1F | unnamed s | | 0.00152 | 0.00152 | |
| 1GQBjhcXVwhgkPXZ8H5TuCmrQ1 | unnamed s | | 0.045563 | 0.045563 | |
| 1EN7Mg1ffiEavmby3qRjqxEtpoSz | unnamed s | | 0.001557 | 0.001557 | |
| 13B1Mxt6HwUtoqndBHeCFqpnNL | unnamed service | | | 0.14 | |
| 1Ey2E9sw| | Vaultoro.com | exchange | 0.003008 | 0.123008 | |
| 15p4iUfhnsszLNAbx4Hnayz5zZQZ | unnamed service | | | 0.125 | |
| 1Jtigdhvkk9np5B8nGD4WTB3LYFc | unnamed s | | 0.00213 | 0.00213 | |
| 3Mqc5fSbhcWHKZNE3oJTUNFg53 | unnamed s | | 0.011163 | 0.046163 | |
| 1Lbd88UP| | Mega-Trader.net | scam | 0.134457 | 0.134457 | |
| 1xvmeFyvZQmJ4XNPHET8jqvSFbb | unnamed s | | 0.015 | 0.025 | |

| Address | Name | Type | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|---|
| 3NJ5CrpizK | Bitero.io | scam | | 0.005 | |
| 1KU2AsJftomeprywtXq31kBSVzoP | | unnamed service | | 0.03 | |
| 1D2PJJeNEzbsAufmWoKgWKmngJ | unnamed s | | 0.00811 | 0.00811 | |
| 1GaQw4NtVYda1z1Q5VQZgHsissz | | unnamed service | | 0.005 | |
| 19W2SrV76HT1BeSSXd7gr7AQGe: | unnamed s | | 0.16669 | 0.17169 | |
| 3PZZ4vMCl | Delta.Exchange | exchange | 0.421078 | 0.431078 | |
| 1BwysMVmbstiJ1cDWX2Yn5WnT( | | unnamed service | | 0.025 | |
| 1G9KGxW9p3BbmSchywTuqtrMfc | unnamed s | | 0.019753 | 0.019753 | |
| 1waRgbL12 | Trade401.com | scam | | 0.005 | |
| 3G3kTLj7S/ | Bitlo.com | exchange | 0.00126 | 0.00626 | |
| 1HGRHz3qLKyXk4NAkXheNqGoUi\ | unnamed s | | 0.028937 | 0.028937 | |
| 3Gjox4LdBl | Net-cents.com | merchant services | | 0.055 | 1.215 |
| 384uXhkZN | Fokawa.com | p2p exchange | | 0.005 | |
| 15ehV9b6Ji5yJfgNc1GJvJ6e28DFG | unnamed s | | 0.001317 | 0.001317 | |
| 1Cb9FYYtfCx8StxgVXUSDbwvQKJjf | unnamed s | | 0.008519 | 0.008519 | |
| 1A1nBCs5pdYZf7GqhWLaGajDHda | unnamed s | | 0.004633 | 0.004633 | |
| 15QaPLWBcLys1cTgQw7JbngaUz | unnamed service | | | 0.12 | |
| 1JmZa9rtKJVhBV1Dwzm7gXmjJBV | unnamed s | | 0.004671 | 0.004671 | |
| 1PTvK3ukP | FinancePrime.com | scam | | 0.025 | |
| 13mpQcVR | Unknown - Ransomwa | high risk exchange | | 0.01 | |
| 18BZT2jGx' | WasabiWallet.io | mixing | 6.553861 | 17.74886 | 0.155 |
| 1NyXtB1pkrPC44Mt8oGB6AHq6y8 | | unnamed service | | 0.035 | |
| 33Eh4Z8m | Infinity | darknet ma | 0.045018 | 0.080018 | |
| 1N6FsSMS93zYjpNTzGi1eGUtbL3e | unnamed s | | | 0.05 | |
| 1B8LJbt4QTub1v1jng9iQE1U3Dha | unnamed s | | 0.002476 | 0.002476 | |
| 1A7tWftaG | Coinberry.com | exchange | | 0.075 | |
| 388nbTUK7vdVF7v9VVuGYjH1GGl | unnamed s | | 0.043261 | 0.043261 | |
| 1M54qp2LBjaTaCSYxVBzooRtTo9\ | | unnamed service | | 0.005 | |
| 175bZvRhAwtBcnC4fUqd7pubUyr | unnamed service | | | 0.005 | |
| 33DA29zrVVpSipLB8RF8Hn92X6m | unnamed s | | 0.0027 | 0.0027 | |
| 3GBdoySe1 | PowerCash21.com | merchant s | 0.0061 | 0.0061 | |
| bc1qt6erd50dnj5ghlrh42drqvn8ku | unnamed s | | 0.04516 | 0.07516 | |
| 1BxTutunPb5HLpvAyE4ctgYurDnW | unnamed s | | 0.008263 | 0.808263 | |
| 17zcuMbob7Zyu4tP3k1C5UJaM2i\ | unnamed s | | 0.002417 | 0.002417 | |
| 1D5fH4binnSPCPPKNkbcGWLm6Fi | unnamed s | | 0.002598 | 0.002598 | |
| 1AnD77GWKNg4EZLWnjNVVpm21 | unnamed s | | 0.035786 | 0.035786 | |
| 1GvxzYdJCzG6Kru4NryRW5VUXS5 | unnamed service | | | 0.01 | |
| 39NPNwNe9ZimUWtzVp2skJp9Xe | unnamed s | | 0.183471 | 0.183471 | |
| 19xfiH6v9e | Bitfinex.com | exchange | 2.487108 | 5.132108 | 57.745 |
| 1H3DgHAsFwMTiJiMn1DzqLNsLyp | unnamed s | | | 0.055 | |
| 32CST4Hzc | Ibandirect.com | exchange | | 0.04 | |
| 1ANCfmoKtHUZs1GwPaDCPAgUtb | unnamed s | | 0.038025 | 0.038025 | |
| 3CRZtw8oL4mL5kfRYfvwwQSZ5U1 | unnamed service | | | | 0.045 |
| 1Fz2zdmRTrYdoNf76DLkyQ1cv2dk | unnamed s | | 0.00736 | 0.00736 | |
| 33rXht7zQDQzaYzLi9ZqEFUhfGU2 | unnamed service | | | | 0.04 |
| 3B4ZCfz98ypar7PWa9v8fDqwt3py | unnamed s | | 0.012895 | 0.012895 | |
| 35E8YJnDV | WirexApp.com | exchange | 0.001264 | 1.106264 | 0.015 |

| Address | Type | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|
| 33Wxsiv6bTDWcsNi3yB4uHjrTpNt | unnamed s | 0.044834 | 0.049834 | |
| 19uiKbp9C APEXMarkets.io | exchange | 0.014072 | 0.199072 | |
| 1LjaoNDiahGfrZxpYuQRgb2TV4JaA | unnamed service | | 0.075 | |
| 3DG3XeDJFgEZxyven5KdgNAPPno | unnamed service | | | 0.08 |
| 1GqpTqFxF Uphold.com | exchange | 36.08507 | 42.61507 | 0.03 |
| 1Bxtr7HN6UhQNqxnU3mQzQag9t | unnamed s | 0.001863 | 0.001863 | |
| bc1qp0empjcy4pyn30q9lc2ur5edt | unnamed s | 0.00055 | 0.00055 | |
| 3CUjUN3hNNfLizQT7C9djxLLFNgQ | unnamed s | 0.003758 | 0.003758 | |
| 37DarKzWo8TL5UE7UMcoUvgBZ7 | unnamed service | | | 0.01 |
| 1CjReh8yfT EagleFX.com | exchange | 0.003153 | 0.008153 | |
| bc1qyxr8y8 SamouraiWallet.com - mixing | | | 0.685 | |
| 3HznzQ72bWfTiWg37GrwxazoHiZ | unnamed s | 0.003047 | 0.008047 | |
| 1Ln64ycK5FV6Ph4yrMyBdutk8NP/ | unnamed service | | 0.13 | |
| 3PbaA54H72UYhsHEneyn1jLgazPi | unnamed s | 0.043046 | 0.043046 | |
| 1CXcLMebDsQbZsaN5LSMrZ4TMx | unnamed s | 0.08785 | 0.08785 | |
| 39p4JKUmDw7pF2gK8Hnt4kg1P2! | unnamed s | 0.005153 | 0.005153 | |
| 34M15vAbMyCyRF2MuCVKqAZqV | unnamed s | 0.000199 | 0.000199 | |
| 16mUG9jMrwMyfSHCt14FCEd25V | unnamed s | 0.006259 | 0.006259 | |
| 1kP7gx4Vm5DJCPz4rkJ2Vir4DSTD: | unnamed s | 0.010997 | 0.010997 | |
| 1F4VG2yikqFpVjPQTMaSEzwTqZp: | unnamed s | 0.004801 | 0.004801 | |
| 1AceRE3azZDyJT3zKX69daeL3ruS8 | unnamed service | | 0.005 | |
| 3EMqZexsFdbQKsGykrMp668xsryl | unnamed s | 0.148822 | 0.148822 | |
| bc1q8whqmjlkffcd7gwuwvcjpfmsl | unnamed service | | 0.01 | |
| 3Lpmc84P\ FoxInvestmentTrade.o | scam | 0.813753 | 4.993753 | |
| 134Xgqda8VLbxDboZtbNYFQFe87! | unnamed s | 0.001224 | 0.001224 | |
| 1NHpy7ueCg3yqFtRav61gqrpLdNF | unnamed s | 0.016342 | 0.016342 | |
| 3FVtf5a4q! Atomars.com | exchange | 0.278629 | 0.278629 | |
| 34PBVod3tS5JLcMhWNGwS7jzpe> | unnamed s | 0.06679 | 0.06679 | |
| 1392s3a2jaNXRWBCFoWgtUZJEHE | unnamed s | 0.002175 | 0.002175 | |
| 36qqeFpm CoinDCX.com | exchange | 0.478833 | 2.498833 | |
| 12GqPPchBNuvMeyYp5gEFV3W8I | unnamed service | | 0.045 | |
| 1DRUcwWbuAwP2aawGS8mYEnP | unnamed service | | 0.27 | |
| 17kkTWavckrMFMmqjoRKoTNM8 | unnamed service | | 0.01 | |
| 37CteejrvBis9ENLovmToM3Ub9T\ | unnamed service | | | 0.015 |
| 365py4Wqb9GoZUGTerkowbhcQr | unnamed s | 0.011053 | 0.011053 | |
| 187MF5dsI Velic.io | exchange | | 0.705 | |
| bc1qck5z0vqtsy9ed9kzv3597fkxv7 | unnamed s | 0.008384 | 0.008384 | |
| 1rfwwnuBxqneZY7jYVcuy5tT7B1SI | unnamed s | 0.00364 | 0.00364 | |
| 1HZqayHJRpvb3TR1LaHYDt6wHgn | unnamed s | 0.007391 | 0.007391 | |
| 323sLS9KHzbsWJxptoYXH5LUrvnP | unnamed s | 0.299698 | 0.299698 | |
| 39h9TihWa1oJVrNCcupc6fj6UTAiy | unnamed s | 0.007888 | 0.102888 | |
| 3QaQ33KSoPVYmZtfTNe6mXt5R3j | unnamed service | | | 2.21 |
| 1QFiXEiat4rqBjM7SM5Fjd5u1Grkt | unnamed s | 0.01461 | 0.14461 | |
| 3Pqi4RLmbDvay7EduVYt5y6b4RM | unnamed service | | 0.02 | |
| 1GNaQh78sv5stUowie3Bjs4U1MZ | unnamed s | 0.001019 | 0.001019 | |
| 3BJBp7oBBucC6HSJ13SUADGfvP1! | unnamed s | 0.017357 | 0.017357 | |
| 1FcpBFzARPf3QNrNBMHDviFqjNq | unnamed service | | 0.02 | |

| Address | Service | Type | | | | |
|---|---|---|---|---|---|---|
| 1JDapbiQDnzVxLpztxiF6YvMepJQj | unnamed service | | | | 0.015 | |
| 122ujMmwdhta7X3CKAFxmBmEj8 | unnamed service | | | | 0.005 | |
| bc1qwxtxqmr0flh64ey6kcqhn4asx | unnamed s | | 0.005177 | | 0.005177 | |
| 1EYEx7DoVXbhs92oFJYXzuewjHaC | unnamed s | | 0.037048 | | 0.037048 | |
| 36TndHDYtZEPoBKzkJ2hgaXj4X83I | unnamed s | | 0.009803 | | 0.009803 | 0.065 |
| 12yJEcG2g2bj5pmsLyvQPCHDKBt4 | unnamed s | | 0.00826 | | 0.00826 | |
| 1MusK1yP' | Musk-Prize.com | scam | 0.06665 | | 0.06665 | |
| 36CWK78UybVM76SV1vhAaUA34 | unnamed s | | 0.01658 | | 0.01658 | |
| 1JvnV6PyTKgeNUhoK79KvvrCBrbS | unnamed s | | 0.0144 | | 0.0144 | |
| 1BZvhaUx6 | Bitaps.com | merchant s | 0.04231 | | 1.49731 | 0.005 |
| 1135APUp | Binance.us | exchange | 105.9653 | | 125.7803 | 0.325 |
| 1FK2pFvFmCrjgSZkpYChAM2t4xN | unnamed s | | 0.001704 | | 0.001704 | |
| 1PUJaeM6 | BitroMarkets.com | scam | 0.001656 | | 0.001656 | |
| bc1qam8yddkqph6n5hngrpy3m78 | unnamed s | | 0.019506 | | 0.019506 | |
| 3QZvGETgUP2HZgMcskaJqX2z24a | unnamed s | | 0.00494 | | 0.00494 | |
| 1AajfmCZu | CoinifyTradingBolt.con | scam | 0.005685 | | 0.005685 | |
| 131v6kzpWrpZrxTs9WADaDGnDa | unnamed service | | | | 0.005 | |
| 3Pgcr21tVyfbKW2HoGpGvzt59dX | unnamed s | | 0.002265 | | 0.002265 | |
| bc1q0xmpqzfk0gfk2xmedps2l24cr | unnamed s | | 0.007939 | | 0.007939 | |
| 3PDysWYJcyurNV4e3H79H3gaC3k | unnamed service | | | | 0.005 | |
| 194DnA1FrjzVq6CWy72kJos2gkUc | unnamed s | | 0.100859 | | 0.100859 | |
| 1128Ev6iM | Binance.co | Binance   exchange | 358.5268 | 3.0043 | 1047.792 | 222.1593 |
| 1MQUG4bZ9LHHigSDiQy78eNcsRI | unnamed service | | | | 0.02 | |
| bc1qk8wwsr0awjumazt68fjsx5f53 | unnamed service | | | | 0.02 | |
| 1BHf5rD7N | Stocks.Exchange | exchange | 1.654632 | | 1.799632 | 0.01 |
| 1818YkSVMzjoKY1Dd6dZ5yXD1Hd | unnamed s | | 0.015227 | | 0.015227 | |
| 3HgkEfDdA | Bitcoiniacs.com | atm | | | 0.02 | |
| 1DBCHdsZ6Lvxz6wCTBHZm3doFxf | unnamed s | | 0.018692 | | 0.018692 | |
| 3CTMyWfT | BTC.com Pool | mining pool | | | | 0.285 |
| bc1qgvvtvltmnr0k3js4vlgjxp8nxzq | unnamed s | | 0.003159 | | 0.008159 | |
| 3QhVjnvZXVzZuMXgkyufexJVR8M | unnamed s | | 0.001424 | | 0.001424 | |
| 1MLd4zDg | BTCMarkets.net | exchange | | | 0.315 | |
| 1P7HT5acjnBALmrGaMLsGMne87 | unnamed s | | 0.006033 | | 0.006033 | |
| bc1qr92rqy3w6tqnndxs5zqcq7spc | unnamed s | | 0.009112 | | 0.009112 | |
| 1Ns6jFfKu6yH7bpxNxMtGSZWxv1 | unnamed service | | | | 0.075 | |
| 174P3STmbmHHY4HSQboiiZuXmr | unnamed s | | 0.009737 | | 0.009737 | |
| 33Hbf1svoXHieq7hBHy6ALh6PXbv | unnamed s | | 0.0151 | | 0.0351 | |
| 1ArqmXkxNQhxKBWFQAwX5S9F8 | unnamed s | | 0.000846 | | 0.000846 | |
| 3QoxdKXv8xLadVEGczWiNsLmFGu | unnamed service | | | | 0.025 | |
| 1PmoH6QnAt7iWyPM5vWmQ6D( | unnamed s | | 0.001589 | | 0.001589 | |
| 347KzY8udcXUZodyTBmSuDRNzP) | unnamed service | | | | 0.005 | |
| 1BJfsj8LWVtuCkfhGi1kirDR8Tm9k | unnamed s | | 0.003207 | | 0.003207 | |
| 34QNKdpF | ABSystem.pro | scam | | | 0.02 | |
| 3DWVbJwotYFGHpVUsGuoUj9mW | unnamed s | | 0.010966 | | 0.010966 | |
| 3DuXFu3BvqyVWAbBHb2uJUhN8k | unnamed s | | 0.002266 | | 0.007266 | |
| 361SutatvucBNkTBZvmNPaXThLbl | unnamed s | | 2.363718 | | 3.933718 | 0.08 |
| 1Hz9j8va3: | TradeFX21Mining.com | scam | 0.009154 | | 0.009154 | |

| Address | Category | Value1 | Value2 | Value3 |
|---|---|---|---|---|
| 3Kn181DM2tKfDF2aBmW61GccV. | unnamed s | 0.021044 | 0.021044 | |
| 3J5A7ni4wnBTMGjs2iwdJM8a4J2( | unnamed s | 0.087312 | 0.092312 | |
| 3Er1VLxgfd5vUaaSHUVj2W9BPeXI | unnamed s | 0.530355 | 0.530355 | |
| 1HhVMYrx( Bitstamp.n Bitstamp | exchange | 6.78347 | 9.65347 | 21.885 |
| 387rtKeNCi1W2pu6uFWvJYZH2s1 | unnamed s | 0.141256 | 0.146256 | |
| 12xjTvg1aqK9Jc46N4cxTLiKnCWnl | unnamed service | | 0.085 | |
| bc1qn3fqg: Reported as Cuba Ran: ransomware | | | 0.05 | |
| 38ZqHHmtvQpxZHF3cc5ZoxDZcg( | unnamed s | 0.007926 | 0.007926 | |
| 36HyjWwP7Z5rHqP9pi52tbGfBPB: | unnamed s | 0.065115 | 0.065115 | |
| 39Nmsvj8eFjtpzHjzLKUMVBT8YBk | unnamed s | 0.003272 | 0.028272 | |
| 1DxsEFmxcV7sCp2qc4FGTnqSWLP | unnamed s | 0.004807 | 0.004807 | |
| 3JZiYC4ASHYsJZeAzqZ2A1Rd3HNr | unnamed service | | | 0.07 |
| 19oEeFqtnPL57htTNSX1otYeSkbjb | unnamed service | | 0.03 | |
| 1AdjhHJyTj Twitter Scam: Fake Elo | scam | 1.432234 | 1.432234 | |
| 1QDEWLUNQ7uKWfy5sgzrKmvRb | unnamed service | | 0.2 | |
| 3QWRQ7jvq6J7zPEy2dkLLoMd41\ | unnamed service | | | 0.01 |
| 1EZ7vNjrQ: StandardAssetManage | scam | 0.003134 | 0.003134 | |
| 1CNZ3qPoR98rQwfZ3jGdoAqxQ1N | unnamed s | 0.40142 | 0.64642 | |
| 1HYDyGaU8ueyQo1fLbXTVowFan. | unnamed service | | 0.01 | |
| 1G3K4y99VAb6vUc5A8QHVGqZz8 | unnamed service | | 0.005 | |
| 379UmsuKWNJ1nwDJm9tgP7Bnc | unnamed s | 0.003191 | 0.008191 | |
| 3AQfSWLZH9djEpiZ3kP9g8pB4zjsk | unnamed s | 0.56656 | 0.65156 | |
| 14wxmAB8 BladexTradeFinance.cc | scam | | 0.005 | |
| 12ZDggFG3 YABTCL.com | gambling | 0.001997 | 0.001997 | |
| 1tiV7WrZKeHCgsqvxWn5wNvaD4I | unnamed s | 0.00276 | 0.00276 | |
| 18N1CJqm5eg2YggKw| HSC ML clu | unnamed s | 0.498544 | 0.498544 | |
| bc1q6dprunrwqugywe50j6l5amsp | unnamed service | | 0.005 | |
| 1JGZFQFyc Big.ONE | exchange | 0.14326 | 0.24826 | 0.195 |
| 13LpEby4TBA2WJfjnd68jfukDgstq | unnamed s | 0.011193 | 0.016193 | |
| 17vnh4GeZaRhBMk7UcoQMN3M! | unnamed s | 0.001325 | 0.001325 | |
| bc1qns9f7\ FixedFloat. FixedFloat | high risk exchange | | 0.02 | 0.015 |
| 18emExMg Eligius.st | mining poc | 0.03052 | 0.03052 | |
| bc1qph34n SamouraiWallet.com - | mixing | | 0.03 | |
| 12xZoVcb1 Silk Road Marketplace | darknet market | | | 0.005 |
| 1Ap3qTVhbZu2J6ZzqcAUMURqxq: | unnamed s | 0.003045 | 0.003045 | |
| 1MZJTTGx1 SNLBTC.com | scam | 0.003566 | 0.003566 | |
| 17Ctn7KmJK8QkHggvyogt3LeDFQ | unnamed service | | 0.03 | |
| 33YmdKcAkK8qtqFBvs832wAsz9A | unnamed service | | | 0.025 |
| 361oysuEzFzDHiAnRB4zw4Pxv72Z | unnamed service | | 0.005 | |
| 1KMZWJZeQqhCPu2t8YXVzd39cM | unnamed service | | 0.035 | |
| 139dXCsABoMWXjab5hgEahVq75 | unnamed s | 0.002412 | 0.002412 | |
| 35xhTTM6n2H2wf6HgZ48cKLR42F | unnamed s | 0.297921 | 0.417921 | |
| 1GtvQHTvGRKRcwZUXB6T7BhhL7 | unnamed s | 0.006495 | 0.006495 | |
| 3FCQkEMUqdPqE5RHAVpnRfCLRC | unnamed s | 0.044775 | 0.049775 | |
| 18sRUqwy) Coinfloor.co.uk | exchange | | 0.065 | |
| 3JbXwLVM ErisX.com | exchange | | 0.07 | 0.05 |
| 1Dc698AivHSTMk27htJk5mF6vmu | unnamed service | | 0.04 | |

| Address | Type | | | |
|---|---|---|---|---|
| 1BbtuMzUwpK49EfxEjBaxJwciZder | unnamed s | 1.328642 | 1.448642 | |
| 1BaJJQEb7JbTxEb6zwaVG14oUEfG | unnamed service | | 0.005 | |
| 1PBAGN4LwiusVnXLQLSpMNLCFjt | unnamed service | | 0.02 | |
| 1KsB9nho8 SlushPool.com | mining pool | | | 6.67 |
| bc1qef3uxzycqquckd04pdddf7d7h | unnamed service | | 0.035 | |
| 1D1LHUAX Coinmate.io | exchange | 0.235181 | 0.475181 | |
| 1HRnPikH1QoqhCXZyDw6yQndh5 | unnamed s | 0.001819 | 0.001819 | |
| 17NNSnfj95nXsN1k4B83Mj35QLFv | unnamed s | 0.006439 | 0.006439 | |
| 1EDDjanhsbirq2epnTArxNasXGLsi | unnamed s | 0.015569 | 0.015569 | |
| 192E8sjVfxCBJgG26HL6q8wzpSYZf | unnamed service | | 0.005 | |
| 13JQDe2ciobrvhkgVx8REZbX8bbD | unnamed service | | 0.27 | |
| 1ArQegpfi3 Crex24.com | exchange | 0.734684 | 0.774684 | |
| 18uXkATZRoSDNfHWfy7TgeuK1sji | unnamed s | 0.052475 | 7.047475 | |
| 3LC8dDKyE MARA Pool | mining pool | | | 0.01 |
| 12Ys86VrxNFKBwDHeKj7qkyMvh6 | unnamed s | 0.014283 | 0.014283 | |
| 1LoHRWE5 Crypterium.com | hosted wal | 0.874771 | 1.014771 | |
| 1GUL3ZrwLrQ5o6uj2FYrK9RXjUtXl | unnamed s | 0.022273 | 0.022273 | |
| 1DJEYjUwekbKoTBk2WQxsMowsF | unnamed s | 0.018347 | 0.058347 | |
| bc1qj8u84pg2z8hjep7sw853zmxk | unnamed s | 0.003497 | 0.003497 | |
| 1ESc6PXEAA1CpndZFSTzpwXvsvKF | unnamed service | | 0.015 | |
| 1Lsv4HAgH7SkQ6CVQB9QmR5cw | unnamed s | 0.273222 | 0.288222 | 0.01 |
| 33j5NFCibc BetFury.io | gambling | 0.901055 | 1.466055 | |
| 1zLt7vs5QJvApymG2CbHUo1rNVC | unnamed s | 0.006936 | 0.006936 | |
| 1FctNT7B8ykugfj7XemV2SbuiA5X | unnamed s | 0.03734 | 0.03734 | |
| 34YKBQwqHfvwaWiiVCUPiZVFBcj | unnamed s | 0.001112 | 0.001112 | |
| 3FGn3EMF Vclub | fraud shop | 0.00172 | 0.01672 | |
| 3GEC2Esthcm9VgnPrPdfanphpiCP | unnamed s | 0.02014 | 0.02014 | |
| 3K8CTWUTUCwtt4s6y7avdUxsJ1X | unnamed service | | 0.045 | |
| 17si2uq7bFNHvbxertAUmyuRfgeK | unnamed s | 0.000842 | 0.000842 | |
| 19ugUjBdC SkyCryptoTrading.com | scam | 0.004825 | 0.004825 | |
| 1AWvwhZy Spend.com | hosted wal | 0.124381 | 0.189381 | |
| 1DPzSpMXd85Cd72r2jF4P2H4yEK | unnamed s | 0.006458 | 0.006458 | |
| bc1q9ny3x386v7074qpn4fmze2r3 | unnamed s | 0.03989 | 0.03989 | |
| 3BYUBv9EuZMnCAiH2XE4TChsUd | unnamed s | 0.20789 | 0.22289 | |
| 3FkbdMf1z Konvert.im | high risk exchange | | 0.01 | |
| 3BvxiX5ck6 CoinSmart.com | exchange | | 0.075 | |
| 14huBQm6BfcqMrrYAoGAxWYXB | unnamed s | 0.01196 | 0.01196 | |
| 16vbzq7vAZaHKCxuSPdtviN3tDP1 | unnamed s | 0.000966 | 0.000966 | |
| bc1qwk930wrj8a05hgqkxhww7an | unnamed s | 1.354 | 1.384 | |
| 1HknzCBfiV NetEx24.ne Netex24.cc | high risk exchange | | 0.305 | |
| 1DNHtBBUXqV4wKTi3uh1cigmxAv | unnamed s | 0.00798 | 0.00798 | |
| 3BgWGLvDNun6gVNjvjy5fu8ycpdl | unnamed s | 0.008005 | 0.008005 | |
| 1PN6souJmyHFGn47FPuP8TGYiSJt | unnamed s | 0.0025 | 0.0025 | |
| 37DwDeLCZWEG9hGVmn87wo2V | unnamed s | 0.002129 | 0.002129 | |
| 3Px193ZPbnPFm9iJmEF8G7ges3V | unnamed service | | 0.02 | |
| 398SQPPT9ANLV8SSh7ggvscHjHd | unnamed service | | 0.01 | |
| 33YR4X8yC B2BX.com | exchange | 1.213442 | 1.793442 | |

| Address | Category | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|
| 1Fc1yT7Eu6M3AWj2XogEVDVXZr\ | unnamed s | 0.000885 | 0.000885 | |
| 1DeBhNp73ExcFmZG1EoiuJjr4Jry6 | unnamed s | | 0.06 | |
| 3KRToc5Bv YouHodler.com | other | 2.195231 | 2.535231 | |
| 1MXBqiZLDV91a4WMLdMv3qqgj1 | unnamed service | | 0.01 | |
| 36k7bhErv ExMarkets.com | exchange | 6.128501 | 6.138501 | |
| 19tppHPewC4SUEEoPLDJtLCyEUS( | unnamed s | 0.08656 | 0.08656 | |
| 3BZreSq2rl CardBazaar.com | other | 0.035312 | 0.035312 | |
| 1BBsxjQNo8nHAoumgNFPDTQcUr | unnamed s | 0.002647 | 0.002647 | |
| 1CyFs3t7Y2TVyE2GYaCskYZkeJkLX | unnamed service | | 0.18 | |
| 32tGcgBWEAfmWQiMhkWgGMXE | unnamed s | 0.014454 | 0.014454 | |
| 3KdxSrw9VCqZiaZxok4GkzWkaXc5 | unnamed s | 0.004026 | 0.004026 | |
| 3FKt7vqhnBXNuLXkwPFCfp6kho2€ | unnamed service | | 0.065 | |
| bc1q7dmjqztn342e7qyl4tlfyqc8mj | unnamed service | | 2.405 | |
| 36TiSCgUjX4MVvTC2MoncV3Xa3g | unnamed service | | 0.03 | |
| 1FsSjYWDFc1Y6ncUN1JDNFSuJWs | unnamed s | 0.01009 | 0.01009 | |
| 34yeN7K2W6Ghv9SsP2VEvWsZCh | unnamed service | | 0.07 | |
| 1N3EsHp8GSApcf7JodhfWBk4abn | unnamed s | 0.001776 | 0.001776 | |
| 3K49BvzCgV4WgsuLtPanH79saJZn | unnamed s | 0.001701 | 0.001701 | |
| 3Mg6gYsXl NiceChange.net | high risk exchange | | 0.03 | |
| 1AWmgKvujeBDvdbECuVDzwxJjiN | unnamed s | 3.17943 | 3.47943 | |
| 1Mzgh1Dt3AEvUtAjHu8CiwDJUW\ | unnamed service | | 0.015 | |
| 15U8DHhcZ8b3NrMt36gtufs2K4Q | unnamed service | | 0.005 | |
| 1FhJYVL7meU3iJdfcXLMVAc2HGr | unnamed s | 0.108812 | 0.108812 | |
| 13JY5mGhcBCAXbfjpHk9qpA2SbXl | unnamed s | 0.002159 | 0.002159 | |
| 1KvXGMCa DiamondSB.com | gambling | 0.311412 | 0.341412 | |
| 1HhZNpq85vQgTjCgRqjdJXpKPkw\ | unnamed service | | 0.105 | |
| 1P2g3cgZs4EtsKQqTW4mf7ErJs7sl | unnamed service | | 0.155 | |
| 32GZXLRrjP1mMB8wLmVjd38CPt₂ | unnamed service | | | 0.005 |
| 1Q1vfZekFD9z7R6gFYWSKGB8mN | unnamed s | 0.005302 | 0.005302 | |
| 3PEUSaFc7Rr71qhpyVPHQk562Pv. | unnamed service | | | 0.03 |
| bc1qfujyqvj72w7u3ettguzngnut9t | unnamed s | 0.011119 | 0.011119 | |
| 1HCqQYdajGxZkC9cPWJvZaBDqzo | unnamed service | | 0.4 | |
| 14WssHT4kEqECFJVQ62SLbsg1N8 | unnamed service | | 0.06 | |
| 1qojApGjJyszPkhHKQE6ZeMZPYLL | unnamed service | | 0.005 | |
| 3GX6jt6rWRuPMZVeD4frSKKYsKG | unnamed s | 0.001007 | 0.001007 | |
| 3MjMMspzBRaCqTmjWChR8u91Z | unnamed s | 0.004175 | 0.079175 | |
| 34mPEQE17R5DNdsMzBJxmKd28/ | unnamed s | 0.016816 | 0.016816 | |
| 33MQJRpHpmMjHzwjsj81iXX3ww | unnamed service | | 0.015 | |
| 127L8RW3uXTUXrq1uiQMrTtKLm | unnamed s | 0.003233 | 0.003233 | |
| 3J7dP143s6ESEv4E1qdRtkqJcoUDl | unnamed s | 0.017046 | 0.017046 | |
| 37XByDio4u2n6y2FXaKHFhHfXZTg | unnamed s | 0.000607 | 0.000607 | |
| 152yDcY5UaMnpR2GsspKxLsMtBł | unnamed s | 0.011312 | 0.011312 | |
| 3D2yXUT68XWyPGGFqrBcRB2KJ2I | unnamed s | 0.005967 | 0.015967 | |
| 1CKirn2ecNPDMPbQkuhGGZhafbS | unnamed s | 0.005168 | 0.005168 | |
| 3GPxhsV4tmDZWm2cToMH5FNf1 | unnamed service | | 0.005 | |
| bc1qczrv0ł SamouraiWallet.com - mixing | | | 1.115 | 0.005 |
| 3Gh3429v Anchorage.com | exchange | 30.2427 | 30.3727 | 0.66 |

| Address | Type | Val1 | Val2 | Val3 |
|---|---|---|---|---|
| 1KH2sNCzYPayeer.com | high risk ex | 0.329465 | 0.864465 | |
| 16wYXUTy1rdnMVrZLDSo1H7LSN) | unnamed service | | 0.005 | |
| 1961QXNGq1uYpBMdAf6WWiCpY | unnamed service | | 0.025 | |
| 3HfrTrDaeSib3Anb37wwohP1VJXx | unnamed service | | 0.01 | |
| 3J2RBCYAr2LqveLhpaaFAEMULBn | unnamed service | | | 0.135 |
| 3DjS6u6kJAnFkWqnkURXVyAyNUI | unnamed service | | 0.005 | |
| 1GQNWLAvXMHwFhatYc4jndrGTc | unnamed service | | 0.34 | |
| 3PEqVSoa1sLLUnYL8pN7FeM1M9 | unnamed service | | 0.015 | |
| 1HGYm3KfiBingbon.pro | exchange | | 4.69 | |
| 398Jd1Gro8HohxCDx9cSxpPs6LX9 | unnamed service | | | 0.005 |
| 13JGjAhwvXLGBjM5QMa7yCozEap | unnamed s | 0.003055 | 0.003055 | |
| 1Br7hE5jLFce6TpYDQapfUuk649gi | unnamed service | | 0.015 | |
| 17RrdGXGy1zjPFh2V9xdE9kCTG5Z | unnamed service | | 0.015 | |
| 31hVzYC222xdPNLVgW5fPSj4G9TI | unnamed s | 2.651601 | 6.261601 | |
| 1QHDzxFyU1uKJGzsd5xYEaF7RPDI | unnamed s | 0.001068 | 0.001068 | |
| 3BvcKp8nH6yd1GJCYVEzxtYoszTX( | unnamed s | 0.001603 | 0.001603 | |
| 3F73JJN99RU7f62oN4zG4d1CCtq5 | unnamed service | | 0.35 | |
| 147QzSkc4bCiZwGQsFvsXvq8ZnSn | unnamed s | 0.03418 | 0.03418 | |
| 1DCWkeZvxCcRDsT3uZk8qKoMbX | unnamed service | | 0.005 | |
| 18TXrPQcr1StttfYTERjucq51uWfn( | unnamed s | 0.088855 | 0.088855 | |
| 1BkK5gaB1ENbdvRNaV6eXA6pMs | unnamed s | 0.001713 | 0.001713 | |
| 1Bdj5n4C5,Block-Bank.io | scam | | 0.005 | |
| 1AEfunFgx6CBXtnaMj93K5c9ZaLcI | unnamed service | | 0.01 | |
| 1MXAk7NF4BrQwERTAVd3onSGR' | unnamed service | | 1.815 | |
| 32dgjvc5DjU4mWDKhZCEUYbBEt( | unnamed service | | | 13.75 |
| 1JakRHK8u NairaEx.com | exchange | 1.160423 | 1.980423 | |
| bc1qtfnyslvBitLocity.io | scam | 0.023862 | 0.063862 | |
| 1H2qqP4L3 LBank.info | exchange | 0.170616 | 0.275616 | |
| 1EmhqHhP6GAqhisZ4yTvgUbGvvY | unnamed service | | 0.185 | |
| 1G5YyuFVUdnRxMZzbMgDjMgqjb | unnamed service | | 0.005 | |
| 3M7SeomCZRMCTF4knnwcubpyP | unnamed service | | | 0.535 |
| 3D1zNxiVb CoinList.co | exchange | 2.176043 | 8.331043 | 67.865 |
| 3Ecwy78zvpEzWFZFnfDkFdU3eQy | unnamed service | | 0.01 | |
| 37R1UYNr8dbE8QHKRgujiUmLWT | unnamed s | 0.007473 | 0.007473 | |
| 1BAiBytCeDpHq5RdHw3JgNxpsaN | unnamed service | | 0.015 | |
| 3ErHhbVhTcCSif8X9rzsvYS2C6qirrl | unnamed s | 0.002 | 0.002 | |
| 13xHAVXnv9ZpTBWSYZNN8unyjuy | unnamed service | | 0.04 | |
| 36dnPjsGc3zZ8wqpEbyuDxCdZNj2 | unnamed service | | 0.01 | |
| 3PsPtfp8zh CoinBox.org | hosted wal | 2.214252 | 3.394252 | |
| 1Ao7UoorBx5PDKHSUpogqbGA7a | unnamed s | 0.002687 | 0.002687 | |
| bc1qcts655dw7vmjnypmx2qvtcd8 | unnamed s | 0.00026 | 0.00026 | 0.01 |
| 19uH755AqdzbtAQ1hmNtFzffQrW | unnamed s | 0.001556 | 0.001556 | |
| 36P1HAhhUXEWnoEcy76mcAPN7 | unnamed service | | | 0.095 |
| 1DrK44np3 Bitfury.com | mining pool | | 0.005 | |
| 1HvDfUCw7WPNkdmh6yb75zvJjzl | unnamed s | 0.019684 | 0.019684 | |
| 1EDkou8ctPbiWqqGr9ukWRnVxxp | unnamed service | | 0.115 | |
| 34TFzoQ4AyWKQA7GD5J6MPLJZV | unnamed s | 0.006752 | 0.006752 | |

| Address | Type | Amount1 | Amount2 | Amount3 |
|---|---|---|---|---|
| 324VHEaDI ArgenBTC.com | exchange | | 0.015 | |
| 33P4Defim FTX.com | exchange | 112.3835 | 125.4185 | 91.27 |
| 3M72mGc: Altilly.com | exchange | 0.450616 | 0.465616 | |
| 32UXXFZcSHxUgb1n99eVCGpE6W | unnamed s | 0.005713 | 0.005713 | |
| 194cQW4YK4rG1sXrozscT5hXFNK | unnamed service | | 0.005 | |
| 1MCmJ2SRQ82xKGoR Unknown S | unnamed service | | 0.03 | |
| 32CFV21maHm8Yx1noKMjXWQE( | unnamed service | | 0.035 | |
| 1NeVopN1eJvLVqSziu8VX3fAEh3c | unnamed s | 0.006144 | 0.006144 | |
| 3NM17if4a9jPhnfYAzEio1Fzbtsfjj5 | unnamed s | 0.016866 | 0.016866 | 0.075 |
| 1ATx1JzfdmDLgrNefGCjiDYbQZtoZ | unnamed service | | 0.015 | |
| 1G1mtZTxF17UYUGR5XwhccEatqs | unnamed s | 0.010408 | 0.010408 | |
| 1BLDvrP778oVNCHpjV6EkFgzVZoS | unnamed s | 0.007303 | 0.007303 | |
| 14nnqC4xexU4vLpV1VQpAJ4BwFL | unnamed s | 0.00542 | 0.00542 | |
| 37o7WvD9TRBuh96nX8XRbr3kzDl | unnamed service | | 0.015 | |
| bc1q3yqae802luep7av0pn88h87z | unnamed s | 0.017821 | 0.017821 | |
| 1252nvxuXBJGmTrXdQdDUjktf6V\ | unnamed service | | 0.005 | |
| 18WrqSYCJJJ3iQmrcnJZrQi7yknuV | unnamed s | 0.006608 | 0.041608 | |
| 3NC26Rqg| Namecheap.com | infrastructure as a service | | 0.075 | |
| 1Ew8izi8JPn11C9nRcNEN8Efh4bx\ | unnamed s | 0.0585 | 0.0585 | |
| 1GXrcR1yJ8ciSeTrr4GL91DhoC34R | unnamed s | 0.005 | 0.005 | |
| 1JHPYo9D5AuxXLyF9D1rGDs1YW> | unnamed s | 0.000735 | 0.000735 | |
| 1HAeRBqx( Bitzlato.com | high risk ex | 4.299106 | 7.999106 | 0.005 |
| 1Aca757ovcdYuZQnh3X1iNFknrry! | unnamed service | | | 0.005 |
| 1HSAMnG4gXagaxJPeDnZttsR6PiV | unnamed s | 0.006137 | 0.006137 | |
| 17pQodquEr792V3hEJWqeQDi2K | unnamed s | 0.035925 | 0.115925 | |
| 1EtZorzi1qrVLgMGr4BkNhXsX3pFH | unnamed s | 0.032093 | 0.032093 | |
| 19gpZcU3TySt8Pka6qfg6LzkAF1Gb | unnamed service | | 0.375 | |
| 1779p5Dfq9iFq95VTECz2QoCrHd( | unnamed s | 0.000523 | 0.000523 | |
| 36jTV1CcAEg23vcqMCGkYUF1fw\ | unnamed s | 0.0323 | 0.0323 | |
| 37f2dNNC( Buda.com | exchange | | 0.055 | |
| 1XLHmUiHryW6iQab1R1PFQKtDT | unnamed service | | 0.04 | |
| 124R1axxzrHQVu2fwtaQvPNQb7S | unnamed service | | 0.2 | |
| 3BYj9uERwRLbnRqSwHr8THtfL5Ek | unnamed s | 0.061484 | 0.081484 | |
| 1732hug94QnUyzNmbuA9tubDPP | unnamed s | 1.659729 | 1.659729 | |
| 3KySewdHrmLBp81REimeLG4rBdk | unnamed s | 0.002329 | 0.002329 | |
| 1FT1LBykT| Pintu.co.id | exchange | 0.001064 | 0.001064 | |
| 3EmsBxPS1VHGucSx5nyE5ua6uGF | unnamed s | 0.065196 | 0.065196 | |
| 38YweVoYD7og83qLtSTHkpFKtBal | unnamed s | 0.007331 | 0.057331 | |
| 19Jp1J2NjgWvr5XdgNKvgdQhoiVz | unnamed s | 0.002825 | 0.002825 | |
| 3HqGEA4VPZ9bMrsUR2dYbV6pkN | unnamed service | | | 0.155 |
| 37AYt5D8SJVn7RZujgHSFPR7vwnr | unnamed service | | 0.02 | |
| 14ot1U5su TeslaGate.top | scam | 0.000423 | 0.000423 | |
| 15zN6YhX9vftb6VkJbWhLMvhE6Q | unnamed service | | 0.005 | |
| 32r1vcp6UWbKHngQqRrjcBpmpA | unnamed service | | 0.005 | |
| 1Gh4hmhXGd48x83CQcowP1FG7 | unnamed s | 0.011898 | 0.011898 | |
| 1Ea93qGeQYzbxAfUiDEZUJTFF37 | unnamed service | | 0.435 | |
| 3H9cpuKJvW1i1UN8XiNcHnQNbG | unnamed service | | 0.03 | |

| | | | | | |
|---|---|---|---:|---:|---:|
| 35yLKJrDjn Omega-Digital.io | scam | 0.0695 | 0.0945 | |
| 38jbhj3nzGU8GvcqHdymeoBcJWj | unnamed service | | 0.005 | |
| 3MkuhX47kcz2BY4V6tJKbrkaJq6E\ | unnamed s | 0.038996 | 0.038996 | |
| 35zbxntQrYf6dH3Z6yAEnXHBuj67 | unnamed service | | | 0.01 |
| 35hmRq8ZsmwHgiDEFtYBow15vf | unnamed s | 0.007034 | 0.007034 | |
| bc1q7cyrfn Crypto.com | exchange | 278.2725 | 301.8775 | 0.055 |
| 1JbdceMnLH67UhSTj1EGfoQXVwJ | unnamed s | 0.027552 | 0.027552 | |
| 1FqxMo5W3ez1WwGmjXx7yemt( | unnamed s | 0.077337 | 0.082337 | |
| 1EvPaNR81CryptoFXETrade.com | scam | 0.01179 | 0.01179 | |
| 3J6GAV1QZAkpLfk5gsBGSDigykDb | unnamed s | 0.000194 | 0.000194 | |
| 38a4eEn85kBoSPoJafd6ny31ZHJj2 | unnamed s | 0.004951 | 0.004951 | |
| 1ABUH1XA ProtonMail.com | infrastructure as a service | | 0.005 | |
| 16m7oFtZ3Sbtwdw41cdSg4aEWRl | unnamed s | 0.057232 | 0.057232 | |
| 3CwT5tmrWC1PsNBm5kuTLiMf9p | unnamed s | 0.040782 | 0.040782 | |
| 1QA2qs1vE AmberGroup.io | exchange | 1.889779 | 2.354779 | 0.22 |
| 1AzV4EoSwV5bA5vbyGne7U75QE | unnamed service | | 0.235 | |
| 1CssRS8mDys9fyUbJCJ5hAJtdbsBX | unnamed s | 0.003634 | 0.003634 | |
| 1CFXtggwL BTCArbitrage.live | scam | 0.010584 | 0.010584 | |
| 3Bihw1wErhBPLqyB7xq6e1TeTL24 | unnamed service | | 0.03 | |
| 1GLyqEkgoWYvzK9PHDY9wZze7q\ | unnamed service | | 0.01 | |
| 1FpSihBgv4c8dsywEPVbTqu8HkPx | unnamed s | 0.015214 | 0.030214 | |
| 3KLFXsH3P4CiGMmqdSUb2ycAMH | unnamed s | 0.000564 | 0.000564 | |
| 1KRXjmMtr leap | illicit actor-org | | 0.02 | |
| 112zx9L2xyaD97Afx1cRPR7D8R3H | unnamed s | 0.001614 | 0.001614 | |
| bc1qkjf9rhg65avfs2mszkuyh6qzg7 | unnamed s | 0.048739 | 0.048739 | |
| 3JyHWH3pdLhFgdQ98og5dcwJXM | unnamed service | | | 0.195 |
| 12EDpP8PaS4HJyJ1aoxUW1sdEzV | unnamed s | 1.146719 | 1.146719 | |
| 37b743oGxWcQCmYbpBZcF7wXCl | unnamed service | | 0.025 | |
| 37oWSr97f F-Change.biz | high risk exchange | | 0.245 | |
| 1LJ8q18RjN Gate.io | exchange | 30.08482 | 41.84982 | 0.02 |
| 3CvHgk3M BISONApp.com | exchange | | 0.01 | |
| 3EC2JP2turqnAkENk4Uv3Dv9Xj7ja | unnamed service | | 0.04 | |
| 1GgiMc1iiZsPQstn96iRzNMpB19s2 | unnamed service | | 0.01 | |
| 12qxb4cvqSXrUmazR2i2FyNRNQV | unnamed service | | 0.42 | |
| 1PRGCvU78m5WAzdnu3maJ6UG\ | unnamed s | 0.001383 | 0.001383 | |
| 3ESZnUuAkVdHJHVQKs2PfXQxudL | unnamed service | | 0.295 | |
| 373wCLpZC1quHkeMhAfzSaGzZV\ | unnamed service | | 0.03 | |
| 1KAdif8MN StanceCapitalMarket.c | scam | 0.010738 | 0.010738 | |
| 1No48VQug37ZivnJhG4Q7DkAVX1 | unnamed s | 0.000127 | 0.000127 | |
| 3BtMxWZF Safe.Trade | exchange | 0.019739 | 0.059739 | |
| 1NPumfz4ZyHQ3bXdz9v8pZYEe6x | unnamed s | 0.017855 | 0.017855 | |
| 14ikK7R3x6 Crypto2Cash.com | exchange | | 0.01 | |
| 13a7TdyybQmWKzLGBMqVUu5G! | unnamed service | | 0.005 | |
| bc1qggdj3ewpjpp3898pmwjnpvcv | unnamed s | 0.00523 | 0.00523 | |
| 1EVt9uZaBREx3BdKA4amRVRAv7l | unnamed service | | 0.005 | |
| 37o1PYeJyVSVpAbBhvn2sbv7NZn | unnamed s | 0.000589 | 0.000589 | |
| 3Lu8AWjc1amArQnfVe7cRzhNF7y | unnamed s | 0.045 | 0.045 | |

| Address | Type | Value1 | Value2 | Value3 |
|---|---|---|---|---|
| 33Lg5AqMFW9vJ5uwNYJZp8Bt2Fi | unnamed s | 0.003074 | 0.003074 | |
| 13JUuiWSL MiningRigRentals.com | merchant | 0.024663 | 0.059663 | |
| 13PUWtb5TkJTeS2TKxQeSGYV35Z | unnamed s | 0.00151 | 0.00151 | |
| 13DpzY1zVNYjvCAjF12KfaJny7bZ7 | unnamed service | | 0.005 | |
| bc1qsjptutj Duelbits.com | gambling | 0.542813 | 0.597813 | |
| 14Y7yQAAjwzVseqqPaRumcg2jW\ | unnamed s | 0.010917 | 0.015917 | |
| 1Ngq9aoiEWKjXVkMzGHipRE4Cm: | unnamed s | 0.000479 | 0.000479 | |
| 1He8DF3c1A8KsgnDEUrmTKx6BVi | unnamed s | 0.010456 | 0.010456 | |
| 1sVMhm8tUY4HQT4cLsZdEKiqNo: | unnamed service | | 0.005 | |
| 1sopd2iWAZagVjup9doU4LBz6Np! | unnamed s | 0.001152 | 0.001152 | |
| 14w7WuN9yCU2Qavj9gdpXSuv8c | unnamed s | 0.000609 | 0.000609 | |
| 19AgKXNrK5Fb27Ewkmyt6JufUTV | unnamed s | 0.002952 | 0.002952 | |
| 38guQmrWVEqtD3ST9vK7Qqordw | unnamed s | 0.104819 | 0.264819 | |
| 3DHfcdLNUwVuqXLoBm8e8ynLrW | unnamed service | | 4.445 | |
| 136dnfh49kK6xv64SJdxo2YGXJJN | unnamed s | 0.002552 | 0.002552 | |
| 1KDZMmDkykZ5NgrTqtiu9x1Rjyh7 | unnamed service | | 0.005 | |
| 1LKWoXhy4pvBsG6r18Mhbsw2DL | unnamed s | 0.131811 | 0.221811 | |
| 3AY8bSoqwq8c4uSmmdNAeAKak: | unnamed s | 0.0047 | 0.0047 | |
| bc1qqcehurvrkzkymla3uq0drl025r | unnamed service | | 0.035 | |
| 1FPwWDqtxfmoxf3AJWGguoK6UL | unnamed service | | 0.01 | |
| 32tXs6kFhtczuo7Qpfnkp5Hg6M8j | unnamed s | 0.564646 | 0.644646 | |
| 1waeiTHAf8DpDJjwX9dAzSN5ayG | unnamed service | | 0.02 | |
| 32ZWgfAkGdLub4JkKkWJFLMRCtx | unnamed service | | 0.07 | |
| 3Qf4e6MN Roobet.com | gambling | 0.747195 | 1.107195 | 0.12 |
| bc1qjr8200frt2cluw8e99z2dynfj42 | unnamed s | 0.0195 | 0.0245 | |
| 1ApznPorj1 Coinsquare.com | exchange | 0.025786 | 0.345786 | |
| 3Lc79dEQoc57zQZQ8YKEubjnbmy | unnamed s | 0.001442 | 0.006442 | |
| 1CUMq9xk3g31yK4WP8etz1sczGT | unnamed s | 0.002084 | 0.002084 | |
| 1BKnkK7a4ez1PnMJSyzg778Jx1BJl | unnamed s | 0.001709 | 0.001709 | |
| 3FEkrTckS8avVmDYXBVBTdpGFnN | unnamed service | | 0.07 | |
| 3EnSyvakj4uvKj8nuv5vYBcPoSyKr | unnamed service | | 0.005 | |
| bc1q3paw7cz3f2hx0qczla4sc90h7: | unnamed service | | | 0.075 |
| 3No1XofHKC9VbEvrNDCXrTjwEDu | unnamed s | 0.00101 | 0.00101 | |
| 394stoXSXm3RKdY4Y5xwm7A5rC: | unnamed s | 0.000532 | 0.000532 | |
| 33Epdr9GZ8ZguTSrpRecPnA3Qv4E | unnamed s | 1.175622 | 1.205622 | 0.005 |
| 3PfvP9eAHLPyTxJib7KXBhdzSGqg4 | unnamed s | 0.001057 | 0.001057 | |
| 1GYzwNWdqncfLPqTpUQwoSjbW | unnamed service | | 0.03 | |
| 3CSMjSbaVWnGQvUgbq8vWypux: | unnamed service | | 0.015 | |
| 1UoMpa5zah8Xqdg8kp3XSNwmCl | unnamed s | 0.112125 | 0.157125 | |
| 1EiZ3sJjZ2gev3hRpmtxvMeuCxCnc | unnamed s | 0.001001 | 0.001001 | |
| 3Mmq3x5gWv1bQEn3rY31xVf2dV | unnamed service | | 0.015 | |
| 3DkERKBBdFpLSPEyxpesCzmSTv4l | unnamed service | | 0.01 | |
| 35EDMUeUJHUZmooenhVNi3sTSN | unnamed s | 0.004666 | 0.004666 | |
| 182xE6C2LYuF9pSXMrpkrEqeeJv3. | unnamed s | 0.002082 | 0.002082 | |
| 1LBzvwBNvby5sv5NCYPscbScCQ8: | unnamed service | | 0.025 | |
| 1Emy12njhyzxogsniaNziaobUnVS4 | unnamed s | 0.004255 | 0.004255 | |
| 37CYkpDTCzghKQAAH6iFP7aFKfvT | unnamed service | | 0.005 | |

| Address | Service | | | |
|---|---|---|---|---|
| 1B8wa8tkPFt4QXxYrUhD5ufspfvxl | unnamed service | | 0.445 | |
| 1M11UTUL CoinGate.com | exchange | 0.040156 | 0.310156 | |
| 1NKkdnGahpfgiET8f4CCNsxMUrau | unnamed s | 0.013151 | 0.013151 | |
| 31ivTzCDzLhTxYUGTZvrZxV6wa3au | unnamed service | | | 0.045 |
| 1LB34q942 CoinEx.com | exchange | 11.85551 | 13.58551 | 0.025 |
| 3FG83TZL3 CoinSenda.com | exchange | | 0.02 | |
| 34AbWGMSP4GPT3Sw44JaR7yPg! | unnamed s | 0.068848 | 0.068848 | |
| 1JAbJh4zpHCD7FpXEKuedwq61XF | unnamed s | 0.021244 | 0.021244 | |
| 17DAhq459GoF7pzUzJgskFH6hPXI | unnamed s | 0.0025 | 0.0025 | |
| 12Qw1pXboyQSa98xrWgq7hiK5KI | unnamed s | 0.012505 | 0.017505 | |
| 3Q1B7Lnq4kAgHAUCrr7M8WmZA | unnamed s | 0.002813 | 0.002813 | |
| 1KHfZZHcaowhuZ2vvpsSs66JKx5yt | unnamed s | 0.186093 | 0.241093 | |
| 339AcreBhtBqkXMiT4XhvZK7G8rr | unnamed s | 0.00762 | 0.00762 | |
| 13h4yuqCf Rahakott.io | mixing | 0.085911 | 0.095911 | |
| 3QNiP3fKijCRFy9AfdFv6vj71Yo8Dæ | unnamed service | | 0.005 | |
| 1FGUkYicC OXBTC.com | mining pool | | 0.015 | |
| 111hvbgaN BitForex.com | exchange | 25.80174 | 27.01174 | |
| 1DXvHrtPjPy92tMYmEf86w5uKnk | unnamed service | | 0.005 | |
| 1VBqZ34jN AnalyticFXPro.org | scam | | 0.01 | |
| bc1qwrvk03awg3gt5z2kewv97hvl | unnamed s | 0.001738 | 0.001738 | |
| 3Df6uD8rw CoinHako.c Coinhako | exchange | | 0.055 | |
| 36dsFFhyxl DarkMarket | darknet ma | 0.442535 | 1.042535 | |
| bc1qjmsl360kfsvazrl2x9qfqujugk9 | unnamed service | | 0.025 | |
| 3FuRaYzp1491KuM1D69zaXimXqji | unnamed service | | | 0.005 |
| 3Htqku13GaXrHjhg5DKuEeuiM2V/ | unnamed s | 0.007507 | 0.007507 | |
| 1K8Y8LniU CoinApult.com | exchange | | | 0.13 |
| 18w7QogsjGG6mfEZMmB3gHnu3 | unnamed s | 0.001255 | 0.001255 | |
| 16zTPDnjf9mNummSyKguSF5eG2j | unnamed s | 0.016588 | 0.016588 | |
| 3D1tr3hpj3 ChangeHero.io | exchange | | 6.925 | |
| 1EPnQA1s7 ViaBTC.com | mining pool | | | 0.04 |
| 1AczoFtp9q1UzZpkfedLuTdkBfMG | unnamed s | 0.001435 | 0.001435 | |
| 36gMwopsX6PsyZrJt2EwWMK9Bs | unnamed s | 0.000169 | 0.000169 | |
| 1F7Aw1hZ9rt9AYWTYerskPxqGzA | unnamed s | 0.072885 | 0.117885 | |
| 3E8ociqZaS Bitcoin.org Donation | other | 0.000531 | 0.000531 | |
| 36b9skt5Hfq6nRX5K9S3NVQk8AY | unnamed s | 0.002594 | 0.002594 | |
| 12bDQ42F5rCzm5iGvZvSaixmCHL\ | unnamed s | 0.027024 | 0.032024 | |
| 19AfYprQKyrftn3C6kreAh5S4jHZcr | unnamed s | 0.009474 | 0.009474 | |
| 1K6bRhnkHGQVV7naHG26xfCjfQ9 | unnamed s | 0.000675 | 0.000675 | |
| 1JVKdRT6fpZjAtCDS8eHAsZzWiJN( | unnamed s | 0.010368 | 0.010368 | |
| bc1qw7qmr8h3pz6m3nmqchahx0 | unnamed s | 0.002729 | 0.002729 | |
| 17eqcxoRsDajTEPzSSCqjktdhq3W/ | unnamed s | 0.094 | 0.094 | |
| 3BmHSCCPVgPj5j8hhniQymo1Hdl | unnamed s | 0.039124 | 0.039124 | |
| 1JvBwX3XE Coinswitch Coinswitch | exchange | 0.250164 | 3.440164 | |
| 37tDG8GXek5VrZYdNUm9xPTRM( | unnamed s | 0.000662 | 0.000662 | |
| 3DnNCSBpECV69J53XDSYbmXwcA | unnamed s | 0.18991 | 0.21491 | |
| 19aAQUNgHhm2rhBbcTtFtMfLt6o | unnamed service | | 0.285 | |
| 1LFt8DFSRQyYS5QuE4sRkPR9Yiuw | unnamed s | 0.024472 | 0.024472 | |

| Address | Name | Type | | | |
|---|---|---|---|---|---|
| 1Azx9xp1cybD1QvW59Rdyh5y3sK | | unnamed s | 0.009147 | 0.009147 | |
| 1G8eNoD1 | CryptoProfitTrade.com | scam | 0.007 | 0.007 | |
| bc1q8mvj3rj9uk4fpp7c5f2wc65az | | unnamed s | 0.072857 | 0.072857 | |
| 33Gt5JmtQ55G2ggFAedrWXqKn2I | | unnamed s | 1.629982 | 3.714982 | |
| 3GDgbaYy | UPbit.com | exchange | 0.22426 | 2.31426 | 0.04 |
| 1PbG8BXgDm6ANRbrPm8k3JoqaN | | unnamed service | | 0.125 | |
| bc1qwxxjekqs8v3e9gujsjrk0fkqu9 | | unnamed s | 0.00266 | 0.00266 | |
| 3288sqB1E1hPmoJ3VWeCQbJMX2 | | unnamed s | 0.047244 | 0.052244 | |
| 1KX7kxM6 | MyFXChoice.com | exchange | 1.674683 | 1.859683 | |
| 1NXjqCWN | AirdropStart.net | scam | 0.002 | 0.002 | |
| 18F4wHZNS6db88WGgKsRqx3oU1 | | unnamed s | 0.027883 | 0.027883 | |
| 1EyEP76sRAQRYtNt753tpxVrNNG | | unnamed service | | 0.015 | |
| 1N3Z6Xt7obNoQtqNhS1P3nWeRN | | unnamed s | 0.016194 | 0.016194 | |
| 14NiMxcMpTHiVcenZRJpYu46zS85 | | unnamed s | 0.009961 | 0.009961 | |
| 3QfCSfTaotgRh9qR5eAiyHMV6Uy | | unnamed s | 0.001433 | 0.001433 | |
| 3GTyV8cm | PetronPay.com | scam | 0.172084 | 0.202084 | |
| 15HfdDGYJP29J1MENCaC7KCWCq | | unnamed service | | 0.005 | |
| 1PktPwDM | RenrenBit.com | exchange | | 0.075 | 1.145 |
| 17v5W4TS | Zenocapitals.com | scam | | 0.005 | |
| 3FYPWjCcvoHBcsCe6P9dr8RhMqL | | unnamed s | 0.004169 | 0.004169 | |
| 38w2gQckM2WKKKjrVWu7WRzYN | | unnamed service | | 0.005 | |
| 1KoVusCzgzbtUK9ryfDJohByeewY | | unnamed s | 0.003685 | 0.003685 | |
| 38i7L9G2z8Fh9JuZ9fFtAWShC4K2 | | unnamed service | | | 0.01 |
| 36a3CNJZDfzgVva5t5wmpeT4A6e | | unnamed service | | 0.005 | |
| 17umSuXyaPWmdbU8562cKZHW | | unnamed service | | 0.005 | |
| 1PLF4HuhSgpnBJ1AdjDHK7cUYFSv | | unnamed s | 0.124147 | 0.124147 | |
| 1MTYaSB5JyQRLaUnxkpfvJuhNF6N | | unnamed s | 0.434513 | 0.519513 | |
| 1B6TM3epET9STSqg4pp1mF7CyZF | | unnamed service | | 0.02 | |
| 357Tq7eRyoCZkb2RMifrvmqZKjXn | | unnamed s | 0.000702 | 0.030702 | |
| 15qBmRM1zSMu3vn8TJew2JR4AX | | unnamed s | 0.018373 | 0.023373 | |
| 3AcAhDeyNLpUc4Ae7mR7QhzrwF | | unnamed s | 0.014923 | 0.014923 | |
| 3637STgVH5tV7hdHf5H39p3AoGE | | unnamed s | 0.002447 | 0.002447 | |
| 3QfqRAK31 | CHYMall.net | scam | | 0.005 | |
| bc1qukshladra85ace889gcd68khe | | unnamed s | 3.419553 | 3.644553 | |
| 159f2JjHxCT2QhqDQ63yKzqNY5CF | | unnamed s | 0.233703 | 0.273703 | |
| 34wtZ7zeYdKiGhDsgsSnxRhaf13h1 | | unnamed s | 0.000708 | 0.000708 | |
| 18tMMG8XZe8iER8rLS8LuCPDutL | | unnamed service | | 0.09 | |
| 1ChiJu9XUI | Btc2pm.me | high risk ex | 0.066105 | 0.126105 | |
| 32oX3gNd | BitPreco.com | exchange | | 0.21 | |
| 3K1Acf2XQ | Prosperity4x.com | exchange | 0.076124 | 0.091124 | |
| 1BKtSn86P | BiKi.com | exchange | 0.064589 | 0.064589 | |
| bc1qah6x5427gkelk3qr4f23ag8z8 | | unnamed service | | | 0.105 |
| bc1qqqp4da40dhxpqmgt5wjvkgu | | unnamed s | 0.015 | 0.015 | |
| 1PXvVQxq | Buybest - GoldenShop | fraud shop | 0.004431 | 0.074431 | |
| 356tHo3ULTT1AtgUa8exUepBqwL | | unnamed s | 0.002287 | 0.002287 | |
| 12r6YdbFW | ExpertOption.com | exchange | | 0.015 | |
| 1ErpF2KykfRSrVvwtVS92FysvNWp | | unnamed service | | 0.035 | |

| Address | Type | Col3 | Col4 | Col5 |
|---|---|---|---|---|
| 3DCVEaDjSbrZdA8n4tGGJ5xnu484 | unnamed service | | 0.005 | |
| 37HsYT4GwpuQpweScYHyQgjaUf( | unnamed s | 0.000925 | 0.045925 | |
| 1GQQ1yQ9GHwu2TXfuAX7iqgieTk | unnamed s | 0.011885 | 0.011885 | |
| 3EDVMN8NZcxy8xEK3vrxriHeTaq( | unnamed service | | | 0.01 |
| 1B7Eicj6vEKdrF5kNNPmwAN8x59( | unnamed s | 0.008505 | 0.008505 | |
| 181Tgyv1gD5eXMDRuxb74NNxajv | unnamed s | 0.00171 | 0.00171 | |
| 1AEWnAjtR9BSSJ1J4hGRvinCro1K; | unnamed s | 0.015905 | 0.020905 | |
| 1PUPysYwc9Jojk1pdmLoza9f3gD8 | unnamed s | 0.008699 | 0.008699 | |
| 1Gh1oAJH2w6amhSGJ7NESQWuX | unnamed service | | 0.06 | |
| 345hWybWUvo2ULBWFcDp7uRW | unnamed service | | 1.575 | |
| 1DGhbi6nx Zaif.jp - FISCO Cryptoc( | exchange | | 0.03 | |
| 32ApDqp572b8trc6NLSciXaFytseB | unnamed s | 0.008574 | 0.008574 | |
| 1Q3sXhqtvoovDGo7TKr5eXPB6KZ; | unnamed s | 0.000987 | 0.000987 | |
| 12ffoHdvxQmbiPkAK8XUJN8qVmk | unnamed service | | | 0.02 |
| 3GQ2wNLZ9HtCRSrbAAtZ5SZ1Bs6 | unnamed service | | | 0.045 |
| 12xbfRV5m8R71thQc7FhKeFdSz8( | unnamed s | 0.017447 | 0.057447 | |
| 3BMEXuajJ BitMEX.com | exchange | 7.225745 | 11.51075 | 9.15 |
| 3KEoSJnL7nhGNtg2h53eJWyxdWt | unnamed service | | 0.005 | |
| 38CD4hhaGVrBxoGsLUS2NVfHYUI | unnamed service | | 0.01 | |
| 17KCo2pjyVKEz8j7HTq2fzaNEoeD | unnamed s | 0.001933 | 0.001933 | |
| 162QZxHSRC2nTLQuikH35m6EoiE | unnamed service | | 0.005 | |
| 1MCPcGbn Huobi.com | exchange | 5.581902 | 23.1919 | 130.355 |
| 1HrWX79CsRokhYgQYmHuqYM5u | unnamed service | | 0.045 | |
| 1BdYF4dH; AscentTrader.co | scam | 0.02573 | 0.02573 | |
| bc1qk4s0gj InitialTrades.com | scam | 0.251968 | 1.801968 | |
| 338dUSR3V2ddxt2K6s75SuAk553; | unnamed service | | 0.035 | |
| 1NuJojzZHkCqHe6o9Xn7re9D2RW | unnamed s | 0.001752 | 0.001752 | |
| 14fTKFKKEpbkUoPWJvhhbuMr6yL | unnamed service | | 0.04 | |
| 1Cm6YkTN Kuna.io | exchange | 0.325522 | 1.395522 | |
| 1DWxysF7GPRYGShNxL5ux2N2JLR | unnamed service | | | 2.385 |
| 1CgWKj81dNnLHLKT4gFYu74dsdc | unnamed service | | 0.185 | |
| bc1qzfufy96whdcdyy7y5cjtknumt | unnamed service | | 0.015 | |
| 3AjRaoDCA Roqqu.com | exchange | 0.507796 | 0.697796 | |
| 38CXLSZmNn7aciMZ4Q5k92RWgF | unnamed service | | | 0.07 |
| 139Xet5aGAfFn5ByW6Pk5F9pZg6 | unnamed s | 0.8843 | 1.7693 | |
| 19qCf1YF8 Stake.com | gambling | 11.69898 | 13.37398 | 0.055 |
| 36terEhN72rpdP6SRcAsoBLfiyDhC | unnamed s | 0.000338 | 0.000338 | |
| 39ot9YgGe GetCoins.com | atm | | 0.01 | |
| 3AJRhWyParzm8kt5sbV7rfM5hNz | unnamed s | 0.183449 | 0.228449 | |
| 36x5UzqA8Cg4vQk8VuzBuBzfM36 | unnamed s | 0.013655 | 0.018655 | |
| 1MjHUCYrr bitbank.cc | exchange | | 0.015 | 0.005 |
| 3GecP9riVCw6Ma6MY3GrerVwgic | unnamed service | | | 0.015 |
| 3G2LAtU3Wx6nwkQFrYuziqjrRW2 | unnamed s | 0.006587 | 0.006587 | |
| 3EaYvtt57cxThUJrsm7KhczCfUEJk | unnamed s | 0.003149 | 0.003149 | |
| 3K32Wx9sMAYisRdorgMsnobqp4) | unnamed service | | 0.005 | |
| 14Mu1PbpgjErAiWaABbG5BS1xM | unnamed service | | 1.555 | |
| 1FQKfTmySKi7NgowQzKKPtcQsdsl | unnamed service | | 0.025 | |

| Address | Type | | | |
|---|---|---|---|---|
| 17xV3gGCxGKtidANsoUWHkK5pkb | unnamed s | 0.016909 | 0.016909 | |
| 36xkNe4UV8E5SXs3T5WhzZUWW | unnamed s | 0.0005 | 0.0005 | |
| 1JMtxeMRBzQmgoqv84APpKfbcM | unnamed service | | 0.245 | |
| 3M6Q1pTJ4tfgVxWtqHPBixnRi3u3 | unnamed s | 0.071323 | 0.156323 | |
| 1MQRp2bMytR9L4Fzp2jYg7vj5LW | unnamed s | 0.018464 | 0.018464 | |
| 1P5TNgM4 SolelyTrading.com | scam | 0.520046 | 0.635046 | |
| 179rreqNa DigiFinex.com | exchange | 0.128651 | 0.203651 | |
| 31h8ZQB4\ Bitbns.com | exchange | 0.433764 | 0.433764 | |
| 32KWN4PHx98PKLp5k6K7KmUmS | unnamed service | | | 0.015 |
| 3EJiEBxpSFAzHWmKasYoyGa3Dxh | unnamed s | 0.628176 | 0.663176 | |
| 1LkbJjWPYekWzCJL7D5v9L2fVXgx | unnamed s | 0.002421 | 0.002421 | |
| 1LPhim6HcPMsqyyPvfPtU92u86fM | unnamed service | | 0.57 | |
| 3CQ2MXBt6mFy9W4AbktEWDSYN | unnamed s | 0.087444 | 0.087444 | |
| 374pZaX1f6aezioitcvLt8tqe1Cepg | unnamed s | 0.010432 | 0.010432 | |
| 3EdgAiXKxgC3AnBiymLAahhGgUyt | unnamed service | | 0.02 | |
| 3NEXay7ro1XGQRUF7Sas4WSUYy | unnamed service | | 0.005 | |
| 32zBmdDe Apollon Market | darknet ma | 0.035711 | 0.235711 | |
| 1DmmBgTpDnPkWF8m7V6pZoh3; | unnamed service | | 0.015 | |
| 132FexKHT Bexplus.com | exchange | 4.037591 | 4.442591 | |
| 3MckQ9buMqstaMg4j6VmJnmDD | unnamed s | 0.088678 | 0.108678 | |
| 1PtNH8pRZVTtsjHNqxKYJpSpk4v8l | unnamed service | | 0.005 | |
| 16Di4Zcc3f SouthXchange.com | exchange | 1.571963 | 1.966963 | |
| 3DZWq1y6zrotRTUMFxQnBRxrq2> | unnamed s | 0.002142 | 0.002142 | |
| bc1qw43dzyceuqcawfn52hvycmm | unnamed s | 0.213221 | 0.238221 | |
| 1EHbssL3u Indacoin.com | exchange | | 0.035 | |
| 1EtKhaWV\ WorldMarkets.com | scam | | 0.63 | |
| 1J9Sr2Kg5> MyCoins.ge | exchange | | 0.02 | |
| 1D97uQU3 Goldux.com | high risk ex | 0.002273 | 0.002273 | |
| 3JsgMqhxY VNDC.io | exchange | | 0.02 | |
| 12ekFeEKyyoS5xkQ8kiijqGPqvfxGl | unnamed s | 0.000926 | 0.000926 | |
| 38gL9Mig4VpAhBMUubpzYMFFT7 | unnamed service | | 0.01 | |
| 3GGsrah7eueM9YsSM1PGCwEsM | unnamed s | 0.030205 | 0.050205 | |
| 1Knfy3m4; BitPay.com | merchant a | 0.892037 | 20.10704 | 0.01 |
| 18sZS2uaX Circle.com | exchange | | | 0.005 |
| 1FUufLSdn BitCash.cc | high risk exchange | | 0.02 | |
| 3LfR7UAGr QubitTech.ai | scam | 0.755389 | 0.980389 | |
| 1HNMSmD8A9rtGpc98CXxYvTW4l | unnamed service | | 0.02 | |
| 1MmL4q8FTQc1TzmhnUz94n9g52 | unnamed s | 1.143156 | 1.533156 | |
| 357RBteB6TBonxqngbHFGn8kdLb | unnamed s | 0.007395 | 0.007395 | |
| 1KnMmnUvYuTWp1vA5Usxp3v6u | unnamed s | 0.000228 | 0.000228 | |
| bc1qcxx84 All world cards shop | fraud shop | | 0.01 | |
| 1G6RzfXghe4dfWa2jhMPU2u3WT | unnamed s | 0.00121 | 0.00121 | |
| 1NL2HNrYJ Luckygames.io | gambling | 0.061505 | 0.151505 | |
| 32rK5VFc336YTbP7uavkTi9idVT86 | unnamed service | | 0.005 | |
| 13WAPtWZMSjV1EDiat3EyVc3ydH | unnamed service | | 0.005 | |
| 14rHrNhiRCpiraWsf2G78EYK9TQp | unnamed s | 0.005115 | 0.005115 | |
| 12dH5WZKLcyG6gxg7oiYgrvcR8JQ | unnamed s | 0.01523 | 0.03023 | |

| Address | Entity | Type | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|---|
| bc1qxf3t7zs6wz4k8tfaveuzgmr68> | unnamed s | | 0.007444 | 0.007444 | |
| 19St1kMfCPs4kar2F5AJBwV4HMX | unnamed service | | | 0.005 | |
| 1BFg5uDnK32BNhPGtrML6ESi3Do | unnamed service | | | 0.26 | |
| 13G2uGwTfCF3zv3YfjY4rNq2z4zd< | unnamed s | | 0.007755 | 0.007755 | |
| bc1q29mfq9d9t6clyehwc383c25z | unnamed service | | | | 0.055 |
| 1EDSymLZ47pPEbpUKMBknk26kg | unnamed s | | 0.059595 | 0.739595 | |
| 1CsBUC7NN9JTXwu1HiZcUcVKrT9 | unnamed s | | 0.015608 | 0.025608 | |
| 1FhFT4MKqtBBETdRpVPT7vp3xxw | unnamed s | | 0.005446 | 0.005446 | |
| 35xjREkk6yeBM3i4SgYiUb18nhDy | unnamed service | | | | 0.015 |
| 1FL9S45yNrpNeNdQdnuEdnPJywR | unnamed service | | | 0.005 | |
| 16Euvif3W BTC-e.com | high risk exchange | | | | 0.02 |
| 1B1Fmw4x1fsbBEPcabey3ccjwHS( | unnamed service | | | 0.085 | |
| 3KxHhNNgtWHMDJSMGrLspXCuL( | unnamed service | | | 0.03 | |
| 1LbxmPeJtkpy6LXSM3iLjq1MZdbR | unnamed s | | 0.002575 | 0.002575 | |
| 19Mebbapq55KBvYgEBQDpZTwi8 | unnamed s | | 0.008539 | 0.008539 | |
| 1CoiNMixq CoinMixer.io | scam | | 0.003787 | 0.048787 | |
| 3CC6SMbo Wallex.id | high risk jurisdiction | | | 0.015 | |
| 1E4wTKtm CoinOne.co.kr | exchange | | 0.156204 | 0.246204 | 0.005 |
| 3CkQA7LpBc6X8UDMmiuuRjxD5g | unnamed s | | 0.004926 | 0.004926 | |
| 1Musk7suk BTCDay.net | scam | | 0.001218 | 0.001218 | |
| 1PquEhAb2 TheFiniko.com | scam | | 0.030283 | 0.340283 | |
| 1N6nkeR2PjzfV6jYF6iK7L3ekXpskc | unnamed s | | 0.001682 | 0.001682 | |
| 3PFXxLTUNSV85KgunMh5JuM1j7\ | unnamed s | | 0.446745 | 0.446745 | |
| 1JV9F3mTVZVP233KAsWzv188Kc\ | unnamed s | | 0.000586 | 0.000586 | |
| 3Gg3aHZxzxWf8x45DLjFCB14yorU | unnamed s | | 0.004701 | 0.004701 | |
| 14FihQisKYVxu9MkgdoFfveW937\ | unnamed s | | 0.003328 | 0.003328 | |
| 1LDuVfyXryheza3X9hingUeu4tiv2< | unnamed service | | | 0.02 | |
| 1FqzNi9mc MaxiCapitalFundsLtd.c | scam | | 0.109455 | 0.109455 | |
| 15Ye3aEfTPReuqyvCFzUTDvq4GJE | unnamed s | | 0.029551 | 0.029551 | |
| 12CrX1wWSvsC6SynHzuPAjEBVoK | unnamed service | | | 0.025 | |
| 36W2U9o9XHTjr6EPq9zgF3Yy8ryt | unnamed s | | 0.001511 | 0.001511 | |
| 36bJXmvHgujHjmuA9aMXwcmc3S | unnamed s | | 0.001326 | 0.001326 | |
| 12mqm12B4qQhhSLMNAYYDFa6A | unnamed service | | | 0.3 | |
| 33qZnV1xS6WZDFVnwpgw9Xw9B | unnamed s | | 0.002513 | 0.002513 | |
| 1MQRVKRja9jiPsCxHZNk2fgFGRyV | unnamed s | | 0.0045 | 0.0045 | |
| 3JMjHDTJj} imToken - wBTC | decentralized exchange contract | | 5.895 | 0.025 | |
| 1F8HS2KG85z7FZFDX8ajBV3FvTsd | unnamed s | | 0.010853 | 0.010853 | |
| 14SjhzyiEDo67cyVf5bLbF35qfD7JF | unnamed s | | 0.001432 | 0.001432 | |
| 3L3yWuezCGyH3Pi7M4oBw3PH5\ | unnamed s | | 0.0018 | 0.0018 | |
| 31h9v1mX4vKVTd1g5aZgvo5cVM; | unnamed s | | 8.377926 | 8.642926 | |
| 37JodXT55Yvg8mfXkf39BF6wcTun | unnamed service | | | 0.005 | |
| 3M4tBGZp53oiZrbhagwT1htMS3Z | unnamed s | | 1.113985 | 1.403985 | 0.005 |
| 14Muf2WsAik36ZBmTZnvrXkaGU( | unnamed s | | 0.001908 | 0.001908 | |
| 3A54d7DbWkrfxMv1bhDmdr42hp | unnamed s | | 0.055 | 0.055 | |
| 3FzPhoZFYNAyCAcZqtzNiaPtB7z6B | unnamed s | | 0.16624 | 0.16624 | |
| 32GMPNuf Busha.co | exchange | | 1.271229 | 2.201229 | 0.005 |
| bc1qwycsx Monopoly Market | darknet ma | | 0.0033 | 0.0183 | |

| Address | Entity | Category | | | | |
|---|---|---|---|---|---|---|
| 1Hufi4FuYi | PaxForex.com | exchange | 0.247774 | | 0.247774 | |
| 3CqmWERb6SFvhC4DJUFTwubz7s | | unnamed s | 0.001595 | | 0.006595 | |
| 1GrbDEZ3u7DypPCijhZf3agTHUFX | | unnamed service | | | 0.32 | |
| 3H8tVP36JAYxWyrZrTzgnnQzYZxLI | | unnamed s | 0.010553 | | 0.010553 | |
| 1LtCYaR4z | Bitvo.com | exchange | | | 0.015 | |
| 1FKPL8zPo | pTokens.io | exchange | | | 0.01 | |
| 3NTA3rpqGNf4dJBuGya7jKYu8KNI | | unnamed service | | | | 0.045 |
| 3FAfkK8jvHZdPHxMWai7MYZniRy | | unnamed service | | | 0.01 | |
| 32VXTiHv7gkhg1XJhLVVSpgzWfE9 | | unnamed s | 0.001527 | | 0.001527 | |
| 1CNP8ykYr | Hugosway.com | exchange | 9.703395 | | 10.9084 | 0.035 |
| 1JtPEWSC1 | BlockOptions.net | scam | 0.192251 | | 0.192251 | |
| 3Qq9qiwWPnqPphVA64o2qkVExi | | unnamed s | 0.00252 | | 0.00252 | |
| 33xV7HPW | Quidax.com | exchange | 1.346849 | | 1.956849 | |
| 13W7iTwckW3Am9g2uHXgNJZDN | | unnamed s | 0.000812 | | 0.055812 | |
| 35c12qopmbUvuN2s1VG2zxSd9w | | unnamed service | | | 0.03 | |
| 3BC9vCoDo3vVtDvuDZZgUTWqa5 | | unnamed s | 0.017598 | | 0.017598 | |
| 3FZXkHL3uLog9PWxsJnGQhMpPN | | unnamed service | | | 0.105 | |
| bc1qlkte4plf8vxnyzjgul76yj5ral40: | | unnamed s | 0.0003 | | 0.0003 | |
| 3M2bxFrnLP7JzmVa4odYpYhPeRP | | unnamed s | 0.002519 | | 0.002519 | |
| 36EgSU8W | Minerift.biz | scam | 0.089685 | | 0.099685 | |
| 1LvxudWH | Cryptonator.com | high risk ex | 0.374698 | | 2.244698 | |
| 1F39QcL66Zo8hmP8SErG9oR8wJz | | unnamed service | | | 0.015 | |
| 39RtzoWF | PGIGlobal.trade | scam | 0.092631 | | 0.387631 | |
| 12R1TJM1ciqjtExBsLbroiF8LJuNmJ | | unnamed s | 0.00277 | | 0.00277 | |
| 3NFnfb83F | PrimeXBT.com | exchange | 17.42963 | | 20.36463 | 0.21 |
| 1Nz4Rq2HE4zD2MVpcmu7Rz5SDc | | unnamed s | 0.002794 | | 0.552794 | |
| 3Bj2jVXAdk Changenov | ChangeNov | exchange | 15.39742 | 0.002014 | 58.36242 | 0.107014 |
| 3BKriAneGX9M8b4X63oh54g59m | | unnamed s | 0.007257 | | 0.007257 | |
| 3KkdJKuBPoiF84WG9WL3SSiZfFnf | | unnamed s | 0.005 | | 0.405 | |
| 1LbiKVKAJfk1KRK39bhgNJLwjJrE3 | | unnamed s | 0.099739 | | 0.099739 | |
| 149yRpLsD | YieldNodes.com | scam | 0.490577 | | 0.775577 | |
| bc1qpzcfsy | memo.sv spam advert | other | | 5.47E-05 | | 5.47E-05 |
| 1MLEmSPYY2YfdAENa3hAXCKCWI | | unnamed service | | | 0.18 | |
| 1AbWusa9aWWCFk8SjcRFGWqT9 | | unnamed service | | | 0.005 | 0.005 |
| 3AwbyjaE9xCT47jxUXwppNjGHKz | | unnamed s | 0.001161 | | 0.001161 | |
| 1PKEhVKK7otLWkEdEXCZ2uPSeaG | | unnamed s | 1.482342 | | 1.507342 | |
| bc1qkgguhpps6nkeqap7cz7easkyt | | unnamed s | 0.003392 | | 0.008392 | |
| 1CbPu7RR5TVEbQaQKAtP8BvprN | | unnamed s | 0.00595 | | 0.00595 | |
| bc1qtphhvzuju44xtvl3delxkd7pl7g | | unnamed service | | | | 0.01 |
| 3L6MFP7Jz | EQONEX.com | exchange | | | 0.005 | |
| 1FvQ4YuuxSfhykGDeojXmvKjYiRkl | | unnamed s | 0.002548 | | 0.002548 | |
| 39B6BLkvD5EL4drskhj7zS8yJZxm4 | | unnamed s | 0.003277 | | 0.003277 | |
| 1HEfio1kre | Cryptopia.co.nz | exchange | | | 0.005 | |
| 1DKGRGJXGNLAtTeFb9SNPNHtrkZ | | unnamed service | | | 0.005 | |
| 32sFBWLdKAFToyNkU11bSu2CmY | | unnamed s | 0.001199 | | 0.001199 | |
| 37LXVoPWwtBF6SiKJ5yFfPg2vVyB | | unnamed s | 0.0833 | | 0.0833 | |
| 3PdgWRBXV2WhXmBa76i1wjdQq | | unnamed s | 0.026287 | | 0.031287 | |

| Address | Type | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|
| 1Fx3UUsXp Zebpay.com | exchange | 0.222811 | 1.542811 | 0.005 |
| 1cECeUjaQgzD2jSVvXiS2N2j4mLuh | unnamed s | 0.008313 | 0.008313 | |
| 1LjAK2WCsoPkFP9Qn3kdM22CyQ | unnamed service | | 0.025 | |
| 18Dg1mdw Queen-Casino.com | gambling | | 0.025 | |
| 1PcMwBza6Tb5t8iEUZBfjYVH3c3D | unnamed service | | 0.115 | |
| bc1qpustlyd5ks2k6k6tms9xrpr327 | unnamed s | 0.027651 | 0.027651 | |
| 1BFVrpFun Totalcoin.io | hosted wal | 0.0441 | 0.1641 | |
| 1KtPiYnBmeJ3CHDCSNseFXLczDiiL | unnamed service | | 0.005 | |
| 1CnWzFrRSteu23AAXkULHt6uXSH | unnamed service | | 0.005 | |
| 1B16khJvB; Blockfills.com - OTC De | exchange | | 0.165 | 0.8 |
| 1BLT5HfwPtxAwkGKxYJAMUowac | unnamed s | 0.010665 | 0.010665 | |
| 3QipF9vgx6Wn9TtPZhQryASJ5d6t | unnamed s | 0.006648 | 0.006648 | |
| 36nA3m6uL7WcYTT1AekHEMEry5 | unnamed s | 0.037235 | 0.412235 | |
| 1Ene14BJ4 Whitebit.com | exchange | 1.47951 | 2.78451 | |
| 3M4nRwrji GXNitrous.com | exchange | | 0.09 | |
| 19GCPNXz) LuxSocks.ru | fraud shop | 0.000283 | 0.065283 | |
| 3PTJHLqGf3GZphSka1FfTey9wKMl | unnamed s | 0.001 | 0.006 | |
| 3DEi5HHAvCvjaBHQrJKyRoD6nJsh | unnamed s | 2.375821 | 3.330821 | 0.025 |
| 39avPvZpHZLoDXQt7pLm3zAM9z\ | unnamed service | | 0.025 | |
| 17VUBbZRi Joker's Stash Market | fraud shop | 0.010772 | 0.095772 | |
| 3JSogEzJbw BitGalaxy.net | exchange | | 0.02 | |
| 34dxYiVy22Xj1UXaS4tVVYGwNyM | unnamed s | 0.021585 | 0.021585 | |
| 1GEz8o8an Energycontrol.org | other | 0.069209 | 0.069209 | |
| 157EDTdFE Kraken.com | exchange | 227.1991 | 315.1441 | 21.63 |
| 3Qx5LN3LsmtiKAM1i83ZZ7LibSv4t | unnamed s | 2.861422 | 2.921422 | |
| 3AwRasMAwkFUawY3jroNt5c336\ | unnamed service | | 0.01 | |
| 1Nb5G2S6tisQ3nq6ZY7K13oBWhJ | unnamed s | 0.00436 | 0.00436 | |
| 3BysbwiUp9LqvMAJy6bHeVqTwm | unnamed s | 0.002283 | 0.007283 | 0.16 |
| 1Jz9nwPL2A3FWLEW9Njv6cXyVBl | unnamed s | 0.003345 | 0.003345 | |
| 1MnWNniHdgMgQkUzn2NMbQav | unnamed service | | | 0.05 |
| 17aZ7HervotJ55JnAVFr2QGdVVVv | unnamed s | 0.009508 | 0.009508 | |
| 3JRBuATZFGXBX4joyM1BfM2JmV( | unnamed s | 0.001752 | 0.001752 | |
| 3LKS8S8jU6XzJhCXH64qCz54Sm43 | unnamed s | 0.060473 | 0.060473 | |
| 395qv1nSk9jzDboM4CiS52XSTCzy. | unnamed s | 0.603752 | 0.608752 | |
| 3Nurm7uuo2dRaH83kHxbo6CTLXI | unnamed service | | | 0.965 |
| 1FcmhcwpbJc41qLoVNkUCMMKw | unnamed s | 0.020658 | 0.020658 | |
| 19tuQvtPiwpxGEptjANeKjXDyC5H | unnamed service | | 0.025 | |
| 38D8WTQwUafHWdr4E5fgK9gPxc | unnamed s | 0.008785 | 0.008785 | |
| 12H28MfCC4JZNxTfVRJjLDgvw4yK | unnamed s | 0.046045 | 0.066045 | |
| 3Ph2Hsajb2mCDEmA82TRGpPFiuf | unnamed service | | 0.015 | |
| 3KTkzwucfbbkf3AkmpAMYDgVjPY | unnamed s | 0.044943 | 0.044943 | |
| 1PaYKX7MCXtQzwNi4Q819UjWRE | unnamed service | | 0.095 | |
| 38tHykRirK19RjR5hK4hqYXSftFSJV | unnamed service | | 0.08 | |
| 1GfZdZxEaCgwwW3iQG9dLkcBVF( | unnamed s | 0.002096 | 0.002096 | |
| 1278okLec AAX.com | exchange | | 0.34 | |
| 17F9EG6sck4Wv6Ess8KpXhC3Ek7( | unnamed s | 0.022852 | 0.022852 | |
| 15SdoFCiw Poolin.com | mining poc | 0.08453 | 0.08953 | 2.29 |

| Address | Name | Type | | | |
|---|---|---|---|---|---|
| 3CuwMAM | CoinZoom.com | exchange | 0.598399 | 0.743399 | 8.02 |
| 162tEx4PmuLLKhtEdKAW6v13p7X | | unnamed service | | 0.015 | |
| 1HqGi8e2b | OctaFX.com | exchange | | 0.045 | |
| 1Gymff1Z5 | IntrexInvestment.com | scam | 0.172299 | 0.172299 | |
| 37SJr1TNFQJKvfXLtbCLRy57cwQH | | unnamed s | 0.00075 | 0.00075 | |
| bc1qdjwlkg | BlueWallet.io | hosted wal | 0.184733 | 0.289733 | |
| 1PbvbcRv4WxCFFYSrXNteNqMfig) | | unnamed s | 0.027273 | 0.027273 | |
| 3MZihDBFmagp7ijuc1oVswWqRD( | | unnamed service | | 0.21 | |
| 16Dd4Npu | MrGreen.ws | fraud shop | | 0.02 | |
| 1Q88eMvg | Easydeals | fraud shop | | 0.005 | |
| 1K2b8gBg5 | Indodax.com | exchange | 0.145086 | 3.050086 | 0.26 |
| 1P6pvnhedXNiAosjjzuhXG8LDAXEI | | unnamed s | | 0.065 | |
| 1NbphwKcUowpVBY2YCqH2eCPjE | | unnamed s | 0.010174 | 0.010174 | |
| 1E3Qt4xaD | SecuredCryptoTraders | scam | 0.006781 | 0.006781 | |
| bc1q4zkrmq92ksrs5vd82mcehgcp | | unnamed s | 0.010797 | 0.010797 | |
| 1123mRrEł | Bankomat.cc | fraud shop | | 0.105 | |
| bc1qq69gpyzsptx94mfx858fklzedt | | unnamed s | 0.001727 | 0.016727 | |
| 3EM7hJRRB4iGHh2o9B4VmZgN2C | | unnamed s | 0.0033 | 0.0033 | |
| bc1qpf9rar48jfgvqy0a534klmkgr5 | | unnamed service | | 0.01 | |
| 1Mipj6s5hXtVpsBPBxmU16CyEwF | | unnamed service | | 0.145 | |
| 13hLyfRHg | XMR.to | high risk exchange | | | 0.005 |
| 1CDVnFDF| | Any.cash | high risk ex | 0.011548 | 0.421548 | |
| 3LWLRFx7igjuZi7m6Zh9nKtbsLqjb) | | unnamed service | | 0.02 | |
| 1FYQ7ymZQyHF6NJ54yZkv8KzTuY | | unnamed service | | 0.01 | |
| bc1qt0ncf( | MDL3.net | scam | 0.01 | 0.01 | |
| 1cCtcDjYirVXGnUL8dvFFxewT4mfI | | unnamed s | 0.00563 | 0.00563 | |
| 1ETm2FTcqpSmRZXGef3UHsLfBkU | | unnamed s | 0.002187 | 0.002187 | |
| 1B3vq3aYvvwTrWj3Uis7FsuYVa1P | | unnamed s | 0.007832 | 0.012832 | |
| 1MhzHHhss7a8qmGaRfKjBUKe12T | | unnamed service | | 0.005 | |
| 19QaoHxdI | incognito.org | p2p exchange | | 0.95 | |
| 3A8iW5ME7pa3bi1pxbL7qvKkWjh | | unnamed s | 0.022386 | 0.027386 | |
| 1Apoidqz5wQqMDszY1f6TEu96ha | | unnamed service | | 0.075 | |
| 33QpaTQNRR2yA4KxdNrtsyiMt31 | | unnamed s | 0.001231 | 0.001231 | |
| 1Ed4bFVaMfD5w79Ef5Yiz7yyq4Q! | | unnamed service | | 0.005 | |
| 124YFf57sxdW6CfkVC1yG6k1cTro | | unnamed service | | 0.01 | |
| 1DsdTFdDKZXqkPgAExU71Dt4tNH | | unnamed service | | 0.08 | |
| 1C1rFhgBnVRuwYy9QopcavKrmZc | | unnamed s | 0.000732 | 0.000732 | |
| 35Ca5e2sxb1Pw3MbeRiC288763h | | unnamed s | 0.320846 | 0.410846 | |
| 13Dy3vbF6MaK2ahUNhR2oYEgSH | | unnamed s | 0.000971 | 0.000971 | |
| 1Pdx3X383VwxayiFvNcYjHkxWvJV | | unnamed s | 0.023834 | 0.023834 | |
| 39k8YhfbQ | LMAX Digital | exchange | | 0.045 | 0.205 |
| 1FAoDtbFC | BrasilBitcoin.com.br | exchange | | 0.145 | |
| 3LNibQtvwrja2bGvZ8qCgtCmeqSjr | | unnamed service | | 0.025 | |
| 3KwP1Rfq> | CryptoBrowser.site | other | 0.017457 | 0.017457 | |
| 3GaRfjis5C | AMIGOS Shop | darknet market | | 0.08 | |
| 15iksRMot | Bitvest.io | gambling | | 0.01 | |
| 3P3f4HPPHwF4haeGbrHuXSi74f6[ | | unnamed s | 1.128278 | 1.278278 | |

| Address | Name | Type | | | |
|---|---|---|---|---|---|
| 3B6T5vFJcKxE1FVZ6bxkvPzdZ84P7 | unnamed service | | | 0.035 | |
| 1CuoeTJYuuYDix6zXqPcAgjTxksTsJ | unnamed service | | | 0.005 | |
| 3Ccen1tus/ CoinFLEX.com | exchange | | | | 0.375 |
| 32hjziv4SZvTBXotaSwpWTtMuqxC | unnamed s | 0.029109 | 0.049109 | |
| bc1qr7rvfn7chaphg4q95hsz9tsqp | unnamed s | 0.027953 | 0.037953 | |
| 3PYT22usYsbyPehZf9zBpUKVVzLm | unnamed service | | 0.13 | |
| 1frsHKVkyx9KA8ja3P3N1GTSPqS8 | unnamed service | | | 4.18 |
| bc1q9hftrhe0wgav80qmywx9tn5c | unnamed service | | 0.01 | |
| bc1qp36fs205hvth94nx9sxysjfsx0 | unnamed s | 0.0011 | 0.0011 | |
| 13pULb5BfB3cqpgUGE4nBFrj5Db5 | unnamed s | 0.537726 | 1.702726 | |
| 1EGZhVvL1 Viva-Minerva.com | scam | 1.380528 | 1.500528 | |
| bc1q3zkfkx3kn4njs3vsjte6nlpmp3 | unnamed service | | 0.03 | |
| 3AtUnMeh Hubi.com | exchange | 0.008449 | 0.008449 | |
| 33uy5rdfkN Satang.pro | exchange | | 0.025 | |
| 366dMTppFHMm6G7fMrsUvFufLF | unnamed s | 0.001148 | 0.001148 | |
| 37CVDJixrA6jqYVax4XQRb9Hn4EH | unnamed s | 0.028219 | 0.033219 | |
| 1E5ewaCvctN2nDLGbVvfeE3BpcjT | unnamed service | | 0.045 | |
| 1BGcPW9q BitMaxCoins.com | scam | 0.01311 | 0.04811 | |
| bc1qqyefvant90hw8aeu3j7zgky6f | unnamed s | 0.025482 | 0.025482 | |
| 3Mftxy9Lal WOLF.bet | gambling | 0.002116 | 0.002116 | |
| bc1qfsx63snj9gnklklyzdt5ykssmqt | unnamed s | 0.011362 | 0.011362 | |
| 3Ppa4vkDc Unknown - OTC related | exchange | | | 0.01 |
| 1E7v1Bw5\ NimbusPlatform.io | scam | 0.0317 | 0.0317 | |
| 13DdfKxdE Korbit.co.kr | exchange | 0.451 | 0.456 | |
| 3AbBpdoQnLBvMZHgSZCgCe5mKE | unnamed s | 0.011488 | 0.046488 | |
| 1EBjLQE6Fvi1LfKHx9rhmn7pDkxTz | unnamed service | | 0.075 | |
| 13FyLXYQJw8GuGthGpBE11Ety6c | unnamed s | 0.037586 | 0.037586 | |
| 14TCgpA97aJWPhVYcnQSxM11ej( | unnamed service | | 0.07 | |
| 1GKh6Vm6 OGS-Investment.com | scam | | 0.005 | |
| 192PMU9vDnrt8gAGYrvP7HhkugE | unnamed s | 0.005905 | 0.005905 | |
| 1HjdpRr4ziF7kGX3pmr3JAVPPjJ8R | unnamed s | 0.006 | 0.006 | |
| 14gbmBo3 Purse.io | merchant s | 0.016684 | 0.036684 | |
| 1CUneudHPc9A4zXGxBTcUGzHh2l | unnamed s | 0.00051 | 0.00051 | |
| 3PBZiYKBwmYUFuepT293YEpzHQl | unnamed s | 0.170587 | 0.170587 | |
| 1P4rxKTgPQQ4moojfgHfpNrxKeRE | unnamed s | 0.012909 | 0.012909 | |
| 14Dh4Z8bipBzAwPPdximrEbPwqk | unnamed service | | 0.005 | |
| 14TGQ7hApbtTDtppBQFuuymLVx | unnamed service | | 1.995 | |
| 13PhzoK8n Coincheck.com | exchange | | 0.075 | 0.01 |
| 1GCtiRyoMNBEDgXseCiKTidwsVar | unnamed service | | 0.005 | |
| 32KSWzNTFvrkzhjrtDUKEWDMoC | unnamed s | 0.131267 | 0.131267 | |
| 1PRZ2cDYe Bitsler.com | gambling | 0.29158 | 0.31158 | |
| 16cXuX54V Ripio.com | exchange | 0.000176 | 0.035176 | |
| 1Q3T61RZf NitrogenSports.eu | gambling | 17.30022 | 21.83522 | 0.025 |
| 1E9Z9iv4Ldi7uA669fNSh28BEjwjBi | unnamed service | | 0.025 | |
| 1E8BoJDHr SlilPP Market | fraud shop | 0.008704 | 0.083704 | |
| 1CsfSWxabeBbpobEokcCig9YFFUj | unnamed service | | 0.42 | |
| 18ZiAQUgr ZB.com | exchange | 0.086719 | 1.166719 | |

| Address | Name | Type | | | |
|---|---|---|---|---|---|
| 1LrfeSBhA₂ | Coin-Farm.net | scam | 0.001456 | 0.001456 | |
| bc1qug5ga | ThorChain | exchange | | 1.665 | |
| 1jXHqezHGGfhoqCXM8PLJG17XQ[ | | unnamed s | 0.002603 | 0.002603 | |
| 1JEWuNbRuJ4HiQphPgDye7gsW5j | | unnamed s | 0.004408 | 0.004408 | |
| 1FUmu6LsAtDwnRACfqQi3bGibZsi | | unnamed service | | 0.015 | |
| 112YtkiJFVNDN4Nuo3yy2WxqX9w | | unnamed s | 0.018251 | 0.018251 | |
| 35MLBMojBKeFFgHAVDccPE2CtKf | | unnamed s | 0.002028 | 0.002028 | |
| 18SFq6p4bmzbhbZT6GSQa12pd9F | | unnamed service | | 0.01 | |
| 3EfsyrofEq | Bitvavo.com | exchange | 0.005 | 0.045 | |
| 1ntb2HjiFB | Unknown - OTC relate( | exchange | | 0.01 | |
| 37SqMcQNYvyUVXjCnTKisSActKAs | | unnamed s | 0.000433 | 0.000433 | |
| 1AFyHbMkD3khThcyWnodAPHkd" | | unnamed s | 0.002681 | 0.002681 | |
| 1BiyKHB2H | EstamaFX.com | scam | | 0.015 | |
| 3KmQnjVV1REi9hAj4taGKxkwNJC! | | unnamed s | 0.095514 | 0.105514 | |
| 15A2oB7UgytiLR9jpZLBP2fUome8 | | unnamed s | 0.018674 | 0.018674 | |
| 3H6mybEiFMn74UjULmmvYtRLm( | | unnamed service | | | 0.01 |
| 1LuXmdSw | MtGox.com | exchange | | | 0.125 |
| 12L7TGYHppGAftp8xHCP8s8ZB7r: | | unnamed s | 0.014758 | 0.064758 | |
| 33XCRUnzPwaeDqfCkQYDRhCJKQ | | unnamed service | | 0.035 | |
| 1NALG1vZj | BTCStep.net | scam | 0.02 | 0.02 | |
| 3Qqr6Z3NiL4ySqfF69hwJVoqBNA! | | unnamed service | | | 0.01 |
| bc1qtwedf4vdm4w7frt732jwjmy4 | | unnamed s | 0.043668 | 0.043668 | |
| 1JDMvSPsvnEQnxtXZg1ko8sFKLdw | | unnamed service | | 0.005 | |
| 1NrVRvD19Bfs3DtbA39fNFxANSsc | | unnamed service | | 0.755 | |
| 1D6aSF1oSyedYpCcy1ERuMJsXkfd | | unnamed service | | 0.005 | |
| 1329yFzoVQMvkn8ie5Sx2f5LUYeV | | unnamed s | 0.0016 | 0.0016 | |
| 3DUHDZqTbF7eqKwvqDSDVd6J5r! | | unnamed service | | 0.02 | |
| 1NsDwpSTK7zwh8V2GK3GwSfAEV | | unnamed s | 0.001925 | 0.001925 | |
| 3DD1hKortQhjbLtZvTqBtUA1e1UP | | unnamed s | 0.008726 | 0.008726 | |
| bc1qr2x6t7q29pu3fht24xn3qcgpn | | unnamed s | 0.018172 | 0.018172 | |
| 3BdM8T1qfDdYttehrh27mWgXhii' | | unnamed s | 0.001484 | 0.001484 | |
| bc1q9f09wlcsz9juf25vycpsz8m5nr | | unnamed s | 0.004461 | 0.004461 | |
| 3GSzUZS7thwz1w3Y8S2eJm6KLHv | | unnamed service | | | 0.015 |
| 38mqnRQLtWGMGwXJHMtR8saQ | | unnamed s | 0.0095 | 0.0095 | |
| 1J9Jd6L5s2g4Ywmi2R81eL3TH5oL | | unnamed s | 0.037295 | 0.037295 | |
| 1F5bfN9hoydgAYBdujKqNE2krL7Y | | unnamed s | 0.001697 | 0.001697 | |
| bc1quxr4qd3htsmwecmfdesd3p0( | | unnamed s | 0.0005 | 0.0005 | |
| 34uDfcUrt9ZNh7EjUSEFZUDgMes( | | unnamed service | | 0.01 | |
| 18cPvKDfrYcLpH55zZCp9CDKcJD9' | | unnamed s | 0.001581 | 0.001581 | |
| 18rEawauRMheC6qi8hyKGN2WpE | | unnamed service | | 0.02 | |
| 3AzdigCcmvRd8vvdg6j5DLWR6Xg' | | unnamed service | | 0.005 | |
| 16PXVSPe1ep9CoPuaqsegcjWc9Vl | | unnamed s | 0.0041 | 0.0091 | |
| 3DcDg4r7WxNmBFX9Nvi1UevWul | | unnamed s | 0.000599 | 0.000599 | |
| 38h5JkU7wB8GseKnE5nQGjWEzCi | | unnamed s | 0.004829 | 0.009829 | |
| 3Li6tRmjheTSdJM7W9yteYXQqXEj | | unnamed s | 0.000449 | 0.000449 | |
| 35aDdzQcsCwZLRot1KPYq9q4CinI | | unnamed service | | 0.01 | |
| bc1qx05hzzz5qt7u8ggj60c70dtd9 | | unnamed s | 0.001083 | 0.001083 | |

| Identifier | Type | | | |
|---|---|---|---|---|
| 13TvzEQLFZN6g2oroGfn1GMqvYb | unnamed s | 0.00137 | 0.00137 | |
| 3BuTfxWdVzVBCkbB8WuwagKdfh | unnamed service | | 0.01 | |
| 1CVb4voAzBitZ.ai | exchange | 0.011436 | 0.026436 | |
| 1AYTZLhPN GiftGemini Giveaway i | scam | | 0.145 | |
| 38ea7dV6aJjGFuwgneFcRfjd1y3na | unnamed service | | 0.03 | |
| 3EaPZTdBL LVL.co | exchange | 2.864768 | 2.864768 | |
| 1NCYeoBskPs2Sq4Q7B5dMdaJ8DV | unnamed service | | 0.2 | |
| 17dC3EsSH BitSeven.com | exchange | | 12.595 | |
| 1958oM2r5dzspeqhDRJDbrNq2StI | unnamed s | 0.008571 | 0.008571 | |
| 1LiLwUZFS1p9oxgXxavwiDutSEx31 | unnamed service | | 0.09 | |
| 141QU5PC Thodex.com | exchange | | 0.005 | |
| 1DVcJBruiAkGmRFTfrLjv9fAHkXyrk | unnamed service | | 0.055 | |
| 1BrBGvYdc CoinCola.com | exchange | 5.057872 | 7.897872 | |
| 3872fg3XJeA5HMfzp8FCEaNVExiX | unnamed service | | | 0.005 |
| 1JeojVyPvyus7oDPu9ByG83i2tfpD | unnamed s | 0.004687 | 0.069687 | |
| 35NV1tVYRyHQFwP7drtbW285hz | unnamed s | 0.020314 | 0.020314 | |
| 19Xenm4suCmcuSU2E2nb2CjRiuu | unnamed s | 0.013058 | 0.013058 | |
| 1LgfGQyugbmtbTabuGMPnWV1H | unnamed service | | 0.005 | |
| 1FVVQGSszBQzqQseCZNbaf5FrVZk | unnamed s | 0.003508 | 0.013508 | |
| 39QDF6SGn9CZm6cGLC6h4hLH2g | unnamed service | | 0.01 | |
| 3AdRGgNotwRYXaQTzWD7r82Jvjy | unnamed s | 0.008747 | 0.008747 | |
| 1AvfdKH955gpf7wNxQcHnaxosCW | unnamed s | 0.005143 | 0.010143 | |
| 3J3SZpnoiktwq46WotHwhkp3Zqe | unnamed service | | 0.03 | |
| 3K9sS5WN Baksman.org | high risk exchange | | 0.03 | |
| 1CrAG5r4e CoinTiger.com | exchange | 0.296623 | 0.301623 | |
| 1GhwjLVSNheXHW83Cbbbg7sQeE | unnamed service | | 0.015 | |
| 12LF1bqBBe57icLXQ8vu1f5juV4m | unnamed service | | 0.015 | |
| 3Mcs6vfvtE SamouraiWallet.com f | mixing | | 0.015 | |
| 16zHkkns5LxHmQFTMvi7Qgwy3p | unnamed service | | 0.55 | |
| 1HYHDR21CPPHeDxcPMBs44R5w | unnamed s | 0.003091 | 0.003091 | |
| 1Bu5qshWAwAbknaLzDRjipL2nWj | unnamed s | 0.00299 | 0.00299 | |
| bc1q92g35s78fynknea87w5trwye | unnamed service | | 0.015 | 0.055 |
| 343FouKENNGWVk6ckVTqJmaaPk | unnamed service | | | 0.015 |
| 3DCa2uWg Coins.co.th | exchange | 0.540021 | 1.035021 | |
| 14UT8AWsiLZWCb818F5HaZetUaj | unnamed service | | 0.01 | |
| 3K4sHSwHiheKY4GSCv12pNCAei6 | unnamed service | | 0.06 | |
| 125LHvA4PQVGbNHUvVXw44ws9 | unnamed s | 0.011105 | 0.011105 | |
| 34puxiy1oERoQcLSfNZf4Wmamqk | unnamed s | 0.106255 | 0.136255 | |
| 19gcFrE83NQ992HpxTxWdskn5oA | unnamed s | 0.007849 | 0.007849 | |
| bc1q99czu Reported as stolen fun | stolen funds | | 0.01 | |
| 35EsZZtCtXDTbfqChdf8C7AsCQzdt | unnamed service | | | 0.005 |
| 1Po7JdJAv6vNNENE6uaupniaUqYk | unnamed s | 0.04995 | 0.06495 | |
| 16nTegE27cn8Kc5SQMycCunTgTk | unnamed s | 0.063417 | 0.063417 | |
| 17jijDFF4Jp BitcoinWallet.com | hosted wal | 0.867837 | 0.877837 | |
| bc1q0cqe7frxuzpyyvwjr607cjpwu | unnamed s | 0.393623 | 0.718623 | |
| 3DTjnAGuLubCrbhNTTae9cgsXcSH | unnamed service | | 0.01 | |
| 1HLcdRT6UumKTFNJXVAPK25YGt | unnamed s | 0.001652 | 0.001652 | |

| Address | Type | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|
| 1PAJP2yzR Wazirx.com | exchange | 0.775897 | 2.420897 | |
| 38hZrMiph Multival.is | high risk exchange | | 0.03 | |
| 3LzP6FtpGaVr2AQQYQ6bBc98yJD | unnamed service | | 0.005 | |
| 1DF2Y8tP13Y9P1CU62wunHYfE5C | unnamed service | | 0.01 | |
| 1sXkudtuHG8JVxV3StF5Sunmz2tq | unnamed s | 0.001619 | 0.001619 | |
| bc1qmvx526ylawzyfnpr0rc4sq3h5 | unnamed s | 0.096216 | 0.191216 | |
| bc1q2m4klu9hjyzcz5y8vtwjpeyj0h | unnamed s | | 0.015 | |
| 15uLSCu1bB6N62e6Xakk1TiLkqKT | unnamed s | 0.019536 | 0.149536 | |
| 1D4aFFdFLS354rQ7MJjADhLMKyq | unnamed s | 0.007171 | 0.007171 | |
| 1FzkLyDNBoeJbHv9vffSw5bm72A | unnamed service | | 0.255 | |
| 31q1q174LGgJK2QyMWELmGXuR | unnamed service | | 0.01 | |
| 1AaY59NahrMAdBGyyuKcnyYnjHn | unnamed s | 0.004741 | 0.004741 | |
| 324j2QbC5WZNN6eTGecdV5bKbjl | unnamed s | 0.000692 | 0.000692 | |
| 3FHGpyohoeiXBs61sZjGhEopGDx | unnamed service | | 0.015 | |
| 164d9x4p9yX8sP1WparCFxBwnhl | unnamed service | | 0.15 | |
| 3GKTRi1xAAvHT1562kjj7JBNTWaY | unnamed s | 0.046499 | 0.051499 | |
| 1HUvMpbbiCEWeMNMFAVpKoAv | unnamed service | | 0.17 | |
| 14f5DsXVC MINE.exchange | high risk exchange | | 0.035 | |
| 3A3RsLwG2AWDcJxZcx3KcUCUYP | unnamed s | 0.028083 | 0.028083 | |
| bc1q8p4vmvg56e2q2ntpchgd2eg | unnamed s | 0.006008 | 0.006008 | |
| 36sH6xiMkUAqBB5pjWUSCM8dtE | unnamed service | | | 0.075 |
| 1KGPbQZL6VynNCZ8Ww19euHyo | unnamed service | | 0.01 | |
| 1AoJNaWXs6Tjv2WeZsCCd3ajMa | unnamed service | | 0.045 | |
| bc1qxjmm8fvdcxqur8r6m5j73g7p | unnamed s | 0.000896 | 0.000896 | |
| 31khhay5BmzwLSF2jmiwLJkqmSh | unnamed service | | 0.03 | |
| 17tkmccARrLjkJAjTcGPSzcQ1RLHy | unnamed service | | 0.7 | |
| 13LAVA8DHR23GhZX4e4bqZkWH | unnamed s | 0.007757 | 0.007757 | |
| 3CAaWUmXgw1ammiFEP7NGtZro | unnamed s | 0.018472 | 0.018472 | |
| 1Q2vBRTzl Cryptopay.me | merchant services | | 0.39 | 0.01 |
| 1LixFYFjEyrbrdyDqFwqtsQnjFGyqz | unnamed s | 0.001846 | 0.001846 | |
| 3K96HHBxSyzGhbYoYvemcZRMub | unnamed s | 0.008679 | 0.008679 | |
| 11EqVoGKdB9bzfCLWwb7SSqVYja | unnamed s | 0.004222 | 0.004222 | |
| 3CUfuDZkR8uC5hpMQs3dRs8J4A | unnamed s | 0.001124 | 0.001124 | |
| 38jADPP8c5N5YTKx2wUMh8M1P | unnamed s | 0.000739 | 0.000739 | |
| 3Gw1nBFBQGzznco6aqabcPSpe4 | unnamed service | | 0.01 | |
| 1CSq5C4HK9r4wMxP2AaiWNNXLI | unnamed s | 0.009039 | 0.009039 | |
| 1BcQC5wrdD8JZdEC4DrLxVcBph6 | unnamed s | 0.003625 | 0.003625 | |
| 14UfD6pjnMH7APduFLKFtTdFma | unnamed service | | 0.385 | |
| bc1q8sea3ekrmu4nu893zafyrecfn | unnamed s | 0.000867 | 0.000867 | |
| 1LnxBuv5AoBwws9JQBDGqdXcW | unnamed service | | 0.07 | |
| 1Ea7zHpBPUT2H9CVXyX5ae67u8 | unnamed s | 0.006773 | 0.006773 | |
| 1DF7y49Jr Mercatox.com | exchange | 2.160646 | 2.205646 | |
| 33bw5VKGiQKF4oLZ7GojnGiWWB | unnamed s | 0.01106 | 0.01106 | |
| 3Bc2TqaMvBwgTJLDLYjUtsFqRQ4 | unnamed s | 0.002922 | 0.002922 | |
| 1BBhCGPQ Changelly.com | exchange | 0.081969 | 0.841969 | |
| 1KjZBQ93a Gemini.com | exchange | 155.7452 | 309.9902 | 111.095 |
| 3B2doVSmsPMrcaiRgrpfJwEGX4JC | unnamed s | 0.012735 | 0.012735 | |

| Address | Type | Amount 1 | Amount 2 | Amount 3 |
|---|---|---|---|---|
| 1dMMyquhBaHHhnYPaCTiyhi8khc | unnamed s | 0.003592 | 0.003592 | |
| 1BoNpqLcQbn85m6ZNZjxovw7Lxl | unnamed service | | 0.005 | |
| 1Ha3dS6w Bitso.com | exchange | 1.794082 | 4.674082 | 0.005 |
| 1Kcr99fKKU7Wd2L3XQL1bweugW | unnamed service | | 0.065 | |
| 17XmGM8dRosxYHFAC75FEP5Tfq | unnamed s | 0.002153 | 0.002153 | |
| 3CUWuPdC Benumb Shop | fraud shop | | 0.035 | |
| 1DKfR4npVaxZqJ961WpT1epmwR | unnamed s | 0.020241 | 0.020241 | |
| 18uB3aM1bUNgatHHyLTTzMeCoH | unnamed s | 0.000864 | 0.000864 | |
| 3F5ntKAcfcjYATEzneRA82AvFm5v | unnamed s | 0.003913 | 0.003913 | |
| 3PUFyFj23RTUt4Wq9hJD48KRoAF | unnamed s | 0.001392 | 0.001392 | |
| 16jHJMr7WpKhNd8pdWr2MZ1pqi | unnamed s | 0.005648 | 0.005648 | |
| 15vwJpHJX XChange.cash | high risk exchange | | 0.005 | |
| 1XtfE15BnvtUScRLkbTvNFF8QKfH | unnamed s | 0.028516 | 0.028516 | |
| 1EzsmGzvSjWbqAq2RG66j9AwXN | unnamed s | 0.001235 | 0.001235 | |
| 15eyMeLG Dcoin.com | exchange | 0.27791 | 0.27791 | |
| 37xoqtqmbTfQKKRhmWTfgUYh1i | unnamed s | 0.006037 | 0.006037 | |
| 1FbT8qydDBCtRWdj2g7oYzGUs19 | unnamed s | 0.001357 | 0.001357 | |
| 1J4ph5FLe UnitEx.one | exchange | 0.282894 | 0.287894 | |
| 1QGnvUa6DRqrofDsbos6ytANEmc | unnamed s | 0.002577 | 0.002577 | |
| 1BK79K8R7mqMYowAB9BrPFBG5 | unnamed s | 0.010329 | 0.010329 | |
| 1MjECsYrdRWWvzD74316jzEHA8H | unnamed service | | 0.005 | |
| 33z6oGnxNE2Y6B4cUdncrTWd1Js | unnamed service | | 0.005 | |
| 3HsAvCQuPLPt9hpRnDUeyszsMxS | unnamed s | 0.001562 | 0.056562 | |
| 36YS2yKrW EurekaX.io | scam | | 0.005 | |
| 33gDXMpnhRTL5kiuFZZhq1E13Ms | unnamed s | 0.029907 | 0.029907 | |
| 1KAxxNZTuHDD12CvBMWP9HkxL | unnamed s | 0.005014 | 0.005014 | |
| 3GbbdVuHSn3xdT6f4GcAdwveNB | unnamed s | 0.004033 | 0.004033 | |
| 15HNUoVES8HaVteMnejgejJHNuR | unnamed s | 0.02471 | 0.02971 | |
| bc1qpupge SamouraiWallet.com - | mixing | | 0.01 | |
| 1M9rpQ2g GoUrl.io | high risk ex | 1.400457 | 1.685457 | |
| 1PTC5ewvCY76AysN961vCe1ftq8c | unnamed s | 0.429182 | 0.429182 | |
| 13D6QVUDRbX5vmmXcmbMViMS | unnamed service | | 0.025 | |
| bc1qv6scxvy6p5v58ukrnrxpjyjyt0l | unnamed service | | 0.07 | |
| 17a9fnAsR9fbdfgGuGd32AKkqZVB | unnamed service | | | 0.005 |
| 1MLy9sruz56qRDxxsiTYmxJ6CKYfl | unnamed s | 0.000281 | 0.000281 | |
| 15opG1AXbpJcyJ7GVi4yNy6FZki7p | unnamed s | 0.015786 | 0.015786 | |
| bc1qapqnx6gcevs8v4ess4djf5466j | unnamed service | | 0.005 | |
| 32HoFfZbSAw9jDhT989F1sVhPyJN | unnamed s | 0.01676 | 0.02176 | |
| 3JysdboHfxJNJAyA51wkqsK9QNnS | unnamed service | | 0.02 | |
| 3AYgpr6JB( redeeem.com | p2p exchar | 0.220948 | 0.220948 | |
| 3DDmbqTJst3nkEH52K IDDB4K3SA | unnamed s | 0.009988 | 0.009988 | |
| 3NDfmk6VLRq5Z4Qxt444qAAeL4T | unnamed s | 0.034107 | 0.054107 | |
| 16yvmY8LA1RXhWVfmYLSRyT6BD | unnamed service | | 0.035 | |
| 3E7YbpXuh Chatex.com | high risk ex | 0.009663 | 0.049663 | |
| 19FXJx57tx1yNoNHq8eMiqxndQC | unnamed service | | 0.05 | |
| 1MmV7Xxj BKEX.com | exchange | 0.087941 | 0.117941 | |
| 1HYCSQdbq8YZroLB5fbTnAZFH6d! | unnamed s | 0.001767 | 0.001767 | |

| Address | Type | | | | |
|---|---|---|---|---|---|
| 15PugmmLmdGnerz4Xwh7gbwPz | unnamed service | | | 0.015 | |
| 15jHo7ezu | NYDIG.com | exchange | | 0.055 | 14.93 |
| 18SxtstZnjCnRBVnGMK8MEhnAZb | unnamed s | 0.001294 | | 0.001294 | |
| 3NFxWYCQJNCybvMUhdeutyjW6f | unnamed service | | | 0.005 | |
| 1MpEYiDDQbganpuFGommYxb5ty | unnamed s | 0.031507 | | 0.031507 | |
| 37ZzPpS7ewammcyMsG2cFHUWl | unnamed s | 0.020403 | | 0.020403 | |
| 1A1sj3sDPWDxtt2saBdvKHuhB9vF | unnamed service | | | 0.32 | |
| 3FamvQdaUxHBUUbcSufjKAGAhC | unnamed s | 0.002268 | | 0.002268 | |
| 1PkkdNAQ6z11ez6iD2vbtv9jph8D | unnamed service | | | 0.035 | |
| 3Abw48AY | P2PB2B.io | exchange | 0.343725 | | 0.393725 | |
| 1EyUhw3GwsRGATABpP2DBZRqh | unnamed service | | | 0.065 | |
| 1F4Umi6h | FXInvestmentsLimited.scam | | | 0.17 | |
| 13pYnRCihur8JB5tSmtCz37nQ4n6 | unnamed s | 0.003307 | | 0.003307 | |
| bc1qesg5fqu6rhj4umk9hazlzjaa42 | unnamed s | 0.016043 | | 0.016043 | |
| 1NYcKuujVTrMAQks3tjgjLePvjbes | unnamed s | 0.011416 | | 0.056416 | |
| bc1q8n3q7r6rs07szetkmzyyx0xp9 | unnamed s | 0.001167 | | 0.001167 | |
| 13PaVyCKn3GknzNXUmHar3HUTF | unnamed s | 0.006038 | | 0.006038 | |
| 1Ayz1YQTjexp8ouiCxBmQ9PNAG6 | unnamed service | | | 0.005 | |
| 15WgajYQbMFENQQm1dpXv2LW | unnamed s | 0.014405 | | 0.014405 | |
| 14VbVafSR | Iconomi.com | exchange | 0.005011 | | 0.005011 | |
| 3DHy26eTz6AMmJmdbuawzc7egl | unnamed s | 0.003597 | | 0.003597 | |
| 1LwV8T7Q | BitSeller.com.br | exchange | | | 0.035 |
| 37KWmcVfw8qcbmq6pLYKaC8eU | unnamed service | | | 0.27 | |
| 36qbZbZ2N | BitMix.biz | mixing | 0.041276 | | 0.136276 | |
| 3Ev6xoY3FpXWzeL4FHmbjStTJkFb | unnamed s | 0.003335 | | 0.003335 | |
| 1ByMKvJhYgdANSriHcbJ8j9pj4wd | unnamed service | | | 0.095 | |
| 1PGd2LvCrmXLbfcLR25FdroxwUR | unnamed s | 0.006097 | | 0.006097 | |
| 3J9MjMz5k | SparrowExchange.com | exchange | | | 0.01 |
| 1LC5iDQTu2RSbd9HgCw6Eo3puH | unnamed s | 0.000534 | | 0.000534 | |
| 17kQY6j4TjBo11qiziPJ2vKYYHuVC | unnamed s | 0.000843 | | 0.000843 | |
| 1P8RpGV7WYHiBLZH9nhxeZkLAG | unnamed service | | | 0.185 | |
| 1Cmkq5Zq | 365Cash.co | high risk exchange | | 0.03 | |
| 1HvjUWDYMdU1X8ekojQUJsxxkti | unnamed s | 0.00588 | | 0.00588 | |
| 3466VynRfGWJNhqoxCrG7RXm6n | unnamed s | 0.005528 | | 0.005528 | |
| 3H8QATgbGy6V7nVuLq655f9JzM/ | unnamed s | 0.388366 | | 0.388366 | |
| 3N9YydsiGyRwPD24RfDzUEyd3qH | unnamed service | | | 0.015 | |
| 3B15Y4MPvXZZDnKW4bBecTSEDp | unnamed service | | | 0.01 | |
| 1DqDqJTBr | Huobi.co.kr | exchange | | 0.015 | |
| bc1qdnqwj9yvq4wg4vkrc27c36za | unnamed service | | | 0.005 | |
| 18i4hFd2gf | SofTradeAI.com | scam | | 0.01 | |
| 12nnBHpxgryGatWzbkeUGGmMZ | unnamed service | | | 0.01 | |
| 3A3ZTN5pDizRZ57aour1Mmk4FjJf | unnamed s | 0.026222 | | 0.026222 | |
| 3JU4FDpKAoyLH8D6jUmuhM8Y1k | unnamed service | | | | 0.01 |
| 12LKg79Jk | Hodlnaut.com | other | 30.98483 | | 31.78983 | 0.065 |
| bc1qzqye8dsfq688lzkjlrlqlvkdtey5 | unnamed s | 0.008031 | | 0.008031 | |
| 1A87YAygokCwnTW4h5bp4Lh5Eq | unnamed s | 4.190968 | | 4.390968 | |
| 1583MDNI | SharedCoin | mixing | | | 0.01 |

| Address | Service | Name | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|---|
| 1MkF9SNp | Unicc | fraud shop | 0.145763 | 1.120763 | |
| bc1q7wlf2ughu9sfc0s6drmruzevlj | unnamed s | | 0.001559 | 0.001559 | |
| 38DPYmsa | MoonBit.co.in | other | 0.01014 | 0.01014 | |
| 3BRcC5jBbocgMefRGGNmPABi9R | unnamed service | | | | 0.02 |
| 1Fpw5pdDRsQfhnKtSxnmBwq8Un | unnamed s | | 0.109839 | 0.109839 | |
| 1LUUEYsHMEg8JvzJH251tVyRMLv | unnamed service | | | 0.005 | |
| 13MbC1db3SKvrKNj5BY7mKfd7vn | unnamed service | | | 0.025 | |
| 31vDoGasF | LoanTech.top | scam | 0.025733 | 0.025733 | |
| 3MKN5LeH | BlockFi.com | other | 731.833 | 804.933 | 0.285 |
| bc1ql6u33mhlphh6dgs8h7yxexwq | unnamed service | | | | 0.015 |
| 34xtN7A4opZrfv6nJXoA456iwzmrl | unnamed service | | | 0.005 | |
| 3HkuJftKFg3pX91Lj4LhGXQHbXrN | unnamed s | | 0.00381 | 0.00381 | |
| 1DSuPnFWPpKRPBSLK4gByhRPAiE | unnamed s | | 0.004082 | 0.004082 | |
| 3NQKVhtdtdCkDEnvXRkh9C1sP5vl | unnamed s | | 0.100796 | 0.105796 | |
| 16fnGyWd | Bustabit.com | gambling | 0.081324 | 0.136324 | |
| 1NsHkqN5B9moZKyW4fGonPCqjC | unnamed s | | 0.001954 | 0.001954 | |
| 3MmB3oo | BitGo.com | hosted wal | 80.13458 | 88.88958 | |
| bc1qfelyrhfs0wy4un5pc3jjfxh6ndt | unnamed s | | 0.048 | 0.048 | |
| 34T17offw6vUXJNZpEEkBsueYB8y | unnamed s | | 0.004325 | 0.004325 | |
| bc1qua22vyg0k9mfdas7ta96mfk8 | unnamed s | | 0.050179 | 0.090179 | |
| 16G9EaR2RFBRVM6pBrEv2SKmojr | unnamed s | | 0.010816 | 0.010816 | |
| 18X7JgctubT83RBU4o6fKMNKU9g | unnamed s | | 0.002259 | 0.002259 | |
| 3NNCq6DH | PhenixFXPro.com | scam | 0.237859 | 1.112859 | |
| 159EEUiedzih7Uur1f5GBCmrjaAC | unnamed service | | | 0.015 | |
| bc1qtz65n63280s97tl8jvyr3edj73 | unnamed service | | | 0.005 | |
| 399CmEWbbdAgxkaiLAasrNEAan7 | unnamed service | | | | 0.01 |
| 1H4yEmGVE4SffiXcm2Y1c6obwpg | unnamed s | | 0.001192 | 0.001192 | |
| 1MQKX68y | Cumberland.io | exchange | 0.108488 | 0.758488 | 45.5 |
| 19yTZ9E7C | AmericanCrypto.com | atm | 0.091343 | 6.096343 | |
| 13AyBJMyUzxm6FEBihM34YYAX8 | unnamed s | | 0.003685 | 0.003685 | |
| 38wChBzgKEZsngXukpDjLA2fubbe | unnamed s | | 0.035594 | 0.060594 | |
| 3FSYFUHL4yTMAwRrkc24vp75Ebs | unnamed service | | | | 0.01 |
| 1EVCVf97v | AlphaCryptoMiners.co | scam | 0.005472 | 0.005472 | |
| bc1q8gffqsv0cfysgwp88yfrkgnh2y | unnamed s | | 0.001867 | 0.001867 | |
| 3QaRFHyrk | LocalcoinATM.com | atm | | 0.295 | |
| 3AEYyQ1jvQR1JFKTjctNapWU2jXg | unnamed s | | 0.199898 | 0.204898 | |
| 33a8xqHz8fQypuEGDs8eokyoqcel | unnamed s | | 0.003826 | 0.003826 | |
| 37DnnpXebGJC72bAfAXqZZaeXBA | unnamed s | | 0.538592 | 0.598592 | |
| bc1q2605l02qmjdvxvk2mx33q9ks | unnamed s | | 0.038098 | 0.108098 | |
| 1JvMhYCDgYiktFDqL1sxwqfjkeQq | unnamed service | | | 0.015 | |
| 3AN6ohwQxuiGYW6ngF3yUHFCDI | unnamed s | | | 0.005 | |
| 1AzVJz2fg1id6cwzhaEiRePTtKrnxr | unnamed s | | 0.014476 | 0.014476 | |
| 1H1Hsn1EQhRqeQQU8A9zEF4Qu | unnamed service | | | 0.425 | |
| 135cH5Frc55pJu9RFQj79vBPdjAS1 | unnamed service | | | 0.04 | |
| 1H2U97kR | BitBonus.top | scam | 0.005 | 0.005 | |
| 19omSnSYQgX4UVAd6WAanteR3r | unnamed service | | | 0.615 | |
| 3A3RgxWq | BTCTurk.com | exchange | 1.320529 | 1.860529 | 0.025 |

| Address | Name | Type | Value1 | Value2 | Value3 |
|---|---|---|---|---|---|
| 3777wEHpEzLFVCyV16EnoZYyao8 | unnamed service | | | 0.005 | 0.065 |
| 1Ba7moKd | EnvyCorporation.com | scam | | 0.005 | |
| 1AZtbQDxWATKDMnTQo8Xd62EL | unnamed service | | | 0.01 | |
| 1QHmqSYp8Dce4wsFiNhqmQKRJ/ | unnamed s | | 0.000911 | 0.000911 | |
| 3A6Kqp5Er1rns14VVvEkH8YDXAK | unnamed s | | 0.001738 | 0.001738 | |
| 3CC3TUF1b4tyUG7GNZkMm3w5D | unnamed s | | 0.000972 | 0.000972 | |
| 3HPQs3vgD2RSx8EkgWfjeLaDQBF | unnamed service | | | | 0.01 |
| 1LsQcrpHbFeWQdovz2Vs7hGqCta | unnamed service | | | 0.02 | |
| 3KGJW6zRekqazyKMX7WGzwrM7 | unnamed service | | | | 0.01 |
| 1ATn1Sc2hiGemHmSCW2HJnQJj4 | unnamed service | | | 0.005 | |
| 37MghJLTZ | Xpesa.io | exchange | | 0.01 | |
| 1KHQhdH3GB8rDuQMuKe8eXaQ3 | unnamed service | | | 0.035 | |
| 1Mi5KTCvo8E6CWwKctPSqvoSEgc | unnamed service | | | 0.025 | |
| 1D4gWiUzdizpsA7TxCyNQBM1JCZ | unnamed service | | | | 0.005 |
| 12ZKAKZgF | Antares.trade - InterCh | scam | | 0.185 | |
| 33PggwXzAawDB8XhUouQN4N5c | unnamed s | | 0.019796 | 0.019796 | |
| 15f9cZMxw | FatBTC.com | exchange | 0.006192 | 0.006192 | |
| 34Q11fgea | Bitcoinz.io | other | 0.000937 | 0.070937 | |
| 1FqLEWyMKpp71pWMxYzPdvAn6 | unnamed service | | | 0.03 | |
| 156k47MTHTsfEXUb8JM4K4b3nPr | unnamed s | | 0.053498 | 0.058498 | |
| 18JMZyduBcAY1HzcTMkD9gVeUq | unnamed s | | 0.000819 | 0.000819 | |
| 33TdfNrWt | Nominex.io | high risk exchange | | 0.11 | |
| 37Y9stfVioqhZu2QU8ZHCiucHFo4! | unnamed service | | | 0.035 | |
| 35CxrW6zgYwuXSjAfp78QKi8doyZ | unnamed s | | 1.912133 | 1.987133 | |
| 18zucdrZwBsNZXNC5MxkJT15WhI | unnamed service | | | 0.005 | 0.405 |
| 3MD2MuM3m25TBFB1kjMjN7kQ! | unnamed s | | 0.125 | 0.125 | |
| 1GkY5jm6Qyze3aTdQ9xwfiShPhvs | unnamed s | | 0.000115 | 0.000115 | |
| 17Vayoqdx | Chamath.charity | scam | 0.052689 | 0.052689 | |
| 18wBfiXMCjBFJeRG3PFzLMjynPQv | unnamed s | | 0.009046 | 0.009046 | |
| 1Kw5Sjoz1geC3deejiGhicBajC5Lxq | unnamed service | | | 0.01 | |
| 1A6x2cSUkeHJPUjHd8c2gQ35d5y1 | unnamed service | | | | 0.005 |
| bc1qjryksn26xg9nwj277xrjdpmd2! | unnamed s | | 0.001261 | 0.001261 | |
| bc1qqdqjethqk5z8tj862zlv2t75e2r | unnamed s | | 0.014495 | 0.014495 | |
| 3BFZt5kuWjXETZrUXBLvnzSTdAj8> | unnamed service | | | | 0.005 |
| 39xZ2eEMb38C3XmykJVPwcUcQy | unnamed s | | 0.009617 | 0.009617 | |
| 18YgfT9AW | FaucetHub.io | hosted wal | 0.001 | 0.001 | |
| 3NLJ4XSxG73opUVEUFtcNRxEu2r4 | unnamed s | | 0.028788 | 0.063788 | |
| 1qPwtQsVFi3Cjy9btR6Hxu5cGdktj | unnamed service | | | 0.025 | |
| 1ENmnkfFU7o2hhipBPBSzsQzToa4 | unnamed s | | 0.006608 | 0.006608 | |
| 39dha2GLL | Bitladon.com | exchange | | 0.03 | |
| 1CNZtzXSEW6bUqb9q4GRZukBU7 | unnamed s | | 0.003323 | 0.003323 | |
| 3DU2s6QA | trade.mn | exchange | 0.000271 | 0.000271 | |
| 1JB7uHk3qw1Qhxf1DqW6GHPetC | unnamed service | | | 0.035 | |
| 18EoVvWbQu9sQPAmtS4yUN2WJ | unnamed service | | | 0.16 | |
| 141qBgFW | EuCanna shop | darknet ma | 0.00815 | 0.01315 | |
| 15HTDcJot5A8PVLhnn9Eu8QRzQz | unnamed s | | 0.002522 | 0.002522 | |
| 1H6YiHSjkG9AmzmmQRbuyUNvF1 | unnamed s | | 0.009999 | 0.009999 | |

| Address | Name | Category | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|---|
| bc1qsmkl0mqau8zqscnvu3yzja3yx | unnamed s | | 0.005644 | 0.005644 | |
| 18J8oNYjem7DbSsLvtuN4NNM1R | unnamed s | | 0.0207 | 0.0207 | |
| 1FZSTcBcJdkNWqsa18Sc71BaA6xh | unnamed s | | 0.00298 | 2.30798 | |
| 18WhedLC | BitBazaar | darknet ma | 0.04395 | 0.06895 | |
| 16NCFv5bhG5qYW7wTMzvaJjjkml | unnamed s | | 0.012169 | 0.012169 | |
| 39dQjQYpVRpH59eUJGM85teGGh | unnamed s | | 0.050748 | 0.050748 | |
| 3C3wyZ1wzDH3ror1qaqe6ZmCMN | unnamed service | | | 0.135 | |
| 367PqwMkucRjmwy9HXRmWRcG | unnamed s | | 0.13861 | 0.14361 | |
| 137mEaUo | IndependentReserve.c | exchange | | 0.03 | |
| 15ZQnzRztw9ViUWSWRsWZNryx6 | unnamed service | | | 0.085 | |
| 3Lpoy53K6 | Garantex.io | high risk exchange | | 2.365 | 0.01 |
| 36EAqnTD | Nexo.io | other | | 1.525 | 0.09 |
| 16r3FLpxvdT9DF63JgpEmXdChFbT | unnamed s | | 0.001294 | 0.001294 | |
| 3PNVF8CrD | Oscar Market | darknet ma | 0.037893 | 0.052893 | |
| 14W6yxEWceVbLB2gfyTMKtn7S6 | unnamed s | | 0.002173 | 0.002173 | |
| 3KeaqbtvqVKegVUt843ZHD6jKB1 | unnamed service | | | 0.005 | |
| 36dnwzxq4c4h44ykAb42jErcMsv8 | unnamed s | | 0.022859 | 0.022859 | |
| 3HmJA7RMRGuZ9xC1HDLQ9XT7t | unnamed s | | 0.000269 | 0.000269 | |
| 13KDrw4dfZaWvoi9K2Lao1UDTLx | unnamed s | | 0.00107 | 0.00107 | |
| 191MS7KXEJgAnojcTuJ8icE6kjTVs | unnamed s | | 0.020374 | 0.025374 | |
| 16wnuWtoqsZ6PSqugwyez1K58y | unnamed s | | 0.002062 | 1.822062 | |
| 1EmurJhDveid7EhotJJTtJ6RaFyP9z | unnamed s | | 0.690781 | 0.750781 | |
| 15TSfuWQ8b3M29vBrBFVXJUxYb | unnamed s | | 0.50387 | 0.68887 | |
| 3HR1hQ53Laec8hYudhui3PwBy67 | unnamed s | | 0.00036 | 0.00036 | |
| 1McdkAP2zFuuVrBM83nkvb1VPq | unnamed service | | | 0.005 | |
| 1HgAEBzU | Reported as PedoHub | child abuse | 0.0054 | 0.0054 | |
| 3HfrSzhhegGzKdRpNgkLABKiMj3W | unnamed s | | 0.00103 | 0.00103 | |
| 35qsCvSDnBYYT4wbKwTDjAEpA8t | unnamed s | | 0.00461 | 0.00461 | |
| 18J4fdz6cxn41JpaqLRSZ5RTaczK6 | unnamed service | | | 0.005 | |
| 1JK29mX7PMLBgcyzkpjFATuvEQn | unnamed service | | | 0.08 | |
| 1Hn2ybVKbY9ag6p1sKcXs3UmrXE | unnamed s | | 0.00259 | 0.00259 | |
| 3NMMnhB | Catex.io | exchange | 0.001107 | 0.001107 | |
| 32KVon8LE | Blockchain.io | exchange | 0.000811 | 0.000811 | |
| 1yotjzTSv14SfuYJv5Lp | victim 1yot | unnamed service | | 0.21 | |
| 1HYXxcoTjvXY99ebm5kPtkR4xuiv | unnamed s | | 0.007252 | 0.007252 | |
| bc1qcwx76rgf039u6xdta2esvmrf9 | unnamed service | | | 0.005 | |
| 38N6Gks8 | StormGain.com | exchange | 0.006947 | 0.031947 | |
| 12owGNjbZodRWnyqWzkT98GPk | unnamed s | | 0.003385 | 0.003385 | |
| 33KMUxqH | Zipmex.com | exchange | 0.000131 | 0.000131 | 0.025 |
| 1LJ9hZzWr | TeslaPortals.com | scam | 0.02 | 0.02 | |
| 1DddrCpMTbepvJUUL6Fj3VhDthn | unnamed s | | 0.014404 | 0.014404 | |
| 1A45YNkq4UmZR8R13Sz4ufPGwD | unnamed s | | 0.007586 | 0.007586 | |
| 3H86ixtY5nJp15VMRamCeBeLfJbL | unnamed service | | | | 0.01 |
| 17MyHfvS | Games.Bitcoin.com | gambling | | 0.005 | |
| 136gLDuSxeN7sUFwU8bsFHzR2Ct | unnamed s | | 0.002066 | 0.002066 | |
| 1DFzYgfExcuxypVDX1B7njfL1Lx4jF | unnamed service | | | 0.035 | |
| 39A7KcdM | BitLeague.com | exchange | 0.000598 | 0.010598 | |

| Address | Service | Col1 | Col2 | Col3 |
|---|---|---|---|---|
| 37voWNe9qjyMXJCkuz6jCFUnz58 | unnamed s | 0.309827 | 0.369827 | |
| 12mmtry9g2r8c79ZsGwDwGKeyL! | unnamed service | | 0.02 | |
| 34BvsSGbRDyrgHmYE5HayeZN2zC | unnamed service | | 0.005 | |
| 32yFpAgSE EmpiresX.com | scam | | 0.005 | |
| 1FHse1FWHqCiTwpcKVPKyQ9GwF | unnamed service | | 0.47 | |
| 32rGnSNfp8BHgeauw\ Bitrefill | unnamed service | | | 0.04 |
| 15TCEmRShEqgrashzvUDhA33PGp | unnamed service | | 0.04 | |
| bc1qw5c52mc9hfsfra0d5huteejte | unnamed s | 0.001709 | 0.001709 | |
| 1Q9VoyyPJebxL9UnDSymetPSpyw | unnamed s | 0.01515 | 0.01515 | |
| 156o2isRqEVSV3jCqRqHDTXx1Sso | unnamed s | 0.01102 | 0.01102 | |
| 36B7iZmKZ Bityard.com | exchange | 0.362621 | 0.367621 | |
| 1BVqUmgs CryptoGenesis.net | scam | 0.008192 | 0.008192 | |
| 1KLcVJm3KiGXDEHgXrVJMQMxBF | unnamed s | 0.003657 | 0.003657 | |
| 343QtcNdvmrthGtcF6NEukq35dfC | unnamed service | | 0.005 | |
| bc1qmjnx037t0rh7rwlnalf7nxc55f | unnamed s | 0.001586 | 0.001586 | |
| 34PGryFxecSFU1NMZxDjKco8u6JA | unnamed service | | 0.01 | |
| 37RLGC2SRS33YimXEoB6xPXh2aW | unnamed service | | 0.01 | |
| 3D3TkQ6S: Elude.in | high risk exchange | | 0.01 | |
| 3ECzWyTkWgLryGPf8wdygM8RGj | unnamed s | 0.002027 | 0.002027 | |
| 3MQPcNMSAnYBUbxmGdrJ6e16b | unnamed s | 0.003731 | 0.003731 | |
| 1HnPADti8JKxxc7Ng8VnqTVu6yvh | unnamed s | 0.002773 | 0.002773 | |
| 13K2quuzE LuckyFish.io | gambling | 0.059632 | 0.059632 | |
| 3QjVu6aYVtDm9sQrQHbkkcgdAgh | unnamed s | 0.01189 | 0.01189 | |
| 33f9wZshXRAdd9rMZLwZDqgiyTN | unnamed service | | 0.03 | |
| 3A1e63Kor Bitrefill.com | exchange | 0.109559 | 0.264559 | 1.19 |
| 3GgFnPqrCKfv5yFSfxBeSSqzcqUM' | unnamed s | 0.002117 | 0.002117 | |
| 3BYzwtQPmKueon3kmT91WVrN8 | unnamed service | | 0.005 | |
| 1GemEmW Gemini-Verify-Transac: | scam | | 0.06861 | |
| 3GAc7Shcq Coinfield.com | exchange | | 0.04 | |
| 3CTRXKCmiPRuVNE72wjtkhL15zZF | unnamed s | 0.004126 | 0.004126 | |
| 1LPw3onMWAd8CJDrqDpKiz3qgs\ | unnamed service | | 0.025 | 27.26 |
| 3MEVYLXxsnuajYpVHQE2pf4RdNS | unnamed s | 0.002286 | 0.002286 | |
| 15Vfbk8PTnM27BvTmDxoVockBv! | unnamed s | 0.009315 | 0.009315 | |
| 3J1Cz6p2wnTkBEoqQkuSMqw1Z3 | unnamed service | | 0.005 | 0.035 |
| 1A8TY7dxL Discus Fish (F2Pool) | mining pool | | | 0.11 |
| 114Wp5pmR7wBhGZuaixBgeUxZV | unnamed s | 42.84636 | 45.72636 | |
| 33ns4GGpz AMFEIX.com | scam | | 0.655 | |
| 3NFD7MpmJ122xGqegRcKoKto5Z | unnamed service | | 0.005 | |
| 17TquZTTHEjE9Y3Pqeu7tYaSdH6B | unnamed service | | 0.785 | |
| 3PczVixDogf47DmEAmELn5zoj4Rł | unnamed s | 0.015484 | 0.015484 | |
| 16tSTAxtH5K8FiMcXeiTNkE8gwRp | unnamed service | | 0.015 | |
| 1C73949BFzz2EadHvXrUFUX74E1k | unnamed s | 0.000577 | 0.000577 | |
| 16gup43TvSHhqn6bFZnpnKJezoN\ | unnamed s | 0.004982 | 0.004982 | |
| 1MTKLNMUy3pwtQ5yssViewsTGc | unnamed s | 0.001824 | 0.001824 | |
| 19x7eBrtAgVRdj3E8YbQ51j3aUhvl | unnamed s | 0.002844 | 0.047844 | |
| 17eeEzVcS2LfZyjmz1qHn8DoFWtE | unnamed service | | 0.01 | |
| 1PtNbx2tv8MBovyUdrJnckkgFKGF | unnamed service | | 0.085 | |

| Address | Type | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|
| 14zDZEGULYzCc6vepZ5awSnZ9RW | unnamed service | | 0.09 | |
| 1CtCSCvL4Y8PoSgMg1nujgxmiYKd | unnamed s | 0.005941 | 0.005941 | |
| 16aZ1paoMw7RkPy4FdoqdyThnM | unnamed s | 0.006613 | 0.006613 | |
| 1AoYRsMkjVilkov.com | high risk exchange | | 0.02 | |
| 15AUwwGeHrco3V1mBLFxH2SgBi | unnamed service | | 0.01 | |
| 17EKhHipQjJ8prCMFV9NRCfa2Yng | unnamed s | 0.0105 | 0.0105 | |
| 16VNnvh8j Luno.com | exchange | 21.5474 | 27.2524 | 0.055 |
| 1CmXNFiVAXvLRT8Y2DLye9KG5C2 | unnamed service | | 0.315 | |
| 3BkRY9CwvCSAp9r6tMPRv2nzZZzt | unnamed s | 0.011795 | 0.011795 | |
| 1MUGww5KWPv4ijtnVSgwigxLYCr | unnamed s | 0.096636 | 0.096636 | |
| bc1qezl6mwfr350jg3unruy6u4d45 | unnamed service | | 0.005 | |
| 1JpZj7RqMdoAiAsQqqqWAfG9YM | unnamed s | 0.021408 | 0.046408 | |
| bc1qhnzkzfj2d2fvujrc4tl5c3tjenxcv | unnamed s | 0.002435 | 0.017435 | 0.065 |
| 1AKDBpNVDdgvz4JdqdrWHpgGU1 | unnamed s | 0.00122 | 0.00122 | |
| 1GS214v8V42G59p1BFcVWywqW | unnamed s | 0.002502 | 0.202502 | |
| 3P5S7fAEEm238QqSXYb3W9WyA! | unnamed s | 0.001 | 0.001 | |
| 17GJY5exG EpicsTrade.com | scam | | 0.015 | |
| 3PC3ZWZPxnP3QcLQ4XgmVE6aBS | unnamed service | | 0.005 | |
| 35zk7m7fC MuchBetter.com | merchant s | 0.01723 | 0.55723 | 0.025 |
| 15VyEAT4L Bittrex.com | exchange | 197.9562 | 207.1862 | 0.985 |
| 19GBf7zTw7CxwtQq6M6vKmAqoi | unnamed s | 0.010204 | 0.010204 | |
| 1Ld3rkwjQzPggrEz7ktDBMkBDogk | unnamed s | 0.022925 | 0.022925 | |
| 1K75wviRC7YfH8d1X2wcE7UBAJX | unnamed s | 0.002062 | 0.132062 | |
| 3HPxNhffR9CS7zqYb2WqT4h2Z4W | unnamed service | | | 0.095 |
| 3Fr99x1SL8 VALR.com | exchange | 1.08411 | 2.05911 | |
| 1XPTgDRhN8RFnzniWCddobD9iKZ | unnamed service | | | 0.005 |
| 32RhsN5AZLfdZVQg4R7pmj8HTg1 | unnamed s | 0.083521 | 0.128521 | |
| 3GnT32omrZi5DrF9Jk1Xa4N1NWk | unnamed s | 0.004437 | 0.004437 | |
| 37SsJLAHKrhPFwcwWqNVU9LDW | unnamed s | 0.006573 | 0.011573 | |
| 1EHyTkZh6tA9dsHFJEDVr5DK5QA | unnamed s | 0.340047 | 1.225047 | |
| 3QRL3yfeAxbsfMrwa7nMBdv3SuT | unnamed s | 0.000461 | 0.000461 | |
| 16N6X8XH7dgzdYyu3JLuNdX5jUW | unnamed s | 0.023124 | 0.153124 | |
| 15gNq98R\SimpleFX.com | exchange | 0.018147 | 0.148147 | |
| 1Bnu8HLgg2FavyUkz82ETWPYCd5 | unnamed service | | 0.015 | |
| 1K7WvCQuwbaSAsFMgSYnq6JnRC | unnamed service | | 0.075 | |
| 3NKhYk4EaQ8GaR5Amy1YYQfFoT | unnamed s | 0.008109 | 0.008109 | |
| 1AcCxTQT7YKHkENuDRvTTcrX5W( | unnamed s | 0.001826 | 0.001826 | |
| 1KcZqjt5vb Unknown - OTC relatec | exchange | | 0.05 | 204.93 |
| 1GPEbMQg67br3EQTsSgs7jK7ivCN | unnamed service | | 0.26 | |
| 3CzWovvcncUkvkiHisr;N.Exchange | unnamed service | | 0.7 | |
| 17QVX2ugVwYmBgMDCAJWh3g3i | unnamed s | 0.005935 | 0.005935 | |
| 1FSNfNyfkXMGKCJxYykVtzKHaLgC | unnamed s | | 0.155 | |
| 3GpofzwwpGLAfXk86FLw3Mk2wu | unnamed s | 0.001681 | 0.001681 | |
| 1DoRgnxshukgnj4jJTsXwMZzNcGC | unnamed service | | 0.01 | |
| bc1qzr5cxpx9mslh2l227z6nsxn2se | unnamed s | 0.006178 | 0.006178 | |
| 3KCcjT1tyXaMzWW9Jfi8ur3oXztCr | unnamed s | 0.008414 | 0.008414 | |
| 3K2L8i3rPiLA7mkjeLTwLPnxPzMJy | unnamed service | | 0.005 | |

| Address | Service | | | |
|---|---|---|---|---|
| 3Qv2BQ8wwJ44tHFfshDvZhGppEl | unnamed s | 0.000116 | 0.000116 | |
| 1GLFrsaPBWusZEJJTav4YZMXS4JJ6 | unnamed s | | 0.56 | |
| 1HwEvPfCPWaiQRHxP7HJ1SJzLnEi | unnamed service | | 0.04 | |
| 1ErssAPJml | Bixin.com | exchange | 0.000457 | 0.215457 | 0.17 |
| 3QBftkBUXV4UqQYs4XSDvxj9QFV | unnamed s | 0.00215 | 0.00715 | |
| 3A85PgRyeyT8cohfzm26En46S2X4 | unnamed service | | 0.005 | |
| 1ECTQbBRMLWCeV9He6rMqYa2c | unnamed s | 0.001433 | 0.001433 | |
| 1MMieEhfxUDJz2A2SieCLRLNSSjrc | unnamed service | | 0.025 | |
| 167QN5vaa8ipNstCHbUmHKAPSN | unnamed s | 0.016637 | 0.016637 | |
| 3LQrqinngZFC7gb752KEVByXrcrLY | unnamed s | 0.252817 | 0.332817 | |
| 1M1PzW3hgGSMFnSQ8zqggGom6 | unnamed service | | 0.035 | 2.73 |
| 12jS7KygCl | Phemex.com | exchange | 88.97622 | 95.87122 | 0.005 |
| 37Ggwkz52fJGCNJVdPadeiNSBZQ | unnamed s | 0.360013 | 0.385013 | |
| 3HM7MkB2LDggqQb3rmfq6kbd3) | unnamed s | 0.002486 | 0.002486 | |
| 1DQnH5T59iLbZYCWbjEo3dnBcFB | unnamed s | 5.248002 | 5.663002 | |
| 1KUiVbG5DNgRMnkVesUFEes6Lp; | unnamed s | 0.010704 | 0.010704 | |
| 39VmhqzY6esFYg2gTS24ZCqk6caF | unnamed s | 0.0078 | 0.0078 | |
| 338zoeAKN | KOT4X.con | IV2SER447 | exchange | 1.565039 | 1.900039 |
| 1F1sfcDMY | OKEX.com | exchange | 2.738236 | 8.128236 | 8.89 |
| 38wEjuX2F | CyberBTC.com | high risk exchange | | 0.015 | |
| 38dJZXrzdUxj3B6oZz9Y65Kb5JY2Q | unnamed s | 0.004445 | 0.004445 | |
| 1N7Hqv8r9k3Zxia5eecKD8HSqyoV | unnamed s | 0.001937 | 0.011937 | |
| 1DfyApKmrPVQna4DCN7fuPXYJQ( | unnamed service | | 0.125 | |
| 18uCCYLV1x29jNiTRLae8JhUv3MN | unnamed s | 0.006028 | 0.006028 | |
| 3K2RULtA4R1YfYKrkfzz12paTnojQ | unnamed service | | | 0.03 |
| 38ndGuobl | Russian Market | fraud shop | 0.004011 | 0.029011 | |
| 1CsWMDCr4VomV58KNJmChUCY( | unnamed service | | 0.19 | |
| 3GQ8vdPVAgZUdhkjrQN3W7bbaf( | unnamed s | 0.00389 | 0.01389 | |
| 13oWDLug1qDcMBVNJ9xraamyK( | unnamed s | 0.031527 | 0.056527 | |
| 3CGvCocj1bwn4cyNKCGcXAnCiWr | unnamed service | | 0.325 | |
| 35sfdf2mRaWhsahWK2H8D5RWi: | unnamed s | 0.00259 | 0.00259 | |
| 18VyRm9JcrH7TsFuXoRNxv9yjhAh | unnamed s | 0.021152 | 0.021152 | |
| 3FDj5iFmr6 | BitMart.com | exchange | 35.301 | 39.366 | |
| 1NZcfHxwRn2zB3GqYWmcWiDdN | unnamed s | 0.022783 | 0.022783 | |
| 3KyrbnMp8AFAhd77WTTEgaTyprL | unnamed service | | 0.01 | |
| 3G199HSm3RCYUkNbwYbLh5vuB) | unnamed s | 0.007993 | 0.042993 | |
| 1N8hkH9sFzjFqmcpajU4vPid3mnA | unnamed service | | 0.02 | |
| 12gpJqMH; | YoloDice.com | gambling | 0.088668 | 0.088668 | |
| 39HeCjNtw | DueDEX.com | exchange | 1.877379 | 1.917379 | |
| 1DHdCoH5aPRBExx9PAhRkcCsLk2 | unnamed s | 0.000921 | 0.000921 | |
| 19xu4Mz2y7k4U9yFtiF9KzjPxhyCs | unnamed s | 0.011187 | 0.011187 | |
| 1GGw324L3US9fs3ygzofNJGEQGv | unnamed s | 0.01281 | 0.01281 | |
| 3FwUF2LLpvMNTfHkQLz9qR5XPM | unnamed s | 0.349252 | 0.349252 | |
| 1PUocbzxS | BTC.top | mining pool | | | 0.51 |
| 1BqeR8miYkuemBy4zvVuTUrocUp | unnamed s | 0.002 | 0.002 | |
| 1NiZXkUL1LxAfYnzaVoFFEwDNs7b | unnamed service | | 0.02 | |
| 3GBgzoGM8H79XdHz5WTbqx3Cd' | unnamed s | 0.001044 | 0.001044 | |

| | | | | | |
|---|---|---|---|---|---|
| 1JXJUDggT... | Kinesis.money | exchange | | 0.885 | 0.005 |
| 3MyKdKdF... | ECD.rs | exchange | | 0.01 | |
| 1EKAfxrhkE4XvkpunDvqkPUVZnv6 | unnamed s | 0.0097 | 0.0097 | |
| 3K1hv8snhaNHnqAdCxT6dxYnZNd | unnamed s | 0.000589 | 0.000589 | |
| 3C3aVvf1r3XMUjLyCbFxrCL97V3C | unnamed service | | | 0.035 |
| 1HFSnrYM... | CoinHitFX.com | scam | 1.03 | 1.03 | |
| 1ACBbDLU8k3FfqYQsv6wvkYFKZw | unnamed service | | | 0.93 |
| 1CUJN28NnbEW5YFHKdbvir7vPKV | unnamed s | 0.005017 | 0.005017 | |
| 34g3AJEWNxFucqp6i9cR1665EHA | unnamed s | 0.000313 | 0.000313 | |
| bc1qr5ntct2qlnry23lqpf5ufpwmjvl | unnamed service | | | 0.005 |
| 3QsF5JFUp | SBICrypto.com | mining pool | | | 0.155 |
| 3CcWkaZrN | AdBTC.top | scam | 0.000256 | 0.000256 | |
| 1E6Ab5Z6r2Jpzfg8Q15wEpbUA7W | unnamed service | | | 0.015 |
| 3GuR5ADdcdKBujBqs6XxQzt9Kna8 | unnamed service | | | 0.005 |
| 1QLKsx31P | Bitxmi.com | exchange | 3.944427 | 4.134427 | |
| 1Dpo1vYNG5ogNbUnzaKPeLmBcq | unnamed s | 0.001252 | 0.001252 | |
| 1DtGYmd2oZkXWMVd5fXYZM9an | unnamed s | 0.004246 | 0.004246 | |
| 1HBCvTrEDWKQpH1eFMJDNBjsny | unnamed service | | | 0.015 |
| 3QU7bgvhVmrtURXf8o9wJG9NNi: | unnamed s | 0.031962 | 0.036962 | |
| 38SX5q8P6r9tv9QV9Q8ZJAAhrct5 | unnamed s | 0.246594 | 0.256594 | |
| 1FKoQrXCA | Matrixport.com | exchange | 0.307578 | 1.027578 | 2.86 |
| 1JJnEXNQUBc9n13LQ23e4MJdAPk | unnamed s | 0.010057 | 0.010057 | |
| 1GcD38gv2 | Bit2c.co.il | exchange | 0.337 | 0.347 | |
| 1rAiRiHSeP | B2C2.com | exchange | | 1.535 | 16.005 |
| 1EA25qXQa1PdwHn1UbD3GRiB12 | unnamed service | | | 0.005 |
| 3QyVG4F9 | PaiWangLuo Poker Ne | gambling | 10.01785 | 21.23285 | 0.005 |
| 3KjXcYNwSShgAa1cujhxj1L9ooUA | unnamed service | | | 0.115 |
| 3EV8YoNzw4tofxtBXMPQTdjRwhX | unnamed s | 0.014874 | 0.014874 | |
| bc1qgwtulkkknqafaczna5z6h3xwp | unnamed s | 0.000727 | 0.000727 | |
| 124TBXCGPsoN3hj64sdBrLARbVaf | unnamed service | | | 0.005 |
| 1Km9a96MoURctxc4SFyCNJ3UQE | unnamed service | | | 0.005 |
| 3BtPFNda5w4Q1vDyTCy8A19imhr | unnamed s | 0.010636 | 0.010636 | |
| 3FhFgyY54vCd2yVdq3HhJhG6vGj4 | unnamed s | 0.000228 | 0.000228 | |
| 1PgYXBAV( | OneHash.com | gambling | 0.002 | 0.002 | |
| 3KC94Mz7 | Babel.Finance | exchange | | | 0.09 |
| 19YqztHms | Poloniex.com | exchange | 1.733115 | 4.258115 | 0.18 |
| 1HXMc6F5jgxqvsewNtmJYAWpQP | unnamed s | 0.001225 | 0.001225 | |
| 1Dij2xdpvaULXKGGahwRRzHsrcrV | unnamed s | 0.002623 | 0.002623 | |
| 13JXeCUXUGfCbjZLMujGvpjQ264F | unnamed s | 0.024689 | 0.024689 | |
| 1QTD6LEJsFeiJP4GMFu1yXc2PCky | unnamed s | 0.045922 | 0.045922 | |
| 1JP8FqoXt( | Volabit.com | exchange | | 0.005 | |
| 3NroxAxbxusrKuPU1fZ9i6NdQ1vY | unnamed s | 0.002152 | 0.002152 | |
| 1YZJKaAx2 | Bitcoin Fog | mixing | | 0.025 | 0.01 |
| 1LGKzbo3ELBNXYm9FtriTCwF1ib5 | unnamed service | | | 0.005 |
| bc1q5j60p | Krypto-Cloud.com | scam | 0.01094 | 0.01094 | |
| 3GXhLGUi66n5Zu5J7j7YJMUEX3Tj | unnamed s | 0.0004 | 0.0004 | |
| 3Diihxge2RVXifj21v8wwXwVuNKA | unnamed service | | | 0.005 |

| Address | Service | Type | | | |
|---|---|---|---|---|---|
| 3CnURQLSGHoo.com | exchange | 0.487686 | 0.552686 | 0.06 | |
| 1N1Q32Yzjz9nYKqyLvkYg8RMJ2Yr | unnamed s | 0.04 | | | |
| 12Pk4ydwUzU9pNt6wRNMyLno4F | unnamed s | 0.000879 | 0.000879 | | |
| 1DFvmCDKHy1Bz9VTHHLipej4fdrF | unnamed s | 0.012067 | 0.012067 | | |
| 3HzkcMDJc BitcoinWell.com | atm | 0.015 | | | |
| 13c5DJqRKVkncTSBhj5mSvzhb1z7 | unnamed service | 0.12 | | | |
| bc1q258gyz60rmj3v938rxzvcxztyf | unnamed s | 0.010433 | 0.010433 | | |
| 1C1bm3mC KuCoin.com | exchange | 431.0302 | 480.3702 | 0.265 | |
| 1G2AuvKmS69pNZrSQgxyTd4Twzz | unnamed service | 0.495 | | | |
| 1EdfCps6bp7kmGioRiNKPUqjhnvo | unnamed service | 0.01 | | | |
| 38496c2vvm7UdejvcV3DeAdGJQv | unnamed s | 1.02696 | 1.06696 | | |
| 13nW8kHjS BinaryInvestmentHub. | scam | 7.533073 | 11.50807 | 0.045 | |
| 32SbrM6NqRwJd9bgCuLAvgYnUjZ | unnamed s | 0.04 | | | |
| 3CSeY9MFc Switchain.c Switchain | exchange | 13.57 | 0.01 | | |
| 3MAPVBdDfx54gWLZ26rePDGU55 | unnamed s | 0.001041 | 0.001041 | | |
| 1HZiYJDPgZ4Bk5ZVcv7PRu8m85bC | unnamed s | 0.082024 | 0.082024 | | |
| 1AdpiV6eGWufAuaBnWFDvrohKz> | unnamed s | 0.019991 | 0.019991 | | |
| 14fbppPiY7YPsN5u3ex9zuAS6x5X/ | unnamed s | 0.0153 | 0.0153 | | |
| 1EfMwsWzt87xEBhRfgVV7WyUps | unnamed s | 0.043052 | 0.063052 | | |
| 1MPnKoiCDghhNQpeJ1XE3ZtSvjbt | unnamed s | 0.249117 | 7.194117 | | |
| 3Pt24temU5X3vN1cArj55yfp3Mg\ | unnamed s | 0.000714 | 0.000714 | | |
| 3NiDnFsEC BitcoinofAmerica.org | atm | 0.01 | | | |
| 14VZsej9BfUHXhZEEzcwpzbgxgg2 | unnamed s | 0.003958 | 0.003958 | | |
| 37AkMQ4dVm274VYZQsDDHAcm | unnamed s | 0.001898 | 0.001898 | | |
| 1CyBvKhQE Bypass Shop | fraud shop | 0.012365 | 0.097365 | | |
| 12wcKJanU2Q4Fjv7ALRGv9QTHHF | unnamed s | 0.001707 | 0.001707 | | |
| 1K9va4P9YKg3rnSgCiumPf9oF1no | unnamed service | 0.085 | | | |
| 1H3k6z1rAR3Shrs4N3ijjk2YSNNBv | unnamed s | 0.001137 | 0.256137 | | |
| 1HkhH85ov Deribit.com | exchange | 54.9192 | 57.2942 | 10.615 | |
| bc1q0r7kh8fp6cvpskgafmesmwq8 | unnamed s | 0.0285 | 0.0285 | | |
| 1K7kAKkzCqeE8HoAKbHNjqjegXnS | unnamed s | 0.0066 | 0.0066 | | |
| 1FPhFmGr5KSZZr61WLpKxfsMP7T | unnamed s | 0.5129 | 0.5129 | | |
| 32z2vQuZLQ47tdTubaxrAaZoBxpK | unnamed s | 0.010904 | 0.010904 | | |
| 3NVxnbLdf Mercuryo.io | exchange | 0.01 | | | |
| 1FTY4ujgHatRe3NCcCTnhuiRCySSL | unnamed service | 0.005 | | | |
| 17u5MD7yGwsoPvxPxzX8wrJBzQ\ | unnamed s | 0.001076 | 0.001076 | | |
| 1A7hpJ9sFHKs6qDpFv88Cozdy24g | unnamed service | 0.025 | | | |
| 14h9ATHxvdzQWG25Qj4WytakuE | unnamed s | 0.006531 | 0.006531 | | |
| 1BUgsQjrbl Currency.com | exchange | 0.01 | 0.035 | | |
| 1FLpK8vFwPkXB5K91nR7DfBmZpk | unnamed service | 0.135 | | | |
| 1Fd17q9W Binary.com | exchange | 0.077382 | 0.202382 | | |
| 3NRwavQvoX1smFbjGRMnZSeSe5 | unnamed service | 0.005 | | | |
| bc1qlcc7522y6z6v9j3x3ww9ftqyy | unnamed s | 0.001442 | 0.001442 | | |
| 3Kiw4hr5g9wNEwr9hU57SSBZYeP | unnamed s | 0.072089 | 0.072089 | | |
| 3NUqSRyK9ZR77y3SCqEi1Bgm3ih: | unnamed s | 0.002035 | 0.002035 | | |
| 3PDBdg2qι B4UTrades.com | exchange | 0.055 | | | |
| 33eTmiky2dHTj4Xc6UGR8d19jov\ | unnamed s | 0.003263 | 0.208263 | | |

| Address | Type | Value1 | Value2 | Value3 |
|---|---|---|---|---|
| 35iAvyweVRXTBvruxsRQySiKY2FL3 | unnamed s | 0.00224 | 0.00224 | |
| 188Lac52BVasL7joKN5hgeHrH2ze | unnamed s | 0.019149 | 0.019149 | |
| 1JYjwkqHJs Coin.z.com - GMO Coin | exchange | | 0.03 | |
| 3Hn4w8tpi Dacxi.com | exchange | | 0.005 | |
| 1292Qx5FC FortuneJack.com | gambling | 0.70004 | 0.86004 | |
| 19gmzBk4Vpfd33L7kxHT56WNLY1 | unnamed service | | 0.025 | |
| 3KY7QVcJwD7yHbvFDhaC69GSuzS | unnamed s | 0.000587 | 0.000587 | |
| 3PzJ4Xeh29b9DoqdYkWfJEjmXhm | unnamed service | | 0.015 | |
| 157qkJk4VafyXNE8KhbDyYhLjTUX | unnamed service | | 0.005 | |
| 3KeEBsVrcPLhj1LLWemnqidBG2je | unnamed s | 0.256853 | 0.596853 | 0.01 |
| 1Q5M1Uqkax1W4ZNeZWkE3viGR | unnamed service | | 0.02 | |
| 1DgKLpAgAiXZK2LrdJkcmS7bnRGE | unnamed s | 0.004182 | 0.004182 | |
| 1KaNzXWq GetBABB.com | exchange | 0.041068 | 0.041068 | |
| 1cj3QDzXN FlipperFX.org | scam | 0.116441 | 0.116441 | |
| 3N1ZhzzVHt2aV6phmAzqDR6PG2l | unnamed service | | 0.01 | |
| 1HRP4xDFCHr1cKCvKZBLQS72gstH | unnamed service | | 0.015 | |
| 18am9jrQP4Ynk6ZgJA6r7Af3Zzrp1 | unnamed s | 0.002072 | 0.002072 | |
| 3HF93k7cgj8MDe2Ss2PvhcLfdFxp | unnamed service | | 0.035 | |
| 1DqxzxLn4GoXmuQvngEhqzS66W | unnamed s | 0.002015 | 0.002015 | |
| bc1ql5zyywe2j34e067r60xu937p7 | unnamed s | 6.801639 | 9.636639 | |
| 15MfAU32Yk6vLNu2T7VhafNohGi | unnamed s | 0.000918 | 0.000918 | |
| 3Mzi2xCvsl PARiBU.com | exchange | 0.001298 | 0.201298 | |
| 3HTyL1B7J Try2check | fraud shop | | 0.02 | |
| 3BNEUQFpRSovj134s7fbZpnChUfF | unnamed s | 0.021321 | 0.021321 | |
| 1JNc9hWLKRbLUXhgwd3jgLGaoG8 | unnamed service | | 0.045 | |
| 39djaAdzEt My-CryptoUnit.com | scam | | 0.045 | |
| 1AaG59B6unx7xKuNx4eqNKwQoX | unnamed service | | 0.04 | |
| 3F6PbrKvmYtiTYbh5MHyhT14rmP | unnamed s | 0.001958 | 0.001958 | |
| 1BLw6c7S7fUB5NM7YnHjwHkWG | unnamed s | 0.014549 | 0.014549 | |
| 36qtz4GUBT1EJexot4yUpC4hYbW | unnamed service | | 0.01 | |
| 16UQ423rAWfk3MohRDBjAshVJu | unnamed service | | 0.005 | |
| 3Lqb9oxFd6VjZREFA8huFca2BdB2 | unnamed service | | 0.015 | |
| 17kb7c9nd BitcoinTrade.com.br | exchange | 0.0166 | 0.1016 | |
| 3CWTiZ5ujko4V5bb2BmqER86Xef | unnamed s | 0.001102 | 0.001102 | |
| 1LjRMfFWI Binance.sg | exchange | 0.008832 | 0.008832 | |
| 14zhKtDA4XCCSQpNfhDYP6zZnbT | unnamed s | 0.004885 | 0.004885 | |
| 3GdgxtPml Trastra.com | exchange | 0.0005 | 0.0255 | |
| bc1q5uad4qmwh2krgma8mkgqn8 | unnamed service | | 0.01 | 0.03 |
| 36hxrvdpTgsHzVHWu8MptMxMJx | unnamed service | | 0.075 | |
| 3MHhTa1B Gamdom.com | gambling | 0.028335 | 0.088335 | |
| 1BrupPFmSRQM5USeuUg4Suh2Ss | unnamed service | | 0.04 | |
| 36fwEdrYLDqfz9kYxMziA4df4naNc | unnamed service | | 0.015 | |
| 392JTYfQCA2Gpvrt8zL1H35XRuHv | unnamed s | 0.00021 | 0.00021 | |
| 1AYvPyr72uoa8cMUesykFr7GhbA | unnamed s | 0.002698 | 0.002698 | |
| 1NhwBVsH Arbistar.com | scam | | 0.035 | |
| 3Qud2sYTaBERJkHYN9XppPP3Kgi | unnamed s | 0.000599 | 0.000599 | |
| 1A2jwSrkLqdTbT791rjM5FUpJaBz | unnamed service | | 0.005 | |

| Address | Entity | Type | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|---|
| 13jukSJUzL3B97EBDX7sVbpTAyseI | unnamed s | | 0.012147 | 0.012147 | |
| 18CAx3AVhPe1goiQfuwFHDeEJ4g | unnamed s | | 0.001273 | 0.001273 | |
| 18vPJ54EHVkDByDEV8E2btJuPrV3 | unnamed service | | | 0.095 | |
| 1AkZ68fch4BsAxUCcdbLsrfpEax77 | unnamed s | | 0.0099 | 0.0099 | |
| 35QsdqacUEwDDK1V1j5H6GHtSYI | unnamed s | | 0.026104 | 0.026104 | |
| 11BCqQh2QkKvNnwibZnbngNNcn | unnamed s | | 0.015107 | 0.015107 | |
| 1PtrhNyBq | Little Minx | child abuse | 0.0006 | 0.0006 | |
| 1PoU7KVDaYrbWh89en2DxbutBF | unnamed s | | 0.008479 | 0.008479 | |
| 3Ji4f9EEdK4wv6NaxjXGLLQkookP | unnamed service | | | 0.03 | |
| bc1qhzms4sudscm2q4g3l390urzjf | unnamed s | | 0.001802 | 0.001802 | |
| 11n3uxJiQM7yTieSeYyTav3MkrcP | unnamed s | | 0.045362 | 0.045362 | |
| 3Nc14mDYYXSWVWTrMQd6yxLY | unnamed s | | 0.002173 | 0.002173 | |
| bc1qjvtqqnfmcnh496n447zntzrz6 | unnamed s | | 0.003 | 0.003 | |
| 16k9dZNVxAU3JEbqvu6d4tNPrMH | unnamed service | | | 0.005 | |
| 3MmdpmiCP6uVzzAGnZsbFDnGbg | unnamed s | | 0.047392 | 0.062392 | |
| 3CUszNkS6SCq6trGrpCwHhNrwLw | unnamed s | | 1.990235 | 2.435235 | |
| 3AQ8BUjc3wuSToL5JghqhGBWGe | unnamed s | | 0.013878 | 0.018878 | |
| 1EFrrfTLM | JoinMarket | mixing | | | 0.09 |
| 1HzfcZdeUVPgtn9eE2nMjQBjxNN | unnamed service | | | 0.28 | |
| 3FkgeFX6MVo3AFq2aNFwinUqkT | unnamed s | | 0.001723 | 0.001723 | |
| 37T3chan8 | Arbitly.io | scam | | 0.01 | |
| 1FdT5waj9qu2UPMD9QxNVVF9u | unnamed s | | 0.001836 | 0.001836 | |
| 12QdbHoAi8aJx7tAtrex8STDnzpL | unnamed s | | 22.06213 | 22.54713 | 0.12 |
| 1NbsTVXtV | HotBit.io | high risk ex | 18.14178 | 21.25178 | 0.005 |
| 1Cm8ZkbYU3jFUNZf5uVoiw2fqcs | unnamed service | | | 0.005 | |
| 1Nns4ha221fXGb1mhBXNXE9B9A | unnamed service | | | 0.045 | |
| 33Q3f7tZnv6KhzGARYB9i5DXZYrv | unnamed s | | 0.006277 | 0.006277 | |
| 3CNx6xXaS2ym693uPeGmKKT7Az | unnamed s | | 0.07241 | 0.07241 | |
| 1MiVPKsCBKGnv37kY68SNnGh1U | unnamed s | | 0.001542 | 0.001542 | |
| 1P9oescQVrCfTHsFCow8ACsyPyNi | unnamed s | | 0.001 | 0.001 | |
| 1FRdJs1wLmQoDAgLS8U9spX8j3X | unnamed s | | 0.108467 | 0.108467 | |
| 3KR6vSqB2 | Genesis Trading OTC | exchange | | 0.675 | 76.19 |
| 17KEtwzszkGV1ykMo4Wtto4HHkL | unnamed s | | 0.000905 | 0.000905 | |
| 1N8t6pqd56wFwAjFXr2MANTRml | unnamed s | | 0.005219 | 0.005219 | |
| 13oBJoSQPvAapbWNWM2ViYnSQ | unnamed service | | | 0.045 | |
| bc1qupna9h4m2eru3vw2an2qkm | unnamed s | | 0.010184 | 0.010184 | |
| 3JBD8vfhB2VXxGpnLcTXTefTi9UW | unnamed s | | 0.01752 | 0.02252 | |
| 1EkCqD8xv8FikxnxcYsJQmwxG3W | unnamed service | | | 0.01 | |
| 19xFjXwbN | HackedCardBuy.com | illicit actor- | 0.00401 | 0.00401 | |
| 112Brjdn2 | DragonEx.io | exchange | 0.019372 | 0.019372 | |
| 15kb7mTuk1gJoJCsgatDjZKRhnerx | unnamed s | | 0.007632 | 0.027632 | |
| 3BRH5QrZ9Dz3ogiziQcJxtiSThgCeg | unnamed s | | 0.146683 | 0.216683 | 0.005 |
| 1GZdEnJKC | Watermine.io | scam | 0.292862 | 0.292862 | |
| 3KBicqUDtdwXtoEvgr1hs8ajpSm4l | unnamed s | | 0.008482 | 0.008482 | |
| 19Tqsmho8SdjHxXVLP62FQ788uD | unnamed service | | | 0.105 | |
| 18wiW3VQppqDYMewkzcRW3G2 | unnamed service | | | 0.01 | |
| 13iPgr16ei | CoinPayments.net | merchant | 20.32955 | 26.11455 | 0.17 |

| Address | Type | Value 1 | Value 2 | Value 3 |
|---|---|---|---|---|
| 1PujNpDgf6cKPpiwBwV5apuxrLTjJ | unnamed s | 0.001115 | 0.001115 | |
| 38QyN51NwgZwRDFB4CP1GHopN | unnamed s | 0.00522 | 0.00522 | |
| 1B3FQBjv69SYz6ngPDK8LaSHHd4h | unnamed service | | 0.4 | |
| 3KLKe7ZJh49JiHgNgF5FKYrBPhg2C | unnamed s | 0.587185 | 0.737185 | |
| bc1qxd6cu6tsa6cm3fp2jqxncay3e | unnamed e | 0.016671 | 0.016671 | |
| 1Mg61d9sqMWnaKKz8crzKAAKipS | unnamed s | 0.001987 | 0.001987 | |
| 1FbDAYSJK eGifter.com | other | | 0.015 | |
| bc1qls05pvwtdwfnw9m2n2kz2ptc | unnamed s | 0.027213 | 0.037213 | |
| 3Ew2PrxQEMxs7CfmCPzjiUBbKbfl | unnamed service | | | 0.025 |
| 1PtE7xFCu HolyTransaction.com | exchange | 0.008809 | 0.018809 | |
| 1GPCmg9w Netcoins.app | exchange | | 0.005 | |
| 33SRgEppShXc9neyhifvgUCZvB7X\ | unnamed s | 0.001529 | 0.001529 | |
| 34CVdsUxdyXBSwq1JzeBxGsUShQ | unnamed service | | 0.025 | |
| 39TQugJ4N Eurobit.cc | high risk exchange | | 0.055 | |
| 35nzqFHJtxZCxgRhRDKgKyEN9suzi | unnamed service | | | 0.015 |
| 17vpsCC2ujap1pehw8wmFTd3ezk | unnamed s | 0.00088 | 0.00088 | |
| 39zJs86396XMa9NjVk3hpp9hPGQ | unnamed s | 0.002697 | 0.002697 | |
| 1BJNYJLjgtl CoinCasso.com | exchange | 0.061005 | 0.086005 | |
| 1PtbV2vBV Unknown - Money Lau | high risk exchange | | 0.005 | |
| 3QMVxkHSQPFHmTTzhH6jm8djpj | unnamed s | 0.077071 | 0.082071 | |
| 1PJC1sbNH Instacoins.com | exchange | | 2.875 | |
| 37wzmPFF3esDuhXsX8rzePWr8Rh | unnamed s | 0.001022 | 0.001022 | |
| bc1qjlhxxu0gda4x8jxwzs7zn4r3tf2 | unnamed s | 0.000758 | 0.000758 | |
| 15RE3CGgkebnpP31Rqf2G1CCxug | unnamed s | 0.075866 | 0.075866 | |
| 3Pzi2JUv53ZzAfT1yuSQrBvxU2qhP | unnamed service | | 0.025 | |
| 3DoPtnho7CsvqVbbWs9GJGuXT2N | unnamed service | | | 0.005 |
| 3Mh7czC91wXsKWjZ1BzmkktQWz | unnamed s | 0.000624 | 0.000624 | |
| 152AS3XLC ShapeShift.com | exchange | 0.032629 | 0.627629 | 0.005 |
| 35jpBJLHkUnvgqhLJDirjtitrdD7EHk | unnamed s | 0.164089 | 0.269089 | |
| 3QwjaNvsN5FR73uPwVXobtUCfa5 | unnamed service | | 0.025 | |
| 3KBbFNp5mMYAWTNEgqoYd48Xz | unnamed service | | 0.005 | |
| 386w6Ry2aXcN9LSrnD6FrbkhVvM | unnamed s | 0.885992 | 0.905992 | |
| 1kx46KYon33QDpRceVZhbBAUpU | unnamed service | | 0.005 | |
| 13XxYzmJHzLg2vWvrJv6hJnTjmSK | unnamed s | 0.000816 | 0.000816 | |
| 3HdYbN63TaRPydWoB7jNNzZLX2I | unnamed s | 0.362723 | 0.517723 | |
| 1A4qgmnV2We8xiYoTxC2GXwMjr | unnamed s | 0.002126 | 0.002126 | |
| 1EcFjhqpFncBcWYgkHSh5tGm5uh | unnamed service | | 0.025 | |
| 1Lm49p1YSiY5iztVyV5cNNYA4Qgjj | unnamed s | 0.008691 | 0.008691 | |
| 37MkKKwv ChivoWallet.com | exchange | 0.07329 | 0.14829 | |
| bc1qce30rsna08qphpst5rpd2hw8 | unnamed s | 0.146498 | 0.166498 | |
| 14AXH73t8gjrtBRdr5typSpHK2rrch | unnamed service | | 0.01 | |
| 3FqAi5bQTKYaPR7RniaZzupuLm2Z | unnamed s | 0.001425 | 0.001425 | |
| 14iRBXLdrEQBRrenpFKhfqPQ6NPC | unnamed s | 0.015651 | 0.015651 | |
| 17YoDSp7M7aftJhpk2iYzMK2BrDV | unnamed service | | 0.005 | |
| 39LyQR887n5yvvtg5Gk3HDufQhjk | unnamed s | 0.006819 | 0.006819 | |
| 1MjL4FVDqixrUUZGzUvBfPH4qnC | unnamed service | | 0.005 | |
| 3377fMhg) WW-Pay.net | high risk exchange | | 1.225 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| 3FQ5oRgUQovNrENTe4Jy2Q55DX | unnamed s | 0.045502 | | 0.045502 | | |
| 17NbBKF4tS5ES8xfVuBu6qe6QtXk | unnamed s | 0.005669 | | 0.035669 | | |
| | fees | 14.2078 | | 21.6378 | | |
| | unspent | | | 1396.935 | | |
| | dust | 0 | 0 | 8.461752 | 1.621815 | |
| | untraced | 0 | 0 | 7.899906 | 0 | |
| | tracked to self | | | 0.04 | 0.04 | |

# Exhibit D

(CipherBlade Preliminary Expert Report)























# Exhibit E

(CipherBlade Preliminary Expert Report)

Link:

https://youtu.be/zF5nHhLhpaM

# Exhibit F

(CipherBlade Preliminary Expert Report)



| Captured | Trading Pair | Voyager | Coinbase | Binance | FTX | Kraken | Uniswap | Sushiswap | Remarks |
|---|---|---|---|---|---|---|---|---|---|
| PM EST | (Voyager) | $31.62 | | | | | $32.05 | | |
| PM EST | (Voyager) | $41.71 | | | | | | $44.29 | small arbitrage opportunity for a more volatile |
| PM EST | ZRX/USD | $7.56 | $7.65 | | | | | | |
| PM EST | ZRX/USD | $7.58 | | | $7.05 | | | | |
| PM EST | MANA/USD | $22.55 | | | | $22.87 | | | |
| PM EST | BTC/USD | $102.45 | $103.05 | | | | | | 0.002212 BTC |
| PM EST | BTC/USD | $102.37 | | | $102.47 | | | | 0.002212 BTC |
| PM EST | BTC/USD | $102.33 | | $102.87 | | | | | 0.002212 BTC |
| PM EST | LTC/USD | $101.06 | $101.72 | | | | | | 0.58524 LTC |
| PM EST | LTC/USD | $101.16 | | $101.73 | | | | | 0.58524 LTC |
| PM EST | LTC/USD | $101.07 | | | | $101.86 | | | 0.58524 LTC |
| PM EST | LINK/USD | $99.90 | $100.73 | | | | | | 3.77 LINK |
| PM EST | LINK/USD | $100.24 | | $100.79 | | | | | 3.77 LINK |
| PM EST | LINK/USD | $100.17 | | | | $100.42 | | | 3.77 LINK |
| PM EST | LINK/USD | $100.24 | | | | | $101.75 | | 3.77 LINK |



| Captured | Cryptocurrency | Amount | Voyager | Coinbase | Binance | FTX | Kraken | Uniswap | Sushiswap | Remarks |
|---|---|---|---|---|---|---|---|---|---|---|
| PM EST | BTC | $100 | 0.002139 | 0.00214953 | | | | | | |
| PM EST | BTC | $10,000 | 0.00213589 | 0.002145 | | | | | | |
| PM EST | BTC | $1,000 | 0.021355 | | | | 0.02147056 | | | |
| PM EST | ETH | $10,000 | 3.147620 | 3.1688357 | | | | | | |
| PM EST | ETH | $5,000 | 1.5751 | | | 1.585 | | | | |
| PM EST | ETH | $20,000 | 6.29402 | | | | 6.339 | | | |
| PM EST | DOGE | $500 | 1541.8 | 1567.7 | | | | | | |
| PM EST | DOGE | $50,000 | 154228 | | | 158121 | | | | |
| PM EST | DOGE | $100,000 | 307503 | | | | 315410 | | | |
| PM EST | DOGE | $25,000 | 77065 | | 77830 | | | | | Utilized USDC for the Binance pair. |
| PM EST | ADA | $1,000 | 420.2 | | 423.4 | | | | | Utilized USDC for the Binance pair. |
| PM EST | LINK | $9,001 | 331.04 | | 332.69 | | | | | Utilized USDC for the Binance pair. |
| PM EST | LINK | $500,000 | 18422.99 | 18493.53 | | | | | | |
| PM EST | LINK | $123.456 | 4569.06 | | | | | 4561.92 | | Utilized USDC for the Uniswap pair. |

# Exhibit O

**CASTELL**

Preliminary Expert's Report                    *MARK CASSIDY and Others v VOYAGER*

### IN THE UNITED STATES COURT
### FOR THE STATE OF FLORIDA

**BETWEEN**

### MARK CASSIDY, on behalf of himself
### and all others similarly situated
### ("CASSIDY")

<u>**Plaintiff**</u>

**-and-**

### VOYAGER DIGITAL LTD, and VOYAGER DIGITAL LLC

### ("VOYAGER")

<u>**Defendants**</u>

_____

### Preliminary Expert's Report
### December 19, 2021
_____

| | |
|---|---|
| **Prepared for:-** | Adam Moskowitz, Partner<br>The Moskowitz Law Firm, PLLC<br>2 Alhambra Plaza, Suite 601<br>Coral Gables, FL 33134, USA<br>Tel: +1 (305) 740-1423<br>Email: Adam@moskowitz-law.com<br>*https://moskowitz-law.com/* |
| **Prepared by:-** | *CASTELL Consulting*<br>(Castell Computer and Systems Telecommunications Ltd)<br>PO Box 334, Witham<br>Essex CM8 3LP, United Kingdom<br>Tel:  +44 1621 891 776    Mobile:  +44 7831 349 162<br>Email:  stephen@castellconsulting.com<br>*http://www.e-expertwitness.co.uk* |
| **Author:-** | Dr Stephen Castell |

**Notice**

This **Preliminary Expert's Report** has been prepared in connection with the matter of *CASSIDY -v- VOYAGER*. It is not intended, and should not be used, for any other purpose.  Any opinions expressed by the author herein are presented for this purpose alone, and may be subject to modification or deletion in the light of further information and investigation.  These opinions are based solely on reviews of people, documentation, systems and other information as supplied or made available to *CASTELL Consulting*.

**THIS IS A PRELIMINARY DRAFT.  IT HAS BEEN PREPARED BASED ON PRELIMINARY INFORMATION AND ASSUMPTIONS.  NO ONE MAY RELY ON THIS DRAFT.  IT IS SUBJECT TO CHANGE AS ADDITIONAL INFORMATION BECOMES AVAILABLE OR IS CLARIFIED.**



## IN THE UNITED STATES COURT
## FOR THE STATE OF FLORIDA

**BETWEEN**

### MARK CASSIDY, on behalf of himself
### and all others similarly situated
### ("CASSIDY")

<div align="right">

**Plaintiff**
</div>

### -and-

### VOYAGER DIGITAL LTD, and VOYAGER DIGITAL LLC

### ("VOYAGER")

<div align="right">

**Defendants**
</div>

_____

### Preliminary Expert's Report
### December 19, 2021

_____

**CONTENTS**                                                    **PAGE**

**1. Introduction and Background**
**1.1 Personal Information**                                      **3**
**1.2 Background to the Dispute and my Appointment**              **4**
**1.3 Statement of Impartiality**                                 **6**

**2. Research Methodology**
**2.1 Documents Reviewed**                                        **7**
**2.2 Investigations Carried Out**                                **7**

**3. Issues addressed in this Preliminary Expert's Report**       **8**

**4. Analysis and Findings**
**4.1 Introduction to Blockchain and Cryptocurrency**             **9**
**4.2 Scope of Expert Work**                                      **9**
**4.3 Review of the Complaint**                                   **10**

**5. Provisional Conclusions and Opinions**                       **15**

**6. Appendices**
*Appendix ONE*: **Dr Stephen Castell – qualifications and experience**   **18**
*Appendix TWO*: **Documents Provided and Reviewed in this Report**       **20**

**7. *Addendum A*: Introduction to Blockchain and Cryptocurrency**   **21**

**8. Expert's Declaration and Statement of Truth**                **29**



# 1.    Introduction and Background

- **I, Stephen Peter Castell, submit the following preliminary report declaring my interim and provisional opinions related to those technical issues and case documentation which I have been instructed to examine, as presently arising from this *CASSIDY v VOYAGER* matter.**
- **This preliminary report provides my provisional opinions, about which I may testify at the Trial on behalf of CASSIDY, in regard to these issues, as well as the bases of those opinions.  This preliminary report is based on my study, examinations, investigations, expertise and experience to date, and sets forth the interim testimony that I am likely to present regarding my provisional opinions.**
- **I expect also to develop my testimony dependent on future disclosure of relevant documentation and other evidence, including computer software and systems; and may also eventually present testimony in rebuttal to any testimony and evidence that VOYAGER may present.**

## 1.1    Personal Information

### *Personal Details*

**1.**  I, Stephen Peter Castell, am a Chartered IT Professional and an independent consultant in computer and telecommunications systems and software development.  I am Chairman of the United Kingdom company CASTELL Computer and Systems Telecommunications Limited ('*CASTELL*' or '*CASTELL Consulting*'), a professional firm of Management and Financial Consultants in Information Technology of over 40 years' standing.  I am an expert in the specification, design, development, project direction and contract management of computer applications software; in areas of Information & Communications Technology ('ICT') and software applications industry custom and practice; in analysis of value and other assessments of software, systems and ICT outsourcing and other supply agreements; and in forensic examination of data and other records in respect of the validity, development and use of computer and telecommunications systems, of the consequences of such use, and the inferences and conclusions to be drawn from them.  I have been instructed as an expert witness on a wide range of ICT and ICT services assignments, and related litigious and non-litigious disputes, and in particular, for example, in software copyright, and ICT technology patent, disputes, and in computer software and systems litigation; for both Plaintiffs, Claimants or Pursuers, and Defendants, Respondents or Defenders, and for both purchasers/users and providers/suppliers of ICT software, systems and services, and on behalf of insurers, in the UK, the USA, and internationally.

**2.**  My qualifications, experience and a note of some of the cases on which I have been instructed as expert are given at ***Appendix ONE*: Dr Stephen Castell – qualifications and experience** of this **Preliminary Expert's Report**.

### *Authorship of this Preliminary Expert's Report*

**3.**  I have personally carried out or directed all work undertaken in regard to my investigations, analyses and findings.  I confirm that the conclusions and opinions expressed herein are entirely my own.



## 1.2    Background to the Dispute and my Appointment

**4.**   I was by Letter of Instruction dated July 16, 2021 (as given at ***Appendix TWO***: **Documents Provided and Reviewed in this Report**), appointed and instructed by Attorney Adam Moskowitz, Partner, *The Moskowitz Law Firm*, PLLC, to produce an independent preliminary expert's report on behalf of his client, the Plaintiff, *MARK CASSIDY and Others*.  I understand from my Letter of Instruction that a CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL is to be filed by Attorney Moskowitz on Behalf of the Plaintiff in a UNITED STATES COURT FOR THE STATE OF FLORIDA.  However, as the Complaint has yet to be filed, I have been instructed to bear in mind that the expression of the allegations and claims in the case are provisional at this stage, and are highly likely to evolve in due course, with attendant likelihood of development of issues for me as an expert potentially to address in the future ('the Complaint').

**5.**   I further understand from my Letter of Instruction that, in regard to the preliminary issues upon which I have been asked to opine, in the field of my expertise, the background to and the allegations in this case are in summary as follows:

- "Voyager, through its Voyager Platform, offers investors, developers and platform providers a fully functional suite of APIs and mobile apps to allow anyone who is legally able to do so the ability to trade, invest, earn and secure digital assets across multiple types of digital assets. According to its creators, Voyager 'is a publicly traded holding company whose subsidiaries operate a crypto-asset platform that provides retail and institutional investors with a turnkey solution to trade crypto assets. The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace.'"
- Voyager Digital LLC ("VDL"), one of Voyager's subsidiaries, acts as a "crypto broker," being a digital agent broker that facilitates users buying and selling of cryptocurrencies delivering deep pools of liquidity. It also offers a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.
- Included prominently throughout Voyager's uniform marketing representations to its customers is that the Voyager Platform offers trades that are "100% Commission-Free."
- Voyager's "100% Commission-Free" representations, however, are false and are reasonably likely to mislead objective consumers acting reasonably under the circumstances.  While Voyager does not openly display the commissions it charges on each cryptocurrency trade, Voyagers utilizes various methods to secrete the exorbitant commissions it retains from every trade.
- To effectuate these unfair and deceptive business practices, the Voyager Defendants claim to use proprietary systems they have developed, which they refer to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm."
- In describing the Smart Order Router, the Voyager Defendants maintain that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills them in the market for the customer



using its proprietary order routing algorithm." The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across [Voyager's] liquidity sources and streams this price to its users."

- In reality, and unbeknownst to customers, the Voyager Defendants' "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" are designed to be intentionally obscure and to provide Voyager with hidden commissions on every trade that in most cases exceed the disclosed fees and commissions charged by its competitors. Voyager unfairly gains an edge on its competition and overcharges customers by collecting these secret commissions to the detriment of its unknowing customers.

- After being exposed to the Voyager Defendants' representations that their Platform is "100% Commission-Free," the Plaintiff registered for an account on the Voyager Platform on March 17, 2021, and in reliance on the Voyager Defendants' representations, the Plaintiff executed a number of trades on the Voyager Platform, some of which are to be exhibited within the Complaint, for example as screenshots of the Plaintiff's May 11, 2021 'Market Buy trade at Order ID Dx65EW', enclosed herewith at Annex A".

**6.** My Letter of Instruction further sets out that:

"We anticipate and request that you will work as a computer evidence, software and systems procurement, development, performance and quality expert in consultation and co-ordination with Mr Rich Sanders, of *Cipherblade*, the blockchain forensics expert whom we are also retaining, with instructions to and arrangements made for him to access and make a series of concurrent test trades using the Voyager App, and, for comparison and contrast, using certain other different cryptocurrency trading platforms";

and requests and instructs me to:

- "Review the Complaint, in particular the screenshots enclosed herewith at Annex A, together with consideration of initial case documentation that we provide to you.
- Working with, but independently of, Mr Sanders, monitor, record, write-up and analyse the concurrent test trades that Mr Sanders will carry out using and operating the Voyager App and certain other cryptocurrency trading platforms.
- Produce examinations by way of provisional analyses, findings, conclusions and opinions, giving such insights as may be sensibly achievable based on both the restricted documentation available prior to discovery and disclosure and relying on the data obtained from the concurrent test trades that Mr Sanders will carry out. We recognize and agree that, prior to discovery and disclosure, these examinations cannot and will not include carrying out your own technical investigation or research on or into, nor testing of, the specific or detailed software and systems specification, design, construction, testing, commissioning, deployment, operation, user experience (including guides and documentation), maintenance and fault-logging of the Voyager App and other Voyager systems that may be involved.
- Provide a brief overview and explanation of the blockchain and cryptocurrency, crypto assets etc field to assist the understanding of the Court, in respect of principally a general introduction, plus as regards technical issues relevant in the case".



**7.** This **Preliminary Expert's Report** is my account of the review that I have carried out, giving, as instructed, my explanations, findings, conclusions and preliminary opinions.


## 1.3    Statement of Impartiality

**8.** Prior to being appointed in this case, I have not worked or acted in any capacity for or on behalf of MARK CASSIDY and Others, or VOYAGER, or with regard to any matter in which they were or are involved.   I believe that in this report the facts I have stated are true and the opinions I have expressed are correct.

**9.** I understand that my overriding duty is to assist the Court on matters that are within my expertise.   I also understand that this duty overrides any obligation to *The Moskowitz Law Firm*, PLLC, who act for MARK CASSIDY and Others in this matter, or their clients.   I further understand that, if called upon to provide a written report of my procedures and findings and to supply expert testimony at deposition, trial, or other hearings, my report will need to comply with federal and local court rules or procedures, if any, regarding expert reports; and, in connection with preparation of a report, opinion, or testimony on a matter, I will need to perform the procedures that I consider necessary to express a professional conclusion.

**10.** I further confirm that I have at all times conducted, and will at all times conduct, my expert inspections and examinations pursuant to the expected standards of impartiality and independence.   Notwithstanding its provisional status, I confirm that this **Preliminary Expert's Report** is intended to comply with the applicable requirements of the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and the best practices and guidelines developed by the US National Institute of Justice's Scientific Working Group on Digital Evidence.  I acknowledge that the opinions I render in this matter shall be made in good faith and supported by a reasonable amount of research and analysis.



## 2.     Research Methodology

### 2.1    Documents Reviewed

**11.**  On July 16, 2021, August 26, 2021, and October 28, 2021, I was provided with the documents given at ***Appendix TWO*: Documents Provided and Reviewed in this Report** of this **Preliminary Expert's Report**.

**12.**  Where I make reference herein to a page or pages of any one of these documents, this is in one of the formats:
 'n/N; <Pdf ID>': where n is the pdf page number in question located within the total of N pages in the document with 'Pdf ID'; <u>or</u>
 'P <page number(s) within document> <Document ID>', where 'Document ID' is as given in the following table:

| Document ID |
| --- |
| Complaint |
| Plaintiff's Screenshots |
| Annex A to Letter of Instruction: Screenshots of the Plaintiff's May 11, 2021, 'Market Buy trade at Order ID Dx65EW' |
| RESULTS OF TEST TRADES CARRIED OUT BY RICH SANDERS |
| 'investor presentation sept 2021.pdf' (Voyager Digital Limited) |
| 'Condensed Interim Consolidated Financial Statements 3 and 9 months ending march 31, 2021 and 2020.pdf' (Voyager Digital Limited) |
| 'MDA for 3 and 9 months ended March 31 2021.pdf' (Voyager Digital Limited – "MANAGEMENT'S DISCUSSION AND ANALYSIS") |
|  |

### 2.2    Investigations Carried Out

**13.**  The investigations that I have carried out have consisted of
 • Reading and considering the documentation supplied to me, as given at ***Appendix TWO*: Documents Provided and Reviewed in this Report** of this **Preliminary Expert's Report**.
 • Some limited literature, web etc research.



## 3.    Issues addressed in this Preliminary Expert's Report

**14.**  This **Preliminary Expert's Report** provides an account of my investigations, analyses, and findings in regard to my instructions to

- Review the Complaint, in particular the screenshots exhibited therein, together with consideration of the initial case documentation provided.
- Monitor, record, write-up and analyse the concurrent test trades carried out by Mr Sanders using and operating the Voyager App and certain other cryptocurrency trading platforms.
- Produce provisional analyses, findings, conclusions and opinions, giving such insights as may be sensibly achievable based on both the restricted documentation available prior to discovery and disclosure and relying on the data obtained from the concurrent test trades as carried out by Mr Sanders.
- Provide an introduction to the blockchain and cryptocurrency, crypto assets etc field to assist the understanding of the Court.

**15.**   The relevant technical issues that fall within my field of expertise are the computer software and systems aspects of the Voyager App and other Voyager systems that may be involved.

**16.**  I make it clear that I am not a capital or currency market trading professional or financial advisor, and neither offer nor provide investment advice.  Neither do I have any commercial interest in or management connections with any cryptocurrency, cryptocurrency trading exchange or any operators of such entities or promotors of associated businesses.



# 4.    Analysis and Findings

## 4.1  Introduction to Blockchain and Cryptocurrency

**17.**   In simple terms, blockchain is the computer software and systems technology that (among other things) enables the existence of cryptocurrency.  Bitcoin is the name of the best-known cryptocurrency, being the cryptocurrency for which blockchain technology was originally developed.  Like the USD, a cryptocurrency is a medium of financial value exchange, but it is digital and uses encryption techniques to control the creation of monetary units and to verify the transfer of funds.

**18.**   A blockchain is a software and systems application that provides a decentralized ledger of all transactions across a peer-to-peer network.  The key principle of using blockchain is that participants can confirm transactions without a need for a central clearing authority.  Potential applications in the financial and investment sector can include fund transfers, and settling trades.  Other application areas, or 'use cases', for blockchain are myriad, and include voting, supply chain logistics management and health informatics.

**19.**   Blockchain thus has potential applications far beyond Bitcoin and cryptocurrency.  From a general business perspective, blockchain technology may be thought of as a type of next-generation business process improvement software.   'Collaborative technology' such as blockchain can offer the ability to improve the business processes that occur between companies, significantly lowering the 'cost of trust'.   For this reason, there is a growing management and investor realization that, in the right use cases, blockchain may offer substantially higher returns 'for each investment dollar spent' than many traditional  corporate internal technology investments.

**20.**   I set out further basic introduction to and explanation of blockchain and cryptocurrency in general, and Bitcoin in particular, in ***Addendum A***:  **Introduction to Blockchain and Cryptocurrency** of this **Preliminary Expert's Report**.

## 4.2  Scope of Expert Work

**21.**   The expert investigations that it seems to me need to be carried out to undertake the analyses required by my instructions in order to arrive at conclusions and opinions on the issues, of assistance to the court, include within their scope examination of:

- Computer Software & Evidence – within Voyager App (smartphone or other end-user platform).
- Computer Software & Evidence – within Voyager Digital Company ('backend', middleware, interconnections with other systems, especially price data feeds from trading exchanges etc).
- Computer Software & Evidence – Third Parties.
- Algo Software – 'Best Execution Price' Computer Software and Systems, Techniques, etc: (a) Voyager Digital's software and systems, in particular, its "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm"; and (b) software and systems in Financial Services, Market Trading and Price Comparison industries generally.

CASTELL

**22.**  However, based on the restricted documentation available prior to Defendants' discovery and disclosure, for the purposes of producing my provisional opinions for this **Preliminary Expert's Report**, undertaking the full scope of these investigations is simply not possible.  I am therefore able, and am instructed, only to consider here the contents of the Complaint and associated support documentation, together with the data obtained from the concurrent test trades as carried out by Mr Sanders.

## 4.3  Review of the Complaint

**23.**  Reviewing the Complaint, it appears to me that, as far as can be seen at present, the core expert questions to be addressed are:

**(i)**  To what extent does the available technical evidence show that the Voyager App does not materially provide the user functionality as represented by Voyager Digital (a) as regards achieving the 'best market price' or 'fair market price' for the user/trader (whether that failure to provide the represented functionality is centred principally within the "Smart Order Router," the "Voyager Pricing Engine," the "Proprietary Fills Algorithm"; and/or any other Voyager Digital system component); and/or (b) as regards any other representations or claims made.

**(ii)**  Is there any evidence that the Voyager App fails to perform in compliance with the representations made by Voyager Digital (if it materially does not) due to faults in design, construction and operation thereof, as distinct from being deliberately and intentionally fashioned to perform in the way that it does?

**(iii)**  To what extent is it possible to determine the extent of the financial consequences of the Voyager App's not providing the user functionality as represented by Voyager Digital (if it materially does not) on any Voyager App user's cryptocurrency or other trading?

**(iv)**  Does the technical governance of Voyager Digital in the management, operation, integrity, representations and security of its Voyager App and of its other management and customer systems meet accepted professional standards for, and/or custom and practice in, the consumer electronic financial services and/or online trading sectors?

**24.**  I set out in the following paragraphs my analysis and findings as regards each of these questions, to the extent possible prior to discovery and disclosure.

**25.  (i)**  <u>To what extent does the available technical evidence show that the Voyager App does not materially provide the user functionality as represented by Voyager Digital (a) as regards achieving the 'best market price' or 'fair market price' for the user/trader (whether that failure to provide the represented functionality is centred principally within the "Smart Order Router," the "Voyager Pricing Engine," the "Proprietary Fills Algorithm,; and/or any other Voyager Digital system component); and/or (b) as regards any other representations or claims made.</u>

**26.**  I have examined the RESULTS OF TEST TRADES CARRIED OUT BY RICH SANDERS documentation provided to me, as contained in the Preliminary Expert's Report of Mr Rich Sanders of *Cipherblade*.  I have arrived thereby at the following understandings and provisional findings.

CASTELL

Preliminary Expert's Report                    *MARK CASSIDY and Others v VOYAGER*

**(a)**  Based on a sample of approximately 30 illustrative trades carried out through use of the Voyager App (whether 'buy' or 'sell' trades), when executed near-simultaneously, for controlled comparison purposes, with the identical trades carried out direct with/on one or more cryptocurrency exchanges (such as Coinbase, Binance, FTX, Kraken), such that the latter direct trades may in my opinion be taken, between them, as having been executed at the realistic 'best market price' or 'fair market price' practically achievable in the market for each such trade, on each and every occasion the trade in the sample as confirmed by execution of the Voyager App was executed at a comparatively worse price.  That is, whether a 'buy' or 'sell' trade, each such trade <u>resulted in an overcharge to the Voyager App user compared with the trade executed direct on exchanges</u>.

**(b)**  In my view this overcharge to the Voyager User may be characterised or thought of as essentially an undisclosed commission levied by Voyager Limited.   The overcharge/ undisclosed commission varied somewhat per individual trade, between approximately 0.5% and 1% of the value of the trade, across all trades in the sample, i.e. the overcharge was never less than 0.5% of the value of the trade.

**27.**  Taking these results into account, in my preliminary view it is quite clear that the technical evidence so far available shows that the Voyager App does not materially provide the user functionality as represented by Voyager Digital as regards achieving the 'best market price' or 'fair market price' for the user/trader.

**28.  (ii)**  <u>Is there any evidence that the Voyager App fails to perform in compliance with the representations made by Voyager Digital (if it materially does not) due to faults in design, construction and operation thereof, as distinct from being deliberately and intentionally fashioned to perform in the way that it does?</u>

**29.  (a)**  In my experience, it is in principle conceivable that the failure of the Voyager App to perform in compliance with the representations made by Voyager Digital (which failure, in the light of the RESULTS OF TEST TRADES CARRIED OUT BY RICH SANDERS, is clearly materially evident), and the resulting overcharge to the Voyager App user, could perhaps be due to faults in design, construction and operation, as distinct from (and/or in addition to) being deliberately and intentionally fashioned to perform in the way that it does.  However, until Defendant's discovery and disclosure of all relevant documentation and data pertaining to the Voyager App, and the Voyager Digital, software and systems, I am presently unable to carry out any substantive examinations or analysis speaking to answering this question.

**(b)**  In the meantime, whether the overcharge is as a result, on the part of Voyager Digital's management, of a fault in Voyager Digital's software development management, i.e. the company's software design, build, testing, deployment and operational processes, or arises from a deliberate intent of the company to deceive and overcharge the users of its Voyager App, or some combination of both, in my view and experience, and dependent, as noted herein, on due inspection and examination of the software development, management and operational documentation to be disclosed by Voyager Digital, such overcharge provisionally appears to me to be a definite *software material defect*.  I naturally defer to the court to make that finding legally in due course, and, if so, determine what restitution and compensation falls to be provided by Voyager Digital for the financial consequences of such a software material defect.

**(c)**  However, and subject to the Discovery that will be necessary to analyze definitively whether what the Voyager Digital company's management is doing is intentional, in my

**Preliminary Expert's Report**                                                    *MARK CASSIDY and Others v VOYAGER*

preliminary view, since the overcharge/undisclosed commission appears to be present in every trade, it is highly likely that the Voyager App is deliberately conceived and designed by the company's management to function that way, or, equally, the company's management has grossly failed to discharge its requisite IT and corporate governance duties, and has failed to correct this software material defect, perhaps because it is to their company's benefit. It seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.

**30. (iii)** <u>To what extent is it possible to determine the extent of the financial consequences of the Voyager App's not providing the user functionality as represented by Voyager Digital (if it materially does not) on any Voyager App user's cryptocurrency or other trading?</u>

**31.** Until Defendant's discovery and disclosure of its financial accounting systems, software and data, so that an examination of actual accounting records can be undertaken and a determination made of the scale of the quantitative financial consequences on any Voyager App user's cryptocurrency or other trading, I am presently unable to carry out an analysis, on a realistic calculated, grounded data basis, speaking to answering this question.

**32.** In the meantime I tentatively analyse, by way of an estimate, as follows. For purposes of commencing estimate calculations I consider for illustration:

    10,000 Voyager App users; and
    $1,000 of buy trades each per user, per month, on average.

Using these illustrative nominal figures gives a total of 10,000 x $1,000 = $10m of buy trades per month executed by Voyager Digital across all Voyager App users, that is a total of 12 x $10m = <u>$120m pa</u>. From the RESULTS OF TEST TRADES CARRIED OUT BY RICH SANDERS summarised above, it appears highly likely that the Voyager App causes each buy trade of every user to cost at least 0.5% more than the 'best price' or 'fair price' that the Voyager App promises. On the above 'nominal figures' basis, this would therefore amount to a total buy trades overcharge to all Voyager App users running at a rate of at least 0.5% x $120m pa = <u>$0.6m pa overcharge</u>.

**33.** However, this estimate of a $0.6m pa overcharge to all Voyager App users is an illustrative result only, based simply on assumed nominal figures. I now move on from those assumed nominal figures, and refer to Voyager Digital's own actual data: on pages 9-11/28 of the Voyager Digital Limited document 'investor presentation sept 2021.pdf', I note the following financial details presented:

    "Key Metrics: Verified Users 9/7/21 2.0 million
    Fiscal 3Q Highlights (millions): Revenue $60  Operating Profit $30  Operating Margin 50%
    Where we are today: $5.0B+ Assets Under Management
    Voyager Timeline: Q3/20 $150MM AUM ... Q1/21 $1.7B AUM ... Q2/21 $3.3B AUM & $100MM+ Quarterly revenue ...".

**34.** These details appear also to be consistent with, and confirmed by, the accounts and presentations given in the Voyager Digital Limited documents 'Condensed Interim Consolidated Financial Statements 3 and 9 months ending march 31, 2021 and 2020.pdf' and 'MDA for 3 and 9 months ended March 31 2021.pdf'. The links I have noted at end of this paragraph additionally essentially present discussion and figures that are consistent with these. The Voyager accounts and presentations show, on Voyager Digital's own March 2021

CASTELL

announced figures therein, that the company had Assets Under Management (AUM) exceeding $2.4 billion, with Total Funded Accounts as at March 2021 at over 270,000, suggesting a persistent level of funding available for buy trades per user of $2.4bn / 270,000 = $8,889 on average per user (rather than the $1,000 that I assumed in my nominal figures). The Voyager Digital Limited document 'investor presentation sept 2021.pdf' states that Voyager's AUM as at September 2021 were $5.0 billion, i.e. its AUM had grown (5.0-2.40/2.4) = 108.33% between March 2021 and September 2021. I make what I believe is a reasonable assumption that the company's Total Funded Accounts would in the same period have grown *pro rata* and thus have been at the level of slightly over double the figure at March 2021, i.e. (270,000 x 108.33%) + 270,000 = 562,500. These September 2021 figures therefore suggest once again a persistent level of funding available for buy trades per user of $5.0bn / 562,500 = $8,889 on average per user.

https://www.fool.com/the-ascent/cryptocurrency/voyager-crypto-review/
Voyager Review: Buy & Sell 50+ Digital Currencies on This User-Friendly App  Nov. 11, 2021 ...  Voyager says you can earn up to 9% APY on stablecoins, such as USDC, and 6.25% on Bitcoin ...  Voyager is a cryptocurrency broker that facilitates trading across more than a dozen of the best cryptocurrency exchanges. It's not an exchange itself; instead, it uses proprietary technology called the Voyager Smart Order Router to give customers access to dozens of currencies across multiple exchanges. ...  You have to download the app to use Voyager ...  Voyager trades are technically commission-free -- you never pay anything above the quoted price for a trade. Instead, Voyager takes a small cut of the difference if it finds you a price below its quote and lets you keep the rest. So Voyager only takes money if it saves you money. ...

https://blockworks.co/voyager-digital-preliminary-revenue-drops-40-from-previous-quarter/
Voyager Digital Preliminary Revenue Drops 40% from Previous Quarter  October 6, 2021 Voyager projects its revenue for its fiscal 2022 first quarter ending on September 30 to be between $63 million to $67 million, down from $109 million in the previous quarter ending on June 30.  … Although revenue is projected lower, Voyager's total verified users on its platform increased to more than 2.15 million, up about 23% from 1.75 million in the previous quarter, according to the data …

https://www.prnewswire.com/news-releases/voyager-digital-provides-business-update-and-march-2021-metrics-301262690.html
Voyager Digital Provides Business Update and March 2021 Metrics  Apr 06, 2021 … Assets Under Management (AUM) exceeded US$2.4 billion. Total Funded Accounts at the end of March 2021 were over 270,000. Total Verified Users on the platform were over 1 million. …

**35.** Relying on Voyager Digital's own data, therefore, it seems to me that, for the current calendar year 2021, and looking forward four more years, i.e. for the period 2021-2025, reasonably estimated projections are given by the following table, in which I make what I believe are conservative assumptions, as follows:

- Total Number of Voyager Funded Accounts: increase by 30% each year.
- Actively trading Voyager App users: are 40% of Total Number of Voyager Funded Accounts in each year.

CASTELL

Preliminary Expert's Report                                    *MARK CASSIDY and Others v VOYAGER*

| Year | Total Number of Voyager Funded Accounts, as at September in each Year: Assume increases by 30% each Year | (i) Actively trading Voyager App users: Assume = 40% of Total Number of Voyager Funded Accounts in each Year | (ii) Amount of buy trades each per actively trading Voyager App user, per annum, on average: assume constant at $8,889pm x 12 | Likely total overcharge to all actively trading Voyager App users in the Year = (i) x (ii) x 0.5% Million |
|---|---|---|---|---|
| 2021 | 562,500 | 225,000 | $106,668 | $120 |
| 2022 | 731,250 | 292,500 | $106,668 | $156 |
| 2023 | 950,625 | 380,250 | $106,668 | $203 |
| 2024 | 1,235,813 | 494,325 | $106,668 | $263 |
| 2025 | 1,606,556 | 642,622 | $106,668 | $343 |
| TOTALS | 5,086,744 | 2,034,697 | | $1,085 |

In summary, relying on Voyager's own reported figures, and setting out what I believe are reasonable (conservative) projections, I make my preliminary finding that an estimate for the total overcharge to all actively trading Voyager App users over the years 2021-2025 is highly likely to be at least $1,085m.

**36. (iv)** <u>Does the technical governance of Voyager Digital in the management, operation, integrity, representations and security of its Voyager App and of its other management and customer systems meet accepted professional standards for, and/or custom and practice in, the consumer electronic financial services and/or online trading sectors?</u>

**37.** Until Defendant's discovery and disclosure of the Voyager Digital corporate management policies, procedures, staffing, and business, financial and technical governance documentation, I am presently unable to carry out any substantive examinations or analysis speaking to answering this question definitively. However, in the interim (and taking into account findings in Mr Sanders' report concerning how, for example, Voyager systems transfer money to *HTC Trading*, or use customer funds for Voyager to trade for its own account on *Binance*), my provisional view is that the technical governance of Voyager Digital in the management, operation, integrity, representations and security of its Voyager App and of its other management and customer systems are unlikely to meet accepted professional standards for, and/or custom and practice in, the consumer electronic financial services and/or online trading sectors.

Preliminary Expert's Report                                   *MARK CASSIDY and Others v VOYAGER*

# 5.    Provisional Conclusions and Opinions

**38.**  I have carried out my instructions to
- Review the Complaint, in particular the screenshots exhibited therein, together with consideration of the initial case documentation provided.
- Monitor, record, write-up and analyse the concurrent test trades carried out by Mr Sanders using and operating the Voyager App and certain other cryptocurrency trading platforms.
- Produce provisional analyses, findings, conclusions and opinions, giving such insights as may be sensibly achievable based on both the restricted documentation available prior to discovery and disclosure and relying on the data obtained from the concurrent test trades caried out by that Mr Sanders.
- Provide an introduction to the blockchain and cryptocurrency, crypto assets etc field to assist the understanding of the Court;

and declare that my provisional conclusions and opinions are as follows.

**39.**  I have provided an introduction to and explanation of blockchain and cryptocurrency in general, and Bitcoin in particular, in ***Addendum A***:  **Introduction to Blockchain and Cryptocurrency** of this **Preliminary Expert's Report**.

**40.**  On the basis of my preliminary review and analysis of the contents of the Complaint and associated support documentation:

**(i)** To what extent does the available technical evidence show that the Voyager App does not materially provide the user functionality as represented by Voyager Digital (a) as regards achieving the 'best market price' or 'fair market price' for the user/trader (whether that failure to provide the represented functionality is centred principally within the "Smart Order Router," the "Voyager Pricing Engine," the "Proprietary Fills Algorithm,; and/or any other Voyager Digital system component); and/or (b) as regards any other representations or claims made.

In my preliminary view it is clear that the available technical evidence shows that the Voyager App does not materially provide the user functionality as represented by Voyager Digital as regards achieving the 'best market price' or 'fair market price' for the user/trader.

**41. (ii)** Is there any evidence that the Voyager App fails to perform in compliance with the representations made by Voyager Digital (if it materially does not) due to faults in design, construction and operation thereof, as distinct from being deliberately and intentionally fashioned to perform in the way that it does?

In my experience, it is conceivable that the, clearly materially evident, failure of the Voyager App to perform in compliance with the representations made by Voyager Digital, and the resulting overcharge to the Voyager App user, could perhaps be due to faults in design, construction and operation.  However, until Defendant's discovery and disclosure of all relevant documentation and data pertaining to the Voyager App, and the Voyager Digital, software and systems, I am presently unable to answer this question.  In the meantime, whether through an unintentional failure, or deliberate act, in my view such overcharge provisionally appears to be a definite *software material defect*, and it seems highly unlikely to me that the Voyager Digital company's IT and corporate management did, and does, not know (and, if not, it should), what was and is happening as regards this software material defect and its overcharge/undisclosed commission financial consequences to the Voyager App user.

Preliminary Expert's Report                          *MARK CASSIDY and Others v VOYAGER*

**43.  (iii)**  <u>To what extent is it possible to determine the extent of the financial consequences of the Voyager App's not providing the user functionality as represented by Voyager Digital (if it materially does not) on any Voyager App user's cryptocurrency or other trading?</u>

Making what I believe are reasonable assumptions, relying on Voyager's own reported figures, and setting out what I believe are conservative projections, I provisionally assess the total overcharge to all actively trading Voyager App users over the years 2021-2025 is highly likely to be at least <u>$1,085m</u>.

**44.  (iv)**  <u>Does the technical governance of Voyager Digital in the management, operation, integrity, representations and security of its Voyager App and of its other management and customer systems meet accepted professional standards for, and/or custom and practice in, the consumer electronic financial services and/or online trading sectors?</u>

Until Defendant's discovery and disclosure of the Voyager Digital corporate management policies, procedures, staffing, and business, financial and technical governance documentation, I am presently unable to carry out any substantive examinations or analysis speaking to answering this question.  However, my provisional view is that the technical governance of Voyager Digital in the management of its Voyager App, and of its other management and customer systems, are unlikely to meet these accepted professional standards, and/or relevant custom and practice.

**45.**  In summary, it is my firm preliminary opinion that the Voyager App does not materially provide the user functionality as represented by Voyager Digital as regards achieving the 'best market price' or 'fair market price' for the user/trader.

**46.**  Furthermore, in my preliminary opinion the failure of the Voyager App to provide the represented functionality is likely to be accounted for by elements of the coding or programmed behaviour of its "Smart Order Router," and/or its "Voyager Pricing Engine," and/or its "Proprietary Fills Algorithm", either acting alone, amongst themselves, or in conjunction with the Voyager Digital corporate software and systems with which these modules connect and inter-operate.  However, prior to Defendant's discovery and disclosure, it is not possible for me to determine any further details or insights on the matter, and it will be essential, in order for me to carry out the expert examinations reasonable to arriving at the necessary conclusions and opinions addressing this issue, that disclosure is given of all relevant software documentation including but not limited to software and systems specification, design, construction, testing, commissioning, deployment, operation, user experience (including guides and documentation), maintenance and fault-logging of these elements of the Voyager App and of the other Voyager Digital systems involved.

**47.**  Prior to Defendants' discovery and disclosure, it has not been possible in this **Preliminary Expert's Report** for me to arrive at any finding or conclusion as to whether there is evidence that the Voyager App's material failure to perform in compliance with the representations made by Voyager Digital is due to faults in design, construction and operation thereof, as distinct from being deliberately and intentionally fashioned to perform in the way that it does.

**48.**  Prior to Defendants' discovery and disclosure, it has not been possible in this **Preliminary Expert's Report** for me to arrive at any finding or conclusion, other than on an assumptive basis, as to what is the extent of the financial consequences of the Voyager App's material failure to provide the user functionality as represented by Voyager Digital on any Voyager App

*CASTELL*

user's cryptocurrency or other trading.  In the meantime, making what I regard as reasonable assumptions and projections, I have made a provisional estimated assessment that the total overcharge to all actively trading Voyager App users over the years 2021-2025 is highly likely to be at least <u>$1,085m</u>.

**49.**  In order for me to develop an objectively justifiable model for and accurate quantitative assessment of the quantum of such financial consequences, based on reliable financial and accounting records, it is imperative in my view and experience that disclosure includes all relevant transaction and accounting financial books and records kept and maintained by Voyager Digital pertaining to each Voyager App user's cryptocurrency or other trading, whether held digitally, manually or in or on other media.

**50.**  Based on the evident material failure of Voyager Digital to provide its promised Voyager App 'best market price', and '100% Commission Free', user functionalities, whether those failures be through deliberate policy and systems design, or through faults in software construction and operation, I am of the preliminary opinion that the technical governance of Voyager Digital in the management, operation, integrity, representations and security of its Voyager App and of its other management and customer systems are likely not to meet, in whole or in part, accepted professional standards for, and/or custom and practice in, the consumer electronic financial services and/or online trading sectors, but cannot arrive at a final considered view prior to Defendants' discovery and disclosure.

### Overall Summary of my Provisional Conclusions and Opinions

**51.**  It is my firm view that for the purposes of my expert investigations to assist the Court with its judicial pursuit and determination of, or in otherwise resolving, the Complaint, the Voyager company must declare and disclose all documentation, materials and data, including financial accounting data, relating to the development, functioning and operation of the Voyage App, and the software and systems with which it inter-operates or interfaces, including third-party network or other connections such as those to and with cryptocurrency exchanges. This is in order that my software and systems expert examination and investigation may reasonably be carried out, intended to arrive at independent technical findings, conclusions and opinions as to the specification, objective, intent, design, algorithms, code construction, behavior, testing, faults, deployment, support, maintenance, revision and operational user ticket handling, and the operational and financial consequences thereof, as they apply and relate to the Voyager App and all relevant Voyager company software and systems.

Case 1:22-cv-22439-BMA   Document 43-15   Entered on FLSD Docket 10/28/2022   Page 496 of 513



# 6.    Appendices

### *Appendix ONE*:  Dr Stephen Castell – qualifications and experience

Management, Financial and Business Development Consultant in Information Systems, Computer and Communications Software, Technologies, Industries, Legislation and Regulation, Broadcasting, Media, Telecommunications, Internet, E-commerce.   New Entrepreneurial Business Development Specialist. Expert Witness.  CEDR-Trained Mediator, ICC Arbitrator, Expert Determiner. On the List of Experts: Arbitration and Mediation Center, *World Intellectual Property Organization*, Geneva
Analytical  ●  Creative  ●  Practical  ●  Professional

**Education**
> University of Nottingham
> PhD in Mathematics : "*Certain Transformations in Gas- and Magnetogas- Dynamics*".
> Whole PhD thesis published in international mathematics/physics journals.   Postgraduate Prizewinner.
> MSc in Mathematics  (Computer Science and Fluid Mechanics)
> University of London
> BSc First Class Honours in Mathematics, Physics and Psychology
> Schooling
> Hamond's Grammar School, Swaffham, Norfolk
> 11 'O' Levels, 2 'A' Levels.   House Captain.   Athletics *Victor Ludorum*.
> Prince Rupert School, Wilhelmshaven, Germany        Magnus Grammar School, Newark, Notts.

**Career**
*1978 to present*:   Chairman, Castell Computer and Systems Telecommunications Ltd
('*CASTELL*' or '*CASTELL Consulting*')
> Own independent consultancy company.   *CASTELL* specialises in the strategising, planning, management and development of businesses in information and communications technologies, broadcasting and the media, and in analysing and influencing the financial, market, economic, regulatory and legal factors which affect them. It undertakes professional consultancy in IT and communications software/systems development, management and strategy.   Dr Castell is in particular well known for the high quality and effectiveness of his work as an Expert Witness in major computer software and systems litigation having developed powerful techniques of *Forensic Systems Analysis*, and having achieved a special reputation in researching computer law and evidence issues.   He has a track-record for business development/management in the fields of professional services, e-commerce/the internet, new media, databroadcasting, satellite, digital television, and image, voice, data and multimedia communications, particularly for entrepreneurial new companies and corporate venturing.

*Previously*:         ● Manager, Group Management Services
Bremar Holdings Ltd, international merchant bankers
● Consultant, Touche Ross & Co, Management Consultancy
● Senior Mathematician, Bearing Research Centre, RHP plc
● Applied Mathematician, Chalfont Park Research Laboratories, BACo plc.

**Publications**
A large number of papers and articles in national, international, professional, trade and technical press on IT, mathematical, technology, finance and investment subjects.  Bestseller book "*Computer Bluff*", 1983.  "*The APPEAL Report*", May 1990, a major study commissioned by the CCTA (H M Treasury) on admissibility of computer evidence in court and the legal reliability/security of IT systems.  Numerous letters published in e.g. *The Times* and *Financial Times* on business, finance, technology, communications, science and law topics. Many appearances at International Conferences to present papers on e.g. information services, software, databroadcasting, satellite business services, digital television, computer evidence, venture capital, enterprise management, litigation and ADR.  Author and Presenter of '*Avoiding IT Disasters – the Expert Way*' Course, first held Nice, France, March 2005.  His seminal paper '*Forensic Systems Analysis: A Methodology for Assessment and Avoidance of IT Disasters and Disputes*' was issued as a *Cutter Consortium Executive Report*, Enterprise Risk Management & Governance Advisory Service series (Vol. 3, No. 2, March 8, 2006).  Author of the much-cited '*The future decisions of RoboJudge HHJ Arthur Ian Blockchain: Dread, delight or derision?*', *Computer Law & Security Review*, Volume 34, Issue 4, August 2018, Pages 739-753, the Landmark 200th issue of *CLSR* under the Editorship of Emeritus Professor Steve Saxby. https://doi.org/10.1016/j.clsr.2018.05.011.

**CASTELL**

Preliminary Expert's Report                              *MARK CASSIDY and Others v VOYAGER*

Other Qualifications                                    Languages
CITP, Chartered IT Professional
FIMA, MInstP, MBCS, MCMI, CPhys, MIoD                   Working knowledge of French and German
MEWI, Member of the Expert Witness Institute
Law Society's Directory of Expert Witnesses
Awards and Recognitions
Medallist, *IT CONSULTANT OF THE YEAR*, British Computer Society IT Professional Awards, 2004.
*Corporate America News* Expert Witness of the Year 2016 (Risk Assessment & Management).
Computers Expert Witness of the Year (*Lawyer Monthly*), Expert Witness Awards 2016.
2019: Honoured with an interview for *Archives of IT: Capturing the Past, Inspiring the Future*
*In-depth experiences of the people who influenced the development of IT in the UK*:
https://archivesit.org.uk/interviews/stephen-castell/

Recreations
Business, Family. Swimming, Music, Sailing, Tennis. Patron, *London Cantamus Bach Choir and Orchestra*.
Past Parent School Governor, 1982-1985. Endowed "*Castell Computer Creativity Contest*".
Committee Member, British Computer Society (BCS) *Law Specialist Group*.
Member, Real Time Club. Past Member, Working Groups of BCS Strategy Review Panel.
Past Member, BCS *Legal Affairs Committee*.
Past Correspondent Panel Member, *Computer Law and Security Report* (now *Review*), Elsevier.

*CASTELL Consulting*'s clients have included:
Airtours plc (Expert Witness in its action *versus* EDS)
Axon Solutions Ltd (Expert Witness on behalf of *Hiscox*, its PI Insurers, in re its position as Part 20 Defendant
in the *W H Smith versus Fujitsu Siemens Computers* action concerning UK's largest SAP implementation)
British Broadcasting Corporation (BBC Data; Telecoms/Broadcasting Regulatory & Business Strategy)
BBC Enterprises Ltd (BBC Datacast; BBC Eurocast/OLYMPUS Satellite)
British Telecom plc (New Venture Business Development; Satellite Services)
BT Syntegra (Expert Witness in its actions *versus* Ministry of Defence; and SwapsWire)
Cable and Satellite Telecomms. Ltd (National Transcommunications Privatisation; Channel 5 TV Licence Bid)
Central Computer and Telecommunications Agency (CCTA, H M Treasury, British Government)
Cincinnati Bell Information Systems Ltd (Cable TV/Telephony Systems and Services)
Department of Trade and Industry, British Government (Telecoms Product Development; VANS Licensing)
European Commission/BT Tallis (INFOSEC Trusted Third Party Services)
European Space Agency (Satellite Databroadcasting)   France Telecom (New Venture Advice; AT&T
Telemarketing)
GEC-Marconi (Expert Witness in its action *versus* London Fire and Civil Defence Authority)
H M Treasury (Expert Witness - Lord Chancellor's Department in its action *versus* Price Waterhouse)
HSR, Milan (Expert Witness in its action *v.* ACT Medisys re Hospital IS for large Italian Hospital)
International Chamber of Commerce, Paris (Arbitrator in 3-man ICC Arbitral Tribunal, European litigants)
INFOCAST/Citibank (Databroadcasting Strategy)
London Ambulance Service (Expert Witness in its action *versus* CAP-CGS)
Mercury Communications Limited (National Transcommunications Privatisation)
Misys plc (Expert Witness on major cases in the UK, Italy, Ireland, Australia; Business/Product Strategies)
Motorola (Mobile Communications Interconnect and Licensing)
Pearson Group plc/Financial Times (Databroadcasting Strategy)
Personal Communications Networks: Mercury PCN and Unitel
SAIT Electronics SA, Belgium (Satellite Communications and Databroadcasting Development)
Superdrug Stores Plc (Expert Witness in its actions *versus* TEC UK Ltd)
The Meteorological Office, UK (New Business Development: Data/Databroadcasting Services)
The Press Association, London (Satellite Data Distribution).
Transfield Obayashi Joint Venture (Expert re Australia's largest infrastructure project, *Melbourne Citylink*)
United Arab Shipping Company S.A.G., Kuwait (Expert Witness in software action *v.* BIDM, Inc, New York)

Links
http://www.e-expertwitness.co.uk
http://www.computerweekly.com/Articles/2005/09/13/211761/Disasterbutnorecovery.htm.

CASTELL

### ***Appendix TWO*:  Documents Provided and Reviewed in this Report**

*In separate files.*

**1.**  I received on July 16, 2021, '20I6120-2021.07.16 - CASTELL - Moskowitz Law Firm - Letter of Instruction - Voyager App (FINAL).DOC.pdf'.

**2.**  I also received on July 16, 2021, from *The Moskowitz Law Firm, PLLC*:

| Document ID |
| --- |
| Complaint |
| Annex A to Letter of Instruction: Screenshots of the Plaintiff's May 11, 2021, 'Market Buy trade at Order ID Dx65EW' |
| |

**3.**  I received on August 26, 2021, a spread sheet 'Voyager trade comparison.xlsx', together with graphs and commentary, from Rich Sanders of *Cipherblade*, the blockchain forensics specialist I understand also engaged by *The Moskowitz Law Firm, PLLC*, as an independent expert in this matter:

| Document ID |
| --- |
| RESULTS OF TEST TRADES CARRIED OUT BY RICH SANDERS Contained in '[Draft] Preliminary Expert Report of Richard A. Sanders (Cassidy and others v. Voyager).docx' |
| |

**4.**  I further received on October 28, 2021, from *The Moskowitz Law Firm, PLLC*:

| Document ID |
| --- |
| 'investor presentation sept 2021.pdf' (Voyager Digital Limited) |
| 'Condensed Interim Consolidated Financial Statements 3 and 9 months ending march 31, 2021 and 2020.pdf' (Voyager Digital Limited) |
| 'MDA for 3 and 9 months ended March 31 2021.pdf' (Voyager Digital Limited – "MANAGEMENT'S DISCUSSION AND ANALYSIS") |
| |

CASTELL

# 7.   *Addendum A*:  Introduction to Blockchain and Cryptocurrency

## *Introduction and Overview*

A blockchain is a digital record of transactions.  The name comes from its structure, in which individual records, called blocks, are linked together in single list, called a chain.  Blockchains are used for recording transactions made with cryptocurrencies, such as Bitcoin, and have many other applications.

Each transaction added to a blockchain is validated by multiple computers on the Internet. These systems, which are configured to monitor specific types of blockchain transactions, form a peer-to-peer network.  They work together to ensure each transaction is valid before it is added to the blockchain.  This decentralized network of computers ensures a single system cannot add invalid blocks to the chain.  When a new block is added to a blockchain, it is linked to the previous block using a cryptographic hash generated from the contents of the previous block.  This ensures the chain is never broken and that each block is permanently recorded. It is also intentionally difficult to alter past transactions in blockchain since all the subsequent blocks must be altered first.

While blockchain is widely known for its use in cryptocurrencies such as Bitcoin, Litecoin, and Ether, the technology has several other uses.  For example, it enables 'smart contracts', software programs which execute when certain conditions are met.  This can provide an automated escrow system for transactions between two parties.  Blockchain can potentially be used to allow individuals to pay each other without a central clearing point, as in Automated Clearing House and wire transfers.  It has potential to increase markedly the efficiency of stock trading by allowing transactions to settle almost instantly instead of requiring three or more days for each transaction to clear.

Blockchain technology can also be used for non-financial purposes.  For example, the InterPlanetary File System (IFPS) uses blockchain to decentralize file storage by linking files together over the Internet.  Some digital signature platforms now use blockchain to record signatures and verify documents have been digitally signed.  Blockchain can also potentially be used to protect intellectual property by linking the distribution of content to the original source.

## *How Bitcoin really works*

The question "Hey, how does it 'really work', this Bitcoin?" is often heard, and it can seem that there is considerable confusion, and possibly misinformation, on the subject.

If you could 'pick up a Bitcoin and look it over', what would you see?  Well, *nothing* meets the eye—the Bitcoin is contained in something that is virtual, rather than anything physical, a *Bitcoin wallet*, essentially the equivalent of a bank account.  This wallet allows Bitcoin to be received, stored, and then sent on to others.  If you own Bitcoin, think of the wallet that contains it as your personal interface to the Bitcoin network, similar to how your online bank account is an interface to the regular monetary system.  This wallet contains a private key, a secret code, that allows you to transfer or trade Bitcoin.

CASTELL

It is useful to try to straighten out further some detailed technical elements of the 'Bitcoin birth and lifecycle', and to take that a layman's step, or 'one dumb question', at a time.

**1. One bitcoin is 'created', coming into someone's initial ownership: i.e. someone mines 1 bitcoin, or gets 'rewarded' with 1 bitcoin ('BTC') for 'verifying transactions'. *Yes or no, is that what happens? Or what?***

That's what everyone may be told happens. But it isn't. Every ten minutes records are taken from a backlog (the *Mempool*) and put into a block 1MB in size, around 2,000 transactions. A competition is then held for miners to calculate a *nonce*, which is a number that when added to the rest of the data in the block and cryptographically hashed gives an output of a specific format (with a certain number of leading zeroes).

The winner of this race is allocated a reward, 12.5BTC (or 6.25BTC after the 'halving' https://blockgeeks.com/guides/bitcoin-halving/). This reward is notated as the first record in the next block. So at the beginning of each block there is a transaction from 'Coinbase' for 12.5BTC going to the wallet address of the miner. This is where what happens in the real world, and what people think happens, differ. The miner is not rewarded with 1BTC, serial number 'xyz1', 1BTC serial number 'xyz2', etc. No, the miner is allocated 12.5BTC 'worth' of BTC. So it's like putting $100 in your bank account, $100 on the bank's ledger. It *isn't* a register that you own $1 serial number 'xyz1', $1 serial number 'xyz2', etc…

So, what we see on the Bitcoin Blockchain Ledger, https://www.blockchain.com/explorer, is a BTC balance created from thin air and allocated to the miner's public key (which ISN'T a wallet). Think of it as a Post Office Box Number.

**2. Isn't that 1 bitcoin's 'genesis' or 'birth' recorded somewhere on a (public) blockchain? *Yes or no? Or what?***

Yes, the allocation of the 12.5BTC (or 6.25BTC) WORTH is recorded in the first transaction of the next block. That's always a good 'pub quiz question' to ask to see if someone actually knows how Bitcoin really works.

**3. How is the record of that 'bitcoin birth' recorded? Is it not essentially recorded as "Mined as at <date 0> by {who?} in {where?}", and as 'one amount associated with one address, a unique string of letters and numbers' (eg 1Ez69SnzzmePmZX3WpEzMKTrcBF2gpNQ55)? *Yes or no? Or what?***

Yes, it is. For example, we can see this on https://www.blockchain.com/btc/block/0000000000000000000f938f46a145f5f85a5e956f04751367affec12128eb4d

This contains the details of block 621096, mined at 2020-03-10 15:25 by a miner known as *Slushpool*. Here's the coinbase transaction:

CASTELL

Preliminary Expert's Report                    *MARK CASSIDY and Others v VOYAGER*



**4. That 1 bitcoin is then sold on to a first buyer, just 1 bitcoin, 1 buyer; and that Transaction Number 1 is of course recorded on a blockchain, with data essentially of at least "Transacted as at <date 1>".** *Yes, or no? Or what?*

Yes, the transfer is recorded.  In fact if you go to https://www.blockchain.com/btc/block/0000000000000000000f938f46a145f5f85a5e956f04751367affec12128eb4d and click on the address highlighted above you will see that transactions have subsequently transferred elsewhere.  Scroll down the page and you will see an example:



So it looks like this busy miner has paid out a bunch of BTC to over 400 addresses in one transaction.  The challenge is that, just like money in your bank account, there is no way of knowing that any particular amount is directly from another amount (because it isn't).

**5. To keep it simple, let's assume that this first new owner of that 1 bitcoin did not own any bitcoins prior to his/her purchase thereof, and after Transaction Number 1 does not add to his/her holding.  This first owner now has the bitcoin essentially 'stored alone' in his/her wallet, i.e 'containing' just that same single bitcoin address "1Ez69SnzzmePmZX3WpEzMKTrcBF2gpNQ55".** *Yes or no? Or what?*

Let's not mix up wallets and addresses.  The Bitcoin Blockchain allocates BTC values to addresses.  A wallet, whether hardware or software, simply holds details of those addresses.  A wallet also usually has functionality to store public and private keys and can sign transactions, using the Elliptic Curve Digital Signature Algorithm (ECDSA https://en.bitcoin.it/wiki/Elliptic_Curve_Digital_Signature_Algorithm).  If we looked at the history of that person's bitcoin address, we would indeed just see the one transaction coming in.

CASTELL

**6.  Transaction Number 2: that first owner sells that same 1 bitcoin to another person (again, to keep it simple, owning no bitcoin prior to this transaction, and none further added afterwards).  This Transaction Number 2 is also recorded on a blockchain, with data essentially of at least "Transacted as at <date 1.1>".  *Yes, or no?  Or what?***

Yes, with same caveats as above, it shows value transfer from Address A to Address B.  If you've looked at some of the transactions on the explorer you'll get this now.

**7.  The second owner, in turn, now has the bitcoin alone stored in his/her wallet, 'containing' just that same single bitcoin address "1Ez69SnzzmePmZX3WpEzMKTrcBF2gpNQ55".  *Yes or no?  Or what?***

Not quite.  Remember values are stored against addresses.  Wallets store addresses.  Wallets don't therefore hold bitcoin, they provide the means to access them.

**8.  After N such simple identical sell-buy transactions we arrive at, say, Richard, owning that same 1 bitcoin, by way of Transaction Number N, "Transacted as at <date 2>"; and thus someone is then able to say, by appropriately interrogating the relevant blockchain records:    This 1 bitcoin has "wallet address {XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX}.  It was originally mined by {who?} in {where?}, and after being mined was transferred (bought and sold) [N] times between <date 1> and <date 2>".  *Yes or no?  Or what?***

No.  But…  We can use the Bitcoin Blockchain to see values allocated to addresses changing.  So we could see that Richard had 1 BTC "worth" in his address 12345xxxxx and then a message with a transaction to "move" 0.5BTC to Stephen's address 6789xxxx took place.  And we would also see the remaining 0.5BTC being sent back to Richard's address because Bitcoin uses 'unspent output from bitcoin transactions' (UTXO https://www.investopedia.com/terms/u/utxo.asp).

This is where there can be potential befuddlement between those who regularly transact in BTC who *think* they understand how it works, versus those who *know* how it *actually* works.  For example, prosecuting authorities can bring actions against crypto scammers, fraudsters and illegal users of BTC because prosecutors don't have to prove a specific BTC was used in illegal activity (think 'individual banknote' in fiat currencies).  This is similar to how a drug dealer will have an entire bank account seized and not just the individual USD notes that were obtained illegally.  You can track transactions between Bitcoin accounts.  But the transactions are *changes in ledger balance values* and *not* movements of specific coins, albeit the latter is what it looks like to those who don't know better.

Furthermore, the ledger balances and the Bitcoin accounts could all be owned by entirely different real people or, equally, they could all simply be in the legal ownership and control of the same person – just as for USD, the same person may hold and operate several different bank accounts, and also either with the same bank, or with different banks, and move his or her own USD between them.  Bitcoin value movements as tracked on the Bitcoin Blockchain and as may be recorded as changes in addresses accessed via wallets may in reality be nothing more than the digital currency equivalent of someone moving his or her own USD notes and coin 'from one pants pocket to another'.

CASTELL

Just as anyone could have many different (varying) piles, or pockets full, of USD notes and coins, and many different pants pockets, all of which could change with time, with no one-to-one relationship ever among them, so any one person could have many different, changing BTC values recorded on the Bitcoin Blockchain, and many different wallets recording, dynamically, their addresses.

### *The fundamentals of analysis of cryptocurrency and blockchain transactions*

There is much in the technical literature on analysis of cryptocurrency and blockchain transactions, including in regard to identifying and verifying account holders, and associated transactions carried out by them **[1]**.  To my knowledge few, if any, techniques and processes that seek to do this have achieved wide or generally-recognised standing either legally or technically.

It should be borne in mind that *blockchain* still has few settled international standards, and the concept, and device-implementation, of a *cryptocurrency wallet*, its definition, structure, meaning, interpretation and use are not wholly standardised or consistent.  They are also operationally dependent on, and subject to manipulation by, wallet-specific private vendor software, which is rarely independently verified or checked as to functional correctness or adequacy, quality, reliability, consistency, security and forensic provability **[2]**.

Cryptocurrency frauds and scams routinely occur and the amounts of fiat money now relentlessly misappropriated criminally runs to many billions of USD.  It is a feature of these activities that (i) they principally involve proprietary third-party transactional software and systems (eg that running and offered by cryptocurrency trading exchanges), the 'on and off ramps' that connect the trader, the end-user consumer, to the secure cryptocurrency blockchain itself: such systems may be of questionable, and unaudited, provenance, quality or reliability; and (ii) since cryptocurrency trading is essentially globally unregulated **[3]**, with few checks by authorities or regulators on the *bona fides* or substantive financial standing of the promoters and operators thereof, investigators and prosecutors have difficulty identifying and/or catching perpetrators.  If and when they do, they have additional challenges in securing the relevant fraudulent transactional blockchain and misappropriated crypto-asset movement evidence sufficient to prove an offence and gain a conviction to the usual 'beyond a reasonable doubt' standard.

In short, it is widely recognized that digital currencies, such as Bitcoin, readily offer convenience and security to criminals, who operate in an essentially 'black market'.  And this state of affairs is unlikely to change whilst cryptocurrencies continue to exist and their trading transactions persist operationally without the backing and responsibility of Regulated/Trusted Third Parties, and thus, it has been argued, essentially outside the Rule of Law **[4]**.

For the same reason, it should be noted that investigators examining transactions and holdings of reputable and ordinary citizens who may legitimately trade and invest in cryptocurrency need to take care not to make inferences and draw conclusions of supposed illegal intent on the part of such traders and investors based only on technical analysis.  Blockchain may, by virtue of its cryptographic data recording and distributed consensus mechanism, provide technically a decentralized 'trust' architecture; but blockchain, in and of itself, cannot necessarily constitute a sound, robust, rigorous, trusted and authenticated 'chain of evidence' upon which to rely to prove apparently suspicious intent and possibly unlawful actions.

CASTELL

### *Illustrative References*

**[1]** Examples:

https://link.springer.com/article/10.1007/s41109-019-0249-6
*Quantitative analysis of cryptocurrencies transaction graph Amir Pasha Motamed & Behnam Bahrak Published: 30 December 2019*
*Introduction  Cryptocurrencies have made it possible for a financial system to perform transactions without the need for a centralized authority while keeping the transaction details and money generation clear and publicly available. Despite this transparency, people's identities are hidden, and they can transact anonymously. All transaction information of a cryptocurrency is usually stored in a distributed public ledger, named blockchain. The tasks of recording, updating, and maintaining the blockchain is the responsibility of network users for each coin, whose identities are unknown, and rewards have been created to provide them with sufficient incentives to do so, making the network up and running. Although the system is running by anonymous people, due to computational infeasibility of forging digital signatures and security of cryptography algorithms, transaction alteration is almost impossible. This level of security is guaranteed by cryptographic algorithms, and as long as these algorithms are secure, cryptocurrencies integrity is protected. ...*

https://www.researchgate.net/publication/277248535_Identifying_Bitcoin_users_by_transaction_behavior
*Identifying Bitcoin users by transaction behavior Vinnie Monaco Naval Postgraduate School April 2015 DOI: 10.1117/12.2177039 Conference: SPIE DSS*
*ABSTRACT Digital currencies, such as Bitcoin, offer convenience and security to criminals operating in the black marketplace. Some Bitcoin marketplaces, such as Silk Road, even claim anonymity ... This claim contradicts the findings in this work, where long term transactional behavior is used to identify and verify account holders. Transaction features, such as timestamp, coin-flow, and connectivity, contribute to revealing the account-holder's identity. The time between successive transactions is the result of low-frequency effects, such as the desire purchase an item and daily schedule, as well as higher frequency effects, such as hardware and network latency. In addition to transaction time-intervals, dynamic network features of each transaction, such as coin flow and number of edge outputs and inputs, can also be used to identify account-holders. In this paper, we propose novel methodology for identifying and verifying Bitcoin users based on the observation of Bitcoin transactions over time. ... A subset of Blockchain 230686 is analyzed, selecting users that initiated between 100 and 1000 unique transactions per month for at least 6 different months. This dataset shows evidence of being nonrandom and nonlinear, thus a dynamical systems approach is taken. Identification and verification accuracies are obtained using monthly Bitcoin samples. Outgoing transactions, as well as both outgoing and incoming transactions, are considered. Results show an inherent lack of anonymity by exploiting patterns in long-term transactional behavior. ...*

https://www.frontiersin.org/research-topics/12966/cryptocurrency-transaction-analysis-from-a-network-perspective
*Cryptocurrency Transaction Analysis from a Network Perspective*
*Cryptocurrencies ...store their transactions publicly in blockchains. These longitudinal transaction records form large temporal networks of millions of nodes (addresses or accounts) and billions of edges (coin transfers or program function calls) connecting them together. They are probably the largest empirical datasets of complex networks, or graph data, publicly available.  Cryptocurrencies have a wide adoption in (dark) markets and financial activities (for example, goods purchasing, fundraising, etc.), criminal activities (for example, fraud, money laundering, pyramid schemes, etc.) and gaming (for example, gambling, lottery, etc.). The public transaction records contain rich information and complete traces of these activities. ...*

https://www.chainalysis.com/professional-services/
*Advanced blockchain forensics  Combining expertise in Chainalysis software, open source data analysis, and the latest investigative techniques, our team makes the cryptocurrency space safer by tackling the most challenging cases.*

CASTELL

**[2]**
https://www.iso.org/committee/6266604.html
ISO/TC 307 Blockchain and distributed ledger technologies
Scope: Standardisation of blockchain technologies and distributed ledger technologies.
5 published ISO standards.  12 ISO standards under development under the direct responsibility of
ISO/TC 307.  43 Participating members.  19 Observing members.

'Blockchain – The Legal Implications of Distributed Systems', The Law Society HORIZON
SCANNING August 2017, 12 pages.

https://hackernoon.com/what-are-the-requirements-for-a-modern-crypto-wallet-fwt130jw
*What Are the Requirements for a Modern Crypto Wallet?  August 28th 2019 Kirill Shilov*
*Out of the 18 million of mined Bitcoins, nearly 27% are out of circulation, and most of those are*
*supposedly lost. … the majority of them are lost due to mistakes in money management. That's why*
*the importance of crypto wallets increases every day …  The first crypto wallet … was very simple: it*
*allowed for the generation of new addresses and sending BTC to other people. No special measures*
*were taken to protect or recover the private key, and it was easy to type an incorrect address and send*
*coins to the wrong destination. …  The first exchange was launched in 2010, called Bitcoinmarket.com.*
*The next year, 2011, was the year when Mt.Gox was launched, and people started to use it as some*
*kind of a wallet. The Mt.Gox hack (when its users lost nearly 650,000 BTC) taught us not to store crypto*
*on exchanges, and the demand for secure crypto wallets increased. Over time, many new wallets such*
*as Exodus and Jaxx appeared, with multi-currency support and new security features. Nowadays, there*
*are a lot of competing wallets for any currency ...*

https://www2.deloitte.com/mt/en/pages/technology/articles/mt-article-cryptocurrency-
security-standard-CCSS.html
*Cryptocurrency Security Standard (CCSS)  By Sandro Psaila: IT Audit Senior Manager*
*As cryptos are expected to shift into the mainstream, one of the biggest challenges is confidence. Can*
*CCSS bridge the gap? …  People and organisations are concerned about the authentication,*
*authorisation and/or confidentiality limitations of cryptocurrency transactions. …  By standardising the*
*security techniques and methodologies used by crypto systems around the globe, end-users will be*
*able to make educated decisions more easily about which products and services to use and with which*
*companies they wish to align. On the other hand, many cryptos, like Bitcoin, are not governed by a*
*central control point or "authority"; standardising on security will be a challenging process. …  Although*
*this standard has been around since 2014 and the number of crypto systems have mushroomed*
*recently, very few organisations are claiming adherence with the CCSS when it comes to the*
*management of crypto wallets. In fact, it is perceived that a considerable number of businesses in this*
*space, mainly start-ups, do not follow security best practices, and their operations do not meet minimal*
*security standards.  …*

**[3]**
'In a new Survey, a Majority of Attorneys & Expert Witnesses Call for Increased Cryptocurrency
Regulation', by Dr Stephen Castell CITP, EXPERT WITNESS JOURNAL, AUGUST 2021.

**[4]**
'Blockchain vs Trust: The Fundamental Expert Dilemma', by Dr Stephen Castell, EXPERT
WITNESS JOURNAL, WINTER 2019.

https://www.arachnys.com/2019/10/22/addressing-the-aml-risks-of-cryptocurrencies/
*Addressing the AML risks of cryptocurrencies  OCTOBER 22, 2019 BLOG*
*With the recent explosion in cryptocurrencies, from the early beginnings of Bitcoin back in 2009 …in*
*2019, there still remains serious unanswered questions about the money laundering risks they bring to*
*banks, consumers and regulators.  Ciphertrace's 'Q2 2019 Cryptocurrency Anti-Money Laundering*

CASTELL

**Preliminary Expert's Report**                    *MARK CASSIDY and Others v VOYAGER*

*Report'* … claims that theft, scams and other forms of misappropriation of funds "from cryptocurrency users and exchanges netted criminals and fraudsters approximately $4.26 billion in aggregate." …  Dr Stephen Castell, an independent FinTech consultant, admits that there are few innocent investor protections to fall back on: "This is essentially the case worldwide today, and it looks like it will continue that way for the foreseeable future." …

*Digital Bytes*, Weekending 26th October 2019, TeamBlockchain Ltd.
http://www.teamblockchain.net/
… *Binance's latest quarterly results … in the last two years it has made over $1billion of profit. CEO of Binance, Changpeng Zhao, … established Binance only in 2017. Binance raised $15 million via an Initial Coin Offering (ICO) and CZ is reported to be worth $1.2 billion. Binance, based in Hong Kong, is different from its competitors … based in the USA e.g. Coinbase (San Fran), Kraken (San Fran), Bittex (Las Vagas) and Bitbox (NYC).  The amount of Cryptos that were traded in September 2019 on exchanges like Binance was still over $500 billion - down from nearly $800 billion in June 2019. According to the website Coin.Market there are now over 260 different Crypto exchanges …*

'Code of practice and management guidelines for trusted third party services', S. Castell, INFOSEC Project Report S2101/02, 1993.
*The APPEAL Report*, Dr Stephen Castell, 1990, Eclipse Publications, ISBN 1-870771-03-6).

*CASTELL*

Preliminary Expert's Report                                    *MARK CASSIDY and Others v VOYAGER*

## 8.    Expert's Declaration and Statement of Truth

**Expert's Declaration**
I Stephen Peter Castell DECLARE THAT:
1.  I understand that my duty in providing written reports and giving evidence is to help the Court, and that this duty overrides any obligation to the party by whom I am engaged or the person who has paid or is liable to pay me. I confirm that I have complied and will continue to comply with my duty.
2.  I confirm that I have not entered into any arrangement where the amount or payment of my fees is in any way dependent on the outcome of the case.
3.  I know of no conflict of interest of any kind, other than any which I have disclosed in my report.
4.  I do not consider that any interest which I have disclosed affects my suitability as an expert witness on any issues on which I have given evidence.
5.  I will advise the party by whom I am instructed if, between the date of my report and the trial, there is any change in circumstances which affects my answers to points 3 and 4 above.
6.  I have shown the sources of all information I have used.
7.  I have exercised reasonable care and skill in order to be accurate and complete in preparing this report.
8.  I have endeavoured to include in my report those matters, of which I have knowledge or of which I have been made aware, that might adversely affect the validity of my opinion. I have clearly stated any qualifications to my opinion.
9.  I have not, without forming an independent view, included or excluded anything which has been suggested to me by others, including my instructing lawyers.
10. I will notify those instructing me immediately and confirm in writing if, for any reason, my existing report requires any correction or qualification.
11. I understand that –
    (a) my report will form the evidence to be given under oath or affirmation;
    (b) questions may be put to me in writing for the purposes of clarifying my report and that my answers shall be treated as part of my report and covered by my statement of truth;
    (c) the Court may at any stage direct a discussion to take place between experts for the purpose of identifying and discussing the expert issues in the proceedings, where possible reaching an agreed opinion on those issues and identifying what action, if any, may be taken to resolve any of the outstanding issues between the parties;
    (d) the Court may direct that following a discussion between the experts that a statement should be prepared showing those issues which are agreed, and those issues which are not agreed, together with a summary of the reasons for disagreeing;
    (e) I may be required to attend Court to be cross-examined on my report; and
    (f) I am likely to be the subject of public adverse criticism by the judge if the Court concludes that I have not taken reasonable care in trying to meet the standards set out above.

**Statement of Truth**

I confirm that, insofar as the facts stated in this my **Preliminary Expert's Report** are within my own knowledge, I have made clear which they are and I believe them to be true; and that the findings I have presented represent my true and complete professional analysis, conclusions and opinion for the purposes of such a report and all of the opinions expressed herein are opinions which I hold to a reasonable degree of scientific certainty.

**Signature**
...................................................................................................

**Date**          DECEMBER 19TH, 2021
...................................................................................................

**Dr Stephen Castell, *CASTELL Consulting***                    December 19, 2021

# Exhibit P

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF FLORIDA
 3            CASE NO: 21-4441-CIV-ALTONAGA/Torres
 4    MARK CASSIDY, on behalf of himself
      and others similarly situated,
 5
          Plaintiff,
 6    vs.
 7    VOYAGER DIGITAL LTD, and VOYAGER
      DIGITAL LLC,
 8
          Defendants.
 9    *****************************************************
10    VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF:
11                          BRIAN NISTLER
12    DATE TAKEN:           April 19, 2022
13    TIME:                 10:00 a.m. to 5:40 p.m.
14    PLACE:                Via Zoom
15    TAKEN BEFORE:         JERI DRUM, COURT REPORTER
                            AND NOTARY PUBLIC
16    *****************************************************
17
18
19
20
21
22
23
24
25
```

1      A    Yes.

2      Q    And so you are saying here under oath that

3  you agree with your counsel that the name of the

4  entity that you just referenced in your testimony is

5  an attorney/client privileged communication?

6      A    Yes.

7      Q    Who is HTC Trading, Incorporated?

8      A    It is a subsidiary of Voyager Digital LTD.

9      Q    And what does HTC Trading, Incorporated

10  do?

11      A    Currently it has no operations.

12      Q    What do you mean by currently?

13      A    It has had no operations while I have been

14  employed at Voyager Digital Holdings, Incorporated.

15      Q    And how do you know that?

16      A    Because it was applying for a VASP license

17  during my time there.  It applied for a VASP license

18  during my time there and could not operate until

19  that license was secured.

20      Q    What license is that?

21      A    The V-A-S-P license, VASP.

22      Q    What does that stand for?

23      A    Virtual Asset Service Provider.

24      Q    And who issues that license?

25      A    A Cayman regulatory authority.

Page 38

1      Q    HTC Trading, Incorporated is a Cayman

2  corporation?

3      A    Yes.

4      Q    Does HTC Trading, Incorporated hold any

5  accounts?

6      A    No.

7      Q    Does HTC Trading, Incorporation have any

8  employees?

9      A    No.

10     Q    And, to your knowledge, HTC Trading,

11  Incorporation conducts no activities?

12     A    That's correct.

13     Q    And they are wholly owned by Voyager

14  Digital LTD?

15     A    That is correct.

16     Q    So an LLC takes the money from customers

17  when they place a trade order on a platform.  And,

18  according to your testimony, they give it to some

19  unspecified third party to conduct the trade?

20          MR. SADEGHI:  Objection to form.

21          THE WITNESS:  Can you repeat that?

22     Q    (By Mr. Kaye)  Sure.  So when Voyager LLC

23  receives money from a customer on the platform and a

24  customer places a trade order, whether it is buy or

25  sell, Voyager LLC takes that money and that trade

Page 44

1          Q    (By Mr. Kaye)  You can answer.

2          A    I don't know.

3          Q    I'm going to show you what I'm marking as

4    Exhibit 4.

5                    (Exhibit 4 was marked

6                     for identification.)

7          Q    (By Mr. Kaye)  Do you see on the screen

8    the preliminary expert report of CipherBlade

9    Blockchain Investigation Agency?

10          A    I do.

11          Q    And you testified before you skimmed

12    through this report when the complaint was filed?

13          A    I recall reading excerpts from the

14    complaint that referenced the expert report.  I

15    don't recall reading the report itself.

16          Q    Okay.  So specifically this is a part that

17    was referenced in the complaint.  So you recognize

18    this chart as one that is generated from

19    Chainalysis?

20          A    I do not.

21          Q    Okay.  Well, I'll represent to you that in

22    this report Rick Sanders conducted trades and

23    followed them through Chainalysis.  And this right

24    here represents where the funds were traveling.  And

25    as he states in paragraph 37 as shown above, my

Page 45

1    Bitcoin deposit to Voyager was sent to HTC Trading.

2    Voyager wholly owns HTC Trading.  It is impossible

3    to determine exactly what Voyager and/or HTC Trading

4    utilized my Bitcoin for after this deposit.

5                    Do you see that?

6        A    I see it.

7        Q    So does HTC Trading hold any accounts

8    through which client funds travel?

9        A    Not to my knowledge.

10       Q    Now, if this chart represents that funds

11   did in fact travel from LLC through HTC Trading, you

12   would have no reason to dispute that?

13       A    I don't know where that chart came from.

14       Q    That's fine.  I'm saying if that's what

15   this chart shows, you have no reason to dispute it

16   because you have no knowledge; is that right?

17            MR. SADEGHI:  Objection.

18            THE WITNESS:  I have no knowledge with

19       regard to that.

20       Q    (By Mr. Kaye)  Are you aware that funds

21   that customers used to trade on the Voyager platform

22   are sometimes utilized by Voyager to place trades on

23   the Binance Exchange?

24       A    Can you repeat that question?

25       Q    Are you aware that funds that are provided