### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 22-cv-22538-ALTMAN/Reid

**PIERCE ROBERTSON**, *et al.,* on behalf of
themselves and all others similarly situated,

*Plaintiffs,*

*v.*

**MARK CUBAN**, *et al.*,

*Defendants.*

**AMENDED CLASS ACTION
COMPLAINT**

**JURY DEMAND**

_____/

## <u>AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL</u>

*I … am a [Voyager and Steve Ehrlich] customer and I've been a customer for
several months now I like to use it, it's easy, it's cheap, it's fast, and the pricing is
actually really good, so we find it as **a perfect fit for our Mavs fans and reaching
Mavs fans of all ages…** it's **as close to risk free** as you're going to get … just the
ability to make that much more on your savings as an individual and as a business
is a huge opportunity.*

**– Defendant Mark Cuban (Governor, Dallas Mavericks)**



Plaintiffs Pierce Robertson, Rachel Gold, Sanford Gold, Rahil Sayed, Christopher Ehrentraut, Todd Manganiello, Dan Newsom, William Ayer, Anthony Dorn, Dameco Gates, Marshall, and Edwin Garrison ("Plaintiffs") file this class action complaint on behalf of themselves, and all others similarly situated, against Mark Cuban ("Cuban") and Dallas Basketball Limited, d/b/a Dallas Mavericks (the "Mavericks").[1]

## INTRODUCTION

1.       On December 24, 2021, counsel for Plaintiffs and the class members brought the first (and only) putative nationwide class action complaint styled *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), alleging that the Deceptive Voyager Platform owned and operated by Voyager Digital Ltd. ("Voyager") and Voyager Digital LLC ("VDL") was an unregulated and unsustainable fraud. The operative complaint in the *Cassidy* Action found at ECF No. 46 is attached hereto as **Exhibit A** (the "*Cassidy* Complaint"). In that complaint, Plaintiffs also alleged that Defendant Ehrlich, Voyager's CEO, teamed up with Defendants Cuban and the Dallas Mavericks to promote Voyager and VDL by making false representations and employing other means of deception. As a result, Plaintiff and the class members have sustained losses in excess of $5 billion.

2.       The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting the Deceptive Voyager Platform—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Dallas Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

---

[1]   Undersigned Counsel represents hundreds of injured Voyager investors, and these select Plaintiff investors agreed to serve as class representatives at this stage. Moreover, discovery has yet to commence, but Plaintiffs' counsel anticipates adding additional responsible parties as Defendants.

3.      After the *Cassidy* Complaint was filed, the following important actions took place:

(a)      the United States Securities and Exchange Commission (SEC) began an enforcement review focused on whether Voyager's Earn Program Accounts ("EPAs") constitute unregistered securities;

(b)      seven state Attorney Generals (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) took specific action finding that Voyager was violating their state laws, including issuing "cease and desist" letters to Voyager, finding that the EPAs, like the one Plaintiff Mark Cassidy was offered and sold by Voyager, was an unregistered security, prohibiting the crypto-asset broker-dealer from selling any more unregistered securities (finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022 (thousands of these EPAs were Florida-based); and

(c)      on March 29, 2002, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the Earn Program is not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[2]

4.      On July 5, 2022, Voyager Digital Holdings, Inc. and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases (the "Bankruptcy Cases") are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

5.      On September 28, 2022, Voyager filed a motion in the Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (i) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (ii)

---

[2]      https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed October 28, 2022); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed October 28, 2022)

additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

6.      In the Bankruptcy Cases, Voyager has reported that it has in excess of 3.5 million investors. This action seeks to hold Ehrlich, Cuban, and the Dallas Mavericks (and possibly other soon-to-be-named defendants) responsible for making Voyager's investors whole.

## PARTIES

7.      Plaintiff Pierce Robertson is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Robertson purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Robertson did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Robertson has sustained damages for which Cuban and Ehrlich are liable.

8.      Plaintiff Rachel Gold is a citizen and resident of the State of Florida. She is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ms. Gold purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on her holdings. Plaintiff Ms. Gold did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Ms. Gold has sustained damages for which Cuban and Ehrlich are liable.

9.      Plaintiff Sanford Gold is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Mr. Gold purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Mr. Gold did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Mr. Gold has sustained damages for which Cuban and Ehrlich are liable.

10.     Plaintiff Rahil Sayed is a citizen and resident of the State of New Jersey. He is a natural person and is otherwise *sui juris*. Plaintiff Sayed purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Sayed did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Sayed has sustained damages for which Cuban and Ehrlich are liable.

11.     Plaintiff Christopher Ehrentraut is a citizen and resident of the State of Tennessee. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ehrentraut purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Ehrentraut did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Ehrentraut has sustained damages for which Cuban and Ehrlich are liable.

12.     Plaintiff Todd Manganiello is a citizen and resident of the State of Louisiana. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Manganiello purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Manganiello did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Manganiello has sustained damages for which Cuban and Ehrlich are liable.

13.     Plaintiff Dan Newsom is a citizen and resident of the State of Alabama. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Newsom purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Newsom did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive

Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Newsom has sustained damages for which Cuban and Ehrlich are liable.

14.     Plaintiff William Ayer is a citizen and resident of the State of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Ayer purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Ayer did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Ayer has sustained damages for which Cuban and Ehrlich are liable.

15.     Plaintiff Anthony Dorn is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Dorn purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Dorn did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Dorn has sustained damages for which Cuban and Ehrlich are liable.

16.     Plaintiff Dameco Gates is a citizen and resident of the State of California residing. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Gates purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Gates did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Gates has sustained damages for which Cuban and Ehrlich are liable.

17.     Plaintiff Marshall Peters is a citizen and resident of the State of Pennsylvania. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Peters purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Peters did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive

Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Peters has sustained damages for which Cuban and Ehrlich are liable.

18.     Plaintiff Edwin Garrison is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Plaintiff Garrison purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Plaintiff Garrison did so after being exposed to some or all of Cuban's and Ehrlich's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in this complaint, and executed trades on the Deceptive Voyager Platform in reliance on those misrepresentations and omissions. As a result, Plaintiff Garrison has sustained damages for which Cuban and Ehrlich are liable.

19.     Defendant Mark Cuban is a citizen of the State of Texas. Cuban is the well-known businessman, investor, television and media personality, and the team owner of the American professional basketball team, the Dallas Mavericks.

20.     Defendant Dallas Basketball Limited, d/b/a Dallas Mavericks is a Texas limited partnership doing business in the United States.

**JURISDICTION AND VENUE**

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than the Defendants.

22.     This Court has personal jurisdiction against Defendants because they conduct business in Florida, and/or have otherwise intentionally availed themselves of the Florida consumer market through the promotion, marketing, and sale of Voyager's EPAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of Voyager's unregistered securities to consumers in Florida. This purposeful availment renders the exercise of jurisdiction by this Court over Defendants permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District under 28 U.S.C. § 1391 because thousands of Class Members either reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and

because Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District.

24.     All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

## FACTUAL ALLEGATIONS

**A.     Background on Voyager and VDL.**

25.     Until seeking the protection of the Bankruptcy Court, Voyager Digital LTD ("Voyager") and Voyager Digital LLC ("VDL") operated a multi-billion-dollar mobile application cryptocurrency investment service (the "Deceptive Voyager Platform") that placed cryptocurrency trade orders on behalf of users like Plaintiff and Class Members and offered interest bearing cryptocurrency accounts.

26.     Voyager was first listed on the Toronto Venture Exchange (TSX.V) under the symbol VYGR.V in February of 2019.[3] In September 2019, Voyager Digital Ltd was listed on the Canadian Stock Exchange (CSE) under the symbol VYGR.CN. In 2021, Voyager announced its approval to trade on the Toronto Stock Exchange (TSX) under the new ticker symbol VOYG and de-list from the CSE. Voyager stock was also available Over-the-Counter (OTC) through many US brokerages and could be purchased in the state of Florida and throughout the United States via the symbol VYGVF.

27.     Voyager quickly became one of the most utilized avenues for nascent investors to purchase cryptocurrency.  By the time Voyager filed for Bankruptcy protection, customers had entrusted over $5 billion to it.

28.     The Deceptive Voyager Platform was based upon false representations and other deceptive conduct.  In this case, the scheme was specifically designed to take advantage of unsophisticated investors who utilize mobile apps to make their investments.

**B.     Voyager's offer and sale of EPAs, which are unregistered securities.**

29.     On October 23, 2019, Voyager began offering interest-bearing cryptocurrency accounts to public investors. Since then, it has referred to these accounts by various names,

---

[3]  *See*  https://www.investvoyager.com/blog/why-voyager-is-a-public-company/  (accessed October 28, 2022)

including the "Voyager Interest Program" or the "Voyager Earn Program Account." ("EPAs"). Voyager initially launched the EPAs for customers holding Bitcoin, but thereafter extended them periodically to include dozens of other crypto assets, including USDC and Ethereum through end of fiscal year 2021.  Plaintiffs and other similarly situated individuals invested in Voyager's EPAs.

30.     Voyager maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

31.     The EPAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. Although Voyager promised its investors a fixed return for their EPA investments, Voyager's Annual Information Form filed with Canadian regulators stated, "Rewards earned on crypto assets are variable, and reward rates are determined by voyager at its sole discretion."  In order to generate revenue to fund the promised interest, Voyager pooled the EPA assets to engage in lending and staking activities from which it derived revenue to pay interest on the EPA accounts. These activities make the EPAs a "security" under state and federal law.

**C.     The Deceptive Voyager Platform**

32.     The Deceptive Voyager Platform offered investors a fully functional suite of APIs and mobile apps to allow anyone who legally able to do so the ability to trade, invest, earn and secure digital assets across multiple types of digital assets.[4] According to its creators, "The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace."[5]

---

[4]     Voyager Digital LTD Management's Discussion and Analysis for the Three and Six Months Ended December 31, 2020 (attached to the Cassidy Complaint as Exhibit H).

[5]     *See* "Voyager Digital and Market Rebellion to Form Online Broker Platform for Equities, Options, and Futures Trading," dated May 5, 2021 (attached to the Cassidy Complaint as Exhibit J)

33.     VDL, one of Voyager's subsidiaries, acted as Voyager's "crypto-broker."  VDL and Voyager represented prominently and consistently to the investing public that the Voyager Platform offered trades that were "100% Commission-Free."

34.     VDL also claimed to provide users buying and selling of cryptocurrencies with the execution of trades across a spectrum of exchanges to give Voyager "deep pools of liquidity."[6] It also offered a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.[7] Some of the services offered by VDL included:

    (a)     users could open an account in three minutes or less. VDL utilizes third party service providers for know-your-client and anti-money-laundering checks to ensure fast and secure account openings;

    (b)     users could trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies;

    (c)     minimizing transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing VDL's patented "Smart Router" technology;

    (d)     providing users with data in order for them to manage and track their crypto investments, including delivering news, social feeds and real-time alerts to keep users connected to the market, and providing portfolio tools to track performance, balances and transactions; and

    (e)     storing crypto assets in a secure wallet and in a "cold" facility, with 24/7 security. (fiat currency is stored at custodial banks).[8]

35.     These representations enabled VDL to obtain an edge over its competitors, including but not limited to Coinbase, Gemini, Kraken, and Binance, who openly display the applicable fees and commissions they charge on each trade.

36.     These "100% Commission-Free" representations, however, were false and mislead objective consumers acting reasonably under the circumstances.  In fact, VDL secretly charged exorbitant commissions on each trade.

37.     VDL perpetrated the scheme by, among other means, maintaining the "spread" (i.e., the difference between the "Bid Price" and "Ask Price" on a given cryptocurrency) intentionally

---

[6]     *See Cassidy* Complaint, Ex. H.

[7]     *Id.*

[8]     *Id.*

wide on all cryptocurrencies listed throughout the Voyager Platform. Voyager explained in its most recent Management's Discussion and Analysis that the spread was a main source of revenue:[9]

> Fee revenue for the three and nine months ended March 31, 2021 was $53.7 million and $57.4, an increase of $53.5 and $57.1 compared to the same periods in 2020. The increase in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 was primarily due to an increase of $5.0 billion in trade volumes, and an increase in average spread of 70.1 bps. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31, 2020 was primarily due to an increase of $5.5 billion in trade volumes, and an increase in average spread of 60.6 bps.

38.     Although the Voyager Platform displayed a "Fair Market Price" for each cryptocurrency, which fell somewhere in the middle of the spread, the Voyager Platform's systems automatically executed market orders at the highest end of the spread, from which they pocketed secret commissions. Moreover, once a user submitted a market buy order, the "Estimated Price" for the trade displayed on the Voyager Platform automatically defaulted to an amount higher than the quoted "Ask Price" at the top end of the spread, so that an order could be executed at an amount "less" than the "Estimated Price," but still at the very top end of the spread. Similarly, for market sell orders, the trade automatically defaulted to an amount lower than the quoted "Bid Price" at the bottom end of the spread so that the order could be executed at an amount "more" than the "Estimated Price," but still at the bottom end of the spread.

39.     To effectuate and conceal this deception, VDL claimed to use proprietary systems, which they referred to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm."[10]

40.     In describing the Smart Order Router, VDL maintained that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills

---

[9]     *See* Voyager Digital Ltd. Management's Discussion and Analysis for the Three and Nine Months Ended March 31, 2021, dated May 25, 2021, (attached to the *Cassidy* Complaint as Exhibit M).

[10]    *See* "Passion for Product: Voyager Trading System," published Jan 23, 2020 at https://www.investvoyager.com/blog/passion-for-product-trading/ (accessed October 28, 2022)

them in the market for the customer using its proprietary order routing algorithm."[11] The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across our liquidity sources and streams this price to its users."[12]

41.     VDL also utilized vague and opaque representations to represent that VDL would only "share" in "price improvement" where it could fill a user's order at a price better than that which was quoted to the user (which is not in the bid/ask spread or fair market price, but rather in the jacked up estimated price that is only shown after the customer submits the market order).[13] "By example, if the user is quoted $10,040 and the router is able to fill at $10,030, Voyager may price improve the user's order to $10,035 (note: share of price improvement is variable and is determined by Voyager's proprietary fills algorithm)."[14]

42.     In reality, and unknown to customers, the "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" were designed to be intentionally obscure and to provide VDL with hidden commissions on every trade that in most cases exceed the disclosed fees and commissions charged by its competitors. VDL unfairly gains an edge on its competition and overcharges customers by collecting these secret commissions to the detriment of its unknowing customers.

43.     Attached to the *Cassidy* Complaint as Exhibits "N" and "O", respectively, are  the expert reports of Richard A. Sanders, the Co-Founder and Lead Investigator of CipherBlade, a blockchain forensics and cybercrime investigative firm[15] and Dr. Stephen Peter Castell, a Chartered IT Professional, independent consultant in computer and telecommunications systems and software development, and the Chairman of the United Kingdom company CASTELL Computer and Systems Telecommunications Limited, a professional firm of Management and Financial Consultants in Information Technology of over 40 years' standing.[16]  These experts have

---

[11]   *Id.*

[12]   *Id.*

[13]   *Id.*

[14]   *Id.*

[15]   *See Cassidy* Complaint at Exhibit N ("Sanders Report")

[16]   *See Cassidy* Complaint at Exhibit O ("Castell Report")

concluded that Voyager fraudulently conducted business by making false claims by, among other false representations, claiming that its trades were commission-free.  Dr. Castell, in particular, concluded that each time a user made a "commission free" trade, an overcharge occurred that amounted to no less than 0.5% of the total value of the trade.

**D.  The Defendants Aggressively Marketed the Voyager Platform**

> **(i)   Defendants Cuban and the Dallas Mavericks Team Up with Ehrlich to Lure Investors to the Voyager Platform**

44.     The National Basketball Association ("NBA") encourages teams to negotiate international sponsorship arrangements and shares in the revenue derived from such partnerships. In the 2021-22 season, the NBA's second largest category of sponsorships came from the crypto industry.  NBA teams partnered with, among others, Crypto.com, Webull, Coinbase, FTX and Socios.

45.     Cuban is a proponent of investment in the cryptocurrency and Non-Fungible Token ("NFT") markets. In 2020, Cuban began advocating for investments in NFTs, created his own store and began speaking publicly of the benefits of investing in Bitcoin and Ethereum. Earlier this year, in a podcast he did with Jon Stewart, he stated that 80% of the investments he makes outside of those on Shark Tank "are in or around cryptocurrencies"[17] because "[t]hat is really where I look to invest."[18]

46.     On October 28, 2021, at a Mavericks press conference, Cuban announced that the Mavericks had entered into a 5-year "exclusive, integrated partnership" with Voyager.[19] Defendants explained in the press release that "[t]his partnership makes Voyager the first international partner of the Dallas Mavericks, enabling both parties to reach a wider, global audience to raise brand awareness and drive cryptocurrency adoption around the world."

---

[17]       https://www.cnbc.com/2022/01/14/mark-cuban-says-80percent-of-his-non-shark-tank-investments-are-in-crypto.html (accessed October 28, 2022).

[18]     *Id*.

[19]     https://www.mavs.com/mavsvoyager/ (accessed October 28, 2022).



**(a) They Made Public Appearances and Held Press Conferences**

47.     Defendant Cuban proudly described how he would significantly increase the scope

and presence of the Deceptive Voyager Platform for those with limited funds and experience:

> You know, there's a lot of hype, there's a lot of discussion, but most people don't understand the fundamentals behind it. We're going to try to bring that level of education to our fans and to our joint customers."

> To put it simply: there's untapped potential in the future of digital currencies and it's an attractive investment for novice investors who might only have $100 to start. That's where Voyager enters the picture.

> In other words, it's a way to earn high returns while also getting skin in the game and the Voyager platform makes the process easy and simplified for fans of all ages. The 60+ crypto assets allows you to build a diverse portfolio from a single account.

> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started. My now 12-year-old son got me in Dogecoin when it was less than a penny. I was like "let's do this" because it's a cheap way for him to learn how all of this works. While you have to put in a $100 to get the $100 bonus the next two days, if you don't have a hundred dollars and you just want to download the app

and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.[20]

48.     Defendant Ehrlich agreed with Cuban and added as follows:

That's one of the advantages of Voyager. You can actually download the app and fund your account and trade in three minutes or less. We make it really simple. We have a very easy-to-use and integrative platform that allows you to get engaged in the crypto market very quickly. That's one of the values of Voyager. You'll be trading in three minutes or less.

About 220 million people have crypto right now and we (anticipate) a billion in four years. So that shows you where we can actually go with crypto and crypto adoption. Now the comparison there is the internet. It took the internet eight years, for the same time frame, for the internet to grow that fast. So it's a great time to enter the space and learn more. [21]

49.     Cuban even hyped up the fact that he was investing his own money into the Deceptive Voyager Platform to further induce retail investors to follow in his footsteps:[22]

I gotta add, I am a customer and I've been a customer for several months now, I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a perfect fit for our Mavs fans and reaching Mavs fans of all ages.

. . .

And, of course, the Mavs being a leader I think we are going to extend this far deeper than just Mavs fans, I think Voyager is going to be a leader amongst sports fans and crypto fans around the country.

50.     While Cuban claimed to be a Voyager customer, he has never disclosed the nature, scope and amount of compensation that he has personally received in exchange for promoting the Voyager digital platform.  Other celebrities who have failed to disclose compensation in exchange for promoting crypto investments, including Kim Kardashian, Floyd Mayweather and DJ Khaled, have been fined millions of dollars for violating the anti-touting provisions of the federal securities laws.

---

[20]   https://www.mavs.com/mavsvoyager/ (accessed October 28, 2022)

[21]   *Id*.

[22]   https://www.youtube.com/watch?v=aB9GpBOroIw (accessed October 28, 2022)

51.     Throughout the October 28, 2021 press conference, Cuban continuously represented that Voyager was an easy to use platform that offered the best pricing in the market:

> And so for those of you who already use crypto, I know for me it was really easy, I took some of my MATIC tokens that I own and transferred it over because Voyager paid a higher interest rate or return rate than the application I was using before, Aave. So it was really easy to give you a wallet address, you just go into your metamask or whatever you're using, you just send it to that destination address, it shows up an hour later, you start earning more money, and so right immediately I was earning more when I went over to Voyager, and it's the same with USDC, a stablecoin. And the other thing about it is for those of you who use DeFi, the pricing is always higher on DeFi as they try to look through all the decentralized financing platforms to try to get the best—not even the best, but *a* price— and so with Voyager, the pricing has been far, far better, so if you're paying attention and want to get the best price, Voyager is a great platform for it.

52.     Ehrlich, in turn, continuously touted the Voyager rewards program, characterizing it as a way to "educate" investors while they "create wealth," and particularly that he wanted to get people as young as possible investing in the Deceptive Voyager Platform: [23]

> You know, we have an extensive rewards program. As you hold a certain amount or level of assets you even get more rewards on the program, so we're trying to engage you and bring you in the platform and teach and educate and create that wealth through our extensive rewards program.
>
> . . .
>
> It's never too late. I think actually it's the right time. Because as I've said, I still think it's the first half of the first quarter on crypto adoption. . . . It's a great time to enter the space, learn more, and I think that's the key. You've got to come in, you've got to learn, educate yourself. We help, we help educate, but you've got to learn more. And I think that's the key.
>
> . . .
>
> Financial literacy, we need to teach the youth, that's part of what we want to bring, too, is the education when we build out the education, we're in the middle of building that out, crypto 101 is the first thing that we do to teach people. Teach the youth, go to the community and teach the youth about financial literacy, I think that's important because most young kids don't get the opportunity to learn about financial literacy and they wind up going to college and now they're on their own and don't know how to manage their money and they're out in the real world earning salaries and they don't even know what FICA is . . . but that's what happens,

---

[23]     *Id.*

and so we need to teach financial literacy and it's gotta start at the young ages, you know we gotta get out there and it's part of the plan.

53.     Cuban also shamelessly pushed investors to invest heavily into USDC and other assets on the Deceptive Voyager Platform, claiming that investing in the Deceptive Voyager Platform was "***as close to risk free as you're going to get in the crypto universe***," that it was good for small businesses, and even that it was "a lot easier" than opening a savings account at a bank for young children:[24]

> One of the reasons we want to do the education program is there's a big opportunity for small businesses. One of the challenges of small businesses is if you have any cash in the bank, you're making .025%. You can convert to put it into a USDC stablecoin on Voyager, and I thought it was 7% but now it's 9%. And so I've taken a lot of my cash and made it available on USDC. I'm not here trying to sell you it's 100% risk free, but it's as close to risk free as you're going to get in the crypto universe. And so just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.
>
> . . .
>
> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's impossible except on a few platforms to spend $10 and get started. You know, my now 12-year-old son got me into Dogecoin when it was less than a penny.
>
> . . .
>
> So there's a lot of ways to inexpensively start to get an understanding. And it's a lot easier than even opening up a savings account. It's a pain in the ass to open up a savings account, particularly for your kids these days. There's so much paperwork, and whether it's yourself personally, someone you're trying to teach— you're trying to teach your kids about personal finance, believe it or not, this is actually a better way, and so that's one of the unique opportunities and why it's not too late.
>
> . . .
>
> It's also something you can do on your phone. You don't have to have a bank account. So, people who are unbanked, trying to learn about financing, but have a smart phone and can download the app, you can start getting into this and saving your money and that's just a unique opportunity.

54.     Further, Ehrlich, contrary to the position he is now taking in the Voyager bankruptcy, claimed that the rewards program is based on "staking" assets that customers own (as

_____

[24]     *Id.*

opposed to lending them out to institutional investors like 3AC), and falsely stated that he was prioritizing security *and insurance* on customer's cryptocurrency holdings: [25]

> We're connected to about a dozen different market makers, exchanges around the globe, and so we bring a best price back to consumers for that. . . . We run a rewards program, so when you bring your assets over, we're going to reward you with earnings on those assets based upon your balances, based upon tokens you hold and so forth. And so it's a whole rewards program that we've built together and it's really probably state of the art when it comes to crypto with rewards programs, and that's how we like to operate, to give consumers rewards back for using and holding assets on the platform.
>
> . . .
>
> Our rewards are generated through staking, you know it's a lot staking these days, we have 30-something coins that we offer rewards on and a bunch of them are on the staking side, yep.
>
> . . .
>
> I was waiting for that question on security, it's a really important aspect. Security starts with you as an individual. What we recommend to every individual that buys and sells cryptocurrency is to use two-factor authorization when you actually hold your cryptocurrency. Do not use an SMS text message, there are a lot of scammers out there, there are a lot of people who try to SIM-swap you, it almost happened to me a month ago, on a Friday night my phone was trying to be SIM-swapped and I caught it quick enough and called the phone company, but I use two-factor authentication and I think everybody should start there. That means using a Google authenticator, authy, duo, or any of the other products you can use for 2fa. Outside of that, after from you to us is we use multiple custodians. We do not keep all our coins in one place, we keep them across multiple custodians, we've built a really detailed infrastructure for that, to make sure that we're spreading that risk and the insurance we get on all of that across multiple custodians, so it starts with the individual and making sure you have proper security and then it's also us as well.

55.     Finally, Cuban went to great lengths to cast investing in the Deceptive Voyager Platform as a "fun" opportunity with a low cost of entry: [26]

> Access, first and foremost. The simplicity of access, The fact that you don't have to rush into it and put all your money into it so patience is a big part of it. And then experimentation, right? Be curious. . . . Because there's such a low cost of introduction and you know obviously the people who need the most education hopefully are spending the least amount of money, there's a lot of programs and educational programs that we can do that guide people through the process. And

---

[25]   *Id.*

[26]   *Id.*

that's really the key. . . . One of the greatest values of the lower cost crypto isn't so much "hey it could be an investment," it's more the community. . . . It's a low cost entry to fun.

56.     As an incentive, Defendants Cuban and the Mavericks even ran a promotion shortly after the press conference where individuals who downloaded the Voyager app to invest during a certain time would receive $100 in Bitcoin.[27]

57.     In a press release, Cuban stated that "[w]e believe our partnership with Voyager will allow Mavs and NBA fans to learn more about Voyager and how they can earn more from Voyagers' platform than from traditional financial applications."[28] Ehrlich, in turn, emphasizing the "educational" nature of the partnership, said "[t]his partnership gives us the opportunity to educate people all over the world on ways to use crypto in their everyday lives. We want to help people learn alternate ways to grow their wealth to achieve true financial freedom and build intergenerational wealth through crypto. We found a great partner to do this with in the Mavs and their owner, Mark Cuban, who is already deeply involved in the space."[29]

### (b)  They Used Social Media.

58.     Defendants also relied on social media to promote Voyager. On May 3, 2021, Ehrlich made a number of misrepresentations to induce people to invest in Voyager, including that he and Voyager are "really trying to create wealth for retail investors," and, citing his 25 years of experience in finance, he is "looking out for best interests of consumers." https://www.youtube.com/watch?v=nKevUsTGN3I (accessed September 30, 2022).

59.     On October 13, 2021, when asked in an interview by Dan Weiskopf, "is it true the customers own the crypto, specifically Bitcoin and Ethereum on your platform, where that's not necessarily the case on other platforms," Ehrlich unequivocally stated that customers "absolutely" own all of their crypto on the platform and can remove it at any time:[30]

Yes, ***they absolutely own it***. ***They can take it off the platform any time they want*** and bring it into their own personal wallets. You know, a lot of customers want us

---

[27]     https://markets.businessinsider.com/news/currencies/mark-cuban-dallas-mavericks-free-bitcoin-100-voyager-digital-app-2021-10 (accessed October 28, 2022).

[28] *Id.*

[29] *Id.*

[30]
https://twitter.com/mrstevensteele/status/1549665655275884545?s=11&t=aeo96ASWA8 K8FMOgVdpqOA (accessed October 28, 2022).

> to hold it for them and everyone who brings crypto into us has a specified wallet address for them. But if you want to take it out to your own personal wallet, say you have a Trezor or a Ledger or you were using some other wallet app – ***yes, you can take it any time you want***. Now we have limits on withdrawals and that's for customer safety and protection but ***you can take anything off whenever you want, you know, no questions asked.***

He also stated that this ownership of the cryptocurrency assets is "a differentiator" from other wallet apps.

60.    Ehrlich also made a number of misleading representations at an October 23, 2019 interview broadcast on the internet,[31] including:

> We aren't an exchange. We are a broker. We are a regulated agency broker so our job is to do nothing but find the best price and execution for the consumers. So we don't have a horse in the race. We don't have proprietary trading, we don't need to get people to put orders off the bid and the ask, we are trying to find the best execution for the consumer on every single trade. We are a traditional online service provider, but in the crypto space.

61.    Ehrlich even personally took to Reddit to host an "AMA" (Ask-Me-Anything) session on the r/Invest_Voyager subreddit, in order to communicate directly with Voyager customers and potential Voyager customers in order to induce them to invest or to continue investing in the Deceptive Voyager Platform:[32]

---

[31] https://www.youtube.com/watch?v=NwVA1wiDr5E (accessed October 28, 2022)

[32]

https://www.reddit.com/r/Invest_Voyager/comments/tbyp2w/ama_hi_reddit_im_steve_ehrlich_v oyagers_cofounder/?utm_source=share&utm_medium=ios_app&utm_name=iossmf    (accessed October 28, 2022)



62.     During that AMA, Ehrlich played up Cuban's involvement as his advisor:



63.     He also played up Voyager's "transparency":



64.     He even advocated for customers to *ditch their bank accounts* in favor of investing in Voyager:



65.     Ehrlich also falsely represented that he and Voyager sought to "ensure the safety and security of all customer assets at all points in time," that customers could earn rewards with "no lockup on your token," and that Voyager "eat[s the] risk on our end to ensure you get a consistent monthly return on your end":

*How does voyager plan to increase staking revenues to maintain their yield payment.*

Our main strategy is to add more staking coins, where we can bring value to our consumers. Over the past 40 days, we've added 20 new coins–10 of which are staking tokens. As you may know, we work with at least 8 custodians and we're looking to add more. We have multiple execution providers and exchanges and multiple node providers delivering new coins with competitive rewards as fast as we can. The key to this is ensuring everything meets our security standards so that we can ensure the safety and security of all customer assets at all points in time

Apart from that, some of our non-staking rewards are based on market demand. We'll always aim to offer competitive rates on as many tokens as we can. Some key benefits outside of the rewards number alone is the ability to earn with no lockup on your token, and the reward rate staying consistent on a monthly basis. The market demand can shift on a daily basis, but we eat that risk on our end to ensure you get a consistent monthly return on your end.

66.   When specifically asked whether he anticipated any "major fines like BlockFi," Ehrlich sought to reassure his customers:

*Does voyager anticipate any major fines like BlockFi?*

I believe our rewards program is different from BlockFi's program and complies with current law. I've been in the financial services industry, working with regulators for 28 years now. Since the start of Voyager, we've been in communication with regulators to ensure we operate not only within the rules but we are also planning for any potential necessary changes.

67.   Although Ehrlich claims that one of the major benefits of Voyager is its transparency, his own dealings in connection with Voyager have been extremely opaque. According to a report from CNBC, Ehrlich made millions of dollars selling Voyager shares in February and March 2021 when shares were near their peak, financial records show, in an apparent insider trading move.[33] What is evident, based on corporate insider disclosures and Voyager filings, is that Ehrlich made over $30 million disposing of Voyager equity as the crypto lender's shares neared an all-time high.[34] Ehrlich and his Delaware LLCs sold nearly 1.9 million shares

---

[33]   https://www.cnbc.com/2022/08/03/voyager-ceo-made-millions-in-stock-sales-in-2021.html (accessed October 28, 2022).

[34]   *Id.*

from February 9, 2021, to March 31, 2021**,** in 11 separate sales which totaled $31 million, according to data from the Canadian Securities Administration. [35] The three largest of Ehrlich's transactions – totaling 1.4 million shares worth nearly $19 million – were connected to a $50,000,000 secondary offering by Stifel Nicolaus in February 2021.[36] Voyager shares would peak at $29.86 *__a week after Ehrlich's final sale__* on April 5, 2021. [37] Three weeks later, VOYG shares had lost 41% of their value. By November 2021 — as the crypto market overall was peaking — Voyager was down 69% from its peak. [38]

### (c)   Investors Were Lured by the Defendants Cuban's and Dallas Mavericks' Participation

68.      As intended, the Defendants' aggressive promotion of the Voyager Digital Platform worked. Hundreds of investors, including Class Member Anand Bhatt, who resides in Wyoming, joined Voyager. Anand recalls that "the only reason I signed up is because of Mark Cuban offering the free Bitcoin/Dallas Mavericks deal."

69.      As Plaintiff Pierce Robinson explained:

So, I first heard about Voyager from Mark Cuban. The dogecoin hype was at its peak and I was thinking about investing in crypto. This was back in the summer of 2021. I saw Mark promoting dogecoin and then Voyager and thought "he's a sound investor," so I downloaded the app and began to play around with a very small amount of money in June 2021. Later in the year, I remember the news was on Voyager and all over the TV and internet that there was a partnership with Mark and the Mavericks, so I trusted that it was legitimate started putting more and more money into the app. I invested even more because of the interest opportunities on Voyager that Mark loudly promoted the second half of last year.

70.      Another Class Member, Katie Damore, states:

I opened my Voyager account . . . after hearing Mark Cuban's partnership and support with Voyager I felt overly confident in the platform and I made 3 more deposits . . . I am an inexperienced investor and crypto person and I got caught up in the hype.

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

71.     Others have similarly pointed to Defendants for their decision to join Voyager:

"[I] saw many statements from Mark Cuban stating that Voyager was "100% Risk Free, and it's as close to risk free as you are going to get in the crypto universe . . . [Mark Cuban's] trust in Voyager [] made me purchase the coin from Voyager . . ."

        Class Member, Nikhila Beesetti

"I was aware that Mark Cuban and others . . . had become investors . . . so I felt comfortable to move the bulk of my holdings to Voyager . . . These gave me comfort."

72.     A further reason for the necessity of taking in as many customers as possible to use their funds to perpetuate the Deceptive Voyager Platform, Founder and President, Steve Ehrlich, explains the importance of "spread revenue" to his investors at the earnings call for Voyager's Second Quarter for Fiscal Year 2021:[39]

With the growth of assets under management, we remind investors of our 2 main revenue sources, spread revenue and interest revenue. Estimated spread revenue is derived by the trading velocity of our assets while interest revenue was driven by the gross interest earned on the overall assets under management. Historically, the company has earned between 10 to 12% annualized revenue on assets under management.

At this point, I would also like to remind investors of certain drivers of our business. As in agency brokerage business, market volatility can often act as our friend. Voyager executes trades and captures spread revenue in both up and down markets. One example of the powerful agency model happened on Tuesday, February 23rd when Bitcoin decreased from a high of $56,000 to $45,000. That day, Voyager experienced a record day for trading volume, revenue and net deposits. Investors were very active buying the dips across all of the coins Voyager offers.

---

[39] *See* Transcript of Voyager Digital FY2Q 2021 Earnings Call dated March 1, 2021, attached to the *Cassidy* Complaint as Exhibit B.

## CLASS ACTION ALLEGATIONS

73.     As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

**A.     Class Definitions**

74.     Plaintiffs seek to represent the following Nationwide Classes and State Subclasses (collectively, "the Classes").  If the Court agrees with Undersigned Counsel that the NJ Statue will apply to all class members, the Court may only have to certify the Nationwide Class and the New Jersey Subclass):

(1) **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in an EPA.

(2) **Florida Subclass:** All persons or entities in the state of Florida who, within the applicable limitations period, purchased or enrolled in an EPA.

(3) **New Jersey Subclass:** All persons in the state of New Jersey who, within the applicable limitations period, purchased or enrolled in an EPA.

(4) **Virginia Subclass:** All persons in the state of Virginia who, within the applicable limitations period, purchased or enrolled in an EPA.

(5) **Alabama Subclass:** All persons in the state of Alabama who, within the applicable limitations period, purchased or enrolled in an EPA.

(6) **Louisiana Subclass:** All persons in the state of Louisiana who, within the applicable limitations period, purchased or enrolled in an EPA.

(7) **California Subclass:** All persons in the state of California who, within the applicable limitations period, purchased or enrolled in an EPA.

      **(8)** <u>**Oklahoma Subclass:**</u> All persons in the state of Oklahoma who, within the applicable limitations period, purchased or enrolled in an EPA.

      **(9)** <u>**Pennsylvania Subclass:**</u> All persons in the state of Pennsylvania who, within the applicable limitations period, purchased or enrolled in an EPA.

      **(10)**    <u>**Tennessee Subclass:**</u> All persons in the state of Tennessee who, within the applicable limitations period, purchased or enrolled in an EPA.

Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

    75.    Plaintiffs reserve the right to modify or amend the definition of the proposed Nationwide, Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana Subclasses, or to include additional classes or subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Nationwide Class in part because all offers of Voyager EPAs to Plaintiffs and the Class Members (in which Ehrlich, Cuban, and The Mavericks each substantially participated) were made by Voyager Digital LLC from their principal place of business in New Jersey, and thus every single offer to sell a Voyager EPA stems from a transactional occurrence that emanated from the State of New Jersey. Plaintiffs seek certification of the State Subclasses in the alternative. Plaintiffs' Counsel further represent clients from the states of Arizona, Colorado, Connecticut, Georgia, Illinois, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Ohio, Puerto Rico, South Carolina, South Dakota, Texas, Utah, Washington, Wisconsin, and Wyoming, who are all necessarily putative Class Members of the Nationwide Class. Plaintiffs may seek leave of Court to assert claims for these Class Members on behalf of each of these states and territories to the extent necessary to seek certification of subclasses on their behalf, also in the alternative to the Nationwide Class.

**B.      Numerosity**

76.      The Classes are comprised of thousands, if not millions, of consumers nationwide and throughout the states of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana, to whom Voyager offered and/or sold EPAs. Moreover, thousands, if not millions, of consumers nationwide and throughout these states have executed trades on the Voyager Platform within the applicable limitations period. Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through Voyager's corporate records. Undersigned Counsel currently represents dozens of Voyager customers who all have collectively sustained millions of dollars in damages proximately caused by the Deceptive Voyager Platform.

**C.      Commonality/Predominance**

77.      This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

(a)      whether the EPAs were unregistered securities under federal, Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana law;

(b)      whether Defendants' participation and/or actions in Voyager's offerings and sales of EPAs violate the provisions of the Securities Act and Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana securities law.

(c)      the type and measure of damages suffered by Plaintiffs and the Classes.

(a)      whether Defendants' description of the Voyager Platform as being "100% commission free" is deceptive, unfair, false and misleading;

(b)      whether Defendants' representations are objectively likely to mislead reasonable consumers to believe that their trading platform operates as "100% commission free";

(c)      whether Defendants' practices violate the UDAP statutes of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana;

(d) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

(e) whether Plaintiffs and Class members are entitled to injunctive relief;

(f) whether Plaintiffs and Class members are entitled to declaratory relief; and

(g) whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

**D.      Typicality**

78.     Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold Voyager's EPAs as a result of Defendants' actions and/or participation in the offering and sale of these unregistered securities, or that Plaintiffs and all members were exposed to Defendants' misrepresentations and omissions regarding the Voyager Platform being "100% commission free," and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to either Defendant that are unique to Plaintiffs.

**E.      Adequacy of Representation**

79.     Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firm, which has the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

**F.      Requirements of Fed. R. Civ. P. 23(b)(3)**

80.     The questions of law or fact common to Plaintiffs' and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling the EPAs, which are unregistered securities, (2) in making identical and uniform misrepresentations and

omissions regarding the functionality of the Deceptive Voyager Platform, and/or (3) in receiving secret undisclosed compensation for their promotion of the Deceptive Voyager Platform.

81.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

82.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

**G.     Superiority**

83.     A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

> (a) Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the state;
>
> (b) Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;
>
> (c) There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;
>
> (d) The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;
>
> (e) Individual suits would not be cost effective or economically maintainable as individual actions; and
>
> (f) The action is manageable as a class action.

**H.     Requirements of Fed. R. Civ. P. 23(b)(2)**

84.     Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the EPAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

85.     Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive Voyager Platform,

and/or in receiving secret undisclosed compensation for their promotion of the Deceptive Voyager Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

**I.      Requirements of Fed. R. Civ. P. 23(c)(4)**

86.      As it is clear that one of the predominant issues regarding Defendants' liability is whether the EPAs Voyager offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the "EPA" Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

87.      As it is clear that another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, or Louisiana in making identical and uniform misrepresentations and omissions regarding the functionality of the Deceptive Voyager Platform, and/or in receiving secret undisclosed compensation for their promotion of the Deceptive Voyager Platform, utilizing Rule 23(c)(4) to certify the "Platform" Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

**J.      Nature of Notice to the Proposed Classes.**

88.      The names and addresses of all Class Members are contained in the business records maintained by Voyager and are readily available to Voyager. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

| THE NATIONWIDE AND NEW JERSEY CLAIMS |
|---|

## COUNT ONE

### For Violations of the New Jersey Consumer Fraud Act,
### §§ 56:8-1 *et seq.*

### (Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)

89.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

90.     The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*, prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

91.     Defendants have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade and/or commerce in the State of New Jersey, as described more fully hereinabove.

92.     Defendants' statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because Voyager in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

93.     Defendant's acts and omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiff and Class members, into investing in the Comp any's falsely touted business and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Those acts and omissions include, among other things as more fully alleged above:

      a.   knowingly and intentionally concealing the Defendant's specific roles and interests in Voyager;

      b.   knowingly and intentionally using and/or failing to disclose the use of the Promotor Defendants to "instill trust" in uninformed investors to promote the financial

benefits of a highly speculative and risky investment in Voyager, in an effort to induce them to purchase Voyager EPAs;

c. Making statements, either knowingly and intentionally, negligently, or with reckless disregard for their veracity, that the Voyager Platform is "100% Commission-Free" although Voyager did in fact did charge Plaintiff and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

d. Making statements, either knowingly and intentionally, negligently, or with reckless disregard for their veracity, that funds or assets held in the Voyager Platform are FDIC insured.

94.     The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. N.J.S.A. 56:8-19.

95.     Plaintiffs and the Class are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

96.     Plaintiffs and the Class have suffered an ascertainable loss of moneys or property as a direct and proximate result of VDL's unconscionable practices.

97.     Plaintiffs and the Class have a private right of action against Defendants and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

98.     Plaintiffs and the Class have suffered, and will continue to suffer, irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

## COUNT TWO

**Violations of New Jersey Statute Section 49:3-60,**

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

99.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

100.    N.J.S.A. 49:3-60 provides that it is unlawful for any person to sell or offer to sell a security within the State of New Jersey unless the security is exempt under N.J.S.A. 49:3-50, is a federally covered security, or is registered pursuant to Section 49.

101.    N.J.S.A. 49:3-52 also makes it unlawful "for any person, in connection with the offer, sale, or purchase of any security," to either directly or indirectly:

    a.  employ any device, scheme, or artifice to defraud;

    b.  make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

    c.  engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

102.    The Voyager Earn Program Account is a security pursuant to N.J.S.A. 49:3-49(m).

103.    The Voyager Earn Program Account was and is required to be registered with the Bureau pursuant to N.J.S.A. 49:3-60.

104.    The Voyager EPAs offered for sale to Plaintiffs and Class members have not been registered with the Bureau, are not exempt from registration, and are not federally covered.

105.    In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest in Voyager, Defendants made untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning the Voyager EPAs and the Voyager Platform, as described above.

106.    Defendants assisted in and actively participated in Voyager's offer and sale of the unregistered Voyager EPAs to Plaintiffs and the members of the Class.

107.    As a result of these actions, Defendants violated N.J.S.A. 49:3-60.

## COUNT THREE

**Declaratory Judgment**

**(Declaratory Judgment Act, N. J. S. A. 2A:16-51 *et seq*.)**

**(Plaintiffs Individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey subclass)**

108.    Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1–87 as if fully set forth herein.

109.    This Count is asserted against Defendants under Section 2A:16-59 of the New Jersey Revised Statutes.

110.    The Declaratory Judgments Act, N.J. Stat. Ann. § 2A:16-51 et seq. (West), authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity. *Chamber of Com. of U. S. v. State*, 89 N.J. 131, 140 (1982). To maintain such an action, there must be a "justiciable controversy" between adverse parties, and plaintiff must have an interest in the suit.

111.    Plaintiffs and the members of the Class have an obvious and significant interest in this lawsuit.

112.    Plaintiffs and members of the Class purchased EPAs, based in part on justifiable reliance on the Defendants' misrepresentations and omissions regarding the Deceptive Voyager Platform as further described hereinabove.

113.    If the true facts had been known, including but not limited to that the EPAs are unregistered securities, the Deceptive Voyager Platform does not work as represented, and Mark Cuban was paid exorbitant sums of money to peddle Voyager to the nation, Plaintiffs and the Class would not have purchased EPAs in the first place.

114.    Thus, there is a justiciable controversy over whether the EPAs were sold illegally, and whether the Defendants illegally solicited their purchases from Plaintiffs and the Class. Plaintiffs and the Class seek an order declaring that the EPAs were securities required to be registered with the SEC and state regulatory authorities, that the Deceptive Voyager Platform did not work as represented, and Mark Cuban was paid exorbitant sums of money to peddle Voyager to the nation.

| THE FLORIDA CLAIMS |
|:---:|

## COUNT FOUR

**For Violations of the Florida Deceptive and Unfair Trade Practices Act,**

**§ 501.201, Florida Statutes, *et seq.***

**(Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)**

115.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

116.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat.

117.    Plaintiffs and Class members are consumers as defined by section 501.203, Fla. Stat. Defendants are engaged in trade or commerce within the meaning of the FDUTPA.

118.    Florida Statute section 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

119.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

120.    Defendants have violated the FDUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

121.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform and in the amount of their lost investments.

122.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

123.    Pursuant to sections 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

124.    Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and the Class to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## COUNT FIVE

**Violations of the Florida Statute Section 517.07,**

**The Florida Securities and Investor Protection Act**

**(Plaintiffs Robertson, Ms. Gold, Mr. Gold Individually and on behalf of the Florida Class)**

125.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

126.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell or offer to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

127.    Section 517.211 extends liability to any "director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security, or for damages, if the purchaser has sold the security."

128.    The Voyager Earn Program Account is a security pursuant to Fla. Stat. § 517.021(22)(a).

129.    The EPAs sold and offered for sale to Plaintiffs and Class members were not:

   a.  exempt from registration under Fla. Stat. § 517.051;

   b.  a federal covered security;

   c.  registered with the Office of Financial Regulations (OFR); or

   d.  sold in a transaction exempt under Fla. Stat. § 517.061.

130.    Voyager sold and offered to sell the unregistered EPAs to Plaintiffs and the members of the Class.

131.    Defendants are directors, officers, partners and/or agents of Voyager pursuant to Fla. Stat. § 517.211.

132.    Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Fla. Stat. § 517.07 et seq.

---

**THE LOUISIANA CLAIMS**

---

## COUNT SIX

**For Violations of the Unfair Trade Practices and Consumer Protection Law,**
**R.S. 51:1401, et seq.,**

**(Individually by Plaintiff Manganiello against Defendants)**

133.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

134.    This cause of action is brought pursuant to Louisiana's Unfair Trade Practices and Consumer Protection Law ("LUTPA").

135.    Plaintiff is a consumer as defined by section 1402(1). Defendants are engaged in trade or commerce as defined by section 1402(10).

136.    Section 1405(A) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

137.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

138.    Defendants have violated the LUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

139.    Plaintiff has been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising in the amount of their lost investments.

140.    The harm suffered by Plaintiff was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

141.    Pursuant to section 1409, Plaintiff brings this action and makes claims for actual damages, attorneys' fees and costs.

## COUNT SEVEN

### Violations of the Louisiana Section 51:705 et seq,
### (Plaintiff Manganiello Individually and on behalf of the Louisiana Class)

142.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

143.     RS 51:705 provides that it is unlawful for any person to offer for sale or sell a security within the State of Louisiana unless the security or transaction is exempt under RS 51:708 or 709, is a federally covered security, or is registered.

144.     The Voyager Earn Program Account is a security pursuant to RS 51:702 (15)(a).

145.     The EPAs sold and offered for sale to Plaintiffs and Class members were not exempt from registration under RS 51:708 or 709, federal covered securities, or registered.

146.     Voyager sold and offered to sell the unregistered EPAs to Plaintiffs and the members of the Class.

147.     Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated RS 51:705 et seq.

## THE ALABAMA CLAIMS

## COUNT EIGHT

### For Violations of the Alabama Deceptive Trade Practices Act,
### (Plaintiff Newsom Individually and on behalf of the Alabama Class)

148.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

149.     This cause of action is brought pursuant to the Alabama Trade Practices Act, section 8-19-1 *et seq*. ("Alabama DTPA"). The stated purpose of the Alabama DTPA is to "protect the interest of both the consuming public and the legitimate businessperson." § 8-19-2.

150.     Plaintiffs and Class members are consumers as defined by section 8-19-3(2). Defendants are engaged in trade or commerce within the meaning of the Alabama DTPA.

151.     Section 8-19-5(27) declares unlawful "[e]ngaging in any [] unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

152.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

153.     Defendants have violated the Alabama DTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

154.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform.

155.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

156.     Pursuant to Section 8-19-10, Plaintiffs and consumers in the Class bring this cause of action for actual damages, attorneys' fees and costs.

157.     Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 8-19-10entitles Plaintiffs and the Class to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

<u>COUNT NINE</u>

**Violations of the Code of Alabama 1975, Chapter 6**

**(Plaintiff Newsom Individually and on behalf of the Alabama Class)**

158.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

159.     Section 8-6-17 provides that it is unlawful for any person to sell or offer to sell a security within the State of Alabama unless the security is registered pursuant to Ch. 6, exempt from registration under § 8-6-10, or the transaction is exempt under § 8-6-11.

160.     Section 8-6-17 also provides prohibited acts regarding the offer, sale or purchase of securities, including, for example:

     a.   Employing any device, scheme, or artifice to defraud;

b. Making untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

c. Engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

161. The Voyager Earn Program Account is a security pursuant to § 8-6-2(10).

162. The EPAs sold and offered for sale to Plaintiffs and Class members were not:

a. registered;

b. exempt from registration under § 8-6-10; or

c. part of a transaction exempt under § 8-6-11.

163. Voyager sold and offered to sell the unregistered EPAs to Plaintiffs and the members of the Class.

164. Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated Chapter 6.

---

## THE VIRGINIA CLAIMS

## COUNT TEN

**For Violations of the Virginia Consumer Protective Act,**

**§ 59.1-196 et seq, Code of Virginia**

**(Plaintiff Ayer Individually and on behalf of the Virginia Class)**

165. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

166. This cause of action is brought pursuant to the Virginia Consumer Protection Act of 1977 ("VCPA"). The stated purpose of the VCPA is to "promote fair and ethical standards of dealings between suppliers and the consuming public." § 59.1-197.

167. Plaintiffs and Class members are consumers as defined by § 59.1-198. Defendants are "supplier(s)" and engage in "consumer transaction(s)" as defined by the Act.

168. Section 59.1-200 declares unlawful "[u]sing any [] deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

169.     Defendants have violated the VCPA by engaging in the unfair, fraudulent, and deceptive practices as described herein.

170.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair, fraudulent, and deceptive practices and acts in the amount of their lost investments.

171.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the unfair, fraudulent, and deceptive practices of Defendants, as more fully described herein.

172.     Pursuant to section 59.1-204, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT ELEVEN

### Violations of Section 13.1-501 et seq, Code of Virginia

### (Plaintiff Ayer Individually and on behalf of the Virginia Class)

173.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

174.     Section 13.1-507 provides that it is unlawful for any person to sell or offer to sell a security "unless (i) the security is registered under this chapter, (ii) the security or transaction is exempted by this chapter, or (iii) the security is a federal covered security."

175.     Section 13.1-502 makes it unlawful "for any person in the offer or sale of any securities, directly or indirectly,"

    a.   "employ any device, scheme or artifice to defraud";

    b.   "obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or

    c.   "engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser."

176.     The Voyager Earn Program Account is a security pursuant to Section 13.1-501.

177.     The Voyager EPAs offered for sale to Plaintiffs and Class members have not been registered, are not exempt from registration, and are not federal securities.

178.     In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest in Voyager, Defendants made untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, concerning the Voyager EPAs and the Voyager Platform, as described above.

179.     Defendants assisted in and actively participated in Voyager's offer and sale of the unregistered Voyager EPAs to Plaintiffs and the members of the Class.

180.     As a result of these actions, Defendants violated Sections 13.1-501 et seq.

---

## THE CALIFORNIA CLAIMS

## COUNT TWELVE

**For Violations of the Unfair Competition Law Business & Professions Code § 17200, et seq.**
**(Plaintiffs Dorn and Gates Individually and on behalf of the California Class)**

181.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

182.     California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq.* (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

183.     Defendants have committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct and unlawful conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

184.     The conduct of Defendants as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

185.    Defendants' conduct was a proximate cause of the injuries to Plaintiffs and the California Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the California Class. By reason of the foregoing, Defendants should be required to pay restitution to Plaintiffs and members of the California Class.

## COUNT THIRTEEN

### Violations of the CSL

### (Plaintiffs Dorn and Gates Individually and on behalf of the California Class)

186.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

187.    California Corp. Code § 25110 prohibits the offer or sale by any person in California of securities that are not qualified through registration. California Corp. Code § 25503 affords a statutory cause of action to victimized investors for violations of Section 25110. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25110 and makes them jointly and severally liable with any other person liable under Section 25503.

188.    Voyager, with Defendants' material assistance, offered and sold the EPAs **Securities** in California without being properly registered or qualified for offer or sale either with any federal or California regulator.

189.    Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of Section 25110 does not require proof that Defendants intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendants' knowledge of and participation in Voyager's non-compliance with the CSL establishes their intent to deceive investors regarding the EPAs.

190.    California Corp. Code § 25210(b) provides: No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

191.    Defendants breached Section 25210(b) by encouraging Voyager to offer and sell the EPAs **Securities** despite the fact that such securities were not qualified under the CSL.

192.     California Corp. Code § 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

193.     California Corp. Code § 25401 prohibits fraud in the offer or sale by any person in California of securities. California Corp. Code § 25501 affords a statutory cause of action to victimized investors for violations of Section 25401. Finally, California Corp. Code § 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of Section 25401 with the intent to deceive or defraud, and makes them jointly and severally liable with any other person liable under Section 25503.

194.     Voyager, with Defendants' material assistance, offered and sold the EPAs Securities in California by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

195.     Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under Cal. Corp. Code § 25504.1.

196.     Plaintiffs hereby conditionally tender their Voyager Securities in accordance with Cal. Corp. Code § 25503.

| **THE PENNSYLVANIA CLAIMS** |
|---|

## **COUNT FOURTEEN**

**For Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201-1 et seq**

**(Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)**

197.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

198.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. §§ 201-1 et seq, prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of Section 201-2(4).

199.     Defendants have engaged in, and continue to engage in, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the State of Pennsylvania, as described more fully hereinabove.

200.     Defendants' statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because Voyager in fact did charge Plaintiffs and Class members

undisclosed commissions on cryptocurrency trades made on the Voyager Platform. Defendants' representations regarding Voyager's FDIC insured status were also false.

201.    Defendant's acts and omissions constitute unfair trade practices because they are fraudulent or deceptive and create a likelihood of misunderstanding. *See* 73 Pa. Stat. § 201-2(4)(xxi).

202.    Plaintiffs and the Class are "person(s)" as that term is defined in 73 Pa. Stat. § 201-2(2).

203.    Plaintiffs and the Class have suffered an ascertainable loss of moneys or property as a direct and proximate result of Defendants' unconscionable practices described above. Plaintiffs and the Class have a private right of action against Defendants and they are entitled to recover, in addition to their actual damages, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. 73 Pa. Stat. § 201-9.2(a).

204.    Plaintiffs and the Class have suffered, and will continue to suffer, irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

## COUNT FIFTEEN

### Violations of the Pennsylvania Securities Act of 1972,

### 70 Penn. Stat. §§ 1-102 *et seq*

### (Plaintiff Peters Individually and on behalf of the Pennsylvania subclass)

205.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

206.    70 Penn. Stat. § 1-201 provides that it is unlawful for any person to sell or offer to sell a security within the State of Pennsylvania unless the security is exempt under the act, is a federally covered security, or is registered pursuant to the act.

207.    70 Penn. Stat. § 1-401 makes it unlawful "for any person, in connection with the offer, sale or purchase of any security in this State, directly or indirectly: (a) To employ any device, scheme or artifice to defraud; (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

208.    70 Penn. Stat. § 1-503 extends liability to any person who "materially aids" in a violation of the Pennsylvania Securities Act and makes them jointly and severally liable with any other person liable under the Act.

209.    The Voyager EPA is a security pursuant to 70 Penn. Stat. § 1-102(t).

210.    The Voyager EPAs offered for sale to Plaintiffs and Class members were not registered, were not exempt from registration, and were not federally securities.

211.    In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest, Defendants made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning Voyager EPAs, including but not limited to, that the Voyager Platform was "100% Commission-free" and that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured, as described above.

212.    As a result of these actions, Defendants violated 70 Penn. Stat. § 1-201 and § 1-401 and are liable to Plaintiffs pursuant to 70 Penn. Stat. § 1-501.

---

**THE TENNESSEE CLAIMS**

---

## COUNT SIXTEEN

**For Violations of the Tennessee Consumer Protection Act,**

**Tenn. Code § 47-18-101 et seq**

**(Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)**

213.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

214.    This cause of action is brought pursuant to the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code § 47-18-101 et seq.

215.    The stated purpose of the TCPA is to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within th[e] state." Tenn. Code § 47-18-102(2).

216.    Plaintiffs and Class members are consumers as defined by Tenn. Code § 47-18-103(2). Defendants are engaged in trade or commerce as defined by Tenn. Code § 47-18-103(19).

217.     The TCPA declares unlawful "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code § 47-18-104(a). This includes actions which cause "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods" and cause "likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another." Tenn. Code § 47-18-104(2)-(3).

218.     Defendants' unfair and deceptive practices as described herein are objectively likely to cause—and have caused— confusion and misunderstanding to consumers acting reasonably in the circumstances.

219.     Defendants have violated the TCPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

220.     Plaintiffs allege that the unfair and deceptive acts and practices described herein are distinct from the marketing or sale of a security, which is expressly excluded by Tenn. Code § 47-18-109(h).

221.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments.

222.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

223.     Pursuant to Tenn. Code § 47-18-109, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT SEVENTEEN
### Violations of Tennessee Securities Act of 1980,
### Tenn. Code § 48-1-122
### (Plaintiff Ehrentraut Individually and on behalf of the Tennessee subclass)

224.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

225.     Tenn. Code § 48-1-104(a) makes it unlawful to sell a security in Tennessee unless the security is registered, exempted, or the security is a covered security as defined in the act.

226.     Tenn. Code § 48-1-121 makes it unlawful "for any person, in connection with the offer, sale or purchase of any security in this state, directly or indirectly, to: (1) Employ any device, scheme, or artifice to defraud; (2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."

227.     The Voyager EPA is a security pursuant to Tenn. Code § 4-1-102(20)(A).

228.     The Voyager EPAs offered for sale to Plaintiffs and Class members were not registered, were not exempt from registration, and were not covered.

229.     In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest, Defendants made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning Voyager EPAs, including but not limited to, that the Voyager Platform was "100% Commission-free" and that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured, as described above.

230.     As a result of these actions, Defendants violated Tenn. Code § 48-1-104(a) and § 48-1-121 and are liable to Plaintiffs pursuant to Tenn. Code § 48-1-122.

**THE OKLAHOMA CLAIMS**

**COUNT EIGHTEEN**

**For Violations of the Oklahoma Consumer Protection Act, *Stat. Tit. 15, Section 751 et seq***
**(Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)**

231.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

232.     This cause of action is brought pursuant to the Oklahoma Consumer Protection Act, *Okla. Stat. tit. 15, § 751 et seq.*

233.     The Oklahoma Consumer Protection Act provides that an "unfair trade practice" is "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *See* § 752(14). It declares unlawful any unfair or deceptive trade practice "as defined in Section 752." § 753(20).

234.     Plaintiffs and Class members are persons as defined by section 752(1). Defendants are engaged in a "consumer transaction" as defined by section 752(2).

235.     Defendants have violated the Oklahoma Consumer Protection Act by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

236.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments.

237.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

238.     Pursuant to section 761.1 of the Act, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT NINETEEN

**Violations of the Oklahoma Uniform Securities Act of 1980,**

**Okla. Stat. Tit. 71, §§ 1-101 *et seq***

**(Plaintiff Garrison Individually and on behalf of the Oklahoma subclass)**

239.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–87 above, as if fully set forth herein.

240.     71 Okla. Stat. § 1-102(32) makes it unlawful "for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly":

a.    "employ a device, scheme, or artifice to defraud";

b.    "make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which it is made, not misleading"; or

c.    "engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person."

241.     The Voyager EPA is a security pursuant to 71 Okla. Stat. § 1-102(32).

242.     In promoting the Voyager EPAs and encouraging Plaintiffs and Class members to invest with Voyager, Defendants made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning the Voyager EPAs, including but not

limited to, that the Voyager Platform was "100% Commission-free" and that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured, as described above.

As a result of these actions, Defendants violated 71 Okla. Stat. § 1-102(32) and are liable to Plaintiffs pursuant to 71 Okla. Stat. § 1-509.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.   Certifying the Classes as requested herein;

b.   Awarding actual, direct and compensatory damages;

c.   Awarding restitution and disgorgement of revenues if warranted;

d.   Awarding declaratory relief as permitted by law or equity, including declaring the Defendants' practices as set forth herein to be unlawful;

e.   Awarding injunctive relief as permitted by law or equity, including enjoining the Defendants from continuing those unlawful practices as set forth herein, and directing the Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.   Awarding statutory and multiple damages, as appropriate;

g.   Awarding attorneys' fees and costs; and

h.   Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated: October 28, 2022                    Respectfully submitted,


**By: /s/ Adam M. Moskowitz**                **By: /s/ Stephen Neal Zack**
Adam M. Moskowitz                            Stephen Neal Zack
Florida Bar No. 984280                       Florida Bar No. 145215
adam@moskowitz-law.com                       Hon. Ursula Ungaro (Ret.)
Joseph M. Kaye                               Florida Bar No. 200883
Florida Bar No. 117520                       **BOIES SCHILLER FLEXNER LLP**
joseph@moskowitz-law.com                     100 SE 2nd St., Suite 2800
Barbara C. Lewis                             Miami, FL 33131
barbara@moskowitz-law.com                    Office: 305-539-8400
Florida Bar No. 118114                       Fax: 305-539-1307
**THE MOSKOWITZ LAW FIRM, PLLC**             szack@bsfllp.com
2 Alhambra Plaza, Suite 601                  uungaro@bsfllp.com
Coral Gables, FL 33134
Telephone: (305) 740-1423

                                             David Boies
*Co-Counsel for Plaintiffs and the Class*    (*Pro Hac Vice Application Pending*)
                                             **BOIES SCHILLER FLEXNER LLP**
                                             333 Main Street
                                             Armonk, NY 10504
                                             Phone: (914) 749–8200
                                             dboies@bsfllp.com

                                             *Co-Counsel for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the forgoing was filed on October 28, 2022, with the Court via CM/ECF system, which will send notification of such filing to all attorneys of record.

By: */s/ Adam M. Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280