### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

#### Case No.: 22-CV-22538-ALTMAN/REID

Pierce Robertson, et al., on behalf of themselves and
all others similarly situated,

             Plaintiffs,                      **CLASS ACTION COMPLAINT**

v.

                                          **JURY DEMAND**

Mark Cuban, Dallas Basketball Limited, d/b/a
Dallas Mavericks,

             Defendants.

_____/

#### PLAINTIFFS' MOTION TO CERTIFY ONLY A NATIONWIDE ISSUE CLASS, PURSUANT TO FEDERAL RULES 23(a), 23(b)(3), and 23(c)(4)

Plaintiffs/Proposed Class Representatives, Pierce Robertson, Rachel Gold, Sanford Gold, and Edwin Garrison, assert in this class action claims against Defendants, Mark Cuban ("Cuban"), Dallas Basketball Limited d/b/a Dallas Mavericks (the "Mavericks") (collectively, "Defendants") for various common law and statutory violations, including specifically participating in the offer and sale of unregistered securities, in the form of the Voyager Earn Program Account (the "EPA"), which has already been the subject of great examination and sanctions from numerous state and federal regulatory entities. The Proposed Class Representatives now move the Court for certification of a Nationwide Issue Class pursuant to Federal Rules of Civil Procedure 23(a), (b)(3), and (c)(4), with respect to the specific and simple issue of whether (or not) the EPAs constitute unregistered securities.[1]

---

[1] Only Plaintiffs Pierce Robertson, Rachel Gold, Sanford Gold, and Edwin Garrison are moving *at this time* for certification of a nationwide issue class with respect to the issue of whether the EPAs constitute unregistered securities. Plaintiffs have already served some brief discovery on Defendants (which is **not** necessary to decide this Motion), and we have been retained by hundreds of other class members residing across the country who invested many millions of dollars in purchasing the EPAs.

## INTRODUCTION

Based upon daily developing facts and circumstances, including the recent many billion dollar implosion and bankruptcy of FTX, and its revoked agreement to purchase Voyager's assets in the Chapter 11 Bankruptcy proceedings,[2] this Court now has an important responsibility and opportunity, having before it the only active, pending proposed nationwide class action with allegations and litigation going back almost a year before this Court, encompassing many billions of dollars in ongoing losses for millions of victims, across this country.

The parties on all sides before this Court and others being adversely impacted on a daily basis by this horrible public relations nightmare, especially as new litigation is being filed across the country daily, have expressed a sincere desire to have all of this litigation proceed in one venue, with the necessary experience and history to provide a path towards any realistic resolution for the millions of victims who sustained billions in damages—rather than the alternative, where any and all of the available funds that could go to compensate victims, would go instead toward lawyer fees and expenses to finance many years of extensive litigation in district and bankruptcy courts across the country. This was the great lesson taught recently by the Honorable Michael Hanzman here in Miami, Florida, who presided over the unprecedented $1.3 billion dollar victim recovery achieved in the Champlain Towers South Collapse Litigation, in less than one year. Judge Hanzman had the great wisdom and foresight to make sure that all of the victims were fully compensated, before any and all of the recovery was dissipated, after years of extensive (and wasteful) litigation, as is typical in many complex cases.

We have already endured months of delay and the expenditure of millions of dollars (from proceeds that could have paid victims) in litigating the Voyager Bankruptcy proceedings in New York, which was supposed to culminate in an asset sale to FTX in just a few weeks. Now that FTX—like Voyager—has also declared bankruptcy, based upon their fundamentally flawed plan and structure, leaving investors with billions of dollars in losses, FTX has revoked its offer to proceed with the Voyager asset purchase agreement, leaving Plaintiffs and Class Members with ___no relief___ and ___no path towards recovery___—except for this putative nationwide class action.

While both the FTX and Voyager bankruptcy litigations will no doubt continue for many years, and will cost the expenditure of millions of dollars of what would otherwise be possible recovery for the victims, everyone agrees that finally, at least the specific claims brought against Defendants

---

[2]   https://seekingalpha.com/news/3906705-voyager-digital-reopens-bidding-process-after-ftx-files-for-chapter-11-bankruptcy (accessed November 15, 2022).

Mark Cuban, his Dallas Mavericks, and any other responsible third party (that discovery here reveals is responsible for directly causing damages) must now proceed.

Plaintiffs respectfully suggest that it will greatly benefit all parties, if this Court now certifies simply the main common questions in this litigation, so they can be appropriately certified and decided on behalf of all proposed class members, and not waste years on myopic individual issues. EPA purchasers have already collectively ***lost billions of dollars***, and enough time and resources have already been wasted in the Voyager Chapter 11 bankruptcy process, such that it is time now to advance these issues for the true victims of these crimes.

Nearly ***a year*** after first being accused of directly promoting one of the nation's largest frauds, which resulted in billions of dollars in losses to largely retail investors across the country, Defendant Mark Cuban **has finally publicly responded** to these incredible allegations. Speaking on Veteran's Day at a national conference hosted by Sports Business Journal, the billionaire proudly told the audience:

> "First, you've got to understand crypto. There's speculation—that's all the noise. Then there's things that have happened with **Voyager and with FTX now**—that's somebody running a company that's just dumb as fuc*** greedy. [3]

A jury will be able to decide early next year, whether Mr. Cuban is correct, namely that the billions of dollars in damages to the proposed class were caused because those running Voyager, like former CEO Mr. Stephen Ehrlich, were "dumb as fuc*** greedy," or whether Mr. Cuban, his Dallas Mavericks and possibly other third-party organizations are also to blame for these specific alleged damages.

Moreover, the same jury can also certainly decide the very narrow and specific question, that will be identical and yield the same answer for each and every class member, whether Voyager's sale of EPAs—as alleged by the SEC and seven state attorneys general—was (or was not) the sale of unregistered securities. The answer to those simple questions will be binding upon all of the certified class members and thus will undoubtedly help materially advance this litigation, that cannot be disputed.

---

[3] Hear it from Mr. Cuban directly: https://youtu.be/5DT0aVPtyFY; *see also* https://fortune.com/2022/11/12/elon-musk-mark-cuban-slam-ftx-sam-bankman-fried/?showAdminBar=true

Voyager's retained counsel will now undoubtedly argue (as they have already indicated in objecting to this motion) that the Court should not consider this motion as it is "premature." They will argue again, that there will be some opaque, yet dire, consequences in not deciding *this* Motion, before they are provided the opportunity to draft, prepare and file many more motions, with months of delay, even while other crypto companies are declaring bankruptcy on a daily basis, causing billions of dollars of more losses, and ruining any chance for any recovery by the Voyager victims. Remember, it was Voyager's counsel who originally told Chief Judge Altonaga that there was "no reason" *not* to stay the *Cassidy* Action, in which they fought heavily for dismissal and to compel arbitration, while at the exact same time, they were preparing and filing extensive bankruptcy petitions in New York. Those papers were not drafted overnight.

The truth is that Defendants have been alerted to these specific allegations since the original *Cassidy* complaint was filed on December 24, 2021, which included specific allegations detailing how Defendants Mark Cuban and his Dallas Mavericks specifically violated numerous state and federal laws that directly caused billions of dollars in losses to our hundreds of existing clients and millions of proposed class members. This 2nd action has now been pending officially for over three months, and the current operative complaint has not changed as to these Defendants (only some claims and Mr. Ehrlich were dropped). Thus, the Court should reject outright any such delay arguments because ruling on this Motion expeditiously, even before considering Defendants' yet-to-be-filed Motion to Stay all discovery and Motion to Dismiss, would be entirely appropriate and would not violate the rule against one-way intervention.[4]

And the Defendants' yet-to-be-filed Motion to Dismiss would certainly not dispose of this entire action, let alone raise any real reason to dispose of any portion of it. That is specifically why

---

[4] "'One-way intervention' occurs when the potential members of a class action are allowed to 'await . . . final judgment on the merits in order to determine whether participation [in the class] would be favorable to their interests.'" *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1252 (11th Cir. 2003) (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 547 (1974)). "The result is that putative class members can simply observe the proceedings without assuming any risk that their individual claims may be precluded by an adverse ruling on the merits." *Newton v. S. Wood Piedmont Co.*, 163 F.R.D. 625, 630 (S.D. Ga. 1995), *aff'd*, 95 F.3d 59 (11th Cir. 1996). That is a potential problem, because without class certification, the absent plaintiffs would not be bound by the court's ruling on the merits. "Rule 23(c)(2)'s requirement that, in opt-out class actions, notice be given to all class members as soon as practicable was intended by Congress to prevent one-way intervention." *London*, 340 F.3d at 1252-53 (citing *Schwarzschild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995) ("[D]istrict courts generally do not grant summary judgment on the merits of a class action until the class has been properly certified and notified.")).

Defendants' counsel has been threatening to file a Motion to Stay all discovery since August, but never have, because they know it would not be granted by this Court.[5]

Especially considering that Plaintiffs have dismissed Voyager's former CEO Defendant Ehrlich (who Mr. Cuban previously told our investors was his "good friend" and "extremely knowledgeable," but this weekend told the public was " dumb fuc**** greedy"), there is simply no basis now to seek to compel arbitration of any claims. Plaintiffs have certainly alleged standing in that they each purchased an EPA and were harmed by Defendants' conduct in promoting their sale. Plaintiffs have assiduously documented many of the specific misrepresentations Cuban and the Mavericks made in promoting the sale of these unregistered securities, which would objectively lead the Class to rely on them in making the purchases. Plaintiffs and all Class Members are certainly entitled to rescission of the EPA contracts and returns of their investments under these facts.

Were that enough, under New Jersey law, which may apply nationwide in this instance as every EPA was offered and/or sold to Plaintiffs and the Class by the Voyager Entities from their base of operations in New Jersey, Defendants, as agents of the Voyager Entities, are jointly and severally liable for the full measure of Plaintiffs' and the Class's damages to the same extent as the Voyager Entities. *See* N.J.S.A. 49:3-60 ("It is unlawful for any security to be offered or sold in this State unless . . . [t]he security is registered under this act"); *see also* N.J.S.A. 49:3-71(d) ("every . . . agent who materially aids in the sale or conduct [is] also liable jointly and severally with and to the same extent as the seller or investment adviser"). As it is clear that this action should proceed beyond the motion to dismiss phase, the next logical step is to certify the Nationwide Issue Class and set the issues for an expedited trial or to consider them on summary judgment.

Finally, on November 7, 2022, Plaintiffs served on Defendants very narrow and targeted discovery—which is not required for the Court to resolve *this* motion, but which will expedite preparation for an expedited trial on the merits of Defendants' liability for Plaintiffs' claims— including (1) a Request for Production on Defendants, (2) a Set of Interrogatories on Defendants, (3) just three Requests for Admission on Defendant Cuban, (4) Notice of Taking Defendants' Corporate Representative Depositions by Zoom on January 12 and 13, and (5) subpoenas for third party

---

[5] That was specifically why Defendants' counsel told this Court that they needed "many weeks" to file the Joint Scheduling Report, just so they could try to prevent Plaintiffs from serving any discovery. Such delay tactics did not work and Plaintiffs have already served much of the discovery that will be necessary for these proceedings.

depositions (without documents) for Henry Gaskins on December 15, Jeff Mishkin on December 16, and Stephen Ehrlich on December 19.

Defendants, of course, ignore these requests, claiming since the parties' initial meet and confer back in August after this action first commenced that they do not need to respond to any of discovery requests (or produce the Mavericks/Voyager Sponsorship Agreement dated October 29, 2021 as part of their initial disclosure obligations, which Plaintiffs received from Voyager in the Bankruptcy Proceedings) because they plan on, at some point, filing a motion to stay all discovery. However, "[i]t has never been the rule in this district that one party can unilaterally stay proceedings and ignore the comprehensive discovery practices well-established under the Federal Rules of Civil Procedure as well as the Local Rules for the Southern District of Florida." *Monks v. Diamond Resorts Int'l, Inc.*, 17-14307-CIV, 2018 WL 4208330, at *2 (S.D. Fla. May 11, 2018) (citing *PSF Trust v. Northeastern Capital Funding*, 2008 WL 11333495, *2 (S.D. Fla. 2008)). Without a "specific showing of prejudice or burdensomeness" by the movant, "unilateral motion[s] to stay discovery pending a ruling on a dispositive motion should be denied." *Id.* (citing *Bocciolone v. Solowesky*, No. 08-20200, 2008 WL 2906719, at 2 (citing S.D. Fla. Local Rule app. A, I(D)(5) (2008))). Thus, the Court should reject Defendants' yet-to-be-filed attempt to avoid their discovery obligations.

As explained below, the Court should exercise its discretion and certify the Nationwide Issue Class, reject their attempts to avoid any discovery obligation, and enter a Case Management Order setting this case for an expedited trial, on the specific issue of whether the EPAs constitute "unregistered securities" such that these Defendants should be required to answer for their liability in promoting them to the detriment of millions of American investors to the tune of billions of dollars in damages.

## FACTUAL BACKGROUND

On October 23, 2019, Voyager began offering interest-bearing cryptocurrency accounts to public investors. ECF No. 34 ¶ 29. Plaintiffs and other similarly situated individuals invested in Voyager's EPAs. *Id.* There is no dispute that Voyager never registered the EPAs with the United States Securities and Exchange Commission ("SEC") or with any state securities regulators. The reason for this drastic decision (by selling unregistered securities) was fueled solely by Voyager's extreme greed. Because these extremely attractive EPAs (offering cryptocurrency assets as returns on investments) were not registered, Voyager could spend tens of millions in dollars to market them to every consumer in the country, without worrying whether any were "accredited investors" (as Voyager's competitors that comply with the law are restricted). Instead, with the help of unscrupulous agents such as the

Defendants, they targeted college students, sport fans and many lower income households, with admittedly very limited experience with the crypto market. That is the main reason the SEC and many state attorneys general are now preaching for the need for more regulation in the crypto market.

Voyager maintains that it does not offer for sale any product that constitutes a "security" under federal or state law. ECF No. 34 ¶ 30. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and by the SEC, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

The EPAs were "securities" as defined by the United States securities laws and as interpreted by the Supreme Court, the federal courts, and the SEC. ECF No. 34 ¶ 31. Although Voyager promised its investors a fixed return for their EPA investments, Voyager's Annual Information Form filed with Canadian regulators stated, "Rewards earned on crypto assets are variable, and reward rates are determined by voyager at its sole discretion." *Id.* In order to generate revenue to fund the promised interest, Voyager pooled the EPA assets to engage in lending and staking activities from which it derived revenue to pay interest on the EPA accounts. *Id.* These activities make the EPAs a "security" under state and federal law. *Id.*

As explained more fully, below, the question of whether Voyager's offering and selling the EPAs, which are unregistered securities, violates applicable securities laws, is a common and predominant issue that is capable of swift resolution by this Court on a classwide basis, which determination would materially advance this litigation for Plaintiffs and the potentially millions of affected consumers around the nation. Therefore, Plaintiffs move for certification of an issue class for these expedited proceedings.

On October 28, 2021, at a Mavericks press conference, Cuban announced that the Mavericks had entered into a 5-year "exclusive, integrated partnership" with Voyager.[6] Defendants explained in the press release that "[t]his partnership makes Voyager the first international partner of the Dallas Mavericks, enabling both parties to reach a wider, global audience to raise brand awareness and drive cryptocurrency adoption around the world." ECF No. 34 ¶ 46.

Defendant Cuban proudly described how he would significantly increase the scope and presence of the Deceptive Voyager Platform for those with limited funds and experience:

---

[6]   ECF No. 34 ¶ 46 (citing https://www.mavs.com/mavsvoyager/ (accessed November 15, 2022)).

You know, there's a lot of hype, there's a lot of discussion, but most people don't understand the fundamentals behind it. We're going to try to bring that level of education to our fans and to our joint customers."

To put it simply: there's untapped potential in the future of digital currencies **and it's an attractive investment for novice investors who might only have $100 to start. That's where Voyager enters the picture.**

In other words, it's a way to earn high returns while also getting skin in the game and the **Voyager platform makes the process easy and simplified for fans of all ages.** The 60+ crypto assets allows you to build a diverse portfolio from a single account.

**You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started. My now 12-year-old son got me in Dogecoin when it was less than a penny. I was like "let's do this" because it's a cheap way for him to learn how all of this works**. While you have to put in a $100 to get the $100 bonus the next two days, if you don't have a hundred dollars and you just want to download the app and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.[7]

Cuban even hyped up the fact that he was investing his own money into the Deceptive Voyager Platform to further induce retail investors to follow in his footsteps:[8]

I gotta add, **I am a customer and I've been a customer for several months now,** I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a perfect fit for our Mavs fans and reaching Mavs fans of all ages.

. . .

And, of course, the Mavs being a leader I think we are going to extend this far deeper than just Mavs fans, I think Voyager is going to be a leader amongst sports fans and crypto fans around the country.

While Cuban "claimed" to be a Voyager customer, he has never disclosed the nature, scope and amount of compensation that he has personally received in exchange for promoting the Voyager digital platform and he is not listed on any of the bankruptcy papers as a creditor. ECF No. 34 ¶ 50. *It is very important to know <u>now</u> (the very simple factual question) whether Mr. Cuban ever, in fact, made any large investment in Voyager (as he told everyone), and if so, whether he was able to recover any of his funds, before the Ponzi scheme collapsed for all victims.*

Throughout the October 28, 2021 press conference, Cuban continuously represented that Voyager was an easy to use platform that offered the best pricing in the market:

---

[7]   ECF No. 34 ¶ 47 (citing https://www.mavs.com/mavsvoyager/ (accessed November 15, 2022)).

[8]   ECF No. 34 ¶ 49 (citing https://www.youtube.com/watch?v=aB9GpBOroIw (accessed November 15, 2022)).

> And so for those of you who already use crypto, I know for me it was really easy, I took some of my MATIC tokens that I own and transferred it over because Voyager paid a higher interest rate or return rate than the application I was using before, Aave. So it was really easy to give you a wallet address, you just go into your metamask or whatever you're using, you just send it to that destination address, it shows up an hour later, you start earning more money, and so right immediately I was earning more when I went over to Voyager, and it's the same with USDC, a stablecoin. And the other thing about it is for those of you who use DeFi, the pricing is always higher on DeFi as they try to look through all the decentralized financing platforms to try to get the best—not even the best, but *a* price— and so with Voyager, the pricing has been far, far better, so if you're paying attention and want to get the best price, Voyager is a great platform for it.

ECF No. 34 ¶ 51.

Cuban also shamelessly pushed investors to invest heavily into USDC and other assets on the Deceptive Voyager Platform, claiming that investing in the Deceptive Voyager Platform was "***as close to risk free as you're going to get in the crypto universe***," that it was good for small businesses, and even that it was "a lot easier" than opening a savings account at a bank for young children:[9]

> One of the reasons we want to do the education program is there's a big opportunity for small businesses. One of the challenges of small businesses is if you have any cash in the bank, you're making .025%. You can convert to put it into a USDC stablecoin on Voyager, and I thought it was 7% but now it's 9%. And so I've taken a lot of my cash and made it available on USDC. I'm not here trying to sell you it's 100% risk free, but it's as close to risk free as you're going to get in the crypto universe. And so just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.
>
> . . .
>
> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's impossible except on a few platforms to spend $10 and get started. You know, my now 12-year-old son got me into Dogecoin when it was less than a penny.
>
> . . .
>
> So there's a lot of ways to inexpensively start to get an understanding. And it's a lot easier than even opening up a savings account. It's a pain in the ass to open up a savings account, particularly for your kids these days. There's so much paperwork, and whether it's yourself personally, someone you're trying to teach—you're trying to teach your kids about personal finance, believe it or not, this is actually a better way, and so that's one of the unique opportunities and why it's not too late.
>
> . . .
>
> It's also something you can do on your phone. You don't have to have a bank account. So, people who are unbanked, trying to learn about financing, but have a smart phone

---

[9]    ECF No. 34 ¶ 53. (citing https://www.youtube.com/watch?v=aB9GpBOroIw (accessed November 15, 2022)).

and can download the app, you can start getting into this and saving your money and that's just a unique opportunity.

Finally, Cuban went to great lengths to cast investing in the Deceptive Voyager Platform as a "fun" opportunity with a low cost of entry: [10]

> Access, first and foremost. The simplicity of access, The fact that you don't have to rush into it and put all your money into it so patience is a big part of it. And then experimentation, right? Be curious. . . . Because there's such a low cost of introduction and you know obviously the people who need the most education hopefully are spending the least amount of money, there's a lot of programs and educational programs that we can do that guide people through the process. And that's really the key. . . . One of the greatest values of the lower cost crypto isn't so much "hey it could be an investment," it's more the community. . . . It's a low cost entry to fun.

As an incentive, Defendants Cuban and the Mavericks even ran a promotion shortly after the press conference where individuals who downloaded the Voyager app to invest during a certain time would receive $100 in Bitcoin.[11]

In a press release, Cuban stated that "[w]e believe our partnership with Voyager will allow Mavs and NBA fans to learn more about Voyager and how they can earn more from Voyagers' platform than from traditional financial applications."[12] Ehrlich, in turn, emphasizing the "educational" nature of the partnership, said "[t]his partnership gives us the opportunity to educate people all over the world on ways to use crypto in their everyday lives. We want to help people learn alternate ways to grow their wealth to achieve true financial freedom and build intergenerational wealth through crypto. We found a great partner to do this with in the Mavs and their owner, Mark Cuban, who is already deeply involved in the space."[13]

Each of the Proposed Class Representatives purchased an EPA offered for sale from Voyager's base of operations in New Jersey after being exposed to some or all of Cuban's misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in the complaint, and they each sustained damages as a result. *See* Declarations of Pierce Robertson, Rachel Gold, Sanford Gold, and Edwin Garrison, each dated November 15, 2022, attached as **Exhibits A– D** ("Proposed Rep. Decls."), ¶ 3. The EPAs that Voyager sold the Proposed Class Representatives

---

[10]  ECF No. 34 ¶ 55. (citing https://www.youtube.com/watch?v=aB9GpBOroIw (accessed November 15, 2022)).

[11] ECF No. 34 ¶ 56 (citing https://markets.businessinsider.com/news/currencies/mark-cuban-dallas-mavericks-free-bitcoin-100-voyager-digital-app-2021-10 (accessed November 15, 2022)).

[12] *Id.*

[13] *Id.*

were no different than any of the other EPAs that Voyager offered and sold throughout the nation, all of which are currently subject to investigation by federal and state regulatory authorities as potentially being unregistered securities, and which number in "at least tens of thousands" in Florida alone. *See* Excerpts of Transcript of Voyager Digital LLC's corporate representative, ECF No. 34-1, at 89 (41:20–42:15) ("Q. [I]f Mr. Cassidy was in Texas or if he was in California, would there be any differen[ce] that you would look at in this chart in terms of how he was paid interest every month if both people met the minimum amount that was necessary each month? . . . THE WITNESS: **No. His earn would be the same**, as far as I know, in those state -- in those states. Q. **So there's no distinction for the Voyager Earn Program by state**. . . . THE WITNESS: **Yes, as far as I'm aware**."); *see also* **Exhibit E** 107:10–13 ("Q. There's definitely at least tens of thousands of Voyager Platform members that are residents of the State of Florida? A. Oh. Yes."); 133:2–134:13 ("Q. Okay. So . . . my next question is, all of these investigations that are being done by the State AGs and the SEC applies to Mark Cassidy's account? . . . THE WITNESS: I'm not sure. I – I would – I think, yes. . . . Q. What else do you need from us so that you can say, as the corporate rep depo -- deponent who is the most qualified to talk about Mark Cassidy's account, that **his account is the same account that these attorney generals and the SEC are saying possibly should be registered securities?** . . . THE WITNESS: To the extent I know, they – **they would not be different from any of the other accounts.**").

The Court is not required to resolve these issues at this stage of the litigation, however, the Proposed Class Representatives submit it is clear that their resolution will be applied equally to ***all*** Proposed Class Members' claims, making class treatment appropriate.

## RELIEF REQUESTED

The purpose of a class action is to facilitate judicial economy by avoiding multiple suits on the same subject matter, provide a feasible means for asserting the rights of those who would have no realistic day in court if a class action were not available, and deter inconsistent results, assuring a uniform, singular determination of rights and liabilities. *Am. Pipe & Constr., Co. v. Utah*, 414 U.S. 538 (1974).

As explained more fully below, the Proposed Class Representatives at this stage seek a very narrow certification order that utilizes Rules 23(a), 23(b)(3), and 23(c)(4) to certify a liability issue class for the purpose of adjudicating first whether the EPAs constitute a security that Voyager should have

registered before offering and selling to Plaintiffs and Class Members.[14] Rule 23(c)(4) provides that "an action may be brought or maintained as a class action with respect to particular issues." *See In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 697 (N.D. Ga. 2003) (certifying issues of "Defendants' duty to Plaintiffs and whether Defendants breached that duty"). "The theory of Rule [23(c)(4)] is that the advantages and economies of adjudicating issues that are common to the entire class on a representative basis should be secured even though other issues in the case may have to be litigated separately by each class member." *Nelson v. Walmart Stores, Inc.*, 245 F.R.D. 358, 380 (E.D. Ark. 2007). The Court has this tool and others at its disposal to facilitate common-sense treatment of the common claims and issues as part of its class certification.

In this regard, the Proposed Class Representatives submit that the Court should certify a liability issue class under Rule 23(a), (b)(3), and (c)(4) so the Proposed Class Representatives can move forward on expeditiously trying the issue before this Court as to whether Voyager's EPA constitutes an unregistered security—*a method of organizing this litigation that Plaintiffs' counsel has used with very recent success in both state and federal class actions. Collins v. Quincy Bioscience, LLC*, No. 19-CV-22864, 2020 WL 3268340 (S.D. Fla. Mar. 19, 2020) (Goodman, M.J.) (recommending certifying a liability issue class and bifurcating proceedings into liability and damages phases where defendant's liability would be determined regarding uniform representations made to the class);[15] *Las Olas Co. v. Fla. Power & Light Co.*, No. CACE19019911-18, 2020 WL 9874296 (Fla. 17th Cir. Ct. Dec. 14, 2020), *aff'd per curiam Infratech Corp. v. Las Olas Co.*, 320 So. 3d 751 (Fla. 4th DCA 2021), *reh'g denied* (Fla. 4th DCA July 13, 2021) (affirming certification of a liability issue class and proceeding to a bifurcated jury trial regarding defendants' liability for causing a single-incident mass tort—which trial lasted one week and resulted in favorable liability verdict for the class). Courts throughout this Circuit have also demonstrated the utility in this approach. *See Andreas-Moses v. Hartford Fire Ins. Co.*, 326 F.R.D. 309 (M.D. Fla. June 18, 2018) ("The Court will exercise its discretion under Rule 23(c)(4) to certify a merits-only class and bifurcate damages from the merits."); *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d

---

[14] *Jones v. Desantis*, No. 4:19cv300-RH/MJF, 2020 WL 5646124, at *2 (N.D. Fla. Apr. 7, 2020) (a plaintiff may move for class certification of selected counts only) (citing, *inter alia, Jenkins v. United Gas Corp.*, 400 F.2d 28, 35 (5th Cir. 1968)).

[15] *Collins* is also instructive because in that case Plaintiff's counsel also filed a Motion for Class Certification one week after filing the Amended Complaint, because they were able to marshal and present the necessary supporting evidence. The *Collins* court not only rejected the defendant's arguments that the motion was filed "prematurely" and should be stayed, but it also *granted* class certification because plaintiffs satisfied all of the requirements of Federal Rule 23.

1275 (N.D. Fla. 2017) (same); *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 317 (S.D. Fla. 2001) (explaining that "the Court may either appoint a master to resolve actual damages or merely allow class members to bring individual actions with the benefit of a *res judicata* finding of liability").

As there can be no dispute that determining whether Voyager's EPAs are unregistered securities would materially advance the litigation for all Class members, the Court may use Rule 23(c)(4) to certify a Liability Issue Class. Accordingly, the Proposed Class Representatives respectfully move the Court for its Order certifying the following Nationwide Issue Class to litigate the selected claims described below:[16]

> (1) **Nationwide Issue Class:** All persons or entities in the United States who, within the applicable limitations period, purchased or enrolled in an EPA.

Excluded from the Proposed Class are Defendants and their officers, directors, affiliates, legal representatives, and employees, the Voyager Entities and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

The Proposed Class Representatives also respectfully request that the Court (a) appoint them to serve as Class Representative for the Proposed Class, and (b) appoint The Moskowitz Law Firm, PLLC, and Boies Schiller Flexner LLP, as Class Counsel.

## APPLICABLE STANDARD

A district court has broad discretion in determining whether to certify a class. *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992); *Griffin v. Carlin*, 755 F.2d 1516, 1531 (11th Cir. 1985).

As a threshold matter, courts consider whether "the proposed class is adequately defined and clearly ascertainable." *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 693 (S.D. Fla. 2015).[17] Additionally, "the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the

---

[16] To whatever extent that the proposed class definition should be refined to more clearly cover the class of individuals affected by a defendant's alleged misconduct, the Court has discretion to do so. *Herman v. Seaworld Parks & Ent., Inc.*, 320 F.R.D. 271, 285 (M.D. Fla. 2017). Plaintiffs and proposed Class Counsel further reserve the right to seek certification of additional classes and/or to seek appointment of additional class representatives as appropriate.

[17] In *Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021), the United States Court of Appeals for the Eleventh Circuit disavowed the "administrative feasibility" requirement for establishing ascertainability of class members as a precondition to certification, which it had previously adopted in its unpublished decision in *Karhu*.

requirements set forth in Rule 23(b)." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004). The party seeking to maintain the class action must affirmatively demonstrate its compliance with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011).

Rule 23 "establishes the legal roadmap courts must follow when determining whether class certification is appropriate." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). The Rule 23(a) requirements are commonly referred to as the "numerosity, commonality, typicality, and adequacy of representation" requirements. *Valley Drug Co.*, 350 F.3d at 1188. Under Fed. R. Civ. P. 23(b)(3), the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*

## LEGAL ARGUMENT

### A.  STANDING

"[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) (quoting *Gen. Tel. Co. of Sw.*, 457 U.S. at 156) (internal quotations and citation omitted). "[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991). "An economic injury is the 'epitome' of a concrete injury." *Lewis v. Mercedes-Benz USA, LLC*, No. 19-CIV-81220-RAR, 2021 WL 1216897, at *5 (S.D. Fla. Mar. 30, 2021) (citing *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019).

Here, Proposed Class Representatives each clearly have standing as each purchased an EPA offered for sale from Voyager's base of operations in New Jersey after being exposed to some or all of Cuban's and the Mavericks' misrepresentations and omissions regarding the Deceptive Voyager Platform, and each sustained damages as a result. *See* Proposed Rep. Decls. ¶ 3.

### B.  ASCERTAINABILITY

As the Eleventh Circuit has recently held, to be ascertainable the proposed class need only be "adequately defined such that its membership is capable of determination." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1304 (11th Cir. 2021) (rejecting any requirement to demonstrate administrative feasibility). Here, membership in each Proposed Class can be readily determined from Voyager's own corporate records. *See* ECF No. 34-1 at 56 (Voyager explaining that "[b]y the end of calendar 2021, we had 250 employees, 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets on the platform."); *see also* Ex. E 107:10–13. *See, e.g., In re Health Insurance*, 2021 WL 1341881, at *7

(settlement class adequately defined and clearly ascertainable where membership was objectively determinable from corporate records).

### C.  **NUMEROSITY**

"To establish numerosity, [a plaintiff] must show that the class is so numerous that joinder of all members is impracticable." *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 684 (S.D. Fla. 2013) (internal quotes and citation omitted). "While mere allegations of numerosity are insufficient, Rule 23(a)(1) imposes a generally low hurdle, and a plaintiff need not show the precise number of members in the class." *Id.*; *accord*, *Palm Beach Golf Ctr.*, 311 F.R.D. at 695. The "general rule of thumb in the Eleventh Circuit is that 'less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.'" *Manno*, 289 F.R.D. at 684 (quoting *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)); *see, e.g., Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986).

Numerosity is easily satisfied for the Proposed Class, given that Voyager reports approximately 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets under management, with tens of thousands in Florida. *See* ECF No. 34-1 at 56; *see also* Ex. E 107:10–13.

### D.  **COMMONALITY**

Commonality requires the identification of an issue that by its nature "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Proof of commonality is a "relatively light burden.*" County of Monroe, Fla. v. Priceline.com, Inc.*, 265 F.R.D. 659, 667 (S.D. Fla. 2010) (internal quotation marks and citation omitted). Commonality "does not require that all the questions or law and fact raised by the dispute be common." *Id.* "What matters to class certification . . . [is] the capacity of a classwide proceeding to generate common ***answers*** apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (internal quotation marks and citation omitted) (emphasis original). Commonality is readily found where, as here, "[d]efendants have engaged in a standardized course of conduct that affects all class members." *In re Terazosin Hydrochloride,* 220 F.R.D. at 687; *Agan v. Katzman & Korr, P.A.,* 222 F.R.D. 692, 697 (S.D. Fla. 2004).

There are numerous common legal issues subject to classwide resolution that will determine "in one stroke" the issues central to Plaintiffs' claims. *Id.* They include:

(a) whether the EPAs were unregistered securities under applicable law;

(b) whether Defendants' participation and/or actions in Voyager's offerings and sales of EPAs violate the provisions of applicable securities law; and

(c)  the type and measure of damages suffered by Plaintiff and the Class.

ECF No. 34 ¶ 77.

The common issues raised in this action are straightforward. If the EPAs are in fact securities that must be registered, Defendants' conduct in promoting the Voyager EPAs and in assisting in and actively participating in Voyager Digital's offer and sale of the EPAs, which are unregistered securities that were offered and sold by the Voyager Entities from the State of New Jersey, tainted the sales to all investors. Commonality is thus satisfied by these common issues.

### E. **TYPICALITY**

"[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Prado-Steiman*, 221 F.3d at 1279. The focus of the typicality requirement is whether the named plaintiff will advance the interests of the class members by advancing his own interests. *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 698 (S.D. Fla. 2004); *Herman*, 320 F.R.D. at 293 (same).

Much like the commonality requirement, the typicality requirement does not require that the claims of the Proposed Class Representatives and the proposed class be identical: all that is required is that "the claims or defenses of the class and class representative arise from the same event or pattern or practice and are based on the same theory." *Agan*, 222 F.R.D. at 698 (citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)). Rule 23(a)(3) typicality is thus satisfied where the Proposed Class Representatives' claims are "reasonably co-extensive" with absent Class Members' claims; they need not be "substantially identical." *In re Checking Account Overdraft Litig.*, 281 F.R.D. 667, 675 (S.D. Fla. 2012). Generally, "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences." *Prado-Steiman*, 221 F.3d at 1279 n.14 (citation omitted).

The question of whether each EPA was a security rests on identical factors for the Proposed Class Representatives and the Class: whether the Class invested money in the EPAs, whether the investors in the EPAs participated in a common enterprise, whether reasonable investors purchased the EPAs with an expectation of profit from owning them, and whether investors reasonably expected profits from the EPAs to be derived from the managerial efforts of Voyager, the EPA issuer.

As a result of Voyager's conduct in offering and selling unregistered EPAs, the Proposed Class Representatives, like every member of the proposed Class, are entitled to recover the consideration paid for the EPAs or damages for the investments in the EPAs that were previously sold. Stated otherwise, the Proposed Class Representatives' claims and each proposed Class member's claims

"arise from the same event or pattern or practice and are based on the same theory." *Agan*, 222 F.R.D. at 698 (citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)).

Accordingly, the typicality requirement is satisfied.[18]

### F. **ADEQUACY**

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy is satisfied where (i) counsel for the class is qualified and competent to vigorously prosecute the action, and (ii) the interests of the proposed class representatives are not antagonistic to the interests of the Class. *See, e.g.*, *Fresco v. Auto Data Direct, Inc.*, No. 03-61063-CIV, 2007 WL 2330895, at *2 (S.D. Fla. May 14, 2007). The central component of representative adequacy is the absence of conflicts of interest between the named representative and the class. *Amchem*, 521 U.S. at 625–26 ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (internal quotation marks and citations omitted)).

The Proposed Class Representatives' and the Class Members' interests are fully aligned in seeking to determine whether Voyager's EPAs are unregistered securities. The Proposed Class Representatives have already served the Court and the Class in a representative capacity and have evidenced their commitment through their active prosecution of this lawsuit. *See* Proposed Rep. Decls. (indicating that the Proposed Class Representatives have reviewed the pleadings, provided information to counsel, will respond to interrogatories and document requests, prepare for deposition, are willing to make themselves available for trial, and are knowledgeable of the case and of their duties to the Class).

Moreover, as set forth below at greater length in the context of Rule 23(g), proposed Class Counsel is highly experienced in prosecuting class action litigation. *See, e.g., Fruitstone v. Spartan Race, Inc.*, No. 20-cv-20836-BLOOM/Louis, 2021 WL 2012362, at *12 (S.D. Fla. May 20, 2021) (finding in approving class settlement that Class Counsel's "reputation, diligence, expertise, and skill are reflected

---

[18] To oppose class certification, Defendants may emphasize that Plaintiffs' monetary injury varies in dollar amount from other members of the Proposed Class. But not only is Eleventh Circuit law clear that individual variations among class members' claims with respect to the extent of their damages do not defeat typicality for purposes of class certification, *Kornberg*, 741 F.2d at 1337 ("Differences in the amount of damages between the class representative and other class members does not affect typicality."). The Proposed Class Representatives only seek to certify a narrow and targeted issue class at this stage that would ask this Court to determine whether the EPAs are unregistered securities.

in the excellent results they have achieved"); *In re: Blue Cross Blue Shield Antitrust Litigation, MDL* 2406, U.S. District Court, Northern District of Alabama; *In re: Takata Airbag Products Liability Litigation, MDL* 2599, U.S. District Court, Southern District of Florida (Miami); *In re: Google Digital Advertising Antitrust Litigation, MDL* 3010, U.S. District Court, Southern District of New York; *In re: Grupo Televisa Sec. Litig.,* U.S. District Court, Southern District of New York; *Brown v Google LLC,* U.S. District Court, Northern District of California, No. 4:20-cv-0366; *Feller v. Transamerica Life Ins. Co.,* No. 16-cv-01378 CAS (GJSx), 2019 WL 6605886, at *6 (C.D. Cal. Feb. 6, 2019) (same, finding Class Counsel "have demonstrated that they have fully and competently prosecuted all causes of action, claims, theories of liability, and remedies reasonably available to the Settlement Class Members"); *In Re: Champlain Towers South Collapse Litigation*, Case No. 2021-015089 CA 01 (Fla. 11th Jud. Cir. July 16, 2021).

### G. PREDOMINANCE

The requirement that common questions of law or fact predominate means "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989) (citation omitted); *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016) (The Rule 23(b)(3) predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." (quoting *Amchem*, 521 U.S. at 623)). Here, too, the addition or subtraction of any given member from the Proposed Class would have no substantial effect on the nature or quantity of the evidence offered to prove Defendants' liability, readily satisfying *Brown*'s practical test of predominance.

Nor does proof of causation undermine predominance. Indeed, the only material individual variation in the class claims is the dollar amount of each investor's loss, which is not only recognized as no bar to class certification, *Brown*, 817 F.3d at 1239 ("The 'black letter rule' recognized in every circuit is that 'individual damage calculations generally do not defeat a finding that common issues predominate.'") (quotation omitted); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.") (internal citations omitted), it is not an issue even remotely presented by the requested *issue class*, which will not at this stage seek to adjudicate the Proposed Class Representatives' or Class Members' damages, but would rather focus on adjudicating the issue regarding whether the EPA is in fact an unregistered security. [19]

---

[19] That some class members ultimately may not be successful on their damage claims does not defeat

Common issues predominate with respect to the causes of action the Proposed Class Representatives seek to certify. For example, New Jersey's Uniform Securities Law imposes liability for the offer or sale of an unregistered security, as well as secondary liability for these Defendants, jointly and severally with Voyager. *See* N.J.S.A. 49:3-60 ("It is unlawful for any security to be offered or sold in this State unless . . . [t]he security is registered under this act"); N.J.S.A. 49:3-71(d) ("every . . . agent who materially aids in the sale or conduct [is] also liable jointly and severally with and to the same extent as the seller or investment adviser"). Thus, "irrespective of the individual issues which may arise, the focus of the litigation concerns the alleged common course of unfair conduct embodied in [Voyager's] scheme" to market and sell unregistered securities. *See Larsen v. Union Bank, N.A. (In re Checking Account Overdraft Litig., MDL No. 2036)*, 275 F.R.D. 666, 676 (S.D. Fla. 2011) (internal quotations omitted). Defendants' participation in this scheme will be substantiated by common evidence—including much of the evidence attached to this motion—which shows that Defendants materially aided in Voyager's conduct in selling the EPAs from New Jersey to the Proposed Class Representatives and the Class, despite knowing that the EPAs were securities which were required to be (and which were not) registered. This evidence would remain the same regardless of class size or composition. Further, the EPAs are materially identical and a Court could easily conclude that they are all securities based on the *Howey* test. Accordingly, the predominance requirement is met.

## H. <u>SUPERIORITY</u>

Rule 23(b)(3) superiority requires the court to analyze "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Palm Beach Golf Ctr.*, 311 F.R.D. at 699 (quoting *Klay*, 382 F.3d at 1269); *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 521 (S.D. Fla. 2013) (citations omitted). Here, there can be little doubt as to the judicial efficiency in litigation the claims of thousands—if not millions—of EPA purchasers on a class-wide rather than through individual lawsuits. A comprehensive resolution of the Class members' claims in this action would be far superior to litigating each of their claims separately, and will provide them a better chance at relief:

---

certification where common issues otherwise predominate. *Navelski*, 244 F. Supp. 3d at 1309 (citing *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016) ("[E]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct.")); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (observing that it is inevitable "that a class will often include persons who have not been injured by the defendant's conduct;" but "[s]uch a possibility or indeed inevitability does not preclude class certification")).

> Since the damage amounts allegedly owed to each individual [borrower] are relatively low — especially as compared to the costs of prosecuting the types of claims in this case involving complex, multi-level business transactions between sophisticated defendants — the economic reality is that many of the Class members would never be able to prosecute their claims through individual lawsuits.

*Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233, 280 F.R.D. 665, 675 (S.D. Fla. Feb. 21, 2012).

There are thousands of potential Class members whose claims are based on an alleged common course of conduct, rendering the litigation more manageable as a class action than as thousands of individual suits. *See* ECF No. 34-1 at 56 (Voyager explaining that "[b]y the end of calendar 2021, we had . . . 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets on the platform."); *see also* Ex. E 107:10–13. Even if the Class members were able individually to prosecute their claims, "[s]eparate actions by each of the Class members would be repetitive, wasteful, and an extraordinary burden on the courts." *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983). Thus, there is no other practical method of adjudicating these claims.

## I.  APPOINTMENT OF CLASS COUNSEL

Rule 23(g) governs the appointment of class counsel. In appointing class counsel, the Court is to consider: (1) "the work counsel has done," (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," (3) "counsel's knowledge of the applicable law," and (4) "the resources [] counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Here, Proposed Class Counsel have decades of experience handling class action litigation, have demonstrated a sound knowledge of the legal issues pertaining to Proposed Class Representatives' and the Class's claims against Voyager, have retained experts needed to address the esoteric securities and cryptocurrency issues that may arise, and certainly have the collective financial wherewithal to capably prosecute these claims on a class-wide basis. *See* Firm Resumes attached as **Composite Exhibit F**. Accordingly, the appointment of The Moskowitz Law Firm PLLC and Boies Schiller Flexner LLP as Class Counsel is both appropriate and warranted.

## CONCLUSION

For the foregoing reasons, the Court should (a) certify the Proposed Liability Issue Classes; (b) appoint the Proposed Class Representatives to serve as Class Representatives for the Proposed Nationwide Issue Class; and (c) appoint The Moskowitz Law Firm, PLLC, and Boies Schiller Flexner LLP, to serve as Class Counsel for the Proposed Nationwide Issue Class.

## **S.D. FLA. L.R. 7.1 CERTIFICATION**

Counsel for the Movants has made reasonable efforts to confer with all parties who may be affected by the relief sought in the motion in a good faith effort to resolve it, and were informed Defendants oppose the motion.

## **REQUEST FOR ORAL ARGUMENT**

The Proposed Class Representatives respectfully request oral argument pursuant to Local Rule 7.1(b)(2). This case and the Proposed Class Representatives' motion raise complex questions of law and fact regarding whether the Class should be certified. Given the importance of these questions to the determination of this case, the Proposed Class Representatives believe that the Court's decision-making process would be significantly aided by oral argument. The Proposed Class Representatives estimate just one hour will be necessary for oral argument.

Dated: November 15, 2022

Respectfully submitted,

By: */s/ Adam Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
Barbara C. Lewis
barbara@moskowitz-law.com
Florida Bar No. 118114
**THE MOSKOWITZ LAW FIRM, PLLC**
2 Alhambra Plaza, Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

By: */s/ David Boies*
David Boies
(Admitted *Pro Hac Vice*)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Phone: (914) 749–8200
dboies@bsfllp.com

By: */s/ Stephen Neal Zack*
Stephen Neal Zack
Florida Bar No. 145215
Hon. Ursula Ungaro (Ret.)
Florida Bar No. 200883
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., Suite 2800
Miami, FL 33131
Office: 305-539-8400
szack@bsfllp.com
uungaro@bsfllp.com

*Co-Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed on November 15, 2022, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

By: */s/ Adam M. Moskowitz*
ADAM M. MOSKOWITZ
Florida Bar No. 984280