# EXHIBIT 2

REDACTED

```
                                                              Page 1

 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
 2
 3   PIERCE ROBERTSON et al,     )
     on behalf of himself and    )
 4   others similarly            )
     situated,                   )
 5                               )
              Plaintiff,         )
 6                               )
     VS.                         )         CASE NO.:
 7                               ) 22-cv-22538-ALTMAN/Reid
     MARK CUBAN and DALLAS       )
 8   BASKETBALL LIMITED, d/b/a   )
     Dallas Mavericks, et al,    )
 9                               )
              Defendants.        )
10
     ----------------------------------------------------------------
11         CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
12             ORAL AND VIDEOTAPED DEPOSITION OF
                         RYAN MACKEY
13                   FEBRUARY 14, 2023
     ----------------------------------------------------------------
14
15         ORAL AND VIDEOTAPED DEPOSITION OF RYAN MACKEY,
16   produced as a witness at the instance of the Plaintiff and
17   duly sworn, was taken in the above-styled and numbered
18   cause on Tuesday, February 14, 2023, from 9:18 a.m. to
19   6:01 p.m., before Kari Behan, CSR, RPR, CRR, a Texas
20   certified machine shorthand reporter, at the offices of
21   Winston & Strawn LLP, 2121 N. Pearl Street, Suite 900,
22   Dallas, Texas, pursuant to the Federal Rules of Civil
23   Procedure 30.
24
25   Job No. FLA 5681911
```

```
 1                  A P P E A R A N C E S
 2    FOR THE PLAINTIFFS AND THE CLASS:
 3         JOSEPH M. KAYE, ESQ.
           ADAM M. MOSKOWITZ, ESQ. (REMOTELY)
 4         BARBARA LEWIS, ESQ. (REMOTELY)
           THE MOSKOWITZ LAW FIRM, PLLC
 5         2 Alhambra Plaza, Suite 601
           Coral Gables, Florida 33134
 6         (305) 740-1423
           joseph@moskowitz-law.com
 7         adam@moskowitz-law.com
           barbara@moskowitz-law.com
 8
                - and -
 9
           ALEXANDER M. BOIES, ESQ.
10         BOIES SCHILLER FLEXNER LLP
           55 Hudson Yards
11         New York, New York 10001
           (212) 446-2300
12         dboies@bsfllp.com
13         STEPHEN NEAL ZACK, ESQ. (REMOTELY)
           BOIES SCHILLER FLEXNER LLP
14         100 SE 2nd Street, Suite 2800
           Miami, Florida 33131
15         305-539-8400
           szack@bsfllp.com
16
17
      FOR THE DEFENDANTS, Mark Cuban AND DALLAS MAVERICKS:
18
           CHRISTOPHER E. KNIGHT, ESQ.
19         FOWLER WHITE BURNETT, P.A.
           Brickell Arch
20         1395 Brickell Avenue
           14th Floor
21         Miami, Florida 33131
           (305) 789-9210
22         cknight@fowler-white.com
23
24
25
```

```
 1   APPEARANCES (CONTINUED):
 2   FOR THE DEFENDANTS, MARK CUBAN, ET AL:
 3        STEPHEN A. BEST, ESQ.
          RACHEL O. WOLKINSON, ESQ.
 4        BROWN RUDNICK
          601 Thirteenth Street NW, Suite 600
 5        Washington, DC 20005
          (202) 536-1737
 6        sbest@brownrudnick.com
          rwolkinson@brownrudnick.com
 7
 8        TIFFANY B. LEITZ, ESQ.
          SIGMUND S. WISSNER-GROSS, ESQ. (REMOTELY)
 9        BROWN RUDNICK
          Seven Times Square
10        New York, New York 10036
          (212) 209-4731
11        tlietz@brownrudnick.com
          swissner-gross@brownrudnick.com
12
13
     ALSO PRESENT (REMOTELY):
14
          Rejane Passos
15
          Brooke Alexander
16
          Sekou Lewis, General Counsel, Dallas Mavericks
17
18   THE VIDEOGRAPHER:
19        Luis Acevedo, Videographer, Veritext Legal
20
21
22
23
24
25
```

Page 15

1    Q.  Okay.  And below senior director is directors
2  or --
3    A.  Directors, account executives, things like that.
4    Q.  Okay.  Do you normally have two additional vice
5  presidents and three senior directors working a -- a
6  sponsorship like this?
7    A.  Not normally.
8    Q.  Okay.  How come for this one?
9    A.  It was a -- a -- a deal that was going to require
10 a lot of hands-on work, so we put a lot of people on it
11 for that reason.
12   Q.  What kind of hands-on work?
13   A.  Well, the sponsorship included a lot of things
14 that we had to execute on our side, and, you know, that --
15 spreading out some of that work was -- we felt like, was
16 the best way to -- to tackle it.
17   Q.  Can you give me an example?
18   A.  Like an example of another sponsorship that would
19 be like this?
20   Q.  No, like the types of hands-on work that were
21 done for this partnership.
22   A.  Well, there was elements of the deal that were
23 going to require sort of -- a lot of work in a short
24 period of time.  For example, you know, if the deal
25 included naming rights to our gaming facility, which was

1  almost a project in and of itself.  There was educational
2  components that would require attention.  And, you know,
3  just the magnitude of the -- of the assets that we had to
4  execute in a short period of time, it felt like that was
5  the best way to -- to handle the situation.
6      Q.  And when you say the -- the gaming center, that's
7  the virtual eSports arm of the Mavericks?
8      A.  Correct.
9      Q.  Okay.  And team members on that virtual team,
10 where are they from?
11     A.  On the virtual team?
12     Q.  Yeah.  The eSports team?
13     A.  Well, they're -- they're not virtual; I mean,
14 they're live people that live in Dallas, and they compete
15 as our team.  We compete against other teams in the NBA 2K
16 League.  So there -- it's a -- it's a separate entity of
17 the Mavericks.
18     Q.  And that's all done on-line?
19     A.  The games are -- are actually done in person --
20 well, it can be done either way, but the games are --
21 physically, the -- the competitors meet in a room, and
22 they'll compete.  The game itself is done on-line, yes,
23 but the -- the competitors are real, live people.
24     Q.  Right.  And they're -- the games are
25 live-streamed?

```
 1        A.    Yes.
 2        Q.    Okay.  When's the season for Mavs gaming?
 3        A.    Typically summer.
 4        Q.    After baseball season?
 5        A.    Tends to move around, but yes.
 6        Q.    All right.  You said that it's a -- a lot of work
 7   that had to be done in a short period of time.  Why was --
 8   why was there a short period of time?  What was the rush?
 9        A.    Well, because our season was about to begin, and
10   typically sponsorships are centered around our season.  So
11   when we started the conversation, it was -- we only had
12   a -- really, a couple of months until we started playing.
13   So we didn't have a lot of time to get started before our
14   season began.  Because each game that we play is -- is an
15   asset (signalling quotes), and so any games missed is an
16   asset missed.
17        Q.    And about when did the Voyager deal sort of come
18   across your desk?
19        A.    On or about August 19th was the first
20   conversation that I had about them.
21        Q.    Who did you have the conversation with?
22        A.    His name is ████████████ with ████████████.
23        Q.    Who's ████████████?
24        A.    They're an industry/agency that works in a
25   variety of things, but they sell sponsorships; they handle
```

```
 1   a variety of different things in the sports industry.
 2        Q.   Do you work with ████ often?
 3        A.   I have in the past.
 4        Q.   About how long has that relationship gone on for?
 5        A.   I've known their representatives for a long time.
 6   I went to graduate school with -- with one of them -- one
 7   of their senior execs, and so I -- I've been familiar with
 8   them for ten years.
 9        Q.   And are they, like, the exclusive source for
10   partnerships like this?
11        A.   They're not.
12        Q.   Okay.  Was Voyager the first crypto company that
13   you guys considered doing a partnership with?
14        A.   No.
15        Q.   Who are some of the others?
16        A.   A company called Anchor, Coinbase, FTX,
17   BlockGaming, StormX; those are just a few.
18        Q.   When did you start talking to Coinbase?
19        A.   I don't recall.
20        Q.   Was it before Voyager?
21        A.   Before Voyager.
22        Q.   All right.  But they, ultimately, went with the
23   NBA, right, not with any particular team?
24        A.   Correct.
25        Q.   And that partnership was announced also right
```

1  before the season?
2      A.  I don't recall.
3      Q.  Did you have serious talks with FTX?
4          MR. COOK:  Object to the form.
5          THE WITNESS:  We had conversations with FTX.
6  BY MR. KAYE:
7      Q.  And you fielded pitches from each of these
8  companies?
9      A.  Well, we -- we submitted pitches to a variety of
10 companies.  Not all -- not all of them that I described or
11 had mentioned earlier, I -- I can't recall if we actually
12 pitched those companies, but we spoke to them.
13     Q.  Okay.  So, like, you pitched the services that
14 you would be able to provide through the partnership.  Did
15 they -- they made offers in return for how much they were
16 willing to pay for it?
17     A.  In some cases.
18     Q.  In comparison to these other companies you're
19 talking about, where did Voyager fall in the line of the
20 amount that they were willing to pay for this partnership?
21     A.  Roughly in line, slightly more.
22     Q.  More than enough to make a difference?
23         MR. COOK:  Object to the form.
24         THE WITNESS:  I mean, our -- our job is
25 to -- to find -- to maximize revenue for the Mavericks, so

Page 243

1      A.  Nothing.
2      Q.  Did Mr. Cuban have any implied or implicit
3  obligation to do anything to promote Voyager that was
4  agreed to as part of the negotiations?
5      A.  No.
6      Q.  The Sponsorship Agreement itself, I think you
7  talked about earlier and you testified that the purpose of
8  the Sponsorship Agreement was to promote the Voyager
9  platform; is that correct?
10     A.  Yes.
11             MR. KAYE:  Object to form.
12 BY MR. COOK:
13     Q.  The Voyager platform itself, does that include
14 the Voyager app, for example?
15             MR. KAYE:  Object to form.
16             THE WITNESS:  Yes.
17 BY MR. COOK:
18     Q.  And if you were to sign up for Voyager and
19 download that app and become a customer, what does that
20 allow you to do?
21             MR. KAYE:  Object to form.
22             THE WITNESS:  If you deposit money into the
23 account, you have the ability to buy, sell, trade, crypto
24 currencies, amongst other things.
25 BY MR. COOK:

Page 244

1    Q.  Was one of the other things that was available to
2    customers of Voyager participation in the Earn Program
3    account?
4    A.  Yes.
5    Q.  And was promotion of the Earn Program account
6    ever part of the negotiations of the Sponsorship Agreement
7    with the Mavericks?
8              MR. KAYE:  Object to the form.
9              THE WITNESS:  No, it was not.
10   BY MR. COOK:
11   Q.  Was it ever contemplated that the Mavericks would
12   promote the EPA program?
13             MR. KAYE:  Object to the form.
14             THE WITNESS:  No.
15   BY MR. COOK:
16   Q.  Did the Mavericks ever run any international
17   promotional activities for Voyager?
18             MR. KAYE:  Object to the form.
19             THE WITNESS:  No.
20   BY MR. COOK:
21   Q.  And in going back to Mr. Cuban, how did you
22   communicate with Mr. Cuban in connection with the Voyager
23   Sponsorship Agreement?
24   A.  By e-mail.
25   Q.  Did you ever communicate with Mr. Cuban

Page 245

1  concerning the Voyager Sponsorship Agreement orally?
2      A.  No.
3      Q.  I'm going to ask you to pull out from that stack
4  in front of you Exhibit 67-A.  It's the large document.
5      A.  All right.
6      Q.  If you turn to the seventh page in the deck, it's
7  one we looked at earlier that has the word "Mark Cuban" on
8  the right-hand side.
9          Do you see that?
10     A.  I do.
11     Q.  Do you recall earlier today Mr. Kaye pointed to
12 you -- pointed out to you the reference to the number of
13 followers that Mr. Cuban has on his Facebook, Twitter,
14 LinkedIn, and Instagram accounts?
15     A.  Yes.
16     Q.  To your knowledge, did Mr. Cuban ever promote
17 Voyager on his Facebook account?
18     A.  No.
19     Q.  To your knowledge, did Mr. Cuban ever promote
20 Voyager on his Twitter account?
21     A.  No.
22     Q.  Did he ever promote Voyager on his LinkedIn
23 account?
24     A.  No.
25     Q.  Did he ever promote Voyager to his Instagram

Page 247

1    THE VIDEOGRAPHER:  Off the record, 5:57.
2         (Brief recess taken.)
3    THE VIDEOGRAPHER:  We are on the record.
4  The time is 6:01.
5    MR. KAYE:  Ryan, subject to the same
6  reservation of rights I put at the end of your direct, I
7  don't have any further questions at this time.  Thank you
8  for your patience with me today, and I appreciate you
9  sitting all day for this deposition.
10   THE WITNESS:  Thank you.
11   THE VIDEOGRAPHER:  All right.  Off the
12 record, 6:01.
13        (Deposition concluded at 6:01 p.m.)

```
 1
                   UNITED STATES DISTRICT COURT
 2                 SOUTHERN DISTRICT OF FLORIDA
 3
     PIERCE ROBERTSON et al,      )
 4   on behalf of himself and     )
     others similarly             )
 5   situated,                    )
                                  )
 6            Plaintiff,          )
                                  )
 7   VS.                          )         CASE NO.:
                                  ) 22-cv-22538-ALTMAN/Reid
 8   MARK CUBAN and DALLAS        )
     BASKETBALL LIMITED, d/b/a    )
 9   Dallas Mavericks, et al,     )
                                  )
10            Defendants.         )
11   -----------------------------------------------------------
12         CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
13                   REPORTER'S CERTIFICATION
                  ORAL & VIDEOTAPED DEPOSITION OF
14                         RYAN MACKEY
                    TUESDAY, FEBRUARY 14, 2023
15
16      I, Kari J. Behan, CSR, RPR, CRR, and in and for the
     state of Texas, do hereby certify that the facts as stated
17   by me in the caption hereto are true;
18      That there came before me the aforementioned named
     person, who was by me duly sworn to testify the truth
19   concerning the matters in controversy in this cause;
20      And that the examination was reduced to writing by
     computer transcription under my supervision; that the
21   deposition is a true record of the testimony given by the
     witness.
22
        I further certify that I am neither attorney or
23   counsel for, nor related to or employed by, any of the
     parties to the action in which this deposition is taken,
24   and further that I am not a relative or employee of any
     attorney or counsel employed by the parties hereto, or
25   financially interested in the action.
```

Page 251

1      Given under my hand and seal of office on this 17th
       day of February, 2023.
2
3      *Kari J. Behan*
4      _____
       KARI BEHAN, CSR, CCR, RPR, CRR
5      Texas CSR NO. 8564;
       Expiration Date: 7-31-2024
6      VERITEXT LEGAL SOLUTIONS
       Firm Registration No. 571
7      300 Throckmorton Street
       Suite 1600
8      Fort Worth, Texas 76102
       Telephone:  (800) 336-4000
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25