# Exhibit A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 22-CV-22538-ALTMAN/Reid

Dominik Karnas, *et al.*, on behalf of themselves and
all others similarly situated,

      *Plaintiffs,*

v.

Mark Cuban, Dallas Basketball Limited, d/b/a
Dallas Mavericks, Robert Gronkowski, Victor
Oladipo, and Landon Cassill,

      *Defendants.*

_____/

**SECOND AMENDED CLASS
ACTION COMPLAINT**

**JURY DEMAND**


## SECOND AMENDED CLASS ACTION COMPLAINT

# CONTENTS

INTRODUCTION ........................................................................................................................... 4

JURISDICTION AND VENUE ..................................................................................................... 24

PARTIES ........................................................................................................................................ 25

   I.   PLAINTIFFS ..................................................................................................................... 25

   II.   DEFENDANTS .................................................................................................................. 39

FACTUAL ALLEGATIONS .......................................................................................................... 41

   A.   The Voyager Scheme ......................................................................................................... 41

     B.   Voyager Misrepresented its Products and Deceived the Public. ..................................... 42

     C.   Voyager's Products Are Unregistered Securities ............................................................. 46

     D.   Regulatory Enforcement Actions Confirm that Defendants Were Promoting Unregistered Securities. .......................................................................................................................... 52

     E.   Recent Enforcement Actions Against Crypto Influencers Confirm that Defendants Were Required to Disclose Their Payments from Voyager. ...................................................... 57

     F.   Voyager's Bankruptcy and Related Litigation. ............................................................... 59

   G.   Defendants' Deceptive and Unlawful Promotions. .......................................................... 61

     H. Mark Cuban and the Dallas Mavericks ........................................................................ 63

     I.   Rob Gronkowski ............................................................................................................. 91

     J.   Victor Oladipo .............................................................................................................. 104

     K.   Landon Cassill .............................................................................................................. 110

CLASS ACTION ALLEGATIONS ............................................................................................ 124

   I.   CLASS DEFINITIONS .................................................................................................. 124

   II.   RULE 23 ALLEGATIONS ............................................................................................. 129

     A.   Requirements Of Rule 23(A). ....................................................................................... 129

     B.   Requirements of Rule 23(b)(2). .................................................................................... 132

     C.   Requirements of Rule 23(b)(3). .................................................................................... 132

     D.   Requirements of Rule 23(c)(4). .................................................................................... 133

COUNT ONE ............................................................................................................................... 135

COUNT TWO .............................................................................................................................. 136

COUNT THREE .......................................................................................................................... 138

COUNT FOUR ............................................................................................................................ 139

COUNT FIVE .............................................................................................................................. 141

COUNT SIX ................................................................................................................................ 142

COUNT SEVEN..................................................................................................144

COUNT EIGHT..................................................................................................145

COUNT NINE....................................................................................................146

COUNT TEN......................................................................................................148

COUNT ELEVEN..............................................................................................149

COUNT THIRTEEN..........................................................................................151

COUNT FOURTEEN.........................................................................................152

COUNT FIFTEEN..............................................................................................153

COUNT SIXTEEN.............................................................................................154

COUNT SEVENTEEN.......................................................................................156

COUNT EIGHTEEN..........................................................................................157

COUNT NINETEEN..........................................................................................158

COUNT TWENTY.............................................................................................159

COUNT TWENTY-ONE....................................................................................160

COUNT TWENTY-TWO...................................................................................161

COUNT TWENTY-THREE...............................................................................162

COUNT TWENTY-FOUR.................................................................................163

PRAYER FOR RELIEF.....................................................................................164

DEMAND FOR JURY TRIAL..........................................................................164

## INTRODUCTION

## FACTUAL BACKGROUND OF THE CRYPTO LITIGATION

1.      The cryptocurrency landscape has vastly changed since this case was originally filed.

*First,* Voyager has been in bankruptcy now for almost 1 year, admittedly costing Voyager proposed class members many substantial amounts in bankruptcy costs and fees each month. *Second,* the first approved "purchaser" of Voyager in bankruptcy, FTX, is now being sued by federal regulators, its leadership has been arrested and awaiting trial and Undersigned Counsel has pending class action litigation before this Court (along with cases against the FTX Brand Ambassadors and Social Media Influencers). The federal regulators have already concluded that FTX was a massive fraudulent Ponzi scheme that sold similar unregistered securities. *Third,* the second proposed "savior" of Voyager, Binance, is also now being sued by federal regulators and Undersigned Counsel before this Court (along with the Binance Brand Ambassadors and Social Media Influencers). *Fourth,* as predicted by Undersigned Counsel, the SEC and state and federal regulatory authorities have now filed many, additional securities enforcement actions, all uniformly finding that these same Crypto Tokens and Crypto Interest Accounts are all the sale of unregistered securities.

2.      This is Plaintiffs' first proposed substantive amendment to the Complaint, and the only amendment proposed after *any* discovery was produced. Now that relevant discovery has been compelled and produced, Plaintiffs can support each allegation with actual evidence and are thus now in position to: (a) file a Motion for Class Certification and (b) Motion for Partial Summary Judgment, if and when the Court denies Defendants' Motion to Dismiss. This Amended Complaint also includes

additional class representatives (as demanded by Defendants),[1] as well as additional Voyager Brand Ambassador Defendants who are also liable for damages to Plaintiffs and the Class.

3.  Two of the basic questions at the core of this case are: (1) whether the "Voyager Earn Program" and/or Voyager's own native crypto tokens ("VGX") are "unregistered securities," and (2) did Defendants Mark Cuban and/or his Dallas Mavericks promote these unregistered Voyager products, for personal financial gain. There is no dispute there is no "reliance" element under any of the relevant state securities laws —including specifically New Jersey—and thus the answer for both questions (whether in the affirmative or negative) will be the same for every proposed class member, which is why this action is appropriate to proceed on a class basis to resolution.

## FACTUAL BACKGROUND OF THE CUBAN/VOYAGER GLOBAL PARTNERSHIP

4.  After many months of unsuccessfully trying to prevent his deposition, Defendant Mark Cuban finally admitted -- under oath and in video deposition -- that he only had one question for Steven Ehrlich, when Steven asked Mark to please lead Voyager's battle against the SEC so they could sell Voyager's Tokens, and Interest Accounts: **HOW MUCH MONEY WILL I RECEIVE?**

5.  It is now clear beyond reasonable dispute that Voyager was a massive fraud that ended in bankruptcy and victimized more than a million victims, costing innocent investors billions of dollars.  FTX was the first potential buyer/savior that failed and more recently Binance.  The reason

---

[1] Undersigned Counsel represented many Voyager victims who desired to serve as class representatives when this case was *first* filed. Undersigned Counsel has now been retained by hundreds of additional Voyager victims from Florida, and across the country, that now desire to serve as Class Representatives. Although reliance is *not* an element for any of the asserted claims, Plaintiffs now represent numerous Voyager victims who are Florida residents, heard Mr. Cuban's specific national Voyager/Mavericks Partnership press conference and specifically utilized the unique Mavericks/Voyager Code for receiving bonus Voyager funds. In fact, Voyager produced a list of over ███ specific Florida residents who all utilized the same Mavericks/Voyager unique bonus-code and all received the bonus funds as a result of their actions. Accordingly, Mr. Cuban's original protestations to this Court that this case has "no connection" to Florida has been revealed to be false.

is now clear, all of these platforms (Voyager, FTX and Binance) involve the sale of billions of dollars of the same unregistered securities, all in the form of native tokens and interest accounts. The SEC has made it clear that they will never allow these illegal practices to continue.

6. In order to make the Voyager scheme work, Voyager's founder and CEO, Stephen Ehrlich, contracted with world-famous celebrities and athletes to enlist them as Voyager's agents to solicit and promote Voyager's unregistered securities, in order to successfully raise billions of dollars and reach as many as 300 million investors across the country. Significant discovery has confirmed that the most important of these Voyager celebrity agents were Mark Cuban, and his own NBA team, the Dallas Mavericks. Voyager could not have succeeded without the support and credibility these promoters provided.

7. None of the celebrity promoters, including Mr. Cuban and the Mavericks, had a reasonable basis for what they said to promote Voyager and its unregistered securities; none revealed the nature and extent of the compensation they were receiving.

8. Mr. Cuban and the Mavericks knew that Mr. Cuban's personal participation was critical because "he's so visible in the industry" (Plaintiffs' Exhibit 13); Mr. Cuban personally touted Voyager as the way for investors to "increase their wealth" (Plaintiffs' Exhibit 2); that it was "a perfect fit for our Mavs fans" (*Id.*); "as close to risk free as you are going to get in the crypto space" (*Id.*); a way "to earn more from Voyager's platform than from traditional financial applications" (Plaintiffs' Exhibit 23A); and that "immediately, I was earning more when I went over to Voyager" (Plaintiffs' Exhibit 2).

9. Mr. Cuban also touted what he purported was his own investment in Voyager: "I am a customer and I've been a customer for several months now, I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good" (Plaintiffs' Exhibit 2).

10.     Mr. Cuban also orchestrated a plan by which Mavericks players would act as shills, asking questions fed to them by the Mavericks and Voyager to further help promote Voyager.

11.     Crucial evidence now <u>confirms</u> that while Mr. Ehrlich was managing Voyager, with a multi-billion-dollar valuation and in an extremely competitive cryptocurrency market, he was dealing with a very serious regulatory crackdown by the SEC for rampant unregistered securities violations. Mr. Ehrlich became desperate and personally contacted and enlisted Mark Cuban, the single most influential person who at this same time, was publicly tweeting to his millions of followers, and the world at large, that the cryptocurrency industry needed to "go on the offense against the SEC" after they announced that they were going to stop the sale of these same crypto tokens and crypto interest accounts. Mr. Ehrlich contacted Mr. Cuban so Voyager could use Cuban's great influence to help push Voyager's unregistered products on the masses across the globe (what would become, "The Global Voyager/Mavericks Partnership").

12.     After Ehrlich contacted Cuban about taking him up on Mark's offer to "go on the offense" against the SEC, **Mr. Cuban had only one question for Mr. Ehrlich** (which he confirmed in his sworn deposition): **How much would Voyager pay him?** Not whether these Voyager products were the sale of "unregistered securities," but instead, how much money was this deal going to make for him (in fact, he told his team internally, that he did not care if the American Airlines Center was provided revenues by Voyager, because he did not own it).

13.     Mr. Ehrlich agreed to Mr. Cuban's personal demands for an "unprecedented" (a word used by the defendants), multimillion dollar "international partnership" with his own Dallas Mavericks (i.e., a guaranteed more than ███████ for the first 5 years, just after the COVID pandemic). To make matters much worse for Defendant, it was just revealed and confirmed, that ████████████ ███████████████████████████████████ ████████████████████████ ██████████████████████████████████ just to ensure that Mr. Cuban would agree

7

to accept this unprecedented proposal. Specifically, Mr. Ehrlich informed Mark that



²

14.     There is no doubt that the NBA was required to "<u>affirmatively approve</u>" the Mavericks/Voyager Global Partnership, and no doubt that the NBA raised significant, specific objections to it. To obtain that approval, Mr. Cuban and the Mavericks made false and misleading representations to the NBA, including use of a purported "legal opinion" that Defendants knew was not complete and accurate. The very last email on this specific issue, generated a few hours before the Voyager/Mavericks nationwide press conference announcing the Global Partnership, simply states: "Mark said it was ok to go forward with the deal." Plaintiffs' Exhibit 150.³

---

² Mr. Ehrlich's sole defense, when he was recently confronted in sworn deposition with this insider trading evidence, was that it was still "okay" to have provided the information to Cuban and the Mavericks because Voyager had signed a Non-Disclosure Agreement ("NDA") with the Dallas Mavericks. Unfortunately for Mr. Ehrlich, he was provided with a copy of the referenced NDA, and he had to admit, the very first paragraph of the NDA specifically states that it simply does <u>not apply</u> to Mark Cuban.

³ Mark Cuban and the Dallas Mavericks would not allow Counsel to depose the only two representatives of the Mavericks identified by the Mavericks as having personal knowledge of these specific matters (including Mavericks General Counsel, Mr. Sekou Lewis, who personally attended the depositions in this matter). Mr. Lewis played basketball professionally for Caudillos de Morelos in Mexico and, prior to serving as the Mavericks' General Counsel, from 2012 until July 2018, he was an associate at Schnader Harrison, representing private and public companies in real estate and corporate matters. Defendants would not allow Plaintiffs to depose Mr. Lewis, and best Cuban and his Counsel would agree to do was to state that it was Mr. Lewis who purportedly told Cuban that he personally spoke to the NBA and received "affirmative approval" to proceed with the deal. Mr. Cuban assured Plaintiffs that there were certainly documents and exhibits that would corroborate this specific alleged "conversation" between Sekou and the NBA. While the Agreement requires the approval to be in the "affirmative", and thus in writing, not a single piece of evidence has **_ever_** been produced to confirm that statement, and in fact, much evidence has been produced to date that evidences the opposite, that Mark Cuban, not the NBA, approved the Voyager/Mavericks Global Partnership.

15. There can also be no dispute that this Global Partnership was made during the direst period in the history of the NBA, when NBA Commissioner Adam Silver was quoted as stating that the COVID Pandemic could be "the death knell" of the NBA.

16. The Voyager/Mavericks Global Partnership was the very first "International Partnership" in NBA history. The reason was because, as the Mavericks explained to Voyager, Voyager would thus be able to <u>circumvent</u> the "traditional" NBA rules for advertising, which required limitations such as confining the promotions to a 150-mile radius of the American Airlines Center.

## WHY WAS THE VOYAGER/MAVERICKS GLOBAL PARTNERSHIP IMPORTANT?

17. Mr. Cuban and Mr. Ehrlich had extensive, daily discussions regarding the specifics of the Global Partnership. The evidence shows that they worked together to circumvent the requirement to have the NBA "affirmatively" approve the Global Partnership before it became effective; their concern was that the NBA might withhold their "affirmative approval" because Voyager could not sufficiently answer their very specific and crucial written questions, which are at the very heart in this lawsuit: namely: whether Voyager was offering and selling "unregistered securities" to the American public. In fact, after the NBA raised that specific question, Voyager and the Mavericks revised the Global Partnership Agreement, specifically to **remove** the ability for the NBA to exercise a right to cancel the Global Partnership Agreement, if Voyager became aware of any "government inquiries."

18. It was during this desperation to close the deal, that ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ Between the specific date Mr. Ehrlich disclosed this inside information to Mr. Cuban and the Mavericks, to the time the inside information became public, VGX nearly *doubled* in value. **Fifty-two minutes** after Mr. Cuban acknowledged receipt of this inside stock information, the Mavericks' general counsel, Mr. Sekou Lewis, confirmed to the

Mavericks team working on the deal that **_Mark Cuban_**, _not_ the NBA, had approved the Global
Partnership.

19.       As explained in great detail below, the methods Voyager and these Defendants used
to solicit the sales of Voyager's unregistered securities from its base of operations in New Jersey, to
consumers in Florida and nationwide, were wildly successful, resulting in millions of Americans
collectively losing billions of dollars when Voyager collapsed and declared bankruptcy in July 2022.
This action seeks to hold Defendants, including Mark Cuban, his Dallas Mavericks, and the other
Brand Ambassadors named herein, rightly liable for the full rescissory damages to which Plaintiffs and
Class Members are entitled.

## BACKGROUND OF THE VOYAGER TOKENS AND INTEREST ACCOUNTS

20.       On October 23, 2019, Voyager began offering through its mobile phone
cryptocurrency trading application interest-bearing cryptocurrency accounts to public investors,
offering high rates of return, represented as low-risk, in an otherwise near zero-interest rate
environment. Voyager has referred to these accounts by various names over time, including the
"Voyager Interest Program" or the "Voyager Earn Program Accounts" (hereafter referred to as
"Earned Programs Accounts" or "EPAs"). But regardless of the name, every account Voyager sold
during the class period was necessarily an EPA. Plaintiffs and other similarly situated individuals all
invested in Voyager's EPAs. These EPAs are clearly securities under applicable law.[4] There is no
dispute that Voyager never registered the EPAs with the United States Securities and Exchange
Commission ("SEC") or with any state securities regulators.

---

[4] The question of whether Voyager's offering and selling the EPAs violates applicable securities laws
is a common and predominant issue that is capable of swift resolution by this Court on a class-wide
basis, which determination would materially advance this litigation for Plaintiffs and the potentially
millions of affected consumers around the nation.

21.     Voyager spent tens of millions of dollars to market these EPAs to every consumer in the country, without following any of the regulatory requirements required of issuers offering and selling securities designed to protect investors.

22.     Instead, with the help of unscrupulous agents such as Mark Cuban and his Dallas Mavericks, they targeted retail investors in Florida and across the country, many with admittedly very limited experience with cryptocurrency.

23.     This Amended Complaint could only be generated because the Court compelled Defendants to finally produce responsive discovery. There can now be no dispute: Mark Cuban was a vital, key member of Voyager's fraudulent scheme to push billions of dollars of its unregistered securities on the American public. Mr. Ehrlich, as Voyager's CEO, needed Mr. Cuban to provide him the necessary gravitas and credibility to do so, particularly in the face of all the state and federal regulatory activities, while Mr. Cuban needed Mr. Ehrlich to supplement the hundreds of millions of dollars he and the Mavericks lost as a result of the COVID pandemic and the lack of in-person attendance for his Dallas Mavericks games.

24.     The timing of their first meeting was *not coincidental.* As explained in detail below, the SEC had been cracking down on these exact same, crypto currency interest bearing accounts and crypto tokens, since the very beginning of their existence. The SEC has unequivocally and consistently held that such "Crypto Interest Accounts," as well as the platform's native, branded cryptocurrency tokens, are considered "securities" under the applicable securities laws and thus must be registered and must meet all concomitant regulatory requirements required of registered securities.

25.     As far back as 2017, the SEC began issuing opinions regarding the promotion of similar unregistered offerings for many of the largest crypto platforms, including Coinbase, FTX, Voyager, and BlockFi. After enforcement proceedings were brought by the SEC and state regulators in mid-2021, BlockFi — represented by the law firm Sullivan & Cromwell (who also represented FTX)

— agreed to settle similar "unregistered securities" charges with the SEC and numerous state attorneys general, paying an over $100-million-dollar fine and agreeing to injunctive changes regarding their practices surrounding the offer and sale of interest-bearing cryptocurrency accounts. Also in mid-2021, Coinbase was in confidential discussions with the SEC about their similar interest-bearing cryptocurrency accounts. When these discussions were made public, Mark Cuban, who was previously sued by the SEC for alleged insider trading and believes the SEC is "useless,"[5] decided to gratuitously jump into the dispute, tweeting his position to the SEC, Coinbase, and to his millions of social media followers across the globe.

26.    Specifically, Cuban directed his tweet to Brian Armstrong, Coinbase's CEO and Founder, and stated that Coinbase should **"go on the offensive"** to fight the SEC over its position on Coinbase's proposed Lend Program, which would have been Coinbase's roll out of interest-bearing cryptocurrency accounts.[6] Coinbase, much like BlockFi, lost the fight with the SEC and decided not to roll out the Lend Program.

27.    Ehrlich emailed Cuban:

Hi Mark,Saw [sic] your tweets last night on SEC/Coinbase. I have been in the securities/broker-dealer world for 27 years and would be happy to talk about crypto regulation and how it compares to securities (ie [sic] FINRA/SEC) and where all the gaps are.Its [sic] truly amazing about how the SEC is going about this and could put the US at a competitive disadvantage. Look [sic] forward to discussing all of this and more at some point.

Plaintiffs' Exhibit 11.

28.    Ehrlich explained that Cuban's involvement in the Global Partnership and his influence would aid Voyager's goal of bringing "crypto to all":

As a challenger brand, we look to partner with companies and people that want to demystify crypto and challenge the status quo. Partnering with Gronk is a way for us to connect with a

---

[5] https://www.yahoo.com/video/mark-cuban-sec-151005564.html (accessed May 8, 2023).
[6] https://decrypt.co/80494/mark-cuban-urges-coinbase-go-offensive-against-sec (accessed May 8, 2023).

broader audience. We know with the Mavs, and with your support, we can help bring crypto to all and truly level the playing field.

Plaintiffs' Exhibit 14.

29. As evidence and depositions confirmed, Mark Cuban only cared about one question in regard to entering a Global Partnership with Voyager, "how much do they want to spend?" (*See* Cuban Tr., Plaintiffs' Exhibit 282, at 178:16–179:04;[7] Plaintiff's Exhibit 10). His team informed him that he was getting the very best crypto deal of anyone in the NBA, as Voyager would overpay by ███████████ for a █████ deal that would bring in at least ███████████ over the course of five years, with options to renew—in large part due to Cuban's "implied commitment" to support the Global Partnership and his planned direct involvement in many of the public aspects of the deal. It was a deal that Mr. Cuban specifically authorized his team to agree to, while knowing full well that the NBA did not (as required by the express terms of the Global Partnership Agreement) "affirmatively approve" the Global Partnership. Mr. Cuban also knew that the SEC had already taken actions, specifically against Coinbase and BlockFi at the very same time, for the exact same type of crypto interest account and crypto tokens.

30. Thus, the evidence has revealed that Cuban, both in public and behind the scenes, worked to ensure that he and his Mavericks (his ownership in which is currently his largest asset) helped Voyager achieve its sole goal of driving all U.S. investors to purchase EPAs. Unfortunately for Plaintiffs and the Class, Cuban's own personal efforts were wildly successful.

31. There can be no doubt that Cuban proudly touted to all the Mavericks employees who worked on closing the Voyager Global Partnership: "We **crushed it** for [Voyager] and a lot of that was *because **I endorsed it***." (Plaintiffs' Exhibit 53).

---

[7] A video of Cuban's sworn testimony may be viewed here: https://moskowitz-law.com/041423mcdepo (password will be provided separately to the Court and Parties).

32. After Voyager collapsed and Plaintiffs brought this lawsuit to hold him accountable, Cuban shifted course, and now expects the public to believe that he "sat meekly in the background" with absolutely no involvement whatsoever in the Dallas Mavericks' first ever, fully integrated, international Global Partnership, with what was at the time, one of the country's fastest growing cryptocurrency exchanges. Cuban's transparent attempts to distance himself now from his work highlights his understanding of the severity of these claims against him and the immense liability he and his team now face if the claims are successful, as the rescissionary damages sought are now admittedly *in the many billions of dollars.*

33. The evidence shows that Mark Cuban was personally behind the wheel for the entire negotiating process of the Voyager/Mavericks Global Partnership and was fully and personally invested in getting this deal done, which would result in ███████████████████ into his Dallas Mavericks, Mr. Cuban's largest personal asset, amid a global pandemic that had nearly crippled the NBA and sports industry, during which stadiums sat largely empty for nearly two years.

34. Before Ryan Mackey, Mavericks' Senior Vice President of Corporate Sponsorships, formally introduced Cuban to Ehrlich, he explained to Cuban and the Mavericks CEO that Voyager, like "[a]ll of them we've talked to, are interested in having access to Mark in some way **because he's so visible in the industry.** We can still get deals done, but it will move the needle higher on investment level if Mark is **willing/perceived to be engaged.**" (Plaintiffs' Exhibit 13) (emphasis added). Mackey went on to make clear that "[w]e don't include any of this in pitches and don't promise anything" and that Cuban would only have "**an implied commitment to support the partnership.**" *Id.* (emphasis added).

35. Cuban's primary concern before speaking with Ehrlich was **"How much does Voyager want to spend?"** (Plaintiff's Exhibit 10). Cuban reaffirmed in his deposition that the **money** was "all I cared about":

Q. [Ehrlich] says: "Let's make history here and create the first ever NBA Team sponsorship in crypto. I think we can blow the roof off!" He sounds pretty excited about this arrangement; would you agree?

A. I mean, it sounds like he's excited.

Q. I mean, were you excited?

A. Depends how much money they were going to spend; that's all I cared about.

**Q. That's all you cared about is how much money?**

**A. Yeah.**

Cuban Tr. 178:16–179:04. [8]

36.    Mackey explained that Voyager was looking to spend more than ▮▮▮▮▮ per year

(well more than what the other crypto platforms were offering), and clarified that in exchange for the

hefty fees:



Plaintiffs' Exhibit 10.

37.    Cuban responded: "Put me on an email with them. I'll find out what his goals are and

of [sic] they are a fit." *Id.* With this understanding, Mackey introduced Cuban to Ehrlich to begin

negotiating the deal directly.

38.    Throughout the negotiation process, there was heavy emphasis on Mark Cuban being

publicly involved in the Global Partnership, including its announcement at the Press Conference.

Mackey and his team even developed a "Marks Car" promotion (where a lucky fan would win a

---

[8] A video of the relevant portion of Cuban's sworn testimony may be viewed here: https://moskowitz-law.com/041423mcdepo (password will be provided separately to the Court and Parties).

Voyager and Mark Cuban branded electric Lexus), the possibility of a crypto summit with Cuban holding a discussion with educational content about cryptocurrency, and other events designed to capitalize on Cuban's involvement in promoting Voyager.

39.     Even the "pitch deck" the Mavericks put together to solicit an offer from Voyager for the partnership highlighted Mark Cuban as part of the "Mavs Power," i.e., a benefit to partnering with the Dallas Mavericks, and highlighted the reach of his influence on social media as well, including the number of followers he had on relevant social media platforms. Mackey admitted at deposition that the Mavericks essentially were overpaid for the partnership deal by ████ and acknowledged that "a sponsorship can have more value than the actual assets itself." Plaintiffs' Exhibit 283 ("Mackey Tr.") 118:23–120:01, Plaintiffs' Exhibit 38.

40.     It is also clear that Mr. Cuban's involvement went beyond merely being the Governor of the Dallas Mavericks in this Global Partnership—he took an active, personal role in managing the Voyager/Mavericks negotiations, requesting to be copied on all correspondence. Mackey Tr. 85:05–86:18; Plaintiffs' Exhibit 64. Mackey would run every provision of the Global Agreement specifically by Mr. Cuban, not Mrs. Cynt Marshall, the CEO of the Mavericks, whenever he needed to confirm the Mavericks could agree to it. Mackey Tr. 124:20–126:21, Plaintiffs' Exhibit 41.

41.     Leading up to the launch of the Global Partnership, the Mavericks and Voyager had strategy discussions about how to "maximize coverage" by the local and national media surrounding the promotion of Voyager by Cuban and the Mavericks. Mavericks' marketing executives discussed that the "media list includes 350 reporters, locally **and nationally**." The media strategy contemplated providing feeds to national broadcasters like CNBC, without any restrictions on covering the events in Florida and nationwide; in fact, they made sure all those residents were to be reached and targeted.

42.     Cuban's national press conference, as explained below, was a wild success, being picked up by all the news outlets across the country and yielding **billions of online impressions.**

Thousands of new Voyager customers purchased EPAs during the first 48 hours after the Voyager/Mavericks world and internet News Conference, including over ▮▮▮ Florida residents who all used the same "MAVS100" promotional code that Mark Cuban specifically hyped at the Press Conference, including specifically Plaintiff and Class Representative Mr. Todd Webb. (Plaintiffs' Exhibit 242). Mr. Todd Webb from Florida, for the record, is a big Mark Cuban fan, not a Mavericks fan. He watched the Press Conference, heard what Cuban specifically had to say about Voyager, and then signed up using the MAVS100 code to purchase his Voyager EPA. He funded his Voyager account and held assets in it until Voyager declared bankruptcy, and his account became frozen.

43.     This was clearly the ultimate goal that Mark Cuban and his Mavericks were tasked by Voyager with achieving. As Cuban himself explained, "We will help them open [Voyager] accounts to trade on voyager, we encourage people to use it. . . . **[t]hat is exactly what Steve [Ehrlich] and I discussed and agreed to."** Plaintiffs' Exhibit 18.

44.     This is exactly what Cuban and the Dallas Mavericks did, and they did on a nationwide basis. How were they able to do so, though, considering apparent NBA geographic limitations from on advertising? This was the *first international partnership* of the Dallas Mavericks. Mackey Tr. 122:05–122:08. As Erika Szychowski, Voyager's Senior Vice President of Brand Marketing & Partnerships, recounted to Mackey during negotiations over a revision to the Partnership Agreement, "Section 9.04 it restricts our territory to the standard radius around Dallas, but I thought we discussed that by having International Rights, it would provide us rights to run **national promotions** and that is why we went ahead with Int'l out the gate vs. postponing year 1." Plaintiffs' Exhibit 76.

45.     This point came up in additional negotiation materials, where Voyager representatives explained: "We are excited about the opportunity to expand both brands internationally and appreciate your point that we can run national promotions if we have these rights. We also recognize international was not part of your original pitch." (Plaintiffs' Exhibit 38B). As a result of these new rights, and a

means to circumvent NBA restrictions on nationwide advertising, Voyager *significantly increased* the value of their bid to the Mavericks for the partnership.

46.     There was another important snag in the negotiations between Voyager, Cuban and his Mavericks: the Global Partnership was subject to the express approval by the NBA.

47.     It is clear from the emails exchanged between Voyager and the Mavericks that the NBA was **very much concerned** with (the same basic questions in this case), namely whether the EPAs and Voyager's native token, VGX, were unregistered securities, as relayed by the Mavericks' in house counsel, Mr. Sekou Lewis, to David Brill, general counsel for Voyager, on October 16, 2021:



Plaintiffs' Exhibit 72.

48.     In order to provide a legal opinion on whether VGX was a security, Voyager insisted on the Mavericks executing an NDA, which Ryan Mackey did on behalf of the Mavericks. Plaintiffs' Exhibits 73, 73A. It has now been confirmed that Voyager and the Mavericks **revised** the Partnership Agreement to specifically **remove** the NBA's ability to exercise a right to cancel the Partnership in the

event Voyager became subject to any **"governmental inquiries,"** instead revising the language to require a formal "governmental enforcement action". *Compare* Plaintiffs' Exhibit 7 (final Partnership Agreement) with Plaintiffs' Exhibit 264 (prior redlined version). This was done because the NBA already told Mr. Cuban that it had serious concerns about the legality of this Voyager/Mavericks Global Partnership, due specifically to the existing SEC "cease and desist" action brought against Coinbase, for the same earn reward program.

49.     After several days of back and forth with no clear resolution, on October 25, 2021, Mackey reached out to NBA representatives, letting them know "we're having some trouble getting our contract done…are either one of you available to talk about this really quick? May need some assistance! Thank you!" (Plaintiffs' Exhibit 74). Mackey, apparently, did not receive a response.

50.     Ehrlich ultimately reached out to Cuban directly two days later, at 8:35am on October 27, 2021, just hours before the Press Conference announcing the Global Partnership, explaining that the deal was being *"held up by legal,"* and asking Cuban to *"guide us to the finish line."* Plaintiffs' Exhibit 92. Ehrlich then specifically explained, ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *Id.*

51.     It is important to note that many crypto exchanges for the past few years have sought to obtain their own confidential legal opinions to share with investors to convince them that their interest-bearing accounts, native cryptocurrency tokens, and other offerings were not securities required to be registered with any securities regulators. This became more difficult, however, as the SEC brought dozens of enforcement actions and made public their findings that the majority of these offerings are, in fact, securities, dealing a significant blow to any "fair notice" defenses or ability for law firms to plausibly state in good faith that these offerings were not securities.

52.     The McCarter & English legal opinion, unsurprisingly, includes many spurious arguments and claims that are not based on credible authorities or evidence. The memo principally relies on the "Framework for 'Investment Contract' Analysis of Digital Assets (April 3, 2019), a speech given by then SEC director of Corporate Finance, Bill Hinman, in September 2018, and two no action letters related to "utility tokens" provided by the SEC. However, the memo was written in May 2021, at which time there was plenty of other SEC enforcement actions,[9] multiple speeches,[10] Congressional testimony,[11] and several official SEC statements[12] and proclamations.[13] Notably, the memo ignores the 2017 Section 21(a) Report of Investigation that looked at the facts and circumstances of "The DAO," which was an infamous initial coin offering that the SEC found constituted an unregistered security. The memo also ignores the SEC's complaint against Telegram, filed on October 11, 2019, and a preliminary injunction issued in May 2020 barring the delivery of Telegram's token, Grams, and finding that the SEC had shown a substantial likelihood of proving that Telegram's sales were part of a larger scheme to distribute the Grams to the secondary public market unlawfully. Further, footnote 1 to the Hinman speech notes that "this speech expresses the author's views and does not necessarily reflect those of the Commission, the Commissioners or other members of the staff." Hinman was a one-time employee of the SEC who left the Commission in December 2020, well before this memo was written. Therefore, the speech reflects the opinion of one person who was no longer an SEC employee, it cannot, and should not, be taken as legal guidance. Finally, the opinion admits that the

---

[9]  https://www.sec.gov/spotlight/cybersecurity-enforcement-actions(Crypto Assets and Cyber Enforcement Actions) (accessed May 8, 2023).
[10]  https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 (accessed May 8, 2023).
[11]  https://www.sec.gov/news/testimony/gensler-2021-05-26 (accessed May 8, 2023).
[12]  https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (accessed May 8, 2023).
[13]  https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (accessed May 8, 2023).

first two prongs of the *Howey* test are met and does not raise valid arguments to establish the remaining two are not.

53.     After providing the Legal Opinion did not move the Global Partnership forward, in an apparent act of desperation, 

." *Id.*

54.     The import of this revelation is astounding and telling. 

. Records reveal that between October 27, 2021, when this revelation was made, and November 17, 2021, when that information was made public, *VGX tokens increased by 70% in value*.[14]

55.     Under extremely similar facts, a former Coinbase product manager's brother was recently charged and convicted for charges of insider trading for receiving inside information from the Coinbase employee regarding assets that were going to be listed for trading on the exchange, with the prosecution still ongoing as to the employee.[15]

56.     Discovery finally compelled and uncovered from Cuban and Voyager reveals a minute-by-minute update of these nefarious activities. At that point, all bets were off. Cuban responded at 9:16am "Let me find out more from Sekou." (Plaintiffs' Exhibit 92). At 10:08am, Mr. Sekou Lewis informed the Mavericks team that "*Mark said* it was ok to go forward with the deal." Plaintiffs'

---

[14]  *See*  https://www.fxstreet.com/cryptocurrencies/news/voyager-token-skyrockets-70-as-vgx-secures-coinbase-listing-202111180402 (accessed May 8, 2023).
[15]  *See*  https://www.reuters.com/legal/ex-coinbase-managers-brother-sentenced-10-months-insider-trading-case-2023-01-10/ (accessed May 8, 2023).

Exhibit 150. At 11:04am, Mackey informed Marcia Steinberg, Vice President of Team Marketing & Business Operations for the NBA, *"Well, we're going with it,"* after forwarding her a copy of the press release announcing the partnership, published two minutes prior. Plaintiffs' Exhibit 77.

57.     Mackey was even congratulated by the General Counsel for the American Airlines Center (the Mavericks' home arena) for reaching the Global Partnership. Plaintiffs' Exhibit 93. Yet, two days later, <u>after the Press Conference announcing the Voyager/Mavericks Global Partnership, and after the Voyager-sponsored opening game (and half time shot) for the Mavericks,</u> after more than 75,000 new customers signed up for Voyager specifically with the MAVS100 promotional code, Mackey amazingly responded **"Thanks man! It was (still is) a legal nightmare getting the contract done. Still not quite there**." *Id.* Accordingly, the evidence is now clear that Mark Cuban personally, gave the green light to conduct the extremely well-orchestrated Press Conference, proudly announcing to the world the Voyager/Mavericks Global Partnership, ***when secretly, the deal had not yet even been approved!***

58.     In other words, it was Mark Cuban, not the NBA, who, after receiving material, nonpublic information about Voyager, approved the Voyager and the Mavericks' first fully integrated international partnership.

59.     When this bombshell information finally came out during Mr. Ehrlich's deposition, (despite his attempts to stay and prevent the deposition from occurring), he tried to simply attest that he had not shared any inside information with Cuban and the Mavericks in a bid to close the Global Partnership. After realizing the gravity of the found email, Mr. Ehrlich retreated and tried to claim that the information "was protected by the NDA," however, Mr. Ehrlich's story fell apart during Mr. Boies' questioning, who marked and pointed out that the Voyager/Mavericks NDA in question actually ***excluded* Mark Cuban specifically from its protections.** Plaintiffs' Exhibit 73A.

60. Each of the Plaintiffs and the proposed Class Members, purchased, repurchased, invested, reinvested, deposited, and/or transferred additional crypto into an EPA offered for sale from Voyager's base of operations in New Jersey after being exposed to Defendants' misrepresentations and omissions regarding the Deceptive Voyager Platform as detailed in the complaint, and they each sustained damages as a result. As discussed below, New Jersey specifically intended its own state securities laws to apply extraterritorially for the benefit of every purchaser nationwide because the actions of Voyager took place from its principal place of business in New Jersey. The EPAs that Voyager sold to Plaintiffs were no different (in any manner) than any of the other EPAs that Voyager offered and sold to all investors throughout the nation during the class period, all of which are currently subject to investigation by federal and state regulatory authorities as being unregistered securities, and which number in "at least tens of thousands" in the state of Florida alone.[16]

---

[16] *See* Excerpts of Transcript of Voyager Digital LLC's corporate representative in *Mark Cassidy v. Voyager Digital Ltd., et al.,* Case No. 21-24441-CIV-ALTONAGA/Torres (the "*Cassidy* Action"), at ECF No. 34-1, at 89 (41:20–42:15) ("Q. [I]f Mr. Cassidy was in Texas or if he was in California, would there be any differen[ce] that you would look at in this chart in terms of how he was paid interest every month if both people met the minimum amount that was necessary each month? . . . THE WITNESS: No. His earn would be the same, as far as I know, in those state -- in those states. Q. So there's no distinction for the Voyager Earn Program by state. . . . THE WITNESS: Yes, as far as I'm aware."); *see also id.* (107:10–13) ("Q. There's definitely at least tens of thousands of Voyager Platform members that are residents of the State of Florida? A. Oh. Yes."); *id.* (133:2–134:13) ("Q. Okay. So . . . . my next question is, all of these investigations that are being done by the State AGs and the SEC applies to Mark Cassidy's account? . . . THE WITNESS: I'm not sure. I – I would – I think, yes. . . . Q. What else do you need from us so that you can say, as the corporate rep depo -- deponent who is the most qualified to talk about Mark Cassidy's account, that his account is the same account that these attorney generals and the SEC are saying possibly should be registered securities? . . . THE WITNESS: To the extent I know, they – they would not be different from any of the other accounts.").

## JURISDICTION AND VENUE

61.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action for a sum exceeding $5,000,000.00, exclusive of interest and costs, in which at least one class member is a citizen of a state different than Defendants.

62.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants, pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6), because Defendants conduct substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, engaging in a civil conspiracy with residents of the state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries Defendants were engaged in solicitation or service activities within this state, or products that Defendants promoted, sold, and offered for sale in this state were used or consumed within this state in the ordinary course of commerce, trade, or use.

63.     Additionally, Defendants have intentionally availed themselves of the Florida consumer market through the targeted promotion, marketing, and sale of Voyager's EPAs in Florida, which constitutes committing a tortious act within the state of Florida. Defendants have also marketed and participated and/or assisted in the sale of Voyager's unregistered securities to consumers in Florida, in violation of section 517.07 *et seq.* Defendants have also violated Florida's consumer protection statute, section 501.201 *et seq.* As just one example, discovery has revealed that in just the first 48 hours following Cuban's press conference announcing the Voyager/Mavericks partnership, over ███ Florida residents opened EPAs with Voyager using the MAVS100 promotional code.

Personal jurisdiction over Defendants is established under Rule 4(k)(1) of the Federal Rules of Civil Procedure based on service of summons upon or waiver of service by Defendants, each of which is subject to the jurisdiction of courts of general jurisdiction in Florida. This Court's exercise of jurisdiction over Defendants for the claims asserted in this action comports with traditional notions of fair play and substantial justice.

64. Venue is proper in this Court under 28 U.S.C. § 1391 because thousands of Class Members reside in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; Defendants have caused harm to Class members residing in this District; Defendants entered into transactions and/or received substantial profits from Class Members who reside in this District; and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this District.

65. All conditions precedent to the institution and maintenance of this action have been performed, excused, waived, or have otherwise occurred.

**PARTIES**

**I.    PLAINTIFFS**

**Rachel Gold**

66. Rachel Gold is a citizen and resident of Coral Springs, Florida. She is a natural person over the age of 21 and is otherwise *sui juris*. While in Florida, Ms. Gold purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to her EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform after those misrepresentations and omissions were made.

25

67.     While in Coral Springs, Florida, on January 7, 2022, Ms. Gold, individually and as attorney-in-fact for her husband Eric Rares, used marital funds to purchase an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on her holdings. The Gold family account was opened in the name of Ms. Gold's husband, Eric Rares. At all relevant times, Ms. Gold was authorized to open the family account in the name of her husband and make all purchases and deposits in the account. Ms. Gold further repurchased, reinvested, deposited, and/or transferred additional funds into the EPA throughout 2022, and earned interest on certain holdings, until Voyager collapsed.

68.     Ms. Gold was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, Ms. Gold, while in Coral Springs, Florida, viewed the October 2021 press conference as detailed below. Ms. Gold was also aware of the Mavs reward code, but it had expired by the time she signed up her family account. Also, while in her home in Coral Springs, Florida, Ms. Gold researched the Voyager platform and viewed statements from Cuban regarding Voyager's safety and that "USDC was a very wise, safe investment choice and that it was better than just leaving your money in the bank." It was "a very wealthy, successful man like Mark Cuban['s] endorse[ment]" of Voyager, and statements regarding its "risk-free" nature that put Ms. Gold "over the edge of actually really investing in Voyager." Ms. Gold "relied on the validity of [Cuban's] word that it was a safe platform that he himself was investing in." Cuban's and the Mavericks' endorsement of the Voyager platform caused Ms. Gold to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into her EPA, as well as keep the EPA open until Voyager's collapse.

**Edwin Garrison**

69.     Edwin Garrison is a citizen and resident of the State of Oklahoma. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Garrison purchased, repurchased, invested,

reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

70.     On October 29, 2021, Mr. Garrison originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Garrison used the Mavs100 promotion code from the Mavericks when he made his initial purchase and was awarded $100 in Bitcoin from that promotion on November 24, 2021. Mr. Garrison further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

71.     Mr. Garrison was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, Mr. Garrison viewed the October 2021 Press Release announcing the partnership of Cuban and the Mavericks with Voyager. He also reviewed articles as well as internet and social media postings regarding the October 2021 press conference, which caused him to view Voyager as the safer, more reputable, and most risk-free crypto platform. Cuban's and the Mavericks' endorsement of the Voyager platform caused Mr. Garrison to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into his EPA, as well as keep the EPA open until Voyager's collapse.

**Dominik Karnas**

72.     Dominik Karnas is a citizen and resident of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Karnas purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and

omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

73.     While in Florida, on or about November 14, 2021, Mr. Karnas purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Karnas further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

74.     Mr. Karnas was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, Mr. Karnas watched the October 2021 press conference with Cuban and the Mavericks, and reviewed articles as well as internet and social media postings regarding the partnership, which caused him to view Voyager as the safer, more reputable, and most risk-free crypto platform. Mr. Karnas researched the Voyager platform and viewed statements from Cuban stating that Voyager was better than just leaving your money in the bank. Cuban's and the Mavericks' endorsement of the Voyager platform caused Mr. Karnas to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into his EPA, as well as keep the EPA open until Voyager's collapse.

**Rahil Sayed**

75.     Rahil Sayed is a citizen and resident of the State of New Jersey. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Sayed purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

76. On February 3, 2021, Mr. Sayed originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Sayed further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

77. Mr. Sayed was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, Mr. Sayed viewed the October 2021 Press Release announcing the partnership of Cuban and the Mavericks with Voyager and was aware of the partnership of Cuban and the Mavericks with Voyager through his review of articles as well as internet and social media postings which caused him to view Voyager as the safer, more reputable, and most risk-free crypto platform. Cuban's and the Mavericks' endorsement of the Voyager platform caused Mr. Sayed to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into his EPA, as well as keep the EPA open until Voyager's collapse.

**Christopher Ehrentraut**

78. Plaintiff Christopher Ehrentraut is a citizen and resident of the State of Tennessee. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Ehrentraut purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

79. On June 17, 2021, Mr. Ehrentraut originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Ehrentraut further repurchased, reinvested, deposited, and/or

transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

80.     Mr. Ehrentraut was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, Mr. Ehrentraut watched the October 2021 press conference with Cuban and the Mavericks, and reviewed articles as well as internet and social media postings regarding the partnership, which caused him to view Voyager as the safer, more reputable, and most risk-free crypto platform. Cuban's and the Mavericks' endorsement of the Voyager platform caused Mr. Ehrentraut to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into his EPA, as well as keep the EPA open until Voyager's collapse.

**Todd Manganiello**

81.     Plaintiff Todd Manganiello is a citizen and resident of the State of Louisiana. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Manganiello purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

82.     On May 9, 2021, Mr. Manganiello originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Manganiello further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

83.     Mr. Manganiello was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, Mr. Manganiello watched the October 2021

press conference with Cuban and the Mavericks, and reviewed articles as well as internet and social media postings regarding the partnership, which caused him to view Voyager as the safer, more reputable, and most risk-free crypto platform. Cuban's and the Mavericks' endorsement of the Voyager platform caused Mr. Manganiello to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into his EPA, as well as keep the EPA open until Voyager's collapse.

**Dan Newsom**

84.     Plaintiff Dan Newsom is a citizen and resident of the State of Georgia. At all relevant times, he was a citizen and resident of the state of Alabama. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Newsom purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

85.     On March 25, 2021, Mr. Newsom originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Newsom further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

86.     Mr. Newsom was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, Mr. Newsom watched the October 2021 press conference with Cuban and the Mavericks, and reviewed articles as well as internet and social media postings regarding the partnership, which caused him to view Voyager as the safer, more reputable, and most risk-free crypto platform. Cuban's and the Mavericks' endorsement of the

Voyager platform caused Mr. Newsom to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into his EPA, as well as keep the EPA open until Voyager's collapse.

**William Ayer**

87. Plaintiff William Ayer is a citizen and resident of the Commonwealth of Virginia. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Ayer purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

88. On February 1, 2021, Mr. Ayer originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Ayer further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

89. Mr. Ayer was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, Mr. Ayer watched the October 2021 press conference with Cuban and the Mavericks, and reviewed articles as well as internet and social media postings regarding the partnership, which caused him to view Voyager as the safer, more reputable, and most risk-free crypto platform. Cuban's and the Mavericks' endorsement of the Voyager platform caused Mr. Ayer to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into his EPA, as well as keep the EPA open until Voyager's collapse.

**Anthony Dorn**

90.     Plaintiff Anthony Dorn is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Dorn purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

91.     On February 12, 2021, Mr. Dorn originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Dorn further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

92.     Mr. Dorn was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. Specifically, Mr. Dorn was aware of Gronkowski's promotion of the Voyager Platform. Mr. Dorn was also aware of the partnership of Cuban and the Mavericks with Voyager through the review of articles as well as internet and social media postings which caused him view Voyager as the safer, more reputable, and most risk-free crypto platform. Cuban's, Gronkowski's, and the Mavericks' endorsement of the Voyager platform caused Mr. Dorn to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into his EPA, as well as keep the EPA open until Voyager's collapse.

**Dameco Gates**

93.     Plaintiff Dameco Gates is a citizen and resident of the State of California. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Gates purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased,

invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint.

94.     On May 6, 2021, Mr. Gates originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Gates kept his EPA open throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

95.     Mr. Gates was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, Mr. Gates watched the October 2021 press conference with Cuban and the Mavericks, and reviewed articles as well as internet and social media postings regarding the partnership, which caused him to view Voyager as the safer, more reputable, and most risk-free crypto platform. Cuban's and the Mavericks' endorsement of the Voyager platform caused Mr. Gates to keep the EPA open and hold his crypto assets on the Voyage Platform until Voyager's collapse.

**Marshall Peters**

96.     Plaintiff Marshall Peters is a citizen and resident of the Commonwealth of Pennsylvania. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Peters purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

97.     On December 7, 2020, Mr. Peters originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Peters further repurchased, reinvested, deposited, and/or transferred

additional crypto into his EPA throughout the remainder of 2020, 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

98. Mr. Peters was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, Mr. Peters was aware of the partnership of Cuban and the Mavericks with Voyager through the review of articles as well as internet and social media postings which caused him to view Voyager as the safer, more reputable, and most risk-free crypto platform. Mr. Peters was also exposed to Cuban's statements about Voyager through his review of articles as well as internet and social media postings. Cuban's endorsement of the Voyager platform caused Mr. Peters to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional crypto into his EPA, as well as keep the EPA open until Voyager's collapse.

**Todd Webb**

99. Plaintiff Todd Webb is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Webb purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

100. On October 30, 2021, Mr. Webb originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Webb further repurchased, reinvested, deposited, and/or transferred additional crypto into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

101. Mr. Webb was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, while in Florida, Mr. Webb conducted

research on cryptocurrency. As a fan of Mark Cuban, he became aware of and viewed the October 2021 press conference as detailed below. Mr. Webb signed up for his Voyager account using the Mavs100 promo code. *See* Plaintiffs' Exhibit 242. Cuban's endorsement of the Voyager platform caused Mr. Webb to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional crypto into his EPA, as well as keep the EPA open until Voyager's collapse.

**Lisa Dagnoli**

102.    Plaintiff Lisa Dagnoli is a citizen and resident of the Commonwealth of Massachusetts. She is a natural person over the age of 21 and is otherwise *sui juris*. Ms. Dagnoli purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to her EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

103.    On September 2, 2021, Ms. Dagnoli originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on her holdings. Ms. Dagnoli further repurchased, reinvested, deposited, and/or transferred additional crypto into her EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

104.    Ms. Dagnoli was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. For example, Ms. Dagnoli was aware of Gronkowski's promotion of the Voyager Platform. Ms. Dagnoli was also aware of the partnership of Cuban and the Mavericks with Voyager. Gronkowski's and Cuban's endorsement of the Voyager platform caused Ms. Dagnoli to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into her EPA, as well as keep the EPA open until Voyager's collapse.

**Anthony Shnayderman**

105.     Plaintiff Anthony Shnayderman is a citizen and resident of the State of Florida. He is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Shnayderman purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to his EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

106.     On April 8, 2021, Mr. Shnayderman originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on his holdings. Mr. Shnayderman further repurchased, reinvested, deposited, and/or transferred additional funds into his EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

107.     Mr. Shnayderman was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. Mr. Shnayderman reviewed articles on the Internet as well as social media postings regarding Voyager's Partnerships with Defendants and Defendants' endorsements, which caused him to view Voyager as the safer, more reputable, and most risk-free crypto platform. Defendants' endorsements of the Voyager Platform caused Mr. Shnayderman to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into his EPA, and to purchase, repurchase, invest, and/or reinvest in VGX Tokens as well as keep the EPA open and hold VGX tokens until Voyager's collapse.

**Katharine Sugrue**

108.     Plaintiff Katharine Sugrue is a citizen and resident of the State of California. She is a natural person over the age of 21 and is otherwise *sui juris*. Ms. Sugrue purchased, repurchased,

invested, reinvested, deposited and/or transferred additional funds to her EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

109.     On September 6, 2021, Ms. Sugrue originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on her holdings. Ms. Sugrue further repurchased, reinvested, deposited, and/or transferred additional funds into her EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

110.     Ms. Sugrue was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. Ms. Sugrue reviewed articles on the Internet as well as social media postings regarding Voyager's Partnerships with Defendants and Defendants' endorsements, which caused her to view Voyager as the safer, more reputable, and most risk-free crypto platform. Defendants' endorsements of the Voyager Platform caused Ms. Sugrue to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into her EPA, and to purchase, repurchase, invest, and/or reinvest in VGX Tokens as well as keep the EPA open and hold VGX tokens until Voyager's collapse.

**Lisa Provino**

111.     Plaintiff Lisa Provino is a citizen and resident of the State of Connecticut. She is a natural person over the age of 21 and is otherwise *sui juris*. Ms. Provino purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to her EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens after being exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform as detailed in this

complaint, and executed trades on the Voyager Platform in reliance on those misrepresentations and omissions.

112. On May 3, 2021, Ms. Provino originally purchased an unregistered security from Voyager in the form of an EPA and funded the account with a sufficient amount of crypto assets to earn interest on her holdings. Ms. Provino further repurchased, reinvested, deposited, and/or transferred additional funds into her EPA throughout the remainder of 2021 and 2022, and earned interest on certain holdings, until Voyager collapsed.

113. Ms. Provino was exposed to some or all of Defendants' misrepresentations and omissions regarding the Voyager Platform. Ms. Provino reviewed articles on the Internet as well as social media postings regarding Voyager's Partnerships with Defendants and Defendants' endorsements, which caused her to view Voyager as the safer, more reputable, and most risk-free crypto platform. Defendants' endorsements of the Voyager Platform caused Ms. Provino to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into her EPA, and to purchase, repurchase, invest, and/or reinvest in VGX Tokens as well as keep the EPA open and hold VGX tokens until Voyager's collapse.

## II.    **DEFENDANTS**

114. Defendant <u>Mark Cuban</u> was at all relevant times a citizen of the State of Texas. Cuban is a well-known businessman, investor, television and media personality, and the team owner of the American professional basketball team, the Dallas Mavericks. From his own personal experiences and interactions with fans, Cuban is aware of the influence he has on consumer decisions. Cuban has substantial ties to Florida, including owning two condominiums on Miami Beach and traveling to Florida either for personal reasons or for Mavericks away games in Miami and Orlando multiple times per year—including multiple visits to Florida during the time period the Mavericks were serving as brand ambassadors for Voyager.

115.     Defendant <u>Dallas Basketball Limited, d/b/a Dallas Mavericks</u> ("the Mavericks") is a Texas limited partnership doing business in the United States. Kyle Tapply, Senior Director of Corporate Partnerships for the Mavericks, conceded that the Mavericks "have fans everywhere" including "in Florida" and around the country. *See* Tapply Tr., Plaintiffs' Exhibit 280, at 14:4-23. The Mavericks operate a professional basketball team in the National Basketball Association. The Mavericks' home stadium is in Dallas, and they play games against other teams in the NBA in stadiums around the country. The Mavericks played at least two games in Florida while they were Brand Ambassadors for Voyager.

116.     Defendant <u>Rob Gronkowski</u> was at all relevant times a citizen of the state of Florida. He is a well-known former player in the National Football League and commentator who won four Super Bowls, including one for the Tampa Bay Buccaneers. He is among the most recognizable sports celebrities to play for a Florida franchise in recent years. He has a massive social media following and was the first professional football player to launch his own series of Non-Fungible Tokens ("NFTs") on the Ethereum blockchain featuring his iconic Super Bowl moments. Mr. Gronkowski was a proud Voyager Brand Ambassador and was paid millions of dollars by Voyager for his promotion of Voyager and their crypto products.

117.     Defendant <u>Victor Oladipo</u> was at all relevant times a citizen of the state of Florida. He is a well-known NBA player for the Miami Heat. Mr. Oladipo is a proud Voyager Brand Ambassador and was paid millions of dollars by Voyager for his promotion of Voyager and their crypto products.

118.     Defendant <u>Landon Cassill</u> was at all relevant times a citizen of the state of North Carolina. Cassill is a well-known NASCAR driver, having started his NASCAR career in 2006. He competes in races around the country, including at least two races in Florida during his time as a Voyager Brand Ambassador before Voyager filed for bankruptcy. Mr. Cassill is a proud Voyager Brand

Ambassador and was paid millions of dollars by Voyager for his promotion of Voyager and their crypto products.

## FACTUAL ALLEGATIONS

### A. The Voyager Scheme.

119.    Voyager operated a cryptocurrency investing application for iOS and Android mobile devices (hereinafter, the "Voyager Platform") that allowed users to purchase and trade cryptocurrency and invest money in interest bearing accounts. Until Voyager's recent bankruptcy, it claimed to have more than $5 billion in assets under management and over 3.5 million investors.

120.    At all times relevant to this lawsuit, Voyager's stock was listed and publicly traded on Canadian stock exchanges and sold throughout the United States, including in Florida, through many US brokerages in "over-the-counter" trading.

121.    Voyager quickly became one of the most utilized avenues for investors to purchase and invest in cryptocurrency and related crypto securities. It engaged in an extremely aggressive promotional and solicitation campaign via influencers and celebrities who received financial incentives, that targeted primarily new or less knowledgeable cryptocurrency users. Users could download the application, create an account, fund it (by transferring US dollars ("USD") from a bank or cryptocurrency from a "wallet"[17]), and begin trading immediately. Voyager claimed that users could open an account and begin trading in three minutes or less.

122.    Voyager positioned itself to connect users with more than a dozen different cryptocurrency exchanges and to trade more than 50 cryptocurrencies. Voyager did that so its users

---

[17] Cryptocurrency is sent and received from or to so-called "wallets," which are locations identified by a combination of letters and numbers called a "hash" that is unique to the holder of the "key" for that wallet address. Wallets are roughly analogous to an email address or bank account number that allows for the transmission of cryptocurrency from one user to another.

could build a portfolio of crypto assets without having to sign up for multiple exchanges and manage multiple accounts.

123. To execute transactions and obtain for its users the best execution prices for crypto trades, Voyager claimed to employ various proprietary technologies including the so-called "Voyager Smart Order Router." According to Voyager, when users made a purchase or a trade, they could select the currencies they intended to buy or sell (and the amount), but users would not choose which exchange they currency came from. Rather, Voyager represented to users that it would execute the transaction at the best price available across multiple exchanges.

124. The Voyager Platform was based upon false representations and other deceptive conduct. Voyager's scheme was specifically designed to take advantage of unsophisticated investors who utilize mobile apps to make their investments.

**B. Voyager Misrepresented its Products and Deceived the Public.**

125. According to its creators, "The Voyager Platform provides its customers with competitive price execution through its smart order router and as well as a custody solution on a wide choice of popular crypto-assets. Voyager was founded by established Wall Street and Silicon Valley entrepreneurs who teamed to bring a better, more transparent, and cost-efficient alternative for trading crypto-assets to the marketplace." [18] Voyager represented prominently and consistently to the investing public that the Voyager Platform offered trades that were "100% Commission-Free."

126. Voyager also claimed to provide users that bought and sold cryptocurrencies the ability to execute trades across a spectrum of exchanges in order to give Voyager "deep pools of liquidity." [19]

---

[18] The operative complaint in *Cassidy*, found at ECF No. 46, is attached hereto as Plaintiffs' Exhibit 284 ("*Cassidy* Complaint"). *See* "Voyager Digital and Market Rebellion to Form Online Broker Platform for Equities, Options, and Futures Trading," dated May 5, 2021 (attached to the *Cassidy* Complaint as Exhibit J).
[19] *See Cassidy* Complaint, Ex. H.

It also offered a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors.[20] Some of the additional features that Voyager offered were: (a) users could trade between fiat and cryptocurrency on a wide variety of core and alternative cryptocurrencies; (b) Voyager allegedly minimized transaction costs by aggregating orders and routing the order flow through the optimal mix of exchanges, by utilizing the "Smart Router" technology; and (c) Voyager claimed to store crypto assets in a secure wallet and in a "cold" facility, with 24/7 security.[21]

127.    These representations enabled Voyager to obtain an edge over its competitors, including but not limited to Coinbase, Gemini, Kraken, and Binance, who openly display the applicable fees and commissions they charge on each trade.

128.    Voyager's representation that trades on the Voyager Platform were "100% Commission-Free," however, were false and intended to mislead reasonable consumers. In fact, Voyager secretly charged exorbitant commissions on each trade.

129.    Voyager perpetrated the scheme by, among other means, maintaining the "spread" (i.e., the difference between the "Bid Price" and "Ask Price" on a given cryptocurrency) intentionally wide on all cryptocurrencies listed throughout the Voyager Platform. Voyager explained in its most recent Management's Discussion and Analysis that the spread was a main source of revenue:[22]

> Fee revenue for the three and nine months ended March 31, 2021 was $53.7 million and $57.4, an increase of $53.5 and $57.1 compared to the same periods in 2020. The increase in the three months ended March 31, 2021 compared to the three months ended March 31, 2020 was primarily due to an increase of $5.0 billion in trade volumes, and an increase in average spread of 70.1 bps. The increase in the nine months ended March 31, 2021 compared to the nine months ended March 31, 2020 was primarily due to an increase of $5.5 billion in trade volumes, and an increase in average spread of 60.6 bps.

---

[20] *Id.*
[21] *Id.*
[22] *See* Voyager Digital Ltd. Management's Discussion and Analysis for the Three and Nine Months Ended March 31, 2021, dated May 25, 2021, (Ex. M of the *Cassidy* Complaint).

130.     Although the Voyager Platform displayed a "Fair Market Price" for each cryptocurrency, which fell somewhere in the middle of the spread, Voyager automatically executed market orders at the highest end of the spread, from which they pocketed secret commissions.

131.     Moreover, once a user submitted a market buy order, the "Estimated Price" for the trade displayed on the Voyager Platform automatically defaulted to an amount higher than the quoted "Ask Price" at the top end of the spread, so that an order could be executed at an amount "less" than the "Estimated Price," but still at the very top end of the spread. Similarly, for market sell orders, the trade automatically defaulted to an amount lower than the quoted "Bid Price" at the bottom end of the spread so that the order could be executed at an amount "more" than the "Estimated Price," but still at the bottom end of the spread.

132.     To effectuate and conceal this deception, Voyager claimed to use proprietary systems, which they referred to as the "Smart Order Router," the "Voyager Pricing Engine," and the "Proprietary Fills Algorithm."[23]

133.     In describing the Smart Order Router, Voyager maintained that the Voyager Platform "does not let clients post orders directly on the exchanges to which it connects or with the market makers that provide liquidity, but instead its Smart Order Router accepts customer orders and fills them in the market for the customer using its proprietary order routing algorithm."[24] The Voyager Pricing Engine "calculates the fair market price while constantly analyzing the order books, executions, depth of liquidity, commissions and other proprietary factors across our liquidity sources and streams this price to its users."[25]

---

[23] *See* "Passion for Product: Voyager Trading System," published Jan 23, 2020 at https://www.investvoyager.com/blog/passion-for-product-trading/ (accessed May 8, 2023).
[24] *Id.*
[25] *Id.*

134.     Voyager also utilized vague and opaque representations to represent that it would only "share" in "price improvement" where it could fill a user's order at a price better than that which was quoted to the user (which is not in the bid/ask spread or fair market price, but rather in the escalated estimated price that is only shown after the customer submits the market order).[26] "By example, if the user is quoted $10,040 and the router is able to fill at $10,030, Voyager may price improve the user's order to $10,035 (note: share of price improvement is variable and is determined by Voyager's proprietary fills algorithm)."[27]

135.     In reality, and unbeknownst to customers, the "Smart Order Router," "Voyager Pricing Engine," and "Proprietary Fills Algorithm" intentionally were designed to be obscure and to provide Voyager with hidden commissions on every trade, that in most cases, would exceed the disclosed fees and commissions charged by its competitors. Voyager unfairly gained an edge on its competition and overcharged customers by collecting these secret commissions to the detriment of its unknowing customers.

136.     In addition, Voyager's representations about providing the best execution of trades across the marketplace and "Better Pricing on Trades" across the exchanges are demonstrably false. Numerous other exchanges provide better rates. For the vast majority of transactions that users performed on Voyager, such users could have obtained better pricing from other cryptocurrency exchanges. In fact, the rates Voyager offers would result in a plainly worse deal to users, often to the tune of nearly or more than 1% higher than 2competitors, even on highly liquid products.

137.     Voyager also represents to the public on its website that it is "publicly traded, licensed, and regulated." What Voyager fails to disclose in proximity to its advertising claim that it is "publicly

---

[26] *Id.*
[27] *Id.*

traded," however, is that Voyager Digital, LLC's parent company, Voyager Digital Ltd., is publicly traded *in Canada,* not the U.S. Thus, Voyager's advertising claim that it is "publicly traded" is inaccurate with respect to Voyager Digital, LLC, which is not a publicly traded entity, and creates a misleading impression with respect to Voyager Digital, LLC's regulatory status, particularly because Voyager's website notes that "[a]ll services [are] provided by Voyager Digital, LLC." Voyager's claim to be "licensed" stems from state licensing in far fewer than all U.S. states as a money transmitter, or money services business, which is unrelated to Voyager's offering and selling of unregistered securities and conveys the impression to unsophisticated investors that Voyager is "licensed" to offer and sell such securities, when it is not.

### C. Voyager's Products Are Unregistered Securities.

138.    On October 23, 2019, Voyager began offering the EPAs to public investors.

139.    From October 23, 2019, until Voyager declared bankruptcy on July 5, 2022, every account sold to customers of Voyager was necessarily an EPA, unless the customer took affirmative steps to separately "opt out" of having an EPA. There was no separate step necessary to opt in to having an EPA, there was no separate type of Voyager account to choose from when signing up for the account immediately after downloading the app (which was only available by phone, no desktop application for computers or any other devices). Ehrlich did not know the process, nor did he know how many opted out, though he admitted Voyager had that information. Upon information and belief, the amount of customers who "opted out" of having an EPA is de minimis, and it is even possible that there were no opt outs.

140.    Voyager initially launched the EPAs for customers holding Bitcoin and subsequently expanded its EPA program to provide high rates of return to users who maintained a variety of crypto assets in their Voyager accounts. Through the pervasive promotions, advertisements, and solicitations

by Voyager and Defendants, the EPAs became one of the most popular crypto-related investments nationwide, particularly for novice investors.

141. Voyager solicits retail investors to invest in the Voyager EPAs by depositing certain eligible investments into the EPA. Voyager then pools these cryptocurrencies together to fund its various income generating activities, including lending operations, proprietary trading, cryptocurrency staking, and investments in other cryptocurrency trading platforms. In exchange for investing in EPAs, investors are promised monthly returns and interest.

142. The vast majority of assets on the Voyager Platform consisted of EPAs. Voyager's own documents stated that its "users are automatically enrolled in the Voyager Earn Program" and would earn interest if they: "Simply maintain the required minimum monthly average balance of any of our reward-bearing digital assets to participate. Rewards are paid out on assets monthly and deposited directly into your Voyager account." Voyager Chief Executive Officer, Steve Ehrlich, testified that he had no idea what percentage of new users opted out of the EPA program or whether it was more or less than 1%. He never cared what the number was and did not even know what the process was to opt out.

143. Voyager also operated a "Loyalty Program." Under that program, and "depending on [users'] loyalty tier," users could double or triple the amount of their "annual rewards boost paid in" Voyager Token (VGX) for holding certain assets on the Voyager Platform. VGX in turn, was Voyager's propriety cryptocurrency token whose value (and therefore the value of the "annual rewards boost" paid to Voyager users) was substantially linked to the ability of Voyager and Defendants to successfully promote Voyager's platform and its products.

144. To obtain the promised value of VGX rewards, Plaintiffs had to give something of value to Voyager. For example, Plaintiffs purchased VGX tokens from Voyager using traditional fiat currency or other forms of cryptocurrency.

145. The rates of return associated with EPAs reflected Plaintiffs' participation in earnings resulting from Voyager's use of Plaintiffs' funds. Voyager explained:

> We will lend, sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of funds and cryptocurrency assets to counterparties, and we will use our commercial best efforts to prevent losses.
>
> In consideration for the interest earned on your account, you grant the right, subject to applicable law, without further notice to you, to hold the cryptocurrency held in your account in the firm name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer or use any amount of such cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining a like amount of cryptocurrency, and to use or invest such cryptocurrency at its own risk.

146. The investors' success was linked to the success of Voyager, including because Plaintiffs expected to receive variable interest returns for investing in cryptocurrency on the Voyager Platform, and the returns were dependent on Voyager's use and investment of Plaintiffs' assets.

147. On information and belief, when Plaintiffs and other investors transferred cryptocurrency tokens to Voyager, the assets were pooled together and investors shouldered the risks associated with the platform and other platforms and/or entities to which Voyager would "lend, sell, pledge, rehypothecate, assign, invest, use, commingle," etc., investors' assets while using Voyager's "best efforts" to provide financial returns.

148. Both Voyager and Defendants, acting as agents and/or partners of Voyager, prominently touted that cryptocurrency holdings on Voyager would earn rates of return of up to 9% or more. All Plaintiffs had to do was fund the investment, which allegedly could be done in three minutes. The investors had no material involvement generating the advertised profits. These passive investment returns were a primary focus of Defendants' paid promotions and solicitations directed at Plaintiffs.

149. The EPAs constituted "securities" as defined by state and federal securities laws. Although Voyager promised its investors a fixed return for their EPA investments, Voyager's Annual

Information Form filed with Canadian regulators stated, "Rewards earned on crypto assets are variable, and reward rates are determined by voyager at its sole discretion." To generate those "variable" rates of return, Voyager pooled the EPA assets and engaged in risky financial activities.

150. The more transactions conducted on the Voyager Platform, the more profit Voyager made by taking commissions (i.e., by manipulating the price at which the trade was executed). On information and belief, Voyager used some portion of that revenue, directly or indirectly, in combination with revenue generated from undisclosed high-risk loans or other activity to finance interest that Voyager was paying on EPAs.

151. Notwithstanding Voyager's misleading claims to be licensed and regulated, Voyager's EPAs were neither licensed nor regulated by state or federal securities regulators, even though it is a security required to be registered.

152. The absence of any registration statement meant that Plaintiffs and other investors lacked material information about the Voyager EPAs. The missing material information included, among other things, the business and financial condition of Voyager, the fees charged, the extent of Voyager's profits, and specific and detailed risks of the investment, including how Voyager determined to lend or stake investor tokens and the extent of liquidity reserves, or whether investor's crypto investments are put to some other use.

153. Under federal securities laws as construed by the United States Supreme Court in its decision *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*") and by the SEC, sources of authority that state courts around the country look to in construing their own analogous state securities laws, an investment contract is a form of security under United States securities laws when (1) the purchaser makes an investment of money or exchanges another item of value (2) in a common enterprise (3) with the reasonable expectation of profits to be derived from the efforts of others.

154.     Here, both the EPAs and Voyager's VGX tokens are clearly securities under the *Howey* test. Clearly purchasers of EPAs and VGX expected profits. Voyager's main selling point for both EPAs and VGX is that purchasing either entitled users to earn "rewards" on the Voyager Platform. For instance, EPA purchasers could earn up to 9% interest on USDC held in their EPAs, and VGX holders were entitled to earn 7% of VGX held in their account per year. Use of the word "rewards" is misleading; in this case it is the exact same thing as interest. Thus, the company was marketing that EPA and VGX holders could earn interest on their holdings, thus clearly communicating a profit opportunity (one they made sound like was risk free). Voyager never explains where these "rewards" came from. Rather, they just claim that they are delivered from the Voyager's "treasury." This means absolutely nothing. The only way rewards could be paid is either the company created new VGX tokens out of thin air to pay "rewards," or pooled user VGX tokens and other cryptocurrency tokens and loaned them out to other parties and paid interest, minus a spread, to EPA and VGX token holders. Either way, Voyager's efforts are critical to the success of the EPA and VGX endeavors.

155.     Voyager also made it clear that VGX tokens were tradeable on secondary exchanges, including the world's largest crypto exchange, Binance. The presence and marketing of secondary trading is another way the company led users to believe they could expect to profit off of VGX. Even the "Framework for "Investment Contract" Analysis of Digital Assets" lists the following factor as making it more likely "that there is a reasonable expectation of profit" under this circumstance: "The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future."[28]

---

[28]     https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets     (accessed May 8, 2023).

156.    Voyager has argued that VGX tokens are akin to airline miles but the key difference is that airlines miles are NOT tradeable on a secondary market. Note that the "Framework" acknowledges this point as well in footnote 19. Furthermore, Voyager cannot plausibly argue VGX is a utility token when anybody could have used the Voyager platform without ever having to hold VGX.

157.    Clearly, Voyager's efforts were instrumental in making its EPAs and VGX worth anything at all. This is obvious for VGX when you consider the fact that the price of VGX plummeted once Voyager filed for bankruptcy. Furthermore, Voyager played the most critical role in generating the "rewards" paid pursuant to the EPAs and in making VGX work, including:

a.    Voyager was responsible for paying "rewards."

b.    Holders of New VGX would rely on the company to be the administrator so as to maintain features and rewards of VGX.

c.    All VGX "rewards" are tied to use of the Voyager platform, such as 7% rewards on VGX tokens, trades executed on Voyager or using a Voyager debit card. Voyager therefore needs to be a functioning company for these "rewards" to have any value.

d.    The fact that Voyager was able to execute a "swap" of old VGX for new VGX makes clear that Voyager solely controlled the issuance and destruction of VGX tokens and could do whatever they wanted, whenever they wanted. Voyager administered the swap contract that executes the "swap" and could turn the swap on and off at a moment's notice.

158.    Similarly, under the "family resemblance" test set forth in *Reves v. Ernst & Young*, 494 U.S. 56 (1990) ("*Reves*"), an instrument is *presumed* to be a "security," and that presumption may be rebutted only by a showing that the note bears a strong resemblance to one of the categories of instrument identified by the Second Circuit in the case of *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir. 1976): the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its

assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[, and] … notes evidencing loans by commercial banks for current operations. The Supreme Court in *Reves* listed four factors to determine whether an instrument bears a strong resemblance to the instruments on the list: (1) the motivation that would prompt a reasonable seller and buyer to enter into the transaction; (2) the distribution plan of the instrument; (3) the reasonable expectations of the investing public; and (4) the existence of another regulatory scheme that significantly reduces the risk of the instrument.

159. Voyager sold investment contracts without registering the offer or sales with state or federal regulators, including the SEC, as required by law, and no exemption from the registration requirement applied.

**D. Regulatory Enforcement Actions Confirm that Defendants Were Promoting Unregistered Securities.**

160. Both Voyager and Defendants knew or should have known that the objective of their partnership, and the promotional activity they undertook together, constituted promoting unregistered securities.

161. Both before and after Defendants began soliciting investments in Voyager's digital assets, there was significant national attention to the fact that cryptocurrency investment products substantially identical to Voyager's products were investment contracts that constituted securities under both federal and state law, including New Jersey law that applies here for all class members nationwide.

### i. BlockFi Order

162.    On July 20, 2021, the New Jersey Bureau of Securities published a press release that received media attention titled "New Jersey Bureau of Securities Orders Cryptocurrency Company 'BlockFi' to Stop Offering Interest-Bearing Accounts."[29]

163.    The Bureau stated that it was ordering the "financial services company based in Jersey City from selling unregistered securities in the form of interest-earning cryptocurrency accounts"; and that the company had been funding its "cryptocurrency lending operations and proprietary trading at least in part through the sale of unregistered securities in violation of the Securities Law."[30]

164.    The Bureau announced that "Cryptocurrency investment products offered and sold on decentralized finance platforms carry significant risks, even beyond those associated with the volatility of cryptocurrency . . . Platforms like BlockFi may mirror the traditional financial structures that we know and trust, but in reality they can leave investors extremely vulnerable."

165.    Voyager's products functionally mirror what BlockFi was offering, i.e., the opportunity to invest in an "interest account by depositing certain eligible cryptocurrencies – including Bitcoin and Ethereum – into accounts at BlockFi. BlockFi then pools these cryptocurrency deposits together to fund its cryptocurrency lending operations and proprietary trading. In exchange for investing in the BlockFi Interest Accounts, investors are promised an attractive interest rate that is paid monthly in cryptocurrency."

166.    In material respects, the financial products offered by Voyager were the same as BlockFi accounts that were unregistered securities under New Jersey law.

---

[29] https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-company-voyager-digital-to-stop-offering-and-selling-interest-bearing-accounts/ (accessed May 8, 2023).
[30] https://www.nj.gov/oag/newsreleases21/BlockFi-Cease-and-Desist-Order.pdf (accessed May 8, 2023).

### ii. Celsius Order

167.    On September 17, 2021, New Jersey regulators published a press release that received media attention titled "New Jersey Bureau of Securities Orders Cryptocurrency Firm Celsius to Halt the Offer and Sale of Unregistered Interest-Bearing Investments."[31] The Bureau stated that the cryptocurrency platform "has been funding its cryptocurrency lending operations and proprietary trading at least in part through the sale of unregistered securities in violation of the New Jersey Securities Law" and that "[i]f you sell securities in New Jersey, you need to comply with New Jersey's investor-protection laws."

168.    As described by the Order in New Jersey, Celsius's interest bearing program was substantially the same as Voyager's EPAs in all material respects. The Bureau pointed out that "Earn Rewards investors can earn a variable interest rate on their investment and may withdraw their digital assets at any time, subject to a maximum three-day processing time specified by Celsius." Celsius offered returns that were "tiered depending upon the nature and amount of cryptocurrency invested, as explained on the Celsius Website."

169.    The Bureau's Order also emphasized that the Earn Rewards program were promoted as "long-term investments" as evidenced by the statement on Celsius's homepage: "Start earning top rates on any amount of crypto and get paid every paid every [sic] Monday to keep 'HODLing." Celsius encouraged users to hold their investments instead of selling or trading as "it would be a mistake to sell at this early stage." (As discussed below, Voyager and certain Defendants also encouraged Plaintiffs to "hold" their digital asset investments.)

---

[31]     https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-firm-celsius-to-halt-the-offer-and-sale-of-unregistered-interest-bearing-investments/ (accessed May 8, 2023).

170.     Much like Voyager, Celsius did "not disclose to investors: (a) the amount of money devoted to each of these investment activities; (b) the nature and creditworthiness of the borrowers, as well as the identity of any borrowers to whom Celsius has lent material amounts of cryptocurrency; (c) the terms and duration of the loans; (d) the types of securities and digital assets it trades; or (e) the profits or losses derived from these activities."

171.     The Bureau concluded that the "Earn Rewards product is a security as defined in section 49:3-49(m) of the NJUSL. The Earn Rewards product was and is required to be registered with the Bureau pursuant to section 49:3-60 of the NJUSL. The Earn Rewards product has not been registered with the Bureau, is not exempt from registration, and is not federally covered. Celsius has offered and sold unregistered securities in violation of section 49:3-60 of the NJUSL and continues to do so."

### iii. Kraken Order

172.     On February 9, 2023, the SEC published a press release that received media attention titled "Kraken to Discontinue Unregistered Offer and Sale of Crypto Asset Staking-As-A-Service Program and Pay $30 Million to Settle SEC Charges."[32] The SEC announced that it had charged the entities known as Kraken "with failing to register the offer and sale of their crypto asset staking-as-a-service program, whereby investors transfer crypto assets to Kraken for staking in exchange for advertised annual investment returns of as much as 21 percent," and that the Kraken entities, to settle the SEC's charges, "agreed to immediately cease offering or selling securities through crypto asset staking services or staking programs and pay $30 million in disgorgement, prejudgment interest, and civil penalties."

---

[32] https://www.sec.gov/news/press-release/2023-25 (accessed May 8, 2023).

173.     The SEC detailed Kraken's "staking services," in which "Kraken pools certain crypto assets transferred by investors and stakes them on behalf of those investors. Staking is a process in which investors lock up—or 'stake'—their crypto tokens with a blockchain validator with the goal of being rewarded with new tokens when their staked crypto tokens become part of the process for validating data for the blockchain. When investors provide tokens to staking-as-a-service providers, they lose control of those tokens and take on risks associated with those platforms, with very little protection." The SEC alleged that "Kraken touts that its staking investment programs offers an easy-to-use platform and benefits that derive from Kraken's efforts on behalf of investors, including Kraken's strategies to obtain regular investment returns and payouts."

174.     The SEC's action confirms that the types of crypto products offered by Voyager were securities. The press release quotes SEC Chair Gary Gensler stating, "Whether it's through staking-as-a-service, lending, or other means, crypto intermediaries, when offering investment contracts in exchange for investors' tokens, need to provide the proper disclosures and safeguards required by our securities laws. Today's action should make clear to the marketplace that staking-as-a-service providers must register and provide full, fair, and truthful disclosure and investor protection."

### iv. Voyager Order

175.     On March 29, 2022, New Jersey regulators published a press release that received media attention titled "New Jersey Bureau of Securities Orders Cryptocurrency Company 'Voyager Digital' to Stop Offering and Selling Interest-Bearing Accounts."[33]

176.     The Bureau announced that it was ordering the "Jersey City-based financial services company from selling unregistered securities in the form of interest-earning cryptocurrency accounts

---

[33] https://www.njoag.gov/new-jersey-bureau-of-securities-orders-cryptocurrency-company-voyager-digital-to-stop-offering-and-selling-interest-bearing-accounts/ (accessed May 8, 2023)

that have raised at least $5 billion nationwide," and that the company had been allegedly funding its "income generating activities—including lending operations, digital asset staking, and proprietary trading—at least in part through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts in violation of the Securities Law."

177.     The Bureau stated, "Unregistered securities offerings pose significant risk to investors because the issuers do not make the same types of disclosures, including, for example, providing detailed financial statements that typically accompany registered offerings." The Bureau detailed how "[i]nvestors in unregistered offerings like the 'Voyager Earn Program Accounts'…may not receive any information about the specific investment strategies used by the issuer to generate investment returns, may not be advised about the creditworthiness of counterparties with whom the issuer does business, and may not be apprised of the use of leverage, or other risky investment strategies employed by the issuer to generate a return."

178.     The Bureau outlined that "Voyager solicits investors to invest in the Voyager Earn Program Accounts by depositing certain eligible cryptocurrencies into the investors' Voyager account. Voyager then pools these cryptocurrencies together to fund its various income generating activities, including lending operations, digital asset staking, proprietary trading, and investments in other cryptocurrency platforms, such as Celsius Network. In exchange for investing in the Voyager Earn Program Accounts, investors are promised an attractive interest rate that is paid monthly in the same type of cryptocurrency as originally invested."

### E. Recent Enforcement Actions Against Crypto Influencers Confirm that Defendants Were Required to Disclose Their Payments from Voyager.

179.     Recently, the SEC reached a settlement with former professional basketball player and sports analyst Paul Pierce for touting on Twitter for a two-week period in 2021 a "crypto asset security" that was being offered and sold. Although not related to Voyager, the SEC's findings are instructive about what kind of activity violates the securities laws:

Pierce, at least negligently, made materially false and misleading misstatements in his Twitter posts promoting the crypto asset security, including statements regarding the amount he had earned from holding the crypto asset security, and statements indicating that he was holding—and intended to increase—his investment in the crypto asset security while contemporaneously selling the securities. Pierce's conduct violated Section 17(a)(2) of the Securities Act, which prohibits obtaining money or property by means of an untrue statement of a material fact or any omission of material facts necessary to make statements made not misleading in the offer or sale of securities.

In addition, Pierce did not disclose that he was being compensated by the entity offering and selling the security for giving the crypto asset security publicity. Pierce's failure to disclose this compensation violated Section 17(b) of the Securities Act, which makes it unlawful for any person to promote a security without fully disclosing the receipt and amount of such consideration from an issuer.[34]

180.    The Paul Pierce case was not the only time an influencer was fined for non-disclosure. On October 22, 2022, the SEC reached a settlement with Kim Kardashian for touting on Instagram a "crypto asset security" that was being offered and sold by EthereumMax without disclosing the payment she received for the promotion.

181.    Although not related to Voyager, the SEC's findings are instructive about what kind of activity violates the securities laws:

On June 13, 2021, Kardashian—a well-known media personality and businesswoman—touted on social media a crypto asset security that was being offered and sold. Kardashian did not disclose that she was being compensated for giving such security publicity by the entity offering and selling the security. Kardashian's failure to disclose this compensation violated Section 17(b) of the Securities Act, which makes it unlawful for any person to promote a security without fully disclosing the receipt and amount of such consideration from an issuer. Kardashian's crypto asset security promotion occurred after the Commission warned in its July 25, 2017, DAO Report of Investigation that digital tokens or coins offered and sold may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws. 2 The promotion also occurred nearly four years after the Commission's Division of Enforcement and Office of Compliance Inspections and

---

[34] *In re* Pierce, SEC Admin. Proceeding File No. 3-21305 (Feb. 17, 2023) (summary of order instituting cease-and-desist proceedings at paras. 1–2).

Examinations issued a statement reminding market participants that "[a]ny celebrity or other individual who promotes a virtual token or coin that is a security must disclose the nature, scope, and amount of compensation received in exchange for the promotion. A failure to disclose this information is a violation of the anti-touting provisions of the federal securities laws.[35]

### F. Voyager's Bankruptcy and Related Litigation.

182. On December 24, 2021, counsel for Plaintiffs and the class members brought the first (and only) putative Nationwide Class Action complaint against Voyager, the *Cassidy* Action (Plaintiffs' Exhibit 284). In that complaint, the plaintiffs alleged that Ehrlich teamed up with Defendants Cuban and the Mavericks to promote Voyager by making false representations and employing other means of deception.

183. The allegations in the *Cassidy* complaint—and specifically Mark Cuban's role in promoting the Voyager Platform—received national attention. *See* https://www.jdsupra.com/legalnews/new-lawsuits-target-cryptocurrency-9604406/ (summarizing the allegations and explaining that "Mark Cuban, owner of the NBA's Mavericks, is a major stakeholder in Voyager. The complaint alleges that he made comments at a press conference in which he specifically targeted unsophisticated investors 'with false and misleading promises of reaping large profits in the cryptocurrency market.'"); https://www.law.com/dailybusinessreview/2021/12/29/mark-cuban-linked-crypto-platform-hit-with-florida-nationwide-class-action-lawsuit-in-miami-federal-court/?slreturn=20220701214901 (same, in the *Daily Business Review*).

184. After the *Cassidy* Complaint was filed, the following important actions took place: (a) the SEC began an enforcement review focused on whether Voyager's EPAs constitute unregistered

---

[35] *In re* Kardashian, SEC Admin. Proceeding File No. 3-21197(Oct. 3, 2022) (summary of order instituting cease-and-desist proceedings at para. 1).

securities; (b) seven state Attorney Generals (New Jersey, Alabama, Kentucky, Oklahoma, Texas, Vermont and Washington) found that Voyager was violating their state laws, including finding that Voyager used these EPAs to raise millions of dollars in revenue worldwide as of March 1, 2022 (thousands of these EPAs were Florida-based) and that the EPAs are an unregistered security; and (c) on March 29, 2022, the State of New Jersey Bureau of Securities entered a Cease and Desist Order against Voyager, finding that the Earn Program is not exempt from registration under the law, and instead that it must be registered—and as a result, Voyager's stock price tanked by 25% in a day and is down over 80% for the year.[36]

185.    On July 5, 2022, Voyager and two affiliated debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code. Voyager's bankruptcy cases are jointly administered under Case No. 22-10943 before the Honorable Michael E. Wiles in the United States Bankruptcy Court for the Southern District of New York.

186.    On September 28, 2022, Voyager filed a motion in the Bankruptcy Cases seeking authority to enter into an asset purchase agreement with West Realm Shires Inc., d/b/a FTX US whereby Voyager will sell substantially all of its assets for a purchase price of approximately $1.422 billion, which includes (a) the value of cryptocurrency on the Voyager platform as of a date to be determined, which, as of September 26, 2022, is estimated to be $1.311 billion, plus (b) additional consideration which is estimated to provide at least approximately $111 million of incremental value to the Debtors' estates.

---

[36]       https://seekingalpha.com/article/4498956-voyager-digital-plunged-25-percent-heres-why (accessed May 8, 2023); https://seekingalpha.com/article/4503716-voyager-digital-buy-dip-during-crypto-crash (accessed May 8, 2023).

## G. Defendants' Deceptive and Unlawful Promotions.

187.     Voyager's rapid growth in 2021 and 2022 was made possible due to the sustained and aggressive promotion and advertising campaign by Defendants.

188.     Defendants collectively were paid millions of dollars in cash and VGX crypto currency (among other crypto currencies) to broadly solicit potential investors with promotional statements, contests, coupon codes, offers of free cryptocurrency, sign-up incentives, and other strategies to entice people to purchase cryptocurrency on Voyager, including express or implied solicitations for their fan bases to purchase EPAs, which were unregistered securities.

189.     Moreover, there is no question that all Defendants were touting EPAs, regardless of whether their advertisements expressly referenced EPAs. Defendants all touted the interest rates between 7% and 12% Voyager offered on crypto assets. These interest rates were available only to EPA account holders. Additionally, as described above, all users were <u>automatically signed up</u> for an EPA unless they expressly opted out (to date discovery has not revealed any evidence of a single opt out). For example, Cuban specifically touted the EPAs during the October 27, 2021 press conference, explaining

> You can convert to put it into a USDC stablecoin on Voyager, and I thought it was 7% but now it's 9%. And so I've taken a lot of my cash and made it available on USDC. I'm not here trying to sell you it's 100% risk free, but it's as close to risk free as you're going to get in the crypto universe. And so just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.

190.     Defendants knew that their endorsements of Voyager would influence people because of their substantial professional accomplishments and celebrity status. They all have thousands or even millions of followers across social media. They all understood the effect their promotional activity for Voyager was causing—including because social media sites like Twitter, Instagram, and YouTube display allowed them to see the number of impressions, "likes," views, comments, re-Tweets, etc., that the promotions were generating. On information and belief, Defendants also knew their promotional

activity had a significant impact on investor behavior based on feedback and information they received from Voyager. Indeed, though reliance is not an element of these claims, many—if not all Plaintiffs— *and* Class Members specifically relied on Mr. Cuban's and the Mavericks' statements and the Voyager advertisements, even downloading Voyager using their promotional codes.[37]

191.     Every single public-facing announcement or press release concerning Defendants' relationships with Voyager described Defendants as "partners" of Voyager, and all the announcements referred to Defendants' "partnerships" with Voyager, the sole exception being for Defendant Cassill, who was identified as a brand ambassador and partner of Voyager, but whose agreement with Voyager was characterized as the "sponsorship" of his racing vehicle, which is consistent with the common parlance of NASCAR. The purpose of these partnerships was to influence people to download Voyager and make investments.

192.     Defendants' success in touting Voyager depended on concealing their true motives. Many of the public promotions intentionally had a quality of being spontaneous, quasi-public-regarding messages in which the celebrities were merely seeking to educate people about cryptocurrency and share their own supposed enthusiasm for Voyager's products. In fact, these promotions were anything but spontaneous or public-minded; they were scripted, calculated, carefully timed, commercially motivated, and contractually required.

193.     Moreover, Defendants' own financial interests depended on getting users to sign up for Voyager—not only because they had been paid for performing that service, but also because they

---

[37] *See, e.g., Calabro v. Pares*, 2020 WL 7481301, at *2 (S.D. Fla. May 27, 2020), *report and recommendation adopted*, 2020 WL 7481304 (S.D. Fla. June 12, 2020) (outlining the requirements to prevail on a claim under Fla. Stat. § 517.07 and not including reliance); *Matter of Bruno*, 2021 WL 1140095, at *6 (N.J. Super. Ct. App. Div. Mar. 25, 2021) (outlining the requirements to prevail on a claim under N.J.S.A. 49:3-60 and not including reliance); *Musolino v. Yeshiva Machzikei Hadas Belz*, 137 F.App'x 321 (11th Cir. 2005) (affirming judgment that the Defendant had violated Fla. Stat. § 517.07, even though the district court did not conclude that reliance is an element of a claim under Fla. Stat. § 517.07).

had expectations of being long-term brand ambassadors for Voyager under lucrative sponsorship contracts. And as discussed in more detail below, they were paid in Voyager's own token and therefore stood to benefit from that token's long-term growth and success.

### H. Mark Cuban and the Dallas Mavericks.

*I … am a [Voyager] customer and I've been a customer for several months now I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a* **perfect fit for our Mavs fans and reaching Mavs fans of all ages…** *it's* **as close to risk free** *as you're going to get … just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.*

– Mark Cuban (Governor, Dallas Mavericks)



    **i.    Defendants Cuban and the Dallas Mavericks Partnered with Voyager to Drive Investors to Sign Up For Voyager Accounts and Invest In EPAs.**

194.    Over the last decade, hosting the multi-Emmy Award-winning investment-themed reality show Shark Tank, which is one of the most watched unscripted shows on television, Cuban has built his national brand identity around being an extremely savvy and trustworthy investor. Each week, millions of viewers tune in to Shark Tank to watch Cuban evaluate what is a good investment and what is not. As it relates to this case, he put all his influence behind Voyager.

195.     In October 2021, Voyager became the first international partner of the Mavericks.[38] According to the Mavericks and Voyager, their five-year exclusive, integrated partnership has a three-fold mission: (a) make cryptocurrency more accessible through educational and digital programs, (b) reach a global audience with activations; and (c) create innovative and transformative fan engagement programs. In fact, the "primary goals" of the partnership was "helping educate [Mavericks] fans on what the crypto industry was" and "create new customers." Tapply Tr. 81:4-9; 107-6-9. Given the amount of NBA fans in the country, the Mavericks knew that their marketing the Voyager Platform would be consumed by the unsuspecting masses. Indeed, Ehrlich conceded that Voyager's "main goal" with the Voyager and Mavericks partnership "was to bring cryptocurrency to the masses," meaning 320 million people. Plaintiffs' Exhibit 281 ("Ehrlich Tr.") 97:17-23.

196.     Voyager sought to partner with the Mavericks based on Cuban's own ability to generate publicity and "media visibility," the international roster and "usage" of the team (Tapply Tr.78:12-22-79:21) and because "of their knowledge on cryptocurrency." Ehrlich Tr. 30:16-21.

197.     In fact, Voyager sought after Cuban and the Mavericks for potential "additional press coverage via speaking engagements on crypto publications." Tapply Tr. 107:10-25. In the initial discussions between Cuban, Ehrlich, and other executives from both companies and marketing agencies, Voyager told the Mavericks and Cuban that it was "excited to learn more about your vision for crypto/blockchain integrations across the organization and identify opportunities for Voyager to lead/support those initiates as part of this partnership. Voyager added that "we are very excited to work together on a fully integrated and long term partnership." In response, Cuban claimed to be "very familiar with Voyager."

---

[38] https://www.mavs.com/mavsvoyager/

198.    In or around the same time, Ehrlich wrote to Cuban: "[l]et's make history here and create the first ever NBA Team sponsorship in crypto. I think we can blow the roof off!" Unfortunately, the partnership made history for the wrong reasons—it induced, as it resulted in inducing widespread investments by class members on the deceptive Voyager Platform, and their investments were lost.

199.    Leading up to the launch of the partnership, the Mavericks and Voyager had strategy discussions about how to "maximize coverage" by the local and national media surrounding the promotion of Voyager by Cuban and the Mavericks. Mavericks' marketing executives discussed that the "media list includes 350 reporters, locally and nationally." The media strategy contemplated providing feeds to national broadcasters like CNBC without restrictions on covering the events in Florida and nationwide.

200.    On October 27, 2021, Voyager Tweeted about "team[ing] up with the @dallasmavs as their official crypto brokerage & international partner. Catch the official press conference live at 4 PM CT // 5 PM ET, with the Mavs, @Ehrls15, and @mcuban. See you on the paint."[239] Later that same day, Voyager Tweeted again that they "could not be more excited to partner with the Dallas Mavericks to make crypto more accessible for all."[40]

---

[39] https://twitter.com/investvoyager/status/1453416487323152384?s=20
[40] https://twitter.com/investvoyager/status/1453416489143386117?s=20



201.    Under the October 29, 2021 Agreement, Voyager would pay the Mavericks between

██████████████ per year from 2021 to 2026 with the objective that the Mavericks' promotions

would help drive activations and investments on the Voyager platform not only by Mavericks fans,

but also by NBA fans, including the Plaintiffs and individuals in Florida. Cuban summarized the purpose of the agreement as "We will help them open accounts to trade on voyager, we encourage people to use it. . . . [t]hat is exactly what Steve [Ehrlich] and I discussed and agreed to." Plaintiffs' Exhibit 18.

202.     The NBA encourages teams to negotiate international sponsorship arrangements and shares in the revenue derived from such partnerships. In the 2021-22 season, the NBA's second largest category of sponsorships came from the crypto industry. NBA teams partnered with, among others, Crypto.com, Webull, Coinbase, FTX and Socios.

203.     Cuban is a proponent of investing in the cryptocurrency and NFT markets. In 2020, he began advocating for investments in NFTs, created his own store and began speaking publicly of the benefits of investing in Bitcoin and Ethereum. Earlier this year, in a podcast he did with Jon Stewart, Cuban stated that 80% of the investments he makes outside of those on Shark Tank "are in or around cryptocurrencies"[41] because "[t]hat is really where I look to invest."[42]

204.     On October 27, 2021, at a Mavericks press conference in Dallas, Texas, Cuban announced that the Mavericks had entered into a 5-year "exclusive, integrated partnership" with Voyager.[43] Cuban explained in the press release that "[t]his partnership makes Voyager the first international partner of the Mavericks, enabling both parties to reach a wider, global audience to raise brand awareness and drive cryptocurrency adoption around the world."

---

[41]     https://www.cnbc.com/2022/01/14/mark-cuban-says-80percent-of-his-non-shark-tank-investments-are-in-crypto.html (accessed May 8, 2023).
[42] *Id.*
[43] https://www.mavs.com/mavsvoyager/ (accessed May 8, 2023).



      **ii.**    **Cuban and the Mavericks Engaged in a Sustained and Aggressive Promotion and Advertising Campaign Leading Up to, During, and After, the October 27, 2021 Press Conference.**

205.    Leading up to the press conference on October 27, 2021, where the Mavericks, Cuban, and Voyager announced their partnership, the Mavericks and Voyager worked together for weeks planning all aspects of the roll out of their partnership, including Cuban's written press statements, drafts of the talking points of the Mavericks webcast with Ehrlich, the media strategy, deciding which media outlets to invite (including certain web media outlets with a national audience), which cryptocurrency journalists and bloggers should attend, how to increase social media impact, the promotional activities to be performed at the arena during the Mavericks' home game that week, special MAVS promotional codes and incentives that would be offered to persuade potential investors to open new Voyager accounts, and other activities with the intent of making the partnership launch impactful and newsworthy.

206. The Mavericks and Voyager even planned for several Mavericks team members to attend the press conference, sit in the audience, and ask at least one question to Cuban or Ehrlich. Tapply conceded that the Mavericks and Voyager worked together to surreptitiously prepare the questions and "gave" them to the players in advance. Tapply Tr. 205:3-18. Nobody disclosed to the public that the team members who showed up to the press conference on October 27, 2021, were, in fact, acting as paid shills receiving ████ from Voyager (50% of which was paid in VGX tokens) to ask questions to assist in the promotion of Voyager.



207. Internal documents also show that, in preparing promotion materials for the launch of the partnership and the Mavericks home game on October 28, 2021, the Mavericks marketing team complied with requests by Voyager to edit certain promotional materials to emphasize that Voyager users should "hold" their assets rather than trade them, and to make a misleading edit to a graphic of the market value of BitCoin (i.e., to cut short the line graph showing the recent market value of BitCoin in order to omit the recent dip in the value and disguise the volatility of cryptocurrency).

208. Local and national media, the Texas Blockchain Council, and Mavericks players attended the October 27, 2021, press conference. In addition to the in-person press conference, which

was held at the Mavs Gaming hub, the press conference was livestreamed on mavs.com and garnered 3,700 viewers. [44] There, the Mavericks and Voyager gifted media in attendance personalized "Mavericks x Voyager" pullovers:



209.    At the October 27 press conference, Cuban proudly described how he would significantly increase the scope and presence of the Voyager Platform for those with limited funds and experience:

> You know, there's a lot of hype, there's a lot of discussion, but most people don't understand the fundamentals behind it. We're going to try to bring that level of education to our fans and to our joint customers."
>
> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started. My now 12-year-old son got me in Dogecoin when it was less than a penny. I was like "let's do this" because it's a cheap way for him to learn how all of this works. While you have to put in a $100 to get the $100 bonus the next two days, if you don't have a hundred dollars and you just want to download the

---

[44] Plaintiffs' Exhibit 85A.

app and put in $5 and buy SHIBA INU (SHIB) and Dogecoin (DOGE), there's a lot of ways to inexpensively start.

210.  Ehrlich agreed with Cuban and, in response to player Dorian Finney-Smith's question

about how they can get a Voyager account, he added as follows:

> That's one of the advantages of Voyager. You can actually download the app and fund your account and trade in three minutes or less. We make it really simple. We have a very easy-to-use and integrative platform that allows you to get engaged in the crypto market very quickly. That's one of the values of Voyager. You'll be trading in three minutes or less.
>
> About 220 million people have crypto right now and we (anticipate) a billion in four years. So that shows you where we can actually go with crypto and crypto adoption. Now the comparison there is the internet. It took the internet eight years, for the same time frame, for the internet to grow that fast. So it's a great time to enter the space and learn more.[45]



---

[45] *Id.*



211. At the press conference, Cuban even hyped up the fact that he was investing his own money into the Voyager Platform to further induce retail investors to follow in his footsteps:[46]

> I gotta add, I am a customer and I've been a customer for several months now, I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a perfect fit for our Mavs fans and reaching Mavs fans of all ages.
>
> . . .
>
> And, of course, the Mavs being a leader I think we are going to extend this far deeper than just Mavs fans, I think Voyager is going to be a leader amongst sports fans and crypto fans around the country.

212. While Cuban claimed to be a Voyager customer during the press conference, he has never publicly disclosed the full nature, scope and amount of compensation that he has personally received, including as 70% owner of the Dallas Mavericks, in exchange for promoting the Voyager digital platform. Other celebrities who have failed to disclose compensation in exchange for promoting crypto investments, including Kim Kardashian, Floyd Mayweather and DJ Khaled, have been fined millions of dollars for violating the anti-touting provisions of the federal securities laws.

---

[46] https://www.youtube.com/watch?v=aB9GpBOroIw (accessed May 8, 2023).

213.     Throughout the October 27, 2021 press conference, Cuban continuously represented that Voyager was an easy-to-use platform that offered the best pricing in the market:

> And so for those of you who already use crypto, I know for me it was really easy, I took some of my MATIC tokens that I own and transferred it over because Voyager paid a higher interest rate or return rate than the application I was using before, Aave. So it was really easy to give you a wallet address, you just go into your metamask or whatever you're using, you just send it to that destination address, it shows up an hour later, you start earning more money, and so right immediately I was earning more when I went over to Voyager, and it's the same with USDC, a stablecoin. And the other thing about it is for those of you who use DeFi, the pricing is always higher on DeFi as they try to look through all the decentralized financing platforms to try to get the best—not even the best, but *a* price— and so with Voyager, the pricing has been far, far better, so if you're paying attention and want to get the best price, Voyager is a great platform for it.

214.     At this same press conference, in response to player Maxi Kleber asking if it was too late to get into crypto, Ehrlich, continuously touted the Voyager rewards program, characterizing it as a way to "educate" investors while they "create wealth," and particularly that he wanted to get people as young as possible investing in the Voyager Platform:[47]



You know, we have an extensive rewards program. As you hold a certain amount or level of assets you even get more rewards on the

---

[47] *Id.*

program, so we're trying to engage you and bring you in the platform and teach and educate and create that wealth through our extensive rewards program.

. . .

It's never too late. I think actually it's the right time. Because as I've said, I still think it's the first half of the first quarter on crypto adoption. . . . It's a great time to enter the space, learn more, and I think that's the key. You've got to come in, you've got to learn, educate yourself. We help, we help educate, but you've got to learn more. And I think that's the key.

. . .

Financial literacy, we need to teach the youth, that's part of what we want to bring, too, is the education when we build out the education, we're in the middle of building that out, crypto 101 is the first thing that we do to teach people. Teach the youth, go to the community and teach the youth about financial literacy, I think that's important because most young kids don't get the opportunity to learn about financial literacy and they wind up going to college and now they're on their own and don't know how to manage their money and they're out in the real world earning salaries and they don't even know what FICA is . . . but that's what happens, and so we need to teach financial literacy and it's gotta start at the young ages, you know we gotta get out there and it's part of the plan.

215.    During the press conference, Cuban also shamelessly pushed the EPAs and pressed for investors to invest heavily into USDC and other assets on the Voyager Platform, claiming that investing in the EPAs was "*as close to risk free as you're going to get in the crypto universe*," that it was good for small businesses, and even that it was "a lot easier" than opening a savings account for young children at a bank:[48]

---

[48] *Id.*

74

Case 1:22-cv-22538-RKA Document 185-1 *SEALED* on FLSD Docket 10/24/2023 Page 76 of 166
Case 1:22-cv-22538-RKA Document 185-1 *SEALED* Entered on FLSD Docket 10/24/2023 Page 77 of 166
Page 167 of 166



**Dallas Mavericks** ✔
@dallasmavs                                              ...

"We're going to be at the forefront of innovation."

@mcuban on our new partnership with @investvoyager.

7:55 PM · Oct 27, 2021

188 Retweets    39 Quote Tweets    973 Likes

One of the reasons we want to do the education program is there's a big opportunity for small businesses. One of the challenges of small businesses is if you have any cash in the bank, you're making .025%. You can convert to put it into a USDC stablecoin on Voyager, and I thought it was 7% but now it's 9%. And so I've taken a lot of my cash and made it available on USDC. I'm not here trying to sell you it's 100% risk free, but it's as close to risk free as you're going to get in the crypto universe. And so just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.

. . .

You don't have to spend a lot of money in order to learn. It's not like the stock market where it's impossible except on a few platforms to spend $10 and get started. You know, my now 12-year-old son got me into Dogecoin when it was less than a penny.

. . .

So there's a lot of ways to inexpensively start to get an understanding. And it's a lot easier than even opening up a savings account. It's a pain in the ass to open up a savings account, particularly for your kids these days. There's so much paperwork, and whether it's yourself personally, someone you're trying to teach—you're trying to teach your kids about

personal finance, believe it or not, this is actually a better way, and so that's one of the unique opportunities and why it's not too late.

. . .

It's also something you can do on your phone. You don't have to have a bank account. So, people who are unbanked, trying to learn about financing, but have a smart phone and can download the app, you can start getting into this and saving your money and that's just a unique opportunity.

216. Even prior to the October 27 press conference, Cuban told people, including Ehrlich, that he liked the Voyager app and found it easy to use. Ehrlich Tr. 131:21-25—132:1-8.

217. In making these recommendations to potential investors —and particularly targeting novice investors, young people, and people who don't even necessarily have savings accounts—Cuban had a duty not to make materially misleading or incomplete representations about Voyager or its EPAs.

218. On *Shark Tank* and elsewhere, Cuban holds himself out as an expert in evaluating investment opportunities, particularly as they relate to the technology sector. Given that Cuban and his entity the Mavericks were enriching themselves by promoting Voyager, Cuban—at a minimum— had a duty to perform due diligence and not to recklessly (a) endorse a financial product that was profoundly risky as being "as close to risk free as you're going to get in the crypto universe" to an audience of "kids" and "people who are unbanked," and (b) claim that it was a "huge opportunity" to make more money than opening a bank account and that it offered "pricing [that] is actually really good." All those factual statements were false. Cuban knew or should have known they were false and knew or should have known people would rely on them in their investment decisions.

219. At a minimum, Cuban knew that he was making these statements at the October 27, 2021, press conference without any substantial factual basis. On information and belief, he had no factual basis to say, for example, that pricing on Voyager was "really good" because, in fact, the pricing

for cryptocurrency trades on Voyager was almost always more expensive than if the trades had been made on other platforms. Indeed, Voyager's pricing was *not* good; it was artificially inflated.



220.     Cuban made these statements at a time when, by his own admission, he did not bother to research (or even ask) how Voyager was able to offer such high rates of return on its investment products, even though he knew or should have known that Voyager was lending investors' assets or otherwise using their assets for transactions that presented significant risk.

221.     Further, Ehrlich, contrary to the position he is now taking in the Voyager bankruptcy, claimed that the rewards program is based on "staking" assets that customers own (as opposed to lending them out to institutional investors like 3AC), and falsely stated that he was prioritizing security *and insurance* on customer's cryptocurrency holdings: [49]

> We're connected to about a dozen different market makers, exchanges around the globe, and so we bring a best price back to consumers for that. . . We run a rewards program, so when you bring your assets over, we're going to reward you with earnings on those assets based upon your balances, based upon tokens you hold and so forth. And so it's a whole rewards program that we've built together and it's really

---

[49] *Id.*

probably state of the art when it comes to crypto with rewards programs, and that's how we like to operate, to give consumers rewards back for using and holding assets on the platform.

. . .

Our rewards are generated through staking, you know it's a lot staking these days, we have 30-something coins that we offer rewards on and a bunch of them are on the staking side, yep.

. . .

I was waiting for that question on security, it's a really important aspect. Security starts with you as an individual. What we recommend to every individual that buys and sells cryptocurrency is to use two-factor authorization when you actually hold your cryptocurrency. Do not use an SMS text message, there are a lot of scammers out there, there are a lot of people who try to SIM-swap you, it almost happened to me a month ago, on a Friday night my phone was trying to be SIM-swapped and I caught it quick enough and called the phone company, but I use two-factor authentication and I think everybody should start there. That means using a Google authenticator, authy, duo, or any of the other products you can use for 2fa. Outside of that, after from you to us is we use multiple custodians. We do not keep all our coins in one place, we keep them across multiple custodians, we've built a really detailed infrastructure for that, to make sure that we're spreading that risk and the insurance we get on all of that across multiple custodians, so it starts with the individual and making sure you have proper security and then it's also us as well.

222.    Moreover, during the press conference on October 27, 2021, Cuban went to great

lengths to cast investing in the Voyager Platform as a "fun" opportunity with a low cost of entry:[50]

Access, first and foremost. The simplicity of access, the fact that you don't have to rush into it and put all your money into it so patience is a big part of it. And then experimentation, right? Be curious. . . Because there's such a low cost of introduction and you know obviously the people who need the most education hopefully are spending the least amount of money, there's a lot of programs and educational programs that we can do that guide people through the process. And that's really the key. . . One of the greatest values of the lower cost crypto isn't so much "hey it could be an investment," it's more the community. . . It's a low cost entry to fun.

---

[50] *Id.*

223.     As an incentive, Cuban and the Mavericks even ran a promotion shortly after the press

conference where individuals who downloaded the Voyager app to invest during a certain time would

receive $100 in Bitcoin[51]



<hr />

[51]  https://markets.businessinsider.com/news/currencies/mark-cuban-dallas-mavericks-free-bitcoin-
100-voyager-digital-app-2021-10 (accessed May 8, 2023).

224. On October 28, 2021, to promote the partnership announcement, Voyager was the presenting sponsor of the Mavericks game that night against the San Antonio Spurs. As part of that sponsorship, Voyager received, among other things, Mavs100 promotions, LED Scorer's Table Signage, TV-visible LED signage in all televised games, a halftime presentation, and a Voyager $100k Crypto Shootout.[52]





---

[52] Plaintiffs' Exhibit 85A.

225.     Donning a Voyager t-shirt and surrounded by Mavericks players and Ehrlich, the

Mavericks fan hit a half-court shot and walked away with $100,000 worth of cryptocurrency.



**Dallas Mavericks** ✅
@dallasmavs                                    ...

#MFFL 🏀, Isaiah Stone, just won the LARGEST cash prize ever hit for an on-court promotion on the Dallas Mavericks court ‼️

He went home with $100k worth of cryptocurrency (Bitcoin) courtesy of our newest partner, @investvoyager 💰 💰



11:32 PM · Oct 28, 2021

343 **Retweets**   124 **Quote Tweets**   3,073 **Likes**

s





226.    And, on October 27, 2021, in a press release, Cuban stated that "[w]e believe our partnership with Voyager will allow Mavs **and NBA fans** to learn more about Voyager and how they can earn more from Voyagers' platform than from traditional financial applications."[53]

227.    Ehrlich—emphasizing the "educational" nature of the partnership—said "[t]his partnership gives us the opportunity to educate people all over the world on ways to use crypto in their everyday lives. We want to help people learn alternate ways to grow their wealth to achieve true financial freedom and build intergenerational wealth through crypto. We found a great partner to do this with in the Mavs and their owner, Mark Cuban, who is already deeply involved in the space."[54]

228.    Later, on January 15, 2022, viewers could see a TV-visible LED 360 Voyager advertisement during a home game against the Orlando Magic that was streamed in Texas, Florida, and across the country. Per Nielsen TV Exposure Analytics, the total exposure time for the TV-visible LED Stanchion Arm Voyager signage was 1 hour, 33 minutes, and 42 seconds. That is 1 hour, 33 minutes, and 42 seconds of the Mavericks promoting and giving their stamp of approval of Voyager to viewers in Texas, Florida, and across the country.

---

[53] *Id.*
[54] *Id.*







229.    At other home games, there were also TV-visible virtual signage and statistics showing that Voyager signage at the Mavericks' American Airlines Center has appeared in 376 posts on Mavericks' social media. The signage includes a Scorer's Table LED, a TV-visible Stanchion Arm LED, and others. As of June 13, 2022, the total social media exposure for this signage had been 19 million total impressions and 939k total engagements.[55] The Mavericks also featured Voyager in the Fan Clapper Back—a folded poster that when hit against the palm of the fan's hands creates a loud electric thunder that fills the arena—and placed on about 10,000 seats at each game.



230.    At another home game against the Toronto Raptors on January 19, 2022, the Mavericks hosted a "Crypto Dash," another on-court promotion, and on March 21, 2022, at a home game against the Minnesota Timberwolves, the Mavericks hosted Voyager "Skee-Ball," during which every participant received a "Mavericks x Voyager" t-shirt.





      **iii.**    **Cuban and the Mavericks Knew or Should Have Known They Were Soliciting or Assisting Voyager Solicit Investments In Unregistered Securities.**

231.     Given Cuban's substantial experience in investing crypto-related enterprises (which he has asserted constituted about 80% of his recent investment activity, excluding *Shark Tank* companies), he was surely aware of the regulatory concerns about companies selling unregistered crypto securities.

232.     Four years before the Voyager promotions, the SEC issued a report in July 2017 warning about potential compliance issues relating to promotion or sale of cryptocurrency that constituted an investment contract. Indeed, Cuban himself acknowledged his familiarity with issues relating to the legal status of crypto-related assets. He even advocated for increased "regulation" with respect to "tokens" because he "think[s] it would be of help." Cuban Tr. 32:5-14.

233.     Internal documents also confirm that while negotiating with Voyager, Cuban and the Mavericks were on notice of the potential legal compliance risks associated with the promotion. They acknowledged that Voyager is "not an exchange like Coinbase" but is an "agency broker—which means that it is Voyager's responsibility to transact in the best interest of customers."

234.     In addition, the NBA itself warned teams that to enter a sponsorship deal with a cryptocurrency company, the team needed to "ensure regulatory compliance" of the crypto product and obtain NBA approval.

235.     But NBA approval was not itself sufficient. The team itself was required to ensure regulatory compliance. At a minimum, that required due diligence on the part of Cuban and the Mavericks to understand how Voyager was pooling investments in a common enterprise and using those assets to generate the promised returns. Otherwise, it would be impossible to ensure Voyager was not selling or offering to sell securities. Cuban and the Mavericks disregarded their obligation and instead acted as an agent or partner of Voyager and solicited investments.

236.     Furthermore, Cuban and the Mavericks knew or should have known that Voyager was engaged in the kind of conduct that securities regulators in New Jersey and elsewhere had already concluded required registration, such as staking investors' cryptocurrency assets to generate interest for yield bearing accounts. Cuban was essentially told as much by Ehrlich: "[w]ith the advent of staking we are evolving our model to stake much of the $5bn and growing of customer AUM [assets under management]." Plaintiffs' Exhibit 14. In other words, Cuban and the Mavericks knew or should have known that Voyager was using investors tokens to engage in the kind of risky financial activity that required registration disclosures that Voyager was not making.

### iv.     Cuban and the Mavericks Knowingly Directed Their Conduct at Plaintiffs in Florida and Nationwide.

237.     The promotions by Cuban and the Mavericks were directed to Florida and beyond. The Sponsorship Agreement itself contemplated and permitted <u>international promotions.</u> Internal discussions between Voyager and the Mavericks discussed that "by having international rights it would provide [Voyager] rights to run national promotions and that is why we went ahead with Int'l out the gate vs. postponing year 1." Ryan Mackey, who was the head of brand partnerships for the Mavericks, conceded that the Mavericks' partnership with Voyager was a "fully integrated international partnership" and that so-called "global" promotions could include the entire United States. Mackey Dep. 53:6-9; 121:9-19. There were also nationally televised NBA games that featured the Voyager promotions, as well as national promotions through the media and social media that, on information and belief, Cuban and the Mavericks knew and intended would reach people in Florida and nationwide.

238.     Cuban himself edited a draft press statement regarding the Mavericks/Voyager partnership to add the language that: "We believe our partnership with Voyager will allow *Mavs and NBA fans* to learn more about Voyagers' application and how they can earn more from Voyager's

savings programs than from traditional financial applications." Plaintiffs' Exhibit 23A. A promotional campaign targeted at "Mavs fans" includes Mavericks fans who live in Florida; likewise, for "NBA fans." That was part of the quote that Cuban *himself* drafted and approved.

239. The promotions by Cuban and the Mavericks had an immediate and material influence on investors, including those in in Florida. Promotional activity was covered or exhibited on national television; internal documents indicated that the Mavericks/Voyager partnership launch announcement received 59 pieces of coverage (including 21 broadcast hits) and generated over 1 billion online impressions and over 1.4 billion in broadcast views. The Mavericks admitted receiving that information and did not dispute its accuracy.

240. Within just the first 48 hours after the promotions by Cuban and the Mavericks, more than ▮▮▮ Voyager accounts **were created by people specifically in Florida** using a MAVS coupon code that was used to persuade them to sign up, including Plaintiff Todd Webb. *See* Plaintiffs' Exhibit 242.The state of Florida had among the most redemptions of the code compared to other states, demonstrating the targeted impact of the promotion on people in Florida. Indeed, on November 8, 2021, internal Mavericks and Voyager e-mails discussed how in just in 48 hours, there were over 75,000 Voyager downloads using the MAVS coupon code. Plaintiffs' Exhibit 22. Voyager previously confirmed that they made more sales and profits in the state of Florida, than in most other states.

241. In late November 2021, Cuban discussed internally more opportunities to profit from the partnership with Voyager, directing his team to focus on making more money from Voyager for his Mavericks, as opposed to the Dallas Stars or the American Airlines Arena (in which he has no ownership interest), urging them to "[f]ind a way for us to further partner with the Mavs. We crushed it for [Voyager] and a lot of that was because I endorsed it. I won't approve anything that isn't for the Mavs[.]"

From: Mark Cuban
Sent: Mon 11/22/2021 3:09 PM (GMT-00:00)
To: Kyle Tapply
Cc: Billy Phillips; Cynthia Marshall; Mark Cuban; Ryan Mackey
Bcc:
Subject: Re: Sales Report

And on the stars. I have no interest in getting money for the stars. Zero. None. Double extra zero. I don't want any money going to the aac when it could come to the mavs. Particularly voyager.

Find a way for us to further partner with the mavs. We crushed it for them and a lot of that was because I endorsed it.

I won't approve anything that isn't for the Mavs

Plaintiffs' Exhibit 53.

242.   In early 2022, while the Mavericks were under contract to promote Voyager, Cuban also travelled to Miami to attend cryptocurrency conferences, during which, on information and belief, he also engaged in touting Voyager or otherwise working to further Voyager's partnership goals.

### I.   Rob Gronkowski

#### i.   Rob Gronkowski Partnered with Voyager to Promote Its Platform.

243.   Gronkowski was identified by Voyager as a promotor because of his credibility with his widespread fanbase (which was heavily concentrated in Florida). According to Voyager, his partnership could help "demystify crypto and challenge the status quo" and help Voyager "connect with a broader audience." In a press release surrounding Gronkowski's partnership with Voyager, Voyager's CEO stated that "When people hear something from Gronk, they know they're getting the real deal. We also know that by working with Gronk, we are going to get our message out there and have a lot of fun."

244.   ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



245.

246.

247.

248.     Gronkowski did not disclose the form amount, or number of payments received under either agreement to the public when promoting Voyager.

### ii. Gronkowski Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.

249.     Gronkowski partnered with Voyager as anticipated and provided services in accordance with his agreement. For example, he appeared in still shots and videos used to promote Voyager, shared Voyager co-branded promotions on his social media platforms, and wore Voyager branded merchandise in public, including on his social media platforms. Specific examples of his promotions of Voyager follow:

250.     Starting on or about September 2021, Gronkowski and Voyager launched a series of campaigns designed to bring cryptocurrency and investing in the Deceptive Voyager Platform to the masses.

251.    On or about September 8, 2021, Voyager announced its partnership with Gronkowski through a Press Release.[56]

252.    In that announcement, Voyager said that Gronkowski and Voyager were launching a series of campaigns designed to "bring crypto investing to the mainstream." Ehrlich said that "[w]hen people hear something from Gronk, they know they're getting the real deal. We also know that by working with Gronk, we are going to get our message out there." Gronkowski said that the "Voyager app is so easy to use right from the start … When I looked at the competition, it seemed like a no-brainer. Together, Voyager and I are bringing crypto to everyone."

253.    Voyager described the scope of the advertising as follows: "Today, Gronk and Voyager kick off the first of a series of campaigns across various social media channels, including Twitter and Instagram. The premier campaign is called 'New Best Friend' and features Gronk going about his day with a dog that most notably is not his well-known French bulldog, Ralphie. Gronk is playing in the yard, watching movies, and paddling around the pool with a Shiba Inu, the dog breed closely associated with Dogecoin and the Shiba Inu coin, meant to symbolize crypto in general. Voyager created the campaign with Omnicom's digital agency Organic. Gronk and Voyager will be releasing additional videos, including "Crypto Clues" later in the year, as well as hosting a livestream event, and releasing an NFT through Voyager for Good to benefit the Gronk Nation Youth Foundation."

254.    On or about September 8, 2021, Gronkowski posted a video[57] which, according to Ehrlich, was videotaped in a rented house in Tampa, Florida, to his social media channels, including Instagram and Twitter, consistent with the description in the press release issued the same day,

---

[56] *See* https://www.investvoyager.com/pressreleases/voyager-digital-partners-with-football-star-rob-gronkowski-to-expand-crypto-platform-and-support-gronk-nation.

[57] The video can be accessed at: https://twitter.com/RobGronkowski/status/1435585933450088451 https://www.instagram.com/p/CTj274SAQuf/?hl=en.

announcing the partnership and launching the @NewBestFriend promotion through which participants had a chance to win Bitcoin and Voyager tokens. Ehrlich Tr. 89:5-13.

[Rob Gronkowski Crypto Commercial for Voyager App - YouTube](Rob Gronkowski Crypto Commercial for Voyager App - YouTube)





255. Voyager responded to this promotion shot in Tampa, Florida, by Gronkowski that same day:



256.     On or about September 22, 2021, Gronkowski appeared on his social media platforms and on Voyager's social media platforms, including Instagram and Twitter, wearing a gold VGX token necklace to announce the grand prize winner of the @NewBestFriend promotion. Still shots of that promotion, which was filmed in Tampa, Florida, are below.[58]



---

[58]     The     videos     can     be     accessed     at: https://twitter.com/RobGronkowski/status/1440806750697844737; https://twitter.com/investvoyager/status/1440822608753160194.



On or about October 13, 2021, Gronkowski launched a series of Voyager promotions, which were filmed in Tampa, Florida, to reward new users. New Voyager users who used promotion code GRONK were offered $25 in bitcoin for themselves and $25 in crypto as a matching donation to the Gronk Nation Youth Foundation. A still shot appears below.[59]

---

[59] The video can be accessed at: https://www.instagram.com/p/CU-LujygklZ/.



257.    On or about October 22, 2021, Gronkowski further advertised that promotion. A still

shot appears below.[60]



_____

[60]    The    videos    can    be    accessed    at:
https://twitter.com/RobGronkowski/status/1451583469251960869.

258.    Gronkowski advertised the promotion, which was filmed in Tampa, Florida, again on November 24, 2021. A still shot appears below.[61]

259.    On or about December 20-22, 2021, Gronkowski launched a new promotion with Voyager on his social media platforms called Gronk's Cryptic Crypto Clues. Voyager offered $1000 in VGX tokens to 10 winners. Still images are below.[62]



<hr />

[61]    The video can be accessed at: https://twitter.com/RobGronkowski/status/1463551128734470146.

[62]    The video can be accessed at: https://www.instagram.com/p/CXzQ6eVPo3C/; https://www.instagram.com/tv/CXucLC3MAv0/?hl=en



Rob Gronkowski ✓
@RobGronkowski

Wanna play my new game?!?

Solve at least 5 clues 🕵️ 🕵️ and you could win $1,000 in Voyager Tokens (VGX) from @investvoyager.

Find the clues on my IG:
bit.ly/3GYUCG9

#CrypticCryptoClues #VoyagerPartner



instagram.com
Rob Gronkowski (@gronk) • Instagram video

9:08 PM · Dec 20, 2021

**28** Retweets    **1** Quote Tweet    **184** Likes

100







260.    Voyager also advertised the promotion, which was filmed in Tampa, Florida, on

December 21, 2021:



### iii. Gronkowski Had Financial Incentives to Induce Class Members to Invest in Voyager and to Trust the Platform.

261.     Gronkowski had a financial incentive to induce Plaintiffs to invest with Voyager. He was paid, in part, in VGX tokens and Voyager stock – the value of which depended on the financial success of Voyager.

262.     Further, Gronkowski had every incentive to be an effective promoter of Voyager to continue the ambassador relationship and continue receiving his annual payments, including cash.

### iv. The Promotions Were Deceptive and Unlawful.

263.     Starting on or about September 2021, Gronkowski and Voyager launched a series of campaigns designed to bring cryptocurrency and investing in the Deceptive Voyager Platform to the masses. Gronkowski did not disclose that he was being compensated by the entity offering and selling the security for promoting the sale of Voyager securities to the masses.

264.     Gronkowski made deceptive statements "to everyone" in his Twitter and Instagram posts promoting Voyager, including statements that the "Voyager app is so easy to use right from the start."

### v. Gronkowski knew or should have known they were soliciting or assisting Voyager solicit investments in unregistered securities.

265.     Given Gronkowski's substantial experience in investing crypto-related enterprises (including being the first professional football player to launch his own series of NFTs), he was surely aware of the regulatory concerns about companies selling unregistered crypto securities, especially to his millions of followers.

### vi. The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.

266.     Gronkowski's Voyager promotions were published on public social media accounts, accessible to plaintiffs nationwide including in Florida, and carried by nationwide media, as well as Florida media.

267.     The Voyager/Gronkowski partnership specifically targeted Florida residents because Gronkowski is a Florida resident and played for a Florida professional sports team – the Tampa Bay Buccaneers – during the relevant time period. His social media followers, and fans in general, are likely to be drawn disproportionately from Florida. Likewise, Florida media is likely to cover his interviews, promotions, and other happenings because he is of interest to fans of his team.

268.     As outlined in the Section entitled Parties, Plaintiffs Gold, Garrison, Karnas, Sayed, Ehrentraut, Manganiello, Newsom, Ayer, Dorn, Gates, Peters, Webb, and Dagnoli invested in Voyager in reliance on Gronkowski's statements, and lost money as a result.

### J.   Victor Oladipo

#### i.   Victor Oladipo Partnered with Voyager to Promote Its Platform.

269.     On or about April 2021, Victor Oladipo partnered with Voyager to provide it with spokesperson and marketing services pursuant to a written agreement. Those services included posting on social media, appearing on a podcast, wearing Voyager gear, and appearing in still and video media.

270.     In exchange for these services, Oladipo received a substantial total compensation package. This compensation package included Voyager stock options subject to 1 year vesting and VGX tokens.

271.     Oladipo did not disclose the form or number of payments received under either agreement to the public when promoting Voyager.

#### ii.   Oladipo Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.

272.     Oladipo partnered with Voyager and provided services in accordance with his agreement. For example, he posted on social media, appeared in images used to promote Voyager, and wore Voyager branded merchandise in public, including on social media platforms. Specific examples of his promotions of Voyager follow:

273. Starting on or about May 13, 2021, Oladipo and Voyager publicly announced their partnership in a press release.[63]

274. The press release quotes Oladipo: "Voyager is bringing the future of finance to everyone." And further: "Voyager's unbeatable combination of over fifty-five crypto assets, outstanding earnings potential with competitive interest rates and an app that is easy and fun to use, make it the perfect platform for anyone getting into the crypto market." Oladipo, who has been an early adopter of cryptocurrency, recently made a large real estate acquisition using cryptocurrency for a portion of the purchase.

275. The press release also announces the Voyager for Good campaign, "a breakthrough referral program in the cryptocurrency space that awards the charity of an athlete's choice with digital assets each time a new account is opened and traded with a special referral code." When discussing Oladipo, Ehrlich states: "Victor Oladipo is not only an all-star athlete in the NBA, but he is also a highly-engaged investor who brings passion and positivity to everything he does." "It's a privilege to launch our Voyager for Good referral program with such an outstanding athlete and to have Victor Oladipo in Voyager's court."

276. The press release itself went on to launch the program, stating: "About Voyager for Good: At Voyager, you can build your stack and give back. When Victor Oladipo's followers open a new Voyager account using his unique referral code, deposit at least $100, and make their first trade, they will receive $25 in Bitcoin for themselves, and Voyager will also donate $25 in Bitcoin to the Oladipo Foundation to empower the next generation of youth, especially young women, to thrive without limits through confidence, creativity, capacity and community."

---

[63] https://www.prnewswire.com/news-releases/voyager-digital-announces-partnership-with-two-time-nba-all-star-victor-oladipo-301290794.html.

277.    The press release also contained a photograph of Oladipo in a Voyager branded shirt:



278.    On May 13, 2021, Voyager Tweeted about the Partnership.[64]

---

[64] https://twitter.com/investvoyager/status/1392833369772216329?s=20



279.    On or about May 22, 2021, Voyager announced the partnership on its social media.[65]

---

280.    Despite injury, Oladipo engaged with the Voyager on social media throughout his

season, including, for example:[66]



---

[66] https://twitter.com/VicOladipo/status/1435295535242493954?s=20



       iii. **Oladipo Had Financial Incentives to Induce Class Members to Invest in Voyager and to Trust the Platform.**

281.    Oladipo had a financial incentive to induce Plaintiffs to invest with Voyager. He was paid in VGX tokens and Voyager stock options – the value of which depended on the financial success of Voyager.

282.    Further, Oladipo had every incentive to be an effective promoter of Voyager in order to continue the ambassador relationship and continue receiving payments.

       iv. **Oladipo Knew or Should Have Known They Were Soliciting or Assisting Voyager Solicit Investments In Unregistered Securities.**

283.    Given Oladipo's substantial experience in investing crypto-related enterprises (including his recent real estate acquisition where he used cryptocurrency for a portion of the purchase) and given his social media following and the knowledge of the NBA's reach, he was surely aware of the potential concerns about companies selling unregistered crypto securities, especially to his millions of followers.

v. **The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.**

284.    Oladipo's Voyager promotions were published on public social media accounts, accessible to plaintiffs nationwide including in Florida, and carried by nationwide media, as well as Florida media.

285.    The Voyager/Oladipo partnership specifically targeted Florida residents because Oladipo is a Florida resident and played for a Florida professional sports team – the Miami Heat – during the relevant time period. His social media followers, and fans in general, are likely to be drawn disproportionately from Florida. Likewise, Florida media is likely to cover his interviews, promotions, and other happenings because he is of interest to fans of his team.

## K.  Landon Cassill

### i.  Cassill Partnered with Voyager to Promote Its Platform.

286.    On or about June 2021, Voyager partnered with Landon Cassill, through his company, Landon Cassill, Inc., for Cassill to assist Voyager in soliciting investors in Voyager products, including EPAs, by driving a "Voyager" branded race car at NASCAR Xfinity Series race events in 2021 and actively promoting, marketing, and advertising the Voyager Platform.

287.    Primary car sponsorship included, among others, advertising placed in an agreed location on the race car and on the clothing worn by the driver.

288.    Promotional services included media appearances, meet and greets on the track, off track live events, virtual events, posting on social media, creating a joint NFT, and providing signed memorabilia.

289.    ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

290.    ██████████████████████████████████████████████████████████
████████████████████████

291.  ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

292.  Cassill did not disclose the form or number of payments received under either agreement to the public when promoting Voyager.

### ii. Cassill Engaged in a Sustained and Aggressive Promotion and Advertising Campaign.

293.  Cassill partnered with Voyager as anticipated and provided services in accordance with his agreement. For example, he appeared in still shots and videos used to promote Voyager, shared Voyager co-branded promotions on his social media platforms, displayed Voyager advertising on his race car, and wore Voyager branded merchandise in public, including on his social media platforms and while racing. Specific examples of Cassill's promotions of Voyager follow:

294.  Starting on or about June 2021, Cassill and Voyager launched a series of campaigns designed to bring cryptocurrency and investing in the Voyager Platform to the masses.

295.  On or about June 17, 2021, Voyager issued a press release announcing the partnership, which reads in part:[67]

---

[67] https://www.nascar.com/news-media/2021/06/17/voyager-digital-sponsors-first-nascar-driver-paid-fully-in-cryptocurrency/ (accessed May 8, 2023).

Landon Cassill has partnered with Voyager Digital Ltd. for the remainder of the 2021 NASCAR Xfinity Series season, making him the first driver to be paid fully in cryptocurrency. JD Motorsports announced the 19-race primary sponsorship deal Thursday.

Quite literally and figuratively, Cassill is investing his financial and professional future in Voyager.

"You can say no pun intended, but it really is," Cassill told NASCAR.com. "I check my Voyager account probably 100 times a day."

**RELATED:** Nashville Paint Scheme Preview | Full schedule for Nashville

Voyager operates a crypto-asset trading platform. Cassill, an avid supporter of the cryptocurrency market, met Voyager CEO Steve Ehrlich a couple years ago at a crypto conference and has kept in contact since then. Their budding relationship is what sparked this partnership.

JD Motorsports' No. 4 Chevrolet will officially sport its first Voyager paint scheme in Saturday's Tennessee Lottery 250 at Nashville Superspeedway (3:30 p.m. ET on NBCSN/NBC Sports Live, MRN and SiriusXM NASCAR Radio). Ehrlich and other Voyager employees plan to be in attendance, as the company is excited about joining the sport and gaining a national platform.

"It goes all to education, and what we try to do is educate the masses on why cryptocurrency matters, why digital dollars is where we're going," Ehrlich said. "... I always tend to ask people as customers or people that are wanting to learn more: When was the last time you actually used real greenback dollars? Most people don't. They use debit cards, and everything is electronic anyway. So, this is the next phase of electronic currency."

Cryptocurrency can be turned into everyday cash and transferred to a personal banking account, thus avoiding volatility. Voyager even offers various interest rates to its users; the amount depends on the asset. Voyager will pay Cassill and JD Motorsports in a portfolio of crypto assets led by Litecoin and Voyager Token.

296.    Steve Ehrlich Tweeted out news of the deal that same day:



297.    Voyager also posted an announcement using Cassill's image in a Voyager racing firesuit:



Case 1:22-cv-22353-RKA Document 186-5 *SEALED* on FLSD Docket 01/09/2024 Page 114 of Page 116 of 166

298. On or about June 17, 2021, Cassill announced the deal on Instagram, specifically promoting the EPAs and claim that Voyager offers "no fees on trading":

> "To me crypto has been a part of my personal portfolio for several years, but today I can finally say that it is part of my professional work as well. For the past couple years, @investvoyager CEO Steve Ehrlich and I have spent time together, scratched ideas over dinner, and educated each other about our respective industries. Today, we're launching a 19 race sponsorship on my @jdmotorsports01 4 car to finish out the season. Voyager is going to tap into the community and do lots of cool stuff with me and our fans this year, and I can't wait. Their platform offers incredible interest rates for holding crypto (over 6% for BTC and up to 10% for USDC), and no fees on trading. I'm active on the platform myself and love how easy it is to use."



Cassill began soliciting for Voyager the same day, posting on his social media that users who signed up by clicking his link would receive $25 in free bitcoin.

299.    On or about June 25, 2021, Cassill launched a new promotion. When users signed up

for a Voyager account using the promo code LANDON, they would receive 1,000,000 $SHIB tokens

and $25 bitcoin:



300.    On that same day, Voyager posted about the promotion:



301.     Cassill actively engaged with followers, answering questions about the promotion on social media.[68]

302.     From October 2021 through April 2022, Cassill advertised the Voyager Debit Card and also promoted the interest-bearing nature of the Voyager Account.

303.     Throughout his sponsorship, Cassill tweeted about Interest Day, meaning the day Voyager paid him interest on his account. In the examples below, Cassill promoted or retweeted statements about people receiving numerous interest payments in a single day:



_____

[68]         *See*                  https://twitter.com/landoncassill/status/1408584389701902344;
https://twitter.com/landoncassill/status/1408610466797076482?s=20;
https://twitter.com/landoncassill/status/1408815973566668805.



304.    On or about December 9, 2021, Voyager issued a press release regarding the extension of Cassill's partnership. "Continuing my partnership with Voyager Digital and driving for Kaulig Racing is an incredible opportunity for me," said Cassill in the press release. "I have a world-class partner in Voyager and the best support team in the business with Kaulig Racing. I am excited to not only have a shot to win races, but to also bring awareness to crypto and help educate people in a space that I've been personally invested in for a number of years."

305.    Voyager specifically noted in a Twitter announcement that Cassill is the first NASCAR driver to be fully paid with crypto.



306.     That same day, Kaulig Racing posted a photograph of the redesigned car, featuring the

Crypto For All slogan. A video accompanied the Tweet where Cassill proudly discusses his

relationship with Voyager Steve Ehrlich: [69]

> "I wouldn't have gotten this opportunity if it weren't for Voyager Digital and
> my relationship with Steve Ehrlich, the CEO. I owe this to them. Voyager is
> crypto for all and we're going to bring that to NASCAR."

---

[69] https://twitter.com/KauligRacing/status/1468928419480092674



307.    On or about April 24, 2022, Cassill promoted earning 9% interest on USDC through

Voyager.



Case 1:22-cv-22538-RKA Document 186-55 *SEALED* Entered on FLSD Docket 11/22/2023 Page 120 of
Case 1:22-cv-22538-RKA Document 185 *SEALED* Filed on FLSD Docket 11/22/2023 Page 137 of
Page 137 of 166

308.     Just days before the Daytona 500, where Cassill raced in Florida on February 15, 2022

(just one of Cassill's many races in Florida with his Voyager car and clothing), he went on a Re-

Tweeting spree of Voyager Tweets:

> Replying to Philip @PhilipEytan NFT PRODUCT AND WALLET.
> "Welcome to the next phase of Voyager @investvoyager," Cassill said: "The
> next phase of Voyager's utility. I've been asking for this, love it!"[70]

> Cassill simply Re-Tweeted @investvoyager · "Earnings are in and fiscal Q2 22
> was our best quarter yet with $164.8M in revenue. And the momentum carries
> into calendar 2022 with the debit card rollout, dark mode, international
> expansion, equities trading, and NFTs. #Voyager #CryptoForAll #Crypto."[71]

> Cassill simply Re-Tweeted Turn Left Tribe @TurnLeftTribe's response to
> Voyager's Tweet about their best quarter yet: "Seems as though @landoncassill
> may be one of the few (if not only) driver(s) who have hitched their wagon to
> a proper crypto company.

309.     On or about April 20, 2022, Cassill shared an image of his re-wrapped race car sporting

the Voyager Debit Card on the hood:

---

[70] https://twitter.com/landoncassill/status/1493570010228436998?s=20
[71] https://twitter.com/investvoyager/status/1493558338596098050?s=20



310.     In addition to Cassill's pervasive social media advertisements, he touted Voyager in connection with NASCAR races dozens of times (including two races in Florida, as Ehrlich conceded) before nationally televised audiences. As Cassill is a nationally acclaimed, highly skilled, professional race car driver, NASCAR fans looked up to Cassill. Ehrlich Tr. 104:8-10; 107:5-10.

311.     Under the first agreement, Cassill agreed to promote Voyager, including by displaying Voyager's logo on his race car, at 19 races. On information and belief, Cassill promoted Voyager at each such race in accordance with the terms of his partnership agreement:

- June 19, 2021, Nashville, Tennessee

- June 27, 2021, Pocono, Pennsylvania

- July 3, 2021, Elkhart Lake, Wisconsin

- July 10, 2021, Atlanta, Georgia

- July 17, 2021, Loudon, New Hampshire

- August 7, 2021, Watkins Glen, New York

- August 14, 2021, Indianapolis, Indiana

- August 21, 2021, Brooklyn, Michigan

- August 27, 2021, Daytona Beach, Florida

- September 4, 2021, Darlington, South Carolina

- September 11, 2021, Richmond, Virginia

- September 17, 2021, Bristol, Tennessee

- September 25, 2021, Las Vegas, Nevada

- October 2, 2021, Talladega, Alabama

- October 9, 2021, Charlotte, North Carolina

- October 16, 2021, Fort Worth, Texas

- October 23, 2021, Kansas City, Kansas

- October 30, 2021, Martinsville, Virginia

- November 6, 2021, Phoenix, Arizona

312.    Under the subsequent agreement, Cassill agreed to promote Voyager at all NASCAR races in the 2022 and 2023 seasons. On information and belief, Cassill promoted Voyager at all races up until Voyager's bankruptcy filing, including:

- February 19, 2022, Daytona Beach, Florida

- February 26, 2022, Fontana, California

- March 5, 2022, Las Vegas, Nevada

- March 12, 2022, Phoenix, Arizona

- March 19, 2022, Atlanta, Georgia

- March 26, 2022, Austin, Texas

- April 2, 2022, Richmond, Virginia

- April 8, 2022, Martinsville, Virginia

- April 23, 2022, Talladega, Alabama

- April 30, 2022, Dover, Delaware

- May 7, 2022, Darlington, South Carolina

- May 21, 2022, Fort Worth, Texas

- May 28, 2022, Concord, NH

- June 4, 2022, Portland, Oregon

- June 25, 2022, Nashville, Tennessee

- July 2, 2022, Plymouth, Wisconsin

### iii. Cassill Had Financial Incentives to Induce Class Members to Invest in Voyager and to Trust the Platform.

313.     Cassill had a financial incentive to induce Plaintiffs to invest with Voyager. He was paid millions of dollars in VGX tokens and other digital assets through the Voyager platform – the value of which depended on the financial success of Voyager.

314.     Further, Cassill had every incentive to be an effective promoter of Voyager in order to continue the ambassador relationship and continue receiving his lucrative contracts to help Voyager solicit potential investors in Florida and nationwide.

### iv. The Promotions Were Deceptive and Unlawful.

315.     Cassill did not disclose that he was being compensated by the entity offering and selling the security for promoting the sale of Voyager securities.

316.     Cassill made deceptive statements in his Twitter and Instagram posts promoting Voyager, including statements like "I'm active on the platform myself and love how easy it is to use" and statements suggesting that Voyager earnings (and the Voyager Debit Card) were more reliable than interest-bearing saving accounts at a bank: "Does your savings account pay you 9%? Does it even pay you 0.9%?" and "Use the card ... Another step towards your financial freedom." He even Re-Tweeted a Tweet stating, "I can't wait not only for #Voyager to replace my bank, but for it to supplant my normal paycheck."

### v.  Cassill Knew or Should Have Known They Were Soliciting Or Assisting Voyager Solicit Investments In Unregistered Securities.

317.     Given Cassill's substantial experience in investing crypto-related enterprises (including being the first NASCAR driver to be exclusively paid in crypto), he was surely aware of the regulatory concerns about companies selling unregistered crypto securities, especially to his thousands of followers.

### vi.  The Promotions Were Directed at Plaintiffs in Florida, and Customers Nationwide.

318.     Cassill's Voyager promotions were published on public social media accounts, accessible to plaintiffs nationwide including in Florida, and carried by nationwide media, as well as Florida media. Cassill knew or should have known that his social media followers included people in Florida, particularly given the relative popularity of NASCAR in Florida, which hosts the most famous NASCAR event each year in Daytona Beach.

319.     The Voyager/Cassill partnership specifically targeted Florida residents because Cassill raced in multiple races within the state while driving the Voyager logo car and wearing Voyager clothing. On information and belief, two such races occurred in Daytona Beach, Florida – on August 27, 2021, and February 19, 2022. Furthermore, on information and belief, Cassill promoted Voyager in person and through media appearances within the state of Florida surrounding those races.

## CLASS ACTION ALLEGATIONS

320.     As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure.

321.     The names and addresses of all Class Members are contained in the business records maintained by Voyager and are readily available to Voyager. The Class Members are readily and objectively identifiable. Plaintiffs contemplate that notice will be provided to Class Members by e-mail, mail, and published notice.

## I.     CLASS DEFINITIONS

322.     Plaintiffs seek to represent the following Nationwide Class, if the Court finds that New Jersey's securities statutes apply to all class members,[72] or in the alternative to represent their respective State Subclasses (collectively, "the Classes") under their respective state laws:

> **(1)** **Nationwide Class:** All persons or entities in the United States who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

---

[72] *See, A.S. Goldmen & Co. v. New Jersey Bureau of Sec.*, 163 F.3d 780, 782, 788, (3d Cir. 1999) (finding that N.J.S.A. § 49:3–60 governs sales of unregistered securities to people in other states provided the transaction occurred partially in New Jersey, even if the transaction would have been legal under the laws of the states where investors were being solicited, because New Jersey had an interest in maintaining the integrity of legitimate, in-state sellers and brokers by preventing the state "from being used as a base of operations for crooks marauding outside the state.").

Alternative Classes:

**(2) Florida Subclass:** All persons or entities in the state
of Florida who, within the applicable limitations
period, purchased, repurchased, invested, reinvested,
deposited and/or transferred additional funds to an
EPA and/or purchased, repurchased, invested,
and/or reinvested in VGX Tokens.

**(3) New Jersey Subclass:** All persons in the state of
New Jersey who, within the applicable limitations
period, purchased, repurchased, invested, reinvested,
deposited and/or transferred additional funds to an
EPA and/or purchased, repurchased, invested,
and/or reinvested in VGX Tokens.

**(4) Virginia Subclass:** All persons in the
Commonwealth of Virginia who, within the
applicable limitations period, purchased, repurchased,
invested, reinvested, deposited and/or transferred
additional funds to an EPA and/or purchased,
repurchased, invested, and/or reinvested in VGX
Tokens.

**(5) Alabama Subclass:** All persons in the state of
Alabama who, within the applicable limitations
period, purchased, repurchased, invested, reinvested,
deposited and/or transferred additional funds to an

EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

(6) **Louisiana Subclass**: All persons in the state of Louisiana who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

(7) **California Subclass**: All persons in the state of California who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

(8) **Oklahoma Subclass**: All persons in the state of Oklahoma who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

(9) **Pennsylvania Subclass**: All persons in the Commonwealth of Pennsylvania who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred

additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

(10) **Tennessee Subclass:** All persons in the state of Tennessee who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

(11) **Massachusetts Subclass:** All persons in the Commonwealth of Massachusetts who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

(12) **Connecticut Subclass:** All persons in the state of Connecticut who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

323. Excluded from the Classes are Defendants and their officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

324. Plaintiffs reserve the right to modify or amend the definition of the proposed Nationwide Class or State Subclasses, or to include additional classes or Subclasses, before or after the Court determines whether such certification is appropriate as discovery progresses. Plaintiffs seek certification of the Nationwide Class in part because all of the actual sales of Voyager EPA or VGX Tokens to Plaintiffs and the Class Members (in which Defendants each substantially participated) occurred from Voyager's principal place of business in New Jersey. Although Defendants' promotions, inducements, and solicitations occurred in a variety of states, and were directed at people in Florida and a variety of states, all of the securities transaction emanated from the State of New Jersey and therefore violated New Jersey law. Plaintiffs seek certification of the State Subclasses in the alternative.[73]

---

[73] Plaintiffs' Counsel further represent clients from the states of Arizona, Colorado, Georgia, Illinois, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Ohio, Puerto Rico, South Carolina, South Dakota, Texas, Utah, Washington, Wisconsin, and Wyoming, who are all necessarily putative Class Members of the Nationwide Class, and whose claims may be asserted by class representatives from other states. *See In re Zantac (Ranitidine) Prod. Liab. Litigaion*, No. 21-10335, 2022 WL 16729170, at *4 (11th Cir. Nov. 7, 2022) (holding that class representatives have standing to "represent unnamed class members whose claims fall under different states' laws"). Plaintiffs may seek leave of Court to assert claims for these Class Members on behalf of each of these states and territories to the extent necessary to seek certification of Subclasses on their behalf, also in the alternative to the Nationwide Class.

## II.     RULE 23 ALLEGATIONS

### A.     Requirements Of Rule 23(A).

#### i.   Numerosity.

325.     The Classes are comprised of thousands, if not millions, of consumers nationwide and throughout the states of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, Louisiana, Massachusetts, or Connecticut to whom Voyager offered and/or sold EPA or VGX Tokens. Moreover, thousands, if not millions, of consumers nationwide and throughout these states have executed trades on the Voyager Platform within the applicable limitations period. Membership in the Classes is thus so numerous that joinder of all members is impracticable. The precise number of class members is currently unknown to Plaintiffs but is easily identifiable through Voyager's corporate records. Undersigned Counsel currently represents dozens of Voyager customers who all have collectively sustained millions of dollars in damages proximately caused by the Voyager Platform.

#### ii.  Commonality/Predominance.

326.     This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following:

- whether the EPA or VGX Tokens were unregistered securities;

- whether Defendants' participation and/or actions in Voyager's offerings and sales of EPA or VGX Tokens violate the provisions of the Securities Act and Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, Massachusetts, Connecticut, or Louisiana securities law.

- the type and measure of damages suffered by Plaintiffs and the Classes.

- whether Cuban's description of the Voyager Platform as being "100% commission free" is deceptive, unfair, false and misleading;

- whether Cuban's representations are objectively likely to mislead reasonable consumers to believe that their trading platform operates as "100% commission free";

- whether Cuban's and the Dallas Mavericks' practices violate the UDAP statutes of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, Connecticut, Massachusetts, or Louisiana;

- whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss;

- whether Plaintiffs and Class members are entitled to injunctive relief;

- whether Plaintiffs and Class members are entitled to declaratory relief; and

- whether Plaintiffs and Class members are entitled to consequential damages, punitive damages, statutory damages, disgorgement, and/or other legal or equitable appropriate remedies as a result of Defendants' conduct.

### iii. Typicality.

327. Plaintiffs' claims are typical of the claims of the members of the Classes because all members were injured through the uniform misconduct described above, namely that Plaintiffs and all class members were offered and/or sold Voyager's EPA or VGX Tokens as a result of Defendants' actions and/or participation in the offering and sale of these unregistered securities, or that Plaintiffs and all members were exposed to Defendants' misrepresentations and omissions regarding the Voyager Platform, and Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all such members. Further, there are no defenses available to either Defendant that are unique to Plaintiffs.

### iv.   Adequacy of Representation.

328.   Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs have retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Classes. Plaintiffs anticipate no difficulty in the management of this litigation as a class action. To prosecute this case, Plaintiffs have chosen the undersigned law firms, which have the financial and legal resources to meet the substantial costs and legal issues associated with this type of consumer class litigation.

### 2.   Requirements of Rule 23(b)(3).

329.   The questions of law or fact common to Plaintiffs' and each Classes member's claims predominate over any questions of law or fact affecting only individual members of the Classes. All claims by Plaintiffs and the unnamed members of the Classes are based on the common course of conduct by Defendants (1) in marketing, offering, and/or selling the EPA or VGX Tokens, which are unregistered securities, (2) in making identical and uniform misrepresentations and omissions regarding the functionality of the Voyager Platform, and/or (3) in receiving secret undisclosed compensation for their promotion of the Voyager Platform.

330.   Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

331.   As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Classes as is in the case at bar, common questions will be held to predominate over individual questions.

332.   A class action is superior to individual actions for the proposed Classes, in part because of the non-exhaustive factors listed below:

- Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside nationwide and throughout the states;

- Individual claims by Class members are impracticable because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions;

- There are no known individual Class members who are interested in individually controlling the prosecution of separate actions;

- The interests of justice will be well served by resolving the common disputes of potential Class members in one forum;

- Individual suits would not be cost effective or economically maintainable as individual actions; and

- The action is manageable as a class action.

### C. Requirements of Rule 23(b)(2).

333.    Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of aiding and abetting the offering and/or selling the EPAs, which are unregistered securities, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

334.    Defendants have acted and refused to act on grounds generally applicable to the classes by engaging in a common course of conduct of uniformly identical and uniform misrepresentations and omissions regarding the functionality of the Voyager Platform, and/or in receiving secret undisclosed compensation for their promotion of the Voyager Platform, thereby making appropriate final injunctive relief or declaratory relief with respect to the classes as a whole.

### D. Requirements of Rule 23(c)(4).

335. As it is clear that one of the predominant issues regarding Defendants' liability is whether the EPA or VGX Tokens Voyager offered and/or sold are unregistered securities, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

336. As it is clear that another predominant issue regarding Defendants' liability is whether they have violated the consumer protection and securities laws of Florida, New Jersey, California, Pennsylvania, Oklahoma, Tennessee, Alabama, Virginia, Massachusetts, Connecticut, or Louisiana in making identical and uniform misrepresentations and omissions regarding the functionality of the Voyager Platform, and/or in receiving secret undisclosed compensation for their promotion of the Voyager Platform, utilizing Rule 23(c)(4) to certify the Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

### <u>CHOICE OF LAW</u>

337. Voyager is a cryptocurrency broker that operated a cryptocurrency investing application for iOS and Android mobile devices which allowed trading across many cryptocurrency exchanges and allowed the holder of the account to earn interest on their crypto.

338. Voyager promoted and sold EPA or VGX Tokens to vulnerable and unsophisticated consumers throughout the country from its headquarters in Jersey City, New Jersey.

339. Voyager benefitted from conducting business in New Jersey yet violated relevant New Jersey statutes and regulations to harm consumers both inside and outside state borders. Because the legally pertinent aspects of Voyager's conduct—false promises related to the sale of cryptocurrency and the offer to sell an unregistered security—both occurred within New Jersey, New Jersey has the right to protect its reputation as a place to conduct lawful and legitimate business through the application of New Jersey state law.

340. The New Jersey Uniform Securities Act was enacted to "'prevent [New Jersey] from being used as a base of operations for crooks marauding outside the state.'"[74] The Third Circuit, relying on long-established precedent, has recognized that "states are permitted to regulate in-state components of interstate transactions so long as the regulation furthers legitimate in-state interests."[75] In *A.S. Goldmen & Co.*, the Third Circuit interpreted N.J.S.A. § 49:3–60 to apply to the sale of unregistered securities to out-of-state consumers, provided that the offer to sell the security occurred in New Jersey, even if the transaction would have been legal under the laws of the states where investors were being solicited.[76]

341. New Jersey has a resounding interest in protecting its reputation as a place to conduct lawful securities transactions and has the most significant relationship to the conduct at issue. All of the pertinent conduct related to the securities transactions emanated from New Jersey. Further, Voyager developed and disseminated its advertising from New Jersey, and reached agreement with each Defendant to provide spokesperson and promotional services from the state of New Jersey. For these reasons, this Court should apply New Jersey law to these claims.

342. In the alternative, this Court should apply the law of the state with the next most significant relationship to the conduct at issue – the state from which each plaintiff purchased the

---

[74] *Caspersen as Tr. For Samuel M.W. Caspersen Dynasty Tr. V. Oring*, 441 F. Supp. 3d 23, 41 (D.N.J. 2020) quoting *Stevens v. Wrigley Pharmaceutical*, 9 N.J. Misc. 385, 386 (N.J. Ch. Div. 1931).
[75] *A.S. Goldmen & Co. v. New Jersey Bureau of Sec.*, 163 F.3d 780, 782 (3d Cir. 1999).

[76] *Id.*; *see also In re Libor-Based Fin. Instruments Antitrust Litig.,* 2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) (collecting cases and stating "[c]ourts have always recognized that states have a legitimate interest in regulating securities transactions that occur, in relevant part, within the state."); *Simms Inv. Co. v. E.F. Hutton & Co. Inc.*, 699 F. Supp. 543, 545 (M.D.N.C. 1988) ("Blue Sky laws protect two distinct public policies. First, the laws protect resident purchasers of securities, without regard to the origin of the security. Second, the laws protect legitimate resident issuers by **exposing** illegitimate resident issuers to liability, *without regard to the markets* of the issuer.") (emphasis added).

security. Individual classes under Plaintiffs' respective state laws are pled herein, only in the alternative to the nationwide New Jersey Class.

<div style="border:1px solid">

**THE NATIONWIDE CLAIMS, OR, IN THE ALTERNATIVE, THE NEW JERSEY CLAIMS**

</div>

## COUNT ONE
### Violations of the New -Jersey-Uniform-Securities-Law
### N.J.S.A. §§ 49:3-60 *et seq.*
### (Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey Subclass)

343.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

344.     The New Jersey Uniform Securities Law ("NJUSL") section 49:3-60, *et seq.*, provides that it is unlawful for any person to sell or offer to sell a security within the State of New Jersey unless the security is exempt under section 49:3-50, is a federally covered security, or is registered pursuant to Section 49.

345.     The Voyager EPAs and/or VGX Tokens are each a security pursuant to section 49:3-49(m) of the NJUSL.

346.     The Voyager EPAs and/or VGX Tokens were and are required to be registered with the Bureau pursuant to section 49:3-60.

347.     The Voyager EPAs and/or VGX Tokens offered for sale to Plaintiffs and Class members have not been registered with the Bureau, are not exempt from registration, and are not federally covered.

348.     Defendants, having partnered with Voyager to broadly solicit potential investors with press conferences, promotional statements, contests, coupon codes, offers of free cryptocurrency, sign-up incentives, and other strategies to entice people to purchase cryptocurrency on Voyager, and having received millions of dollars in cash and VGX crypto to do so, per N.J.S.A. 49:3-71(d), Defendants materially assisted in and actively participated in Voyager's offer and sale of the

unregistered EPAs and/or VGX Tokens to Plaintiffs and the members of the Class, and accordingly, violated section 49:3-60.

349.    Additionally, because Defendants knew or should have known about Voyager's sale of unregistered EPAs and/or VGX Tokens, and substantially and materially assisted Voyager in the offer and sale of unregistered EPAs and/or VGX Tokens to Plaintiffs and the members of the class, Defendants are secondarily liable as aider-abettors and violated section 49:3-60.

<div align="center">

**COUNT TWO**
**Violations of the New Jersey Consumer Fraud Act**
**N.J.S.A §§ 56:8-1 *et seq.***
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey Subclass)**

</div>

350.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

351.    The New Jersey Consumer Fraud Act ("NJCFA") section 56:8-1, *et seq.*, prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." § 56:8-2.

352.    Defendants have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of its trade and/or sale of merchandise in the State of New Jersey. Cuban's statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because Voyager in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform. Defendants' omissions constitute both deceptive and unfair trade practices because the false representations and omissions made by Defendants have a tendency or capacity to deceive consumers, such as Plaintiffs and Class members, into investing in the Company's falsely touted business and are

immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Those acts and omissions include, among other things as more fully alleged above:

- knowingly and intentionally concealing Defendants' specific roles and interests in Voyager;

- knowingly and intentionally using and/or failing to disclose the use of Defendants to "instill trust" in uninformed investors to promote the financial benefits of a highly speculative and risky investment in Voyager, in an effort to induce them to purchase Voyager EPAs and/or VGX Tokens;

- Making statements, either knowingly and intentionally, negligently, or with reckless disregard for their veracity, or that they should have known were false, that the Voyager Platform is "100% Commission-Free" although Voyager did in fact did charge Plaintiff and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform.

353.     The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. § 56:8-19.

354.     Defendants assisted in Voyager's sale and advertisement of merchandise as those terms are defined in section 56:8-1(d) of the NJCFA and generally, as all states use uniform definitions. Voyager EPAs constitute any objects, wares, goods, commodities, services, or anything offered, directly or indirectly to the public for sale and Defendants advertised such merchandise when it directly or indirectly publicized, by dissemination, solicitation, or indorsement or circulation to induce directly or indirectly any person to acquire title or interest in said merchandise.

355.     Plaintiffs and Class members are natural persons and/or legal representatives and accordingly, Plaintiffs and Class members are "person(s)" as that term is defined in section 56:8-1(d).

356.     Defendants' unconscionable commercial practices, deceptive acts, and misrepresentations caused damages to Plaintiffs in the amount of their lost investments.

357.     Plaintiffs and Class members have a private right of action against Defendants, and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person, interest, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. § 56:8-19.

358.     Plaintiffs and Class members have suffered, and will continue to suffer, irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

## COUNT THREE
### Declaratory Judgment under the New Jersey Declaratory Judgment Act
### N. J. S. A. §§ 2A:16-51 *et seq.*
### (Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey Subclass)

359.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–342 as if fully set forth herein.

360.     This Count is asserted against Defendants under Section 2A:16-59 of the New Jersey Revised Statutes.

361.     The Declaratory Judgments Act ("NJDJA") section 2A:16-51 *et seq.*, authorizes courts to declare rights, status and other legal relations so as to afford litigants relief from uncertainty and insecurity. *Chamber of Com. of U. S. v. State*, 89 N.J. 131, 140 (1982). To maintain such an action, there must be a "justiciable controversy" between adverse parties, and plaintiff must have an interest in the suit.

362.     Plaintiffs and Class members have an obvious and significant interest in this lawsuit.

363. Plaintiffs and members of the Class purchased EPAs and/or VGX Tokens, based in part on justifiable reliance on Defendants' misrepresentations and omissions regarding the Voyager Platform as further described hereinabove.

364. If the true facts had been known, including but not limited to that the EPAs and/or VGX Tokens are unregistered securities, the Voyager Platform does not work as represented, and Defendants were paid exorbitant sums of money to peddle Voyager to the nation, Plaintiffs and Class members would not have purchased EPAs and/or VGX Tokens in the first place.

365. Thus, pursuant to NJDJA section 2A:16-51, there is a justiciable controversy over whether the EPAs and/or VGX Tokens were sold illegally, and whether Defendants illegally solicited their purchases from Plaintiffs and Class members. § 2A:16-51.

366. Plaintiffs and Class members seek an order declaring that the EPAs and/or VGX Tokens were securities required to be registered with the SEC and state regulatory authorities, that the Voyager Platform did not work as represented, and Defendants were paid exorbitant sums of money to peddle Voyager to the nation.

## COUNT FOUR
### Civil Conspiracy
### to Violate and Assist in the Violation of the New Jersey Consumer Fraud Act
### N.J.S.A §§ 56:8-1 *et seq.*
### (Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Sayed individually and on behalf of the New Jersey Subclass)

367. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

368. Voyager directed Defendants to engage in and worked together with Defendants to engage in deceptive conduct, promotions, and marketing tactics designed to target unsophisticated and innocent consumers in order to get them to download the Voyager Mobile application in violation of NJCFA section 56:8-1.

369. Voyager represented to Plaintiffs that the Voyager Platform was "100% Commission-

free" to unfairly obtain an edge over their competition who openly disclose the commissions and fees they charge on cryptocurrency trades, when Voyager did in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Deceptive Voyager Platform. Voyager also misrepresented Voyager's FDIC insured status, repeatedly stating that assets held in the Deceptive Voyager Platform were as "safe" as if they were in a bank, misleading customers and prospective customers with the false impression that any cryptocurrency assets held on the Deceptive Voyager Platform were FDIC insured.

370.     Moreover, Defendants engaged in deceptive marketing tactics by failing to disclose that they were being compensated by Voyager for promoting the sale of their securities to consumers in Florida and throughout the United States. These deceptive marketing tactics and misrepresentations include statements about how easy it was to use the Voyager mobile application and how Voyager earnings were more reliable than interest bearing accounts at a bank.

371.     Voyager entered into one or more agreements with Defendants with the purpose of making these misrepresentations and/or omissions to induce Plaintiffs and consumers to invest in Voyager and/or use the Voyager Platform.

372.     Defendants engaged in unlawful acts with Voyager, namely, the misrepresentations and omissions of material facts made to Plaintiffs concerning the undisclosed commissions on cryptocurrency trades made on the Voyager Platform, Voyager's FDIC insured status, and their failure to disclose pertinent information related to their compensation.

373.     Defendants' conspiracy substantially assisted or encouraged the wrongdoing conducted by Voyager; further, Defendants had knowledge of such deception and wrongdoing, because of their experience and extensive relationship with Voyager, as described above and as such, knew that the representations and omissions made to Plaintiffs were deceptive. In the alternative, Plaintiffs argue that Defendants should have known. Plaintiffs plead that Defendants participated in

the deceptions and misrepresentations by participating in the creation of Voyager's marketing strategy which contained clear misstatements and omit material facts that should have been disclosed to Plaintiffs, and by other actions described in this complaint.

374. Defendants' conspiracy with Voyager caused damages to Plaintiffs in the amount of their lost investments.

---

**THE FLORIDA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS**

---

**COUNT FIVE**
**Violations of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201 *et seq.***
**((Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiffs Gold, Karnas, and Webb individually and on behalf of the Florida Subclass)**

375. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

376. This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") section 501.201, *et seq*. The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2).

377. Plaintiffs and Class members are consumers —i.e., individuals—as defined by section 501.203. Defendants are engaged in trade or commerce within the meaning of the FDUTPA, and other state statutes, in that they are engaged in advertising, soliciting, providing, offering, or distributing, whether by sale or otherwise, a good or service, or any property whether tangible or intangible.

378. FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1).

379.     Defendants' unfair and deceptive practices as described herein are objectively likely to mislead and have misled consumers acting reasonably in the circumstances.

380.     Defendants have violated the FDUTPA by engaging in practices that are both deceptive and/or unfair as described herein, which offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

381.     Plaintiffs and Class members have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform after witnessing Defendants' advertisements and downloading the Voyager App in the amount of their lost investments.

382.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

383.     Pursuant to sections 501.211(2) and 501.2105, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

384.     Defendants still utilize many of the deceptive acts and practices described above. Plaintiffs and the other members of the Class have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 501.211(1) entitles Plaintiffs and Class members to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

## COUNT SIX
### Violations of the Florida Securities and Investor Protection Act
### Fla. Stat. §§ 517.07 *et seq.*
### ((Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiffs Gold, Karnas, and Webb individually and on behalf of the Florida Subclass)

385.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

386.     The Florida Securities and Investor Protection Act ("FSIPA"), section 517.07(1) *et seq.*,
provides that it is unlawful and a violation for any person to sell or offer to sell a security within the
State of Florida unless the security is exempt under section 517.051, is sold in a transaction exempt
under § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

387.     Section 517.211 extends liability to any "director, officer, partner, or agent of or for
the seller, if the director, officer, partner, or agent has personally participated or aided in making the
sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns
the security, or for damages, if the purchaser has sold the security."

388.     The Voyager EPAs and/or VGX Tokens are each a security pursuant to section
517.021(22)(a), as described more fully herein.

389.     The EPAs and/or VGX Tokens sold and offered for sale to Plaintiffs and Class
members were not:

- exempt from registration under § 517.051;

- a federal covered security;

- registered with the Office of Financial Regulations (OFR); or

- sold in a transaction exempt under § 517.061.

390.     Voyager sold and offered to sell the unregistered EPAs and/or VGX Tokens to
Plaintiffs and the members of the Class.

391.     Defendants are agents of Voyager pursuant to § 517.211, tasked with acting on behalf
of Voyager within the state of Florida and beyond to broadly solicit potential investors to purchase
cryptocurrency on Voyager. Voyager held out Defendants as possessing sufficient authority to sell
securities when, it publicly collaborated or partnered with Cuban, for instance, in a way that sanctioned
Cuban to discuss selling Voyager investments and related cryptocurrencies. The average and

reasonable person looking at these collaborations and brand partnerships would reasonably believe that Voyager held out Defendants as possessing sufficient authority to sell securities.

392.     More specifically, Voyager acknowledged its agency relationship with Defendants and their roles as agents who would materially participate in the solicitation and sale of cryptocurrency of Voyager within the state of Florida and beyond when Voyager Tweeted, for instance, that it "could not be more excited to partner with the Dallas Mavericks to make crypto more accessible for all." Similarly, Voyager acknowledged its agency relationship with Gronkowski, "a Brand Ambassador, Voyager Shareholder, and holder of the Voyager Token, VGX" when it announced its partnership with Gronkowski and stated that together, they were launching a series of campaigns designed to "bring crypto investing to the mainstream … This partnership is a continuation of a series of professional sports relationships Voyager is putting together." Additionally, Voyager acknowledged its agency relationship with Oladipo and Cassill when, for example, it allowed them to ring the Toronto Stock Exchange bell on behalf of Voyager.

393.     Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs and/or VGX Tokens to Plaintiffs and the members of the Class. As a result of this assistance, Defendants violated FSIPA section 517.07 *et seq.*

---

**THE LOUISIANA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS**

---

### COUNT SEVEN
**Violations of the Unfair Trade Practices and Consumer Protection Law
R.S. §§ 51:1401, *et seq.***
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff
Manganiello individually and on behalf of the Louisiana Subclass)**

394.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

395.    This cause of action is brought pursuant to Louisiana's Unfair Trade Practices and Consumer Protection Law ("LUTPA"), which prohibits deceptive acts or practices in the conduct of any trade or commerce.

396.    Plaintiffs are consumers —i.e., any persons who use, purchase, or lease goods or services—as defined by section 1402(1) of the LUTPA and other state statutes. Defendants are engaged in trade or commerce as defined by section 1402(10) of the LUTPA and other state statutes.

397.    Section 1405(A) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

398.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

399.    Defendants have violated the LUTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous and injurious to consumers.

400.    Plaintiffs have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising in the amount of their lost investments.

401.    The harm suffered by Plaintiffs was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

402.    Pursuant to section 1409, Plaintiffs bring this action and makes claims for actual damages, attorneys' fees and costs.

**COUNT EIGHT**
**Violations of the Louisiana Securities Law**
**La. Stat. Ann. §§ 51:701 *et seq.***
**((Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Manganiello individually and on behalf of the Louisiana Subclass)**

403.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

404.     Section 51:705 of the Louisiana Securities Law ("LSL") provides that it is unlawful for any person to offer for sale or sell a security within the State of Louisiana unless the security or transaction is exempt under sections 51:708 or 709, is a federally covered security, or is registered.

405.     The Voyager EPAs and/or VGX Tokens are each a security pursuant to section 51:702 (15)(a), as described more fully herein.

406.     The EPAs and/or VGX Tokens sold and offered for sale to Plaintiffs and Class members were not exempt from registration under section 51:708 or 709, federal covered securities, or registered.

407.     Voyager sold and offered to sell the unregistered EPAs and/or VGX Tokens to Plaintiffs and the members of the Class.

408.     Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs and/or VGX Tokens to Plaintiffs and Class members. As a result of this assistance, Defendants violated section 51:705.

---

### THE ALABAMA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS

---

### COUNT NINE
**Violations of the Alabama Deceptive Trade Practices Act**
**Ala. Code §§ 8-19-1 *et seq.***
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Newsom individually and on behalf of the Alabama Subclass)**

409.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

410.     This cause of action is brought pursuant to the Alabama Trade Practices Act, ("ADTPA") section 8-19-1 *et seq.* The stated purpose of the ADTPA is to "protect the interest of both the consuming public and the legitimate businessperson." § 8-19-2.

411.    Plaintiffs and Class members are consumers as defined by section 8-19-3(2) and Defendants are engaged in trade or commerce within the meaning of the ADTPA, as described more fully hereinabove.

412.    Section 8-19-5(27) declares unlawful "[e]ngaging in any [] unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

413.    Defendants' unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

414.    Defendants have violated the ADTPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

415.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform.

416.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

417.    Pursuant to section 8-19-10, Plaintiffs and consumers in the Class bring this cause of action for actual damages, attorneys' fees and costs.

418.    Plaintiffs and the other Class members have suffered and will continue to suffer irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices. Section 8-19-10 entitles Plaintiffs and Class members to obtain both declaratory or injunctive relief to put an end to Defendants' unfair and deceptive scheme.

**COUNT TEN**
**Violations of the Alabama Securities Act**
**Ala. Code §§ 8-6-1,** *et seq.*
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff**
**Newsom individually and on behalf of the Alabama Subclass)**

419.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

420.    Section 8-6-17 of the Alabama Securities Act ("ASA") provides that it is unlawful for any person to sell or offer to sell a security within the State of Alabama unless the security is registered pursuant to Ch. 6, exempt from registration under § 8-6-10, or the transaction is exempt under § 8-6-11.

421.    The Voyager EPAs and/or VGX Tokens are each a security pursuant to § 8-6-2(10), as more fully described hereinabove.

422.    The EPAs and/or VGX Tokens sold and offered for sale to Plaintiffs and Class members were not:

- registered;

- exempt from registration under § 8-6-10; or

- part of a transaction exempt under § 8-6-11.

423.    Voyager sold and offered to sell the unregistered EPAs and/or VGX Tokens to Plaintiffs and Class members.

424.    Voyager, with Defendants' material assistance, offered and sold the unregistered EPAs to Plaintiffs and Class members within the state of Alabama. As a result of this assistance, Defendants violated Chapter 6 of the ASA.

---

**THE VIRGINIA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS**

---

**COUNT ELEVEN**
**Violations of the Virginia Consumer Protective Act**
**Code of Virginia §§ 59.1-196 *et seq.***
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Ayer**
**individually and on behalf of the Virginia Subclass)**

425.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

426.     This cause of action is brought pursuant to the Virginia Consumer Protection Act of 1977 ("VCPA"). The stated purpose of the VCPA is to "promote fair and ethical standards of dealings between suppliers and the consuming public." § 59.1-197.

427.     Section 59.1-200 declares unlawful "[u]sing any [] deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

428.     Defendants are "supplier(s)" and engage in "consumer transaction(s)" as defined by the Act and as described herein. Defendants engaged in, among other things, the advertisement, sale, or offering for sale of goods or services to be used primarily for personal purposes.

429.     Defendants have violated the VCPA by engaging in the unfair, fraudulent, and deceptive practices as described herein.

430.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair, fraudulent, and deceptive practices and acts in the amount of their lost investments as more fully described herein.

431.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the unfair, fraudulent, and deceptive practices of Defendants as more fully described herein.

432. Pursuant to section 59.1-204, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

### COUNT TWELVE
### Violations of the Virginia Securities Act
### Code of Virginia §§ 13.1–501 *et seq.*
### (Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Ayer individually and on behalf of the Virginia Subclass)

433. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

434. Section 13.1-507 of the Virginia Securities Act ("VSA") provides that it is unlawful for any person to sell or offer to sell a security "unless (i) the security is registered under this chapter, (ii) the security or transaction is exempted by this chapter, or (iii) the security is a federal covered security."

435. The Voyager EPAs and/or VGX Tokens are each a security pursuant to Section 13.1-501, as more fully described herein.

436. The Voyager EPAs and/or VGX Tokens offered for sale to Plaintiffs and Class members have not been registered, are not exempt from registration, and are not federal securities.

437. Defendants assisted in and actively participated in Voyager's offer and sale of the unregistered Voyager EPAs and/or VGX Tokens to Plaintiffs and the members of the Class, as more fully described herein.

438. As a result of these actions, Defendants violated sections 13.1-501 of the VSA.

> ### THE CALIFORNIA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS

### COUNT THIRTEEN
**For Violations of the Unfair Competition Law Business & Professions Code § 17200, *et seq.***
**(Plaintiffs Dorn and Gates Individually and on behalf of the California Class)**

439.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

440.    California's Unfair Competition Law, Business & Professions Code §§ 17200 *et seq.* (the "UCL") prohibits acts of unlawful and unfair competition, including any "unlawful, unfair or fraudulent business act or practice," any "unfair, deceptive, untrue or misleading advertising" and any act prohibited by Business & Profession Code §17500.

441.    Defendants have committed business acts and practices that violate the UCL by aiding and abetting the breaches of fiduciary duties, fraudulent and unfair conduct, and unlawful conduct. Defendants' conduct as alleged above constitutes unlawful competition in that, for the reasons set forth above, said acts and practices violate the Corporations Code.

442.    The conduct of Defendants as alleged above also constitutes unfair competition in that, for the reasons set forth above, the acts and practices offend public policy and are unethical, oppressive, and unscrupulous, and are substantially injurious to the public.

443.    Defendants' conduct was a proximate cause of the injuries to Plaintiffs and the California Class alleged herein, and it caused and continues to cause substantial injury to Plaintiffs and the members of the California Class. By reason of the foregoing, Defendants should be required to pay restitution to Plaintiffs and members of the California Class.

## COUNT FOURTEEN
### Violations of the California Securities Law
### Cal. Corp. Code §§ 25110 *et seq.*
### (Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiffs Dorn and Gates individually and on behalf of the California Subclass)

444. Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

445. Section 25110 of the California Securities Law ("CSL") prohibits the offer or sale by any person in California of securities that are not qualified through registration. CSL section 25503 affords a statutory cause of action to victimized investors for violations of section 25110. Additionally, section 25504.1 extends liability under Section 25503 to any person who materially assists in a violation of section 25110 and makes them jointly and severally liable with any other person liable under section 25503.

446. Defendants materially assisted Voyager in the offering and selling of EPAs and/or VGX Tokens Securities in California without being properly registered or qualified for offer or sale either with any federal or California regulator in violation of section 25503. [52]

447. Moreover, CSL section 25210(b) provides: No person shall, … on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless [a licensed] broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

---

[52] Plaintiffs contend that secondary liability for materially assisting a strict liability violation of the qualification requirements of a violation pursuant to section 255030 does not require proof that Defendants intended "to deceive or defraud." However, Plaintiffs in the alternative contend that even if so, Defendants' knowledge of and participation in Voyager's non-compliance with the CSL establishes their intent to deceive investors regarding the EPAs and/or VGX Tokens.

448.     Defendants breached section 25210(b) by encouraging Voyager to offer and sell the EPAs and/or VGX Tokens Securities despite the fact that such securities were not qualified under the CSL.

449.     Additionally, CSL section 25501.5 affords a statutory cause of action to victimized investors for violations of Section 25210(b).

450.     Defendants are accordingly joint and severally liable to Plaintiffs for rescissionary damages under section § 25504.1.

451.     Plaintiffs hereby conditionally tender their Voyager Securities in accordance with section § 25503.

---

## THE PENNSYLVANIA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS

### COUNT FIFTEEN
**Violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
73 Pa. Stat. §§ 201-1 *et seq.*
(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Peters individually and on behalf of the Pennsylvania Subclass)**

452.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

453.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPA"), §§ 201-1 *et seq.* prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of section 201-2(4).

454.     Defendants have engaged in, and continue to engage in, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the Commonwealth of Pennsylvania, as described more fully hereinabove. As defined by in section 201-2(3), Defendants engaged in trade and commerce through their advertising, offering for sale or distribution of the Voyager platform and its services.

455.    More specifically, for instance, Defendants' statements regarding the Voyager Platform being "100% Commission-Free" were false and misleading because Voyager in fact did charge Plaintiffs and Class members undisclosed commissions on cryptocurrency trades made on the Voyager Platform. Defendants' representations regarding Voyager's FDIC insured status were also false.

456.    Defendants' acts and omissions as described more fully herein constitute unfair trade practices because they are fraudulent or deceptive and create a likelihood of confusion and misunderstanding. § 201-2(4)(xxi).

457.    Plaintiffs and Class members are "person(s)"—i.e., natural persons—as that term is defined in section 201-2(2).

458.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unconscionable practices and acts of false advertising by paying undisclosed commissions on cryptocurrency trades on the Voyager Platform after witnessing Defendants' advertisements and downloading the Voyager App in the amount of their lost investments. Plaintiffs and the Class have a private right of action against Defendants, and they are entitled to recover, in addition to their actual damages, an award of reasonable attorney's fees, filing fees and reasonable costs of suit. § 201-9.2(a).

459.    Plaintiffs and the Class have suffered, and will continue to suffer, irreparable harm if Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

### COUNT SIXTEEN
**Violations of the Pennsylvania Securities Act of 1972**
**70 Penn. Stat. § 1-102 *et seq.***
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Peters individually and on behalf of the Pennsylvania Subclass)**

460.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

461.     Section 1-201 of the Pennsylvania Securities Act ("PSA") provides that it is unlawful for any person to sell or offer to sell a security within the Commonwealth of Pennsylvania unless the security is exempt under the act, is a federally covered security, or is registered pursuant to the act.

462.     Section 1-502 of the PSA creates a cause of action against any "person who violates section 201" who shall be liable to the person purchasing the security offered or sold in violation of section 201.

463.     Section 1-503 extends liability to any person who "materially aids" in a violation of the Pennsylvania Securities Act and makes them jointly and severally liable with any other person liable under the Act.

464.     The Voyager EPAs and/or VGX Tokens are each a security pursuant to 1-102(t), as described more fully herein.

465.     The Voyager EPAs and/or VGX Tokens offered for sale to Plaintiffs and Class members were not registered, were not exempt from registration, and were not federally securities, as described more fully herein.

466.     These sales were made with Defendants' material assistance, as described more fully herein.

467.     As a result of these actions, Defendants violated section 1-201 and are liable to Plaintiffs pursuant sections 1-502 and 503 of the PSA.

> **THE TENNESSEE CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS**

### COUNT SEVENTEEN
**Violations of the Tennessee Consumer Protection Act**
**Tenn. Code § 47-18-101 *et seq.***
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Ehrentraut individually and on behalf of the Tennessee Subclass)**

468.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

469.     This cause of action is brought pursuant to the Tennessee Consumer Protection Act ("TCPA"), section 47-18-101 *et seq.*

470.     The stated purpose of the TCPA is to "protect consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within th[e] state." § 47-18-102(2).

471.     Plaintiffs and Class members are consumers as defined by section 47-18-103(2) and Defendants are engaged in trade or commerce as defined by section 47-18-103(19), both of which are described more fully herein.

472.     The TCPA declares unlawful "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce." § 47-18-104(a). This includes actions which cause "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods" and cause "likelihood of confusion or misunderstanding as to affiliation, connection or association with, or certification by, another." § 47-18-104(2)-(3).

473.     Defendants' unfair and deceptive practices as described herein are objectively likely to cause—and have caused— confusion and misunderstanding to consumers acting reasonably in the circumstances.

474.     Defendants have violated the TCPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

475.     Plaintiffs allege that the unfair and deceptive acts and practices described herein are distinct from the marketing or sale of a security, which is expressly excluded by section 47-18-109(h).

476.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments, as described more fully herein.

477.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

478.     Pursuant to section 47-18-109, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT EIGHTEEN
### Violations of Tennessee Securities Act of 1980
### Tenn. Code § 48-1-122 *et seq.*
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Ehrentraut individually and on behalf of the Tennessee Subclass)**

479.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

480.     Section 48-1-104(a) of the Tennessee Securities Act ("TSA") makes it unlawful to sell a security in Tennessee unless the security is registered, exempted, or the security is a covered security as defined in the act.

481.     The Voyager EPAs and/or VGX Tokens are each a security pursuant to Tenn. Code § 4-1-102(20)(A), as described more fully herein.

482.     The Voyager EPAs and/or VGX Tokens offered for sale to Plaintiffs and Class members were not registered, were not exempt from registration, and were not covered, as described more fully herein.

483.     As a result of these actions, Defendants violated section 48-1-104(a) and are liable to Plaintiffs and Class members pursuant to TSA section 48-1-122.

---

**THE OKLAHOMA CLAIMS, AS AN ALTERNATIVE TO THE NATIONWIDE CLAIMS**

---

### COUNT NINETEEN
**Violations of the Oklahoma Consumer Protection Act**
**Okla. Stat. Ann. tit. 15, § 751 *et seq.***
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Garrison individually and on behalf of the Oklahoma Subclass)**

484.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

485.     This cause of action is brought pursuant to the Oklahoma Consumer Protection Act ("OCPA") section 751 *et seq.*

486.     The Oklahoma Consumer Protection Act provides that an "unfair trade practice" is "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." § 752(14). It declares unlawful any unfair or deceptive trade practice "as defined in section 752." § 753(20).

487.     Plaintiffs and Class members are persons as defined by section 752(1). Defendants are engaged in a "consumer transaction" as defined by section 752(2), and as described more fully herein.

488.     Defendants have violated the OCPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

489.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments.

490.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

491.     Pursuant to section 761.1 of the OCPA, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

## COUNT TWENTY
### Violations of the Oklahoma Uniform Securities Act of 1980
### Okla. Stat. Tit. 71, §§ 1-101 *et seq.*
### (Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Garrison individually and on behalf of the Oklahoma Subclass)

492.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

493.     71 Section 1-301 of the Oklahoma Securities Act ("OSA") makes it unlawful to sell a security in Oklahoma unless the security is registered, exempted, or the security is a covered security as defined in the act.

494.     The Voyager EPAs and/or VGX Tokens are each a security pursuant to 71 Okla. Stat. § 1-102(32), as described more fully herein.

495.     As a result of these actions, Defendants violated section 1-102(32) and are liable to Plaintiffs pursuant to section 1-509 for both primary and secondary violations of Oklahoma securities law, as described more fully herein.

| IN THE ALTERNATIVE, THE MASSACHUSETTS CLAIMS |
|---|

## COUNT TWENTY-ONE
### Violations of the Massachusetts Consumer Protection Act
### Mass. Gen. Laws ch. 93A, § 1.1 *et seq.*
### (Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Dagnoli individually and on behalf of the Massachusetts Subclass)

496.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

497.    The Massachusetts Consumer Protection Act ("MCPA"), ch. 93A, section 4 prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by sections 4.5 and 4.7, 4.8, and 4.10.

498.    Plaintiffs and Class members are consumers and Defendants are engaged in trade or commerce as defined in section 7.5, as described more fully herein.

499.    The MCPA declares unlawful "conduct which is not actually false, but which is likely to mislead a Plaintiff" and "false statements made intentionally, knowingly, recklessly, or negligently." § 4.5. The MCPA also declares unlawful unfair conduct—"acts that are unfair, although not necessarily deceptive or fraudulent," including conduct that "violates at least an established concept of unfairness." §§ 4.7, 4.8, 4.10.

500.    Defendants have engaged in, and continue to engage in, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the Commonwealth of Massachusetts, as described more fully hereinabove. Defendants' deceptive and unfair practices as described herein are objectively likely to mislead—and have misled—consumers acting reasonably in the circumstances.

501.    Defendants have violated the MCPA by engaging in the unfair and deceptive practices as described herein, which offend public policies and are immoral, unethical, unscrupulous, and injurious to consumers.

502.    Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices in the amount of their lost investments.

503.    The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

504.    Pursuant sections 9(4) and 11.3, Plaintiffs and consumers in the Class make claims for actual damages, attorneys' fees and costs.

### COUNT TWENTY-TWO
**Violations of the Massachusetts Uniform Securities Act**
**Mass. Gen. Laws Ann. Pt. I, tit. XV, Ch. 110A, Pt. I *et seq.***
**(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Dagnoli individually and on behalf of the Massachusetts Subclass)**

505.    Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

506.    Section 301 of the Massachusetts Uniform Securities Act ("MUSA") makes it unlawful to sell a security in Massachusetts unless the security is registered, exempted, or the security is a covered security as defined in the act.

507.    Section 410 creates a cause of action against "any person who offers or sells a security in violation of sections 201(a), 301, or 405(b)" who shall be liable to the person purchasing the security offered or sold in violation of section 301.

508.    Section 410(b) extends liability to "every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale" and makes them jointly and severally liable with any other person liable under MUSA.

509.    The Voyager EPAs and/or VGX Tokens are each a security pursuant to section 401, as described more fully hereinabove.

510.     The Voyager EPAs and/or VGX Tokens offered for sale to Plaintiffs and Class members were not registered, were not exempt from registration, and were not covered, as described more fully hereinabove.

511.     As a result of these actions, Defendants violated Mass. Gen. Laws Ann. ch. 110A, § 301 and are liable to Plaintiffs pursuant to sections 410 and 410(b) of the MUSA.

| IN THE ALTERNATIVE, THE CONNECTICUT CLAIMS |
| :---: |

### COUNT TWENTY-THREE
**Violations of the Connecticut Unfair Trade Practices Act,
Conn. Gen. Stat. Section 42-110a *et seq.*
(Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Provino
individually and on behalf of the Connecticut Subclass)**

512.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as if fully set forth herein.

513.     Section 42-110b(a) of the Connecticut Unfair Trade Practices Act ("CUTPA") declares unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."

514.     Plaintiffs and Class members are persons as defined by Section 42-110a(3), Conn. Gen. Stat, and Defendants are engaged in trade or commerce within the meaning of the CUTPA.

515.     Defendants unfair and deceptive practices as described herein are objectively likely to mislead – and have misled – consumers acting reasonably in the circumstances.

516.     Defendants have violated the CUTPA by engaging in the unfair and deceptive practices as described herein.

517.     Plaintiffs and consumers in the Class have been aggrieved by Defendants' unfair and deceptive practices and acts of false advertising in the amount of their lost investments.

518.     The harm suffered by Plaintiffs and consumers in the Class was directly and proximately caused by the deceptive and unfair practices of Defendants, as more fully described herein.

519.     Pursuant to section 42-110g, Conn. Gen. Stat., Plaintiffs and consumers in the Class

make claims for actual damages, attorneys' fees and costs.

## COUNT TWENTY-FOUR
### Violations of the Connecticut Uniform Securities Act
### Conn. Gen. Stat., Ch. 672A, Section 36b-2 *et seq.*
### (Plaintiffs individually and on behalf of the Nationwide Class, alternatively Plaintiff Provino individually and on behalf of the Connecticut Subclass)

520.     Plaintiffs repeat and re-allege the allegations contained in paragraphs 1–342 above, as

if fully set forth herein.

521.     Section 36b-16 of the Connecticut Uniform Securities Act ("CUSA") makes it

unlawful to offer or sell a security in Connecticut unless the security is registered, exempted, or the

security is a covered security as defined in the act.

522.     Section 36b-29(a) creates a cause of action against any person who offers or sells a

security in violation of Section 36b-16, who "is liable to the person buying the security, who may sue

either at law or in equity to recover the consideration paid for the security, together with interest at

eight per cent per year from the date of payment, costs and reasonable attorneys' fees, less the amount

of any income received on the security, upon the tender of the security, or for damages if he no longer

owns the security.

523.     Section 36b-29(c) extends liability to "every partner, officer or director of" a person

liable under Section 36b-29(a), "every person occupying a similar status or performing similar

functions, every employee of such a person who materially aids in the act or transaction constituting

the violation and every broker-dealer or agent who materially aids in the act or transaction constituting

the violation" and makes them jointly and severally liable with and "to the same extent" of any other

person liable under CUSA.

524.     The Voyager EPAs and/or VGX Tokens are each a security pursuant to Section 36b-

3, as described more fully hereinabove.

525.     The Voyager EPAs and/or VGX Tokens offered for sale to Plaintiffs and Class members were not registered, were not exempt from registration, and were not covered, as described more fully hereinabove.

526.     As a result of these actions, Defendants violated Conn Gen. Stat. Ch. 672A, § 36b-16 and are liable to Plaintiffs pursuant to sections 36b-29(a) and 36b-29(c) b) of the CUSA.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for a judgment on behalf of themselves and the Classes:

a.     Certifying the Classes as requested herein;

b.     Awarding actual, direct and compensatory damages;

c.     Awarding restitution and disgorgement of revenues if warranted;

d.     Awarding declaratory relief as permitted by law or equity, including declaring Defendants' practices as set forth herein to be unlawful;

e.     Awarding injunctive relief as permitted by law or equity, including enjoining Defendants from continuing those unlawful practices as set forth herein, and directing Defendants to identify, with Court supervision, victims of their conduct and pay them all money they are required to pay;

f.     Awarding statutory, punitive, and multiple damages, as appropriate;

g.     Awarding attorneys' fees and costs; and

h.     Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as to all claims so triable.

Dated:  June 9, 2023                          Respectfully submitted,


By: **/s/ Adam M. Moskowitz**                 By: /s/ David Boies
Adam M. Moskowitz                             David Boies
Florida Bar No. 984280                        (admitted *pro hac vice*)
adam@moskowitz-law.com                        Alexander Boies
Joseph M. Kaye                                (admitted *pro hac vice*)
Florida Bar No. 117520                        Brooke Alexander
joseph@moskowitz-law.com                      (admitted *pro hac vice*)
Barbara C. Lewis                              **BOIES SCHILLER FLEXNER LLP**
barbara@moskowitz-law.com                     342  Main Street
Florida Bar No. 118114                        Armonk, NY 10504
**THE MOSKOWITZ LAW FIRM, PLLC**              Phone: (914) 749–8200
2 Alhambra Plaza, Suite 601                   dboies@bsfllp.com
Coral Gables, FL 33134                        aboies@bsfllp.com
Telephone: (305) 740-1423                     balexander@bsfllp.com

*Co-Counsel for Plaintiffs and the Class*     Stephen Neal Zack
                                              Florida Bar No. 145215
                                              Tyler Ulrich
                                              Florida Bar No. 94705
                                              **BOIES SCHILLER FLEXNER
                                              LLP** 100 SE 2nd St., Suite 2800
                                              Miami, FL 33131
                                              Office: 305-539-8400
                                              Fax: 305-539-1307
                                              szack@bsfllp.com

                                              *Co-Counsel for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the forgoing was filed on June 9, 2023, with the Court

via CM/ECF system, which will send notification of such filing to all attorneys of record.

By: <u>/s/ Adam M. Moskowitz</u>
Adam M. Moskowitz
Florida Bar No. 984280