Case 1:22-cv-22538-RKA   Document 155-27 *SEALED*   Entered on FLSD Docket 06/09/2023   Page 1 of 522

# Plaintiffs' Exhibit 280

CONFIDENTIAL

Page 1

```
 1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
 2
 3   PIERCE ROBERTSON et al,      )
     on behalf of himself and     )
 4   others similarly             )
     situated,                    )
 5                                )
             Plaintiff,           )
 6                                )
     VS.                          )         CASE NO.:
 7                                ) 22-cv-22538-ALTMAN/Reid
     MARK CUBAN and DALLAS        )
 8   BASKETBALL LIMITED, d/b/a    )
     Dallas Mavericks, et al,     )
 9                                )
             Defendants.          )
10
     -----------------------------------------------------
11        CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
12            ORAL AND VIDEOTAPED DEPOSITION OF
                        KYLE TAPPLY
13                   FEBRUARY 16, 2023
     -----------------------------------------------------
14
15            ORAL AND VIDEOTAPED DEPOSITION OF RYAN MACKEY,
16   produced as a witness at the instance of the Plaintiff and
17   duly sworn, was taken in the above-styled and numbered
18   cause on Thursday, February 16, 2023, from 9:04 a.m. to
19   6:26 p.m., before Kari Behan, CSR, RPR, CRR, a Texas
20   certified machine shorthand reporter, at the offices of
21   Winston & Strawn LLP, 2121 N. Pearl Street, Suite 900,
22   Dallas, Texas, pursuant to the Federal Rules of Civil
23   Procedure 30.
24
25   Job No. FLA 5681930
```

CONFIDENTIAL

Page 2

```
 1                A P P E A R A N C E S
 2    FOR THE PLAINTIFFS AND THE CLASS:
 3        ALEXANDER M. BOIES, ESQ.
          BOIES SCHILLER FLEXNER LLP
 4        55 Hudson Yards
          New York, New York 10001
 5        (212) 446-2300
          aboies@bsfllp.com
 6
             - and -
 7
          JOSEPH M. KAYE, ESQ. (REMOTELY)
 8        ADAM M. MOSKOWITZ, ESQ. (REMOTELY)
          BROOKE ALEXANDER, ESQ. (REMOTELY)
 9        THE MOSKOWITZ LAW FIRM, PLLC
          2 Alhambra Plaza, Suite 601
10        Coral Gables, Florida 33134
          (305) 740-1423
11        joseph@moskowitz-law.com
          adam@moskowitz-law.com
12        balexander@bsfllp.com
13
             - and -
14
          STEPHEN NEAL ZACK, ESQ. (REMOTELY)
15        BOIES SCHILLER FLEXNER LLP
          100 SE 2nd Street, Suite 2800
16        Miami, Florida 33131
          305-539-8400
17        szack@bsfllp.com
18
19    FOR THE DEFENDANTS, MARK CUBA AND DALLAS MAVERICKS:
20        CHRISTOPHER E. KNIGHT, ESQ. (REMOTELY)
          FOWLER WHITE BURNETT, P.A.
21        Brickell Arch
          1395 Brickell Avenue
22        14th Floor
          Miami, Florida 33131
23        (305) 789-9210
          cknight@fowler-white.com
24
25
```

CONFIDENTIAL

Page 3

```
 1    APPEARANCES (CONTINUED):
 2    FOR THE DEFENDANTS, MARK CUBAN, ET AL:
 3         STEPHEN A. BEST, ESQ.
           RACHEL O. WOLKINSON, ESQ.
 4         BROWN RUDNICK
           601 Thirteenth Street NW, Suite 600
 5         Washington, DC 20005
           (202) 536-1737
 6         sbest@brownrudnick.com
           rwolkinson@brownrudnick.com
 7
 8         TIFFANY B. LEITZ, ESQ.
           BROWN RUDNICK
 9         Seven Times Square
           New York, New York 10036
10         (212) 209-4731
           tlietz@brownrudnick.com
11
12
      ALSO PRESENT (REMOTELY):
13
           Rejane Passos
14
           Sekou Lewis, General Counsel, Dallas Mavericks
15
16    THE VIDEOGRAPHER:
17         Luis Acevedo, Videographer, Veritext Legal
18
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 4

```
 1                         - - -
                       I N D E X
 2                         - - -
 3   EXAMINATION OF KYLE TAPPLY                    PAGE
 4
 5     BY MR. BOIES............................... 11
 6     BY MR. COOK...............................245
 7     BY MR. BOIES..............................263
 8     BY MR. COOK...............................264
 9     CHANGES AND SIGNATURE.....................265
10     REPORTER'S CERTIFICATION..................267
11                       *   *   *
12                   E X H I B I T S
13   EXHIBITS            DESCRIPTION           PAGE
14    Exhibit 29  Dallas Mavericks + Voyager     181
                  Launch Outline (Tentative and
15                Conceptual),
                  MAVSCUBAN00000018961 through
16                MAVSCUBAN00000018970
17    Exhibit 30  E-mail dated 9/15/2021,         25
                  MAVSCUBAN00016454 and
18                00016455, CONFIDENTIAL
19    Exhibit 31  E-mail dated 9/15/2021,         39
                  Subject: RE: Gronk + VGX -
20                does it get any better?,
                  MAVSCUBAN00018517 through
21                MAVSCUBAN00018520,
                  CONFIDENTIAL
22
      Exhibit 32  E-mail dated 9/15/2021,         61
23                Subject: FW: Confidential
                  Partnership, MAVSCUBAN00012330
24                through MAVSCUBAN00012332,
                  CONFIDENTIAL
25
```

CONFIDENTIAL

Page 5

```
 1   EXHIBITS (CONTINUED):
 2     Exhibit 33  E-mail dated 9/16/2021,          68
                   Subject: Voyager,
 3                 MAVSCUBAN00012350 and
                   MAVSCUBAN00012352,
 4                 CONFIDENTIAL
 5     Exhibit 34  E-mail dated 9/17/2021,          70
                   MAVSCUBAN00018769 through
 6                 MAVSCUBAN00018774,
                   CONFIDENTIAL
 7
       Exhibit 35  E-mail dated 9/17/2021,          86
 8                 MAVSCUBAN00012460 through
                   MAVSCUBAN00012468,
 9                 CONFIDENTIAL
10     Exhibit 36  E-mail dated 9/17/2021,         102
                   Subject:  RE: Mavs + Voyager
11                 Connect, MAVSCUBAN00012366
                   through MAVSCUBAN00012371,
12                 CONFIDENTIAL
13     Exhibit 37  E-mail dated 9/21/2021,         117
                   Subject: Re: Partnership
14                 Outline, MAVSCUBAN00005324
                   through MAVSCUBAN00005328,
15                 HIGHLY CONFIDENTIAL -
                   ATTORNEYS' EYES ONLY
16
       Exhibit 38  E-mail dated 9/21/2021,         125
17                 Subject: RE: Partnership
                   Outline, MAVSCUBAN00015015
18                 through MAVSCUBAN00015022,
                   HIGHLY CONFIDENTIAL -
19                 ATTORNEYS' EYES ONLY
20     Exhibit 39  E-mail dated 9/22/2021,         146
                   Subject: RE: Partnership
21                 Outline, MAVSCUBAN00005336
                   through MAVSCUBAN00005339,
22                 CONFIDENTIAL
23     Exhibit 40  Invite dated 9/22/2021,         152
                   MAVSCUBAN00016511,
24                 CONFIDENTIAL
25
```

Page 6

```
1    EXHIBITS (CONTINUED):
2      Exhibit 41  E-mail dated 9/24/2021,        155
                   Subject: RE:  Thank you,
3                  MAVSCUBAN00006662 through
                   MAVSCUBAN00006666,
4                  CONFIDENTIAL
5      Exhibit 42  E-mail dated 10/6/2021,        169
                   Subject: Re: Employee
6                  Education / Mavs / PR Launch,
                   MAVSCUBAN00010268 through
7                  MAVSCUBAN00010269,
                   CONFIDENTIAL
8
       Exhibit 43  E-mail dated 10//2021,         177
9                  MAVSCUBAN00018335,
                   CONFIDENTIAL
10
       Exhibit 44  E-mail dated 10/13/2021,       131
11                 MAVSCUBAN00015331 through
                   MAVSCUBAN00015371,
12                 CONFIDENTIAL
13     Exhibit 45  E-mail dated 10/18/2021,       194
                   Subject: Sales Report,
14                 MAVSCUBAN00005978 through
                   MAVSCUBAN00005980,
15                 CONFIDENTIAL
16     Exhibit 47  E-mail dated 10/182021,        198
                   Subject RE: Voyager Press
17                 Conference - Player
                   Appearance, MAVSCUBAN00015904
18                 through 15909, CONFIDENTIAL
19     Exhibit 48  E-mail dated 10/21/2021,       203
                   Subject: FW: Voyager/Mavs
20                 Announcement,
                   MAVSCUBAN00010330 through
21                 MAVSCUBAN00010338,
                   CONFIDENTIAL
22
       Exhibit 49  E-mail dated 10/25/2021,       208
23                 Subject: RE: FW: Timeline for
                   Mark - Voyager,
24                 MAVSCUBAN00018031 through
                   MAVSCUBAN0018043, CONFIDENTIAL
25
```

Page 7

1   EXHIBITS (CONTINUED):

2     Exhibit 50      E-mailed dated 11/3/2021,      215
                      MAVSCUBAN00018316,
3                     CONFIDENTIAL

4     Exhibit 51      E-mail dated 11/4/2021,        217
                      MAVSCUBAN00018318,
5                     CONFIDENTIAL

6     Exhibit 52      E-mailed dated 11/10/2021,     221
                      Subject: RE: Voyager In-Game
7                     Promos, MAVSCUBAN00013219
                      through MAVSCUBAN00013224,
8                     CONFIDENTIAL

9     Exhibit 53      E-mail dated 11/22/2021,       224
                      Subject: Re: Sales Report,
10                    MAVSCUBAN00010353 and
                      MAVSCUBAN00010354,
11                    CONFIDENTIAL

12    Exhibit 53A     E-mail dated 11/22/2021, RE:   234
                      Sales Report,
13                    MAVSCUBAN00010355 through
                      MAVSCUBAN00010357,
14                    CONFIDENTIAL

15    Exhibit 54      E-mail dated 12/15/2021,       236
                      Subject Re: Mavs x Voyager
16                    Education Session,
                      MAVSCUBAN00008875 through
17                    MAVSCUBAN00008911,
                      CONFIDENTIAL
18

      Exhibit 55      E-mail dated 1/6/2022,         237
19                    Subject: RE: Voyager Gaming
                      Hub Naming,
20                    MAVSCUBAN00015676 and
                      MAVSCUBAN00015677,
21                    CONFIDENTIAL

22    Exhibit 56      E-mail dated 2/7/2022,         238
                      Subject: RE: Mavs Gaming Hub
23                    renaming, MAVSCUBAN00007247
                      and MAVSCUBAN00007248,
24                    CONFIDENTIAL

25

CONFIDENTIAL

Page 8

```
 1    EXHIBITS (CONTINUED):
 2     Exhibit 57      E-mail dated 3/14/2022,        241
                       Subject: FW: Voyager Logo
 3                     Update, MAVSCUBAN00007281
                       through MAVSCUBAN00007285,
 4                     CONFIDENTIAL
 5     Exhibit 58      E-mail dated 4/7/2022,         241
                       Subject: FW: 619090,
 6                     MAVSCUBAN00007490 through
                       MAVSCUBAN00007291,
 7                     CONFIDENTIAL
 8     Exhibit 59      E-mail dated 6/13/2022,        242
                       Subject: Sales Report,
 9                     MAVSCUBAN00005907 through
                       MAVSCUBAN00005909,
10                     CONFIDENTIAL
11     Exhibit 102     E-mail dated 9/16/2021,         70
                       MAVSCUBAN00018360,
12                     CONFIDENTIAL
13     Exhibit 106     Invite dated 9/17/2021,         96
                       MAVSCUBAN00016466,
14                     CONFIDENTIAL
15     Exhibit 108     E-mail dated 9/17/2021,         97
                       MAVSCUBAN00018364,
16                     CONFIDENTIAL
17     Exhibit 133     E-mail dated 10/13/2021,       192
                       Subject: RE: Mavs Meet
18                     Marla, MAVSCUBAN00016404,
                       CONFIDENTIAL
19
20     Exhibit T1      Document Titled "Create Your   257
                       Password"
21
       Exhibit T2      Voyager Account Order          259
22                     History
23     Exhibit T4      Voyager Lost Amount            261
24
25
```

CONFIDENTIAL

Page 9

1
2                     PRIOR EXHIBITS REFERENCED
3   EXHIBITS                                        PAGE
4     Exhibit 4.................................  50
5     Exhibit 7................................. 229
6     Exhibit 15................................ 150
7     Exhibit 17................................ 210
8     Exhibit 22................................ 218
9     Exhibit 24................................ 113
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 10

```
 1                       PROCEEDINGS:

 2           (Thursday, February 16, 2023, 9:04 a.m.)

 3                    THE VIDEOGRAPHER:  We are on the record for

 4      the deposition of Kyle Tapply.  The time is 9:04 a.m. on

 5      February 16, 2023, in the matter of Pierce Robertson, Et

 6      Al., versus Mark Cuban, Et Al., Civil Action No.

 7      22-cv-22538 being held in the United States District Court

 8      for the Southern District of Florida.

 9                    The court reporter is Kari Behan; the

10      videographer is Luis Acevedo; both are representatives of

11      Veritext.

12                    Will counsel state their appearances for the

13      record.

14                    MR. BOIES:  Alex Boies from Boies Schiller

15      Flexner, LLP, for the plaintiffs.

16                    MR. COOK:  Stephen Cook on behalf of the

17      witness, Kyle Tapply.  With me today is Stephen Best and

18      Tiffany Lietz also from Brown Rudnick on behalf of the

19      defendants and Kyle Tapply.

20                    MR. BEST:  And Rachel --

21                    MR. ZACK:  Steve -- Steve Zack from Boies

22      for the plaintiff.

23                    MR. BOIES:  And -- and virtually --

24                    MS. ALEXANDER:  Brooke Alexander --

25                    MR. BOIES:  Yep.
```

CONFIDENTIAL

Page 11

1              MS. ALEXANDER:  -- also Boies Schiller.

2              MR. BOIES:  And virtually we have Steve Zack

3    and Brooke Alexander from Boies Schiller Flexner, and

4    Adam Moskowitz and Joey Kaye from the Moskowitz Firm.

5              MR. LEWIS:  Sekou Lewis, Dallas Mavericks,

6    General Counsel.

7              THE COURT REPORTER:  Mr. Tapply, would you

8    please raise your right hand.

9              Do you solemnly swear the testimony you're

10   about to give will be the truth, the whole truth, and

11   nothing but the truth, so help you God?

12             THE WITNESS:  Yes.

13             THE COURT REPORTER:  Thank you.

14                       EXAMINATION

15   BY MR. BOIES:

16        Q.  Good morning, Kyle.  Where are you from?

17        A.  Denton, Texas.

18        Q.  Denton, Texas.

19             How far is that from here in Downtown

20   Dallas?

21        A.  About an hour.

22        Q.  About an hour from Dallas.

23             Where did you go to college?

24        A.  Dallas Baptist University.

25        Q.  What was your first job out of college?

CONFIDENTIAL

Page 12

1        A.  I sold radio for CBS Radio.

2        Q.  How long did you work at that?

3        A.  A little less than a year.

4        Q.  And your next job out of college after that job

5    at CBS radio, where -- where was that?

6        A.  The Dallas Mavericks.

7        Q.  Dallas.

8            So you've been with the Dallas Mavericks as

9    your second job out of college?

10       A.  Yes.

11       Q.  How long -- how long ago was that?

12       A.  I've been full-time with the Mavericks for about

13   15 years and a month or two.

14       Q.  So that's about 2007?

15       A.  Yes.

16       Q.  Yes.

17           And were you with the Dallas Mavericks when

18   they won their championship in 2011?

19       A.  Yes.

20       Q.  Was that a very exciting moment for you?

21       A.  Yes.

22       Q.  Did you get to go to any of the finals games?

23       A.  Yes.

24       Q.  Who were they -- who were they playing?

25       A.  Miami.

CONFIDENTIAL

Page 13

1     Q.  Were they -- did you get to go to Miami to go to

2  any of those games?

3     A.  Yes.

4     Q.  Did you get to go to Game 6?

5     A.  Yes.

6     Q.  Did you get to sit with Mark Cuban?

7     A.  No.

8     Q.  Did you see Mark Cuban at the game in Game 6?

9     A.  Yes.  He was standing on the floor holding the

10  trophy.

11     Q.  And -- and you were also in the stands in Miami

12  when Mark Cuban was standing on the floor holding the

13  trophy?

14     A.  I was in the stands, yes.

15     Q.  Did that win generate a lot of Dallas Mavericks

16  fans nationwide?

17          MR. COOK:  Object to form.

18          THE WITNESS:  Yes.

19  BY MR. BOIES:

20     Q.  In -- in your opinion --

21     A.  Yes.

22     Q.  -- in your experience, have you met people from

23  lots of different places who have become Dallas Mavericks

24  fans as a result of that win in -- that championship win?

25     A.  Yes.

CONFIDENTIAL

Page 14

1    Q.  Did it generate a lot of Dallas Mavericks fans in

2  Florida?

3              MR. COOK:  Object to form.

4              THE WITNESS:  We have fans everywhere.

5  BY MR. BOIES:

6    Q.  In your experience, did that particular win,

7  beating the Miami Heat in Game 6 and LeBron James, have

8  you met people from Florida that have had specific love --

9  are MFFLs, Mavs Fans For Life, from Florida as a result of

10  -- of those games?

11    A.  I have not met any MFFLs in Florida.  I have

12  friends that are Magic fans and Heat fans.

13    Q.  If -- okay.

14              But you -- but you don't know of anybody who

15  has become a Mav- -- a Mavs Fan For Life as a result of

16  that championship who live in Florida?

17    A.  I have not met anyone in Florida who's an MFFL.

18    Q.  Do you believe that there are MFFLs that live in

19  Florida?

20              MR. COOK:  Object to form.

21              THE WITNESS:  I'm sure there are plenty of

22  Mavs fans, just like there are plenty of Mavs fan

23  everywhere, in -- in Florida.

24  BY MR. BOIES:

25    Q.  Do you know how Mark Cuban celebrated that

Case 1:22-cv-22538-RKA   Document 155-27 *SEALED*   Entered on FLSD Docket 09/24/2023   Page 16 of
Page 265 of 522
CONFIDENTIAL

Page 15

 1    victory on -- that Game 6 victory?

 2         A.  I believe he went to a club, but I wasn't there,

 3    so I...

 4         Q.  Okay.  After -- after that victory -- you've been

 5    with the -- what -- what was your position at that time?

 6         A.  I've been in the corporate sponsorship team in

 7    this -- in a sales-related role my entire full-time

 8    career.

 9         Q.  Have you been promoted since -- since that time?

10         A.  I've had two promotions.

11         Q.  When were those promotions?

12         A.  I don't know the exact dates.

13         Q.  Approximately, when was your last promotion?

14         A.  Maybe three years ago --

15         Q.  What --

16         A.  -- four years ago.

17         Q.  What position were you promoted to?

18         A.  Senior director of corporate sponsorships/sales.

19         Q.  And -- and you've been in that position for three

20    or four years; is that correct?

21         A.  Something like that.

22         Q.  What are your responsibilities?

23         A.  I help find new sponsors and bring in revenue for

24    the department.

25         Q.  How do you find new sponsors?

CONFIDENTIAL

Page 16

```
 1        A.  Wide array of new business that we see on -- on
 2    -- you know, new -- new business that we see coming from
 3    other sports teams doing deals, companies that come up
 4    that are startups that, you know, get funding.  There's a
 5    wide variety of different ways to find different
 6    partners/sponsors.
 7        Q.  Do you solicit them over the Internet?
 8        A.  Yes.
 9        Q.  Do you solicit them on Twitter?
10        A.  I have done that once or twice, but that's not a
11    normal way to...
12        Q.  Were you successful in -- in those solicitations?
13        A.  Like, finding a contact or asking someone,
14    like -- I can't remember the specific call -- the
15    opportunity, but I don't -- and I don't remember, like, if
16    it led to a deal or anything.
17        Q.  But you use all sorts of avenues and all sorts of
18    ways to find them?
19        A.  Correct.
20        Q.  And is one of the ways you find them through
21    agencies?
22    ██   ██  ████████████████████████
23    ████
24        Q.  Is there a level of scrutiny that you give, or
25    due diligence, for companies that you find on your own
```

CONFIDENTIAL

Page 17

1    versus companies that come to you through an agency?

2    ██  ███████████████████████████████████████████

3    ████████████████████████████████████████████

4    ███████████  ██████████████████████████████

5    ██████████████████████████████

6         Q.  Have you had any experience personally having a

7    company brought to you that you found -- from an agency,

8    that you found unsavory --

9              MR. COOK:  Object to form.

10              THE WITNESS:  Sav- --

11   BY MR. BOIES:

12        Q.  -- or unreputable?

13              MR. COOK:  Object to form.

14              MR. BOIES:  Can you repeat?  I don't

15   understand.

16   BY MR. BOIES:

17        Q.  In your experience, have you had any companies

18   that have come to you from an agency that you have found

19   thereafter to be unreputable?

20        A.  No.

21        Q.  Have you ever decided that a company was not

22   reputable enough for a partnership or a sponsorship with

23   the Mavericks?

24        A.  As it relates to an agency or just in general?

25        Q.  In general.

CONFIDENTIAL

Page 18

```
 1        A.  Yes, we have decided not to do deals with
 2   companies.
 3        Q.  Have -- have you made those decisions, or has
 4   someone else made -- sorry.
 5                 Have you made those decisions?
 6        A.  It's a collective -- it's typically a collective
 7   decision.
 8        Q.  Is there a company that comes to mind that you
 9   have declined to do because of their reputation?
10                 MR. COOK:  Object to form.
11                 THE WITNESS:  I don't recall.
12   BY MR. BOIES:
13        Q.  What is -- what is your background in
14   cryptocurrency prior to this deal?
15        A.  Entry-level, not -- not super sophisticated on
16   it.
17        Q.  Did you own a wallet before -- do you know what a
18   "wallet" is?
19        A.  Yes.
20        Q.  Did you know what a wallet was before this deal?
21        A.  Yes.
22        Q.  Did you own a wallet prior to this deal?
23        A.  I -- yes.  My neighbor is a crypto fan, and he
24   had paid me in crypto just to get started.
25        Q.  What did he pay you for?
```

CONFIDENTIAL

Page 19

1        A.   Our wives went somewhere, and -- and he was

2    paying me in crypto for the shared --

3        Q.   For reimbursement?

4        A.   -- costs.   Yeah.

5        Q.   And -- and when your neighbor suggest -- got you

6    into crypto, what -- what wallet was it?

7        A.   I believe it was BlockFi.

8        Q.   And, approximately, when was that?

9        A.   Probably sometime in 2021, summer.

10       Q.   So about six months, five months before this

11   deal?

12       A.   Around then.

13       Q.   Do you -- do you remember which cryptocurrency

14   you were paid in?

15       A.   Bitcoin.

16       Q.   Do you remember how much Bitcoin you received?

17       A.   No.

18       Q.   Do you remember what the value of the Bitcoin was

19   when you received it?

20       A.   No.   It was a small portion.   Like, I received,

21   like, a very small amount --

22       Q.   In -- in --

23       A.   -- in Bitcoin.

24       Q.   Hundredths of a Bitcoin?

25       A.   Yeah.

Page 20

1      Q.   Thousandths?

2      A.   I don't remember -- I don't remember the amount.

3      Q.   At this time, Bitcoin -- do you remember

4  approximately the price range that Bitcoin was trading at

5  in the summer of 2011 -- '21?

6      A.   No.  I mean, it would be a guess.  It -- I mean,

7  it was, I think, around 18 or 20.  I -- I could be wrong,

8  so -- it was such a small amount.  It was a few hundred

9  dollars that he gave me.

10     Q.   Do you remember what the Bitcoin price was in

11 October of 2021?

12     A.   I don't know the exact price, but it was --

13     Q.   Range?

14     A.   -- 40s, 50s.  It was something -- it was

15 something like that.

16     Q.   High on the -- on the overall value of Bitcoin,

17 from your perspective --

18     A.   I believe it was at the top --

19     Q.   -- in October of 2021 --

20          MR. COOK:  Wait.

21 BY MR. BOIES:

22     Q.   -- it was near the top, correct?

23     A.   Correct.

24     Q.   How did you get involved in this deal?

25     A.   I was brought into this deal by Ryan Mackey.

CONFIDENTIAL

Page 21

1      Q. When was that?

2      A. Sometime either late September or early October

3 of 2021.

4      Q. So if -- do -- do you know how the deal got

5 brought to Mr. Mackey?



CONFIDENTIAL

Page 22

1             MR. COOK:  Object to form.

2             THE WITNESS:  I was not involved in those

3    conversations.

4    BY MR. BOIES:

5        Q.  So when -- do you often work with people at your

6    level?

7        A.  Yes.

8        Q.  So is Kory Nix and Clay Christopher on your level

9    professionally?

10       A.  Yes.

11       Q.  What -- and that is the Sen- -- and what is your

12   title?

13       A.  Senior Director.

14       Q.  And that -- and -- and they have that same title

15   as you?

16       A.  I believe so.

17       Q.  Do the three of you report to the same person?

18       A.  Yes.

19       Q.  Who is that?

20       A.  Ryan Mackey.

21       Q.  Who else do you report to?

22       A.  Billy Phillips is our VP of corporate sponsorship

23   as well, but we typically report to Ryan.

24       Q.  Do -- similar to you, Clay, and Kory filling the

25   same equivalent spots, do Billy and Ryan fill equivalent

CONFIDENTIAL

Page 23

1   spots, or -- or is Ryan a head or is Ryan, sort of, more

2   of a lay- -- you know, hands-on individual?

3                    MR. COOK:  Object to the form.

4                    THE WITNESS:  I don't understand.

5   BY MR. BOIES:

6        Q.  Does Ryan report to Billy?

7        A.  No.

8        Q.  Does Billy report to Ryan?

9        A.  Yes.

10       Q.  So when Billy reports to Ryan, does Billy also

11  report to Mark?

12                   MR. COOK:  Object to form.

13  BY MR. BOIES:

14       Q.  Mark Cuban?

15       A.  Yes.  I don't -- he reports to Mackey.  I mean --

16       Q.  And does Mackey report -- who does Mackey -- who

17  does Mr. Mackey report to?

18       A.  Our CEO.

19       Q.  Who is your --

20       A.  Well, now, we have a chief revenue officer, so he

21  would report in to Theo, and then in to our CEO,

22  Cynt Marshall.

23       Q.  Does Ryan Mackey report to Mark Cuban?

24                   MR. COOK:  Object to form.

25                   THE WITNESS:  He reports to Cynt, as -- from

Case 1:22-cv-22538-RKA   Document 155-27 *SEALED* Entered on FLSD Docket 09/24/2023   Page 25 of
Page 265 of 522

Page 24

1   our org chart.

2   BY MR. BOIES:

3       Q.  But never to Mark Cuban?

4               MR. COOK:  Object to form.

5   BY MR. BOIES:

6       Q.  Does Cynt report to Mark Cuban?

7       A.  Correct.

8       Q.  So the -- you -- you would -- the -- the line of

9   -- sort of, the chain of command goes:  Mark Cuban, Cynt,

10  Ryan, Billy, Kory, Clay, and you now?

11      A.  There's -- there's a new CRO in there, but yes.

12      Q.  So does the CRO come before the CEO?

13      A.  No.  It goes Cynt, as the CEO, and now we have a

14  chief revenue officer, who is Theo, and Ryan now reports

15  in to him.

16      Q.  Is that chain of command always kept --

17  meaning -- sorry.  Let me rephrase.

18              Does -- does Ryan send an e-mail to Cynt,

19  and then Cynt sends an e-mail to Mark?

20              MR. COOK:  Object to the form of the

21  question.

22              THE WITNESS:  On different occasions, we

23  will -- Ryan can send e-mails -- Ryan would send e-mails

24  to Cynt, and then Cynt would send e-mails to Mark, but he

25  could also e-mail Mark himself.  But he reports to Cynt.

Page 25

BY MR. BOIES:

2      Q.  Does Cynt approve everything or -- and that --

3  and -- or does Mark approve everything?

4           MR. COOK:  Object to form.

5           THE WITNESS:  Cynt approves a majority --

6  most of our deals if we have to get her involvement.

7  BY MR. BOIES:

8      Q.  For this deal, who approved this deal?

9      A.  I -- I wasn't involved in the approval, outside

10  of when Cynt had told us that the deal was going to

11  happen.

12      Q.  When did Cynt tell you the deal was going to

13  happen?

14      A.  I don't know the exact date.  It was around the

15  -- the time that we were announcing the deal.

16      Q.  So -- okay.  Let's just start with some

17  documents.

18           Here's Exhibit 30.

19           (Exhibit 30 was marked for identification.)

20  BY MR. BOIES:

21      Q.  Who -- who is this e-mail -- at the -- at the

22  bottom of the page, who is this e-mail from?

23      A.  Ryan Mackey.

24      Q.  And who is it to?

25      A.  It is to Clay, myself, and Kory, and copied

CONFIDENTIAL

Page 26

1    Billy Phillips.

2        Q.  And -- and -- and is he copying Billy Phillips to

3    keep Billy abreast because you, Kory, and Clay report to

4    Billy?

5                MR. COOK:  Object to the form.

6                THE WITNESS:  He's -- yes, he's our VP, so

7    he would be included in conversations like this.

8    BY MR. BOIES:

9        Q.  And -- and what makes this an unprecedented move?

10               MR. COOK:  Object to form.

11               THE WITNESS:  ███████████████████████

12   ████████████████████████████████████████████████████

13   ██████   ███████████████████████████████████████

14   ████████████████████████████████████████████████████

15   █████████████

16   BY MR. BOIES:

17       ███   █████████████████████████████████████████

18   ████████████████████████

19       ███   ██████████████████   ████████████████████████

20   ████████████████████████████████████████████████████

21   ███████████████████████

22       Q.  When you say "category," what does -- what are

23   you referring to?

24       A.  The crypto category, because it was a -- it was

25   an up-and-coming sponsor across the sports.

Page 27

1     Q.  Had -- did -- did Clay and Kory have as much

2  experience in crypto as you did?

3     A.  I can't speak to their experience.

4     Q.  Do you know if they had a wallet at the time?

5     A.  I can't recall.

6     Q.  Do you have any -- did you have conversations

7  with them about cryptocurrency in the summer of 2021?

8     A.  I'm sure we had conversations.  I don't recall if

9  they had crypto wallets.

10     Q.  Did you ever send them cryptocurrency?

11     A.  No.

12     Q.  Did you ever refer them to a cryptocurrency

13  exchange?

14     A.  No.

15     Q.  What about cryptocurrency at this time made it

16  such an attractive category for you personally?

17     A.  Across the sports industry, they were spending --

18  across, you know, naming rights, deals, they were just --

19  it was a good lead because there was a lot of activity

20  across multiple crypto brands/companies.

21     Q.  What other cryptocurrency brands were you

22  speaking to personally?

23     A.  ██████████████████████████████████████████

24  ████████ who had just had a deal with ████████  Those were

25  the ones I was -- I was specifically -- ████████ was another

CONFIDENTIAL

Page 28

1   one that we had talked to.

2       Q.  Are those cryptocurrency exchanges?

3       A.  Some of them are.

4       Q.  Are they just generally related into the

5   cryptocurrency world?

6               MR. COOK:  Object to form.

7               THE WITNESS:  Yes.

8   BY MR. BOIES:

9       Q.  Were you excited when this deal -- when -- when

10  you received this e-mail offering this unprecedented move

11  to work with Kory and Clay on this -- on this -- in this

12  space?

13              MR. COOK:  Object to the form.

14  BY MR. BOIES:

15      Q.  Did this -- you were excited for that, correct?

16      A.  Yes.

17      Q.  Do you get competitive with Kory and Clay for

18  deals?

19              MR. COOK:  Object to the form.

20              THE WITNESS:  We all compete, but we are a

21  family and -- and end up working with each other a lot.

22  BY MR. BOIES:

23      Q.  When it says:  We want -- when it says:  Puts

24  three sets of eyes and ears on this deal and category, is

25  that a reference to the importance of this deal and this

CONFIDENTIAL

Page 29

1    category to the Dallas Mavericks?

2                    MR. COOK:  Object to the form.

3                    THE WITNESS:  It was more about we knew it

4    was going to take three people to help get this part- --

5    sponsorship off the ground.

6    BY MR. BOIES:

7        Q.  Why?

8        A.  The size of the deal and how close it was to the

9    start of the season.

10       Q.  Do -- do deal -- when do deals normally get

11   negotiated?

12       A.  Every day, every month.  There's -- there's no

13   specific time.

14       Q.  Could this deal have started in December?

15       A.  Can you --

16       Q.  Would you --

17       A.  -- rephrase?  Like, I don't understand.

18       Q.  Let's say you got -- let's -- let's say the deal

19   was not able to close in October, and they were still

20   negotiating the contract, and they were still working out

21   the details of the assets that Voyager was buying from the

22   Mavericks.  Would the deal have gotten done if it was for

23   after the season, the 2021-2022 start of the season?

24                    MR. COOK:  Object to the form.

25                    THE WITNESS:  That was a long question.

CONFIDENTIAL

Page 30

1              MR. COOK:  Are you asking him to rephrase

2    the question?

3              THE WITNESS:  Yes.

4    BY MR. BOIES:

5         Q.  Do deals of this magnitude often close midseason?

6         A.  It has happened in the past.

7         Q.  May you give me an example?

8         A.  We closed our jersey patch partner, 5miles, in

9    December, the year it started.

10         Q.  Was that an unprecedented deal?

11         A.  It was the first jersey patch.

12         Q.  And so up -- so when did you have the opportunity

13    to negotiate a jersey patch beginning?  Because the NBA

14    changed their rules that summer; is that correct?

15              MR. COOK:  Wait.  The question was compound.

16    I'm not sure which question you want him to answer.

17    BY MR. BOIES:

18         Q.  The -- the second one.

19              Did the NBA change their rules that summer

20    to allow for a jersey patch the year you negotiated the

21    midterm -- the midseason?

22         A.  Yes.  I don't believe -- I don't recall if it was

23    that -- if it was the summer, what -- what specific time,

24    but, yes, it was during the summer prior to that season.

25         Q.  Do you remember which team got the first jersey

CONFIDENTIAL

Page 31

1   patch sponsorship agreement?

2          A.  I believe it was the 76ers with SeatGeek.

3          Q.  Do you know what year that was?

4          A.  Do not.

5          Q.  Do you know what year that your midseason

6   sponsorship agreement was created for the jersey patch?

7          A.  2017-18 is a guess.

8          Q.  So closing this -- this Voyager deal, there --

9   there was a time impetus to get it done before the season;

10  is that correct?

11              MR. COOK:  Object to the form.

12              THE WITNESS:  I don't -- I don't believe

13  there was a time.  It was mandatory to get it done.

14  BY MR. BOIES:

15         Q.  Was it mandatory to get a contract signed before

16  the press release?

17              MR. COOK:  Object to form.

18              THE WITNESS:  It was not mandatory.

19  BY MR. BOIES:

20         Q.  Was it -- is it normal for there to be a press

21  release before a contract is done?

22         A.  It is -- it has happened before where we

23  delivered some of the marketing before a contract is

24  finalized.

25         Q.  What are your obligations to your partner or

Page 32

1    sponsor?

2         A.  Sponsor.

3         Q.  What are your obligations to your sponsor before

4    a contract is finalized?

5                    MR. COOK:  Object to the form.

6                    THE WITNESS:  I don't understand.

7    BY MR. BOIES:

8         Q.  For -- for the Mavericks -- speaking for -- on

9    behalf of the Mavericks -- and I understand you're an

10   employee -- the prior to executing a contract, do you have

11   any obligations to a sponsor?

12                   MR. COOK:  Object to form.

13                   THE WITNESS:  Can you elaborate on what -- I

14   don't -- I don't know what you're asking.  What

15   obligations would you be -- are you asking about?

16   BY MR. BOIES:

17        Q.  Do you have to provide them tickets to games?

18        A.  There are no obligations that we have to provide.

19        Q.  Before a con- -- would -- when you think about

20   obligations in a contract, do you think about assets that

21   are -- that the Mavericks have that have been promised to

22   a sponsor?

23                   MR. COOK:  Object to form.

24                   THE WITNESS:  As it relates to what's in

25   their contract?

CONFIDENTIAL

Page 33

1    BY MR. BOIES:

2        Q.  As it relates to their deal.  So when you're

3    negotiating a deal, you put the assets that you are

4    offering to your sponsor in the deal, correct?

5        A.  Correct.

6        Q.  And in this deal, what were some of the assets

7    that were in the deal?

8    ███ ██████████████████████████████████████

9    ████████████████████████████

10   ███ ██████ ███████████████████████

11       ██████████████████████████████████

12   █████████████████████████████

13           ██████████ ██████████████

14           ████████████ ████████████

15   BY MR. BOIES:

16       Q.  █████████████████████████████████████

17   ████████████████████ █████████████████████

18   ████████

19              MR. COOK:  Object to form.

20              THE WITNESS:  ████████████████

21   BY MR. BOIES:

22       Q.  Do you know what date the contract was executed

23   in this Voyager deal?

24       A.  I don't know the specific date.

25       Q.  Do you know who would?

CONFIDENTIAL

Page 34

1       A.  Ryan Mackey.

2       Q.  Do you know what date this deal became official,

3   in your mind?

4       A.  It was around the 28th or 29th.

5       Q.  October 28th, was that the beginning of the Mavs

6   2021-2022 season?

7       A.  I would have to look at a calendar.

8       Q.  Do you know if they started their game -- their

9   season that year on the road or at home?

10      A.  That was a year ago, more than a year ago.

11      Q.  Do you remember how the Mavericks performed last

12  year?

13      A.  We ended up in the Western Conference finals.

14      Q.  Who did they lose to?

15      A.  Golden State.

16      Q.  Who -- in the playoffs, who did they beat?

17      A.  Phoenix.

18      Q.  Who else did they beat?

19      A.  First round -- I should know this.

20          (Speaking sotto voce.)  I -- I would have to

21  --

22      Q.  Was it the Utah Jazz?

23      A.  Yes, Utah.  Thank you.  I should know that.

24      Q.  On October 28th, was there a halftime promotion?

25          MR. COOK:  Object to form.

CONFIDENTIAL

Page 35

```
 1              THE WITNESS:  There was -- was there a

 2   halftime promotion?

 3   BY MR. BOIES:

 4       Q.  Yes.  Was there a halftime promotion on

 5   October 28th --

 6       A.  For --

 7       Q.  -- 2021?

 8       A.  For Voyager?

 9       Q.  For the -- for the Mavs -- yes, for the -- let me

10   re- -- let me just restart.

11              On October 28th, was there a halftime

12   promotion for the Dallas Mavericks?

13       A.  We have a halftime promotion every game.

14       Q.  Do you remember the halftime promotion from

15   October 28th, 2021?

16              MR. COOK:  Object to form.

17              THE WITNESS:  I don't.

18   BY MR. BOIES:

19       Q.  Do you remember if there was a halftime promotion

20   on October 28th, 2021, for Voyager?

21       A.  I don't remember if it was a halftime promotion

22   or if it was a quarter-break promotion.

23       Q.  When would a hundred-thousand-dollar shot

24   promotion take place?

25              MR. COOK:  Object to form.
```

CONFIDENTIAL

Page 36

1    BY MR. BOIES:

2        Q.  At halftime or during a quarter break?

3        A.  It could happen during both; I just don't know

4    which one it was.

5        Q.  Generally -- generally, in your experience --

6        A.  It would typically happen during a quarter break,

7    unless we needed more time to do the halftime, but I -- I

8    don't recall which one it -- which break it was in.

9        Q.  Do you know how long it takes for the half-court

10   shot promotion to -- to -- to take place?  Do you know --

11   do you know the internal mechanism -- what -- what does

12   the shooter have to do to win the $100,000?

13                MR. COOK:  Object to form.

14                THE WITNESS:  I believe he had to hit the

15   shots in 30 seconds.

16   BY MR. BOIES:

17       Q.  After hitting the shots in -- the -- the layup,

18   the free throw, and three-pointer --

19       A.  Yes.

20       Q.  -- in 30 seconds --

21       A.  Yes.

22       Q.  -- is that correct?

23       A.  I believe so.

24       Q.  And then he had to hit a half-court shot?

25       A.  He had to hit them all together, correct.

Page 37

 1         Q.  Did he have to hit the half-court shot in the --

 2    in the same 30 seconds?

 3         A.  Yes.

 4         Q.  Were you present at this promotion?

 5         A.  Yes.

 6         Q.  Where were you sitting?

 7         A.  I don't recall.

 8         Q.  Did you Tweet about this promotion?

 9         A.  I don't recall.

10         Q.  Did you re-Tweet this promotion?

11         A.  I don't recall.

12         Q.  Have you ever Tweeted at very famous people about

13    this promotion?

14              MR. COOK:  Object to form.

15              THE WITNESS:  I don't recall.

16    BY MR. BOIES:

17         Q.  Have you ever Tweeted at Elon Musk?

18         A.  I don't believe so.

19         Q.  Have you ever Tweeted at Michael Saylor?

20         A.  No.

21         Q.  Have you ever Tweeted at Darrell Rovell?

22         A.  Yes.

23         Q.  Do you know who Darrell Rovell is?

24         A.  I believe you're saying -- is it Darren Rovell?

25         Q.  Darren Rovell.

CONFIDENTIAL

Page 38

1  A. I do know he's a sports person.

2  Q. Does he have a million of followers?

3    MR. COOK: Object to form.

4    THE WITNESS: I don't know how many

5 followers he has.

6 BY MR. BOIES:

7  Q. Have you ever re-Tweeted Mark Cuban?

8  A. Yes.

9  Q. Do you know who Michael Saylor is?

10  A. He's a Bitcoin guy.

11  Q. And -- and you didn't Tweet at Michael Saylor

12 saying that: We need more Bitcoin following this

13 promotion?

14  A. I don't believe so. I don't recall.

15  Q. When you first heard about -- when you first got

16 the e-mail in front of you from Ryan Mackey, what -- what

17 was the date on that e-mail?

18  A. 9/15/2021.

19  Q. Do you know if other e-mails came in around

20 that -- shortly thereafter, sort of getting you up to

21 speed on this Voyager deal?

22  A. Were there --

23  Q. Were there other e-mails related to the Voyager

24 deal that came in shortly after this e-mail?

25    MR. COOK: Object to form.

CONFIDENTIAL

Page 39

1              THE WITNESS:  I assume, yes, that we would

2   have e-mails to bring us up to speed on what -- the deal

3   points.

4              MR. BOIES:  Exhibit 31.

5              (Exhibit 31 was marked for identification.)

6   BY MR. BOIES:

7       Q.  Do you remember receiving this e-mail?

8       A.  (Witness examines document.)

9              I don't remember this specific e-mail, but

10  it looks like an e-mail that Billy sent to us about

11  updating us on what Voyager was.

12      Q.  Had -- had you heard of Voyager before -- before

13  this?

14      A.  I don't believe so.

15      Q.  You -- you had said that you had a BlockFi

16  wallet --

17      A.  Right.

18      Q.  -- sometime in the summer.

19              Did you get any other wallets at the time?

20      A.  Not at that time.

21      Q.  Have you gotten any wallets since that time?

22      A.  I have a Coinbase wallet.

23      Q.  Do -- do you have any wallets that are

24  noncustodial?

25      A.  No.

Page 40

1      Q.  Do you know what I mean by that?

2      A.  I have -- I only have three wallets:  Voyager,

3  BlockFi, and Coin- -- Coinbase.

4      Q.  And when you hold cryptocurrency, you either are

5  the holder of it --

6      A.  Right.

7      Q.  -- or someone else is the --

8      A.  Correct.

9      Q.  -- custodian of it, and you have put your trust

10  in that custodian?

11      A.  Correct.

12          MR. COOK:  Object to form.

13  BY MR. BOIES:

14      Q.  Is that correct?  Does that reflect your

15  understanding of -- of what a wallet is?

16      A.  Correct.

17      Q.  And in your circumstance, all -- your three

18  wallets are custodial wallets --

19      A.  My -- It's not a self-custodial wallet, correct.

20      Q.  And you know -- and -- and you understand what

21  that means?

22      A.  Yes.

23      Q.  Did you understand what that meant in October --

24  in September of 2021?

25      A.  I have -- I was probably educated on that

Page 41

1    afterwards.

2         Q.  Have -- have you heard the term "not your keys"?

3         A.  Yes.

4         Q.  Do you know how that ends, that --

5              MR. COOK:  Object to form.

6    BY MR. BOIES:

7         Q.  -- that phrase ends --

8         A.  I do not.

9         Q.  -- "not your keys"?

10             On this -- on this page -- on this document,

11   the second page, at the -- at the top of the page, do you

12   see that it says, "VGX is the key"?

13        A.  I can read that, yes.

14        Q.  What is VGX?

15        A.  VGX is their -- their token.

16        Q.  The -- the e-mail that Billy Phillips forwarded

17   to you, that that -- do you think of that as an

18   advertisement, sort of -- for Voyager, the -- the -- the

19   body of the -- of the e-mail that is from Voyager to

20   Billy Phillips, subject:  Gronk + VGX, does it get any

21   better?  Do you think of that as an advertisement?

22             MR. COOK:  Object to form.

23             THE WITNESS:  It looks like it's an e-mail

24   with information to learn about their product.

25   BY MR. BOIES:

CONFIDENTIAL

Page 42

1     Q.  And when learning about their product, is that --

2  is that advertising their product?

3          MR. COOK:  Object to form.

4          THE WITNESS:  It -- yeah, it looks like an

5  ad in some respect, yes.

6  BY MR. BOIES:

7     Q.  And what is their product?

8     A.  They have -- they're a crypto exchange.

9     Q.  Is VGX their product?

10         MR. COOK:  Object to form.

11         THE WITNESS:  It's a -- I believe it's a

12  token.

13  BY MR. BOIES:

14     Q.  Is -- is having an account with Voyager their

15  product?

16         MR. COOK:  Object to form.

17         THE WITNESS:  I don't understand.  "Having

18  an account"?

19  BY MR. BOIES:

20     Q.  Is having an -- if you sign up for an account

21  with Voyager, have you bought a Voyager product?

22     A.  No.  If you're just having an account, you're

23  just signing up for an account.  You don't have to put

24  money in or -- or do any trades.

25     Q.  If you put money in, have you bought a product?

CONFIDENTIAL

Page 43

1          MR. COOK:  Object to form.

2          THE WITNESS:  If you put money in, doesn't

3   nec- -- it doesn't mean that you've made a trade.

4   BY MR. BOIES:

5       Q.  What does it mean to you to make a trade?

6       A.  To buy a -- some sort of cryptocurrency, like

7   Bitcoin.

8       Q.  Could you buy a stable coin on Voyager?

9       A.  I --

10      Q.  Do you know what a stable coin is?

11      A.  No.  I --

12      Q.  Have you ever heard the term "stable coin"?

13      A.  I've heard the term "stable coin," but I don't

14   know if I can tell you the exact definition.

15      Q.  Do you know if a stable coin differs from a

16   native token?

17      A.  I don't know the difference.

18      Q.  Is VGX a stable coin?

19      A.  I don't know.

20      Q.  Is VGX the native token of Voyager?

21      A.  That would sound correct, but I don't know.

22      Q.  On that -- on that second page, the second line,

23   "with 7 percent staking rewards," what does that mean?

24      A.  "With 7 percent staking rewards"?

25      Q.  Yeah.  What does that mean?

CONFIDENTIAL

Page 44

1              MR. COOK:  Object to form.

2              THE WITNESS:  Staking is a -- is a -- it's a

3    percentage of money that you get back, like an interest.

4    BY MR. BOIES:

5         Q.  Like an interest payment?

6         A.  Yes.

7         Q.  Like if I put my money into a bank, it grew

8    through an interest rate, that is similar to the 7 percent

9    staking rewards that you're receiving as advertised here?

10             MR. COOK:  Object to form.

11             THE WITNESS:  I -- I don't know that -- if

12   that's exactly what you're saying.  It's -- reading it,

13   "with 7 percent staking rewards, crypto-backed on a trades

14   and more," I can read that, but I don't necessarily -- I

15   -- I don't know the difference between staking and -- what

16   was -- can you say that question again?

17   BY MR. BOIES:

18        Q.  An interest --

19        A.  Yeah.  I believe --

20        Q.  Stak- -- staking on Voyager, is that -- do you

21   put that as equivalent, in your mind, as an interest rate

22   from a bank?

23             MR. COOK:  Object to form.

24             THE WITNESS:  Earning -- earning interest.

25   BY MR. BOIES:

Page 45

1        Q.  You think of those two as the same?

2        A.  Yes.

3        Q.  Do you know what stake -- do you know what

4    staking as it relates to Ethereum is?

5        A.  No.

6        Q.  Do you know what staking as it relates to Bitcoin

7    is?

8        A.  Staking is -- is a form of holding your money is

9    how I -- how I understand it.

10       Q.  Have you ever heard the terms "proof of work" as

11   it relates to Bitcoin?

12       A.  I have heard the phase.  I don't know if I can

13   tell you the full meaning of it.

14       Q.  Have you heard the phrase "proof of stake" as it

15   relates to Ethereum?

16       A.  I don't.  I could not tell you what that means.

17       Q.  Have you ever held Ethereum?

18       A.  I don't believe so.

19       Q.  Do you know what Ethereum is?

20       A.  Yes.

21       Q.  Did you hold any other kinds of cryptocurrency

22   other than Bitcoin?

23       A.  I had several different tokens.

24       Q.  Which ones?

25       A.  I can't -- I don't know all of them.

Page 46

1      Q.  Did you have VGX?

2      A.  I did have VGX.

3      Q.  Did you buy VGX?

4      A.  On the app?

5      Q.  With your own money, yes?

6      A.  Yes.

7      Q.  Did you receive VGX as a result of this deal from

8  Voyager?

9      A.  Did I re- --

10              MR. BEST:  Object to form.

11              THE WITNESS:  I don't -- can you ask that

12  again?

13  BY MR. BOIES:

14      Q.  As part of your -- as part of this deal, did you

15  receive any VGX into your Voyager wallet?

16      A.  I did not receive any VGX from Voyager outside of

17  what money I had put into it from, like, the -- the --

18  when you -- whenever you have money in it, I believe, they

19  give us a certain amount of VGX back, but they never --

20  the Voyager company team never gave me any compensation in

21  VGX, if that's what you were saying.

22      Q.  When you signed up for Voyager, did you use a

23  Voyager code --

24      A.  I used --

25      Q.  -- a promo code?

Page 47

```
 1        A.  I used a referral code from my neighbor.

 2        Q.  When you signed up for Voyager, you used a

 3   referral code from your neighbor?

 4        A.  Yeah.

 5        Q.  The same neighbor that referred you to BlockFi?

 6        A.  Yes.

 7        Q.  He had multiple --

 8        A.  Wallets.

 9        Q.  -- custodial wallets with multiple --

10        A.  Yes.

11             MR. COOK:  Object to form.

12   BY MR. BOIES:

13        Q.  -- exchanges?

14             When did he sign up for Voyager?

15        A.  I don't know.

16             MR. COOK:  Object to form.

17   BY MR. BOIES:

18        Q.  When did he speak to you -- when did he refer you

19   to Voyager?

20        A.  I don't recall.

21        Q.  Was that done through your Dallas Mavericks

22   e-mail?

23             MR. COOK:  Object to form.

24             THE WITNESS:  I -- is my main account

25   underneath -- no.
```

Page 48

1    BY MR. BOIES:

2        Q.  You -- when you sign up for Voyager and you give

3    an e-mail account, do you give your Dallas Mavericks

4    e-mail account?

5        A.  No.

6        Q.  What e-mail account do you -- did you give?

7        A.  My personal e-mail.

8        Q.  When your neighbor sent you a referral code, did

9    he send that to your personal e-mail?

10       A.  The referral code?

11       Q.  Yes.

12       A.  I don't recall.

13       Q.  How much did you have in Voyager?

14              MR. COOK:  Object to the form.

15              MR. BEST:  I'm going to object to form.

16              MR. COOK:  I don't know what the conceivable

17   relevance would be to that question.

18              MR. BEST:  I will tell you this on record:

19   I'm happy to share -- we are going to go into this in

20   detail.  As long as it's a quid pro quo and you sat- --

21   you all satisfy your obligations of giving me everything

22   that Pierce Robertson had in his multiple crypto accounts,

23   which I haven't gotten to date and which has been refused

24   to me by your colleagues.  So we're going to play this

25   both ways, I'm happy to have you ask all these questions

CONFIDENTIAL

Page 49

1    with an understanding:  I get everything about Pierce

2    Robertson's account, which have not been given to me,

3    which have been refused to me.

4                    MR. BOIES:  Well, that just got refused to

5    me, so let's go quid pro -- quid pro quo.

6                    MR. BEST:  So we're going to go quid pro quo

7    -- and Adam, while you're listening here, I just want you

8    to know, within 24, 48 hours, I want all of Pierce

9    Robertson's crypto account information.  Do you want to

10   take a break and discuss this?

11                   MR. MOSKOWITZ:  Yeah.  Why don't we do that.

12                   MR. BEST:  All right.  Thank you.

13                   THE VIDEOGRAPHER:  Off the record,

14   10:00 a.m.

15                   (Brief recess taken.)

16                   THE VIDEOGRAPHER:  We're on the record.  The

17   time is 10:09.

18                   MR. COOK:  I'm withdrawing my previous

19   objection, and Mr. Best is withdrawing his objection as

20   well.

21                   MR. BEST:  Can you read back the question?

22   BY MR. BOIES:

23        Q.  How much did you have in Voyager?

24        A.  I -- the end-of-the-year statement, I lost ████

25   ███████████████████████

Page 50

1          Q.  Of -- of that, how much was tied into VGX?

2          A.  I don't know the exact percentage, but most of my

3     money was Bitcoin.

4          Q.  Do you know what the value of Bitcoin was at the

5     time the year-end statement was given?

6          A.  I don't.

7          Q.  I'll give you Exhibit 4.  And for -- for the

8     exhibits that I have -- I'm referencing that have already

9     been submitted, I'm not going to share.  I'm only going to

10    share the new exhibits.

11               This -- this was a pretty -- pretty big deal

12    for -- for the Mavericks; is that correct?

13               MR. COOK:  Object to form.

14    BY MR. BOIES:

15         Q.  The Voy- -- is the -- the Voyager deal was a

16    pretty big deal for the Mavericks; is that correct?

17               MR. COOK:  Object to form.

18               THE WITNESS:  It -- it was a new deal, yes.

19    BY MR. BOIES:

20         Q.  Do you know how big -- in relation to other deals

21    the Mavericks were doing, how this ranked compared to

22    them?

23         A.  It was in our Top 10.

24         Q.  Was it in the Top 5?

25         A.  Potentially.

CONFIDENTIAL

Page 51

1    ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2    ▮ ▮▮▮▮▮▮▮▮▮

3    ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4    ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6    ▮ ▮▮▮

7    ▮ ▮▮▮▮▮▮▮▮▮▮▮

8    ▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮

10    Q.  And they -- they -- and you know that they are

11 paying more than ▮▮▮▮▮▮ a year to the Mavericks for

12 their sponsorship -- partnership?

13    A.  It was around the same money.  ▮▮▮▮▮▮▮

14 ▮▮▮▮▮▮  but we -- it's in the same ballpark.

15    Q.  Was there the same amount of fluff built into

16 that deal as the Voyager deal?

17         MR. COOK:  Object to form.

18         THE WITNESS:  I can't speak to that deal; I

19 didn't work on it.

20 BY MR. BOIES:

21    Q.  In the middle of this page, from Ryan Mackey to

22 you, Clay, Billy and -- and Kory was cc'd, but I assume he

23 was -- the intended -- the four of you were the intended.

24         Was Billy going to receive the -- does --

25 does he get -- when it says in -- do you see where it

Page 52

1    says:  But if this all goes to -- planned, each of you

2    will be paid on close to ████████ per year?  What -- is

3    that re- -- what is that referring to?

4        A.  The commission being split between the three --

5    three of us:  Kory, Clay, and myself.

6        Q.  And how does that commission get calculated?

7        A.  It's a standard rate.

8        Q.  What is the rate?

9        A.  ██████

10        Q.  So this deal would lead you to -- lead you,

11    individually, to receive ██████ as a result?

12        A.  Approximately.

13        Q.  Were you excited about this deal?

14            MR. COOK:  Object to the form.

15            THE WITNESS:  We're excited about bringing

16    in all new partners.

17    BY MR. BOIES:

18        Q.  Did this deal make you more excited than bringing

19    in a smaller deal?

20            MR. COOK:  Object to form.

21            THE WITNESS:  It's -- their -- the size of

22    it was bigger, so yes.

23    BY MR. BOIES:

24        Q.  What are "shortbread biscuit cookies"?

25        A.  Is that in this?

CONFIDENTIAL

Page 53

1          Q.  Yes.  It's on the second page.

2          A.  (Witness examines document.)

3                  Bringing the -- Billy -- Billy looks like he

4    was making a joke.  I don't know the reference.

5          Q.  Do you know what that could mean?

6                  MR. COOK:  Object to form.

7                  THE WITNESS:  I don't.

8    BY MR. BOIES:

9          Q.  Do you remember receiving it?

10                 MR. COOK:  What, the cookies or the e-mail?

11   BY MR. BOIES:

12         Q.  The e-mail.  Do you remember receiving --

13         A.  I'd rather have the cookies.

14         Q.  Did you receive the -- did you bring -- did you

15   bring shortbread biscuit cookies to the office?

16         A.  No.  Billy is older and makes jokes like this.

17         Q.  Would you say you have a -- a light off- --

18   office atmosphere?

19                 MR. COOK:  Object to form.

20   BY MR. BOIES:

21         Q.  Do you joke in the office often with -- with one

22   another?

23         A.  We've been working together for a long time, so

24   we have a good rapport.

25         Q.  I, personally, have heard Mark say that he

Page 54

1  doesn't like to trade players because he doesn't like to

2  lose a part of his family.

3                Do you -- do you feel like the Mavericks are

4  run in a way that keeps players and keeps personnel

5  grounded?

6       A.  I can't speak to Mark.

7                MR. COOK:  Wait.  Object to form.

8                Go ahead.

9  BY MR. BOIES:

10      Q.  Do you -- do you feel -- do you -- in your

11  experience, in your own experience, do the Mavericks keep

12  personnel around for a long time?

13      A.  Yes.

14      Q.  Do they fire people often?

15      A.  I -- that's not something I --

16                MR. BEST:  Object to form.

17                THE WITNESS:  Yeah.  I don't -- I don't

18  know.

19  BY MR. BOIES:

20      Q.  Have -- have you watched Mark fire people off the

21  cuff?

22                MR. BEST:  Object to form.

23                THE WITNESS:  No.  Mark is rarely in the --

24  in the office.

25  BY MR. BOIES:

Page 55

1          Q.  Does Mark come to all the basketball games --

2                  MR. COOK:  Object- --

3     BY MR. BOIES:

4          Q.  -- all home games?

5                  MR. COOK:  Object to form.

6                  THE WITNESS:  Most of them.

7     BY MR. BOIES:

8          Q.  Where is your office located?

9          A.  1333 North Stemmons Freeway.

10         Q.  How far is that from the American Airlines arena?

11         A.  Across the highway.

12         Q.  Do most Mavs personnel who work in the office

13    with you go to the home games?

14         A.  I can't speak to everybody, but I go to most of

15    them.

16         Q.  Is that -- one of the perks of the job is to --

17    to be able to go to the games?

18         A.  I --

19         Q.  When you were taking it as -- right out of

20    college, did you really like that aspect of the job?

21         A.  Going to the games?

22         Q.  Going to the games.

23         A.  Yes.

24         Q.  When you are negotiating deals, the title that

25    you give the deal, do you call -- a prospective sponsor,

Page 56

1   when you're first making contact with them, do you ever

2   call them a customer?

3                   MR. COOK:  Object to form.

4                   THE WITNESS:  Do you mean the -- what we

5   typically call them as a -- we use -- we can use "client,

6   customer, partner" -- all -- "sponsor;" all of those are

7   common.

8   BY MR. BOIES:

9        Q.  All of them are common.

10                  But -- but when you're first making an

11  introduction to -- through, let's say, Excel.  ██████

12  ████████████████████████ -- let's call it ███████████ --

13  would you -- on that first call, how would you -- how

14  would you talk about the potential sponsorship --

15                  MR. COOK:  Object to form.

16  BY MR. BOIES:

17       Q.  -- with that potential client, generally?

18                  MR. COOK:  Object to form.

19                  THE WITNESS:  I don't understand.

20  BY MR. BOIES:

21       Q.  When you -- do you cold-call companies?

22       A.  Yes.

23       Q.  When you cold-call companies and you introduce

24  yourself as a member of the -- of the Mavericks team, do

25  you -- how do you address your potential --

Page 57

1      A.  Sponsor?

2      Q.  -- sponsor?

3      A.  We address them in many different forms.

4      Q.  Initially, do you ever call them a "partner"?

5      A.  It's a common vernacular to use "partner"

6  interchangeably with "sponsor" --

7      Q.  When a poten- --

8      A.  -- and "customer" and "client."

9      Q.  When a -- when a potential client comes in, do

10  they think of themselves as customers coming in to -- to

11  peruse a store and buy a product?

12             MR. COOK:  Object to form.

13             THE WITNESS:  They -- do they -- what do you

14  mean when they come in?

15  BY MR. BOIES:

16      Q.  When they -- when you -- do they come into your

17  office to make the -- to close these deals?

18      A.  Not always.

19      Q.  When -- when you speak to them on the phone or

20  they come into your office to close a deal, does -- does

21  that -- do they ever come into your office to close a

22  deal?

23      A.  In the 15 years that I've been working there, it

24  has happened before, but it's not, you know, mandatory.

25      Q.  And increasingly rare since the COVID --

CONFIDENTIAL

Page 58

1      A.  Right.

2      Q.  -- 19 virus?

3           Now, most of your deals get done over the

4  phone, over the Internet?

5      A.  (Witness nods head affirmatively.)

6      Q.  When you're addressing people --

7           MR. COOK:  Wait, wait.  I'm sorry.  You need

8  to answer audibly for the record.  Sorry.

9           THE WITNESS:  Yes, they happen over the --

10  the phone and/or Teams call or Zoom video.

11  BY MR. BOIES:

12      Q.  And -- and when you're making e-mail -- when

13  you're trading back and forth a sponsorship agreement --

14      A.  Yep.

15      Q.  -- do you use the word "partner" interchangeably

16  with "sponsor"?

17      A.  Yes.

18      Q.  In the client's -- in -- in your experience, in

19  the client's mind, do you imprint partnership as the same

20  thing as sponsorship in -- in that client's mind?

21           MR. COOK:  Object to the form.

22           THE WITNESS:  I can't speak to a client's

23  mind.

24  BY MR. BOIES:

25      Q.  Do you think, from a client's perspective -- in

CONFIDENTIAL

Page 59

1   your own personal experience, from a client's perspective,

2   there's any difference between partnership and

3   sponsorship?

4               MR. COOK:  Object to the form.

5               THE WITNESS:  Do I think there's a

6   difference --

7   BY MR. BOIES:

8       Q.  Yeah.

9       A.  -- between partner and sponsorship?

10      Q.  Yeah.  Internally, we've established that

11  "partnership" and "sponsorship" get used interchangeably;

12  is that correct?

13      A.  Correct.

14      Q.  In a client's mind, externally, do -- when you're

15  working with a client, do they think of "sponsorship" and

16  "partnership" as interchangable?

17              MR. COOK:  Object to the form.

18              THE WITNESS:  I can't speak to what the

19  client's intent is on using either of those.

20  BY MR. BOIES:

21      Q.  No, not -- not intent.  How -- are you in sales?

22      A.  Yes.

23      Q.  Do you ever make assumptions about what your

24  sales targets are feeling?

25              MR. COOK:  Object to form.

CONFIDENTIAL

Page 60

1          THE WITNESS:  I don't -- I don't understand.

2     What they're feeling, like, emotionally?

3     BY MR. BOIES:

4        Q.  Yes.

5             MR. COOK:  Object to form.

6             THE WITNESS:  I'm hoping that they are happy

7     to be working with us.

8     BY MR. BOIES:

9        Q.  Would giving them tickets make them feel good?

10            MR. COOK:  Object to form.

11            THE WITNESS:  Bringing them out to the game

12    is something that we do as a -- as a normal business

13    practice.

14    BY MR. BOIES:

15       Q.  And when you're -- when you're at the game with

16    them and you're in small talk, do you ever refer to them

17    as "my customer"?

18       A.  I don't -- I mean, we would call -- we would use

19    all forms of the ones I was saying:  "sponsor,"

20    "customer," "partner."

21       Q.  So you're -- so, hypothetically, you're out at a

22    game and -- and you're with an important client and you

23    introduce them.  Are you going to introduce them as "my

24    partner"?  "My sponsor"?  "My client?"  Which -- which

25    word would you most often use?

CONFIDENTIAL

Page 61

1          MR. COOK:  Object to form.

2          THE WITNESS:  I would use all of them.

3          MR. BOIES:  This is premarked Exhibit 32.

4          (Exhibit 32 was marked for identification.)

5          THE WITNESS:  I don't know if I have the

6   right thing (indicating).

7          MR. BOIES:  Yeah.  I don't know if I have

8   the right thing either.

9   BY MR. BOIES:

10      Q.  Do you -- do you remember the "Voyager Notes

11   Final Proposal.docx" that is referenced in this e-mail?

12      A.  "Voyager Notes Final Proposal..."

13          This was something that Sarah put together.

14   I don't -- I can't speak to -- to this exact document, no.

15      Q.  Did you receive this document?

16      A.  It says:  Ryan Mackey has shared this OneDrive

17   business file with you.  So I am -- I assume that I have

18   received this, but I can't speak to what document this is.

19      Q.  In the subject line, what is -- what is the --

20   what does the subject line say there?

21      A.  "Confidential Partnership."

22      Q.  And that is referring to the partnership between

23   the Mavericks and Voyager; is that correct?

24          MR. COOK:  Object to form.

25          THE WITNESS:  It could also say the same as

Page 62

1    confidential sponsorship.

2    BY MR. BOIES:

3        Q.  It -- it could, but does it?

4        A.  Not in this case.  But, again, "sponsorship" and

5    "partnerships" are common vernacular for us.

6        Q.  Do you think that it ever has the impact on the

7    mind of a client of yours that a partnership is more

8    valuable than a sponsorship?

9                MR. COOK:  Object to the form.

10               THE WITNESS:  I believe they're the same.

11   BY MR. BOIES:

12       Q.  In all cases, a partner and a sponsor are the

13   same?

14               MR. COOK:  Object to form.

15               THE WITNESS:  I -- I -- we use them

16   interchangeably, yes.

17   BY MR. BOIES:

18       Q.  Do you have any friends that are partners at a

19   law firm?

20       A.  Yes.

21       Q.  Do you have any friends that are sponsors at a

22   law firm?

23       A.  Those are two completely different industries.

24       Q.  Absolutely.

25               And -- and in -- in your mind, would those

CONFIDENTIAL

Page 63

1   -- in a totally different industry, would sponsor and

2   partner have the same meaning?

3                   MR. COOK:  Object to the form.

4                   THE WITNESS:  I can't speak to my friends

5   that are partners versus what they would think of a

6   sponsorship, as a sponsor.

7   BY MR. BOIES:

8       Q.  But you're in sales, so one of the things you do

9   is you consider how people would feel when they are --

10  when they are being approached, correct?

11                  MR. COOK:  Object to form.

12  BY MR. BOIES:

13      Q.  In all different industries, because you work

14  with partners in all different industries; is that

15  correct?

16                  MR. COOK:  Wait.  I'm sorry.  He didn't

17  answer the first question.

18                  MR. BOIES:  Oh.

19                  MR. COOK:  So I'm not sure which one you --

20                  MR. BOIES:  I'm sorry.  I -- I --

21                  THE WITNESS:  The same answer:  We -- it's

22  a -- we use these interchangeably, "sponsorship" and

23  "partnership."

24  BY MR. BOIES:

25      Q.  Do you work with sponsors in many different

CONFIDENTIAL

Page 64

 1  industries?

 2      A.  Yes.

 3      Q.  Do you adapt your vernacular to the industries

 4  that you're working with?

 5      A.  Do you have an example?

 6      Q.  Crypto is an industry, correct?

 7      A.  Yes.

 8      Q.  "Not your keys" is a crypto term, correct?

 9      A.  I've heard it before.  I don't know the meaning.

10      Q.  "Pulling the rug out" is a crypto term, correct?

11      A.  I've heard it.

12      Q.  Those terms might not mean the same in other

13  industries, correct?

14      A.  Correct.

15      Q.  Would -- when you're working in crypto, might you

16  use words that are crypto terms --

17      A.  Yes.

18      Q.  -- that might not mean anything to the basketball

19  industry?

20              MR. COOK:  Object to form.

21              THE WITNESS:  We would use phrases, yes.

22  BY MR. BOIES:

23      Q.  And you will adapt your phrases to the industries

24  that you're working with?

25              MR. COOK:  Object to form.

CONFIDENTIAL

Page 65

1                    THE WITNESS:  I would have to see a specific

2    example.

3    BY MR. BOIES:

4        Q.  Do you remember the Mark's car idea?

5        A.  Yes.

6        Q.  Whose idea was that?

7        A.  That was mine.

8        Q.  Why didn't you choose Ford?

9                    MR. BEST:  Objection, form.

10                   THE WITNESS:  Because Mark drive -- drives a

11   Lexus.

12   BY MR. BOIES:

13       Q.  Mark has one car?

14       A.  Well, he's -- he has driven a Lexus.

15       Q.  What kind of car does Mark drive?

16                   MR. BEST:  Objection, form.

17                   THE WITNESS:  I don't know exactly what car

18   he drives.

19   BY MR. BOIES:

20       Q.  Have you hear- -- have you heard of the Ford

21   Maverick?

22       A.  Yes.

23                   MR. BEST:  Objection, form.

24   BY MR. BOIES:

25       Q.  Would that be -- does that invoke the Dallas

Page 66

1    Mavericks to you?

2                   MR. COOK:  Object to form.

3                   MR. BEST:  Objection, form.

4                   THE WITNESS:  Say that question again.  Are

5    you saying a play on words?

6    BY MR. BOIES:

7         Q.  Does -- does -- yes.  Does a pun -- do you use

8    puns in -- in any of your selling of assets?

9                   MR. COOK:  Object to form.

10                  THE WITNESS:  Yes.  Selling of assets, I

11   mean, we use them as -- as you're saying, phrases?

12   BY MR. BOIES:

13        Q.  Phrases.

14        A.  Yeah, I mean, we use -- yes, we use phrases.

15   Like, I don't know if we use them for sales purposes.

16        Q.  When you put a promotion on to win a car, who

17   buys the car?

18                  MR. COOK:  Object to form.

19                  THE WITNESS:  We would -- we would use money

20   from the sponsorship agreement, but that never happened.

21   It was just an idea.

22   BY MR. BOIES:

23        Q.  Nobody had a chance to win Mark's car?

24        A.  No.

25        Q.  Does Mark drive an entry-level Lexus?

CONFIDENTIAL

Page 67

1          MR. COOK:  Object to form.

2          THE WITNESS:  I don't know what car he

3   drives.

4   BY MR. BOIES:

5       Q.  In your experience, do billionaires drive

6   entry-level vehicles?

7          MR. COOK:  Object to form.

8          THE WITNESS:  I know that he has driven a

9   Lexus.  I don't know what exact car or model he drives.

10  BY MR. BOIES:

11      Q.  Is Lexus a sponsor of the Dallas Mavericks?

12      A.  Yes.

13      Q.  Did you get any pushback about the value of

14  Mark's car?

15         MR. COOK:  Object to the form.

16         THE WITNESS:  The -- the Mark --

17  BY MR. BOIES:

18      Q.  ███████████████████████████████████████

19  ███████████████████████████████████████████

20  ████████████████████████████████████████

21  ██████████

22        █████████   ████████████

23        ██████████   ██████████████████████

24  ███████████████████   ███████████████████████

25  ███████████████████████████

Page 68

BY MR. BOIES:

  Q.  Did -- did Billy send you an e-mail about --
about that specific idea?

  A.  I don't recall.  You'd have to help --

            MR. BOIES:  This is Exhibit 33.

            (Exhibit 33 was marked for identification.)

BY MR. BOIES:

  Q.  Did you receive this e-mail from Ryan Mackey?

  A.  Yes.

  Q.  Who would have put this into a DIGIDECK of the
lis- -- listed recipients on this e-mail?

            MR. COOK:  Object to form.

            THE WITNESS:  On this, it would have been --
Sarah would have helped.

BY MR. BOIES:

  Q.  Who would have built the deal sheet?

  A.  We collectively did it, Clay, Kory, and myself.

  Q.  Do you put together deal sheets?

  A.  We do.

  Q.  Is that something your senior director of
partnerships does?

  A.  It's not specific to our title.  It's everyone
that's a salesperson.

  Q.  And on page 2, this -- the -- the █████████
██████████████████████████████████ this -- this was your

CONFIDENTIAL

Page 69

1   idea?

2      A.  Yes.

3      Q.  And I'll point you back to the beginning.  This

4   is on Thursday, September 16th at 10:05 p.m., so that's

5   really 4- -- 4:00 p.m. Central Time.

6         You've only been working on this deal for a

7   day, is that correct, at that point?

8      █  ████████████████████████████████████████

9   ████████████████████████████████████████████████

10   ███████████████████████████████████████████

11   ██████████████████

12      █  ████████████████████████████████████████

13   ███████████████████████████████████████

14   ███████████

15      A.  No.

16      Q.  It was a new idea that you had?

17      A.  It was a new idea that never went anywhere.

18      Q.  It never went anywhere.

19         Was one of the reasons why it didn't go

20   anywhere the discrepancy in -- ████████████████████

21   ████████████████████████████████████

22         MR. COOK:  Object to form.

23         THE WITNESS:  Our job is to create

24   outlandish ideas and figure out which ones can be created

25   and then put into the deal.  This -- this was an

CONFIDENTIAL

Page 70

1    outlandish idea that never went anywhere.

2                    MR. BOIES:  This is Exhibit 102.

3                    (Exhibit 102 was marked for identification.)

4    BY MR. BOIES:

5        Q.  Was -- was this about when you had that idea?

6        A.  Uh-huh.

7                    MR. BOIES:  Exhibit 34.

8                    (Exhibit 34 was marked for identification.)

9    BY MR. BOIES:

10       Q.  And you see the e-mail that -- maybe go to the

11   second page -- Billy is responding to -- to you at the top

12   of the second page.  For example -- may I point you to the

13   middle of the paragraph where it starts:  For example, are

14   we...

15                   MR. COOK:  Alex, would you mind sitting

16   down.

17                   MR. BOIES:  Oh, man, am I making you

18   nervous?

19                   MR. COOK:  You might make the witness

20   nervous.

21                   MR. BOIES:  I apologize.  I'm --

22                   THE WITNESS:  Back hurting?

23                   MR. BOIES:  No, I'm fine.  I stand often.

24   BY MR. BOIES:

25       Q.  Do you see, for example:  Are we prepared to

CONFIDENTIAL

Page 71

1    present the solar idea?

2            What's the "solar idea"?

3        A.  Let me read it real quick.

4        Q.  Sure.

5        A.  (Witness examines document.)

6            I don't remember what the solar idea was --

7    oh, no, I do.  ████████████████████████████████████

8    ████████████

9        ██  ████████████████████████

10       ██  ████████████████

11       ██  ██████████████████████████

12   ████████████    ████████████████████████████le

13   ████████████

14           ████████████████████████    ████████████████

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ██████████

18           ████████████████████

19       A.  Yes.

20       Q.  What did Billy mean by that?

21           MR. COOK:  Object to the form.

22           THE WITNESS:  I can't tell you what Billy

23   was thinking.

24   BY MR. BOIES:

25       Q.  Would it -- it's addressed to you.  How did you

CONFIDENTIAL



Page 72

1    interpret it?

15   Q.   So -- so some ideas are too big to be real?

16   A.   Yes.

17   Q.   And so some ideas are not real?

18   A.   Correct.

19   Q.   Is it safe to say that some assets are not real?

20            MR. COOK:  Object to form.

21            THE WITNESS:  That's a vague statement.  I

22   don't know that.

23   BY MR. BOIES:

24   Q.   So are -- an idea is an asset, correct?

25   A.   An idea could turn into something that we could

CONFIDENTIAL

Page 73

1    put into a proposal.

2        Q.  And in the proposal, once the idea is written

3    into the proposal, it is no longer just an idea; it has

4    morphed into an asset?

5                MR. COOK:  Object to form.

6                THE WITNESS:  Potentially.

7    BY MR. BOIES:

8        Q.  And once the idea -- do you ever put ideas into

9    proposals that are unfathomable?

10   ███   ████████████████████████████████████████

11   ████████████████████████████████████████████

12   ████████████████████████████████████████████

13   ████████████████████   ███████████████████████

14   ████████████████████████████

15       Q.  Did you respond to this e-mail from Billy?

16       A.  I -- I don't know.

17       Q.  I'll bring you back to the first page.  And it

18   appears that you responded 34 minutes later.

19                And do you see the third paragraph on --

20       A.  Ahh.

21       Q.  -- of your response?

22       A.  What's the question?

23       Q.  Well, the question was:  Do you see it?

24       A.  Yes.

25       Q.  But when you came up with this idea, did you have

Page 74

1  in your mind what kind of car Mark drove?

2           MR. COOK:  Object to the form.

3           THE WITNESS:  I believe that they announced

4  this ████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ████████████████████████████████████████████████

7  ██████████████████████████████

8  BY MR. BOIES:

9      Q.  And, in your mind, if a fan wanted to win Mark's

10  car, do you think that fan would be disappointed if, when

11  he won that car, he received an entry-level vehicle?

12           MR. COOK:  Object to form.

13           THE WITNESS:  That has no meaning to --

14  that's irrelevant; it never came to fruition.

15  BY MR. BOIES:

16      Q.  When you're putting together these assets, do you

17  think about the effect that they will have on the -- the

18  potential fan?

19           MR. COOK:  Object to form.

20           THE WITNESS:  ██████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ██████████████████

25  BY MR. BOIES:

CONFIDENTIAL

Page 75

1     Q.  Would you have given away a $45,000 car?

2           MR. COOK:  Object to form.

3           THE WITNESS:  I don't know.

4  BY MR. BOIES:

5     Q.  Did you think it was possible that the Mavericks

6  were willing to spend $45,000 on a car promotion?

7           MR. COOK:  Object to form.

8           THE WITNESS:  ██████████████

9  ████████████████████████████████████

10  ██████████████████████████████████████

11  ██████████████████████

12  BY MR. BOIES:

13     Q.  When working with Voyager, did you look for any

14  other cross-promotional opportunities?

15     A.  I don't recall.

16     Q.  When you are working with any customer of yours,

17  do you look for efficiencies by using multiple partners in

18  the same promotion?

19     A.  That is a standard, yes, that we would -- if it

20  benefits one, it could benefit another.

21     Q.  When it benefits one and it could benefit

22  another, do you give them discounts on the assets that

23  they are buying?

24           MR. COOK:  Object to form.

25  BY MR. BOIES:

CONFIDENTIAL

Page 76

1         Q.  "They" being your customers?

2                 MR. COOK:  Same objection.

3                 THE WITNESS:  Can you rephrase that?

4    BY MR. BOIES:

5         Q.  Sure.

6                 When doing a cross-promotional -- when doing

7    a cross-promotion, meaning promoting more than one partner

8    at the same time, do you give each partner a discount on

9    the assets that they are buying?

10                MR. COOK:  Object to form.

11                THE WITNESS:  That scenario has not played

12   out.

13   BY MR. BOIES:

14        Q.  ████████████████████████████████

15   ████████████████████████████████████████████████

16   ████████████████████████████████████████████  ████

17   ████████████████████████████████████████████

18   ██████████

19                MR. COOK:  Object to form.

20                THE WITNESS:  ████████████████████████

21   ██████████████████████████████████████████████

22   ██████████████████████████████████████████████

23   ████████████████████████  ████████████████████████

24   ████████████████████████████████████████████████

25   ██████  ████████████████████████████████████████

CONFIDENTIAL

Page 77

1
████████████████████████

2                    MR. COOK:  Alex, at a convenient time, can

3     we take a break?

4                    MR. BOIES:  Absolutely.  Give me two more

5     minutes; I have just one little thing.

6                    MR. COOK:  Sure.

7                    MR. BOIES:  What document do you have?

8                    THE WITNESS:  34.

9     BY MR. BOIES:

10        Q.  May you go to the second-to-last page of that

11    document?

12        A.  Of 34?

13        Q.  Of 34.

14                    In this deal, what is Voyager -- did you see

15    this list when -- did you -- did you see this list on

16    September 17th at 11:55 a.m. GMT time?  Did -- did you

17    look through this entire e-mail when you received it, the

18    bottom parts of it, specifically the September 10th e-mail

19    from Erika Szychowski -- I might be pronouncing that

20    wrong -- to Ryan Mackey?

21        A.  What was the question?

22        Q.  Would you have paid attention to that -- that

23    even though it was at the bottom of the e-mail?

24        A.  I don't recall.

25        Q.  Do -- do you see it now -- do you see it now?

CONFIDENTIAL

Page 78

1              MR. COOK:  I'm sorry.  See what?

2    BY MR. BOIES:

3         Q.  Do you see the second-to-last -- do you see

4    Erika's e-mail to Ryan on September 10th at 3:07 p.m.?  Do

5    you see that e-mail?

6         A.  Yes.

7         Q.  Do you see in the body of that e-mail, on the

8    next page, what Voyager is seeking?

9         A.  The -- the bullet points from below that?

10        Q.  Yeah, the bullet points from below that.

11        A.  Yes.

12        Q.  Is this what Voyager was seeking from the deal

13   with the Mavericks?

14              MR. COOK:  Object to form.

15              THE WITNESS:  These are some of the

16   components that were their marketing priorities.

17   BY MR. BOIES:

18        Q.  And the sixth bullet point down, starting with

19   "███████████████," what does that -- what does that

20   bullet say?

21       ███    ████████████████████████████

22   █████████████

23       ███  ████████████████████████████████

24   █████████

25       ███  ███████████████████████████

Page 79



1      Q.  I --

2             MR. BOIES:  Will you read back the question?

3  BY MR. BOIES:

4      Q.  Did Voyager in this deal get the use of Mark?

5

6

7

8

9

10

11

12

13

14

15

16             MR. COOK:  Object to the form.

17             THE WITNESS:

18  BY MR. BOIES:

19      Q.  Is there anything like what they are asking for

20  in -- in Bullet Point 6 in the contract?

21

22

23

24

25      Q.  Did she get any usage of Mark Cuban during the

Page 80

```
 1    Voyager launch -- Voyager/Mavericks partnership launch?

 2             MR. COOK:  Object to form.

 3             THE WITNESS:  ███████████████████████

 4    BY MR. BOIES:

 5        Q.  ████████████████████, but did he

 6    participate in the Voyager/Mavericks launch?

 7        A.  Mark introduced the partnership at the press

 8    conference.

 9        Q.  So he was present at the press conference?

10        A.  Correct.  He -- he announced the sponsorship

11    deal.

12        Q.  Did he -- is that all he did that day was just

13    come in and announce it and then go home?

14        A.  No.

15             MR. COOK:  Object to form.

16    BY MR. BOIES:

17        Q.  What else did he do?

18             MR. COOK:  You mean at the press conference?

19    BY MR. BOIES:

20        Q.  At the -- at the press conference on

21    October 27th, 2021, what did Mark Cuban do?

22        A.  Have you watched the press conference?

23             MR. COOK:  You just have to answer his

24    question.

25             MR. BOIES:  Yes.
```

CONFIDENTIAL

Page 81

1            THE WITNESS:  Okay.  So --

2    BY MR. BOIES:

3        Q.  Yeah.

4        A.  -- the -- the primary role of the press

5    conference was to announce the partnership and share with

6    our fans that it was based off of creating educational

7    opportunities and helping us educate our fans on what the

8    crypto industry was.  That was the primary -- one of the

9    primary goals of the sponsorship.

10       Q.  Were there educational discussions between Steve

11   and Mark and player representatives?

12            MR. COOK:  Object to the form.

13            THE WITNESS:  I was not involved in any of

14   those conversations, so I don't know.

15   BY MR. BOIES:

16       Q.  Were you there on the -- at the press conference?

17       A.  At -- sorry.  You're asking about the press

18   conference?

19       Q.  Were -- were you present at the press conference?

20       A.  Yes.

21       Q.  Did you watch the press conference?

22       A.  Yes.

23       Q.  Did Steve and Mark and player representatives

24   have discussions about cryptocurrency at the press

25   conference?

CONFIDENTIAL

Page 82

1      A.  Yes.  They had educational dialogue.  The players

2  were -- is that what you're asking?

3      Q.  Yeah.  Yes.  I -- I am -- I am asking about the

4  educational discussions between Mark, Steve Ehrlich,

5  player representatives of the Mavericks, at the 10/27 --

6      A.  Yes.

7      Q.  -- press conference.

8      A.  The players and Mark both spoke on educational

9  topics for the announcement.

10      Q.  Did -- and -- and you'll see here that on

11  September 17th -- or, actually, on September 10th, Erika,

12  from Voyager, asked for that -- asked for that type of

13  involvement --

14                 MR. COOK:  Object to form.

15  BY MR. BOIES:

16      Q.  -- correct?

17                 And that type of involvement was given

18  on October 27th, correct?

19                 MR. COOK:  Wait.  So he didn't answer your

20  first question.

21                 MR. BOIES:  I know.  I know.  I always get

22  distracted.

23                 THE WITNESS:  The --

24                 MR. COOK:  Wait.

25                 THE WITNESS:  Can you ask --

Page 83

1          MR. BOIES:  Let's -- we're going to

2    rephrase -- we're going to rephrase, but I have to sign

3    back in to see what I said.  And now I can't remember my

4    password.

5          MS. WOLKINSON:  Do you want to take a little

6    break?

7          MR. BOIES:  One last question.

8          MS. WOLKINSON:  Okay.

9    BY MR. BOIES:

10       Q.  The involve- -- you said earlier that a lot of

11   clients can ask for things, but that doesn't mean that

12   they will receive them, correct?

13       A.  Correct.

14       Q.  In this case, did Voyager ask for things and then

15   not receive them in the deal?

16       A.  Can you --

17          MR. COOK:  Object to the form.

18          THE WITNESS:  That's -- that's pretty broad.

19   Can you narrow that down?

20   BY MR. BOIES:

21       Q.  Were there any things -- like, is there anything

22   that comes to your mind specifically that Voyager asked

23   for at the beginning of the deal that was not delivered to

24   them during the deal?

25       A.  I don't think I can answer that fully.  There --

CONFIDENTIAL

Page 84

1   there could have been things that they asked for that

2   didn't make it into the contract, sure.

3        Q.  But you don't have, in your mind, any specific

4   example of them asking for something and then not

5   receiving that thing as a result of this deal?

6             MR. COOK:  Object to form.

7             THE WITNESS:  ████████████████████████████

8   ████████████████████████████████████████████████████

9   BY MR. BOIES:

10       Q.  When did they ask -- did they ask for Mark Cuban

11  to participate in any other events other than the 10/27

12  press conference?

13       A.  Not to my knowledge.

14       Q.  Okay.

15            MR. BOIES:  All right.  We'll take our break

16  now.

17            THE VIDEOGRAPHER:  Off the record, 10:59.

18            (Brief recess taken.)

19            THE VIDEOGRAPHER:  We are on the record.

20  The time is 11:24.

21            MR. BOIES:  And how much time do we have on

22  the record?

23            THE VIDEOGRAPHER:  An hour, 40 minutes.

24            MR. BOIES:  Great.

25  BY MR. BOIES:

CONFIDENTIAL

Page 85

```
 1        Q.  You -- just before break, you mentioned that
 2   Mark Cuban was not a specific deliverable within the --
 3   within the contract; is that correct?
 4        A.  Correct.
 5        Q.  In your experience, a -- a contract of this
 6   magnitude, are -- is everything in the contract --
 7                MR. COOK:  Object to form.
 8   BY MR. BOIES:
 9        Q.  -- when it -- when it is executed?
10        A.  Primarily.
11        Q.  Primarily?
12                Does there ever have to be a certain level
13   of trust on both sides that they -- that each other will
14   deliver value and provide what each other are looking for?
15                MR. COOK:  Object to form.
16                THE WITNESS:  Say that again.
17   BY MR. BOIES:
18        Q.  Does there need to be trust on both sides that
19   both the Mavericks and their partner, or sponsor, will
20   deliver the value and provide what the partner is looking
21   for?
22                MR. COOK:  Object to form.
23                THE WITNESS:  ████████████████████████████
24   ████████████████████████████████████████████████████████
25   ██████████████████████████████
```

CONFIDENTIAL

Page 86

1    BY MR. BOIES:

2        Q.  Do you ever expedite the contractual process

3    so -- so that not everything is included in the contract?

4                    MR. COOK:  Object to form.

5                    THE WITNESS:  Can you expand on "expedite"?

6    Are you saying do we deliver before the contract is done,

7    or --

8    BY MR. BOIES:

9        Q.  Do you ever short-circuit the contract, the

10   contractual negotiations and say:  We're going to deliver

11   the value you're seeking, but we're not going to give you

12   the specifics about the assets that you're buying?

13                   MR. COOK:  Object to form.

14                   THE WITNESS:  ████████████████████

15   ███████████████████████████████████████████████████████

16   ██████████████████████████████████████████████████████

17   ██████████████████████████████████

18                   MR. BOIES:  I'll give you Exhibit 35.

19                   (Exhibit 35 was marked for identification.)

20   BY MR. BOIES:

21       Q.  Do you see how you -- where you are -- where you

22   received this e-mail from Kory Nix, at the top of the

23   e-mail?

24       A.  (Witness examines document.)  Yes.

25       Q.  And you received this e-mail?

1      A.  So it looks.

2      Q.  Did -- did you read it when you received it?

3      A.  Back -- yes.  This is quite a while ago.

4      Q.  Do you see in the -- in the first sentence on

5   sort of the -- the second or third phrase, where it says:

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████

8      A.  Yes.

9      Q.  What does that mean to you?

10   ███  ████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ██████

15      Q.  "We will have over 100-plus years of experience

16   on this call."  What is -- whose experience?

17      A.  The -- if you add up all of the senior directors

18   and VPs, we have over a hundred years' worth of

19   experience.

20      Q.  And that is you, Kory, Clay, Billy, and Ryan?

21      A.  Correct.

22      Q.  Between the five of you, you have a hundred years

23   of -- of experience?

24      A.  Yes.

25      Q.  Together averaging 20 years of experience?

CONFIDENTIAL

```
 1              MR. COOK:  Object to form.

 2              THE WITNESS:  Around that, yes.

 3    BY MR. BOIES:

 4         Q.  Your experience is how long?

 5         A.  Fifteen.

 6         Q.  And your lack of -- you're not quite at 20 years

 7    of experience --

 8         A.  Right.

 9         Q.  -- but that's made up for it with your

10    colleagues --

11         A.  Correct.

12         Q.  -- is that correct?

13              How long has Ryan been with the Mavericks?

14         A.  Approximately 25.

15         Q.  Did he predate you?

16         A.  Yes.

17         Q.  Did he predate Mark Cuban?

18         A.  That's a good question.  I mean, Mark bought the

19    team in -- I would assume so.

20         Q.  That's fine.

21         A.  Right around that.  You're asking me to do math,

22    and --

23         Q.  That's fine.

24         A.  Yeah.

25         Q.  What did you major in college?  What was your
```

Page 89

1    major in college?

2           A.  Business management/marketing.

3           Q.  And in -- with that -- do you see the last -- the

4    last line of -- of that paragraph from Kory?  What does

5    that say?

6           A.  It says:  Communicate that they're in great hands

7    with us and MC as their partner.

8           Q.  Now, did -- and did you -- do you read that as

9    Kory is suggesting -- who does "MC" refer to in this?

10          A.  Mark.

11          Q.  And so Mark Cuban, as their partner, is that what

12   Kory Nix is referring to here?

13                 MR. COOK:  Object to form.

14                 THE WITNESS:  I can't speak to Kory's --

15   BY MR. BOIES:

16          Q.  Well, how did you interpret it?

17          A.  That they're going to be in good hands with us as

18   an organization.

19          Q.  And that Mark Cuban would be their partner?

20                 MR. COOK:  Object to form.

21                 THE WITNESS:  As the Dallas Mavericks is

22   what -- I'm reading it as Dallas Mavericks.

23   BY MR. BOIES:

24          Q.  You're -- you're reading "MC" as Dallas

25   Mavericks?

Page 90

1      A.  They're in great hands with us, the Dallas

2  Mavericks, and Mark Cuban, as the partner.  He's a part of

3  the Dallas Mavericks.

4      Q.  And so he would be a partner to Voyager --

5              MR. COOK:  Object to form.

6  BY MR. BOIES:

7      Q.  -- in this -- in this deal?

8              MR. BEST:  Object to form.

9              THE WITNESS:  This is not -- this was gone

10  before we had any of the deal points.

11  BY MR. BOIES:

12      Q.  Did there need -- because of the speed at which

13  this deal was moving, did there need to be a level of

14  trust on both sides?

15              MR. COOK:  Object to form.

16              THE WITNESS:  There needed to be trust on

17  both sides.

18  BY MR. BOIES:

19      Q.  And would -- do you think that Voyager, in their

20  mind, was thinking of the trust as Mark Cuban, as their

21  partner here, but then not when it came contractual time?

22              MR. COOK:  Object to form.

23              THE WITNESS:  I can't speak to Kory's train

24  of thought.

25  BY MR. BOIES:

CONFIDENTIAL

Page 91

1      Q.  But you under- -- I'm talking about your -- you

2   received this e-mail, and your understanding of what this

3   e-mail says.

4              MR. COOK:  Wait for a question.

5   BY MR. BOIES:

6      Q.  ████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████

9   ██████████████████████████████████████████████████████

10  ████████████████████████

11               ████████████  ████████████████

12               ████████████████  ████████████████████████

13  ████████████████████████████████████████████████████████

14  ██████████████████████████

15  BY MR. BOIES:

16     Q.  And if you -- if you go back -- if you go to the

17  third-to-last page, it's 12466 in the bottom right corner,

18  this is back -- this is, again, the Erika e-mail to Ryan

19  from September 10th where -- where she discusses what

20  Voyager is seeking?

21     A.  Yep, I see that.

22     Q.  And, again, this is -- this is where -- do -- do

23  you feel that what Voyager was seeking was delivered to

24  Voyager?

25              MR. COOK:  Object to form.

Page 92

1           THE WITNESS:  They were seeking several of

2    these things, but they -- they weren't delivered.

3    BY MR. BOIES:

4        Q.  Which weren't?

5        A.  ███████████████████████████████████████

6    ██████████████████████████████████████████████

7    ██████████████████████████████████████████████

8    ███████████████████████

9        Q.  Did Mark get involved in the Voyager/Dallas

10   Mavericks partnership?

11           MR. COOK:  Object to form.

12           THE WITNESS:  ████████████████████████████

13   ██████████████████████████████████████████████

14   ███████████████████

15   BY MR. BOIES:

16       Q.  What else did they ask for, other than the press

17   announcement?

18       A.  They -- I don't recall all of them, but they

19   asked for several things from Mark that --that didn't come

20   to fruition.

21       Q.  Did they ask Mark to Tweet about Voyager?

22       A.  I don't -- I don't -- I wasn't aware of that.

23       Q.  Did they ask Mark to have an interview on CNBC

24   with Stephen Ehrlich?

25       A.  They -- they did ask for him to do a -- a press.

Page 93

1   I don't remember if it was specifically that news outlet

2   or with Stephen Ehrlich, but --

3       Q.  Did they do press together?

4       A.  I don't recall.  Again, we -- we get a lot of

5   asks from different sponsors, and we -- they don't always

6   end up in the deal.

7       Q.  But when they ask for something and they receive

8   it, do they pay for it?

9               MR. COOK:  Object to form.

10              THE WITNESS:  That's not really -- I mean,

11  they pay for what's in the agreement.

12  BY MR. BOIES:

13      Q.  And sometimes they get more than what's in the

14  agreement?

15  ███ ████████████████████████  ████████████████

16  ████████████████████  ████████████████████████████

17  ███ ██████████████████████████████

18  █████████████████████

19          ███████████  █████████████

20  ████████████

21  ███ ████████████████████████████

22  ███ █████████████████████████████████████

23  ███ ██████████████████████████████

24  ████████████████████

25      ███  ███

Page 94

1      Q.  Would that press announcement have gone forward

2    without Mark Cuban?

3      A.  Yes.

4      Q.  Did they -- did Voyager, and its representatives,

5    ever confirm Mark Cuban's availability for the Sept- --

6    for the October 27th press conference?

7                    MR. COOK:  Object to form.

8                    THE WITNESS:  Can you say that again?

9    BY MR. BOIES:

10     Q.  Did Voyager confirm Mark Cuban's availability for

11    the October 27th press conference --

12                    MR. COOK:  Object to form.

13    BY MR. BOIES:

14     Q.  -- prior to the --

15     A.  Voyager -- are you asking if Voyager scheduled

16    that with Mark?

17     Q.  Did Voyager -- sure.  Sure.  We'll start with

18    that.

19                    Did Voyager schedule the September -- the

20    October 27th press conference with Mark Cuban?

21     A.  No.

22     Q.  Who did they schedule it with?

23                    MR. COOK:  Object to form.

24                    THE WITNESS:  Our team invited Mark to

25    participate.

CONFIDENTIAL

Page 95

1   BY MR. BOIES:

2      Q.  Did Voyager ever confirm Mark's participation

3   prior to October 27th?

4            MR. COOK:  Object to form.

5            THE WITNESS:  I don't know what date Mark

6   was -- Mark confirmed to be there at the press conference,

7   but that was a --

8   BY MR. BOIES:

9      Q.  Was it important, in your mind, to Voyager to

10  have Mark Cuban at that press conference?

11           MR. COOK:  Object to form.

12           THE WITNESS:  I can't speak for Voyager.

13  BY MR. BOIES:

14      Q.  But as the sales representative from the

15  Mavericks who was in charge of putting together this deal,

16  you had some idea about what was important to Voyager; is

17  that correct?

18      A.  The -- they did the partnership without him being

19  a contractual asset, so, obviously, it wasn't something

20  that they required.

21      Q.  Was the level of trust that needed to be had on

22  both sides communicated to Voyager at any point?

23           MR. COOK:  Object to form.

24           THE WITNESS:  That's -- that they would have

25  to believe that we were going to become a good sponsor and

Page 96

1    deliver what was in the contract.

2                    MR. BOIES:  Exhibit 106.

3                    (Exhibit 106 was marked for identification.)

4    BY MR. BOIES:

5        Q.  Did you -- did you organize phone calls and

6    meetings with -- with people from Voyager?

7        A.  We -- we had numerous calls that would have been

8    scheduled through Teams.  I don't know if I did every one

9    of them, but I did some of them.

10       Q.  When -- when you schedule a call through Teams,

11   is that, like, Microsoft Teams?

12       A.  Yeah.

13       Q.  Is it videoconference?

14       A.  Yes.

15       Q.  Are those videoconferences recorded?

16       A.  No, not that I'm aware of.

17       Q.  Do you take notes on those videoconferences?

18       A.  Not all the time.

19       Q.  When you do, what kind of notes do you take?

20                    MR. COOK:  Object to form.

21                    THE WITNESS:  A summary of the conversation

22   or how we would then put specific deal points into the --

23   into a proposal or how we activate the deal.

24   BY MR. BOIES:

25       Q.  What does "activate" mean?

CONFIDENTIAL

Page 97

1          A.  How we -- how we execute the deliverables.

2          Q.  And -- and when you take notes on these calls, do

3   you put them into the summary form and distribute them to

4   your colleagues?

5                    MR. COOK:  Object to form.

6                    THE WITNESS:  I don't recall.  I took some

7   notes.  I don't recall doing them every time.

8                    (Exhibit 108 was marked for identification.)

9   BY MR. BOIES:

10         Q.  And on that same day, you sent this e-mail to --

11  Exhibit 108 -- premarked Exhibit 108 to Victor Ribakare?

12         A.  "Ribakare."

13         Q.  "Ribakare."

14                   Who is Victor Ribakare?

15         A.  He is our activation team.

16         Q.  He's on your activation team?

17         A.  Uh-huh.

18         Q.  Does he work below you?

19         A.  He works side by side.

20         Q.  Side by side to you.

21                   So he had -- is he a senior director as

22  well?

23         A.  No.  He's on the activation team.  There's a

24  sales team, and then there's an activation team.

25         Q.  This might be a little late, but let's -- do you

Page 98

1    mind helping me go through, sort of, the corporate

2    structure?

3              So you say there's an activation team and a

4    sales team.  What -- what other teams are there?

5         A.  In our group, in the sponsorship team?

6         Q.  So is a sponsorship team different than -- and

7    activation team different from a sales team?

8         A.  Well, big picture, sponsorship team, right?

9         Q.  Okay.

10   ████ ███████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13        Q.  The -- so the proposals are done by a third team

14   from the activation and the sales team?

15        A.  The sales team primarily does it, but we have

16   help from them, like, with creating logos, et cetera.

17        Q.  Now, is that a communications team?

18        A.  No.

19        Q.  What team is Erin Finegold White on?

20        A.  She's on our marketing -- she's in our marketing

21   department, not in -- in our --

22        Q.  Is the sponsorship team different than marketing?

23        A.  Yes.

24        Q.  And is that different than player personnel?

25        A.  Correct.

CONFIDENTIAL

Page 99

```
1        Q.  How many different of those teams do you have?
2   Like, sponsorship team?  Marketing team?
3        ██    ████████    ████████████████
4   ████████████████████████████████████
5   ████    ████████████████████████████████
6   ████  ████████████████  ████████████████
7   ████████████████████████████
8   ████████████████████████████████
9   ██████
10       Q.  So -- so there might be a sales group under the
11  ticket --
12       A.  Correct.
13       Q.  -- under the ticketing group, but that will have
14  nothing to do with the sponsorship?
15       A.  Correct.
16       ██  ████████████████████████████
17  ██████████████████████████████
18  ██████████████████████████████
19  ████████████████
20       A.  Yes.
21       Q.  -- is that correct?
22       A.  Correct.
23       Q.  And in this e-mail, you -- you -- you tell -- and
24  who -- sorry, remind me where -- and Victor Ribakare --
25  sorry if I'm mispronouncing --
```

CONFIDENTIAL

Page 100

```
 1        A.  That's okay.

 2        Q.  -- he works on -- he works in your sales team or

 3    in the activation team?

 4        A.  Activation.

 5        Q.  But under that sponsorship umbrella?

 6        A.  Correct.

 7        Q.  And when you say, "Voyager is taking over the

 8    day," what do you mean by that?

 9        A.  We were working on putting together the proposal,

10    I imagine, for this -- on that day, and we were working on

11    it throughout the day.

12        Q.  Did it take -- did -- did working on Voyager take

13    away from other obligations you had?

14        A.  I don't recall that specific day.

15        Q.  What prompted you to tell Victor this?

16        A.  I may have been in another meeting, but I don't

17    recall the exact e-mail.

18        Q.  And the -- and the marketing team, that's sort of

19    a separate group, the marketing group, did they have any

20    involvement with this Voyager deal?

21        A.  We work close with them for different deal

22    points.

23        Q.  Like the drumline video, will that be -- what

24    team -- of -- of these five teams, what -- what team did

25    you work with to -- to produce that video?  Do you
```

CONFIDENTIAL

Page 101

1  remember the drumline video?

2      A.  Yes.

3      Q.  The drumline video, what -- what team produced

4  that?

5      A.  We used an outside agency to create that video.

6      Q.  So you wouldn't have gone to your own marketing

7  team?  So your marketing team had nothing to do with that?

8              MR. COOK:  Object to form.

9              THE WITNESS:  They would have -- have seen

10  the storyboard.  They would have seen the -- what the

11  video was and approved -- approved it.

12  BY MR. BOIES:

13      Q.  I know I just said -- and I know I just asked

14  this question, so I apologize.

15              But what does "activation" mean?

16      A.  They're the support group of our sales arm.

17      Q.  And when you say "support group," they -- that

18  means they are often the ones fulfilling the

19  obligations --

20      A.  Yes.

21      Q.  -- making sure that the assets that you've

22  promised in your sponsorship agreement come to fruition?

23      A.  Yes.

24      Q.  If the car had come to fruition, it'd be the

25  activation team that would go out and get that car; is

Page 102

1    that -- is that a fair statement?

2        A.  The activation team helps us create or execute

3    what signage is being run, our media trafficking, social.

4    They're an extension of our team to make sure that things

5    are executed.

6        Q.  So this is Exhibit, premarked, 36.

7            (Exhibit 36 was marked for identification.)

8    BY MR. BOIES:

9        Q.  And did you receive this e-mail on or about the

10   time it says at the top of that page from Ryan Mackey?

11       A.  Yes.

12       Q.  Did you have a call that day where it says:

13   FYI --

14       A.  On the 17th?

15       Q.  -- for our call today?

16       A.  Yes.  I can't specifically recall what -- what

17   the call was about, but yes.

18       Q.  If you -- like, I think I showed you Exhibit 106.

19   If you go back just a few exhibits, was that you

20   organizing that call that occurred?

21       A.  Started at 4:30.

22       Q.  Well, 4:30 is -- is not actually 4:30.

23       A.  Oh.

24       Q.  4:30 is actually 11:30 or 10:30.  I'm a little

25   confused myself about the actual times.

CONFIDENTIAL

Page 103

1      A.  Yeah, I was about to say, the times aren't --

2      Q.  So this is GMT, so that's Greenwich Mean Time.

3  So that's 4:30 in -- in Engl- -- England.

4      A.  I don't know if those timelines match up.  Is

5  that what you're saying?

6      Q.  I'm asking -- I'm -- I'm asking you if -- if

7  the -- the e-mail was sent at 4:29 p.m. GMT 00, your --

8  your start to the --

9      A.  Yeah, 4:30 to 5:30.

10     Q.  -- call, 4:30 GMT OO.

11          Are these -- do you think -- do you have any

12  reason to think that this call that you organized with

13  Erika is not the same call referenced by Mackey on the --

14  at 4:29?

15          MR. COOK:  Object to form.

16          THE WITNESS:  I -- I -- it's hard to say.  I

17  would -- I mean, this -- I scheduled a meeting at 4:30.

18  BY MR. BOIES:

19     Q.  Okay.  Do you remember if that meeting happened?

20          MR. COOK:  Object to form.

21          THE WITNESS:  I -- I assume it did.

22  BY MR. BOIES:

23     Q.  Do you think that this e-mail was discussed on

24  that meeting?

25          MR. COOK:  Object to form.

CONFIDENTIAL

Page 104

1              THE WITNESS:  Voyager -- Mavs + Voyager

2     Connect, Voyager & Mavs Asset Summary.

3              Yes.  I mean, this looks like something we

4     would have gone over.

5     BY MR. BOIES:

6          Q.  I'll -- I'll put you -- are you on page 12368?

7          A.  Yes.

8          Q.  So at the top left, it says, "Partnership

9     Objectives," correct?

10         A.  Yep.

11         Q.  Now, you -- you're saying that -- you've said

12    that partnership and sponsorship are the same, so it could

13    have said, "Sponsorship Objectives"?

14         A.  Again, they can -- yeah, it's a common vernacular

15    for us to use sponsorship and partnership as the same.

16         Q.  Now, is -- "sponsor" and "partner," are those

17    interchangable.

18         A.  It's common vernacular.

19         Q.  So -- so it could say, "Sponsor Objectives"?

20         A.  It could.

21         Q.  So -- so when -- when it says "Spon-" -- when it

22    says "Partner Objectives," this is, in your mind,

23    Voyager's objectives?

24              MR. COOK:  Object to form.

25              THE WITNESS:  These are the objectives that

```
 1    Voyager was looking to do, yes.

 2    BY MR. BOIES:

 3        Q.  And -- and the second bullet -- bullet point,

 4    "███████████████████████████████████ is that --

 5        ██  ████████████████████████

 6        Q.  -- are those Voyager objectives?

 7                MR. COOK:  Object to -- object to form.

 8                THE WITNESS:  These are some of the

 9    objectives that we identified going into the call.

10    BY MR. BOIES:

11        ██  ██████████████████████████████████████

12        ██  ████████████████

13        ██  ██████████████████

14        ██  ████████████████████

15        Q.  Sorry.  I'm going to ask you again slightly --

16    slightly different.

17                      ████████████████████████████████

18    ██████████████████████████████████████████████████

19    ████████████████████

20        ██  ██████████████████████████████████████

21        ██  ████████████████████████████████████

22    ██████████████████████████████████████████████████

23    ██████████████████████████████████████████████████

24    ████████████

25                MR. COOK:  Object to form.
```



CONFIDENTIAL

Page 107



 9    BY MR. BOIES:

CONFIDENTIAL

Page 108

CONFIDENTIAL

```
 1   BY MR. BOIES:

 2        Q.  If Mark had been available and willing, would he

 3   have engaged in that additional press, regardless of his

 4   contractual obligation?

 5                  MR. COOK:  Object to form.

 6                  THE WITNESS:  I can't speak for Mark.

 7   BY MR. BOIES:

 8        Q.  Do -- do you e-mail Mark Cuban directly?

 9        A.  I have in the past, yes.

10        Q.  And in the -- this deal, one of the -- in this

11   deal, you -- you saw national press as one of the things

12   that Voyager was interested in; is that correct?

13        A.  They wanted to tell as -- you know, as many of

14   our fans about the announcement as they could.

15        Q.  And those fans -- you've got Mavs fans across the

16   country; is that correct?

17        A.  We have Mavs fans everywhere, yes.

18        Q.  Do you have Mavs fans in Germany?

19                  MR. COOK:  Object to form.

20                  THE WITNESS:  I assume so.

21   BY MR. BOIES:

22        Q.  Do you have Mavs fans in Slovenia?

23                  MR. COOK:  Object to form.

24                  THE WITNESS:  I assume so.

25   BY MR. BOIES:
```

Page 109

1    Q.  Do you have Mavs fans in California?

2              MR. COOK:  Object to form.

3              THE WITNESS:  I am sure there are Mavs fans

4    in every state.

5    BY MR. BOIES:

6    Q.  And through this partnership, you wanted to reach

7    Mavs fans in every state?

8              MR. COOK:  Object to form.

9              THE WITNESS:  Our -- we have a marketing

10   territory that we're supposed to market to, which is in

11   North Texas, so all of our partnerships/sponsorships are

12   geared towards those fans.

13   BY MR. BOIES:

14   Q.  Does El Paso, Texas, fall within that?

15   A.  I don't believe it's in our marketing territory.

16   There's a 150-mile marketing radius territory.

17   Q.  Have you ever been to El Paso, Texas?

18   A.  I honestly -- I may have driven through it

19   whenever I was a kid.

20   Q.  But El Paso is more than 150 miles from here?

21   A.  I don't know.  Yes, I don't know --

22   Q.  That's okay.  So let's say I'll tell you El Paso,

23   Texas, is more than 150 miles away from Houston, San

24   Antonio, and Dallas.  Would -- would El Paso, Texas, under

25   that scenario, be able to receive any team-specific NBA

Page 110

1    marketing --

2              MR. COOK:  Object to form.

3    BY MR. BOIES:

4        Q.  -- under your understanding of the rules?

5              MR. COOK:  Same objection.

6              THE WITNESS:  If they are -- they are in

7    Texas and outside of those marketing territories of the

8    other teams, then, yes, we would be able to market to

9    them.

10   BY MR. BOIES:

11       Q.  You would be able to market to them if they

12   are out- --

13       A.  If they --

14       Q.  So -- so -- sorry.

15       A.  As it relates to, like, e-mail, is that what

16   you're asking?  Like --

17             MR. COOK:  Wait for him to ask a question.

18   BY MR. BOIES:

19       Q.  If I live -- if -- if I live more than 150 miles

20   away from any of the three sports -- three basketball

21   teams in Texas, can the Mavericks advertise to me without

22   geofenced -- without geofencing?

23             MR. COOK:  Object to form.

24             THE WITNESS:  Is that a question?

25   BY MR. BOIES:

CONFIDENTIAL

Page 111

1        Q.  Well, I tried to be.  It wasn't very clear.

2                Do -- do you know if you can advertise to a

3    Texan that lives more than 150 miles away from San

4    Antonio, Houston, and Dallas?

5                MR. COOK:  Object to form.

6                THE WITNESS:  I don't re- -- I don't know

7    which territories -- which territories we can and cannot

8    market outside of the -- in Texas.  El Paso could be

9    somewhere that we could do a -- we could send an

10   advertisement to.

11   BY MR. BOIES:

12       Q.  So if Bally Sport -- Bally Sports is -- is in

13   El Paso, Texas, they are play -- they get the Mavs game --

14       A.  Right.

15       Q.  -- they can see Voyager -- they can see the

16   Voyager signage just as if they're sitting in

17   Fort Worth -- Dallas-Fort Worth; is that -- is that your

18   understanding?

19       A.  I don't --

20               MR. COOK:  Object to form.

21               THE WITNESS:  I don't know if they receive

22   Bally's in El Paso, Texas.

23   BY MR. BOIES:

24       Q.  But Pensacola, Florida, do you know where

25   Pensacola, Florida is?

Page 112

1      A.  Yes, it's northern part of --

2      Q.  More than 150 miles away from Orlando and Miami;

3  more than 150 miles away from any sports team; I think

4  more than 150 miles from New Orleans, but I could be

5  wrong.

6           MR. COOK:  Just wait for a question.

7  BY MR. BOIES:

8      Q.  But wait for the question.

9           Do you know if geofencing, as it relates to

10 your advertisements, are restricted in areas such as that?

11           MR. COOK:  Object to form.

12           THE WITNESS:  I don't recall.  I don't know

13 the answer to that.

14 BY MR. BOIES:

15     Q.  But you understood the Voyager proposal included

16 things that were for national promotions to drive consumer

17 acquisitions?

18           MR. COOK:  Object to form.

19           THE WITNESS:  The Sponsorship Agreement that

20 we had was intended to reach our marketing territory in

21 North Texas.

22 BY MR. BOIES:

23     Q.  And no other territory?

24     A.  Someone on TV could have seen signage.  We --

25 that's not in our control.

CONFIDENTIAL

Page 113

1        Q.  But your deal with Voyager was only for

2    promotions within the 150-mile radius of

3    Dallas-Fort Worth?

4                MR. COOK:  Object to form.

5                THE WITNESS:  The marketing assets in this

6    deal were intended to be utilized across North Texas in

7    our marketing territory.

8    BY MR. BOIES:

9        Q.  Here's Exhibit 24.

10               Did you write that e-mail?

11       A.  Yes.

12       Q.  Did you prepare the sales report that is

13    referenced in the subject line of that e-mail?

14       A.  Yes.

15       Q.  When you prepare a sales report, do you do it for

16    more than one sponsorship -- sponsor?

17       A.  Yes.

18       Q.  Is the reason the rest of this page blacked out

19    is because there are other companies that you are giving a

20    sales report that might not be relevant to this

21    litigation?

22               MR. COOK:  Object to form.

23               THE WITNESS:  I would assume that's the

24    case.

25    BY MR. BOIES:

CONFIDENTIAL

Page 114

```
 1      Q.  You -- and looking at this page right now -- and
 2   this is a yes-or-no question.  Looking at this page right
 3   now, is there anything to suggest to you that there is
 4   advice that was given to you through counsel underneath
 5   this blacked-out point?
 6               MR. COOK:  Object to form.
 7               THE WITNESS:  Say that question again.
 8   BY MR. BOIES:
 9      Q.  Is there legal advice under here?
10               MR. COOK:  Object to form.
11               THE WITNESS:  I -- I don't know what's
12   specifically in this -- what's underneath that.
13   BY MR. BOIES:
14      Q.  Did you write what is underneath that, or were
15   you forwarding part of a document that was underneath
16   that?
17      A.  No, that would have -- most likely have been
18   another update on another sponsor.
19      Q.  Do you ever give legal advice?
20      A.  No.
21      Q.  Do you ever -- okay.  So that's fine.  That's I
22   just want to...
23               Do you see in the second line of -- of --
24   so:  ███████     ████████████████████████████████
25   ████████████████████████████████████████████████
```

Page 115

1           Do you see that?

2      A.   Yep.

3      Q.   The second item is, ███████████████

4      ███████████████████████████

5         ██  ███████████████████████████

6      ███████████████████████████████████

7      ███████████████████████████████

8      ███████████████████

9      Q.   But this is what Voyager wanted?

10          MR. COOK:  Object to form.

11          THE WITNESS:  ██████████████████

12     ████████████████████

13     BY MR. BOIES:

14     Q.   ██████████████████

15     ███████████████████████████████████

16     █████████████████

17          ███████████  ██████████

18          ██████████  ████████████████

19     ███████████████████████████████

20     ███████

21     BY MR. BOIES:

22     Q.   And this partnership, was one of the things that

23     it's intended to do was to build trust and credibility; is

24     that correct?

25          MR. COOK:  Object to form.

Page 116

 1          THE WITNESS:  ████████████████████

 2   ███████████████████████████████ of

 3   █████████████████████████████████ d

 4   ████████████████████

 5   BY MR. BOIES:

 6       Q.  In the cryptocurrency industry, is building trust

 7   and credibility important?

 8               MR. COOK:  Object to the form.

 9               THE WITNESS:  Yes.

10   BY MR. BOIES:

11       Q.  Why?

12               MR. COOK:  Object to form.

13               THE WITNESS:  So that fans would be willing

14   to engage the sponsor.

15   BY MR. BOIES:

16       Q.  And in this case, willing to put money onto the

17   platform?

18       A.  Or to sign up for an account and learn about it,

19   yes.

20       Q.  And possibly put down $100 and make a trade?

21               MR. COOK:  Object to form.

22               THE WITNESS:  Yes.

23               MR. COOK:  Alex, what time do you want to

24   break for lunch?

25               MR. BOIES:  At least 15 -- at least 10

CONFIDENTIAL

                                                    Page 117

 1    minutes --

 2                   MR. COOK:  That's fine.

 3                   MR. BOIES:  -- 20 -- then 20 minutes would

 4    be -- 20 min- -- 12:30 we should be able to --

 5                   MR. COOK:  Okay.

 6                   MR. BOIES:  -- might be -- might be a few

 7    minutes one way or the other, but --

 8                   MR. COOK:  That's fine.

 9                   MR. BOIES:  This is Exhibit 37.

10                   (Exhibit 37 was marked for identification.)

11    BY MR. BOIES:

12        Q.  And this is an e-mail from you to Clay and Mackey

13    and Kory, correct?  But then it has a body from Clay and

14    previously from Mackey, correct?

15        A.  Correct.

16        Q.  And on page 2, ███████████████████████████████

17    ██████████████████████

18        A.  Where is that at?  Okay, ████████████ I got it.

19                   MR. COOK:  I'm sorry.  Could you read the

20    question back.  I was looking for it on the exhibit.

21                   (Requested material was read back.)

22                   MR. COOK:  Object to form.

23                   THE WITNESS:  ███████████████████████████

24    ████████████████████████████████████████████████████████

25    █████████████████████████████████████████████████

CONFIDENTIAL

Page 118



```
 1   ███████████████████████████████████████████
 2   ████████     So there's --
 3   BY MR. BOIES:
 4       Q.  Does this -- does this go back to trust --
 5   trusting --
 6       A.  ███████████████████████████████████████
 7   █████████████████████████████████████████████ a
 8   ██████████████████████████████████████
 9     ██  ███████████████████████████████████████
10   ███████████████████████████████████████████
11   ███████████████████████████████████████████
12   ████████████
13     ██   ███  █████████████████████████████████
14   ██████████████████
15     ██    ███████
16     ██  █████████████████████████████████████
17   ████████████████████████████████████████████
18   ███████████████████████████████████████████
19   ███████████████████████████████████████████
20   ██████████████████
21          ██████████████████████████████
22   ████████████████████████████████████████████████
23   ████████████████████████████████████
24     ██  ███████████████████████████████████████
25     ██  ███████████████████████████████████████
```

Page 119

1    ████████

2    Q.  Are a lot of deals as ████████████  deal?

3    ██  ████████████████████████████████████

4    ████████████████████████████████████████

5    ████████████    ████████████████████████████

6    ████████████████████████████████████

7    ████████████████████

8    Q.  And last -- and last year -- if you go to, sort

9    of, two -- two pages later, 5327 at the bottom right --

10   A.  Uh-huh.

11   Q.  -- the Mavericks made the playoffs; is that

12   correct?

13   A.  Correct.

14   Q.  Would Voyager have paid a playoff fee?

15   A.  Yes.

16   Q.  Did Voyager pay a playoff fee?

17   A.  I assume so.  I don't know what that number

18   was -- is.

19   Q.  Is the playoff fee -- does the sponsor get more

20   than they're -- then they're paying for?

21   MR. COOK:  Object to form.

22   THE WITNESS:  Repeat that.

23   BY MR. BOIES:

24   Q.  When the -- when the Mavericks makes the

25   playoffs --

Page 120

1          A.  Yes.

2          Q.  -- it's a really -- it's a big deal because the

3   playoffs is nationally -- is -- is nationally televised,

4   correct?

5          A.  The games are nationally televised, correct.

6          Q.  And the games in -- in last year's playoffs were

7   nationally televised, correct?

8          A.  Correct.

9          Q.  And Voyager was a sponsor of -- of the Dallas

10  Mavericks during their playoff run last year, correct?

11         A.  They had assets during the games, but those would

12  not have been visible on the national TV.

13         Q.  Why not?

14         A.  We don't control those rights.

15         Q.  Are there any rights that are protected?

16         A.  So trad- --

17                 MR. COOK:  Object to form.

18                 THE WITNESS:  ███████████████████████

19  ████████████████████████████████████████████████████

20  █████████████████████████████████████████████████████

21  ███████████████████████████████████████████     ██████

22  ███████████████████████████████████████████████

23  ███████████

24  BY MR. BOIES:

25         Q.  So the only playoff fees that they would have

Page 121

1   paid were for geofenced within the 150-mile-radius assets?

2                    MR. COOK:  Object to form.

3                    THE WITNESS:  Yes.

4   BY MR. BOIES:

5        Q.  And when ESPN picks up a highlight from a Dallas

6   Mavericks game, does it use the national televised

7   programming, or does it use the Bally Sports Southwest

8   televised programming?

9                    MR. COOK:  Object to form.

10                   THE WITNESS:  I don't -- I can't speak to

11  what ESPN broadcast they use.

12  BY MR. BOIES:

13       Q.  Do -- do you watch ESPN?

14       A.  Not as much anymore.

15       Q.  Did you watch -- did you used to watch the

16  SportsCenter Top 10?

17       A.  Yes.

18       Q.  Would the SportsCenter Top 10 blur out

19  advertisement signage if it was picking up on a Bally's

20  Sports Southwest feed?

21                   MR. COOK:  Object to form.

22                   THE WITNESS:  I don't believe so.

23  BY MR. BOIES:

24       Q.  So somebody sitting in Ohio might be able to see

25  a -- a Luka highlight, if it's at the Top 10, and all the

Page 122

1    signage would be in the background?

2                    MR. COOK:  Object to form.

3    BY MR. BOIES:

4        Q.  Just the same as it was as when it was being

5    broadcast in Downtown Dallas?

6                    MR. COOK:  Same objection.

7                    THE WITNESS:  That was a long question.

8                    MR. BOIES:  That was a long question.

9    BY MR. BOIES:

10       Q.  So somebody sitting in Ohio watching ESPN Top 10

11   and saw a Luka highlight from a game that was only shown

12   on Bally Sports Southwest, would the signage in the

13   background of the Luka highlight be visible to that

14   individual sitting in Ohio watching SportsCenter?

15                   MR. COOK:  Object to the form.

16                   THE WITNESS:  Yes.

17   BY MR. BOIES:

18       Q.  Same thing with California; the individual

19   watching ESPN on -- Top 10 in California -- in California

20   or in Florida, would see a Luka highlight and the signage

21   in the background on the Bally Sports Southwest feed would

22   be visible to that individual watching the ESPN Top 10?

23                   MR. COOK:  Object to form.

24                   THE WITNESS:  Pending they were using that

25   broadcast.

Page 123

```
 1   BY MR. BOIES:

 2        Q.  Does -- in your experience, does Luka bring --

 3   have a lot of highlights --

 4                 MR. COOK:  Object to form.

 5   BY MR. BOIES:

 6        Q.  -- that are worthy of the ESPN Top 10?

 7                 MR. COOK:  Object to form.

 8                 THE WITNESS:  Luka is a very good player.

 9   BY MR. BOIES:

10        Q.  So, yes, he would have a lot of highlights?

11                 MR. COOK:  Object to form.

12                 THE WITNESS:  He -- yes.

13   BY MR. BOIES:

14        Q.  Is -- is he a -- do people, coast to coast, like

15   Luka Doncic?

16                 MR. COOK:  Object to form.

17                 THE WITNESS:  I believe he is a -- a big

18   fan -- or a big player across the NBA spectrum, yes.

19   BY MR. BOIES:

20        Q.  Are you excited to have a second star to promote

21   with your -- within your team now that you have

22   Kyrie Irving?

23                 MR. COOK:  Object to form.

24                 MR. BEST:  Not for the Jewish community.

25                 THE WITNESS:  We are excited that we have
```

CONFIDENTIAL

Page 124

1   good talent on the floor.

2   BY MR. BOIES:

3       Q.  One of the things that Voyager was looking for

4   was player participation.  Would having a second star

5   increase the assets that were available to be sold to a

6   sponsor?

7                   MR. COOK:  Object to the form.

8                   THE WITNESS:  I don't know how that's

9   relevant to this, considering he's now --

10  BY MR. BOIES:

11      Q.  Kyrie is certainly not relevant to Voyager, and I

12  --

13      A.  Okay.

14      Q.  -- I will -- if you want to object -- if you just

15  don't want to answer that, I'm perfectly happy not

16  including Kyrie.

17                  But having a -- but last year did you have a

18  second star?

19      A.  We -- we had a lot of good players who made it to

20  the Western Conference finals.

21      Q.  Did you have a second All-Star on your team?

22      A.  No.

23      Q.  But Jalen Brunson really helped you in the

24  playoffs?

25      A.  He was not an All-Star, but yeah.

Page 125

1        Q.  He was not; he is now on the Nets.

2        A.  He should be an All-Star.

3        Q.  All right.  One more document.

4                MR. BOIES:  Okay.  Just this one last thing.

5   BY MR. BOIES:

6        Q.  So with the -- so this is Exhibit 38.

7                (Exhibit 38 was marked for identification.)

8   BY MR. BOIES:

9        Q.  This is an e-mail from Ryan to Mark Cuban, and it

10  refers to the -- the:  Over ████████ in ████ built it.

11               Do you see that?

12       A.  Yep.

13       Q.  Do you see where Mavs gaming and legends would

14  each get ████ as part of the deal?

15       A.  Yep.

16       Q.  What did you understand Mr. Mackey as referring

17  to with regards to the:  ████████ fluff built in?

18       A.  That we put ████████ dollars towards ████████

19  ████████████████████

20       Q.  And -- ████████████ -- I'm sorry.

21               Do you prepare the deal sheets?

22       A.  It's a collective effort.

23       Q.  Did you prepare this --  the deal sheet that is

24  attached to the last two pages of this exhibit where your

25  name is --

Page 126

| | |
|---|---|
| 1 | A.  Yes. |
| 2 | Q.  -- with Kory and Clay on the top right? |
| 3 | A.  As I said, it's a collective effort. |
| 4 | Q.  And -- and what does "rate card" mean? |
| 5 | ██ ████████████████████████ |
| 6 | ████████████████████████████ |
| 7 | ███████████████████████████████to |
| 8 | ██████████████████ |
| 9 | ████████████████████████████ |
| 10 | ███████████████████████████ |
| 11 | ███████████████ |
| 12 | Q.  So when it says, "MTA Scholarship Program" -- |
| 13 | A.  Where are we at? |
| 14 | Q.  The last page. |
| 15 | --  ████████  ██████████████, |
| 16 | ██████████████████████████████ |
| 17 | ███ |
| 18 | A.  Yep. |
| 19 | Q.  Those -- those two numbers are the same on this |
| 20 | circumstance.  What does that mean? |
| 21 | A.  ███████████████████████ |
| 22 | █████████████████████████████ |
| 23 | █████████████████████████████ |
| 24 | ██████████████ |
| 25 | Q.  And -- and rate card -- and the sale rate can be |

Case 1:22-cv-22538-RKA   Document 155-28 *SEALED* on FLSD Docket 07/29/2023   Page 128
of 265

1   either discounted or -- or given a premium, correct?

2           MR. COOK:  Object to form.

3           THE WITNESS:  Correct.

4   BY MR. BOIES:

5       Q.  But the rate card isn't -- does the rate card

6   include costs to the Mavericks?

7       A.  Does it include -- I don't know.  Sometimes.

8       Q.  ███████████████████████████████████

9   ████████████████████████████   ██████████████

10  ████████████████████████

11          ████████████   █████████████

12          █████████████   ████████████████████████

13  █████████████████████████████████████

14  ████████████

15      ██   █████

16      ██  ██

17      ██  █████████████████████████

18          █████████████   █████████████

19  ██████████████

20      ██   █████████

21      ██  ████████████   ████████████████████████

22  ████████████████████

23      Q.  Would there be anywhere where it would say what

24  the costs are for these various assets?

25      A.  Some places, yes.

Page 128

```
 1        Q.  So, like, social media -- social campaign, is --
 2    is -- the rate card is zero.
 3        A.  So whenever you see "Social Media Campaign,
 4    Miscellaneous" --
 5        Q.  Yeah.
 6        A.  -- that means that there's a line item in there
 7    that we clicked on that didn't have a -- a rate next to
 8    it, and then it allowed us to put our rate in.  Does that
 9    make sense?
10    ███   ████   ████████████████████████████████████████
11    ███████████████████████████████████████████
12    ███   ████████████████████████████████████████████████
13    ███████████████████████████████████████
14        Q.  And then at the bottom, when you grand total all
15    those numbers --
16        A.  Yep.
17        Q.  ██████████████████████████████
18        A.  I'm sorry.  I don't see -- oh, over here on the
19    right?
20        Q.  Yeah.
21        A.  That's just how much money that the total
22    sponsorship was going to be.  That -- that part of it was
23    going to be added up and equals ████████████████
24        Q.  And the unadjusted gross value ████████████████
25    ████████████████████████████
```

CONFIDENTIAL

Page 129

1      A.  Correct.  Which is where the -- you're saying the

2  unadjusted right here.  Yeah, then one is next to each

3  other, correct.

4      Q.  Is the difference between those two numbers, the

5  ███████████████████████ built in?

6      A.  That is the premium, yes.

7      Q.  And this ████████████████████████

8  ███████████   ████████████████████████

9           MR. COOK:  Object to form.

10           THE WITNESS:  Sorry.  Say that again.

11  BY MR. BOIES:

12      Q.  The -- the ████████████  appears to be the --

13      A.  The --

14      Q.  -- sum of the two numbers to the left --

15      A.  Right.

16      Q.  -- or the three numbers to the left, but it's

17  really only two numbers?

18  ███  ██████████████████████████

19      Q.  Correct.

20      A.  Yes.

21      Q.  ████████████████████████████████

22  ██████████████████

23           MR. COOK:  Object to form.

24           THE WITNESS:  ████████████████████

25  ██████████████████████████████

CONFIDENTIAL

Page 130



```
 1  ████████████████████████
 2  BY MR. BOIES:
 3    ██  ████████████████████████████████████
 4    ██  ████
 5    ██  ███████████████████████████████████
 6  ██████████████████████████████
 7    ██  ████████████████████████████████████████
 8  ██████████████████████  ████████████████████
 9  ███████████████████████
10    Q.  What are hard costs?
11    A.  ████████████████████████████████████
12  █████  █████████████████████████████████
13  ██████████████████████████████████████████
14  █████████████  ████████████████████████████
15  ████████████
16    ██  ██████████████████████████████
17  ███████████████████
18    ██  ██  █████████████████████████████
19    ██  ██████████████████████████
20    ██  █████████████████
21      ██████████  ████████  ██████  ████████████
22  ██████████████████
23      █████████████  ████████████████████
24  █████████████████████████
25            MR. BOIES:  Now is a good time for lunch.
```

CONFIDENTIAL

Page 131

```
 1              MR. COOK:  Great.

 2              THE VIDEOGRAPHER:  Off the record, 12:33.

 3              (Lunch break taken.)

 4              THE VIDEOGRAPHER:  We are on record.  Time

 5    is 1:47.

 6              MR. BOIES:  And how much time have we been

 7    on the record?

 8              THE VIDEOGRAPHER:  2 hours, 54 minutes.

 9              MR. BOIES:  All right.  Where were we?

10    BY MR. BOIES:

11       Q.  Let's see.  This next exhibit was produced the

12    way it was.  It, to me, appears to be eight e-mails, sort

13    of combined, but it was produced as one e-mail with it

14    nestled, so this might get a little --

15              MR. COOK:  Is there any reason we can't

16    break it up if it's different e-mail threads, different

17    exhibits?  It's going to make for a messy record.

18              MR. BOIES:  That is -- that is my concern.

19    The only thing was is that this -- I was told this is

20    exactly how it was produced.

21              MR. COOK:  It's your depo.  I'll do what you

22    want.

23              MR. BOIES:  All right.  So this is -- this

24    is Exhibit 44.

25              (Exhibit 44 was marked for identification.)
```

Page 132

BY MR. BOIES:

Q.  So this is Exhibit 44.  And there are going to be
a number of e-mails from -- from you.  But this is just
the way it was produced, so bear with me.

Do you see the top, the first e-mail is from
you to Erin Finegold White, Collin Kim, and Bonnie Pena.
Who -- who are those individuals?

A.  Erin is our SVP of comms.  I believe that's her
title.  CK works for her in the public rel- -- I guess,
she's our PR person as well.  And Bonnie is -- is
executive assistant.

Q.  And you work with them with -- with Voyager for
the launch and any press releases; is that correct?

A.  Correct.

Q.  And in this e-mail, you are, sort of, sharing
updates about the launch and the press; is that correct?
The very first --

A.  To Erin and CK, yeah.

Q.  Yeah.  And No. 2 on -- in the body of your
e-mail, it says:  I believe Ryan is making the ask to Mark
about the media interview with Steve.

What was that -- what was that in reference
to?

A.  I don't know.

Q.  You -- you don't know now, or you -- you didn't

CONFIDENTIAL

Page 133

1  know then?

2          MR. COOK:  Object to form.

3          THE WITNESS:  I don't know now what that

4  particular ask was.

5  BY MR. BOIES:

6     Q.  Did Steve -- did -- did Voyager ever ask for an

7  interview -- a media interview between Mark and Steve?

8     A.  They made -- yes, they made an ask for him to do

9  an interview with a -- I don't remember what media it was,

10  but I don't think that ever came to fruition.

11     Q.  Okay.  Well, I guess, move ten pages, or so, to

12  15340, bottom right.

13     A.  Okay.

14     Q.  Do you see -- is this -- and you might look in

15  the page right before it.

16          Do you see that this is an e-mail from

17  Mark Cuban to -- addressed to Erin Finegold White but has

18  you in the cc line.  Do you see that?

19          MR. COOK:  Do you mind, Alex, if I just note

20  for the record that this question appears to relate to a

21  separate e-mail thread beginning at the page number that

22  Mr. Boies indicated and ending at 15344?

23          THE WITNESS:  Okay.  So -- (Witness examines

24  document.)  Now that I have read it, what was the

25  question?

CONFIDENTIAL

Page 134

```
 1   BY MR. BOIES:

 2       Q.  So the question was, simply:  Do you see that --

 3   the Mark -- do you see that Mark is being asked for an

 4   exclusive interview with Jabari Young with CNBC ahead of

 5   the press conference on the 27th?

 6       A.  Yes.  I read that.

 7       Q.  And do you see that he does not -- he says "no"

 8   to this?  Do you see why?

 9               MR. COOK:  Object to the form.

10               THE WITNESS:  I don't know that -- I can't

11   speak for Mark.

12   BY MR. BOIES:

13       Q.  But do you -- do you see that he says "no," and

14   then he says a sentence in which he says -- states:  They

15   will ask me more -- one question on Voyager and all other

16   questions will be non-Voyager.  They just used this as an

17   excuse to get me on.

18               Do you see that?

19       A.  I can read that, yes.

20       Q.  And is it -- is -- when you read this at the

21   time, back in -- back about a year and a half ago, did

22   that mean -- what did that mean to you?

23               MR. COOK:  Object to form.

24               THE WITNESS:  I don't -- I don't recall.

25   BY MR. BOIES:
```

CONFIDENTIAL

Page 135

1        Q.  But he wasn't willing to do the interview; is

2    that correct?

3                    MR. COOK:  Object to form.

4                    THE WITNESS:  It says no.

5    BY MR. BOIES:

6        Q.  Would he be -- in your -- in your experience,

7    would he have done the interview if it was exclusive to

8    Voyager?

9                    MR. COOK:  Object to form.

10                   THE WITNESS:  I can't answer Mark's...

11   BY MR. BOIES:

12       Q.  If you go back -- if you continue just maybe --

13   the next page, do you see where it says:  We were

14   trying -- that you -- that you send to -- to Ryan and

15   Erin:  We were trying to make it closer to lunch, but we

16   can do what -- whenever he is available.

17                   Who's "he" in that sentence?

18       A.  I would assume that we're referencing Mark, since

19   the subject says "timeline for Mark."

20       Q.  And what -- what about his availability?  In --

21   in that last three words, "whenever he is available," what

22   did that mean to you?

23                   MR. COOK:  Object to form.

24   BY MR. BOIES:

25       Q.  Or what did -- what did you mean by that, because

Page 136

1  this is your -- your writing?  What did you mean by that?

2              MR. COOK:  Object to form.

3              THE WITNESS:  That our schedule was

4  flexible.

5  BY MR. BOIES:

6      Q.  Who is "our" in your -- that our schedule is

7  flexible, who's "our" in that response of yours?

8      A.  The event timeline.

9      Q.  When the event would take place on the 27th was

10  flexible --

11      A.  Right.

12      Q.  -- for the Mavericks?

13      A.  Right.

14      Q.  Was it flexible for Mark?

15              MR. COOK:  Object to form.

16              THE WITNESS:  I don't know Mark's schedule.

17  BY MR. BOIES:

18      Q.  Would -- were you trying to confirm Mark's

19  schedule for the 27th so that he could participate in the

20  press release and launch?

21              MR. COOK:  Object to the form of the

22  question.

23              THE WITNESS:  We were asking if he was

24  available.

25  BY MR. BOIES:

CONFIDENTIAL

Page 137

1    Q.  At the top of that page, what is his response?

2    A.  "Sure."

3    Q.  And so that "sure" on October 14th -- on

4  October 13th -- oh, God -- that -- that "sure" that was

5  written from -- from Mark Cuban to Ryan, to Dawn, to Cynt,

6  that was referring -- that was answering in the

7  affirmative his availability for a conference with Steve

8  from -- Ehrlich from Voyager on October 27th; is that

9  correct?

10              MR. COOK:  Object to the form.

11              THE WITNESS:  It was for the -- the

12  partnership announcement -- sponsorship announcement.

13  BY MR. BOIES:

14    Q.  And that partnership announcement occurred on

15  October 27th?

16    A.  Yes.

17    Q.  Do you know what time that partnership

18  agreement -- or partnership announcement took place; do

19  you remember?

20    A.  It was around 2:00 p.m.

21    Q.  And this -- these -- this e-mail chain is from

22  two weeks prior to the -- the announcement -- the

23  partnership announcement?

24    A.  I don't -- can you point me to that e-mail?

25  Which page are you looking at?

CONFIDENTIAL

Page 138

1      Q.  I'm looking at -- we can just look at 12- --

2   15340, just where it says, "Mark Cuban," and e-mail

3   "sure."  His -- his response to Ryan Mackey.

4      A.  That's 314 for me.  Am I missing a page?

5      Q.  314?

6      A.  341.

7      Q.  341.  Yes.  Yes.  It's sort of straggling 340 and

8   341.

9              That -- that e-mail where Mark Cuban

10   confirmed his availability for the October 27th press

11   conference was two weeks before that October 27th press

12   conference?

13              MR. COOK:  Hold on.  I'm sorry.  I didn't --

14   I didn't get the question there.

15              THE WITNESS:  I didn't either.

16   BY MR. BOIES:

17      Q.  The e-mail that Mark sent confirming his

18   availability, was that sent two weeks prior to the

19   October 27th press conference?

20      A.  October 13th, yes.

21      Q.  It -- did he make any alterations to that

22   confirmation?

23      A.  I don't know.

24              MR. COOK:  Object to the form.

25   BY MR. BOIES:

Page 139

1      Q.  Did -- did he appear on October 27th?

2      A.  Yes.

3      Q.  So on October 13th, he confirmed that he would be

4  available on October 27th?

5              MR. COOK:  Object to the form.

6              THE WITNESS:  He says, "Sure."

7  BY MR. BOIES:

8      Q.  Yeah.

9              During these two week -- these two, three

10  weeks between, sort of, the -- in -- in the middle of

11  October, from, sort of, now -- from -- from when we're

12  talking about October 13th until the October 27th press

13  release, what -- what were you doing?  What were your

14  obligations?

15              MR. COOK:  Object to the form.

16              THE WITNESS:  I -- that's a long time ago,

17  and there's a two-week period there.  I was working.  I

18  can't tell you what I specifically was working on.

19  BY MR. BOIES:

20      Q.  Was this deal a primary focus of yours?

21      A.  I have several clients, so I was working on all

22  of my sponsorships.

23      Q.  Did you have any new sponsorships --

24      A.  Yes.

25      Q.  -- being negotiated that month?

Page 140

1      A.  I don't -- I can't recall the exact ones, but

2   yes.

3      Q.  Did you close any new partnerships that month?

4      A.  I can't tell you exactly which ones, but there

5   was new partners/sponsors going into that month.

6      Q.  That you were involved in the sales and

7   negotiating the contracts for?

8      A.  I was involved in the -- the sales primarily.

9      Q.  Do -- do you take part in the negotiation of a

10  contract?

11     A.  Can you elaborate?

12     Q.  In the -- in this -- with Voyager, did you

13  partake in the negotiations for what was exactly in the

14  contract?

15             MR. COOK:  Object to the form.

16             THE WITNESS:  It was a collective group of

17  us that did that.

18  BY MR. BOIES:

19     Q.  What was your role in that negotiation?

20     A.  To help put the deal points together.

21     Q.  And one of the deal -- one of the deal points

22  that you put together was the drumline video?

23     A.  Yes.

24             MR. COOK:  Object to form.

25  BY MR. BOIES:

Page 141

1    Q.  Did you -- were you the point of contact with

2  Infinite?

3    A.  Yes.

4    Q.  Who is Infinite?

5    A.  They're a third-party agency that we use to help

6  create videos creative for our various sponsors.

7    Q.  Do you pay Infinite?

8    A.  Yes.

9    Q.  Would -- the amount you pay to Infinite for their

10  services in rolling out the drumline video, would that --

11  how would that appear on the deal sheet internally?

12    A.  I don't know.

13    Q.  Would that be a hard cost?

14    A.  I don't recall how it was done.

15    Q.  Speaking more generally, when you get third-party

16  vendors to -- to help you with assets, how -- who pays --

17  who pays the third-party vendor?

18    A.  It ranges from us to the sponsor.

19    Q.  And do you -- do you, as a person in the sales

20  group, help make those arrangements?

21    A.  Can you restate that?

22    Q.  Do you -- do you make the determination about who

23  should pay the third-party sponsor, whether it be the

24  Mavericks or whether it be the sponsor?

25    A.  I don't recall what happened in this example.

Page 142

1      Q.  And in the -- on the second page, that e-mail
2   from Ash Movshovich, who -- what -- who or what is
3   Ketchum?
4      A.  They are a PR agency.
5      Q.  Are they --
6             MR. COOK:  Alex, what page are you on?
7             THE WITNESS:  332.
8             MR. BOIES:  332.
9             MR. COOK:  Thank you.
10  BY MR. BOIES:
11     Q.  And did -- what was their role in this deal?
12     A.  They were assisting Voyager in the press release.
13     Q.  And did you use the press releases that were
14  provided by Ketchum and Voyager in -- in forming your
15  own -- the Dallas Mavericks press releases?
16     A.  I don't recall.
17     Q.  Who would have been in charge of the Dallas
18  Mavericks press releases?
19     A.  Erin Finegold.
20     Q.  And I'm going to have you turn to 345.  This
21  appears to be a new e-mail from you to -- or from Kory Nix
22  to you and Ryan and Clay, 345.
23     A.  Is -- is 345 --
24     Q.  The bottom --
25     A.  -- all the way to 348 the same e-mail chain --

Page 143

```
 1   thread?

 2        Q.  Yes.

 3        A.  Okay.

 4        Q.  Yes.  Voyager gave --

 5        A.  Can I take a second to read this?

 6        Q.  Of course.

 7        A.  (Witness examines document.)  Okay.

 8        Q.  The Voyager gaming assets, what -- what were

 9   they?

10        A.  They were a collection of assets for our 2K team.

11        Q.  And approximate -- approximately how much was

12   the -- was the game -- was Mavs gaming to receive from

13   this deal?

14        A.  I believe it was stated earlier, it was ███████

15        Q.  And what were -- what was Voyager going to

16   receive as a result of this deal related specifically to

17   the Voyager gaming assets?

18             MR. COOK:  Object to the form.

19             THE WITNESS:  Can you -- can you, yeah, say

20   that again?

21   BY MR. BOIES:

22        Q.  What was Voyager -- what were the deliverables to

23   Voyager related to Mavs gaming?

24        A.  Okay.  Thanks.

25             They were to have the ████████████████████
```

Page 144

1 ████████████████████████████████████████████

2 ████████████    ████████████████████████████

3 ██████████████████████

4       Q.  What is a Texas Ticket Tournament?

5       A.  It was a tournament for individuals to come play

6 2K.

7       Q.  Did that occur?

8       A.  I believe so.

9       Q.  Do you know when that occurred?

10      A.  I do not.

11      Q.  Was that in the -- was -- was that the summer of

12 2022, or was that the summer of 2021?  Do you have about

13 when that would have occurred?

14      A.  I-- I'd be guessing.

15      Q.  Give -- give -- give me your best guess.

16      A.  Sometime between March and May of 2022.

17      Q.  When does the 2K season begin?

18      A.  I believe it began this season in February.

19      Q.  Is there overlap between the -- the 2K gaming

20 season and the Mavericks season?

21      A.  Yes.

22      Q.  Do you remember what the gaming center naming

23 rights ended up being?

24      A.  That asset was not fulfilled because the building

25 we were going to name was sold.

CONFIDENTIAL

Page 145

1      Q.  Do you have an alternative gaming center now?

2      A.  No.

3      Q.  Where do your 2K players play?

4      A.  They play here, and they -- they move here and

5  they are in apartment -- apartments, and they played

6  inside that -- those houses during this period of time.

7      Q.  To- -- today, do you have a new Mavs gaming

8  center?

9      A.  We have an office for -- it's -- it's not

10  completed, but there will -- there's a gaming place that

11  they're going to move into.

12      Q.  Is eSports as big as they thought it would be?

13              MR. COOK:  Object to the form.

14              THE WITNESS:  That's -- can you qualify who

15  "they" are?

16  BY MR. BOIES:

17      Q.  In the past year and a half, has Mavs gaming

18  grown as much as the Dallas Mavericks would have hoped?

19              MR. COOK:  Object to the form.

20              THE WITNESS:  I don't know the answer to

21  that.

22  BY MR. BOIES:

23      Q.  Do you have a lot of experience with Mavs gaming?

24      A.  Nope.

25      Q.  Do you play 2K?

CONFIDENTIAL

Page 146

1      A.  Ten years ago, I did.

2      Q.  Do you -- when Voyager came -- when the deal

3  started, or when you first came on board, one of the

4  titles that Voyager wanted to have was official and

5  exclusive crypto brokerage exchange partner; is that

6  correct?

7      A.  I -- I don't recall the exact term.

8      Q.  Do -- do you re- --

9          MR. BOIES:  Exhibit 39.

10          (Exhibit 39 was marked for identification.)

11  BY MR. BOIES:

12      Q.  Do you see this e-mail you sent on September

13  22nd?

14      A.  Yes.

15      Q.  And it says:  It looks like we have -- already

16  have the language they need to start.  We can add this...

17  Bullet point:  Official and Exclusive Crypto Brokerage

18  Exchange Partner - likely need to define this further.

19          Do you see that?

20      A.  Yes.

21      Q.  Did you type "likely need to define this

22  further"?

23      A.  Yes.

24      Q.  What about that needed to be defined further?

25      A.  I don't recall.

Page 147

1      Q.  Is that an awkward name?

2              MR. COOK:  Object to the form.

3              THE WITNESS:  I don't -- I don't recall

4      the -- where this landed.

5      BY MR. BOIES:

6      Q.  In the third -- when you "@Ryan Mackey," and when

7      you're @'ing somebody, "@," is that just getting their

8      attention, or does that create, like, a hashtag?  In

9      Twitter, when you @ somebody --

10     A.  Oh.

11     Q.  -- you know how it -- it becomes blue, and you

12     click on them?

13             MR. COOK:  Object to form.

14     BY MR. BOIES:

15     Q.  Do you have any system like that in the Maverick

16     -- in your Mavericks database?

17     A.  It announced -- I think it'll recognize that he

18     is being pointed out in this e-mail.

19     Q.  So I'm going to -- that -- that question you

20     asked:  Do we need to review this with legal/marketing?

21             Why did you ask that question?

22     A.  I don't recall.

23     Q.  What about this deal -- do -- do you ask that

24     about all your deals?

25             MR. COOK:  Object to form.

Page 148

```
 1                    THE WITNESS: ███████████████

 2   ████████████████████████████████████████████████

 3   █████████████████████

 4   BY MR. BOIES:

 5        Q.  And this being a crypto brokerage exchange deal,

 6   did you think any additional legal scrutiny might be

 7   warranted?

 8                    MR. COOK:  Object to the form.

 9                    THE WITNESS:  I don't -- I don't know.

10   BY MR. BOIES:

11        Q.  Did you have any opinions about the legality of

12   crypto brokerage exchanges at that time?

13                    MR. COOK:  Object to form.

14                    THE WITNESS:  I -- same answer:  I don't

15   recall what was --

16   BY MR. BOIES:

17        Q.  Do -- do you ever rush over that part, the legal

18   and marketing, sort of, do -- do you ever try to expedite

19   things beyond legal and marketing --

20                    MR. COOK:  Object to form.

21   BY MR. BOIES:

22        Q.  -- to get things done quickly?

23        A.  We -- we would need to get ███████████████████

24   ████████████████████████████      █████████████████████

25   █████████████████████████████████
```

CONFIDENTIAL

Page 149

1     Q.  And what does legal have to approve?

2     A.  They're the same.

3     Q.  Legal and marketing are the same?

4     A.  Legal and marketing would have to --

5     Q.  Is that one -- we had -- earlier, we talked about

6  the various general teams, I believe, the -- the sales

7  team and activation team was under the sponsorship

8  heading; marketing was a different one.  Is legal separate

9  from marketing?

10     A.  Yes.

11     Q.  So when -- when you're going to legal marketing,

12  you're actually going to two different other departments?

13     A.  Correct.

14     Q.  And when you're going to marketing, you're more

15  focused on:  How is this going to look?  How does the

16  drumline video appear?  Correct?

17          MR. COOK:  Object to form.

18          THE WITNESS:  For --

19  BY MR. BOIES:

20     Q.  For marketing, you care more about how it

21  appears; is that correct?

22     A.  The creative.

23     Q.  Yeah.

24          MR. COOK:  Object to form.

25  BY MR. BOIES:

CONFIDENTIAL

Page 150

1        Q.  And in legal, do you care more about what the

2    implications are of partnering with that -- or working

3    with that particular sponsor?

4                    MR. COOK:  Object to form.

5                    THE WITNESS:  I wasn't -- that wasn't a part

6    of my responsibility to work with legal as much.

7    BY MR. BOIES:

8        Q.  So why -- so why were you taking on that

9    responsibility by asking Ryan whether this needed to be

10   reviewed?

11                   MR. COOK:  Object to form.

12                   THE WITNESS:  I was making sure that Ryan

13   was having that conversation.

14   BY MR. BOIES:

15       Q.  So in your opinion, it was Ryan's responsibility

16   to have that conversation with legal?

17       A.  We were looking for his guidance on it.

18       Q.  What else were you doing to move this along

19   quickly?

20       A.  I don't know.

21       Q.  Here's Exhibit 15.

22                   And is this an e-mail that Kory Nix sent to

23   you?

24       A.  Appears to be.

25       Q.  And in the second paragraph, "we," who is "we" in

Page 151

1    that circumstance?

2        A.  I would be guessing for Kory.

3        Q.  But you received this e-mail; it was addressed to

4    you; it was responsive to an e-mail you sent.  How did you

5    interpret "we" in this -- in this paragraph?

6                MR. COOK:  Object to form.

7                THE WITNESS:  Same; I -- I don't know what

8    he was exactly saying.

9    BY MR. BOIES:

10       Q.  "We will be promoting it with our assets."  "We"

11   and "our" are pronouns, and it is your -- it is your

12   testimony that you do not know what "we" and "our" as it

13   relates to Kory Nix writing to you, Billy, Ryan, Clay and

14   Patrick?

15       A.  I would assume that he is saying "we," as in the

16   Mavericks.

17       Q.  So "we," as in the Mavericks, "will be promoting

18   it."  What is "it" in that sentence, in your opinion?

19       A.  I -- I -- I don't know.

20       Q.  Was it the Voyager Club?

21               MR. COOK:  Object to the form.

22               THE WITNESS:  I would be speculating that

23   that's what it is.  I don't know for sure.

24   BY MR. BOIES:

25       Q.  What did you mean when you sent -- earlier that

1    day that prompted this e-mail:  That was scary timing.

2    Reading your e-mail and this came in.

3                    What is "this"?

4         A.  Lee Bratcher with the North Texas Blockchain

5    Council had reached out to me on LinkedIn and wanted to

6    have a conversation about what we're doing in the

7    education space for crypto.

8         Q.  Did you respond to him?

9         A.  Yes.

10        Q.  What is the North Texas Blockchain Council?

11        A.  It's a coalition of crypto enthusiasts that are

12   working on educational programs.

13        Q.  Are -- is North Texas Blockchain Council a

14   competitor of Voyager?

15                 MR. COOK:  Object to form.

16                 THE WITNESS:  No.

17   BY MR. BOIES:

18        Q.  Did anything come to fruition with North Texas

19   Blockchain Council?

20        A.  They attended the press conference.

21        Q.  Are they a -- themselves a press entity?

22        A.  I don't know.

23        Q.  This is Exhibit 40.

24                 (Exhibit 40 was marked for identification.)

25   BY MR. BOIES:

CONFIDENTIAL

Page 153

1     Q.  As -- as one of the -- the salespeople on this,

2  did you help Ryan manage his relationship with

3  Drew Northfeld- -- -field at Excel?

4            MR. COOK:  Object to the form.

5            THE WITNESS:  I don't recall this meeting.

6  BY MR. BOIES:

7     Q.  Did -- did you organize this meeting?

8     A.  It shows that I did, but I don't --

9     Q.  Do you have any reason to believe this meeting

10  didn't occur?

11     A.  I -- I don't know, to be honest.

12     Q.  And in -- in the two weeks after this deal

13  came -- begun in, sort of, the -- in the end of -- in the

14  last half of September, the length of the deal was a

15  question; is that correct?

16            MR. COOK:  Object to the form.  And I'm not

17  sure what time frame you're talking about.  You said the

18  two weeks before the deal began?

19  BY MR. BOIES:

20     Q.  September 16th through September 30th, 2021.  So

21  this is the -- the second half of September, after you

22  have been brought in by Ryan Mackey.

23  [REDACTED]

24  [REDACTED]

25     Q.  After -- after Excel was already handing the

Page 154

1   baton on to you, Clay, and Kory, after the unprecedented

2   -- the unprecedented move was September 15th; do you

3   remember that?

4            MR. COOK:  Object to the form.

5            THE WITNESS:  Can you ask that --

6   BY MR. BOIES:

7        Q.  Do you remember the e-mail where Ryan sent to

8   you --

9        A.  The unprecedented --

10       Q.  -- the unprecedented move?

11       A.  Yes.

12       Q.  That -- do you trust me if I tell you that that

13   occurred on either September 15th or September 16th.

14            MR. COOK:  You don't have to answer that.

15            MR. BOIES:  You don't have to answer that.

16            MR. BEST:  Just say "assuming."

17            MR. COOK:  If you want him to accept a

18   premise, he'll do it for purposes of the question.

19   BY MR. BOIES:

20       Q.  May you -- assuming that that e-mail came -- so I

21   don't have to reach back and show you it, assuming that

22   e-mail came on the 15th or 16th, were you involved in the

23   negotiations over the next six weeks leading until the --

24   the deal got done?

25       A.  Yes.

CONFIDENTIAL

Page 155

```
 1        Q.  Was one of the components that was being
 2   negotiated between Voyager and the Dallas Mavericks, the
 3   amount of years the deal would be done for?
 4        A.  I don't recall.
 5        Q.  Did you have an opinion about the value of the
 6   deal to Voyager based on the amount of time the deal would
 7   be contracted for?
 8                MR. COOK:  Object to the form.
 9                THE WITNESS:  That was long.  Can you just
10   shorten that?
11   BY MR. BOIES:
12        Q.  Did you have an opinion about the value of the
13   deal for Voyager based on how long the deal would take
14   place?
15                MR. COOK:  Object -- object to the form.
16   BY MR. BOIES:
17        Q.  Would a three-year deal bring less value to
18   Voyager than a five-year deal?
19                MR. COOK:  Object to the form.
20                THE WITNESS:  I don't -- I don't know.
21   BY MR. BOIES:
22        Q.  Okay.  Well, we'll just -- okay.
23                MR. BOIES:  This is Exhibit 41.
24                (Exhibit 41 was marked for identification.)
25   BY MR. BOIES:
```

CONFIDENTIAL

Page 156

1        Q.  You're welcome to read it, but I'm going to bring

2   you, at first, to page 2, towards the bottom where it

3   says:  Ryan -- Ryan Mackey, and he's sending an e-mail to

4   Kory Nix, Kyle Tapply, and Clay Christopher.  The body of

5   it says, "Translation."

6        A.  Okay.

7        Q.  Does Mr. Mackey often ask for your help in

8   translating Mark Cuban?

9                MR. COOK:  Object to the form.

10               THE WITNESS:  I don't recall.  Are there

11   examples?

12   BY MR. BOIES:

13       Q.  What was he asking you to translate in this

14   e-mail chain?

15               MR. COOK:  Object to the form.

16               THE WITNESS:  I -- I wrote that -- I read

17   that:  ████████████████████████████████████

18   ████████████████████████████  which I can't speak to

19   Mark's, you know, train of thought, but that's the way I

20   interpreted what I'm assuming is the -- on the next page.

21   BY MR. BOIES:

22       Q.  And on the -- if you keep going to 6665, on the

23   bottom right, second-to-last page, on this, Erika is

24   writing to -- to Ryan:  We are incredibly excited to be

25   your new -- your partner.

Page 157

 1                 Do you think that in that context "partner"
 2      could be -- could be changed to "customer"?
 3                 MR. COOK:  Object to the form.
 4                 THE WITNESS:  As we've stated, the
 5      sponsor -- sponsor vernacular and, as it is written in the
 6      contract, it says that they are not a partner; they are a
 7      sponsor.  So, again, she --
 8      BY MR. BOIES:
 9         Q.  So Erika's just --
10                 MR. COOK:  Wait, wait, wait.
11                 Finish your answer.
12                 THE WITNESS:  Again, she's -- we are -- this
13      is before the contract was done.  She's saying things that
14      weren't necessarily in -- in the contract.
15      BY MR. BOIES:
16         Q.  Did anyone correct her into saying that:
17      We're -- we're -- that you should be excited to be our
18      sponsor, rather than our partner?
19         A.  It --
20                 MR. COOK:  Object to the form.
21                 THE WITNESS:  It was corrected in the -- the
22      contract that they wrote, because it says they are not a
23      partner; they are a sponsor.
24      BY MR. BOIES:
25         Q.  In the contract, it says they are not a partner?

1      A.  I believe it says they are a sponsor.

2      Q.  Does it say they are a customer?

3      A.  I'm saying it says that they're a sponsor.

13     A.  Can you tell me which page we're on?

14     Q.  It's just 6664.

15     A.  Got it.  Thank you.

16     Q.  -- your -- is it your belief that that could just

17 say "Sponsor Designations"?

18          MR. COOK:  Object to the form.

19          THE WITNESS:  Repeat the question.

20 BY MR. BOIES:

21     Q.  Where it says "Partner Designations" --

22     A.  I believe we've gone through this before, but

23 "sponsor" and "partner" are interchangable in our

24 vernacular.  But in the contract, does it -- I believe it

25 says that they are a sponsor.

CONFIDENTIAL

Page 159

1          Q.  And in your negotiations -- during negotiations,

2     you choose to use the word "partner."  During the

3     contract, you choose to use the word "sponsor."

4                    After the contract is executed, do you

5     occasionally call them "customers"?

6                    MR. COOK:  Object to the form.

7                    THE WITNESS:  I don't -- I don't recall.

8     There's a "you;" it's too broad.

9     BY MR. BOIES:

10         Q.  Do you ever refer to your sponsors as

11    "customers"?

12         A.  I don't -- we don't typically call them

13    "customers."  We usually call them "sponsors" and/or

14    "partners."

15         Q.  And under this partner designation, in the second

16    line:  Official Cryptocurrency Payments Provider, after

17    BitPay, ensuring we can use Doge --

18         A.  "Doge."

19         Q.  -- (as agreed in Mark/Steve phone call - this was

20    a Mark requirement).

21                    Do you see that?

22         A.  Yes.

23         Q.  When did the Mark/Steve phone call take place?

24                    MR. COOK:  Object to the form.

25                    THE WITNESS:  I wasn't involved in those.

Page 160

1   BY MR. BOIES:

2       Q.  Do you have any other personal knowledge about

3   the Mark/Steve phone call referenced here?

4                   MR. COOK:  Object to the form.

5                   THE WITNESS:  Same answer.  I don't have...

6   BY MR. BOIES:

7       Q.  When it says, "this was a Mark requirement," how

8   would you interpret that?

9                   MR. COOK:  Object to the form.

10                  THE WITNESS:  I -- I don't know Mark as --

11  as a train of thought, I can't -- I can't speak for Mark.

12  BY MR. BOIES:

13      Q.  But your -- but -- but your interpretation of

14  "This was a Mark requirement" --

15      A.  Are you asking me to speculate on what Mark is

16  saying?

17      Q.  No.  I'm asking you to give me what you -- how --

18  how you interpret that bullet point that you received,

19  and -- and when you -- "and" to give yourself the context

20  to make the translation of:  I -- I read that as "he's,"

21  meaning Mark Cuban, correct, ███████████████████

    ███████████████████████████████████████████████████

    ██████  ████████████  ███████████

24                  I'm just -- I am asking you:  In the context

25  of your interpretation here, how did you interpret "This

CONFIDENTIAL

Page 161

```
 1    was a Mark requirement"?

 2                    MR. COOK:  Can you read that question back?

 3    Because I lost it.

 4    BY MR. BOIES:

 5        Q.  In the context of your interpretation --

 6                    MR. COOK:  Are you withdrawing the question

 7    and asking another one?

 8                    MR. BOIES:  No, I'm actually -- I'm just

 9    asking the exact same question.  I'm trying to read it,

10    because I used the word "here."

11    BY MR. BOIES:

12        Q.  So I was going to say:  In the context of your

13    interpretation of this translation, how did you interpret

14    "this was a Mark requirement"?

15                    MR. COOK:  Object to the form.

16                    THE WITNESS:  I don't recall making an

17    interpretation based off of that -- that sentence.

18    BY MR. BOIES:

19        Q.  Okay.  So -- so how did you make your

20    interpretation?

21                    MR. COOK:  Object to the form.

22                    THE WITNESS:  I don't recall.

23    BY MR. BOIES:

24        Q.  We've touched on staking.

25                    What is "DCM"?  If you want to go to the
```

CONFIDENTIAL

Page 162

1    first page, you're welcome to see the context in which I'm

2    asking.

3         A.  It's an acronym for -- I -- I don't know what the

4    acronym stands for.  I did then; I don't know now.

5         Q.  Staking and DCM, are those broad categories of --

6    of crypto?

7                   MR. COOK:  Object to the form.

8                   THE WITNESS:  Those are -- are two different

9    types of crypto; is -- is that what you're asking?

10   BY MR. BOIES:

11        Q.  Well, I'm -- I'm -- let's take the whole

12   sentence:  We can still have staking, DCM, and other

13   categories that aren't defined, like Cryptomining.

14        A.  What's your question?

15        Q.  What are these broad categories you're

16   referencing?

17        A.  We were discussing if we could find other

18   partners/sponsors in these categories.

19        Q.  Were you hoping to narrow the contract with

20   Voyager so you might be able to find other companies in

21   the crypto space that might not be competitors of Voyager?

22                   MR. COOK:  Object to the form.

23                   THE WITNESS:  ███████████████████████████

     ██   ███████████████████████████████████████

25   BY MR. BOIES:

Page 163

1        Q.  And why was a five-year deal better than a

2    three-year deal for Voyager?

3                  MR. COOK:  Object to form.

4                  THE WITNESS:  Five years is bigger than

5    three.

6    BY MR. BOIES:

7        Q.  It has nothing to do with:  After three years

8    getting to the good part of the deal where fans recognize

9    who they are and the brand equity they've established?

10                 MR. COOK:  Object to form.

11                 THE WITNESS:  Correct.  It's better for us

12   to have a five-year deal than a three-year deal.

13   BY MR. BOIES:

14       Q.  "Us" being?

15       A.  The -- the Mavericks.

16       Q.  So the Mavericks benefit more from the -- from

17   the longer-term deal than Voyager?

18       A.  The Mavs and our fans, because it's -- it's --

19       Q.  So what did you mean by, "We shouldn't pull the

20   rug out from them"?

21       A.  ████████████████████████████████████████████

████  ████████████████████████████████████████████████████

████  ████████████████████████████████████████████████████

████  ████████████████████████████        ████████████████████

████  ████████████████████████████████████████████████████

Page 164

1 ████████████████████████████████████████

████████████████████████████████████████

██████████

4          Q.  Were you worried that after three years a deal

5    with -- after three years of a deal with Voyager, a new

6    deal with a different cryptocurrency exchange might get

7    the benefit of your three-year deal with Voyager?

8                    MR. COOK:  Object to the form.

9                    THE WITNESS:  Say that again.

10   BY MR. BOIES:

11         Q.  Were you worried that after three years of the

12   deal with Voyager, if it were to stop after that amount of

13   time, and you were to make a new deal with a different

14   cryptocurrency exchange, that that new cryptocurrency

15   exchange would improperly benefit from the deal with

16   Voyager.

17                    MR. COOK:  Object to the form.

18                    THE WITNESS:  I don't -- I don't follow now.

19   BY MR. BOIES:

20         Q.  So what does "pull the rug out" mean in that

21   context?

22         A.  That we would be stopping the deal earlier.

23         Q.  Is "pulling the rug out" a crypto term?

24                    MR. COOK:  Object to form.

25                    THE WITNESS:  I don't believe -- I don't

Page 165

```
 1   know if it is.

 2   BY MR. BOIES:

 3        Q.  Have you heard "getting rug pulled" --

 4        A.  No, I don't believe so.

 5        Q.  -- or -- or "pulling the rug out" in any crypto

 6   term -- in any cryptocurrency lingo?

 7        A.  I've -- I have heard --

 8             MR. COOK:  Object to the form of the

 9   question.

10             THE WITNESS:  I have heard it, but that's

11   not what this was.

12   BY MR. BOIES:

13        Q.  Are you aware that "pulling the rug out" is a

14   common crypto scam where fraudulent developers lure

15   investors into what appears to be a lucrative new project

16   then disappear with the funds leaving investors with a

17   worthless asset?

18             MR. COOK:  Object to the form.

19             THE WITNESS:  I did not know that was what

20   that meant, and was not intending for that to be phrased

21   that way.

22   BY MR. BOIES:

23        Q.  Are you worried that investors in Voyager got the

24   rug out pulled out from under them?

25             MR. COOK:  Object to form.
```

1              THE WITNESS:  I -- I don't know.

2    BY MR. BOIES:

3         Q.  And in -- the "crypto trading swim lane," do you

4    see that on here on the first paragraph?

5         A.  "Swim lane," yes, all of --

6         Q.  What -- what did that mean to you?

7         A.  ████████████████████████████████████

8    ████████████████████

9         Q.  Were you in talks with other ones?

10        A.  ████████████████████████

11        Q.  ████████████████████████████████

12               ████████████   ████████████

13               ████████████   ██████████████████

14   ████████████████████████████████████████

15   ████████████

16   BY MR. BOIES:

17        Q.  Did the 7 percent staking affect that decision?

18               MR. COOK:  Object.

19               THE WITNESS:  At no point did we ever

20   discuss anything to do with 7 percent staking.

21   BY MR. BOIES:

22        Q.  And when you say "7 percent staking," do you, in

23   your mind, equate that to 7 percent interest rate?

24        A.  I don't know.

25               MR. BEST:  So he was responding to your

Page 167

1  question about a 7 percent staking.  He was just answering

2  your question.  So it is strangely inappropriate for you

3  to ask him what he meant by it, when he's just responding

4  to what you said in your question.

5  BY MR. BOIES:

6      Q.  Were you aware that Voyager offered a 7 percent

7  staking?

8              MR. COOK:  Object to form.

9              THE WITNESS:  At no point did we promote any

10  sort of staking or rewards benefit.

11  BY MR. BOIES:

12      Q.  That was not my question.

13              MR. BOIES:  Please, may I get -- may I get

14  the read -- question read back for me, please.

15              (Requested material was read back.)

16              MR. COOK:  Same objection.

17              THE WITNESS:  No.

18  BY MR. BOIES:

19      Q.  You were not aware --

20      A.  Are you ask -- what are you -- I'm sorry.

21      Q.  Were you aware -- did you know, when this deal

22  was going through, did you have personal knowledge that

23  Voyager offered a 7 percent staking?

24              MR. COOK:  Is that the end of your question?

25              MR. BOIES:  Yes.

CONFIDENTIAL

Page 168

1           MR. COOK:  Object to the form.  Object to

2    the repetition.

3           THE WITNESS:  Again, that was not something

4    that we promoted.  We promoted the platform.

5           MR. BEST:  Can we go off the record for just

6    one sec?

7           MR. BOIES:  Sure.  Off the record, please.

8           THE VIDEOGRAPHER:  Off the record, 2:48.

9           (Off-record discussion.)

10          THE VIDEOGRAPHER:  We are on the record.

11   The time is 2:53.

12   BY MR. BOIES:

13       Q.  Did -- on any of their products, did Voyager

14   offer a 7 percent staking?

15          MR. COOK:  Object to form.

16          THE WITNESS:  From the Mavericks standpoint,

17   we never were involved in any of those types of

18   conversations.

19   BY MR. BOIES:

20       Q.  Were you aware of any products that Voyager

21   offered a 7 percent staking reward for?

22       A.  I can't tell you if I was aware of what

23   percentage those tokens -- or what they were back during

24   this time.  I've learned a lot since then, to a certain

25   degree, but I -- I don't know -- back then, I don't know

Page 169

1  what staking -- I can't tell you what staking was.

2      Q.  Back -- back then, did you know that when you put

3  your money into a Voyager account it would grow?

4              MR. COOK:  Object to form.

5              THE WITNESS:  I -- I -- I don't recall what

6  my knowledge of this platform was back during these

7  conversations -- during these e-mails.

8              MR. BOIES:  What exhibit was the last

9  exhibit I gave you?

10             THE WITNESS:  41.

11             MR. BOIES:  Exhibit 42.

12             (Exhibit 42 was marked for identification.)

13  BY MR. BOIES:

14     Q.  Did you receive this e-mail from Erika

15  Szychowski?

16     A.  "Szychowski," yes.  It's a hard --

17     Q.  I can say it another five times, I'll still

18  struggle.

19             Does this -- does this e-mail purport to

20  have an attachment to it?

21             MR. COOK:  Object to form.

22             What do you mean does it purport to have an

23  attachment to it?

24  BY MR. BOIES:

25     Q.  Is there an attach- -- is --is there an

Page 170

1    attachment in this --

2         A.  It shows that there's a --

3         Q.  Would that normally be an attachment?  Would you

4    normally click on that if you saw that?

5         A.  Looks like it's a PDF.

6         Q.  Yeah.  Would a PDF be an attachment?

7         A.  Yes.

8              MR. COOK:  Object to form.

9    BY MR. BOIES:

10        Q.  Do you remember that attachment?

11        A.  I don't.

12        Q.  Where it says:  ████████████████████

     ████████████████████████████████████████████████

     ██████████

15        A.  Can I read it real quick?

16        Q.  Sure.

17        A.  (Witness examines document.)  Okay.

18        Q.  Did -- did that Player Symposium occur?

19        A.  The -- the document that they are referencing was

20   a presentation that they shared with -- I believe it was

21   the group of NFL players.

22        Q.  Meaning they weren't Dallas Mavericks players?

23        A.  It was a previous -- it was a previous group, a

24   presentation that they were showing to us.

25        Q.  Do you know anybody who would have been involved

Page 171

1   in that?

2        A.  No.

3        Q.  Was Robert Gronkowski involved in that?

4              MR. COOK:  Object to form.

5              THE WITNESS:  I have no idea.

6   BY MR. BOIES:

7        Q.  Were you aware of Robert Gronkowski's involvement

8   with Voyager at this point?

9        A.  Not -- no, not -- I don't believe at this point,

10  no.  This was early on.

11       Q.  Go back to Exhibit 31.  Do you remember receiving

12  that -- do you remember talking about that earlier today?

13       A.  Yes.

14       Q.  Do you see -- do you see the Voyager e-mail that

15  was sent to Billy Phillips?

16       A.  Yes.

17       Q.  Do you see the next page?  On that -- on that

18  exhibit, do you see the next page --

19       A.  Yes.

20       Q.  -- where -- where it references Robert

21  Gronkowski?

22       A.  Yes.

23       Q.  Do you know who Robert Gronkowski is?

24       A.  Yes.

25       Q.  Who is Robert Gronkowski?

Page 172

 1          A.  Football player.

 2          Q.  What team did they play for at that time?

 3          A.  Tampa.

 4          Q.  May you give me the full name of the team,

 5     please?

 6          A.  Tampa Bay Buccaneers.

 7          Q.  Where does -- what -- where -- where is Tampa Bay

 8     located?

 9          A.  Florida.

10          Q.  In the same document that I was just referencing,

11     31, do you see at the top of that page, where it says:

12     The Voyager loyalty program is unlocking your crypto

13     potential, and VGX is the key?

14          A.  I'm reading that, yes.

15          Q.  Do you see that?

16               Do you see on the next paragraph where it

17     says, "with 7 percent staking rewards"?

18          A.  Okay.

19          Q.  Had you received this e-mail -- were you on

20     notice of these components to Voyager as of

21     September 15th, 2021?

22               MR. COOK:  Object to the form.

23               THE WITNESS:  I don't know what they meant.

24     BY MR. BOIES:

25          Q.  Back to Exhibit 42.  Do you see on October 7th,

CONFIDENTIAL

Page 173

1    at 12:37 p.m., Erika wrote an e-mail:  Thank you all for

2    your -- for the time yesterday.  And they were --

3         A.  I'm sorry.  I don't -- okay.  Right here in the

4    middle.  You said October 7th, right?

5         Q.  I'm sorry.  I said October -- I meant

6    October 6th.  I may have said October 7th.

7         A.  Okay.

8         Q.  See the second paragraph:  We are thrilled to be

9    moving towards our official announcement of this

10   partnership.

11              See that?

12        A.  Yep.

13        Q.  Why does she say, "pending Mark's availability"?

14              MR. COOK:  Object to the form.

15              THE WITNESS:  I don't know.

16   BY MR. BOIES:

17        Q.  How would you define that -- how would you

18   interpret that as you sit here today?

19              MR. COOK:  Object to the form.

20              THE WITNESS:  I have no idea.

21   BY MR. BOIES:

22        Q.  That they needed Mark's availability for

23   October 27th in order to move forward with scheduling it?

24              MR. COOK:  Object to the form.

25              THE WITNESS:  I don't know.

Page 174

1    BY MR. BOIES:

2        Q.  Would the October 27th press conference have

3    happened without Mark Cuban with your knowledge of this

4    phrase?

5                    MR. COOK:  Object to the form.

6                    THE WITNESS:  I'd be speculating.

7    BY MR. BOIES:

8        Q.  Speculate for me.

9        A.  I'm assuming, speculating, that she would -- they

10   want to have Mark at the press conference.

11       Q.  Do you think, to Voyager, he was a necessary

12   component?

13                   MR. COOK:  Object to the form.

14                   THE WITNESS:  ███████████████████████████

     ████████████████████████████████████████████████████████

     ███████████████████████████████████

17   BY MR. BOIES:

18       Q.  Was the contract signed/executed by this date?

19       A.  I believe it was a day after.

20       Q.  A -- a day after what?

21       A.  The 27th.

22       Q.  So on October 6th, there was no contract?

23                   MR. COOK:  Object to the form.

24   BY MR. BOIES:

25       Q.  Correct?

CONFIDENTIAL

Page 175

```
 1        A.  Correct.

 2        Q.  On October 27th, there was no contract, correct?

 3             MR. COOK:  Object to the form.

 4             THE WITNESS:  Not to my knowledge.

 5    BY MR. BOIES:

 6        Q.  However, the whole press release went forward,

 7    and Mark was involved without any contract being executed,

 8    correct?

 9        A.  Correct.

10        Q.  There was a level of trust on both sides that

11    enabled you -- "you," the Mavericks, and "them," Voyager,

12    to work to smooth out the details?

13             MR. COOK:  Object to the form.

14             THE WITNESS:  I don't know why it took the

15    extra time.

16    BY MR. BOIES:

17        Q.  But you are aware that the press conference

18    happened, and Mark participated in it without having any

19    contractual obligations to have done so?

20             MR. COOK:  Object to the form.

21             THE WITNESS:  He -- he was at the press

22    conference.  But, again, ████████████████████

23    BY MR. BOIES:

24        Q.  At -- as of October 27th, 2021, what were the

25    contractual obligations of the Dallas Mavericks?
```

CONFIDENTIAL

Page 176

```
 1              MR. COOK:  Object to the form.

 2              THE WITNESS:  Can you elaborate?

 3   BY MR. BOIES:

 4      Q.  I can ask again, but I can't elaborate.

 5      A.  I don't know.

 6              MR. COOK:  If he doesn't understand your

 7   question, he can't answer it.

 8   BY MR. BOIES:

 9      Q.  Were there any contractual obligations of the

10   Dallas Mavericks on October 27th, 2021, if the contract

11   was signed a day or two later?

12      A.  We were working to have the press announcement

13   the day before.

14      Q.  Do you normally have press announcements of

15   partnerships before a contract is executed?

16              MR. COOK:  This is the third time you've

17   asked that question today, and that he's answered it.

18   He'll do it again, but at some point it's got to stop.

19              Go ahead and answer.

20              THE WITNESS:  We have done several

21   partnerships/sponsorships without a contract being in

22   place.

23   BY MR. BOIES:

24      Q.  So it is normal for you to have press conferences

25   without contracts in place?
```

CONFIDENTIAL

Page 177

1              MR. COOK:  Object to the form; argumentive;

2       repetitious.

3              MR. BEST:  We have been going for about an

4       hour and a half.  Can we take a break in a few minutes?

5              MR. BOIES:  Sure.  I just have two

6       documents, and then we can take a break.

7              (Exhibit 43 was marked for identification.)

8       BY MR. BOIES:

9          Q.  Exhibit 43, did you receive this e-mail from

10      Kory?

11         A.  Yes.

12      ██  ████████████████████████████████

        ██ █████████████ ██████████████████

        ██ █████████████████████████████████

        ██ ████████

        ██  ██ ███████████████████████████████

        ██ █████████████████████████████████

        ██ ████████████████████████████████

        ██ █████████████

        ██  ██ ████████████████████

        ██ ███████████████████████

        ██ ██████

23             MR. COOK:  Object to the form.

24             THE WITNESS:  I don't -- I don't know what

25      he was specifically saying there.

Case 1:22-cv-22538-RKA   Document 155-28 *SEALED* on EnSDeDocket FLSD 07/29/2023 06/09/2023   Page 1795of 522
Page 179 of 265

CONFIDENTIAL

Page 178

```
 1   BY MR. BOIES:

 2        Q.  Did you -- did you understand this deal as a

 3   promotion related to fans investing in cryptocurrency?

 4        A.  We were promoting the platform of Voyager.

 5        Q.  And part of the promotion of the platform was

 6   adoption of the platform, correct?

 7                 MR. COOK:  Object to the form.

 8                 THE WITNESS:  Once the fan got on the

 9   platform, that was up to them to determine.

10   BY MR. BOIES:

11        Q.  But the MAVS100 code encouraged people to sign up

12   for an account and deposit $100 and make one trade; is

13   that correct?

14                 MR. COOK:  Object to the form.

15                 THE WITNESS:  That was the promotion.

16   BY MR. BOIES:

17        Q.  And that promotion was intended to drive people

18   to sign up for new accounts with Voyager?

19        A.  Yes.

20        Q.  And to put money into that account for Voyager?

21                 MR. COOK:  Object to the form.

22                 THE WITNESS:  ███████████████████
```

██  ████████████████████████████████████

██  ████████████████████████████████████████

██  ████████████████████████████████████

Page 179

1 ████████

2 BY MR. BOIES:

3     Q.  One of the objectives was to build trust and

4 credibility of Voyager, correct?

5     A.  Correct.

6     Q.  And by building trust and credibility for

7 Voyager, Mavs fans would be more willing to invest their

8 money on a platform like Voyager's?

9           MR. COOK:  Object to the form.

10           MR. BEST:  Object to the form.

11           THE WITNESS:  I'm sorry.  I was waiting for

12 you to repeat that.

13 BY MR. BOIES:

14     Q.  Oh.  So -- by building trust and credibility for

15 Voyager, Mavs fans would be more willing to invest their

16 money in Voyager?

17           MR. COOK:  Object to the form.

18           THE WITNESS:  I -- we can't --

19 BY MR. BOIES:

20     Q.  Was that an -- was that --

21           MR. COOK:  Wait, wait.  Let him finish his

22 answer.

23           THE WITNESS:  We -- we can only get them to

24 the platform.  From -- what they do from there, it's up to

25 them.

Page 180

1    BY MR. BOIES:

2         Q.  Could you encourage them to sign up for an

3    account?

4                   MR. COOK:  Object to form.

5                   THE WITNESS:  We can provide promotional

6    offers, but it's up to them on if they want to make a

7    deposit or make a trade.

8    BY MR. BOIES:

9         Q.  Did you encourage them to make a trade through

10   your promotional products?

11                  MR. COOK:  Object to the form.

12                  THE WITNESS:  If they wanted the -- the

13   promotion, then that's what they would have had to have

14   done.

15   BY MR. BOIES:

16        Q.  And what did Mr. -- what did you understand

17   Mr. Nix as meaning by "from our assets" in that question?

18        A.  I don't know.

19        Q.  What are your assets in that context?

20                  MR. COOK:  Object to the form.

21                  THE WITNESS:  We have a wide variety of

22   marketing assets, so I -- I don't know what, specifically,

23   he was referencing.

24   BY MR. BOIES:

25        Q.  Would a MAVS100 be one of those assets?

CONFIDENTIAL

Page 181

1        A.   That's a Voyager offer.

2        Q.   MAVS100 is solely a Voyager offer?

3        A.   Well, it was an offer on Voyager.  That was an

4   offer that they made for fans once they got on the -- once

5   they signed up for an account.

6        Q.   Who made the announcement of the MAVS100

7   promotion?

8        A.   I don't know who.

9        Q.   Did the Dallas Mavericks announce the MAVS100

10  promo code?

11       A.   It was included in some of our promotional

12  messaging, yes.

13       Q.   Did Mark Cuban promote the MAVS100 promo code?

14            MR. COOK:  Object to the form.

15            THE WITNESS:  I don't recall.

16            MR. BOIES:  This is Exhibit 29.

17            (Exhibit 29 was marked for identification.)

18  BY MR. BOIES:

19       Q.   I'll have you go to towards the end.  It's not

20  the last page; it's the third-to-last page.

21            Do you recognize this document?

22       A.   This is the Voyager launch outline, yes.

23       Q.   Correct.  And this is a draft of that outline.

24  It appears an early -- an early enough draft that it's

25  prior to October 14th, 2021.

CONFIDENTIAL

Page 182

```
 1              Do you see at the very top --

 2      A.  Yes.

 3      Q.  -- it says October 14th, that probably wouldn't

 4  have occurred...

 5              Is that correct?

 6      A.  Correct.

 7      Q.  On that third-to-last page, do you see where you

 8  appear -- where your name appears in the margin?

 9      A.  Yeah.  Are we on 68?

10      Q.  Yes.

11      A.  Okay.

12      Q.  Why -- why -- why does your name appear in a

13  margin like that?

14              MR. COOK:  Object to the form.

15              THE WITNESS:  This was a working document

16  that we used to track some of the assets leading up to the

17  announcement.

18  BY MR. BOIES:

19      Q.  Are hashtags an asset?

20      A.  I don't know what that's referencing.

21      Q.  I'm -- don't worry about the document.

22              Are hashtags a Dallas Mavericks asset?

23              MR. COOK:  Object to the form.

24              THE WITNESS:  I -- I liter- -- I don't know

25  what you're ref-  -- like, what a hashtag is referencing.
```

CONFIDENTIAL

Page 183

1    BY MR. BOIES:



CONFIDENTIAL

Page 184

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████

4          Do you see that?

5      A.  Yep.

6      Q.  Was that a communication goal of the October 27th

7  Mavs/Voyager launch?

8              MR. COOK:  Object to the form.

9              THE WITNESS:  All of these could have been

10  goals, but I don't know how they were communicated during

11  the press conference.

12              MR. COOK:  Alex, I need to take a break.

13              MR. BOIES:  Sure, sure, sure, sure.  I

14  will --

15              THE VIDEOGRAPHER:  Off of the record, 3:19.

16              (Brief recess taken.)

17              THE VIDEOGRAPHER:  We're on record.  The

18  time is 3:37.

19  BY MR. BOIES:

20      Q.  And back to this -- this launch outline that --

21  that you were working on, you know, a few weeks -- at

22  least two weeks before the launch event.  The -- this

23  document sets forth the communication goals, the

24  communication strategy, and the communication objectives;

25  is that correct?

Page 185



1       A.  For the overall partnership/sponsorship.

2       Q.  And so everything here is for the overall

3  partnership, not just that one event?

4       A.

25       Q.  And so the goals for the launch were the exact

CONFIDENTIAL

Page 186

1    same as the goals of the overall partnership?

2              MR. COOK:  Object to the form.

3              THE WITNESS:  I -- I can't clearly say that.

4    BY MR. BOIES:

5        Q.  On page 2, the bold, "Key Messages," at -- what

6    were the key messages for the launch versus the key

7    messages for the partnership as a whole?

8        ■    ███████████████████████   ████████

     ■  █████████████████████████████████████

     ■   █████████████████████████████████████

11       Q.  What does "global international partner of the

12   Dallas Mavericks" mean?

13       ■    ████████████████████████████████

     ■  █████████████████████████████████████

     ■   ██████████████████████████████████

16       Q.  Did the international designation also have

17   national implications?

18              MR. COOK:  Object to the form.

19              THE WITNESS:  It would have allowed them to

20   have a -- a broader reach in Year 2.

21   BY MR. BOIES:

22       Q.  Could they advertise nationally in Year 2?

23       ■    ████████████████████████████████

     ■  ██████████████████████████

25       Q.  What are digital assets on a national scale?

CONFIDENTIAL

Page 187

1     █████ ████████████████████████████████████████

    ████████████████ ██████████████████████████

    ███████████████████████ █████████████████████

    █████████████

5     Q.  Was that an important part of the deal to the

6  Dallas Mavericks?

7     A.  I can't speak for everyone, but it was our -- it

8  would have been our first international spon- -- partner-

9  -- I mean, sponsorship agreement, so yes.

10     Q.  And being able to reach Mavs fans -- fans

11  nationally is different from what you can do now because

12  of geofencing?

13         MR. COOK:  Object to form.

14         ████████████ ██████████████████████

    ███████████████████████████████████

    ███████████████████████████

17  BY MR. BOIES:

18     Q.  And -- and, generally, who are Mavs fans?

19         MR. COOK:  Object to form.

20         THE WITNESS:  It's very broad.

21  BY MR. BOIES:

22     Q.  Do you have a demographic?

23     A.  Still very broad.  I mean, it's -- a Mavs fan --

24     Q.  Is there an age --

25     A.  Someone --

CONFIDENTIAL

Page 188

1        Q.  -- age range --

2        A.  -- someone --

3        Q.  -- that you might -- that you might assign to a

4    Mavs fan?

5                    MR. COOK:  Hold on.

6                    Go ahead and answer his last question, and

7    then answer --

8                    THE WITNESS:  The age range -- I don't know

9    off the top of my head what our -- our age range

10   demographic is.

11   BY MR. BOIES:

12       Q.  Is there a gender?

13                   MR. COOK:  Object to form.

14                   THE WITNESS:  It's -- typically, it would

15   skew more male than female, but I don't know the

16   percentage off the top of my head.

17   BY MR. BOIES:

18       Q.  What are "avid sports fans of winning teams"?

19       A.  Where are you reading that from?

20       Q.  How would you, on your -- in your personal -- in

21   your personal interpretation, what is an avid sports fan

22   of a winning team?

23                   MR. COOK:  Object to the form.

24                   THE WITNESS:  I don't -- I don't know what

25   my -- someone who follows the team.

1   BY MR. BOIES:

2       Q.  And in this -- in -- in -- in your launch, you

3   were hoping to highlight crypto for all; is that correct?

4                MR. COOK:  Object to form.

5                THE WITNESS:  I don't recall if that was a

6   main focus of the -- the press announcement.

7   BY MR. BOIES:

8       Q.  Was it a focus of the partnership agreement?

9       A.  We had --

10               MR. COOK:  Object to form.

11               THE WITNESS:  We had assets that said:

12   Voyager Crypto For All.

13   BY MR. BOIES:

14      Q.  In bullet 3 on the second page, do you see the

15   last sentence where it says:  ███████████████████

16  █  ████████████████████████

17      A.  I'm sorry.  Where are you at?

18      Q.  On --

19      A.  Are you on 961?

20      Q.  961, the -- the bullet where's it's the No. 3.

21      A.  Oh, No. 3, okay.

22      Q.  Sorry.  The second No. 3 at the middle of the

23   page, the last sentence of that paragraph, starting with:

24  ██████████████████████████████

   █  ██████████████████████████████

CONFIDENTIAL

Page 190

1

███  █████

██  ███  ██████████████████████

██  ███  ████████████████

██  ███  ███████████████████████

██  ███████████████████████████████████

██  █████████████████████████

7              MR. COOK:  Object to form.

8              THE WITNESS:  I don't know.

9    BY MR. BOIES:

10      Q.  Why might that not want to be included -- why --

11   strike that question.

12              Why might the Mavericks not want to include

13   specific demographics in this launch outline?

14              MR. COOK:  Object to form.

15              THE WITNESS:  The Ketchum agency, who put

16   this together, highlighted a lot of this stuff, and I

17   don't know.  I can't speak for everything that they wrote

18   in this.

19   BY MR. BOIES:

20      Q.  But in your experience, limiting the demographic

21   would be -- would not be consistent with crypto for all?

22              MR. COOK:  Object to form.

23              THE WITNESS:  Again, I didn't -- I didn't

24   put this together.

25   BY MR. BOIES:

Page 191

1  Q. Did you work on this document?

2  A. I worked on it, but I did not read or --

3 everything that was a part of this.  This was -- this was

4 more Erin Finegold's -- I was -- I was aware but I didn't

5 read every single thing on it.

6  Q. Just the first page, comment 3 in the -- in the

7 -- where it says: ████████████████████████████

████ ████████████████████████ ███████████

████ ██████████████████████

10    MR. COOK:  Where are you looking?

11    THE WITNESS:  Right here (indicating).

12    MR. COOK:  Oh, the comments?

13    MR. BOIES:  Comment section.

14    MR. COOK:  Okay.

15 BY MR. BOIES:

16  Q. "MC," in that context, is Mark Cuban?

17  A. Yes.

18  Q. And so Mark Cuban will be involved in some

19 capacity.  Is -- is that distributing digital content via

20 Mavs.com.  Is that -- is that -- are those comments

21 referring to that?

22  A. I don't --

23    MR. COOK:  Object -- wait.  Object to form.

24    THE COURT REPORTER:  Repeat your answer.

25    THE WITNESS:  I don't know who wrote that,

CONFIDENTIAL

Page 192

1  so I can't speak to --

2  BY MR. BOIES:

3       Q.  How would you interpret it?

4            MR. COOK:  Object to the form.

5            THE WITNESS:  I would interpret that Mark

6  will be involved in the press announcement in some

7  capacity.

8  BY MR. BOIES:

9       Q.  And so at least two weeks before -- well, that's

10  fine.  Okay.

11            MR. BOIES:  This is Exhibit 133.

12            (Exhibit 133 was marked for identification.)

13  BY MR. BOIES:

14       Q.  Who -- who is this e-mail to?

15       A.  To me.

16       Q.  From who?

17       A.  Erika.

18            MR. COOK:  There's a couple e-mails on this

19  page.

20            MR. BOIES:  The top e-mail.  Sorry.

21  BY MR. BOIES:

22       Q.  The top e-mail, the very top says -- this is from

23  Kyle sent 10/13/2021, 6:43.

24       A.  Oh, yeah, sorry.  I was looking --

25       Q.  Who is that e-mail to?

Page 193

1      A.  That's to Erika and Marla, I'm assuming.

2      Q.  Who's Marla?

3      A.  To be --

4      Q.  Marla Knapp?

5      A.  To be honest, I don't remember.

6          Marla?  She was involved in some capacity,

7  but it wasn't -- she wasn't someone we dealt with a bunch.

8      Q.  The -- the -- the phrase "going to the moon," is

9  that a crypto lingo phrase?

10     A.  Yeah.

11     Q.  What does that mean?

12     A.  It's a -- it was something that they were --

13 during that time, Bitcoin was popular, and they'd say it

14 was going to the moon.

15     Q.  What was going to the moon?

16     A.  The Bitcoin price.

17     Q.  So the price of Bitcoin was going so high that it

18 was -- looked like the charts was pointing upwards towards

19 the moon?

20         MR. COOK:  Object to the form.

21         THE WITNESS:  I didn't start that

22 vernacular, so I don't know exactly if that was the

23 intent.

24 BY MR. BOIES:

25     Q.  But at this time, you were -- you used a lot of

Page 194

```
 1   crypto lingo at this time?
 2        A.  That's probably one of the only crypto lingo that
 3   I -- that I used.
 4        Q.  Around this time you also sent --
 5             MR. BOIES:  I'll give you Exhibit 45.
 6             (Exhibit 45 was marked for identification.)
 7   BY MR. BOIES:
 8        Q.  What -- what is this e-mail?
 9        A.  (Witness examines document.)  It's a report that
10   I send to Mark on a weekly basis.
11        Q.  Is this the second report you've sent regarding
12   Voyager as a sales report?
13        A.  I don't remember what the date is of the other
14   one, but there were two.
15        Q.  There were two sales reports prior to the launch?
16        A.  No, I mean, I'm saying I've seen two of these.
17        Q.  You've seen --
18        A.  Yeah.
19        Q.  Okay.  You've seen two, okay.  I have -- I have
20   shown you two.
21             What are -- and -- and black -- the black --
22   the black-out areas are below and above, in your mind,
23   have nothing to do with Voyager, correct?
24        A.  Correct.
25        Q.  And it would not be your practice to send
```

CONFIDENTIAL

Page 195

1    anything related to legal opinions and -- and have them,

2    therefore, be blacked out as a result of legal opinion?

3        A.  No.

4              MR. COOK:  Object to form.

5    BY MR. BOIES:

6        Q.  Just -- what were you doing to get players

7    involved in the crypto space?

8    ████    ████████████████████████████████

     █    ██████████████████████████████████

     █    ██████████████████████████████    ██████████

     █    ████████████████████████████████████████

     █    █████████████████████████████████████████

     █    ██████████

14       Q.  Were they?

15       A.  Yes.

16       Q.  Which players were interested in learning about

17   the crypto space?

18       A.  I -- I can tell you the ones that were for sure

19   interested were the ones that came to the partnership --

20   sponsorship announcement.

21       Q.  Do you remember which players those were?

22       A.  Jalen, Dwight --

23       Q.  That's Jalen Brunson --

24       A.  Jalen Brunson --

25       Q.  -- and Dwight Powell?

Page 196

```
 1        A.  -- Dwight Powell, Maxi Kleber, Dorian

 2   Finney-Smith.  Those are the four that...

 3        Q.  Did -- did they attend the press conference?

 4        A.  Yes.

 5        Q.  Did they ask questions at the press conference?

 6        A.  They asked one question each.

 7        Q.  Did they come up with that one question each on

 8   their own?

 9             MR. COOK:  Object to form.

10             THE WITNESS:  It was provided for them.

11   BY MR. BOIES:

12        Q.  Who provided the question for them?

13        A.  I don't recall.

14        Q.  Was the fact that the questions were provided to

15   them prior ever disclosed?

16             MR. COOK:  Object to form.

17             THE WITNESS:  I don't -- disclosed to what?

18   BY MR. BOIES:

19        Q.  Was -- was the fact that the questions were

20   provided to the players prior to them asking, was that

21   ever disclosed in the press release?

22             MR. COOK:  Object to form.

23             THE WITNESS:  We -- I don't believe so.

24   BY MR. BOIES:

25        Q.  If a person watching the press release heard
```

Case 1:22-cv-22538-RKA   Document 155-28 *SEALED* on FLSD Docket 07/09/2023   Page 198 of 522
Page 1965 522

CONFIDENTIAL

Page 197

1    Jalen Brunson ask a question, would it be their impression
2    that Jalen Brunson came up with that question?
3                    MR. COOK:  Objection, form.
4                    MR. BEST:  Objection, form.  I mean, you
5    know he can't answer that.  I mean, come on.
6                    MR. COOK:  You're asking his opinion as to
7    somebody watching the video, what they would think?
8                    MR. BOIES:  What his op- what -- what he
9    would think the impression would be on a viewer.
10                   MR. BEST:  Right.  Objection, form.
11                   MR. COOK:  Same.
12                   MR. BEST:  Calls for speculation.
13                   THE WITNESS:  I don't know what a person
14   watching the video would feel if -- when they were reading
15   a card.
16   BY MR. BOIES:
17        Q.  Did they read a card?
18        A.  Or answer.  I don't --
19        Q.  Was -- was the question that was provided to
20   them, was it written on a card or were they told what it
21   would be ahead of time?
22        A.  There was a card.
23        Q.  And so they were handed a card and read from the
24   card what the question would be --
25                   MR. COOK:  Object to form.

                                                        Page 198

1    BY MR. BOIES:

2         Q.  -- during -- during --

3         A.  I believe so.

4         Q.  Exhibit 47.

5              (Exhibit 47 was marked for identification.)

6    BY MR. BOIES:

7         Q.  In -- in this top e-mail that -- where you write:

8    Yes, she was okay to pay all the guys who showed up for

9    this one.

10             Who is "she"?

11        A.  Erika.

12        Q.  Who are the guys?

13        A.  The players who showed up for the press

14   conference.

15        Q.  How much were they paid?

16        A.  I don't -- I don't know what -- what they ended

17   up getting paid, and there was -- there was some

18   suggestions, but at the end of the day, we weren't

19   involved in those conversations.

20        Q.  On -- on the second page -- and the first

21   question, but on the first page -- the last line on the

22   first page and the entirety of the second page, who

23   answer -- who -- who wrote those answers to those four

24   questions?

25                  MR. COOK:  Object to form.

CONFIDENTIAL

Page 199

```
 1              THE WITNESS:  I -- I wrote this, but I don't
 2     know if that's what ended up happening is my point.
 3     BY MR. BOIES:
 4         Q.  Did you suggest that █████ per player be paid to
 5     each player for their participation in this launch?
 6         A.  That's our normal appearance fee.
 7         Q.  In this circumstance, how would that normal
 8     appearance fee be paid?
 9         A.  The player would get paid a █████ fee.  And
10     Erika took over those conversations with the players.
11         Q.  The -- in that first paragraph on the second
12     page, I guess, the third sentence down:  To be honest, the
13     upside right now is in VGX given how high ETH and BTC
14     currently are.
15              Do you see that?
16         A.  Yeah.
17         Q.  What did you mean by that?
18         A.  That they -- if they got paid in VGX, that they
19     would have more crypto, but I don't know if that's how
20     they ended up getting paid.
21         Q.  Why was the upside in VGX?
22              MR. COOK:  Object to form.
23              THE WITNESS:  It was because they -- VGX was
24     a smaller amount.
25     BY MR. BOIES:
```

CONFIDENTIAL

Page 200

1      Q.  Well, what about Doge, was that smaller too?

2                MR. COOK:  Object to form.

3                THE WITNESS:  That was -- that was just

4      something that -- that was an idea, but, again, it never

5      came to fruition.  I don't -- I don't believe that came to

6      fruition.

7      BY MR. BOIES:

8      Q.  So when you said to Ryan:  Yes, she was okay to

9      pay all the guys who showed up for this one --

10     A.  Right.  I don't know how they --

11               MR. COOK:  Wait.  Wait for him to ask a

12     question.

13     BY MR. BOIES:

14     Q.  You don't -- do you know if they got paid?

15     A.  They did get paid.

16     Q.  But you don't know how they got paid?

17     A.  Correct.  I don't know if they got paid in BTC,

18     Ethereum, or VGX or cash.

19               MR. BEST:  And by whom?

20               THE WITNESS:  By Voyager.

21     BY MR. BOIES:

22     Q.  Would there be individual agreements between

23     Voyager and these individual players for this ████

24     appearance fee?

25               MR. COOK:  Object to form.

Page 201

```
 1              THE WITNESS:  I don't know.

 2   BY MR. BOIES:

 3        Q.  At this time, in your experience, was Ethereum

 4   and Bitcoin really high?

 5        A.  I don't recall what point it was on that date.

 6        Q.  And in Question 2, the -- the question is:  What

 7   is the exact ask for the event on 10/27/21?

 8              Was -- whose attendance -- attended the

 9   press conference event, whose attendance was of the exact

10   ask?

11              MR. COOK:  Object to form.

12              THE WITNESS:  I'm assuming that this is

13   related to the players attending the press conference,

14   given that it says:  We can help with some prepared

15   questions or talking points.

16   BY MR. BOIES:

17        Q.  So who prepared the players' questions?

18        A.  I don't know.

19        Q.  Did you prepare the players' questions?

20        A.  No.

21              MR. COOK:  Object to form.

22   BY MR. BOIES:

23        Q.  Did Voyager prepare the questions?

24        A.  I don't know.

25        Q.  And was there a chat about crypto between Mark
```

Page 202

```
 1   and Steve on the 10/27/21 event?
 2       A.  The press announcement, they discussed crypto in
 3   general.
 4       Q.  In -- what did they discuss, in general, within
 5   crypto?
 6       A.  I -- there was a 30-minute interview.  I don't --
 7       Q.  Did they discuss NFTs?
 8               MR. COOK:  Object to form.
 9               THE WITNESS:  I don't -- I don't recall.
10   BY MR. BOIES:
11       Q.  Do you know what an NFT is?
12       A.  Yes.
13       Q.  What is an NFT?
14       A.  It's a --
15       Q.  What does NFT stand for?
16       A.  It's a non-fungible token.  Did I get that right?
17       Q.  Do you own any N- -- NFTs?
18       A.  I believe I have some from the games if we had a
19   ticket, but I don't think I've really ever looked at them;
20   the Mavs, that is.
21       Q.  Does -- does Mark own any NFTs?
22               MR. COOK:  Object to form.
23               THE WITNESS:  I'm not Mark; I don't know.
24   BY MR. BOIES:
25       Q.  Do you know what lazy.com is?
```

Page 203

1       A.  It's a NFT website.

2       Q.  Through your experience with the Mavericks, have

3   you come across lazy.com/MCuban before?

4               MR. COOK:  Object to the form.

5               THE WITNESS:  I -- I -- it -- would be

6   guessing that I've gone to that page at some point in

7   time, if there -- if there's a page.

8               MR. BOIES:  All right.  Exhibit 48.

9               (Exhibit 48 was marked for identification.)

10  BY MR. BOIES:

11      Q.  The second e-mail down, Erin Finegold White is

12  sending an e-mail to Erika and Stephanie from Invest

13  Voyager and then cc'ing Ketchum, Collin, Kyle.

14              Do you see that?

15      A.  The "Hey, Marla and team"?

16      Q.  Yes.

17      A.  Yeah.

18      Q.  Do you see at the end:  We will def need info on

19  the educational portion and the planted questions for each

20  of the players we have on the list so far.

21              Do you see that?

22      A.  Yes.

23      Q.  The planted questions, were those the same

24  prepared questions we previously discussed?

25              MR. COOK:  Object to form.

CONFIDENTIAL

Page 204

1              THE WITNESS:  I would assume so.

2    BY MR. BOIES:

3        Q.  Were those planted questions asked by those

4    players at that press conference?

5              MR. COOK:  Object to form.

6              THE WITNESS:  Say that again.

7    BY MR. BOIES:

8        Q.  Were those planted questions, as referenced --

9        A.  Yep.

10       Q.  -- in this e-mail, asked by those players,

11   whoever they were, at that press conference?

12       A.  I don't know.

13       Q.  Were questions asked by players at the press

14   conference?

15             MR. COOK:  Objection, repetition.

16             MR. BOIES:  Well, he's got -- he said --

17             MR. COOK:  How many times does he have to

18   tell you --

19             THE WITNESS:  I don't know.

20             MR. COOK:  -- he was there, he watched the

21   players read cards and answer questions, Alex.  I mean,

22   come on.

23             MR. BOIES:  He should say "I don't know."

24             MR. COOK:  You're saying -- asking about

25   these e-mails and whether these questions are the same as

CONFIDENTIAL

Page 205

1    the ones he asked at the press conference.  That's

2    different.

3                MR. BOIES:  No, there's no -- there's no

4    these -- the questions are the planted questions.  Were

5    the questions that --

6    BY MR. BOIES:

7        Q.  Were the questions asked by the players, planted

8    questions?

9        A.  Right.  I just -- if you're inferring there are

10   questions in here, I don't know if that was the case.  But

11   there are players --

12       Q.  There was no inference of that.

13       A.  There are players that did answer questions, or

14   asked questions.

15       Q.  Were those questions planted questions?

16               MR. COOK:  Object to the form.

17               THE WITNESS:  I said this; they -- they gave

18   them questions.

19   BY MR. BOIES:

20       Q.  Will you switch to -- will you flip to page 4, or

21   333 on the bottom right corner?

22       A.  The list?

23       Q.  Yes.  What are those?  What is that?

24       A.  Those --

25               MR. COOK:  Object to form.

CONFIDENTIAL

Page 206

1          THE WITNESS: ████████████████

████████████████████████████████

████████████      ████████████████████

████████████████

5    BY MR. BOIES:

6        Q.  Do any of those media outlets -- strike that

7    question.

8               When those media outlets covered -- covered

9    the press release --

10              MR. COOK:  Object to the form.

11   BY MR. BOIES:

12       Q.  I haven't asked anything yet.  Sorry.  That was

13   not the question.

14              MR. COOK:  Okay.

15   BY MR. BOIES:

16       Q.  Those media outlets that covered the press

17   release, were they geofenced?

18              MR. COOK:  Object to the form.

19              THE WITNESS:  I don't know.

20   BY MR. BOIES:

21       Q.  Are any of these media outlets national news

22   outlets?

23              MR. COOK:  Object to form.

24              THE WITNESS:  I don't -- I don't know each

25   of these distribution.

CONFIDENTIAL

Page 207

1    BY MR. BOIES:

2        Q.  Can I -- do you think I can access Mavs.com in

3    New York?

4        A.  Yes.

5        Q.  Does Texas Monthly have a national reach?

6                MR. COOK:  Object to the form.

7                THE WITNESS:  I don't know.

8    BY MR. BOIES:

9        Q.  Was the intent of inviting all of these media

10   outlets to get national coverage on this press release?

11               MR. COOK:  Object to form.

12               THE WITNESS:  The intent was to announce the

13   partnership; it's -- was not to be -- we were telling all

14   of our Mavs fans.

15   BY MR. BOIES:

16       Q.  You were telling all of your Mavs fans nationwide

17   that this partnership existed --

18               MR. COOK:  Object to the form.

19   BY MR. BOIES:

20       Q.  -- and was launching?

21               MR. COOK:  Object to the form.

22               THE WITNESS:  We -- we -- yes, we announced

23   the partnership.

24   BY MR. BOIES:

25       Q.  To all -- okay.  Good.

1          MR. BOIES:  This is Exhibit 49.

2          (Exhibit 49 was marked for identification.)

3   BY MR. BOIES:

4      Q.  Do you know what a CTA is in this context?

5      A.  Call to action.

6      Q.  What is a call to action within the meaning of

7   the Dallas Mavericks?

8      A.  ██████████████████████████████████████

   ████████████████████████████████████████████████

   ████████████████████████████████████████

11     Q.  Is --

12     A.  It's -- it's an offer just to our Mavs fan.

13     Q.  Is a CTA an asset?

14     A.  It's a broad term for a promotional message.

15     Q.  When we were back on the deal sheet a while ago,

16  there were line items for assets that had rate cards

17  and -- and hard costs and things like that.

18          Is a CTA, or a promo like this, one of those

19  line items?

20     A.  It would have been one of the promotional

21  deliverables in the contract.

22     Q.  And what is MAVS100?

23     A.  That was an offer that Voyager put together.

24     Q.  Was it a success?

25     A.  Yes.

Page 209

```
 1        Q.  Did fans all over the country use it to sign up
 2   for Voyager?
 3              MR. COOK:  Object to form.
 4              THE WITNESS:  I can't answer that.
 5   BY MR. BOIES:
 6        Q.  Was it available to fans all over the country?
 7              MR. COOK:  Object to form.
 8              THE WITNESS:  The intent of all of our
 9   promotions is to work within the sponsorship territory of
10   our promotional vehicles, so...
11   BY MR. BOIES:
12        Q.  I apologize.  I'm going to ask it again.
13              Was the MAVS100 promo available to fans all
14   over the country?
15              MR. COOK:  Object to form.
16              THE WITNESS:  We -- we can't control if
17   somebody outside of our territory were to have received
18   this message, but the intent of the Sponsorship Agreement
19   is to target our fans inside our marketing territory.
20   BY MR. BOIES:
21        Q.  When you talk about the international -- the
22   first international partner as a component of this deal --
23   █████   ███████████████████████████████
     ███   ███████████████████████████
     ███   █████████████████████████████████████████
```

1 ████████████████████████████████████████████

■ ████████████████████████

■ ████ ████████████████████████████████

■ ████ ██████████████████████████████████

■ ████████████████████████████████████████████████

■ ████████████████████

7     Q.  Was Voyager an international company as you saw

8 it before -- when you were doing -- when you were going

9 through the negotiations?

10          MR. COOK:  Object to form.

11          ██████████████ ████ ████████████████████████

■ ████████████████████████████████████████████████████

■ ████████████████████████████████████████████████

■ ████████████████████████████

15 BY MR. BOIES:

16     Q.  Did your Sponsorship Agreement contemplate how it

17 could use national advertisements if Voyager were able to

18 reach international company status?

19          MR. COOK:  Object to the form.

20          THE WITNESS:  ████████████████████████████

■ ██████████████████

22 BY MR. BOIES:

23     Q.  Did you ever have those conversations?

24     A.  I don't recall.

25          MR. BOIES:  This is Exhibit 17.

Page 211

1   BY MR. BOIES:

2       Q.  The first -- well, this e-mail is addressed to

3   you and Mark Cuban.  It says:  Hey, Mark.

4               Correct?

5       A.  I was --

6       Q.  At the very top of the e-mail.

7       A.  I believe she is replying to a previous e-mail of

8   mine.

9       Q.  On the third page -- we're at the end of her

10  e-mail -- the player questions, and it says:  Dorian

11  Finney-Smith, Dwight Powell, Maxi Kleber, Jalen Brunson,

12  Frank Ntilikina, Reggie Bullock, correct?

13      A.  Yep, these are the questions.

14      Q.  Were these questions asked at the event?

15      A.  I believe all of them were asked, outside of

16  Reggie.  I don't believe he was in attendance.

17      Q.  Is Frank "Ntilikina" --

18      A.  "Ntilikina."  It's hard.

19      Q.  I know.  We used to call him the French Prince --

20      A.  Yeah.

21      Q.  -- when he played for the Knicks.  Is he -- is he

22  from outside the United States?

23      A.  He's from France, hence the hard name pronounced.

24      Q.  And hence the French Prince.

25               Was this question planted for him because he

Page 212

1   was from France?

2                    MR. COOK:  Object to the form.

3                    THE WITNESS:  I don't know why they asked

4   that question.

5   BY MR. BOIES:

6        Q.  Did they give questions to players that might

7   have their own following?

8                    MR. COOK:  Object to form.

9                    THE WITNESS:  I -- I don't -- I wasn't

10  involved in these, so I -- I don't know the intent behind

11  them.

12  BY MR. BOIES:

13       Q.  And on the first page, on the schedule, sort of,

14  Mark Cuban is first; is that correct?

15       A.  No.  Erika welcomed everyone:  We are ready to

16  get started.  We would like to introduce you to the

17  governor of the Dallas Mavericks, Mark Cuban, and the CEO

18  of Voyager, Stephen Ehrlich.

19       Q.  During the press conference, who announced the

20  partnership?

21       A.  I believe it was our governor, Mark Cuban.

22       Q.  When you say "governor," is he more than a

23  governor?

24                   MR. COOK:  Object to the form of the

25  question.

Page 213

1              THE WITNESS:  Yeah.  I don't --

2     BY MR. BOIES:

3        Q.  Does he have more than one role with the

4     Mavericks, other than governor of the Mav- --Dallas

5     Mavericks?

6              MR. COOK:  Object to form.

7              THE WITNESS:  I don't think.  I mean, he's

8     our governor.

9     BY MR. BOIES:

10       Q.  Does owner and -- is every owner of a basketball

11    team also a governor of that basketball team?

12             MR. COOK:  Object to form.

13             THE WITNESS:  They -- I believe, they

14    changed the name "owner" to "governor" several years ago.

15    So it's kind of, like, sponsor and partner, they're used

16    in the same sense.

17             MR. BOIES:  Exhibit 23.

18    BY MR. BOIES:

19       Q.  Is this the --

20             MR. BOIES:  I gave you two.

21    BY MR. BOIES:

22       Q.  Is this the press release?

23             MR. COOK:  Object to form.

24             THE WITNESS:  Appears to be.

25    BY MR. BOIES:

Page 214

1        Q.  And on the first page on the fourth paragraph of

2   the -- of the news release, it has a quote from

3   Mark Cuban.  In the second -- in the third sentence of

4   that quote, it says:  We believe our partnership with

5   Voyager will allow Mavs and NBA fans to learn more about

6   Voyager and how they can earn more from Voyager's platform

7   than from traditional financial applications.

8                In reading that quote, do you think that

9   this news release was targeted at more than just Mavericks

10  fans, but also NBA fans as a whole?

11               MR. COOK:  Object to form.

12               THE WITNESS:  Mark is much more smart than I

13  am, so I can't speak to his brilliance.

14  BY MR. BOIES:

15       Q.  Mark being brilliant, as he is, would have not

16  included NBA fans if he didn't mean NBA fans; is that

17  correct?

18               MR. COOK:  Object to form.  Come on.

19               THE WITNESS:  NBA fans could easily be in

20  the marketing territory that we have.

21  BY MR. BOIES:

22       Q.  Are there a lot of NBA fans in your marketing

23  territory that are not Mavericks fans?

24               MR. COOK:  Object to form.

25               THE WITNESS:  I don't know.

Page 215

1    BY MR. BOIES:

2       Q.  In the -- the second phrase of that:  How they

3    can earn more from Voyager's platform than from

4    traditional financial applications.

5               To you, what did that mean?

6               MR. COOK:  Object to form.

7               THE WITNESS:  Once again, I'm not as smart

8    as Mark.  I can't attest to what that is supposed to mean.

9    BY MR. BOIES:

10       Q.  Did that have anything to do with the 7 percent

11    staking reward?

12               MR. COOK:  Object to form.

13    ███████████████   ███████████████████

██    █████████████████████████████████████████

██    ███████████████████████████████

16               MR. BOIES:  Exhibit 50.

17               (Exhibit 50 was marked for identification.)

18               THE WITNESS:  It's getting to be a big pile.

19               MR. BOIES:  Well, I'm getting little over

20    here, so we're working towards the end.

21    BY MR. BOIES:

22       Q.  This e-mail was sent by you on November 3rd,

23    2021; is that correct?

24       A.  So it appears.

25       Q.  The contract had been executed at this point,

1    correct?

2        A.  I believe so.

3        Q.  Had all the deliverables by the Dallas Mavericks

4    been set out in the contract?

5            MR. COOK:  Object to form.

6            THE WITNESS:  ███████████████

███████████████████████████████

███████████████████████████████

9    BY MR. BOIES:

10       Q.  So there may be more promotional assets that are

11   added onto the contract that were not a part of the

12   contract at the time of making it?

13           MR. COOK:  Object to the form.

14           THE WITNESS:  We were working on various

15   promotions during the -- during the contract.

16   BY MR. BOIES:

17       Q.  Was one of them being able to meet Mark Cuban?

18       ███   ███   ███████████████████

19       Q.  Okay.  In that last sentence that you write:  We

20   could fly the fans into the game, have them meet MC, et

21   cetera, make it a really cool promotion.

22           What did you mean by that?

23       ███   ███████████████████████████

███   ████████████████████

25       Q.  Is it because Mark Cuban wanted nothing to do

Case 1:22-cv-22538-RKA   Document 155-28 *SEALED on Entered on FLSD Docket 06/09/2023
Page 218 of 522

1  with this?

2              MR. COOK:  Object to form.

3              THE WITNESS:  I don't know.

4  BY MR. BOIES:

5      Q.  Would he want to meet a fan?

6              MR. COOK:  Object to form.

7              THE WITNESS:  I -- I can't answer that.

8  BY MR. BOIES:

9      Q.  In your experience, is he very personable and

10 ready to meet fans when promotions come up?

11             MR. COOK:  Object to form.

12             THE WITNESS:  He meets fans at games.

13             MR. BOIES:  Getting close.  Getting close.

14             Exhibit 51.

15             (Exhibit 51 was marked for identification.)

16 BY MR. BOIES:

17     Q.  Did you write this e-mail?

18     A.  Yep.

19     Q.  How did you -- were you tracking Voyager's market

20 cap prior to the deal?

21     A.  I don't recall if it was prior to the deal, but

22 I, obviously, was doing it after to see how the -- how the

23 -- the performance.

24     Q.  What metric were you using to calculate this

25 2.8 million and 800 million?

Page 218

1       A.  I don't recall what source I was looking at.

2       Q.  Was Voyager publicly traded at this time?

3       A.  I don't re- -- I believe they were on -- I

4  believe so, yes.

5       Q.  Were you, in this e-mail, attributing the

6  increase from $2 billion to $2.8 billion to the launch of

7  the Mavericks and Voyager partnership?

8       A.  We would probably love to take credit for that,

9  but that's not what the reality is.  We were just tracking

10 it as a performance metric.

11      Q.  Is this another sales report you sent to Mark

12 after the launch of the Voyager/Mavericks partnership?

13      A.  Appears to be, 11/8.

14           MR. BOIES:  Exhibit 22.

15 BY MR. BOIES:

16      Q.  In the third sentence, it says:  They said they

17 had over 75K downloads with fans who use MAVS100 to claim

18 offer.

19           Do you see that?

20      A.  Yep.

21      Q.  What does that mean to you?

22      A.  That it was a successful sponsorship

23 announcement -- program.

24      Q.  Does it mean that 75,000 people downloaded the

25 Voyager and used MAVS100?

Page 219

1      A.  So they had told us.

2      Q.  And it says:  Over 30,000 people funded the

3   account to claim the hundred-dollar offer, and still

4   counting?

5      A.  Correct.

6      Q.  The offer was only limited, correct?

7      A.  It was a 48-hour window.

8      Q.  So how could they still be counting?

9      A.  They had people on a waitlist.

10     Q.  So if you signed up three weeks after, you

11  wouldn't get the $100, but you would still get your

12  account, and you would still get the data that they signed

13  up with the MAVS100 account?

14           MR. COOK:  Object to form.

15           THE WITNESS:  That was a two-part question.

16  Can you ask one at a time?

17  BY MR. BOIES:

18     Q.  Sure.

19           So if you signed up three weeks after the

20  limited time, you could -- you would still get an account,

21  correct?

22     A.  I'll correct you that it was the people who were

23  on the wait list were people who signed up during that

24  48-hour window, but from what they told us, is they have

25  to go in and validate each customer, and there was a -- --

CONFIDENTIAL

Page 220

1    that takes a while, so they had to put people on a wait

2    list to verify each individual account.

3        Q.  To make sure that they were a new account?

4            MR. COOK:  Object to form.

5            THE WITNESS:  I don't know.

6    BY MR. BOIES:

7        Q.  Was one of the necessary parts of the MAVS100 to

8    be a new account?

9        A.  I don't recall if that was a stipulation.

10       Q.  Earlier, we discussed that you had a Mav- -- a

11   Voyager account prior to this launch.

12           Were you able to use the MAVS100 account and

13   get $100 into your account?

14           MR. COOK:  Object to form.

15           THE WITNESS:  I did not use the MAVS100

16   account.  To be honest, I don't know what coup- -- code I

17   used.  I wish I would have waited, but I didn't.

18   BY MR. BOIES:

19       Q.  And it says:  Overall, they had 175,000 downloads

20   for first week.

21           Now, that extra hundred thousand downloads

22   from the -- from the two sentences above it, is that just

23   from people who didn't use the MAVS100 code.  Is that a

24   fair reading of your words?

25       A.  I can't -- I'm just relaying information that

Page 221

1  they shared with me.  I -- I don't know what the context

2  of what those 175,000 were.

3      Q.  And that they had over 1 billion impressions on

4  the partnership announcement in addition to the

5  hundred-thousand-dollar crypto give-away half-court shot?

6      A.  Yes.  The PR agency mentioned that they had a

7  billion impressions for the weekend of the -- of that

8  48-hour period.

9      Q.  Were you excited about the success of this

10 launch?

11             MR. COOK:  Object to form.

12             THE WITNESS:  Yes.

13 BY MR. BOIES:

14     Q.  Could you have had a better launch?

15             MR. COOK:  Object to form.

16             THE WITNESS:  I believe it says, later, we

17 could not have had a better launch.

18 BY MR. BOIES:

19     Q.  When did the Voyager -- I'll just quickly,

20 Exhibit 52.

21             (Exhibit 52 was marked for identification.)

22 BY MR. BOIES:

23     Q.  Did you continue coming up with new ideas for

24 Voyager after the launch?

25     A.  They had a few promotional opportunities that we

Page 222

1    were finalizing.

2         Q.  And in the second sentence -- in the second page

3    on your e-mail, where you're sending it to Ryan and

4    Spencer and Jonathan, you -- you say that:  We've already

5    had a home run with the shooting promotion?

6         A.  Yes.

7         Q.  What is that?

8         A.  That was the half-court shot that received an

9    enormous amount of coverage.

10        Q.  Was that half-court shot covered by ESPN?

11        A.  I believe so, yes.

12        Q.  Was it a top-ten play?

13        A.  I believe it made it to that, yes.

14        Q.  Did it get national coverage?

15        A.  I believe it was on their network, so... but

16   that's not something we control.

17        Q.  Correct.  But when a -- when you hit a home run,

18   under certain circumstances, it might have national

19   appeal, correct?

20             MR. COOK:  Object to the form.

21             THE WITNESS:  The intent of the sponsorship

22   deal is to market to the fans, and specifically at that

23   game who saw that shot, so that was the intent of the

24   sponsorship agreement.

25   BY MR. BOIES:

CONFIDENTIAL

Page 223

1    Q.  When you created the sponsorship agreement, did

2    you think there was a good chance he'd hit the half-court

3    shot?

4              MR. COOK:  Object to the form.

5              THE WITNESS:  It was a very hard task to --

6    to do that.  So I -- would have -- would have hoped for it

7    to happen, but I didn't think it would have happened.

8    BY MR. BOIES:

9    Q.  Do you -- do you assign probabilities to things

10   like that?

11   A.  I don't.

12   Q.  When -- when you're doing expected outcomes and

13   expected values of future events, do you, you know,

14   multiply the cost of something by the percentage of it

15   occurring?

16   A.  No.

17   Q.  Do you know how Mark Cuban feels about the Dallas

18   Stars?

19             MR. COOK:  Object to the form.

20             THE WITNESS:  I don't.

21   BY MR. BOIES:

22   Q.  Do you do any promotions with your clients with

23   the Dallas Stars?

24   A.  There are shared accounts across the Mavs COC and

25   the Stars.

CONFIDENTIAL

Page 224

```
 1              MR. BOIES:  Exhibit 53.

 2              (Exhibit 53 was marked for identification.)

 3   BY MR. BOIES:

 4       Q.  Is -- is this an e-mail where Mark Cuban is

 5   responding to a sales report that you sent to him?

 6       A.  It appears to be.

 7       Q.  And in the body of your e-mail where it says,

 8   "Voyager Status Meeting, we've had some additional

 9   conversations with Voyager about getting some additional

10   funds for the AAC/Stars."

11              What -- what were those conversations?

12              MR. COOK:  Object to form.

13              THE WITNESS:  I don't recall exactly what

14   those conversations were about.

15   BY MR. BOIES:

16       Q.  And in the -- in the first -- in Mark's response

17   to you, he says:  And on the Stars, I have no interest in

18   getting money for the Stars.  Zero.  None.  Double extra

19   zero.

20              What did that mean to you?

21              MR. COOK:  Object to form.

22              THE WITNESS:  I don't know his -- his

23   intent, but clearly the assumption would be is he doesn't

24   want us to help sell for the Stars.

25   BY MR. BOIES:
```

Page 225

1          Q.  Why particularly Voyager?

2                    MR. COOK:  Object to the form.

3                    THE WITNESS:  Can you ask that in a

4     different way?

5     BY MR. BOIES:

6          Q.  What is -- what is "AAC"?

7          A.  The American Airlines Center.

8          Q.  Do other teams, other than you and the Stars,

9     play in the American Airlines Center?

10         A.  It's only the Mavs and the Stars from a

11    professional team standpoint.

12         Q.  And -- and American Airlines is a partner of

13    both, correct?

14         A.  Correct.

15         Q.  Why would -- why would Mark want to keep Voyager

16    separate from the Stars?

17                    MR. COOK:  Object to the form.

18                    THE WITNESS:  I don't know the intent of

19    Mark.

20    BY MR. BOIES:

21         Q.  In the second sentence -- paragraph, the second

22    sentence of the second paragraph, what does that say?

23         A.  "I don't want any money going to the AAC when it

24    could come to the Mavs" --

25         Q.  No, no, no, the next paragraph --

Page 226

1       A.  Oh.

2       Q.  -- second sentence of the next paragraph.

3       A.  "Find a way for us to further partner with the

4   Mavs.  We crushed it for them, and a lot of that was

5   because I endorsed it."

6       Q.  What is he referring to?

7               MR. COOK:  Object to the form.

8               THE WITNESS:  I don't -- I can't speak for

9   his intent.

10  BY MR. BOIES:

11      Q.  Who is "we"?

12              MR. COOK:  Object to the form.

13              THE WITNESS:  Still can't speak to that.

14  BY MR. BOIES:

15      Q.  In your interpretation, because he's responding

16  to your e-mail, is "we" you and him --

17              MR. COOK:  Object.

18  BY MR. BOIES:

19      Q.  -- individually?

20              MR. COOK:  Object to the form.

21              THE WITNESS:  Are you asking me to guess?

22  BY MR. BOIES:

23      Q.  No.  I'm asking you to tell me what you thought

24  at the time you received this e-mail, what you thought

25  "we" meant in that context?

Page 227

1              MR. COOK:  Object to form.

2              THE WITNESS:  That the -- that "we" would be

3    encompassing of the Mavs.

4    BY MR. BOIES:

5         Q.  Another -- could -- could -- did you read it as:

6    The Mavericks crushed it for them, and a lot of it was

7    because I endorsed it?

8         A.  I believe --

9              MR. COOK:  Object to the form.

10             THE WITNESS:  We -- "we crushed it for them"

11   would be as the Dallas Mavericks.

12   BY MR. BOIES:

13        Q.  And "because I endorsed it," "I" is Mark Cuban?

14        A.  I can't speak to his...

15        Q.  How did you interpret these words as the

16   recipient of this e-mail?

17             MR. COOK:  Object to the form.

18             THE WITNESS:  That he helped announce the

19   partnership.

20   BY MR. BOIES:

21        Q.  And that -- and the partnership was -- the launch

22   was a success, correct?

23             MR. COOK:  Object to the form.

24             THE WITNESS:  There were a lot of variables

25   of why the sponsorship was a success.

CONFIDENTIAL

Page 228

1   BY MR. BOIES:

2       Q.  And Mark is telling you that a lot of that was

3   because he endorsed it?

4               MR. COOK:  Object to the form.  You asked

5   Mark about this.

6               MR. BOIES:  I didn't.

7               MR. COOK:  Your partners did.

8               MR. BOIES:  I didn't.

9               MR. COOK:  Why are we going through his

10  speculation about what Mark meant when you asked him

11  directly.

12              MR. BOIES:  He received this and how --

13              MR. COOK:  What difference does it make,

14  Alex?  You can ask, and did ask Mark about it.  So this is

15  dragging on way too long.

16              MR. BOIES:  How much time do I have on the

17  record?

18              THE VIDEOGRAPHER:  5 hours, 31 minutes.

19              MR. BOIES:  Sounds like I'll be here for

20  another hour and 29 minutes.

21              MR. COOK:  Take your time.

22              MR. BOIES:  If you want to do it like that.

23              MR. BEST:  We're going to be here actually a

24  lot longer than that, but keep going.  You take as much

25  time as you need.

CONFIDENTIAL

Page 229

```
 1              MR. BOIES:  This is Exhibit 7.
 2    BY MR. BOIES:
 3         Q.  What is this?
 4              MS. WOLKINSON:  Sorry.  7?
 5              MR. BOIES:  Exhibit 7.
 6              MS. WOLKINSON:  Thank you.
 7              THE WITNESS:  This appears to be the
 8    Sponsorship Agreement.
 9    BY MR. BOIES:
10         Q.  And on page 2855, bottom right --
11         A.  (Witness examines document.)  Okay.
12         Q.  -- under "Signage," is signage something you deal
13    with?
14         A.  Yes, collectively.
15         Q.  Collectively.
16    ████████████████████████████████████████
████  ████████████████████████████████████████████
████  ████████████████████████████████
████  ██  ████████████████████████████████████
████  ██  ██████████████████████████████████
████  ████████████████████████████████████████
████  ██████████████████████████████  ████████
████  ██████████████████████████████████████
████  ██████████████████████████████
████  ██  ████████
```



1

17    Q.  So there are deliverables within the contract

18  that you don't deliver because, on your end, it's not

19  good?

20         MR. COOK:  Object to form.

21         THE WITNESS:  We were -- we were going to

22  try to at some point integrate into the app, but as we

23  learned, it was harder than we anticipated whenever we

24  were looking at putting this deliverable into the -- into

25  the contract.

Page 231

BY MR. BOIES:

    Q.  Did you provide a discount to Voyager thereafter as a result of not being able to give them one of the deliverables that had been promised?

████  █████████████████████████████████

████████████████████████████████████████

███████████████████████████████

    Q.  Would a substitute replacement asset for them be something that's not listed in this contract and be an additional contract deliverable?

████  ████████████  ████████████████████

████████████████████

    Q.  So you could just bolster another part of the contract to help -- another line item of the contract to make up for not giving them a different part of the contract?

████  ███████████████████████████

███████  ██████████████████████████████

████  ████████████████████████████████

██████████  ██████████████████████████

██████████████████████████████████████

██████████

    A.  Yep.

    Q.  Was that ever delivered?

    A.  ████████████████████████████████████

1 ███████████████████████████████████

███████████████████████████████

██ ███ █████████████████████████████████

██ ████████████████████████

5     Q.  Do you know who they played that game?

6     A.  No, I don't.  If I'm guessing, it was the Spurs.

7     Q.  Who were they playing when he hit the half-court

8 shot?

9     A.  I don't recall.  If -- I don't know.  Philly?  I

10 don't know.

11     Q.  Did that promotion for that last game go forward?

12     A.  We -- yes, we had some sort of promotion for the

13 -- for the end of the season.

14     Q.  When is last game of the season, approximately?

15     A.  Mid-April.

16     Q.  At the time when that promotion occurred, was

17 that a -- a national promotion?

18     ███ ████████████████████████████████████

██ ███████████████████████████ ████████

██ █████████████████████████

21     Q.  What were your nationwide promotions related to

22 Voyager?

23          MR. COOK:  Object to the form.

24          THE WITNESS:  We didn't end up having the --

25 any of these national promotions.

CONFIDENTIAL

Page 233

1    BY MR. BOIES:

2    ████  █████████████████████████████████

█  ██████████████████████████████████████████████

█  ██████████████████████████████████████████████

█    ████  ██████████

6        Q.  Going back for a quick second.  When you said

7    that there were waitlisted people for the MAVS100 term a

8    few minutes ago, do you re- -- do you remember where those

9    people were located on the waitlist?

10              MR. COOK:  Object to form.

11              THE WITNESS:  I don't recall.

12    BY MR. BOIES:

13        Q.  Did they give you any demographics about who

14    signed up and where they were when they signed up --

15        A.  No.

16        Q.  -- for the MAV- -- with the MAVS100 code?

17        A.  No, I don't believe so.

18              MR. BEST:  "They" being Voyager?

19              MR. BOIES:  Yes.

20    BY MR. BOIES:

21        Q.  Did Voyager give you demographics about where

22    people signed up with the MAVS100 code?

23        A.  Can you -- so the word "demographic," can you ex-

24    -- can you give us more -- I don't know what you're

25    asking, what's that word.

CONFIDENTIAL

Page 234

1     Q.  Did Voyager give you the location --

2     A.  Ahh.

3     Q.  -- of where people signed up with the MAVS100

4  code?

5     A.  So demographics is different than location, just

6  FYI, in my opinion.  And then the answer is:  I don't

7  recall if they gave us information on where the location

8  of the fans that were waitlisted were.

9           MR. BOIES:  Example 53 -- example.

10  Exhibit 53-A.

11           (Exhibit 53-A was marked for

12  identification.)

13  BY MR. BOIES:

14     Q.  Do you know what this company is?

15           THE WITNESS:  Bless you.

16           Yes.

17  BY MR. BOIES:

18     Q.  Okay.  Is it in any way related to Voyager?

19     A.  Absolutely not.

20     Q.  Did -- do you know what led Mark Cuban to come to

21  the conclusion that this is not a real company?

22     A.  I can't speak to his intent.  You'd have to ask

23  him.

24     Q.  Was there due diligence done by you on this

25  company?

1     A.  Yes.

2     Q.  Did you think this was a real company?

3     A.  I'm not as smart as Mark, and so he knows a lot

4  more about this than I do, so my due diligence would have

5  been lacking in comparison to his.

6     Q.  In the fifth line down in Mark's e-mail:  But if

7  they want to buy ads to promote themselves in the

8  straightforward deal for advertising, that's fine.

9         How did you interpret that?

10

17     Q.  Would an advertising agreement with this company

18  be a sponsorship agreement?

19         MR. COOK:  Object to the form.

20         THE WITNESS:  Sponsorship, yes.

21  BY MR. BOIES:

22     Q.  So if they -- if that had -- did they ever buy

23  ads to promote themselves?

24     A.  No.

25     Q.  If they had bought ads to promote themselves and

CONFIDENTIAL

Page 236

1   they be -- and they were able to get a sponsorship

2   agreement, would they internally be referred to as

3   partners?

4           MR. COOK:  Object to form.

5           THE WITNESS:  That never happened, so I --

6   it's speculating.

7           MR. BOIES:  Here's Exhibit 54.

8           (Exhibit 54 was marked for identification.)

9           (Off-record discussion.)

10  BY MR. BOIES:

11      Q.  It's the --

12      A.  Jesus.

13      Q.  When did the partnership end?

14      A.  I don't know the exact date off the top of my

15  head.

16      Q.  Did it end after November 10th, 2021?

17      A.  Yes, it ended after November 10th, 2021.

18      Q.  Did it end after November 10th, 2022?

19      A.  It would have ended between the summer of --

20  after playoffs, June, July, August.  I just -- I don't

21  know the exact date.

22      Q.  And did you continue to give them deliverables

23  from November of 2021 until June, July, August of 2022?

24      A.  We continued to perform our side of the

25  deliverables so that we were not in breach of contract.

CONFIDENTIAL

Page 237

```
 1        Q.  There's just one or two more things I want to get

 2   to.

 3                  MR. BOIES:  Exhibit 55.

 4                  (Exhibit 55 was marked for identification.)

 5   BY MR. BOIES:

 6        Q.  What is -- who is Murphy DiRosa?

 7        A.  I know this is going to sound bad, but...

 8                  (Reading sotto voce.)

 9                  I don't even -- I don't recall who this

10   person is.

11        Q.  Please see below for my -- for some of my

12   comments.

13                  You see where he wrote that?

14        A.  Yeah.

15        Q.  Which are your comments?

16        A.  (Reading sotto voce.)  Voyager...

17                  (Reading sotto voce.)

18                  So, I think -- okay.  I do know who this is

19   now.  Which -- are -- my comments are the -- the ones that

20   are beneath the underlined assets.

21        Q.  So she wrote the underlined assets, and you wrote

22   the bullet points?

23        A.  I'm saying mine are the -- are in there.

24        Q.  I don't know exactly which ones are yours --

25        A.  Right.
```

CONFIDENTIAL

Page 238

```
 1        Q.  -- which ones are hers.

 2             What's VGX?

 3    ███   ████████████████████████████████

 █   ███████████████████████████████████████

 5        Q.  Would the -- would a VGX hub be what you were

 6    talking about as the gaming use -- the Mavs gaming

 7    facility?

 8    ███  ████   ██████████████████████████

 █   █████████████████████████████████

 █  ██████████████

11        Q.  Why?

12        A.  It wasn't a legal -- they weren't allowed --

13    their legal team did not allow it.  I don't know why, but

14    that was -- that's all -- that's all we heard at some

15    point.

16             MR. BOIES:  Exhibit 56, take a look at that.

17             (Exhibit 56 was marked for identification.)

18    BY MR. BOIES:

19        Q.  So did this e-mail happen after the last e-mail?

20             MR. COOK:  Which e-mail?

21    BY MR. BOIES:

22        Q.  Yeah, sorry.  Sorry.  The e-mail from Kory Nix to

23    Ryan, Kyle, Clay, Billy, Patrick and Spencer, at the very

24    top?

25        A.  Yes.
```

CONFIDENTIAL

Page 239

1      Q.  This e-mail chain occurred in February; is that

2  correct?

3      A.  Correct.

4      Q.  The previous e-mail chain I gave you was in

5  January, correct?

6      A.  Correct.

7      Q.  When Kory -- who is Kory responding to after --

8  who is Kory responding to?

9      A.  Looks like he's sending correspondence to Mackey

10  and us.

11      Q.  And before that, what prompted those responses?

12              MR. COOK:  Object to form.

13              THE WITNESS:  I need to read this.

14              (Witness examines document.)

15              We were -- we were going through an approval

16  process of working with our marketing team, our gaming

17  team, our branding team on the name of the gaming hub that

18  ultimately did not happen.

19  BY MR. BOIES:

20      Q.  Did -- in the -- in the e-mail before, did

21  Cynt Marshall send you this e-mail regarding the name of

22  the "VGX Home of Mavs Gaming"?

23      A.  Yeah.  There was about a month period where we

24  were internally deliberating which name we would like to

25  present to Voyager for -- for the naming rights, and they

Page 240

1  were -- we were, obviously, about a month to deliberate

2  which name we were going to take before we brought that

3  name to them.

4      Q.  And once you brought that name to them, that is

5  when legal at Voyager said:  No, we can't use that name?

6      A.  Correct.

7      Q.  And they did not explain why they could not use

8  that name?

9            MR. COOK:  Object to form.

10           THE WITNESS:  They -- no, I don't know the

11  answer to that.

12  BY MR. BOIES:

13     Q.  Do you have any inkling that it might be related

14  to that VGX is the name of its token?

15           MR. COOK:  Object to form.

16           THE WITNESS:  They didn't give us a reason.

17  BY MR. BOIES:

18     Q.  Did they tell you not to do it over e-mail or

19  over the phone?

20     A.  Sorry.  Say that again.

21           MR. COOK:  Yeah.  Objection.  Vague and

22  ambiguous.

23  BY MR. BOIES:

24     Q.  Did Voyager tell you not to name the VGX Home of

25  Mavs Gaming in an e-mail or over the phone?

Page 241

```
 1        A.  I don't recall.

 2              MR. BOIES:  Exhibit 57.

 3              (Exhibit 57 was marked for identification.)

 4   BY MR. BOIES:

 5        Q.  On the last page, did Mavs gaming ever wear these

 6   jerseys --

 7        A.  Yes.

 8        Q.  -- to your knowledge?

 9        A.  Yes.

10              MR. BOIES:  Exhibit 58.

11              (Exhibit 58 was marked for identification.)

12   BY MR. BOIES:

13        Q.  Why was Kevin Spann asking you to approve this

14   space app?

15              MR. COOK:  Object to the form.

16              THE WITNESS:  I don't recall.

17   BY MR. BOIES:

18        Q.  And this is April 7th, 2022; is that correct?

19        A.  Yep.

20        Q.  Was this playoffs yet?

21        A.  No.

22        Q.  Do you have any idea what this was in -- what

23   this would be used for?

24        A.  I don't.

25              MR. COOK:  Object to form.
```

CONFIDENTIAL

Page 242

1            THE WITNESS:  I don't know the specific

2    reason.

3    BY MR. BOIES:

4        Q.  What are 96-by-96 proofs usually used for?

5        A.  They are a backdrop for a large space.

6            MR. BOIES:  Exhibit 63.

7    BY MR. BOIES:

8        Q.  What -- what did I just give you?

9        A.  59.

10           MR. COOK:  59.

11           MR. BOIES:  I said 63.  Excuse me.  Excuse

12   me.  I'm getting a little sloppy.

13           THE WITNESS:  Time to leave.

14           (Exhibit 59 was marked for identification.)

15   BY MR. BOIES:

16       Q.  Exhibit 59, what is this e-mail?

17       A.  It was another sales report to Mark.

18       Q.  And blacked-out area, that is it's because of a

19   company not at all related to Voyager?

20       A.  Once again, the same answer.

21       Q.  I don't know what that -- sorry.  Just give me --

22   sorry.

23       A.  No.

24           MR. COOK:  Would you read the question back

25   again and then answer the question.

CONFIDENTIAL

Page 243

```
 1    BY MR. BOIES:
 2         Q.  The --
 3              MR. COOK:  I think he misunderstood the
 4    question.
 5    BY MR. BOIES:
 6         Q.  Sure.  This blacked-out area, this is not
 7    covering any -- sorry.  This -- this blacked-out area is
 8    covering other companies that you work with that have
 9    nothing to do with Voyager, correct?
10         A.  Correct.
11              Two partners.
12         Q.  Were you still providing deliverables to Voyager
13    at this time?
14         A.  On 6/13 we were still meeting to discuss the
15    following 16.
16         Q.  Do you know when the Mavs lost to the Suns last
17    year, before or after this date?
18         A.  We lost to the Warriors.
19         Q.  Warriors.
20              When you lost to the Warriors -- when did
21    you lose -- do you know when you lost to the Warriors last
22    year?
23         A.  I don't know the exact date.  It would have -- it
24    would have been around this time.
25         Q.  And did you -- and did -- would this have
```

Page 244

1  included any playoff fees that Voyager would have paid for

2  playoff deliverables?

3               MR. COOK:  Object to the form.

4               THE WITNESS:  Can you restate that?

5  BY MR. BOIES:

6      Q.  Did -- did orders pay the Dallas Mavericks any

7  playoff fees for additional deliverables as a result of

8  the Mavericks reaching the playoffs?

9               MR. COOK:  Object to the form.

10              THE WITNESS:  I believe so.

11  BY MR. BOIES:

12

CONFIDENTIAL

Page 245

1          MR. COOK:  Object to the form.

2          THE WITNESS:  I --

3    BY MR. BOIES:

4      Q.  Were -- did you help solicit funds from Voyager

5    to make sure that they paid on time?

6          MR. COOK:  Object to the form.

7          THE WITNESS:  Do we schedule payments?

8    BY MR. BOIES:

9      Q.  Yes.

10     A.  We have a software that schedules out payments,

11   but I don't know if playoffs had been scheduled at that

12   point.

13     Q.  Okay.

14         THE WITNESS:  No more folders.

15         MR. BOIES:  No more folders.  No more

16   questions.

17         MR. BEST:  Let's take a break.

18         THE VIDEOGRAPHER:  Off the record, 5:16.

19         (Brief recess taken.)

20         THE VIDEOGRAPHER:  We are on the record.

21   The time is 6:06.

22                    EXAMINATION

23   BY MR. COOK:

24     Q.  Mr. Tapply, did Voyager ever ask the Mavericks to

25   promote the Earned Program account?

Case 1:22-cv-22538-RKA   Document 155-28 *SEALED on EbSDocket 10/29/2023   Entered on FLSD Docket 06/09/2023
Page 247 of 265   Page 247 of 522
CONFIDENTIAL

Page 246

1       A.  No.

2       Q.  Did the Mavericks ever market or promote

3   Voyager's Earned Program account?

4       A.  No.

5       Q.  Did that -- the Earned Program account ever come

6   up during the negotiations of the sponsorship agreement?

7       A.  It was never a consideration.

8       Q.  I'm going to ask you to take a look at

9   Exhibit 53-A.  It should be in the stack in front of you

10   there.  Right there.

11       A.  Which one was it, 53?

12       Q.  53-A.

13       A.  Oh, man, you're going to have to make me go

14   through this.

15               THE WITNESS:  Did you put these in order?

16               THE COURT REPORTER:  (Shakes head

17   negatively.)

18               THE WITNESS:  Oh, I was going to say.

19               MR. COOK:  That's it.

20               THE WITNESS:  Great.

21   BY MR. COOK:

22       Q.  It's the one with the redactions on it?

23       A.  Yes.

24       Q.  Okay.  This is an e-mail from Mark to you copying

25   some other folks?

CONFIDENTIAL

Page 247

1      A.  Yes.

2      Q.  And it's the one that has the company name

3  redacted?

4      A.  Yes.

5      Q.  Okay.  For purposes of my questions, I'm going to

6  use "Company A" as the name of the company.

7           Do you recall what Mr. Cuban's concerns were

8  with regard to Company A?

9  ████  ████    █████████████████████████

██ ████████████████████████████████████████████

██ ███████████████████████████████

12     Q.  Okay.  And to -- to your knowledge, was Mr. Cuban

13 concerned that Company A wasn't -- was a fraud or wasn't

14 actually a real company?

15          MR. BOIES:  Objection to form.

16          THE WITNESS:  It was -- he was concerned

17 that -- that we would -- wouldn't need their product --

18 BY MR. COOK:

19     Q.  Okay.

20     A.  -- use their product.

21     Q.  Okay.  Well, take a look at the last sentence in

22 his e-mail to you where it says:  But we aren't going to

23 commit to using their technology.

24          Do you see that?

25     A.  Yes.

Page 248

1      Q.  Do you have an understanding as to why Mr. Cuban

2  did not want to commit to using their technology?

3      A.  Because he didn't think it would benefit the

4  basketball operations team.

5      Q.  What was the nature of their technology?

6      A.  ███████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████

9      Q.  Okay.  Was his concern that the technology

10  actually didn't exist, or it just wasn't functional for

11  the Mavericks purposes?

12      A.  It didn't -- that it wouldn't benefit our team;

13  it wouldn't work for us.

14      Q.  But he was willing to advertise for this company,

15  correct?

16      A.  Yes.

17      Q.  Okay.  When you testified earlier about playoffs

18  fees -- do you remember that testimony?

19      A.  Yes.

20      Q.  -- what is the purpose of a playoff fee?

21      A.  That they pay additional funds for additional

22  games.

23      Q.  Okay.  And why are they paying for -- paying

24  additional funds beyond what's agreed to specifically in

25  the agreement -- Sponsorship Agreement?

CONFIDENTIAL

Page 249

```
 1        A.  Because playoff games are additional assets.
 2        Q.  Okay.  So the Sponsorship Agreement and the
 3   amount agreed to there covers the regular season?
 4        A.  Correct.
 5        Q.  And if the team happens to go to the playoffs,
 6   they get additional games?
 7        A.  Correct.
 8        Q.  And additional promotional activities during
 9   those home games for the playoffs?
10        A.  Correct.
11             MR. BOIES:  Objection to form.
12   BY MR. COOK:
13        Q.  You testified earlier about something called the
14   Opportunity Fund?
15        A.  Yes.
16        Q.  That's found in the Sponsorship Agreement?
17        A.  Correct.
18        Q.  Let's take a look at that.  If you look at
19   Exhibit 7; should be in your stack there.
20             And if you turn to page -- it's back at the
21   back in the exhibit.
22        A.  Yep.
23        Q.  Do you see the section for Opportunity Fund?
24        A.  Yes, page 855.
25        Q.  Okay.  What is the purpose of the Opportunity
```

1    Fund?

2    ███ ████████████████████████████████

███████████████████████████████████████

███ ████ █████████████████████████

█████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████

████████████ █████████████████

███████████ ████ ███████████████

██████████████████████████████████

██████████████

13   BY MR. COOK:

14       Q.  And -- and how would you determine with your

15   sponsors how to use an Opportunity Fund?

16           MR. BOIES:  Objection to form.

17   ██████████████ █████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

21   BY MR. COOK:

22   ███ █████████████████████████████

███████████████████████████████████

██████████████████████████████████████

████████████

CONFIDENTIAL

Page 251

1          MR. BOIES:  Objection to form.

2          THE WITNESS:  Yes.  We come up with a lot of

3   ideas.  Some materialize, and some do not.

4   BY MR. COOK:

5   ███  ██████████████████████████

    ██  ████████████████████████████████

    ██  ██████████████████████████████

    ██  ████████████

    ██  ███  ███  ████████████████

    ██  ███  ████████████████████████████

    ██  ████████████████████████████

    ██  ████████████████████████████

    ██  ████████████████████████████████

    ██  ███  ███

    ██  ████████  ██████████████████

    ██  ██████████  ██████  ██████████████

    ██  ████████████

18  BY MR. COOK:

19      Q.  We discussed earlier -- you discussed with

20  Mr. Boies the meaning of the word "partner" and

21  "partnership."

22          Do you remember that?

23      A.  Yes, many times.

24      Q.  So just so I'm clear, when you use the word

25  "partner" or "partnership" in your industry, what does

Page 252

1    that mean to you?

2        A.  It's a common use of sponsor- -- the two phrases

3    are interchangable, in a -- in a common -- in a

4    vernacular.

5        Q.  Do you have any understanding as to whether

6    Mr. Cuban or the Mavericks were partners with Voyager in

7    any other sense, other than the one you just described?

8        A.  No.

9        Q.  In any formal legal sense?

10       A.  No.

11       Q.  You're familiar with the terms of the Sponsorship

12   Agreement, correct?

13       A.  Correct.

14       Q.  In fact, I believe you testified earlier that it

15   was your recollection that in the Sponsorship Agreement it

16   states expressly that Voyager is not a partner with the

17   Mavericks?

18              MR. BOIES:  Objection to the form.

19   BY MR. COOK:

20       Q.  Was that your testimony?

21       A.  Yes.  It is outlined in here that they are a

22   sponsor and not a partner.

23       Q.  Take a look at Section 14.01; it's on page 2849.

24

CONFIDENTIAL

Page 253



17   BY MR. COOK:

Page 254



BY MR. COOK:

    Q.  Did anyone at the Mavericks, to your knowledge,
receive Voyager's public company filings before they were
publicly available?

    A.  No.

    Q.  You testified that you understood Voyager was a
public company, correct?

    A.  Yes.

    Q.  Okay.  Did the Mavericks play any role in how

CONFIDENTIAL

Page 255

1    Voyager conducted its internal business operations?

2         A.  No.

3         Q.  To your knowledge, did the Mavericks make any

4    hiring decisions for Voyager?

5                   MR. BOIES:  Objection to form.

6                   THE WITNESS:  No.

7    BY MR. COOK:

8         Q.  Did they make any termination decisions for

9    Voyager?

10                  MR. BOIES:  Objection to form.

11                  THE WITNESS:  No.

12   BY MR. COOK:

13        Q.  Did the Mavericks have authority to make any

14   decisions on behalf of Voyager, to your knowledge?

15        A.  No.

16        Q.  To your knowledge, did the Mavericks or any

17   representative of the Mavericks ever publicly state that

18   they did have authority to make decisions on behalf of

19   Voyager?

20                  MR. BOIES:  Objection to form.

21                  THE WITNESS:  No.

22   BY MR. COOK:

23        Q.  And -- and how about with regard to the

24   Mavericks, did -- to your knowledge, did Voyager ever play

25   any role in how the Mavericks was operated?

Page 256

```
 1                    MR. BOIES:  Objection to form.
 2                    THE WITNESS:  No.
 3    BY MR. COOK:
 4         Q.  Did Voyager ever make any hiring or firing
 5    decisions for the Mavericks?
 6                    MR. BOIES:  Objection to form.
 7                    THE WITNESS:  No.
 8    BY MR. COOK:
 9         Q.  Did they have the authority to do so, to your
10    knowledge?
11         A.  No.
12         Q.  Did Voyager have the authority to make any
13    decisions at all concerning the business operations of the
14    Mavericks?
15                    MR. BOIES:  Objection to form.
16                    THE WITNESS:  No.
17    BY MR. COOK:
18         Q.  And to your knowledge, did Voyager ever state
19    publicly that they did have authority to make decisions on
20    behalf of the Mavericks?
21                    MR. BOIES:  Objection to form.
22                    THE WITNESS:  No.
23    BY MR. COOK:
24         Q.  Do you know who signed the Sponsorship Agreement
25    on behalf of Voyager?
```

Page 257

1       A.  I believe -- on behalf of Voyager?

2       Q.  Yes.

3       A.  I believe it was Steve.

4       Q.  And do you know in what capacity he signed it?

5  Was it as a CEO?

6       A.  I believe so.

7       Q.  And do you know who signed the Sponsorship

8  Agreement on behalf of the Mavericks?

9       ███  █████████████

   ███  ███  ████████████████████████████████████████

   ███  ████████████

   ███  ███  █████████████

13      Q.  Okay.  And I'm going to hand you what's been

14  marked as Defendant's Exhibit -- Tapply Exhibit No. 1.

15              Do you have that in front of you?

16      A.  Yes.

17              (Tapply 1 was marked for identification.)

18  BY MR. COOK:

19      Q.  Is this a -- well, do you recognize the document?

20      A.  Yes.

21      Q.  What is it?

22      A.  It appears to be a Voyager page that you use to

23  create an account.

24      Q.  Okay.  When you download the Voyager app, do you

25  have to go through a process to sign up to create an

CONFIDENTIAL

Page 258

1    account?

2        A.  Yes.

3        Q.  Is this one of the pages or screens that you see

4    as part of that process?

5        A.  Yes.

6        Q.  Okay.  And as part of the process of signing up

7    to open a Voyager account, do you have to click that box

8    there in the middle that says, "By creating an account,

9    you agree to our terms"?

10       A.  Yes.

11           MR. BOIES:  Objection to form.

12   BY MR. COOK:

13       Q.  And if you look at the word "terms," you see it's

14   bolded and -- and -- and -- is that a hyperlink --

15           MR. BOIES:  Objection to form.

16   BY MR. COOK:

17       Q.  -- within the app?

18       A.  Yes.

19       Q.  And if you click on that link, does it take you

20   to the terms and conditions?

21       A.  Yes.

22       Q.  Okay.  Did you actually read the terms and

23   conditions?

24       A.  No.

25       Q.  But you agreed to it?

CONFIDENTIAL

Page 259

```
 1        A.  Yes.
 2        Q.  What was your understanding of your commitment to
 3   the terms and conditions by checking that box?
 4        A.  That I was responsible for my actions.
 5        Q.  Were you bound by the terms and conditions --
 6             MR. BOIES:  Objection to form.
 7   BY MR. COOK:
 8        Q.  -- to your -- was that your understanding?
 9        A.  Yes.
10        Q.  I'm going to hand you what's been marked as
11   Tapply Exhibit No. 3.
12             MR. BEST:  I'll let you have both of them.
13             MS. WOLKINSON:  Sorry.
14             THE WITNESS:  Yes.
15             MR. COOK:  Actually, it's the same one.
16   Yep.
17             [Inaudible discussion.]
18             MR. COOK:  It's not that one.  Yes, that's
19   the one.
20             MR. BEST:  Okay.  This is what I have.
21             MR. COOK:  3, and then 2 -- 2.  There we go.
22   Sorry about that.
23             (Tapply 2 was marked for identification.)
24   BY MR. COOK:
25        Q.  Tapply Exhibit No. 2 is in front of you?
```

CONFIDENTIAL

Page 260

```
 1        A.  Yes.

 2        Q.  You recognize this document?

 3        A.  Yes.

 4        Q.  What is it?

 5        A.  It's an order history -- it's an account of all

 6  of my orders on Voyager since I've opened the account.

 7        Q.  Okay.  And does this reflect your buy and sell

 8  history of the various cryptocurrencies on -- offered by

 9  Voyager?

10        A.  Yes.

11        Q.  Okay.  And if you scroll -- scroll -- if you go

12  to the first page of the document, the last page, the

13  earliest in time --

14        A.  Yep.

15        Q.  -- when was your first purchase on your Voyager

16  account?

17        A.  My first purchase was October 30th of 2021.

18        Q.  And do you recognize what you purchased?  Do you

19  remember what that is?

20        A.  I don't know what BAT was.  But I -- yes, they

21  were tokens.

22        Q.  Why did you open a Voyager account?

23        A.  My neighbor was involved in -- in this crypto

24  space, and he piqued my interest, and it was something new

25  and -- something new to learn and try and experience.
```

Page 261

1          Q.  Who made the decision for you to open your

2    Voyager account?

3          A.  I did.

4          Q.  Going to hand you what's been marked as Tapply 4.

5               (Tapply 4 was marked for identification.)

6    BY MR. COOK:

7          Q.  You recognize that document?

8          A.  I do.

9          Q.  What is it?

10         A.  It is how much I've lost as of July 5th, whenever

11   the claim.

12         Q.  July 5th, 2022?

13         A.  Correct.

14         Q.  And when you suffered these losses, Mr. Tapply,

15   did -- did you sue your neighbor?

16         A.  No.

17         Q.  Why not?

18         A.  Because I made these decisions on my own.

19         Q.  What about Mark Cuban?  Did you sue Mark Cuban?

20         A.  I did not.

21         Q.  Why?

22         A.  Because I made these decisions on my own.

23         Q.  Did you sue anybody in connection with this

24   nearly ██████ in loss?

25         A.  Nope.

Page 262

1      Q.  Why?

2      A.  Because I'm responsible for my actions, and these

3  were my decisions.

4      Q.  Who do you blame for your losses?

5      A.  I blame myself.  My wife blames me.

6           MR. COOK:  I don't have any further

7  questions.  Just note for the record the documents are

8  confidential and protected by the protective order, the

9  new documents I produced today.

10          MR. BOIES:  Yes.  The --

11          MR. COOK:  We'll -- we'll tag them

12 appropriately going forward.

13          MR. BOIES:  Okay.  And -- and she will have

14 these copies to be able to distribute widely?  I don't

15 need to be the one to distribute these?

16          MR. COOK:  No, you don't need to distribute

17 those.  And --

18          MR. BOIES:  Meaning -- meaning within our --

19 within our confidential -- people protected by the

20 confidential order.

21          MR. BEST:  Right.

22          MR. BOIES:  Okay.  Great.

23          I have no -- I have no further -- I have --

24          MR. BEST:  Hello?

25          MR. BOIES:  Sorry.  One second.  Just give

CONFIDENTIAL

Page 263

1   me one second.

2                          RE-EXAMINATION

3   BY MR. BOIES:

4       Q.  Your -- your first trade here was October 30th.

5   How many days after the -- the press release was this?

6       A.  Two.

7       Q.  Were there any trades prior to this?

8       A.  That's my first trade on Voyager.

9       Q.  On Voya- -- on Voyager.

10              But you had previously said that you had a

11  BlockFi account; is that correct?

12      A.  Correct.

13      Q.  Okay.  Have you done -- been able to do anything

14  to get this claim for ████████ back?

15      A.  As of right now, I have not been able to do

16  anything.

17      Q.  Are there any actions that you've taken --

18      A.  No.

19      Q.  -- whatsoever?

20      A.  No.

21              MR. COOK:  Object to form.

22              THE WITNESS:  I have not.

23  BY MR. BOIES:

24      Q.  Have you followed the bankruptcy in -- in

25  Delaware that they are a part of?

CONFIDENTIAL

Page 264

1       A.  I've followed it somewhat, but I don't know the

2   ins and outs of it.

3       Q.  Okay.

4              MR. BOIES:  All right.  No further

5   questions.

6                          RE-EXAMINATION

7   BY MR. COOK:

8       Q.  The October 30th purchase that's reflected in the

9   exhibit, that's your first purchase on Voyager, correct?

10      A.  Correct.

11      Q.  That wasn't the same day you actually downloaded

12  and -- and opened the account, was it?

13      A.  Correct.

14      Q.  Do you remember how long it took from the time

15  you downloaded the app and acknowledged the terms and

16  conditions and provided your information to when you could

17  actually make a trade?

18      A.  I don't recall.

19      Q.  Okay.

20             MR. COOK:  No further questions.

21             THE VIDEOGRAPHER:  Off the record, 6:26.

22          (Deposition concluded at 6:26 p.m.)

23

24

25