Case 1:22-cv-22538-RKA   Document 155-31 *SEALED*   Entered on FLSD Docket 06/09/2023   Page 1 of 375

# Plaintiffs' Exhibit 283

(Part 1)

Page 1

1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2
3    PIERCE ROBERTSON et al,        )
     on behalf of himself and       )
4    others similarly               )
     situated,                      )
5                                   )
              Plaintiff,            )
6                                   )
     VS.                            )          CASE NO.:
7                                   ) 22-cv-22538-ALTMAN/Reid
     MARK CUBAN and DALLAS          )
8    BASKETBALL LIMITED, d/b/a      )
     Dallas Mavericks, et al,       )
9                                   )
              Defendants.           )
10
     ------------------------------------------------------------
11        CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
12            ORAL AND VIDEOTAPED DEPOSITION OF
                       RYAN MACKEY
13                 FEBRUARY 14, 2023
     ------------------------------------------------------------
14
15            ORAL AND VIDEOTAPED DEPOSITION OF RYAN MACKEY,
16   produced as a witness at the instance of the Plaintiff and
17   duly sworn, was taken in the above-styled and numbered
18   cause on Tuesday, February 14, 2023, from 9:18 a.m. to
19   6:01 p.m., before Kari Behan, CSR, RPR, CRR, a Texas
20   certified machine shorthand reporter, at the offices of
21   Winston & Strawn LLP, 2121 N. Pearl Street, Suite 900,
22   Dallas, Texas, pursuant to the Federal Rules of Civil
23   Procedure 30.
24
25   Job No. FLA 5681911

Page 2

```
 1                  A P P E A R A N C E S
 2   FOR THE PLAINTIFFS AND THE CLASS:
 3        JOSEPH M. KAYE, ESQ.
          ADAM M. MOSKOWITZ, ESQ. (REMOTELY)
 4        BARBARA LEWIS, ESQ. (REMOTELY)
          THE MOSKOWITZ LAW FIRM, PLLC
 5        2 Alhambra Plaza, Suite 601
          Coral Gables, Florida 33134
 6        (305) 740-1423
          joseph@moskowitz-law.com
 7        adam@moskowitz-law.com
          barbara@moskowitz-law.com
 8
              - and -
 9
          ALEXANDER M. BOIES, ESQ.
10        BOIES SCHILLER FLEXNER LLP
          55 Hudson Yards
11        New York, New York 10001
          (212) 446-2300
12        dboies@bsfllp.com
13        STEPHEN NEAL ZACK, ESQ. (REMOTELY)
          BOIES SCHILLER FLEXNER LLP
14        100 SE 2nd Street, Suite 2800
          Miami, Florida 33131
15        305-539-8400
          szack@bsfllp.com
16
17
     FOR THE DEFENDANTS, Mark Cuban AND DALLAS MAVERICKS:
18
          CHRISTOPHER E. KNIGHT, ESQ.
19        FOWLER WHITE BURNETT, P.A.
          Brickell Arch
20        1395 Brickell Avenue
          14th Floor
21        Miami, Florida 33131
          (305) 789-9210
22        cknight@fowler-white.com
23
24
25
```

Page 3

APPEARANCES (CONTINUED):

FOR THE DEFENDANTS, MARK CUBAN, ET AL:

    STEPHEN A. BEST, ESQ.
    RACHEL O. WOLKINSON, ESQ.
    BROWN RUDNICK
    601 Thirteenth Street NW, Suite 600
    Washington, DC 20005
    (202) 536-1737
    sbest@brownrudnick.com
    rwolkinson@brownrudnick.com

    TIFFANY B. LEITZ, ESQ.
    SIGMUND S. WISSNER-GROSS, ESQ. (REMOTELY)
    BROWN RUDNICK
    Seven Times Square
    New York, New York 10036
    (212) 209-4731
    tlietz@brownrudnick.com
    swissner-gross@brownrudnick.com


ALSO PRESENT (REMOTELY):

    Rejane Passos

    Brooke Alexander

    Sekou Lewis, General Counsel, Dallas Mavericks

THE VIDEOGRAPHER:
    Luis Acevedo, Videographer, Veritext Legal

```
1                           - - -
                          I N D E X
2                           - - -
3    EXAMINATION OF RYAN MACKEY                 PAGE
4
5      BY MR. KAYE................................ 13
6      BY MR. COOK...............................242
7      CHANGES AND SIGNATURE.....................248
8      REPORTER'S CERTIFICATION..................250
9                          *   *   *
10                     E X H I B I T S
11   EXHIBITS              DESCRIPTION           PAGE
12    Exhibit 36    E-mail dated 9/17/2021, RE:   110
                    Mavs + Voyager Connect,
13                  MAVSCUBAN00012366 through
                    MAVSCUBAN00012371,
14                  CONFIDENTIAL
15    Exhibit 38    E-mail dated 9/21/2021, RE:   115
                    Partnership Outline,
16                  MAVSCUBAN00015015 through
                    MAVSCUBAN00015022,
17                  CONFIDENTIAL
18    Exhibit 38A   E-mail dated 9/20/2021, FW:   120
                    Partnership Outline,
19                  MAVSCUBAN00001906,
                    CONFIDENTIAL
20
      Exhibit 38B   Titled "Voyager + Dallas      120
21                  Mavericks,"
                    MAVSCUBAN00001907 through
22                  MAVSCUBAN00001910, HIGHLY
                    CONFIDENTIAL - ATTORNEYS'
23                  EYES ONLY
24
25
```

Page 5

```
 1    EXHIBITS (CONTINUED):
 2     Exhibit 41    E-mail dated 9/24/2021, RE:    124
                     Thank you, MAVSCUBAN00006662
 3                   through MAVSCUBAN00006666,
                     CONFIDENTIAL
 4
 5     Exhibit 49    E-mail dated 10/25/2021, RE:   231
                     FW: Timeline for Mark -
 5                   Voyager, MAVSCUBAN00018031
 6                   through MAVSCUBAN00018043,
                     CONFIDENTIAL
 7
 8     Exhibit 51    E-mail dated 11/4/2021,        196
                     MAVSCUBAN00018318,
                     CONFIDENTIAL
 9
       Exhibit 53A   E-mail dated 11/22/2021, RE:   171
10                   Sales Report,
                     MAVSCUBAN00010355 through
11                   MAVSCUBAN00010357,
                     CONFIDENTIAL
12
       Exhibit 60    E-mail dated 8/25/2021,        218
13                   Subject: FW: Voyager Company
                     Overview (Confidential),
14                   MAVSCUBAN00003061 through
                     MAVSCUBAN00003063,
15                   CONFIDENTIAL
16     Exhibit 61    E-mail dated 8/25/2021,         60
                     Subject: Re: Voyager Company
17                   Overview (Confidential),
                     MAVSCUBAN00001859 through
18                   MAVSCUBAN00001862,
                     CONFIDENTIAL
19
       Exhibit 62    E-mail dated 8/25/2021,         74
20                   Subject: Re: Voyager Company
                     Overview (Confidential),
21                   MAVSCUBAN00003620 through
                     MAVSCUBAN00003625,
22                   CONFIDENTIAL
23
24
25
```

Page 6

```
 1   EXHIBITS (CONTINUED):
 2     Exhibit 64    E-mail dated 9/9/2021,          82
                     Subject: Fwd:
 3                   Voyager/Mavericks
                     Introduction,
 4                   MAVSCUBAN00002969 through
                     MAVSCUBAN00002972,
 5                   CONFIDENTIAL
 6     Exhibit 65    E-mail dated 9/9/2021,          84
                     Subject: Fwd:
 7                   Voyager/Mavericks
                     Introduction,
 8                   MAVSCUBAN00002980 through
                     MAVSCUBAN00002982,
 9                   CONFIDENTIAL
10     Exhibit 66    E-mail dated 9/15/2021, RE:     88
                     Confidential Partnership,
11                   MAVSCUBAN00010378 through
                     MAVSCUBAN00010380,
12                   CONFIDENTIAL
13     Exhibit 67    E-mail dated 9/15/2021,         98
                     MAVSCUBAN00011273,
14                   CONFIDENTIAL
15     Exhibit 67A   DIGIDECK Presentation           98
                     Platform
16
       Exhibit 68    E-mail dated 9/15/2021,         221
17                   Subject: Re: Gronk + VGX -
                     does it get any better?,
18                   MAVSCUBAN00018643 through
                     MAVSCUBAN00018650,
19                   CONFIDENTIAL
20     Exhibit 70    E-mail dated 9/20/2021,         113
                     Subject: RE: Suggested
21                   Approach, MAVSCUBAN00018392
                     and MAVSCUBAN00018393,
22                   HIGHLY CONFIDENTIAL -
                     ATTORNEYS' EYES ONLY
23
24
25
```

Page 7

```
 1   EXHIBITS (CONTINUED):
 2    Exhibit 71     E-mail dated 10/13/2021,      227
                     Subject: FW: Mavs PR Plan,
 3                   MAVSCUBAN00015331 through
                     MAVSCUBAN00015371,
 4                   CONFIDENTIAL
 5
      Exhibit 72     E-mail dated 10/16/2021,      137
 6                   Subject: RE: NBA
                     Questionnaire,
 7                   MAVSCUBAN00009363 and
                     MAVSCUBAN00009364,
 8                   CONFIDENTIAL
 9    Exhibit 72A    E-mail dated 10/17/2021,      142
                     Subject: NBA Questionnaire,
10                   MAVSCUBAN00009481 through
                     MAVSCUBAN00009484,
11                   CONFIDENTIAL
12    Exhibit 72B    E-mail dated 10/22/2021,      141
                     Subject: Re: NBA
13                   Questionnaire,
                     MAVSCUBAN00014891 through
14                   MAVSCUBAN00014895,
                     CONFIDENTIAL
15
      Exhibit 74     E-mail dated 10/25/2021,      144
16                   Subject: FW: RE: Contract,
                     MAVSCUBAN00008541 through
17                   MAVSCUBAN00008544,
                     CONFIDENTIAL
18
      Exhibit 75     E-mail dated 10/27/2021, RE:  147
19                   Sponsorship Agreement,
                     MAVSCUBAN00013133 through
20                   MAVSCUBAN00013141,
                     CONFIDENTIAL
21
      Exhibit 75A    Sponsorship Agreement,        147
22                   MAVSCUBAN00013142 through
                     MAVSCUBAN00013162,
23                   CONFIDENTIAL
24
25
```

Page 8

```
 1    EXHIBITS (CONTINUED):
 2      Exhibit 76      E-mail dated 10/26/2021,        150
                        Subject: RE: Contract,
 3                      MAVSCUBAN00012924 through
                        MAVSCUBAN00012948, HIGHLY
 4                      CONFIDENTIAL - ATTORNEYS'
                        EYES ONLY
 5
        Exhibit 79      E-mail dated 12/13/2021,        176
 6                      Subject: RE: Wire
                        Instructions (Voyager),
 7                      MAVSCUBAN00013227 through
                        MAVSCUBAN00013233, HIGHLY
 8                      CONFIDENTIAL - ATTORNEYS'
                        EYES ONLY
 9
        Exhibit 80      E-mail dated 12/15/2021,        176
10                      Subject: Voyager Digital
                        payment, MAVSCUBAN00008873,
11                      HIGHLY CONFIDENTIAL -
                        ATTORNEYS' EYES ONLY
12
        Exhibit 81      E-mail dated 2/26/2022,         179
13                      Subject: FW: TPD Content
                        Update & NEW Front Page
14                      Partnership Sessions,
                        MAVSCUBAN00008053 through
15                      MAVSCUBAN00008055,
                        CONFIDENTIAL
16
        Exhibit 81A     Dallas Mavericks Team           179
17                      Partnership Revenue Report,
                        2021-22 Midseason Report,
18                      MAVSCUBAN00008056 through
                        MAVSCUBAN00008059, HIGHLY
19                      CONFIDENTIAL - ATTORNEYS'
                        EYES ONLY
20
        Exhibit 82      E-mail dated 7/12/2022,         182
21                      Subject: RE: Voyager,
                        MAVSCUBAN00011586 and
22                      MAVSCUBAN00011587,
                        CONFIDENTIAL
23
24
25
```

Page 9

```
 1    EXHIBITS (CONTINUED):
 2      Exhibit 83    E-mail dated 7/13/2022,      185
                      Subject: RE: Voyager,
 3                    MAVSCUBAN00013226,
                      CONFIDENTIAL
 4
        Exhibit 84    E-mail dated 8/2/2022,       188
 5                    Subject: FW: Start of Season
                      Team Partnership Requests:
 6                    22-23 Season,
                      MAVSCUBAN00008870 through
 7                    MAVSCUBAN00008872,
                      CONFIDENTIAL
 8
        Exhibit 85    E-mail dated 10/11/2022,     159
 9                    MAVSCUBAN00010935,
                      CONFIDENTIAL
10
        Exhibit 85A   "Voyager Crypto For All"     159
11                    Presentation
12      Exhibit 86    E-mail dated 8/25/2022,      197
                      Subject: RE: Start of Season
13                    Team Partnership Requests:
                      22-23 Season,
14                    MAVSCUBAN00013932 through
                      MAVSCUBAN00013936,
15                    CONFIDENTIAL
16      Exhibit 89    E-mail dated 12/13/2021,     207
                      Subject: FW: Mavs Crypto
17                    Survey Results
18      Exhibit 90    E-mail dated 1/6/2022,       213
                      Subject: RE: Activation
19                    Ideas, Voyager/Mavs
20      Exhibit 91    E-mail dated 3/30/2022,      215
                      Subject: FW: Voyager News
21      Exhibit 92    E-mail dated 10/27/2021,     204
                      Subject: Fwd: Mavs and
22                    Voyager, MAVSCUBAN00011928
                      through MAVSCUBAN00011930,
23                    CONFIDENTIAL
        Exhibit 93    E-mail dated 10/29/2021,     203
24                    Subject: RE: Congrats,
                      MAVSCUBAN00008442,
25                    CONFIDENTIAL
```

Page 10

1   EXHIBITS (CONTINUED):

2     Exhibit 150        E-mail dated 10/27/2021,    152
                         Subject: Re: FW: Voyager,
3                        MAVSCUBAN00011692 through
                         MAVSCUBAN00011694,
4                        CONFIDENTIAL

5     Exhibit 150A       E-mail dated 11/7/2022,     152
                         Subject: FW: Voyager,
6                        MAVSCUBAN00013295,
                         CONFIDENTIAL

7

      Exhibit 161        E-mail dated 11/11/2021,    167
8                        Subject: FW: Could you
                         pull unique visitors to
9                        your site?,
                         MAVSCUBAN0017509 and
10                       MAVSCUBAN0017510,
                         CONFIDENTIAL

11

      Exhibit 207        E-mail dated 11/09/2021,    155
12                       Subject: Voyager + Dallas
                         Mavericks Coverage Recap

13

14

15              PRIOR EXHIBITS REFERENCED

16  EXHIBITS                                    PAGE

17    Exhibit 3................................  77

18    Exhibit 9................................ 170

19

20

21

22

23

24

25

```
                                                         Page 11

 1                       PROCEEDINGS:

 2              (Tuesday, February 14, 2023, 9:18 a.m.)

 3              THE VIDEOGRAPHER:  We are on the record for

 4   the deposition of Ryan Mackey.  The time is 9:18 a.m. on

 5   February 14th, 2023, in the matter of Pierce Robertson, Et

 6   Al., versus Mark Cuban, Et Al., Civil Action No.

 7   22-cv-22538 being held in the United States District Court

 8   for the Southern District of Florida.

 9              The court reporter today is Kari Behan, and

10   the videographer is Luis Acevedo; both representatives of

11   Veritext.

12              Will counsel state appearances for the

13   record.

14              MR. KAYE:  For the plaintiffs, Joey Kaye

15   from The Moskowitz Law Firm.

16              MR. BOIES:  Alex Boies from Boies Schiller

17   Flexner LLP.

18              MR. COOK:  Stephen Cook from Brown Rudnick

19   on behalf of the defendants and Mr. Mackey.

20              MR. ZACK:  Steve Zack from Boies Schiller

21   for the plaintiff.

22              MR. KNIGHT:  Christopher Knight on behalf of

23   Mark Cuban and the Mavericks, Fowler White Burnett.

24              MR. BEST:  Stephen Best, Brown Rudnick, on

25   behalf of Mr. Cuban and the Mavericks.
```

Page 12

1           MS. WOLKINSON:  Rachel Wolkinson from

2   Brown Rudnick, on behalf of Mr. Cuban and the Dallas

3   Mavericks.

4           MR. KAYE:  And, for the record, we also have

5   Sekou Lewis, General Counsel for the Mavericks in the

6   room, and remotely we have Adam Moskowitz and

7   Barbara Lewis also from The Moskowitz Law Firm for the

8   plaintiffs.

9           Before we start, I just want to have on the

10  record that this is Plaintiff's deposition, and we have

11  Kari Behan from Veritext here as the court reporter.  I

12  understand that Kelly Bryant is a second court reporter

13  that was hired by the defense to be here as well.

14          Steve, I'm assuming that's to have realtime

15  transcription on your end?

16          MR. COOK:  Right.  And last time, I -- my

17  understanding is the court reporter was here virtually.

18  So we wanted someone here live as well, but -- that isn't

19  the case this time.

20          MR. KAYE:  Right.  Because we -- so is -- is

21  the realtime transcription being sent to anybody remotely,

22  or is it just for everyone in the room right now?  Because

23  we just want to make sure that, you know, whoever's

24  receiving it remotely is party to the confidentiality

25  order in this case.

Page 13

1                    MR. COOK:  It's not being sent remotely.

2                    MR. KAYE:  Okay.  So just everyone in here,

3      that's it, or just you specifically?

4                    MR. COOK:  Just everyone in the room.

5                    MR. KAYE:  Okay.

6                    THE COURT REPORTER:  Swear him in?

7                    MR. KAYE:  Yeah, please.

8                    THE COURT REPORTER:  Mr. Mackey, would you

9      please raise your right hand.

10                    Do you solemnly swear the testimony you're

11     about to give will be the truth, the whole truth, and

12     nothing but the truth so help you God?

13                    THE WITNESS:  I do.

14                    THE COURT REPORTER:  Thank you.  We may

15     proceed.

16                              EXAMINATION

17     BY MR. KAYE:

18          Q.  Could I call you Ryan?

19          A.  Sure.

20          Q.  You can call me Joey.

21          A.  Okay.

22          Q.  I have Alex here with me.

23                    You are a veteran with the Mavericks, right?

24          A.  Some would say that, yes.

25          Q.  You're involved -- you predate Mark Cuban?

Page 14

1       A.  I do.

2       Q.  Okay.  And so as -- as far as sponsorships or

3   partnerships, like the one you guys have with Voyager,

4   you're the guy, right?

5               MR. COOK:  Object to form.

6               THE WITNESS:  Yes.

7   BY MR. KAYE:

8       Q.  Everything goes through you?

9               MR. COOK:  Object to form.

10              THE WITNESS:  As it pertains to the

11  sponsorships.

12  BY MR. KAYE:

13      Q.  And who reports to you?

14      A.  There's about 24 people that report to me.

15      Q.  Okay.  For the Voyager partnership, who reported

16  to you on this one?

17      A.  Well, there was multiple people, but

18  predominantly, it was Billy Phillips, our Vice President;

19  Patrick Sorensen, our Vice President; Kyle Tapply, Senior

20  Director; Kory Nix, Senior Director; Clay Christopher,

21  Senior Director.

22      Q.  What's the difference between a vice president

23  and a senior director?

24      A.  Vice president oversees the sales group, which

25  would be the senior directors and below.

Case 1:22-cv-22538-RKA   Document 155-34 *SEALED*   Entered on FLSD Docket 09/24/2023   Page 16 of 375
Page 248 of 375

Page 15

1          Q.   Okay.  And below senior director is directors

2     or --

3          A.   Directors, account executives, things like that.

4          Q.   Okay.  Do you normally have two additional vice

5     presidents and three senior directors working a -- a

6     sponsorship like this?

7          A.   Not normally.

8          Q.   Okay.  How come for this one?

9          A.   It was a -- a -- a deal that was going to require

10    a lot of hands-on work, so we put a lot of people on it

11    for that reason.

12         Q.   What kind of hands-on work?

13         A.   Well, the sponsorship included a lot of things

14    that we had to execute on our side, and, you know, that --

15    spreading out some of that work was -- we felt like, was

16    the best way to -- to tackle it.

17         Q.   Can you give me an example?

18         A.   Like an example of another sponsorship that would

19    be like this?

20         Q.   No, like the types of hands-on work that were

21    done for this partnership.

22         A.   Well, there was elements of the deal that were

23    going to require sort of -- a lot of work in a short

24    period of time.  For example, you know, if the deal

25    included naming rights to our gaming facility, which was

Page 16

1    almost a project in and of itself.  There was educational

2    components that would require attention.  And, you know,

3    just the magnitude of the -- of the assets that we had to

4    execute in a short period of time, it felt like that was

5    the best way to -- to handle the situation.

6         Q.  And when you say the -- the gaming center, that's

7    the virtual eSports arm of the Mavericks?

8         A.  Correct.

9         Q.  Okay.  And team members on that virtual team,

10   where are they from?

11        A.  On the virtual team?

12        Q.  Yeah.  The eSports team?

13        A.  Well, they're -- they're not virtual; I mean,

14   they're live people that live in Dallas, and they compete

15   as our team.  We compete against other teams in the NBA 2K

16   League.  So there -- it's a -- it's a separate entity of

17   the Mavericks.

18        Q.  And that's all done on-line?

19        A.  The games are -- are actually done in person --

20   well, it can be done either way, but the games are --

21   physically, the -- the competitors meet in a room, and

22   they'll compete.  The game itself is done on-line, yes,

23   but the -- the competitors are real, live people.

24        Q.  Right.  And they're -- the games are

25   live-streamed?

Page 17

1       A.   Yes.

2       Q.   Okay.  When's the season for Mavs gaming?

3       A.   Typically summer.

4       Q.   After baseball season?

5       A.   Tends to move around, but yes.

6       Q.   All right.  You said that it's a -- a lot of work

7    that had to be done in a short period of time.  Why was --

8    why was there a short period of time?  What was the rush?

9       A.   Well, because our season was about to begin, and

10   typically sponsorships are centered around our season.  So

11   when we started the conversation, it was -- we only had

12   a -- really, a couple of months until we started playing.

13   So we didn't have a lot of time to get started before our

14   season began.  Because each game that we play is -- is an

15   asset (signalling quotes), and so any games missed is an

16   asset missed.

17       Q.   And about when did the Voyager deal sort of come

18   across your desk?

19       A.   On or about August 19th was the first

20   conversation that I had about them.

21       Q.   Who did you have the conversation with?

22       A.   His name is Jude Northfield with Excel Sports.

23       Q.   Who's Excel Sports?

24       A.   They're an industry/agency that works in a

25   variety of things, but they sell sponsorships; they handle

Page 18

1   a variety of different things in the sports industry.

2        Q.  Do you work with Excel often?

3        A.  I have in the past.

4        Q.  About how long has that relationship gone on for?

5        A.  I've known their representatives for a long time.

6   I went to graduate school with -- with one of them -- one

7   of their senior execs, and so I -- I've been familiar with

8   them for ten years.

9        Q.  And are they, like, the exclusive source for

10  partnerships like this?

11       A.  They're not.

12       Q.  Okay.  Was Voyager the first crypto company that

13  you guys considered doing a partnership with?

14       A.  No.

15       Q.  Who are some of the others?

16  ██   █████████████████████████████████

██ ████████████████████████████████

██   ██ ████████████████████████████

19       A.  I don't recall.

20       Q.  Was it before Voyager?

21       A.  Before Voyager.

22       Q.  All right.  But they, ultimately, went with the

23  NBA, right, not with any particular team?

24       A.  Correct.

25       Q.  And that partnership was announced also right

Page 19

1  before the season?

2      A.  I don't recall.

3      ▮ ████████████████████████

   ▮    ███████████   █████████████

   ▮    ███████████   ███████████████████

6  BY MR. KAYE:

7      Q.  And you fielded pitches from each of these

8  companies?

9      ▮ ████████████████████████████████

▮  ████████████   ███████████████████████████

▮  ███████████████████████████████████████

▮  ████████████████████████████████

▮      ▮   ████   ███████████████████████  ▮

▮  █████████████████████████████████████████

▮  █████████████████████████████████

▮      ▮  ████████████████

▮      ▮   ███████████████████████████

▮  ████████████████████████████████████

▮  ██████████████████████████████████████████

▮      ▮   ████████████████████████

22      Q.  More than enough to make a difference?

23          MR. COOK:  Object to the form.

24          THE WITNESS:  I mean, our -- our job is

25  to -- to find -- to maximize revenue for the Mavericks, so

Page 20

1    typically we're looking for the best deal we can find.

2    BY MR. KAYE:

3         Q.  And are you the ultimate decision-maker for these

4    types of spon- -- partnerships, or do you report to

5    anybody?

6         A.  I report to Cynt Marshall, our CEO.

7         Q.  Anybody else?

8         A.  Nope.

9         Q.  You don't report to Mark Cuban?

10        A.  I mean, I don't directly report to him, no.

11        Q.  So your position is that it's Cynthia Marshall,

12   and only Cynthia Marshall, that will give the go-ahead for

13   a partnership like this to go forward?

14             MR. COOK:  Object to the form.

15             THE WITNESS:  You asked me who I report to,

16   and Cynt Marshall is who I report to.  So, ultimately,

17   that's my boss that will give me direction on my

18   day-to-day.

19   BY MR. KAYE:

20        Q.  Do you go to Mark for direction?

21             MR. COOK:  I'm sorry.  Can you say that

22   again?

23   BY MR. KAYE:

24        Q.  Do you go to Mark for direction?

25             MR. COOK:  Object to the form.

Page 21

1             THE WITNESS:  With -- in conjunction with

2    Cynt.

3    BY MR. KAYE:

4        Q.  Okay.  Can one override the other?

5        A.  I don't know.

6             MR. COOK:  Object to the form.

7    BY MR. KAYE:

8        Q.  What was that?

9        A.  I can't answer that question.  I don't know.

10       Q.  You don't know?  How about in your personal

11   experience?

12            MR. COOK:  I'm sorry.  What in his personal

13   experience?

14   BY MR. KAYE:

15       Q.  Same question.  How about in -- in your personal

16   experience, you ever had a situation where Cynt wanted to

17   go one way, Mark wanted to go the other?

18       A.  Yeah.

19       Q.  Which way did you go?

20       A.  I'm not sure because I don't know who made the

21   decision.

22       Q.  When you do a -- a partnership like this, does it

23   ultimately need to be approved by the NBA?

24       A.  Yes.

25       Q.  What does that process look like?

Page 22

1          A.  I'm not really privy to how it all works, but

2     typically, we submit our -- all of our contracts to the

3     NBA, and if there's an issue with a contract or a -- a

4     sponsorship, then we would hear something from them.

5          Q.  Is that over the phone?  Through e-mail?

6          A.  Not really sure.  Probably e-mail.

7          Q.  The approval, the ultimate approval for a

8     partnership to go forward from the NBA, does that have to

9     be in writing?

10              MR. COOK:  Object to the form.

11              THE WITNESS:  I don't know.

12     BY MR. KAYE:

13          Q.  Is that something that you would be privy to?

14          A.  I'd be privy if it wasn't approved.

15          Q.  How?

16          A.  Because I would hear from somebody that would say

17     that:  This was not approved.

18          Q.  Who do you normally hear from?

19              MR. COOK:  Object to the form.

20              THE WITNESS:  I would probably hear from

21     Sekou.

22     BY MR. KAYE:

23          Q.  You ever talk directly to anybody at the NBA when

24     you're working on these partnerships?

25          A.  Sometimes.

Page 23

1      Q.   Who?

2      A.   Specifically who --

3      Q.   Uh-huh.

4      A.   -- or a department?  Because it -- it can vary.

5      Q.   Okay.  Start with the department.

6      A.   It's a division of the NBA called TMBO, which is,

7   essentially, services that assist the teams with, in

8   our -- in our world, sponsorships.

9      Q.   Is that T-M-B-O?

10     A.   Correct.

11     Q.   What does that stand for?

12     A.   That's a good question.  Team Marketing Business

13  Operations.

14     Q.   And who from TMBO do you normally talk with?

15     A.   Today, it would be Cassidy Rooke or Marcia

16  Steinberg.

17     Q.   What about at the time of the Voyager partnership

18  when you're negotiating it?

19     A.   I believe it was Anthony Ronca.

20     Q.   Anybody else?

21     A.   Not that I recall.

22     Q.   And this was the first international partnership

23  that the Mavericks did with a crypto company, right?

24     A.   Yes.

25     Q.   Was it the first international partnership at

Page 24

1   all?

2        A.  Yes.

3        Q.  What was the impetus for that?

4             MR. COOK:  Object to the form.

5             THE WITNESS:  Voyager had intentions of

6   expanding their business outside of the United States.

7   BY MR. KAYE:

8        Q.  And the Mavericks were interested in taking

9   advantage of the opportunity to market internationally as

10  well?

11            MR. COOK:  Object to the form.

12            THE WITNESS:  Voyager was interested in

13  expanding outside of the United States, and, therefore,

14  that was part of the discussion.

15  BY MR. KAYE:

16       Q.  And were the Mavericks interested in taking

17  advantage of the opportunity to market internationally?

18            MR. COOK:  Object to the form.

19            THE WITNESS:  Wasn't part of the discussion.

20  BY MR. KAYE:

21       Q.  And the Mavericks is a very diverse team, right?

22            MR. COOK:  Object to the form of the

23  question.

24            THE WITNESS:  Can you re- -- rephrase that.

25  BY MR. KAYE:

Case 1:22-cv-22538-RKA   Document 155-34   *SEALED*   Entered on FLSD Docket 09/24/2028   Page 26 of
Page 248 of 375

1          Q.  The Mavericks is very diverse team; you have

2     players that come from all over the country, or all over

3     the world even, right?

4          A.  We do have players from various countries, yes.

5          Q.  What were some of the international components of

6     this Voyager partnership?

7          A.  I don't recall what was written in the contract.

8          Q.  Do you recall what you discussed?

9          A.  I don't.

10          Q.  You were primarily responsible for implementing

11     the partnership after it was entered, right?

12          A.  Yes.

13          Q.  And is the partnership still ongoing?

14          A.  The sponsorship is not ongoing at the moment.

15          Q.  Was there any formal cancellation?

16          A.  No.

17          Q.  Did either party breach the partnership

18     agreement?

19                    MR. COOK:  Object to the form.

20                    THE WITNESS:  It hasn't been addressed.

21     BY MR. KAYE:

22          Q.  So what happened?

23                    MR. COOK:  Object to the form of the

24     question.

25                    THE WITNESS:  What happened in what way?

Page 26

BY MR. KAYE:

    Q.  Are you -- are you still running promotions for
Voyager?

    A.  No.

    Q.  Are you still advertising for Voyager?

    A.  No.

    Q.  So what happened?

        MR. COOK:  Object to the form.

        THE WITNESS:  What happened in what way?
Why -- why are we not doing that?

BY MR. KAYE:

    Q.  Right.

    A.  Because we haven't -- we haven't pursued that;
they haven't pursued it.

    Q.  And this is since they filed bankruptcy, or
before?

    A.  Well, once the season ends, there's typically not
very -- there's -- there's no real -- there's -- there's
no assets to provide, and so we haven't provided any
assets since last season.

    Q.  What about the Mavs gaming season?

        MR. COOK:  Object to the form.

        THE WITNESS:  We provided them what was in
their contract.

BY MR. KAYE:

Page 27

1        Q.  And that started immediately after the Mavericks

2   2021-2022 season ended?

3        A.  I don't recall.

4        Q.  Was the Mavs gaming season occurring in July of

5   2022?

6        A.  I believe so.

7        Q.  And did you promote Voyager in July of 2022 for

8   Mavs gaming?

9        A.  I don't recall.

10        Q.  You say you don't recall any international

11   components.  Were there any international components of

12   the deal that you recall discussing or implementing in the

13   first year of the partnership?

14                MR. COOK:  Object to the form.

15                THE WITNESS:  No.

16   BY MR. KAYE:

17        Q.  What about the second, third, fourth year?

18                MR. COOK:  Same objection.

19                THE WITNESS:  No.

20   BY MR. KAYE:

21        Q.  Because there was a lot of publicity about the

22   fact that it was the Mavericks first international

23   partnership.  So it was just interesting -- there was no

24   international components implemented during that first

25   year?

Page 28

1              MR. COOK:  Object to the form; misstates

2    testimony.

3              THE WITNESS:  Correct.

4    BY MR. KAYE:

5        Q.  You know what geofencing is?

6        A.  I do.

7        Q.  What is that?

8        A.  It is utilizing web technology to fence messaging

9    within a -- a radius.

10       Q.  Does the -- does the Mavs utilize geofencing in

11   any of the marketing?

12       A.  We do.

13       Q.  In what way?

14       A.  Lots of ways.

15       Q.  Can you give me a couple of examples?

16       A.  Well, per the NBA rules, our geofencing is -- is

17   required to be -- to keep certain assets within a 150-mile

18   radius of Dallas-Fort Worth.

19       Q.  And the same goes for, like, physical promotions,

20   like billboards?

21              MR. COOK:  Object to the form.

22              THE WITNESS:  Correct.

23   BY MR. KAYE:

24       Q.  But you couldn't put a Mavericks billboard up in

25   Houston?

Case 1:22-cv-22538-RKA   Document 155-34  *SEALED*  Entered on FLSD Docket 09/24/2023  Page 30 of
Page 30 of 375

1      A.  Correct.

2      Q.  Did the Mavericks utilize geofencing for the

3  Voyager promotion?

4      A.  To my knowledge, yes.

5      Q.  Do the Mavericks require partners that they work

6  with to utilize geofencing in their promotions?

7      A.  Yes.

8      Q.  And that's when they're using Mav- -- Mavericks

9  assets in those promotions?

10      A.  Correct.

11      Q.  And was that required to be used in the Voyager

12  partnership?

13      A.  Yes.

14      Q.  For all promotions?

15      A.  Yes.

16      Q.  Are you sure?

17      A.  Yes.

18              MR. COOK:  Object to the form.

19  BY MR. KAYE:

20      Q.  Who's your primary point of contact with Voyager?

21      A.  Erika Szychowski.

22      Q.  Can you spell that last name?

23      A.  I can't.

24      Q.  Can you say it again, just --

25      A.  Szychowski.

Page 30

1       Q.  "Szychowski"?

2              MR. KAYE:  We'll get you a spelling for it.

3   A lot of consonants.

4   BY MR. KAYE:

5       Q.  Overall, this was a pretty good deal for the

6   Mavericks, right?

7              MR. COOK:  Object to the form.

8   BY MR. KAYE:

9       Q.  Had it continued?

10             MR. COOK:  Same objection.

11             THE WITNESS:  It's one of the deals that we

12  did that contributed to our goal of raising revenue for

13  the Mavericks, yes.

14  BY MR. KAYE:

15      Q.  Do you guys rank the partnerships in order of

16  revenue?

17      A.  It's kind of self-explanatory.

18      Q.  I'm sorry?

19      A.  Isn't that self-explanatory?  I mean, do we rank

20  them?  I mean, we don't, you know, create documents that

21  rank our sponsors.  We -- but the -- the revenue speaks

22  for itself.

23      Q.  Do you know where the revenue from the Voyager

24  partnership ranked in relation to the other partnerships

25  that the Mavericks were in at the 2021-2022 season?

Page 31

1      A.  I do.

2      Q.  Where's that?

3      ██  ████████████████████████

  ██   ██  ████████████

  ██   ██  ████████████████

  ██   ██  ██████████████████████████████

  ██   █████████████████████████████████

8      A.  Yes.

9      Q.  Where did they rank in terms of new partnerships

10  entered into that year?

11     ██  ████████████

12     Q.  How do you know this?

13     A.  It's my job to know that.

14     Q.  Are there any documents that reflect this?

15          MR. COOK:  Object to the form.

16          THE WITNESS:  There's -- yes.

17  BY MR. KAYE:

18     Q.  What kind?

19     A.  Sales reports.

20     Q.  Are those done biweekly?  Monthly?  Annually?

21  Quarterly?

22     A.  They exist in a platform that we could pull

23  hourly, daily, by the minute.

24     Q.  What's that platform called?

25     A.  Kore.

Page 32

1     Q.  Kore?

2     A.  Kore.

3     Q.  How did you spell that?

4     A.  K-O-R-E.

5     Q.  What else does Kore do?

6     A.  A lot of things.

7     Q.  Like what?

8     A.  ███████████████████

██████████████████████████████

███████████████  ███████████████

█████████████████  █████████████

12    Q.  Does it -- it tracks the promotional activities

13 as well?

14    A.  Can you rephrase that?

15    Q.  Does your -- does the Kore system track, like,

16 any metrics related to your promotion activities?

17    A.  No.

18    Q.  Do you have a system that does that?

19    A.  We have third-party vendors that assist us with

20 that.

21    Q.  Can you name some of them?

22    ███  ████████████████████████

███  █████

24    Q.  Do they both apply metrics for the Voyager

25 partnership promotions?

Page 33

1       A.  They did.

2       Q.  Are there any others who did?

3       A.  Not that I'm aware of.

4       Q.  Would that be written somewhere?

5               MR. COOK:  Object to the form.

6               THE WITNESS:  I don't know.

7   BY MR. KAYE:

8       Q.  Do you know anybody other than you who would know

9   better?

10      A.  I don't know.

11      Q.  ██████████████████████████████████

██  ██████████████████████████████████████

██  ████████████████████████████████████████

██  ██████████████████

██          ████████████  ████████████████████

██          ████████████████  ██████

17  BY MR. KAYE:

18      Q.  What was the ultimate goal of the partnership for

19  the Mavericks in terms of what they were going to do for

20  Voyager?

21              MR. COOK:  Object to the form.

22              THE WITNESS:  The ultimate goal of the

23  Mavericks?

24  BY MR. KAYE:

25      Q.  Right.  Like, what did Voyager want coming to the

Page 34

1    Mavericks for their partnership?

2        A.  I can't answer --

3            MR. COOK:  I'm sorry.  Wait.  Did -- did you

4    ask what Voyager wanted, or did you ask what Mavericks

5    wanted?

6    BY MR. KAYE:

7        Q.  What did Voyager state to you they wanted from

8    this partnership with the Mavericks?

9            MR. COOK:  Object to the form.

10   BY MR. KAYE:

11       Q.  Their ultimate goals?

12           MR. COOK:  Object to the form.

13           THE WITNESS:  I don't -- I can't speak for

14   them.

15   BY MR. KAYE:

16       Q.  I'm asking what they said to you?

17       A.  I don't recall.

18       Q.  Did Voyager ever express to you that Mark Cuban

19   was a major component of this partnership?

20       A.  No.

21       Q.  Not at all?

22           MR. COOK:  Object to the form.

23           THE WITNESS:  No.

24   BY MR. KAYE:

25       Q.  Did Voyager ever state that they were fine with

Page 35

1   proceeding with the partnership without any involvement

2   from Mark Cuban whatsoever?

3        A.  Yes.

4        Q.  They did?

5        A.  Yes.

6        Q.  Is that written anywhere?

7                  MR. COOK:  Object to the form.

8                  THE WITNESS:  I don't recall.

9   BY MR. KAYE:

10       Q.  When did that conversation happen?

11                 MR. COOK:  Object to the form.

12                 THE WITNESS:  I don't recall.

13  BY MR. KAYE:

14       Q.  But, ultimately, he was involved in the

15  partnership?

16                 MR. COOK:  Object to the form.

17                 THE WITNESS:  That wasn't in the contract.

18  BY MR. KAYE:

19       Q.  Did it have to be in the contract?

20                 MR. COOK:  Object to the form of the

21  question.

22                 THE WITNESS:  It wasn't -- our practice is

23  to follow the contract.

24  BY MR. KAYE:

25       Q.  Are there any partnership contracts that the

Page 36

1   Mavericks have entered into that specifically state that

2   Mark Cuban is to be involved?

3                   MR. COOK:  Object to the form.

4                   THE WITNESS:  I don't recall.

5   BY MR. KAYE:

6       Q.  Any?

7                   MR. COOK:  Object to the form.

8                   THE WITNESS:  I don't recall.

9   BY MR. KAYE:

10      Q.  You've worked with the Mavericks for 24 years

11   now, the entire 23 years of Mark Cuban's tenure.  ███████

     ██████████████████████████████████████  You can't recall

13   a single one that has Mark Cuban expressly included as

14   part of the deal?

15                  MR. COOK:  Object to the form.

16                  THE WITNESS:  I can't.

17   BY MR. KAYE:

18      Q.  Is Voyager current in their payments under the

19   contract pursuant to this partnership?

20      A.  I don't know.

21      Q.  Do you know if they were paid full-up for the

22   2021-2022 season?

23      A.  Yes.

24      Q.  And they haven't paid anything for the 2022-2023

25   season?

Page 37

1          A.  Not that I'm aware of.

2          Q.  Now, was -- was that just a mutual walk-away, a

3     mutual pause?  Were there any conversations with Voyager

4     about that?

5                    MR. COOK:  Object to the form.

6                    THE WITNESS:  It wasn't really discussed.

7     BY MR. KAYE:

8          Q.  With Voyager?

9          A.  Yes.

10          Q.  Did you discuss it with anybody?

11          A.  Discussed it with my internal team.

12          Q.  Within the Mavericks?

13          A.  Yes.

14          Q.  What about with the NBA?

15          A.  No.

16          Q.  You didn't discuss it with the NBA?

17          A.  No.

18          Q.  You're sure?

19          A.  Yes.

20                    MR. COOK:  Object to the form.

21     BY MR. KAYE:

22          Q.  Did Voyager require any ███████████  as part of

23     this partnership?

24          A.  Yes.

25          Q.  In what sense?

Page 38

1      A.  Can you be more specific?

2      Q.  What level of ████████ did they require?  What

3 level of ███████ did they ultimately obtain?  And is

4 that ref- -- is that referenced in the contract?

5         MR. COOK:  Okay.  Pause.  Which question do

6 you want him to answer?  There were three there.

7 BY MR. KAYE:

8      Q.  We'll start with the first.  What level of

9 ███████ did they require in these negotiations?

10

18      Q.  And they wanted to be the ███████

███████ platform for the Mavericks?

20         MR. COOK:  Object to the form.

21         THE WITNESS:  Yes.

22 BY MR. KAYE:

23      Q.  Did they ever specify any competitors that they

24 wanted the Mavericks to avoid doing any business with?

25      A.  Yes.

Page 39

1     Q.  Who?

2     A.  I don't recall.

3     Q.  But it's written somewhere?

4     A.  Should be written in the contract.

5     Q.  Were there any companies that it was a hard no

6   for the Mavericks where:  We're not going to include them

7   ███████████████████████████

8     A.  Yes.

9     Q.  Who?

10    A.  I don't recall.

11    Q.  That would be written down somewhere too?

12    A.  Yes.

13          MR. KNIGHT:  Anyone else need a morning

14  bathroom break?

15          MR. BEST:  A little bit.  Whenever you're

16  ready.

17  BY MR. KAYE:

18    Q.  There's been a lot of discussion in this lawsuit

19  about the October 27th, 2021, press conference that

20  announced the partnership with Voyager and the Mavericks,

21  and that included Mark Cuban and Stephen Ehrlich, right?

22          MR. COOK:  Wait.  I'm sorry.  What was the

23  question?

24  BY MR. KAYE:

25    Q.  The press conference included Mark Cuban and

Page 40

1    Stephen Ehrlich, right?

2         A.  Yes.

3         Q.  Okay.  And were you responsible for overseeing

4    the organization of that press conference?

5         A.  No.

6         Q.  Who was?

7                   MR. COOK:  Object to form.

8                   THE WITNESS:  It was a team effort.

9    BY MR. KAYE:

10        Q.  Who was on that team?

11        A.  It was a lot of people.

12        Q.  Can you name some of the major players?

13        A.  Members of my staff, members of our marketing

14   team, members of our PR team, members of our operations

15   and event team; multiple people.

16        Q.  What about Billy Phillips, was he involved?

17        A.  Yes.

18        Q.  Kory Nix?

19        A.  Yes.

20        Q.  Kyle Tapply?

21        A.  Yes.

22        Q.  And they reported to you throughout this process?

23        A.  Yes.

24        Q.  And did you ever make reports to Cynthia or

25   Mark Cuban about the organization of the press conference?

Page 41

1      A.  I don't recall.

2      Q.  You don't recall?

3           Did you have any direct involvement in

4  preparing Mark Cuban for the press conference?

5      A.  No.

6      Q.  Did you receive reports from people who were

7  directly involved in preparing Mark Cuban for the press

8  conference?

9      A.  No.

10     Q.  Did you receive e-mails related to preparation

11  for the press conference?

12     A.  I don't recall.

13     Q.  Okay.  Now -- but the press conference was just

14  the launch of the partnership, right?

15          MR. COOK:  Object to the form.

16          THE WITNESS:  Yes.

17  BY MR. KAYE:

18     Q.  Every game is an asset for the Mavericks?

19     A.  Yes.

20     Q.  So there were services provided to Voyager

21  pursuant to the partnership throughout the whole 2021-2022

22  season?

23     A.  Per the contract, yes.

24     Q.  Uh-huh.  And there was a few other events that

25  were held during that season?

Page 42

1             MR. COOK:  Object to the form.

2             THE WITNESS:  Specifically?

3   BY MR. KAYE:

4        Q.  Like the Mavs ball?

5        A.  Mavs ball was held during that season, yes.

6        Q.  And you oversaw the negotiations for the naming

7   rights to the Mavs gaming center?

8             MR. COOK:  Object to the form.

9             THE WITNESS:  Can you rephrase that?

10  BY MR. KAYE:

11       Q.  Did you oversee the negotiations with Voyager for

12  the naming rights to the Mavs gaming center?

13  █████████████████████████████████████████████████

██ ████████████████████

██ ████████████████████████████████████████

██ ████████████████

██ ████████████████ ██████████████████████

██ ████████████████████████████████████

██ ████████████████████████████████████████

██ ██████████████████████████████████████████

██ ██████████████

██ ████████████ ██████████████████

██ ██████████████ ██████████

24  BY MR. KAYE:

25       Q.  What happened with that?

Page 43

 1              MR. COOK:  Object to form.

 2              THE WITNESS:  Kind of a general question.

 3    Can you be more specific?

 4    BY MR. KAYE:

 5        Q.  Sure.  What did the dispute entail?

 6        A.  The name of the facility.

 7        Q.  What about the name of the facility?

 8        A.  It was -- it was a process to come up with a name

 9    that made sense.

10        Q.  What does that mean "made sense"?

11              MR. COOK:  Object to the form.

12              THE WITNESS:  It meant that it's the name of

13    a facility.  It -- it has to be somewhat concise and

14    reflect certain things, and so it was a process to -- to

15    get to a point where we could agree on what that would be

16    named.

17    BY MR. KAYE:

18        Q.  What -- you said there were certain things that

19    needed to be reflected.  What were those certain things?

20        A.  Well, it's -- first and foremost, it's a Mavs

21    gaming center, so we felt like the Mavs should have a name

22    within the -- the name of the facility.  So there was just

23    a lot of discussion about what that would -- what -- what

24    name made sense for both parties.

25        Q.  And did you ultimately land on a name?

Case 1:22-cv-22538-RKA Document 155-34 *SEALED* Entered on FLSD Docket 09/24/2023 Page 45 of
Page 45 of 375

1       A.  I don't recall.

2       Q.  The Mavs gaming center, what sorts of events are

3  held there?

4       A.  There's a lot of different things.  First and

5  foremost, it was meant to house our gaming team.  That's

6  where they practice.  And then we try to utilize that

7  facility for third-party events.

8       Q.  Was the press conference held at the gaming

9  center?

10      A.  Yes.

11      Q.  Were there any other Voyager-related events held

12  at the gaming center?

13              MR. COOK:  Object to the form.

14              THE WITNESS:  Specifically -- specifically

15  for Voyager?

16  BY MR. KAYE:

17      Q.  Yeah, for Voyager, sponsored by Voyager.

18      A.  We held one event, which was an educational event

19  at the facility.

20      Q.  And that was December of 2021?

21      A.  I don't recall exactly.

22              MR. COOK:  Joey, can we take a break,

23  please?

24              MR. KAYE:  Yeah.  Let's take a -- what do

25  you want, five, ten minutes?

Page 45

1          MR. COOK:  Ten should be fine.

2          MR. KAYE:  Okay.

3          THE VIDEOGRAPHER:  Off the record, 9:56.

4          (Brief recess taken.)

5          THE VIDEOGRAPHER:  We are on the record.

6    The time is 10:13.

7    BY MR. KAYE:

8        Q.  So, Ryan, again, you said that every Mavs game is

9    an asset that can be monetized in some way for partnership

10   purposes, right?

11       A.  Yes, I did say that.

12       Q.  Is the intellectual property of the Mavericks

13   also an asset, like, use of the logos?

14       A.  Yes.

15          MR. COOK:  Object to the form.

16   BY MR. KAYE:

17       Q.  And that would be something that is -- the use of

18   those marks and logos, names, that's something that would

19   be negotiated as part of the partnership as well?

20       A.  █████   ████████████████████████████

21   ████████

22       Q.  Specifically for the partners to use them in some

23   of their own promotions?

24          MR. COOK:  Object to the form.

25          THE WITNESS:  ███████████████████████

1 ███████████████████████████████████████

2 ██ ████████████████████████████

3  BY MR. KAYE:

4       Q.  As defined by the partnership contract?

5            MR. COOK:  Object to form.

6            THE WITNESS:  The sponsorship contract, yes.

7  BY MR. KAYE:

8       Q.  Would you say that you have -- sorry.

9            What would you say your experience level at

10  the time of negotiating this Voyager partnership with the

11  crypto space was?

12       A.  Can you be more specific?

13       Q.  Sure.

14            Did you have experience with what

15  cryptocurrency was?

16            MR. COOK:  Object to form.

17            THE WITNESS:  Personally, did I understand

18  or know about cryptocurrency?

19  BY MR. KAYE:

20       Q.  Yeah.

21       A.  I was aware of it.

22       Q.  Were you aware of any of the issues that were

23  reported publicly in terms of regulation of

24  cryptocurrency?

25            MR. COOK:  Object to the form.

Page 47

1                    THE WITNESS:  I don't recall.

2    BY MR. KAYE:

3         Q.  Did you have questions about what was -- what

4    Voyager did as a company?

5         A.  In what way?  Did I have questions about what

6    they did?

7         Q.  Like what their business was?

8         A.  Can you rephrase that?

9                    I'm not sure I understand what you mean

10   "what their business was."

11        Q.  Sure.

12                   At the time that Voyager came across your

13   desk in September or August of 2021, whichever it was, did

14   you understand what Voyager did as a business?

15        A.  For the most part.

16        Q.  Okay.  And what was your understanding?

17        A.  They were an exchange for cryptocurrencies, so we

18   got -- similar to a TD Ameritrade, for example.  It was a

19   platform to --

20                   MR. KAYE:  Bless you.

21                   MR. KNIGHT:  Thank you.

22                   THE WITNESS: --  buy, sell, hold

23   cryptocurrency.

24                   (Off-record discussion.)

25   BY MR. KAYE:

Case 1:22-cv-22538-RKA   Document 155-34   *SEALED* on FLSD Docket 11/24/2023   Page 49 of
Page 49 of 375

Page 48

1         Q.  Did you have any questions about their business

2    or how it operated?

3         A.  Like what?

4         Q.  Any?

5              MR. COOK:  Object to form.

6              THE WITNESS:  Not really.

7    BY MR. KAYE:

8         Q.  What sort of due diligence did you do as part of

9    the negotiation of this Voyager partnership?

10             MR. COOK:  Object to form.

11             THE WITNESS:  So, as a sponsorship, we

12   would, you know, explore the landscape of an industry, and

13   in this case, I mean, there was -- I mean, it's probably

14   too much to -- to really answer here.  I mean, I don't --

15   I don't recall or -- or know all of the due diligence that

16   was done.

17   BY MR. KAYE:

18        Q.  Was there any due diligence that you personally

19   did?

20        A.  I don't recall.

21        Q.  Was there any due diligence that you requested be

22   done?

23        A.  I don't recall.

24        Q.  Were there any concerns that you or anyone on

25   your team expressed with entering a partnership with a

Page 49

1   crypto company?

2              MR. COOK:  Object to form.

3              THE WITNESS:  A sponsorship?

4   BY MR. KAYE:

5        Q.  Right.

6        A.  I don't recall.

7        Q.  Do you recall any issues that were raised by Mark

8   Cuban about the level of involvement that the partnership

9   with Voyager with entail?

10             MR. COOK:  Object to form.

11             THE WITNESS:  "Level of involvement"?

12  BY MR. KAYE:

13       Q.  Is there anything he told you we're not going to

14  do as part of this partner- -- partnership?

15             MR. COOK:  Object to form.

16             THE WITNESS:  Be -- can you be more

17  specific?  "We" are not going to do?

18  BY MR. KAYE:

19       Q.  The Mavericks?

20       A.  I don't recall.

21       Q.  Is there anything that he said he specifically

22  wouldn't do in connection with the partnership?

23             MR. COOK:  Object to form.

24             THE WITNESS:  "He" being Mark Cuban?

25  BY MR. KAYE:

Page 50

1        Q.  Right.

2        A.  That wasn't discussed.  What was discussed is

3   what the Mavericks could provide to Voyager.

4        Q.  And there was no discussion about the Mavericks

5   providing, in connection with the partnership, any

6   involvement with Mark Cuban?

7                MR. COOK:  Object to form.

8                THE WITNESS:  ████████████████████████

9   BY MR. KAYE:

10       Q.  Was it part of the discussions?

11       A.  █████████████████████████████████████

█   ██████████████████████████████████████████████

█   █████████████████████████

█     ██  ███████████████████████████████

█   ██████████████████████████████████████████

█          ████████████   █████████████

█          █████████████   ██████████████████

█   ██████

19  BY MR. KAYE:

20       Q.  Do you ever do more than what you're obligated to

21  do to keep a customer happy?

22       A.  Sometimes.

23       Q.  Like what?

24       A.  Provide tickets that aren't in the contract, for

25   example.

Page 51

1     Q.  Uh-huh.  Anything else?

2     A.  There's a lot of different things.

3     Q.  Do you think that -- has anybody from Voyager

4 ever expressed to you that having Mark Cuban formally or

5 informally involved in this partnership in any way was a

6 factor in their decision to seek to do business with the

7 Mavericks?

8          MR. COOK:  Object to form.

9          THE WITNESS:  I don't recall.

10 BY MR. KAYE:

11     Q.  Okay.  ████████████████████████████

12 and you were involved in overseeing every step of

13 negotiating and entering into the contract, and you don't

14 recall?

15          MR. COOK:  Object to form.

16          THE WITNESS:  I don't recall specifically.

17 BY MR. KAYE:

18     Q.  Do you recall if Voyager ever asked to have the

19 VGX token included as something that the Mavericks would

20 promote in the partnership?

21     A.  No.  That was restricted.

22     Q.  By who?

23     A.  The NBA.

24     Q.  Why?

25          MR. COOK:  Object to form.

Page 52

1              THE WITNESS:  Specifically, sponsorships

2    were not allowed to utilize or promote -- I shouldn't say

3    "utilize" -- promote specific tokens.

4    BY MR. KAYE:

5        Q.  Why?

6              MR. COOK:  Object to form.

7              THE WITNESS:  I couldn't tell you.

8    BY MR. KAYE:

9        Q.  Did you ever ask?

10       A.  No.

11       Q.  You never had any discussions about that?

12       A.  Discussions with?

13       Q.  Anybody.

14       A.  No.

15       Q.  Did you ever have any discussion regarding the

16    interest-bearing components of the Voyager accounts as

17    part of the negotiations for the Voyager partnership?

18             MR. COOK:  Object to form.

19             THE WITNESS:  ████████████████████████████████

    ██████████████████████████████████████

    █████████████████████

    ██      █████████████████████████████████████████████

    ███████████████████████████████████████████████

24             MR. COOK:  Object to form.  Joey, I think

25    part of the problem is there's a disconnect.  You keep

Case 1:22-cv-22538-RKA Document 155-34 *SEALED* Entered on FLSD Docket 09/24/2026 Page 54 of 375
Case 1:22-cv-22538-RKA Document 155-34 *SEALED* Entered on FLSD Docket 09/24/2026 Page 848 of 375
Page 848 of 375

1    using the word "sponsorship" -- or "partnership."  He's

2    using sponsorship, and you haven't defined these terms.

3    Maybe if you'd like him to define the term, we'd be all on

4    the same page.

5    BY MR. KAYE:

6         Q.  All right.  So the Mavericks publicly states that

7    this was an integrated -- fully integrated international

8    partnership with Voyager.

9              Do you recall seeing that in any of the

10   press releases?

11        A.  Yes.

12        Q.  Okay.  So to the public, it's called a

13   partnership.  Internally, do you guys call it something

14   different?

15        A.  Both internally and externally, we call

16   partnerships "sponsorships," as stated in the agreements.

17   We also call them "customers."  So those are

18   interchangable terms in our industry.  They're used all

19   the time.

20        Q.  So in the negotiations of the Mavericks/Voyager

21   partnership, did -- were you ever a part of any

22   conversations regarding the interest-bearing component of

23   the Voyager accounts?

24              MR. COOK:  Object to form.

25              THE WITNESS:  I don't recall.

Page 54

1    BY MR. KAYE:

2         Q.  Did you ever sign a nondisclosure agreement with

3    Voyager?

4                   MR. COOK:  Object to form.

5                   THE WITNESS:  Personally?

6    BY MR. KAYE:

7         Q.  You personally signing it on behalf of the

8    Mavericks?

9         A.  I don't recall.

10        Q.  You don't recall having any discussions about it?

11        A.  I don't recall.

12        Q.  Did you ever have any direct conversations with

13   the NBA regarding the approval of this deal?

14        A.  I don't recall if I spoke to anyone at the NBA.

15        Q.  Who's Amy Brooks?

16        A.  Amy Brooks is the -- I don't know what her title

17   is, but she leads TMBO for the NBA.

18        Q.  Okay.  Did you ever -- did you ever have any

19   conversations with Amy Brooks?

20        A.  No.

21        Q.  Would you normally have conversations with Amy

22   Brooks?

23        A.  No.

24        Q.  For this deal, it was just Cassidy Rooke and

25   Anthony Ronca?

Page 55

1              MR. COOK:  Object to form.

2              THE WITNESS:  I'm not quite sure, because I

3    don't -- I don't know who would be involved.

4    BY MR. KAYE:

5        Q.  Would it be you that would be the one that would

6    contact the NBA or TMBO for anything related to approval

7    of a partnership?

8              MR. COOK:  Object to form.

9              THE WITNESS:  No.

10   BY MR. KAYE:

11       Q.  Who would that be?

12       A.  Typically, that would be handled by Sekou.

13       Q.  Okay.  Were you ever part of any discussions

14   about the success or lack of success of the October 27th

15   press conference announcing the partnership?

16       A.  I don't recall.

17       Q.  Do you recall any conversations with Mark Cuban

18   about the success of the press conference?

19       A.  I didn't have any conversations with Mark Cuban.

20       Q.  Do you know who made the introduction between

21   Mark Cuban and Voyager during the negotiations of this

22   contract?

23       A.  I believe I did.

24       Q.  Do you know around when that was?

25       A.  I don't recall.

Page 56

1      Q.  Why did you introduce Mark to Voyager?

2      A.  He's the governor of the team, and they wanted to

3 have a relationship with him.

4      Q.  What kind of relationship?

5          MR. COOK:  Object to form.

6          THE WITNESS:  I -- I can't really speak to

7 that.

8 BY MR. KAYE:

9      Q.  Why not?

10     A.  Because I don't know.

11     Q.  Were you ever privy to any of the conversations

12 between Mark Cuban and Stephen Ehrlich?

13     A.  I don't recall.

14     Q.  Did anyone ever tell you why Mark wanted to be --

15 or Voyager wanted to have a relationship with Mark Cuban?

16     A.  No.

17     Q.  Did you ever discuss specifically the assets that

18 the Mavericks were going to offer up to be available for

19 this Voyager partnership to Voyager?

20         MR. COOK:  Object to form.

21         THE WITNESS:  Did I ever discuss -- can you

22 repeat that question?

23 BY MR. KAYE:

24     Q.  Sure.

25         Did you ever discuss with Voyager the assets

Page 57

1    that were going to be offered up -- the Mavericks assets

2    that were going to be offered as part of this Voyager

3    promotion -- partnership?

4                MR. COOK:  Object to form.

5                THE WITNESS:  Sponsorship, yes.

6    BY MR. KAYE:

7        Q.  Okay.  And what sorts of assets were discussed?

8        A.  Various assets.

9        Q.  Like what?

10       A.  ████████████████████████████████████

    ████████████████████████████        ████████████████

    ██    ██████████████████████

13       Q.  Now, when the sponsorship -- the agreement, you

14   said it included all of the assets that would be offered

15   up as part of the whole agreement.

16               Is everything in the partnership agreement

17   something that would actually be used?

18               MR. COOK:  Object to form.

19               THE WITNESS:  In the Sponsorship Agreement,

20   not necessarily.

21   BY MR. KAYE:

22       Q.  It's just the outer limits of what you're -- what

23   the Mavericks are willing to do?

24       A.  I guess you could say that.

25       Q.  Unless they want to do something extra?

Page 58

1      A.  Not necessarily.

2      Q.  What do you mean "not necessarily"?

3           MR. COOK:  Object to form.

4           THE WITNESS:  The contract is the guideline

5    for the -- in the -- is the -- the assets are specifically

6    spelled out in the contract.  ███████████████████████

7    ███  ███████████

8    BY MR. KAYE:

9      Q.  And your testimony is that Mark Cuban's

10   involvement is not an asset that is offered up as part of

11   these partnerships?

12     A.  Yes.

13     Q.  Expressly?

14           MR. COOK:  Object to form.

15           THE WITNESS:  I don't understand what you

16   mean.

17   BY MR. KAYE:

18     Q.  So it's not expressly offered up as an asset for

19   the partnership, right?

20           MR. COOK:  Object to form.

21   ██████████████  ████████████████████

22   ███  ██████████

23   BY MR. KAYE:

24     Q.  And is it ever implied?

25           MR. COOK:  Object to form.

Page 59

```
 1                THE WITNESS:  No.
 2    BY MR. KAYE:
 3         Q.  Is Mark Cuban's involvement included in any
 4    pitches that are made to companies like ████ Voyager
 5    when you're negotiating a partnership?
 6                MR. COOK:  Object to form.
 7                THE WITNESS:  Involvement when?
 8    BY MR. KAYE:
 9         Q.  Just in general.
10         A.  Mark is discussed as the governor of the
11    Mavericks, and so he is, you know, part of the -- you
12    know, he owns the team, so he's part of the discussion.
13         Q.  Uh-huh.  Is there anything about what Mark brings
14    to the table that's included in any of these pitches?
15                MR. COOK:  Object to form.
16                THE WITNESS:  Not included, no.
17    BY MR. KAYE:
18         Q.  It's just:  Here's our governor?
19                MR. COOK:  Object to the form.
20                THE WITNESS:  Yes.
21    BY MR. KAYE:
22         Q.  Okay.  So, from your perspective, it doesn't
23    matter if it's a slide that says:  Here's Mark Cuban, our
24    governor, versus:  Here's Cynthia Marshall, our CEO?
25                MR. COOK:  Object to form.
```

```
                                                     Page 60

 1                   THE WITNESS:  What do you mean by that, "it

 2      doesn't matter"?

 3      BY MR. KAYE:

 4          Q.  Did you ever include Cynthia Marshall as part of

 5      the -- any of the pitches you made to these companies?

 6          A.  The use of Cynt Marshall and Mark Cuban is to

 7      reflect their roles with the team and our commitment to

 8      success.

 9          Q.  I'm going to show you what we previously marked

10      as Exhibit 61 for Plaintiffs.

11                   MS. WOLKINSON:  Are you e-mailing that

12      around?

13                   MR. KAYE:  Yeah.  Alex is going to e-mail

14      it.

15                   (Exhibit 61 was marked for identification.)

16      BY MR. KAYE:

17          Q.  Have you seen this e-mail before?

18          A.  I have.

19          Q.  You want to take a second to read it?

20          A.  (Witness examines document.)  Okay.

21          Q.  Okay.  So you're on the first page.  If we start

22      on the last page, the last -- well, go to the second page.

23          A.  Okay.

24          Q.  You see where it says:  On Tuesday, August 24th,

25      2021, at 9:53 p.m.?
```

Page 61

```
 1        A.  Yes.
 2        Q.  Okay.  So this is your e-mail to -- "MC" is
 3   Mark Cuban?
 4        A.  Yes.
 5        Q.  Okay.  And you sent this to Mark and Cynthia?
 6        A.  Yes.
 7        Q.  Okay.
 8        A.  I believe so.  It's -- I -- I don't see that
 9   there's a designation in the e-mail.
10        Q.  Uh-huh.  Okay.  And this is your initial summary
11   as to the Voyager ask to Mark Cuban?  Is that what this
12   is?
13        A.  Yes.
14        Q.  Okay.  Why did you send this to Mark?
15        A.  Well, I sent it to Mark because, as I said in the
16   e-mail, I said that he would check them out.
17        Q.  Why would he check them out?
18        A.  To see if it's a company we would want to do
19   business with.
20        Q.  Why wouldn't Cynthia be the one you'd send this
21   to?
22        A.  I did send it to Cynthia, I believe.
23        Q.  Why aren't you asking Cynthia to check them out?
24             MR. COOK:  Object to form.
25             THE WITNESS:  I copied her on the e-mail, so
```

Page 62

1    I was sending it to both of them.

2    BY MR. KAYE:

3        Q.  Right.

4            Why didn't you ask Cynthia to check them out

5    and just copy Mark if you wanted to keep them in the loop?

6            MR. COOK:  Object to form.

7            THE WITNESS:  Mark's the governor of the

8    team, and I wanted him to be aware.

9    BY MR. KAYE:

10       Q.  Okay.  But you previously testified that it was

11   Cynthia, not Mark, that had the final say over the

12   partnership?

13           MR. COOK:  Just go ahead and wait for a

14   question.

15           MR. KAYE:  That was a question.

16           MR. COOK:  You asked him whether or not he

17   testified to that.

18   BY MR. KAYE:

19       Q.  You previously testified that it was Cynthia, and

20   not Mark, that was to make the final decision over whether

21   to proceed with this partnership, right?

22       A.  I don't believe that's what I said.

23       Q.  Okay.  Why do you say:  Your potential

24   involvement (input/support not endorsement) is very

25   attractive to them as well?

Page 63

1      A.  I don't recall why I would have said that at the

2  time.

3      Q.  What -- what's the difference between input or

4  support versus endorsement?

5              MR. COOK:  Object to form.

6              THE WITNESS:  You're asking me specifically,

7  in general, what those -- the difference is between those

8  two terms?

9  BY MR. KAYE:

10     Q.  Right.

11             You said this in your e-mail to Mark.

12 You're specifying that his involvement would be

13 input/support, not endorsement.  What did you mean by

14 that?

15     A.  I was clarifying that this was not an

16 endorsement.

17     Q.  But what does "input/support" mean?

18     A.  Typically, any sponsor -- or sponsorship that we

19 have, the -- the client would like to know that our

20 leadership is in support of them.

21     Q.  Well, not leadership.  This is specifically

22 Mark Cuban, right?

23     A.  As well as Cynthia Marshall.

24     Q.  That's not what it says.

25             MR. COOK:  Object to form.

Page 64

1          That's not a question.  Just wait for a

2   question.

3          THE WITNESS:  Okay.

4   BY MR. KAYE:

5       Q.  What did you mean by █████████████████

    ██████████████████████████?

7       A.  I mean, I don't recall exactly what I meant at

8   that time.

9       Q.  Okay.  So in response, Mark says, a few hours

10  later:  I'll dig in some more.  The one thing we can't do

11  is push a token as being better than others or claiming

12  it's a good investment.  So if that's important to them,

13  that's an issue.

14          Do you know why he said that?

15          MR. COOK:  Object to form.

16          THE WITNESS:  I can't speak for him.

17  BY MR. KAYE:

18      Q.  Did you ever have any follow-up discussions with

19  him?

20      A.  No.

21      Q.  Do you know if Mark Cuban endorses any particular

22  token?

23      A.  I don't know.

24      Q.  Go back to the first page at the bottom.

25          Now, Cynthia Marshall chimes in, because she

Page 65

```
 1   was cc'd on this e-mail between you and Mark, right?

 2        A.  Yes.

 3        Q.  So she says:  Thanks, Boss.

 4             Why is she calling Mark her boss?

 5             MR. COOK:  Object to form.

 6             THE WITNESS:  Because he is her boss.

 7   BY MR. KAYE:

 8        Q.  She is the CEO; he's the governor.  Is there --

 9   do they work concurrently, or does she ultimately report

10   to Mark?

11        A.  I don't know.

12        Q.  You just know that when you send these types of

13   e-mails, it goes to both of them?

14             MR. COOK:  Object to form.

15             THE WITNESS:  When I "send these types of

16   e-mails"?

17   BY MR. KAYE:

18        Q.  Right.  E-mails asking to make decisions about

19   partnerships?

20             MR. COOK:  Object to form.

21             THE WITNESS:  I did on this occasion.

22   BY MR. KAYE:

23        Q.  Was it because it's your standard practice, or

24   was it because they specifically wanted Mark's

25   involvement?
```

Page 66

1      A.  Typ- -- sometimes I'll send e-mails to Mark and

2   Cynt; sometimes I won't.

3      Q.  Will you sometimes send e-mails just to Mark?

4           MR. COOK:  Object to form.

5           THE WITNESS:  Not usually.

6   BY MR. KAYE:

7      Q.  But sometimes?

8      A.  Not usually.

9      Q.  Has there ever been a single occasion you can

10  recall where you sent an e-mail to Mark and not Cynthia?

11     A.  Yes.

12     Q.  More than once?

13     A.  Previous to Cynt being the CEO, yes.

14     Q.  How about after she became CEO?

15     A.  Rarely.

16     Q.  But it happens on occasion?

17     A.  It's happened in the past.  Hasn't happened in a

18  long time.

19     Q.  So your response -- well, first, Cynthia says:

20  Mackey, are they willing to move forward without Mark's

21  involvement?  I think that can be a tad comprising, just

22  my 2 cents.  She uses that pun a lot.

23     A.  Right.

24     Q.  Why would it be "a tad comprising"?

25           MR. COOK:  Object to form.

Page 67

1          THE WITNESS:  I don't really know what she

2    was saying.

3    BY MR. KAYE:

4        Q.  Did you ever ask for clarification?

5        A.  I did not.

6        Q.  You just didn't understand it and left it at

7    that?

8              MR. COOK:  Object to form.

9              THE WITNESS:  I -- I don't know what she was

10    thinking.

11    BY MR. KAYE:

12        Q.  Did you have any assumption as to what you

13    thought she was thinking?  What was your understanding at

14    the time of that statement?

15        A.  I don't recall.

16        Q.  Okay.  So your e-mail response is:  ███████

███████████████████████████████████████████████

███████████████████████████████████

19              What did you mean by that?

20        A.  I don't recall what I meant at the time.

21        Q.  What about now?  Do you have any understanding of

22    what that could have meant?

23        A.  Are you asking me to speculate on what I thought

24    at the time?

25        Q.  It's your -- your own e-mail.  When you -- let's

Page 68

1   start with this.  You say "visible in the industry."  What

2   industry are you talking about?

3        A.  I believe I meant cryptocurrency.

4        Q.  Okay.  And you said: ███████████████████

    █ ████████████████████████████████████████████████

    █ ██████████████████████████████████████████

7        A.  I did say that.

8        Q.  Let's start with "willing to be engaged."  Why

9   would that move the needle higher on investment level?

10       A.  As I just said earlier, customers of ours like to

11  have a comfort level that Mark and Cynt are comfortable

12  with them or -- or feel good about them being a sponsor of

13  the Mavericks.

14       Q.  All right.  But this discussion is not whether

15  Cynt is going to be involved; it's whether Mark is going

16  to be involved, right?

17       A.  That's what I wrote, yes.

18       Q.  What did you mean by "perceived to be engaged"?

19       A.  Going back to what I just said, sponsors like to

20  feel like they're supported by our ownership and by our

21  CEO. ███████████████████████████████████████████

    █ ███████████████████████

23       Q.  Okay.  You're talking about his visibility in the

24  cryptocurrency industry?

25       A.  I was speaking about just sponsorships in

Page 69

1    general.

2        Q.   "Things we've been asked: ███████████

██████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

6                You remember writing all that?

7        A.   I don't remember writing it, but I see that I

8    did.

9        Q.   Okay.  Do you know why you were asked for ████████

██████████████████████████████████████████

11       A.   I don't remember.

12       Q.   Do you know why you were asked for ████████

█████████████████████████████████████

██████ ████████████████████████████████

██████████████████████████████████████████████

████████████ ████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████

23       Q.   Okay.  And in -- in this context, where you're

24   giving -- the subject line of the e-mail is "Voyager

25   company overview," you're talking about being asked by

Page 70

1    Voyager for ████████████████████████████████

██   ████████████████████

3                MR. COOK:  Object to form.

4                THE WITNESS:  ████████████████████

██   ████████████████████████████████████████████

██   ██████    ██████████████████████████████████

██   ████████████████████████████████████

8    BY MR. KAYE:

9        Q.  Is that because it was something that was set up

10   for the second, third, fourth or fifth year of the

11   integrated partnership?

12               MR. COOK:  Object to form.

13               THE WITNESS:  I don't recall.

14   BY MR. KAYE:

15       Q.  Okay.  So you're relaying to Mark here that

16   Voyager asked for the ████████████████████████████████

██   ████████████████████

18               Do you have any more specificity for that?

19               MR. COOK:  Object to form.

20               THE WITNESS:  I don't.

21   BY MR. KAYE:

22       Q.  Do you know whether ████████████████████

██   ████████████████████████████████████████████

██   ████████████████████████████

25       A.  I don't know.

Page 71

1      Q.   Okay.  Why did Voyager want to use Mark's name

2   along with the Mavs where appropriate?

3              MR. COOK:  Object to form.

4              THE WITNESS:  I don't know.

5   BY MR. KAYE:

6      Q.   Is that a common ask?

7      A.   No, it's not a common ask.

8      Q.   Did ████ask for that as part of the negotiations?

9      A.   I don't recall.

10     Q.   You don't recall?

11             So the next -- the next three sentences:  ██

████  ███████████████████████████████████████████████

████  ██████████   ████████████████████████████████████

████  ██████████████████████████   ███████████████████████

████  ████████████████████████████████████████████████

16             You remember writing that?

17     A.   I wrote that.

18     Q.   Did you ever relay to Voyager that it was an

19   implied commitment to the Voyager partnership by Mark?

20     A.   No.

21     Q.   And, again, when you guys made pitches to

22   Voyager, did you include Mark Cuban or his potential

23   involvement at all in part of the pitch?

24     A.   I don't recall.

25     Q.   What was your response to Voyager for these

Page 72

1   things that they asked you for, like using Mark's name

2   with the Mavs where appropriate?

3        A.  I don't recall.

4        Q.  That would've been a phone call or an e-mail?

5        A.  I don't recall.

6        Q.  ████████████████████████████████████████

    ██  ████████████████████  ████████████████████

8            Did you ever receive a response to that?

9        A.  I don't remember.

10       Q.  Well, Mark did participate in the launch press

11  conference, right?

12       A.  Yes.

13       Q.  And so, ultimately, it was decided by somebody

14  that Mark would have at least that involvement in the

15  partnership?

16           MR. COOK:  Object to form.

17           THE WITNESS:  In the press conference, yes,

18  Mark attended.

19  BY MR. KAYE:

20       Q.  He didn't just attend; he held it, right?

21       A.  I think it's interpretation of his role in the

22  press conference.

23       Q.  So, in other words, ultimately, it was not

24  preferred to move forward without Mark Cuban's

25  involvement, right?

Page 73

1               MR. COOK:  Object to form.

2               THE WITNESS:  ███████████████

   ███████████

4  BY MR. KAYE:

5      ███  █████████████████████████████

   ████████████████████████████████████

   ████  ████████████████████

8      Q.  Was it an implied commitment from Mark to support

9  the partnership?

10     A.  You're asking me -- me to answer for Mark?

11     Q.  No.  You're the one that ran this deal.

12     A.  We never asked Mark to specifically do anything

13 as it pertains to the contract.

14     Q.  You never asked him to be involved in any crypto

15 conversations with Steve Ehrlich?

16     A.  Personally, I didn't ask him, no.

17     Q.  Did you have anybody from your team ask him?

18     A.  Not that I recall.

19     Q.  Did you have anybody ask his assistant or anybody

20 indirectly connected to him?

21     A.  Not that I recall.

22     Q.  Do you know how Mark became involved in the press

23 conference?

24     A.  I don't recall.

25     Q.  Do you know who would know?

Page 74

```
 1        A.  I don't.

 2        Q.  I'm going to show you now what we've previously

 3   marked as Exhibit 62.

 4                (Exhibit 62 was marked for identification.)

 5   BY MR. KAYE:

 6        Q.  Do you recognize this e-mail chain?

 7        A.  I do.

 8        Q.  Do you recall participating in it?

 9        A.  Yes.

10        Q.  Okay.  So if we start at the top of the second

11   page, this is the same chain we were talking about before,

12   right?

13        A.  Right.

14        Q.  But we're picking up where Cynthia says:  Let us

15   dig in more.  What would you like to know?  Back on the

16   first page, Mark's response is:  How much do they want to

17   spend?

18                Right?

19        A.  Uh-huh.

20        Q.  And that was directed to you because you

21   responded:  ███████████████████████  right?

22        A.  Correct.

23        Q.  Was  ███████████████████  ultimately,

24   arrived at?

25        A.  No.
```

Page 75

1      Q.  What was it?

2      A.  I don't specifically remember.  ████████

█      ████████ in the deal, so the -- the specific figure is

4   not -- I wouldn't know it.

5      Q.  ████████████████████████████████████, does

6   that sound about right?

7      A.  Sounds right.

8      Q.  Okay.  And you tell him:  Tokens are not a big

9   part of their strategy.  Adoption of their mobile app

10  using multiple currencies is.

11          Where did that come from?  It kind of comes

12  out of the blue in the chain.

13          MR. COOK:  Object to form.

14          THE WITNESS:  I can't recall.

15  BY MR. KAYE:

16      Q.  If you go back to page 2 in the middle, Mark is

17  saying:  I'll dig in some more.  ████████████████

█   ████████████████████████████████████

█   ████████████████   ████████████████

█   ████████████

21          So going back to the first page --

22      A.  Uh-huh.

23      Q.  -- it looks like your response to that statement,

24  right?

25          MR. COOK:  Object to form.

1               THE WITNESS:  I can't say for sure.

2    BY MR. KAYE:

3        Q.  But it would be logical from reading this chain

4    that your response to Mark is: ████████████████████

     ████████████████████████████████████████████████

     ██████████

7               Was that your understanding of what Voyager

8    was looking for from -- at least as one of their major

9    goals from this partnership?

10              MR. COOK:  Object to the form of the

11   question.

12              THE WITNESS:  It's possible.

13   BY MR. KAYE:

14       Q.  Would that be something reflected in the

15   Sponsorship Agreement?

16              MR. COOK:  I'm sorry.  I couldn't hear the

17   question.

18              MR. KAYE:  Bless you, or -- that was a cough

19   or sneeze.

20              (Off-record discussion.)

21   BY MR. KAYE:

22       Q.  Would driving adoption of the Voyager platform be

23   something that's set forth in the partnership agreement?

24              MR. COOK:  Object to form.

25              THE WITNESS:  ██████████████████████

Page 77

1　████████████████████████

2　BY MR. KAYE:

3　　　　Q.  Okay.  All right.

4　　　　　　　MS. WOLKINSON:  Alex, can you send 62,

5　please?

6　　　　　　　MR. BOIES:  It did not go through?

7　　　　　　　MS. WOLKINSON:  Oh, I just received it.

8　Thank you.

9　BY MR. KAYE:

10　　　　Q.  Okay.  I'm going to show you what was previously

11　marked as Exhibit 3.

12　　　　　　　Remember sending this e-mail?

13　　　　A.  I mean, obviously, I did.  I don't remember it

14　exactly, but yes.

15　　　　Q.  Okay.  And this was what we talked about earlier,

16　right; this was your e-mail introducing Mark Cuban to the

17　Voyager team?

18　　　　A.  Uh-huh.

19　　　　Q.  Okay.  Cynthia Marshall is not on this e-mail?

20　　　　A.  They wanted an introduction directly to Mark.

21　　　　Q.  Are you aware of any direct conversations between

22　Cynthia Marshall and the Voyager team?

23　　　　A.  Not that I'm aware of.

24　　　　Q.  So you had no direct discussions with them

25　regarding negotiating the partnership?

Page 78

1              MR. COOK:  Object to the form.

2              THE WITNESS:  I had conversations with Cynt

3     periodically about all of the sponsorships we were working

4     on.

5     BY MR. KAYE:

6         Q.  Right.  You updated her about what you were doing

7     as vice president of corporate sponsorships?

8         A.  Correct.

9         Q.  Okay.  But she had no direct involvement; you

10    just reported to her?

11        A.  No.  She has direct involvement.  I mean, she's

12    my boss, so there's back-and-forth discussions about what

13    I'm doing.

14        Q.  Yeah.  You have direct back-and-forth

15    conversations with her about what you're doing?

16        A.  Correct.

17        Q.  Right.  But conversations with Voyager, as of

18    now, that's -- at this stage, that's you and Mark.

19        A.  This was specifically an introduction of the

20    Voyager team to Mark.

21        Q.  Uh-huh.  Who are Billy Phillips and

22    Patrick Sorensen again?

23        A.  They are both vice presidents that report to me.

24        Q.  And they were, sort of, your underlings for this

25    Voyager negotiation?

Page 79

```
1              MR. COOK:  Object to form.
2              THE WITNESS:  They both report to me, so
3    they're kept abreast of things that are -- we're working
4    on.
5    BY MR. KAYE:
6         Q.  Uh-huh.  And then Kyle Tapply, Kory Nix -- and
7    who's the third one?
8         A.  Clay Christopher.
9         Q.  -- Clay Christopher, those three, do they work
10   directly underneath you or underneath Billy and Patrick?
11        A.  They work directly underneath Billy.
12        Q.  Okay.  But you would have conversations directly
13   with them and just keep Billy abreast of it?
14        A.  Yes.
15        Q.  Is that standard procedure for these sorts of
16   partnership deals?
17              MR. COOK:  Object to form.
18              THE WITNESS:  Sponsorship deals, yes.
19   BY MR. KAYE:
20        Q.  And you're very actively involved in them?
21        A.  Depends.
22        Q.  On what?
23        A.  Sometimes I am; sometimes I'm not.
24        Q.  What would determine whether you are or aren't?
25        A.  Can vary quite a bit.
```

Page 80

1          Q.  How about in the case of the Voyager

2     negotiations?

3          A.  I was the one who spoke directly to Drew to start

4     the conversation, so I stayed involved.

5          Q.  Uh-huh.  You could have delegated it to Billy and

6     just let him keep you abreast like you keep Cynt abreast,

7     right?

8                    MR. COOK:  Object to form.

9                    THE WITNESS:  I could have.

10    BY MR. KAYE:

11         Q.  But you wanted to be involved in this deal?

12         A.  I felt like because I was directly communicating

13    with Drew on -- at the onset, that I should stay involved.

14         Q.  Did that make a difference in your compensation

15    for the deal?

16         A.  No.

17         Q.  And you remained the primary point of contact for

18    the Voyager deal for the life of the partnership?

19                    MR. COOK:  Object to form.

20                    THE WITNESS:  I wouldn't say that.

21    BY MR. KAYE:

22         Q.  What would you say?

23         A.  Once deals are executed, for example, Kyle and

24    Kory and Clay, if they're involved in a -- in a deal, then

25    they would take ownership of that process and work on the

Page 81

1    execution of the deal.

2         Q.  Okay.  So, in other words, once the deal is set,

3    you basically let them take more of a laboring role in

4    implementing it?

5         A.  That's fair.

6              THE WITNESS:  Mind if we get a break in

7    about five minutes?

8              MR. COOK:  Absolutely.

9              (Simultaneously speaking.)

10             MR. KAYE:  Yeah.  We can take a break in

11   five minutes.

12             MR. COOK:  You need to go now, or do you

13   want to wait?

14             THE WITNESS:  If I can go now, that would be

15   great.

16             MR. COOK:  Let's do that.

17             We are in between questions, so take a break

18   now?

19             MR. KAYE:  Sure.

20             THE VIDEOGRAPHER:  Off the record, 11:04.

21             (Brief recess taken.)

22             THE VIDEOGRAPHER:  We are on record.  The

23   time is 11:20.

24   BY MR. KAYE:

25        Q.  Okay.  So before the break, we looked at

Page 82

1    Exhibit 3, which was your introduction of Mark to the

2    Voyager team, right?

3         A.  Right.

4         Q.  Were you kept abreast of any of the conversations

5    between Mark and the Voyager team after that?

6         A.  No.

7         Q.  Are you sure?

8              MR. COOK:  Object to form.

9              THE WITNESS:  Yeah, I'm sure.

10             (Exhibit 64 was marked for identification.)

11   BY MR. KAYE:

12        Q.  Okay.  Let's do Exhibit 64.

13             Do you remember sending this e-mail?

14        A.  Yes.

15        Q.  Okay.  So you were cc'd on Stephen Ehrlich's

16   initial introduction e-mail, at least, to Mark Cuban,

17   right?

18        A.  Yes.

19        Q.  Okay.  And why did you forward it to Billy and

20   Patrick?

21        A.  Just to keep them informed.

22        Q.  About what?

23        A.  Steve's e-mail to -- to Mark.

24        Q.  Okay.  And you're that -- were you kept abreast

25   of the conversations between Mark and the rest of the

Page 83

1    Voyager team?

2                MR. COOK:  Object to form.

3                THE WITNESS:  I mean, I was copied on this

4    e-mail, but I wasn't aware of what they were specifically

5    talking about, unless I was copied on an e-mail.

6    BY MR. KAYE:

7        Q.  Uh-huh.  Did you ever -- did you understand what

8    Steve was talking about in this e-mail, about how Voyager

9    derives its revenue?

10       A.  I mean, I'd have to read this again.

11       Q.  Sure.  Go ahead.

12       A.  (Witness examines document.)  Okay.

13                I'm sorry.  The question was?

14       Q.  Did you understand what Stephen Ehrlich is

15   talking about in terms of how Voyager derives its revenue?

16       A.  Generally.

17       Q.  Do you know what "staking" is?

18       A.  Somewhat.

19       Q.  What's "staking"?

20       A.  It's essentially lending -- lending of crypto.

21       Q.  So when you hear "staking," to you, that means

22   lending crypto?

23       A.  Generally, yes.

24       Q.  Okay.  And you understood this at the time of

25   negotiating the Voyager deal?

Page 84

```
 1              MR. COOK:  Wait.  Understood the definition
 2   of "staking" at the time?
 3              MR. KAYE:  As he just stated.
 4              THE WITNESS:  That's how I understood it.
 5   BY MR. KAYE:
 6      Q.  Okay.  Who -- whose crypto is being lent?
 7      A.  I wasn't -- I wasn't really in the weeds on that.
 8      Q.  How did you come to understand that "staking"
 9   meant lending crypto?
10      A.  From other conversations we had in the crypto
11   space.
12      Q.  Conversations with who?
13      A.  Other companies.
14      Q.  ███████████████████████
15      A.  I don't recall.
16      Q.  Do you know what the "spread revenue" is?
17      A.  I don't.
18      Q.  Okay.  So from here, you reading the discussion
19   about staking, you understood that to mean that Voyager
20   was lending out cryptocurrency to generate revenue?
21              MR. COOK:  Object to form.
22              THE WITNESS:  Specifically to that question,
23   yes.
24              (Exhibit 65 was marked for identification.)
25   BY MR. KAYE:
```

Page 85

1        Q.   Okay.   I want to show you what we're -- what
2    we've previously marked as Exhibit 65.
3                    Do you remember this e-mail?
4        A.   I do.
5        Q.   So this is in the middle of the page starting
6    Wednesday, September 8th, 2021, at 3:43 p.m., this was you
7    e-mailing Mark and copying Cynthia saying:   FYI, going to
8    copy you in.
9                    You remember that?
10       A.   Yes.
11       Q.   Okay.   So, ostensibly, right after this is when
12   you made the introduction between Mark and Voyager, right?
13       A.   Okay.
14       Q.   Okay.   So Mark's e-mails comes the next day at
15   around 5:00 p.m.   And if you look back at Exhibit 64,
16   Steve Ehrlich's --
17                    MR. KAYE:   Bless you.
18   BY MR. KAYE:
19       Q.   -- Steve Ehrlich's e-mail is September 8th at
20   9:41 p.m.   So this is a little over a day late- -- about a
21   day later, right?
22       A.   (Witness nods head affirmatively.)
23       Q.   And Mark says:   I'm good with the deal and
24   working with them.   Just make sure to keep me cc'd on
25   everything to keep it all in line with what we can or

Case 1:22-cv-22538-RKA   Document 155-34 *SEALED* Entered on FLSD Docket 09/24/2025   Page 248 of 375
Page 248 of 375

Page 86

1    can't do.  Thanks.

2               You remember receiving that instruction?

3       A.  I do.

4       Q.  And did you keep Mark cc'd on everything?

5       A.  I don't recall, but probably not on everything.

6       Q.  On everything important?

7       A.  Probably just depends.

8       Q.  On what?

9       A.  I -- I don't know, because I don't have a

10   specific example to reference.

11      Q.  But, here, Mark is giving you the go-ahead to

12   work with them on this deal, right?

13      A.  He said:  I'm good with the deal and working with

14   them.

15      Q.  He just wanted you to keep him cc'd on

16   everything?

17               MR. COOK:  Object to form.

18               THE WITNESS:  That's what he said.

19   BY MR. KAYE:

20      Q.  Uh-huh.  And that he would keep you-all in line

21   with what you can and can't do?

22               MR. COOK:  Can -- I'm sorry.  Can you read

23   that back, please?

24               (Requested material was read back.)

25               MR. COOK:  Object to form.

Case 1:22-cv-22538-RKA   Document 155-34  *SEALED*   Entered on FLSD Docket 09/24/2023   Page 88 of 375
Page 88 of 375

1           THE WITNESS:  No.  That's -- he said:  To

2     keep it all in line with what we can or can't do.  So he

3     would keep us in line.

4     BY MR. KAYE:

5           Q.  "Just make sure to keep me cc'd on everything to

6     keep it all in line with what we can or can't do."

7           A.  "It."  You -- you said "he" before.

8           Q.  Okay.  So your reading of the e-mail now is that

9     keep -- keeping him cc'd on everything would not keep you

10    in line with what you can or can't do?

11          MR. COOK:  Object to form.

12          THE WITNESS:  What he wrote was:  Just make

13    sure to keep me cc'd on everything to keep it all in line

14    with what we can or can't do.

15    BY MR. KAYE:

16          Q.  "It" being the Voyager partnership?

17          MR. COOK:  Object to form.

18    BY MR. KAYE:

19          Q.  That you were negotiating?

20          A.  I -- I can't speak for Mark.

21          Q.  What was your understanding of this e-mail?

22    Because you said:  Got it.

23          A.  I just understood it as we were -- we were going

24    to move forward with Voyager.

25          Q.  Let me show you what we have as Exhibit 66.

1            (Exhibit 66 was marked for identification.)

2    BY MR. KAYE:

3        Q.  Before we do, who is Sarah Musaali?

4        A.  She worked for me.

5        Q.  Previously?

6        A.  Previously.

7        Q.  Okay.  What -- what did she work for you in

8    regards to?

9        A.  She was in our partnership mark- -- or

10   sponsorship marketing department, which meant that she was

11   involved in our sales process.

12       Q.  How was she involved in the sales process?

13       A.  Developing proposals, working with internal

14   teams.  It's kind of a -- a bit of a broad-based role.

15       Q.  Would she put together the pitch decks for you to

16   review?

17       A.  Most often.

18       Q.  Okay.  Do you recall if she did that for Voyager?

19       A.  I don't recall.

20       Q.  So starting at the bottom of this e-mail chain,

21   it looks like this is Mark Cuban discussing with

22   ████████████████████████████████████████████████████

     ████████████████████████████████████████    ████████

24       A.  Correct.

25       Q.  Okay.  Do you know who those competitors were on

Page 89



1    September 13th, 2021?

16              You understand that?

17    A.  I do.

18    Q.  What's your understanding of that?

19    A.  Let me read that, see where -- figure out where

20    we are here.  (Witness examines document.)

21              Okay.  I'm sorry.  Can you repeat the

22    question?

23    Q.  Sure.  You need me to reread the portion?

24    Because the question was:  What was your understanding of

25    that?

1

██ █████████████████████

██  ██ ████████████████████████████

██ ██████████████████████████████████████

██ ████████████████████████████████████████████

██ ██████████████████████████████████  ██████████

██ ████████████████████████████████████████

██ ████████████████████████████████████

██ ███████████████

9          What's your understanding of that?

10          MR. COOK:  Object to form.

11          THE WITNESS:  Well, specifically to that

12   question, I mean, I really didn't pay any attention to it,

13   because it really wasn't pertinent.

14   BY MR. KAYE:

15      Q.  My question is:  What's your understanding of it?

16      A.  My understanding of what he said is that they

17   make money based on transactions.

18      Q.  As opposed to?

19      A.  As opposed to?

20      Q.  Getting users to trade on the exchange?

21          MR. COOK:  Wait.  Wait for him to ask a

22   question.

23   BY MR. KAYE:

24      Q.  Right?

25      A.  Okay.  So what's the question?

Page 91



1     Q.

8    BY MR. KAYE:

9     Q.  Is that your understanding of -- of this e-mail?

10

of the e-mail,

13    it's kind of, like, a pitch to still do business even if

14    the Mavericks contract with a competitor, right?

15           MR. COOK:  Object to form.

16    BY MR. KAYE:

17

23           MR. COOK:  Object to form.

24           THE WITNESS:  I mean, I can't speak for him,

25    but that -- that makes sense.

Page 92

1    BY MR. KAYE:

2        Q.  On the second page, Mark's response, which only

3    you are cc'd on, is: ███████████████████████

4    ███████████████████████████████

5                Does he mean -- what -- what does he mean by

6    that?

7                MR. COOK:  Object to form.

8                THE WITNESS:  I can't -- I can't speak for

9    Mark.

10   BY MR. KAYE:

11       Q.  Looks like: ███████████████████████

12   ███████████████████████     ████████

13               MR. COOK:  What --

14               THE WITNESS:  What's the question?

15   BY MR. KAYE:

16       Q.  █████████████████████████████████

17   ████████████████████

18               MR. COOK:  Object to the form.  It's

19   unintelligible.

20               If you can understand the question, you can

21   answer it, Ryan.

22   BY MR. KAYE:

23       Q.  Do you understand the question?

24       A.  I mean, can you be -- can you try to rephrase it?

25       Q.  Sure.  So what Mark is saying here is that,

Page 93



1    regardless of ▮▮▮▮▮ ideas, he says: ▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3         A.  Okay.

4         ▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮

6              MR. COOK:  Object to the form.

7              THE WITNESS:  ▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮  ▮▮▮▮▮▮▮

▮    ▮▮▮▮

▮    ▮▮  ▮▮  ▮▮▮▮▮▮  ▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮

▮    ▮▮  ▮▮▮▮

18        Q.  If we do get -- correct, okay.

19              And then you take this e-mail and you send

20   it to Drew Northfield saying: ▮▮▮▮▮  ▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮

▮    ▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮

24              Do you remember sending that e-mail?

25        A.  Yeah.

Page 94

1       Q.  Do you know what any of this is referring to?

2       A.  Not exactly.

3       Q.  When you say "checking with legal on the

4    agreement," would that be checking with Sekou?

5       A.  Yes.

6       Q.  When you say "also we had a brainstorming session

7    today," is that you with Sekou?

8       A.  I don't recall.

9       Q.  Would it be you with Kory, Kyle?

10      A.  Could have been any number of people.

11      Q.  So back to the -- okay.  So at the top of this

12   page, Jason -- and was he -- was Jason your main point of

13   contact at Excel?

14      A.  No.

15      Q.  Was -- oh, no, no, no.  Sorry.  Jason was

16   standing in for Drew, right; Drew was your main contact at

17   Excel?

18      A.  Correct.

19      Q.  Okay.  So Jason is saying:  Voyager reached out

20   today asking for an update.  When should I expect them --

21   when should I tell them to expect a turn -- a next turn of

22   the proposal?

23          And this was on September 13th, right?

24      A.  Yeah.

25      Q.  Okay.  So this is five days after you linked them

Page 95

1   up with Mark Cuban?

2               MR. COOK:  Object to form.

3               THE WITNESS:  This was September 13th, yes.

4   BY MR. KAYE:

5       Q.



22              What was your understanding of that?

23              MR. COOK:  Object to the form.

24              THE WITNESS:  I mean, I -- I can't speak for

25   Billy.

Page 96

```
 1   BY MR. KAYE:
 2        Q.  Did you have any conversations with Billy about
 3   this?
 4        A.  I did not.
 5        Q.  What does ███████████████████ mean?
 6                MR. COOK:  Object to form.
 7                THE WITNESS:  Generally, I think -- let me
 8   look at this again.
 9                (Witness examines document.)
10                Well, similar to what I said before, we
11   didn't have any specifics to provide to Voyager at that
12   time, so we were -- we wanted to provide a proposal to
13   Voyager to start the conversation.
14   BY MR. KAYE:
15        Q.  Uh-huh.  Including the ██████████████
16                MR. COOK:  Object to form.
17                THE WITNESS:  They had asked for certain
18   things from Mark, and we weren't prepared to delve into
19   any conversations about Mark at that time.
20   BY MR. KAYE:
21        Q.  Okay.  Unless you have a commitment conversation
22   with him first?
23                MR. COOK:  Object to form.
24                THE WITNESS:  Yeah, and I -- I didn't
25   address that.  I don't know what Billy meant by that.
```

 1    BY MR. KAYE:

 2         Q.  Okay.  But you're being told:  ▇▇▇▇▇▇▇▇

      ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

 4              MR. COOK:  Object to form.

 5              THE WITNESS:  That's what Billy wrote.

 6    BY MR. KAYE:

 7         Q.  Uh-huh.

 8              MR. KAYE:  Let's give him 67 and 67-A.

 9              MR. BOIES:  This is 67.

10              MS. WOLKINSON:  Alex, can you check your

11    computer?  We haven't gotten --

12              MR. BOIES:  E-mail is cutting out.  And so

13    64, 65, and 66 should have just arrived.

14              MS. WOLKINSON:  Okay.  Maybe somebody from

15    your team can send remotely from your computer when they

16    hear it, because I haven't gotten anything since 62.

17              MR. BOIES:  Okay.  Do we have a hard-line

18    Internet here?

19              MR. COOK:  You mean like an Ethernet?

20              MR. BOIES:  Ethernet plug.  People remotely

21    won't be able to do this, so it's either me or --

22              MS. WOLKINSON:  Okay.

23              MR. BOIES:  And they're -- they're being

24    sent as -- as they're being -- it's just the Internet --

25    my Internet is slow or something.

Page 98

```
1              This is 67-A.  But they should have just
2     arrived one minute ago, 64, 65, and 66.
3              MR. BEST:  I just got 65 and 6.
4              MR. COOK:  Do you have extra copies, Alex,
5     of what you -- 67-A?
6              MR. BOIES:  Yes.  I just gave you a copy.
7              MR. COOK:  You gave me.  They may want one
8     down there.
9              (Exhibit 67 was marked for identification.)
10             (Exhibit 67-A was marked for
11    identification.)
12    BY MR. KAYE:
13       Q.  Who are Lacey Frederick and Spencer Santora?
14       A.  Lacey used to work in our group as well.  Spencer
15    still does.  They're both in our -- Lacey worked with
16    Sarah in our sponsorship marketing department.  Spencer
17    works in our activation department.
18       Q.  Okay.  And you have in front of you 67-A.
19             Do you recognize -- if you want to flip
20    through it, do you recognize that document?
21       A.  I don't.  And I see several of these a day, so I
22    don't recognize this particular one, but...
23       Q.  And what does it look like to you?
24       A.  It looks like a copy of our DIGIDECK presentation
25    platform that we use to send proposals to potential
```

Page 99

1    sponsors.

2        Q.  Okay.  If you look at page 2, what logo is on the

3    top right?

4        A.  Voyager.

5        Q.  Okay.  And if you skip ahead a couple pages, page

6    4 -- wait.  You just passed it.

7        A.  Okay.

8        Q.  --

```
                                                    Page 100

 1              MR. COOK:  Object to form.

 2              THE WITNESS:  I can't say -- say

 3   specifically.

 4   BY MR. KAYE:

 5       Q.  How would you be able to?

 6       A.  Have to look at the data.

 7       Q.  How is that data kept?

 8       A.  Just through historical records of ██████

 9   data and things like that that we receive over time.

10       Q.  And do you guys compile that data?

11       A.  We generally use it.

12       Q.  How is that data broken down?

13       A.  I mean, I couldn't tell you.

14       Q.  Are -- do Mavericks fans exclusively live in the

15   state of Texas?

16              MR. COOK:  Object to the form.

17              THE WITNESS:  I couldn't really answer that.

18   BY MR. KAYE:

19       Q.  Would that be in the data?

20       A.  Probably.

21       Q.  Is there anywhere in the data that shows other

22   states where Mavs fans are prevalent?

23       A.  I don't believe states, no.

24       Q.  How would it be broken down?

25       A.  Generally, it's the Dallas-Fort Worth area, and
```

Page 101

1  then there's data on international fans as well.

2       Q.  And your position is there's no data kept on

3  other areas within the U.S.?

4                 MR. COOK:  Object to the form.

5                 THE WITNESS:  I don't believe so.

6  BY MR. KAYE:

7       Q.  Do you know who would know for sure?

8                 MR. COOK:  Object to the form.

9                 THE WITNESS:  I don't.

10 BY MR. KAYE:

11      Q.  Is there anyone responsible in the Mavericks for

12 maintaining that data?

13      A.  I don't believe so.

14      Q.  Do you know who would know for sure?

15      A.  I don't, but it -- ████████████ data is focused on

16 the Dallas-Fort Worth area, and that's likely where this

17 information came from.

18      Q.  Is that ███████████ data, and you said previously

19 ████████ data, is that normally collected for Mavs home

20 games?

21      A.  It's collected on -- well, so ██████████ data is

22 different.  I mean, that -- that's a general cross-section

23 of -- of the Dallas-Fort Worth area, and they ask

24 questions of fans or just people in the area about their

25 likes and dislikes and preferences and things like that.

Page 102

1      Q.  Uh-huh.  What about the ███████ data?

2      A.  It's a little different.  ████████measures

3  visibility of signage and -- and things like that.

4      Q.  Uh-huh.  Is that collected for away games as

5  well?

6      A.  It's collected for them, yes.

7      Q.  What about, like, for the playoffs?

8      A.  Yes, we get data on playoffs.

9      Q.  Uh-huh.  And the Mavs got pretty far in the

10  playoffs last season, right?

11      A.  Yes, we did.

12              MR. BEST:  Depends who you ask.

13              MR. KAYE:  Not far enough.

14              MR. BEST:  Correct.

15              THE WITNESS:  That's what I was going to

16  say.  I didn't want to be on record for that.

17  BY MR. KAYE:

18      Q.  So the last bullet point is:  ███████████

██  ███████████████████████████████████████████████

██  ██████████████████████████████

21              What do you guys mean by that when you

22  include that in the pitch deck?

23              MR. COOK:  Object to the form.

24              THE WITNESS:  █████████████████████████

██  ████████████████████████████████████████████████



Page 103

1     ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

    ▆▆▆▆▆▆

3     BY MR. KAYE:

4     ▆ ▆▆▆ ▆▆▆▆▆▆

    ▆ ▆▆▆▆▆▆

    ▆ ▆▆▆ ▆▆▆▆▆

    ▆ ▆▆▆▆

    ▆ ▆▆▆▆▆▆▆▆

    ▆ ▆▆▆

    ▆ ▆▆▆ ▆▆▆▆ ▆▆▆

    ▆ ▆▆▆▆

12               THE WITNESS:  Okay.

13     BY MR. KAYE:

14       Q.  We have had discussions about that, right?

15             MR. COOK:  Who is "we"?

16     BY MR. KAYE:

17       Q.  You and I sitting here in the deposition, we've

18     had discussions early on in the deposition about

19     Mark Cuban being a public figure in the crypto space,

20     right?

21       A.  I don't --

22             MR. COOK:  Objection.

23             THE WITNESS:  I don't recall that.

24     BY MR. KAYE:

25     ▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Page 104



11    Q.  All right.  And this is a pitch deck; it's

12 designed to get a company to do business with the

13 Mavericks, right?

23         MR. COOK:  Object to the form of the

24 question.

25              THE WITNESS:  I can't say.



Page 105

1    BY MR. KAYE:

2         Q.   Then why include it?

23   BY MR. KAYE:

Page 106

1        ████████████

█                  MR. COOK:  Object to the form of the

3    question.

4                  THE WITNESS:  I'm sorry.  So the question

5    is?

6    BY MR. KAYE:

7         Q.  Is that right?

8         A.  You'll have to rephrase it.  I'm sorry.

9         ██  ██████████████████████████████████████

█    ██████████████████████████████████████████████████

█    ████████████████████████████████████████████████

█    ██████████████████████████████████████████████████████

█    █████████████████████████████████████

█              █████████████  █████████████████████

█         ████████████████  ████████████████████████

█    █████████████  ███████████████████████████████████

█    ██████

18   BY MR. KAYE:

19        Q.  Right.

20        A.  Just like all of these other slides are.

21        Q.  It's an implication?

22        A.  No.

23                 MR. COOK:  Wait.  Wait.  Wait.  Wait for him

24   to ask a question.

25   BY MR. KAYE:

Page 107

1      Q.  It was a question.

2              MR. COOK:  "It was an implication" is a

3  question?

4              MR. KAYE:  Yeah.

5              MR. COOK:  If you understand that question,

6  you can answer.

7              THE WITNESS:  Can you rephrase the question?

8  BY MR. KAYE:

9      Q.  So you just testified -- in response to my

10  question about why all of Mark's followers would be

11  reflected in the pitch deck, your response is:  That

12  doesn't come into our proposals.  It's simply a reflection

13  of who the Mavericks are.

14              But it comes into the pitch deck, right?

15              MR. COOK:  Object to the form.

16              THE WITNESS:  ███████████████████████

   ████████████████████████████████████████████ ██████

   ██████████████████████████ ███████████████████████

   ██████████████████

20  BY MR. KAYE:

21      Q.  Right.  ██████████████████████████████████

   ████████████████████████████████████████████████

   ██████████████████████████████████████████████████

   █████████████████████████████████

25              MR. COOK:  Object to the form.

Page 108

1   BY MR. KAYE:

2        Q.  Is that right?

3                MR. COOK:  Object.

4                THE WITNESS:  It's -- it's just a reflection

5   of the Mavericks.

6   BY MR. KAYE:

7        Q.  Where's the slide with --

8   ██  █████████████████████████████

9        Q.  Sorry.  Are you done?

10       A.  Yes.

11       Q.  Where's the slide with Cynthia Marshall's social

12  media followers?

13               MR. COOK:  Object to the form.

14               THE WITNESS:  Sometimes it's in there;

15  sometimes it's not.  The -- the platform has multiple

16  slides that can be used.

17  BY MR. KAYE:

18  ██  ████████████████████████████████████

██  ██████████████████████████████████

██  ███████████████████████████████

21       A.  I can't off the top of my head, no.

22  ██  ████████████████████████████████

██  ████████████████████████████████████

24       A.  I don't recall.

25       Q.  If you skip ahead two slides.

Page 109

1        A.   (Complies.)

2        ██  ████████████████████████████████████

██  ██████████████

4        A.   That's correct.

5        ██  ████  ████████████████████████

██  ████████████████████████████████████

██  ██████████

8             Do you have any -- does the Mavericks

9    maintain any metrics that specify where these followers

10   are located, that you're aware of?

11       A.   We probably do.

12       Q.   Can you skip to the last page of this for me?

13       A.   (Complies.)

14       ██  ████████████████████████████████████

██  ██████████████████████████████████

██  ██████████████████████████████████████

██  ██████████

18       A.   Correct.

19       Q.   And in the -- in the center of that slide, one

20   of -- one of the components that says:  Each term of

21   agreement Voyager ████████████████████████████

██  ███████████████████████████████

23              ██████████████████ right?

24       A.   Likely, yes.

25       Q.   Okay.

Page 110

1      A.  Okay.

2              MR. BOIES:  67-A is not getting delivered to

3      some people, and it's being delivered to others, just

4      based on the size -- it's the sheer size of the document.

5      So we'll send that afterwards, just to make sure everyone

6      has that, through a zip file, just to make sure.

7              (Off-record discussion.)

8              MR. KAYE:  36.

9              MR. BOIES:  36.

10             (Exhibit 36 was marked for identification.)

11      BY MR. KAYE:

12      Q.  Do you recognize this e-mail and the attached PDF

13      that you sent around to your team on September 17th, 2021?

14      A.  I do.

15      Q.  Okay.  What is this PDF that's attached to it,

16      starts with:  Dallas Mavericks and Voyager...

17      A.  Just looks like an outline of potential ideas

18      that we could discuss with Voyager in a -- in a

19      sponsorship agreement.

20      Q.  And do you know who prepared this?

21      A.  I don't.

22      Q.  Did you have any involvement in preparing this or

23      providing any input?

24      A.  I did not.

25      Q.  Do you recall having any discussions about it?

 1         A.  I don't recall.

 2         Q.  Do you know if this was a document that was

 3   prepared for internal discussion with your team?

 4         A.  I'm sorry.  It was pre- -- can you rephrase that?

 5         Q.  Do you know if this document was prepared for

 6   internal discussion with your team, as reflected in the

 7   calendar invite?

 8         A.  Yeah, it -- it must have been.

 9         Q.  Okay.  And as part of partnership objectives, the

10   second sub-bullet of ███████████████████████

██   ████████████████████████████████████████████

12   right?

13         A.  Correct.

14         Q.  Okay.  ██████████████████████████

██   ████████████████████████████████████

██   ███████████

17              MR. COOK:  Object to the form.

18              THE WITNESS:  Yeah, that -- were some of the

19   objectives that Voyager gave us.

20   BY MR. KAYE:

21         Q.  Uh-huh.  And the second main sub-bullet is:

22   ████████████████████    ███████████████████

██   █████████████████████████████████████████████

██   █████████████████████████

25         A.  Correct.

Page 112

```
 1        Q.  Okay.  ██████████████████████████████
          ██████████████████████████████████████████
          ██████████████████████████████████████████
          ████████████████████████████████████████████
          ██████████████████████████████████████████
 6        A.  Okay.
 7        Q.  That was part of the discussions of the
 8   partnership?
 9                MR. COOK:  Object to the form.
10                THE WITNESS:  Those were ideas that Voyager
11   gave us to discuss as part of a potential sponsorship.
12   BY MR. KAYE:
13        Q.  What was the ████████████ promotion?
14        A.  Again, this is an idea that came out of Voyager's
15   discussions that -- you know, it was -- it was simply an
16   idea that they -- they came up, that we, ultimately,
17   didn't follow through on.
18        Q.  Who came up with the idea?
19        A.  I don't recall.
20        Q.  And sitting here today, do you know if it was
21   something that didn't occur because it was scheduled to
22   occur in a subsequent Mavericks season?
23        A.  No.
24        Q.  You're not aware?
25        A.  This was never written into a contract.
```

Page 113

1              MR. KAYE:  Exhibit 70.

2              (Exhibit 70 was marked for identification.)

3    BY MR. KAYE:

4        Q.  You recognize this e-mail chain?

5        A.  I'm looking at it.  (Witness examines document.)

6            Yes, I do.

7        Q.  So starting at the bottom of page 1, Kyle is

8    asking you:  Should we wait to see what they come back and

9    see what the priority assets are?  Feel like we need some

10   flexibility in what programs we offer after we showed them

11   so many ideas.

12       A.  Uh-huh.

13       Q.  Do you know what that's referring to?

14       A.  I can't speak for Kyle, but I can speculate.

15       Q.  Okay.  What was your understanding of this when

16   you received it?

17       A.  My speculation on this is that there were a lot

18   of ideas in the document you just showed me that were,

19   quite frankly, not feasible for us to accomplish.  So what

20   Kyle was saying is, as we move forward in the discussions,

21   that we become more general in our explanation or

22   description of the assets in order to come to an agreement

23   that we can move forward with, but not be specific about

24   some of the examples that were -- were listed, because

25   they just weren't feasible or -- or realistic.

Page 114

1      Q.  So your response to his e-mail is that:  They

2  want to move to contract.  I think we should set

3  expectations on what we can do this year and mention the

4  rest as potential add-ons.  They will have to trust us

5  like ███████ did, but the contract is top priority.

6      A.  Correct.

7      Q.  What does that mean, "They have to trust us like

8  ████ did"?

9      A. ██████████████████████████████████████

██  ████████████████████████████████████████

██  ██████████████████████████████████████████

██  ████████████████████████████████████

██  ███████████████████████

14      Q.  Uh-huh.  So, like, additional ones could be added

15  in for Year 2, 3, 4; you'll have that discussion later

16  down the road?

17           MR. COOK:  Object to the form.

18  BY MR. KAYE:

19      Q.  Is that right?

20      A.  I mean, we were trying to get to a point where we

21  could write a contract that they were comfortable with

22  that we could sign.

23      Q.  That you could charge the highest price for?

24           MR. COOK:  Object to the form.

25           THE WITNESS:  Our objective is to drive as

Page 115

1    much revenue for the Mavericks as possible, and our goal

2    would be to sign the best deal that we can.

3    BY MR. KAYE:

4        Q.  Towards the top, you're saying to the team:  I

5    think we need to go higher than ████████ because, yes, we

6    do have to pay ████████ to Excel each year.  We didn't

7    really have time to play games with Excel as this one fell

8    in our lap and moved quickly, thus why we just need the

9    deal to be ██████.  And yes, we need to determine

10   categories ASAP.

11              So what do you mean, "We need the deal to be

12   ██████

13       A.  It refers to what I was talking about before, in

14   that we -- we just wouldn't be able to be as specific as

15   they would like about some of the ideas that they had.

16       Q.  Why'd you use the word ████████

17       A.  ████████████████████████████████████

██   ████████████████████████████

19       Q.  Was it fluffy like a Pomeranian that looks like

20   there's a lot there, and then when they get wet, there's

21   like -- it's just a little guy?

22              MR. COOK:  Object to the form.

23              THE WITNESS:  I mean, I guess you could say

24   that.

25              (Exhibit 38 was marked for identification.)

Page 116

```
 1   BY MR. KAYE:
 2        Q.  Show you what we previously marked as Exhibit 38.
 3              You recognize this e-mail chain?
 4        A.  I do.
 5        Q.  And you remember sending it to Mark and Cynthia?
 6        A.  I do.
 7        Q.  Then the last two pages of it is:  2021 Deal
 8   Sheet Summary.
 9              What's that?
10        A.  It's an internal way we allocate portions of a
11   deal into specific assets.
12        Q.  And is this an internal document, or is this
13   something that is shared with --
14        A.  Internal.
15        Q.  Okay.  And internally, what's the purpose for it?
16        A.  Tracks revenue against certain assets.  It helps
17   us execute the contracts, kind of a variety of things.
18        Q.  Uh-huh.  And if you look at page 5; has the Bates
19   number at the bottom ending in 15019, your September 19th
20   e-mail.
21              And it says:  Mark/Cynt, we are now on the
22   doorstep of a deal here with Voyager.  We have to
23   negotiate the final terms of Excel, but we could net
24   around ████████ annually if they add on the international
25   partnership.
```

Page 117

1          So at what point was the international

2   partnership added into the deal?

3          A.  I don't really recall, but it looks like it was

4   something we discussed around this date.

5          Q.  Was it something that the Mavericks proposed to

6   Voyager?

7          A.  I don't remember.

8              MR. KAYE:  Bless you.

9   BY MR. KAYE:

10         Q.  Were those conversations --

11             MR. KAYE:  Bless you.

12  BY MR. KAYE:

13         Q.  Were those conversations that you had with

14  Voyager?

15         A.  I don't recall.

16         Q.  ████████████████████████████████

██   █████████████████████████████████

██      ████████████████████████████████

██   ██████████████████████████████████████

██   ████████████████████████

██   ██  ████████████████████

██   ██  ███████████████████████████████

██   ████████████████  █████████████████

██   ███████  ██████████████████████████

██   ██████████████████████  ███████████

Page 118



1 ████████████████████████████████████████

█ ████████████████  ██████████████████

█ ██████████████████████████████████████

█ ███████████████████

█ █████████████████████████  ████████████

█ ██████████████████████████  ████████████

█ ████████████████████████████████████

█ ███████████████████

█ █████████████████████████████████

█ ███████████████████████████████████████

█ ███████████████████████████████████

12          MR. COOK:  Object to the form.

13          THE WITNESS:  So you're specifically asking

14    me about the assets that are listed in Exhibit 1, right?

15    BY MR. KAYE:

16       Q.  I'm asking you if your understanding -- or if you

17    relayed to Voyager during the negotiations that they

18    shouldn't expect to get everything that's outlined in the

19    deal?

20          MR. COOK:  Object to the form.

21          THE WITNESS:  I don't recall.

22    BY MR. KAYE:

23       Q.  At the top, you're forwarding to Mark and Cynthia

24    the internal deal sheet.  You say:  We have over ████████

█ █████████████████

Page 119



1        How do you determine that there's ████████

BY MR. KAYE:

12       Q.  Uh-huh.│ ████████████████████████████

15       A.  That's probably what I meant.

16       Q.  So on a five-year partnership, did Voyager

17  ███████████████  for this deal?

18            MR. COOK:  Object to the form.

19            THE WITNESS:  ███████████████████████

23  BY MR. KAYE:

24       Q.  Based on everything that's involved in that

25  partnership?

Page 120

1      A.  Correct.

2      Q.  All right.

3            MR. KAYE:  Let's do 38-A and B.

4            MR. BOIES:  This is 38-A; this is 38-B.

5            (Exhibit 38-A was marked for

6  identification.)

7            (Exhibit 38-B was marked for

8  identification.)

9  BY MR. KAYE:

10     Q.  The purpose of 38-A is -- it's the same e-mail

11  chain from 38, but it's showing the attachment that, it

12  looks like, you forwarded to Mark and Cynthia from Erika;

13  is that right?

14     A.  I'm assuming so, yes.

15     Q.  So 38-B, "Voyager + Dallas Mavericks," was this

16  something that resulted from the negotiations at that

17  stage with Voyager and the Mavericks?

18     A.  Yes.  We were starting to narrow down the

19  specifics of the deal.

20  ████ █████ ██████████████ █████

█ ████████████████████████████████

█ ███████████████████████████████████████

█ █████████████████████████████

█        ████████████

█    ███ ██████████████████████████

Page 121



10    BY MR. KAYE:

11        Q.  Right.

12

23                    MR. COOK:  Object to the form.

24                    THE WITNESS:  A lot more specific than that.

25    BY MR. KAYE:



Page 122

1     Q.  Like what?

2     A.  Well, we've never really executed one, so I

3 couldn't tell you.

4     Q.  What do you mean you never executed one?

17    Q.  And starting on page 2 --

18           MS. WOLKINSON:  Sorry.  What exhibit is

19 this?

20           MR. KAYE:  This is 38-B.

21 BY MR. KAYE:

Page 123

1          You remember a discussion of that as part of

2  the partnership?

3      A.  Yes.

4      Q.  Do you know about how many of those incentives

5  were deployed during the 2021-2022 season?

6      A.  I don't know specifically; one or two, I believe.

7      Q.  If you look at page 3, towards the center, now

8  we're talking about Year 2, and some of the assets to be

9  deployed in Year 2, right?

10     A.  It says "Year 2" here, yes.

11     Q.  ████████████████████████████████████████

   ████████████████████████████

13     A.  Is that a question?  Yes, ████████████████

   ██████████████████

15     Q.  Okay.  And it says: ████████████████████████

   ██████████████████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████████████    ████████████████

   ████████████████████████████████████████████

   ████████████████████████████████████████████

   ████████████████    ████████████████████████████████

   ████████████████████████████████████████████

   ████████████████████    ████████████████████████████████

   ████████████████████████████████████    ████████

   ████████████████████████████████████

Page 124

1          Do you remember all the negotiations about

2    this asset to be deployed in Year 2?

3               MR. COOK:  Object to the form.

4               THE WITNESS:  I don't remember, no.

5    BY MR. KAYE:

6        Q.  Do you know who from your team had more direct

7    discussions with Voyager about that asset?

8        A.  I don't recall.

9        Q.  Do you know who would?

10       A.  It could have been one of several people in our

11   group.

12       Q.  Such as?

13       A.  Billy, Patrick, Kory, Kyle, Clay.

14              MR. COOK:  Is this a good time to break for

15   lunch, Joey?

16              MR. KAYE:  Yeah, one more exhibit.

17              Do Exhibit 41.

18              (Exhibit 41 was marked for identification.)

19   BY MR. KAYE:

20       Q.  Do you recognize this e-mail chain?

21       A.  Yes.

22       Q.  So starting on page 4, towards the bottom,

23   September 23rd, you're e-mailing Erika Szychowski.  You

24   say:

1   ████████████████   ████████████████████████

██   ██████████████████████████████████████████████

██   ██████   ████████████

4             Do you remember that?

5        A.  Yes.

6        Q.  Do you remember having that discussion with

7   Mark Cuban?

8        A.  I don't.

9        Q.  Clearly, it happened, right?

10            MR. COOK:  Object to the form.

11   BY MR. KAYE:

12        Q.  And you wanted to make sure that he's good with

13   the ████████████████████?

14        A.  That -- the question is what?

15        Q.  You wanted to make sure that Mark was okay with

16   the ████████████████ that Voyager was asking for?

17            MR. COOK:  Object to the form.

18            THE WITNESS:  I was asking Erika to send a

19   summary of the ████████████ that they were looking for.

20   BY MR. KAYE:

21        Q.  To share with Mark and see if he was good with

22   it?

23        A.  I was just asking Erika to provide that

24   information so we could review it.

25        Q.  Okay.  Why don't you go one page back to page 3.



Page 126

1        A.  (Complies.)

2        Q.  So, there, you say: ███████████████

███████████████████████   ███████████████

████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████   █████████████████████████

████████████████████████████████████

██████████████████████████████████████

███████████████████████████   ████████████

████████████████████████████████████

██████████████████████   █████████

13       A.  Okay.

14       Q.  You remember that?

15       A.  I do.

16       Q.  Okay.  Okay.  So you were running these

17   ████████████████████  by Mark?

18       A.  I did, yes.

19       Q.  Okay.  And you wanted to make sure he was good

20   with it?

21       A.  Yes.

22       Q.  And his response to you is: ███████████████

████████████████████████   ███████████████

███████████████████   ████████████████████

25              And then you forwarded that to Kory, Kyle,

Page 127

1    and Clay saying:  Translation?

2              What about this did you not understand?

3              MR. COOK:  Object to the form.

4              THE WITNESS:  I'm sorry.  So what was the

5    question?

6    BY MR. KAYE:

7        Q.  So you were asking Kory, Kyle, and Clay for a

8    translation to Mark's e-mail.  And I'm assuming that's

9    because they were very close to the deal as well, right?

10       A.  I was probably seeking their input.  Appears that

11   I didn't understand what Mark was saying.

12       Q.  Okay.  Well, we're not going to read through all

13   of this, but at the top of the first page, Kyle is

14   responding to Kory and Clay, and expanding on his initial

15   response to your question.  And he's saying: ███████████

██   ███████████████████████████████████████████████

██   ██████████████████████████████  ████████████████

██   ████████████████████████████████  ████████████

██   ████████████████████████████████████████

██   ████████████████████████████████████

██   ███████

██           ██████████████

23             MR. COOK:  Object to the form.

24             THE WITNESS:  I don't know.

25   BY MR. KAYE:

Page 128

1      Q.  And what -- what does -- what does he mean that:

2      ███████████████████████████████████████████████

▮      ██████████

4              MR. COOK:  Object to the form.

5              THE WITNESS:  I don't know what Kyle's

6      thinking.

7      BY MR. KAYE:

8      Q.  Did you ask for any clarification?

9      A.  Sorry.  What was the question again?

10     Q.  Did you ask for any clarification on what he

11     meant by: ███████████████████████████████████████

▮      ████████████████████

▮      ████ ██████████████████████████████████████████████

▮      ████████████████████████████████████████████████

▮      ████████████████████████████████████████████

▮      ████████████████████████████████████████████████

▮      ████████████████████████████████████████████

18     Q.  And then he concludes:  ███████████████████████

▮      █████████████████████████████

20              I'm assuming because it's a ████████████████

21     right, as you guys discussed?

22              MR. COOK:  Object to the form.

23              THE WITNESS:  I'm sorry.  Rephrase the

24     question.

25     BY MR. KAYE:

Page 129

1    Q.  So he's -- I'm reading through his conclusion.

2    And he starts with: ███████████████████████████

███  ███████████████████████

4         And I was just saying to you, it's because,

5    as we've discussed, it was a ████████ at this point,

6    right?

7              MR. COOK:  Object to the form.

8    BY MR. KAYE:

9    Q.  So it made it a good deal from an asset

10   standpoint?

11             MR. COOK:  Same objection.

12             THE WITNESS:  Yes. ██████████████████

███  ████████████████████████████████

███  █████████████████████████████

15   BY MR. KAYE:

16   Q.  ██████   ██████████   ████████████████

███  ██████████████████████████████   █

███  ████████████████   █████████████████

███  ███████████████████████████████████

███  ███████

███  ████████   █████████████████████

███  ████████████████████████████████

███  ███████████████████████████████

███  ██████████████

25   A.  No.

1        Q.   Why not?

2        A.   ████████████████████████████

████  ████  ██████████████████████████████████

████  ████████████████

5        A.   Not in this circumstance, no.

6        Q.   Okay.  So what would you -- if you disagree with

7   Kyle, then how would you characterize this?

8                MR. COOK:  Object to the form.

9                THE WITNESS:  I just felt like the assets

10   and the -- the sponsorship were -- could stand on their

11   own merit.

12   BY MR. KAYE:

13       Q.   Okay.  And at this point, the end of September,

14   we saw about a month, month and a half, before this is

15   when Drew first reached out to you about Voyager coming to

16   you for a sponsorship deal, right?

17       A.   Correct.

18       Q.   And the first -- the opening game for the Mavs

19   season was October 28th?

20       A.   Somewhere about there.

21       Q.   Somewhere about there?

22                So, yeah, at this point there was only a

23   month left before the season.  You guys were pretty far

24   along in your negotiations, right?

25       A.   Correct.

Page 131

1              MR. KAYE:  We can break for lunch.  Great.

2              THE VIDEOGRAPHER:  Off the record, 12:35.

3              (Lunch break taken.)

4              THE VIDEOGRAPHER:  We are on the record.

5    The time is 1:29.

6              MR. KAYE:  So before we jump back into the

7    deposition, we just received over the lunch break a

8    production of about 1400 pages of documents.  We were

9    provided only about five or six pages of it at the start

10   of this deposition.

11             Is there anything you want to say on the

12   record about why that was done and why these weren't

13   previously produced?

14             MR. COOK:  No.

15             MR. KAYE:  And these are the only ones you

16   contend, from the 1400 pages of documents, are relevant to

17   the deposition today?

18             MR. COOK:  I'm not contending anything on

19   the record.  If you want to have conversion about the doc

20   production, we can go off the record and talk about it.

21             MR. KAYE:  I just want to make sure we have

22   your position before we get to the Court on this.

23             MR. COOK:  You don't have my position.  I'm

24   not doing it at the deposition.  If you want to talk off

25   the record, we can do that.  This is a deposition of

Page 132

1    Mr. Mackey, not of Mr. Cook.  So if you want to talk, we

2    can go off the record.

3              MR. KAYE:  Right.  It's a deposition where

4    we were repre- -- where it was represented to us that all

5    documents had been produced; the same as before the Cuban

6    deposition.  So if we're going to have to bring Mr. Cuban

7    back for another deposition, that's one conversation.  If

8    we want to avoid having Mr. Mackey come back again, we can

9    have that conversation as well.

10              We received five pages of 1400 documents, so

11   I'm just trying to figure out what the thinking was -- was

12   for that.

13              MR. COOK:  You have my position, Joey.

14              MR. KAYE:  You literally just said I don't

15   have your -- I don't have your position.

16              MR. COOK:  I'm happy to have a conversation

17   with you about the document production off the record.

18   This is a deposition of Mr. Mackey.  He's here; he's

19   available; you're free to question him.  If you want to

20   talk about documents --

21              MR. KAYE:  These are the only documents from

22   that production that include Mr. Mackey --

23              MR. KNIGHT:  Let's just take -- wait just --

24   a while ago -- let's just take a break.  We're going off

25   the record.  We should have done this before we got back

Page 133

1   from the lunch break, but let's step outside and have a

2   chat about it.

3                   THE VIDEOGRAPHER:  Off the record, 1:31.

4                   (Brief recess taken.)

5                   THE VIDEOGRAPHER:  We're on the record.  The

6   time is 1:35.

7   BY MR. KAYE:

8        Q.  Ryan, who's Collin Kim?

9        A.  Her name is Colleen.  She is in our PR

10  department.

11       Q.  Okay.  And what are -- what were her

12  responsibilities in connection with the Voyager/Mavericks

13  partnership?

14       A.  Sponsorship.  She was involved in the press

15  release creation and likely some of the press conference.

16  She's in our communications department.

17       Q.  Currently, as well as at the time?

18       A.  Currently, yeah.

19       Q.  When negotiating this agreement with Voyager, did

20  you have any questions or internal discussions regarding

21  the propriety of promoting a cryptocurrency platform like

22  Voyager?

23                   MR. COOK:  Object to the form.

24                   THE WITNESS:  I'm sorry.  Did I have any --

25  say that again, I'm sorry.

Page 134

BY MR. KAYE:

    Q.  Sure.  When negotiating this agreement with
Voyager, did you have any questions or internal
discussions regarding the propriety of promoting a
cryptocurrency platform like Voyager?

    A.  "Propriety," could you break that down and what
you mean.

    Q.  Sure.  Just whether it would break any rules?

    A.  No.

    Q.  It was never a concern on your end?

              MR. COOK:  Object to the form.

              THE WITNESS:  You're asking if --
following-up question?

BY MR. KAYE:

    Q.  Right.

    A.  No.

    Q.  And you were never party to any conversations
regarding the legality of promoting interest-bearing
cryptocurrency accounts, like the ones Voyager offers?

              MR. COOK:  Objection to the form.

              And in answering a question, you shouldn't
disclose or reveal any communications you've had with your
lawyers.

              THE WITNESS:  I can't disclose any
communications I had with my lawyers.

Page 135

1   BY MR. KAYE:

2       Q.  Did you have any communications that included

3   counsel from other firms, outside counsel, that did not

4   represent the Mavericks?

5       A.  I did.

6       Q.  Who?

7       A.  I don't remember his name -- David --

8   David Brill, maybe.

9       Q.  What were those conversations about?

10              MR. COOK:  Objection.  Instruct the witness

11  not to answer.

12              MR. KAYE:  On what basis?

13              MR. COOK:  I need to have a conversation

14  with my client to make sure I understand the scope of his

15  answer before I let him answer.

16              So why don't we step outside briefly.

17              MR. KAYE:  I'm not going to do that in the

18  middle of a line of questioning.

19              MR. COOK:  It's a privilege objection.  So

20  if you want me to let him answer --

21              MR. KAYE:  The question is whether he had

22  conversations with outside counsel --

23              MR. COOK:  I'm going to finish what I was

24  saying, and then you can interrupt me.

25              I'm going to let him talk to me and tell me

Page 136

1   what his answer would be and confirm it doesn't reveal any

2   attorney-client confidences.  If you'd rather not do that,

3   I'll just instruct him not to answer, and you can move on.

4   It's your choice.

5                    MR. KAYE:  We can let you coach the witness.

6                    MR. COOK:  Okay.

7                    MR. KAYE:  You want to take a break, tell

8   him what to say?

9                    MR. COOK:  Are you suggesting I'm going out

10  to coach the witness?  Because if that's the case, we're

11  leaving.  Is that what you're suggesting I'm going to do?

12                   MR. KAYE:  Want to take a few minutes to go

13  talk to him?

14                   MR. COOK:  To talk to my client?  Yes.

15                   MR. KAYE:  Sure.

16                   THE VIDEOGRAPHER:  Off the record, 1:40.

17                   (Brief recess taken.)

18                   THE VIDEOGRAPHER:  We are on the record.

19  The time is 1:45.

20  BY MR. KAYE:

21      Q.  You're ready to answer the question, Ryan?

22                   MR. COOK:  Can we have it read back?

23  BY MR. KAYE:

24      Q.  What were those conversations about with

25  David Brill?

Page 137

1              MR. COOK:  In answering that question, you

2      can do so without revealing any attorney-client

3      communications.

4              THE WITNESS:  Okay.

5              I -- I wasn't -- these were e-mails that I

6      happened to be copied on.

7      BY MR. KAYE:

8          Q.  Were there any calls that you were on, phone

9      calls with David Brill and anyone else from Voyager, about

10     these issues?

11         A.  Not that I recall.

12             MR. COOK:  And same instruction for this

13     line of questioning.

14             THE WITNESS:  Okay.

15     BY MR. KAYE:

16         Q.  Okay.  And these e-mails that you're referring

17     to, what were they about?

18         A.  I don't recall.

19             MR. KAYE:  Do all of the 72 but start with

20     just 72.

21             (Exhibit 72 was marked for identification.)

22     BY MR. KAYE:

23         Q.  Is this one of the e-mails that you were

24     referring to?

25         A.  Yes.

Page 138

1      Q.  Okay.  And it indicates here that these were

2   follow-up questions from the NBA regarding Voyager's

3   business.  Do you know when that conversation with the NBA

4   occurred?

5      A.  I do not.

6      Q.  Were you a party to that conversation?

7      A.  I was not.

8      Q.  Did it happen through e-mails?

9            MR. COOK:  Object to the form.

10           THE WITNESS:  No.

11  BY MR. KAYE:

12     Q.  You don't recall being cc'd on any e-mails?

13     A.  From the NBA?

14     Q.  With the NBA regarding these issues?

15     A.  No.

16     Q.  ███████████████████████████████████████

   ████████████████████████████████████████████

   █████████████████████████████████████████████

   ██████████████████

20           Do you know anything about that?

21     A.  No.

22     Q.  Did you understand the issues that were being

23  discussed in this e-mail?

24     ████ ████████████████████████████████████████

   ████████████████████████████████████████████████

███████████████████████████

███████████████████████████

████  ████████████████████

4        Q.   Okay.  And your position is without any

5   involvement from you?

6        A.   Correct.

7             MR. COOK:  Object to the form.

8   BY MR. KAYE:

9        Q.   You go down to the bottom of this e-mail chain

10   that starts with David Brill -- it's on the first page --

11   addressing an e-mail to Sekou and Ryan:  Good to meet you

12   both via e-mail.

13             Why is he addressing it to both of you?

14             MR. COOK:  Object to the form.

15             THE WITNESS:  Because I was the one who

16   forwarded this e-mail to Voyager for them to complete the

17   questionnaire.

18   BY MR. KAYE:

19        Q.   Forwarded what e-mail?

20        A.   There was a -- the NBA Questionnaire that needed

21   to be completed, and so I communicated that to Voyager.

22        Q.   And how did you get the NBA Questionnaire?

23        A.   I don't recall.

24        Q.   Is it something you just had internally, or did

25   you get it from the NBA?

Page 140

1      A.  I don't recall.  It -- it was not a -- but to

2  clarify, it was not an internal document.

3      Q.  Meaning, it came from the NBA, not -- it's not a

4  Mavs internal document; is that what you're saying?

5      A.  Yeah.  It didn't come from the Mavs.

6      Q.  The question is:  Did you receive it from the NBA

7  to give to Voyager?

8      A.  I, likely, received it from Sekou.

9      Q.  And he asked you to forward it to --

10             MR. BEST:  Objection.

11  BY MR. KAYE:

12     Q.  -- Voyager?

13             MR. BEST:  I'm going to -- I'm going to

14  instruct him not to answer that question.  You're asking

15  him to divulge an attorney-client conversation.  If you

16  can rephrase --

17             MR. KAYE:  What's privileged about that?

18             MR. BEST:  If you can rephrase it, try.

19  BY MR. KAYE:

20     Q.  Were you instructed by Sekou to send the

21  document?

22     A.  I don't recall.

23     Q.  Do you know anything about the Coinbase Lend

24  program that was cancelled?

25     A.  Not really.

Page 141

1      Q.  And at this time, you had no idea why the
2  question was being asked?
3      A.  Again, it wasn't really my jurisdiction to get
4  involved in this discussion.
5                  MR. KAYE:  72-B.
6                  (Exhibit 72-B was marked for
7  identification.)
8  BY MR. KAYE:
9      Q.  You remember this e-mail?
10     A.  Yes.
11     Q.  This is Erika -- that's Erika from Voyager,
12  right?
13     A.  Yes.
14     Q.  -- and she is saying:  Ryan has confirmed that
15  Sekou has more insight.  Can we get on a call?
16              You remember that conversation?
17     A.  No, I don't.
18     Q.  Would that conversation have been through e-mail
19  or over the phone?
20     A.  Conversation?  What conversation are you
21  referring to?
22     Q.  Confirming that Sekou has more insight?
23     A.  So you're referring to a conversation that I had
24  with Sekou?
25     Q.  With Erika.

Page 142

1          A.  I don't recall.

2          Q.  Did you ever review the responses received to

3     these questions from David Brill?

4          A.  I don't recall.

5                    MR. KAYE:  72-A.

6                    (Exhibit 72-A was marked for

7     identification.)

8     BY MR. KAYE:

9          Q.  So this is the same e-mail chain, and the top

10    indicates it was pulled from your Outlook and you're cc'd

11    on it?

12         A.  Uh-huh.

13         Q.  And this includes all of David Brill's responses

14    to the questions from the NBA.

15                    Did you ever review this?

16         A.  I didn't read this.

17         Q.  You didn't think it was important at all for the

18    partnership agreement you were entering into with Voyager?

19                    MR. COOK:  Object to the form.

20                    THE WITNESS:  I -- I had nothing to do with

21    this particular matter, so I felt it was appropriate for

22    Sekou to handle it.

23    BY MR. KAYE:

24         Q.  So you just relied on him completely?

25         A.  Yes.

Page 143

1        Q.  Would it have been important for you to know, as
2    the main negotiator of the Voyager partnership, whether
3    the accounts that were being offered were in violation of
4    any SEC rules?
5                MR. COOK:  Object to the form of the
6    question.
7                THE WITNESS:  Can you repeat the question?
8    BY MR. KAYE:
9        Q.  Sure.
10               Would it have been important for you to
11   know, as the main negotiator of the Voyager agreement,
12   whether the accounts that were being offered by Voyager
13   were in violation of any SEC rules or regulations?
14               MR. COOK:  Object to the form of the
15   question.
16               THE WITNESS:  I relied on Sekou to handle
17   this part of the discussion, and I was -- I would take
18   direction from him as to how to move forward.
19   BY MR. KAYE:
20       Q.  And, ultimately, the agreement was entered into?
21       A.  Yes.
22       Q.  You remember signing the NDA in this case?
23       A.  I don't.
24       Q.  Do you remember why you needed to sign an NDA in
25   this case?

Page 144

1        A.  I don't.

2              MR. COOK:  Object to the form.

3    BY MR. KAYE:

4        Q.  Other than David Brill, do you remember any other

5    outside counsel from Voyager that you may have had or been

6    cc'd on any conversations with?

7              MR. COOK:  Object to the form.

8              THE WITNESS:  No.

9              MR. KAYE:  Exhibit 74.

10             (Exhibit 74 was marked for identification.)

11   BY MR. KAYE:

12       Q.  You remember this e-mail conversation?

13       A.  I do.

14       Q.  Okay.  And you know that the date is

15   October 25th, late in the afternoon, right?

16       A.  I see that, yes.

17       Q.  And the press conference announcing the

18   international integrated partnership with the Mavericks

19   and Voyager was October 27th, 2021.  Do you remember that?

20       A.  Yes.

21       Q.  Okay.  Now, you sent this to Anthony Ronca and

22   Cassidy Rooke.  And I believe you testified before that

23   they are with the TMBO and the NBA?

24       A.  Correct.

25       Q.  Okay.  What did you mean when you said:  We're

Page 145

1    having some trouble getting our contract done.  Are either

2    of you available to talk about this?

3        A.  I'm speculating here, but I believe I was

4    interested in letting them know that there was some

5    urgency around this particular contract, that I was

6    hopeful the NBA was aware of.

7        Q.  The "urgency" being this day and a half before

8    the press conference?

9        A.  Correct.

10       Q.  And the NBA hadn't approved it yet?

11       A.  To my knowledge.

12       Q.  Okay.  Did you have a call with them?

13       A.  I don't remember.

14       Q.  Is there any reason why you separately went to

15   Anthony and Cassidy directly without cc'ing anyone else

16   from the Mavs team?

17       A.  I mean, they were just our -- my contacts at the

18   NBA.  And like I said, I wanted to make sure they are

19   aware that there was urgency involved in this particular

20   deal.  In my experience in the past, they may not always

21   be aware of that.

22       Q.  And is this the first time that you spoke with

23   Anthony and Cassidy about the Voyager deal?

24       A.  I don't recall.  I don't believe so.

25       Q.  Okay.  You think -- and so this wasn't the only

Page 146

1   time, either, you spoke with them about the deal prior to

2   it being entered?

3        A.  "Spoke with," I don't believe I spoke with them.

4        Q.  E-mailed?

5        A.  I don't recall specifically, but I believe that I

6   did make them aware that this deal was potentially going

7   to happen.

8        Q.  Are you saying towards the beginning of the

9   negotiations, back in, like, September?

10       A.  Somewhere in between.

11       Q.  Do you know who Chad Warpula is?

12       A.  No.

13       Q.  How about Billy Baucom?

14       A.  No.

15       Q.  Brian Nistler?

16       A.  No.

17       Q.  You recognize this e-mail chain, a being part of

18  it?

19       A.  Yes.

20       Q.  Okay.  At the bottom -- well, top of page 2,

21  Erika is e-mailing saying:  @Ryan Mackey, can you advise

22  when you will have the answers on the business side as

23  discussed on the call?

24            Do you know what she's referring to?

25       A.  No, I do not.

Page 147

1          Q.  If you look on the bottom of page -- no, strike

2     that.

3                    MR. KAYE:  Give me 75-A.

4                    (Exhibit 75 was marked for identification.)

5                    (Exhibit 75-A was marked for

6     identification.)

7     BY MR. KAYE:

8          Q.  So this is the red line of the agreement that was

9     attached to the e-mail we just discussed that Nicole Leach

10    transmitted to Voyager.

11                    Have you ever seen this one before?

12         A.  There were a lot of versions of the contract.  I

13    probably did, but...

14         Q.  Did you have any direct role in reviewing or

15    approving any of these red-lines?

16         A.  To the extent they pertained to the sponsorship,

17    I would have had some input.

18         Q.  When you say "pertained to the sponsorship," do

19    you mean the assets that were being included in, like, the

20    exhibits and so forth?

21         A.  Yes.

22         Q.  Okay.  You see on page 7 --

23         A.  Page 7 of the contract or page 7 of this

24    document?

25         Q.  They are the -- they are the same.

Page 148

1      A.  Oh, they are?

2      Q.  Yeah.

3      A.  Oh, yeah.



15             Do you know what that means?

16     A.  I do.

17     Q.  What does that mean?

18     A.

20     Q.  Meaning, it could be sent out to the whole

21  nation?

22             MR. COOK:  Object to the form.

23  BY MR. KAYE:

24     Q.  Right?

25     A.  No.  Can you clarify that question?

Page 149

1     Q.  Says they: ███████████████████████████

██  ████████████████████████████████████████████████

██  ███████████████████████████

4     A.  Would you like me to clarify that?

5     Q.  ████████████████████████████████████████

██  ████████████████████████████████████████

██  █████████

8          MR. COOK:  Wait for a question.

9          THE WITNESS:  Okay.

10   BY MR. KAYE:

11    Q.  I said "right?"

12         MR. COOK:  I don't understand the question.

13   Maybe we can have it read back and it'll be more clear.

14   BY MR. KAYE:

15   ██  ████████████████████████████████████████

██  █████████████████████████████████████

██  ████████████████████████  ████████████████████

██  █████████████████████████████████████████

██  ███████████████████████

██  ████  ██████

██  ████  ████████

██  █████████████████████████████████████████

██  ██████████████████████████████████████

██  ████████████████████████

25         MR. COOK:  Object to the form.

1          THE WITNESS:  What that means is that needs

2     to follow the inter- -- NBA's international team marketing

3     program guidelines, which are more nuanced than how that

4     reads.

5     BY MR. KAYE:

6          Q.  And that's your nonlegal interpretation, right?

7          A.  No.  It's just my interpretation of the

8     international team marketing program.

9          Q.  Right.  I'm saying you're not aware, right?

10         A.  No, but I understand the international team

11    marking program.

12    ██    ██████    ████████████████████████████████

██  ████████████████████████████

14         A.  I don't recall.

15              MR. KAYE:  Let's do 76.

16              (Exhibit 76 was marked for identification.)

17    BY MR. KAYE:

18         Q.  You remember this e-mail chain?

19         A.  Yes.

20         Q.  Okay.  Starting on page 3, in the center -- and

21    this is Erika to you, Erika from Voyager:  ██████████████

██  ████████████████████████████████████████████

██  ██████████████████████████████████████

██  ████████████████████████████████████████████

██  ████████████████████████████████████████████

1   █████████████████████████████████████████

2        A.  What's your question?

3        Q.  Do you recall having that conversation?

4        A.  I don't recall having a conversation.

5        Q.  Okay.  That's fine.

6             Who, ultimately, gave the go-ahead for this

7   deal to go forward?

8             MR. COOK:  Object to the form.

9             THE WITNESS:  I'm sorry.  Can you -- "who,

10  ultimately, gave the go-ahead"?

11  BY MR. KAYE:

12       Q.  Right.  Who had the final say on whether the

13  Voyager/Mavs deal could go forward from the Mavericks?

14       A.  I recall that I received word from Sekou that we

15  could move forward with the contract.

16       Q.  On whose instruction?

17            MR. COOK:  Object to the form.

18            THE WITNESS:  I don't recall.

19  BY MR. KAYE:

20       Q.  Who's Marcia Steinberg?

21       A.  She is a NBA representative.

22       Q.  And what's her position with the NBA?

23       A.  She's also in TMBO.

24       Q.  And what's her position in relation to Anthony

25  Ronca and Cassidy Rooke?

Page 152

1        MR. COOK:  Object to the form.

2        THE WITNESS:  I don't know specifically.  I

3   just know that she works at the NBA as a team

4   representative.

5        MR. KAYE:  Let's do Exhibit 150.

6        (Exhibit 150 was marked for identification.)

7        (Exhibit 150-A was marked for

8   identification.)

9   BY MR. KAYE:

10       Q.  Do you recall this e-mail chain?

11       A.  I'd like to read it.

12       Q.  Sure.

13       A.  (Witness examines document.)  Okay.

14       Q.  So first off, bottom of page 2 and going into

15   page 3, October 27th, again, was the day of the press

16   conference?

17       A.  Correct.

18       Q.  Are you aware that the agreement with Voyager

19   wasn't officially signed until October 29th?

20       A.  I don't recall specifically, but -- yeah, I don't

21   recall specifically.

22       Q.  Do you know why it was signed two days

23   afterwards?

24       A.  No.

25       Q.  If you look on page 3, this is Sekou e-mailing

Page 153

1    you and Ron -- you and Kyle:  Mark said it was okay to go

2    forward with the deal.

3                Do you know why he's telling you that Mark

4    told you it was okay to go forward with the deal?

5         A.  You have to ask Sekou.

6         Q.  Talking about your comments in the response to

7    Erika on the first page.  So you made the two comments,

8    and here was the response -- first off, who -- who

9    responded to your comments?

10        A.  I don't remember.

11        Q.  Do -- does reading the comments and the responses

12   refresh your recollection at all:  We wish to remain

13   silent on this topic listing tokens in the rules.  Not

14   sure what that means?

15        A.  I don't.

16        Q.  ████████████████████████████████████████

     ███████████████████████████████████████████████████████

     ███████████████████████████████████████    ████████████

     ███████████████████████████████████████████████

20        A.  I do not --

21        Q.  "Nicole" being Nicole Leach?

22                MR. COOK:  Wait for a question.

23   BY MR. KAYE:

24        Q.  The question was:  Would Nicole be Nicole Leach?

25        A.  It's very likely.

1    Q.  So is it likely these comments are coming from

2   Sekou?

3    A.  I don't know.  This appears to be cut-and-pasted

4   from a document that I had made comments on, and I

5   don't -- I mean, I -- I don't recall exactly what this is

6   in reference to.

7            MR. KAYE:  150-A.

8   BY MR. KAYE:

9    Q.  I was just curious about this, because on

10  November 7th, 2022, so well over a year after this

11  original e-mail was sent, you re-forwarded it to yourself.

12            Do you remember why you did that?

13   A.  No.

14   Q.  Do you have any idea?  It's a specific e-mail.

15            MR. COOK:  Object to the form.

16            THE WITNESS:  I forward a lot of e-mails to

17  myself.

18  BY MR. KAYE:

19   Q.  Sitting here today, you don't know why forwarding

20  the e-mail of Mark saying it's okay to go forward with the

21  deal, in November, just a couple months ago, why you would

22  be forwarding that to yourself?

23            MR. COOK:  Object to the form.

24            THE WITNESS:  I would say I -- I e-mail -- I

25  send a lot of e-mails back to myself, so I couldn't answer

Page 155

1    that.

2    BY MR. KAYE:

3        Q.  Okay.  So after -- so this is all October 27th.

4    But on October 27th was the date of the press conference.

5            Do you remember -- do you remember any

6    discussions that you had or were involved with about the

7    response that was received by the general public from the

8    press announcement of the international partnership with

9    Voyager and the Mavericks?

10           MR. COOK:  Object to the form.

11           THE WITNESS:  I don't recall.

12           MR. KAYE:  Exhibit 207.

13           (Exhibit 207 was marked for identification.)

14   BY MR. KAYE:

15       Q.  I'm going to show you Exhibit 207.

16           MR. COOK:  Thank you.

17   BY MR. KAYE:

18       Q.  How was Ketchum involved in all of this?

19       A.  Ketchum is a PR agency hired by Voyager.

20       Q.  Specifically for the announcement of the

21   partnership?

22       A.  I don't know.

23       Q.  What was their involvement here?

24           MR. COOK:  Object to the form.

25           THE WITNESS:  I'd have to read this.

Page 156

1              (Witness examines document.)

2    BY MR. KAYE:

3        Q.  Let me ask it differently:  Did you have any

4    direct conversations with Ketchum coordinating anything

5    with the press conference?

6        A.  I did not.

7        Q.  Would that be Colleen Kim?

8              MR. COOK:  Object to the form.

9              THE WITNESS:  I couldn't tell you if it was

10   her specifically.

11   BY MR. KAYE:

12       Q.  Here, it discusses, in this e-mail that you're

13   on, that Stephen Ehrlich was going to be going on Fox

14   Business to discuss the partnership.

15       A.  I'm sorry.  Where is that?

16       Q.  That's on -- it's on the first page in the --

17       A.  Oh, okay.

18       Q.  -- first paragraph.

19              Are you aware that the press conference

20   received a significant amount of national press?

21              MR. COOK:  Object to the form.

22              THE WITNESS:  I'm aware that it received

23   coverage.  I don't know that I can answer that it was

24   significant.

25   BY MR. KAYE:

1  Q.  Is that something that you would be responsible

2 for knowing in your dealings with your partners or

3 sponsors as the relationship goes forward, to give them

4 updates on the types of press that you're able to get for

5 them?

6     MR. COOK:  Object to the form.

7     THE WITNESS:  Not really.

8 BY MR. KAYE:

9  Q.  No?

10  A.  (Witness shakes head negatively.)

11     MR. COOK:  Same objection.

12 BY MR. KAYE:

13  Q.  Brand awareness, media exposure, those aren't

14 parts of doing business with the Mavericks?

15  A.  So the day-to-day results or, you know, data that

16 comes from sponsorship doesn't necessarily get into my

17 day-to-day dealings.  That's -- our representatives that

18 are on this -- or that were on this would spend more time

19 on that than me.

20  Q.  Okay.  Do you ever review the partnerships with

21 the partners on an annual basis?

22  A.  Sometimes.

23  Q.  Sometimes?  In what sense?

24     MR. COOK:  Object to the form.

25     THE WITNESS:  In what sense do I review the

Page 158

1    results; is that what you're asking?

2    BY MR. KAYE:

3        Q.  With -- with the partners, yeah.

4        A.  If I'm involved in the conversation, I may be

5    privy to that.

6        Q.  Is a recap deck something that you would normally

7    produce for your partners?

8                    MR. COOK:  Object to the form.

9                    THE WITNESS:  Me personally?

10   BY MR. KAYE:

11       Q.  Your team.

12       A.  Most often.

13       Q.  And what's the purpose of the recap deck?

14       A.  To show the execution of the contract and the --

15   essentially, the proof of performance.

16       Q.  So showing them that they're getting their

17   money's worth?

18       A.  Is that a question?

19       Q.  Essentially, right?

20                   MR. COOK:  Wait.

21                   THE WITNESS:  We show them what --

22                   MR. COOK:  Wait.  Wait.

23                   MR. KAYE:  You can let him finish.

24                   MR. COOK:  I didn't hear the question.

25   BY MR. KAYE:

Page 159

```
 1        Q.  The question was:  Essentially, showing that

 2   they're getting their money's worth?

 3              MR. COOK:  If you understand, you can

 4   answer.

 5              THE WITNESS:  We would show them that the

 6   assets in their contract were executed by the Mavericks,

 7   both in copy and in visuals.

 8              (Exhibit 85 was marked for identification.)

 9              (Exhibit 85-A was marked for

10   identification.)

11   BY MR. KAYE:

12        Q.  I'm going to show you Exhibits 85 and 85-A.

13              MR. BOIES:  This is 85, and this is 85-A.

14   BY MR. KAYE:

15        Q.  First off, why are you asking Spencer -- why are

16   you asking Spencer Santora, in October of 2022, for a copy

17   of the recap deck from Voyager for the 2021-2022 season?

18        A.  I don't recall.

19        Q.  Were you still actively servicing the Voyager

20   account at this time, October 2022?

21        A.  No.

22        Q.  Was there any reason that you were requested to

23   obtain this deck, that you can recall?

24              MR. COOK:  Object to the form.

25              THE WITNESS:  October of '22, I don't
```

Page 160

1    recall.

2    BY MR. KAYE:

3         Q.  Okay.  So if you can skip to the end of it and

4    then go back -- one, two, three, four, five, six -- about

5    15 pages or so to the page that says:  2022 NBA playoffs.

6         A.  Okay.

7         Q.  You said before, ████████  you used for the

8    national metrics on press outreach?

9         A.  No.

10        Q.  What do you use ██████for?

11        A.  ████████████████████████████

     ██████████████████████  ████████████████████

     ██████████████████

14        Q.  Visible in the arena from TV?

15        A.  Yes.

16        Q.  Okay.

17        A.  Also within the arena.

18        Q.  And the playoffs are nationally televised?

19        A.  Yes.

20        Q.  And the playoffs would have been in April or May

21   of 2022?

22        A.  Thereabouts.

23        Q.  If we could go just through some of these pages

24   afterwards that shows -- was it the 360 -- the 360 degree

25   signage?

Page 161

1       A.  Uh-huh.

2       Q.  So this is that -- these -- these are the home

3   games for the Mavericks playoff games that were nationally

4   televised?

5               MR. COOK:  Object to the form.

6               THE WITNESS:  I'm assuming so.

7   BY MR. KAYE:

8       Q.  If you skip forward to the page that says, █████

█   █████████████████████████████████████████

10      A.  I must have missed it.  Okay.

11      Q.  █████████████████████████████████████████████

█   ████████████████████████████████████████████

█   ██████████████████████████████

█   ████  █████████████████████████

15      Q.  And what does this media equivalency figure

16  that's there, what's that mean?

17      A.  It's a metric that ████████ uses to measure

18  signage.

19      Q.  So if you can start from the beginning and go to

20  page 11.

21      ████  ████████████████████████████

█   ████  ██████████████████████████████

█   ████  ██████

█   ████  █████████████████████████████████████  ██████████████

█   ████  █████████



Page 162

18   BY MR. KAYE:

19       Q.  Kind of like a pat on the back for getting them

20   that coverage?

21               MR. COOK:  Object to the form.

22               THE WITNESS:  (No response.)

23   BY MR. KAYE:

24       Q.  If you go ahead another eight pages, there's

25

Page 163

1      A.  Okay.

2      Q.  Do you see that?

3      A.  I do.

4      ██  █████  ██████████████████████████

█  █████████████████████████████████████████

█  ██████

7      A.  Correct.

8      Q.  --  ██████████████████████████████

█  ███████████████  ████████████████████████

█  ███████████████████████████████████

█  █████████████████████████████████████

█  ███████████████████████████████████

13            First, is Mavs social media -- is that

14   limited to any particular state, or is it just on social

15   media open to everyone?

16      A.  No.  That's just geofenced to our 150-mile

17   radius.

18      Q.  Okay.  What about the fact that it's picked up by

19   media outlets and receiving all these on-line and TV

20   impressions?

21            MR. COOK:  Object to the form.  There's no

22   question.

23   BY MR. KAYE:

24      Q.  Is that geofenced?

25            MR. COOK:  Is what geofenced?

Page 164

1          THE WITNESS:  Is what geofenced?

2    BY MR. KAYE:

3        Q.   ████████████████████████████████████

     █████████████████████████████████████████████

     ██████████████████████████████████

6          MR. COOK:  Wait for a question.

7          THE WITNESS:  What's the question?

8          MR. KAYE:  It's a clarification, dude.

9    Like --

10         MR. COOK:  First of all, Joey, I'm not --

11   BY MR. KAYE.

12       Q.   ████████████████████████ --

13         MR. COOK:  -- I'm not dude.

14   BY MR. KAYE:

15       Q.   ██████████████████████████████████

     █████████████████████████████████████████████

     ████████████████████████████████████████

     ██████████████████████

19         MR. COOK:  Object to the form.

20         MR. BEST:  Let's avoid "dude" too, please.

21         THE WITNESS:  I -- I still don't really

22   understand the question.

23   BY MR. KAYE:

24       Q.   When the Mavs put something on their social

25   media, it can be shared, right?

Page 165

```
 1              MR. COOK:  Object to the form.

 2              THE WITNESS:  Yes.

 3  BY MR. KAYE:

 4      Q.  By anybody?

 5              MR. COOK:  Object to the form.

 6              THE WITNESS:  Anyone on the platforms.

 7  BY MR. KAYE:

 8      Q.  Uh-huh.  And if a Mavs post on social media,

 9  you're saying that if I went on the Mavs Instagram account

10  right now, from Florida, I wouldn't be able to see

11  something that's posted on there?

12              MR. COOK:  Object to the form.

13              THE WITNESS:  So what's your question?

14  BY MR. KAYE:

15      Q.  If I, from the state of Florida, went on

16  Instagram and accessed the Mavs Instagram account, you're

17  telling me that I wouldn't be able to see any of the Mavs

18  social media posts?

19              MR. COOK:  Object to the form.

20              THE WITNESS:  As it pertains to -- to answer

21  your question:  I don't know; I'm not in Florida.

22  BY MR. KAYE:

23      Q.  In your experience with the Mavs social media

24  platforms, which, as we saw before, is Facebook,

25  Instagram, Twitter, when the Mavs post something on any of
```

Page 166

1   those three platforms, is it just posted generally on the

2   platform?

3          MR. COOK:  Same objection.

4          THE WITNESS:  Yes, it's posted on the

5   platform.

6   BY MR. KAYE:

7      Q.  So anybody who uses the platform can see it?

8          MR. COOK:  Object to the form.

9          THE WITNESS:  I couldn't tell you that.  I

10   don't know who can see it and who can't.

11   BY MR. KAYE:

12      Q.  Is the Mavs social media -- are the Mavs social

13   media accounts public accounts?

14      A.  Yes.

15      Q.  They're not private where people who request to

16   follow need to be approved to follow?

17      A.  Yes, you do need to follow.  I don't know if

18   they'd need to be approved, but you do need to follow.

19      Q.  Right.

20          Like a personal Instagram account, you can

21   click "Follow" sometimes, and it says "Requested," and you

22   have to wait to be added?

23      A.  Right.

24      Q.  That's not a function of the Mavs social media --

25      A.  No.

Page 167

1          Q.  -- you can just follow?

2          A.  Correct.

3          Q.  And, again, are there Mavs fans outside of the

4     state of Texas?

5                    MR. COOK:  Object to the form.

6                    THE WITNESS:  I'm assuming there are, yeah.

7                    MR. BEST:  I'm in DC.

8                    THE WITNESS:  One Mavs fan right there.

9                    MR. KAYE:  Let's take a five-minute break.

10                   THE VIDEOGRAPHER:  Off the record, 2:33.

11                   (Brief recess taken.)

12                   THE VIDEOGRAPHER:  We are on the record.

13    The time is 2:49.

14                   MR. KAYE:  Let's do Exhibit 161.

15                   (Exhibit 161 was marked for identification.)

16    BY MR. KAYE:

17         Q.  So you are on this e-mail chain on the second

18    page, and my question is:  Voyager is asking for these

19    certain metrics, unique visitors during those dates, what

20    you would consider your audience size to be, and your Mavs

21    fan base size.

22                   Did you ever provide that information to

23    Voyager?

24         A.  I'm sorry.  I'm going to read this real quick.

25         Q.  Sure.

1    A.  (Witness examines document.)  Okay.  I'm sorry.
2  The question was?

3    Q.  The metrics that they're asking for, unique
4  visitors to the Mavs site during those dates, what you
5  would consider your audience size to be, your Mavs fan
6  base size, did you provide all those metrics to Voyager?

7    A.  It looks like we did in the e-mail on Wednesday,
8  November 10th.

9    Q.  So this is for the Mavs site.  I'm saying -- I'm
10  asking about the other metrics that are in there:  The
11  Mavs fan base size, talking about the social media
12  platforms.  Are you aware of whether those metrics were
13  ever provided to Voyager?

14    A.  Not that I'm aware of.

15    Q.  Is that something that the Mavericks are able to
16  track?

17    A.  Specifically, I'm sorry, the question was, were
18  we able to track what?

19    Q.  The fan base size.

20    A.  We wouldn't be able to track that, no.

21    Q.  Is that something you rely on third-party vendors
22  to obtain metrics for?

23    A.  Well, as it pertains to our fan base, that would
24  be something that we would get from ▮▮▮▮▮▮▮▮  That
25  comes on an annual basis when we do subscribe to it.  So,

Page 169

```
 1    no, that's not something we could pull from something like

 2    this.

 3         Q.  You'd have to request it from ██████████

 4         A.  Correct.

 5         Q.  Are there any other companies that you use for,

 6    say, like, social media, search-engine optimization, any

 7    of those metrics?

 8              MR. COOK:  Object to the form.

 9              THE WITNESS:  I'm not really familiar with

10    any of those agencies.  I don't work in that, sort of,

11    side of the business.

12    BY MR. KAYE:

13         Q.  Is that a -- that's a different department within

14    the Mavericks?

15         A.  Correct.

16         Q.  Okay.  What's that department called?

17         A.  We have a digital media department.

18         Q.  Who had -- who was the head of that department in

19    -- during the 2021-2022 season?

20         A.  That was likely Erin Finegold.

21         Q.  Erin Fine- -- Erin Finegold?

22         A.  Uh-huh.

23         Q.  Is that Erin Finegold White?

24         A.  Yes.

25         Q.  Okay.
```

Page 170

```
 1              MR. KAYE:  All right.  Let's do Exhibit 9.
 2              MR. BOIES:  9?
 3              MR. KAYE:  Yeah.
 4              (Off-record discussion.)
 5              MR. KAYE:  And 53-A for after.
 6  BY MR. KAYE:
 7     Q.  So there's a number of these that you're cc'd on.
 8  So Kyle would send sales reports or marketing reports to
 9  Mark Cuban?
10     A.  Correct.
11     Q.  And the redaction that's in there, we've been
12  advised, is because these reports are as to any of the
13  partnerships that are active.  Are you aware of that?
14     A.  No.
15              MR. COOK:  Object to the form.
16  BY MR. KAYE:
17     Q.  Do you ever see or review the weekly sales
18  reports that are sent on a weekly basis by Kyle Tapply to
19  Mark Cuban?
20     A.  I do.
21     Q.  Okay.  And they discuss partnerships other than
22  the Voyager partnership?
23     A.  All of our sales are UpSend reports, and, yes,
24  the intention is to discuss all of the activity that we
25  have in our -- in our world.
```

Page 171

```
 1          Q.  And they send them all to Mark Cuban?

 2          A.  Not everybody does.

 3          Q.  Why does Kyle?

 4          A.  Some of the reps that have been around for a long

 5     time, that was common practice for us to send reports to

 6     Mark.  As we hired some new people, they didn't

 7     necessarily send them to Mark.

 8          Q.  Okay.

 9                    MR. KAYE:  53-A.

10                    (Exhibit 53-A was marked for

11     identification.)

12     BY MR. KAYE:

13          Q.  The reason why these are together is it's the

14     same weekly sales report that Kyle sent.  There's just a

15     different discussion above it.  And you're -- let me know

16     when you've had a chance to read it.

17          A.  (Witness examines document.)  Okay.  I read it.

18          Q.  Okay.  So you don't have to say, because it's

19     redacted, but I'm pretty sure this is ██████ which is

20     the company.  Are you aware who ██████ is?

21                    MR. COOK:  Object to the form.

22                    THE WITNESS:  No.

23     BY MR. KAYE:

24          Q.  You're not involved in the potential negotiations

25     with ██████      ██████████████████████
```

```
1   [REDACTED]

2              MR. COOK:  Object to the form.

3              THE WITNESS:  Doesn't ring a bell.  I mean,

4   do they go by another name?

5   BY MR. KAYE:

6       Q.  I mean, I think they changed to, like, [REDACTED] or

7   something like that.

8       A.  Okay.  I'm familiar with them.

9       Q.  Okay.  So, here, Mark is expressing a lot of

10  skepticism about doing a partnership with this company,

11  right; he wants to do some due diligence first?

12      A.  Sponsorship with this company.

13      Q.  Right.

14              But he's expressing skepticism and wants to

15  do his due diligence first?

16              MR. COOK:  Object to the form.

17              THE WITNESS:  He is offering his opinion on

18  this particular company.

19  BY MR. KAYE:

20      Q.  Uh-huh.  And he's saying here, specifically:  I

21  will not meet with them under any circumstances, nor will

22  we do all the stuff that FC Dallas is doing.

23              That's you guys' soccer team?

24      A.  Uh-huh.

25      Q.  "I don't want to get caught up doing community
```

Page 173

1    stuff and have them turn out to be a messed up company in

2    some way.  But, if they want to buy ads and promote

3    themselves in a straightforward deal for advertising,

4    that's fine."

5                      Is that the general approach to these

6    partnerships, versus advertising?

7                      MR. COOK:  Object to the form.

8                      THE WITNESS:  I really have no idea what

9    Mark was thinking when he said -- when he wrote that.

10   BY MR. KAYE:

11       Q.  And here, it looks like he is -- he's the one

12   that will decide if it goes to the partnership route or

13   the straight advertising route where it will take some

14   money to run some ads?

15                      MR. COOK:  Object to the form.

16   BY MR. KAYE:

17       Q.  Is that the standard practice?

18                      MR. COOK:  Object to the form.

19                      THE WITNESS:  I wouldn't say that's standard

20   practice.

21   BY MR. KAYE:

22       Q.  So in your 23 years of experience working with

23   Mark, right, does it err more on the side of this

24   skepticism or the guns-a-blazing, let's go with Voyager?

25                      MR. COOK:  Wait.  What is the "it" here?

1    BY MR. KAYE:

2        Q.  Does -- Mark's decision-making whether to go the

3    partnership route or the straight advertising route, does

4    it err on the skeptical side, like we're seeing here with

5    what I assume to be ████████, or is it more so:  The

6    guns-a-blazing, let's go all out as fast as we can with

7    Voyager?

8                MR. COOK:  Object to the form.

9                THE WITNESS:  I can't really answer that

10   question.  I mean, that's a -- you're asking me to

11   differentiate from one side to the other.

12   BY MR. KAYE:

13       Q.  Right.  In your personal experience after

14   23 years of working with him.

15               MR. COOK:  Same objection.

16               THE WITNESS:  Most of the time, this is

17   never discussed.

18   BY MR. KAYE:

19       Q.  What's "this"?

20       A.  You just referenced two different scenarios.

21   Most of the time, those scenarios aren't discussed, so...

22       Q.  Are potential partnerships that want --

23       A.  Sponsorships.

24       Q.  -- companies that want to receive pitches, is

25   that something generally you and your sales team discuss

Page 175

1   with Mark and Cynthia?

2               MR. COOK:  Object to the form.

3               THE WITNESS:  Generally, no.

4   BY MR. KAYE:

5       Q.  So if you receive a lead from Drew over at Excel,

6   is that something you would normally bring to Mark and

7   say:  What do you think --

8       A.  No.

9       Q.  -- if you think it has legs?

10      A.  No.

11      Q.  So what -- under what circumstances do you make

12  that decision?

13      A.  It's many circumstances.

14      Q.  Well, describe some of them.  What are some of

15  the driving factors?

16      A.  I mean, there's so many to name, and they can be

17  nuances in so many different ways.  I -- I guess I can't

18  really differentiate between them without an exact

19  scenario.

20      Q.  Well, we have two here we've been discussing,

21  Voyager and the scenario that's on the e-mail in front of

22  you.

23              MR. COOK:  Object to the form.

24  BY MR. KAYE:

25      Q.  Question is simply:  In your personal experience

Page 176

1    of over 23 years of working with Mark, which side of him

2    do you see more often, the "we'll take a few dollars for

3    some ads" or "let's go guns a-blazing for a partnership"?

4                    MR. COOK:  Object to the form of the

5    question.

6                    THE WITNESS:  Mark simply offered his

7    opinion on this particular company.  In general, we talk

8    to a lot of different companies all the time, so I would

9    say that it's really hard to answer.  I mean, I can't say

10   that there's any differentiating factor that would have

11   Mark get involved in a deal.  It's really up to him as far

12   as his opinion goes.

13   BY MR. KAYE:

14       Q.  Okay.

15                   MR. KAYE:  Let's do 79 and 80.

16                   MR. BOIES:  And here's 80.

17                   (Tenders documents to witness.)

18                   (Exhibit 79 was marked for identification.)

19                   (Exhibit 80 was marked for identification.)

20   BY MR. KAYE:

21       Q.  Starting on 79 -- if you want to start at the

22   bottom of the e-mail chain, it's on -- it's on the

23   second-to-last page, but it cuts off.  It's on the

24   third -- the third and second-to-last pages.

25                   You see the October 29th e-mail from Erika?

1      A.  Okay.  Yes, I do.

2      Q.  Okay.  So, here, she is referencing:  Once we

3  have a fully executed agreement, we will wire the first

4  half of the funds.  She is asking for wiring instructions.

5  So as of October 29th, at 8:00 p.m. local time, there was

6  still no fully executed agreement between Voyager and the

7  Mavericks.

8              MR. COOK:  Object to the form.

9              THE WITNESS:  I don't recall.

10  BY MR. KAYE:

11      Q.  Is there any reason to doubt the authenticity of

12  this e-mail that's saying just that?

13              MR. COOK:  Object to the form.

14              THE WITNESS:  No.

15  BY MR. KAYE:

16      Q.  Is it common for things like nationwide press

17  conferences and hundred-thousand-dollar promotions to

18  happen at games before you have an agreement fully inked?

19              MR. COOK:  Object to the form.

20              THE WITNESS:  It's common to begin a

21  sponsorship prior to having a contract retained.

22  BY MR. KAYE:

23      Q.  I'm sorry.  I didn't catch the end of that.

24      A.  It's common to begin a sponsorship without having

25  a fully executed agreement.

Page 178

1        Q.  What do you mean by "begin a sponsorship"?

2        A.  Start executing assets.

3        Q.  Okay.  And going up a page, this is just a

4    confirmation that November 2nd was when the first

5    ███████████Voyager sent to the Mavericks?

6        A.  No.  I'm sorry.  You're saying -- specifically,

7    what page are you on, the first page?

8        Q.  No, no.  It was -- it was up a page from where we

9    are at.

10       A.  Okay.

11       Q.  So it was the page that has number 13230 on the

12   bottom left-hand side.

13       A.  Okay.  Got it.

14       Q.  Okay.  You see:  Wire for ███████████ has been

15   sent, with, like, a confirmation number?

16       A.  Okay.  Yes.

17       Q.  And that came from Evan Psaropoulos at Voyager?

18            MR. COOK:  Object to the form.

19            THE WITNESS:  Correct.

20   BY MR. KAYE:

21       Q.  And if you just look real quick at Exhibit 80,

22   which was the other document.

23       A.  Okay.

24       Q.  Who is Jana Fleming?

25       A.  She is in our accounts receivable department.

1      Q.  What's her position?

2      A.  I don't know her title, but she is in accounts

3   receivable.

4      Q.  Do you know about how long she has been with the

5   Mavericks?

6      A.  20 years.

7      Q.  And this e-mail is just her confirming to you

8   that in -- December 15th, 2021, they received a second

9   ███████ payment from the Mavericks?

10     A.  Correct.

11     Q.  Are you aware of any other payments that were

12  received by the Mavericks from Voyager pursuant to this

13  partnership agreement?

14     A.  No.

15            MR. COOK:  Object to the form.

16  BY MR. KAYE:

17     Q.  You know if the Mavericks have made any claims in

18  the Voyager bankruptcy stating the amounts that they are

19  still owed?

20     A.  I'm not aware.

21     Q.  So Exhibits 81 and 81-A, this is just an e-mail

22  with its attachment, so the two travel together.

23     A.  Okay.

24            (Exhibit 81 was marked for identification.)

25            (Exhibit 81-A was marked for

Page 180

1   identification.)

2   BY MR. KAYE:

3       Q.  First off, on the second page of 81, there's a

4   big chunk that's redacted.  Do you have any idea why?

5       A.  I do not.

6       Q.  Okay.  This was -- I guess you were bcc'd on it,

7   because you're sending an e-mail forwarding around, but

8   you're not on the e-mail below it.

9           But what -- what's the TPD content update?

10      A.  So an e-mail from the NBA that provides updates

11  within our -- within our industry, and I received this

12  just like other team does.

13      Q.  And it says:  Please watch the other two videos

14  from Chris and Tony.  That's you talking to your team.

15          What were the last two videos?

16      A.  I have no idea.

17      Q.  Okay.  And on 81-A, I just want to clarify.  So

18  this is a Dallas Mavericks team partnerships revenue

19  report midseason 2021 to 2022.

20          There's a bunch here that's redacted, but

21  would this report be specific to the Mavericks, or is this

22  talking about partnerships with all of the league teams?

23          MR. COOK:  Object to the form.

24          THE WITNESS:  This -- which report are you

25  talking about.

Page 181

```
 1  BY MR. KAYE:
 2      Q.  First report.  Because it has "Dallas Mavericks"
 3  at the top.  Was this report specifically for the
 4  Mavericks to review midseason?
 5      A.  This particular report is, yes.
 6      Q.  Okay.  And does it include a mix of revenue
 7  reported from just what the Mavericks have brought in, or
 8  does it also have just the NBA generally, all of the
 9  league teams?
10      A.  No, I mean, this report just specifies our
11  revenue as a -- as a sponsorship department, and then it
12  shows comparisons to other teams as to how we rank in
13  certain areas.
14      Q.  Okay.  So on page 3 where it shows "Accounts,"
15  and the one part that's not redacted is:  "Top Team Sold
16  Accounts by Revenue."  Is that the top team accounts sold
17  for every team, or is this just within the Mavericks?
18      A.  This is just the Mavericks.
19      Q.  So Voyager is the ███████████████████████
    ██  ██████████████████████████ new one for that season?
21      A.  Yes.
22              MR. KAYE:  Okay.  Let's do --
23  BY MR. KAYE:
24      Q.  When did you first become aware that Voyager
25  declared bankruptcy?
```

Page 182

1          A.  I don't recall.

2          Q.  Do you recall how you became aware?

3          A.  I don't.

4               MR. KAYE:  Let's do 82.

5               (Exhibit 82 was marked for identification.)

6    BY MR. KAYE:

7          Q.  Up until the time that you became aware --

8    because you, ultimately, became aware that Voyager had

9    filed for bankruptcy -- were there any major issues or

10   breaches of the agreement from Voyager's end?

11              MR. COOK:  Object to the form.

12              THE WITNESS:  Not that I recall.

13   BY MR. KAYE:

14         Q.  Okay.  And there were no complaints about the

15   Mavericks execution of the agreement or implementation up

16   until that point?

17         A.  No.

18         Q.  So there was --

19         A.  Not that I'm aware of.

20         Q.  It was overall a good deal?

21         A.  As far as --

22              MR. COOK:  Object to the form.

23              THE WITNESS:  As far as I understood, yes.

24   BY MR. KAYE:

25         Q.  Okay.  So this Exhibit 82.

Page 183

1          At the bottom of the first page, you have

2    Anthony Ronca e-mailing you and Patrick Sorenson saying:

3    Saw the ask to remove all Voyager assets from 2KL signage.

4    I've, of course, seen the news, so figured I'd just check

5    in on the status, put together some backup documents for

6    our senior leadership team on the current landscape and

7    just want to confirm I have the latest.

8          And Patrick asked you:  Do you want me to

9    respond?  And you responded:  Did Voyager request this?

10        A.  Correct.

11        Q.  What did you mean by that; you weren't sure if it

12   was Voyager that said call off the signage?

13        A.  Correct.

14        Q.  Did you ever find out who made the ask?

15        A.  I don't remember.

16        Q.  Is that -- is that something you would normally

17   do if that decision was made?

18        A.  No.

19        Q.  Who, on the Mavericks side, would be the one to

20   make that call?

21        A.  Oh, you -- you were asking me is that something I

22   would do or make the call?

23        Q.  Yeah, to do -- when I say "make the call," would

24   you ask for removal of the Voyager signage?

25        A.  I got you.

Page 184

1          I would probably confer with Cynt on

2     something like this.

3          Q.  Okay.  And would she be the one to reach out to

4     you and say:  Hey, they just declared bankruptcy; do

5     something about this?

6               MR. COOK:  Object to the form.

7               THE WITNESS:  Potentially.

8     BY MR. KAYE:

9          Q.  But at this point --

10         A.  I'm sorry.

11         Q.  I'm sorry.

12              At this point, you had no knowledge of what

13    was going on?

14              MR. COOK:  Object to the form.

15              THE WITNESS:  I don't -- I -- I think I do

16    at this point.

17    BY MR. KAYE:

18         Q.  Does it refresh your recollection at all as to

19    about when or how you learned of the bankruptcy?

20         A.  It doesn't.

21         Q.  Okay.  Did you learn before this that they had

22    declared bankruptcy?

23         A.  I don't know for sure.

24         Q.  So the date that Voyager declared bankruptcy was

25    immediately after the July 4th weekend.

Page 185

1           Would it have taken longer than a week for

2    you to be made aware of that?

3                MR. COOK:  Object to the form.

4                THE WITNESS:  Again, I can't say exactly

5    when I found out.

6                (Exhibit 83 was marked for identification.)

7    BY MR. KAYE:

8        Q.  All right.  So showing you Exhibit 83 -- so this

9    is your response that came about an hour and a half or so

10   from your previous internal e-mails with Patrick.

11               You say:  Hey, Anthony.  Yes, we're pausing

12   most of their stuff for now until the situation is

13   resolved.  They believe they can emerge from this and keep

14   our deal alive, but it may change in scope or size and

15   even a brand name change afterwards.  That's if they

16   manage to survive.  We're going to wait it out.  If you

17   need anything else, give me a call.

18               Do you remember sending that?

19       A.  I do.

20       Q.  Do you remember any conversations that occurred

21   in that hour and a half from getting the e-mail from

22   Patrick and sending this response to Anthony?

23       A.  I don't.

24       Q.  You don't remember who you spoke to?

25       A.  Can I read this again?

Page 186

1          Q.  Yeah.

2          A.  (Witness examines document.)  Okay.  So this

3     was -- this was actually the next day, right?  Okay.

4     No --

5          Q.  No, no, you're --

6          A.  All right.

7          Q.  -- his response was the next day.

8          A.  The next day, okay.

9               I don't recall if there was a conversation

10    about this.

11         Q.  So the largest new partnership that you were

12    directly responsible for bringing in, negotiating, getting

13    it executed, getting it implemented, it blows up, Voyager

14    declares bankruptcy, and you don't remember any

15    conversations that you had about it at this time?

16               MR. COOK:  Object to the form.

17               THE WITNESS:  Not specifically to this time

18    period, no.

19    BY MR. KAYE:

20         Q.  Do you remember any conversations that you had

21    about what steps you were going to take after Voyager

22    declared bankruptcy?

23         A.  Okay.  So I -- at some point, I spoke to Erika

24    and was given her feedback on the situation.  And at that

25    point, I decided or spoke to our team about what we would

1   do moving forward.  At this stage, there wasn't a lot that

2   we could do.  The Mavs season had passed, and so at this

3   point, we were close to the end of our season with the --

4   the 2K League season.

5       Q.  When does the 2K season run again?

6       A.  It's in the summer.  I don't know exactly when it

7   ends.

8       Q.  Okay.  Had you done any activations for Mavs

9   gaming from the 2K League after the Mavericks NBA season

10  ended and up until the bankruptcy?

11      A.  Yes, because the NBA 2K League had begun at

12  that -- at that point.

13      Q.  Uh-huh.  And Voyager was on the jerseys for the

14  NBA 2K League?

15      A.  Yes.

16      Q.  At what point was that removed?  Was it

17  midseason, or did you finish the season out with it?

18      A.  I think we finished the season.

19      Q.  Was the gaming center renamed at that point?

20      A.  No.

21      Q.  What held that up?

22      A.  As far as -- can you be more specific?

23      Q.  Yeah.  We went through some documents before

24  referencing the renaming and the naming rights.  What held

25  up the fact that you never settled on a name, or did you

Page 188

1    settle on a name?

2        A.  At some point during that year, the building was

3    set to be sold and repurposed, and so we called Voyager

4    and told them that the ability to sponsor that asset was

5    no longer available.

6        Q.  About when was that?

7        A.  I don't remember.

8        Q.  Was it before the 2K season?

9        A.  I'm pretty sure.

10       Q.  I'm showing you Exhibit 84.

11       A.  Okay.

12           (Exhibit 84 was marked for identification.)

13   BY MR. KAYE:

14       Q.  What is Anthony talking about when he talks about

15   court-side protections?

16       A.  ████████████████████████████████

████  ████████████████████████████████████

████  ████████████████████████████████ ████████

████  ██████████████████████████████████████

████  ████████████████████████████ ██████████

████  ████████████████████████████████████

████  ██████████████████████

████  ████ ██████ ████████████████████████████

████  ██████████████████

████  ████ ████████████

Page 189

1      Q.  And did you have any discussions about this with

2  anybody?

3      A.  I don't recall.

4      Q.  Sorry?

5      A.  I don't recall.

6      Q.  Okay.  And were there nationally televised games

7  where these sponsors were included, like ████, on the

8  jerseys and Voyager?

9              MR. COOK:  Object to the form.

10             THE WITNESS:  You'd have to rephrase that.

11 Are there any -- you can say it again.

12 BY MR. KAYE:

13     Q.  Were there nationally televised games where these

14 sponsors were included, like ████, on the jerseys or

15 Voyager and signage, or any other assets?

16             MR. COOK:  Object to the form.

17             THE WITNESS:  In the '22-23 season?

18 BY MR. KAYE:

19     Q.  '21-22.  We know the playoffs.  I'm talking about

20 other nationally televised games.

21     A.  Okay.  So in the playoffs, to clarify that, the

22 -- the same rules apply in the playoffs, so the league

23 takes over all of those TV-visible assets in all playoff

24 home games.  As it pertains to '21-22, ████ still

25 receives -- received their logo on the jersey patch;

Page 190

1   American Airlines was still the naming rights of the

2   arena, therefore, it still said "American Airlines Center"

3   on the court, but those were the only two that were

4   visible during national games.

5        Q.  You remember the -- any conversations you had

6   about whether you were going to retain court-side

7   protections?

8        A.  I don't recall specifically.

9        Q.  And as far as any of the rights that Voyager was

10  given pursuant to their sponsorship agreement, if there

11  are any marks or social media posts that the Mavs put out,

12  there's nothing preventing Voyager from re-sharing any of

13  those materials?

14              MR. COOK:  Object to the form.

15              THE WITNESS:  Can you rephrase -- or repeat

16  the question?

17  BY MR. KAYE:

18       Q.  Sure.

19              So for any broadcast, posts, any televised

20  events that the Mavericks are a part of, to the extent

21  they're posted on-line or posted on social media, Voyager,

22  under the agreement, is able to share those materials?

23              MR. COOK:  Object to the form.

24              THE WITNESS:  Can you break that question

25  up?  Because you mentioned media and things like that.

Page 191

BY MR. KAYE:

    Q.  I would say, to the extent that there's any that are posted on-line, we'll start there.

    A.  Okay.  Keep going.

    Q.  Okay.  Voyager is able to share those materials?

    A.  To some extent, yes.

    Q.  And social media posts, they can re-Tweet, re-share, re-distribute?

    A.  There's specific rules around that that the league doesn't allow.

    Q.  And is that related to the international rights?

    A.  No.

    Q.  What are you referring to?

    A.  Game footage is not allowed to be reposted, for example.

    Q.  By any partners?

    A.  Correct.

    Q.  And where is that set out?

            MR. COOK:  What do you mean, where in the contract?

            MR. KAYE:  Right.

            MR. COOK:  Object to the form.

            If you know, you can answer.

            THE WITNESS:  Be more specific, please.

BY MR. KAYE:

Page 192

1      Q.  If you're referencing rules, where are the rules

2  set out?

3      A.  ██████████████████████████████████

   ████████████████████      ███████████████████

   █████████████████████████████████████████████

   ██████████████████████████████████████

   ████████   ██████████████████████

8      Q.  Uh-huh.  Like when they're implementing

9  international partnerships that have -- that was a change

10 to the rules, right?

11             MR. COOK:  Object to the form.

12             THE WITNESS:  That was -- wouldn't

13 necessarily say it was a change to the rules.  It was an

14 additional marketing opportunity that was provided by the

15 league.

16 BY MR. KAYE:

17     Q.  Uh-huh.  Shifting gears for a second.  Did you

18 ever have a Voyager account?

19     A.  Yes.

20     Q.  When did you sign up for Voyager?

21     A.  I don't remember specifically.

22     Q.  Was that your first experience with having a

23 crypto account?

24     A.  Yes, it was.

25     Q.  Okay.  Was it before or after this partnership?

Page 193

```
 1              MR. COOK:  Object to the form.
 2              THE WITNESS:  I don't recall specifically.
 3   I may have opened it beforehand, but I don't think I
 4   actively used it until afterwards.
 5   BY MR. KAYE:
 6       Q.  Uh-huh.  Did you use it up until the platform
 7   shut down?
 8       A.  I still have it.
 9       Q.  I don't care about specific amounts or anything.
10   But it was -- you had money on it or assets when it was
11   shut down?
12       A.  Correct.
13       Q.  Aside from having that account, do you have any
14   other experience with trading in crypto, or any knowledge
15   about cryptocurrency, that you thought was pertinent to
16   being able to take part in these negotiations and
17   implementing this partnership with Voyager?
18              MR. COOK:  Object to the form.
19              THE WITNESS:  I read certain things, but,
20   no, I wasn't fully versed in it.
21   BY MR. KAYE:
22       Q.  Did you rely on any of your team members for any
23   crypto knowledge?
24       A.  I don't recall.
25              THE WITNESS:  Mind if we take a break after
```

                                                        Page 194

1    this?

2                    MR. KAYE:  Yeah.  We can take it now if you

3    want.

4                    THE WITNESS:  Okay.  Great.

5                    THE VIDEOGRAPHER:  Off the record, 3:33.

6                    (Brief recess taken.)

7                    THE VIDEOGRAPHER:  We are on the record.

8    The time is 4:03.

9    BY MR. KAYE:

10       Q.  So we've discussed, overall, that aside from

11   Voyager going under, that this was a -- a good

12   partnership; it was a good deal on both sides, right?  At

13   a general level for the 2021-2022 season, do you consider

14   it a success as far as your partnerships generally go?

15                   MR. COOK:  Object to the form.

16                   THE WITNESS:  It was a successful

17   Sponsorship Agreement.

18   BY MR. KAYE:

19       Q.  And was the launch of the partnership a

20   successful launch?

21       A.  You're asking my opinion?

22       Q.  Starting with your opinion.

23                   MR. COOK:  Object to the form.

24                   THE WITNESS:  It seemed to be, yes.

25   BY MR. KAYE:

```
 1          Q.  Okay.  Did you ever receive any metrics or other
 2    information as to the success of the launch on either the
 3    Voyager side or the Mavericks side?
 4          A.  I was copied on some e-mails about it.
 5          Q.  What aspect of it?
 6               MR. COOK:  Object to the form.
 7               THE WITNESS:  Some of the metrics that were
 8    -- were compiled, anecdotally, Voyager, Erika seemed
 9    pleased.
10    BY MR. KAYE:
11          Q.  So the metric you're referring to is like the --
12    the reach of the broadcast and the media of the launch,
13    like the specific press conference and just the -- the
14    coverage that you were able to get?
15               MR. COOK:  Object to the form.
16               THE WITNESS:  The general sense from Voyager
17    is that they were pleased.  There were no metrics promised
18    or expectations made prior to.  And according to Erika,
19    she seemed happy with it.
20    BY MR. KAYE:
21          Q.  And one of the objectives of the partnership was
22    to ███████████████████████████████████, right?
23          A.  One of the objectives of the -- I'm sorry.  Can
24    you repeat that?
25          Q.  Sure.
```

Page 196

▮▮▮▮▮▮▮▮

8          A.  Yes.

9                    MR. KAYE:  Let's go to Exhibit 51.

10                   MR. BOIES:  Of course.

11                   (Exhibit 51 was marked for identification.)

12    BY MR. KAYE:

13         Q.  Have you seen this document before?

14         A.  Yes.

15         Q.  And it looks like what Kyle is telling you,

16    right, is that since the Voyager partnership with the

17    Mavericks launched, that the Voyager market cap grew by

18    $800 million; is that right?

19         A.  That's what he wrote.

20         Q.  Okay.  Do you know where he got that information?

21         A.  I don't.

22         Q.  Did you ask?

23         A.  I did not.

24         Q.  Did you follow up on that at all?

25         A.  I'm sorry.  Can you repeat that?

Page 197

1      Q.  Did you follow up on that at all?

2      A.  I don't recall.

3      Q.  All right.  Showing you Exhibit 86.

4           (Exhibit 86 was marked for identification.)

5   BY MR. KAYE:

6      Q.  If you want to take a second and read through

7   that, let me know when you're ready.

8      A.  Okay.  (Witness examines document.)  Ready.

9      Q.  You -- you read the whole thing?

10     A.  Well, I read the -- I've already read the other

11  part from the first time -- the last exhibit you gave me,

12  so yeah.

13     Q.  Okay.  So go to page 3.

14     A.  (Complies.)

15     Q.  So at the top of page 3, you're talking to

16  Anthony Ronca and Cassidy Rooke, August 8th, 2022, so a

17  little over a month after Voyager declared bankruptcy.

18  And you asked:  ██████████████████████████████

    ██  ██████  █████████████████████████████  ██████████

    ██  ████████████████████████████

21            What did you mean by that?

22     A.  ████████████████████████████████████████████

    ██  █████████████████████████████████████████

    ██  ████████████████

25     Q.  Okay.  And what were you hoping to know more of

Page 198

1    by the end of the month?

2        A.    ███████████████████████████

███████████████████████████████████████████

███████████████████████████████   ██████████

███████████████████████████████████████████

███████████████████████████████████████

███████████

8        Q.    Okay.  And if you go -- if you go up to the next

9    page, page 2 -- well, first, Cassidy, at the top of

10   page 3:    ██████████████████    ████████████████

██████   ████████████████████████████████████████

████████████████████   ████████████████████

13            And on page 2, your response is:  Thanks,

14   Cassidy.  We're hopeful Voyager will come out of this,

15   perhaps even through a buyout.  We also have a few deals

16   in play.  American and ██████are solid, though.

17            So at this stage, you guys were -- "you

18   guys" being the Mavs -- were still hopeful that you could

19   continue the partnership with Voyager?

20            MR. COOK:  Object to form.

21            THE WITNESS:  Potentially.  As I read this

22   further, I also -- the category didn't, necessarily, have

23   to be a cryptocurrency.  The category could have been

24   another category completely different.  █████████████

████████████████████████████████████████████████

Page 199

BY MR. KAYE:

9      Q.  Okay.  All right.  So, then, on page 1 -- well,

10   we're still -- still on page 2 for a second.

11              She wants to follow up, and so on

12   August 11th, at 10:00 in the morning, you are saying:  We

13   were out all day in a company meeting, but I'll have this

14   for you at 10:00 a.m. Central.

15              Did that meeting have anything to do with

16   the discussion around court-side protections?

17      A.  I don't recall.

18      Q.

22      Q.  Okay.  Who would you normally speak to about that

23   kind of stuff?

24      A.  Billy, Patrick, some of my other team members.

25      Q.  Okay.  So all downstream from your chain of

Page 200

1   command?

2      A.  Correct.

3      Q.  Okay.  When it came time to make the decision,

4   did you make the decision?

5      A.  Yes.

6      Q.  Okay.  Did you check it with Cynthia?

7      A.  No.

8      Q.  Did you check it with Mark?

9      A.  No.

10      Q.  Did you check it with Erika or anybody at

11  Voyager?

12      A.  No.

13      Q.  Okay.  What made you make that decision?

14      A.  █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

18      Q.  Okay.  But then on page 1, the next day, you

19  followed up, and you said:  Hey, Cassidy, so sorry.  ██

██████████████████████████████████████████

███    ████████████████

22         So who are you debating with?

23      A.  I don't recall exactly.

24      Q.  Do you recall for certain that it wasn't Mark?

25         MR. COOK:  Object to form.

Page 201

1              THE WITNESS:  Yes.

2    BY MR. KAYE:

3        Q.  Do you recall for certain that it wasn't Cynthia?

4        A.  Yes.

5        Q.  Do you recall for certain that it wasn't Erika at

6    Voyager?

7        A.  Yes.

8        Q.  Do you recall for certain that it wasn't Sekou?

9        A.  Yes.

10       Q.  Okay.  So you don't recall, but the universe of

11   people, based on your current recollection, is any of the

12   five individuals below you that we've been discussing,

13   right; Patrick, Billy, Kory, Clay or Kyle?

14       A.  Some others.  Our other sales reps as well.

15       Q.  Which other sales reps did you have on the deal?

16       A.  Well, not on this deal, but as it pertains to the

17   category protection, ████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████

20       Q.  Okay.  So, ult- -- ultimately, you were the

21   decision-maker, 100 percent?

22       A.  Yes.

23       Q.  Okay.  Did you lose faith in Voyager?

24              MR. COOK:  Object to form.

25              THE WITNESS:  Can you be more specific about

Case 1:22-cv-22538-RKA   Document 155-34 *SEALED* on Ent. on FLSD Docket 06/09/2023
Case 1:22-cv-22538-RKA   Document 155-34   Entered on FLSD Docket 06/09/2023   Page 203 of 375
Page 204 of 375

Page 202

1    that?

2    BY MR. KAYE:

3        Q.  Yeah.  So you guys were debating:  Do we keep

4    Voyager in or not?  And you decided no.

5             The question is:  Did you lose faith in

6    Voyager, their ability to continue as a -- an ongoing

7    concern?

8        A.  I didn't feel it was necessary to protect Voyager

9    at that time, no.

10       Q.  Okay.  And just a broader question, because you

11   said before that the sponsorship agreement, the

12   partnership agreement, we're talking about the same

13   document, that dictates the outer limits of what the

14   Mavericks were required to do as part of the Voyager

15   partnership; is that right?

16       A.  The Sponsorship Agreement dictates the assets

17   that we would deliver, yes.

18       Q.  ███████    ███████████████████████████

     ██  ███████████████████████████████████████████████

     ██  █████████████████████████

     ██               █████████████████████

     ██        ███  ██████

23       Q.  Okay.  If the Sponsorship Agreement does say

24   something to that effect, you're just mistaken, and the

25   agreement, obviously, controls?

Page 203

```
1          A.  If the Sponsorship Agreement states that, then
2     I'm mistaken.
3          Q.  Okay.  Let's do -- and I'm still not clear.  At
4     what point did you become aware that the NBA had approved
5     the Sponsorship Agreement to go forward?
6                    MR. COOK:  Object to the form.
7                    THE WITNESS:  I don't recall.
8                    MR. KAYE:  All right.  Let's do 3442, so
9     Exhibit --
10                    MR. BOIES:  -- 93.
11                    MR. KAYE:  All right.
12                    (Exhibit 93 was marked for identification.
13     BY MR. KAYE:
14          Q.  Show you what we have marked as Exhibit 93.
15                    Who is Alex Arellano?
16          A.  He is the general counsel for American Airlines
17     Center.
18          Q.  And he's saying:  Ryan, congrats on Voyager deal.
19     Interesting platform.
20                    And that was October 27th at 2:43 p.m.  You
21     see that?
22          A.  I do.
23          Q.  And your response, October 29th, it says 5:50
24     p.m., but that's Greenwich Mean Time, so come back six
25     hours for Central Time; we're at 11:50 a.m.
```

Page 204

1           You respond:  Thanks, man.  It was, still

2    is, a legal nightmare getting the contract done.  Still

3    not quite there.

4           Do you recall sending that?

5       A.  Yeah.

6       Q.  Why was it a "legal nightmare"?

7       A.  Because the contract wasn't an easy process.

8       Q.  And at almost noon on the 29th, it's -- still

9    weren't quite there with getting it done?

10              MR. COOK:  Object to form.

11              THE WITNESS:  As far as I was aware at the

12    moment.

13    BY MR. KAYE:

14       Q.  Do you remember what was holding it up?

15       A.  Not specifically.

16              MR. KAYE:  All right.  Let's do -- let's do

17    92.

18              (Exhibit 92 was marked for identification.)

19              (Off-record discussion.)

20    BY MR. KAYE:

21       Q.  Now, just in reference to the prior exhibit, you

22    say that:  It's a legal nightmare to get the deal done.

23    And what are -- what are some examples of the kinds of

24    things that you would consider a legal nightmare to try

25    and close a deal?

Page 205

1           MR. COOK:  Object to form.

2           THE WITNESS:  Generally, anything that is

3   impeding the progress of signing a deal.

4   BY MR. KAYE:

5       Q.  And do you regularly encounter legal nightmares?

6       A.  Yes, I do.

7       Q.  As part of the contract-negotiating process?

8       A.  Yes.

9       Q.  Okay.  Now, when it says "nightmare" in that

10  e-mail, is that suggesting outside forces to the contract

11  process, or just negotiating between the parties?

12      A.  So you're asking in the legal process, it's one

13  or the other?

14      Q.  Well, your -- your reference to it being a legal

15  nightmare, is it that negotiations between the Mavericks

16  and Voyager were holding up finalizing the deal, or was

17  there still waiting for NBA approval, or waiting for some

18  other outside issue?

19      A.  All of the above can come into play.  It's

20  just -- generally, getting a signed contract is the

21  ultimate goal.

22      Q.  Okay.  Looking at that e-mail that you sent at

23  around noon to general counsel at American Airlines Center

24  saying it was:  A legal nightmare and we're still not

25  quite there yet, does that refresh your recollection as to

```
                                                        Page 206

 1   whether NBA approval had been received for the deal?

 2        A.  No.

 3        Q.  Do you know if NBA approval was obtained at that

 4   time for the deal?

 5        A.  I don't know.

 6        Q.  Okay.  So you don't know if it could have been

 7   obtained, if at all, minutes before it was signed later

 8   that day?

 9             MR. COOK:  Object to form.

10             THE WITNESS:  I don't know.  I didn't have

11   any reason to believe that it wasn't going to be approved,

12   or it wasn't approved.

13   BY MR. KAYE:

14        Q.  So looking back at Exhibit 92 that's in front of

15   you, the new exhibit, so Erika sends this to you and says:

16   Again, please don't forward because of listing note.

17             Do you know what that means?

18        A.  I'd have to read the e-mail.

19        Q.  Sure.

20        A.  (Witness examines document.)

21             Okay.  I know what it means.

22        Q.  What does it mean?

23        A.  She stated that:  ████████████████████████████

24   ██████████████████████████████████████████████████

25   ███████████████████████████████████
```

Page 207

1          Q.  Okay.  And -- so the rest of the e-mail -- so we

2    have Stephen Ehrlich, 1:30 in the morning the night after

3    the press conference:  Wanted to reach out as we were at

4    the finish line and prepared to announce before the market

5    opens tomorrow, but have been held up by legal.  I'm

6    concerned by the delay as we've been on standby without

7    clarity.  Any chance you can guide us to the finish line?

8                    Mark responds:  What is our legal saying is

9    the problem?

10                   All right.  And Stephen Ehrlich says, at the

11   bottom of page 1:  ███████████████████████████████████████,

12   ██████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████

15                   Is "your counsel" Sekou?

16        A.  Yes.

17        Q.  "█████████████████████████████████████████

18   ████████████████████████████████████████████████

19   █████████████████████████████████████████"

20                   What does that mean; Sekou had to sign off

21   to the NBA for the NBA to approve it?

22                   MR. COOK:  Object to form.

23                   THE WITNESS:  I believe that's what this is

24   saying.

25                   (Exhibit 89 was marked for identification.)

Page 208

1    BY MR. KAYE:

2         Q.  Going to show you what we marked as Exhibit 89.

3    It doesn't have a Bates number yet, because this is what

4    we received this morning, so we'll add that later.

5              Spencer Santora, at the bottom, is

6    discussing with Erika:  The results so far of our crypto

7    session survey.  This is as December 13th, 2021.

8              Do you know what he's referring to?

9         A.  I'll have to read the back.

10             (Witness examines document.)  Okay.

11        Q.  Do you know what he's referring to by "crypto

12   session survey"?

13        A.  I believe he polled our people within our company

14   as to whether or not they'd be interested in being

15   involved in a private session with Voyager.

16        Q.  Okay.  And in her response e-mail, she says:

17   Looks like most are beginners, but a few questions is an

18   awesome start.  And then she refers to:  Is your HR

19   matching the deposit, or is it just Voyager?

20             Do you know what she is referring to?

21        A.  Similar to the -- the fan promotion that we ran,

22   there was discussion about providing that offer to our

23   employees.

24        Q.  Okay.  And was that code provided?

25        A.  I don't recall if it was.

```
 1         Q.  Were you one of those 70 RSVPs for the crypto

 2   session?

 3         A.  I don't remember.

 4         Q.  No?  In December of 2021, did you already have

 5   your own Voyager account?

 6         A.  I don't know for sure, but I likely did, yes.

 7         Q.  Okay.  So to your recollection, you didn't avail

 8   yourself of any Mavs HQ100 code?

 9         A.  I did not.

10         Q.  And Kyle's asking you if you spoke with Sekou

11   about the offer and care about the substance of them.

12              Did you ever have that conversation with

13   him?

14         A.  I don't recall.

15         Q.  What was the Voyager Assist campaign?

16         A.  I couldn't -- I couldn't really explain it to

17   you, because I wasn't fully aware of the details.

18         Q.  Okay.  Well, generally, what was it?

19         A.  I'd have to be speculating a bit.

20         Q.  Okay.  Just to the best of your recollection?  I

21   understand that you don't understand the -- you don't

22   recall the full details.  But just what do you recall at

23   this point in time about what the Mavs Assist program was?

24              MS. WOLKINSON:  Is it Mavs Assist or Voyager

25   Assist?
```

Page 210

 1            MR. KAYE:  The Voyager Assist program.

 2            Thank you.

 3            THE WITNESS:  Well, again, I'd have to be

 4  speculating, because I didn't really dig into the weeds on

 5  all of the promotions that we did.  So...

 6            MR. COOK:  All right.  Let him ask -- if he

 7  wants you to speculate, he'll ask you to, and then you can

 8  answer.

 9            THE WITNESS:  Okay.

10  BY MR. KAYE:

11     Q.  Did you ever have any awareness of a Voyager

12  Assist program with the Mavericks that was made pursuant

13  to the Sponsorship Agreement?

14     A.  Yes.

15     Q.  What was the level of your awareness?

16     A.  Very little.

17     Q.  What do you know about it based on your low level

18  of awareness?

19     A.  Not enough to explain it.

20     Q.  Was it, like, assisting people with wheelchairs

21  into the stadium?

22            MR. COOK:  Object to form.

23            THE WITNESS:  No.

24  BY MR. KAYE:

25     Q.  Is it talking about assists that happened during

Page 211

1    the course of Mavs games?

2        A.  Again, I -- I don't know for sure.  If you would

3    like me to speculate, I can do that.

4        Q.  It's not speculating if we're going off of your

5    recollection.  I'm asking:  At a very high level, are you

6    aware of what the Mavs Assist -- the Voyager Assist

7    program was?

8        A.  Well, I -- I really don't want to answer that

9    question, because I don't know enough about it, so I'd be

10   speculating about my answer.

11       Q.  So you are saying that you recall literally zero

12   percent of anything about what the Voyager Assist program

13   was?

14              MR. COOK:  Object to the form.

15              THE WITNESS:  I wouldn't be able to describe

16   it.  I don't feel confident I can describe it correctly.

17   BY MR. KAYE:

18       Q.  Was it an activation?

19       A.  Yes.

20       Q.  Pursuant to the Sponsorship Agreement?

21       A.  Yes.

22       Q.  Was it a social media campaign?

23       A.  I don't -- I don't recall.

24       Q.  Was it something done on-line?

25       A.  I don't recall that either.

1      Q.  Does it involve the Mavericks?

2      A.  Yes.

3      Q.  Does it involve Mavericks Assist?

4              MR. COOK:  Object to form.

5              THE WITNESS:  Assist during the game,

6      likely.

7      BY MR. KAYE:

8      Q.  Was it an activation connected with Voyager?

9      A.  Yes.

10     Q.  Okay.  Was it an activation connected with

11     Voyager and the Mavs/Voyager agreement during the

12     2021-2022 season?

13     A.  Yes.

14     Q.  Okay.  Would Kyle Tapply know more about the

15     specifics?

16             MR. COOK:  Object to form.

17             THE WITNESS:  You'd have to ask him.

18     BY MR. KAYE:

19     Q.  Who was responsible for the Mavs Assist program?

20     A.  Nobody was specifically responsible; it was,

21     again, my team worked on that particular promotion.

22     That's why I don't really know much about it.

23     Q.  Okay.  Do you know which of your team members

24     made you aware of it?

25     A.  I don't recall.

1      Q.  It would have been either Kyle, Kory, or Clay?

2      A.  Very likely.

3      Q.  So the rest of this e-mail from Erika to you,

4  among others, on the -- the Mavs team that were involved

5  in this partnership --

6                (Off-record discussion.)

7                MR. KAYE:  This is exhibit --

8                MR. BOIES:  This is Exhibit 98.

9                MR. KAYE:  Yes.

10                MR. BOIES:  So you have to give that to

11  Ryan.

12                MR. KAYE:  I was asking the question about

13  it.  This is Exhibit 90.

14                (Exhibit 90 was marked for identification.)

15  BY MR. KAYE:

16      Q.  This is Erika talking on January 5th, 2022, to

17  the Voyager team involved in the partnership agreement

18  about, quote:  Some ideas for activation/on court/in

19  arena.

20                See that?

21      A.  I do.

22      Q.  Okay.  And you're, obviously, aware of this one

23  because you responded:  Thanks, Erika.  We'll take these

24  back for a brainstorm session and get back to you.

25      A.  That's what I said, yes.

1   Q.  So it discusses some ideas like the ball machine.

2       What's the ball machine?

3   A.  I -- I couldn't tell you.

4   Q.  What about the Doge/Shib dog challenge on court?

5   A.  I couldn't say, more than what she wrote here.

6   Q. ████████  █████████████████████████████████████

    █  ████████████████████████████████████████████

    █      ███████████████████   ██████████████████

    █      ███████████████   ███████████████████████

    █  ███████████████████████████████████████████

    █  ██████████████████   ███████████████████████

    █  █████████████████████████████████████████

    █  ████████████████████████████████████████████

    █  ███████████████████████████

15  BY MR. KAYE:

16      Q.  Right.

17          So are these new activations that could be

18  implemented within the general guidelines of the

19  Sponsorship Agreement?  Is that a fair statement?

20          MR. COOK:  Object to form.

21          THE WITNESS:  Without reading through these

22  to -- specifically, I -- I don't know exactly what these

23  entail.  Some of these ideas may be executable; some of

24  them may not.

25  BY MR. KAYE:

Page 215

1      Q.  Okay.  You want to take a second to read through

2  them?

3      A.  Sure.  (Witness examines document.)

4              THE WITNESS:  Bless you.

5              MR. KAYE:  Bless you.

6              THE WITNESS:  Okay.  I've -- I've read

7  through them.

8  BY MR. KAYE:

9      Q.  Okay.  My question was:  Just generally, are

10  these some ideas for activations -- new activations that

11  could be implemented during this season that would fit

12  within the guidelines of the Sponsorship Agreement?

13              MR. COOK:  Object to form.

14              THE WITNESS:  Potentially, yes.

15              (Exhibit 91 was marked for identification.)

16  BY MR. KAYE:

17      Q.  Okay.  Show you what we have marked as

18  Exhibit 91.

19              Do you know why these materials are

20  redacted, including your response to Cynthia?

21              MR. COOK:  You can answer the question yes

22  or no.

23              THE WITNESS:  No.

24  BY MR. KAYE:

25      Q.  Okay.  Do you remember participating in this

Page 216

1    e-mail chain?

2         A.  Yes.

3         Q.  Was this date the first time you became aware

4    that various state regulators issued cease and desist

5    orders as to Voyager's interest-bearing accounts?

6              MR. COOK:  Object to form.

7              THE WITNESS:  I have to read this e-mail

8    here.  (Witness examines document.)

9              So, I'm sorry, can you repeat the question?

10   BY MR. KAYE:

11        Q.  Sure.

12             Was this e-mail chain the first time that

13   you ever became aware that various state regulators issued

14   cease and desist orders against Voyager's crypto

15   interest-bearing accounts?

16             MR. COOK:  Object to form.

17             THE WITNESS:  I don't recall.

18   BY MR. KAYE:

19        Q.  Do you recall ever learning about that?

20        A.  Yes.

21        Q.  Around when did you learn that?

22        A.  I don't know specifically.  Probably around this

23   time.

24        Q.  Do you know how you learned it?

25        A.  I don't recall.

Page 217

 1      Q.  Did you learn it at work or just looking at the
 2  news?
 3      A.  It was, likely, something I read on the news.
 4      Q.  Did it -- did you have any reaction to that as
 5  pertains to the partnership that you helped form between
 6  Voyager and the Mavericks or specifically these types of
 7  accounts?
 8                  MR. COOK:  Object to form.
 9                  MR. BEST:  Object.
10                  THE WITNESS:  Did I have any reaction to
11  that in what way?
12  BY MR. KAYE:
13      Q.  Did you think it implicated the sponsorship deal
14  at all?
15      A.  I mean, I don't really recall.
16      Q.  So Mark's e-mail at the bottom says:
17  Unfortunately, it's not a surprise.
18                  Do you share that sentiment?
19                  MR. COOK:  Object to form.
20                  THE WITNESS:  I really had no opinion.  I
21  didn't know enough about it to have an opinion either way.
22  BY MR. KAYE:
23      Q.  Uh-huh.  Okay.  So he's talking about connecting
24  Steve with his lawyer who's done crypto and SEC stuff.
25                  Do you know what that's referring to?

Page 218

1         A.  No.

2                 (Exhibit 60 was marked for identification.)

3    BY MR. KAYE:

4         Q.  I'm going to show you what we have previously

5    marked as Exhibit 60.

6                 You remember sending this to Kory?

7         A.  I do.

8         Q.  And why do you hope you don't get kicked in the

9    groin?

10        A.  At that point -- well, let's see, this -- this

11   was written on the 25th of 2021.

12        Q.  In August?

13        A.  August, yes.

14                I mean, I don't recall exactly what I meant

15   at that time.

16        Q.  Under the next part:  One of these days he's

17   going to bitch at me or us for not knowing enough about

18   crypt.

19                Does that give context to the first

20   sentence?

21        A.  I'm sorry.  I'm having trouble remembering the --

22   the dates here, because I -- so I sent this first e-mail

23   to Mark and Cynt on August 24th, 2021, so this was a few

24   days after --

25        Q.  Uh-huh.

Page 219

1       A.  -- I had a conversion with Drew, right?

2       Q.  No, no, no.  Oh, the 24th e-mail?

3       A.  Yeah.

4       Q.  Yeah, yeah.

5       A.  Okay.

6       Q.  Around the same time you had the conversation

7   with him.

8       ███  ████  ████████████████████████████

█   ████████████████████████████████████████

█   ████████████████████████████████████████

█   ███████████████████████████████

12       Q.  I'm assuming that you're meaning figuratively,

13   but has he reacted that way to you about not knowing

14   enough about crypto previously?  What made you -- what

15   made you think he would react that way?

16       ███  ██████████████████████████████████

█   ████████████████████████████████████████

█   ██████████████████████████████████

█   ████  ████████████████████████████████████

█   █████████████████████████████████████████

█   ████████████████████████████████████

█   █████████████████████████████████████████

█   ████████████████████████████████████████

█   ███████████████

25       Q.  Did you lack confidence in what you were saying

1  to him in the e-mail?

2      A.  Not necessarily.  I was simply summarizing

3  where -- what we had -- what we had accomplished or what

4  we had -- what we knew about the industry at that time.

5      Q.  And did you -- you were concerned that it wasn't

6  enough?

7              MR. COOK:  Object to form.

8              THE WITNESS:  I guess.

9  BY MR. KAYE:

10     Q.  Do you still feel that way?

11     A.  No.

12     Q.  How come?

13             MR. COOK:  Object to form.

14             THE WITNESS:  Why don't I feel that way any

15  longer?

16  BY MR. KAYE:

17     Q.  Yeah.

18     A.  Learned a lot about the industry over the last

19  couple of years.  This e-mail was really sent in -- in

20  jest to a coworker.

21     Q.  Uh-huh.  There's a grain of truth in every joke,

22  right?

23             MR. COOK:  Object to form.

24             THE WITNESS:  Do I have to answer that

25  question?

Page 221

1          MR. COOK:  No, you don't.

2          MR. KAYE:  Exhibit 68.

3          (Exhibit 68 was marked for identification.)

4    BY MR. KAYE:

5      Q.  You can read through the whole thing if you want,

6    and let me know when you're ready for some questions.

7      A.  (Witness examines document.)  Okay.

8      Q.  You remember Billy sharing this Voyager

9    newsletter?

10     A.  Yeah.

11     Q.  Do you -- is this the time that you became aware

12   of a partnership between Voyager and Rob Gronkowski?

13          MR. COOK:  Object to form.

14          THE WITNESS:  I don't recall if that was

15   exactly when I was aware of it.

16   BY MR. KAYE:

17     Q.  Okay.  But you were aware of it while you were

18   doing these negotiations?

19     A.  Yes.

20     Q.  Okay.  Did that affect, in any way, the way you

21   approached the negotiations?

22     A.  No.

23     Q.  No?  Didn't give you more confidence that, you

24   know, Gronk had already entered into an agreement with

25   them?

Page 222

```
 1              MR. COOK:  Object to form.
 2              THE WITNESS:  No.
 3   BY MR. KAYE:
 4       Q.  Okay.  It was just a piece of information?
 5       A.  Yeah.
 6       Q.  Okay.  And Kory says here that, you know:  ██████
     ████████████████████████████████████████████████████████
     █████████████████████████████████████████████████████████
     █████████████████████████████████████████████
10              So is that -- are you included in that, or
11   is Kory referring to research and discussions with him,
12   Kyle, and Clay?
13       A.  I can't really speak for Kory.
14       Q.  I'm asking if you were involved in the research
15   and the category and discussing cool ideas around the
16   space?
17          ████    █████████████████████████████████████████
     ████████████████████████████████████████████████████████
     █████████████████████████████████████████████
20       Q.  And what is Clay referring to when he says "Doge
21   Pepper nights"?
22              MR. COOK:  Object to form.
23              THE WITNESS:  That was -- I believe that's a
24   joke.
25   BY MR. KAYE:
```

```
 1          Q.  Is ███████ another --

 2          A.  They're --

 3          Q.  -- partner?

 4          A.  ███████ is one of Clay's clients.

 5          Q.  Do you remember the discussion around that idea?

 6     Was it -- what was it, to --

 7          A.  This entire chain is -- is in jest.  These are

 8     just playful -- this is just playful banter.

 9          Q.  Why are you guys bantering around about Doge?

10          A.  Well, I mean, because I just read that this

11     promotion is about -- well, because this promotion is

12     about Dogecoin, which even has a little symbol of a dog

13     next to, and I believe the jokes were just intended to be

14     made about Doge and dogs.

15          Q.  Okay.  Aside from the dog, where is any

16     discussion of Dogecoin in here?  I'm just curious.

17          A.  I think Clay brought it up when he said "Doge

18     Pepper nights," when he joked about that.

19          Q.  Okay.  And then Billy sums it up with -- or

20     finishes up the chain with:  Don't laugh.  Ryan will share

21     Mark's Doge ideas.

22               Do you know what he's referring to?

23          A.  No.

24          Q.  Do you know what Mark's Doge ideas were?

25          A.  No.
```

Page 224

1     Q.  Did you ever have any discussion with Mark about

2   Dogecoin?

3     A.  Not that I recall.

4     Q.  Okay.

5         MR. KAYE:  Let's take about a ten-minute

6   break, and I think I can short-circuit everything.

7         MR. BEST:  Great.

8         THE VIDEOGRAPHER:  Off the record at 4:50.

9         (Brief recess taken.)

10        THE VIDEOGRAPHER:  We are on the record.

11  The time is 5:14.

12  BY MR. KAYE:

13    Q.  Ryan, I want to clarify something:  Did you

14  previously testify that for the 20- -- the playoffs that

15  occurred in 2022, right, Mavericks against, I think, Utah

16  Jazz --

17    A.  Uh-huh.

18    Q.  -- that there were no Voyager marks or anything

19  on any of the nationally televised stations?

20    A.  That's not what I was saying.

21    Q.  Okay.  So what were you saying?

22        MR. COOK:  Wait.  Wait.  What was the --

23  BY MR. KAYE:

24    Q.  So what were you saying?

25        MR. COOK:  He didn't know what your question

Page 225

1    was.

2                MR. KAYE:  The ques- -- I'm asking him to

3    clarify what I thought was his prior testimony.

4    BY MR. KAYE:

5         Q.  Were there nationally televised playoffs games

6    that included Voyager in -- Voyager marks?

7         A.  There may have been.

8         Q.  Okay.  So, like, you know, the -- the 360 ring

9    that's the LED ring that goes around the whole center,

10   right, if that's something that's playing and it has

11   "Voyager" on it during the game and the game is being

12   broadcast on, say, like, ESPN, the cameras would -- they

13   might pick that up, right?

14        A.  Correct.

15        Q.  Okay.  And the playoffs were -- I mean, they're

16   the playoffs, right; they're picked up by a lot of

17   nationally broadcast stations?

18                MR. COOK:  Object to form.

19                THE WITNESS:  They're broadcast on a

20   particular national station, yeah, first and foremost, and

21   they're also broadcast locally in Dallas in the first

22   round, and then as you move to the second round and

23   beyond, those are all national broadcasts only.

24   BY MR. KAYE:

25        Q.  Okay.  And when a team is visiting the American

Page 226

1    Airlines Center to play the Mavs at a home game, the same
2    question:  If those -- if the 360 ring is in play and it's
3    being broadcast in the away-team's jurisdiction, the
4    cameras would pick that up?
5                    MR. COOK:  Object to form.
6                    THE WITNESS:  The cameras can potentially
7    pick that up.
8    BY MR. KAYE:
9         Q.  Okay.
10        A.  I mean, the cameras aren't directed at the -- at
11   that particular asset, but that doesn't mean it can't, by
12   happenstance, be visible.
13        Q.  Okay.  So, like, crowd shots and that kind of
14   stuff?
15        A.  Correct.
16        Q.  All right.  Aside from the playoffs, do you know
17   offhand about how many nationally televised games the
18   Mavericks play or played in the 2021-2022 season?
19        A.  I wouldn't know offhand.
20        Q.  Is every game nationally televised?
21        A.  No.
22        Q.  Okay.  Do you have a general number?  Like, is it
23   a dozen games are nationally televised?  Is it more than
24   that?
25        A.  I'd have to guess.

Page 227

1       Q.  Okay.  Well, in 24 years in the business, your

2   guess would be pretty good, right?

3                  MR. COOK:  Object to form.

4                  THE WITNESS:  If you want to rephrase the

5   question, I can answer it.

6   BY MR. KAYE:

7       Q.  Sure.

8                  In your 24 years working for the Mavericks,

9   in your experience, what is your best guess as to how many

10  Mavericks games are nationally televised?

11      A.  Well, it varies year to year quite a bit, but as

12  far as home games go, it ranges five to ten.

13      Q.  Okay.  And even for games that are not nationally

14  televised, it would be regionally televised for -- more

15  often than not, both in the Dallas area for the Mavericks

16  and in the home -- the away-team's jurisdiction?

17      A.  That's correct.

18      Q.  Okay.

19                  MR. KAYE:  Let's do 71.

20                  (Exhibit 71 was marked for identification.)

21  BY MR. KAYE:

22      Q.  Let me show you what we've previously marked as

23  Exhibit 71.

24      A.  (Witness examines document.)

25      Q.  Let me know when you've had a chance to review

Page 228

1    it.

2        A.  I've flipped through it, but if you want to ask a

3    specific question, I can go to the -- that particular line

4    item.

5        Q.  Okay.

6            MR. KAYE:  Bless you.  Bless you.

7            (Off-record discussion.)

8    BY MR. KAYE:

9        Q.  All right.  Go to -- it's the eleventh page of

10   the PDF.  It has at the bottom 15341.

11       A.  Okay.

12           MR. COOK:  Can I -- can I just ask a

13   question, Joey?

14           MR. KAYE:  Yeah.

15           MR. COOK:  Is this a composite exhibit?  It

16   appears to be multiple e-mail threads all bunched

17   together.

18           MR. KAYE:  I think it might be.  I think

19   this was just how it was produced, but it's --it's all

20   consecutive Bates ranges.

21           MR. COOK:  Is there -- okay.  I just want to

22   make sure the witness has an opportunity to review the

23   particular thread you want to focus on since there's many.

24           MR. KAYE:  Yeah.

25   BY MR. FAYE:

Page 229

1      Q.  If you want to review that thread, you can, but

2   it starts at 15331 and goes down to 15371.  My question

3   was about 15341.

4      A.  (Witness examines document.)

5           MR. COOK:  While he's doing that, I just

6   want to note for the record that Exhibit 71, which begins

7   on 15331 and continues to 15371, appears to be a

8   collection of several different documents, including

9   various e-mail threads.

10           MR. KAYE:  Thank you.

11   BY MR. KAYE:

12      Q.  Are you ready for a question about 15341, Ryan?

13      A.  Yeah, sure.

14      Q.  Okay.  So Wednesday, October 13th, 2021, at 10:06

15   p.m., you e-mailed Mark and Cynthia asking:  Are you able

16   or willing to participate in this launch event press

17   conference from Steve with Voyager on the 27th.  Time

18   frame is currently 1:30 to 2:30 but could change slightly.

19   Hoping you both can be there for this, as it's very

20   important to Voyager.  Ryan.

21           You remember sending that?

22      A.  I do.

23      Q.  Okay.  And then immediately above, Mark is the

24   one who answered:  Sure.

25           Right?

1      A.  Okay.

2      Q.  Okay.  So earlier in the deposition, I asked you

3  if you were the one that made the ask to Mark to get him

4  involved in the press conference, and there was some

5  ambiguity in the answer.

6           Does that re- -- refresh your recollection?

7      A.  It does.

8           MR. COOK:  What page are you on, Joey?

9           MR. KAYE:  15341.

10  BY MR. KAYE:

11     Q.  Can you go to page 3 of the PDF, 15333?

12     A.  Okay.

13     Q.  Okay.  And if you want to go back two pages to

14  confirm the first page of the document, you are cc'd on

15  this e-mail chain?

16           MR. COOK:  This is a different e-mail

17  thread, correct?

18           MR. KAYE:  Right.  It's one that he's cc'd

19  on.

20  BY MR. KAYE:

21     Q.  So going back to 15333, Ashley Movshovich, vice

22  president of tech from Ketchum, is saying:  A few things

23  to call out.  And No. 4:  Since we're not sharing the deal

24  size, which media will want to know and drives coverage,

25  if it's large, let's be sure to lean into, one, Cuban's

Page 231

1    investment with crypto and Voyager, especially why he's

2    interested in Voyager, continue the thread of Voyager

3    making strides in the sports industry, and the sports

4    industry further back in crypto.

5                    You see that?

6         A.  I see it.

7         Q.  Okay.  Do you know why the deal size wasn't

8    shared in any of the press releases?

9                    MR. COOK:  Object to form.

10                   THE WITNESS:  It's typically not.

11   BY MR.  KAYE:

12        Q.  And it's typically not in any Mavs partnerships?

13        A.  Correct.

14                   MR. COOK:  Object to form.

15   BY MR. KAYE:

16        Q.  Why is that?

17        A.  I'm not aware -- I'm not aware of any that we've

18   shared the deal size in.

19        Q.  Okay.  And why is that?

20        A.  Confidential information.

21                   MR. KAYE:  49.  This should be the last one.

22                   (Exhibit 49 was marked for identification.)

23   BY MR. KAYE:

24        Q.  So this is what we've marked as Exhibit 49.

25                   And this one is a single e-mail chain.  The

Page 232

1    PDF is 13 pages long.  Let me know if you need some time
2    to look through it.
3         A.   (Witness examines document.)
4              MR. COOK:  Just -- again, just before you
5    start, it appears to be multiple --
6              MR. KAYE:  It's not.  It's one e-mail chain.
7              MR. COOK:  It's one e-mail chain --
8              MR. KAYE:  It's one e-mail chain.
9              MR. COOK:  -- and the PDF includes
10   additional e-mail threads --
11             MR. KAYE:  The PDF is an attachment to the
12   e-mail.
13             MR. COOK:  Let me finish my question, Joey.
14             MR. KAYE:  I don't know.  I don't get what
15   the -- what the explanation is.  It's a single e-mail
16   chain.  It says "Attachments" at the top, "Mavericks Flyer
17   5x7 FINAL.pdf."  That's what this document is.  And I'm
18   not sure what else there is to address.
19             MR. COOK:  All right --
20             MR. KAYE:  Can I -- can I ask the questions
21   now to the witness?
22             MR. COOK:  No.  Are you done?  Are you done?
23   First few pages are an e-mail.  Then there's a PDF, and
24   then there's another e-mail with the same subject line,
25   and then another PDF.

```
                                                      Page 233

 1                MR. KAYE:  There's no PDF.  This is -- this

 2      is information that's pasted into an e-mail chain --

 3                MR. COOK:  What's that?

 4                MR. KAYE:  -- and the PDF -- that's the last

 5      two pages.

 6                MR. COOK:  Of a PDF, correct?

 7                MR. KAYE:  It's a two-page PDF.

 8                MR. COOK:  Yeah.  And then there's an e-mail

 9      thread, and then there's another PDF and another e-mail

10      thread.

11                MR. KAYE:  I'm not sure what you're looking

12      at because Exhibit 49 is 13 pages long.

13                MR. COOK:  Let's do it by Bates number.

14      18031.

15                MR. KAYE:  It goes to 18043.

16                MR. COOK:  Which includes the PDF, correct?

17                MR. KAYE:  18043 is the last page of the

18      exhibit that I'm looking at.

19                MR. COOK:  Well, mine keeps going.  I've got

20      new pages after that.

21                MR. BOIES:  That just got stapled.  It's

22      just a different copy.  That's -- that's a printer's

23      error.

24                MR. COOK:  That's fine.

25      BY MR. KAYE:
```

Page 234

1      Q.  Does yours end with -- does yours end at 18043,

2   Ryan?

3      A.  It does, 18043.

4      Q.  Okay.  Thank you.

5          So it's one e-mail chain with one attachment

6   at the end.  There's a few questions about this.

7          So it's a continuation of the e-mail chain

8   where you made the ask to Mark to be involved in the press

9   conference?

10     A.  Mark and Cynt?

11     Q.  Yeah.  And Mark is the one who responded and said

12  that yes -- or sure, that he'd be involved.

13          Okay.  You see on -- if you go to

14  page 18032, the second page of the document --

15     A.  I do.

16     Q.  -- at the top is an e-mail from Mark, and he

17  says:  Here's a quote.

18          Do you see that?

19     A.  Yes.

20     Q.  And so this is his approved quote, right?

21     A.  Appears to be, yes.

22     Q.  "The Mavs are proud to welcome Voyager to the

23  Dallas Mavericks family," says Mavs governor Mark Cuban.

24  Crypto assets and applications are changing how the

25  business and personal finance are done.  We believe our

Page 235

1    partnership with Voyager will allow Mavs and NBA fans to

2    learn more about Voyager's application and how they can

3    earn more from Voyager's savings programs than from

4    traditional financial applications."

5                 Do you see that?

6        A.  I do.

7        Q.  Okay.  If you go down to the next page -- well,

8    first, back on the first page, when they're sending --

9    when Erin is sending this to Mark, she says a couple of

10   things in this e-mail:  Draft press release with drafted

11   quote from you.  Please let me know of any edits or if

12   okay to go.  We'll send you final-final when approved by

13   Voyager team.

14                 You see that?

15       A.  No, I lost you there.

16       Q.  It's on the --

17       A.  The top page or the page before?

18       Q.  The second page.  Right under where he says:

19   Here's a quote.  We're talking about the prior e-mail.

20       A.  Okay.  I got it.

21       Q.  You see that?  So now if you go to the next page,

22   page 3 --

23       A.  Okay.

24       Q.  -- this is the quote that was originally proposed

25   before Mark revised it, right:  The Mavs are proud to

Page 236

1   welcome Voyagers to the Dallas Mavericks family, said the

2   Mavs governor, Mark Cuban.  Sports fans align very closely

3   with cryptocurrency enthusiasts, as both industries are

4   fast-paced, exciting, and intend to engage loyal

5   supporters.  And as an avid crypto user myself, this deal

6   was a no-brainer.  I'm excited to get not only our players

7   involved, but excited for Voyager to lead an educational

8   component for our entire fan base.

9               Do you see that?

10      A.  I do.

11      Q.  His revision was pretty substantial to that

12   quote, right?  Want to compare it to page 2?

13              MR. COOK:  Object to form.

14              THE WITNESS:  So your -- so your question

15   is?

16   BY MR. KAYE:

17      Q.  His revision was pretty substantial to the

18   proposed quote?

19              MR. COOK:  Object to form.

20              THE WITNESS:  The two -- the two quotes are

21   different, yes.

22   BY MR. KAYE:

23      Q.  Right.  And Mark's proposed version made sure to

24   specify that:  Our partnership with Voyager will allow

25   Mavs and NBA fans to learn more about Voyager's

Page 237

1    application and how they can earn more from Voyager's

2    savings programs than from traditional financial

3    applications.  Right?

4         A.  That's what it says.

5         Q.  Okay.  Do you know if this made it into the final

6    press release?

7         A.  I don't know.

8         Q.  Would it surprise you if it did?

9              MR. COOK:  Object to form.

10             THE WITNESS:  Would it surprise me if that

11   quote made it into the press release?

12   BY MR. KAYE:

13        Q.  Right.

14        A.  No.

15        Q.  Why not?  Because Mark approved it?

16             MR. COOK:  Object to form.

17             THE WITNESS:  Because I don't believe it

18   says anything that would be out of context or out of --

19   out of line.

20   BY MR. KAYE:

21        Q.  Okay.  And so on the first page, also -- "CTA"

22   stands for call to action, right?

23        A.  It appears that way.

24        Q.  Is that a common abbreviation that you guys use?

25        A.  No, I don't, but --

Page 238

1      Q.  Okay.  And it says there:  FYI, this is Voyager's
2   largest offer to date, only for our fans?
3            MR. COOK:  Just wait for him to ask a
4   question.
5   BY MR. KAYE:
6      Q.  Is that what it says?
7      A.  It says:  This is Voyager's largest offer to
8   date, only for our fans.
9      Q.  But the MAVS100 promotion was open to anyone who
10  saw the press conference, right?
11     A.  Can I take a second to look at this?
12            (Witness examines document.)
13            MR. COOK:  Object to form.
14            THE WITNESS:  Okay.  I'm sorry.  The
15  question was?
16  BY MR. KAYE:
17     Q.  That the MAVS100 promotion that accompanied the
18  press conference announcing nationwide the international
19  partnership between Voyager and the Dallas Mavericks was
20  open to anybody who saw the promotion and entered it into
21  the app?  Are you aware of that?
22            MR. COOK:  Object to form.
23            THE WITNESS:  The promotion was available to
24  fans that lived in the Dallas-Fort Worth area per NBA
25  rules.

Page 239

1  BY MR. KAYE:

2      Q.  And you're 100 percent positive about that

3  sitting here today?

4              MR. COOK:  Object to form.

5              THE WITNESS:  I don't see any of the rules

6  that were published for this promotion in this e-mail, but

7  I believe they would have said that.

8  BY MR. KAYE:

9      Q.  Okay.  So your -- your position is, is that if a

10  Mavericks fan, like Steve Best over there living in

11  Washington, D.C., tuned in and saw the press conference

12  and tried to use the MAVS100 code, that it wouldn't work

13  for him?

14              MR. COOK:  Objection.

15              THE WITNESS:  That's my understanding.

16  BY MR. KAYE:

17      Q.  Even though this is announcing the international

18  partnership and is part of the new international marketing

19  campaign?

20              MR. COOK:  Object to form.

21              THE WITNESS:  Yes.

22  BY MR. KAYE:

23      Q.  Okay.  It's your understanding, but you're not

24  100 percent certain?

25      A.  Based on the information I have here, I'm not

Page 240

1   certain, because I don't see any accompanying rules that

2   went with this that, I believe, were -- looking for the

3   fine print here to see where that would have been written,

4   but --

5        Q.  If you --

6        A.  Yeah, my understanding, yes.

7        Q.  So if you look at the bottom, all it says is:

8   Must create a new Voyager account, deposit funds and

9   purchase at least $100 in crypto to qualify.  Please allow

10  up to 24 hours for the reward to be credited to your

11  account.  Offer expires 11:50 p.m. Central October 30th,

12  2021.

13              MR. COOK:  Wait for a question.

14  BY MR. KAYE:

15       Q.  Would it surprise you if that was the only rule,

16  instruction, disclaimer or anything in connection with

17  this promotion?

18              MR. COOK:  Object to form.

19              THE WITNESS:  It would.

20  BY MR. KAYE:

21       Q.  Again, who was providing the hundred dollars --

22  hundred-dollar reward?  Was it the Mavericks or was it

23  Voyager?

24       A.  Voyager.

25       Q.  And it was a Voyager promotion, right?

Page 241

1      A.  Correct.

2      Q.  Was promoting their international partnership

3  with the Dallas Mavericks, right?

4           MR. COOK:  Object to form.

5           THE WITNESS:  No, it was not.  This

6  particular promotion was directed at Mavs fans.  As you

7  can see here, it says:  This is Voyager's largest offer to

8  date, only for our fans.  The international sponsorship

9  hadn't been executed yet.

10  BY MR. KAYE:

11     Q.  And your position is that Mavs fans only live in

12  the Dallas-Fort Worth area?

13          MR. COOK:  Object to form.

14          THE WITNESS:  Yes.

15          MR. KAYE:  Sorry, Steve.

16          I don't have any further questions at this

17  time subject to redirect, and again, as stated earlier, we

18  received 1,400 pages of documents today.  So if there's

19  anything in there that was just produced that something

20  comes up, we reserve the right to reopen the deposition

21  and have you come back.

22          MR. COOK:  Why don't we take a few minutes.

23  I'll see if we have any questions.

24          MR. KAYE:  Sure.

25          THE VIDEOGRAPHER:  Off the record at 5:39

Page 242

1    p.m.

2                    (Brief recess taken.)

3                    THE VIDEOGRAPHER:  We are on record.  The

4    time is 5:52.

5                              EXAMINATION

6    BY MR. COOK:

7        Q.  Ryan, you heard the term "partnership" used

8    throughout the date today and you've seen it used in some

9    of the documents that you were shown.  When the word

10   "partnership" is used in connection with a Sponsorship

11   Agreement with the Mavericks, what does that word mean?

12       A.  In our industry, those terms are interchangable,

13   so "sponsorship" and "partnership" are often used as the

14   same word.

15       Q.  And is that how you understand and understood

16   that term when responding to Mr. Kaye's questions today?

17       A.  Yes.  I was referring to our customer.

18       Q.  And when you use and you've seen used the word

19   "partnership" in connection with your employment at the

20   Mavericks, is that -- in your mind, does it mean the same

21   thing as "customer"?

22       A.  Yes, it does.

23       Q.  Now, you said that -- we talked about Mr. Cuban

24   various times today.  What was Mark Cuban's role in

25   connection with the Voyager Sponsorship Agreement?

Page 243

1      ███ ████████

2          Q.  Did Mr. Cuban have any implied or implicit

3      obligation to do anything to promote Voyager that was

4      agreed to as part of the negotiations?

5          ███  ███

6          Q.  The Sponsorship Agreement itself, I think you

7      talked about earlier and you testified that the purpose of

8      the Sponsorship Agreement was to promote the Voyager

9      platform; is that correct?

10         ███  ███

11                  MR. KAYE:  Object to form.

12     BY MR. COOK:

13         Q.  The Voyager platform itself, does that include

14     the Voyager app, for example?

15                  MR. KAYE:  Object to form.

16                  THE WITNESS:  Yes.

17     BY MR. COOK:

18         Q.  And if you were to sign up for Voyager and

19     download that app and become a customer, what does that

20     allow you to do?

21                  MR. KAYE:  Object to form.

22                  THE WITNESS:  If you deposit money into the

23     account, you have the ability to buy, sell, trade, crypto

24     currencies, amongst other things.

25     BY MR. COOK:

Page 244

1       Q.  Was one of the other things that was available to

2   customers of Voyager participation in the Earn Program

3   account?

4       A.  Yes.

5       Q.  And was promotion of the Earn Program account

6   ever part of the negotiations of the Sponsorship Agreement

7   with the Mavericks?

8                 MR. KAYE:  Object to the form.

9                 THE WITNESS:  ███████████████

10  BY MR. COOK:

11      Q.  Was it ever contemplated that the Mavericks would

12  promote the EPA program?

13                MR. KAYE:  Object to the form.

14                THE WITNESS:  No.

15  BY MR. COOK:

16      Q.  Did the Mavericks ever run any international

17  promotional activities for Voyager?

18                MR. KAYE:  Object to the form.

19                THE WITNESS:  No.

20  BY MR. COOK:

21      Q.  And in going back to Mr. Cuban, how did you

22  communicate with Mr. Cuban in connection with the Voyager

23  Sponsorship Agreement?

24      A.  By e-mail.

25      Q.  Did you ever communicate with Mr. Cuban

Page 245

1    concerning the Voyager Sponsorship Agreement orally?

2         A.  No.

3         Q.  I'm going to ask you to pull out from that stack

4    in front of you Exhibit 67-A.  It's the large document.

5         A.  All right.

6         Q.  If you turn to the seventh page in the deck, it's

7    one we looked at earlier that has the word "Mark Cuban" on

8    the right-hand side.

9              Do you see that?

10        A.  I do.

11        Q.  Do you recall earlier today Mr. Kaye pointed to

12   you -- pointed out to you the reference to the number of

13   followers that Mr. Cuban has on his Facebook, Twitter,

14   LinkedIn, and Instagram accounts?

15        A.  Yes.

16        Q.  To your knowledge, did Mr. Cuban ever promote

17   Voyager on his Facebook account?

18        A.  No.

19        Q.  To your knowledge, did Mr. Cuban ever promote

20   Voyager on his Twitter account?

21        A.  No.

22        Q.  Did he ever promote Voyager on his LinkedIn

23   account?

24        A.  No.

25        Q.  Did he ever promote Voyager to his Instagram

Page 246

1    followers?

2        A.  No.

3        Q.  And with regard to all of the social media

4    accounts belonging to Mr. Cuban, are you aware of him ever

5    promoting to anybody the EPA program offered by Voyager?

6        A.  No.

7        Q.  If you turn to the last page of Exhibit 67-A, if

8    you look at the first sub-bullet on that page --

9        A.  Uh-huh.

10       Q.  -- it says:  Nonexclusive sponsor of Mavs

11   cryptocurrency summit featuring MC.

12               Do you see that?

13       A.  I do.

14       Q.  Is it your understanding that "MC" referred to

15   Mark Cuban?

16       A.  I do.

17       Q.  Did Mark Cuban ever participate -- or was Voyager

18   ever a nonexclusive sponsor of the Mavs cryptocurrency

19   summit?

20       A.  No.  That event never happened.

21               MR. COOK:  I don't have any further

22   questions.  Thank you.

23               MR. KAYE:  Can we just take a break?

24               MR. COOK:  Sure.

25               MR. KAYE:  Two minutes.

Page 247

1                    THE VIDEOGRAPHER:  Off the record, 5:57.

2                    (Brief recess taken.)

3                    THE VIDEOGRAPHER:  We are on the record.

4    The time is 6:01.

5                    MR. KAYE:  Ryan, subject to the same

6    reservation of rights I put at the end of your direct, I

7    don't have any further questions at this time.  Thank you

8    for your patience with me today, and I appreciate you

9    sitting all day for this deposition.

10                   THE WITNESS:  Thank you.

11                   THE VIDEOGRAPHER:  All right.  Off the

12   record, 6:01.

13                   (Deposition concluded at 6:01 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25