**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 22-CV-22538-ALTMAN/Reid**

Dominik Karnas, *et al.*, on behalf of themselves and
all others similarly situated,

     *Plaintiffs,*

v.

Mark Cuban, Dallas Basketball Limited, d/b/a
Dallas Mavericks, Robert Gronkowski, Victor
Oladipo, and Landon Cassill,

     *Defendants.*

_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' OMNIBUS
MOTION [ECF NO. 189] TO DISMISS THE SECOND AMENDED COMPLAINT AND
INCORPORATED MEMORANDUM OF LAW AND REQUEST FOR HEARING**

**TABLE OF CONTENTS**

FACTUAL BACKGROUND ........................................................................................................4

LEGAL STANDARDS .............................................................................................................7

ARGUMENT ...........................................................................................................................8

   I.    Plaintiffs Stated Viable Securities Law Claims ...................................................8

      A.   Defendants Offered and Sold Securities.................................................................8

         1.   Voyager's Products Are Investment Contracts under Howey ...............................8

            i.   Plaintiffs Invested Money for Voyager Securities .......................................9

            ii.   Purchasers of Voyager Securities Invested in a Common Enterprise ............9

            iii.    Plaintiffs Reasonably Expected Profits from the Efforts of Others..........11

         2.   Defendants Are "Sellers" of Voyager Securities .........................................13

      B.   VGX and EPAs Are Also Securities Under the *Reves* Test ...............................16

            i.   Motivations that would Prompt a Reasonable Seller and Buyer to   Enter Into the EPA or VGX Transaction ...............................................17

            ii.   Plan of Distribution of the EPAs ...............................................................18

            iii.    Reasonable Expectations of the Investing Public.....................................18

            iv.    The Presence of an Alternative Regulatory Scheme..................................19

      C.   VGX and EPAs Are Not Commodities ...............................................................19

   II.    Plaintiffs' State Law Consumer Protection Claims Are Legally Sufficient ...........................20

      A. The Rule 8 Pleading Standard Applies, But Plaintiffs' Allegations Satisfy Rule 9(b)..............21

      B.   Defendants Engaged in Unfair, Deceptive, and Unlawful Conduct by Materially Assisting and Actively Participating in Voyager's Offer and Sale of Unregistered Securities.....................24

      C.   Defendants' Misrepresentations Caused Actual Damages to Plaintiffs ................................26

      D.   Plaintiffs Have Standing to Assert the State Law Claims.................................26

   III.   Cuban and the Mavericks Promoted VGX ...........................................27

   IV.   Defendants Illegally Conspired with Voyager.............................................27

   V.    Plaintiffs are Entitled to Declaratory Relief ..........................................28

   VI.   The SAC is Not a Shotgun Pleading ..................................................29

   VII.   Voyager is Not a Necessary Third Party Under Rule 19 .................................30

   VIII.   This Court has Personal Jurisdiction over Cuban and the Mavericks.........................31

      A.   Plaintiffs' Allegations Satisfy Florida's Long-Arm Statute ..........................31

      B.   Cuban and the Mavericks Purposefully Availed Themselves of the Privileges of Conducting Activities in Florida ..................................................33

      C.   The Corporate Shield Doctrine Does Not Protect Cuban .......................................34

CONCLUSION................................................................................................................................35

REQUEST FOR ORAL ARGUMENT..........................................................................................35

Plaintiffs filed their Second Amended Complaint on June 9, 2023. ECF No. 155 (the "SAC"). Defendants filed their Omnibus Motion to Dismiss on October 27, 2023, [ECF No. 189] (the "Motion"), arguing that Plaintiffs could not state *any* causes of actions, against *any* of the five remaining defendants.[1] The SAC is extensive, including 166 pages, 526 paragraphs and 284 exhibits (including many internal emails and numerous deposition transcripts). The crux of this class action comes down to two main questions: (1) are Voyager's native crypto tokens ("VGX") or interest-bearing Earn Program Accounts ("EPAs") unregistered securities, and (2) did any Defendant[2] "solicit" the sale of an unregistered security.

Plaintiffs primarily bring nationwide claims for violations of New Jersey state securities law violations and consumer protection statute violations. SAC Counts 1 & 2. As explained in the "Choice of Law" section of the SAC, ¶¶ 337–342, the Court will not be required to conduct any lengthy or onerous choice of law analysis in deciding whether Plaintiffs can certify a nationwide class for these claims. That is because the New Jersey Uniform Securities Act was enacted to "'prevent [New Jersey] from being used as a base of operations for crooks marauding outside the state,'" so it can be applied extraterritorially to out-of-state consumers where, as here, Voyager's offer to sell its unregistered securities emanated from New Jersey, its base of operations.[3] The same is true for the New Jersey

---

[1] Defendant Landon Cassill settled all of the claims against him under the supervision of Judge Michael Hanzman and the Court has already stayed all of those claims. ECF No. 188.

[2] The Court set a deadline of December 26, 2023 for Plaintiffs to add any additional parties. ECF No. 192. The SAC includes many specific allegations regarding the role of the law firm of McCarter & English, who requested their deposition noticed for September be continued until early December, in that mediation was unsuccessful.

[3] *Caspersen as Tr. For Samuel M.W. Caspersen Dynasty Tr. V. Oring*, 441 F. Supp. 3d 23, 41 (D.N.J. 2020) (quoting *Stevens v. Wrigley Pharmaceutical*, 9 N.J. Misc. 385, 386 (N.J. Ch. Div. 1931)); *see also A.S. Goldmen & Co. v. New Jersey Bureau of Sec.*, 163 F.3d 780, 782, 788, (3d Cir. 1999) (finding that N.J.S.A. § 49:3–60 governs sales of unregistered securities to people in other states provided the transaction occurred partially in New Jersey, even if the transaction would have been legal under the laws of the states where investors were being solicited, because New Jersey had an interest in maintaining the integrity of legitimate, in-state sellers and brokers by preventing the state "from being used as a base of operations for crooks marauding outside the state."); *In re Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) (collecting cases and stating "[c]ourts have always recognized that states have a legitimate interest in regulating securities transactions that occur, in relevant part, within the state."); *Simms Inv. Co. v. E.F. Hutton & Co. Inc.*, 699 F. Supp. 543, 545 (M.D.N.C. 1988) ("Blue Sky laws protect two distinct public policies. First, the laws protect resident purchasers of securities, without regard to the origin of the security. Second, the laws protect legitimate resident issuers by **exposing** illegitimate resident issuers to liability, *without regard to the markets* of the issuer.") (emphasis added).

consumer protection claims.[4] This Court has previously found no issue with applying another state's consumer protection statute extraterritorially when the alleged violations emanated from that state and affected consumers nationwide. *See Fruitstone v. Spartan Race Inc.*, 464 F. Supp. 3d 1268, 1286–87 (S.D. Fla. 2020) (Bloom, J.) (applying Massachusetts consumer protection law where alleged violation emanated from Massachusetts, the state where defendant based its operations, and finding Florida resident had Article III standing to assert those claims on behalf of putative nationwide class); *see also Fruitstone v. Spartan Race Inc.*, 2021 WL 2012362 (S.D. Fla. May 20, 2021) (final approval of nationwide class action settlement).

The Court has set this case for trial next year. ECF No. 192. Because of challenges to jurisdiction, discovery is already well underway. Magistrate Judge Reid has held many discovery hearings; tens of thousands of documents have been exchanged; depositions of Mr. Cuban, Mavericks executives, Mr. Ehrlich, and Plaintiffs have been taken; mediation has already been attempted a number of times, much before Judge Michael Hanzman, which can certainly continue until trial.

As explained in detail in the SAC, seven state Attorneys General and the New Jersey Bureau of Securities all issued "Cease and Desist" orders requiring Voyager to immediately stop selling the EPAs because they were unregistered securities, which was one of the reasons Voyager filed for bankruptcy protection. SAC ¶ 184.[5] Further, as Defendants point out, *see* Motion at 1, the CFTC also recently sued Mr. Ehrlich for misleading users and taking reckless risks. Although Defendants argue that the CFTC's action is somehow definitive proof that Plaintiffs do not state a claim for Defendants' securities law violations, it is clear that products offered for sale can fall "within the concurrent

---

[4] *See, e.g., Elias v. Ungar's Food Products, Inc.*, 252 F.R.D. 233, 247–48 (D.N.J. 2008) ("The Court 'concludes that New Jersey has the strongest interest in applying its consumer fraud statute,' as defendants have sufficient contacts with New Jersey, the essence of this cause of action emanates from New Jersey, and New Jersey's policy of deterring fraudulent conduct by domestic businesses and compensating consumers who are victims of fraud by such businesses is significantly implicated by this litigation. Therefore, the Court will apply the NJCFA to all members of the class, including those who reside in states other than New Jersey.") (quoting *Dal Ponte v. American Mortg. Exp. Corp.*, 2006 WL 2403982, at *7 (D.N.J. Aug. 17, 2006).

[5] *See also* https://www.coindesk.com/policy/2022/03/29/new-jersey-orders-voyager-digital-to-cease-and-desist-crypto-interest-offering/ (acc. November 14, 2023). Voyager was certainly not alone in offering and selling unregistered securities in the form of interest-bearing crypto accounts or exchange tokens. Much litigation is pending before this Court with other crypto companies, such as FTX and Binance, that offered their own unregistered crypto interest accounts and tokens, and each are dealing with their own litigation.

jurisdiction of the CFTC and SEC." *See S.E.C. v. Unique Financial Concepts, Inc.*, 196 F.3d 1195, 1203 (11th Cir. 1999).[6]

And while Defendants make a lot of noise about the CFTC action, conspicuously absent from their Motion is any mention of (1) the SEC's public position that VGX tokens are unregistered securities;[7] or (2) that the Federal Trade Commission (FTC) sued (and already settled with) Voyager, permanently prohibiting it from ever handling any consumers' assets based on its misrepresentations that the EPAs were FDIC insured, and also sued Voyager's former CEO, Mr. Stephen Ehrlich for making the same false statements about these unregistered products.[8]

At this stage, Defendants' Motion should be denied under applicable standards because the allegations, taken as true and with all inferences in Plaintiffs' favor at this stage, state the causes of action alleged. After this case was initially filed, the Eleventh Circuit reversed the law in ***this district*** specifically on solicitation of unregistered securities, holding that anyone who "urges or persuades" another to purchase an unregistered security—even through mass solicitations over the internet not directed at anyone in particular—are liable as statutory sellers for soliciting sales of unregistered securities when they do so for their own financial interest (Defendants) or for the financial interest of the issuer (Voyager). *Wildes v. BitConnect,* 25 F.4th 1341 (11th Cir. 2022). Plaintiffs allege that Defendants' conduct rose to this level of solicitation when they promoted Voyager's unregistered securities offerings, either pursuant to their own contractual obligations with Voyager for their own direct financial benefit (as with Defendants the Mavericks, Oladipo and Gronkowski), or for their own indirect financial interest (such as Mr. Cuban's sizeable financial interest in his Dallas Mavericks, his largest asset).[9]

---

[6] And while Defendants will likely allege when they file their Answer that they were also duped and tricked by Voyager's conduct, those factual issues will certainly be up to the jury to decide, after carefully considering all of the evidence and testimony.

[7] *See SEC v. Coinbase, Inc., et al.*, No. 1:23-cv-04738, ECF No. 1 (S.D.N.Y. June 6, 2023), accessible at www.sec.gov/files/litigation/complaints/2023/comp-pr2023-102.pdf (SEC enforcement action against Coinbase, defining VGX as one of the "Crypto Asset Securities," at ¶114, and conducting full *Howey* analysis at ¶¶270–82.") (acc. November 14, 2023).

[8] *See* https://blockworks.co/news/ftc-cftc-sues-voyager-stephen-ehrlich (acc. November 14, 2023).

[9] S*ee, e.g.,* SAC ¶¶ 15 ("this Global Partnership was made during the direst period in the history of the NBA, when NBA Commissioner Adam Silver was quoted as stating that the COVID Pandemic could be 'the death knell' of the NBA."), 16 ("The Voyager/Mavericks Global Partnership was the very first 'International Partnership' in NBA history. The reason was because, as the Mavericks explained to Voyager, Voyager would thus be able to circumvent the 'traditional' NBA rules for advertising, which

## FACTUAL BACKGROUND

Voyager operated a cryptocurrency investing application for iOS and Android mobile devices (hereinafter, the "Voyager Platform") that allowed users to purchase and trade cryptocurrency and invest money in interest bearing accounts (SAC, at ¶ 119). Until Voyager's recent bankruptcy, it claimed to have more than $5 billion in assets under management and over 3.5 million investors. (*Id.*) Voyager quickly became one of the most utilized avenues for investors to purchase and invest in cryptocurrency and related crypto securities. (SAC, at ¶ 121). It engaged in an extremely aggressive promotional and solicitation campaign via influencers and celebrities who received financial incentives, that targeted primarily new or less knowledgeable cryptocurrency users. (*Id.*) Users could download the application, create an account, fund it (by transferring US dollars ("USD") from a bank or cryptocurrency from a "wallet"[10]), and begin trading immediately. (*Id.*) Voyager claimed that users could open an account and begin trading in three minutes or less. (*Id.*) Voyager has made various misrepresentations to its customers throughout its short life, including that it can obtain "better pricing" on cryptocurrency through various proprietary algorithms, that it is "commission free" for trading, that it was properly licensed to conduct its activities, and even that customer assets held on the Voyager Platform were FDIC insured. (SAC, at ¶¶ 125–137, 369, 372, 455). Voyager also offered and sold EPAs and VGX, which are unregistered securities, from its base of operations in New Jersey, to customers nationwide. (SAC, at ¶¶ 19, 60, 337–342).

On October 23, 2019, Voyager began offering EPAs, its interest-bearing cryptocurrency accounts, to public investors. (SAC, at ¶ 20). *Every single account Voyager offered and sold to its customers was necessarily an EPA.* (*Id.*) Plaintiffs and other similarly situated individuals invested in Voyager's EPAs. *Id.* There is no dispute that Voyager never registered the EPAs with the United States Securities and Exchange Commission ("SEC") or with any state securities regulators. The EPAs and VGX Tokens constitute "securities" as defined by state and federal securities law. (SAC, at ¶¶ 138–159). Although Voyager promised its investors a fixed return for their EPA investments, Voyager's Annual Information Form filed with Canadian regulators stated, "Rewards earned on crypto assets are variable, and reward rates are determined by voyager at its sole discretion." (SAC, at ¶ 149). To

---

required limitations such as confining the promotions to a 150-mile radius of the American Airlines Center.").

[10] Cryptocurrency is sent and received from or to so-called "wallets," which are locations identified by a combination of letters and numbers called a "hash" that is unique to the holder of the "key" for that wallet address. Wallets are roughly analogous to an email address or bank account number that allows for the transmission of cryptocurrency from one user to another.

generate those "variable" rates of return, Voyager pooled the EPA assets and engaged in risky financial activities. (*Id.*) Similar rates of return were offered for holders of VGX tokens, the value of which (as an exchange token) was tied to the success of the Voyager Platform, and which Voyager led its customers to believe would generate profit through the increased value and ability to sell on secondary markets. (SAC, at ¶¶ 154–159).

Defendants have thousands, if not millions of social media followers. (SAC, at ¶ 190). Every single public-facing announcement or press release concerning Defendants' relationships with Voyager described Defendants as "partners" of Voyager – an endorsement of Voyager to thousands, it not millions of users that follow Defendants on platforms like Twitter, Instagram, and YouTube. (SAC, at ¶¶ 190, 191). Defendants received millions of dollars in cash VGX tokens, amongst other compensation, to broadly solicit potential investors with promotional statements, contests, coupon codes, offers of free cryptocurrency, sign-up incentives, and other strategies intended to entice people to cryptocurrency using the Voyager platform and generate interest in the media for the sale of Voyager products, including EPAs. (SAC, at ¶ 188). Defendants actively promoted EPAs by touting interest rates between 7% and 12% that Voyager offered on crypto assets that were available only to Voyager EPA account holders. (SAC, at ¶ 189).

As the first NBA team sponsorship in crypto, the partnership between Voyager and the Dallas Mavericks was a significant stamp of approval for this new form of investing platform. (SAC, at ¶¶ 16, 198). Voyager sought to partner with the Mavericks based on Cuban's own ability to generate publicity and "media visibility," the international roster and "usage" of the team, and because of their knowledge of cryptocurrency. (SAC, at ¶ 196). Voyager expected to drive activation and investments on the Voyager platform not only by Mavericks fans, but also by millions of NBA fans throughout the world. (SAC, at ¶ 195, 201, 204). As Mr. Ehrlich conceded, the "main goal" of Voyager's partnership with the Mavericks "was to bring cryptocurrency to the masses." (SAC, at ¶ 195).

The Mavericks and Voyager engaged in a sustained and aggressive promotion and advertising campaign, beginning with a press conference on October 27, 2021, which was streamed live to the public at large on the Mavericks' official website. (SAC, at ¶ 208). The Mavericks ran many other Voyager promotions, including one on October 28, 2021, in which a fan earned $100,000 worth of cryptocurrency for hitting a half-court shot. (SAC, at ¶ 225). The videos of that shot, which the Mavericks posted on the team's social media accounts, were viewed hundreds of thousands of times. (SAC, at ¶ 225). The Mavericks also posted TV-visible virtual signage and statistics promoting Voyager which appeared in hundreds of posts on the Mavericks' social medial accounts. (SAC, at ¶ 229). As of

5

June 12, 2022, the total social media exposure for these posts had reached more than 19 million impressions. (SAC, at ¶ 229). The Mavericks also held several other Voyager promotions, including a promotion that rewarded individuals who downloaded the Voyager app with $100 in Bitcoin by using the "MAVS100" code. (SAC, at ¶¶ 223, 230).

Cuban was behind most of the hype surrounding the partnership between Voyager and the Mavericks. He attended the October 27, 2021, press conference during which he enthusiastically disclosed that he was investing his own money with Voyager, which he characterized as an easy-to-use platform that offered the best pricing in the market. (SAC, at ¶¶ 212, 213). Cuban also championed the Voyager EPAs by proclaiming that they were "as close to risk free as you're going to get in the crypto universe." (SAC, at ¶ 215). Coming from Cuban, who regularly promotes himself on television shows and other media as a very business savvy investor, particularly in crypto-related enterprises, Cuban's endorsement of Voyager and its EPAs had an immediate and material influence on investors. (SAC, at ¶¶ 203, 204, 231, 239). The October 27, 2021, partnership launch generated over 1 billion online impressions and over 1.4 billion broadcast views. (SAC, at ¶ 239).

By November 2021, Cuban began contemplating more opportunities to benefit personally from the Mavericks' partnership with Voyager. (SAC, at ¶ 241). He directed his team to focus only on promoting Voyager through the Mavericks, as opposed to the Dallas Stars or the American Airlines Arena (in which he held no ownership interest), stating, "[w]e crushed it for [Voyager] and a lot of that was because I endorsed it. I won't approve anything that isn't for the Mavs[.]" (SAC, at ¶ 241).

Defendants Gronkowski and Oladipo were just as integral in ensuring that a significant number of investors would engage with cryptocurrencies through Voyager. Gronkowski is a hugely popular celebrity with a massive social media following. He appeared in numerous still shots and videos used to promote Voyager, shared Voyager co-branded promotions on his social media platforms, and wore Voyager branded merchandise in public, and on his social media platforms in a series of advertising campaigns designed to "bring crypto investing to the mainstream." (SAC, at ¶¶ 249, 252). Oladipo, too, is a famous basketball player with a large social media following. He appeared in a press release announcing his partnership with Voyager and the launch of the "Voyager for Good" campaign, "a breakthrough referral program in the cryptocurrency space that awards the charity of an athlete's choice with digital assets each time a new account is opened and traded with a special referral code." (SAC, at ¶ 275). Oladipo also promoted Voyager to his millions of social media followers by engaging through "retweets" and "likes" with Voyager's promotional social media postings. (SAC, at ¶¶ 277–80).

6

The Mavericks, Gronkowski, and Oladipo were financially motivated to solicit investors – not only because Voyager was paying them for performing that service, but also because they had expectations of being long-term brand ambassadors for Voyager under lucrative sponsorship contracts. (SAC, at ¶¶ 193, 261–62, 281–82). And Defendants Gronkowski and Oladipo agreed to be compensated in VGX tokens and Voyager stock, further cementing their motivation to serve their financial interests. (SAC, at ¶¶ 244–45, 261). If more people signed up for Voyager EPAs and purchased VGX tokens based on their promotional activities, the value of VGX tokens and Voyager's stock would rise along with their fortunes. The same was true for Cuban, who became a Voyager customer shortly before the Mavericks inked their partnership agreement with Voyager and stood to gain significantly as the majority owner of the Mavericks from the Mavericks' partnership agreement with Voyager. (SAC, at ¶ 211, 212).

Indeed, each of the Plaintiffs has alleged that Defendants' endorsements of the Voyager Platform "caused [them] to . . . purchase[], repurchase[], invest[], reinvest[], deposit[] and/or transfer[] additional funds to her EPA and/or purchase, repurchase, invest and/or reinvest in VGX Tokens as well as keep the EPA open and hold VGX tokens until Voyager's collapse." (SAC, at ¶¶ 68, 71, 77, 80, 83, 86, 89, 92, 95, 98, 101, 104, 107, 110, 113).

The SAC identifies the precise statements, actions, and misrepresentations made by each of the Defendants (SAC, at ¶¶ 209, 211, 213, 215, 219, 222, 238, 247–248, 254, 256–257, 264, 272–280), the time and place of such representations (SAC, at ¶¶ 208–209, 223, 224–226, 228–230, 250, 254, 256–259, 272–280, 284 ), the content and manner in which the statements misled the plaintiffs (SAC, at ¶¶ 42, 66–113, 217–219, 223, 239–240, 243, 252, 263, 266, 268, 271), and what each of the defendants gained by the alleged fraud (SAC, at ¶¶ 13, 116–117, 206, 244–246, 261–262, 270, 281–282).

## LEGAL STANDARDS

A court ruling on a 12(b)(6) motion to dismiss must accept the well-pleaded factual allegations as true and view the facts in the light most favorable to the plaintiff. *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017). Dismissal is only proper when, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1278 (11th Cir. 2015). The Court does not view each fact in isolation, but rather considers the complaint in its entirety. *Rensel v. Centra Tech, Inc.*, 17-24500-CIV, 2018 WL 4410110, at *9 (S.D. Fla. Jun. 14, 2018) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

The issue is not whether the plaintiff will ultimately prevail, but "whether the claimant is entitled to offer evidence to support the claims." *Id.* (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Hammer v. Armstrong World Industries*, 679 F.Supp. 1096, 1098 (S.D. Fla. 1987). Notably, only Rule 8 notice pleading is required for Plaintiffs to state a cause of action for these types of claims. *See S.E.C. Levin*, 12-21917-CIV, 2013 WL 594736, at *7 (S.D. Fla. Feb. 14, 2013) (Rosenbaum, J.) ("Rule 9(b) does not apply to [claims for offer or sale of unregistered securities].")" *see also Pirani v. Slack Techs., Inc.*, 445 F.Supp.3d 367, 384 (N.D. Cal. 2020) ("whether or not defendants actually solicited plaintiffs' sales is a factual question . . . plaintiffs need only satisfy Rule 8(a)'s lenient pleading standards.").

## ARGUMENT

### I.   Plaintiffs Stated Viable Securities Law Claims

#### A.   Defendants Offered and Sold Securities

"Congress intentionally defined 'the term 'security' in sufficiently broad and general terms so as to include with the definition the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *S.E.C. v. Kirkland*, 521 F.Supp.2d 1281, 1288 (M.D. Fla. 2007) (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 847–48 (1975)). "This broad construction was designed to 'afford the investing public a full measure of protection." *Kirkland*, 51 F.Supp.2d at 1288 (quoting *S.E.C. v. Howey Co.*, 328 U.S. 293, 298 (1946)). "Courts are therefore called upon to look at the substance and 'economic realit[ies]' of the underlying transaction rather than its label or form." *Id.; see also Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) (explaining that, "in searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality.").

#### 1.   Voyager's Products Are Investment Contracts under Howey

A "security" includes "an investment contract." 15 U.S.C. §§ 77b(a)(1), 78c(a)(1). Under the Supreme Court's holding in *S.E.C. v. Howey Co.*, 328 U.S. 293 (1946), an "investment contract" exists where there is (1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others. *See S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999). Whether the Voyager EPAs are securities depends upon the factual setting at the time of the relevant transactions. *S.E.C. v. Terraform Labs Pte. Ltd.*, 23-CV-1346, 2023 W.L. 4858299, at *11 (S.D. N.Y. Jul. 31, 2023) (Rakoff, J.) (citing *Marine Bank v. Weaver*, 455 U.S. 551, 560 n. 11 (1982); *S.E.C. v. Edwards*, 540 U.S. 389, 390 (2004)). Plaintiffs have sufficiently alleged each of these elements.

i.      **Plaintiffs Invested Money for Voyager Securities**

This prong refers "generally to 'an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses.'" *De Ford v. Koutoulas* No. 6:22-CV-652-PGB-DCI, 2023 WL 2709816 (M.D. Fla. Mar. 30, 2023). Courts applying *Howey* have consistently found that an exchange of crypto assets constitutes an "investment of money." *See Hodges v. Monkey Cap., LLC*, No. 17-81370-CV, 2018 WL 9686569 (S.D. Fla. Aug. 14, 2018) (investment of Ether or Bitcoin was "investment of money"); *Friel*, 2023 WL 2162747, at *9 ("[Plaintiff's] PSLRA Certification establishes he spent considerable money purchasing Moments [NFTs] from [defendant].'"). In the case of EPAs, participants' deposit of fiat currency and other forms of cryptocurrency with Voyager clearly constitutes an investment of assets, and Defendants do not contend otherwise.

ii.     **Purchasers of Voyager Securities Invested in a Common Enterprise**

"'The thrust of the common enterprise test is that the investors have no desire to perform the chores necessary for a return.'" *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999) (quoting *Villeneuve v. Advanced Bus. Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir. 1983)) "They are passive as opposed to active investors." *Id.*

Two types of "commonality" can satisfy the common enterprise element. *S.E.C. v. Kirkland*, 521 F. Supp. 2d 1281, 1292 (M.D. Fla. 2007). Horizontal commonality exists where there is "a pooling of interest or profits" in the transaction that ties together the investors' fortunes. *See Kirkland*, 521 F.Supp.2d at 1292 (quoting *Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989)). Vertical commonality is more "flexible" and less "stringent" than horizontal commonality and exists where "'the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment of third parties.'" *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999) (quoting *Villeneuve v. Advanced Bus. Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir. 1983)). The Eleventh Circuit requires only vertical commonality. *Id.* at 1199-1200.

Defendants argue that EPA holders did not share in the profits and losses with each other or with Voyager, but rather received a fixed interest rate,[11] which precludes a finding of commonality

---

[11] Defendants repeatedly state that EPAs provide a "market" rate of interest, while simultaneously acknowledging that Voyager unilaterally selected the EPA interest rate regardless of the returns generated by the lending program. These are puzzling assertions, as one participant (Voyager) does not constitute a "market."

that would satisfy the common enterprise element. This argument misrepresents the SAC's allegations and erroneously restricts the commonality concept to profit-sharing mechanisms, which is an overly narrow interpretation that is inconsistent with the broader understanding of a common enterprise. Based on what the SAC actually alleges, there is both horizontal and vertical commonality between and among Voyager and the EPA participants.

According to the SAC, when Plaintiffs and other investors deposited cryptocurrency tokens with Voyager, Voyager would pool together those assets to fund its various income generating activities, including lending operations, proprietary trading, cryptocurrency staking, and investments in other cryptocurrency trading platforms. (SAC, at ¶¶ 141, 147). In exchange, Voyager promised EPA owners "rewards," through programs such as the "Voyager Earn Program," which would pay a variable rate of interest on any assets deposited in the EPA, and "Loyalty Program, which allowed EPA depositors to double or triple the amount of the rewards payable in Voyager's proprietary token (VGX). (SAC, at ¶¶ 142, 143, 148, 149). The rates of return Voyager paid customers on EPAs were dependent on Voyager's success in managing its income generating activities. (SAC, at ¶¶ 146, 149, 150).

The facts alleged establish broad vertical commonality; that is, the required tying of the fortunes of EPA participants—as measured by the rewards earned on their EPA accounts—to Voyager's efforts to generate profits through its investment activities. *See S.E.C. v. NAC Foundation, LLC*, 512 F.Supp.3d 988, 996 (N.D. Cal. 2021) (finding that "common enterprise" existed where the fortunes of participants in initial coin offering were linked to the general success of blockchain development company's enterprise); *SEC v Gordon*, No. 3:21-CV-1642-B, 2021 WL 5086556, at *4–5 (N.D. Tex Nov. 1, 2021) (holding that complaint established "broad vertical commonality" where investors would benefit from defendants' ability to generate profits based on its investment and refinancing activities in connection with rental properties); *SEC v ETS Payphones, Inc.,* 408 F3d 727, 732 (11th Cir. 2005) (concluding that a "common enterprise" existed where investors' fortunes depended on the defendant's ability to develop business to realize profits). The rewards earned on crypto assets were variable and the reward rates were determined by Voyager at its sole discretion. (SAC, at ¶ 149). So, the investors were clearly dependent upon Voyager's success in managing its various income generating activities to achieve any return on their investments. *See SEC v. Friendly Power Co. LLC*, 49 F.Supp.2d 1363 (S.D. Fla. 1999) (finding vertical common enterprise where "the investors clearly were dependent upon the efforts of others in order to . . . gain on their investment.").

10

In addition, although it is not required under Eleventh Circuit precedent, these facts also establish horizontal commonality; that is, the required "pooling of assets," tying the fortunes of each investor to each other and to the success of the overall venture. *See Friel v. Dapper Labs, Inc.*, 21 CIV 5837 (VM), 2023 WL 2162747, at *10 (S.D. N.Y Feb. 22, 2023) ("Generally, pooling occurs when the funds received by the promoter through an offering are, essentially, reinvested by the promoter into the business," which, in turn, "increases the value of the instrument offered."). While pro-rata distribution of profits is evidence of horizontal commonality, "such a formalized profit-sharing mechanisms is not required." *Id.; see also SEC v. Kik Interactive, Inc.*, 492 F.Supp.3d 169, 178 (S.D. N.Y. 2020) (accord). Voyager's pooling and reinvestment of depositor assets back into its business was intended to increase the interest rate and rewards that depositors received, thus "[tying] the fortunes of each investor in a pool of investors to the success of the overall venture." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

Thus, Plaintiffs have sufficiently alleged *Howey's* second prong.

### iii.   Plaintiffs Reasonably Expected Profits from the Efforts of Others

"In order to satisfy the third prong of *Howey*, investments must be substantively passive and depend on the 'entrepreneurial or managerial efforts of others.'" *S.E.C. v. Mut. Benefits Corp.* 33 F. Supp. 2d 1337, 1342 (S.D. Fla. 2004), *aff'd*, 408 F.3d 737 (11th Cir. 2005). The key determination is whether it is the promoters' efforts, and not the investors' efforts, that form the "essential managerial efforts which affect the failure or success of the enterprise." *Id.* (quoting *Unique Fin. Concepts*, 196 F.3d at 1201). And "the original requirement that profits be derived 'solely' from the efforts of others has been modified by later opinions to include only that the efforts of others be merely predominant." *Id.*

Defendants argue that Plaintiffs could not reasonably have expected profits from the efforts of others because EPA holders did not share in profits and losses with each other or with Voyager, but rather received an interest payment set by Voyager based on a market rate of interest designed to retain them as customers. *Howey* does not, however, mandate profit-sharing. Rather, it focuses simply on whether investors have a reasonable expectation of profits derived from the efforts of others. *See S.E.C. v. Telegram Group, Inc.*, 448 F.Supp.3d 352, 371 (S.D. N.Y. 2020) (explaining that "*Howey*'s third prong examines whether the investor entered the relevant transaction with the expectation of profit").

"An investor possesses an expectation of profit when their motivation to partake in the relevant 'contract, transaction or scheme' was 'the prospects of a return on their investments.'" *Id.* (quoting *Howey*, 328 U.S. at 301, 66 S.Ct. 1100). "Profit means an 'income or return, to include, for

example, dividends, other periodic payments or the increased value of the investment.'" *Telegram*, 448 F.Supp.3d at 371 (quoting *Edwards*, 540 U.S. 394).

Plaintiffs allege that the EPA and VGX holders did, indeed, expect to derive profit from Voyager's efforts to maintain the preset interest rate and retain customers. The Voyager EPAs represented individual accounts where customers invested their assets with the expectation of earning interest, regardless of their ability to withdraw assets. Voyager's main selling point for both EPAs and VGX is that purchasing either would entitle users to earn "rewards" on the Voyager Platform. (SAC, at ¶ 154). For example, EPA purchasers could earn up to 9% interest on USDC held in their EPAS, and VGX holders were entitled to earn 7% of VGX held in their account per year. (SAC, at ¶ 154). This interest was based on market rates, "determined by Voyager at its sole discretion," and was offered as an investment incentive for customers. (SAC, at ¶ 149). Thus, they had a reasonable expectation of profits based on Voyager's efforts. It is irrelevant whether these profits are fixed or pro rata; what matters is that participants reasonably expected a financial gain.

Voyager EPA holders, like Plaintiffs, received market-based interest payments designed to retain them as customers. Voyager's ongoing efforts to set competitive interest rates, attract customers, and maintain their interest in EPAs influenced EPA holders' profit expectations, establishing a link between Plaintiffs' profit expectations and Voyager's efforts. In this regard, it is imperative to consider the role of Voyager's marketing and promotional efforts. If Voyager's promotional campaigns and advertising influenced the attractiveness of EPAs, and the market-based interest rates Voyager offered, the profits *were* derived from Voyager's efforts.

In this sense, the Voyager EPAs are substantially similar to *Terraform Labs'* "Anchor Protocol" under the *Howey* analysis. The "Anchor Protocol" was an investment pool into which owners of UST coins could deposit their coins and earn a share of whatever profits the pool generated. *S.E.C. v. Terraform Labs Pte. Ltd.*, No. 23-cv-1346, 2023 WL 4858299, *2 (S.D. N.Y. July 3, 2023). The defendants there generated enormous demand for the UST coins by advertising rates of returns of 19-20% on the coin owners' initial investment and touting the "deep relevant experience" of the Terraform team. *Id.* The court found that the plaintiffs had sufficiently alleged the third prong of *Howey* where "defendants' embarked on a public campaign to encourage both retail and institutional investors to buy their crypto-assets by touting the profitability of the crypto-assets and the managerial

and technical skills that would allow the defendants to maximize returns on the investors' coins." *Terraform Labs*, 2023 WL 4858299 at *15.[12]

Thus, here, as in *Terraform Labs*, Plaintiffs reasonably expected to earn profits based on the efforts of Voyager where: (i) Voyager actively marketed EPAs as a means of earning a higher return; (ii) engaged in a public campaign to encourage retail and institutional investors to invest in EPAs; (iii) touted Voyager's own abilities within the marketplace to generate handsome returns for users who invested in EPAs; and (iv) influenced investor decisions to invest to invest in EPAs.

Last, Defendants' general and factually unsupported assertion that Voyager generally lost money on these incentives is irrelevant. Under *Howey*, the relevant issue is not whether the promoter of the security *in fact* generated profits; the question is whether there is a reasonable *expectation* of profit to be derived from the efforts of others. *See SEC v. Xia*, 2022 WL 17539124, at *22 (E.D.N.Y. Dec. 8, 2022) (rejecting argument that "expectation of profit was unreasonable because any actual profit was uncertain and, in any event, not guaranteed"). Here, there unquestionably is such a reasonable expectation, for the reasons discussed above.

## 2.  Defendants Are "Sellers" of Voyager Securities

Under the Supreme Court's decision in *Pinter v. Dahl*, liability for selling unregistered securities "is not limited to persons who pass title" in an unregistered security, but also extends to "the person who successfully solicits the purchase" of that security, "motivated at least in part by a desire to serve his own financial interests or those of the security owner." *Pinter v. Dahl*, 486 U.S. 622, 643–647 (1988). Defendants liken themselves to a "collateral participant" in the vein of accountants, lawyers, and other service providers normally situated beyond the scope of statutory seller liability. *Pinter*, 486 U.S. at 651 (noting Congress did not intend to "expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services" to liability under Section 12). Measured against that standard, Defendants portray Voyager as the only "seller" of Voyager products and their own roles as that of paid celebrities who at most merely assisted in Voyager's solicitation efforts.

Solicitation, however, is a broad concept that encompasses *all* forms of enabling and encouraging of securities purchases and reaches *all* conduct "directed at producing the sale." *Pinter*,

---

[12] The *Terraform Labs* court *explicitly* rejected the distinction drawn "between purchasers" in *SEC v. Ripple Labs Inc.*, 2023 WL 4507900 (S.D.N.Y. July 13, 2023), that Defendants cite (Motion at 9 n.5). 2023 WL 4858299, at *15. As *Terraform Labs* explained, *Howey* "makes no such distinction between purchasers." *Id.*

486 U.S. at 650–51, n. 26. Courts consistently have refused to graft any further limitations on the definition of solicitation, explaining that there is "no indication that Congress was concerned with regulating only a certain type of solicitations," or excluding social media advertising which presents particular "dangers that investors will be persuaded to purchase securities without full and fair information." *Pino v. Cardone Capital, LLC*, 55 F.4th 1253, 1259–60 (9th Cir. 2022).

In *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341 (11th Cir. 2022), the Eleventh Circuit clearly articulated the standard applicable to mass solicitation of unregistered securities, ruling that spokespersons who promoted a crypto Ponzi scheme had engaged in "solicitation" of securities by "urg[ing] people to buy [crypto tokens] in online videos," even if the offering's promoters did not directly target particular purchasers. *Id.* at 1346. In so ruling, the Court observed that the Securities Act does not distinguish between individually targeted sales efforts and broadly disseminated pitches, and noted that in early cases applying the Securities Act of 1933, "people understood solicitation to include communications made through diffuse, publicly available means – at the time, newspaper and radio advertisements." *See Pino*, 55 F.4th at 1258 (discussing and quoting *Wildes*, 25 F.4th at 1346).

In *Pino v. Cardone Capital, LLC*, 55 F.4th 1253 (9th Cir. 2022), the Ninth Circuit adopted *Wildes* in its entirety, holding that a real estate management company that promoted real estate investment funds through "mass communications to potential sellers" via nontargeted internet videos posted on social media could be a statutory seller liable for solicitation based on YouTube videos and Instagram posts touting the investments and rates of return. *Id.* at 1259–60. The court noted that, to state a cause of action, a plaintiff "need not have alleged that he specifically relied on any of the alleged misstatements identified in the [complaint]." *Id.*

In *De Ford v. Koutoulas*, 6:22-CV-652-PGB-DCI, 2023 WL 2709816 (M.D. Fla. Mar. 30, 2023), the court denied a motion to dismiss claims that a spokesperson for "Let's Go Brandon" cryptocurrency (LGBCoin) engaged in the solicitation of unregistered securities. Citing *Wildes*, the court rejected the argument that "mere social media posts cannot make him a seller of securities" and held that the plaintiff had sufficiently alleged a claim for selling unregistered securities by alleging the (1) online promotion of LGBCoin through social media channels, and (2) that the promotions were done to serve the spokesperson's own financial interests. *Id.* at *15.

Here, contrary to Defendants' characterizations of Plaintiffs' allegations, Plaintiffs have alleged that Defendants were significantly more than just bit players in the sale of Voyager products. As explained extensively throughout the Factual Background, above, to further their own financial interests and those of Voyager, Defendants all actively promoted EPAs because every single Voyager

account *was* an EPA, and all were backed by VGX tokens. Voyager sought to partner with the Mavericks in its first ever international partnership (which allowed them to circumvent traditional NBA geographical limitations on advertising) specifically based on Cuban's own ability to generate publicity and "media visibility," the international roster and "usage" of the team, and their knowledge of cryptocurrency, in order to "bring cryptocurrency to the masses". (SAC, at ¶ 196). (SAC, at ¶¶ 195, 196, 201, 204).

Also as explained above, Defendants Gronkowski and Oladipo were just as integral in ensuring that a significant number of investors would engage with cryptocurrencies through Voyager, deploying their significant social media followings to "bring crypto investing to the mainstream." (SAC, at ¶¶ 249, 252, 275, 277–280).

Defendants were financially motivated to solicit investors – not only because Voyager was paying them for performing that service (or, in Cuban's case, increasing the value of the Mavericks, which he owns as his largest asset), but also because they had expectations of being long-term brand ambassadors for Voyager under lucrative sponsorship contracts. (SAC, at ¶¶ 193, 211–212, 244–245, 261–62, 281–82).

Based on these allegations and others set forth in the SAC, Plaintiffs plausibly plead solicitation under *Wildes* and *Pino*. Moreover, each individual Defendant's role and whether it was extensive enough to qualify as an actionable "solicitation" should be tested on an evidentiary basis, and not through a motion to dismiss. *See Houghton v. Leshner*, No. 22-cv-07781-WHO, 2023 WL 6826814, *3 (N.D. Cal. 2023) (holding that the extent of each defendants' role in soliciting the securities in question was a matter that "should be tested on an evidentiary basis."); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. 2009) ("Whether or not defendants actually solicited plaintiffs' sales is a factual question which should generally be left to the jury; at this stage plaintiffs need only satisfy Rule 8(a)'s lenient pleading standards."); *Primo v. Pac. Biosciences of Cal., Inc.*, 940 F.Supp.2d 1105, 1126 (N.D. Cal. 2013) ("The Court also agrees with other courts that have held that whether an individual is a seller under section 12 is a question of fact, not properly decided on a motion to dismiss.").

Defendants' reliance on *Underwood v. Coinbase Glob., Inc.*, No. 21 CIV. 8353 (PAE), 2023 WL 1431965 (S.D. N.Y. Feb. 1, 2023) is misplaced. There, the court found that the secondary marketplace defendant, Coinbase, could not be held liable for "solicitation" under Section 12 because plaintiffs failed to "describe conduct beyond the 'collateral' participation that *Pinter* and its progeny exclude from Section 12 liability." *Id.* at *9. There plaintiffs alleged that Coinbase was an exchange that "promote[d] the sale of Tokens," as well as "participated in direct promotions" and wrote and linked

15

to news updates. *Id.* at \*9. In contrast, Plaintiffs here are not suing the exchanges or marketplaces where VGX tokens were advertised or traded for posting videos or writing news articles about VGX tokens, but rather the Defendants who, for *significant* financial gain, promoted Voyager's products to millions of people in online videos and social media – just like the defendants in *Wildes* and *Pino* did. *See Houghton*, 2023 WL 6826814, \*4 (distinguishing *Coinbase* where, as here, the plaintiffs were not suing a crypto marketplace, but rather the promoters of the crypto currency.).

### 3. **Defendants are Liable as Direct Participants**

Defendants argue that they are not secondarily liable as aiders and abettors of Voyager's sale of unregistered securities. Secondary lability for aiding and abetting is a method by which courts extend liability to persons other than the statutory seller. *See Pinter*, 486 U.S. at 648, n. 24 (explaining that "the aiding and abetting theory – is actually a method by which courts create secondary liability in persons other than the statutory seller."); *S.E.C. v. Murphy*, 626 F.2d 633, n. 20 (9ᵗʰ Cir. 1980) (explaining that "[c]ourts have articulated various tests for secondary participant liability," including secondary liability for aiding and abetting). But the Court need not determine whether Defendants, here, are secondarily liable because they are primarily liable as direct sellers under *Pinter*. In any event, were the Court to reach the issue, Defendants are also secondary liable as agents or partners of Voyager because they "personally participated" and "materially assisted" in the sales. Defendants did so by promoting the products to millions of people through online videos and social media, which was integral to Voyager's marketing and sale strategy.

### B. **VGX and EPAs Are Also Securities Under the *Reves* Test** [13]

Defendants incorrectly argue that the Voyager EPAs are commodities and not securities.[13] In *Reves v. Ernst & Young*, the Supreme Court set forth the proper approach to ascertaining whether a "note" is a security under the Securities Acts. 494 U.S. 56, 64–65 (1990). The Court adopted the "family resemblance" test, under which

> [a] note is *presumed* to be a "security," and that presumption may be rebutted only by a showing that the note bears a strong resemblance ... to one of the ... categories of instrument [identified by the Second Circuit in the case of *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir. 1976)].

*SEC v. 1 Glob. Capital LLC*, No. 18-CV-61991, 2019 WL 1670799, at \*4 (S.D. Fla. Feb. 8, 2019) (citing *Reves*, 494 U.S. at 67) (emphasis supplied). The categories of instruments enumerated by the Second Circuit which are *not* securities include:

---

[13] Defendants nowhere assert that VGX is not a security under *Reves*.

the note delivered in consumer financing, the note secured by a mortgage on a home, the short-term note secured by a lien on a small business or some of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes secured by an assignment of accounts receivable, or a note which simply formalizes an open-account debt incurred in the ordinary course of business (particularly if, as in the case of the customer of a broker, it is collateralized)[, and] ... notes evidencing loans by commercial banks for current operations.

*Id.* at 65 (quoting *Exch. Nat. Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1137 (2d Cir. 1976) and *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 939 (2d Cir. 1984)).

The Supreme Court listed four factors to determine whether an instrument bears a strong resemblance to the instruments on the list: (1) the motivation that would prompt a reasonable seller and buyer to enter into the transaction; (2) the distribution plan of the instrument; (3) the reasonable expectations of the investing public; and (4) the existence of another regulatory scheme that significantly reduces the risk of the instrument. *1 Glob. Capital LLC*, 2019 WL 1670799, at *4 (citing *Reves*, 494 U.S. at 66–67). The Court instructed that if application of *Reves*'s four factors "leads to the conclusion that an instrument is not sufficiently similar to an item on the list," the analyzing court must then decide "whether another category should be added ... by examining the same factors." *Id.* at 67.

The Court in *Reves* conceived of this analysis as comprised of two separate steps, however, "both inquiries involve the application of the same four-factor test, and so the two essentially collapse into a single inquiry." *SEC v. Wallenbrock*, 313 F.3d 532, 537 (9th Cir. 2002); *accord Resolution Tr. Corp. v. Stone*, 998 F.2d 1534,1538–39 (10th Cir. 1993) (treating the two steps as a single inquiry).

### i. Motivations that would Prompt a Reasonable Seller and Buyer to Enter Into the EPA or VGX Transaction

"If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.' " *Reves,* 494 U.S. at 66. On the other hand, "[i]f the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, ... the note is less sensibly described as a 'security.' " *Id.*

In *1 Global*, the Court found persuasive that "the buyers' primary motivation was likely the 'high single digit' or 'low double digit' rate of return" defendant offered, while the defendant's motivation was so it could "expand its current business activities," over which it had "sole discretion." *1 Glob. Capital LLC*, 2019 WL 1670799, at *6.

17

Similarly, in *BlockFi*,[14] the SEC determined that BlockFi offered and sold BlockFi Interest Accounts ("BIAs") to obtain crypto assets for the general use of its business including to pay interest to BIA investors, and purchasers bought BIAs to receive interest.

Here, Plaintiffs' and Class Members' primary motivations, like many others who invested in EPAs or VGX, were to profit on their crypto holdings (though interest or equivalent returns), while Voyager's primary motivation was to create a pool of funds for the general use of its business, which included generating the earnings necessary to pay its investors and to fund its lending and other activities. SAC ¶¶ 141, 145–148.

### ii.    Plan of Distribution of the EPAs

The second factor requires that the court determine whether there was "common trading for speculation or investment" on the EPAs. *1 Glob. Capital LLC*, 2019 WL 1670799, at *6 (citing *Reves,* 494 U.S. at 66). The offer and sale of the EPAs to a "broad segment of the public" is sufficient to establish this element. *Id.* (citing *Id.* at 68). "Importantly, an 'evident interest in widening the scope of distribution,' combined with the 'broad availability of the notes' can tip this factor 'strongly in favor' of classifying the note as a security." *Id.* (citing *SEC v. Thompson*, 732 F.3d 1151, 1164 (10th Cir. 2013) (quoting *Wallenbrock,* 313 F.3d at 539)).

Here, the EPAs and VGX were unquestionably offered and sold to a broad segment of the public, as they were made available nationwide, and—in a self-evident interest in widening the scope of distribution—were promoted through celebrity endorsements, advertising and internet campaigns. SAC ¶¶ 19, 121–122.

### iii.    Reasonable Expectations of the Investing Public

Under the third factor, "we examine the reasonable expectations of the investing public," with the court considering "instruments to be 'securities' on the basis of such public expectations, even where an economic analysis of the circumstances of the particular transaction might suggest that the instruments are not 'securities' as used in that transaction." *1 Glob. Capital LLC*, 2019 WL 1670799, at *6 (citing *Reves,* 494 U.S. at 66). Where the notes are characterized by the originator as "investments" and there are no "countervailing factors" that would lead a reasonable person to question this characterization, "it would be reasonable for a prospective purchaser to take the [originator] at its word." *Id.*  (citing *id.* at 69).

---

[14] https://www.sec.gov/litigation/admin/2022/33-11029.pdf  (acc. November 14, 2023).

As explained extensively above, the EPAs and VGX were all characterized as investments by Defendants to Plaintiffs and the Class, including for instance how Defendant Cuban boasted that Voyager was the way for investors to "increase their wealth;" that it was "as close to risk free as you are going to get in the crypto space;" a way "to earn more from Voyager's platform than from traditional financial applications;" and that he was "immediately . . . earning more when I went over to Voyager." (SAC, at ¶ 8). Based on these characterizations, purchasers would reasonably view these notes as investments. *See Honig v. Kornfeld*, 339 F. Supp. 3d 1323, 1336 (S.D. Fla. 2018) ("third factor supports finding that the notes were securities because of advertised 5–8% annual return, paid on a monthly basis, and representations that the offerings were 'low-risk, high-yield investments backed by high interest rate loans made to commercial borrowers.' "); *Levin*, 2014 WL 11878357, at *10 (third factor supports finding that the notes were securities because they were advertised as a "low risk investment strategy," and investors were promised a high interest rate on their investment.). The third factor also supports a finding that the EPAs and VGX are securities.

### iv.   The Presence of an Alternative Regulatory Scheme

Under the final *Reves* factor, the Court considers whether "some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *1 Glob. Capital LLC*, 2019 WL 1670799, at *7 (citing *Reves*, 494 U.S. at 67). If the note "would escape federal regulation entirely if the Acts were held not to apply," the fourth factor supports characterizing the instrument as a security. *See id.* (citing *id.* at 69 (recognizing as adequate risk-reducing factors (1) insurance provided by the Federal Deposit Insurance Corporation, and (2) comprehensive regulation under the Employee Retirement Income Security Act, because both ensure that an instrument would not "escape federal regulation entirely if the Acts were held not to apply")).

This element is easily satisfied, as the EPAs and VGX tokens are not FDIC insured, as previously represented to Plaintiffs and Class Members. SAC ¶ 369.

### C.   VGX and EPAs Are Not Commodities

Notwithstanding the results of the required *Howey* and *Reves* analyses, Defendants mistakenly rely on a recent lawsuit by the Commodity Futures Trading Commission ("CFTC") against Voyager's CEO, Stephen Ehrlich to argue that Voyager EPAs are not securities. However, the CFTC's allegations that Voyager EPAs are commodities is not binding authority. And these unproven allegations are certainly not dispositive of Plaintiffs' ability to pursue claims concerning Defendants' promotion of unregistered securities. Similarly, the fact that the CFTC filed the lawsuit, and not the

SEC, says nothing about the merits of the claims Plaintiffs assert in this case. It is well-established that multiple regulatory agencies can have concurrent jurisdiction over certain matters. *See Unique Financial Concepts, Inc.*, 196 F.3d at 1203 (holding that "[c]ommodity pools . . . are within the concurrent jurisdiction of the CFTC and the SEC."). The fact that the CFTC sued Mr. Ehrlich does not preclude the SEC from later pursuing its own claims. As shown, under the proper *Howey* and *Reves* standards, EPAs and VGX tokens are securities, and the CFTC's suit against Mr. Ehrlich provides no basis for the Court to conclude otherwise.

## II.     Plaintiffs' State Law Consumer Protection Claims Are Legally Sufficient

Defendants make two threshold arguments in support of their position that the state law consumer unfair and deceptive trade practice claims in the SAC (the "UDAP Claims")[15] are insufficient. Neither of Defendants' two arguments have merit.

First, Defendants argue that the UDAP Claims "have no application to securities transactions." (Motion, p. 22). While this is incorrect, especially in light of recent case law on UDAP statutes,[16] in any event "the Court cannot conclude at this stage that the state consumer law claims are barred by the securities law claims" because Defendants dispute that the EPAs and VGX tokens are "securities," which is an issue that cannot be resolved through a motion to dismiss. *See In re Ethereummax Inv'r*, CV2200163MWFSKX, 2023 WL 6787827, at *17 (C.D. Cal. June 6, 2023) (finding that it would be "unfair" to allow Defendants to characterize cryptocurrency tokens as a security at the motion to dismiss stage to achieve dismissal of the state Consumer Laws, only to later claim that the Tokens are not securities for purposes of summary judgment). Also, Plaintiffs can plead the Consumer Protection Claims in the alternative to the securities claim, so there is no basis for this court to dismiss wholesale the state consumer law claims. *Id.*[17]

---

[15] Counts 2, 5, 7, 9, 11, 13, 15, 17, 19, 21, and 23.

[16] *See Hodges v. Monkey Cap., LLC*, 2018 WL 9686569, at *7–8 (S.D. Fla. Aug. 14, 2018) (finding "a violation of the securities laws is a per se violation of FDUTPA," reasoning that "the securities laws are designed for consumer protection and proscribe unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices."); *see also Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, 2021 WL 6118098, at *7 (M.D. Fla. Dec. 27, 2021) (denying summary judgment on claims of securities fraud and FDUTPA, quoting *Hodges*).

[17] The Court, moreover, need not decide this question at this stage in the litigation, because the consumer protection claims are not predicated solely on Defendants' sale or promotion of securities. This distinguishes the cases cited by Defendants, which involved claims of federal securities fraud under Rule 10b and parallel consumer protection claims. In those cases, defendants' "deceptive" acts underpinning the UDAP claims were the same as the conduct giving rise to their alleged liability under

Second, Defendants argue that the UDAP Claims under Virginia, California, Pennsylvania, and Massachusetts law[18] fail because Plaintiffs are not "customers" or "consumers" of any Defendant. (Motion, p. 22). But a direct sale to a consumer is not required for the transaction to be covered by the state consumer protection laws. *Alexander v. Se. Wholesale Corp.*, 978 F. Supp. 2d 615, 622 (E.D. Va. 2013); *Scilex Pharm. Inc. v. Sanofi-Aventis U.S. LLC*, 21-CV-01280-JST, 2021 WL 11593043, at *6 (N.D. Cal. Aug. 16, 2021) ("[a] non-consumer plaintiff can allege false advertising claims under the [California Unfair Competition Law] and [California False Advertising Law] without alleging its own reliance, as long as the plaintiff has alleged a sufficient causal connection"); *Falco v. Nissan N. Am. Inc.*, 96 F. Supp. 3d 1053, 1063 (C.D. Cal. 2015) (concluding that a manufacturer that is not the direct seller may be liable under California's Unfair Competition Law); *accord Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, 955 F. Supp. 2d 452, 462 (E.D. Pa. 2013); *Valley Forge Towers S. Condo. V. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641, 647 (Pa. Super. Ct. 1990), *aff'd*, 605 A.2d 798 (Pa. 1992); *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303, 310 (Mass. 2002); *AcBel Polytech, Inc. v. Fairchild Semiconductor Intern., Inc.*, CIV.A. 13-13046-DJC, 2014 WL 4656608, at *7 (D. Mass. Sept. 12, 2014).[19] Defendants' argument is unfounded.

### A. The Rule 8 Pleading Standard Applies, But Plaintiffs' Allegations Satisfy Rule 9(b)

Defendants incorrectly contend these claims must be pled with particularity under Rule 9(b). In fact, as many courts in this circuit[20] have expressly recognized, Rule 8—not Rule 9(b)—categorically applies to consumer protection claims. *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1231–

---

federal securities law. *See, e.g., Feng v. Walsh*, 2021 WL 8055449, at *13 (S.D. Fla. Dec. 21, 2021), *report and recommendation adopted*, 2022 WL 669198 (S.D. Fla. Mar. 7, 2022) (FDUTPA claim predicated on 10(b) securities and related fraud)

[18] Counts 11, 13, 15 and 21.

[19] Indeed, these UDAP statutes are liberally construed. *See, e.g., Branin v. TMC Enterprises, LLC*, 832 F. Supp. 2d 646, 650 (W.D. Va. 2011) (interpreting the Virginia CPA broadly, explaining that "[t]he allegedly fraudulent acts only need be 'in connection with' a consumer transaction."); *accord Skeino, LLC v. Reis*, CV214802MWFPVCX, 2022 WL 17357765, at *6 (C.D. Cal. Sept. 26, 2022); *Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, 955 F. Supp. 2d 452, 462 (E.D. Pa. 2013); *Karila v. EF Educ. First Int'l, Ltd.*, 21-CV-10643-DJC, 2022 WL 623872, at *2 (D. Mass. Mar. 3, 2022).

[20] As this is a procedural issue, Eleventh Circuit law controls over that of sister circuits or states. *See, e.g., Caster v. Hennessey*, 781 F.2d 1569, 1570 (11th Cir. 1986) ("[U]nder *Hanna* a federal court need not adhere to a state's strict pleading requirements but should instead follow Fed.R.Civ.P. 8(a)."); Rest. (First) of Conflict of Laws § 585 ("All matters of procedure are governed by the law of the forum.")

34 (S.D. Fla. 2021) (collecting cases and analyzing the correct standard).[21] There is "a split of authority within the Southern District as to whether Rule 9(b) applies to FDUTPA claims." *Carter v. Ford Motor Co.*, No. 19-62646-CIV, 2021 WL 1165248, at *16–18 (S.D. Fla. Mar. 26, 2021) (S.D. Fla. Aug. 11, 2021) (Altman, J.) (contrasting line of cases holding Rule 9(b) applies to the extent the FDUTPA claim sounds in fraud with cases that hold the requirements of Rule 9(b) categorically do not apply to FDUTPA claims, and concluding the Court "need not decide today whether 9(b) applies" because, "whether under Rule 8 or 9(b), the Plaintiffs' FDUTPA claim survives").

Still, this Court should join the line of decisions that have held that Rule 9(b)'s requirements do not apply to consumer protection claims. *See, e.g., Bluegreen Vacations Unlimited, Inc. v. Timeshare Lawyers P.A.,*, No. 20-24681-CIV, 2021 WL 3552175, at *7 (S.D. Fla. Aug. 11, 2021) ("[T]he requirements of Rule 9(b) do not apply to claims arising under FDUPTA"); *see also Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d 1173, 1185 (S.D. Fla. 2019); *Fed. Trade Comm'n v. Student Aid Ctr., Inc.*, 281 F. Supp. 3d 1324, 1333 (S.D. Fla. 2016); *Toback v. GNC Holdings, Inc.*, 13-80526-CIV, 2013 WL 5206103, at *2 (S.D. Fla. Sept. 13, 2013); *Harris v. Nordyne, LLC*, 14-CIV-21884, 2014 WL 12516076, at *4 (S.D. Fla. Nov. 14, 2014); *but see Kukorinis v. Walmart, Inc.,* 1:19-CV-20592, 2020 WL 13388297, at *4 (S.D. Fla. June 1, 2020) ("Because this Court has applied the heightened pleading requirement to FDUTPA claims in the past, the Court will apply Rule 9(b) to Plaintiff's claims.").

In reaching its holding that Rule 9(b) is inapplicable to FDUTPA claims, this Court has previously reasoned that "Rule 9(b)'s concerns with subjecting defendants to unfounded allegations of fraud is lessened by the specificity required" to plead a claim under FDUTPA. *Bluegreen Vacations Unlimited, Inc.,* 2021 WL 3552175, at *7 (explaining that "the uniqueness of the cause of action place[s] it outside the ambit of Rule 9(b)."). The same reasoning applies to the other state UDAP Claims—particularly because Defendants concede that each of the statutes share the common elements of unlawful conduct, actual damages, and causation (Motion at 21).

---

[21] *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 & n.2 (11th Cir. 2006), does not apply because (1) Plaintiffs have not separately raised fraud claims against Promoter Defendants and (2) FDUTPA claims are unlike the non-fraud claims at issue in Wagner because, as courts have acknowledged, FDUTPA prohibits a wide range of conduct and therefore the concerns behind Rule 9(b)'s particularity requirement "categorically do not apply to claims under FDUTPA" even if fraudulent conduct is somehow "implicate[d]." *See Harris v. Nordyne, LLC*, 2014 WL 12516076, at *4–5 (S.D. Fla. Nov. 14, 2014) (citing *Wagner*); *SEC v. Bankatlantic Bancorp, Inc.*, 2012 WL 12837291, at *2 (S.D. Fla. Dec. 7, 2012) (emphasis added) ("Wagner repeatedly limits its holding to cases where the nonfraud claim *requires* proof of a misrepresentation.").

Regardless of which standard this Court applies, Plaintiffs allegations in support of the UDAP Claims are sufficient to satisfy Rule 9(b). The rule requires a plaintiff to establish the "who, what, when, where, and how" of the fraud. *Hicks v. Bombardier Recreational Products Inc.*, 22-CV-61176-RAR, 2023 WL 4763194, at *16 (S.D. Fla. July 26, 2023). The SAC identifies the precise statements, actions, and misrepresentations made by each of the Defendants (SAC, at ¶¶ 209, 211, 213, 215, 219, 222, 238, 247–248, 254, 256–257, 264, 272–280 ), the time and place of such representations (SAC, at ¶¶ 208–209, 223, 224–226, 228–230, 250, 254, 256–259, 272–280, 284 ), the content and manner in which the statements misled the plaintiffs (SAC, at ¶¶ 42, 66–113, 217–219, 223, 239–240, 243, 252, 263, 266, 268, 271), and what each of the defendants gained by the alleged fraud (SAC, at ¶¶ 13, 116–117, 206, 244–246, 261–262, 270, 281–282). These allegations meet Rule 9(b)'s requirements. *Hicks*, 2023 WL 4763194, at *16.[22]

To the extent Defendants attempt to discredit Plaintiffs' allegations regarding the statements made by Cuban and the Mavericks by claiming they are "false" and "fabricated," their efforts are premature. (Motion at 23). When ruling on a motion to dismiss, district courts must "accept the factual allegations in the complaint as true and construe them in the light most favorable to the nonmoving party." *Glob. Network Mgmt., LTD. v. Centurylink Latin Am. Sols., LLC*, 67 F.4th 1312, 1315 (11th Cir. 2023). Defendants' claims about the veracity of these allegations is both inappropriate and irrelevant at this stage of the proceeding.

---

[22] Defendants erroneously rely on *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997), where the plaintiffs' amended complaint was entirely "devoid of specific allegations with respect to the separate Defendants," because the plaintiffs "simply 'lumped together' all of the Defendants in their allegations of fraud" to support their RICO claims for activities that occurred over a period of twelve years, which provided the court with "no basis in fact upon which the Court could conclude that any specific act of any specific Defendants" was indictable. *Id.* In contrast, the SAC here identifies the specific conduct attributable to Cuban, the Mavericks, Gronkowski, and Oladipo and even includes images reflecting each of their different promotional acts. Plaintiffs also affirmatively allege that the Defendants statements endorsing the Voyager platform caused them to deposit and transfer funds into the EPA, and keep their EPAs open until Voyager's collapse. The allegations are sufficient to "reasonably notify the defendants of their purported role in the scheme" and provide fair notice to defendants. *Id.* at 1364. Nothing more is required under Rule 9(b).

**B.  Defendants Engaged in Unfair, Deceptive, and Unlawful Conduct by Materially Assisting and Actively Participating in Voyager's Offer and Sale of Unregistered Securities**

Defendants argue that their alleged statements, actions, and promotions of the Voyager platform were not misleading or otherwise unlawful.[23] Notably, the very case law that Defendants rely on makes clear that the question of whether a business practice is deceptive is ordinarily "a question of fact not appropriately resolved on a motion to dismiss." *Thompson v. Procter & Gamble Co.*, 18-CV-60107, 2018 WL 5113052, at *2 (S.D. Fla. Oct. 19, 2018) (denying motion to dismiss FDUTPA claim and finding that defendants' statements do not qualify as puffery and were false or deceptive when viewed in their full context).

Even if the Court were to entertain this premature argument, it is not a basis for dismissal. The SAC details multiple instances in which each of the Defendants used their substantial professional accomplishments and celebrity status to promote the Voyager platform to reach millions of potential investors by making materially misleading and incomplete representations about Voyager, without a substantial factual basis, and without disclosing that they received substantial compensation for their promotions. That is because courts "do not assess the individual representations in a vacuum" and focus instead on whether a statement would have "contributed . . . to the deceptive context . . . as a whole." *Marty v. Anheuser-Busch Companies, LLC*, 43 F. Supp. 3d 1333, 1342 (S.D. Fla. Sep. 5, 2014) (statement of "German Quality" not puffery); *see also Thompson*, 2018 WL 5113052 at * 2 (statements that detergent is "trusted" and "mild" are not puffery even if not "empirically verifiable."); *Demetriades v. Yelp, Inc.*, 228 Cal. App. 4th 294, 311 (2014) (statement about providing the "most trustworthy" reviews not puffery when "intended to induce consumer reliance").

Among other things, Cuban and the Mavericks misled consumers by claiming that pricing on Voyager was "really good" when, in fact, the pricing for cryptocurrency trades on Voyager artificially inflated and was almost always more expensive than if the trades had been made on other platforms. (SAC, at ¶¶ 218–219). Cuban personally touted Voyager as the way for investors to "increase their wealth;" that it was "as close to <u>risk free</u> as you are going to get in the crypto space;" a way "to earn

---

[23] Defendants also argue that Plaintiffs are required to prove reliance under California—and only California law—thus conceding that reliance is *not* required for any of the other consumer protection claims. Motion at 24. Moreover, the authority on which Defendants rely is outdated even in California. *See Scilex Pharms.*, 2021 WL 11593043, at *6 (joining a "growing chorus of courts that have held ... that individual reliance is not required."). Instead, a plaintiff must plead only "a sufficient causal connection." *Id.* at *7. As explained, here, Plaintiffs have done so.

more from Voyager's platform than from traditional financial applications;" and that he was "immediately . . . earning more when I went over to Voyager." (SAC, at ¶ 8). These statements go beyond mere "puffery." *See In re Ethereummax Inv'r*, 2023 WL 6787827, at *32 (finding that defendant's statement that "he had **already** 'made more money' in 'the past month' than he did in a year at ESPN," was a specific, measurable statement of existing fact and not puffery) (emphasis in original). The misleading promotions by Cuban and the Mavericks had a material and direct effect on investors—as evidenced by the thousands of new Voyager customers who purchased EPAs using the "MAVS100" promotional code during the first 48 hours after the Voyager/Mavericks News Conference.[24]

Oladipo's statements that Voyager was the "perfect platform for anyone getting into the crypto market," because of its "unbeatable combination of over fifty-five crypto assets, outstanding earnings potential with competitive interest rates and an app that is easy and fun to use," also amount to more than puffery. (SAC, at ¶ 105). A reasonable person could rely on his representations regarding the earning potential and rates Voyager offered its users, particularly considering Oladipo's substantial experience in investing in crypto-related enterprises. (SAC, at ¶ 283). *Marty,* 43 F. Supp. 3d at 1342 (rejecting argument that statement was mere puffery and concluding the plaintiffs allegations were sufficient to conclude that a reasonable consumer may be misled); *Thompson*, 2018 WL 5113052, at *2.

Moreover, Oladipo was compensated for his efforts in VGX tokens and Voyager stock, further cementing his motivation to serve his financial interests. By alleging that Oladipo failed to disclose that he was being paid, in part, with VGX tokens and Voyager stocks, Plaintiffs have sufficiently alleged a deceptive and unfair practice that misled thousands of consumers.

Plaintiffs also sufficiently allege that Gronkowski engaged in unlawful conduct when he launched multiple campaigns on his social media page designed to induce potential investors to open accounts and invest in the deceptive Voyager Platform without disclosing that he was being compensated by the entity offering and selling the security for promoting the sale of Voyager securities. (SAC, at ¶¶ 252–264). Like Oladipo, Gronkowski also did not disclose that he was being paid, in part, with VGX tokens and Voyager stock. (SAC, at ¶ 261).[25] In light of these material

[24] Defendants claim that Cuban "expressly warned" potential customers. Motion at 24. But in the context of Defendants continuing promotions, this supposed warning only reflects that Defendants already understood that their followers and other potential customers would rely on their promotions.
[25] First, Defendants incorrectly claim (Motion at 25 n.31) that Plaintiffs omitted the hashtag #voyagerpartner from the screenshot. Yet, the tweet in the cited footnote includes no such hashtag or other disclosure of the paid nature of the partnership. *See*

omissions, reasonable consumers would not be aware of Gronkowski's personal financial inventive to induce Plaintiffs to invest with Voyager. Gronkowski's touting of a financial investment to his millions of loyal followers and encouraging his followers to invest using the Voyager platform, when he knew or should have known the regulatory concerns about companies selling unregistered crypto securities, also constitutes a deceptive and unfair practice. (SAC, at ¶ 265).

### C.   Defendants' Misrepresentations Caused Actual Damages to Plaintiffs

Plaintiffs sufficiently allege that Defendants' deceptive and unfair practices caused their injuries. The element of causation is met if "an objectively reasonable person would have been deceived." *Inetianbor v. Cashcall, Inc.*, 13-60066-CIV, 2016 WL 4250644, at *5 (S.D. Fla. Apr. 5, 2016) (quoting *Fitzpatrick v. Gen. Mills, Inc.*, 635 F.3d 1279, 1283 (11th Cir. 2011) (explaining standard to recover damages under FDUTPA). Plaintiffs were induced to invest in Voyager's platform and purchase unregistered crypto securities from Voyager as a direct result of Defendants aggressive and misleading advertising campaigns and promotional efforts. Defendants' actions caused actual damages to Plaintiffs in the form of lost investments, *see, e.g.*, SAC ¶ 381, which are recoverable under the state consumer protection statutes, such as FDUTPA. *Hodges v. Monkey Capital, LLC*, 17-81370-CV, 2018 WL 9686569, at *8 (S.D. Fla. Aug. 14, 2018) ("As a result of Defendants' deceptive trade practices, Plaintiffs were deceived into investing their cryptocurrency and/or fiat currency with a company that functioned solely as an engine of fraud, thereby causing economic damage to Plaintiffs . . . Plaintiffs have been damaged by, among other things losing their invested cryptocurrency.").

### D.   Plaintiffs Have Standing to Assert the State Law Claims

Defendants' final unavailing argument against the UDAP Claims relates to Plaintiffs' standing to assert these claims against Gronkowski. Specifically, Defendants contend that only two named Plaintiffs (Dorn from California and Dagnoli from Massachusetts) were aware of Gronkowski's promotion of Voyager, so Plaintiffs can only pursue the California and Massachusetts state law claims against him. This argument completely misconstrues and ignores the allegations in the SAC.

---

https://twitter.com/RobGronkowski/status/1435585933450088451. Nor do several other tweets in the SAC reflect that they were paid. See SAC ¶ 256 n.58 (including only hashtags #newbestfriend, #voyager, and #crypo). For others, the simple inclusion of the hashtag #partner does not provide enough information for a view to understand that the content is the result of a paid promotion. Second, to the extent that certain social media message indicate they are paid promotions, this reflects Defendants awareness that they intended to induce reliance through the posts. Moreover, the selective inclusion of disclosure, which themselves vary, on certain posts and not others is all the more so confusing to consumers trying to discern what content is paid for by Voyager.

All Plaintiffs (not just Dorn and Dagnoli) allege that they were exposed to Gronkowski's misrepresentations and omissions regarding the Voyager Platform which caused them to purchase, repurchase, invest, reinvest, deposit, and/or transfer additional funds into their EPAs and suffer injury in each of the eleven states in which claims are asserted. (SAC, at ¶¶ 68, 71, 74, 77, 80, 83, 86, 89, 92, 95, 98, 101, 104, 107, 110, and 113). Accordingly, there is no basis for this Court to strike the UDAP Claims against Gronkowski.

### III.   Cuban and the Mavericks Promoted VGX

Defendants argue that all claims against the Mavericks and Mr. Cuban based on their promotion of or deceptive trade practices related to VGX should fail on the grounds that they declined the opportunity to promote VGX tokens. This argument ignores, however, that promoting Voyager necessarily promotes all its products, including the VGX token, which backed the entire platform..

By promoting the Voyager Platform as a trustworthy and easy-to-use cryptocurrency platform, the Defendants endorsed and promoted Voyager's products and services, including VGX tokens, which were integral to the Voyager Platform's functionality. Indeed, each of the Plaintiffs has alleged that endorsements by Cuban and the Mavericks of the Voyager Platform "caused [them] to . . . purchase, repurchase, invest and/or reinvest in VGX Tokens as well as keep the EPA open and hold VGX tokens until Voyager's collapse." (SAC, at ¶¶ 68, 71, 77, 80, 83, 86, 89, 92, 95, 98, 101, 104, 107, 110, 113).

While Defendants emphasize Mr. Cuban's statements expressing skepticism about VGX tokens and their potential classification as securities, these statements are not dispositive of his liability. Neither does the Mavericks' supposed rejection of the opportunity to promote VGX tokens absolve the Mavericks of their liability regarding VGX tokens' connection to EPAs and their associated risks. Of course, they could have rejected the opportunity to promote Voyager itself in light of these risks— but went ahead anyway. Fundamentally, Defendants chose to promote Voyager to consumers and thereby caused consumers to use Voyager, which meant investing in EPAs and VGX.  They are liable for that for the reasons discussed above in Parts I – II.

### IV.   Defendants Illegally Conspired with Voyager

Defendants incorrectly assert that Plaintiffs' have not pled a civil conspiracy claim (Count 4).

*First*, Defendants argue that this claim fails because there is no underlying tort. However, violations of the consumer protection statutes *are* tortious acts. *See, e.g., Aim Immunotech, Inc v. Tudor*, No. 5:22-CV-323-GAP-PRL, 2023 WL 3975309, at *8 (M.D. Fla. Mar. 28, 2023) (explaining that the

violation of a statute such as FDUTPA is a tortious act). And for the reasons discussed above in Part II, Plaintiffs have properly pled their UDAP Claims.

*Second*, Defendants argue that what the SAC characterizes as a conspiracy is really just a series of separate advertising contracts between Voyager and each Defendant. But the fact that Voyager contracted separately with each Defendant does not bar the existence of a conspiracy.

To support a claim for civil conspiracy, Plaintiffs only need to show that the alleged conspirators "understood the general objectives of the conspiracy, accepted them and made an implicit or explicit agreement to further those objectives." *Vibra-Tech Engineers, Inc. v. Kavalek*, 849 F. Supp. 2d 462, 494 (D.N.J. 2012). Plaintiffs do not need to allege or prove that "the unlawful agreement was express, as long as the plaintiff alleges that each participant shared in the 'general conspiratorial objective.'" *Hanover Architectural Serv., P.A. v. Christian Testimony-Morris, N.P.*, 10-CV-05455 SDW, 2011 WL 6002045, at *9 (D.N.J. Nov. 29, 2011) (quoting *Morgan v. Union Cnty. Bd. Of Chosen Freeholders*, 268 N.J. Super. 337, 633 A.2d 985, 998–99 (N.J.App.Div. 1993)).

Here, Plaintiffs' allegations show that Defendants understood the general objectives of the conspiracy: to target and persuade unsophisticated consumers to invest in Voyager and/or use the Voyager Platform. (SAC, at ¶¶ 6, 21–22, 367–374). Defendants accepted the objectives of the conspiracy and agreed to further those objectives by engaging in deceptive promotions and marketing tactics which contained clear misstatements and omissions of material facts that should have been disclosed to Plaintiffs. *Id.* The methods Voyager and the Defendants used to solicit the sales of Voyager's unregistered securities to consumers across the nation were wildly successful, resulting in millions of Americans collectively losing billions of dollars when Voyager collapsed and declared bankruptcy in July 2022. (SAC, at ¶ 19). This conduct is sufficient to support a claim for civil conspiracy.

## V. Plaintiffs are Entitled to Declaratory Relief

Defendants cite no authority that supports their position that a claim under the New Jersey Declaratory Judgment Act ("NJDJA") may only be asserted by a New Jersey resident. Certainly, the NJDJA itself does not contain any language that restricts standing to in-state residents. Instead, Defendants rely on an entirely inapposite section of the New Jersey Securities Act, N.J. Stat. § 49:3-51, which they contend restricts securities claims to in state residents. However, the legislature intended for the NJDJA to apply broadly, explaining that "[i]ts purpose is to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." N.J.S.A. 2A:16-51 (further explaining that the act "shall be liberally construed and administered"). To have standing

to assert a declaratory judgment action under the NJDJA, a plaintiff need only "have an interest in the subject matter[.]" *Securus Techs., Inc. v. Murphy*, A-5465-16T3, 2019 WL 1244802, at *3 (N.J. Super. Ct. App. Div. Mar. 18, 2019) (quoting *Cty. Of Bergen v. Port of N.Y. Auth.*, 32 N.J. 303, 307 (1960)).

Defendants also fail to support their argument that Plaintiffs have an "improper purpose" for invoking the NJDJA because there are other adequate remedies. (Motion, p. 31). Plaintiffs' claim for relief under the NJDJA "is not precluded by the existence of another appropriate remedy," even "where another remedy would be more effective or appropriate." *See 966 Video, Inc. v. Mayor & Tp. Comm. Of Hazlet Tp.*, 299 N.J. Super. 501, 512, 691 A.2d 435, 440 (Law. Div. 1995). So, the mere fact that plaintiffs have alleged other counts involving similar factual issues does not bar their claim for relief under the NJDJA. *See id.*[26]

## VI.    The SAC is Not a Shotgun Pleading

The Eleventh Circuit has explained that "[t]he essence of a shotgun pleading is 'that it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'" *Vujin v. Galbut*, 836 F. App'x 809, 814 (11th Cir. 2020) (quoting *Anderson v. District Bd. of Trustees of Cent. Florida Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)). The Eleventh Circuit has identified four types of pleadings that produce this problem, including "complaints that assert multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 815 (quoting *Weiland v. Palm Beach Cty. Sherriff's Off.*, 792 F.3d 1313, 1321–23 (11th Cir. 2015)) (internal quotations omitted).

Defendants argue that the SAC is a shotgun pleading of this variety because it supposedly asserts all 24 causes of action against all "Defendants," and improperly attributes statements made by one Defendant to all Defendants. Contrary to Defendants' arguments, however, the factual allegations against each Defendant are entirely clear—the SAC separately describes each alleged statement or action that forms the basis for its claims under each of the relevant statutes underlying each count and indicates exactly which Defendants made each statement or performed such action. *See SEC. v. Complete Business Solutions Group, Inc.*, 538 F.Supp.3d 1309 (S.D. Fla. 2021) (denying motion to dismiss on the grounds that the complaint was a shotgun pleading where the complaint separately described each alleged misrepresentation that forms the basis for its claims and indicated which Defendant made each misrepresentation). And the SAC also identifies each claim with sufficient clarity for Defendants

---

[26] Defendants also argue (Motion at 31 n.36) that this claim fails because Voyager is an indispensable party. However, as Plaintiffs demonstrate below, Part VII, Defendants have not demonstrated that Voyager is an indispensable party.

to frame a responsive pleading. *See Weiland*, 792 F.3d at 1323 (explaining that "[t]he unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."). As such, it certainly is not "virtually impossible" to know which factual allegations are intended to support which claims for relief, which precludes dismissal of the SAC on the grounds that it is a shotgun pleading.

**VII.   Voyager is Not a Necessary Third Party Under Rule 19**

Defendants' argument that Voyager is a required party under Federal Rule of Civil Procedure 19 misrepresents the nature of Plaintiffs' claims and otherwise ignores applicable law.

As the moving party, Defendants have the burden to show that Voyager is an indispensable party within the meaning of Rule 19 and that the case should not proceed outside its presence. *See Selective Ins. Co. of the Southeast v. William P. White Racing Stable, Inc.*, No. 15-21333-CIV-Lenard/Goodman, 2015 WL 11237014, at *4 (S.D. Fla. Dec. 22, 2015) (citing *Nottingham v. General American Communications Corp.*, 811 F.2d 873, 880 (5th Cir. 1987)). To do so, Defendants would have to show that Voyager has an interest in the outcome of the suit which would be impeded by its absence. *William P. White Racing*, 2015 WL 11237014, at *4 (citing *Molinos Valle Del Cibao, C. por A v. Lama*, 633 F.3d 1330, 1344 (11th Cir. 2011)). If Defendants satisfy this first prong, and the Court determines that it is infeasible to join Voyager, then Defendants would have to demonstrate that this action could not proceed in equity and good conscience. *Id.*

Defendants do nothing to demonstrate what interest Voyager has in the outcome of this case that would be impeded in its absence or why this action cannot proceed without it. Instead, Defendants' argument hinges entirely on the assertion that "the Court will need to evaluate Voyager's conduct, as Plaintiffs seek in part to hold Defendants *secondarily* liable for Voyager's alleged primary violations." [ECF No. 189, p. 32] (emphasis added).[27] Defendants highlight certain of the SAC's

---

[27] Defendants dramatically misrepresent the facts of *In re Rensin*, 600 B.R. 870 (Bankr. S.D. Fla. 2019), the sole case they rely on to argue that Voyager's "bankruptcy trustee is a necessary third party," however, *Rensin* was brought *by* the bankruptcy trustee, who sought a declaration that a judgment debtor's offshore trust was property of the bankruptcy estate, and the bankruptcy court concluded that the trustee of the offshore trust was an indispensable party. *See Id.*, at 873, 887.  This case is far different. First, if Plaintiff succeeds in obtaining a judgment against Cuban and/or the Mavericks, it will not affect the assets of the Debtors, so the Court can order complete relief without the presence of the Debtors. Second, Defendants do not explain how rulings in this case about Voyager's conduct which affect Voyager's interests. It *cannot*, because rulings in this case will not have a preclusive effect

paragraphs in which Plaintiffs allege that Voyager violated state securities and consumer protection laws through the sale of allegedly unregistered securities. But Defendants ignore countless other paragraphs alleging that Defendants *directly* solicited the purchase of Voyager securities in violation of those same laws.

As explained above, Plaintiffs are looking to hold Defendants *primarily* liable as direct sellers of Voyager securities under *Pinter, Wildes,* and *Pino.* Complete relief can thus be afforded without Voyager's joinder in this case. *See* Fed. R. Civ. P. 19(a)(1)(A) (providing that a party is a necessary party and must be joined if feasible if complete relief cannot be afforded among existing parties in that party's absence).

### VIII.   This Court has Personal Jurisdiction over Cuban and the Mavericks

When determining whether personal jurisdiction exists over a defendant, district courts in the Eleventh circuit consider: "(1) whether personal jurisdiction exists over the nonresident defendant . . . under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Louis Vuitton Malletier, S.A. v. Mosseri,* 736 F.3d 1339, 1350 (11th Cir. 2013). Both requirements are met here.

#### A.   Plaintiffs' Allegations Satisfy Florida's Long-Arm Statute

Florida's long-arm statute provides that a non-resident defendant is subject to personal jurisdiction in Florida "for any cause of action arising from . . . [c]omitting a tortious act within this state." Fla. Stat. § 48.193(1)(a)(2); *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013).[28] A defendant's physical presence in Florida is not required. *Bluegreen Vacations Unlimited, Inc. v. Montgomery L. Firm LLC*, No. 19-24704-CIV, 2022 WL 17987280, at *2 (S.D. Fla. June 17, 2022). Rather, the statute confers jurisdiction over defendants who commit tortious acts outside the state that cause injury in Florida. *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1272–73 (11th Cir. 2022), *cert. denied sub nom. Expedia Grp., Inc. v. Del Valle*, No. 22-1169, 2023 WL 6377917 (U.S. Oct. 2, 2023).

Florida's Supreme Court has held that "committing a tortious act" in Florida under the long-arm statute "can occur through the nonresident defendant's telephonic, electronic, or written communications into Florida," provided the tort arises from the communication. *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002). That is precisely what Plaintiffs allege here. In particular, allegations that a Florida resident suffered injuries from violations of Florida's Deceptive and Unfair Trade

---

in a different proceeding against a different party. At most, while the Court will need to "evaluate Voyager's conduct," Defendants do not explain how this will actually "implicate Voyager's interests."

[28] Defendants' cases regarding economic injuries only pertain to jurisdiction under § 48.193(1)(a)(6).

Practices Act ("FDUTPA") "are sufficient to state a prima facie case for personal jurisdiction" under the long-arm statute section pertaining to tortious acts. *Richard Boyd Enterprises, Inc. v. Aquarium Pharms., Inc.*, No. 09-22301-CIV, 2010 WL 11448226, at *5 (S.D. Fla. Feb. 5, 2010); *Bluegreen Vacations Unlimited, Inc. v. Montgomery L. Firm LLC*, No. 19-24704-CIV, 2022 WL 17987280, at *3 (S.D. Fla. June 17, 2022) (recognizing that allegations that defendants engaged in practices prohibited under FDUTPA constitute "tortious actions" under Florida's long-arm statute); *Aim Immunotech, Inc v. Tudor*, No. 5:22-CV-323-GAP-PRL, 2023 WL 3975309, at *8 (M.D. Fla. Mar. 28, 2023) (same); *Wyndham Vacation Ownership, Inc. v. Montgomery L. Firm, LLC*, No. 618CV2121ORL37LRH, 2019 WL 5394186, at *3 (M.D. Fla. Aug. 8, 2019) (same).

The SAC identifies multiple instances in which Cuban and the Mavericks made false and misleading statements regarding the Voyager Platform to induce investors—both in Florida and across the nation—to purchase Voyager EPAs and/or VGX Tokens. *See, e.g.*, (SAC, at ¶¶ 194–242). The promotions by Cuban and the Mavericks, including myriad social media posts to their millions of followers, nationally-televised Mavericks basketball games featuring Voyager promotions, and the televised press conference, were accessible in Florida and were in fact viewed in Florida by Florida residents. (SAC, at ¶¶ 22, 41–42, 60, 63, 66–68, 72–74, 99–101, 239–240). The SAC alleges that thousands of individuals in Florida were persuaded to create Voyager accounts using the Mavericks coupon code after the promotions by Cuban and the Mavericks. *Id.* The targeted impact of Cuban and the Maverick's efforts is further demonstrated by the fact that "Florida had among the most redemptions of the [Mavericks] code compared to other states." (SAC, at ¶ 240).

These allegations are sufficient to satisfy Florida's long-arm statute. *See Wyndham Vacation Ownership, Inc. v. Montgomery L. Firm, LLC*, No. 618CV2121ORL37LRH, 2019 WL 5394186, at *5 (M.D. Fla. Aug. 8, 2019) (finding Florida's long-arm statute satisfied where plaintiffs alleged that the non -resident defendants' false and misleading advertisements induced them to stop making payments on their timeshares, which caused injury in Florida); *Moccio v. Bossbabe Societe, Inc.*, No. 8:21-CV-0210-KKM-AEP, 2021 WL 4847034, at *3 (M.D. Fla. Oct. 18, 2021) (finding personal jurisdiction pursuant to Florida's long-arm statute over non-resident defendant that committed tortious act through a website or online platform that is accessible and was accessed in Florida by its customers); *Gubarev v. Buzzfeed, Inc.*, 253 F. Supp. 3d 1149, 1156–57 (S.D. Fla. 2017) ("Because there is no dispute that the Buzzfeed website and the Buzzfeed mobile application are accessible in Florida, the Article was accessible in Florida, and the Article was, in fact, accessed in Florida, it follows that Defendants have committed a tort in Florida for purposes of the jurisdictional analysis.").

Even if Cuban and the Mavericks had no connection to Florida (which they do in connection with both the FDUTPA and unregistered securities claims), they still would be subject to this court's jurisdiction as alleged co-conspirators. (SAC, at ¶¶ 367–374). Florida's long-arm statute reaches all the alleged participants in a civil conspiracy if at least one act in furtherance of the conspiracy is committed in Florida. *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1354 (S.D. Fla. 2009); *NHB Advisors, Inc. v. Czyzyk*, 95 So. 3d 444, 448 (Fla. 4th DCA 2012). In other words, Florida courts may exercise personal jurisdiction over any alleged conspirator "where *any other co-conspirator commits an act in Florida* in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida." *De Ford v. Koutoulas*, No. 6:22-CV-652-PGB-DCI, 2023 WL 2709816, at *8 (M.D. Fla. Mar. 30, 2023), *reconsideration denied,* No. 6:22-CV-652-PGB-DCI, 2023 WL 3584077 (M.D. Fla. May 22, 2023), *appeal dismissed,* No. 23-12109-E, 2023 WL 6213424 (11th Cir. July 31, 2023) (quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281–82 (11th Cir. 2009)).

Plaintiffs have sufficiently alleged that Cuban and the Mavericks were part of a conspiracy to promote the Voyager Platform and that the co-conspirator defendants, Oladipo and Gronkowski, committed acts in Florida in furtherance of the conspiracy. (SAC, at ¶¶ 243–285, 367–374). That is enough to bring Cuban and the Mavericks within the reach of Florida's long arm statute. *De Ford v. Koutoulas*, 2023 WL 2709816, at *8; *Burger v. Hartley*, 896 F. Supp. 2d 1157, 1165 (S.D. Fla. 2012).

**B.** **Cuban and the Mavericks Purposefully Availed Themselves of the Privileges of Conducting Activities in Florida**

Federal courts in the Eleventh Circuit use a three-part test to determine whether exercising jurisdiction over a defendant would violate the Due Process Clause: (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) "whether the ... defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state"; and (3) "whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice." *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1229 (11th Cir. 2023). Each of these prongs is met here.

The first prong of the analysis is satisfied because Plaintiffs' claims arise out of the defendants' tortious acts that were directed to Florida, accessed in Florida, and resulted in injury to thousands of individuals in Florida. (SAC, at ¶¶22, 42, 60, 63, 66–68, 72–74, 99–101, 239–240).

Cuban and the Mavericks also purposefully availed themselves of the privileges of conducting activities in Florida. Plaintiffs satisfy this element by alleging that the tortious acts committed by Cuban

and the Mavericks were intentional, aimed at individuals in Florida, and cause harm that defendants should have anticipated would be suffered in Florida. *In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Pracs. Litig.*, No. ML 12-2317 CAS JEMX, 2012 WL 6062047, at *8 (C.D. Cal. Dec. 3, 2012) ("[I]t is clear that a person should expect to be haled into the courts of a forum state for a claim of false advertising if he or she broadcasts false advertising into that state. Consequently, the Court finds that by appearing in advertisements broadcast into Florida and Ohio, [defendant] purposefully availed himself of these states, and that it would be reasonable for the courts of those states to exercise specific personal jurisdiction over him."). It was certainly foreseeable to Cuban and the Mavericks that Florida residents would be induced to open Voyager accounts because of their highly publicized promotional activities, and defendants "cannot now claim surprise at being haled [sic] into court" in Florida. *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008).

The exercise of personal jurisdiction over Cuban and the Mavericks also comports with traditional notions of fair play and substantial justice. The burden on the defendant in defending the lawsuit, the forum state's interest in adjudicating the dispute, and the plaintiff's interest in obtaining convenient and effective relief are all relevant factors when making this determination. *Smith v. Trans-Siberian Orchestra*, 728 F. Supp. 2d 1315, 1324–25 (M.D. Fla. 2010). These factors weigh in favor of exercising jurisdiction.

Cuban and the Mavericks do not argue that they would be prejudiced or unduly burdened by an adjudication in Florida—presumably because there is none. Cuban (an owner and the Governor of the Mavericks) has substantial ties to Florida—including owning two condominiums on Miami Back and traveling to Florida for personal reasons multiple times a year. (SAC, at ¶ 114). Florida undeniably has a "very strong interest" in exercising jurisdiction over those who commit intentional torts causing injury to its residents. *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008). The Plaintiffs' interest in obtaining convenient and effective relief in Florida also weighs in favor of exercising jurisdiction. Simply put, the Due Process Clause is not offended by Florida's assertion of its jurisdiction over Cuban and the Mavericks.

### C.  The Corporate Shield Doctrine Does Not Protect Cuban

Finally, Cuban cannot use the corporate shield doctrine to avoid personal jurisdiction in Florida. The corporate shield doctrine (also referred to as the fiduciary shield doctrine) "provides that acts performed by a person exclusively in his corporate capacity not in Florida but *in a foreign state* may not form the predicate for the exercise of personal jurisdiction over the employee in the forum state." *Kitroser v. Hurt*, 85 So. 3d 1084, 1088 (Fla. 2012).

34

Notably, the corporate shield doctrine does not apply where the corporate officer commits intentional torts. *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1354–55 (11th Cir. 2013); *see also Bluegreen Vacations Unlimited, Inc. v. Montgomery L. Firm LLC*, No. 19-24704-CIV, 2022 WL 17987280, at *6 (S.D. Fla. June 17, 2022) ("[A] corporate officer who commits fraud or other intentional misconduct outside of Florida may be subject to personal jurisdiction."). Florida law recognizes that participation in an alleged violation of FDUTPA, which is precisely what Plaintiffs allege in this lawsuit, constitutes intentional misconduct sufficient to deprive an individual defendant of the protection of the corporate shield doctrine. *In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Pracs. Litig.*, No. ML 12-2317 CAS JEMX, 2012 WL 6062047, at *6 (C.D. Cal. Dec. 3, 2012) (citing *State, Off. of Atty. Gen., Dep't of Legal Affs. v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598–599 (Fla. 1st DCA 2004)). Because the SAC contains sufficient, well-pled allegations that Cuban committed intentional torts and conspired to commit intentional torts that harmed Florida residents, he cannot invoke the corporate shield doctrine to defeat personal jurisdiction in this case. (SAC, at ¶¶ 22, 42, 60, 63, 66–68, 72–74, 99–101, 239–240).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Motion.

## **REQUEST FOR ORAL ARGUMENT**

In accordance with Local Rule 7.1(b)(2), Plaintiffs respectfully request that the Court hear oral argument on this Motion, and respectfully submit that one hour should be sufficient for all Parties.

Dated: November 17, 2023                         Respectfully submitted,

By: **/s/ Adam M. Moskowitz**                    By: **/s/ David Boies**
Adam M. Moskowitz                                David Boies
Florida Bar No. 984280                           (admitted *pro hac vice*)
adam@moskowitz-law.com                           Alexander Boies
Joseph M. Kaye                                   (admitted *pro hac vice*)
Florida Bar No. 117520                           Brooke Alexander
joseph@moskowitz-law.com                         (admitted *pro hac vice*)
Barbara C. Lewis                                 **BOIES SCHILLER FLEXNER LLP**
barbara@moskowitz-law.com                        333 Main Street
Florida Bar No. 118114                           Armonk, NY 10504
**THE MOSKOWITZ LAW FIRM, PLLC**                 Phone: (914) 749–8200
2 Alhambra Plaza, Suite 601                      dboies@bsfllp.com
Coral Gables, FL 33134                           aboies@bsfllp.com
Telephone: (305) 740-1423                        balexander@bsfllp.com

*Co-Counsel for Plaintiffs and the Class*

35

**By: /s/ Jose M. Ferrer**
Jose M. Ferrer
Florida Bar No. 173746
Desiree Fernandez
Florida Bar No. 119518
**MARK MIGDAL HAYDEN LLP**
8 SW 8th Street, Suite 1999
Miami, FL 33130
Office: 305-374-0440
jose@markmigdal.com
desiree@markmigdal.com

*Co-Counsel for Plaintiffs and the Class*

Stephen Neal Zack
Florida Bar No. 145215
Tyler Ulrich
Florida Bar No. 94705
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., Suite 2800
Miami, FL 33131
Office: 305-539-8400
szack@bsfllp.com
tulrich@bsfllp.com

*Co-Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed on November 17, 2023, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

By: */s/ Adam M. Moskowitz*
ADAM M. MOSKOWITZ
Florida Bar No. 984280

36