# Exhibit A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 22-cv-23171-BLOOM/Torres

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

ARBITRADE LTD.;
CRYPTOBONTIX INC.;
TORY R.J. HOGG;
JAMES L. GOLDBERG;
STEPHEN L. BRAVERMAN;
MAX W. BARBER;
SION TRADING FZE,

      Defendants.

_____/

## ORDER ON MOTION FOR RECONSIDERATION OR CERTIFICATION FOR INTERLOCUTORY APPEAL

**THIS CAUSE** is before the Court upon Defendant James L. Goldberg's ("Goldberg")

Motion for Reconsideration or Certification for Interlocutory Appeal, ECF No. [95] ("Motion"),

filed on November 21, 2023, which was joined by Defendant Tory R.J. Hogg ("Hogg"), ECF No.

[104]. Plaintiff Securities and Exchange Commission (the "Commission") filed a Response in

Opposition, ECF No. [109], to which Goldberg filed a Reply, ECF No. [110]. The Court has

reviewed the Motions, all opposing and supporting submissions, the record in this case, the

applicable law, and is otherwise fully advised. For the reasons discussed below, the Motions are

denied.

## I. BACKGROUND

### A. Complaint

As recounted in the Court's Order on Motions to Dismiss, ECF No. [76] ("Order"), the Complaint alleges the following:

On September 30, 2022, the SEC filed a 13-count Complaint against Arbitrade Ltd. ("Arbitrade"), its "control person" Goldberg, and its Chief Operations Officer, Braverman; Cryptobontix Inc. ("Cryptobontix") and its "control person" Hogg; and SION Trading FZE ("SION") and its founder, owner, and sole officer, Max W. Barber ("Barber"). ECF No. [1] ¶ 1. The Complaint alleges Defendants committed numerous violations of the Securities Act, 15 U.S.C. § 77q(a)(1) *et seq.*, the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78(j)(b) and 17 C.F.R. § 240.10b-5(a) *et seq.*, as well as related aiding and abetting and unjust enrichment claims. *See generally id.* The SEC accuses Defendants of engaging in "a classic pump and dump scheme" involving a crypto asset called "Dignity" or "DIG." *Id.* ¶ 2. The Complaint sets forth the following scheme:

In early 2017, Hogg, through his company Cryptobontix, developed a crypto asset, which was later named "Dignity" or "DIG." *Id.* ¶ 17. Three billion DIG tokens were created, and they were all owned by Hogg and Cryptobontix. *Id.* ¶ 19. Hogg and Cryptobontix began trading the tokens on a crypto asset-trading platform called "Livecoin." *Id.*

Hogg recruited Arbitrade and the individuals who controlled it, Goldberg and Braverman, to assist in promoting an "initial coin offering" of DIG tokens. *Id.* ¶¶ 10-11, 20-21. Arbitrade's website represented that DIG tokens would eventually be redeemable for gold. *Id.* ¶ 24. Arbitrade and Cryptobontix "consistently advertised" that they would back the DIG tokens with gold worth $1 per token. *Id.* ¶ 26.

In the Spring of 2018, Hogg and Goldberg were introduced to Barber and SION as a potential source to acquire gold. *Id.* ¶ 27. Arbitrade and SION executed a "Memorandum of Understanding" ("MOU") in which they agreed to execute a definitive contract under which Arbitrade would purchase $10 billion of gold bullion from SION, in exchange for an equity interest in Arbitrade, 150 million DIG tokens, and monthly installments of approximately $1 million. *Id.* ¶¶ 28-29.

Several days after executing the MOU, Arbitrade and SION signed an "Asset Pledge Agreement," under which SION agreed to provide Arbitrade a "Safe Keeping Receipt" indicating that Arbitrade held title to $10 billion in gold bullion. *Id.* ¶ 30. The deal was finalized in September 2018 when Arbitrade and SION executed an "Assignment Agreement" that purportedly transferred to Arbitrade "all of [SION's] ownership rights and title in the Gold which vests in [SION] pursuant to the [Safe Keeping Receipt]." *Id.* ¶ 31. The Safe Keeping Receipt is a single-page document issued by G4S Cash Services LLC ("G4S"), a company specializing in vaulting and transport of valuable assets. *Id.* ¶ 32. The Safe Keeping Receipt does not refer to Arbitrade or SION holding title to gold of any value, but rather references a gold "Certificate of Guarantee." *Id.* ¶¶ 32-34. That "Certificate of Guarantee" and related documentation are replete with errors and "appear to be forgeries[.]" *Id.* ¶ 40.

To strengthen the appearance that the gold transaction was legitimate, Arbitrade engaged two accounting firms to evaluate and confirm details of the transaction. *Id.* ¶ 41. The scope of one firm's investigation was narrowly dictated by SION, and neither of the firms confirmed whether SION actually possessed rights or title to gold bullion. *Id.* ¶¶ 43-47. Defendants "ignored the red flag presented when SION told [one of the firms] to drop its request for a video conference with the G4S employee whose signature purportedly appears on the Safe Keeping Receipt." *Id.* ¶ 48.

"Arbitrade also acquiesced to SION's requirement that Arbitrade should have no direct communications with G4S personnel." *Id.* ¶ 49.

In October 2018, Braverman on behalf of Arbitrade attempted to hire Bureau Veritas, a company that specializes in inspection and certification services, to provide an opinion about the existence of the gold bullion that Arbitrade purportedly purchased from SION. *Id.* ¶ 50. Bureau Veritas "refused to accept the engagement when it became clear that Arbitrade wanted the firm to issue its opinion without conducting any physical examination of the gold, with Braverman telling the firm that '[c]ounting bars I believe is overkill.'" *Id.* ¶ 51.

From March 2018 through January 2019, Defendants Arbitrade, Cryptobontix, Hogg, Goldberg, Braverman, and Barber "made material misstatements or omissions" concerning Arbitrade's purported acquisition of billions of dollars of gold bullion. *Id.* ¶ 53. In actuality, "Arbitrade never acquired or received title to $10 billion in gold bullion," and no audit of the $10 billion in gold was ever performed by a major accounting firm," as represented in one of the news releases. *Id.* ¶¶ 72-73. Braverman personally reviewed at least one of the false press releases prior to its issuance. *Id.* ¶ 55. The representations in the news and press releases concerning Arbitrade's acquisition of gold bullion "were blatantly false and misleading." *Id.* ¶ 71.

The effect of the false and misleading news stories was to create artificial demand for DIG tokens and inflate their price. *Id.* ¶¶ 76-77. DIG investors bought the DIG tokens with Bitcoin or other crypto assets. *Id.* ¶ 82. They relied on Defendants' representations that the value of DIG tokens would increase once Arbitrade and Cryptobontix secured sufficient gold to back the DIG tokens. *Id.* ¶ 84.

While Arbitrade and Cryptobontix were engaged in "the false promotional campaign," Hogg and Goldberg sold their DIG tokens, making proceeds "totaling about $36.8 million." *Id.* ¶ 79-80.

Braverman converted those proceeds to cash, which he then redistributed between Hogg, Goldberg, and himself. *Id.* ¶¶ 86-88. By February 2020, the DIG token "reached a sustained valuation of zero." *Id.* ¶ 91.

### B.  Order on Motion to Dismiss

Goldberg filed his Motion to Dismiss on January 12, 2023, which was joined by Hogg.[1] ECF Nos. [25], [27]. Goldberg argued this case must be dismissed for lack of subject matter jurisdiction because the SEC lacks the authority to regulate DIG tokens, which Goldberg asserts are not securities. *See generally* ECF No. [25] ("Motion to Dismiss"). The Commission responded that Defendants' sales of DIG tokens constitute investment contracts under the traditional *Howey* test. ECF No. [48] at 5 (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)).

The Court thereafter issued an Order Denying Motions to Dismiss, ECF No. [76] ("Order"). Relevant here, the Court determined the Commission has jurisdiction to bring this lawsuit because the Complaint plausibly alleges Defendants' offer of DIG tokens constitutes an "investment contract" under the *Howey* test. The Court began its analysis by noting "[t]he Securities Act defines the term 'security' to encompass 'any note, stock, treasury stock, security future, security-based swap, bond, debenture, . . . investment contract, . . . or, in general, any interest or instrument commonly known as a 'security.'" *Id.* at 9 (quoting 15 U.S.C. § 77b(a)(1)). The Order explains the Supreme Court established the *Howey* test to determine whether a particular scheme constitutes an "investment contract," namely, "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301. The *Howey* test thus instructs "an investment contract exists if there is (a) an investment of money, (b) in a common enterprise, (c) based on an expectation of profits to

---

[1] Defendant Stephen L. Braverman also filed a Motion to Dismiss challenging the sufficiency of the Complaint's allegations. *See generally* ECF No. [30].

be derived from the entrepreneurial or managerial efforts of others." *SEC v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999)).

In its Order, the Court found the Complaint plausibly alleges that Defendants' scheme satisfies the *Howey* test. Regarding the first element, the Court found the Complaint's allegations "that investors committed funds in the form of Bitcoin and other crypto assets to buy DIG tokens, which would later be redeemable for gold" plausibly alleges those investors made an investment of money. ECF No. [76] at 10 (citing ECF No. [1] ¶¶ 24, 82). Regarding the second element—"common enterprise"—the Court explained the Eleventh Circuit employs a "'broad vertical commonality' test" requiring "the movant 'to show that the investors are dependent upon the expertise or efforts of the investment promotor for their returns.'" *Id.* (quoting *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 (11th Cir. 2005)). The Court determined the Complaint's allegations "that investors' expectation of profits derived from their expectation that the value of their DIG tokens would increase due to the efforts of Arbitrade and Cryptobontix to back the tokens with gold bullion[]" plausibly alleges Defendants' scheme constitutes a common enterprise. Finally, the Court determined the Complaint's allegations satisfy the third element, whether "investors expect their profits to come solely from the efforts of others." *Id.* at 10-11 (quoting *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1201 (11th Cir. 1999) (internal quotation omitted). The Court concluded the allegations that the DIG investors' "role was limited to purchasing the DIG tokens[,]" with the "expectation of profits derived solely from the actions of Arbitrade and Cryptobontix, including their efforts to back the value of DIG tokens with gold bullion[]" were sufficient. *Id.* (citing ECF No. [1] ¶ 84).

The Court observed that "Goldberg does not attempt to apply the *Howey* test to the DIG scheme alleged in the Complaint, nor does Goldberg specify which element of the *Howey* test is

not satisfied." *Id.* at 11 (citing ECF Nos. [25], [62]). The Order noted "[w]hether other crypto assets constitute securities or commodities is not the issue before this Court[,]" explaining the Complaint alleges Defendants' scheme involving DIG tokens constitutes an investment contract, not that the DIG tokens are themselves securities. *Id.* at 12.

Goldberg filed the instant Motion on November 21, 2023. Goldberg requests that the Court reconsider its conclusion that the Commission has jurisdiction to bring this case pursuant to Rule 60(b). Goldberg relies on *SEC v. Ripple Labs, Inc.*, 20 Civ. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023) and contends that the Court's finding that Defendants' alleged scheme constitutes an investment contract is erroneous, and reconsideration is necessary to avoid manifest injustice. Alternatively, Goldberg requests that the Court certify the following question for interlocutory appeal:

1. "[W]hether digital asset sales on trading platforms constitute securities transactions under the *Howey* test[.]"

ECF No. [95] at 11.

## II. LEGAL STANDARD

### A. Motion for Reconsideration

A motion for reconsideration is "an extraordinary remedy to be employed sparingly." *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002). "The burden is upon the movant to establish the extraordinary circumstances supporting reconsideration." *Saint Croix Club of Naples, Inc. v. QBE Ins. Corp.*, No. 2:07-cv-00468-JLQ, 2009 WL 10670066, at *1 (M.D. Fla. June 15, 2009) (citing *Taylor Woodrow Constr. Corp. v. Sarasota/Manatee Airport Auth.*, 814 F. Supp. 1072, 1073 (M.D. Fla. 1993)).

A motion for reconsideration must do two things. First, it must demonstrate some reason why the court should reconsider its prior decision. Second, it must set forth

facts or law of a strongly convincing nature to induce the court to reverse its prior decision. Courts have distilled three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or manifest injustice.

*Cover v. Wal-Mart Stores, Inc.*, 148 F.R.D. 294, 295 (M.D. Fla. 1993) (citations omitted). "Such problems rarely arise and the motion to reconsider should be equally rare." *Burger King Corp.*, 181 F. Supp. 2d at 1369.

Because court opinions "are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure," a motion for reconsideration must clearly "set forth facts or law of a strongly convincing nature to demonstrate to the Court the reason to reverse its prior decision." *Am. Ass'n of People With Disabilities v. Hood*, 278 F. Supp. 2d 1337, 1339, 1340 (M.D. Fla. 2003) (citations omitted). As such, a court will not reconsider its prior ruling without a showing of "clear and obvious error where the 'interests of justice' demand correction." *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, No. 6:11-cv-1637-Orl-31, 2013 WL 425827, at *1 (M.D. Fla. Feb. 4, 2013) (quoting *Am. Home Assurance Co. v. Glenn Estess & Assoc.*, 763 F.2d 1237, 1239 (11th Cir. 1985)). "When issues have been carefully considered and decisions rendered, the only reason which should commend reconsideration of that decision is a change in the factual or legal underpinning upon which the decision was based." *Taylor Woodrow Constr. Corp.*, 814 F. Supp. at 1072-73; *see also Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1247 n.2 (S.D. Ala. 2008) (noting that reconsideration motions are to be used sparingly, and stating, "imagine how a district court's workload would multiply if it was obliged to rule twice on the same arguments by the same party upon request"). A motion for reconsideration "is not an opportunity for the moving party ... to instruct the court on how the court 'could have done it better' the first time." *Hood v. Perdue*, 300 F. App'x 699, 700 (11th Cir. 2008) (citation omitted).

Thus, a motion to reconsider is "appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Kapila v. Grant Thornton, LLP*, No. 14-61194-CIV, 2017 WL 3638199, at *1 (S.D. Fla. Aug. 23, 2017) (quoting *Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) (internal quotation marks omitted). "Such problems rarely arise and the motion to reconsider should be equally rare." *Burger King Corp.*, 181 F. Supp. 2d at 1369. Ultimately, reconsideration is a decision that is "left 'to the sound discretion' of the reviewing judge." *Arch Specialty Ins. Co. v. BP Inv. Partners, LLC*, No. 6:18-cv-1149-Orl-78DCI, 2020 WL 5534280, at *2 (M.D. Fla. Apr. 1, 2020) (quoting *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th Cir. 1993)).

### B. Interlocutory Appeal

Three elements are required to certify a question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b):

(1) a controlling question of law;
(2) over which there is a substantial ground for difference of opinion among courts; and
(3) the immediate resolution of the issue would materially advance the ultimate termination of the litigation.

*See* 28 U.S.C. § 1292(b). Interlocutory appeals under § 1292(b) serve as a "rare exception" to the general rule that final judgment must precede appellate review. *McFarlin v. Canseco Servs., LLC*, 381 F.3d 1251, 1264 (11th Cir. 2004). Further, the Court of Appeals for the Eleventh Circuit considers liberal use of § 1292(b) to be bad policy, as it may promote piecemeal appeals. *Id.* at 1259. Accordingly, § 1292(b) certification is only proper "in exceptional cases where decision of the appeal may avoid protracted and expensive litigation … where a question which would be

dispositive of the litigation is raised and there is serious doubt as to how it should be decided." *Id.*

at 1256.

The first element requires a showing that the question involves a controlling question of

law. This element requires demonstrating the following:

> A "controlling question of law" arises where the appellate court can rule on a controlling question of pure law without having to search deep into the record in order to discern the facts of the underlying case. *See Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1252-53 (11th Cir. 2003). To meet the first element for interlocutory appeal, the movant must demonstrate there is a question of law, and it is controlling. *See McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004). A controlling question of law pertains to "the meaning of a statutory or constitutional provision, regulation, or common law doctrine." *Id.* at 1258. In other words, a controlling question of law is an issue of "pure law" that can be decided "quickly and cleanly without having to study the record." *Id.* The question must also "be stated at a high enough level of abstraction to lift the question out of the details of the evidence or facts of a particular case and give it general relevance to other cases in the same area of law." *Id.* at 1259. By contrast, "[t]he antithesis of a proper § 1292(b) appeal is one that turns on whether there is a genuine issue of fact or whether the district court properly applied settled law to the facts or evidence of a particular case." *Id.* at 1259.

*Cont'l 332 Fund, LLC v. Albertelli*, No. 2:17-cv-41-FtM-38MRM, 2018 WL 3656472, at *2 (M.D.

Fla. Aug. 2, 2018).

With respect to the second element under § 1292(b), where the appellate court is in

"complete and unequivocal" agreement with the district court, a "substantial ground for difference

of opinion" does not exist. *McFarlin*, 381 F.3d at 1258 (quoting *Burrell v. Bd. of Trustees of Ga.

Military Coll.*, 970 F.2d 785, 788-89 (11th Cir. 1992)). Moreover, questions of first impression or

the absence of binding authority on an issue, without more, are insufficient to demonstrate a

substantial ground for difference of opinion. *See In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996);

*Williams v. Saxon Mortgage Co.*, No. CIV. A. 06-0799-WS-B, 2007 WL 4105126, at *2 (S.D.

Ala. Nov. 15, 2007) (citations omitted). Instead, the district court should measure the weight of

opposing arguments to the disputed ruling in deciding whether there is a "substantial ground for dispute." *In re Flor*, at 284.

The final requirement that the controlling question of law "may materially advance the ultimate termination of the litigation" is a straightforward one. This inquiry simply requires an examination of whether the "resolution of [the] controlling legal question would serve to avoid a trial or otherwise substantially shorten the litigation." *McFarlin*, 381 F.3d at 1259.

The Eleventh Circuit has "identifie[d] several principles to guide [courts] in when deciding whether to exercise [their] discretion under § 1292(b) to allow for a rare interlocutory appeal." *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1336 (11th Cir. 2018) (citing *McFarlin*, 381 F.3d at 1264).

> In general, [courts] exercise [their] discretion only when (1) the appeal presents a pure question of law, (2) the question is controlling of at least a substantial part of the case, (3) the district court identifies the question in its order, (4) there are substantial grounds for differences of opinion on the question, and (5) resolution of the question may reduce the amount of litigation necessary on remand.

*Id.* (citing *McFarlin*, 381 F.3d at 1264). "This standard is conjunctive, meaning that if any elements are not satisfied, the Court must deny interlocutory review." *In re Yormak*, No. 2:17-cv-73-FtM-38, 2017 WL 2645601, at *2 (M.D. Fla. June 19, 2017) (citation omitted). Acknowledging the profound hurdles that parties face in seeking interlocutory appeal, the Eleventh Circuit has characterized this certification as a "high threshold," and pointed out that "[m]ost interlocutory orders do not meet this test." *OFS Fitel, LLC*, 549 F.3d at 1359. Ultimately, "§ 1292(b) certification is wholly discretionary with both the district court and [the Court of Appeals]." *Id.* at 1358.

## III. DISCUSSION

Goldberg primarily relies on *SEC v. Ripple Labs, Inc.*, 20 Civ. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ("*Ripple I*") to argue that the Court should reconsider its Order.

Alternatively, Goldberg contends *Ripple I* justifies certifying whether digital asset sales on trading platforms constitute securities transactions for interlocutory appeal. In *Ripple I*, the Commission sued Ripple Labs, Inc. and two of its senior leaders for allegedly unlawful sales of securities, specifically digital XRP tokens. The parties filed cross-motions for summary judgment. A critical question was "whether Defendants offered to sell or sold XRP as a security[,]" by selling XRP tokens as investment contracts. 2023 WL 4507900, at *5. The court applied the *Howey* test to analyze whether the defendants' sales and offers to sell XRP tokens constituted investment contracts. Relevant here, the court drew a distinction between Ripple Labs, Inc.'s "Institutional Sales" of XRP tokens "to sophisticated individuals and entities pursuant to written contracts[,]" and "Programmatic Sales" of XRP tokens "through the use of trading algorithms" on "digital assets exchanges[.]" 2023 WL 4507900, at *2, 9. Unlike the institutional sales of XRP tokens, the programmatic sales consisted of "blind bid/ask transactions" where "Ripple did not know who was buying the XRP, and purchasers did not know who was selling it." *Id.*, at *2.

Applying *Howey* to both types of sales, the court concluded that the institutional sales constituted investment contracts, but the programmatic sales did not. Regarding the institutional sales, the court found that "[b]ased on the totality of circumstances … reasonable investors, situated in the position of the [i]nstitutional [b]uyers, would have purchased XRP with the expectation that they would derive profits from Ripple's efforts," which included "communications, marketing campaign, and the nature of the [i]nstitutional [s]ales" because "reasonable investors would understand that Ripple would use the capital received from its [i]nstitutional [s]ales to improve the market for XRP and develop uses for the XRP ledger." *Id.* at *10. The institutional sales accordingly satisfied the third element of *Howey*, a conclusion further

Case 1:22-cv-22538-RKA Document 123-5 Entered on FLSD Docket 02/06/2024 Page 14 of 25
Case 1:22-cv-23173-BB Document 123-5 Entered on FLSD Docket 02/06/2024 Page 14 of 25

Case No. 22-cv-23171-BLOOM/Torres

supported by contractual provisions providing for discounted sales prices and resale restrictions as well as marketing brochures those institutional buyers received. *Id.*

Unlike those institutional sales, however, the court concluded the programmatic sales failed to satisfy the third element of the *Howey* test. The court noted that "[w]hereas the [i]nstitutional [b]uyers reasonably expected that Ripple would use the capital it received from its sales to improve the XRP ecosystem and thereby increase the price of XRP, [p]rogrammatic [b]uyers were blind bid/ask transactions, and [p]rogrammatic [b]uyers could not have known if their payments of money went to Ripple, or any other seller of XRP." *Id.*, at *11. The court observed that although it "may certainly be the case that many [p]rogrammatic [b]uyers purchased XRP with an expectation of profit, they did not derive that expectation from Ripple's efforts (as opposed to other factors, such as general cryptocurrency market trends)—particularly because none of the [p]rogrammatic [b]uyers were aware that they were buying XRP from Ripple." *Id.*, at *12. The court also noted the programmatic buyers were not subject to contractual provisions restricting resale or offering discounted prices, nor did those buyers receive the same marketing materials provided to the institutional buyers. *Id.* The court therefore concluded "the economic reality and totality of the circumstances[]" demonstrated "Ripple's [p]rogrammatic [s]ales of XRP did not constitute the offer and sale of investment contracts." *Id.* at *13.

**A. Reconsideration**

The Motion does not identify an intervening change in law or the availability of new evidence justifying reconsideration of the Order. Instead, Goldberg contends reconsideration is needed to correct clear error or manifest injustice. Goldberg argues *Ripple I's* finding that the sales of XRP tokens to programmatic buyers failed to satisfy the *Howey* test demonstrates that reconsideration of the Court's Order is warranted. The Commission responds that the Motion is

procedurally deficient, and Goldberg's contention that *Ripple I* is highly persuasive fails to provide a basis for reconsideration.

As a threshold matter, the Court declines to deny the Motion for erroneously seeking reconsideration pursuant to Rule 60(b). "Rule 60(b) applies only to final judgments, orders, or proceedings." *Jacobs v. Hudson Real Est. Holdings, LLC*, No. 20-CIV-80911-RAR, 2021 WL 705785 (S.D. Fla. Feb. 23, 2021). *See* Fed. R. Civ. P. 60(b) ("[T]he court may relieve a party or its legal representative from a *final* judgment, order, or proceeding ....") (emphasis added)). However, "[m]otions for reconsideration, whether considered under Rule 54(b), Rule 59(b), or Rule 60(b) … are generally all evaluated under the same standard." *Onita-Olojo v. Veolette Sellers*, No. 12-CIV-62064, 2016 WL 11600719, at *1 (S.D. Fla. June 27, 2016); *see Maldonado v. Snead*, 168 F. App'x 373, 386-87 (11th Cir. 2006) ("Although the district court reviewed [the] motion under Rule 54(b) as a motion for reconsideration of a non-final order rather than under Rule 60(b) as a motion for relief from judgment, '[w]e see no reason to apply a different standard when the party seeks reconsideration of a nonfinal order' than when the party seeks reconsideration of a final judgment.'") (quoting *Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th Cir. 1993)). The Court accordingly considers the Motion on the merits rather than denying it for improperly seeking relief from a non-final order.

Goldberg contends reconsideration is warranted "in view of *Ripple* … and given the prospect of a Court of Appeals decision holding that digital asset sales on trading platforms are not securities transactions[.]" Motion at 11. The Motion wholly fails to identify any "clear and obvious error where the 'interests of justice' demand correction[,]" however. *Bhogaita*, 2013 WL 425827, at *1 (M.D. Fla. Feb. 4, 2013) (quoting *Glenn Estess & Assoc.*, 763 F.2d at 1239). Instead, Goldberg contends *Ripple I* is analogous and sufficiently persuasive to warrant reconsideration.

Even assuming this is the case, Goldberg fails to articulate how that provides a basis for reconsidering the Court's Order. Moreover, Goldberg does not even suggest, let alone demonstrate, that the Court's Order is clearly erroneous. The Court concludes that reconsideration is inappropriate in the absence of any showing that its Order committed clear error or otherwise caused manifest injustice.

### B. Interlocutory Appeal

Goldberg alternatively argues that the Court should certify the following question for interlocutory appeal: "whether digital asset sales on trading platforms constitute securities transactions under the *Howey* test[.]" ECF No. [95] at 11. Goldberg contends this question satisfies § 1292(b)'s requirements. For additional support, Goldberg points to the Commission's unsuccessful attempt to certify the *Ripple I* court's holding that so-called programmatic sales were not securities under *Howey* for interlocutory appeal. Goldberg contends this demonstrates his proposed question should be certified for interlocutory appeal. The Commission responds that Goldberg's proposed question satisfies none of § 1292(b)'s requirements, and its prior attempt to certify the holding in *Ripple I* for interlocutory appeal fails to show that certification is appropriate here.

The *Ripple* court subsequently denied the Commission's motion to certify two questions for interlocutory appeal. Relevant here, the first question concerned whether "as a matter of law, Defendants' 'Programmatic' offers and sales of XRP over crypto asset trading platforms could not lead investors to reasonably expect profits from the efforts of others[.]"[2] *Sec. & Exch. Comm'n v.*

---

[2] The second question concerned whether "the ruling that Ripple's 'Other Distributions' of XRP as a 'form of payment for services' ... was legally insufficient to constitute an 'investment of money' under [*Howey*]." *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, No. 20 CIV. 10832 (AT), 2023 WL 6445969, at *2 (S.D.N.Y. Oct. 3, 2023). The Court does not discuss this portion of *Ripple I's* analysis, as neither party suggests it provides a basis for certifying an interlocutory appeal.

*Ripple Labs, Inc.*, No. 20 CIV. 10832 (AT), 2023 WL 6445969, at *2 ("*Ripple II*"). The court concluded none of § 1292(b)'s requirements were satisfied. First, the court found the Commission failed to present a controlling question of law. The court explained its prior order "did not hold that offers and sales on a digital asset exchange cannot create a reasonable expectation of profits based on the efforts of others." *Id.*, at *3. Instead, it "held that based on the totality of the circumstances in *this* case, including an examination of the facts, circumstances, and economic realities of the transactions, Ripple's [p]rogrammatic [s]ales could not lead investors to reasonably expect profits from Ripple's efforts." *Id.* (record citations omitted) (emphasis in original). The court also found the Commission's reliance on *SEC v. Terraform Labs Pte. Ltd.*, No. 23 Civ. 1346, ––– F.Supp.3d ––––, ––––, 2023 WL 4858299, at *15 (S.D.N.Y. July 31, 2023) failed to demonstrate a substantial ground for difference of opinion. *Ripple II*, 2023 WL 6445969, at *5-6. Finally, the court concluded certifying the Commission's proposed questions for interlocutory appeal would hinder rather than advance the ultimate termination of the litigation. *Id.* at *6-7.

Goldberg's argument that the Commission's attempt to certify the decision in *Ripple I* for interlocutory appeal demonstrates an interlocutory appeal is appropriate here lacks merit. The parties spill much ink discussing the extent to which the Commission's position in *Ripple II* is inconsistent with its arguments in opposition to Goldberg's Motion. That discussion certainly does not demonstrate that an interlocutory appeal is warranted in this case. Goldberg cannot meet his burden under § 1292(b) by pointing to the Commission's conduct in another case. This is particularly the case considering *Ripple II* denied the Commission's request to certify an interlocutory appeal. As in *Ripple II*—and regardless of the Commission's position in that case—

the Court similarly finds Goldberg's proposed question fails to satisfy any of § 1292(b)'s requirements.[3]

### i. Controlling question of law

Goldberg argues his question presents a controlling question of law because "if the Eleventh Circuit holds, consistent with *Ripple*, that digital asset sales on trading platforms do not constitute securities transactions under the *Howey* test … there is no subject matter jurisdiction here." ECF No. [95] at 12. The Commission responds that the Court's Order does not present a controlling question of law because the Order simply found the Complaint plausibly alleged that Defendants' scheme involving the sale of DIG tokens satisfies the *Howey* test. The Commission contends neither *Ripple* nor this Court's Order turned on the fact that the sales in question took place on trading platforms. The Court agrees.

Despite Goldberg's contrary assertions, the Court's Order does not present the pure legal question of whether digital asset sales on trading platforms constitute securities transactions under *Howey*. Goldberg's suggestion that the Order provides a basis for the Eleventh Circuit to hold that digital asset sales on trading platforms are not securities transactions as a matter of law misunderstands the nature of the *Howey* test. As explained in the Order, the *Howey* test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." ECF No. [76] at 9 (quoting *Howey*, 328 U.S. at 301). Accordingly, "[i]n analyzing whether something is a security, 'form should be disregarded for substance and the emphasis should be on economic reality.'" *Id.* (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).

---

[3] The Commission also argues certifying an interlocutory appeal based on the denial of a motion to dismiss is generally improper, and the Motion is untimely because Goldberg waited over four months to seek an interlocutory appeal. The Court declines the Commission's invitation to dismiss the Motion on procedural grounds and, instead, denied it on its merits.

Consistent with this guidance, the Court's Order concluded "that the 'entire scheme' involving DIG tokens, as alleged in the Complaint, constitutes an 'investment contract' under the *Howey* test." *Id.* at 12 (citation omitted).

Certifying the Court's Order for interlocutory appeal would accordingly merely require the Eleventh Circuit to review the sufficiency of the allegations to determine whether they plausibly satisfy the *Howey* test. Goldberg's proposed question, "whether digital asset sales on trading platforms constitute securities transactions under the *Howey* test" fails to consider that *Howey* is, by its own terms, a flexible standard that turns on the particular facts and overall "economic reality" of the transaction or scheme in question. Goldberg's question suggests the *Howey* test is properly subject to a bright-line rule on whether digital asset sales on trading platforms constitute securities transactions. However, Goldberg has no support for his position, nor does he articulate how any such rule would be consistent with *Howey's* fact-specific test.

Furthermore, as the Commission correctly observes, *Ripple II* rejected the Commission's argument that whether the programmatic sales failed to satisfy the third prong of *Howey* presents a controlling question of law. The court explained its holding was "based on the totality of the circumstances in *this* case, including an examination of the facts, circumstances, and economic realities of the transactions, Ripple's [p]rogrammatic [s]ales could not lead investors to reasonably expect profits from Ripple's efforts." 2023 WL 6445969, at *4. The court observed its "findings come from a direct application of *Howey* to the unique facts and circumstances of this case[]" and rejected the Commission's argument that *Ripple I* presented controlling questions of law due its precedential value. *Ripple II* also made clear *Ripple I's* "holding did not turn on the fact that Ripple's offers and sales [were] on crypto asset trading platforms." *Id.* (alteration added) (record citation omitted).

Consistent with *Ripple I*, the Court applied *Howey* to the Complaint's allegations and found those allegations plausibly satisfy *Howey*. As in *Ripple*, appellate review of this determination requires a fact-specific determination. Although this fact-specific inquiry is less intensive than studying a fully developed record, it nonetheless requires determining "whether the district court properly applied settled law to the facts or evidence of a particular case." *Cont'l 332 Fund, LLC v. Albertelli*, No. 2:17-cv-41-FtM-38MRM, 2018 WL 3656472, at *2 (M.D. Fla. Aug. 2, 2018). The Court accordingly concludes that Goldberg fails to present a controlling question of law.

### ii. Substantial ground for difference of opinion

Even if Goldberg *did* present a controlling question of law, the Motion nonetheless fails to demonstrate a substantial ground for difference of opinion. Goldberg emphasizes the distinctions between the decisions in *Ripple I* and *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, No. 23-CV-1346 (JSR), 2023 WL 4858299 (S.D.N.Y. July 31, 2023) ("*Terraform*"). Goldberg contends the differences between *Ripple I* and *Terraform* creates a substantial ground for difference of opinion justifying certifying his proposed question for interlocutory appeal. The Commission responds that *Ripple I* and *Terraform* simply applied *Howey* to the particular facts of the case and are consistent with the Court's Order.

As discussed above, *Ripple I* found the third element of *Howey* was not satisfied with respect to the programmatic buyers because "[w]hereas … Institutional Buyers reasonably expected that [the defendant] would use the capital it received from its sales to improve the [XRP token] ecosystem and thereby increase the price of [the XRP token]," the so-called programmatic buyers' expectations of profit were not attributable to the defendants' efforts. *Ripple I*, 2023 WL 4507900 at *11-12. That was because those programmatic buyers purchased XRP tokens through secondary transactions and did not know if their payments went to the defendants or to third parties. In *Terraform*, the court found the Commission plausibly alleged the defendants' crypto-

asset scheme satisfied the *Howey* test. With respect to *Howey's* third element, the court determined "the SEC's claim that the defendants held out to the coins' consumers the possibility of profiting from their purchases is supported by specific factual allegations … including readouts of investor meetings, excerpts of investor materials, and screenshots of social media posts made by Mr. Kwon and other Terraform executives." 2023 WL 4858299, at *14. The court accordingly concluded "the SEC's assertion that the crypto-assets at issue here are securities under *Howey* survives the defendants' motion to dismiss." *Id.*

In reaching this conclusion, the court "reject[ed] the approach" adopted by *Ripple I* by "declin[ing] to draw a distinction between these coins based on their manner of sale, such that coins sold directly to institutional investors are considered securities and those sold through secondary market transactions to retail investors are not." *Id.*, at *15. *Terraform* noted *Howey* "makes no such distinction between purchasers" and explained whether "a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts." *Id.*

Goldberg relies on *Terraform's* rejection of the notion that the manner of sale is itself relevant as to whether the *Howey* test is satisfied to argue a substantial ground for difference of opinion exists. Goldberg provides no support for his position that a disagreement between two out-of-circuit cases provides a sufficient basis for an interlocutory appeal. Goldberg cites *Matter of Maine Mar. Museum*, No. 2:21-CV-00238-NT, 2023 WL 3250804, at *3 (D. Me. May 4, 2023) for the general proposition that where "proceedings that threaten to endure for several years depend on an initial question of jurisdiction, limitations, or the like, certification may be justified at a relatively low threshold of doubt." *Id.*, at *3. Aside from being non-binding, the Court is

unpersuaded that Goldberg is properly subject to a "relatively low threshold of doubt[]" here. As discussed above, Goldberg's proposed question oversimplifies *Howey's* fact-specific test to suggest that a favorable appellate ruling will deprive the Commission of jurisdiction and effectively terminate the case. Furthermore, neither *Ripple I* nor *Terraform* is inconsistent with the Court's Order.

As *Ripple II* observes, "[t]he *Terraform* court did not engage with the Court's reasoning in the Order. Nor was it required to, given the different procedural postures of the two cases." *Ripple II* goes on to explain the key differences between its decision in *Ripple I* and *Terraform*:

> As stated above, the Order did not turn on the fact that Programmatic Sales were "sold through secondary market transactions to retail investors." *Id.* Rather, the Court concluded, based on the totality of circumstances, that an objective, reasonable Programmatic Buyer was not led to expect profits from the efforts of Ripple. Order at 24. Unlike in *Terraform*, the reasonable Programmatic Buyer would not believe that "sales from purchases of *all* [XRP] ... would be fed back into [Ripple and the XRP Ledger] and would generate additional profits for *all* [XRP] holders." *Terraform*, —— F.Supp.3d at ——, 2023 WL 4858299, at *15. Similarly, the undisputed record makes clear that many of Ripple's key promotional materials—such as the "Ripple Primer," which states that Ripple "hopes to make money from XRP if the world finds the Ripple network useful," and the "Gateways" brochure, which states that "Ripple's business model is based on the success of [XRP]," Order at 19–20—were only distributed to Institutional Buyers, and not more broadly to Programmatic Buyers, *id.* at 24–25. In other words, after a close examination of the extensive factual record and expert reports, the Court concluded that the Programmatic Buyers did not "ha[ve] every bit as good a reason [as the Institutional Buyers] to believe that [Defendants] would take their capital contributions and use [the capital] to generate profits on their behalf." *Terraform*, —— F.Supp.3d at ——, 2023 WL 4858299, at *15.

*Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, No. 20 CIV. 10832 (AT), 2023 WL 6445969, at *6 (S.D.N.Y. Oct. 3, 2023).

The Court's own review of *Ripple I* and *Terraform* is consistent with *Ripple II's* interpretation of those decisions. As explained above, *Ripple I* concluded that programmatic buyers did not possess the same reasonable expectation of profit as institutional buyers. That

finding was based on the particular factual circumstances surrounding each type of sale, not simply based on the differing manners of sale—sales based on written contracts versus sales executed via digital asset exchanges. The distinctions between *Ripple I* and *Terraform* accordingly fail to provide a basis for an interlocutory appeal. Moreover, neither decision is inconsistent with the Court's Order. Consistent with *Terraform*, the Court determined the Commission's Complaint "sufficiently alleges that DIG investors' fortunes depended on the actions of Arbitrade and Cryptobontix, so the third prong of *Howey* is satisfied." ECF No. [76] at 11 (citation omitted). The Order did not distinguish between the manner of sale to investors when analyzing *Howey*. Nor could it, as the Commission invariably alleges the investors "role was limited to purchasing DIG tokens[,]" "were entirely passive[,]" and were privy to the same marketing materials. *Id.* (citing ECF No. [1] ¶ 84).

This Court's Order and *Terraform* are consistent with *Ripple I*. The Order and *Terraform* each took the Commission's allegations that the purchasers reasonably expected the defendants to use their capital contributions to generate profits as true. Unlike those decisions, *Ripple I* reviewed the extensive record evidence regarding both the institutional sales and programmatic sales and determined that the totality of the circumstances demonstrated the programmatic buyers did not reasonably expect profits based on the defendants' efforts. In sum, *Ripple I* and *Terraform* do not create a substantial ground difference of opinion with respect to whether the manner of crypto-asset sales itself determines whether those transactions are considered securities under *Howey*. Consistent with *Howey*, this Court's Order, *Ripple I*, and *Terraform* each reasonably applied *Howey* to the particular facts—or allegations—of each case. The Court concludes the resulting distinctions among those decisions reflect the differing procedural postures and factual circumstances at issue rather than a principled disagreement on the proper interpretation of the

*Howey* test. Goldberg accordingly fails to demonstrate that a substantial ground for difference of opinion exists justifying an interlocutory appeal.

### iii.    Materially advance the ultimate termination of the litigation

Goldberg has also failed to demonstrate that certifying his question for interlocutory appeal would "materially advance the ultimate termination of the litigation." *McFarlin v. Canseco Servs., LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004). Goldberg is correct that a favorable decision from the Eleventh Circuit could effectively resolve this case. As discussed, however, Goldberg's proposed question glosses over the fact-specific inquiry demanded by *Howey*. The more likely scenario is a considerable delay in these proceedings while the parties await a decision from the Eleventh Circuit. If the Eleventh Circuit concludes the Complaint's allegations plausibly satisfy the *Howey* test, the net result of an interlocutory appeal will simply be delay and additional expense. The Court therefore concludes that Goldberg fails to show an interlocutory appeal "would serve to avoid a trial or otherwise substantially shorten the litigation." *Id.* The above discussion instead suggests "an interlocutory appeal of this derivative issue would not advance, but would rather delay the litigation and would benefit only Defendant [Goldberg] ...." *In re U.S. Oil & Gas Litig.*, 1988 WL 28544 at * 31. Goldberg has thus failed to establish the third element permitting the certification of an interlocutory appeal.[4]

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant James L. Goldberg's Motion for Reconsideration or Certification for Interlocutory Appeal**, ECF No. [95]**, and Defendant Tory R.J. Hogg's Motion for Reconsideration, **ECF No. [104]**, are **DENIED**.

---

[4] Goldberg's request to stay all proceedings in this case if the Court grants the instant Motion is accordingly denied as moot.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 6, 2024.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to: Counsel of Record