**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No.: 22-CV-22538-ALTMAN/Reid**

Dominik Karnas, *et al.*, on behalf of themselves and
all others similarly situated,

       Plaintiffs,

v.

Mark Cuban, *et al.*,

       Defendants.

_____/

**PLAINTIFFS' MOTION TO CERTIFY NATIONWIDE ISSUE CLASSES, PURSUANT TO FEDERAL RULES 23(a), 23(b)(3), AND 23(c)(4), AND INCORPORATED MEMORANDUM OF LAW**

After more than two years of extensive litigation, only two Defendants, Mark Cuban ("Cuban"), and his former NBA team, the Dallas Mavericks ("Mavericks") (collectively, "Defendants") remain in this proposed class action now that Defendants Gronkowski, Oladipo and Cassill have all agreed to proposed class wide settlements. D.E. 226.[1] The essential question when this case was filed was whether the Voyager crypto tokens ("VGX"), and the interest-bearing Voyager Earn Program Accounts ("EPAs") are unregistered securities. Two years ago, that question had only a small minority advocating that they were. However today, after numerous conclusive statements by the Securities Exchange Commission, statements by numerous state and federal securities regulators and all state and federal courts, that question can no longer be disputed and Plaintiffs respectfully suggest the answer should be "yes" for all VGX and EPAs. The answer to even that sole question by the Court, at this stage, will greatly advance this case. This certification process has been routinely followed by state and federal courts in Florida, and across the country.

Voyager sold billions of dollars of unregistered securities, in the form of VGX tokens and EPAs, to innocent victims before declaring bankruptcy, from which it never emerged.[2] Voyager's founder and CEO, Stephen Ehrlich, knew that the only way Voyager could perpetuate this massive fraud was to somehow contract with world-famous celebrities and athletes like Defendants, enlisting them as Voyager's global agents to actively solicit and promote the sale of Voyager's unregistered securities to the masses. Voyager and Mr. Cuban both admit that this could not have succeeded without the support and credibility Defendants provided.

Plaintiffs assert specific claims against Defendants for common law and New Jersey statutory violations, including participating in the offer and sale of these unregistered securities. Proposed Class Representatives,[3] Edwin Garrison and Todd Webb,[4] move to certify Nationwide Issue Classes[5] on the

---

[1] The Court, with the Parties' agreement, created a "Voyager Track 1" (this action) and a consolidated "Voyager Track 2" (*Karnas, et al. v. McCarter & English LLP, et al.,* No. 1:24-cv-20480 (S.D. Fla.), which includes the NBA, McCarter & English, Ketchum, and various other promoters).

[2] The Voyager Bankruptcy Court already confirmed the damages to the class exceed $3 billion dollars.

[3] After extensive discussions with Defendants' counsel, Plaintiffs agreed to proffer only two of the Named Plaintiffs, *at this stage,* as class representatives of the proposed classes, for efficiency.

[4] Although Defendants only recently requested dates for any depositions, Plaintiffs already informed Defendants that Mr. Garrison is available to be deposed by Zoom on March 21, 26, 27, or 28, and Mr. Webb is available to be deposed by Zoom on March 21 or 22, so Defendants have the full opportunity to depose them, along with all of their responsive materials.

[5] *See In re FieldTurf Artificial Turf Mktg. & Sales Practices Litig.,* CV172779MASTJB, 2023 WL 4551435 (D.N.J. July 13, 2023) (certifying 23(c)(4) issue class under similar circumstances); *see also Engle v. Liggett Group,* Inc., 945 So. 2d 1246 (Fla. 2006).

two central, dispositive questions underlying these claims: 1) whether VGX tokens and/or Voyager EPAs are securities under the New Jersey Uniform Securities Law (N.J.S.A. §§ 49:3-60 et seq.) ("NJUSL") (the "Security Issue")[6] and 2) whether Defendants' conduct amounts to solicitation such that they are statutory sellers under the NJUSL (the "Solicitation Issue"). *See* D.E. 186 ("SAC"), ¶ 3.[7]

Certification of these issues at this time will materially advance not only this litigation, but possibly the Voyager Track 2 matters pending before this Court. Under New Jersey law, which applies nationwide in this instance as Voyager issued every EPA and VGX token offered or sold to Plaintiffs and the Class directly from their base of operations in New Jersey, Defendants, as Voyager's agents, are jointly and severally liable for the full measure of Plaintiffs' and the Class's damages to the same extent as Voyager. *See* N.J.S.A. 49:3-60 ("It is unlawful for any security to be offered or sold in this State unless . . . [t]he security is registered under this act"); *see also* N.J.S.A. 49:3-71(d) ("every . . . agent who materially aids in the sale or conduct [is] also liable jointly and severally with and to the same extent as the seller or investment adviser").

As it is clear that this action should proceed beyond the motion to dismiss phase, the next logical steps are to certify these Nationwide Issue Classes, consider the Security Issue on summary judgment, and set the Solicitation Issue for an expedited trial.

A partial summary judgment ruling on the Security Issue would apply broadly across not only all claims in this matter and in Voyager Track 2, it would also have substantial precedential value in other litigations currently pending in this district, including *In re FTX Cryptocurrency Exchange Collapse Litig.*, No. 1:23-cv-md-03076-KMM (S.D. Fla.) and *Sizemore v. Zhao*, No. 23-cv-21261 (S.D. Fla.). Further, such a ruling will permit Plaintiffs to narrow the scope of the litigation – as certain consumer fraud statutes cannot apply to securities, and certain statutory claims apply only to securities.

As Plaintiffs will show on partial summary judgment, a plethora of state and federal actions have already been decisively taken, demonstrating that the EPAs and VGX are unregistered securities. Courts have followed suit, with Judge Ramos just days ago finding a similar interest-bearing account program was a security under both the *Howey* and *Reves* tests. D.E. 230 (citing *SEC v. Genesis Global Capital, LLC, et al.,* No. 23-cv-287, D.E. 54 (S.D.N.Y. Mar. 13, 2024)).[8] Plaintiffs will proffer their

---

[6] On November 15, 2022, Plaintiffs filed a similar motion on the Security Issue, [D.E. 40], which the Court denied without prejudice as premature.

[7] There is no "reliance" element under the NJUSL, so resolving both issues will apply to every class member, making them appropriate for class resolution at this stage. SAC ¶ 190.

[8] For a full discussion of the legal developments since this case was filed, *see* ¶¶ 12–21 of *Karnas, et al.,*

expert, Lee Reiners, who opines on how EPAs and VGX have characteristics that lend themselves to meeting the *Howey* and *Reves* tests, and are highly analogous to the Gemini Earn Program, among other cryptocurrency offerings subject to regulatory scrutiny by the SEC and analogous state regulators. *See* **Exhibit A** ("Reiners Rpt.") [9]

Following certification on the Solicitation Issue, Plaintiffs can move forward towards this Court's calendared November trial on that issue, and prepare to present the law and the facts of promotion to a jury. Plaintiffs believe the law in this area is now clear as well, and a jury will easily find that Defendants conduct meets or exceeds what the law requires to impose joint and several liability.

In *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341 (11th Cir. 2022), the Eleventh Circuit unequivocally articulated the clear standard  applicable to mass solicitation of unregistered securities under section 12 of the Securities Act of 1933, specifically ruling that any spokesperson who promoted a crypto Ponzi scheme had engaged in "solicitation" of securities by "urg[ing] people to buy [crypto tokens] in online videos," even if the offering's promoters did not directly target particular purchasers. *Id.* at 1346. The Court observed that the Securities Act does not distinguish between individually targeted sales efforts and broadly disseminated pitches, and noted that in early cases applying the Act, "people understood solicitation to include communications made through diffuse, publicly available means – at the time, newspaper and radio advertisements." *Id.* [10]

In *Pino v. Cardone Capital, LLC*, 55 F.4th 1253 (9th Cir. 2022), the Ninth Circuit adopted *Wildes* in its entirety, holding that a real estate management company that promoted real estate investment funds through "mass communications to potential sellers" via nontargeted internet videos posted on social media could be a statutory seller liable for solicitation based on YouTube videos and Instagram posts touting the investments and rates of return. *Id.* at 1259–60. The court noted that, to state a cause of action, a plaintiff "need not have alleged that he specifically relied on any of the alleged misstatements identified in the [complaint]." *Id.*

In *De Ford v. Koutoulas*, 6:22-CV-652, 2023 WL 2709816 (M.D. Fla. Mar. 30, 2023), the court denied a motion to dismiss claims that a spokesperson for "Let's Go Brandon" cryptocurrency

---

*v. McCarter & English, LLP, et al.,* No. 1:24-cv-20480, D.E. 1 (S.D. Fla. Feb. 6, 2024)

[9] Plaintiffs informed Defendants Mr. Reiners may be deposed by Zoom on March 22, 28, or 29.

[10] Although the issue of mass solicitations and promotions of unregistered securities has not been directly addressed under the NJUSL, Plaintiffs submit that its provisions should be interpreted at least as broadly as section 12 of the Securities Act, if not more broadly given the New Jersey law's application to "every . . . agent who materially aids in the sale or conduct" who is held "liable jointly and severally with and to the same extent as the seller or investment adviser."

(LGBCoin) engaged in the solicitation of unregistered securities. Citing *Wildes*, the court rejected the argument that "mere social media posts cannot make him a seller of securities" and held that the plaintiff had sufficiently alleged a claim for selling unregistered securities by alleging (1) the online promotion of LGBCoin through social media channels, and (2) that the promotions were done to serve the spokesperson's own financial interests. *Id.* at *15.

Most recently, on September 20, 2023, Judge William H. Orrick of the Northern District of California, applying both *Pino* and *Wildes*, denied a motion to dismiss by a promoter who was sued for participating in a scheme similar to Voyager's to sell unregistered securities in the form of cryptocurrency, concluding that the suit alleged that the defendants actively solicited sales of the crypto assets, and were not just "mere collateral participants." *Houghton v. Leshner*, No. 3:22-cv-07781, 2023 WL 6826814, at *3–5 (N.D. Cal. Sept. 20, 2023). In reaching that conclusion, Judge Orrick reasoned that "[s]olicitation is broadly construed," and a promoter "could be a statutory seller liable for solicitation based on YouTube videos and Instagram posts touting the investments and rates of return." *Id.*, (emphasis added) (citing *Pino*, 55 F.4th at 1256; and then citing *Wildes*, 25 F.4th 1341).

Once this Court finds that these Defendants "promoted" these unregistered Voyager products, this litigation will have greatly advanced (or been defeated[11]) on behalf of hundreds of thousands of class members and only a damages phase will remain.[12]

The proposed Security Class is defined as follows:

> All persons or entities in the United States who, from applicable statutes of limitation through July 5, 2022, purchased, repurchased, invested, reinvested, deposited, held, and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

> Excluded from the Class are Defendants and their officers, directors, affiliates, legal representatives, and employees, any customers who make a timely election to be excluded, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

The proposed Solicitation Class is defined as follows:

---

[11] In the unlikely event this Court finds that VGX tokens and EPAs are not securities, and Plaintiffs securities claims are defeated, Plaintiffs may choose to pursue their remaining consumer fraud claims.

[12] At this juncture, the Court need not decide how the damages phase will proceed. *See In re FieldTurf,* 2023 WL 4551435, *9–10; *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1309 (N.D. Fla. 2017). Numerous state and federal courts have proceeded with this exact same classwide issue analysis, while leaving individual damage trials for a second stage. In fact, those damage issues in this case will be much easier than in most other cases, as we already have specific lists that identify each and every Voyager customer that utilized specific "Mavericks" and "Cuban" Voyager codes, as a result of these false promotions.

All persons or entities in the United States who, from October 27, 2021 through July 5, 2022, purchased, repurchased, invested, reinvested, deposited, held, and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens.

Excluded from the Class are Defendants and their officers, directors, affiliates, legal representatives, and employees, any customers who make a timely election to be excluded, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

Plaintiffs further seek appointment of Boies Schiller Flexner LLP and The Moskowitz Law Firm, PLLC as Co-Lead Class Counsel pursuant to Fed. R. Civ. P. 23(g).

## FACTUAL BACKGROUND

On October 23, 2019, Voyager began offering EPAs, its interest-bearing cryptocurrency accounts, to public investors. D.E. 186 ("SAC"), ¶ 20. *Every single account Voyager offered and sold to its customers was necessarily an EPA. Id.* Plaintiffs and other similarly situated individuals invested in Voyager's EPAs and VGX, Voyager's native crypto token. *Id.*; *see also* Declarations of Edwin Garrison and Todd Webb, each dated March 14, 2024, attached as **Exhibits B–C** ("Proposed Rep. Decls."), ¶ 3. There is no dispute that Voyager never registered the EPAs or VGX with the United States Securities and Exchange Commission ("SEC") or with any state securities regulators. The EPAs and VGX constitute "securities" as defined by state and federal securities law. SAC ¶¶ 138–159. Although Voyager promised its investors a fixed return for their EPA investments, Voyager's Annual Information Form filed with Canadian regulators stated, "Rewards earned on crypto assets are variable, and reward rates are determined by Voyager at its sole discretion." SAC ¶ 149. To generate those "variable" rates of return, Voyager pooled the EPA assets and engaged in risky financial activities. *Id.*; *see also* Reiners Rpt., §§ 2–3. Similar rates of return were offered for holders of VGX tokens, the value of which (as an exchange token) was tied to the success of the Voyager Platform, and which Voyager led its customers to believe would generate profit through the increased value and ability to sell on secondary markets as Voyager continued to grow, with no effort on their parts. SAC ¶¶ 154–159; *see also* Reiners Rpt., § 7.

Defendants have thousands, if not millions of social media followers. SAC ¶ 190. Every single public-facing announcement or press release concerning Defendants' relationships with Voyager described Defendants as "partners" of Voyager – an endorsement of Voyager to thousands, if not millions of users that follow Defendants on platforms like Twitter, Instagram, and YouTube. SAC ¶¶ 190, 191. Defendants received millions of dollars in cash and VGX tokens, amongst other compensation, to broadly solicit potential investors with promotional statements, contests, coupon

codes, offers of free cryptocurrency, sign-up incentives, and other strategies intended to entice people to use the Voyager platform to buy cryptocurrency and generate interest in the media for the sale of Voyager products, including EPAs and VGX. SAC ¶ 188. Defendants actively promoted EPAs by touting interest rates between 7% and 12% that Voyager offered on crypto assets that were available only to Voyager EPA account holders. SAC ¶ 189.

As the first NBA team sponsorship in crypto, the partnership between Voyager and the Dallas Mavericks was a significant stamp of approval for this new form of investment platform. SAC ¶¶ 16, 198. Voyager sought to partner with the Mavericks based on Cuban's own ability to generate publicity and "media visibility," the international roster and "usage" of the team, and because of their knowledge of cryptocurrency. SAC ¶ 196. Voyager expected to drive activation and investments on the Voyager platform not only by Mavericks fans, but also by millions of NBA fans throughout the world. SAC ¶¶ 195, 201, 204. As Mr. Ehrlich conceded, the "main goal" of Voyager's partnership with the Mavericks "was to bring cryptocurrency to the masses." SAC ¶ 195.

The Mavericks and Voyager engaged in a sustained and aggressive promotion and advertising campaign, beginning with a press conference on October 27, 2021, which was streamed live to the public at large on the Mavericks' official website. SAC ¶ 208. The Mavericks ran many other Voyager promotions, including one on October 28, 2021, in which a fan earned $100,000 worth of cryptocurrency for hitting a half-court shot. SAC ¶ 225. The videos of that shot, which the Mavericks posted on the team's social media accounts, were viewed hundreds of thousands of times. SAC ¶ 225. The Mavericks also posted TV-visible virtual signage and statistics promoting Voyager which appeared in hundreds of posts on the Mavericks' social medial accounts, in addition to the exposure it provided during the television broadcasts and reproductions thereof. SAC ¶ 229. By June 12, 2022, the total social media exposure for these posts reached over 19 million impressions. SAC ¶ 229. The Mavericks also held many other Voyager promotions, like a promotion that rewarded individuals who purchased an EPA with $100 in Bitcoin by using the "MAVS100" code. SAC ¶¶ 223, 230. Both Proposed Class Representatives used the MAVS100 code to purchase their EPAs. Proposed Rep. Decls. ¶ 4.

Cuban was personally behind most of the hype about the Voyager/Mavericks Partnership and his motivation was clearly to profit as much as possible for himself, personally, and for his former Dallas Mavericks. He ran the October 27, 2021, Press Conference during which he enthusiastically disclosed that he was investing his own money and "earning more" with Voyager, which he called an easy-to-use platform that offered the best pricing in the market. SAC ¶¶ 212, 213. He also championed the EPAs by proclaiming that they were "as close to risk free as you're going to get in the crypto

universe." SAC ¶ 215. An endorsement of Voyager and its EPAs from Cuban, who regularly promotes himself on television and social media as a very business savvy investor, particularly in crypto, had an immediate and material influence on investors. SAC ¶¶ 203, 204, 231, 239. The October 27, 2021, partnership launch generated over 1 billion online impressions and over 1.4 billion broadcast views, just as Voyager and its agents hoped it would. SAC ¶ 239.

By November 2021, Cuban began contemplating more opportunities to benefit personally from the Mavericks' partnership with Voyager. SAC ¶ 241. He directed his team to focus only on promoting Voyager through the Mavericks, as opposed to the Dallas Stars or the American Airlines Arena (in which he held no ownership interest), stating, "[w]e crushed it for [Voyager] and a lot of that was because I endorsed it. I won't approve anything that isn't for the Mavs[.]" SAC ¶ 241. In other words, during the Voyager/Mavericks partnership, Cuban himself conceded that Voyager's success in selling unregistered crypto-related securities was substantially caused by his promotions.

Each of the Proposed Class Representatives purchased EPAs and VGX offered for sale from Voyager's base of operations in New Jersey after being exposed to some or all of Defendants' misrepresentations and omissions regarding Voyager as detailed in the complaint, and they each sustained damages as a result. *See* Proposed Rep. Decls. ¶ 3. The EPAs and VGX that Voyager sold the Proposed Class Representatives were the same securities that Voyager offered and sold throughout the nation, all of which are currently subject to investigation by federal and state regulators, and which number in "at least tens of thousands" in Florida alone. *See* Excerpts of Transcript of Voyager Digital LLC's corporate representative, D.E. 34-1, at 89 (41:20–42:15) (Voyager Digital LLC corporate representative confirming "there's no distinction for the Voyager Earn Program by state"); *see also* D.E. 40-5, 107:10–13 (Voyager Digital LLC corporate representative confirming there are "at least tens of thousands of Voyager Platform members that are residents of the State of Florida"); 133:2– 134:13 (Voyager Digital LLC corporate representative confirming *Cassidy* Plaintiffs' EPA "is the same account that these attorney generals and the SEC are saying possibly should be registered securities" and "they would not be different from any of the other accounts."); *see also* D.E. 186-26 (Voyager spreadsheet of all Florida residents who used MAVS100 code to purchase EPA).

The Court is not required to resolve these issues—whether EPAs or VGX are securities and whether Defendants' soliciting their sales from Plaintiffs and Class Members violated the NJUSL—at this stage of the litigation, however, the Proposed Class Representatives submit these are common and predominant issues capable of swift resolution by this Court on a class-wide basis, which determination would materially advance this litigation for Plaintiffs and the potentially millions of

affected consumers around the nation, making class treatment appropriate. *See, e.g.,* Reiners Rpt., ¶¶ 1.02, 8.06. Therefore, Plaintiffs move for certification of issue classes for these expedited proceedings.

## ARGUMENT

The purpose of a class action is to facilitate judicial economy by avoiding multiple suits on the same subject matter, providing a feasible means for asserting the rights of those who would have no realistic day in court without a class action, and deterring inconsistent results, assuring a uniform, singular determination of rights and liabilities. *Am. Pipe & Constr., Co. v. Utah*, 414 U.S. 538 (1974).

The proposed Class Representatives seek a narrow certification order that utilizes Rules 23(a), 23(b)(3), and 23(c)(4) to certify the Security Issue and the Solicitation Issue for classwide resolution.[13]

A district court has broad discretion in determining whether to certify a class. *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992); *Griffin v. Carlin*, 755 F.2d 1516, 1531 (11th Cir. 1985). Rule 23 "establishes the legal roadmap courts must follow when determining whether class certification is appropriate." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). As a threshold matter, courts consider whether "the proposed class is adequately defined and clearly ascertainable." *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 693 (S.D. Fla. 2015).[14] Additionally, "the named plaintiffs must have standing, and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b)." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004).

Further, Rule 23(c)(4) provides that "an action may be brought or maintained as a class action with respect to particular issues." *See In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 697 (N.D. Ga. 2003) (certifying issues of "Defendants' duty to Plaintiffs and whether Defendants breached that duty"). "The theory of Rule [23(c)(4)] is that the advantages and economies of adjudicating issues that are common to the entire class on a representative basis should be secured even though other issues in the case may have to be litigated separately by each class member." *Nelson v. Walmart Stores, Inc.*, 245 F.R.D. 358, 380 (E.D. Ark. 2007). The Court has this tool and others at its disposal to facilitate commonsense treatment of the common claims and issues as part of its class certification. In doing

---

[13] *Jones v. Desantis*, No. 4:19cv300-RH/MJF, 2020 WL 5646124, at *2 (N.D. Fla. Apr. 7, 2020) (a plaintiff may move for class certification of selected counts only) (citing, *inter alia, Jenkins v. United Gas Corp.*, 400 F.2d 28, 35 (5th Cir. 1968)).

[14] In *Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021), Eleventh Circuit Court of Appeals disavowed the "administrative feasibility" requirement for establishing ascertainability of class members as a precondition to certification.

so, Plaintiffs do not concede in any way that individual issues will predominate in the damages phase—rather, Plaintiffs believe it is in the best interests of the case, and the court, to advance the litigation until such a decision has been made and proposed Class Representatives are ready to seek certification on additional bases. *Collins v. Quincy Bioscience, LLC*, No. 19-CV-22864, 2020 WL 3268340 (S.D. Fla. Mar. 19, 2020) (Goodman, M.J.) (recommending certifying a liability issue class and bifurcating proceedings into liability and damages phases where defendant's liability would be determined regarding uniform representations made to the class); *Las Olas Co. v. Fla. Power & Light Co.*, No. CACE19019911-18, 2020 WL 9874296 (Fla. 17th Cir. Ct. Dec. 14, 2020), *aff'd per curiam Infratech Corp. v. Las Olas Co.*, 320 So. 3d 751 (Fla. 4th DCA 2021), *reh'g denied* (Fla. 4th DCA July 13, 2021) (affirming certification of a liability issue class and proceeding to a bifurcated jury trial regarding defendants' liability for causing a single-incident mass tort—which trial lasted one week and resulted in favorable liability verdict for the class). Courts throughout this Circuit have also demonstrated the utility of this approach. *See Andreas-Moses v. Hartford Fire Ins. Co.*, 326 F.R.D. 309 (M.D. Fla. June 18, 2018) ("The Court will exercise its discretion under Rule 23(c)(4) to certify a merits-only class and bifurcate damages from the merits."); *Navelski*, 244 F. Supp. 3d 1275 (same); *Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 317 (S.D. Fla. 2001) (explaining that "the Court may either appoint a master to resolve actual damages or merely allow class members to bring individual actions with the benefit of a *res judicata* finding of liability"). Proposed Class Representatives submit the Court should certify the Security and Solicitation Issue classes under Rule 23(a), (b)(3), and (c)(4) so they can move forward expeditiously on deciding these two central issues—a method of organizing this litigation that Plaintiffs' counsel has used with very recent success in both state and federal class actions.

## I.   New Jersey Law Applies Nationwide In This Case.

There is no dispute that Voyager promoted and sold EPAs and VGX Tokens to vulnerable and unsophisticated consumers throughout the country from its headquarters located in Jersey City, New Jersey. Voyager benefitted from conducting business in New Jersey, yet violated specific New Jersey statutes and regulations to harm consumers nationwide. Because the legally pertinent aspects of Voyager's conduct—the offer to sell unregistered securities—occurred within New Jersey, New Jersey has the right to protect its reputation as a place to conduct lawful and legitimate business through the application of New Jersey state law. This right has been clearly afforded by New Jersey's own state courts and its legislature.  The NJUSL was enacted to "'prevent [New Jersey] from being

used as a base of operations for crooks marauding outside the state.'"[15] The Third Circuit, relying on long-established precedent, has recognized that "states are permitted to regulate in-state components of interstate transactions so long as the regulation furthers legitimate in-state interests."[16] In *A.S. Goldmen & Co.*, the Third Circuit interpreted N.J.S.A. § 49:3–60 to apply to the sale of unregistered securities to out-of-state consumers, provided that the offer to sell the security occurred in New Jersey, even if the transaction would have been legal under the laws of the states where investors were being solicited.[17]

New Jersey has a resounding interest in protecting its reputation as a place to conduct lawful securities transactions and has the most significant relationship to the conduct at issue. All of the pertinent conduct related to the securities transactions emanated from New Jersey. Further, Voyager developed and disseminated its advertising from New Jersey, and reached agreement with each Defendant to provide spokesperson and promotional services from the state of New Jersey. For these reasons, this Court should apply New Jersey law to these claims and Issue Classes to determine New Jersey law issues is dispositive for all class members.

## II.    The Proposed Class Representatives Have Standing.

"[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Prado–Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) (quoting *Gen. Tel. Co. of Sw.*, 457 U.S. at 156) (internal quotations and citation omitted).[18] "[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991). To establish Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

---

[15] *Caspersen as Tr. For Samuel M.W. Caspersen Dynasty Tr. V. Oring*, 441 F. Supp. 3d 23, 41 (D.N.J. 2020) *quoting Stevens v. Wrigley Pharmaceutical*, 9 N.J. Misc. 385, 386 (N.J. Ch. Div. 1931).

[16] *A.S. Goldmen & Co. v. New Jersey Bureau of Sec.*, 163 F.3d 780, 782 (3d Cir. 1999).

[17] *Id.*; *see also In re Libor-Based Fin. Instruments Antitrust Litig.,* 2015 WL 4634541 (S.D.N.Y. Aug. 4, 2015) (collecting cases and stating "[c]ourts have always recognized that states have a legitimate interest in regulating securities transactions that occur, in relevant part, within the state."); *Simms Inv. Co. v. E.F. Hutton & Co. Inc.*, 699 F. Supp. 543, 545 (M.D.N.C. 1988) ("Blue Sky laws protect two distinct public policies. First, the laws protect resident purchasers of securities, without regard to the origin of the security. Second, the laws protect legitimate resident issuers by exposing illegitimate resident issuers to liability, without regard to the markets of the issuer.") (emphasis added).

[18] At the class certification stage, courts "may review both the allegations in the complaint and evidence in the record so far to determine whether the named plaintiffs . . . have established Article III standing[.]" *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 888 n.6 (11th Cir. 2023).

decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (first citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); and then citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 180-81 (2000)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560). "An economic injury is the 'epitome' of a concrete injury." *Lewis v. Mercedes-Benz USA, LLC*, 530 F.Supp.3d 1183, 1202 (S.D. Fla. 2021) (citing *MSPA Claims 1, LLC v. Tenet Fla., Inc.*, 918 F.3d 1312, 1318 (11th Cir. 2019). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339 (quoting 504 U.S. at 560 n.1).

Here, Proposed Class Representatives each clearly have standing as each admittedly purchased an EPA offered for sale from Voyager's base of operations in New Jersey after being exposed to some or all of Cuban's and the Mavericks' misrepresentations and omissions regarding the Deceptive Voyager Platform, and each sustained damages as a result. *See* Proposed Rep. Decls. ¶ 3. Despite Voyager's bankruptcy, Proposed Class Representatives have yet to recover their respective initial investments of fiat currency. Webb Decl. ¶ 6; Garrison Decl. ¶ 5. In turn, Proposed Class Representatives have suffered an injury in fact that is fairly traceable to the challenged conduct of the Defendants and that is likely to be redressed by a favorable judicial decision. *See Spokeo*, 578 U.S. at 338. They thus possess standing as to both the Solicitation Issue and the Security Issue.

First, as to injury in fact, Proposed Class Representatives have each suffered an actual "invasion of a legally protected interest" because, contingent on the Court's favorable resolution of the Security Issue and Solicitation Issue, Defendants' solicitation of investments in Voyager's unregistered securities violated the NJUSL. *See id.* at 339; *Int'l Primate Prot. League*, 500 U.S. at 77. Furthermore, Proposed Class Representatives' lost investments in Voyager are tangible, economic injuries that epitomize the concreteness requirement. *See Lewis*, 530 F.Supp.3d at 1202. Additionally, the lost investments affect the Proposed Class Representatives in "a personal and individual way" because each Proposed Class Representative lost their individual investments in Voyager. *See Spokeo*, 578 U.S. at 339; *Lewis*, 530 F.Supp.3d at 1204 (holding particularized harm present where plaintiffs alleged they would not have purchased mass produced automobiles, and thus suffered economic harm, had defendant disclosed vehicles' design defects).

Second, as to traceability, Proposed Class Representatives' economic injuries in fact are traceable to Defendants' alleged violations of the NJUSL. Proposed Class Representatives state that they would not have purchased the VGX tokens and EPAs but for Defendants' solicitation thereof.

*See* Webb Decl. ¶¶ 3–5; Garrison Decl. ¶¶ 3–4. Accordingly, Proposed Class Representatives' injury in fact is "fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court." *See Lujan*, 504 U.S. at 560-61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)) (alteration in original).

Finally, redressability is established here because a favorable ruling from this Court on both the Security Issue and the Solicitation Issue is likely to remedy the injury sustained by Proposed Class Representatives' through Defendants' violation of the NJUSL. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. __, 139 S. Ct. 2356, 2362 (2019) (holding that reversing a district court's order compelling USDA's disclosure of documents pursuant to FOIA, but not requiring the USDA to withhold the docs, would sufficiently redress imminent injuries to grocery stores that would result from disclosure because USDA had previously "unequivocally" stated to grocery stores that it would not disclose the contested information absent a court order). This is because a ruling that the VGX tokens or the EPAs are securities under the NJUSL and that Defendants solicitated the sale of those unregistered securities will likely enable Proposed Class Representatives to recover for the economic injuries caused by Defendants' violations. *See Spokeo* at 338 (defining redressable injury as one likely to be remedied by a favorable judicial decision); Webb Decl. ¶ 11; Garrison Decl. ¶ 10.

Therefore, for the foregoing reasons, Proposed Class Representatives have standing because they have adequately alleged injury in fact, traceability, and redressability in connection with Defendants' alleged violations of the NJUSL.

## III.    The Issue Classes Are Clearly Ascertainable.

As the Eleventh Circuit has recently held, to be ascertainable the proposed class need only be "adequately defined such that its membership is capable of determination." *Cherry*, 986 F.3d at 1304 (rejecting any requirement to demonstrate administrative feasibility). In assessing a proposed class's ascertainability, this Circuit looks only to whether membership in each proposed class "turns on [] objective, verifiable criteri[a][.]" *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1370 (11th Cir. 2021). Plaintiffs need not show "precisely how" they will use this criteria to ascertain class members. *Id.*

Here, membership in the Proposed Class can be readily determined from Voyager's own corporate records. *See* D.E. 34-1 at 56 (Voyager explaining that "[b]y the end of calendar 2021, we had 250 employees, 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets on the platform."); *see also* D.E. 40-5, 107:10–13; D.E. 186-26. *See, e.g., In re Health Insurance*, 2021 WL 1341881, at *7 (M.D. Fla. Mar. 23, 2021) (settlement class adequately defined and clearly ascertainable where membership was objectively determinable from corporate records). These

corporate records are exactly the sort of objective, verifiable criteria necessary to establish ascertainability. *Rensel*, 2 F.4th at 1370 (holding proposed subclass of investors ascertainable because membership could be readily determined using the offeror's internal records or "submissions of claims forms verified by transaction records").

Furthermore, Defendants had their own unique promo codes which were included in certain of their advertisements. Corporate records regarding the identity of individuals who used those promo codes upon sign-up will necessarily show those individuals who most certainly relied upon Defendants advertisements in making their decision to purchase, as both proposed Class Representatives did. Proposed Rep. Decls. ¶¶ 3–4.

Hence, because Voyager and Defendants have ample records of investor transactions, the classes satisfy the ascertainability requirement for the Security and Solicitation Issues.

## IV.   Plaintiffs and These Issue Classes Satisfy the Requirements of Rule 23(a).

The Rule 23(a) requirements are commonly referred to as the "numerosity, commonality, typicality, and adequacy of representation" requirements. *Valley Drug Co.*, 350 F.3d at 1188.

### A. The Classes are so numerous that joinder of all members is impracticable.

"To establish numerosity, [a plaintiff] must show that the class is so numerous that joinder of all members is impracticable." *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 684 (S.D. Fla. 2013) (internal quotes and citation omitted). "While mere allegations of numerosity are insufficient, Rule 23(a)(1) imposes a generally low hurdle, and a plaintiff need not show the precise number of members in the class." *Id.*; *accord*, *Palm Beach Golf Ctr.*, 311 F.R.D. at 695. The "general rule of thumb in the Eleventh Circuit is that 'less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors.'" *Manno*, 289 F.R.D. at 684 (quoting *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)); *see, e.g., Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986).

Numerosity is easily satisfied for the Proposed Class, given that Voyager reports approximately 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets under management, with tens of thousands in Florida. *See* D.E. 34-1 at 56; *see also* D.E. 40-5, 107:10–13; D.E. 186-26. Accordingly, numerosity exists.

### B. There are questions of law and fact common to all Class members.

Commonality requires the identification of at least one issue that by its nature "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Proof of

13

commonality is a "relatively light burden." *County of Monroe, Fla. V. Priceline.com, Inc.*, 265 F.R.D. 659, 667 (S.D. Fla. 2010) (internal quotation marks and citation omitted). Commonality "does not require that all the questions or law and fact raised by the dispute be common." *Id.* "What matters to class certification . . . [is] the capacity of a classwide proceeding to generate common **answers** apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (internal quotation marks and citation omitted) (emphasis original). Commonality is readily found where, as here, "[d]efendants have engaged in a standardized course of conduct that affects all class members." *In re Terazosin Hydrochloride,* 220 F.R.D. at 687; *Agan v. Katzman & Korr, P.A.,* 222 F.R.D. 692, 697 (S.D. Fla. 2004).

The Security Issue and Solicitation Issue are both common legal issues subject to classwide resolution that will determine "in one stroke" the validity of Plaintiffs' claims. *See id.*; *see also* Reiners Rpt., ¶¶ 1.02, 8.06. As both Proposed Class Representatives explain, the viability of the proposed class members' claims depends upon the Court's resolution of the Security Issue and the Solicitation Issue. *See* Webb Decl. ¶ 11; Garrison Decl. ¶ 10. In the event the Court finds that the VGX tokens and EPAs are not, in fact, unregistered securities, then each class member's claim will be disposed, hence the determination of the Security Issue will immediately resolve each class member's claim. *See Rensel*, 2021 WL 4134984, at *8 (holding commonality present because plaintiffs "advance[d] a series of questions that will be answered through common proof, including whether [defendant] sold unregistered securities). And, in the event that the Court answers the Security Issue favorably, and then rules on the Solicitation Issue, each putative class member's claim will be resolved—because a finding of whether Defendants' conduct rose to the level of participation in the solicitation or offering for sale of the unregistered securities that were purchased by the Class Members is dispositive of Defendants' liability to the entire putative class. *See id.*

Thus, because the resolution of the Security Issue and Solicitation Issue will affect all proposed class members, commonality is satisfied. *See id.* (certifying class); *see also In re FieldTurf,* 2023 WL 4551435, *6–11; *Navelski*, 244 F. Supp. 3d at 1309; *Las Olas Co.*, 2020 WL 9874296.

**C. Plaintiffs' claims are typical of those of the Classes.**

"[T]ypicality measures whether a sufficient nexus exists between the claims of the named representatives and those of the class at large." *Prado-Steiman*, 221 F.3d at 1279. The focus of the typicality requirement is whether the named plaintiff will advance the interests of the class members by advancing his own interests. *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 698 (S.D. Fla. 2004); *Herman*, 320 F.R.D. at 293 (same). Much like the commonality requirement, the typicality requirement does not require that the claims of the Proposed Class Representatives and the proposed class be

identical: all that is required is that "the claims or defenses of the class and class representative arise from the same event or pattern or practice and are based on the same theory." *Agan*, 222 F.R.D. at 698 (citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)). Rule 23(a)(3) typicality is thus satisfied where the Proposed Class Representatives' claims are "reasonably co-extensive" with absent Class Members' claims; they need not be "substantially identical." *In re Checking Account Overdraft Litig.*, 281 F.R.D. 667, 675 (S.D. Fla. 2012). Generally, "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences." *Prado-Steiman*, 221 F.3d at 1279 n.14 (citation omitted).

Proposed Class Representatives possess the same interest as the proposed Class because, like the proposed class, they purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or VGX Tokens. Webb Decl. ¶ 3; Garrison Decl. ¶ 3. More specifically, the Proposed Class Representatives share a "nexus" with the proposed Class with respect to the Security Issue and the Solicitation Issue because their claims are based on the same theory. *See Rensel*, 2021 WL 4134984, at *8 (holding typicality satisfied where proposed class representatives alleged that defendants' solicitation of unregistered securities violated securities law); Webb Decl. ¶ 11; Garrison Decl. ¶ 10. For one, the Security Issue, which will be resolved by application of either the *Howey* or *Reves* test, rests on identical factors for the Proposed Class Representatives and the Classes:[19] whether the Class invested money in the VGX tokens or EPAs, whether the investors in the VGX tokens and/or EPAs participated in a common enterprise, whether reasonable investors purchased the VGX tokens and/or EPAs with an expectation of profit from owning them, and whether investors reasonably expected profits from the VGX tokens and/or EPAs to be derived from the managerial efforts of Voyager, the issuer. *See, e.g.*, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

In sum, both Proposed Class Representatives and the proposed Classes stem from Defendants' alleged conduct in offering and selling unregistered securities. Stated otherwise, the claims of the named plaintiffs and unnamed plaintiffs alike all "arise from the same event or pattern or practice and are based on the same theory." *Agan*, 222 F.R.D. at 698 (citing *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984)).

---

[19] It is of no legal consequence that not all holders of EPAs deposited sufficient crypto assets to actually earn interest, and therefore "ch[oo]se not to accept the full offer of an investment contract." *SEC v. Terraform Labs Pte. Ltd.*, 23-CV-1346 (JSR), 2023 WL 8944860, at *13–14 (S.D.N.Y. Dec. 28, 2023) (*citing Howey*, 328 U.S. at 300).

Accordingly, the typicality requirement is satisfied.

**D. Plaintiffs will fairly and adequately protect the interests of the Classes.**

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy is satisfied where (i) counsel for the class is qualified and competent to vigorously prosecute the action, and (ii) the interests of the proposed class representatives are not antagonistic to the interests of the Classes. *See, e.g.*, *Fresco v. Auto Data Direct, Inc.*, 2007 WL 2330895, at *2 (S.D. Fla. May 14, 2007). The central component of adequacy is the absence of conflicts of interest between the named representative and the class. *Amchem*, 521 U.S. at 625–26 ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (internal quotation marks and citations omitted)).

No such fundamental conflict exists here because, certainly, no Class member has an interest in a negative resolution of the Security Issue or the Solicitation Issue as either would extinguish their claims, likely resulting in the permanent loss of their Voyager investment. *See id.*; *Rensel*, 2021 WL 4134984 at *2–3, *8–9 (holding investors in cryptocurrency tokens adequate representatives for class of defrauded investors who purchased the same alleged unregistered securities). The Proposed Class Representatives' and the Class Members' interests, as well as counsel's interests, are fully aligned in seeking a favorable resolution of the Security Issue and the Solicitation Issue. The Proposed Class Representatives have already served the Court and the Class in a representative capacity and have evidenced their commitment through their active prosecution of this lawsuit. *See* Webb Decl. ¶¶ 7–10 (indicating that Mr. Webb has reviewed the pleadings, provided information to counsel, will respond to interrogatories and document requests, prepare for deposition, are willing to make themselves available for trial, and are knowledgeable of the case and of their duties to the Class); Garrison Decl. ¶¶ 6–9 (same). As Proposed Class Representatives prove their own claims, they will also prove those of millions of absent Class members, and thus "share the true interests of the class." *Hastings-Murtagh v. Texas Air Corp.*, 119 F.R.D. 450, 459 (S.D. Fla. 1988); *Tefel v. Reno*, 972 F. Supp. 608, 617 (S.D. Fla. 1997) (ruling that the "common goal of each member of the class" is to remedy the unlawful conduct, and "[i]f the Plaintiffs succeed, the benefits will inure to all class members").

Moreover, as set forth below at greater length in the context of Rule 23(g), proposed Class Counsel is highly experienced in prosecuting class action litigation. *See, e.g., Fruitstone v. Spartan Race, Inc.*, No. 20-cv-20836-BLOOM/Louis, 2021 WL 2012362, at *12 (S.D. Fla. May 20, 2021) (finding in

approving class settlement that Class Counsel's "reputation, diligence, expertise, and skill are reflected in the excellent results they have achieved"); *In re: Blue Cross Blue Shield Antitrust Ligitation, MDL 2406*, U.S. District Court, Northern District of Alabama; *In re: Takata Airbag Products Liability Litigation, MDL 2599*, U.S. District Court, Southern District of Florida (Miami); *In re: Google Digital Advertising Antitrust Litigation, MDL 3010*, U.S. District Court, Southern District of New York; *In re: Grupo Televisa Sec. Litig.,* U.S. District Court, Southern District of New York; *Brown v Google LLC,* U.S. District Court, Northern District of California, No. 4:20-cv-0366; *Feller v. Transamerica Life Ins. Co.*, No. 16-cv-01378 CAS (GJSx), 2019 WL 6605886, at *6 (C.D. Cal. Feb. 6, 2019) (same, finding Class Counsel "have demonstrated that they have fully and competently prosecuted all causes of action, claims, theories of liability, and remedies reasonably available to the Settlement Class Members"); *In Re: Champlain Towers South Collapse Litigation*, Case No. 2021-015089 CA 01 (Fla. 11th Jud. Cir. July 16, 2021).

**V.    Plaintiffs and These Issue Classes Satisfy the Requirements of Rule 23(b).**

Under Rule 23(b)(3), the Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members," and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.*

**a.    Common questions of law or fact predominate.**

The requirement that common questions of law or fact predominate means "the issues in the class action that are subject to generalized proof and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989) (citation omitted); *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016) (The Rule 23(b)(3) predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." (quoting *Amchem*, 521 U.S. at 623)). The predominance inquiry seeks to determine the evidentiary effect of adding plaintiffs to the Class. If adding more plaintiffs requires the introduction of "significant amounts of new evidence," this suggests that individual issues are important. *Klay,* 382 F.3d at 1255. Conversely, if adding more plaintiffs leaves the amount of evidence needed to prove the claims "relatively undisturbed," common issues likely predominate. *Id.* Here, too, the addition or subtraction of any given member from the Proposed Classes would have no substantial effect on the nature or quantity of the evidence offered to prove Defendants' liability, readily satisfying *Brown*'s practical test of predominance.

With respect to both the Security Issue and the Solicitation Issue, the evidentiary presentation changes little if there are 100 class members or 100,000. In either instance, Plaintiffs would present the same evidence regarding the financial products sold by Voyager (which will be applicable to all

such products sold to all Plaintiffs and Class members) and evidence regarding the actions taken by Cuban and the Mavericks, such as presentations made, events held, and statements distributed—i.e., the same kinds of facts and evidence concerning the breadth and extent of a defendant's mass promotion of unregistered securities that the courts in *BitConnect*, *Pino*, *De Ford*, and *Houghton* concluded could trigger liability under the securities statutes.

Once the Security Issue and the Solicitation Issue are determined on a class-wide basis, the evidence will readily be conductive to proving damages at trial in this matter. Among other techniques available to readily identify the damages for each Plaintiff and Class Member with precision, Defendants used specific promotional codes that directly link individual customer purchases to representations by a specific defendant. For example, Defendants used, among others, the MAVS100 referral code. *See* Garrison Decl. ¶ 4; Webb Decl. ¶ 4.

Plaintiffs will be able to show readily which purchases were made with which referral codes. Already, the Proposed Class Representatives have shown that they purchased their EPAs with the MAVS100 code. Proposed Rep. Decls. ¶ 4. Plaintiffs will be able to obtain other evidence as well that shows the promotional codes used by other Plaintiffs. Already, Plaintiffs have obtained through discovery evidence of the number of customers that invested in Voyager using the MAVS100 promotional code in the 48 hours after Mr. Cuban's press conference. *See* D.E. 186-26. Plaintiffs will be able to obtain still further information regarding the promotional codes used for individual investments through ongoing discovery.[20]

Nor does proof of causation undermine predominance. Indeed, the only material individual variation in the class claims is the dollar amount of each investor's loss, which is not only recognized as no bar to class certification, *Brown*, 817 F.3d at 1239 ("The 'black letter rule' recognized in every circuit is that 'individual damage calculations generally do not defeat a finding that common issues predominate.'") (quotation omitted); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) ("the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.") (internal citations omitted), it is not an issue even remotely presented by the requested *issue class*, which will not at this stage seek to adjudicate the Proposed Class Representatives' or Class Members' damages, but would rather focus on adjudicating the Security

---

[20] The promotional code data that is available confirms that there will be no issues with respect to ascertainability. *See Eldridge v. Pet Supermarket, Inc.*, 18-22531-CIV, 2019 WL 4694142, at *6 (S.D. Fla. Aug. 21, 2019) ("the ascertainability element only requires that class members be identifiable at some point in the proceeding.")

Issue. *In re FieldTurf*, 2023 WL 4551435, at *9 ("Finally, the Court is not concerned about management difficulties that may arise as a result of certifying these two discrete issues while leaving other aspects of liability and damages to individual adjudication.") [21]

  Common issues predominate with respect to the causes of action the Proposed Class Representatives seek to certify. For example, the NJUSL imposes liability for the offer or sale of an unregistered security, as well as secondary liability for these Defendants, jointly and severally with Voyager. *See* N.J.S.A. 49:3-60 ("It is unlawful for any security to be offered or sold in this State unless . . . [t]he security is registered under this act"); N.J.S.A. 49:3-71(d) ("every . . . agent who materially aids in the sale or conduct [is] also liable jointly and severally with and to the same extent as the seller or investment adviser"). Thus, "irrespective of the individual issues which may arise, the focus of the litigation concerns the alleged common course of unfair conduct embodied in [Voyager's] scheme" to market and sell unregistered securities. *See Larsen v. Union Bank, N.A. (In re Checking Account Overdraft Litig., MDL No. 2036)*, 275 F.R.D. 666, 676 (S.D. Fla. 2011) (internal quotations omitted). *See, e.g.,* Reiners Rpt.; *see also id.*, ¶¶ 1.02, 8.06. Defendants' participation in this scheme will be substantiated by common evidence—including much of the evidence attached to this motion—which shows that Defendants materially aided in Voyager's conduct in selling the EPAs from New Jersey to the Proposed Class Representatives and the Class, despite knowing that the EPAs were securities which were required to be (and which were not) registered. This evidence would remain the same regardless of class size or composition. Further, the EPAs are materially identical and a Court could easily conclude that they are all securities based on the *Howey* test.[22] Thus, predominance is met.

    **b.  A class action is superior to adjudicating thousands of individual cases.**

  Rule 23(b)(3) superiority requires the court to analyze "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Palm Beach Golf Ctr.*, 311 F.R.D. at 699 (quoting *Klay*, 382 F.3d at 1269); *Muzuco v. Re$ubmitIt, LLC*, 297 F.R.D. 504, 521 (S.D. Fla. 2013) (citations omitted). Here, there can be little doubt as to the judicial efficiency

---

[21] That some class members ultimately may not be successful on their damage claims **does not** defeat certification where common issues otherwise predominate. *Navelski*, 244 F. Supp. 3d at 1309 (citing *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016) ("[E]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct.")); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (observing that it is inevitable "that a class will often include persons who have not been injured by the defendant's conduct;" but "[s]uch a possibility or indeed inevitability does not preclude class certification")).

[22] *See, e.g., Terraform Labs Pte. Ltd.*, 2023 WL 8944860, at *13–14 (S.D.N.Y. Dec. 28, 2023).

in litigating the claims of thousands—if not millions—of EPA and VGX purchasers class-wide rather than individually. A comprehensive resolution of the Class members' claims in this action would be far superior to litigating each of their claims separately, and will provide them a better chance at relief:

> Since the damage amounts allegedly owed to each individual [borrower] are relatively low — especially as compared to the costs of prosecuting the types of claims in this case involving complex, multi-level business transactions between sophisticated defendants — the economic reality is that many of the Class members would never be able to prosecute their claims through individual lawsuits.

*Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233, 280 F.R.D. 665, 675 (S.D. Fla. Feb. 21, 2012).

There are thousands of potential Class members whose claims are based on an alleged common course of conduct, rendering the litigation more manageable as a class action than as thousands of individual suits. *See* D.E. 34-1 at 56 (Voyager explaining that "[b]y the end of calendar 2021, we had . . . 3.2 million verified users and 1.074 million funded accounts with over $5.9 billion of assets on the platform."); *see also* D.E. 40-5, 107:10–13; D.E. 186-26.

## APPOINTMENT OF CLASS COUNSEL

Rule 23(g) governs the appointment of class counsel, providing the Court to consider: (1) "the work counsel has done," (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action," (3) "counsel's knowledge of the applicable law," and (4) "the resources [] counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Here, Proposed Class Counsel have decades of experience handling class action litigation, have demonstrated a sound knowledge of the legal issues pertaining to Proposed Class Representatives' and the Class's claims against Voyager, have retained experts needed to address the esoteric securities and cryptocurrency issues that may arise, and certainly have the collective financial wherewithal to capably prosecute these claims on a class-wide basis. *See* Firm Resumes attached as **Composite Exhibit D**. The Moskowitz Law Firm PLLC and Boies Schiller Flexner LLP have been appointed Co-Lead Counsel in *In Re: FTX Cryptocurrency Collapse Litigation* (MDL 3076), where they have worked extremely efficiently both with each other, and with the more than fifteen other law firms working for Plaintiffs. Their appointment as Co-Lead Class Counsel is both appropriate and warranted.

## CONCLUSION

For the foregoing reasons, the Court should (a) certify the proposed Issue Classes; (b) appoint the proposed Class Representatives to serve as Class Representatives for the proposed Nationwide Issue Classes; and (c) appoint The Moskowitz Law Firm, PLLC and Boies Schiller Flexner LLP, to serve as Co-Lead Class Counsel for the Proposed Issue Classes.

## REQUEST FOR ORAL ARGUMENT

The Proposed Class Representatives respectfully request oral argument pursuant to Local Rule 7.1(b)(2). This case and the Proposed Class Representatives' motion raise complex questions of law and fact regarding whether the Class should be certified. Given the importance of these questions to the determination of this case, the Proposed Class Representatives believe that the Court's decision-making process would be significantly aided by oral argument. The Proposed Class Representatives estimate just one hour will be necessary for oral argument.

Dated:  March 15, 2024                    Respectfully submitted,

By: */s/ Adam M. Moskowitz*          By: */s/ David Boies*
Adam M. Moskowitz                     David Boies
Florida Bar No. 984280                (Admitted Pro Hac Vice)
Joseph M. Kaye                        **BOIES SCHILLER FLEXNER LLP**
Florida Bar No. 117520                333 Main Street
Barbara C. Lewis                      Armonk, NY 10504
Florida Bar No. 118114                Phone: (914) 749–8200
**THE MOSKOWITZ LAW FIRM, PLLC**      dboies@bsfllp.com
Continental Plaza
3250 Mary Street, Suite 202
Miami, FL 33133                       Stephen Neal Zack
**Mailing Address:**                  Florida Bar No. 145215
P.O. Box 653409                       Tyler Ulrich
Miami, FL 33175                       Florida Bar No. 94705
Office: (305) 740-1423                **BOIES SCHILLER FLEXNER LLP**
adam@moskowitz-law.com                100 SE 2nd St., Suite 2800
joseph@moskowitz-law.com              Miami, FL 33131
barbara@moskowitz-law.com             Office: 305-539-8400
                                      szack@bsfllp.com
                                      tulrich@bsfllp.com
*Co-Counsel for Plaintiffs and the Class*

Jose M. Ferrer                        *Co-Counsel for Plaintiffs and the Class*
Florida Bar No. 173746
Desiree Fernandez
Florida Bar No. 119518
**MARK MIGDAL HAYDEN LLP**
8 SW 8th Street, Suite 1999
Miami, FL 33130
Office: 305-374-0440
jose@markmigdal.com
desiree@markmigdal.com

*Co-Counsel for Plaintiffs and the Class*

21

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the forgoing was filed on March 15, 2024, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.


By: */s/ Adam M. Moskowitz*
ADAM M. MOSKOWITZ
Florida Bar No. 984280