# Exhibit A

EXPERT REPORT OF LEE REINERS

03/15/2024

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT
OF FLORIDA, MIAMI DIVISION

DOMINIK KARNAS, et al., on behalf of themselves and all others
similarly situated, Plaintiffs, v. MARK CUBAN, et al., Defendants.

INTRODUCTION AND QUALIFICATIONS

1.01  The Moskowitz Law Firm has retained me as an expert to opine upon whether the Voyager Earn Program Accounts ("EPAs") and Voyager's native cryptocurrency, VGX, have characteristics that lend themselves towards the tests established by the Courts in order to constitute the unregistered offering and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act of 1933 or a state analog, such as the New Jersey Uniform Securities Law. I conclude that the facts and circumstances surrounding all offers and sales of EPAs and VGX support the elements of an investment contract according to the *Howey* test articulated by the Supreme Court in *SEC v. W.J. Howey Co*., 328 U.S. 293, 299 (1946). An "investment contract" is a type of security as defined by the Securities Act, 15 U.S.C. § 77b(a)(1) and The Securities Exchange Act. I also conclude that the facts and circumstances surrounding all offers and sales of EPAs support the elements of what constitutes a note under the test established in *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

1.02  Given the facts of this case, and a growing body of cases that recognize certain cryptocurrency products to be securities regardless of where they are purchased, I believe my analysis of EPAs and VGX is sufficiently uniform such that it applies to any purchaser of an EPA or VGX regardless of their individual circumstances.

1.03  I am a Lecturing Fellow in the department of economics at Duke University and at Duke Law School. In addition, I am a member of the CFA Institute Capital Markets Policy Council. I was chosen for this role because of my expertise in cryptocurrency law and regulation.

1.04  A copy of my Curriculum Vitae is attached hereto as Appendix A. I have taught courses on Cryptocurrency Law and Policy and FinTech Law and Policy at Duke University School of Law for over five years. I began my professional career in 2011 at the Federal Reserve Bank of New York, where I spent five years supervising large financial institutions. I am also a proud veteran of Operation Iraqi Freedom, having served in Baghdad from 2004 to 2005 as a member of the Minnesota Army National Guard.

1.05  I began teaching and writing about cryptocurrency regulation in 2017. I have published several academic papers and book chapters related to cryptocurrency regulation. I also released a popular online course, available on Coursera, titled "FinTech Law and Policy" which provides a primer on the regulation of cryptocurrency in the U.S.

1.06  Since 2017, I have published articles related to cryptocurrency and its regulation in mainstream financial news outlets, including the *Wall Street Journal*, *American Banker*, *The Hill*, and *Coindesk*. I have also participated in cryptocurrency-related forums on mainstream television networks, such as CNBC, CNN, Fox Business Network, and ABC. I have also been quoted as an expert on cryptocurrency regulation in *The New York Times*, *The Wall Street Journal*, *The Washington Post*, *National Public Radio*, and similar media

outlets.

1.07 My expertise on cryptocurrency regulation is frequently sought by government agencies around the world, and by Congress and its staff. In February, 2023, I testified in front of the U.S. Senate Committee on Banking, Housing, and Urban Affairs at a hearing titled "*Crypto Crash: Why Financial System Safeguards are Needed for Digital Assets.*"[1] In March 2023, I testified before the U.S. House of Representatives Committee on Financial Services subcommittee on Digital Assets, Financial Technology and Inclusion at a hearing titled "*Coincidence or Coordinated? The Administration's Attack on the Digital Asset Ecosystem.*"[2]

1.08 I have spoken about cryptocurrency and related regulatory issues at numerous public events, including at the Brookings Institution[3] and the prestigious Seminars at Steamboat speaker series.[4] I also co-host a podcast with my Duke colleague, Jimmie Lenz, which focuses on the cryptocurrency industry called "*Coffee & Crypto with Lee & Jimmie.*" Jimmie Lenz and I are also the co-organizers of the annual Digital Assets at Duke conference.[5] The conference hosts key industry players in the digital assets space, regulatory experts, and select researchers, for two days of rigorous debate, discussion and education on the Duke campus.

1.09  In preparing this Report, I have relied on my general knowledge, training, experience, and expertise. Both my analysis and the factual observations I make in this Declaration are, subject to Section 1.10 below, based solely on the foregoing.

1.10 My work on this matter is ongoing and subject to change as circumstances warrant.  I may review additional materials or conduct further analysis.  I reserve the right to update, refine, or revise my opinion as appropriate.

1.11  I am being compensated for my time in this matter at a billing rate of $1,000 per hour, which is standard and customary in my field for someone with my background and experience.
This compensation is not contingent upon the nature of my findings or on the outcome of this litigation.

2.  OVERVIEW OF EPAs

2.01 My analysis of EPAs is based upon information included in the Plaintiffs' Second Amended Complaint (SAC), the Commodity Futures Trading Commission's (CFTC) October 12, 2023, complaint[6] against former Voyager CEO, Stephen Ehrlich, and other

---

[1] hearing | Hearings | United States Committee on Banking, Housing, and Urban Affairs (senate.gov)
[2] Hearing Entitled: Coincidence or Coordinated? The Administration's Attack on the Digital Asset Ecosystem | Financial Services Committee (house.gov)
[3] Digital asset regulation: The prudential perspective | Brookings
[4] Seminars at Steamboat 2022: Lee Reiners - YouTube
[5] Home - Duke Digital Assets Conference (digitalassetsatduke.org)
[6] https://www.cftc.gov/media/9446/enfstephenehrlichcomplaint101223/download

publicly available sources.

2.02  As noted in the SAC, Voyager has referred to these accounts by various names over time, including the "Voyager Interest Program" or the "Voyager Earn Program Accounts" (hereafter referred to as "Earned Programs Accounts" or "EPAs"). The CFTC refers to these accounts as "Rewards Program" in their complaint against Ehrlich.

2.03  In October 2019, Voyager began offering EPAs, allowing customers to earn rewards based on their crypto deposits. The EPAs were akin to savings accounts, with Voyager paying interest in the form of the crypto that customers held as principal.

2.04  Although Voyager promised its investors a fixed return for their EPA investments, Voyager's Annual Information Form filed with Canadian regulators stated, "Rewards earned on crypto assets are variable, and reward rates are determined by voyager at its sole discretion." (SAC, at ¶ 149). To generate those "variable" rates of return, Voyager pooled the EPA assets and engaged in risky financial activities. *Id.* ¶ 149. Similar rates of return were offered for holders of VGX tokens, the value of which (as an exchange token) was tied to the success of the Voyager Platform, and which Voyager led its customers to believe would generate profit through the increased value and ability to sell on secondary markets.

2.05  Defendants actively promoted EPAs by touting interest rates between 7% and 12% that Voyager offered on crypto assets that were available only to Voyager EPA account holders. According to the SAC, when Plaintiffs and other investors deposited cryptocurrency tokens with Voyager, Voyager would pool together those assets to fund its various income generating activities, including lending operations, proprietary trading, cryptocurrency staking, and investments in other cryptocurrency trading platforms. (SAC, at  ¶¶141, 147). In exchange, Voyager promised EPA owners "rewards," through programs such as the "Voyager Earn Program," which would pay a variable rate of interest on assets deposited in the EPA, and "Loyalty Program," which allowed EPA depositors to double or triple the amount of the rewards payable in Voyager's proprietary token (VGX). *Id.* ¶ 142–143

2.06  According to the CFTC, "Voyager took excessive risks with customer assets."[7] Voyager pooled customer assets stored on the Voyager Platform and conveyed billions of dollars' worth of pooled customer Bitcoin ("BTC"), USD Coin ("USDC"), and other digital asset commodities to high-risk third parties in exchange for returns to fund the Rewards Program.[8]

2.07  From the CFTC complaint:

> "In some cases, Voyager made unsecured transfers in sufficient volume to bankrupt Voyager in the event of non-repayment. As part of this practice, undisclosed to its customers, Voyager conveyed pooled customer assets to counterparties at high risk of default, including Firm A (now bankrupt), Firm B (the now-bankrupt trading arm of a now-bankrupt digital asset trading platform),

---

[7]

https://www.cftc.gov/media/9446/enfstephenehrlichcomplaint101223/download at 5

[8] Id.

4

Firm C (now bankrupt), and Firm D (now bankrupt). Voyager inaccurately determined each counterparty was low risk. Voyager personnel lacked sufficient experience assessing counterparty risk and conducted grossly insufficient due diligence on its counterparties."[9]

2.08 According to the CFTC, after Firm A filed for bankruptcy, Ehrlich and Voyager took extensive actions to conceal Voyager's exposure to Firm A and told Canadian securities regulators "that if customers possessed accurate information regarding Voyager's exposure to Firm A and its own deteriorating financial condition, customers would likely withdraw their assets from the Voyager Platform, resulting in Voyager's failure."[10]  Voyager filed for bankruptcy after Firm A, now known to be Three-Arrows Capital, defaulted.[11]

2.09 According to the CFTC, Voyager generated revenue to pay customer "rewards" in two ways. First, "Voyager earned revenue by charging customers fees in connection with their digital asset transactions on the Voyager Platform."[12] Second, "Voyager pooled the digital asset commodities that its customers purchased or stored and transferred certain of those pooled assets to third parties such as Firms A, B, C, and D, and charged those counterparties interest on the putative 'loans.'"[13]

2.10 Voyager falsely, and illegally, told customers that their funds were insured by the Federal Deposit Insurance Corporation (FDIC). On October 12, 2023, the FDIC reached a settlement with Voyager and filed suit against its former CEO, Stephen Ehrlich, for knowingly making false statements that customer funds were FDIC insured.[14]

## 3.  LEGAL AND REGULATORY ISSUES WITH CRYPTOCURRENCY INTEREST ACCOUNTS

3.01 I conclude that the facts and circumstances surrounding the offer and sale of EPAs support the elements of an investment contract according to the *Howey* test articulated by the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). An "investment contract" is a type of security as defined by the Securities Act, 15 U.S.C. § 77b(a)(1) and The Securities Exchange Act. The *Howey* test says that an investment contract exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.

3.02 Purchasing EPAs required an investment of money, satisfying the first prong of the Howey test. According to the SEC's "Framework for "Investment Contract" Analysis of

[9] *Id.*, at 5.
[10] https://www.cftc.gov/media/9446/enfstephenehrlichcomplaint101223/download at ¶ 10
[11] Voyager founder Stephen Ehrlich hit with fresh charges - CoinGeek
[12] *Id.*, at ¶ 33.
[13] *Id.*
[14] FTC Reaches Settlement with Crypto Company Voyager Digital; Charges Former Executive with Falsely Claiming Consumers' Deposits Were Insured by FDIC | Federal Trade Commission

Digital Assets" (Framework) published in 2019, the investment does not need to come in the form of fiat currency: "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration."[15] Thus, Plaintiffs' purchase of EPAs with various cryptocurrencies like bitcoin and USDC, still represents an investment of money. Other courts have also recognized that the use of cryptocurrency to purchase crypto-asset securities represents an investment of money under the *Howey* framework.

3.03   Several defendants in cryptocurrency-related enforcement actions and private lawsuits have argued that an "investment of money" is different from "merely payment of money"—that is, *Howey* requires not just payment of money but an intent to invest that money. Courts have rejected this argument. Judge Analisa Torres of the United States District Court for the Southern District of New York, in her ruling on cross-motions for summary judgment filed by the SEC and Ripple in relation to ongoing litigation that dates back to December 2020, rejected the distinction between an "investment" of money and "payment" of money under the *Howey* framework. Judge Torres noted that "[t]he proper inquiry is whether the Institutional Buyers "provide[d] the capital," *Howey*, 328 U.S. at 300, "put up their money," *Glen-Arden*, 493 F.2d at 1034, or "provide[d]" cash, *Telegram*, 448 F. Supp. 3d at 368–69."[16]

3.04   In order to satisfy the "common enterprise" aspect of the *Howey* test, federal courts require that there be either "horizontal commonality" or "vertical commonality."  *See Revak v. SEC Realty Corp.*, 18 F.3d. 81, 87-88 (2d Cir. 1994) (discussing horizontal commonality as "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits" and two variants of vertical commonality, which focus "on the relationship between the promoter and the body of investors").  In footnote 11 in the SEC's Framework, the SEC notes that "Based on our experiences to date, investments in digital assets have constituted investments in a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."[17]

3.05   EPAs have both 'horizontal commonality' and 'vertical commonality.'

3.06   Horizontal commonality exists where (1) a sharing or pooling of the funds of investors and (2) that "the fortunes of each investor in a pool of investors" are tied to one another and to the "success of the overall venture." See *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

3.07   EPA investors tendered money, in the form of fiat currency and cryptocurrency, to Voyager to participate in EPAs. Voyager then pooled the EPA investors' assets and used those assets for lending activities that would generate revenue for Voyager that supported

---

[15] https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets
[16] SEC vs Ripple 7-13-23.pdf (uscourts.gov)
[17] SEC.gov | Framework for "Investment Contract" Analysis of Digital Assets

returns to the EPA investors. The returns earned by each EPA investor were a function of the pooling of the loaned fiat currency and cryptocurrency and the ways in which Voyager deployed those loaned assets. In this way, each investor's fortune was tied to the fortunes of the other investors.

3.08 Vertical commonality is also present in EPAs because Voyager would retain any return payments that it received from third parties that were in excess of the promised return to EPA holders. Thus, the fortunes of EPA investors were "interwoven with and dependent on the efforts and success of those [Voyager] seeking the investment or of third parties." *Villeneuve v. Advanced Business Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir. 1983), *affd en banc*, 730 F.2d 1403 (1984).

3.09 Vertical commonality is present even if Voyager did not profit off the EPA program because under "broad vertical commonality" the fortunes of the investors must be linked only to the <u>efforts</u> of the promoter. S*ee Long v. Shultz Cattle Co., Inc.*, 881 F.2d 129, 140-41 (5th Cir.1989).

3.10 The CFTC's complaint against Ehrlich also acknowledges that the Voyager platform operated as a common enterprise.[18]

3.11 As noted by the SEC in their Framework, "the main issue in analyzing a digital asset under the *Howey* test is whether a purchaser has a reasonable expectation of profits (or other financial returns) derived from the efforts of others." Determining whether this prong of *Howey* is met requires an assessment of the "economic reality"[19] of the transaction and "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect."[20]

3.12 The SEC's Framework lists a number of factors that may indicate a reasonable expectation of profit, as well as factors that suggest this expectation can only be fulfilled through the efforts of others. Looking at the facts and circumstances surrounding EPAs, it is indisputable that EPA investors were expecting to profit from their purchase and that this profit would be "derived from the entrepreneurial or managerial efforts of others." *Forman*, 421 53 U.S. at 852.

3.13 The Voyager website, public statements made by Ehrlich, and marketing materials made or created by Voyager and its executives and affiliates led EPA investors, in any objective reality, to expect profits. Numerous examples are provided in the SAC and the CFTC complaint. They include:

- Voyager offering EPA investors rates of return as high as 12%

---

[18] https://www.cftc.gov/media/9446/enfstephenehrlichcomplaint101223/download
at ¶¶ 130–135
[19] *Howey*, 328 U.S. at 298. *See also Tcherepnin*, 389 U.S. at 336 ("in searching for the meaning and scope of the word 'security' in the [Acts], form should be disregarded for substance and the emphasis should be on economic reality.")
[20] *Joiner*, 320 U.S. at 352-53.

- The company emphasized that EPA rewards were " 'a significant premium to traditional savings accounts, especially with interest rates near zero,' and represented that the Voyager Platform offered a straightforward mechanism to keep customer assets safe while also maximizing the assets' value."[21]

3.14 EPA investors had good reason to expect Voyager's efforts to manage the loaned cryptocurrencies profitably. Voyager's user agreement made it clear that the company retained ownership and control over the loaned crypto assets and determined how much to hold and lend. According to the user agreement, Voyager reserved the right to "pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer" customer digital assets and to use or invest those assets at the customer's own risk, including the risk of losing all of a customer's cryptocurrency and that loans to third parties could be unsecured and uncollateralized; and to stake customer digital assets or make unsecured loans of customer digital assets to institutional third parties "determined at Voyager's sole discretion."[22]

3.15 Voyager's lending activities were at its own discretion, and Voyager managed the risks involved.

3.16 My analysis of the security status of EPAs is supported by the New Jersey Bureau of Securities (the Bureau). On March 29, 2022, the Bureau issued a Summary Cease and Desist Order against Voyager for "funding its income generating activities," in part, "through the sale of unregistered securities in the form of cryptocurrency interest-earning accounts."[23]

3.17 The Bureau's order notes that the "Earn Program" unregistered securities was a feature "of all Voyager cryptocurrency trading accounts ("Voyager Earn Program Accounts,") unless the account holder opts out."[24]

3.18 The Bureau's order notes that "the Voyager Earn Program Account is not currently registered with any federal or state securities regulator, nor is it exempt from registration as required by law, even though the Voyager Earn Program Account is a "security" and subject to such requirements."[25] The order states that the "Earn Program Account is a security as defined in N.J.S.A. 49:3- 49(m)." The definition of security under that statute is similar to the definition in the federal securities laws and includes the term "investment contract."

3.19 EPAs are also notes under *Reves v. Ernst & Young, 494 U.S. 56 (1990*).

---

[21]

https://www.cftc.gov/media/9446/enfstephenehrlichcomplaint101223/download at ¶ 4

[22]

https://www.cftc.gov/media/9446/enfstephenehrlichcomplaint101223/download at ¶ 43

[23] Voyager Summary Order.pdf (nj.gov), ¶1

[24] *Id.*

[25] *Id.* at ¶ 27

3.20 Although the term "note" is included in the statutory definition of a security, case law has determined that not every "note" is a security. The definition specifically excludes notes with a term of less than nine months and courts have carved out a range of exemptions over the years for commercial paper type notes such as purchase money loans and privately negotiated bank loans. To reconcile these varying cases, the U.S. Supreme Court in *Reves* established the "family resemblance test," to determine whether a note is a security.

3.21 When applying the Reves test, courts "begin with a presumption that every note is a security." Reves, 494 U.S. at 65. From there, the analysis turns on four factors: (1) the motivations of the parties; (2) the "plan of distribution" of the instrument; (3) the reasonable expectations of the investing public; and (4) whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument. Id. at 66–67.

3.22 The presumption that every note is a security can be rebutted "only by a showing that the note bears a strong resemblance (in terms of the four factors we have identified) to one of the enumerated categories of instrument." Id. at 67. Those categories include 1) a note delivered in consumer financing; 2) a note secured by a mortgage on a home; 3) a short-term note secured by a lien on a small business or some of its assets; 4) a note evidencing a character loan to a bank customer; 5) a short-term note secured by an assignment of accounts receivable; and 6) a note which simply formalizes an open-account debt incurred in the ordinary course of business (such as a trade payable for office supplies); and vii) a note evidencing loans by commercial banks for current operations.

3.23 The "family resemblance" analysis requires:
- A consideration of the motivation of the seller and buyer (e.g. is the seller looking for investment and the buyer looking for profit?);
- The plan of distribution of the note (e.g. is the product being marketed as an investment?);
- The expectation of the creditor/investor (e.g. would the investing public reasonably expect the application of the securities laws to the product); and
- The presence of an alternative regulation (e.g. will the product be registered as a banking product and the offered registered as a bank?).

3.24 EPAs do not resemble any of enumerated categories that would rebut the presumption that a note is a security. Applying the *Reeves* "family resemblance" analysis to the Earn Program reveals the presence of a note.

3.25 First, Voyager offered and sold EPAs to obtain cryptocurrency for the general use of its business, namely to run its lending and investment activities to pay interest to EPA investors, and purchasers invested in EPAs to receive interest on the loaned cryptocurrencies.

3.26 Second, EPAs were marketed as an investment through the use of terms like "reward" and listing the rewards available for specific cryptocurrencies on Voyager's website. EPAs were offered and sold to a broad segment of the general public.

3.27 Third, EPAs investors would expect the protections of securities laws given that their funds were put at risk.

3.28 Finally, there was no alternative regulatory regime that would protect EPA investors, despite Voyager's false claims that: "(1) Voyager itself is FDIC-insured; (2) customers who invested with the Voyager cryptocurrency platform would receive FDIC insurance coverage for all funds provided to, held by, on, or with Voyager; and (3) the FDIC would insure customers against the failure of Voyager itself."[26]

4.  REGULATORY ACTION SHOULD HAVE PUT VOYAGER AND DEFENDANTS ON NOTICE THAT CRYPTOCURRENCY INTEREST ACCOUNTS HAVE CHARACTERISTICS THAT MEET THE *HOWEY* OR *REVES* TESTS

4.01 Voyager had ample notice and warning that EPAs were unregistered securities courtesy of multiple state and federal enforcement actions against identical crypto-lending products.

4.02 In July 2021, the New Jersey Bureau of Securities announced a Summary Cease and Desist Order against BlockFi Lending, LLC (BlockFi), which raised at least $14.7 billion from the unlawful sale of unregistered securities in the form of interest-earning cryptocurrency accounts.[27]

4.03 Voyager's EPAs are functionally identical to BlockFi's program. Differences between the products come down to phrasing (use of words like "interest" versus "rewards"), how frequently rewards are paid out (daily, weekly, or monthly, most commonly) or specific cryptocurrencies that are offered as part of the program.

- *"BlockFi makes money via interest fees, withdrawal fees, spreads, sponsorship fees, crypto mining, as well as premiums collected from investments into other trusts."[28]*

- *"BlockFi engages in two activities to generate return: (1) purchasing, as principal, SEC regulated equities and predominately CFTC- regulated futures; and (2) lending crypto assets in the institutional market. See "What are the risks of holding my crypto at BlockFi?" for more details."[29]*

4.04 On February 22, 2022, the SEC charged BlockFi [30]with failing to register the offers and sales of its retail crypto-lending product and also charged BlockFi with violating the registration provisions of the Investment Company Act of 1940.

---

[26] Joint Letter Regarding Potential Violations of Section 18(a)(4) of the Federal Deposit Insurance Act (fdic.gov)
[27] New Jersey Division of Consumer Affairs Press Release (njconsumeraffairs.gov)
[28] https://productmint.com/blockfi-business-model-how-does-blockfi-make-money/#:~:text=BlockFi%20makes%20money%20via%20interest,million%20in%20funding%20to%20date
[29] How is BlockFi able to pay interest on crypto held on the platform? – BlockFi (archive.org)
[30] https://lnkd.in/d-Xy45ec

4.05 To settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and bring its business within the provisions of the Investment Company Act within 60 days.

4.06 BlockFi's parent company also announced that it intends to register under the Securities Act of 1933 the offer and sale of a new lending product. In parallel actions, BlockFi agreed to pay an additional $50 million in fines to 32 states, including New Jersey, to settle similar charges.

4.07 On September 17, 2021, the New Jersey Bureau of Securities issued a Summary Cease and Desist Order against Celsius for offering unregistered securities in the form of interest-earning cryptocurrency products.[31] Celsius referred to these unregistered securities as its "Earn Rewards" account.

4.08 On July 13, 2023, the SEC alleged the same Celsius product, what it called the "Earn Interest Program," constituted an unregistered offer and sale of securities in a complaint against Celsius and its founder and former CEO, Alex Mashinsky.[32] According to the complaint, Celsius customers invested in the Earn Interest Program by tendering crypto assets to Celsius in exchange for Celsius's promise to provide investors periodic interest payments proportional to their investments in the program. Celsius then pooled assets received from their customers and deployed them into the same revenue-generating activities, and the company paid returns to investors in the Earn Interest Program om a pro rata basis.

4.09 In 2021, Coinbase began marketing a cryptocurrency lending product called Lend. The Lend program purported to allow some Coinbase customers to "earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)."[33] According to Coinbase, its lawyers reached out to the SEC to discuss its Lend product, at which point SEC staff instead served Coinbase with a *Wells Notice*, informing Coinbase of their intention to seek approval from the SEC Commissioners to file a civil enforcement action against Coinbase for violating the federal securities laws.

4.10 According to Coinbase, the SEC issued the Wells Notice because of Coinbase's failure to file a registration statement with the SEC for the offering of its Lend product, which the SEC believed was a security.[34]

4.11 The two cases that Coinbase claims the SEC cites as support for its Wells Notice are *SEC v. Howey* and *Reves v. Ernst & Young*. *Reves* addressed the question of whether a product is a "note" and hence a security (applying the so-called "Familial Resemblance Test").

---

[31]  Celsius Cease and Desist 9.17.21.pdf (nj.gov)
[32] https://www.sec.gov/files/litigation/complaints/2023/comp-pr2023-133.pdf
[33] The SEC has told us it wants to sue us over Lend. We don't know why. - Blog (coinbase.com)
[34] *Id.*

4.12 Under the Lend program, Coinbase customers would clearly be investing "money" at Coinbase and placing their faith in Coinbase to generate a profit for them. Lend investors would have no say in how Coinbase runs the Lend program and Coinbase was not going to permit Lend investors to participate in Lend-related decisions. Given these facts, Lend was clearly an investment contract.

4.13 As a result of the SEC's *Wells Notice* and ongoing dialogue with the SEC, Coinbase decided not to launch the Lend product.[35]

## 5. RECENT CASE LAW AND ENFORCEMENT ACTIONS WHERE CRYPTOCURRENCY PRODUCTS ANALOGOUS TO EPAS WERE FOUND TO SATISFY THE *HOWEY* OR *REVES* TESTS

5.01 On February 7, 2024, the SEC charged TadeStation Crypto, Inc., for failing to register the offer and sale of a crypto lending product that allowed U.S. investors to deposit or purchase crypto assets in a TradeStation account in exchange for the company's promise to pay interest. To settle the SEC's charges, TradeStation agreed to pay a $1.5 million penalty.

5.02 In or around August 2020, TradeStation began to offer and sell an interest feature on the crypto asset accounts ("Interest Feature") in the United States. The Interest Feature allowed United States investors to tender to TradeStation certain crypto assets in exchange for TradeStation's promise to pay a variable interest rate on the tendered assets. TradeStation then loaned investors' crypto assets to institutional borrowers to generate revenue used to fund interest payments to Interest Feature investors. TradeStation's "Interest Feature" is essential identical to Voyager EPAs.[36]

5.03 On September 7, 2023, the SEC announced settled charges against Linus Financial, Inc. for failing to register the offers and sales of its retail crypto lending product. According to the SEC's order, in or around March 2020, Linus Financial began to offer and sell Linus Interest Accounts in the United States. These accounts allowed U.S. investors to tender U.S. dollars to Linus Financial in exchange for Linus Financial's promise to pay interest. Linus Financial converted investors' cash into crypto assets, pooled the crypto assets, and controlled how the pooled assets were used to generate income for Linus Financial itself and for investors' interest payments.[37]

5.04 On January 19, 2023, the SEC charged Nexo Capital Inc. with failing to register the offer and sale of its retail crypto asset lending product, the Earn Interest Product (EIP). To settle the SEC's charges, Nexo agreed to pay a $22.5 million penalty and cease its unregistered offer and sale of the EIP to U.S. investors.[38] Nexo promoted the EIP as an investment, by which investors could earn a consistent return. Nexo took complete control over investors' assets from the EIP, pooled them together, including with Nexo's

---

[35] [Coinbase drops plans to launch interest product after CEO's SEC comments (cnbc.com)](cnbc.com)
[36] [TradeStation Crypto, Inc. (sec.gov)](sec.gov)
[37] [Linus Financial, Inc. (sec.gov)](sec.gov)
[38] [https://www.sec.gov/files/litigation/admin/2023/33-11149.pdf](https://www.sec.gov/files/litigation/admin/2023/33-11149.pdf)

other assets, and then deployed those assets in various revenue-generating activities. Additionally, Nexo's lending and investment activities were at its own discretion, and Nexo was responsible for managing the risks involved.

5.05 On January 26, 2023, in a parallel action, the California Department of Financial Protection and Innovation (DFPI) entered into a settlement agreement with Nexo to resolve charges that the company's EIPs constituted unregistered securities.[39] The settlement agreement references numerous actions taken by other state securities regulators against Nexo for offering and selling unregistered securities in the form of EIP, including Washington, Oklahoma, Maryland, New York, Vermont, Kentucky, South Carolina, Indiana, and Wisconsin.

5.06 On January 12, 2023, the SEC charged Genesis Global Capital, LLC and Gemini Trust Company, LLC for the unregistered offer and sale of securities to retail investors through the Gemini Earn crypto asset lending program.[40]  According to the complaint, "To participate in the Gemini Earn program, Genesis and Gemini required that investors enter into a tri-party Master Digital Asset Loan Agreement with Genesis and Gemini ("Gemini Earn Agreement"), whereby Gemini Earn investors provided crypto assets to Genesis, with Gemini acting as the agent in the issuance. Genesis would send interest payments to Gemini, which would then deduct an "Agent Fee" before distributing the remainder of the interest payments to Gemini Earn investors." Genesis pooled the crypto assets from Gemini Earn investors with assets from other investors. Genesis then deployed the crypto assets – primarily by lending the crypto assets to institutional counterparties ("Institutional Borrowers") – in order to generate revenue for its business, including the revenue necessary to pay interest to Gemini Earn investors. Genesis earned revenue by lending the crypto assets at a higher rate than it paid to Gemini Earn and other investors.

5.07 On October 19, 2023, the New York Attorney General filed a lawsuit against Gemini Trust Company (Gemini), Genesis Global Capital, LLC and its affiliates (Genesis), and Digital Currency Group, Inc. (DCG) for defrauding more than 230,000 investors, including at least 29,000 New Yorkers, of more than $1 billion.[41]

5.08 Based upon the facts in the NY AG complaint, the Gemini Earn program is nearly identical to the Voyager EPA program in its marketing and execution. For example:
- Gemini and Genesis Capital marketed Earn to the public as a high-yield investment program where Gemini customers could profit by passively investing their cryptocurrencies with Genesis Capital.
- Under the Gemini Scheme, Gemini solicited money from the public with false assurances that Earn was a highly liquid investment and that Genesis Capital was creditworthy based on Gemini's ongoing risk monitoring. In reality, however,

---

[39] https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/01/Admin.-Action-Nexo-Capital-Inc.-Settlement-Agreement.pdf
[40] comp-pr2023-7.pdf (sec.gov)
[41] https://ag.ny.gov/sites/default/files/court-filings/nysoag-complaint-against-gemini-et-al.pdf

Gemini's confidential risk reports found that Genesis Capital posed a high risk of default.

- To invest in Earn, investors first had to buy or hold cryptocurrency on Gemini's cryptocurrency platform.
- Gemini failed to disclose to Earn investors the risks of investing in Earn.
- Gemini and Genesis Capital controlled the interest rates and cautioned their investors: "rates may increase or decrease in the future."

5.09 Both Voyager and Gemini (through Genesis) were dangerously exposed to Three Arrows Capital, and suffered losses that resulted in both being unable to pay back their customers.

5.10 The NY AG alleges that "the pooled investment program that Gemini and Genesis Capital referred to as "Gemini Earn" constituted securities under the Martin Act." According to the complaint, "Earn is a security under the Martin Act because Earn investors provided their cryptocurrency assets to Genesis Capital with the expectation of receiving promised yields from Genesis Capital's efforts in deploying investors' pooled assets."[42]

5.11 The complaint also notes that Genesis Capital's Chief Legal Officer knew Earn was an unregistered security: "Genesis Capital's Chief Legal Officer acknowledged several months before the launch of Earn that the program "may be viewed as an investment contract under the securities laws.""[43]

5.12 The SEC's June 2023 complaint against Binance Entities and its founder alleges that crypto lending products "BNB Vault" and "Simple Earn" were unregistered securities.[44] Both products resemble Voyager EPAs. From the complaint:

- Binance markets Simple Earn as programs that pay interest to investors who lend their crypto assets to Binance for fixed or flexible lengths of time. The interest paid depends on the crypto asset lent and the duration of the loan.[45] For instance, investors who lent a particular crypto asset through Simple Earn as of April 24, 2023, were promised profits of 18.9%.
- Binance determines the Simple Earn rate for each of its offerings at its discretion, taking into account various "factors which are carefully designed to ensure that rewards paid to users are sustainable and competitive."[46]
- According to Binance, it may pool assets loaned through Simple Earn and use its managerial expertise to deploy them "for a variety of purposes," including on-chain staking, loans, or for operational purposes by other business units within Binance.[47]

---

[42] *Id.*, at ¶ 193
[43] *Id.*, at ¶ 191
[44] SEC.gov | SEC Files 13 Charges Against Binance Entities and Founder Changpeng Zhao
[45] *Id.*, at ¶ 327
[46] *Id.*, at ¶ 328
[47] *Id.*, at ¶ 329

- BNB Vault is a similar program that is limited to holders of BNB and described on Binance.com as a "BNB yield aggregator" whereby investors can lend their BNB to Binance to earn investment returns.[48]
- In both the Simple Earn and BNB Vault programs, Binance pools the crypto assets lent by investors and uses those assets to generate revenue that was used to pay returns to investors in Simple Earn and BNB Vault. Investors share pro rata the benefits of their pooled investments in the Simple Earn and BNB Vault programs.[49]
- Binance exercises discretion and uses its entrepreneurial expertise in managing both programs, including identifying liquidity needs, negotiating with Launchpool issuers, choosing terms, holding and controlling the invested assets, and generating revenue, through its operation of the Binance.com Platform to pay the Simple Earn and BNB Vault investors.[50]

5.13 The voluminous state and federal enforcement record for cryptocurrency lending products clearly indicate that Voyager EPAs are unregistered securities. If the above products are securities, EPAs are securities.

## 6. RESPONDING TO THE DEFENDANTS' OMNIBUS MOTION TO DISMISS THE SECOND AMENDED COMPLAINTS

6.01 In their Motion to Dismiss, the Defendants argue that EPAs are commodities, not securities, because of the CFTC's enforcement action against Mr. Ehrlich. The Defendants also argue that EPAs are not investment contracts under Howey because there was no "common enterprise," and because Voyager's efforts were not essential to the success of EPAs.

6.02 In their complaint against Stephen Ehrlich, the CFTC alleges that Voyager operated a "commodity pool" by pooling customer assets and then lending these "digital assets to third parties to trade, among other things, commodity interests for the benefit of Voyager's customers ("pool participants")."[51] Thus, Voyager acted as an unregistered commodity pool operator (CPO), and Ehrlich operated as an unregistered associated person (AP) of an unregistered CPO.

6.03 The CFTC states that "[a] commodity pool is an investment vehicle that "pools" together money from many investors to trade commodity futures or options. In most cases, the commodity pool operator (CPO) who organizes the pool must register with the CFTC. The pool operator either invests the funds directly or engages a commodity trading advisor (CTA) to do so."[52]

---

[48] *Id.*, at ¶ 331
[49] *Id.*, at ¶ 335
[50] *Id.*, at ¶ 336
[51]
https://www.cftc.gov/media/9446/enfstephenehrlichcomplaint101223/download, ¶ 13
[52] Before Investing in Commodity Pools (cftc.gov)

6.04 In their motion to dismiss, ECF No. 189, the Defendant's state: "the CFTC alleges Voyager "solicited, accepted, or received **digital asset commodities** for the purpose of trading commodity interests with those assets." Id. ¶ 137 (emphasis added)."

6.05 However, the issue is not whether the specific customer assets that Voyager pooled were commodities.

6.06 In several circumstances, pooled commodities can be transformed into a security. For example, in January 2024, the SEC granted approval to 11 spot Bitcoin exchange-traded funds (ETF).[53] Each of these product's list and trade shares of a Trust that would hold spot bitcoin, in whole or in part, and the SEC acknowledges that bitcoin is a commodity. And most of the other cryptocurrency lending products cited above pooled commodities like bitcoin as well.

6.07 In their complaint, the only digital assets the CFTC claims are commodities are Bitcoin and USDC: "Certain digital assets are "commodities", including BTC, USDC, and others, as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9)." Finding that bitcoin and USDC are commodities does not imply that EPAs cannot be securities.

6.08 The CFTC's complaint does not allege that Voyager itself directly engaged in commodity interest transactions (e.g., futures or swaps).

6.09 According to attorneys from Katten[54]:
"The CFTC has traditionally held that pooled investment vehicles that invest in other investment vehicles that transact in commodity interests are commodity pools. However, this appears to be the first instance where the CFTC has alleged that a pooled investment vehicle that lends customer assets to another investment vehicle (even where it is unrelated) is also a commodity pool where the third party engages in commodity interest transactions. [T]he CFTC is now … claiming that lending of customers' assets by Voyager to third parties that traded in commodity interests was close enough to investing to substantiate charging Mr. Ehrlich with acting as a CPO without registration."

6.10 The CFTC is thus relying on novel legal theory in alleging that Voyager operated an unregistered commodity pool operator. In a statement accompanying the CFTC's complaint, Republic CFTC Commissioner Caroline D. Pham, said:
"I caution that the CFTC's interpretation of a commodity pool operator in this enforcement action would seem to include commonplace lending activity – like taking deposits and providing loans. Such an interpretation is an overreach beyond our statutory authority and would disrupt well-established legal and regulatory frameworks for lending and consumer finance. There is a significant difference between managing investor money for the purpose of trading derivatives and taking deposits and providing

---

[53] 34-99306.pdf (sec.gov)
[54] CFTC Resuscitates Version of MLB's Former 'Neighborhood Play' to Sue Principal of Defunct Crypto-Asset Entity Voyager as a Commodity Pool Operator | Katten Muchin Rosenman LLP - JDSupra

loans to others."

6.11 It is important to note that the CFTC is simply asserting that Voyager was operating an unregistered commodity pool operator, but they are NOT asserting that EPAs (the CFTC refers to it as the "Rewards Program") themselves are commodities and not securities. In fact, as acknowledged by CFTC Commissioner Christy Goldsmith Romero, "something can be a commodity and a security at the same time."[55]

6.12 As acknowledged by former CFTC commissioner and SEC general counsel, Dan Berkovitz, "something can actually be both a commodity and a security."[56] Thus, the CFTC's assertion that Voyager acted as an unregistered CPO does not preclude the SEC or a private plaintiff from asserting that EPAs are unregistered securities.

6.13 As detailed above, the overwhelming number of enforcement actions against the providers of similar cryptocurrency lending products suggests that EPAs are securities.

6.14 The Defendants also assert that EPAs are not investment contracts under *Howey* for several reasons noted below. Similar arguments were also used by Gemini and Genesis in their motion to dismiss the SEC charges that they offered and sold unregistered securities through the Gemini Earn program. The motion was denied by U.S. District Judge Edgardo Ramos on March 13, 2024.[57]

6.15 In their motion to dismiss, Mr. Cuban and other defendants argue that there was no common enterprise because "EPA holders did not share in profits and losses with each other or Voyager;" instead, they received an interest payment set by Voyager, but based on the market rate of interest designed to retain them as customer EPA."[58]

6.16 Gemini and Genesis made a similar argument. They argued that the fortunes of Gemini Earn customers were not tied together because each customer "received a market rate of interest" rather than sharing in profits on a pro rata basis.[59]

6.17 Judge Ramos noted prior decisions did not require a "pro-rata distribution of profits" to demonstrate horizontal commonality. Kik, 492 F. Supp. 3d at 178; see also Balestra v. ATBCOIN LLC, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) (explaining that although purchasers were not entitled to a pro rata share of profits, "such a formalized profit-sharing mechanism is not required for a finding of 12 horizontal commonality").

6.18 Judge Ramos notes that the complaint "need only allege that "the fortunes of each investor depend upon the profitability of the enterprise as a whole." Revak, 18 F.3d at 87." Judge Ramos states "the SEC has satisfied that burden by alleging that the returns earned by each investor were dependent on how Genesis pooled and deployed the crypto

---

[55] Security? Commodity? What happens if crypto is both? (yahoo.com)
[56] ETH can be both a security and a commodity, former CFTC commissioner says (cointelegraph.com)
[57] gov.uscourts.nysd.592343.34.0_1.pdf (courtlistener.com)
[58] ECF No. 189, at 7
[59] gov.uscourts.nysd.592343.34.0_1.pdf (courtlistener.com), at 10.

assets, Doc. 1 ¶¶ 38–41—even if each investor was not entitled to a pro rata share."

6.19 Given that EPAs and the Earn program are nearly identical, Judge Ramos' reasoning also applies in this case. It is clear that the returns earned by each EPA investor were dependent on how Voyager pooled and deployed their customers' cryptocurrency.

6.20 Defendants also argue that "only one variable dictated how "profitable" the EPA program was for customers: the preset, market-based interest that Voyager obligated itself to pay, no matter its profits or losses, in an effort to obtain customers."[60] Therefore, Voyager's efforts did not make any difference and EPA investors "lacked the essential skin in the game characteristic of equity, defeating any finding of horizontal or vertical commonality."[61]

6.21 Judge Ramos rejected similar reasoning in the Earn case: "the Court cannot agree with Defendants' contention that Gemini Earn customers "did not have the skin in the game that defines a common enterprise."[62]

6.22 For purposes of *Howey* analysis, it does not matter if the "incentive program" lost money, as defendants argue.

6.23 For example, according to the NY AG complaint against Gemini and Genisis, after Three Arrows Capital defaulted on billions of dollars in loans extended by Genesis, the "resulting losses created, in Genesis Capital's words, a "structural hole" at Genesis Capital that impaired its ability to repay its open-term liabilities—including to Earn investors." And yet, Earn customers continued to receive their promised rate of interest after that.

6.24 Cuban Defendants similarly argue that EPA investors could not expect the issuer's efforts "would drive any returns" because "the EPA holder's return was a preset interest rate, which did not rise and fall with Voyager's success." Defendants contrast this with the "Anchor Protocol" from Judge Rakoff's Terraform Labs ruling:

"Unlike Voyager EPA customers, who were guaranteed a specific rate of return regardless of Voyager's efforts, customers in Terraform Labs' "Anchor Protocol" received pro rata profits "[i]f [Terraform Labs'] deployment of funds within the Anchor Protocol was successful in generating returns."

6.25 Defendants fail to mention that the Anchor Protocol advertised rates of return of 19-20% (from Judge Rakoff decision) which was literally too good to be true. In his ruling, Judge Rakoff notes that "at various points when revenues from the "Anchor Protocol" investments did not cover the advertised returns to UST depositors, Terraform injected millions of dollars from its reserves -- which included a $50 million dollar fund named the "LUNA Foundation Guard" -- to ensure depositors received the money they were promised."

---

[60] ECF No. 189, at 8.
[61] *Id*., at 7.
[62] gov.uscourts.nysd.592343.54.0.pdf (courtlistener.com), at 12

6.26 Just like EPAs, the Anchor Protocol promised a preset interest rate that Anchor customers received even though the program itself was not profitable, therefore the Cuban defendants contradict themselves. Judge Rakoff explained why there was horizontal commonality in the Anchor Protocol:

> "In essence, the UST tokens were allegedly "pooled" together in the Anchor Protocol and, through the managerial efforts of the defendants, were expected to generate profits that would then be re-distributed to all those who deposited their coins into the Anchor Protocol -- in other words, on a pro-rata basis. If the SEC's allegations are credited -- which, at this stage, they must be -- there was thus plainly horizontal commonality between the defendants and at least those large majority of UST investors who deposited their coins in the Anchor Protocol."

6.27 Judge Rakoff's reasoning can just as well have been applied to Voyager EPAs.

6.28 The Cuban defendants also repeatedly claim that EPAs provided a "market" rate of interest, while at the same time arguing that the EPA interest rate was unilaterally selected by Voyager regardless of the returns generated by the lending program. This is a puzzling assertion, as one firm does not constitute a market. From the motion to dismiss:

- Here, the Voyager EPAs are individual accounts where customers earn only a pre-determined, market interest rate
- Instead, participants received an interest payment set by Voyager, but based on the market rate of interest designed to retain them as customers.
- Only one variable dictated how "profitable" the EPA program was for customers: the preset, market-based interest that Voyager obligated itself to pay, no matter its profits or losses, in an effort to obtain customers.

6.28 The reality is that Voyager offered rates on EPAs that were significantly higher than "market" rates in traditional financial markets. Voyager was aware of this fact and indeed marketed it as a selling point. From the CFTC's complaint against Ehrlich:

> "Voyager also promised customers a high-yield return on certain stored digital asset commodities. Since approximately October 2019, Voyager operated a program (the "Rewards Program"), which promised customers who held certain digital assets on the Voyager Platform a return (or "reward") as high as 12%. Voyager emphasized that its rewards rates were "**a significant premium to traditional savings accounts, especially with interest rates near zero,**" and represented that the Voyager Platform offered a straightforward mechanism to keep customer assets safe while also maximizing the assets' value. Throughout the operation of the Rewards Program, Ehrlich and Voyager promised customers that assets would be treated safely and responsibly." (emphasis added by Reiners)

6.29 Even the Cuban defendants, in their motion to dismiss, acknowledge that "EPA customers opened accounts for commercial purposes—as replacements for traditional savings or money market accounts—to earn a return on their own assets…" But defendants fail to acknowledge that Voyager's promises of returns above and beyond what consumers can get on "traditional savings or money market accounts" is why EPA investors would reasonably believe that it was the efforts of Voyager that would be

responsible for generating these returns. The fact that Voyager's efforts were insufficient to generate the promised returns, and thus the company subsidized the program, is irrelevant for purposes of *Howey*. And the fact that Voyager did have to find additional funds beyond what the EPA program generated in order to pay back investors would suggest that Voyager's efforts were even more essential than what EPA investors were led to believe. Also, it's worth noting that money market accounts are securities and savings accounts can only be offered by banks and are therefore exempt from securities registration.

6.30 It also doesn't matter that Voyager simply made up the interest rate it paid to EPA investors. This element of discretion has been present in multiple crypto cases and is irrelevant for purposes of *Howey*. For instance, the SEC's order against Kraken for its unregistered staking-as-a-service program noted that Kraken arbitrarily set its return: "Defendants determine these returns, not the underlying blockchain protocols, and the returns are not necessarily dependent on the actual returns that Kraken receives from staking."[63]

6.31 The Cuban defendants also point to the fact that customers could withdraw their crypto from EPAs at any time, whereas Judge Torres in the Ripple ruling found that "lockup provisions are consistent with investments, as "a rational economic actor would not agree to freeze [assets]" if that individual did not expect a profitable return. However, defendants fail to mention that Judge Torres, in that portion of her ruling, was assessing the XPR sales to institutional investors, which were done pursuant to a written contract (with a lockup provision). There are multiple types of securities where investors are free to withdraw their funds at any time (MMMFs e.g.).

6.32 Judge Ramos also noted that it does not matter for purposes of *Howey* that "Gemini Earn investors could terminate their investment at any time."[64] Judge Ramos notes that "courts have held that investors' ability to exit a common enterprise does not defeat horizontal commonality"[65] and that "when evaluating horizontal commonality, "the key feature is not that investors must reap their profits at the same time; it is that investors' profits at any given time are tied to the success of the enterprise." Kik, 492 F. Supp. 3d at 179."[66]

6.33 As with Gemini Earn, investor returns in Voyager EPAs turned on how Voyager pooled and deployed the cryptocurrencies.


## 7. THE VGX TOKEN ALSO BEARS CHARACTERISTICS THAT MEET THE ELEMENTS OF THE *HOWEY* TEST

7.01 "VGX is an Ethereum token that's used to reward and incentivize use of the Voyager

---

[63] comp-pr2023-25.pdf (sec.gov)
[64] gov.uscourts.nysd.592343.54.0.pdf (courtlistener.com) at 12
[65] Id
[66] Id at 13

centralized exchange. On Voyager, VGX holders can earn staking rewards, receive cashback on trades, and more."[67]

7.02 The Voyager website noted that the new VGX token (VGX 2.0) "boosts your crypto earning potential even higher with 7% staking rewards. Plus, you can boost your earnings on other cryptos, get crypto back rewards, and more."[68]

7.03 The website includes a link to a VGX 2.0 "White Paper" that provides more information on VGX and highlights its profit making potential.[69] The White Paper notes that through the "Voyager Loyalty Program," "Voyager customers will be automatically enrolled and will stake and earn VGX and, through this process, increase their Platform reward tier levels, earn VGX rewards, and achieve and maintain other reward benefits as described in the White Paper."

7.04 The "staking reward" was 7%. Note that the staking reward was only available to users who held their VGX on Voyager. You could buy and sell VGX on other platforms.

7.05 The White Paper goes on to note "VGX 2.0's benefits are twofold: reward and incentivize our customers for their most common, organic behaviors and favorite actions on our Platform."

7.06 The White Paper also said that Voyager would periodically "burn" a certain amount of VGX. "Burning" a cryptocurrency refers to the act of sending a token to an inaccessible address. Wallet addresses used for burning cryptocurrency are called "burner" or "eater" addresses. The act of burning effectively removes tokens from the available supply, which decreases the number in circulation.

7.07 VGX purchasers provided money consideration (in the form of fiat, including U.S. dollars, or other cryptocurrencies) in exchange for VGX

7.08 VGX purchasers reasonably expected to derive profits from their ownership of VGX. Voyager's marketing of VGX is designed to convince consumers of VGX's profit-making potential through Voyager "rewards."  Additionally, the development of the Voyager platform, and the profits that investors expected to derive therefrom, were based on the technical, managerial, and entrepreneurial efforts of Voyager.

7.09 Investors also expected to profit through Voyager's efforts to reduce VGX supply via burning, thus increasing the price.

7.10 Voyager created and controlled VGX, therefore VGX investors were depending on, and expecting, Voyager's efforts to increase the price of VGX.

7.11 The SEC also alleged that VGX is an investment contract, and thus an unregistered

---

[67] Voyager Token (VGX) Price, Charts, and News | Coinbase: voyager token, vgx coin, voyager crypto
[68] Voyager | The Voyager Token (investvoyager.com)
[69] f-nbTbCe__HBPc6W (investvoyager.com)

security, in its complaint against Coinbase - filed on June 6, 2023 – for operating as an unregistered securities exchange, broker, and clearing agency.[70]

7.12   The SEC notes that beginning in November 2021, VGX became available for trading on Coinbase. The SEC's Framework for "Investment Contract" Analysis of Digital Assets states that the ability to sell a given cryptocurrency at a gain in a secondary market can contribute to an expectation of profit by the purchasers.[71]

7.13   The SEC's Coinbase complaint states: "[f]rom approximately October 2019 until October 2022, Voyager was the majority owner of VGX tokens, holding approximately 60.38% as of October 2022. As of June 2023, Voyager owns approximately 17% of all VGX tokens. Accordingly, Voyager's fortunes were, and remain, aligned with VGX investors' fortunes."[72]

7.14   The SEC also assessed the information in the VGX and VGX 2.0 whitepapers and found multiple statements attesting to the ability of Voyager to generate profit for VGX investors. Thus, according to the SEC, "[t]he information publicly disseminated, and statements made, by Voyager, as well as the economic incentives that Voyager has offered with respect to VGX, have led VGX holders, including those who purchased VGX since November 2021, reasonably to view VGX as an investment in and to expect to profit from Voyager's efforts to develop its trading platform, loyalty program, and other touted features of its business, which, in turn, would increase the demand for and the value of VGX."[73]

## 8. CONCLUSION

8.01   Congress intentionally crafted our securities laws to be principles-based. In the seminal case SEC v. Howey, the Supreme Court found that the term "investment contract:"

   *"[E]mbodies a flexible, rather than a static, principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."*[74]

8.02   The Supreme Court has subsequently been guided by the "fundamental purpose undergirding the Securities Acts," in which Congress "painted with a broad brush" in recognition of the "virtually limitless scope of human ingenuity." Reves v. Ernst & Young, 494 U.S. 56, 60–61 (1990).

8.03   Cryptocurrency and blockchain technology are simply the latest scheme deployed by those seeking to profit from other people's money.

---

[70] Coinbase, Inc. and Coinbase Global, Inc. (sec.gov)
[71] https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_edn19
[72] Coinbase, Inc. and Coinbase Global, Inc. (sec.gov), at ¶ 275.
[73] *Id.*, at ¶ 276.
[74] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

8.04 As the Supreme Court has long made clear, courts deciding whether a given transaction or scheme amounts to a "investment contract" under Howey must analyze the "substance" -- and not merely the "form" -- of the parties' economic arrangement and decide if, under the "totality of the circumstances," that transaction or scheme meets the three requirements of *Howey. Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *Glen-Arden Commodities, Inc. v. Constantino*, 493 F.2d 1027, 1034 (2d Cir. 1974).

8.05 As reiterated by the Supreme Court in *Maine Bank v. Weaver*, to determine the applicability of the securities laws, a given transaction needs to be "evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." 445 U.S. 551, 560 n.11 (1982).

8.06 Despite whatever label the defendants in this case seek to apply to EPAs or the VGX token, the economic reality of both is clear. The EPAs and VGX that Voyager and Defendants offered or sold to Plaintiffs all constituted the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others, and all were no different (in any manner) than any of the other EPAs and VGX that Voyager offered and sold to all investors throughout the nation.

_____

Lee Reiners

**LEE REINERS, CFA**
Lecturing Fellow at the Duke Financial Economics Center
419 Chapel Drive, Box 90097, Durham, NC 27708
919-613-8532; lee.reiners@duke.edu
http://ssrn.com/author=2605227

## ACADEMIC/TEACHING APPOINTMENTS

**DUKE UNIVERSITY,** Durham, NC                                      2022-Present
*Lecturing Fellow, Duke Financial Economics Center*

**DUKE UNIVERSITY SCHOOL OF LAW,** Durham, NC                  2016-Present
*Lecturing Fellow*

**DUKE UNIVERSITY SCHOOL OF LAW,** Durham, NC              2016-August 2022
*Executive Director of the Global Financial Markets Center*

**SAINT PETER'S UNIVERSITY,** Jersey City, NJ                       2015-2016
*Adjunct Professor*

## PROFESSIONAL EXPERIENCE

**FEDERAL RESERVE BANK OF NEW YORK (FRBNY)**                    2011-2016
*Senior Associate, Executive Office (2016)*
*Bank Examiner (2011-2015)*

**U.S. ARMY,** Baghdad, Iraq                                         2004-2005
*Communications Specialist*

## EDUCATION

**DUKE UNIVERSITY, Sanford School of Public Policy**              Durham, NC
Master of Public Policy, Global Policy Concentration, May 2011

**UNIVERSITY OF ST. THOMAS**                                      St. Paul, MN
Bachelor of Science in Business Economics, summa cum laude, May 2009

## RESEARCH & TEACHING INTERESTS

Blockchain, Corporate Finance, Cryptocurrency, Cybersecurity, Financial Institutions, Financial
Regulation, Financial Technology, Climate Finance, Climate Policy

**SCHOLARSHIP**

---

BOOKS

FinTech Law and Policy: The Critical Legal and Regulatory Challenges Confronting FinTech Firms and the Policy Debates that are Occurring across the Country (Independently published, 2018).

PUBLICATIONS

Wanted: A Prudential Framework for Crypto-Assets (with S. Gazi), Arkansas Law Review, Issue 76.2 (2024).

"Regulation of Robo-Advisory Services," invited chapter (Chapter 16, pp.353-376) in FINTECH LAW AND REGULATION (edited by Jelena Madir) (Elgar 2019).

A Proposal for Oversight of Digital Assets, Competition Policy International TechREG Chronicle (1-7) (May 2022)

Blockchain Democracy: Technology, Law and the Rule of the Crowd, 37 Banking & Finance Law Review 191-196 (2021) (reviewing William Magnuson, Blockchain Democracy: Technology, Law and the Rule of the Crowd (2020)).

Cryptocurrency and the State: An Unholy Alliance. Southern California Interdisciplinary Law Journal, Volume 30 Southern California Interdisciplinary Law Journal 695-715 (2021).

"Regulation of Robo-Advisory Services," invited chapter (Chapter 16, pp.353-376) in FINTECH LAW AND REGULATION (edited by Jelena Madir) (Elgar 2021).

"The Uncertain Prudential Treatment of Crypto-Assets," invited chapter in REGTECH, SUPTECH and BEYOND (edited by William Coen and D.R. Maurice) (Risk Books 2021).

Banking on the Cloud (with C. Baker & D. Fratto), Transactions: The Tennessee Journal of Business Law, Volume 21 (2020).

"Fintech Regulation in the United States," invited chapter (Chapter 11) in THE LAW OF FINTECH (Wolter Kluwer Italia 2020) (edited by Claudia Sandei and Marco Cian) (2020).

"Regulation of Robo-Advisory Services," invited chapter (Chapter 16, pp.353-376) in FINTECH LAW AND REGULATION (edited by Jelena Madir) (Elgar 2019).

Bitcoin Futures: From Self-Certification to Systemic Risk (January 14, 2019). North Carolina Banking Institute Journal, Volume 23.

REPORTS

Regulating ESG: The SEC's Upgraded Names Rule and Proposed ESG Disclosure Rule in Comparison with EU Requirements (Climate Risk Disclosure Lab, November 2023) available at:

https://econ.duke.edu/dfe/climate-risk/2022/11/analyzes-efforts-regulate-esg-investing

Summary of Comment Letters for the SEC's Proposed Climate Risk Disclosure Rule (with Morgan Smith)(Climate Risk Disclosure Lab, September 2022) available at: https://econ.duke.edu/dfe/climate-risk/2022/08/summary-comment-letters-secs-proposed-climate-risk-disclosure-rule

The Cost of Climate Disclosure: Three Case Studies on the Cost of Voluntary Climate-Related Disclosure (with Karen E. Torrent) (Climate Risk Disclosure Lab, December 2021) available at: https://econ.duke.edu/dfe/climate-risk/2021/12/climate-risk-disclosure-lab-report-provides-real-time-information-current

From Laggard to Leader: Updating the Securities Regulatory Framework to Better Meet the Needs of Investors and Society (with Tyler Gellasch) (Global Financial Markets Center, February 2021) available at https://web.law.duke.edu/sites/default/files/centers/gfmc/From-Laggard-to-Leader.pdf

Climate Risk Disclosures & Practices: Highlighting the Need for a Standardized Regulatory Disclosure Framework to Weather the Impacts of Climate Change on Financial Markets (with Charlie Wowk) (Climate Risk Disclosure Lab, October 2020) available at https://climatedisclosurelab.duke.edu/2020/10/climate-risk-disclosure-lab-report/

CASE STUDIES

"Danske Bank Money Laundering Case Study," (with J.A. Smith Jr.), The FinReg Blog, September 11, 2019, available at https://sites.duke.edu/thefinregblog/2019/09/11/danske-bank-money-laundering-case-study/

"Wells Fargo Unauthorized Account Openings: A Case Study for Bank Board Directors," (with J. A. Smith Jr.), The FinReg Blog, April 26, 2017, available at https://sites.duke.edu/thefinregblog/2017/04/26/phony-accounts-scandal-a-case-study-for-bank-board-directors/

SHORT ARTICLES

"The worst scam of all: how Binance got away with a slap-on-the-wrist," The Hill, January 14, 2024, available at https://thehill.com/opinion/finance/4405504-the-worst-scam-of-all-how-binance-got-away-with-a-slap-on-the-wrist/

"Statement for the Record in Response to House Financial Services Committee Recent Hearing on Digital Assets," (with Hilary Allen & Mark Hayes), June 28, 2023, available at https://ourfinancialsecurity.org/2023/06/statement-statement-for-the-record-to-the-house-financial-services-committee-in-response-to-the-hfsc-recent-hearing-on-digital-assets/

"On regulation, the crypto industry has everything backward," The Hill, June 9, 2023, available at https://thehill.com/opinion/4038637-on-regulation-the-crypto-industry-has-everything-backwards/

"US lags in financial innovation. Regulatory sandboxes are the answer," (with Jimmie Lenz), American Banker, May 2, 2023, available at https://www.americanbanker.com/opinion/us-lags-in-financial-innovation-regulatory-sandboxes-are-the-answer

"Now I Know the Cryptocurrency Industry Is Here to Stay," CoinDesk, January 10, 2023, available

at https://www.coindesk.com/consensus-magazine/2023/01/10/now-i-know-the-cryptocurrency-industry-is-here-to-stay/

"Regulators are thinking about stablecoins in the wrong way," The Hill, November 12, 2022, available at https://thehill.com/opinion/finance/3731399-regulators-are-thinking-about-stablecoins-in-the-wrong-way/

"The industry will soon know if bank-fintech partnerships need more oversight," American Banker, September 20, 2022, available at https://www.americanbanker.com/opinion/the-industry-will-soon-know-if-bank-fintech-partnerships-need-more-oversight

"10 Things Judges Should Know About Cryptocurrency," Judicature, Summer 2022, available at https://judicature.duke.edu/articles/10-things-judges-should-know-about-cryptocurrency/

"CFTC Should Have Narrow Role in Crypto to Preserve SEC Primacy," (with Hilary Allen & Mark Hayes), September 14, 2022, available at https://ourfinancialsecurity.org/2022/09/news-release-cftc-should-have-narrow-role-in-crypto-to-preserve-sec-primacy/

"Ban Cryptocurrency to Fight Ransomware," Wall Street Journal, May 25, 2021, available at https://www.wsj.com/articles/ban-cryptocurrency-to-fight-ransomware-11621962831?mod=article_inline

"NC should speed help to the 435,000 North Carolinians who are behind on rent," (with J.A. Smith Jr. & Jesse Hamilton McCoy II), Raleigh News & Observer, March 08, 2021, available at https://www.newsobserver.com/opinion/article249735918.html

"Rural America needs an expanded Farm Credit System," American Banker, January 2, 2019, available at https://www.americanbanker.com/opinion/rural-america-needs-an-expanded-farm-credit-system

"Ten years from the bottom, financial crisis continues to reverberate," Triangle Business Journal, March 22, 2019, available at https://www.bizjournals.com/triangle/news/2019/03/22/ten-years-from-the-bottom-financial-crisis.html

"The Problems with crypto's revolving door," American Banker, October 25, 2018, available at https://www.americanbanker.com/opinion/the-problems-with-cryptos-revolving-door

"Should Wells Fargo execs responsible for bilking customers be forced to return their pay?" The Conversation, September 18, 2016, available at https://theconversation.com/should-wells-fargo-execs-responsible-for-bilking-customers-be-forced-to-return-their-pay-65631

BLOG POSTS and COMMENT LETTERS

"Comment Letter to the CFTC Regarding the Use of Voluntary Carbon Credits in Derivatives Contracts,"  (with Susan Lin) The Climate Risk Disclosure Lab, February 21, 2024, available at https://econ.duke.edu/dfe/climate-risk/2024/02/comment-letter-cftc-regarding-use-voluntary-carbon-credits-derivatives

"Reflections on the Ripple Decision," The FinReg Blog, July 17, 2023, available at https://sites.duke.edu/thefinregblog/2023/07/17/reflections-on-the-ripple-decision/

"CFTC Complaint Against Gemini Reveals Weaknesses in the Agency's Approach to Virtual

Currency," The FinReg Blog, July 20, 2022, available at:
https://sites.duke.edu/thefinregblog/2022/07/20/cftc-complaint-against-gemini-reveals-weaknesses-in-the-agencys-approach-to-virtual-currency/

"Non-Intermediated Clearing of Crypto Derivatives on Margin is a Bad Idea," (with Hilary Allen and Ryan Clements) May 12, 2022, available at:
https://sites.law.duke.edu/thefinregblog/2022/05/12/non-intermediate-clearing-of-crypto-derivatives-on-margin-is-a-bad-idea/

"Congress Should Grant the SEC Oversight of Digital Asset Spot Markets," The CLS Blue Sky Blog, April 21, 2022, available at https://clsbluesky.law.columbia.edu/2022/04/21/congress-should-grant-the-sec-oversight-of-digital-asset-spot-markets/

"Russian Sanctions will Compel Further Adoption of Cryptocurrency and Increase Compliance Risks for Cryptocurrency Companies," The FinReg Blog, February 28, 2022, available at https://sites.law.duke.edu/thefinregblog/2022/02/28/russian-sanctions-will-compel-further-adoption-of-cryptocurrency-and-increase-compliance-risks-for-cryptocurrency-companies/

"More Crypto Craziness in Wyoming," The FinReg Blog, February 11, 2022, available at https://sites.law.duke.edu/thefinregblog/2022/02/11/more-crypto-craziness-in-wyoming/

"Recent Comments on Improving Accountability in Net-Zero Commitments," The FinReg Blog, February 9, 2022, available at https://sites.law.duke.edu/thefinregblog/2022/02/09/recent-comments-on-improving-accountability-in-net-zero-commitments/

"Comments to the Commodity Futures Trading Commission on the proposed creation of a carbon markets subcommittee of the Energy and Environmental Markets Advisory Committee," The FinRegBlog, September 23, 2021, available at https://sites.law.duke.edu/thefinregblog/2021/09/23/comments-to-the-commodity-futures-trading-commission-on-the-proposed-creation-of-a-carbon-markets-subcommittee-of-the-energy-and-environmental-markets-advisory-committee/

"Where the Rubber Meets the Road: How Can an SEC Climate Risk Disclosure Rule Survive Cost-Benefit Analysis?" (with Mario Olczkowski) August 9, 2021, available at https://sites.law.duke.edu/thefinregblog/2021/08/09/where-the-rubber-meets-the-road-how-can-an-sec-climate-risk-disclosure-rule-survive-cost-benefit-analysis/

"Summary of Comment Letters for the SEC's Climate Risk Disclosure RFI," (with Mario Olczkowski) July 9, 2021, available at https://sites.law.duke.edu/thefinregblog/2021/07/09/summary-of-comment-letters-for-the-secs-climate-risk-disclosure-rfi/

"A Trip Down Crypto's Memory Lane," The FinReg Blog, June 11, 2021, available at https://sites.law.duke.edu/thefinregblog/2021/06/11/a-trip-down-cryptos-memory-lane/

"Restoring Order in Crypto's Wild West," The FinReg Blog, April 6, 2021, available at https://sites.law.duke.edu/thefinregblog/2021/04/06/restoring-order-in-cryptos-wild-west/

"Beware of the Bitcoin Balance Sheet," The FinReg Blog, February 24, 2021, available at: https://sites.law.duke.edu/thefinregblog/2021/02/24/beware-of-the-bitcoin-balance-sheet/

"The Pandemic Relief Bill and the Battle Over Federal Reserve Emergency Lending Authority," The FinReg Blog, December 21, 2020, available at https://sites.law.duke.edu/thefinregblog/2020/12/21/the-pandemic-relief-bill-and-the-battle-over-federal-reserve-emergency-lending-authority/

"Policy Options for Preventing an Eviction Crisis," The FinReg Blog, December 16, 2020, available at https://sites.law.duke.edu/thefinregblog/2020/12/16/policy-options-for-preventing-an-eviction-crisis/

"Recent Announcement Reveal Financial Regulators Are Serious About Climate Change," (with Charlie Wowk) The FinReg Blog, November 16, 2020, available at https://sites.law.duke.edu/thefinregblog/2020/11/16/recent-announcements-reveal-financial-regulators-are-serious-about-climate-change/

"The Heat is On: U.S. Regulators Facing Increasing Pressure to Enhance Climate Disclosures," (with Charlie Wowk) The FinReg Blog, October 13, 2020, available at: https://sites.law.duke.edu/thefinregblog/2020/10/13/the-heat-is-on-u-s-regulators-facing-increasing-pressure-to-enhance-climate-disclosures/

"Pandemic Bailout of the Fossil Fuel Industry Highlights Financial Sector Risks," The FinReg Blog, July 24, 2020, available at: https://sites.law.duke.edu/thefinregblog/2020/07/24/pandemic-bailout-of-the-fossil-fuel-industry-highlights-financial-sector-risks/

"Designing a Prudential Supervisory Framework for Climate Change in the U.S.," The FinReg Blog, July 16, 2020, available at: https://sites.law.duke.edu/thefinregblog/2020/07/16/designing-a-prudential-supervisory-framework-for-climate-change-in-the-u-s/

"Rolling Back Dodd-Frank: One Bite at a Time," The FinReg Blog, March 11, 2020, available at: https://sites.law.duke.edu/thefinregblog/2020/03/11/rolling-back-dodd-frank-one-bite-at-a-time/

"The Rise of Rent-A-Charter: Examining New Risks Behind Bank-Fintech Partnerships," (with Joseph Caputo) January 23, 2020, available at https://sites.law.duke.edu/thefinregblog/2020/01/23/the-rise-of-rent-a-charter-examining-new-risks-behind-bank-fintech-partnerships/

"What Congress Should Ask About Facebook's New Cryptocurrency," The FinReg Blog, July 2, 2019, available at https://sites.duke.edu/thefinregblog/2019/07/02/what-congress-should-ask-about-facebooks-new-cryptocurrency/

"The SEC Should Continue to Say No to Bitcoin Exchange-Traded Products," The FinReg Blog, April 18, 2019, available at https://sites.duke.edu/thefinregblog/2019/06/18/the-sec-should-continue-to-say-no-to-bitcoin-exchange-traded-products/

"North Carolina's Proposed Regulatory Sandbox Needs Work," The FinReg Blog, May 28, 2019, available at https://sites.duke.edu/thefinregblog/2019/05/28/north-carolinas-proposed-regulatory-sandbox-needs-work/

"Wells Fargo's Failure to Admit Deep-Seated Problems Led to its Current Predicament," The FinReg Blog, April 4, 2019, available at https://sites.duke.edu/thefinregblog/2019/04/04/wells-fargos-failure-to-admit-deep-seated-problems-led-to-its-current-predicament/

"Ten Years From the Bottom: A Reflection on the Financial Crisis and Its Lasting Impact," The FinReg Blog, March 19, 2019, available at https://sites.law.duke.edu/thefinregblog/2019/03/19/ten-

years-from-the-bottom-a-reflection-on-the-financial-crisis-and-its-lasting-impact/

"Bitcoin Futures: From Self-Certification to Systemic Risk," The CLS Blue Sky Blog, December 18, 2018, available at http://clsbluesky.law.columbia.edu/2018/12/18/bitcoin-futures-from-self-certification-to-systemic-risk/

"A New Proposal to Expand Banking Services in Rural America," The FinReg Blog, December 15, 2018, available at https://sites.duke.edu/thefinregblog/2018/12/15/a-new-proposal-to-expand-banking-services-in-rural-america/

"The Revolving Door Comes to Cryptocurrency," The FinReg Blog, October 15, 2018, available at https://sites.duke.edu/thefinregblog/2018/10/15/the-revolving-door-comes-to-cryptocurrency/

"How Regulators are Responding to FinTech," The FinReg Blog , June 29, 2018, available at https://sites.duke.edu/thefinregblog/2018/06/29/how-regulators-are-responding-to-fintech/

"Evolution of the FinTech Industry: From Disruption to Partnership," The FinReg Blog, June 28, 2018, available at https://sites.duke.edu/thefinregblog/2018/06/28/evolution-of-the-fintech-industry-from-disruption-to-partnership/

"What Happens When FinTech Firms Don't Understand Regulation?," The FinReg Blog,  June 27, 2018, available at https://sites.duke.edu/thefinregblog/2018/06/27/what-happens-when-fintech-firms-dont-understand-regulation/

"What is FinTech and Why is it Such a Big Deal?" The FinReg Blog, June 26, 2018, available at https://sites.duke.edu/thefinregblog/2018/06/26/what-is-fintech-and-why-is-it-such-a-big-deal/

"Reflections on NYC Cryptocurrency Conference," The FinReg Blog, June 11, 2018, available at https://sites.duke.edu/thefinregblog/2018/06/11/reflections-on-my-first-cryptocurrency-conference/

"The Future of Bank Stress Testing," The FinReg Blog, February 21, 2018, available at https://sites.duke.edu/thefinregblog/2018/02/21/the-future-of-bank-stress-testing/

"Federal Reserve Consent Order Represents Worst Case Scenario for Wells Fargo Directors," The FinReg Blog, February 6, 2018, available at https://sites.duke.edu/thefinregblog/2018/02/06/federal-reserve-consent-order-represents-worst-case-scenario-for-wells-fargo-directors/

"SEC Stands Firm Against New Bitcoin ETF Proposals," The FinReg Blog, January 12, 2018, available at https://sites.duke.edu/thefinregblog/2018/01/12/sec-stands-firm-against-new-bitcoin-etf-proposals/

"For Bitcoin Futures, the CFTC Defends the Indefensible," The FinReg Blog, January 4, 2018, available at https://sites.duke.edu/thefinregblog/2018/01/04/for-bitcoin-futures-the-cftc-defends-the-indefensible/

"Bitcoin Futures are a Bad Idea," The FinReg Blog, December 13, 2017, available at https://sites.duke.edu/thefinregblog/2017/12/13/bitcoin-futures-are-a-bad-idea/

"Comptroller's Remarks Indicate the Fintech Charter Could Lead to Mixing of Banking and

Commerce," The FinReg Blog, October 2, 2017, available at
https://sites.duke.edu/thefinregblog/2017/10/02/comptrollers-remarks-indicate-the-fintech-charter-could-lead-to-mixing-of-banking-and-commerce/

"Wells Fargo is Broken Beyond Repair," The FinReg Blog, September 2, 2017, available at
https://sites.duke.edu/thefinregblog/2017/09/02/wells-fargo-is-broken-beyond-repair/

"Assessing the New FX Global Code," The FinReg Blog, June 15, 2017, available at
https://sites.duke.edu/thefinregblog/2017/06/15/assessing-the-new-fx-global-code/

"A Review of the Book Fed Up," The FinReg Blog, April 28, 2017, available at
https://sites.duke.edu/thefinregblog/2017/04/28/a-review-of-the-book-fed-up/

"Increasing Transparency at the Financial Stability Board and Basel Committee," The FinReg Blog, March 14, 2017, available at https://sites.duke.edu/thefinregblog/2017/03/14/increasing-transparency-at-the-financial-stability-board-and-basel-committee/

"Don't Expect the OCC to Embrace Fintech Failure," The FinReg Blog, February 22, 2017, available at https://sites.duke.edu/thefinregblog/2017/02/22/dont-expect-the-occ-to-embrace-fintech-failure/

"Do Hedge Funds Threaten Financial Stability?" The FinReg Blog, January 26, 2017, available at
https://sites.duke.edu/thefinregblog/2017/01/26/do-hedge-funds-threaten-financial-stability/

"Killing the Volcker Rule," The FinReg Blog, January 11, 2017, available at
https://sites.duke.edu/thefinregblog/2017/01/11/killing-the-volcker-rule/

"Basel Committee is on the Clock," The FinReg Blog, December 12, 2016, available at
https://sites.duke.edu/thefinregblog/2016/12/12/basel-committee-is-on-the-clock/

"New Legislation Designed to Make the U.S. a Fintech Leader," The FinReg Blog, November 17, 2016, available at https://sites.duke.edu/thefinregblog/2016/11/17/new-legislation-designed-to-make-the-u-s-a-fintech-leader/

"New Regulation Aims to Make Banking Fraud Less Lucrative," The FinReg Blog, November 10, 2016, available at https://sites.duke.edu/thefinregblog/2016/11/10/new-regulation-aims-to-make-banking-fraud-less-lucrative/

"Carmen Segarra and Competing Visions of Bank Supervision," The FinReg Blog, October 25, 2016, available at https://sites.duke.edu/thefinregblog/2016/10/25/carmen-segarra-and-competing-visions-of-bank-supervision/

"Using Living Wills to Break up Big Banks," The FinReg Blog, October 11, 2016, available at
https://sites.duke.edu/thefinregblog/2016/10/11/break-up-the-banks-but-how/

"If Banks Sue the Fed Over Stress Tests, Will They Win?" The FinReg Blog, October 7, 2016, available at  https://sites.duke.edu/thefinregblog/2016/10/07/if-banks-sue-the-fed-over-stress-tests-would-they-win/

"Effects of Regulatory Reform on Growth," The FinReg Blog, October 5, 2016, available at
https://sites.duke.edu/thefinregblog/2016/10/05/effects-of-regulatory-reform-on-growth/

"High-Frequency Trading Comes to Cryptocurrency," (with Marissa Cantu), The FinReg Blog, April 24, 2019, available at https://sites.duke.edu/thefinregblog/2019/04/24/high-frequency-trading-comes-to-cryptocurrency/

"Why a Bitcoin Bubble is a Good Thing," (with R. Clements and S. Semmler), The FinReg Blog, December 5, 2017, available at https://sites.duke.edu/thefinregblog/2017/12/05/why-a-cryptocurrency-market-bubble-is-a-good-thing/

"The Case for a Cryptocurrency Market Bubble," (with R. Clements and S. Semmler), The FinReg Blog, November 22, 2017, available at https://sites.duke.edu/thefinregblog/2017/11/22/the-case-for-a-cryptocurrency-market-bubble/

"Federal Law Leaves Banks Shying Away from Marijuana Businesses," (with John Matthews), The FinReg Blog, December 5, 2016, available at https://sites.duke.edu/thefinregblog/2016/12/05/federal-law-leaves-banks-shying-away-from-marijuana-businesses/

"How Wells Fargo Illustrates the Failure of the CFPB Class Action Waiver Rule," (with B. Jackson Nye), The FinReg Blog, November 23, 2016, available at https://sites.duke.edu/thefinregblog/2016/11/23/how-wells-fargo-illustrates-the-failure-of-the-cfpb-class-action-waiver-rule/

## COURSES TAUGHT

ONLINE

Fintech Law and Policy, available at https://www.coursera.org/learn/fintechlawandpolicy

DUKE UNIVERSITY

Climate Change and Financial Markets (Spring 2023, Spring 2024)

Cybersecurity and Interdisciplinary Law (Spring 2023, Spring 2024)

Financial Regulatory Policy (Fall 2022, Fall 2023)

Issues in Cryptocurrency Law and Policy (Fall 2021, Fall 2022)

The Financial Policy Response to Covid 19 (Fall 2020)

Fintech Law and Policy (Spring 2017, Fall 2017, Fall 2018, Fall 2019, Fall 2020)

FinTech Law and Policy, Master of Judicial Studies Program (Summer 2019, Summer 2022)

Big Bank Regulation (Guest Lecturer on Bank Capital and Lender of Last Resort), Fall 2017, Fall 2018, Fall 2019, Fall 2020, Fall 2021)

Introduction to Cyber Law and Policy (Guest Lecturer, Fall 2018, Fall 2019, Fall 2020, Fall 2021,

Fall 2022, Fall 2023)

Financial Law and Regulation: Practitioner's Perspective (Spring 2017, Spring 2018, Spring 2020, Spring 2022)

Financial Policy Outcomes of the 2016 Elections (Fall 2016)

SAINT PETER'S UNIVERSITY MBA PROGRAM

Corporate Finance (Spring 2015)

Managerial Economics (Fall 2015, Spring 2016)

## GOVERNMENT

U.S. House of Representatives Committee on Financial Services, Subcommittee on Digital Assets, Financial Technology and Inclusion, "Coincidence or Coordinated? The Administration's Attack on the Digital Asset Ecosystem," March 9, 2023, video available at https://financialservices.house.gov/calendar/eventsingle.aspx?EventID=408628 (testimony begins at 56:50)

U.S. Senate Committee on Banking, Housing, and Urban Affairs, "Crypto Crash: Why Financial System Safeguards are Needed for Digital Assets," February 14, 2023, video available at https://www.banking.senate.gov/hearings/crypto-crash-why-financial-system-safeguards-are-needed-for-digital-assets (testimony begins at 32:00)

## SELECTED PRESENTATIONS & WORKSHOPS

Host, "The FinReg Pod," available at https://open.spotify.com/show/3jf8ee1FBg8sAnAa9jdwRw

Co-Host with Jimmie Lenz, "Coffee & Crypto with Lee & Jimmie," Duke Engineering FinTech Program, available at https://open.spotify.com/show/0yxDPqe6ZNwMqG8BT0PwQt

Panelist, "Investing in Cryptoassets:  Custody and Fiduciary Duty Challenges," CFA Institute 27th Annual GIPS Standards Conference, October 17, 2023

Panelist, "Wanted: A Prudential Framework for Crypto-Assets," TechReg360, May 10, 2023, available at https://www.hkufintech.com/techreg360files

Panelist, "What is a Bank? ILCs, FinTechs, and True Lender, and Recent Bank Failures and Regulatory Action," University of North Carolina School of Law's Center for Banking and Finance, Banking Institute, March 30, 2023

Presenter, "Regulating Cryptocurrency in the U.S.: Easier Said than Done," Asian Digital Finance Forum & Awards, March 19, 2023

Panelist, "Technology Trends (including AI & Blockchain) & Privacy Law Impact," University of

Illinois Chicago 66th Annual Intellectual Property, Information & Privacy Law Conference, November 11, 2022

Panelist, "Regulating the Offspring of Blockchain: Digital Currency, Tokens and Organisations," Monash University, October 26, 2022, available at https://www.youtube.com/watch?v=odcnnyuZVMc

Panelist, "Digital asset regulation: The prudential perspective," Brookings, October 20, 2022, available at https://youtu.be/MBgjb_lOgqM

Presenter, "The Rise and Implications of Digital Asset Markets," Harvard Law School Executive Education, the Program on International Financial Systems, and the Qatar Financial Centre Regulatory Authority, October 18, 2022

Panelist, "The Robo Advisor – Reshaping Financial Advisory," Chartered Institute for Securities & Investment, October 4, 2022

Presenter, ""The History of Self-Certification and the Dangers of Including it in the Digital Commodities Consumer Protection Act," Rutgers Fintech and Blockchain Collaboratory, September 30, 2022

Presenter, "Climate Change and Mortgage Finance: A Role for the GSEs," Climate Adaptation Forum, September 30, 2022

Presenter, "Fintech and the Pace of Adoption," Agribank District Conference, September 13, 2022
Panelist, "A Holistic View of Blockchain: Understanding the Non-Financial Applications, and the Latest Developments in Cryptocurrency," National Association of Attorneys General 2022 Presidential Summit, August 9, 2022

Presenter, "Cryptocurrency: The Future of Money or All Hype," Seminars at Steamboat, July 25, 2022, available at https://seminarsatsteamboat.org/lee-reiners/

Presenter, "Ransomware & Cryptocurrencies," Duke University Cybersecurity Leadership Program, June 13, 2022

Virtual Presentation, "What is Crypto and Why Should I Care?" Duke Provost's Summer Academy 2022 Course on Science Policy, May 17, 2022

Panelist, "The Future of Money," Research Triangle Area – Association of Corporate Counsel, Cary, NC, May 4, 2022

Panelist, "Cryptocurrencies Regulations: Is the EU Lagging?" Human Technology Foundation, Webcast, May 3, 2022, available at https://www.youtube.com/watch?v=hXBPG4Qi7c0

Panelist, "Rethinking Student Learning and Engagement: Technology and Education," Campus Consortium's EdTalk Webinar Series, April 27, 2022

Panelist, "Crypto Regulation & Enforcement: The Present & Future," OffshoreAlert Miami 2022, Miami, April 26, 2022

Virtual Presentation, "Cryptocurrency Regulations in the U.S.," Travelers Legal Services Speaker Series, April 26, 2022

AMA Interview, "Blockchain, Law, and Economics," SciEcon-AMA, April 23, 2022, available at https://medium.com/sciecon-ama/blockchain-law-and-economics-9d4bde730efd

Virtual Presentation, "Digital Assets: Crypto and CBDCs," Virtual Training Program on Fintech and Digital Assets for the ASEAN Capital Markets Forum, April 22, 2022

Panelist, "The Role of Crypto in Sanctions Against Russia," Columbia Law School's National Security Law Society, Virtual, April 11, 2022

Panelist, "Crypto: The Wave of the Future of a Giant Ponzi Scheme," Securities Docket Webcast, March 10, 2022, available at https://www.securitiesdocket.com/webcasts/

Panelist, "Current National Security Challenges: Ransomware and Cryptocurrency," Duke Law Center on Law, Ethics and National Security 27th Annual National Security Conference, Virtual, February 25, 2022

Virtual Presentation, "Cryptocurrency: Law and Lawlessness," Osher Lifelong Learning Institute at the University of California San Diego, December 2, 2021

Panelist, "CryptoWorld: BitCoin and Blockchain - The New Way or Passing Fad?" NAFOA 2021 Fall Finance & Tribal Economies Conference, September 27, 2021

Panelist, "The Future of Global Money: How Real is the Cryptocurrency Threat & Value?" Great Talk Inc., September 1, 2021, available at https://youtu.be/FvYA8zvW1G8

Flash Presentation, "Cryptocurrency and the State: An Unholy Alliance," DC Fintech Week, Virtual, October 19, 2020, available at https://www.dcfintechweek.org/videos/

Mentor, "HBCU Blockchain Curriculum Development Institute 2019," Center for Study of Blockchain and Financial Technology, New Orleans, Oct. 31-Nov. 2, 2019

"The Promise and Peril of Facebook's New Cryptocurrency," Pontificia Universidad Católica de Chile, October 4, 2019

"Regulating Cryptocurrency in the United States," National Chengchi University College of Law, August 14-15, 2019

"Cryptoventures, Laws, and Regulatory Trends," Conference on "The Inaugural HBCU Blockchain Summit," Center for Study of Blockchain and Financial Technology, Morgan State University, May 3-4, 2019

"Regulation in Blockchain," Conference on "The Transformative Power of Blockchain," Duke MBA Blockchain Club, April 10, 2019

Co-Chair and Welcoming Remarks, Conference on "Ten Years from the Bottom: A Reflection on the Financial Crisis and its Lasting Impact," Duke University, March 20, 2019

Panelist, Conference on "The Future of Fintech: Blockchain, Cryptocurrency, and the Emerging

Financial Ecosystem," Kenan Institute of Private Enterprise at the University of North Carolina at Chapel Hill, January 24, 2019

Panelist, "Beyond Bitcoin," Michael Best Law and Tech Symposium, October 25, 2018

"Wells Fargo Unauthorized Account Openings Case Study," National Association of Corporate Directors, Research Triangle Chapter, Director's College, April 20, 2018

Moderator, "Beyond Talking Points: Looking at Financial Regulation Through the Frame of Resiliency," Duke in DC, March 27, 2018

Panelist, Blockchain Conference and Hackathon, Lincoln Network, September 29, 2017

Moderator, "Global Financial Markets: A Look Ahead to the Future of Law & Business in a Changing World," Cadwalader, Wickersham & Taft LLP, April 12, 2017

"Media and Different Perspectives on Financial Regulation," Rethinking Regulation at the Kenan Institute for Ethics at Duke University, October 25, 2016

## MEDIA & CITATIONS

David Gura, "Will Bitcoin ETFs lead to crypto becoming more common in investment portfolios?" NPR February 6, 2024, available at https://www.npr.org/people/1019406539/david-gura

Alexander Osipovich, "Wall Street Gets Laser Eyes in Bid for Bitcoin ETF Bucks," Wall Street Journal, February 3, 2024, available at https://www.wsj.com/finance/investing/wall-street-gets-laser-eyes-in-bid-for-bitcoin-etf-bucks-3b890de3

Dave Michaels, "Binance Copped a $4 Billion Plea but Is Still Fighting the SEC," Wall Street Journal, December 4, 2023, available at https://www.wsj.com/finance/regulation/binance-copped-a-4-billion-plea-but-is-still-fighting-the-sec-44a4e5a5

Leo Schwartz and Jeff John Roberts, "Gary Gensler has remade the SEC into a crypto nemesis and climate warrior. Now a backlash is brewing," Fortune, November 28, 2023, available at https://fortune.com/longform/gary-gensler-sec-chair-interview-cryptocurrency-climate-change/

Thomas Barrabi, "Customers outraged over Winklevoss twins' secret $282M crypto withdrawal: 'You didn't tell anyone,' NY Post, October 17, 2023, available at https://nypost.com/2023/10/17/customers-outraged-over-winklevoss-twins-secret-282m-crypto-withdrawal/

Kevin Penton, "Sullivan & Cromwell, Fenwick Draw Scrutiny In FTX Debacle," LAW360, October 3, 2023, available at https://www.law360.com/articles/1726200/sullivan-cromwell-fenwick-draw-scrutiny-in-ftx-debacle

Declan Harty, Eleanor Mueller, Sam Sutton and Jasper Goodman, "How SBF's fall keeps rattling Capitol Hill," Politico, October 3, 2023, available at https://www.politico.com/news/2023/10/03/sam-bankman-fried-trial-crypto-lobby-congress-00118858

Andrew Ross Sorkin, Ravi Mattu, Bernhard Warner, Sarah Kessler, Michael J. de la Merced, Lauren Hirsch and Ephrat Livni, "Crypto's Trial of the Century Is Set to Begin," NYT, October 2, 2023, available at https://www.nytimes.com/2023/10/02/business/dealbook/bankman-fried-ftx-trial.html

Brooke Masters and Scott Chipolina, "Crypto vs SEC: What Grayscale's court victory means for bitcoin ETFs," Financial Times, August 30, 2023, available at https://www.ft.com/content/c862dd6c-6d9f-4565-ae40-1869b00e6e48

Dave Michaels and Paul Kiernan, "SEC's Strategy for Regulating Crypto Stumbles in Ripple Case," Wall Street Journal, July 15, 2023, available at https://www.wsj.com/articles/secs-strategy-for-regulating-crypto-stumbles-in-ripple-case-a003c057

Claire Williams, "BNY Mellon crypto custody application didn't anticipate SEC accounting rule," American Banker, June 28, 2023, available at https://www.americanbanker.com/news/new-document-highlights-conflict-over-bny-mellons-crypto-custody-business

Edd Gent, "U.S. SEC Puts Cryptocurrencies' Futures in Crosshairs," IEEE Spectrum, June 14, 2023, available at https://spectrum.ieee.org/sec-crypto-lawsuits

Joseph Zeballos-Roig, "Congress may be done with crypto," SEMAFOR, June 7, 2023, available at https://www.semafor.com/article/06/07/2023/congress-may-be-done-with-crypto

Michael Martin and David Gura, "The SEC unveils 13 charges in a lawsuit against crypto exchange Binance," NPR, June 6, 2023, available at https://www.npr.org/2023/06/06/1180361045/the-sec-unveils-13-charges-in-a-lawsuit-against-crypto-exchange-binance

Lily Jamali, "Climate change is high on the agenda as the World Bank gets a new president," Marketplace, May 2, 2023, available at https://www.marketplace.org/2023/05/02/climate-change-is-high-on-the-agenda-as-the-world-bank-gets-a-new-president/

Michelle Celarier, "Is the Bitcoin Comeback for Real?" Institutional Investor, April 24, 2023, available at https://www.institutionalinvestor.com/article/2bstor7aqjglivlbmz6yo/portfolio/is-the-bitcoin-comeback-for-real

Russ Bowen, "NC State Treasurer weighs in on First Citizens buying Silicon Valley Bank," March 27, 2023, available at https://www.cbs17.com/news/north-carolina-news/nc-state-treasurer-weighs-in-on-first-citizens-acquisition-of-silicon-valley-bank/

Matt Levin, "Who are bank examiners, and what do they do?" Marketplace, March 24, 2023, available at https://www.marketplace.org/2023/03/24/who-are-bank-examiners-and-what-do-they-do/

Leo Schwartz, "Is Operation Chokepoint real? A crypto skeptic weighs in," Fortune, March 22, 2023, available at https://fortune.com/crypto/2023/03/22/is-operation-chokepoint-real-a-crypto-skeptic-weighs-in/

David Yaffe-Bellany and Erin Griffith, "Crypto Wants it Shine Back," The New York Times, March 20, 2023, available at https://www.nytimes.com/2023/03/20/technology/crypto-rebranding-marketing.html

Joe Light, "Struggling Silvergate Bank Held Reserves for Major Stablecoins, Raising Investor Protection Questions," Barron's, March 4, 2023, available at https://www.barrons.com/articles/silvergate-stablecoins-bitcoin-fdic-banking-a355da8a

Lily Jamali, "Can crypto restore its credibility?" Marketplace, December 13, 2022, available at https://www.marketplace.org/2022/12/13/can-crypto-restore-its-credibility/

Joseph Zeballos-Roig, "A Republican joins the crypto backlash in Congress," December 2, 2022, available at https://www.semafor.com/article/12/02/2022/roger-marshall-kansas

Sharon Thiruchelvam, "FTX failure resets US crypto legislative programme," Risk.net, November 29, 2022, available at https://www.risk.net/regulation/7955328/ftx-failure-resets-us-crypto-legislative-programme

Molly Fischer, "Yam Karkai's Illustrations Made Her an N.F.T. Sensation. Now What?," November 28, 2022, available at https://www.newyorker.com/magazine/2022/12/05/yam-karkais-illustrations-made-her-an-nft-sensation-now-what

Joseph Zeballos-Roig, "Capitol Hill finally wants to regulate crypto. But some critics say just 'let it burn.' Semafor, November 23, 2022, available at https://www.semafor.com/article/11/23/2022/crypto-bill-criticized

Maxwell Strachan, "How SBF Created the New Playbook for Manipulating Washington, D.C., Vice, November 22, 2022, available at https://www.vice.com/en/article/xgyp8d/how-sbf-created-the-new-playbook-for-manipulating-washington-dc

David Yaffe-Bellany, "Inside a Crypto Nemesis' Campaign to Rein In the Industry," New York Times, November 21, 2022, available at https://www.nytimes.com/2022/11/21/technology/gary-gensler-crypto-sec.html

Ephrat Livini, "What is Next for the FTX Fallout," Dealbook, November 20, 2022, available at https://www.nytimes.com/2022/11/19/business/dealbook/ftx-fallout.html

Hannah Albarazi, "Would Rules Have Cured FTX's 'Internal Controls Wasteland'? Law360, November 18, 2022, available at https://www.law360.com/articles/1550638

Matt Levin, "FTX debacle worsens crypto's trust issues," Marketplace, November 18, 2022, available at https://www.marketplace.org/2022/11/21/ftx-debacle-worsens-cryptos-trust-issues/

Sarah Wynn, FTX failure may strengthen case for more robust crypto regulation, Roll Call, November 15, 2022, available at  https://rollcall.com/2022/11/15/ftx-failure-may-strengthen-case-for-better-crypto-regulation/

Karl Evers-Hillstrom, Crypto faces a crisis of confidence amid FTX collapse, The Hill, November 11, 2022, available at https://thehill.com/business-a-lobbying/3730175-crypto-faces-a-crisis-of-confidence-amid-ftx-collapse/

Jeff Ostrowski, FTX Turmoil Undermines Miami's Crypto Strategy, Commercial Observer, November 10, 2022, available at https://commercialobserver.com/2022/11/ftx-turmoil-undermines-miamis-crypto-strategy/#.Y23Bpcfp8f8.twitter

David Yaffe-Bellany, "Binance Pulls Out of Deal to Acquire Rival Crypto Exchange FTX," November 9, 2022, available at https://www.nytimes.com/2022/11/09/technology/ftx-binance-crypto.html

Joe Light, "Face-Off Between Crypto Billionaires Is the Market's Biggest Near-Term Risk," Barron's, November 9, available at https://www.barrons.com/articles/face-off-between-crypto-billionaires-is-the-markets-biggest-near-term-risk-51667865380

David Gura, "Cryptocurrency exchange FTX files for bankruptcy," NPR, November 11, 2022, available at https://www.npr.org/2022/11/11/1135984033/once-valued-at-more-than-30-billion-crypto-currency-ftx-is-near-bankruptcy

Lily Jamali, "Crypto exchange Binance walks away from FTX deal," Marketplace, November 9, 2022, available at https://www.marketplace.org/2022/11/09/crypto-exchange-binance-walks-away-from-ftx-deal/

"Legal Explainer: Regulators face unique hurdles in FTX probes," Reuters Video, November 14, 2022, available at https://www.reuters.com/video/watch/idRCV00BKQQ

"Did FTX meltdown turn the 'crypto winter' into a 'crypto ice age'? Fox Business, November 11, 2022, available at https://video.foxbusiness.com/v/6315399200112#sp=show-clips

"Cryptocurrency exchange FTX facing potential bankruptcy," CBS News, November 11, 2022, available at https://www.cbsnews.com/video/cryptocurrency-exchange-ftx-facing-potential-bankruptcy/

Matt Levin, "What Message is the SEC sending about celebrity crypto endorsements with Kim Kardashian fine?" Marketplace, October 4, 2022, available at https://www.marketplace.org/2022/10/04/what-message-is-the-sec-sending-about-celebrity-crypto-endorsements-with-kim-kardashian-fine/

Sarah Wynn, "GOP midterm victory would add pressure on fintech regulators," Roll Call, October 4, 2022, available at https://rollcall.com/2022/10/04/gop-midterm-victory-would-add-pressure-on-fintech-regulators/

Sarah Emerson, David Jeans, & Phoebe Liu, "Crypto Darling Helium Promised A 'People's Network.' Instead, Its Executives Got Rich." Forbes, September 23, 2022, available at: https://www.forbes.com/sites/sarahemerson/2022/09/23/helium-crypto-tokens-peoples-network/

David Dayen, "Battle Royale for Crypto Oversight Kicks Off," The American Prospect, September 15, 2022, available at   https://prospect.org/power/battle-royale-for-crypto-oversight-kicks-off/

Lily Jamali, "With "the merge,' Ethereum tries to set a greener example for crypto," Marketplace, September 15, 2022, available at https://www.marketplace.org/?s=the%20merge

Kharishar Kahfi, "The world's securities law watchdog is scrambling to create 'common standards' for crypto," The Block, September 3, 2022, available at https://www.theblock.co/post/167451/the-worlds-securities-law-watchdog-is-scrambling-to-create-common-standards-for-crypto

Cynthia Littleton, "A Crypto Skeptic Takes on Web3: 'There's No Real-World-Use Case' for

Cryptocurrencies," Variety, August 17, 2022, available at:
https://variety.com/2022/digital/news/crypto-skeptic-web3-cryptocurrencies-1235342888/

Ben Margulies, "Fed announces new guidelines after master account controversy," Central Banking, August 16, 2022, available at
https://www.centralbanking.com/regulation/banking/7952221/fed-announces-new-guidelines-after-master-account-controversy

Sarah Wynn, "'Securities' label in SEC insider case may have broad crypto impact," Roll Call, August 2, 2022, available at https://rollcall.com/2022/08/02/securities-label-in-sec-insider-case-may-have-broad-crypto-impact/

Katy Pickens, "Law professor tells Steamboat audience crypto not worth the hype," Steamboat Pilot & Today, July 26, 2022, available at https://www.steamboatpilot.com/news/law-professor-tells-steamboat-audience-crypto-not-worth-the-hype/

Julia Gerstein, "Will Current Geopolitical Crisis Influence Crypto Market?" Coinspeaker, July 11, 2022, available at https://www.coinspeaker.com/geopolitical-crisis-crypto-market/

Michael Bologna, "Crypto Crash Weighs on States' Plans for Tax Payment by Bitcoin," Bloomberg, July 5, 2022, available at https://www.bloomberg.com/news/articles/2022-07-05/crypto-crash-weighs-on-states-plans-for-tax-payment-by-bitcoin

Tory Newmyer, "Bill to grant crypto firms access to Federal Reserve alarms experts," The Washington Post, July 3, 2022, available at
https://www.washingtonpost.com/business/2022/07/03/crypto-banks-risk-lummis/

"Crypto's problem is it's having trouble attracting new buyers, says Duke's Lee Reiners," CNBC Crypto Night in America, July 1, 2022 available at
https://www.youtube.com/watch?v=tk9pAFPjCjQ

Jacob Kozhipatt, "A former Federal Reserve regulator turned Duke fintech professor who's calling for crypto to be banned explains why "blockchain's not really better at anything," Business Insider, June 29, 2022, available at https://www.businessinsider.com/crypto-bitcoin-ethereum-federal-reserve-blockchain-regulation-senator-lummins-reiners-2022-6

Kristine Liao, "Crypto companies are getting into carbon credits. But can they actually help the climate?" Popular Science, June 27, 2022, available at
https://www.popsci.com/environment/crypto-carbon-credit-tokens/

Rebecca Heilweil, "Now might be a good time to think about crypto insurance," Vox, June 17, 2022, available at https://www.vox.com/recode/23171782/crypto-terra-ust-celsius-meltdown-crash-insurance

Lauren Foster, "Proposed Legislation Promises to Empower Investors. What to Know." Barron's, June 14, 2022, available at https://www.barrons.com/articles/verizon-communications-stock-downgrade-51659023227
David Yaffe-Bellany and Erin Griffith, "'The Music Has Stopped': Crypto Firms Quake as Prices Fall," June 14, 2022, available at https://www.nytimes.com/2022/06/14/technology/crypto-industry-prices-fall.html

Scott Nover, "Why crypto lender Celsius Network halted withdrawals," June 13, 2022, available at https://qz.com/2177014/why-celsius-network-froze-withdrawals/

Lauren Foster, "How 'Greenwashing' Cost a CEO His Job," Barron's, June 2, 2022, available at https://www.marketwatch.com/articles/greenwashing-dws-group-ceo-51654130739?mod=mw_latestnews&tesla=y

"The bull and bear case for cryptocurrencies," CNBC Crypto Night in America, May 27, 2022, available at https://www.youtube.com/watch?app=desktop&v=Sz-qJ6CMUVA

David Yaffe-Bellany, "A Crypto Emperor's Vision: No Pants, His Rules," New York Times, May 14, 2022, available at https://www.nytimes.com/2022/05/14/business/sam-bankman-fried-ftx-crypto.html

Lily Jamali, "Crypto asset meltdown prompt calls for regulation," Marketplace, May 13, 2022, available at https://www.marketplace.org/2022/05/13/crypto-asset-meltdown-prompts-calls-for-regulation/

Elise Hansen, "Crypto Meltdown Could Speed Stablecoin Regulations," LAW360, May 13, 2022, available at https://www.law360.com/capitalmarkets/articles/1493194/crypto-meltdown-could-speed-stablecoin-regulations

Katrina Northrop, "Born to Run: After capitalizing on China's crypto boom, Binance CEO "CZ" fled China just in the nick of time – and he's been running ever since," The Wire China, May 8, 2022, available at https://www.thewirechina.com/2022/05/08/born-to-run/

Capital Tonight, "Navigating the regulations of cryptocurrency," Spectrum News 1, May 2, 2022, available at https://spectrumlocalnews.com/nc/charlotte/politics/2022/05/02/navigating-the-regulations-of-cryptocurrency

Chris Sommerfeldt, "Mayor Adams suggests scrapping longstanding N.Y. cryptocurrency licensing rule," New York Daily News, April 27, 2022, available at https://www.nydailynews.com/news/politics/new-york-elections-government/ny-nyc-mayor-eric-adams-new-york-state-cryptocurrency-licensing-20220427-5fpxfug3jbe7jkcftqi2wtzgci-story.html

Jacob Kozhipatt, "Experts Debate What Elon Musk's Twitter Acquisition Means for Dogecoin," Business Insider, April 27, 2022, available at https://www.businessinsider.com/elon-musk-twitter-acquisition-crypto-dogecoin-doge-meme-coin-btc-2022-4?utmSource=twitter&utmContent=referral&utmTerm=topbar&referrer=twitter

Charlie Dunlap, "The National Security Challenges of Ransomware and Cryptocurrency," Lawfire (Podcast), April 4, 2022, available at https://sites.duke.edu/lawfire/2022/04/04/podcast-the-national-security-challenges-of-ransomware-and-cryptocurrency/

Corbin Hiar, "Fidelity sparks climate concern by using crypto in 401(k)," E&E News, April 28, 2022, available at https://www.eenews.net/articles/fidelity-sparks-climate-concern-by-using-crypto-in-401k/

Carolina Bolado, "Crypto Industry Can't Count on Congress, At Least Not Yet," Law360, April 26, 2022, available at https://www.law360.com/fintech/articles/1487649/crypto-industry-can-t-count-on-congress-at-least-not-yet

Matt Levin, "What are stablecoins, and why are regulators worried about them?" Marketplace, April 18, 2022, available at https://www.marketplace.org/2022/04/18/what-are-stablecoins-and-why-are-regulators-worried-about-them/

Eric Lipton and David Yaffe-Bellany, "Crypto Industry Helps Write, and Pass, Its Own Agenda in State Capitols," New York Times, April 10, 2022, available at https://www.nytimes.com/2022/04/10/us/politics/crypto-industry-states-legislation.html

David Gura, "Encore: The SEC wants companies to disclose how climate change is affecting them," NPR, March 30, 2022, available at https://www.npr.org/2022/03/30/1089774550/encore-the-sec-wants-companies-to-disclose-how-climate-change-is-affecting-them

Corbin Hiar, "Michael Brune's next battle: Clean up bitcoin," E&E News, March 29, 2022 available at https://www.eenews.net/articles/michael-brunes-next-battle-clean-up-bitcoin/

Lily Jamali, "Proposed bitoin ETFs spotlight debate over rules governing crypto," Marketplace, March 22, 2022, available at https://www.marketplace.org/2022/03/22/proposed-bitcoin-etfs-spotlight-debate-over-rules-governing-crypto/

David Gura, "The SEC wants companies to disclose how climate change is affecting them," NPR, March 21, 2022, available at https://www.npr.org/2022/03/21/1087832674/the-s-e-c-climate-change-disclosures-companies

Claire Williams, "A big bank is in trouble, and no one knows which one or why," America Banker, March 10. 2022, available at https://www.americanbanker.com/news/a-big-bank-is-in-trouble-and-no-one-knows-which-one-or-why

Paul Kiernan and Andrew Duehren, "Bitcoin Price Surges on Biden's Crypto Executive Order," Wall Street Journal, March 9, 2022, available at https://www.wsj.com/articles/biden-to-order-study-of-cryptocurrency-risk-creation-of-u-s-digital-currency-11646823600?page=1

Lily Jamali, "Donations fortify Ukraine's defense spending," Marketplace, March 9, 2022, available at https://www.marketplace.org/2022/03/09/donations-fortify-ukraines-defense-spending/

"You're starting to see institutions revisit that they need a crypto strategy, says Anthony Scaramucci," CNBC Crypto Night in America, March 9, 2022, available at https://www.cnbc.com/video/2022/03/09/youre-starting-to-see-institutions-revisit-that-they-need-a-crypto-strategy-says-anthony-scaramucci.html?__source=sharebar%7Ctwitter&par=sharebar

Corbin Hiar, "Tesla fights shareholder push to ditch carbo-rich crypto," E&E News, March 8, 2022, available at https://www.eenews.net/articles/tesla-fights-shareholder-push-to-ditch-carbon-rich-crypto/

David Dayen, "The Real Reasons Republicans Are Blocking Biden's Fed Nominees," The American Prospect, March 3, 2022, available at https://prospect.org/power/real-reason-republicans-blocking-bidens-fed-nominees/#.YiDyqHQlK1Y.twitter

Nitasha Tiku and Jeremy B. Merrill, "Ukraine asked for donations in crypto. The things got weird," Washington Post, March 3, 2022, available at https://www.washingtonpost.com/technology/2022/03/03/ukraine-cryptocurrency-donations/

Matt Levin, "As the ruble tumbles, cryptocurrency attracts ordinary Russians, oligarchs, maybe even the state itself," Marketplace, March 1, 2022, available at https://www.marketplace.org/2022/03/01/russians-turn-to-cryptocurrency-ruble-tumbles/

Joseph A. Smith, "A Practitioner's View on the Value of Team-Based, Student-Powered Interdisciplinary Research," Methodspace, February 2022, available at https://www.methodspace.com/blog/a-practitioners-view-on-the-value-of-team-based-student-powered-interdisciplinary-research

Charlie Dunlap, "Lee Reiners on "Russian Sanctions will Compel Further Adoption of Cryptocurrency and Increase Compliance Risks for Cryptocurrency Companies," Lawfire, February 28, 2022, available at https://sites.duke.edu/lawfire/2022/02/28/lee-reiners-on-russian-sanctions-will-compel-further-adoption-of-cryptocurrency-and-increase-compliance-risks-for-cryptocurrency-companies/

Elliot Wilson, "Can the Cowboy State sell crypto to the Fed?" February 25, 2022, available at https://www.euromoney.com/article/29rem175z7iw1vgd6zbpc/fintech/can-the-cowboy-state-sell-crypto-to-the-fed

Ben Sessoms, "Crypto miner power draw raises environmental concerns," Carolina Public Press, February 25, 2022, available at https://carolinapublicpress.org/51848/crypto-miner-power-draw-raises-environmental-concerns/

Andrew Ross Sorkin, Jason Karaian, Sarah Kessler, Stephen Gandel, Michael J. de la Merced, Lauren Hirsch and Ephrat Livni "Wall Street Bumps Pay to Stem a Talent Exodus," New York Times, February 9, 2022, avaialable at https://www.nytimes.com/2022/02/09/business/dealbook/wall-street-pay.html

"You're going to see volatility waves in bitcoin, but ling-term holders will by fine, says Anthony Scaramucci." CNBC Crypto Night in America, January 13, 2022, available at https://www.cnbc.com/video/2022/01/13/youre-going-to-see-volatility-waves-in-bitcoin-but-long-term-holders-will-by-fine-says-anthony-scaramucci.html?qsearchterm=Anthony%20Scaramucci

Chad Day, "Only Two Senators Own Crypto Assets. Both Are shaping the Industry's Rule," Wall Street Journal, December 20, 2021, available at https://www.wsj.com/articles/senators-own-cryptocurrency-assets-as-they-shape-rules-for-industry-11640005202?page=1&s=09

Sharon Thiruchelvam, "New Fed regulation head unlikely to roll back all Trump changes," Risk.net, December 3, 2021, available at https://www.risk.net/regulation/7904126/new-fed-regulation-head-unlikely-to-roll-back-trump-changes

"Here's what's on the horizon for crypto regulation," CNBC Crypto Night in America, November 24, 2021, available at https://www.cnbc.com/video/2021/11/24/heres-whats-on-the-horizon-for-crypto-regulation.html

Matt Ott, "Shiba Inu passes Dogecoin as top "dog" in cryptocurrency," ABCNews, November 1, 2021, available at https://abcnews.go.com/Business/wireStory/shiba-inu-passes-dogecoin-top-dog-cryptocurrency-80906180

Andrew Singer, "Cypto lending firms on the hot seat: New regulations are coming?" Cointelegraph,

October 29, 2021, available at https://cointelegraph.com/news/crypto-lending-firms-on-the-hot-seat-new-regulations-are-coming

Andy Blye, "Shifting Sands," Phoenix Business Journal, October 29, 2021, available at https://www.bizjournals.com/phoenix/news/2021/10/29/fintech-sandbox-arizona-report.html

Edd Gent, "Why is Facebook Getting Into Cryptocurrency?" IEEE Spectrum, September 30, 2021, available at https://spectrum.ieee.org/facebook-cryptocurrency-diem-why#toggle-gdpr

Peter Feltman, "SEC seen having clear case against Coinbase's lending program," Roll Call, September 28, 2021, available at https://www.rollcall.com/2021/09/28/sec-seen-having-clear-case-against-coinbases-lending-program/

Elizabeth Weise, "Climate change is 'a freight train' making some places too dangerous to live in, experts say," USA Today, September 28, 2021, available at https://www.msn.com/en-us/news/us/climate-change-is-a-freight-train-making-some-places-too-dangerous-to-live-in-experts-say/ar-AAOWYhA

"Biden administration set to ban crypto for ransomware payments," CNBC The Exchange, September 17, 2021, available at https://www.cnbc.com/video/2021/09/17/biden-administration-set-to-ban-crypto-for-ransomware-payments.html?qsearchterm=Reiners

Cristiano Lima, "Facebook's latest attempt to build a crypto empire meets familiar skepticism in Washington," Washington Post, September 8, 2021, available at https://www.washingtonpost.com/politics/2021/09/08/technology-202-facebook-latest-attempt-build-crypto-empire-meets-familiar-skepticism-washington/

Eric Lipton and Ephrat Livini, "Crypto's Rapid Move Into Banking Elicits Alarm in Washington," New York Times, September 5, 2021, available at https://www.nytimes.com/2021/09/05/us/politics/cryptocurrency-banking-regulation.html

Roger Parloff, "Portrait of a 29-year-old billionaire: Can Sam Bankman-Fried make his risky crypto business work?" Yahoo! Finance, August 12, 2021, available at https://finance.yahoo.com/news/ftx-ceo-sam-bankman-fried-profile-085444366.html?guccounter=1&guce_referrer=aHR0cHM6Ly9sYXcuZHVrZS5lZHUvbmV3cy90YWcvR2xvYmFsJTIwRmluYW5jaWFsJTIwTWFya2V0cyUyMENlbnRlcg&guce_referrer_sig=AQAAAH03H3AIy4eT5-AZU4vDFfPMEWEi9_KcfZSiyffB7mfgYKgHa4chgyfthKOGwLFW5X4Id0S8KyzwEhjDkE3HgXGB47LOtVomonrAB8M0xSHrS1FfvtqQL7yiYO-qLqFAeqqQGXZrU-Zy3d5-lWrn7izXMYsNR2WLxCCtvTbGopLl

Dave Michaels and Alexander Osipovich, "SEC Chief Gary Gensler Braces for Clash With Crypto Traders," Wall Street Journal, August 5, 2021, available at https://www.wsj.com/articles/sec-chief-gary-gensler-braces-for-clash-with-crypto-traders-11628164980?page=1

Maria Aspan, "How Caitlin Long turned Wyoming into crypto country," Fortune, July 29, 2021, available at https://fortune.com/2021/07/29/caitlin-long-wyoming-crypto/

Neil Haggerty, "Why SEC's climate disclosure rules could hit banks hardest," American Banker, July 2, 2021, available at https://www.americanbanker.com/news/why-secs-climate-disclosure-rules-could-hit-banks-hardest

Elena Botella, "Wyoming Wants to Be the Crypto Capital of the U.S.," Slate, June 28, 2021, available at https://slate.com/technology/2021/06/wyoming-cryptocurrency-laws.html

Sophie Quinton, "Relaxed Rules Attract Entrepreneurs to State 'Sandboxes'," PEW, June 15, 2021, available at https://www.pewtrusts.org/ar/research-and-analysis/blogs/stateline/2021/06/15/relaxed-rules-attract-entrepreneurs-to-state-sandboxes

Andrea Vittorio and Jake Holland, "Meat Producer's Hack Ups Pressure to Regulate Crypto Payments," Bloomberg Law, June 3, 2021, available at https://news.bloomberglaw.com/banking-law/meat-producers-hack-ups-pressure-to-regulate-crypto-payments

"Why this expert says to fight ransomware, we need to ban cryptocurrency," CNBC Power Lunch, May 27, 2021, available at https://www.cnbc.com/video/2021/05/27/why-this-expert-says-to-fight-ransomware-we-need-to-ban-cryptocurrency.html

Brendan Pedersen and Hannah Lang,  "Will FDIC, OCC follow Fed into global climate group?" American Banker, May 18, 2021, available at https://www.americanbanker.com/news/will-fdic-occ-follow-fed-into-global-climate-group

Terrence Fraser, "Amazon doesn't take Dogecoin as payment on its site," AP News,  May 6, 2021, available at https://apnews.com/article/fact-checking-196022114861

Alexander Osipovich, "This Vegan Billionaire Disrupted the Crypto Markets. Stocks May be Next," Wall Street Journal, April 16, 2021, available at https://www.wsj.com/articles/this-vegan-billionaire-disrupted-the-crypto-markets-stocks-may-be-next-11618565408

Danica Coto, "Eastern Caribbean Dollar Goes Digital, A Help for the Unbanked," Business Journal, April 8, 2021, available at https://thebusinessjournal.com/eastern-caribbean-dollar-goes-digital-a-help-for-unbanked/

Claire Williams, "FSOC Takes the First Step to Regulate Hedge Funds by Forming a Working Group. What's Next?" Morning Consult, March 31, 2021, available at https://morningconsult.com/2021/03/31/fsoc-regulation-hedge-funds-working-group/

Catherine Boudreau, "When companies go green, the planet doesn't always win," Politico, March 30, 2021, available at https://www.politico.com/news/2021/03/30/companies-green-planet-doesnt-always-win-478460

Ashley Daley, "Who protects landlords? Eviction moratorium extended through June," WCNC, March 29, 2021, available at https://www.wcnc.com/article/money/national-ban-evictions-extended-landlords/275-2617949b-f47c-4471-bac6-9a427ebe1103

Andrew Singer, "Bitcoin ETF may come to US, but not all crypto investors think it's needed," Cointelegraph, March 5, 2021, available at https://cointelegraph.com/news/bitcoin-eft-may-come-to-us-but-not-all-crypto-investors-think-it-s-needed

Chris Mathews, "Progressive hopes for a radical SEC agenda face a unicorn problem," MarketWatch, February 26, 2021, available at https://www.marketwatch.com/story/progressive-hopes-for-a-radical-sec-agenda-face-a-unicorn-problem-11614369773

Avery Ellfeldt, "SEC to toughen climate rules on companies," E&E News, February 25, 2021, available at https://www.eenews.net/stories/1063725965

Matt Ott, "Cost of a single bitcoin exceeds $50,000 for the first time," AP News, February 16, 2021,  available at https://apnews.com/article/single-bitcoin-cost-50k-first-time-cbe42b7f0bbc4194c64bbbaab47e5902

Peter Feltman, "Fintech experts divided on form for U.S. central digital currency," Roll Call, October 27, 2021, available at https://www.rollcall.com/2020/10/27/fintech-experts-divided-on-form-for-u-s-central-digital-currency/

Jon Hill, "Barrett May Reinforce High Court Trends For Banking Industry," Law 360, September 29, 2020, available at https://www.law360.com/securities/articles/1314305/barrett-may-reinforce-high-court-trends-for-banking-industry

Avery Ellfeldt, "This watchdog wants to 'demystify' America's COVID-19 bailout," E&E News, August 24, 2020, available at https://www.eenews.net/climatewire/stories/1063712309/search?keyword=Bharat

Andrew Singer, "WisdomTree Tests SEC's Bitcoin Acceptance Threshold With Latest ETF Filing," Cointelegraph, June 20, 2020, available at https://cointelegraph.com/news/wisdomtree-tests-secs-bitcoin-acceptance-threshold-with-latest-etf-filing

Peter Feltmen, "Optimism abounds on cryptocurrency ETFs despite lack of action," Roll Call, June 9, 2020, available at https://www.rollcall.com/2020/06/09/optimism-abounds-on-cryptocurrency-etfs-despite-lack-of-action/

Commodity Futures Trading Commission, Comment for Federal Advisory Committees and Subcommittees 85 FR 21840, May 9, 2020, available at https://comments.cftc.gov/Handlers/PdfHandler.ashx?id=29174

Duke Today Staff, "Lee Reiners: Who Are Your Trusted Sources on COVID-19?" Duke Today, May 7, 2020, available at https://today.duke.edu/2020/05/lee-reiners-who-are-your-trusted-sources-covid-19

Duke Law Staff, "Reiners, Lawrence JD/LLM '21, and others from Duke Law contribute to Bass Connections analysis of predatory lending," Duke Law: News, May 8, 2020, available at https://law.duke.edu/news/reiners-lawrence-jdllm-21-and-others-duke-law-contribute-bass-connections-analysis-predatory

Nicholas Institute for Environmental Policy Solutions Staff, "Seven Duke Research Projects Receive Catalyst Program Grants for 2020–2021," Nicholas Institute for Environmental Policy Solutions: News, May 5, 2020, available at https://nicholasinstitute.duke.edu/articles/seven-duke-research-projects-receive-catalyst-program-grants-2020-2021

Scott Hawksworth, "Exploring Fintech Law and Regulation with Lee Reiners of Duke Law," PayPod, Episode 83, January 30, 2020, available at https://www.soarpay.com/2019/12/lee-reiners/

Brendan Pedersen, "Does Amazon-Google-Microsoft hold on the cloud pose a risk to banking?" American Banker, September 30, 2019, available at https://www.americanbanker.com/news/does-amazon-google-microsoft-hold-on-the-cloud-pose-a-risk-to-banking

Dave Michaels and Alexander Osipovich, "Venture-Capital Stalwart Battles Washington's Crypto Crackdown," The Wall Street Journal, September 1, 2019, available at https://www.wsj.com/articles/venture-capital-stalwart-battles-washingtons-crypto-crackdown-11567350000

Kristen Haunss, "Leveraged lending risk to be discussed at Congressional hearing Tuesday," Reuters, June 3, 2019, available at https://www.reuters.com/article/levlending-hearing/leveraged-lending-risk-to-be-discussed-at-congressional-hearing-tuesday-idUSL2N23A0RW

Kristen Haunss, "Regulatory crackdown unlikely in US leveraged loan market," Reuters, March 15, 2019, available at https://www.reuters.com/article/regulatory-crackdown-unlikely-in-us-leve/regulatory-crackdown-unlikely-in-us-leveraged-loan-market-idUSL1N2120Q6

Colin Colter, "Once Used for Natural Disasters, Resilience Theory Informs Financial Regulation Debate," Duke Today, April 3, 2018, available at https://today.duke.edu/2018/04/once-used-natural-disasters-resilience-theory-informs-financial-regulation-debate

Robert Schmidt and Benjamin Bain, "Who Wants to Be Bitcoin's Watchdog?" Bloomberg Businessweek, January 12, 2018, available at https://www.bloomberg.com/news/articles/2018-01-12/who-wants-to-be-bitcoin-s-watchdog

Max Diamond, "BitConnect, a cryptocurrency trader, ordered to stop operating in NC," The Raleigh News & Observer, January 11, 2018, available at http://www.newsobserver.com/news/business/article194171819.html

Ronald Orol, "How Trump's Win May Provide a Windfall for Bailed-Out Insurer AIG," The Street, November 14, 2016, available at https://www.thestreet.com/story/13892557/1/how-trump-s-win-may-provide-a-windfall-for-bailed-out-insurer-aig.html

Susan Bruce, "The Attitude with Arnie Arnesen, September 20, 2016," The Attitude with Arnie Arnesen Archive at WNHN 94.7, September 20, 2016, available at http://www.wnhnfm.org/attitude-arnie-arnesen-september-201-2016/

## SERVICE & PROFESIONAL ACTIVITES

PROFESSIONAL SERVICE & MEMBERSHIPS
- Capital Markets Policy Council, CFA Institute (April 2023 – Present)
- CFA® charterholder, CFA Institute

DUKE UNIVERSITY
- Internal Advisory Board Member for Master of Engineering in Climate and Sustainability Engineering
- Co-organizer of the Digital Assets at Duke Conference
- Faculty Affiliate of RESILE: Risk Science for Climate Resilience
- Assistant Coach, Duke University Club Hockey Team