# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>-v.-<br><br>COINBASE, INC. and COINBASE GLOBAL, INC.,<br><br>Defendants. | 23 Civ. 4738 (KPF)<br><br>**OPINION AND ORDER** |

KATHERINE POLK FAILLA, District Judge:

The United States Securities and Exchange Commission (the "SEC" or the "Commission") brings this enforcement action against Coinbase, Inc. ("Coinbase") and Coinbase Global, Inc. ("CGI") (collectively, "Defendants"), alleging that Coinbase intermediated transactions in crypto-asset securities on its trading platform and through related services, all in violation of the federal securities laws.

At first blush, the addition of the prefix "crypto" to a commonly understood word like "asset" may suggest a paradigm shift. And, indeed, it is the putative differences between crypto-assets and their more traditional counterparts that animate Defendants' arguments. It is undisputed, for instance, that Coinbase provides a platform and other services that allow customers to transact in hundreds (and in one instance, thousands) of different crypto-assets. It is also undisputed that Coinbase offers these services without registering with the SEC as a securities exchange, broker, or clearing agency. Coinbase reasons that the transactions executed and facilitated through its platform and related services do not qualify as

"securities," and thus fall outside the scope of the SEC's delegated authority. The SEC disagrees, and counters that at least some of the transactions on Coinbase's platform and through related services constitute "investment contracts," which the federal securities laws have long recognized as securities. The parties readily acknowledge that the viability of this enforcement action hinges on this difference of opinion.

Defendants have moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Having now carefully considered the parties' arguments, as well as the many *amicus curiae* submissions in this case,[1] the Court concludes that because the well-pleaded allegations of the Complaint plausibly support the SEC's claim that Coinbase operated as an unregistered intermediary of securities, Defendants' motion must be denied in large part. As explained herein, the "crypto" nomenclature may be of recent vintage, but the challenged transactions fall comfortably within the framework that courts have used to identify securities for nearly eighty years. Further, the Court finds that the SEC adequately alleges that Coinbase, through its Staking Program, engaged in the unregistered offer and sale of securities. However, the Court agrees with Defendants that they are entitled to dismissal of the claim that Coinbase acts as an unregistered broker by making its Wallet application available to customers.

---

[1] It is not undue flattery to note that the parties, as well as the *amici*, have articulated the strongest and most cogent arguments for their respective positions, and the Court takes this opportunity to thank all sides for the intellectual rigor evident from their briefing and oral argument presentations.

## BACKGROUND[2]

### A. Factual Background

#### 1. The Parties

##### a. The Securities and Exchange Commission and the Regulation of the Securities Markets

The contemporary framework for the regulation of the U.S. securities

markets began with the enactment of the Securities Act of 1933 (the "Securities

Act"), Pub. L. 73-22, 48 Stat. 74, and the Securities Exchange Act of 1934 (the

"Exchange Act"), Pub. L. 73-291, 48 Stat. 881. With the Great Depression

ongoing, and the stock market crash of 1929 still top of mind, Congress sought

to protect investors in the U.S. capital markets by regulating the offer and sale

of securities, theretofore regulated exclusively by the states. With the

Securities Act, Congress sought to "protect investors by requiring publication of

material information thought necessary to allow them to make informed

investment decisions concerning public offerings of securities in interstate

commerce." *Pinter* v. *Dahl*, 486 U.S. 622, 638 (1988) (collecting cases). In the

Exchange Act, enacted one year later, Congress focused on the oversight of

securities through registration and regulation of certain participants in the

---

[2]   This Opinion draws its facts from the Complaint ("Compl." (Dkt. #1)), the well-pleaded
      allegations of which are taken as true for purposes of this Opinion. *See Ashcroft* v.
      *Iqbal*, 556 U.S. 662, 678 (2009).

      For ease of reference, the Court refers to Defendants' answer to the Complaint as the
      "Answer" (Dkt. #22); to Defendants' memorandum of law in support of their motion for
      judgment on the pleadings as "Def. Br." (Dkt. #36); to the SEC's memorandum of law in
      opposition to Defendants' motion as "SEC Opp." (Dkt. #69); and to Defendants' reply
      memorandum of law as "Def. Reply" (Dkt. #83).

securities market, as a means to "insure the maintenance of fair and honest

markets in [securities] transactions." 15 U.S.C. § 78b.

Of central importance to the instant case, Section 2(1) of the Securities

Act defines the term "security" to include:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1). This definition "include[s] the commonly known

documents traded for speculation or investment," such as stock and bonds.

*SEC.* v. *W.J. Howey Co.*, 328 U.S. 293, 297 (1946). "This definition also

includes 'securities' of a more variable character, designated by such

descriptive terms as 'certificate of interest or participation in any profit-sharing

agreement,' 'investment contract' and 'in general, any interest or instrument

commonly known as a 'security.'" *Id.* As discussed in greater detail below, the

Supreme Court has further interpreted the meaning of the term "investment

contract" to implicate transactions "involv[ing] an investment of money in a

common enterprise with profits to come solely from the efforts of others." *Id.* at 301.

Whereas the Securities Act was concerned with the designation and regulation of securities, the Exchange Act focused on the regulation of transactions in such securities in the secondary market. To that end, the Exchange Act established the SEC and "delegate[d] to [it] broad authority to regulate … securities." *SEC* v. *Alpine Sec. Corp.*, 308 F. Supp. 3d 775, 790 (S.D.N.Y. 2018). The statute also set forth a comprehensive regulatory regime designed to, among other things, protect investors from manipulation and fraud, ensure that securities orders were handled fairly and transparently, and make certain that securities transactions resulted in settlement finality. (Compl. ¶¶ 39, 43).[3] As part of this regulatory regime, Congress imposed registration requirements on certain defined participants in the national securities markets, including but not limited to exchanges, brokers, and clearing agencies. (*Id.* ¶ 22). Regulated entities were subject to certain disclosure, recordkeeping, inspection, and anti-conflict-of-interest provisions. (*Id.* ¶ 2).

### b. Coinbase and CGI

Defendant Coinbase is currently the largest crypto-asset trading platform in the United States, servicing over 108 million customers, accounting for billions of dollars in daily trading volume in hundreds of crypto-assets.

---

[3]  Here, the Securities Act clarified the reach of the SEC's regulatory authority, by defining what sorts of assets could be considered "securities" and, therefore, what sorts of market participants could be subject to SEC enforcement. *See* 15 U.S.C. § 77b.

(Compl. ¶ 1).  In April 2014, Coinbase became a wholly-owned subsidiary of CGI, as part of the latter's efforts to become a public company.  (*Id.* ¶ 15).  Further to that end, on February 25, 2021, CGI publicly filed with the SEC a Form S-1 registering an initial offering of its Class A Common Stock.  (*Id.* ¶ 111).  Since April 2021, Coinbase has been a publicly traded company.  (*Id.*).

## 2.  **Crypto-Assets Generally**[4]

The focus of the SEC's charges — and the core of Coinbase's business — involves the mode of exchange known as cryptocurrency.  Also referred to as

---

[4]     Background information about crypto-assets and the broader crypto industry is also set forth in numerous opinions from courts in this Circuit, including, *e.g.*, *Williams* v. *Binance*, — F.4th —, No. 22-972, 2024 WL 995568, at *1-3 (2d Cir. Mar. 8, 2024); *Risley* v. *Universal Navigation Inc.*, — F. Supp. 3d —, No. 22 Civ. 2780 (KPF), 2023 WL 5609200, at *2-9 (S.D.N.Y. Aug. 29, 2023); *SEC* v. *Terraform Labs Pte. Ltd.*, — F. Supp. 3d —, No. 23 Civ. 1346 (JSR), 2023 WL 4858299, at *1-4 (S.D.N.Y. July 31, 2023) ("*Terraform I*"); and *Underwood* v. *Coinbase Glob., Inc.*, 654 F. Supp. 3d 224, 230-32 (S.D.N.Y. 2023).

A word is in order about the term "ecosystem," which is used in different ways to describe aspects of the crypto industry.  In its macro or broadest sense, the crypto "ecosystem" comprises all of the participants in the industry, and has been defined to include:

> issuers (that create or "mint" crypto assets), crypto asset service providers such as exchanges (that facilitate the exchange of crypto assets but can also offer lending and investment services), wallet providers (that store crypto assets and can also be the transfer function), validators or miners (that ensure a consistent, honest, and true ledger), underlying technology (the [distributed ledger technology "DLT"] on which crypto assets are deployed), and regulated financial institutions (that might have exposures to crypto assets).  Crypto asset service providers are also carrying out multiple activities, for example, facilitating the exchange of crypto assets, storing client's crypto assets, providing lending and leverage services to the users, offering transfer services, and clearing and settlement for off-chain transactions.

Arma Bains, Arif Ismail, Fabiana Melo, and Nobuyasu Sugimoto, *Regulating the Crypto Ecosystem: The Case of Unbacked Crypto Assets* 15 (2022), https://www.imf.org/en/Publications/fintech-notes/Issues/2022/09/26/Regulating-the-Crypto-Ecosystem-The-Case-of-Unbacked-Crypto-Assets-523715; *see also* Bank for International Settlements, *The crypto ecosystem: key elements and risks* (July 2023), https://www.bis.org/publ/othp72.pdf; U.S. Dep't of Treasury, *Crypto-Assets:*

"crypto-assets," "tokens," or "coins," these digital assets are computer code entries on "blockchain" technology that record their owners' rights to access applications or services on a network. (Compl. ¶¶ 44-45). A blockchain is a database spread across a network of computers that utilizes a complex software protocol to track every transaction on that network, providing a decentralized ledger that operates as a record of the ownership and transfer of all tokens in that network. (*Id.*). Each blockchain has its own "native token," *i.e.*, a digital asset designed to interact directly with the blockchain and ensure the proper function of the blockchain's protocol. (*Id.* ¶ 46).

---

*Implications for Consumers, Investors, and Businesses*, Sept. 2022, https://home.treasury.gov/system/files/136/CryptoAsset_EO5.pdf.

In a more micro sense, the term "ecosystem" has been used by participants in the crypto industry to describe a collection of interrelated components, often involved in or implicated by the development of a crypto-asset. *See, e.g.*, *SEC* v. *Kik Interactive Inc.*, 492 F. Supp. 3d 169, 180 (S.D.N.Y. 2020) ("[W]ithout the promised digital ecosystem, [the cryptocurrency] would be worthless … [it has] no inherent value and will generate no profit absent an ecosystem that drives demand."). These components typically include: (i) the blockchain, which provides the infrastructure that allows the ecosystem to function and also allows for the creation of a token to use as currency to access that ecosystem; (ii) the protocols, which govern the operation of the blockchain, or some subset of transactions on the blockchain; (iii) the decentralized applications (or "dApps") that are constructed using the protocols; and (iv) the business platforms that build commercial projects on top of these other layers. *See* Hayden M. Baker, *Tales from the Crypt: The Securities Law Implications of Initial Coin Offerings and a Framework for a Compliant ICO*, 46 No. 4 SEC. REG. L.J. Art. 1 (2018); Shawn S. Amuial, Josias N. Dewey, and Jeffrey R. Seul, *Existing protocols — Ethereum*, THE BLOCKCHAIN: A GUIDE FOR LEGAL & BUSINESS PROFESSIONALS § 3:4 (2016); *see also, e.g.*, *Patterson* v. *Jump Trading LLC*, — F. Supp. 3d —, No. 22 Civ. 3600 (PCP), 2024 WL 49055, at *1 (N.D. Cal. Jan. 4, 2024); *Terraform I*, 2023 WL 4858299, at *1-3; *Friel* v. *Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 426-27 (S.D.N.Y. 2023); *Tari Labs, LLC* v. *Lightning Labs, Inc.*, No. 22 Civ. 7789 (WHO), 2023 WL 2480739, at *1-2 (N.D. Cal. Mar. 13, 2023).

In the instant Complaint, the SEC uses the term "ecosystem" in its narrower sense, to refer to the coordinated enterprises contemplated by the issuers and promoters of the thirteen crypto-assets at issue here. (*See, e.g.*, Compl. ¶ 134). This Court uses the term similarly in its analysis of whether transactions in these crypto-assets qualify as "securities" under the federal securities laws.

Critically important to a crypto-asset owner's exercise of control over her crypto-assets are the "public key" and "private key" associated with a crypto-asset, which keys permit the user to effectuate transactions on the associated blockchain. (Compl. ¶ 47). Owners typically store these keys on a piece of hardware or software known as a "crypto wallet." (*Id.*). The wallets, in turn, use both a public key and a private key. The public key is colloquially known as the user's blockchain "address" and can be freely shared with others. (*Id.*). The private key is analogous to a password and confers the ability to transfer a crypto-asset. (*Id.*).

### 3. The Crypto-Asset Market

Crypto-assets are created and maintained by developers (also sometimes referred to as "issuers" or "promoters"), often as sources of funding for the developer's underlying venture, even if the assets have some other nominal purpose. Thus, once a crypto-asset is created, it is typically first offered and sold by its developer to institutional investors in capital-raising events, including so-called "initial coin offerings" or "ICOs." (Compl. ¶ 51). ICOs are generally executed via a combination of direct placements, initial exchange offerings, and simple agreements for future tokens ("SAFTs"). (*See, e.g.*, *id.* ¶ 129). In some instances, developers may release a "whitepaper" or other marketing materials describing a project to which the asset relates, the terms of the offering, and any rights associated with the asset. (*Id.* ¶ 51).

In the second phase of offerings, developers typically sell their crypto-assets into the secondary market. (*See, e.g.*, Compl. ¶ 131). Indeed, to

8

increase the demand for and value of their tokens, and correspondingly to drive secondary trading, crypto-asset issuers often list their tokens on trading platforms — like the Coinbase Platform discussed *infra* — and promote the token's blockchain to retail investors well after the initial coin offering.

Developers must expend considerable efforts to list their crypto-asset on a trading platform. For a crypto-asset to be listed on the Coinbase Platform, for instance, a developer must complete a "listing application," which requires it to provide detailed information about its crypto-asset and blockchain projects. (Compl. ¶ 105). Coinbase's "Listings Team" then works closely with the developer to identify potential roadblocks to the asset's listing. (*Id.* ¶ 109). Coinbase's "Digital Asset Support Committee" ultimately reviews the relevant characteristics of the asset and decides whether to list it on the platform. (*Id.* ¶ 72).

As the number and variety of crypto-assets continue to proliferate — today, there are over 25,000 digital assets in circulation (Answer ¶ 22) — third-party trading platforms have emerged to accommodate the market for transactions in those assets. At their core, trading platforms allow customers to purchase and sell crypto-assets in exchange for either fiat currency or other crypto-assets. (Compl. ¶ 54). Given the increasing size of these markets, trading platforms also offer a variety of more specialized services, including brokerage, trading, and settlement services. (*Id.* ¶ 53).

### 4.     Coinbase's Operations

Coinbase operates one such trading platform (the "Coinbase Platform") through which U.S. customers can buy, sell, and trade crypto-assets.  (Compl. ¶¶ 1, 15).  Launched in 2012, the Coinbase Platform originally began as a single-asset platform that allowed "anyone, anywhere [to] be able to easily and securely send and receive Bitcoin."  (*Id.* ¶ 62).  Today, the Coinbase Platform has evolved into an expansive online trading platform that — according to Coinbase's website — allows customers to "buy, sell, and spend crypto on the world's most trusted crypto exchange."  (*Id.* ¶ 87).  In April 2021, Coinbase made available approximately 55 crypto-assets for trading on the Coinbase Platform; by March 2023, that number had expanded to approximately 254 assets.  (*Id.* ¶ 68).  Whereas the original platform operated as a mechanism for users to send and receive Bitcoin, the crypto-assets currently on the Coinbase Platform may be bought, sold, or traded for consideration, including U.S. dollars, other fiat currencies, or other crypto-assets.  (*Id.* ¶ 115).  There are neither restrictions on the number of tokens that a customer may purchase, nor restrictions on the transferability or resale of tokens.  (*Id.* ¶¶ 122-123).

In addition to the Coinbase Platform, Coinbase offers several other services.  Three services in particular are implicated by the instant enforcement action; they are summarized here, and discussed in greater detail later in the Opinion.[5]

---

[5]     The Court does not address Coinbase's "Asset Hub" service — the specifics of which are contested by the parties — in this Opinion.  (*See* Transcript of Oral Argument held on January 17, 2024 ("Jan. 17, 2024 Tr." (Dkt. #101)) at 11:3-12:5).

### a.  Prime

Since at least May 2021, Coinbase has offered "Prime," a service that
institutional customers can use to execute secondary-market transactions at
scale.  (Compl. ¶ 63).  Prime routes orders not only through Coinbase's
exchange, but also through third-party platforms, thereby providing customers
with what Coinbase describes as "access [to] the broader crypto marketplace
rather than relying solely on prices from Coinbase's exchange."  (*Id.*).  Trades
conducted through Prime therefore allow users to execute large-volume trades
more effectively across a broader array of digital asset markets.  (*Id.* ¶¶ 63, 81).

### b.  Wallet

Since 2017, Coinbase has made available to both retail and institutional
customers a self-custodial "digital wallet," called Coinbase Wallet, or simply
"Wallet."  (Compl. ¶ 64).  Wallet enables customers to store and access their
crypto-assets on their own computers or mobile devices.  (*Id.* ¶ 47).  While
crypto wallets generally offer only the ability to store the owner's private key
securely, Wallet interlinks with third-party platforms to facilitate transactions.
Through Wallet, customers can connect to third-party "decentralized" trading
platforms (often referred to as "decentralized exchanges" or "DEXs") to access
liquidity outside the Coinbase Platform.  (*Id.* ¶ 64).  These third-party platforms
make possible the sending, receiving, and swapping of crypto-assets, among
other decentralized application functions, without using intermediaries like
Coinbase.  (*Id.*).  Unlike with orders placed on the Coinbase Platform or

through the Prime application, Coinbase does not maintain custody over the assets traded through Wallet.  (*Id.*).

### c.    Staking

Since 2019, Coinbase has offered and sold a crypto-asset staking program (the "Staking Program") that allows customers to earn financial returns with respect to certain blockchain protocols.  (Compl. ¶ 7).  Through the Staking Program, participants' crypto-assets are transferred (without loss of ownership), pooled by Coinbase, and subsequently "staked" (or committed) by Coinbase in exchange for rewards, which Coinbase distributes *pro rata* to participants after deducting for itself a 25% or 35% commission.  (*Id.* ¶¶ 7, 310).

### 5.    Coinbase's Challenged Conduct

As alleged, the Coinbase Platform merges three functions that are typically separated in traditional securities markets — that of broker, exchange, and clearing agency.  (Compl. ¶ 1).  For the purposes of the instant motion, Coinbase does not dispute this characterization (with the exception of the Wallet application).

Specifically, the SEC claims that through the Coinbase Platform, as well as the Prime and Wallet applications, Coinbase operates as: (i) an unregistered broker, including by "soliciting potential investors, handling customer funds and assets, and charging transaction-based fees"; (ii) an unregistered exchange, including by "providing a market place that, among other things, brings together orders of multiple buyers and sellers of crypto assets and

12

matches and executes those orders"; and (iii) an unregistered clearing agency, including by "holding its customers' assets in Coinbase-controlled wallets and settling its customers' transactions by debiting and crediting the relevant accounts."  (Compl. ¶ 3).

In support of its claim that Coinbase acts like a traditional securities intermediary, the SEC alleges that Coinbase regularly solicits customers by advertising on its website and social media (Compl. ¶ 75); expends hundreds of millions of dollars each year on marketing and sales efforts to maintain and recruit new investors (*id.* ¶ 78); and facilitates trading in crypto-assets by assisting customers in opening and using trading accounts, handling customer funds and crypto-assets, and routing and handling customer orders (*id.* ¶ 75). According to the SEC, Coinbase also "holds and controls" customers' funds and crypto-assets,[6] provides services that enable customers to place various types of buy and sell orders that can execute immediately, settles customer trades, and charges fees for trades executed through its platform.  (*Id.* ¶¶ 83, 100, 101).

In addition, the Coinbase Platform displays promotional and market information relevant for trading crypto-assets, akin to traditional securities platforms.  (Compl. ¶ 87).  For example, the Coinbase "Trading Page" provides customers with the current and historical prices of each crypto-asset, the

---

[6]    Coinbase requires that customers seeking to buy, sell, or trade through the Coinbase Platform and Prime create an account on coinbase.com and transfer their crypto-assets or fiat currency to Coinbase.  (Compl. ¶ 83).  Once assets are transferred to Coinbase, Coinbase credits the customer account with the corresponding amounts in Coinbase's internal ledger.  (*Id.*).

traded volume for that asset over the preceding 24-hour period, and the circulating supply of the crypto-asset. (*Id.* ¶ 91). Coinbase customers can also access asset-specific pages from the "Explore" page on Coinbase's website. (*Id.* ¶ 121). The information on those pages is typically provided by the crypto-asset's promoter or developer, and includes, among other things: links to the persons who created and launched the token; links to any "whitepaper" for the token's original or ongoing sales; links to the website associated with the token and its developers; a compendium of public statements (including on social media) about the token by its developers or creators; information regarding popularity of the token; historical pricing information; and "detailed instructions" on "how to buy" the token via the Coinbase Platform. (*Id.*).

### 6. The 13 Crypto-Assets at Issue

The SEC alleges that Coinbase, through the Coinbase Platform, as well as the Prime and Wallet applications, made available for trading certain crypto-assets that are offered and sold as investment contracts, and thus as securities. (Compl. ¶¶ 102, 114). These include, but are not limited to, 13 crypto-assets with the trading symbols SOL, ADA, MATIC, FIL, SAND, AXS, CHZ, FLOW, ICP, NEAR, VGX, DASH, and NEXO (together, the "Crypto-Assets"). (*Id.* ¶ 114). With the exception of NEXO (which is available only via Wallet), all of the Crypto-Assets are available for purchase by any person who creates an account with Coinbase. (*Id.* ¶ 119).

The parties do not dispute that, to prevail on its claims, the SEC need only establish that at least one of these 13 Crypto-Assets is being offered and

sold as a security, and that Coinbase has intermediated transactions relating
therewith, such that transacting in that Crypto-Asset would amount to
operating an unregistered exchange, broker, or clearing agency.  (Compl.
¶ 125).  Therefore, by way of illustration, the Court focuses on the SEC's
factual allegations regarding two of the exemplar Crypto-Assets in this case:
SOL and CHZ.

### a.     SOL

"SOL" is a Crypto-Asset that is the native token of the Solana blockchain.
(Compl. ¶ 127).  The Solana blockchain was created by Solana Labs, Inc.
("Solana Labs"), a Delaware corporation founded in 2018 and headquartered in
San Francisco.  (*Id*.).  According to Solana's website, the Solana blockchain "is
a network upon which decentralized apps ('dApps') can be built, and is
comprised of a platform that aims to improve blockchain scalability and
achieve high transaction speeds by using a combination of consensus
mechanisms."  (*Id*.).

To raise capital, Solana Labs conducted a series of initial offerings of SOL
to institutional investors.  (Compl. ¶ 129).  Between May 2018 and early March
2020, initial investors were provided with "sale and issuances rights to receive
[SOL] tokens in the future via a Simple Agreement for Future Tokens (SAFTs)."
(*Id*.).  Through these offers and sales, Solana sold approximately 177 million
SOL, raising over $23 million.  (*Id*.).  Later in March 2020, Solana Labs
conducted additional SOL sales on the CoinList trading platform in a "Dutch
auction," wherein investors placed bids and the entire offering occurred at the

price with the highest number of bidders.  (*Id.* ¶ 130).  During this offering, Solana Labs sold approximately 8 million SOL at an average price of $0.22 per SOL, raising approximately $1.76 million.  (*Id.*).  In August 2021, Solana Labs completed another, purportedly private sale of SOL, raising over $314 million from investors, each of whom paid for SOL with fiat currency and was required to sign a purchase agreement.  (*Id.*).

Beginning in February 2020, Solana Labs took steps to make SOL available on the secondary market.  (Compl. ¶ 131).  To that end, on or about September 17, 2020, SOL became listed on FTX.US and Binance, two then-prominent U.S. exchanges, the fact of which listing Solana publicly announced in posts on its social media account.  (*Id.*).  In particular, in a September 17, 2020 Twitter post, Solana Labs stated: "The Solana community in the United States has been eagerly awaiting the chance to trade SOL on a U.S. exchange, and now that day has come.  SOL/USDT, SOL/USD, and SOL/BTC pairs are all open for trading on @ftx_us."  (*Id.*).  In another Twitter post later the same day, Solana Labs stated: "@BinanceUS announces Support for SOL, making it the Second US Exchange to list SOL within one day."  (*Id.*).  SOL has been available for buying, selling, and trading on the Coinbase Platform since approximately June 2021.  (*Id.* ¶ 132).

Since the initial offering of SOL, Solana Labs has stated publicly that it would pool proceeds from its private and public SOL sales to "fund the development, operations, and marketing efforts with respect to the Solana blockchain in order to attract more users to that blockchain."  (Compl. ¶ 134).

Solana Labs has publicized their promotional efforts to increase participation in its network — and thus demand for SOL — by, among other things, creating a Solana podcast that frequently features interviews with Solana management, a YouTube channel with over 37,000 subscribers, and numerous other promotional channels on platforms such as Twitter, Reddit, GitHub, Telegram, and Discord. (*Id.* ¶ 138).

Promotional statements made in these fora have noted Solana Labs' expertise in developing its blockchain. For example, a July 28, 2019 post on Solana Labs' Medium blog stated that the "Solana team — comprised of pioneering technologists from [several high-profile technology companies] — has focused on building the tech required for Solana to function with these groundbreaking performance standards." (Compl. ¶ 139).

Solana Labs allocated certain percentages of tokens in the initial offering to the company's founders, thereby suggesting that they, too, have a stake in SOL's success. (Compl. ¶ 135). As Solana Labs publicly stated, of the 500 million SOL tokens initially minted, 12.5% were allocated to Solana Labs' founders, and another 12.5% were allocated to the Solana Foundation, a non-profit organization "dedicated to the decentralization, growth, and security of the Solana network." (*Id.*). On April 8, 2020, Solana Labs transferred 167 million SOL tokens to the Solana Foundation, in an effort to further "expand[] and develop[] the ecosystem of the Solana protocol." (*Id.*).

Solana Labs has also emphasized that it exercises control over the supply of SOL by "burning" (or destroying) SOL tokens as part of a

17

"deflationary model" to reduce the total supply and thereby maintain a healthy SOL price. (Compl. ¶ 140). As explained on the Solana website, since the Solana network was launched, the "Total Current Supply" of SOL "has been reduced by the burning of transaction fees and a planned token reduction event." (*Id.*).

All of these inducements, the SEC argues, led SOL holders "reasonably to view SOL as an investment in and expect to profit from Solana Labs' efforts to grow the Solana protocol," which, in turn, would increase the demand for and the value of SOL. (Compl. ¶ 133).

### b.   CHZ

Another exemplar Crypto-Asset — "CHZ" (or Chiliz) — is a token on the Ethereum blockchain, advertised as the "native digital token for the Chiliz sports & entertainment ecosystem currently powering Socios.com," a sports fan engagement platform built on the Chiliz blockchain. (Compl. ¶ 213). The CHZ protocol is described by the Chiliz whitepaper as "a platform where fans get a direct Vote in their favorite sports organizations, connect and help fund new sports and e[-]sports entities." (*Id.*). The CHZ token purportedly allows "fans to acquire branded Fan Tokens from any team or organization partnered with the Socios.com platform and enact their voting rights as their fan influencers." (*Id.* ¶ 214). Examples of voting polls that allow holders of "Fan Tokens" (purchased with CHZ tokens) to influence team decisions with their vote include selecting player warm-up apparel and choosing team pennant designs. (*Id.*).

Similar to Solana Labs, in 2018, the Chiliz team engaged in capital raising events through initial private offerings of CHZ tokens, raising approximately $66 million in exchange for approximately 3 billion CHZ in "Chiliz's Token Generation Event." (Compl. ¶ 215). Since the initial offering, the Chiliz team has marketed its efforts to drive secondary trading of CHZ by offering the token on secondary exchanges, including the Coinbase Platform. (*Id.* ¶¶ 216, 228). For example, an earlier version of the Chiliz whitepaper highlighted "ongoing discussions" to offer CHZ on trading platforms across Asia, while the Chiliz website features a "Listing Content and Q&A" document reflecting a proposal to offer CHZ on the Binance DEX platform. (*Id.* ¶ 228).

Like Solana Labs, the Chiliz team stated publicly that it would pool proceeds from CHZ sales to fund the development, marketing, business operations, and growth of the Chiliz protocol and, consequently, to increase the demand for CHZ in connection with the protocol. (Compl. ¶ 220). For instance, the whitepaper explains that a "majority of funds will be passed on from the Issuer [Chiliz] to an affiliate to develop the Socios.com platform, secure partnerships & realize the platform's digital infrastructure." (*Id.*). The paper also states that "funds will be used to acquire new users for the Socios.com platform and grow engagement." (*Id.*).

The Chiliz team advertised its ability to grow its platform by partnering with more sports and e-sports teams, and, in turn, grow the value of CHZ. (Compl. ¶ 225). For example, the FAQ section located on the Chiliz website provided: "Demand for the Chiliz token will increase as more e[-]sports teams,

19

leagues[,] and game titles are added to the platform, and as more fans want voting rights." (*Id.* ¶ 226).

The Chiliz team also touted its technical and entrepreneurial expertise in developing blockchain. The Chiliz website has introduced the Chiliz team, which operates both the Chiliz protocol and Socios.com, as "comprised of nearly 350+ cross-industry professionals across 27 different nationalities and is constantly growing." (Compl. ¶ 218). The whitepaper and other public statements by Chiliz also have identified several members of the Chiliz leadership teams and their past entrepreneurial and technology experiences and successes. (*Id.* ¶ 219).

Further, the Chiliz team marketed that certain percentages of CHZ tokens would be held by the company's management. 5% and 3% of the total CHZ tokens distributed were allocated to the Chiliz team and an advisory board, respectively — the two groups responsible for the creation and development of the network. (Compl. ¶ 221). Finally, like Solana Labs, the Chiliz team also has told investors that it engages in "burning" CHZ tokens to reduce their total supply as a mechanism to support the price of CHZ. (*Id.* ¶ 229).

As with SOL, the SEC alleges that these representations led CHZ holders reasonably to view CHZ as an investment and to expect profits from the team's technical and managerial efforts to develop, expand, and grow the platform, which, in turn, would increase the demand for and value of CHZ. (Compl. ¶ 217).

## B.    Procedural Background

The SEC initiated the instant action by filing a complaint on June 6, 2023.  (Dkt. #1).  Defendants responded to the complaint by filing an answer on June 28, 2023 (Dkt. #22), and, that same day, filing a pre-motion letter seeking leave to file a motion for judgment on the pleadings (Dkt. #23).  The SEC filed a letter in opposition to Defendants' pre-motion letter and announced its intent to move to strike several of Coinbase's affirmative defenses on July 7, 2023.  (Dkt. #26).  On July 12, 2023, Defendants filed a letter in opposition to the SEC's pre-motion letter.  (Dkt. #27).  On July 13, 2023, the Court held a pre-motion conference, at which the parties discussed Defendants' anticipated motion for judgment on the pleadings and the SEC's anticipated motion to strike Defendants' affirmative defenses.  (*See* July 13, 2023 Minute Entry; Dkt. #30 (transcript)).  Following the conference, the parties submitted a joint letter proposing a briefing schedule for the motion for judgment on the pleadings.  (Dkt. #33).  In the letter, the SEC also informed the Court that it would not be filing a motion to strike.  (*Id.*).  The Court subsequently endorsed the parties' briefing schedule.  (Dkt. #34).

In accordance with the briefing schedule, on August 4, 2023, Defendants filed the instant motion for judgment on the pleadings and supporting papers.  (Dkt. #35-37).  On October 3, 2023, the SEC filed its opposition papers.  (Dkt. #69-70).  On October 24, 2023, Defendants filed their reply memorandum in further support of their motion.  (Dkt. #83).  In addition, several *amicus curiae* briefs were filed in support of both parties.  (Dkt. #48, 50, 53, 55, 59, 60, 75-1,

77, 78-1).  After full briefing, the Court, on January 17, 2024, heard oral

argument on the motion.  (*See* January 17, 2024 Minute Entry; Dkt. #101

(transcript)).

## DISCUSSION

**A.    Applicable Law**

**1.    Motions for Judgment on the Pleadings Under Federal Rule of Civil Procedure 12(c)**

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings

are closed — but early enough not to delay trial — a party may move for

judgment on the pleadings."  Fed. R. Civ. P. 12(c).  Judgment on the pleadings,

pursuant to Rule 12(c) is appropriate where material facts are undisputed and

a judgment on the merits is possible merely by considering the contents of the

pleadings.  *Sellers* v. *M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988);

*Allstate Ins. Co.* v. *Vitality Physicians Grp. Prac. P.C.*, 537 F. Supp. 3d 533, 545

(S.D.N.Y. 2021).

"The standard for granting a Rule 12(c) motion for judgment on the

pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to

state a claim."  *Lively* v. *WARFA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d

Cir. 2021) (quoting *Lynch* v. *City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020)).  When

considering either a Rule 12(b) or a Rule 12(c) motion, a court must "draw all

reasonable inferences in [the non-movant's] favor, assume all well-pleaded

factual allegations to be true, and determine whether they plausibly give rise to

an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir.

2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway*

*Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see generally Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544, 570 (2007). A plaintiff is entitled to relief if she alleges "enough
facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S.
at 570; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007)
("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does
require enough facts to nudge [plaintiff's] claims across the line from
conceivable to plausible." (internal quotation marks omitted)).

"On a [Rule] 12(c) motion, the court considers the complaint, the answer,
any written documents attached to them, and any matter of which the court
can take judicial notice for the factual background of the case." *L-7 Designs,
Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation
marks and citation omitted); *see also Lively*, 6 F.4th at 305 (explaining that a
court "should remain within the non-movant's pleading when deciding" Rule
12(c) motions). A complaint is "deemed to include any written instrument
attached to it as an exhibit, materials incorporated in it by reference, and
documents that, although not incorporated by reference, are 'integral' to the
complaint." *L-7 Designs, Inc.*, 647 F.3d at 422 (citation omitted).[7]

---

[7] The parties disagree over the Court's ability to consider certain materials in the record
in resolving the instant motion, including the opening 33 pages of Coinbase's Answer
and the Coinbase "User Agreement." On a motion for judgment on the pleadings, a
court may consider "all documents that qualify as part of nonmovant's pleading,
including [i] the complaint or answer, [ii] documents attached to the pleading,
[iii] documents incorporated by reference in or integral to the pleading, and [iv] matters
of which the court may take judicial notice." *Lively* v. *WARFA Inv. Advisory Grp., Inc.*, 6
F.4th 293, 306 (2d Cir. 2021) (emphasis omitted). With particular respect to the
Answer, the parties appear to agree that the Court may take judicial notice of the public
statements made by the SEC, legislative proposals to regulate cryptocurrency, and the
SEC filings in other cases. (*See generally* Jan. 17, 2024 Tr.). Additionally, the Court
may consider the Coinbase "User Agreement," which is incorporated by reference in the
Complaint. (*See, e.g.*, Compl. ¶¶ 84-86, 89, 343, 349-350).

### 2. Relevant Securities Laws and Regulations

In its Complaint, the SEC asserts five distinct claims against Coinbase for violation of the federal securities laws. The first three broadly allege that Coinbase operated as (i) a national securities exchange; (ii) a broker; and (iii) a clearing agency, all without first registering its operations with the Commission pursuant to the relevant securities laws. Next, the SEC seeks to hold CGI liable as a "control person" under Section 20(a) of the Exchange Act for Coinbase's violations of the securities laws. Finally, the SEC claims that Coinbase violated Sections 5(a) and 5(c) of the Securities Act by engaging in the unregistered offer and sale of securities in connection with its Staking Program.

As the parties acknowledge, the SEC's ability to prevail on any of its claims depends in large part on the threshold question of whether any of the transactions involving Crypto-Assets qualifies as a "security" under the meaning of the Securities Act. For clarity, therefore, the Court details the applicable law governing the interpretation of the term "security" under the Act, followed by the applicable law for each of the five claims.

### a. *Howey* and the Definition of "Securities" Under the Securities Act

As a general matter, the Securities Act purports to regulate a wide variety of financial instruments that are termed "securities." *See Howey*, 328 U.S. at 297 (noting that "Section 2(1) of the Act defines the term 'security' to include [both] the commonly known documents traded for speculation or investment … [and] 'securities' of a more variable character'"). This statutory definition includes instruments known as "investment contracts"; the definition of

24

"investment contracts," in turn, is at the heart of the instant dispute.
15 U.S.C. § 77b(a)(1).

The Supreme Court, in the seminal case of *SEC* v. *W.J. Howey Co.*,
interpreted the term "investment contract" to include transactions "involv[ing]
an investment of money in a common enterprise with profits to come solely
from the efforts of others." 328 U.S. at 301. Bound by that decision, courts in
the Second Circuit and elsewhere apply the three-element *Howey* test, under
which an investment contract arises out of "(i) an investment of money (ii) in a
common enterprise (iii) with profits to be derived solely from the efforts of
others." *Revak* v. *SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994); *see also SEC*
v. *Terraform Labs Pte. Ltd.*, — F. Supp. 3d —, No. 23 Civ. 1346 (JSR), 2023 WL
8944860, at *13 (S.D.N.Y. Dec. 28, 2023) ("*Terraform II*") ("*Howey*'s definition of
'investment contract' was and remains a binding statement of the law, not
dicta. And even if, in some conceivable reality, the Supreme Court intended
the definition to be dicta, that is of no moment because the Second Circuit has
likewise adopted the *Howey* test as the law." (citing, *e.g.*, *Revak*, 18 F.3d at
87)).

### b. Registration Requirements for National Securities Exchanges Pursuant to Section 5 of the Exchange Act

In Count I, the SEC alleges that Coinbase operates as a national
securities exchange without registering with the SEC pursuant to Section 6 of
the Exchange Act, 15 U.S.C. § 78f, in violation of Section 5 of the Exchange
Act, *id.* § 78e. Under Section 5, it is unlawful for any "exchange" to make use
of any means of interstate commerce "to effect any transactions in a security"

without registering as an exchange with the SEC. *Id.* § 78e. Section 3(a) of the Exchange Act defines "exchange" as

> any organization, association, or group of persons ... which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange.

*Id.* § 78c(a)(1). An organization shall be considered to constitute, maintain, or provide "a market place or facilities for bringing together purchasers and sellers of securities" if it "[i] [b]rings together the orders for securities of multiple buyers and sellers; and [ii] [u]ses established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of a trade." *Intercontinental Exch., Inc.* v. *SEC*, 23 F.4th 1013, 1026-27 (D.C. Cir. 2022) (citing 17 C.F.R. § 240.3b-16(a)(1)-(2)).

### c. Registration Requirements for Securities Brokers Pursuant to Section 15(a) of the Exchange Act

In Count II, the SEC contends that Coinbase brokered securities without registering as a broker in violation of Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a). Under Section 15(a), it is unlawful for any "broker or dealer" to make use of any means of interstate commerce "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" without registering as a broker with the Commission. *Id.* § 78o(a)(1). The Exchange Act broadly defines "broker" as one who "engage[s] in the business of effecting transactions in securities for the account of others." *Id.* § 78c(a)(4)(A). In

determining whether a particular entity falls within this definition, courts

consider whether the entity may be "characterized by 'a certain regularity of

participation in securities transactions at key points in the chain of

distribution.'" *SEC* v. *Hansen*, No. 83 Civ. 3692 (LPG), 1984 WL 2413, at *10

(S.D.N.Y. Apr. 6, 1984) (quoting *Mass. Fin. Services, Inc.* v. *Sec. Inv. Prot. Corp.*,

411 F. Supp. 411, 415 (D. Mass.), *aff'd*, 545 F.2d 754 (1st Cir. 1976)); *see also*

*SEC* v. *Margolin*, No. 92 Civ. 6307 (PKL), 1992 WL 279735, at *5 (S.D.N.Y. Sept.

30, 1992) (finding that "brokerage" conduct may include receiving transaction-

based income, advertising for clients, and possessing client funds and

securities).  The SEC need not prove the broker's scienter to establish a

violation of Section 15(a).  *SEC* v. *Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y.

2003).

### d. Registration Requirements for Clearing Agencies Pursuant to Section 17A(b) of the Exchange Act

In Count III, the SEC asserts that Coinbase performs the functions of a

clearing agency with respect to securities without registering in accordance

with Section 17A(b), 15 U.S.C. § 78q-1(b).  Section 17A(b) of the Exchange Act

makes it unlawful to perform the functions of a clearing agency with respect to

any security (other than an exempted security) without being registered as

such by the SEC.  *Id.*  The Exchange Act generally defines the term "clearing

agency" as "any person who acts as an intermediary in making payments or

deliveries or both in connection with transactions in securities or who provides

facilities for comparison of data respecting the terms of settlement of securities

transactions[.]"  *Id.* § 78c(a)(23)(A).

27

### e. Control Person Liability Pursuant to Section 20(a) of the Exchange Act

In Count IV, the SEC argues that CGI is liable as a "control person" of Coinbase under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for Coinbase's violations of Sections 5, 15(a), and 17A(b). Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its implementing regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." *Id.* § 78t(a). A claim under Section 20(a) is thus predicated on the existence of an underlying securities violation. Indeed, to establish control-person liability, a plaintiff must show [i] "a primary violation by the controlled person"; [ii] "control of the primary violator by the defendant"; and [iii] that the controlling person "was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007); *see also Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).

### f. Registration Requirements for the Sale of Securities Pursuant to Section 5 of the Securities Act

In Count V, the SEC asserts that Coinbase itself offered and sold securities without a registration statement, in violation of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a) and (c), through its Staking Program. Sections 5(a) and 5(c) of the Securities Act prohibit any person from selling unregistered securities using any means of interstate commerce unless the

securities are exempt from registration. *Id.* § 77e(a), (c).  To prove a violation of Section 5, the plaintiff must show that "[i] no registration statement was in effect for the securities at issue; [ii] the defendant sold or offered the securities; and [iii] interstate transportation, communication, or the mails were used in connection with the offer or sale." *SEC* v. *Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020).  If the plaintiff meets this *prima facie* burden, the burden shifts to the defendant to show that an exception applies.  *Id.*  Section 5 is a strict liability statute that does not require a showing of scienter or negligence. *See SEC* v. *Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014).

**B.  Analysis**

**1.  Overview**

The central question before the Court is whether Coinbase intermediated transactions involving investment contracts, and thus securities.  With the exception of the Wallet application, discussed further *infra*, Coinbase does not dispute that it carried out the functions of an exchange, broker, and clearing agency with respect to transactions in the Crypto-Assets, and that it is not registered with the SEC in these capacities.  (Answer 33-24).  Thus, as a practical matter, resolution of this motion hinges on whether any of the transactions involving the 13 exemplar tokens qualifies as an investment contract.

To answer this question, it is important to demarcate the parties' dispute.  As a preliminary matter, the SEC does not appear to contest that tokens, in and of themselves, are not securities.  (*See generally* Jan. 17, 2024

29

Tr.).  The appropriate question, therefore, is whether transactions in which a particular token is implicated qualify as investment contracts.  *See SEC* v. *Terraform Labs Pte. Ltd.*, — F. Supp. 3d —, No. 23 Civ. 1346 (JSR), 2023 WL 4858299, at *11 (S.D.N.Y. July 31, 2023) ("*Terraform I*") ("A product that at one time is not a security may, as circumstances change, become an investment contract that is subject to SEC regulation." (citing *SEC* v. *Edwards*, 540 U.S. 389, 390 (2004))).  The SEC also does not dispute that blind bid/ask transactions carried out on the Coinbase Platform and through Prime — the only type of transaction implicated in this case — "involve no continuing promises from the issuer or developer to the token holder, impose no post-sale obligations on the issuer or developer, and involve no profit-sharing between the issuer or developer and the holders."  (Jan. 17, 2024 Tr. 52:20-53:17).  Rather, the SEC argues that the absence of post-sale obligations is not dispositive as to the existence of an investment contract, and should not foreclose the securities laws from applying in circumstances where token holders reasonably expect the value of their asset to increase based on the issuer's broadly-disseminated plan to develop and maintain the asset's ecosystem.

Coinbase has also made concessions in its position, at least for purposes of the instant motion.  Coinbase does not dispute, for example, that the Court should deny its motion if it finds that a transaction involving at least one of the 13 Crypto-Assets qualifies as a security.  Moreover, Coinbase accepts the SEC's pleadings that at least some Coinbase customers purchased or traded tokens

30

on the Coinbase Platform and through Prime hoping that they would appreciate in value (Jan. 17, 2024 Tr. 81:5-9), and, further, that some of these customers bought tokens with knowledge of the statements of intent of the token's issuer to promote and develop their respective token's ecosystem (*id.* at 83:7-12).

That said, Coinbase sharply parts ways with the SEC on the question of whether secondary market transactions can constitute investment contracts. (Jan. 17, 2024 Tr. 83:19-84:7). Because an issuer owes no contractual obligation to a retail buyer on the Coinbase Platform or through Prime, Coinbase argues that these transactions in the Crypto-Assets do not constitute "investment contracts," and are therefore not "securities," such that Coinbase's conduct does not fall within the ambit of the securities laws. (*See, e.g.*, Def. Br. 6-7 ("Decades of precedent confirm that for an investment to constitute an investment contract, the buyer must have a contractually-grounded expectation of delivery of future value.")).

### 2. The SEC Is Not Barred from Asserting That Coinbase Intermediated Transactions in Securities

Before reaching the merits of Coinbase's arguments, the parties press the Court to consider the question of whether one or more of the "Major Questions Doctrine," the Due Process Clause, and the Administrative Procedure Act (the "APA") prevent the SEC from that alleging the Crypto-Assets transacted on Coinbase are "investment contracts." The Court considers each argument in turn.

### a. The SEC's Enforcement Action Does Not Implicate the Major Questions Doctrine

While it has evolved over the years, the major questions doctrine proceeds from the premise that Congress does not delegate extraordinary powers that transform an agency's authority without speaking clearly. *See West Virginia* v. *EPA*, 597 U.S. 697, 716 (2022). As such, the major questions doctrine requires that an agency point to "clear congressional authorization" in the "extraordinary" case where it claims the "power to regulate a significant portion of the American economy" that has "vast economic and political significance." *Util. Air. Regul. Grp.* v. *EPA*, 573 U.S. 302, 324 (2014) (citations omitted). In *West Virginia*, the Supreme Court rooted the major questions doctrine in "both separation of powers principles and a practical understanding of legislative intent." 597 U.S. at 700. It is premised on the notion that "one branch of government" should not "arrogat[e] to itself power belonging to another," *Biden* v. *Nebraska*, 600 U.S. —, 143 S. Ct. 2375, 2373 (2023), and the "presum[ption] that Congress intends to make major policy decisions itself," *West Virginia*, 597 U.S. at 723 (alteration adopted).

That said, the doctrine is reserved for the most "extraordinary cases," and is therefore rarely invoked. *West Virginia*, 597 U.S. at 721 (stating that the major questions doctrine applies only in "extraordinary cases … in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of the assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority"). Indeed, in the nearly twenty-five years since its recognition in *FDA* v. *Brown &*

*Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000), the doctrine has rarely been successfully invoked.

With this standard in mind, the Court finds that the instant enforcement action does not implicate the major questions doctrine. *First*, while certainly sizable and important, the cryptocurrency industry "falls far short of being a 'portion of the American economy' bearing 'vast economic and political significance.'" *Terraform I*, 2023 WL 4858299, at *8 (citing *Util. Air Regul. Grp.*, 573 U.S. at 324). Simply put, the cryptocurrency industry cannot compare with those other industries the Supreme Court has found to trigger the major questions doctrine. *See, e.g.*, *West Virginia*, 597 U.S. at 724 (finding Clean Power Plan to be major because it would empower the EPA to "substantially restructure the American energy market"); *Nebraska*, 143 S. Ct. at 2375 (finding student loan forgiveness program to be major where it aimed to forgive approximately $430 billion in debt). Indeed, the securities industries over which Congress has expressly given the SEC enforcement authority are even broader than the markets for cryptocurrencies, and implicate larger portions of the American economy.

Perhaps more importantly, the SEC is asserting neither a "transformative expansion in its regulatory authority," nor a "highly consequential power beyond what Congress could reasonably be understood to have granted" it. *West Virginia*, 597 U.S. at 724 (alteration adopted). To the contrary, in filing this action, the SEC is exercising its Congressionally bestowed enforcement authority to regulate "virtually any instrument that might be sold as an

33

investment," "in whatever form they are made and by whatever name they are

called," including "[n]ovel, uncommon, or irregular devices" like the crypto-

assets at issue here. *Edwards*, 540 U.S. at 393; *SEC* v. *C.M. Joiner Leasing*

*Corp.*, 320 U.S. 344, 351 (1943); *see also Terraform I*, 2023 WL 4858299, at *9

("[T]here is no indication that Congress intended to hamstring the SEC's ability

to resolve new and difficult questions posed by emerging technologies where

these technologies impact markets that on their face appear to resemble

securities markets.").

 The very concept of enforcement actions evidences the Commission's

ability to develop the law by accretion. The SEC has a long history of

proceeding through such actions to regulate emerging technologies and

associated financial instruments within the ambit of its authority as defined by

cases like *Howey* — a test that has existed for nearly eight decades. *See, e.g.*,

*SEC* v. *SG Ltd.*, 265 F.3d 42, 44 (1st Cir. 2001) (applying federal securities laws

to "virtual shares in an enterprise existing only in cyberspace"). Using

enforcement actions to address crypto-assets is simply the latest chapter in a

long history of giving meaning to the securities laws through iterative

application to new situations. More to the point, a finding that transactions

involving certain crypto-assets qualify as investment contracts would merely

result in those sales having to comply with longstanding securities laws.

Accordingly, the Court declines in this instance to permit the major questions

doctrine to displace or otherwise limit SEC enforcement actions under *Howey*.

*See Terraform I*, 2023 WL 4858299, at *9 ("Defendants cannot wield a doctrine

intended to be applied in exceptional circumstances as a tool to disrupt the routine work that Congress expected the SEC … to perform."); *cf. FTC* v. *Kochava Inc.*, No. 22 Civ. 377 (BLW), 2023 WL 3249809, at *13 (D. Idaho May 4, 2023) (concluding that the major questions doctrine was inapplicable to bar an FTC enforcement action because the FTC "is merely asking a court to interpret and apply a statute enacted by Congress").

Nor does Congressional consideration of new legislation implicating cryptocurrency, on its own, alter the SEC's mandate to enforce existing law, notwithstanding Defendants' arguments to the contrary. (Def. Br. 23). As the Supreme Court recently remarked in *Slack Technologies, LLC* v. *Pirani*, although "Congress remains free to revise the securities laws at any time … [the judiciary's] only function lies in discerning and applying the law as we find it." 598 U.S. 759, 770 (2023). Until the law changes, the SEC must enforce, and the judiciary must interpret, the law as it is.

### b. The SEC Has Not Violated Defendants' Rights Under the Due Process Cause and the APA

Next, Defendants argue that the SEC violated their due process rights by bringing this enforcement action without first providing "fair notice" that crypto-assets traded on the Coinbase Platform and through Prime would be treated as securities. (Answer ¶¶ 18, 71, 76). This line of argument evokes the Due Process Clause, under which agencies bringing an enforcement action must provide "fair notice" of what conduct is required or proscribed. *FCC* v. *Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012) (ruling that the Due Process Clause requires that agencies bringing an enforcement action

"provide … a person of ordinary intelligence fair notice" that the regulated conduct was "prohibited").  Here, Defendants argue that the SEC's enforcement action marks a dramatic shift in position regarding its authority to regulate secondary crypto-markets.

In support of their argument, Defendants make much hay out of a position taken by SEC Chair Gary Gensler in his May 2021 Congressional testimony, in which he suggested that "only Congress" could address any gap in the SEC's ability to regulate crypto-exchanges.  (Def. Br. 4-5).  Yet an examination of the broader timeline of the SEC's positions regarding crypto-assets reveals that the SEC provided Coinbase (and similarly situated actors) fair notice — through written guidance, litigation, and other actions — that the sale or offering of certain crypto-assets could prompt an enforcement action by the SEC.

In July 2017, the SEC issued *The Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: the DAO* (the "DAO Report"), cautioning "those who would use … distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws."  (Compl. ¶ 60).[8]  In April 2019, the SEC published additional guidelines that admonished those

---

[8]     The DAO Report also advised that "any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate pursuant to an exemption," even "with respect to products and platforms involving emerging technologies and new investor interfaces."  (Compl. ¶ 61).  The DAO Report further found that the trading platforms at issue "provided users with an electronic system that matched orders from multiple parties to buy and sell [the crypto asset securities at issue] for execution based on non-discretionary methods," and therefore "appear to have satisfied the criteria" for being an exchange under the Exchange Act.  (*Id.*).

"engaging in the offer, sale, or distribution of a digital asset" to consider "whether the digital asset is a security" that would trigger the application of "federal securities laws." SEC, *Framework for "Investment Contract" Analysis of Digital Assets* (April 2019). Within this document, the SEC also provided (i) "a framework for analyzing whether a digital asset is an investment contract," and (ii) a list of characteristics that, if present in a given digital asset, would make the SEC more likely to view the asset as a "security." *Id.* In doing so, the SEC signaled its view that whether an offer and sale of crypto-assets was in fact an offer and sale of securities was dependent on individualized facts and circumstances.

Aware of this guidance, Defendants conducted risk assessments that acknowledged the potential application of the federal securities laws to Coinbase's products and services. (Answer ¶ 55). Indeed, Defendants admit that — in accordance with SEC guidance — they "established a systematic analytical process for reviewing crypto assets" specifically to determine which "could be deemed 'securities' under the SEC's definition." (*Id.*).

As detailed in the Complaint, Coinbase repeatedly touted to the investing public its familiarity with the relevant legal standards governing the offer and sale of securities, as well as its awareness of the risk it would create if it facilitated transactions in crypto-assets that were found to be securities. For example, in or around December 2016, Coinbase released on its website a document entitled, "A Securities Law Framework for Blockchain Tokens." (Compl. ¶ 103). This document included a section on "How to determine if a

token is a security," and explained: "The US Supreme Court case of *SEC* v[.] *Howey* established the test for whether an arrangement involves an investment contract." In that section, Coinbase acknowledged that, "[f]or many blockchain tokens, the first two elements of the *Howey* test" — *i.e.*, investment of money and common enterprise — "are likely to be met." (*Id.*).

In 2018, Coinbase also publicly released the "Coinbase Crypto Asset Framework," which included a listing application form for issuers and promoters seeking to make their tokens available on the Coinbase Platform. (Compl. ¶ 104). Among other information, the application requested that issuers provide information relevant to a *Howey* analysis of the respective token, such as "any statements … made about the token/network noting the potential to realize returns, profits or other financial gain." (*Id.* ¶ 105).

In 2019, Coinbase and other crypto-asset businesses founded the Crypto Rating Council (the "CRC"). (Compl. ¶ 106). The CRC subsequently released a framework for analyzing crypto-assets that "distilled a set of yes or no questions which are designed to plainly address each of the four *Howey* test factors" and provide conclusions regarding whether an asset has characteristics strongly consistent with treatment as a security. (*Id.*). Coinbase itself used and relied on the CRC framework to assess whether certain crypto-assets had the characteristics of securities under *Howey*. (*Id.* ¶ 108). While Coinbase may have come to a different conclusion than the SEC, it can hardly claim to have lacked notice that (i) the legal framework potentially applied and (ii) the SEC could bring an action under it. Accordingly, the SEC

38

has satisfied its obligations under the Due Process Clause.  *See United States* v.
*Zaslavskiy*, No. 17 Cr. 647 (RJD), 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11,
2018) ("[T]he abundance of caselaw interpreting and applying *Howey* at all
levels of the judiciary, as well as related guidance issued by the SEC as to the
scope of its regulatory authority and enforcement power, provide all the notice
that is constitutionally required."); *see also SEC* v. *Kik Interactive Inc.*, 492 F.
Supp. 3d 169, 183 (S.D.N.Y. 2020) ("[T]he law regarding the definition of
investment contract gives a reasonable opportunity to understand what
conduct and devices it covers.").

It follows from the foregoing that the APA also does not foreclose the SEC
from bringing this enforcement action.  While it may be true that in cases
where an agency purports to promulgate *new* regulatory authority, notice-and-
comment rulemaking may offer a "better, fairer, and more effective" method of
implementing agency policy than punitive enforcement actions, such is not the
case here.  *Cmty. Television of S. California* v. *Gottfried*, 459 U.S. 498, 511
(1983).  Here, the SEC is not announcing a new regulatory policy, but rather is
simply engaging in a fact-intensive application of an existing standard — an
application that Coinbase also conducted — to determine whether certain
transactions involving crypto-assets meet the characteristics of an "investment
contract."[9]

---

[9]     The Court acknowledges Coinbase's representations that it has sought to comply with
the applicable laws and regulations and to work cooperatively with the SEC, including
by engaging the SEC, on multiple occasions, to discuss the applicability of the
securities laws to its business.  (Answer ¶ 11).  While commendable, such conduct does
not foreclose the SEC from bringing this enforcement action.

### 3. The SEC Plausibly Alleges That at Least Some Crypto-Asset Transactions on Coinbase's Platform and Through Prime Constitute Investment Contracts

Having determined that the SEC's action is not barred by the above-described threshold considerations, the Court now turns to the merits of the parties' arguments. In particular, the Court contends with Defendants' position that judgment on the pleadings is appropriate because none of the transactions in the Crypto-Assets identified by the SEC could qualify as an "investment contract," and thus as a "security" implicating the Securities Act and the Exchange Act.

As laid out above, the Securities Act sets out an expansive definition of the term "security" that includes, as relevant here, the undefined term "investment contract." *See* 15 U.S.C. § 77b(a)(1) (stating that "the term 'security' means any ... investment contract"); *see also United Housing Found., Inc.* v. *Forman*, 421 U.S. 837, 847-48 (1975) ("[Congress] sought to define the term 'security' in sufficiently broad and general terms so as to include ... the many types of instruments that in our commercial world fall within the ordinary concept of a security." (internal quotation marks omitted)); *Edwards*, 540 U.S. at 393 ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." (citation omitted)). And as previously noted, *Howey* and subsequent precedent interpret the meaning of "investment contract" to implicate "a contract, transaction[,] or scheme whereby a person [i] invests his money [ii] in a common enterprise and [ii] is led to expect profits solely from the

efforts of the promoter or a third party."  328 U.S. at 298-99; *see also Edwards*, 540 U.S. at 393.

Importantly, the Supreme Court has made it clear that, in analyzing whether a contract, transaction, or scheme is an investment contract, "form should be disregarded for substance and the emphasis should be on [the] economic reality" of the parties' arrangement.  *Tcherepnin* v. *Knight*, 389 U.S. 332, 336 (1967); *see also Forman*, 421 U.S. at 849 (stating "Congress intended the application of [the securities laws] to turn on the economic realities underlying a transaction, and not on the name appended thereto").  Further, in assessing economic realities, courts look at the "totality of the circumstances" surrounding the offer of an investment contract, *Glen-Arden Commodities, Inc.* v. *Constantino*, 493 F.2d 1027, 1034 (2d Cir. 1974), including the "intentions and expectations of the parties at that time," *SEC* v. *Aqua-Sonic Prod. Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981), *aff'd*, 687 F.2d 577 (2d Cir. 1982).  *See also Marine Bank* v. *Weaver*, 455 U.S. 551, 560 n.11 (1982) (stating that a given transaction needs to be "evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole").

Thus, the definition of an investment contract "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profit."  *Howey*, 328 U.S. at 299.  Indeed, *Howey* and its progeny have held a wide range of intangible and tangible assets to be

securities.  *See, e.g.*, *Edwards*, 540 U.S. 389 (payphones); *SEC* v. *Scoville*, 913
F.3d 1204 (10th Cir. 2019) (bundled internet advertising services); *Eberhardt* v.
*Waters*, 901 F.2d 1578 (11th Cir. 1990) (cattle embryos); *Glen-Arden*, 493 F.2d
1027 (whiskey casks); *SEC* v. *Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y.
2020) (digital tokens).  This makes sense, given that the *Howey* standard was
intended to effectuate "[t]he statutory policy of affording broad protection to
investors."  328 U.S. at 301.

### a.    Recent Crypto Cases in This Circuit

Of note, both the SEC and private litigants have brought several
successful actions in this Circuit predicated on crypto-assets falling within the
*Howey* definition of an "investment contract."  *See, e.g.*, *Zaslavskiy*, 2018 WL
4346339, at *1 (securities fraud prosecution of crypto-asset investment
schemes and ICOs); *Balestra* v. *ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y.
2019) (class action involving digital token offerings); *Kik Interactive*, 492 F.
Supp. 3d 169 (enforcement action regarding the sale of crypto-assets); *Williams*
v. *Binance*, — F.4th —, No. 22-972, 2024 WL 995568, at *1 (2d Cir. Mar. 8,
2024) (class action seeking recission of transactions in seven crypto-assets
facilitated through Binance).

In *SEC* v. *Telegram Group Inc.*, the SEC sought to enjoin the defendants
from engaging in a plan to distribute 2.9 billion "Grams," a crypto-asset, to 175
purchasers in exchange for $1.7 billion, in what the Commission considered to
be an unregistered offering of securities.  448 F. Supp. 3d at 358.  The
defendants there argued that only the agreements with the individual

purchasers were securities, but that the anticipated resales of Grams by the 175 purchasers into the secondary market were "wholly-unrelated transactions" and not offerings of securities.  *Id.*  Judge Castel disagreed, finding that, although the resale of Grams on the public market was not pursuant to any written contract, it amounted to "the distribution of securities."  *Id.* at 381.

In reaching this holding, the *Telegram* court found that the initial offering of Grams to the 175 purchasers was "part of a larger scheme to distribute those Grams into a secondary public market, which would be supported by Telegram's ongoing efforts."  448 F. Supp. 3d at 358.  Specifically, the *Telegram* court found that Telegram entered into agreements and understandings with the initial purchasers who provided upfront capital "in exchange for the future delivery of a discounted asset, Grams, which … would be resold in a public market with the expectation that the Initial Purchasers would earn a profit." *Id.* at 367.  As such, a reasonable initial purchaser of Grams understood and expected that she would earn a profit, so long as "the reputation, skill, and involvement of Telegram and its founders remain[ed] behind the enterprise, including through the sale of Grams from the [i]nitial [p]urchasers into the public market."  *Id.*  Taken together, the court found that the initial purchasers and the anticipated resale of the Grams constituted a "single scheme" under *Howey*, and therefore that the contemplated transaction was a security within the scope of the federal securities laws.  *Id.*

43

More recently, in *SEC* v. *Terraform Labs Pte. Ltd.*, the SEC brought an action against a crypto-asset issuer and its founder for orchestrating a multi-billion-dollar fraud in the sale of cryptocurrencies.  *See* 2023 WL 4858299.  There, Judge Rakoff held that the SEC alleged facts sufficient to claim that the defendants' products qualified as "investment contracts" under the three-pronged *Howey* test.  In so concluding, the *Terraform* court looked to "readouts of investor meetings, excerpts of investor materials, and screenshots of social media posts made by … Terraform executives," and concluded from those materials that the defendants' representations led token holders to reasonably believe that they would profit from their purchases.  *Id.* at *14.  The *Terraform* court also found that the SEC demonstrated the existence of a common enterprise through allegations of "horizontal commonality," under which arrangement the defendants used proceeds from coin sales to further develop the tokens' broader "ecosystem," representing that these improvements would increase the value of the tokens themselves.  *Id.* at *2, 12.

Pertinent to the arguments raised in this case, the *Terraform* court further found that, contrary to the defendants' assertions, the "supposed absence of an enforceable written contract" did *not* "preclude" the SEC from asserting that the defendants' crypto-assets were investment contracts.  2023 WL 4858299, at *11.  "By stating that 'transaction[s]' and 'scheme[s]' — and not just 'contract[s]' — qualify as investment contracts," Judge Rakoff wrote, "the Supreme Court made clear in *Howey* that Congress did not intend the

term to apply only where transacting parties had drawn up a technically valid written or oral contract under state law." *Id.* (internal citations omitted).

In concluding its *Howey* analysis, the *Terraform* court declined to draw a distinction between token offerings based on their manner of sale — expressly rejecting the approach adopted in *SEC* v. *Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT), 2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023). 2023 WL 4858299, at *15. Specifically, the *Terraform* court found that, as part of their campaign, the defendants had stated that proceeds from purchases of all crypto-assets — no matter where the coins were purchased — would be fed back into the Terraform blockchain to generate additional profits for *all* crypto-asset holders. *Id.* "These representations," Judge Rakoff wrote, "would presumably have reached individuals who purchased their crypto-assets on secondary markets — and, indeed, motivated those purchases — as much as it did institutional investors." *Id.* As such, retail purchasers had "every bit as good a reason to believe that the defendants would take their capital contributions and use it to generate profits on their behalf." *Id.*

Several teachings can be gleaned from these thoughtful decisions. To begin, there need not be a formal contract between transacting parties for an investment contract to exist under *Howey*. Indeed, courts in this Circuit have consistently declined invitations by defendants in the cryptocurrency industry to insert a "contractually-grounded" requirement into the *Howey* analysis. *See Terraform I*, 2023 WL 4858299, at *11 (declining to adopt defendants' assertion that "an enforceable written contract" was required for an investment contract

45

to exist); *see also Kik Interactive*, 492 F. Supp. 3d at 169, 178 (rejecting
defendant's "ongoing contractual obligation" requirement, observing that
"contractual language is important to, but not dispositive of, the common
enterprise inquiry, and courts regularly consider representations and behavior
outside the contract" (citations omitted)); *cf. Ripple Labs,* 2023 WL 6445969, at
*2 (rejecting defendants' "essential ingredients" test requiring a finding of a
contract and post-sale obligation between promoter and investor).

Next, when conducting the *Howey* analysis, courts are not to consider
the crypto-asset in isolation. Instead, courts evaluate whether the crypto-
assets and the "full set of contracts, expectations, and understandings"
surrounding its sale and distribution — frequently referred to using the
shorthand "ecosystem" — amount to an investment contract. *Telegram*, 448 F.
Supp. 3d at 379 (noting that the "security in this case is not simply the [token],
which is little more than alphanumeric cryptographic sequence"); *see also
Terraform I*, 2023 WL 4858299, at *12 (declining to erect an "artificial barrier
between the tokens and the investment protocols with which they are closely
related" for the purposes of the analysis); *cf. Howey*, 328 U.S. at 297-98
(declining to "treat[ ] the contracts and deeds as separate transactions").

Finally, in assessing the circumstances surrounding the sale of a crypto-
asset, courts should look to what the offeror invites investors to reasonably
understand and expect. To do so, courts examine how, and to whom, issuers
or promoters market the crypto-asset. *See, e.g.*, *Terraform I*, 2023 WL
4858299, at *14 (analyzing "social media posts," "investor materials," and

"readouts of investor meetings" to identify investors' expectations); *Balestra*, 380 F. Supp. 3d at 355 (finding that investors' expectation of profits came from "a marketing campaign," a "press release," "advertisements," and the promoter's website); *Zaslavskiy*, 2018 WL 4346339, at *2, 4-7 (finding that indictment sufficiently alleged the existence of investment contracts based on marketing in online advertising and websites); *Audet* v. *Fraser*, 605 F. Supp. 3d 372, 395-96 (D. Conn. 2022) (finding expectation of profits premised on issuer's "promotional materials," "press release[s]," and "graphic[s] on its website").

      **b.**    **The *Howey* Test, as Applied to the SEC's Claims, Dictates That Certain Transactions Involving the Crypto-Assets Qualify as Investment Contracts**

Against this backdrop, the Court turns to the specific question of whether the SEC has adequately pleaded that Coinbase intermediated transactions involving Crypto-Assets that suffice to constitute "investment contracts" under the three-pronged *Howey* test.  Because Defendants do not dispute that purchasers of the Crypto-Assets make an "investment of money," the Court's analysis focuses on the two remaining *Howey* prongs.  Taking each in turn, the Court concludes that the SEC has adequately alleged that purchasers of certain crypto-assets on the Coinbase Platform and through Prime invested in a common enterprise and were led to expect profits solely from the efforts of others, thereby satisfying the *Howey* test for an investment contract.

### i. Crypto-Asset Purchasers Were in a Common Enterprise with the Developers of Those Assets

The second *Howey* prong, the existence of a common enterprise, may be demonstrated through horizontal commonality. *Howey*, 328 U.S. at 298-99. Horizontal commonality is established when "investors' assets are pooled and the fortunes of each investor [are] tied to the fortunes of other investors as well as to the success of the overall enterprise." *Telegram*, 448 F. Supp. 3d at 369 (citing *Revak*, 18 F.3d at 87); *see also SG Ltd.*, 265 F.3d at 49 (describing "horizontal commonality" as "a type of commonality that involves the pooling of assets from multiple investors so that all share in the profits and risks of the enterprise").[10]

Here, the SEC has plausibly alleged horizontal commonality. As detailed in the Complaint, token issuers, developers, and promoters frequently represented that proceeds from crypto-asset sales would be pooled to further develop the tokens' ecosystems and promised that these improvements would benefit all token holders by increasing the value of the tokens themselves.

---

[10]   *See Kik Interactive*, 492 F. Supp. 3d at 178 n.5:

> "Some circuits hold that a common enterprise can also exist by virtue of 'vertical commonality', which focuses on the relationship between the promoter and the body of investors." [*Revak* v. *SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).] The Second Circuit has expressly rejected broad vertical commonality, which only requires the fortunes of the investors to be linked to the efforts of the promoter. *Id.* at 87-88. The Second Circuit has not yet decided whether strict vertical commonality, which requires that the fortunes of the investor be tied to the fortunes of the promoter, can satisfy the "common enterprise" element of the *Howey* test. *Id.*

As with the court in *Kik Interactive*, because this Court finds that horizontal commonality is present here, it does not consider whether vertical commonality (i) is sufficient for a finding of a common enterprise or (ii) is present here.

(*See, e.g.*, Compl. ¶¶ 133-134 (alleging public statements by Solana Labs that it would pool the proceeds from its private and public SOL sales and use those proceeds to grow Solana's developer ecosystem), 172-179 (alleging online postings by Protocol Labs that it had pooled investment proceeds from FIL sales to fund the development and growth of the Filecoin network, which in turn would "drive demand for the token"), 209 (alleging statements by Sky Mavis that the "team has used funds raised" in the sale of AXS on "development and marketing"); 220 (alleging Chiliz whitepaper statements that funds raised through token sales would be used to "acquire new users" for the CHZ platform and "grow engagement").

The ability of a Crypto-Asset purchaser to profit, therefore, is dependent on both the successful launch of the token and the post-launch development and expansion of the token's ecosystem. If the development of the token's ecosystem were to stagnate, all purchasers of the token would be equally affected and lose their opportunity to profit. As such, the SEC has adequately pleaded that investors and issuers were joined in a common, profit-seeking enterprise. *See, e.g.*, *Terraform I*, 2023 WL 4858299, at *13 (finding that the SEC demonstrated horizontal commonality "by alleging that the defendants[] used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that these improvements would increase the value of the LUNA tokens themselves"); *Kik Interactive*, 492 F. Supp. 3d at 178-79 (finding horizontal commonality where the issuer of the crypto-assets pooled funds and used the funds to construct and develop its digital ecosystem); *Balestra*, 380 F.

49

Supp. 3d at 354 (holding that "the value of [a post-launch digital asset] was dictated by the success of the [blockchain] enterprise as a whole, thereby establishing horizontal commonality").

Contrary to Defendants' assertions, neither *Howey* nor its progeny have held that profits to be expected in a common enterprise are limited just to shares in income, profits, or assets of a business. (Def. Br. 18-21). Indeed, the Supreme Court itself has clarified that "when [it] held that 'profits' must 'come solely from the efforts of others,' [it] w[as] speaking of the profits that investors seek on their investment, not the profits of the scheme in which they invest." *Edwards*, 540 U.S. at 394. In this way, the Supreme Court "used 'profits' in the sense of income or return, to include, for example, dividends, other periodic payments, *or the increased value of the investment.*" *Id.* (emphasis added); *see also Forman*, 421 U.S. at 852 (stating that "[b]y profits, the Court has meant either capital appreciation resulting from the development of the initial investment … or a participation in earnings resulting from the use of investors' funds"). Here, the SEC has sufficiently alleged that investors reaped their profits in the form of the increased market value of their tokens. *See Terraform I*, 2023 WL 4858299, at *13 (concluding that allegations that issuer "used proceeds from LUNA coin sales to develop the Terraform blockchain and represented that these improvements would increase the value of the LUNA tokens themselves" were sufficient to allege "pooling"); *Balestra*, 380 F. Supp. 3d at 354 (finding that a "formalized profit-sharing mechanism," such as rights to *pro rata* distributions, "is not required"); *Kik Interactive*, 492 F. Supp. 3d at

50

178 ("Rather than receiving a pro-rata distribution of profits, which is not required for a finding of horizontal commonality, investors reaped their profits in the form of the increased value of [the asset.]").

### ii. Purchasers of the Crypto-Assets Had a Reasonable Expectation of Profits from the Efforts of Others

The final *Howey* prong considers whether investors were led to believe they could earn a return on their investment solely by the efforts of others. 328 U.S. at 298-99 (defining an investment contract as one in which an investor is "led to expect profits solely from the efforts of the promoter or a third party"). "An investor possesses an expectation of profit when their motivation to partake in the relevant 'contract, transaction or scheme' was 'the prospect[] of a return on their investment.'" *Telegram*, 448 F. Supp. 3d at 371 (citing *Howey*, 328 U.S. at 301). "The inquiry is an objective one focusing on the promises and offers made to investors; it is not a search for the precise motivation of each individual participant." *Id.* (citing *Warfield* v. *Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009)).

Here again, the SEC has adequately pleaded this requirement. The SEC has plausibly alleged that issuers and promoters of the Crypto-Assets — through websites, social media posts, investor materials, town halls, and other fora — repeatedly encouraged investors to purchase tokens by advertising the ways in which their technical and entrepreneurial efforts would be used to improve the value of the asset, and continued to do so long after the tokens were made available for trading on the secondary market. (*See, e.g.*, Compl. ¶¶ 139 (alleging that Solana Labs touted its technical expertise in developing

blockchain networks and described the efforts it would take to develop the
blockchain and attract users to the technology), 160 (alleging that Polygon
founders promoted MATIC tokens by stating that the team had "a very hands
on approach" and was "working around the clock" to scale the platform)).  What
is more, Coinbase concedes that these statements reached not only the
purchasers in the primary market at the initial coin offering stage, but also
those potential investors considering whether to acquire the Crypto-Assets in
the secondary market.  (*See* Jan. 17, 2024 Tr. 83:7-12).  Accordingly, an
objective investor in both the primary and secondary markets would perceive
these statements as promising the possibility of profits solely derived from the
efforts of others.  *See SEC* v. *LBRY, Inc.*, 639 F. Supp. 3d 211, 220 (D.N.H.
2022) (finding expectation of profits derived from the efforts of the issuer's
management team, because the issuer "signaled that it was motivated to work
tirelessly to improve the value of its blockchain for itself and any [token]
purchasers"); *see also Terraform I*, 2023 WL 4858299, at *14 (finding
expectation of profits from the efforts of others when the issuer "repeatedly
touted" that profitability would come about through its "investing and
engineering experience").

The SEC's claim is further supported by allegations of communications,
marketing campaigns, and other public statements to the effect that token
issuers would employ deflationary strategies to reduce the total supply of
tokens and thereby affect the token price.  (*See, e.g.*, Compl. ¶ 140 (alleging
public statements by Solana Labs that "Solana transaction fees are paid in SOL

and burnt (or permanently destroyed) as a deflationary mechanism to reduce the total supply and thereby maintain a healthy SOL price")). *See Telegram*, 448 F. Supp. 3d at 372 (finding an expectation of profits, in part, because token issuers promoted their ability to support the token's market price by reducing the supply of available tokens).

Additionally, Crypto-Asset issuers publicized to investors in the primary and secondary markets that profits from the continued sale of tokens would be fed back into further development of the token's ecosystem, which would, in turn, increase the value of the token. (*See, e.g.*, Compl. ¶¶ 154 (alleging that Polygon advertised to investors that the $450 million raised through sale of MATIC would "secure Polygon's lead"), 243 (alleging that FLOW development team promoted planned development activities to support adoption of its blockchain technology)). *See Telegram*, 448 F. Supp. 3d at 375-76 (holding that purchasers' dependence on the issuer to "develop, launch, and support" the token's blockchain was sufficient to find that purchasers' expectations of profits were reliant on the efforts of another); *see also Terraform I*, 2023 WL 4858299, at *14 (finding expectations of profits, in part, because investors were told that profits from the continued sale of LUNA coins would be used to grow the LUNA ecosystem).

In sum, these specific factual allegations, taken as true at this stage, support the SEC's claim that investors in a common enterprise were motivated to purchase certain crypto-assets based on an expectation of profits solely derived from the efforts of others. Accordingly, the Court finds that the SEC

has adequately pleaded that Coinbase customers engaged in transactions involving the Crypto-Assets that amounted to "investment contracts" under *Howey*.

### iii. Transactions in Crypto-Assets on the Secondary Market Are Not Categorically Excluded from Constituting Investment Contracts

Contrary to Defendants' assertion, whether a particular transaction in a crypto-asset amounts to an investment contract does not necessarily turn on whether an investor bought tokens directly from an issuer or, instead, in a secondary market transaction. (Def. Br. 13-17). For one, *Howey* does not recognize such a distinction as a necessary element in its test of whether a transaction constitutes an investment contract, nor have courts, in the nearly eighty years of applying *Howey*, read such an element into the test. Rather, under *Howey*, the Court must consider the "economic reality" of the transaction to determine whether that transaction is an investment contract. 328 U.S. at 298.

And with specific regard to the Crypto-Assets at issue here, there is little logic to the distinction Defendants attempt to draw between the reasonable expectations of investors who buy directly from an issuer and those who buy on the secondary market. An investor selecting an investment opportunity in either setting is attracted by the promises and offers made by issuers to the investing public. Accordingly, the manner of sale "has no impact on whether a reasonable individual would objectively view the [issuers'] actions and

statements as evincing a promise of profits based on their efforts." *Terraform I*, 2023 WL 4858299, at *15.

Indeed, while it is theoretically possible that developers of a crypto-asset could intentionally avoid promoting that asset to retail purchasers, the SEC alleges with respect to the 13 Crypto-Assets at issue here that promoters and issuers publicly encouraged *both* institutional investors *and* investors trading in the secondary market to buy their tokens. (Compl. ¶¶ 114-305). This marketing makes sense, as the profitability of the enterprise relies, in part, on the success of the token in the resale market and on capital contributions from both institutional investors and retail purchasers. It is therefore unsurprising that Coinbase itself rebroadcasts these representations by featuring whitepapers and other information that could lead a secondary-market purchaser of a crypto-asset reasonably to expect to earn a profit. (*See, e.g.*, *id.* ¶¶ 77, 121, 137, 212, 226, 242).

Further, because these inducements target purchasers in either market, the risk of manipulation, fraud, and other abuses that the securities laws seek to prevent can be found in both markets. Tellingly, the text of the federal securities laws does not distinguish the nature of the instrument based on its manner of sale. 15 U.S.C. §§ 77e(a), (c), 78e (defining "security" regardless of whether someone "sell[s]" or "offer[s] to sell" the instrument, or whether they "effect any transaction" utilizing the facility of an "exchange"). Consequently, the applicability of the federal securities laws should not be — and indeed, as to more traditional securities, is not — limited to primary market transactions.

55

Coinbase also reasons that because the transfer of a crypto-asset from one investor to another on its platform does not involve the transfer of any contractual undertaking, no sale of an investment contract can take place. (Def. Br. 7-13; *see id.* at 8 (suggesting that a formal contractual undertaking is "an irreducible feature of the investment contract")). Such a requirement, however, is not formal, but formalistic, and cannot be fairly read into the *Howey* test.

One need go no further than *Howey* itself, where investors purchased tracts of orange groves pursuant to land sale agreements; all were offered, but only a certain percentage entered into, a separate service contract whereby the defendants committed under state law to undertake efforts to cultivate the land for the investors' benefit. 328 U.S. at 296-99. There, the Supreme Court held that the lower court erred by "treat[ing] the contracts and deeds as separate transactions involving no more than an ordinary real estate sale and an agreement by the seller to manage the property for the buyer." *Id.* at 297-98. Rather, the Court explained that the written contracts only "evidenced" the relationships, and the formal legal transfer of rights was "purely incidental." *Id.* at 300. In other words, the Court found that while the presence of these formalities was instructive, it was not dispositive.

This understanding was also evidenced by the Supreme Court's earlier decision in *Joiner*. There, in deciding whether the sale of oil leasehold interests gave rise to investment contracts, the Court found it "unnecessary to determine" whether the purchaser had acquired "a legal right to compel" the

56

promoter to undertake efforts under state law.  320 U.S. at 349.  In doing so, the Court in *Joiner* made it clear that the ability to compel managerial efforts was a state-law concern, and not a necessary element with respect to the federal securities laws.

In support of their argument, Defendants here cite to state court decisions interpreting "Blue Sky" statutes that predate the federal securities laws.  (Def. Br. 6-7, 11; *see also* Br. for Securities Law Scholars as *Amici Curiae* 3-12).  Tellingly, however, the Court in *Howey* explicitly considered the "many state 'blue sky' laws" in interpreting "investment contract" under the Securities Act, and nevertheless arrived at the foundational principle that "form" should be "disregarded for substance."  328 U.S. at 298.  Indeed, taking note of *Howey's* deliberately expansive language to account for future developments in securities transactions, the Supreme Court has repeatedly emphasized that it is the totality of circumstances — the economic reality — surrounding the offer and sale of an asset that matters, and that reality includes the promises and undertakings underlying the investment contract.  *See, e.g.*, *Forman*, 421 U.S. at 849; *Tcherepnin*, 389 U.S. at 336.

Defendants' reliance on cases involving real estate transactions similarly does not sway the Court.  Coinbase argues that in cases like *Rodriguez* v. *Banco Ctr. Corp.,* 990 F.2d 7 (1st Cir. 1993), and *De Luz Ranchos Inv. Ltd.* v. *Coldwell Banker & Co.*, 608 F.2d 1297 (9th Cir. 1979), courts held that land sale contracts were not securities because promotional statements to develop the land were not legally enforceable.  (Def. Br. 9-10).  These cases serve as

poor comparators to the facts at hand.  As the *Kik Interactive* court explained, real estate has "inherent value," whereas a crypto-asset "will generate no profit absent an ecosystem that drives demand," 492 F. Supp. 3d at 180 — which is precisely what the issuers and promoters of the Crypto-Assets here promised to design and build.  In other words, *Howey's* focus on the economic reality of the transaction undermines any attempt to equate the sale of real properties, which possess inherent value and utility, to discrete groups of buyers, with capital raises on Coinbase's platform by issuers and promoters, through the sale of fungible assets with no inherent value, to a potentially unlimited number of public buyers.

Ultimately, since *Howey*, no court has adopted a contractual undertaking requirement.  And, as previously noted, courts in this Circuit have repeatedly rejected efforts by defendants in the cryptocurrency industry to insert such a requirement into their *Howey* analysis.  *See, e.g., Terraform I*, 2023 WL 4858299, at *11; *Kik Interactive*, 492 F. Supp. 3d at 178.  This Court declines to be the first.[11]

Defendants warn that without a contractually grounded obligation, the SEC could claim authority over essentially all investment activity.  (Def.

---

[11]     Coinbase seemingly advances a textual argument that the word "contract" cannot be read out of the "investment contract" set forth in the securities laws.  (Def. Br. 12).  By stating that investment contracts comprise "transaction[s]" and "scheme[s]," and not just "contract[s]," however, the *Howey* Court made clear that a "contract" is not a prerequisite to an "investment contract."  328 U.S. at 298-99.  A reading to the contrary would be in direct tension with *Howey's* intentionally broad interpretation of "investment contract" to encompass the sale and offer of securities in whatever form or manner they make take.  *See SEC v. Terraform Labs Pte. Ltd.*, — F. Supp. 3d —, No. 23 Civ. 1346 (JSR), 2023 WL 8944860, at *13 (S.D.N.Y. Dec. 28, 2023) ("*Howey's* definition of 'investment contract' was and remains a binding statement of the law, not dicta.").

Reply 2).  Not so.  Contrary to Defendants' characterization, a Coinbase customer does more than simply "part[] with capital" in the hopes that her purchase "will increase in value."  (*Id.*).  Such a characterization ignores *Howey's* second element, the need for a common enterprise.  When a customer purchases a token on Coinbase's platform, she is not just purchasing a token, which in and of itself is valueless; rather, she is buying into the token's digital ecosystem, the growth of which is necessarily tied to value of the token.  This is evidenced by, among others, the facts that (i) initial coin offerings are engineered to have resale value in the secondary markets (*see, e.g.*, Compl. ¶¶ 137-139), and (ii) crypto-asset issuers continue to publicize their plans to expand and support the token's blockchain long after its initial offering (*see, e.g., id.* ¶¶ 138-139).  In a similar vein, developers advertise the fact that capital raised through retail sales of tokens will continue to be re-invested in the protocol, leading token holders reasonably to expect the value of the tokens to increase in accordance with that protocol.  (*See, e.g., id.* ¶ 220).  Therefore, the sale of an investment contract, here, necessarily includes the investment in the token's broader enterprise, manifested by the full set of expectations and understandings surrounding the sale and distribution of the asset.

In this way, the offer and sale of cryptocurrencies can be distinguished from commodities or collectibles.  Unlike in the transaction of commodities or collectibles (including the Beanie Babies discussed during the oral argument, *see* Jan. 17 Tr. 55:8-58:9), which may be independently consumed or used, a crypto-asset is necessarily intermingled with its digital network — a network

without which no token can exist. *See Balestra*, 380 F. Supp. 3d at 357 (stating that "without the promised ATB Blockchain, there was essentially no 'market' for ATB Coins, which clearly distinguishe[d] the coins from the precious metals to which Defendants attempt to analogize them"); *cf. Friel* v. *Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 439 (S.D.N.Y. 2023) (rejecting comparison of non-fungible token transactions to collectibles).

### 4. The Court Declines to Dismiss Counts I, II, III, and IV as Applied to the Coinbase Platform and Prime Service

Having found that the SEC plausibly asserts that Coinbase facilitated transactions in crypto-asset "securities" as the term is defined in the Securities Act, the Court now addresses whether Coinbase acted as an exchange, a broker, and a clearing agency, without registering, in violation of Sections 5, 15(a), and 17A(b) of the Exchange Act (Counts I, II, III), and whether, for purposes of Coinbase's violations of the Exchange Act, CGI was a control person of Coinbase under Section 20(a) of the Exchange Act (Count IV).

According to the well-pleaded allegations of the Complaint, Coinbase provides a marketplace that, among other things, "bring[s] together purchasers and sellers of [crypto-asset] securities" and matches and executes their orders. 15 U.S.C. § 78c(a)(1) (defining "exchange"). Coinbase also "engage[s] in the business of effecting transactions in securities for the account of others" by, for example, soliciting potential investors, holding itself out as a place to buy and sell crypto-asset securities, facilitating trading in crypto-asset securities by opening customer accounts and handling customer funds and assets, and charging transaction-based fees. *Id.* § 78c(a)(4) (defining "broker"). Finally,

Coinbase "acts as a custodian of securities" by requiring customers to deposit their crypto-asset securities in Coinbase-controlled wallets, creating a system for the central handling of securities to settle customers' transactions. *Id.* § 78c(a)(23)(A) (defining "clearing agency"). For the purposes of this motion, Coinbase does not dispute (with the exception of the Wallet application) that it carried out these functions. Accordingly, with respect to the Coinbase Platform and Prime service, the Court denies Defendants' motion to dismiss Counts I, II, and III of the Complaint.[12]

Further, the SEC has adequately pleaded that CGI is liable as a control person of Coinbase for the purposes of Exchange Act Section 20(a). At all relevant times, CGI exercised power and control over its wholly-owned subsidiary, Coinbase, including by managing and directing Coinbase, and by directing and participating in the acts constituting Coinbase's Exchange Act violations. (Compl. ¶ 384). Accordingly, the Court denies Defendants' motion to dismiss Count IV of the Complaint.

### 5. The SEC Plausibly Alleges That Coinbase, Through Its Staking Program, Engages in the Unregistered Offer and Sale of Securities in Violation of Section 5 of the Securities Act

In its Fifth Claim for Relief, the SEC alleges that Coinbase itself is the promoter of a crypto-asset investment contract. In particular, the SEC alleges that Coinbase has violated, and continues to violate, Sections 5(a) and 5(c) of the Securities Act by engaging in the unregistered offer and sale of securities in

---

[12]    Here, the Court discusses Count II only insofar as it relates to acts engaged by Coinbase apart from its offering of the Wallet service. The Opinion discusses the Wallet service itself *infra.*

connection with its Staking Program.  (Compl. ¶ 309).  Through the Staking

Program, customers' crypto-assets are transferred to and pooled by Coinbase

and subsequently "staked" by Coinbase in exchange for rewards, which

Coinbase distributes *pro rata*.

The Staking Program, discussed in greater detail *infra*, enables Coinbase

customers to stake five different crypto-assets.  (Compl. ¶¶ 7, 339).  As the SEC

asserts, the Staking Program as applied to each of these five assets constitutes

an investment contract under *Howey* and, therefore, a security subject to

registration under the Securities Act.  (*Id.* ¶ 339).[13]  Yet, Coinbase has never

filed or otherwise effected a registration statement with the SEC for its offer

and sale of its Staking Program.  This failure, the SEC alleges, deprives

investors of material information about its offerings in connection with the

Staking Program, including information concerning how Coinbase uses the

proceeds of those offerings and the risks and trends that affect the staking

enterprise.  (*Id.* ¶¶ 309, 369).

Coinbase, consistent with its broader crypto ethos, maintains that the

Staking Program does not constitute an investment contract under *Howey*, and

that it was therefore under no obligation to register or otherwise undertake

SEC compliance obligations with respect to the Program.  (Def. Br. 27).  As set

forth herein, the Court finds that the SEC has adequately alleged that the

---

[13]     Consistent with the broad definition of securities under the Securities Act, courts have
found that programmatic offerings akin to the Staking Program can constitute
investment contracts, to the extent they satisfy the elements of the *Howey* analysis.
*See, e.g.*, *SEC* v. *Edwards*, 540 U.S. 389 (2004) (payphone investment program).

Staking Program constitutes an investment contract under *Howey*, given, among other things: (i) the risk of loss associated with participation in the Staking Program, (ii) Coinbase's significant technical efforts in implementing and maintaining the Program, and (iii) Coinbase's promotional efforts to drive customer participation in the Program.

### a. Factual Background

Coinbase's Staking Program is a crypto-asset staking service. Broadly speaking, staking is an essential component of many blockchains' consensus protocols, which, among other things, are necessary to achieve agreement among users as to a data value or as to the state of a ledger on a given blockchain. (Compl. ¶ 48). *See generally Dapper Labs*, 657 F. Supp. 3d at 427-28 (distinguishing "proof of work" and "proof of stake" blockchain validation methods). These consensus protocols employ a decentralized method to agree on which ledger transactions are valid, when and how to update the blockchain, and — importantly — when and how to compensate participants for validating transactions and adding new blocks. (Compl. ¶ 49). The potential for compensation can provide significant upside to holders of a crypto-asset, essentially allowing them to earn a financial return on their crypto-asset simply through participation in the protocol.

To participate in such a protocol requires "[p]roof of stake," which is a type of "consensus mechanism" used by a given blockchain that involves selecting block "validators" from crypto-asset holders who have committed or "staked" a minimum number of crypto-assets. (Compl. ¶ 50). Any holder of a

crypto-asset may qualify for selection into a group or pool of validators, provided that she commit, or "stake," a threshold amount of the blockchain's native asset (*e.g.*, ETH for Ethereum) and secure the technical resources required to run a "validator node" to perform the necessary computing functions. (*Id.* ¶ 313). The staked assets are then held as collateral in the protocol to incentivize the validator to perform required functions. (*Id.*). In addition, certain protocols charge crypto-asset validators fees to stake and unstake crypto-assets and require an upfront refundable deposit (in addition to the crypto-assets staked). (*Id.*). A "correction penalty" is deducted, or "slashed," from the staked crypto-assets of validators who underperform. (*Id.*). Conversely, validators earn rewards, often in the form of additional amounts of the blockchain's native crypto-asset, by timely voting on proposed blocks, proposing new blocks, and participating in other consensus activities. (*Id.*).

Importantly, a crypto-asset holder's chances of being selected as a validator, and thereby qualifying to receive rewards through participation in the consensus protocol, depend on its "proof of stake" and its reliability. (Compl. ¶ 314). A crypto-asset holder can maximize her chances of receiving the maximum staking reward by, in turn, maximizing her "proof of stake" (*i.e.*, the amount of crypto-assets committed to the protocol as collateral) and committing significant processing power to the validation node, to minimize any potential server downtime. (*Id.*). In short, the most successful staking programs maximize the chances of being selected by staking a larger number of

64

assets and by optimizing computer resources to minimize server downtime, relative to other competing programs on a given blockchain.  (*Id.*).

The amount of time set by a protocol for a crypto-asset to be staked by a validator before that validator is eligible to earn rewards is referred to as the "bonding period."  (Compl. ¶ 315).  In certain cases, a bonding period may require a commitment of several weeks before a validator can begin earning rewards.  (*Id.*).  During the time the crypto-assets are bonded to a protocol, the crypto-asset owners are typically unable to transact in them, even to react to market price fluctuations of the crypto-assets.  (*Id.*).  To "unstake" assets and transfer or use them for other purposes can also take weeks.  (*Id.*).

Coinbase's Staking Program capitalizes on the reward structure of the "proof of stake" consensus mechanisms used by the XTZ (Tezos), ATOM (Cosmos), ETH (Ethereum), ADA (Cardano), and SOL (Solana) tokens.  (Compl. ¶¶ 310, 312, 316).  To participate in the Coinbase Staking Program, staking customers must tender their crypto-assets to Coinbase by either purchasing staking-eligible crypto-assets from Coinbase or transferring their own crypto-assets to their Coinbase account for staking.  (*Id.* ¶ 340).  Once each eligible crypto-asset is in a customer's Coinbase account and designated for staking, it is then transferred by Coinbase to an omnibus crypto-asset wallet controlled by Coinbase (and segregated by asset),[14] wherein Coinbase pools the assets along with its own crypto-assets.  (*Id.* ¶¶ 310, 348).  Thereafter, Coinbase "stakes" (or

---

[14]     In other words, Staking Program participants' XTZ, ATOM, ETH, ADA, and SOL tokens are pooled by asset.  (Compl. ¶ 339).

commits) these crypto-assets in connection with validation nodes run by both Coinbase and third-party validators that Coinbase selects, to obtain rewards, which Coinbase then distributes *pro rata* to investors after deducting for itself a 25% or 35% commission.  (*Id.* ¶ 310).

While an individual can stake on her own behalf, or "solo stake," the SEC claims that Coinbase offers and markets several features of its Staking Program that differentiate it from solo staking — a process that, according to Coinbase, can be "confusing, complicated, and costly."  (Compl. ¶¶ 316, 360). For one, Coinbase's Staking Program offers no, or low, staking minimums (the threshold number of crypto-assets discussed above) or deposits to participate in staking.  (*Id.* ¶ 318).  This offer is significant, as the minimums required by many blockchains are considerable, and thus unattainable for solo investors. For example, the Ethereum blockchain requires users to stake a minimum of 32 ETH (worth approximately $60,000 at the time the Complaint was filed) to run a validator node.  (*Id.*).  But the Coinbase Staking Program allows participants to participate in staking without having to meet such thresholds; as Coinbase advertises, customers can "[s]tart earning with as little as $1." (*Id.*).

Relatedly, the SEC alleges that running a validator node is often expensive, for example, due to the significant up-front cost of the equipment and/or software needed to perform the computing functions associated with staking.  (Compl. ¶ 319).  Through the Coinbase Staking Program, investors avoid incurring these expenses directly, because Coinbase operates its own

66

validator nodes to earn and pay investor rewards, in addition to contracting with third-party validators. (*Id.* ¶¶ 319, 345). Operating the equipment and software needed to stake can also be complex and time-consuming. For example, CGI's February 21, 2023 Form 10-K filed with the SEC stated: "Staking independently requires a participant to run their own hardware, software, and maintain close to 100% up-time." (*Id.* ¶ 319). Similarly, Coinbase acknowledges on its website that "[b]ecoming a validator is a major responsibility and requires a fairly high level of technical knowledge." (*Id.*). Through the Staking Program, however, Coinbase "reduces the[se] complexities." (*Id.*).

Further, until approximately April 2023, the Coinbase Staking Program maintained a "liquidity pool" of crypto-assets for each of the five stakeable assets that were held in reserve, which pool enabled Coinbase to provide participant customers with faster liquidity in connection with unstaking requests. (Compl. ¶ 320). While a staking participant would not typically be able to trade or "cash out" their cryptocurrency while earning rewards through staking, Coinbase's liquidity pool allowed customers using Coinbase's staking services to do so. (*Id.*). As a result, during the relevant period, Coinbase was able to offer Staking Program participants enhanced liquidity and quicker reward payments compared to staking on their own.[15]

---

[15]     Effective April 1, 2023, Coinbase purports to no longer maintain reserves of stakeable assets. Accordingly, investors' crypto-assets cannot be traded or sent while they are staked and earning rewards without first unstaking them. (Compl. ¶ 320).

Coinbase seeks to capitalize on these advantages.  For example, on its website, Coinbase states:

> [S]taking your own crypto is a challenge for most investors.  To stake on your own requires running a node on your own hardware, syncing it to the blockchain, and funding the node with enough cryptocurrency to meet minimum thresholds, including providing a sizable deposit and bond.  On Coinbase, we do all this for you.

(Compl. ¶ 360).  Further, Coinbase touts its technical and entrepreneurial skills, for example, stating that it possesses a "fairly high level of technical knowledge," as well as "state-of-the-art encryption and security" required to stake successfully and safely, and that it has "experience [that] allows [it] to … safely support new products like staking."  (*Id.* ¶ 364).  Coinbase also promotes the returns that customers could earn by participating in the Coinbase Staking Program.  (*Id.* ¶ 322).  For example, Coinbase advertises the "estimated reward rate" for each of the five staking-eligible crypto-assets as ranging between approximately 2% and 6.12%.  (*Id.* ¶ 324).

Finally, Coinbase markets the growth of the Staking Program and Coinbase's correlative success in generating returns for customer participants.  (Compl. ¶ 326).  For example, in a post on its Twitter account on or about May 28, 2020, Coinbase stated that "[s]ince launching in the US last fall, customers have earned over $2 million in Tezos staking rewards."  (*Id.* ¶ 327).  And Coinbase's efforts have borne fruit: As of July 2022, over 4 million U.S. customers were invested in the Coinbase Staking Program, and as of the end of 2021, the total value of crypto-assets committed by participants to the Staking

68

Program was approximately $28.7 billion, earning Coinbase approximately $275 million in revenue. (*Id.* ¶¶ 334, 336).

### b.      Analysis

To review, the SEC alleges that the Staking Program allows Coinbase customers to invest their assets and earn financial returns through Coinbase's managerial efforts. (Compl. ¶ 7). Accordingly, the SEC asserts that the Staking Program, as applied to each of the five stakeable assets, is an investment contract under *Howey*. Coinbase does not contest the SEC's allegations regarding the presence of a "common enterprise." Instead, Coinbase asserts that (i) Staking Program participants' tendering of their crypto-assets to Coinbase does not constitute an "investment of money" (Def. Br. 27-29); and (ii) Coinbase's efforts to generate the returns it marketed to participants are not "managerial" but merely "ministerial," such that the profits associated with the Staking Program do not arise from the "efforts of others" (*id.* at 2, 4, 29-30). Taking each argument in turn, the Court finds the SEC has sufficiently pleaded at this stage that Coinbase offered and sold its Staking Program as an investment contract.

### i.      The Complaint Adequately Alleges an Investment of Money

Coinbase argues in the first instance that staking participants do not "invest money" under *Howey* because the Staking Program "create[s] no risk" of loss. (Def. Br. 27-29). This risk-of-loss requirement was added to the *Howey* test by the Supreme Court in *Marine Bank* v. *Weaver*, wherein the Court observed that for an instrument to be a security, the investor must risk loss.

69

*See* 455 U.S. at 558-59; *see also SEC* v. *Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) ("We have stated that *Howey's* 'investment of money' prong requires that the investor 'commit his assets to the enterprise in such a manner as to subject himself to financial loss.'" (quoting *Hector* v. *Wiens*, 533 F.2d 429, 432 (9th Cir. 1976))). This requirement makes sense, for if an investor did not risk financial loss, the need for the protection of the federal securities laws would be "obviate[ed]." *Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985).

Here, however, the Complaint's well-pleaded allegations sufficiently detail the ways in which staking participants' assets are put at a risk of loss. For one, once a customer's crypto-assets are tendered to Coinbase and staked to the underlying blockchain protocol, those assets are at risk of being "slashed." (Compl. ¶ 343). The fact that Coinbase has never suffered a slashing event (*see* Answer ¶ 161), does not change the fact that the risk of loss exists. *See Rubera*, 350 F.3d at 1090 ("[W]hether the majority of investors in the telephone investment program actually suffered a monetary loss is immaterial so long as there existed the risk of loss."). And while Coinbase pledges to indemnify customers for slashing penalties, the indemnification is limited to, among other things, penalties resulting from Coinbase's acts or omissions. (User Agreement App'x 4 § 3.1.3).[16] Conversely, staking customers are expressly not entitled to

---

[16]    In full, the "Slashing" provision of the User Agreement states:

> Some Digital Asset networks subject staked assets to "slashing" if the transaction validator representing those assets incorrectly validates a transaction. Coinbase will use commercially reasonable efforts to prevent any staked assets from slashing; however, in the

indemnification for slashing losses arising out of "acts or omissions of any third party service provider"; "a force majeure event as defined in Section 9.6 of the User Agreement"; "acts by a hacker or other malicious actor"; or "any other events outside of Coinbase's reasonable control." *Id.* While the chances of such downsides might be remote, the downsides themselves are not insignificant, and present a plausible scenario in which a customer may face a significant risk of loss through participation in the Staking Program.

Even if Coinbase's indemnification of customer participants for slashing-related losses were complete, the SEC alleges that customers are still exposed to additional risks that inhere in Coinbase's operation of the Staking Program. For example, once a customer's crypto-assets are staked to the underlying blockchain protocol, those assets are at risk of being lost in the event the relevant blockchain is forced (or chooses) to shut down or cease operations. (Compl. ¶ 344). Further, CGI itself acknowledges other risks in its SEC regulatory filings, including that "customers' assets may be irretrievably lost" due to cybersecurity attacks, loss of customers' private keys, or other security issues, or if Coinbase's node "validator, any third-party service providers, or smart contracts fail to behave as expected." (*Id.* ¶ 345).

---

event they are, Coinbase will replace your assets so long as such penalties are not a result of: (i) protocol-level failures caused by bugs, maintenance, upgrades, or general failure; (ii) your acts or omissions; (iii) acts or omissions of any third party service provider; (iv) a force majeure event as defined in Section 9.6 of the User Agreement; (v) acts by a hacker or other malicious actor; or (vi) any other events outside of Coinbase's reasonable control.

(User Agreement App'x 4 § 3.1.3).

Contrary to Coinbase's assertions, the risk of loss matters even if it applies broadly to all Coinbase customers (not just staking participants), and even if the risk applies equally to solo-staking and non-solo-staking customers. (Def. Br. 27-28). In each circumstance, the customer still commits her assets to the Coinbase Staking Program in such as a manner as to "subject h[erself] to financial loss." *Rubera*, 350 F.3d at 1090. What is more, the Second Circuit has held that risks need not be promoter-specific to constitute a risk of loss for purposes of the *Howey* test. *See Gary Plastic*, 756 F.2d at 241 (finding investors relied on the solvency of both the underlying bank and the promoter). To that point, the economic reality is such here that certain broader risks — including failures by Coinbase or of the underlying protocol — are also inherent in the investments in the staking service and are thus sufficient to demonstrate a risk of loss.

Defendants next take issue with the Complaint's allegation that staking participants "invest money" by "giv[ing] up control" of their crypto-assets in order to stake with Coinbase as additional evidence of risk of loss. (Def. Br. 28-29 (citing Compl. ¶¶ 341-342 (alleging that "investors tender their crypto[-]assets to Coinbase in order to participate in the Coinbase Staking Program"))). Defendants contend that "at no point in the staking process do users ever give up ownership or control of their assets to Coinbase" (*id.*), as the User Agreement makes clear that users at all times "control the Digital Assets held in [their] Digital Asset Wallet" (User Agreement § 2.7.3), and that staking "does

not affect the ownership of [users'] digital assets in any way" (*id.* App'x 3 § 3.1.1).

As it happens, *Howey* imposes no requirement that investors give up permanent "ownership" over the capital invested in the enterprise. *See Edwards*, 540 U.S. at 391-92 (investors purchased payphones but entered into a buyback agreement promising to refund the purchase). Indeed, the sole case Defendants identify in support of their argument — *International Brotherhood of Teamsters* v. *Daniel* — states, in relevant part, "[i]n every decision of this Court recognizing the presence of a 'security' … the person found to have been an investor chose to give up a *specific consideration* in return for a separable financial interest." 439 U.S. 551, 559 (1979) (emphasis added).

Such a condition is satisfied here. To stake with Coinbase, customer participants must transfer their staking-eligible assets to Coinbase's omnibus wallets, where they are commingled with Coinbase's own crypto-assets and treated as fungible. (Compl. ¶¶ 310-311, 340-341, 348-350). Coinbase then stakes the assets, at which point they are locked-in to participate in the staking. (*Id.* ¶¶ 315, 341). During this time, participants are unable to transact in their crypto-assets, including to quickly react to market price fluctuations, and thus their control over their crypto-assets is necessarily constrained. (*Id.*). As such, staking participants provide "specific consideration" in return for financial rewards derived from staking. *Int'l Bhd. of Teamsters*, 439 U.S. at 559.

73

In sum, taking the well-pleaded allegations as true, which the Court must at this juncture, the SEC has sufficiently alleged that Coinbase customers' tendering of their crypto-assets in connection with the Staking Program constitutes an "investment of money" under *Howey*.

### ii. The Complaint Adequately Alleges That Staking Participants Reasonably Expect to Profit Based on Coinbase's Managerial Efforts

Alternatively, Defendants argue the SEC does not "allege any managerial efforts on the part of Coinbase," thereby "negat[ing] *Howey's* efforts-of-others element as a matter of law." (Def. Br. 29-30).[17]  Again, the Court must disagree.

By its terms, *Howey* requires that profits be generated solely from the "efforts of others." 328 U.S. at 298. Prior cases have established that for this prong to be met, the activities of the promoter must be of a managerial or entrepreneurial character, and not merely ministerial or clerical. *See, e.g., SEC* v. *Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir. 1973) (stating that efforts of others must be "undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise"); *see*

---

[17]     Defendants also argue that "[s]taking rewards are not properly conceived as investment profit," but are instead simply "payments" for putting crypto-assets to work. (Def. Br. 29). Here, the SEC has sufficiently pleaded that the investing public is attracted by representations of investment income, as customers were in this case by Coinbase's invitation to "[e]arn as much as you want." (Compl. ¶ 322). While it is true that staking rewards are determined by the protocols of the applicable blockchain network, Coinbase has acknowledged its ability to change the reward payout amount at its discretion. (*Id.* ¶¶ 324 (stating publicly that Coinbase "ha[s not] changed the reward payout rate on [its] retail [staking] product within the year"), 351 (stating on its website that the staking "reward rate can also be influenced by factors including, but not limited to, validator performance" and the "amount staked/stakers," and not just the "rates set by the network")).

*also Forman*, 421 U.S. at 852 ("The touchstone [of the *Howey* test] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."). In *Howey*, for example, the promoter not only sold orchard lots, but also contracted to manage the lots as an orchard after they were purchased. 328 U.S. at 299-300. Such a requirement helps distinguish between investment contracts that are securities and investment contracts that are simply investments. Where the realization of profits depends significantly on the success of the promoter's managerial or entrepreneurial efforts, the degree of dependence between the investors' profits and the promoter's activities is heightened. In contrast, a promoter's ministerial or clerical activities that are routine in nature are less important to investors' expectations, as "anyone including the investor himself could supply these services." *SEC* v. *Life Partners, Inc.*, 87 F.3d 536, 545-46 (D.C. Cir. 1996).

Here, the Complaint sufficiently alleges that Coinbase has promised and undertaken significant post-sale managerial efforts, including: retaining third parties to stake participant assets (in addition to its own validators); deploying proprietary software and equipment; maintaining "liquidity pools" (or reserves) to allow for quicker participant withdrawals; drawing "stake" from pools of investor assets; working to increase the likelihood that a blockchain network will select Coinbase to validate transactions by pooling customer assets across multiple validator nodes; and marshalling its technical expertise to operate and maintain nodes and stake customer assets in a manner that provides

maximum server uptime, helps prevent malicious behavior or hacks, and
protects keys to staked assets.  (*See* Compl. ¶¶ 312-321, 351, 357-367).[18]

Contrary to Defendants' assertion, the fact that Coinbase's efforts may be
technical in nature does not mean they cannot also be managerial or
entrepreneurial.  (Def. Reply 15).  Indeed, courts have recognized investment
contracts in situations where a promoter has taken an established technology
and built an enterprise on top of it.  *See, e.g.*, *Edwards*, 540 U.S. at 391-92
(creating an investment program involving payphones by "install[ing] the
equipment," maintain[ing] and repair[ing]" the payphones, arranging for
connection service, and collecting coin revenues).  Here, Coinbase, through its
deployment of sophisticated and expensive software and hardware, has
created, at a large scale, an opportunity to profit from the complex staking
infrastructure, making it more likely that Coinbase's staking customers will
receive returns because Coinbase can support maximum server uptime and
amass a considerably larger pool of assets to be staked at its validator nodes.
In doing so, Coinbase can more reliably earn rewards and distribute those
returns to participants.  Accordingly, in the aggregate, such efforts cannot be

---

[18]    The parties disagree as to whether a promoter's pre-sale or post-sale efforts alone may
suffice under *Howey*, and both identify authority from outside the Second Circuit in
support of their positions.  *Compare SEC* v. *Life Partners*, 87 F.3d 536, 545 (D.C. Cir.
1996) (observing that "post-purchase entrepreneurial activities are the 'efforts of others'
most obviously relevant to the question whether a promoter is selling a 'security'"), *with*
*SEC* v. *Mut. Ben. Corp.*, 408 F.3d 737, 743 (11th Cir. 2005) ("We are not convinced that
either *Howey* or *Edwards* require such a clean distinction between a promoter's
activities prior to his having use of an investor's money and his activities thereafter.").
Resolution of the significance *vel non* of a promoter's pre-sale efforts is unnecessary
here because, as the SEC argues and the Court agrees, Coinbase's post-sale managerial
efforts alone are sufficient to satisfy *Howey*.  (SEC Opp. 29-30 ("However any distinction
between pre-sale and post-sale efforts is ... meaningless here where the Complaint
alleges Coinbase has ... undertaken significant post-sale managerial efforts[.]")).

said to have no "material impact upon the profits of the investors." *Life Partners, Inc.*, 87 F.3d at 546.

Further, while it remains the case that customers can stake on their own, Coinbase's arguments to this Court downplaying the economic and technical barriers to solo staking stand in sharp contrast to Coinbase's representations to its customers of the significant efforts it exerts to offer and market those features that differentiate the Coinbase Staking Program from staking independently. (*See* Compl. ¶¶ 316 (emphasizing that staking is "confusing, complicated, and costly," but that with the Staking Program, Coinbase is "changing all that"), 319 (explaining that staking independently "requires a participant to run their own hardware, software, and maintain close to 100% up-time," but that Coinbase "reduces the[se] complexities"), 360 (telling potential participants that staking "your own crypto is a challenge," but that Coinbase "do[es] all this for you")). All this is consistent with what Coinbase tells customers when promoting its Staking Program — that Coinbase, and not prospective solo stakers, possesses the "fairly high level of technical knowledge," as well as the "experience [that] allows [it] to … safely support new products like staking." (*Id.* ¶ 364). Anyone reading these statements would expect to rely on the promoter's (here, Coinbase's) managerial efforts to generate the profits. Accordingly, the SEC adequately pleads a reasonable expectation of profits from the efforts of a third party under *Howey*.

77

By virtue of the foregoing, the Court finds that the SEC has sufficiently alleged that Coinbase offers and sells the Staking Program as an investment contract.  Since, for the purposes of this motion, Coinbase does not dispute that it has never had a registration statement filed or in effect with the SEC for the Coinbase Staking Program as it applies to each of the five stakeable crypto-assets, and no exemption from registration applies, the Court finds that the SEC has plausibly alleged that Coinbase has violated Securities Act Sections 5(a) and 5(c).  Accordingly, at this stage of pleading, the Court denies Defendants' motion to dismiss Count V of the Complaint.

### 6. The Court Dismisses the SEC's Claim That Coinbase Acts as an Unregistered Broker Through Its Wallet Service in Violation of Section 15(a) of the Exchange Act

Finally, the SEC alleges that Coinbase conducts brokerage activity though its Wallet application.  (Compl. ¶ 4).  On this point, Coinbase contests the SEC's allegations by reverting to its foundational argument that the underlying Crypto-Assets are not securities, as well as more specific arguments that the allegations regarding Wallet do not support any finding that Coinbase acted as an unregistered broker.  While the Court finds that the SEC has alleged sufficient facts to show that at least some of the transactions in the tokens it identifies in the Complaint (which can be accessed by customers using Wallet) are "investment contracts," it ultimately concludes that the SEC's claim as to Wallet fails for the independent reason that the pleadings fall short of demonstrating that Coinbase acts as a "broker" by making Wallet available to customers.

### a.     Factual Background

As discussed *supra*, important to a crypto-asset owner's exercise of
control over her crypto-asset is the "private key" associated with that asset.
(Compl. ¶ 47).  A "private key" allows owners to transfer their assets.  (*Id.*).
Crypto wallets offer a method to store and manage information about the
crypto-assets, including the "private key" associated with a crypto-asset.  (*Id.*).
Crypto wallets can reside on devices that are connected to the internet
(sometimes called a "hot wallet"), or on devices that are not connected to the
internet (sometimes called a "cold wallet" or "cold storage").  (*Id.*).  Because the
"private key" is stored locally on the user's device, no one but the person who
physically has access to that device, including the creator of the wallet
application, can transact on that user's behalf.  (*Id.* ¶¶ 47, 64).  It is for this
reason that crypto wallet applications are frequently described as "self-
custodial."  (*Id.* ¶¶ 64, 72).

Coinbase offers customers these custodial functions through Coinbase
Wallet.  Wallet is a separate product from the Coinbase Platform, and
customers use Wallet by downloading a separate program on their device.
(Compl. ¶ 67).  Moreover, Coinbase does not maintain custody over the crypto-
assets traded through Wallet — unlike assets held on the Coinbase Platform —
as the assets held through Wallet are "self-custodied."  (*Id.* ¶ 64).

To enhance its functionality, Coinbase's Wallet application also interlinks
with third-party platforms to facilitate a user's transactions.  (Compl. ¶ 64).
Specifically, Wallet allows a Coinbase customer to access third-party

decentralized trading platforms (or DEXs) to participate in retail trades outside

the Coinbase Platform.  (*Id.*).  A user can therefore transact in crypto-assets

from numerous blockchains, including to buy, sell, receive, "swap," or "bridge,"

via assets held in that user's Wallet.  (*Id.*).  Coinbase advertises that "Coinbase

Wallet brings the expansive world of DEX trading to your fingertips, where you

can easily swap thousands of tokens, trade on your preferred network, and

discover the lowest fees," and further proclaims that Wallet "makes it easy to

access [] tokens through its trading feature, which compares rates across

multiple exchanges."  (*Id.* ¶ 82).  In exchange for this service, through at least

March 2023, Coinbase charged a flat fee of 1% of the principal amount for each

transaction executed through the swap/trade feature in Wallet.  (*Id.* ¶ 101).

### b.  Analysis

Under the Exchange Act, a "broker" is broadly defined as "any person

engaged in the business of effecting transactions in securities for the account

of others."  15 U.S.C. § 78c(a)(4)(A).  Courts consider a number of factors to

determine whether an entity is acting as a broker, including whether it

> (1) actively solicits investors; (2) receives transaction-
> based compensation; (3) handles securities or funds of
> others in connection with securities transactions;
> (4) processes documents related to the sale of
> securities; (5) participates in the order-taking or order-
> routing process; (6) sells, or previously sold, securities
> of other issuers; (7) is an employee of the issuer; (8) is
> involved in negotiations between the issuer and the
> investor; and/or (9) makes valuations as to the merits
> of the investment or gives advice.

*SEC* v. *GEL Direct Tr.*, No. 22 Civ. 9803 (JSR), 2023 WL 3166421, at *2

(S.D.N.Y. Apr. 28, 2023); *see also Found. Ventures, LLC* v. *F2G, Ltd.*, No. 08 Civ.

10066 (PKL), 2010 WL 3187294, at *5 (S.D.N.Y. Aug. 11, 2010) (collecting

cases). The key inquiry is whether a promoter's conduct may be characterized

by "a certain regularity of participation in securities transactions at key points

in the chain of distribution." *Mass. Fin. Serv., Inc.*, 411 F. Supp. at 415; *see*

*also SEC* v. *Kramer*, 778 F. Supp. 2d 1320, 1336 (M.D. Fla. 2011) ("The

evidence must demonstrate involvement at key points in the chain of

distribution, such as participating in the negotiation, analyzing the issuer's

financial needs, discussing the details of the transaction, and recommending

an investment." (internal quotation marks omitted)). A determination of

whether a person acts as a broker is based on the totality of the circumstances.

*SEC* v. *RMR Asset Mgmt. Co.*, No. 18 Civ. 1895 (AJB) (LL), 2020 WL 4747750, at

*2 (S.D. Cal. Aug. 17, 2020), *aff'd sub nom. SEC* v. *Murphy*, 50 F.4th 832 (9th

Cir. 2022).

      As an initial matter, the SEC's allegations do not implicate many of the

factors courts use in identifying a "broker." Notably, the SEC does not allege

that the Wallet application negotiates terms for the transaction, makes

investment recommendations, arranges financing, holds customer funds,

processes trade documentation, or conducts independent asset valuations.

(SEC Opp. 25-27). Rather, the Complaint alleges that Coinbase: charged a 1%

commission for Wallet's brokerage services (Compl. ¶ 101); actively solicits

investors (on its website, blog, and social media) to use Wallet (*id.* ¶ 75);

81

compares prices across different third-party trading platforms (*id.* ¶ 82);[19] and "routes customer orders" in crypto-asset securities to those platforms (*id.* ¶ 64). Upon closer examination, these allegations, alone or in combination, are insufficient to establish "brokerage activities."

For starters, the SEC's allegations do little to suggest that Wallet undertakes routing activities in a manner recognized by courts to have been traditionally carried out by brokers, such as by providing trading instructions to third parties or directing how trades should be executed. *See, e.g.*, *GEL Direct Tr.*, 2023 WL 3166421, at *3 (finding that complaint alleged defendant routed securities orders in part because broker "exercised discretion" and "provided trading instructions on behalf of its customers," including directives on "price and volume").

As alleged, Coinbase's participation in the order-routing process is minimal. While Wallet "provide[s] access to or link[s] to third-party services, such as DEXs" (User Agreement App'x 4 § 8.1.2), the SEC does not allege that Coinbase performs any key trading functions on behalf of its users in connection with those activities. As the Complaint acknowledges, Coinbase has no control over a user's crypto-assets or transactions via Wallet, which product simply provides the technical infrastructure for users to arrange transactions on other DEXs in the market. (Compl. ¶ 64). Only a user has

---

[19]    While not pleaded in the Complaint, the SEC cites to Coinbase's website in its opposition; the website defines the swap/trade feature in Wallet as using the "0x decentralized exchange protocol" to help customers "find the best value for [her] trade." (SEC Opp. 27).

control over her own assets, and the user is the sole decision-maker when it comes to transactions.

What is more, while Wallet helps users discover pricing on decentralized exchanges, providing pricing comparisons does not rise to the level of routing or making investment recommendations. *See Rhee* v. *SHVMS, LLC*, No. 21 Civ. 4283 (LJL), 2023 WL 3319532, at *8 (S.D.N.Y. May 8, 2023) ("[M]erely providing information … do[es] not implicate the objectives of investor protection under the Exchange Act and do[es] not constitute effecting a securities transaction."). Similarly, the fact that Coinbase has, at times, received a commission does not, on its own, turn Coinbase into a broker. *See id.* at *9 ("Commission-based payment, standing alone, is not dispositive of whether a party acts as a broker-dealer under the Exchange Act." (quoting *Quantum Cap., LLC* v. *Banco de los Trabajadores*, No. 14 Civ. 23193 (UU), 2016 WL 10536988, at *7 (S.D. Fla. Sept. 8, 2016))).[20]

In sum, even when considered in the aggregate, the factual allegations concerning Wallet are insufficient to support the plausible inference that Coinbase "engaged in the business of effecting transactions in securities for the account of others" through its Wallet application. 15 U.S.C. § 78c(a)(4)(A). In

---

[20]  During oral argument, the SEC stressed the fact that Coinbase has relationships with — and provides its investors connections to — DEXs. (Jan. 17, 2024 Tr. 33:5-17). Facilitation or bringing together parties to transact, however, is not enough to warrant broker registration under Section 15(a). *See Rhee* v. *SHVMS, LLC*, No. 21 Civ. 4283 (LJL), 2023 WL 3319532, at *8 (S.D.N.Y. May 8, 2023) ("[M]erely … bringing two sophisticated parties together" does not suffice to constitute broker activity).

consequence, the Complaint does not plausibly allege that Coinbase is a broker with respect to its Wallet service.

## CONCLUSION

For the forgoing reasons, the Court DENIES Defendants' motion for judgment on the pleadings insofar as the Court finds the SEC has sufficiently pleaded that Coinbase operates as an exchange, as a broker, and as a clearing agency under the federal securities laws, and, through its Staking Program, engages in the unregistered offer and sale of securities. The Court further finds that the SEC has sufficiently pleaded control person liability for CGI under the Exchange Act. The Court GRANTS Defendants' motion, however, with respect to the SEC's claims regarding Wallet.

The Clerk of Court is directed to terminate the motion at docket entry 35. The parties are directed to submit a proposed case management plan on or before **April 19, 2024.**

SO ORDERED.

Dated:    March 27, 2024
        New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge