# EXHIBIT 8

Joshua A. Sussberg, P.C.
Christopher Marcus, P.C.
Christine A. Okike, P.C.
Allyson B. Smith (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| VOYAGER DIGITAL HOLDINGS, INC. *et al.*,[1] | Case No. 22-10943 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF STEPHEN EHRLICH,**
**CHIEF EXECUTIVE OFFICER OF THE DEBTORS,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Stephen Ehrlich, Chief Executive Officer of Voyager Digital Holdings, Inc., hereby

declare under penalty of perjury:

**Introduction**

1.     The Debtors are facing a short-term "run on the bank" due to the downturn in the

cryptocurrency industry generally and the default of a significant loan made to a third party.  But

the Debtors have a viable business and a plan for the future.  As discussed in this Declaration, we

worked tirelessly with our advisors over the last three weeks to develop a strategy that will position

the Debtors for long-term success.  Ultimately, the Debtors filed for chapter 11 relief to protect

their customers and preserve the value of their business.

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
        number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC
        (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY
        10003.

2.      Voyager operates a cryptocurrency brokerage that allows customers to buy, sell, trade, and store cryptocurrency on an easy-to-use and "accessible-to-all" platform.  Using the Company's mobile application, Voyager's customers can earn rewards on the cryptocurrency assets stored on the Company's platform and trade over 100 unique digital assets.  Voyager's mission since inception has been to provide any investor with the tools to enter the cryptocurrency industry on their own terms in a way that is tailored to the needs of each customer.  Voyager's mobile application has been downloaded millions of times and currently has over 3.5 million active users.   In 2021, Voyager was one of the top ten most downloaded cryptocurrency mobile applications in the world.

3.      Recent events in the world economy have roiled traditional markets and the cryptocurrency markets alike.  The lingering effects of the COVID-19 pandemic, coupled with rampant inflation and the adverse effects of the war in the Ukraine on the world economy, contributed to a massive sell-off in traditional assets in 2022.  Total wealth in the United States declined by $5 trillion between January 2022 and May 2022.



The cryptocurrency market is not immune to these macroeconomic trends and likewise experienced extreme market volatility in 2022.  All major coins and cryptocurrency-focused

companies have experienced significant declines; as of June 2022, the cryptocurrency market has lost $2 trillion in aggregate market value. Several major liquidity events in the cryptocurrency space, including the implosion of Terra LUNA ("Luna") (as discussed in Part IV of this Declaration), accelerated the onset of a "crypto winter" and an industry-wide sell-off to manage risk in 2022.



### Bitcoin and Macro Assets Returns

Bonds = iShares 20+ Year Treasury Bond ETF; Gold = COMEX Delayed Price;
Source: CoinDesk Research, St. Louis Fed, Yahoo Finance

4.      In addition to providing brokerage services, Voyager provides custodial services to customers who store cryptocurrency on Voyager's platform. Voyager provides loans, typically in the form of a specific type of cryptocurrency, to counterparties in the cryptocurrency sector to facilitate liquidity or trade settlement. Interest earned from the Company's loans is passed along to customers, who earn a "yield" on their stored cryptocurrency. Due to the severe market down turn in early 2022, the Company proactively engaged in a number of internal initiatives to hedge risk, reduce its outstanding loan balances, and mitigate the effects of a significant market decline on customers. Ultimately, the Company was able to trim exposure on a majority of its loans and generally avoid exposure to counterparty risk in most instances.

5.    In June 2022, it appeared that the Company's loan to Three Arrows Capital ("3AC"), a cryptocurrency hedge fund based in Singapore, was in jeopardy of partial or full nonpayment.  The Company's loan to 3AC was one of its largest outstanding loans.[2]  On June 17, 2022, 3AC announced that it had suffered heavy losses due to massive exposure to Luna.  The Company's management team was acutely aware that nonpayment of the loan to 3AC, coupled with severe industry headwinds, would strain the Company's ability to act as a broker for cryptocurrency assets.  Accordingly, the Company's management team immediately began to explore potential strategic solutions.  On or about June 16, 2022, the Company retained Kirkland & Ellis LLP ("Kirkland") and Moelis & Company LLC ("Moelis").  The Company subsequently retained Berkeley Research Group ("BRG") on June 30, 2022.  The Company engaged in numerous discussions with a number of third parties and potential sources of new liquidity.  The Company also negotiated and secured an unsecured loan from Alameda Ventures Ltd., a major participant in the cryptocurrency space, and began discussions with a host of third parties about a long-term solution.  Discussions with these third parties, however, ultimately revealed that an in-court process would be necessary to yield the most value-maximizing path forward available to the Company.

6.    To that end, and consistent with Voyager's mission to serve its customers, this is not a "free-fall" filing without direction.  On the contrary, Voyager has a path forward and a plan to swiftly bring these chapter 11 cases to an appropriate conclusion.  Voyager's proposed chapter 11 plan of reorganization (attached hereto as **Exhibit C**, the "Plan") contemplates a standalone restructuring that the Company can effectuate without a sale or a strategic partner.  The Company

---

[2]    Voyager disclosed the size of the 3AC Loan in the Company's publically filed financial reports.  The Company disclosed the balance of its seven largest cryptocurrency loans in its March 31, 2022 quarterly financial statements.  The Company also provided the geographic location of the counterparty for each of the seven loans it disclosed in the those financial statements.

will continue a robust marketing process—one that was already underway prepetition—to test the value proposition of the Company's business. This process is designed to position Voyager for success in a turbulent market environment, allowing the Company to support go-forward operations and preserve the value of its customers' assets.

7.      The Company's primary focus has been, and always will be, its customers. The Company's chapter 11 cases allow the Company to continue to meet its objectives by marketing the Company to third-party investors or effectuating a comprehensive restructuring transaction that will preserve the value of the business and operations. Voyager will move as swiftly as possible through these cases to maximize the value of its business and allow customers to fully use the Company's platform.

## Background

8.      I am the Co-Founder and Chief Executive Officer of Voyager Digital, LLC ("Voyager Digital," together with debtor subsidiaries and affiliates, the "Company" or "Voyager"), and have held that position since Voyager Digital's founding in 2018. I am also the Chief Executive Officer of Voyager Digital Holdings, Inc. Prior to co-founding Voyager Digital, I co-founded and served as Chief Executive Officer of Voyager Digital Canada Ltd. and served on Voyager Digital Canada Ltd.'s board of directors. I served as Vice-President, Brokerage of E*Trade Financial Corporation from 1999 to 2006 and Chief Executive Officer of ETrade Professional Trading from 2002 to 2006 before I founded Lightspeed Financial, LLC in 2006.

9.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. Except as otherwise indicated, all facts in this Declaration are based upon my personal knowledge, my discussions with other members of Voyager's management team and advisors, my review of relevant documents and information concerning Voyager's operations, financial affairs, and restructuring initiatives, or my opinions based upon

my experience and knowledge.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

10.     On July 5, 2022 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the Court.  To minimize the adverse effects on their business, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").  I submit this declaration (the "Declaration") to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed contemporaneously herewith.

11.     To familiarize the Court with the Debtors, their business, the circumstances leading up to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration into five sections as follows:

- **Part I** provides a general overview of the cryptocurrency market;

- **Part II** provides an overview of the Company's history and operations;

- **Part III** describes the Company's prepetition corporate and capital structure; and

- **Part IV** provides an overview of circumstances leading to these chapter 11 cases.

**I.     Overview of Cryptocurrency**

12.     The cryptocurrency industry is in its nascent stages, and many of the technologies, terminologies, and platforms discussed in this Declaration may be unfamiliar.  This section provides an overview of some of the key components of the cryptocurrency ecosystem that are discussed throughout this Declaration.

### A. Cryptocurrency and the Blockchain

13.     A cryptocurrency is a digital currency designed to serve as a medium of exchange or store of value.  Cryptocurrency is used to execute transactions on a "blockchain," a digital technology that vets and verifies transactions through a rigorous mathematical process.  Each blockchain utilizes a specific cryptocurrency or a limited number of cryptocurrencies to execute transactions (the Ethereum blockchain uses Ether as its cryptocurrency).  The blockchain is often called a digital "ledger" because it records every single transaction ever made by "native" cryptocurrency.

14.     Cryptocurrencies are decentralized (they are not issued or created by a government or central institution).  Transactions are completely anonymous, but each transaction is recorded by the blockchain and viewable by any individual.  Instead of needing to consult a third party (like a bank or title company) to verify that a transaction took place, an individual could consult the blockchain for free.  One example of the potential utility of cryptocurrency and blockchain technology is buying a house.  If a house was "on the blockchain," a homeowner could provide a potential homebuyer with the blockchain "ID" associated with the house and the homebuyer could see the transaction history of the house and the status of all deeds or titles associated with it without having to consult a third party.  Such a process would provide the homebuyer up-to-date information quickly, securely, and inexpensively and all without the need for a third-party service provider.

### B. Cryptocurrency Overview

15.      There are thousands of cryptocurrencies and blockchain protocols.  Certain cryptocurrencies and blockchain protocols offer specific advantages or use cases.  Of the cryptocurrencies in existence, two have emerged as leaders in the industry:



*Bitcoin*.  Bitcoin or "BTC" was the most successful early cryptocurrency.  The core focus of Bitcoin and the Bitcoin blockchain was developing a decentralized payment network.  Bitcoin is often viewed as the "father" of modern cryptocurrency and is used as a proxy for the cryptocurrency industry in the same way that the S&P 500 is often used as a proxy for the financial markets.  The market capitalization of Bitcoin as of the date hereof is approximately $371 billion.



*Ethereum*.  Ether is the native token of the Ethereum blockchain, though Ether is generally referred to as "Ethereum" as well.  Ether or "ETH" is similar to Bitcoin in that it can be used to make payments or used as a store of value or collateral.  The Ethereum blockchain also enables the use of "smart contracts," or simple programs that can be used on a blockchain to facilitate non-payment related transactions.  Storing the title information for a house, in the example above, would likely be done through a smart contract.  The market capitalization of Ether as of the date hereof is approximately $15 billion.



Other popular cryptocurrencies include Binance Coin, Cardano, and Solana.  All are able to provide the same general utility of Bitcoin or Ethereum, but each uses different blockchain technologies and provides certain unique benefits to participants.

16.     Stablecoins are a separate but important type of cryptocurrency.  A stablecoin is a type of cryptocurrency that is tied (or "pegged") to another currency, commodity, or financial instrument.  Stablecoins are designed to reduce volatility and help facilitate transactions on a blockchain.  USD Coin (or "USDC") is one of the largest stablecoins by market capitalization, and is pegged 1:1 with the U.S. Dollar.  USDC is collateralized by a pool of cash and short-dated U.S. Treasury securities to ensure that it maintains its price stability—for every USDC in circulation, $1 is held as collateral.  Each USDC is redeemable for $1.

17.     All cryptocurrency is stored (or "lives") on the blockchain but can only be accessed by a private "key" held by the cryptocurrency's owner.  Cryptocurrency keys are held in cryptocurrency "wallets" that allow the owner to easily, and securely, manage the keys to their cryptocurrency assets.

## II.     Voyager's History and Operations

### A.     The Company's Corporate History

18.     I helped found Voyager in 2018 along with Philip Eytan, Gaspard de Dreuzy, and Oscar Salazar, a group of Wall Street and Silicon Valley entrepreneurs with extensive experience in the technology and finance sectors.  Voyager was founded to bring choice, transparency, and cost efficiency to cryptocurrency investors and was designed to be "accessible to all" by focusing on the needs of retail investors.

19.     Voyager grew rapidly—in just four years, Voyager's platform evolved from a small startup to an industry-leading brokerage with 3.5 million users and over $5.9 billion of cryptocurrency assets held.  Voyager is a public company and has traded on the Toronto Stock Exchange since 2021 under the ticker "VOYG."

## B.     The Company's Operations

20.     Voyager's primary operations consist of (i) brokerage services, (ii) custodial services through which customers earn interest and other rewards on stored cryptocurrency assets, and (iii) lending programs.  All of the Company's services are accessible through a mobile application that users can download on their smartphones and other smart devices.

### a.  Brokerage Services

21.     Traditional brokerage services have largely focused on either retail investors or institutional investors, tailoring features to one group at the exclusion of the other.  Voyager's founders understood that, though retail investors do not need the full suite of services that an institutional-focused brokerage provides, retail investors deserve a high-quality trading experience that maximizes their ability to invest in the cryptocurrency sector on an equal playing field with other market participants.



22.     Voyager operates as a cryptocurrency "agency broker," matching its customers with counterparties who can facilitate the customer's desired trade.  The Company's platform is simple and easy to use, but beneath the retail investor-focused user interface is an institutional-grade trading platform built to provide Voyager's customers with high-quality trade execution

across numerous digital currencies.  The Company's platform is unique, as it surveys more than a

dozen exchanges and liquidity providers and executes trades through a proprietary algorithm that

evaluates the price, certainty of execution, reliability of the trading venue, and speed of execution

to deliver each customer a high quality execution.  Ultimately, Voyager's customers know that

they have access to a best-in-class trading platform no matter how big or small their trade.

### b.  Custodial Services



23.      Digital currencies deposited by customers are

stored on Voyager's platform rather than individualized digital

"wallets."  In exchange, Voyager customers earn interest on

deposits.  Interest is primarily paid in three ways: (i)  PIK Interest; (ii) through VGX and the

Voyager Loyalty Program; and (iii) through "staking" programs.  To complement its custodial

services and the Voyager Loyalty Program, customers can sign up for the Voyager Debit Card.

24.      ***PIK Interest***.  Customers who deposit certain cryptocurrencies with Voyager earn

payable-in-kind interest ("PIK Interest") on their assets.  Customers can earn up to 12 percent

interest on certain digital currencies, provided that such users maintain a minimum monthly

balance and keep their assets on the Company's platform.

25.      ***Voyager Loyalty Program and VGX Token***.  Voyager token ("VGX") is a digital

currency issued and administered by the Company.  VGX is primarily issued in connection with

the company's loyalty and rewards program (the "Voyager Loyalty Program").  Ownership of

VGX entitles users to benefits on their accounts operating through a tiered reward system.  VGX

is traded on the Coinbase Exchange under the ticker "VGX."

26.      The Voyager Loyalty Program is similar to retail or restaurant loyalty programs,

where loyal users are rewarded for continued use of the platform.  Active users on the Voyager

platform can earn a variety of rewards and incentives, including higher referral bonuses, lower

transaction fees, prioritized customer support, higher PIK Interest rates, and access to special events and investment opportunities.

27.     ***Debit Card***.  The Voyager debit card (the "Voyager Debit Card") is a cobranded debit card that can be used anywhere MasterCard is accepted.  This card is structured as a prepaid debt card issued through Metropolitan Commercial Bank[3] (an FDIC-insured bank) and allows investors to spend cryptocurrency directly without having to pay fees associated with currency conversion.  Voyager Debit Card holders also earn rewards associated with each purchase, including up to 3 percent "crypto back" in the form of VGX.

28.     ***Staking***.  Voyager allows its customers to "stake" cryptocurrencies.  Staking refers to the process of committing cryptocurrency assets to a project in exchange for a set rewards rate determined by each protocol.  Staked cryptocurrency is typically not immediately "callable"— generally, the owner will need to wait for a fixed period before being able to recall the cryptocurrency to their wallet.  Voyager facilitates staking projects for its customers through the Company's simple mobile app, opening up new sources of passive income to cryptocurrency investors and maximizing the utility of the customer's assets.

### c.  Lending Program

29.     To provide customers with PIK Interest, Voyager lends cryptocurrency deposited on its platform to third parties.  Such third parties pay Voyager a pre-negotiated interest rate that is payable in either cash or payment-in-kind (*i.e.*, a Bitcoin loan accrues interest payable in Bitcoin).  Voyager's lending program is an integral part of its business and necessary to provide customers with a meaningful return on their assets.  Loans made by the Company that are outstanding as of the Petition Date are as follows:

---

[3]     Metropolitan Commercial Bank is also an authorized depository in the Southern District of New York.

| Loan Counterparty | Borrowing Rates | Amount Outstanding (in thousands) |
|---|---|---|
| Alameda Research Ltd. | 1% - 11.5% | $376,784 |
| Three Arrows Capital | 3% - 10% | $654,195 |
| Genesis Global Capital, LLC | 4% - 13.5% | $17,556 |
| Wintermute Trading Ltd | 1% - 14% | $27,342 |
| Galaxy Digital LLC | 1% - 30% | $34,427 |
| Tai Mo Shan Limited | 10% | $13,770 |
| Other | 4% - 8% | $751 |
| Total Loan Obligations | | $1,124,825 |

### C.      Using Voyager's Platform

30.      Customers access the Company's entire suite of services through Voyager's mobile application (the "Voyager App").  Customers sign up for a Voyager account on the Voyager App after digitally executing Voyager's customer agreement, and can link their bank account or off-site cryptocurrency wallet to the platform to facilitate the purchase of cryptocurrency or the transfer of the customer's cryptocurrency on the platform.

31.      The Company does not maintain a separate cryptocurrency wallet for each customer.  Instead, all cryptocurrency assets are commingled on an asset-by-asset basis and swept from the Company's commingled wallet to a third-party custodial account that protects and secures keys to the Company's cryptocurrency deposits.  The Company utilizes several custodial accounts depending on the specific type of cryptocurrency asset (*e.g.*, Bitcoin, Ether).

### III.      Voyager's Prepetition Corporate and Capital Structure.

### A.      Voyager's Corporate Structure.

32.      As set forth on the corporate structure chart attached as **Exhibit B**, Debtor entity Voyager Digital Ltd. currently owns, directly or indirectly, each of the other Debtor entities.

B.     **Voyager's Capital Structure.**

a.   **Loan Facility.**

33.     On June 22, 2022, Voyager Digital Holdings, Inc. entered into that certain agreement for the revolving credit facility dated June 21, 2022 (the "Loan Agreement," and such facility, the "Loan Facility") with Alameda Ventures Ltd. ("Alameda") as lender, to provide a revolving credit facility of $200 million cash and USDC (the "Cash Loans") and 15,000 Bitcoin (the "BTC Loans") guaranteed by Voyager Digital Ltd.  As of the Petition Date, the total value of aggregate consideration available under the Loan Facility is approximately $500 million.[4]

34.     The borrowers under the Loan Agreement can draw on the Loan Facility in U.S. dollars or USDC under the Cash Loans, or BTC under the BTC Loans.  The Loan Facility accrues interest on the outstanding principal balance at a rate equal to five percent annually.  Any accrued interest is due on December 31, 2024, the Loan Facility's maturity date.  Repayment of any principal balance is required to be in the currency in which the amount was funded (if in BTC, the repayment must be equal to the amount drawn down and outstanding at the time of repayment).

35.     As of the Petition Date, 75 million USDC are outstanding under the Loan Facility. The aggregate value of the USDC outstanding is $75 million.[5]

b.   **Equity Interests in Voyager.**

36.     As of the Petition Date, the Debtors' ultimate parent, Voyager Digital Ltd., has approximately 196,000,000 shares of common stock outstanding, approximately 9.49% of which is held by Alameda and its affiliates with the remainder widely held by investors.

---

[4]     Assuming a Bitcoin price of $20,000.
[5]     As a stablecoin, USDC is pegged to $1 per coin.

IV.     **Circumstances Leading to These Chapter 11 Cases.**

A.     **Turbulent Market Conditions**

37.     The onset of the COVID-19 pandemic was a watershed moment in traditional markets and cryptocurrency markets alike. Between February 12, 2020, and March 23, 2020, the Dow Jones Industrial Average lost 37 percent of its value and the S&P 500 lost 34 percent of its value. The price of Bitcoin fell over 50 percent over the same time period, and most other cryptocurrencies experienced similar declines.

38.     Fear of a lingering pandemic and its effect on the world economy drove many investors to exit the market altogether. Voyager, however, continued to provide brokerage services through the entirety of the 2020 "COVID Crash." Customers were able to use the platform to trade despite extreme volatility in the markets, and yield rewards were paid out to qualifying customers as well. The Company's response to market headwinds in 2020 solidified its status as a leading cryptocurrency broker—between 2020 and 2022, the number of users on the Company's platform grew from 120,000 to over 3.5 million.

39.     After the COVID Crash, traditional markets and cryptocurrency markets saw a short recovery period followed by a period of sustained growth. Central banks and governments around the world (including, in particular, the United States Federal Reserve) enacted relief programs and adopted quantitative easing monetary policies designed to bridge the world economy to the end of the COVID-19 pandemic. Such policies contributed to growth in traditional markets and cryptocurrency markets, and investment into new projects in the cryptocurrency industry skyrocketed. Between its lowest point in 2020 and its highest point in 2021, the price of Bitcoin rose by over 1,000 percent. The S&P 500 rose by nearly 100 percent over the same period.

40.     In traditional markets, fears of new variants of the COVID-19 virus and a potential economic contraction drove equity markets sideways through the end of 2021. In the

cryptocurrency space, strong selloffs in "risk-on" assets like technology and early-stage equities led to selloffs in the cryptocurrency sector as investors trimmed exposure. Increased regulatory scrutiny internationally also contributed to market pessimism, and strong spot trading from institutional investors drove most cryptocurrencies to double-digit losses from all-time highs.

41.     Ultimately, traditional markets closed 2021 with double-digit growth. On the surface, it seemed like markets were beginning to recover from the COVID-19 pandemic and that its lingering effects would be minimal. But discussions around a possible recession in 2022 began to materialize as inflation rose, along with concerns over whether world governments could navigate a "soft landing" into a slower economic period in 2022.

42.     2022, to date, has been marked by historic levels of volatility in the traditional markets and cryptocurrency markets. On February 24, 2022, Russia invaded Ukraine in a major escalation of conflict between the two countries (the "Ukrainian War"). The Ukrainian War had a swift and profound impact on the world economy. Western countries imposed a series of financial, trade, and travel sanctions against Russia in an effort to weaken Russia's ability to pursue the war, which led to a rampant increase in commodity prices. The S&P 500 shed 20% of its value to date in 2022, while the tech-heavy NASDAQ declined by nearly 30% over the same period. Rising inflation and commodity prices contributed to investor pessimism and further selloffs. In June 2022, market analysts officially labeled 2022 as a bear market.



**Bear Market Sends Grim Signal of Economic Fears**

Source: FactSet

### B.    "Extreme Fear" and the "Cryptopocalypse"

43.    The widespread selloff in traditional markets was mirrored in the cryptocurrency industry.    All major cryptocurrencies experienced significant declines in the first half of 2022; Bitcoin slumped 37.3% in June 2022 alone and is down 60% year-to-date.    Companies in the cryptocurrency industry



also experienced significant equity declines as declining cryptocurrency prices pressured margins and investor pessimism grew.  In June, the aggregate value of the cryptocurrency market slumped below $1 trillion for the first time since January 2021.

44.    Distressed situations faced by two industry participants—Terra and Three Arrows Capital—exacerbated this "cryptocurrency winter."  The eventual implosion of Terra and Three Arrows Capital, and the resulting fallout, created the "cryptopocalyse."

### a.   The Terra Luna Collapse

45.    Terra is an open-source blockchain protocol created by Terraform Labs.  Similar to the Ethereum blockchain (which issues Ether for use on its platform), Terra issued Luna, a

17

cryptocurrency that was used to execute transactions on the Terra blockchain.  In early May 2022, Luna traded at approximately $86 and had a market capitalization of approximately $14 billion.

46.      Terra also issued TerraUSD ("UST"), an algorithmic stablecoin.  Historically, UST traded at $1.[6]  UST maintained its "peg" to Luna via an arbitrage mechanism.  If UST traded above $1, arbitrageurs bought $1 worth of Luna for $1 and exchanged Luna for one UST worth more than a dollar, netting the difference as profit.  If UST traded below $1, arbitrageurs bought one UST for less than a dollar and exchanged it for $1 worth of Luna, netting the difference as profit. These arbitrage trades push the price of UST back to $1, and were intended to keep the two tokens equally scarce and limit oversupply or undersupply of the two tokens.  To incentivize traders to burn Luna to create UST, Terra allowed owners of UST to stake their UST in exchange for a 19.5% yield (payable in UST).

47.      On May 7, 2022, $2 billion of UST was unstaked and immediately sold.  The sale moved UST's price down to $0.91.  UST holders, already sensitive to price movements due to the sell-off in cryptocurrencies generally, saw UST "de-peg" and rushed to unstake and sell their coins. Terra's arbitrage trade was designed to address this type of situation but was not designed to address a situation of this magnitude.  Though traders moved quickly to burn Luna and "arbitrage" the price of UST, traders realized that only $100 million of UST could be burned for Luna each day.  Due to high trading volume, $100 million of UST was insufficient to "re-peg" UST to $1.

---

[6]      Stablecoins are typically backed by the U.S. dollar.  Instead, Terra utilized its arbitrage mechanism with Luna and a reserve of Bitcoin to maintain UST's "peg."

48.  Massive selling pressure led to a downward spiral or, as known in traditional finance, a "death spiral." Traders redeemed UST for Luna and sold their Luna, leading to a significant decrease in the price of Luna. Traders attempted to "re-peg" Luna to UST by burning UST to create Luna, which in turn created an oversupply of Luna that further exacerbated its price decline. Terra allegedly sold $2.2 billion



The collapse of Terra (Luna)
Daily closing price in USD, last three months (22 February - 22 May 2022)
Source: CoinMarketCap

of its Bitcoin reserves to enter the Luna/Terra arbitrage efforts and re-peg the tokens but was unsuccessful. The price of Luna fell from $82.55 to $0.000001 in one week.

49.  The Terra/Luna blockchain protocol was widely viewed as a project with significant promise—Luna had attracted significant interest from institutional investors and retail investors alike. The Luna collapse erased over $18 billion of value and contributed to further selloffs in the cryptocurrency sector.

**b. Three Arrows Capital**

50.  The collapse of Luna had a significant effect on the cryptocurrency industry. Many cryptocurrency-focused hedge funds and other cryptocurrency companies owned Luna and incurred losses on their position after they sold. Some participants were unable to sell their Luna under staking agreements or other lock-up agreements—such participants were forced to incur up to a 99% loss on their investment if they were prohibited from selling their Luna.

51.  In early June 2022, it was reported that 3AC may have incurred significant losses due to Luna's collapse. On June 15, one of 3AC's founders stated that the fund incurred significant losses on account of its staked Luna position and had hired legal and financial advisors to explore

potential liquidity solutions. On June 27, 2022, 3AC was ordered by a court in the British Virgin Islands to commence liquidation proceedings.

52. The Company's management team is familiar with market volatility, having navigated the Company through the COVID Crash and through their collective experience in the finance industry. As Voyager is a brokerage services provider that is not directly dependent on the price of Bitcoin or any other cryptocurrency for revenue, Voyager has limited exposure to an industry-wide selloff.

53. But to provide customers with a yield on the assets they store with Voyager, Voyager loans out a portion of its cryptocurrency reserves to third parties. Voyager customers expressly acknowledge that Voyager may loan the customer's deposited assets (which are pooled with all other retail investors' deposited assets) to third parties when they agree to the Voyager customer agreement, a requirement to deposit assets on Voyager's platform. Loans are typically made in the form of cryptocurrency to, among other things, facilitate the counterparty's transactions or provide the counterparty with additional liquidity of a specific type of token.

54. The Company has entered into a number of third party loans. Between March 2021 and March 2022, the Company entered into 125 third party loans with 9 different counterparties, lending out cryptocurrency with an aggregate market value of $5.15 billion.

55. In March 2022, the Company entered into a master loan agreement with 3AC (the "3AC Loan"). Pursuant to the 3AC Loan, the Company agreed to lend 15,250 Bitcoins and 350 million USDC to 3AC. The 3AC Loan was callable at any time by the Company. 3AC fully drew down on the 15,250 Bitcoins and 350 million USDC.

56. After the Luna crash in 2022, the Company began to assess 3AC's downside exposure and the likelihood of repayment under the 3AC Loan. The Company made an initial

request for a repayment by 3AC of $25 million of USDC by June 24, 2022, and subsequently requested repayment of the entire outstanding balance of Bitcoin and USDC by June 27, 2022. 3AC did not repay either requested amount. Accordingly, on June 27, 2022, Voyager issued a notice of default to 3AC for failure to make the required payments under the 3AC Loan.[7]

### C.    The Alameda Loan and the Prepetition Marketing Process

57.    Once it became clear that 3AC had significant exposure to the Luna crash, Voyager's management team immediately engaged in efforts to identify sources of potential liquidity to stabilize the Company's business and ensure that the Company remained adequately capitalized.

58.    The Alameda Loan Facility provided the Company with $200 million cash and USDC and 15,000 Bitcoin subject to certain restrictions. The Company could draw on the facility in either U.S. dollars or Bitcoin, providing the Company with capital to fund its business and cryptocurrency to facilitate trade execution if necessary. The Alameda Loan Facility also communicated to the market at large that Voyager had significant cash on hand and support from one of the industry's key players.

59.    The Alameda Loan Facility, however, was only a partial solution to the Company's liquidity issues. General market pessimism due to significant declines in cryptocurrency prices, coupled with concerns about the 3AC Loan, contributed to an influx of customer withdrawals. The Company's management team understood that the Company would likely need to pursue a strategic transaction and/or seek additional sources of liquidity. Accordingly, the Company engaged Kirkland as legal counsel, Moelis as investment banker, Teneo Strategy LLC ("Teneo")

---

[7]    As described above, the Company had several other master loan agreements in place with other counterparties in the cryptocurrency space. However, the Company proactively engaged in significant efforts to secure repayment of its other outstanding loans. As of the Petition Date, the 3AC Loan is the Company's only significant outstanding loan.

as a strategic advisor, and Consello MB LLC ("Consello") as a strategic advisor in June 2022 to advise on potential transactions.

60.     In late June 2022, the Company, with the assistance of Moelis, commenced a comprehensive, dual-track marketing process to solicit investor appetite in either (a) a sale of the Debtors' entire business to either a financial sponsor or a strategic company in the cryptocurrency industry and (b) a capital raise whereby a third party (individually or as part of a consortium) would provide a capital infusion into the Debtors' business enterprise.[8]  I understand that Moelis reached out to 60 potential financial and strategic partners across the globe, including domestic and international strategic cryptocurrency-related businesses and private equity and other investment firms that currently have cryptocurrency-related investments and/or historical experience investing in the cryptocurrency industry.  Ultimately, I understand that 22 parties entered into confidentiality agreements with the Debtors.  I understand that Moelis provided these parties with a copy of Voyager's investor presentation and access to a virtual data room with comprehensive information regarding Voyager's business operations and financial position.  I understand that the virtual data room was robust and was supplemented throughout the marketing process and ultimately contained thousands of pages.  I, and other members of the Voyager management team, attended virtual diligence sessions with Moelis and several interested parties.

61.     I understand that the marketing process yielded one proposal for an out-of-court financing.  The Company determined that the proposal was not actionable, however, as the conditions precedent to the proposal and the pro forma capital structure contemplated thereunder were not achievable.  I understand that no other counterparty was willing to participate in an

---

[8]    Additional information regarding the Company's prepetition marketing efforts is contained in the *Declaration of Jared Dermont Regarding the Debtors' Marketing Process and in Support of the Debtors' Chapter 11 Petitions and First Day Motions*, filed contemporaneously herewith.

out-of-court transaction on the timeline required.  However, I understand that several parties indicated interest in participating in a potential in-court transaction.  Accordingly, Voyager and its advisors continued to discuss potential transactions and provide diligence to third parties on potential in-court and out-of-court restructuring transactions.

### D. Gates.

62.    On June 13, 2022, Celsius Network, a cryptocurrency lender with over $11 billion of assets under management, announced that it was raising the "gates" on account activity, pausing all account withdrawals and transfers due to what it referred to as "extreme market conditions." Celsius' announcement triggered a further pulldown in the cryptocurrency markets; Bitcoin slid over 30% in the ensuing days as investors on other platforms began to liquidate their positions. Voyager saw a significant uptick in customer withdrawals—some of which Voyager does not believe are legitimate[9]—putting additional strain on the Company's business and risking the Company's ability to serve customers who remained on its platform.

63.    On June 23, 2022, Voyager reduced its daily withdrawal maximum from $25,000 to $10,000 per user per day.  Putting a cap on withdrawals was necessary to ensure that the Company could effectuate trades for customers on its platform who elected to keep their cryptocurrency assets with Voyager, as well as stabilize the Company's business while it engaged in discussions with potential third-party sponsors.  Ultimately, the initial withdrawal limits maximized the Company's ability to continue to provide brokerage services to its customers.[10]

---

[9]    While the gates are in place, customers may fraudulently attempt to disclaim prepetition purchases by seeking to revoke ACH transactions.  This practice (if permitted by ACH and the banks) would shift the risk of crypto price movements during the intervening period from the customers seeking to evade transactions they initiated to Voyager's other customers, and is unfair and improper.  For that reason and others, Voyager is asking as part of its Cash Management Motion for authority to prohibit MC Bank from honoring chargeback requests from the MC FBO Account for a sixty day period while the Debtors work with MC Bank to confirm whether such requests are legitimate or fraudulent.

[10]    Approximately 97% of customers on Voyager's platform have less than $10,000 in their account.

23

64. Voyager hoped that lower withdrawal limits would allow the Company to stabilize its business. However, as the cryptocurrency markets continued to trend down, the Company realized that further steps were required to preserve customer investments, avoid irreparable damage to the Debtors' business, and ensure that its trading platform operated smoothly for all customers. Accordingly, on July 1, 2022, the Company froze all withdrawals and trading activity on its platform.

65. Though the Company continued to rigorously diligence all potential restructuring transactions, it became clear that a potential strategic transaction would only emerge after the Company petitioned for chapter 11 relief. Accordingly, the Company began to analyze a potential in-court timeline and finalize its contingency preparations process. The Company engaged BRG as restructuring advisor to assist the Company with its contingency planning efforts.

**E.    Governance Initiatives.**

66. Voyager Digital LLC ("OpCo") formally formed a special committee (the "Special Committee") on July 5, 2022, comprised of disinterested directors Timothy Pohl and Jill Frizzley. The Special Committee is vested with the authority to, among other things:

- investigate any historical transactions, public reporting, or regulatory issues undertaken by OpCo that the Special Committee deems necessary or appropriate, and the facts and circumstances surrounding such transactions;

- interview and solicit information and views from management, representatives, consultants, advisors, or any other party in connection with any historical transactions undertaken by OpCo that the Special Committee deems necessary or appropriate;

- request documentation and information regarding OpCo's business, assets, properties, liabilities and business dealings with respect to any historical transactions undertaken by OpCo that the Special Committee deems necessary and appropriate to review;

- perform any other activities consistent with the matters described herein or as the Special Committee or OpCo's board of directors otherwise deems necessary or appropriate; and

- conduct an independent investigation with respect to any potential estate claims and causes of action against insiders of OpCo, including any claims arising from the 3AC Loan (the "Investigation").  The Investigation remains ongoing as of the Petition Date.

The Special Committee is also authorized to prosecute or settle any and all claims and causes of action arising from the historical transactions that are investigated by the Special Committee.

67.  In addition to the appointment of two independent directors and the establishment of the Special Committee at Voyager Digital, LLC, the Debtors also appointed one independent director, Matthew Ray, to the board of directors at Voyager Digital Ltd. and one independent director, Scott Vogel, to the board of directors at Voyager Digital Holdings, Inc.

**F.  The Company's Chapter 11 Plan, these Chapter 11 Cases, and Next Steps.**

68.  The Company filed the Plan concurrently with this Declaration.  The Plan provides for a standalone restructuring transaction that can be effectuated without a sale or a strategic partner.  Under the Plan, account holders will receive a combination of (i) coins, (ii) new common shares in reorganized Voyager, (iii) existing VGX tokens, (iv) and any recovery on account of the 3AC Loan.[11]  Account holders can also elect to increase or decrease their *pro rata* recovery of equity in reorganized Voyager in exchange for an equal increase or decrease in the amount of coins such account holder is entitled to.  Ultimately, the standalone restructuring will provide account holders with a meaningful recovery on account of their claims and vest ownership of the go-forward business of the Company in its customers.

69.  The Plan effectively functions as a "stalking horse" proposal.  The Company will continue discussions with strategic third-party investors to solicit interest in sponsoring the Plan or otherwise providing financing to Voyager in exchange for partial or full ownership of the reorganized Company.  Ultimately, pursuing the standalone restructuring and a marketing process

---

[11]  The Company is pursuing all available avenues to recover the 3AC Loan in 3AC's liquidation proceedings in the British Virgin Islands.

in tandem will allow the Company to consummate the most value-maximizing transaction available.

70.     These chapter 11 cases provide the Company with the best opportunity to stabilize its business, consummate a comprehensive restructuring transaction that maximizes value for all stakeholders, and emerge from chapter 11 positioned for success in the cryptocurrency industry. The proposed transactions under the Plan will also allow the Company to consummate a restructuring transaction that will meet all applicable regulatory and operating requirements in each of the states in which it does business. The Company plans to engage with all constituencies, including the official committee of unsecured creditors (which will likely be composed of largely account holders), in a productive dialogue with the hope of building consensus around the Company's chapter 11 plan of reorganization and, ultimately, a transaction that will maximize the value of the Company's business.

**I.      Evidentiary Support for First Day Motions.**[12]

71.     Contemporaneously herewith, Voyager filed a number of First Day Motions and is seeking orders granting various forms of relief intended to stabilize Voyager's business operations and facilitate the efficient administration of these chapter 11 cases. The First Day Motions seek authority to, among other things, ensure sufficient liquidity to run Voyager's business, ensure the continuation of Voyager's cash management systems, and allow for other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to give Voyager an opportunity to work towards successful chapter 11 cases that will benefit Voyager's stakeholders.

---

[12]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

72.     The First Day Motions request authority to pay certain prepetition claims.  I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, Voyager has narrowly tailored its requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to Voyager and its estates.  Other relief will be deferred for consideration at a later hearing.

73.     I am familiar with the content and substance of the First Day Motions.  The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable Voyager to operate in chapter 11 with minimal disruption to its business operations and constitutes a critical element in successfully implementing a chapter 11 strategy.  A description of the relief requested and the facts supporting each of the First Day Motions is detailed in **Exhibit A**.

## II.     Information Required by Local Bankruptcy Rule 1007-2.

74.     Local Bankruptcy Rule 1007-2 requires certain information related to Voyager, which I have provided in the exhibits attached hereto as **Exhibit D** through **Exhibit O**. Specifically, these exhibits contain the following information with respect to Voyager (on a consolidated basis, unless otherwise noted):[13]

- **Exhibit D**. Pursuant to Local Bankruptcy Rule 1007-2(a)(3), provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in these

---

[13]   The information contained in **Exhibit D** through **Exhibit O** attached to this Declaration does not constitute an admission of liability by, nor is it binding on, Voyager.  Voyager reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

chapter 11 cases, and a brief description of the circumstances surrounding the formation of the committee.

- **Exhibit E**. Pursuant to Local Bankruptcy Rule 1007-2(a)(4), provides the following information with respect to each of the holders of the debtors' 50 largest unsecured claims, excluding claims of insiders: the creditors name; the address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the telephone number; the name(s) of the person(s) familiar with the debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

- **Exhibit F**. Pursuant to Local Bankruptcy Rule 1007-2(a)(5), provides the following information with respect to each of the holders of the five largest secured claims against the debtors: the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

- **Exhibit G**. Pursuant to Local Bankruptcy Rule 1007-2(a)(6), provides a summary of the debtors' assets and liabilities.

- **Exhibit H**. Pursuant to Local Bankruptcy Rule 1007-2(a)(7), provides a summary of the publicly held securities of the debtors.

- **Exhibit I**. Pursuant to Local Bankruptcy Rule 1007-2(a)(8), provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity: the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

- **Exhibit J**. Pursuant to Local Bankruptcy Rule 1007-2(a)(9), provides a list of property comprising the premises owned, leased, or held under other arrangement from which the debtors operate their business.

- **Exhibit K**. Pursuant to Local Bankruptcy Rule 1007-2(a)(10), sets forth the location of the debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the debtors outside the territorial limits of the United States.