# **EXHIBIT 9**



**VOYAGER DIGITAL LTD.**

<u>**ANNUAL INFORMATION FORM**</u>

**FOR THE FISCAL YEAR ENDED JUNE 30, 2021**

**October 27, 2021**

on the CSE at the opening of trading on September 23, 2019.

On October 1, 2019, the Company acquired certain of Ethos' assets, including the Ethos Universal Wallet, Ethos Bedrock, certain blockchain technology and related intellectual property (collectively the "**Ethos IP**"), and a percentage of the Ethos tokens held by it for 7,250,000 Common Shares.

In October 2019, the Company issued 7,638,414 warrants to Jump Digital Currencies LLC ("**Jump**") in exchange for $10,000.  Each warrant issued entitles Jump, a proprietary cryptocurrency trading firm, to acquire one Common Share for an exercise price of C$0.80 per Share.  These warrants expire in August 2022.

On October 7, 2019, the Company granted 1,000,000 options to certain members of the Board, vesting monthly over three years at an exercise price of C$0.56, and with an expiry date of up to 10 years from the date of grant.  The Company also issued 300,000 options to certain advisors vesting one year from the grant date at an exercise price of C$0.56 and 1,000,000 options vesting monthly over 3 years at an exercise price of C$0.80 with an expiry date of up to 10 years from the date of grant.

On October 23, 2019, the Company launched its rewards program (the "**Rewards Program**"), which rewards customers with certain monthly pay-in-kind crypto assets held by participating customers in their Voyager account. The Company initially launched its Rewards Program for customers holding Bitcoin, but thereafter extended the Rewards Program periodically to include 34 crypto assets, including Bitcoin, USDC and Ethereum through end of Fiscal 2021.

On October 28, 2019, the Voyager app was released on the Android operating system.

On November 6, 2019, the Company's Shares began trading on the OTCQB Market.

On December 5, 2019, the Company granted 190,000 options to certain employees with 150,000 options vesting immediately at an exercise price of C$0.30 and 40,000 options vesting monthly over four years with a one-year cliff at an exercise price of C$0.30, and with an expiry date of up to 10 years from the date of grant.

On December 6, 2019, the Company closed a first tranche of a private placement with Thrust Capital through the issuance of 743,294 Common Shares at a price of C$0.80 per Share for total proceeds of approximately $450,000.

On January 15, 2020, the Company completed the acquisition of VYGR, following VYGR receiving approval from FINRA for a change in ownership, which solidified VYGR's position as a broker-dealer on the Platform.

On February 5, 2020, the Company granted 300,000 options to certain employees, vesting monthly over three years at an exercise price of C$0.30, and with an expiry date of up to 10 years from the date of grant.

On February 14, 2020, the Company completed a non-brokered private placement to raise $830,814 through the sale and distribution of 4,416,276 Common Shares at a price of C$0.25 per Common Share. The Company also settled outstanding debts through the issuance of 648,484 Common Shares at a deemed price of C$0.25 per share. Philip Eytan and Guy Elliott, directors of the Company, participated in the private placement for a total of 465,780 Shares; and Steve Ehrlich, Philip Eytan, and Gaspard de Dreuzy, directors and/or officers of the Company, participated in the debt settlement for a total of 427,355 Shares.

On March 23, 2020, the Company announced a non-brokered private placement to raise $100,000 through the sale and distribution of 966,180 Common Shares at a price of C$0.15 per Common Share.

On March 27, 2020, the Company acquired Circle Invest, a retail crypto asset business, from Circle Internet Financial, Inc., adding over 40,000 retail accounts to Voyager's customer base, a majority of which were migrated onto the Platform.

On April 16, 2020, the Company granted 1,000,000 options to certain employees, vesting monthly over one year at an exercise price of C$0.19, and with an expiry date of up to 10 years from the date of grant.

On April 21, 2020, the Company settled outstanding debts through the issuance of 300,000 Common Shares at a deemed price of C$0.25 per Common Share.

Insurance policies held by the Company's custodians are between the applicable custodian and the insurer, and accordingly the custodians' clients are not generally named payees on such policies. The Company is not always able to obtain and review copies of the insurance policies of its custodians. The Company cannot ensure that the limits of any such insurance policies will be available to the Company or, if available, sufficient to make the Company whole for any of its balance that are stolen or lost from such a custodian.

The Company has a due diligence program for all trading partners and conducts security reviews. Additionally, the Company assesses security, reputation, liquidity levels in applicable crypto assets, capitalization, management, internal control practices and operational risks in its determination of utilizing any trading partner, including holding in person meetings. Once onboarded, each trading partner is monitored on an ongoing basis to ensure they maintain compliance with required legal and regulatory standings. The Company also operates certain IT security protocols to ensure privileged and secure access to application programming interface ("**API**") connections with all trading platforms. These procedures are in place to maintain approval processes for the movement of crypto assets held with trading partners.

At present, the Company generally expects that, of its customer assets, approximately 20-50% will be held in Company accounts on Crypto Trading Platforms to facilitate liquidity and efficient trading, approximately 30-50% will be either self-custodied through the Fireblocks platform or held in storage with Anchorage, approximately 15-30% will be held by institutional borrowers through lending agreements, and approximately 1% will be held internally in "hot" wallets. However, the Company reserves the right to change the above noted allocations from time to time as it sees fit. As of Fiscal 2021, the Company had less than 5% of assets held in cold storage.

The Company is not aware of any security breaches or other similar incidents involving self-custodied assets or customer assets held with any third-party custodians, Crypto Trading Platforms or institutional borrowers or anything that would affect its ability to obtain an unqualified audit opinion in respect of its audited financial statements. None of the third-party custodians, Crypto Trading Platforms, or institutional borrowers holding Voyager's crypto assets is a "Canadian financial institution" (as defined in NI 45-106) or, other than Anchorage, a foreign equivalent, a related party of the Company, and none provide services to the Company other than custody, trade execution, and borrowing transactions. Neither Fireblocks nor Anchorage have appointed sub-custodians to hold customer assets, though the Company understands that certain of the Crypto Trading Platforms on which the Company maintains balances may from time to time employ sub-custodians. In the event of bankruptcy or insolvency of third-party Crypto Trading Platforms, custodians or institutional borrowers, the Company expects that it would be treated as an unsecured creditor.

The Company also from time to time makes strategic investments in venture-stage companies across the digital asset, cryptocurrency and blockchain technology, as well as other relevant, sectors. The Company generally invests in companies that are customers, vendors or suppliers of the Company or that the Company believes may be strategically important to the future business of the Company. From time to time, members of executive management (including members of the Board) may have existing positions with or may also participate in or otherwise hold such investments. In such circumstances, the Company may seek independent Board approval or ratification of its participation in such transactions that also involve such investments. As of the date of this AIF, such investments are not, either individually or in the aggregate, material to the operations of the Company.

**Specialized Skill and Knowledge**

The Company's success is largely dependent on the performance of its management and key employees, as well as directors, many of whom have specialized experience relating to the Company's industry, products, regulatory environment, customers and business. The Company believes that it has adequate personnel with the specialized skills and knowledge to successfully carry out the Company's business and operations. See "Risk Factors - Risks Related to the Company's Business" in this AIF for the risks in connection with the Company's reliance on key personnel for its continued success.

**Competition and Market Participants**

In the cryptocurrency industry, there exist multiple Crypto Trading Platforms offering online trading and wallets and multiple online/mobile players providing components of the cryptocurrency ecosystem. The largest US Crypto Trading Platforms are Coinbase, Kraken, Bittrex and Binance (US). Their models offer platforms that only send trades singularly to their wholly owned Crypto Trading Platforms with little or no information available on the platform. Voyager's agency Crypto Trading Platform uses smart order routing to search multiple Crypto Trading Platforms,

market makers and liquidity providers to strategically fill customer orders often at better prices than those offered by such Crypto Trading Platforms directly.

The competitive landscape also includes traditional payment and online brokers such as Robinhood, Sofi Invest, Square, and most recently Paypal, which announced a basic cryptocurrency offering. The Voyager Platform supports self-directed trading of more than 60 crypto assets, with the ability for customers to transfer certain of their crypto assets to their own wallet or custody with Voyager.

**Intangible Properties**

As described above under the heading "Description of Business General – Narrative Description of the Business", VIP holds a provisional patent application with the US Patent Office for the development of the Platform. In addition, the Company has over 20 key domain names, including "investvoyager.ca", "voyagerdigital.com" and "vygrdigital.com", which expire in 2021, with several of them renewing automatically. The Company also has a trademark application filed in the United States.

**Cycles**

The Company's business is not cyclical or seasonal.

**Economic Dependence**

The Company is dependent upon MC Bank pursuant to the Account Services Agreement in order for VDL to carry on its business in the majority of states in the United States. VDH entered into the Account Services Agreement with MC Bank, pursuant to which MC Bank provides deposit and payment systems for VDL's customers using a custodial "for the benefit of" account. MC Bank receives fees for wire transactions and account transactions, subject to a minimum $10,000 monthly fee. See "General Development of the Business - Three Year History" and "Risk Factors - Risks Related to the Company's Business - Arrangement with Metropolitan Commercial Bank" in this AIF for further information.

**U.S. Regulatory Matters**

The Company has considered whether it is required to register, in any capacity, under the relevant securities, commodity futures or derivatives legislation of the United States and specifically whether the Company is an "investment company" under the laws of the United States.

Registration as either a broker or dealer under Section 3(a)(4)(A) of the Exchange Act or as an investment company under the Investment Company Act of 1940 turns, as an initial matter, on whether or not the Company supports, custody's, intermediates, or facilitates, in any fashion, transactions involving "securities" as defined in section 2(a)(1) of the Securities Act of 1933. As further described below, the Company has taken reasonable measures to ensure that it does not support, custody, intermediate, or facilitate any transactions or activities with respect to any product that constitutes a "security". Accordingly, the Company has, after obtaining legal advice, determined that it is not required to be registered in any capacity under applicable U.S. securities laws.

For the avoidance of doubt, due to the fact that the Company does not support or facilitate securities on its Platform, the Company is not required to register as a broker-dealer or exchange with the SEC as indicated above. The Company's conclusion that it is not required to be so registered under U.S. securities laws is based on the due diligence and risk-based analysis it performs on all digital assets supported, or proposed for inclusion, on its platform. The Company performs ongoing due diligence and risk-based analysis to ensure that supported digital assets do not constitute securities under U.S. securities laws.

In particular, the Company performs internal due diligence reviews of all supported digital assets, as well as digital assets that have been proposed for inclusion on the Company's platform to determine the likely regulatory treatment of such digital asset, these procedures may include:

1. **Industry Review**. The Company's operations team (comprised of product, business development, technology, internal and/or external legal, compliance, finance and marketing personnel) will review the digital asset's functional purpose, its competitive position in the industry, the digital asset exchanges on

- 18 -

which it is supported, and its liquidity across markets, including digital asset exchanges, market makers and OTC desks. The Company will also seek information from the digital asset's sponsor (such as the issuer, associated foundation or affiliates thereof).

2. **Technological Review**. The Company's technology team will, to the extent feasible, review the technology underlying the digital asset, including seeking to ensure that the digital asset functions as described in its white paper.

3. **Legal Review**. Given the ongoing development of the law with respect to whether particular digital assets qualify as securities under U.S. securities laws, obtaining a formal legal opinion form external counsel as to the likely regulatory treatment of a particular digital asset may not feasible, and the Company will generally not seek to obtain such a legal opinion. Notwithstanding the foregoing, in an effort to determine the likely regulatory treatment of a digital asset, the Company will (i) seek to engage with legal counsel to the digital asset issuer or associated foundation, and (ii) when appropriate, work with U.S. securities counsel to apply applicable U.S. laws and regulations to the digital asset to determine whether it is reasonably likely to be deemed a security under the existing U.S. laws.

4. **Audit Committee**. Assuming that, after undertaking the above steps, the Company's operations team recommends that the Company support the applicable digital asset, it will summarize its findings for the Company's Audit Committee or such other committee as may be formed for this purpose, for their review and to confirm satisfactory compliance with the above noted procedures.

5. **Ongoing Monitoring**. The Company will on a consistent basis monitor all relevant formal or informal guidance provided by the SEC (and other applicable regulators) with respect to the regulatory treatment of digital assets generally, and the digital assets supported by the Company, specifically. In the event that the Company (i) determines that any of the digital assets it supports have been removed for regulatory reasons from any digital asset exchanges, market makers or OTC desks, (ii) becomes aware that any of its key competitors announced that, for regulatory reasons, it would no longer support digital assets listed on the Platform, or (iii) becomes aware of any information, including adverse media, regulatory disclosures, filings, statements, or other communications that would materially alter the regulatory treatment of a particular digital asset, then the Company will undertake a further review and determination focusing on steps 3 and 4 above. The Company will provide quarterly updates to the board of directors as to any material developments in the treatment of digital assets or legal developments in the process to be applied to the determination of whether a digital asset is a security.

6. **Removal of Digital Assets**. In the event that the Company's operations team, with the advice of the Company's general counsel and U.S. securities counsel (as necessary), determines that a particular digital asset likely will be deemed a security under U.S. securities laws, it will advise the Audit Committee or such other committee as may be formed for this purpose that the digital asset should be removed from the Platform, and will also make determinations regarding the date on which trading should cease and whether such digital assets then held by clients must be removed from the platform in order to ensure an orderly wind down of such digital asset.

The above noted procedures may be subject to change based on, among other things, changes in laws, regulations or the interpretation thereof or changes in industry practices.

The Company has also considered whether it is subject to additional registration requirements pursuant to the Commodity Exchange Act ("**CEA**"). Specifically, Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "**Dodd-Frank Act**") provides the Commodity Futures Trading Commission ("**CFTC**"), among other things, authority over any agreement, contract, or transaction in any commodity that is entered into or offered to a retail customer on a leveraged, margined or financed basis (a "**Retail Commodity Transaction**"). The CFTC has provided guidance that certain digital assets, including but not limited to Bitcoin and Ethereum, are commodities. Retail Commodity Transactions must generally be conducted on or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market or derivatives transaction execution facility. Further, all persons that accept orders for Retail Commodity Transactions as well as accept funds in connection therewith, must generally register with the CFTC as a futures commission merchant ("**FCM**").

The Company's platform currently only facilitates 'spot' transactions in digital assets. The Company does not provide any digital asset transactions on a leveraged, margined, or financed basis. Spot transactions are not considered Retail Commodity Transactions, and therefore the Company is not subject to the registration and CFTC oversight considerations outlined above.

The Company's conclusion that it is not subject to the aforementioned additional CFTC oversight and registration provisions is based upon (a) the plain language of the CEA, (b) the Company's ongoing review and analysis of relevant CFTC guidance, (c) review and evaluation of legal advice provided by outside, qualified legal counsel, as well as (d) ongoing analysis of its operational and business activities.

Notwithstanding these due diligence efforts, the Company recognizes that the legal regime surrounding digital assets in the U.S. is still evolving. Digital assets are a relatively new asset class, and the SEC and CFTC have not developed definitive and comprehensive regulatory regimes targeted specifically to digital assets. Rather, the SEC has communicated to industry participants that it will apply existing securities laws, including the Howey Test, a four-part test developed by the U.S. Supreme Court to determine whether a particular "investment contract" is a security, to digital assets.

Given that the Howey Test is almost 75 years old, was not designed with digital assets in mind, and its application is fact-based, it is possible that the SEC could come to a different conclusion than the Company in respect of a particular digital asset. In addition, it is possible that the SEC, CFTC, or other state or federal regulator could publish additional regulatory guidance that dramatically or substantially alters the Company's regulatory obligations, or that the U.S. implements a comprehensive regulatory regime in respect of digital asset businesses. In either case, those developments could result in the Company being required to become registered, removing certain digital assets from its platform, or being required to cease certain of its operations. See "*The Company's performance will be highly dependent on the future regulatory environment in the United States and elsewhere, which is challenging and unpredictable.*" and the other risk factors under "Risk Factors".

**Employees**

As of Fiscal 2021 year-end, the Company had 141 full-time employees, including management, located in the United States, Canada and France, of which over 60% were dedicated to customer support, engineering/technology and marketing roles.

**Foreign Operations**

The Company is substantially dependent on foreign operations as all of the Company's operating subsidiaries are in the United States. See "Corporate Structure - Intercorporate Relationships" and "General Development of the Business - Three Year History" in this AIF for further information.

The Company intends to expand its business to include Canadians. In order to effect such an expansion, the Company has applied to the CSA for exemptive relief from certain prospectus and registration requirements it believes are necessary to operate its business in Canada. In addition, either directly or through one or more affiliates, the Company intends to apply for registration with the CSA as a "restricted dealer" and to CSA and IIROC for registration as an investment dealer and a member of IIROC, in each case in accordance with the guidance set out by CSA and IIROC from time to time, including Joint CSA/IIROC Staff Notice 21-329 – *Guidance for Crypto-Asset Trading Platforms: Compliance with Regulatory Requirements* as it may relate to the Company.

On August 2, 2021, the Company completed the acquisition of Coinify, a leading cryptocurrency payment platform with a global customer base in over 150 countries. The acquisition accelerates Voyager's international expansion, and provides Voyager with an established and effective gateway to the crypto payment industry through its virtual currency payment platform available in Europe, Asia, North America and South America.

On October 13, 2021, the Company secured final approval to begin onboarding customers in France and the European Union through its wholly owned subsidiary, LGO Europe SAS, following a standard review by the Autorité des marchés financiers (AMF) and the Autorité de contrôle prudentiel et de résolution (ACPR).

**Reorganizations**

The Company completed the RTO in February 2019 upon closing its change of business and acquiring all of the shares of VDH.  See "General Development of the Business - Three Year History".

**New Products**

The Company is developing a debit card through MC Bank. The debit card has been designed internally, and FiCentive, Inc., a subsidiary of Usio Inc. is the program manager. The components required for the finished product have not yet been finalized.

## RISK FACTORS

The following discussion summarizes the principal risk factors that apply to the Company's business and that may have a material adverse effect on the Company's business and financial condition and results of operations, or the trading price of the Common Shares. Due to the nature of Voyager's business, the legal and economic climate in which it operates and its present stage of development and proposed operations, the Company is subject to significant risks.

The risks and uncertainties outlined below are not the only ones facing the Company. Additional risks and uncertainties not currently known to the Company, or that the Company currently deems immaterial, may also impair the operations of the Company.  If any such risks actually occur, the financial condition, liquidity and results of operations of the Company could be materially adversely affected and the ability of the Company to implement its growth plans could be adversely affected.

An investment in the Company's Shares is speculative and will be subject to material risks, and investors should not invest in securities of the Company unless they can afford to lose their entire investment.

*Market Risk for Securities.*

There can be no assurance that an active trading market for the Shares will be sustained.  The market price for the Shares may be subject to wide fluctuations. Factors such as government regulation, cryptocurrency price fluctuations, share price movements of peer companies and competitors, as well as overall market movements, may have a significant impact on the market price of the Company's securities.  The stock market has from time to time experienced extreme price and volume fluctuations, which have often been unrelated to the operating performance of particular companies.

*Additional Funding Requirements.*

Further expansion of the Company's business, in the United States, Canada and internationally, may require additional capital; and the ongoing costs of operations may not generate positive cash flow for the near or long term.  Although the Company believes it has adequate funds to operate for the next 12 months, there is no assurance that such funds will be adequate or that it will be successful in obtaining the required financing for these or other purposes, including for general working capital.  The Company's ability to secure any required financing to sustain operations may depend in part upon prevailing capital market conditions and business success.  There can be no assurance that the Company will be successful in its efforts to secure any additional financing or additional financing on terms satisfactory to management.  If additional financing is raised by issuance of additional Shares from treasury, control may change and Shareholders may suffer dilution.  If adequate funds are not available, or are not available on acceptable terms, the Company may be required to scale back its business plan or cease operating.

*Negative Cash Flow from Operations.*

The Company had negative operating cash flow for Fiscal 2020. Although the Company had positive operating cash flow for Fiscal 2021 and anticipates it will have positive cash flow from operating activities in future periods, the Company cannot guarantee that it will attain or maintain positive cash flow status into the future.

The Company launched its iOS mobile app in February 2019 in the Apple store and later launched the Android version in October 2019. The growth in the trading platform is driven by the increase in funded accounts on the Platform. Additionally, the Company has more recently significantly strengthened its liquidity position in Fiscal 2021 to support the significant increase in revenues and corresponding spend in new customer acquisition costs to drive growth in