# EXHIBIT 2

**United States District Court**
**Southern District of Florida**
**Miami Division**

| | |
|---|---|
| Dominik Karnas, *et al.*, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>Mark Cuban, *et al.*,<br><br>        Defendants. | CASE NO.: 22-CV-22538-ALTMAN/Reid |

# EXPERT REPORT OF PATRICK CONROY

# APRIL 10, 2024

# Contents

List of Exhibits ...................................................................................................... ii

I.    Introduction.......................................................................................................... 3
   A.   Background ...................................................................................................... 3
   B.   Assignment...................................................................................................... 4
   C.   Summary of Opinions ..................................................................................... 4
   D.   Qualifications .................................................................................................. 5
   E.   Materials Considered....................................................................................... 6
   F.   Remuneration .................................................................................................. 6

II.   The EPA Program at Voyager ............................................................................. 6

III.  The Mavericks' Alleged Solicitation................................................................... 7

IV.   Promotions and Publicity Regarding Voyager .................................................... 8
   A.   Celebrity Promotional Campaigns through Social Media ................................. 8
   B.   Voyager's Promotional Activity ...................................................................... 11
   C.   Activity by Voyager's Customers ................................................................... 12
   D.   Social Media Communities and the MAVS100 Code ...................................... 13

V.    Feasibility of Computing Damages on a Class-Wide Basis ................................ 14
   A.   Elements of Plaintiffs' Damages Computation................................................ 14
   B.   Feasibile Identification of Plaintiffs Who Were Successfully Solicited............. 15
      1.   Restriction to Accounts Opened After October 27, 2021 ............................ 15
      2.   Restriction to Accounts Opened with the MAVS100 Code......................... 15
   C.   Feasibile Identification of Which Investments Were the Result of a Successful
        Solicitation .................................................................................................... 16
   D.   Lack of a Common Formula For Rescission Calculation .................................. 17

VI.   Sources of Profit ................................................................................................ 19

# List of Exhibits

Exhibit 1.   Voyager Twitter Promotions (October 27, 2021 – July 5, 2022) .................. 9

Exhibit 2.   Number of Voyager Tweets by Month (October 27, 2021 – July 5, 2022) ......................................................................................................... 11

Exhibit 3.   Plaintiffs' Use of Referral Codes ................................................................. 13

Exhibit 4.   Circulation of the MAVS100 Code without Reference to Press Conference ..................................................................................................... 14

Exhibit 5.   Mr. Garrison's Trades, Transfers, and Account Balance .............................. 17

Exhibit 6.   Hypothetical FIFO vs. LIFO Rescission ....................................................... 18

Exhibit 7.   EPA Eligible Assets for October 2021 ......................................................... 20

# I.    Introduction

1.  I have been retained by counsel to Mark Cuban and the Dallas Mavericks ("**Mavericks**") to review the Plaintiffs' allegations as set forth in the Second Amended Class Action Complaint, dated June 9, 2023,[1] and in the Plaintiffs' Motion to Certify Nationwide Issue Classes, dated March 15, 2024,[2] in the class action litigation filed by the Plaintiffs. I have been asked to discuss issues related to identifying members of the class and assessing their damages, if any.

## A.    Background

2.  Plaintiffs allege that Mr. Cuban and the Mavericks promoted the sale of unregistered securities by Voyager, a cryptocurrency exchange. The unregistered securities alleged to have been promoted by Mr. Cuban and the Mavericks are accounts for holding cryptocurrency ("**EPAs**") at Voyager.[3] Plaintiffs do not appear to allege that Mr. Cuban or the Mavericks promoted the Voyager token ("**VGX**").

3.  Plaintiffs define a nationwide class as "[a]ll persons or entities in the United States who, within the applicable limitations period, purchased, repurchased, invested, reinvested, deposited and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX tokens."[4] Plaintiffs similarly describe alternative state subclasses for the following states: Florida, New Jersey, Virginia, Alabama, Louisiana, California, Oklahoma, Pennsylvania, Tennessee, Massachusetts, and Connecticut.[5]

---

[1] Second Amended Class Action Complaint, (*Dominik Karnas, et al., on behalf of themselves and all others similarly situated v. Mark Cuban, et al.*, U.S.D.C. Southern District of Florida Miami Division No. 22-CV-22538-ALTMAN/Reid), June 9, 2023 (the "**SAC**").

[2] Plaintiffs' Motion to Certify Nationwide Issue Classes, (*Dominik Karnas, et al., on behalf of themselves and all others similarly situated v. Mark Cuban, et al.*, U.S.D.C. Southern District of Florida Miami Division No. 22-CV-22538-ALTMAN/Reid), March 15, 2024 (the "**Motion for Class Certification**").

[3] Whether the EPAs or cryptocurrencies traded on the Voyager platform are in fact securities has not been decided by the Court in this matter.

[4] SAC ¶322 (1).

[5] *Ibid*, ¶322 (2) – (12).

### B.      Assignment

4.  I have been asked to address the below topics.

    a.  Whether damages under §49:3-60 et seq. ("NJUSL") can be calculated using a method that is common to each class member and in a manner consistent with Plaintiffs' theory of liability.

    b.  What promotional activity for Voyager took place between October 27, 2021 and July 5, 2022.

    c.  What sources of profit did Voyager identify in documentation provided to investors in EPAs and what, if any, cryptocurrency tokens were not eligible for reward payments through Voyager's EPAs.

### C.      Summary of Opinions

5.  My opinions are:

    a.  Without individualized inquiry such as deposition testimony, it is not possible to identify the specific class members that were successfully solicited by Mr. Cuban and the Mavericks. In addition, even if an individual is assumed to have been solicited by Mr. Cuban and the Mavericks, without an individualized inquiry, it is not possible to identify which of their purchases were solicited by Mr. Cuban and the Mavericks and which were not. Thus, it is not possible to compute damages for each class member in a manner consistent with Plaintiffs' theory of liability.

    a.  There were multiple sources of promotional activity for Voyager between October 27, 2021 and July 5, 2022. Celebrities, collegiate sports organizations, Voyager's customers, and Voyager were active in promoting Voyager's platform to the public.

    b.  Multiple cryptocurrencies on the Voyager platform were not eligible to receive rewards in the EPA program. Apart from a user trading cryptocurrencies on their own behalf in a manner that was profitable, there was no way for an investor's account to increase in value without receiving a reward.

6. My opinions are subject to revision based on new information that may subsequently come to my attention.

### D.   Qualifications

7. I am a Managing Director at National Economic Research Associates, Inc. ("**NERA**"), where I specialize in securities and financial economics. Since 2001, I have worked in various roles at NERA. From 2013 to 2018, I served as Chair of the Securities and Finance Practice. I am a financial economist by training and experience. Currently I am a consultant to financial institutions, corporations, individuals, governments, and not-for-profit institutions in the areas of securities, banking, regulation, and risk management. I have testified in U.S. state court and U.S. federal court and provided opinions in European, Asian, and Latin American venues.

8. In 1997, I received my Ph.D. in Economics from the University of Miami with a concentration in finance and completed my dissertation on market microstructure. I received my B.A. in Foreign Policy and Economics from American University.

9. I began my career as an economist at the U.S. Securities and Exchange Commission ("**SEC**") working for the Chief Economist from 1997 to 1999. While at the SEC, I covered a broad range of issues including Nasdaq and NYSE market operations, initial public offerings, mutual funds, and electronic communications networks. I worked with divisions of Market Regulation, Investor Education, Enforcement, and the Office of the Chairman in developing SEC policy initiatives and reviewing industry practices and enforcement issues. From 1999 to 2001, I was a project manager at an online broker dealer and was responsible for building and implementing new features for an online portfolio trading brokerage system. In addition, my research has been published in the Journal of Finance[6] and I have lectured at Georgetown University on the regulation of securities.

10. My curriculum vitae listing prior testimony and publications is attached to this report as Appendix I.

---

[6] Aggarwal, Reena and Patrick Conroy, "Price Discovery in Initial Public Offerings and the Role of the Lead Underwriter," *Journal of Finance*, December 2000.

11. Other professionals employed by NERA worked under my supervision and review and assisted me in preparing this report.

### E.    Materials Considered

12. I reviewed the SAC, the Motion for Class Certification, and other filings in this case. I reviewed details of Voyager's promotional programs and EPAs and Voyager's public filings. I reviewed trading and funding activity in the named Plaintiffs' Voyager accounts. The complete list of materials considered in the preparation of this report is attached as Appendix II.

### F.    Remuneration

13. NERA is compensated through hourly billing rates for work performed by its employees. My current hourly billing rate is $1,250. Payments to NERA are not contingent on the opinions expressed in my report, or on the outcome of this matter. The rates charged for other NERA personnel working at my direction on this matter range from $395 to $810 per hour. NERA's compensation is not contingent upon the nature or substance of my findings or on the outcome of this matter.

## II.    The EPA Program at Voyager

14. Voyager launched its EPA program in October of 2019.[7] At the time of bankruptcy, Voyager offered rewards on 39 different coins although this was only a subset of the cryptocurrencies a user of Voyager could hold in their account.[8]

15. All Voyager users were enrolled into the EPA program upon agreeing to and signing the Voyager Customer Agreement and could opt out of the program at any time.[9] According to the Voyager Customer Agreement, by participating in the EPA program users gave Voyager

---

[7] "Introducing the Voyager Interest Program: Earn 3% interest on BTC," Voyager, October 23, 2019, https://web.archive.org/web/20200403222728/https://www.investvoyager.com/blog/3-interest-on-bitcoin/.

[8] "The summer of stacking," Voyager, May 31, 2022, https://web.archive.org/web/20220601050359/https://www.investvoyager.com/blog/june-rewards-2022/.

[9] Voyager Digital, LLC Customer Agreement, January 7, 2022, p. 19 ¶6.

permission to rehypothecate their assets, thereby allowing Voyager to loan cryptocurrency outside of the Voyager platform.[10]

16. Voyager updated EPA rewards monthly, and to receive rewards each user had to meet a minimum balance requirement for that cryptocurrency. Rewards were calculated based on each user's average daily holdings. All rewards were paid in-kind, within five business days following the end of each month, and a user could request to withdraw their money at any time.[11]

17. For some coins, reward rates were tiered, meaning that the reward rate depended upon the size of the user's holdings. For example, in June 2022, Voyager offered tiered rewards for Bitcoin (**"BTC"**), where each user would receive 3.25% on their holdings between 0.01 and 0.25 BTC, 1.75% on their holdings between 0.25 and two BTC, and 1.05% on their holdings above two BTC.[12]

## III.  The Mavericks' Alleged Solicitation

18. On October 27, 2021, Mr. Cuban and Steve Ehrlich, the CEO of Voyager, held a press conference at the Mavs Gaming Hub announcing that the Mavericks had "entered a five-year international, integrated partnership with Voyager."[13] Mr. Cuban himself was not a party to the agreement between Voyager and the Mavericks and was not compensated for his appearance at the press conference.[14] The press conference lasted 29 minutes in total.

---

[10] *Ibid*, p. 17 ¶1.

[11] *Ibid*, p. 18 ¶3-4.

[12] "The summer of stacking," Voyager, May 31, 2022, https://web.archive.org/web/20220601050359/https://www.investvoyager.com/blog/june-rewards-2022/.

[13] "Exhibit A: Transcript of YouTube Video: Dallas Mavericks Voyager Introductory Press Conference," Motion to Dismiss the Amended Complaint, (*Pierce Robertson, Rachel Gold, Sanford Gold, Rahil Sayed, Christopher Ehrentraut, Todd Manganiello, Dan Newsom, William Ayer, Anthony Dorn, Dameco Gates, Marshall Peters, and Edwin Garrison, on behalf of themselves and all others similarly situated v. Mark Cuban and Dallas Basketball Limited, d/b/a Dallas Mavericks*, U.S.D.C. Southern District of Florida Miami Division No. 22-CV-22538-ALTMAN/Reid), November 17, 2022 (the "**press conference**" or "**Mavericks Press Conference**"), p. 2 lines 19-21. The recording of the press conference is available at https://www.youtube.com/watch?v=bbQCUOjjMdc.

[14] Sponsorship Agreement between Voyager Digital Holdings, Inc. and Dallas Basketball Limited, dated October 29, 2021; Mark Cuban Deposition, at 60:1-5.

19. The sponsorship had three components. First, the Mavericks and Voyager were going to educate the community on cryptocurrency.[15] Second, the sponsorship granted Voyager naming rights to the Mavs Gaming Hub, the official gaming and event venue for the Mavericks' NBA 2K league team.[16] Third, the Mavericks and Voyager were going to develop promotions for Mavericks fans, including the MAVS100 promotional code.[17] The MAVS100 promotional code was active from the time of the press conference to October 30, 2021 at 11:59 PM central time. Those that used the promotional code received $100 in Bitcoin from Voyager provided they used the code to register a new Voyager account, made a deposit of $100 in cash or cryptocurrency, and traded a minimum of $10 in their account.[18]

20. While there were other social media statements regarding Voyager from the Mavericks, I am not aware of any further comments regarding EPAs from Mr. Cuban or the Mavericks, and the Mavericks did not enter into any additional agreements with Voyager.

## IV.   Promotions and Publicity Regarding Voyager

21. Voyager, other promoters, and Voyager accountholders consistently promoted the platform and the Voyager EPA on social media from October 2021 up until the bankruptcy.

### A.   Celebrity Promotional Campaigns through Social Media

22. Public figures and organizations were engaged as promoters for Voyager. The exhibit below is a timeline of five Voyager promotions on Twitter between October 27, 2021 and July 5, 2022.[19] These are examples of Voyager's social media presence that are from specific searches on Twitter, not an exhaustive list of material related to Voyager.[20] The fifteen

---

[15] Mavericks Press Conference, p. 3.

[16] *Ibid.*

[17] *Ibid.*

[18] Details of the promotion are available on the "Voyager Promotions" page of the Voyager website. The page is accessible via the Internet Archive's Wayback Machine at https://web.archive.org/web/20211029231930/https://www.investvoyager.com/marketingpromos/.

[19] Following the period of tweets summarized in the below exhibit, Twitter was rebranded to X. Throughout this report, I refer to X, formerly known as Twitter, as Twitter, and refer to posts on the site as tweets and posts interchangeably.

[20] There are 53 tweets in the exhibit. They were retrieved with five advanced searches on Twitter. The searches were "(investvoyager AND get a little, give a little) until:2022-07-05 since:2021-10-01 -filter:replies", "(soccer OR nwsl) (from:investvoyager) until:2022-07-05 since:2021-10-01 -filter:replies", "(cassill OR landon OR landoncassill)

College Athletic Departments' posts are on the respective department's account.[21] Tweets about the National Women's Soccer League (**"NWSL"**), Landon Cassill, Robert Gronkowski, and the Mavericks are posted to the Voyager account. Any promotional posts from these four entities' accounts are not included in the exhibit.

*Exhibit 1.      Voyager Twitter Promotions (October 27, 2021 – July 5, 2022)*



**Notes and Sources**:
Tweets about the National Women's Soccer League, Landon Cassill, Robert Gronkowski, and the Mavericks are all posted to Voyager's account (@investvoyager). Tweets from fifteen College Athletic Departments are from the respective department's account. Voyager reposted three of these fifteen Tweets.

23. Between December 23 and December 28, 2021, fifteen college athletic departments tweeted "get a little, give a little this holiday season" with a unique promotional code. People that opened a Voyager account with one of the codes received $25 in Bitcoin, and Voyager donated to the respective school's athletic department.

---

(from:investvoyager) until:2022-07-05 since:2021-10-01 -filter:replies", "(gronk OR gronkowski OR robgronkowski) (from:investvoyager) until:2022-07-05 since:2021-10-01 -filter:replies", and "(dallasmavs OR mavs OR cuban OR mavericks OR mavs100) from:investvoyager until:2022-07-05 since:2021-10-27 -filter:replies".

[21] Of the fifteen posts, Voyager reposted three to their account.

24. Voyager referenced the NWSL in four tweets. On December 14, 2021, Voyager and the NWSL announced their sponsorship agreement.

25. Landon Cassill, a NASCAR driver, was referenced four times by the Voyager Twitter account. On April 23, 2022, they advertised that people could sign up for Voyager with the code "LANDON" to get $25 in cryptocurrency.

26. Robert Gronkowski, at the time a National Football League player, was referenced ten times by the Voyager Twitter account. In one campaign, Voyager donated to Mr. Gronkowski's youth foundation every time a Voyager account was opened and funded with the "GRONK" code. Mr. Gronkowski posted promotions to his own account, as well. For example, on November 24, 2021, Mr. Gronkowski tweeted, "Feeling those good vibes when you [see] $25 in bitcoin hit your account from @investvoyager."[22] He also posted to his Instagram account on December 20, 2021 describing how to enter for a chance to win $1,000 of crypto from Voyager.[23]

27. Voyager tweeted six times in October 2021 about the Mavericks at the beginning of the sponsorship. For example, on October 27, 2021, Voyager posted, "Voyager teams up with the @dallasmavs as their official crypto brokerage & international partner."[24] They tweeted about the Mavericks sixteen more times between April and May 2022, during the NBA season. For example, on April 28, 2022, they posted, "Game 6 about to be more [fire] than the $APE charts. Go get 'em @DallasMavs."[25]

---

[22] Gronkowski, Rob (@RobGronkowski). "Feeling those good vibes when you ⚫⚫ $25 in bitcoin hit your account from @investvoyager. That's what happens when you use code GRONK to download the Voyager app, deposit $100, and trade. #crypto #partner https://voyager.onelink.me/kFhQ/d02e0df6." Twitter, November 24, 2021, https://x.com/RobGronkowski/status/1463551128734470146?s=20.

[23] Gronkowski, Rob (@gronk). "Hi, I'm Gronk. I love puzzles... and also love crypto. That's why I made Gronk's Cryptic Crypto Clues. Solve 5 clues to be entered to win $1,000 in Voyager Tokens (VGX) from my friends at Voyager. Step 1: Watch the whole 🎥 Step 2: Follow @investvoyager Step 3: List 5 correct answers in comments 🟦 winners in total! Ready? Set! Game On! Rules 🟦 link in bio. #CrypticCryptoClues #GronkNation #Gronk #voyagerpartner." Instagram, December 20, 2021, https://www.instagram.com/p/CXucLC3MAv0/?hl=en.

[24] Voyager (@investvoyager). "Voyager teams up with the @dallasmavs as their official crypto brokerage & international partner 🔴🔵 Catch the official press conference live at 4 PM CT // 5 PM ET, with the Mavs, @Ehrls15 , and @mcuban . See you on the paint From mavs.com." Twitter, October 27, 2021, https://x.com/investvoyager/status/1453416487323152384?s=20.

[25] Voyager (@investvoyager). "Game 6 about to be more 🔥 than the $APE charts. Go get 'em @DallasMavs #NBAPlayoffs #NBA #Crypto4All." Twitter, April 28, 2022, https://x.com/investvoyager/status/1519851461282353154?s=20.

### B.  Voyager's Promotional Activity

28.  Voyager spent 35.1 million USD on marketing and sales in the fiscal quarter ending December 31, 2021,[26] as well as an additional 30.4 million USD in the fiscal quarter ending March 31, 2022.[27]

29.  Voyager actively marketed using Twitter. The Voyager Twitter account tweeted nearly every day. From October 27, 2021 to July 5, 2022, Voyager posted, reposted, or replied to a post 1,394 times. That is an average of more than five Tweets per day. 3% of these Tweets were related to the Mavericks, as shown in the below histogram.[28] Their Tweets included other celebrity endorsements, marketing of certain coins, and general crypto news.

*Exhibit 2.*      *Number of Voyager Tweets by Month (October 27, 2021 – July 5, 2022)*



**Notes and Sources:**
Tweets include original posts, reposts, and reply posts by the Voyager account (@investvoyager). Once the text of the Tweets was retrieved, Tweets related to the Mavericks were identified as those including "dallasmavs", "mavs", "mavs100", "mavericks", or "cuban".

---

[26] Voyager Digital Ltd., *Interim Condensed Consolidated Financial Statements (Unaudited) For the quarter ending December 31, 2021*, filed February 14, 2022.

[27] Voyager Digital Ltd., *Interim Condensed Consolidated Financial Statements (Unaudited) For the quarter ending March 31, 2022*, filed May 16, 2022.

[28] Tweets include original posts, reposts, and reply posts by the Voyager account (@investvoyager). Once the text of the Tweets was retrieved, Tweets related to the Mavericks were identified as those including "dallasmavs", "mavs", "mavs100", "mavericks", or "cuban". Media and external links were not reviewed.

## C.    Activity by Voyager's Customers

30. Voyager customers were actively promoting Voyager through referral codes. In fact, customers were monetarily incentivized to promote Voyager. The referral program at Voyager had two parts. The first part rewarded current account holders for referring new accounts to the Voyager platform. This reward varied over time and was one of the following, as defined by Voyager at the time: $25 in BTC, $25 in VGX, or $50 in VGX.[29]

31. The second part of the program rewarded accounts that signed up using a refer-a-friend code. Similarly, these rewards varied over time as defined by Voyager. The rewards were $25 or $50 in BTC.[30] Voyager's website stated that these rewards were generally given to both parties within 72 hours of the referred account's first deposit and subsequent purchase or sale of at least $100 of cryptocurrency.[31]

32. As shown below in Exhibit 3, customers commonly received rewards for both types of referrals. Out of nineteen accounts, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[29] Referrers could earn $25 of BTC as of February 7, 2021 ("Refer-a-Friend Program," Voyager, February 7, 2021, https://web.archive.org/web/20210207001418/https://rewards.investvoyager.com/refer-a-friend/.), $25 of VGX as of April 19, 2022 ("Refer-a-Friend Program," Voyager, April 19, 2022, https://web.archive.org/web/20220419211206/https://rewards.investvoyager.com/refer-a-friend/.), and $50 in VGX as of June 6, 2022 ("Refer-a-Friend Program," Voyager, June 6, 2022, https://web.archive.org/web/20220609215427/https://rewards.investvoyager.com/refer-a-friend/.).

[30] Accounts that used refer-a-friend codes received $25 in BTC as of February 7, 2021 ("Refer-a-Friend Program," Voyager, February 7, 2021, https://web.archive.org/web/20210207001418/https://rewards.investvoyager.com/refer-a-friend/.) and $50 in BTC as of June 6, 2022 ("Refer-a-Friend Program," Voyager, June 6, 2022, https://web.archive.org/web/20220609215427/https://rewards.investvoyager.com/refer-a-friend/.).

[31] Details are available on the "Refer-a-Friend" page of the Voyager website. The page is accessible via the Internet Archive's Wayback Machine at: https://web.archive.org/web/20210207001418/https://rewards.investvoyager.com/refer-a-friend/

*Exhibit 3.     Plaintiffs' Use of Referral Codes*

| | Referral Rewards | |
|---|---|---|
| **Account #** | **Referred a Friend** | **Signed Up With a Refer-a-Friend Code** |
| **(1)** | **(2)** | **(3)** |



**Notes and Sources:**
Data are from counsel on 19 customer accounts

[1] ████████████████████████████████
███████████████████████████████████

## D.      Social Media Communities and the MAVS100 Code

33. There are multiple examples of communities and platforms circulating various crypto platforms' promotional codes, including Voyager's codes and the MAVS100 code without any link or reference to Mark Cuban's statements at the press conference. The table below shows a few examples of the MAVS100 code being circulated.

*Exhibit 4.*     *Circulation of the MAVS100 Code without Reference to Press Conference*

| Post #<br>(1) | Date<br>(2) | Time<br>(3) | Poster<br>(4) | Platform<br>(5) | Post Contents<br>(6) |
|---|---|---|---|---|---|
| 1 | 10/27/2021 | 5:12 PM | @Ta11Texan | Twitter.com | Wowwww @investvoyager offering $100 in $BTC for new sign ups using "mavs100" in the next 48 hours |
| 2 | 10/27/2021 | 5:49 PM | @BreeYahKnE3 | Twitter.com | @investvoyager is giving away $100 in Bitcoin for all new accounts opened in the next 48 hours if $100 is deposited and traded. You have to use code "Mavs100" $BTC $VGX |
| 3 | 10/27/2021 | 9:49 PM | @OakenshieldVGX | Twitter.com | I've been getting people to sign up for Voyager tonight with the new Mavs promotion code MAVS100, thus forgoing my own promocode rewards. I want @investvoyager to succeed and reach it's full $100B+ enterprise value potential. I want my friends to prosper. $VYGVF $VGX #VGXheroes |
| 4 | 10/29/2021 | 11:12 AM | u/foofette | Reddit.com | Signed up with the MAVS100 code because I need crypto to get a discount on kratom. I have no idea what I'm doing. From reading, it sounds like I cant just use Voyager as a wallet to make a goods purchase. I need to transfer Bito in to an outside wallet. Is that correct? How the hell do I do that? Old and confused. Really old and really confused. |
| 5 | 10/30/2021 | 9:14 AM | u/stevester90 | Reddit.com | I just did the MAVS100 voyager promotion to receive 100 dollars in Bitcoin. It says to wait up to 10 business days to receive the 100 dollars in Bitcoin. Thereafter, I will convert the promotional Bitcoin into SHIB once it has been received |

Notes and Sources:
Post #1 available at: https://x.com/Ta11Texan/status/1453469606266474500?s=20
Post #2 available at: https://x.com/BreeYahKnE3/status/1453479027230998529?s=20
Post #3 available at: https://x.com/OakenshieldVGX/status/1453539482020585473
Post #4 available at: https://www.reddit.com/r/Invest_Voyager/s/GiSOiz5xDw
Post #5 available at: https://www.reddit.com/r/SHIBArmy/comments/qj18za/i_just_did_the_mavs100_voyager_promotion_to/?utm_source=share&utm_medium=web3x&utm_name=web3xcss&utm_term=1&utm_content=share_button

# V.   Feasibility of Computing Damages on a Class-Wide Basis

## A.   Elements of Plaintiffs' Damages Computation

34. It is my understanding from discussions with counsel that Plaintiffs will need to demonstrate for each class member that that person was successfully solicited by Mr. Cuban and the Mavericks to purchase an unregistered security.

35. In addition, the calculation for damages is the rescission of the investment that was solicited, less any proceeds that may have been received by the investor from that investment. This calculation will rely upon assumptions regarding investments by the class member that were not the result of a successful solicitation by Mr. Cuban and the Mavericks. As a result of these assumptions, it is possible that class members will disagree about how the damages calculation should be implemented.

36. I have reviewed data such as trading records for the Plaintiffs, and I do not believe it is feasible to identify which Plaintiffs were successfully solicited by Mr. Cuban and the Mavericks without time intensive methods such as sworn depositions. I further discuss this conclusion below.

## B.  Feasibile Identification of Plaintiffs Who Were Successfully Solicited

37. Records of the date of each class member's trading may allow one to eliminate which class members could not possibly have been successfully solicited, but do not allow positive identification of such activity.

### 1.  Restriction to Accounts Opened After October 27, 2021

38. Class Members who already had an account at Voyager could not have been solicited by Mr. Cuban and the Mavericks to open an EPA at Voyager. The solicitation was explicitly for new customers.

### 2.  Restriction to Accounts Opened with the MAVS100 Code

39. The Plaintiffs suggest that one could use a class member's use of the MAVS100 code to identify whether they were successfully solicited by Mr. Cuban: "Among other techniques available to readily identify the damages for each Plaintiff and Class Member with precision, Defendants used specific promotional codes that directly link individual customer purchases to representations by a specific defendant. For example, Defendants used, among others, the MAVS100 referral code."[32]

40. As discussed in section IV.D above, there appear to be individuals who used the MAVS100 code without even considering the statements by Mr. Cuban. They were instead motivated by the desire to get $100 in free cryptocurrency.

---

[32] Motion for Class Certification, p. 18.

15

### C.    Feasibile Identification of Which Investments Were the Result of a Successful Solicitation

41. Even if one were to use an imperfect proxy for solicitation by Mr. Cuban, such as the MAVS100 code, one cannot identify which investments were due to Mr. Cuban by looking only at data records.

42. Many factors influence the decision to purchase cryptocurrency. It is not plausible to assume that every purchase by an investor after their use of the MAVS100 code was also due to the statements by Mr. Cuban and/or the Mavericks. For many class members, months passed between the press conference and when many of the trading decisions were made. At least 747 investors used the MAVS100 code and made their first deposit at least a month after the press conference.[33]

43. For example, Mr. Edwin Garrison, one of the Proposed Class Representatives,[34] made a long series of investments, and his first transactions were not until ███████████

---

[33] Data are from Rob-Voyager-00000662.xlsx. These data include a subset of investors that opened their account with the Mavs100 code, made a deposit, and earned EPA rewards. This dataset does not include potential investors that deposited small amounts that did not qualify for rewards, or potential investors that opted-out of earning rewards.

[34] Mr. Garrison and Mr. Todd Webb were put forth as Proposed Class Representatives in the Plaintiffs' Motion for Class Certification.

*Exhibit 5.     Mr. Garrison's Trades, Transfers, and Account Balance*



**Notes and Sources:**
Price data are from Yahoo Finance and Artemis Terminal.
Plaintiff data are from Rob-Voyager-00000016 (DO NOT EDIT)(2).XLSX

44. Mr. Garrison acknowledges that not all of his trades were due to the solicitation by Mr. Cuban and the Mavericks. He said his trading strategy on November 23, 2021 was based on a feeling. His testimony was, "If it felt good, I bought it."[35]

### D.     Lack of a Common Formula For Rescission Calculation

45. It is my understanding that the Plaintiffs in this matter are asking for rescission of their investments, which corresponds to them receiving the value of their investment back, less both the rewards earned while holding the investment and any value they obtained from selling it or from the bankruptcy estate. In addition, my understanding is that rescission would entail that they surrender any further claims they may have in the Voyager bankruptcy proceeding to Mr. Cuban and the Mavericks.[36]

---

[35] Edwin Garrison deposition, at 36:3-5.

[36] See 49:3-71. Action for deceit; liability, https://www.njconsumeraffairs.gov/Statutes/New-Jersey-Uniform-Securities-Law.pdf.

46. A complication with this calculation is that, for some class members, not all their investments were the result of a successful solicitation by Mr. Cuban and/or the Mavericks. The loss on an investor's solicited investment is dependent on how one treats the other trades by that investor in that same cryptocurrency. This issue is similar to assigning a cost basis for trades when filing one's taxes. Whether a particular purchase results in a gain or a loss is dependent on which sale or sales one assigns to that purchase. Common methods for matching purchases and sales are Last-In-First-Out ("**LIFO**") and First-In-First-Out ("**FIFO**"). Under LIFO, each sale is matched to the most recent purchase (that has not been paired with a sale yet) and under FIFO each sale is matched to the oldest purchase (that has not been paired with a sale yet).

47. It is likely that some investors would be eligible for a higher rescission payment using LIFO and that some investors who would be eligible for higher rescission payment using FIFO. The below hypothetical demonstrates how this could arise.

48. Suppose an investor purchases one BTC on October 27, 2021 and November 10, 2021, but only the October purchase was solicited by Mr. Cuban and the Mavericks. Suppose this investor then makes two sales, one BTC on November 15, 2021 and one BTC on June 5, 2022. The prices of these transactions are below.

*Exhibit 6.      Hypothetical FIFO vs. LIFO Rescission*

| Date | Trade Direction | Trade Quantity | BTC Price ($) |
|:---:|:---:|:---:|:---:|
| (1) | (2) | (3) | (4) |
| 10/27/2021 | Buy | 1 | 58,482 |
| 11/10/2021 | Buy | 1 | 64,995 |
| 11/15/2021 | Sell | -1 | 63,558 |
| 6/5/2022 | Sell | -1 | 29,907 |

**Notes and Sources:**
Price data are from Yahoo Finance.

49. The alleged solicited investment, from October, is recorded as profitable using FIFO, as the buy at $58,482 is paired with the sale on November 15, 2021 at $63,558. That same solicited investment would be reported as a loss using LIFO, as the solicited purchase would be

matched to the sale in June 2022 at $29,907. This investor would prefer that rescission amounts in this litigation are computed using LIFO. However, it is likely that there are other investors with different trading patterns who would prefer that rescission amounts in this litigation are computed using FIFO.

50. There is no *a priori* financial or economic reason to prefer LIFO or FIFO, they are merely accounting conventions. However, should the calculation of rescission become necessary in this matter, the class members will need to decide upon a methodology to match purchases and sales. That will likely result in some class members receiving a higher payment at the expense of other class members.

## VI.   Sources of Profit

51. It is my understanding from discussions with counsel that one factor in the legal determination of whether a financial instrument is a security is whether "there is an expectation of profit from the efforts of others."[37]

52. Based on my review of the terms of the EPAs, the only way for an investor's account balance to increase, as denominated in cryptocurrency, is to participate in the EPA program and earn "rewards." Such an increase would come from Voyager's efforts to find suitable counterparties to lend the cryptocurrency to and, as such, might be considered the "efforts of others." On a monthly basis, Voyager explicitly listed the tokens and coins that were eligible to earn a reward in an EPA and their respective rates and required balance minimums. Any token or coin not listed by Voyager was not eligible to earn a reward. For example, below is a portion of Voyager's release for October 2021. The full table continued and showed all 35 eligible assets.[38]

---

[37] See SEC v. W.J. Howey Co., 328 U.S. 293 (1946).

[38] The page is accessible via the Internet Archive's Wayback Machine at
  https://web.archive.org/web/20230118151618/https://www.investvoyager.com/blog/october-annual-percent-rewards/.

*Exhibit 7.*     *EPA Eligible Assets for October 2021*

OCT 1 2021, 13:58 EDT / THE VOYAGER TEAM

## Earn crypto this October on Voyager

No tricks, just treats this month on Voyager. Rewards are here for October and they are making it easy to earn crypto on popular assets like Chainlink (LINK), Polkadot (DOT), Cardano (ADA), and more.

This month, join us in welcoming StormX (STMX) to the Voyager Earn Program. You can now earn 2% on STMX just by holding the minimum monthly average in your account.

See below for October rewards and required minimum monthly average balances for 35 of our top digital assets.

| ASSET | REWARD | MIN. MONTHLY BALANCE |
|-------|--------|----------------------|
| Aave | 3.00% | 1 AAVE |
| Cardano | 5.00% | 100 ADA |
| Cosmos | 3.00% | 20 ATOM |
| Basic Attention Token | 1.00% | 300 BAT |

53. It is possible for an investor's account balance to increase due to changes in the value of the cryptocurrency as expressed in U.S. dollars. An investor who reasonably expects to be able to choose cryptocurrencies that increase in value is not relying upon the "efforts of others." To the extent that their expectation is correct, then they are profiting from their own efforts, not the effort of others.

Respectfully submitted,

_____

April 10, 2024

Appendix J

# NERA

**Patrick E. Conroy**
Senior Managing Director
NERA Economic Consulting
200 S. Biscayne Boulevard, Suite 950
Miami, FL 33131
O: (305) 341-5080
M: (203) 722-2581
patrick.conroy@nera.com
www.nera.com

# PATRICK E. CONROY
## SENIOR MANAGING DIRECTOR

Dr. Conroy, Managing Director in NERA's Securities and Finance Practice, specializes in economic analysis of securities and finance issues.

Dr. Conroy has provided evidence in US federal district and state court proceedings, and in European, Asian, and Latin America venues. In addition, he has provided opinions at various arbitrations and mediations.

His securities- and finance-related work at NERA is focused on providing expert testimony and consulting involving securities trading, corporate finance, EFTs and mutual/hedge funds, securities lending, securities fraud, derivatives, leases, swaps, FX, ADRs, private equity, and FCPA matters. Examples of Dr. Conroy's notable engagements include: *United States v. Blankenship; Veleron Holding, B.V. v. BNP Paribas SA; Securities and Exchange Commission v. Cuban;* and *U.S. v. Alcoa World Alumina LLC.*

Dr. Conroy served as Chair of NERA's Securities and Finance Practice for a six-year term. Prior to joining the firm, Dr. Conroy was an economist at the US Securities and Exchange Commission where he conducted research on ECNs, foreign securities, IPOs, underwriting, mutual funds, and securities fraud, and provided support for policy areas such as market microstructure and market regulation. Previously, he was a product manager at the fintech online broker Folio Investing where he designed content and developed new functionality.

Dr. Conroy holds a PhD in economics from the University of Miami and a BA in foreign policy from American University.

Patrick E. Conroy

## Education

**University of Miami**
PhD, economics, 1997
Dissertation on market microstructure

**American University, School of International Service**
B.A., foreign policy and economics, 1988

## Professional Experience

**NERA Economic Consulting**

| | |
|---|---|
| 2023- | Senior Managing Director |
| 2016–2023 | Managing Director |
| 2013–2018 | Chair of Securities and Finance Practice and Managing Director |
| 2011–2016 | Senior Vice President |
| 2006–2011 | Vice President |
| 2001–2006 | Senior Consultant |

**FOLIO*fn, Inc.***

1999–2001   Project Manager, Content Manager

Responsible for moving new features and products through concept, planning, design, and implementation. Developed content related to portfolio construction and trading. Assisted in design and implemented functionality in areas such as portfolio optimization, performance, tax planning, and margin optimization. Assisted in developing additional features related to corporate actions and financial education.

**United States Securities and Exchange Commission**

1997–1999   Economist, Presidential Management Fellowship Office of Economic Analysis

Responsible for providing analysis for Chief Economist and other Commission staff. Worked closely with the divisions of Market Regulation, Investor Education, Enforcement, and the Office of the Chairman in developing SEC policy initiatives and reviewing industry practices and enforcement issues. Developed the SEC Mutual Fund Cost Calculator, an interactive internet application that analyzes mutual fund fees for retail investors. Select areas of research include market microstructure, securities trading, enforcement, and investment management. Academic research conducted while at the SEC included analysis on Initial Public Offerings published in the *Journal of Finance*.

Patrick E. Conroy

## Expert Testimony

FINRA Arbitration, IsZo Capital LP, et al. v. Jefferies LLC, et al., February 2024.

Deposition before the United States District Court for the District of Nebraska, in the matter of *Muri v. National Indemnity Company*, March 2019.

Deposition Testimony before the United States District Court for the Southern District of New York in *Hudson Bay Master Fund Ltd. v. Patriot National, Inc. and Steven M. Mariano v. American Stock Transfer & Trust Company, LLC as Transfer Agent to Defendant Patriot National, Inc.,* November 2017.

Deposition before the US District Court for the Eastern District of Wisconsin, Milwaukee Division, in the matter of *Securities and Exchange Commission v. Stifel, Nicolaus & Co., Inc. et al.*, February 2016.

Expert Testimony in *Ahmed D. Hussein v. UBS Financial Services Inc. et al.,* FINRA Dispute Resolution Arbitration No.14-00162, May 2015.

Deposition Testimony before the United States District Court Southern District of New York in *Veleron Holding, B.V. v. BNP Paribas SA; Morgan Stanley*, Index No.: 12-cv-5966 (CM), August 2014.

Trial Testimony before the United States District Court of Maine, in the matter of *Daniel R. Goldenson v. John L. Steffens, Gregory P. Ho, Spring Mountain Capital GP, LLC*, Docket No. 2:10-CV-440-JAW, July 2014.

Expert Testimony before the Court of Chancery of the State of Delaware, *Lake Treasure Holdings, Ltd., et al. v. Foundry Hill GP LLC, et al. and Foundry Hill Holdings, LP and CP-1 LLC*, Civil Action No. 6546-VCL, April 2014.

Deposition Testimony before the Court of Chancery of the State of Delaware, *Lake Treasure Holdings, Ltd., et al. v. Foundry Hill GP LLC, et al. and Foundry Hill Holdings, LP and CP-1 LLC*, Civil Action No. 6546-VCL, March 2014.

Expert Testimony in *Tullett Prebon Financial Services LLC., v. BGC Financial, L.P.*, FINRA Dispute Resolution Case No. 09-04973, April 2013.

Presentation at the United States Securities and Exchange Commission Division of Enforcement analyzing fixed income trade allocation across hedge funds, mutual funds, and separate accounts, April 2013.

Deposition Testimony before the United States District Court of Maine, in the matter of *Daniel R. Goldenson v. John L. Steffens, Gregory P. Ho, Spring Mountain Capital GP, LLC*, Docket No. 2:10-CV-440-JAW, July 2012.

Patrick E. Conroy

Expert Testimony before the United States Tax Court on behalf of John Hancock Life Insurance Company, TIWAG-Trioler Wasserkraftwerke AG Sellrain Silz Hydroelectric Power Generating Facility, October 2011.

Expert Testimony in an arbitration before JAMS Endispute, Inc., New York, NY in the matter of *TA Associates, Inc., et al. v. James Gandy, et al.*, October 2011.

Expert Testimony in *Jeffrey Penner v. Herbert J. Simms & Co. Inc.,* FINRA Dispute Resolution Case No. 09-05050, December 2010.

Deposition Testimony before the United States District Court District Eastern District of Pennsylvania, *In re: Herley Industries, Inc. Securities Litigation*, October 2009.

Expert Testimony in *Larry W. Papasan Living Trust, et al. vs. Morgan Keegan & Company, Inc., et al.* FINRA Dispute Resolution Arbitration No. 08-01982, August 2009.

Expert Testimony in *Barry and Phyllis Bradshaw vs. Morgan Keegan & Company, Inc., et al.* FINRA Dispute Resolution Arbitration No. 08-02148, July 2009.

Presentation to the United States Securities and Exchange Commission Division of Investment Management analyzing an institutional investment advisory and fee dispute, February 2008.

Trial Testimony before the United States District Court for the Southern District of Indiana, *Hoosier Energy v. John Hancock Life Insurance*, relating to a leveraged lease transaction, November 2008.

Trial Testimony before the United States District Court for the Southern District of New York in *United States of America v. David Finnerty*, October 2006.

Deposition Testimony, *Thomas Hislop v. Fredrick Deluca*, Superior Court, Complex Litigation Docket Judicial District of Waterbury, July 2005.


## Expert Reports

Expert Report in the Secretary of the Commonwealth, Massachusetts Securities Division in the matter of *Robinhood Financial LLC,* January 2023.

Expert Report in response to the Securities and Exchange Commission's proposed Exchange Act Rule 10B-1 on "Position Reporting of Large Security-Based Swap Positions," with Sharon-Brown Hruska, Ph.D., and Nadim Siddique, March 2022.

Expert Rebuttal Report in the United States District Court for the District of Nebraska in *Muri v. National Indemnity Company*, February 2019.

Expert Report in the United States District Court for the District of Nebraska in *Muri v. National Indemnity Company,* January 2019.

Declaration before the United States District Court District of Oregon Portland Division, in the matter of *United States of America v. Dan Heine and Diana Yates*, May 2018.

Expert Report in the United States District Court for the Southern District of New York in *Hudson Bay Master Fund Ltd. v. Patriot National, Inc. and Steven M. Mariano v. American Stock Transfer & Trust Company, LLC as Transfer Agent to Defendant Patriot National, Inc.,* August 2017.

Expert Report in the United States District Court for the Southern District of New York in *CVI Investments, Inc. v. Patriot National, Inc.,* August 2017.

Expert Report in the Federal Court of Australia, Victoria Registry in *Australian Securities Investment Commission v. Australia and New Zealand Banking Group Limited,* August 2017.

Expert Report in the Third Judicial District Court Salt Lake County, State of Utah in *Ahmed D. Hussein v. UBS Financial Services Inc. et al.*, February 2017.

Expert Report before the United States District Court for the Eastern District of Wisconsin, Milwaukee Division, in the matter of *Securities and Exchange Commission v. Stifel, Nicolaus & Co., Inc. et al.*, in connection with synthetic CDO investments, January 2016.

Expert Report filed with the SIX Swiss Board of Arbitration, in the matter of *UBS AG against SIX Swiss Exchange AG* on market reaction to announcements of fines related to LIBOR manipulation dispute, August 14, 2015.

Expert Report before the United States District Court for the Southern District of New York in *Veleron Holding, B.V. v. BNP Paribas SA; Morgan Stanley*, Index No.: 12-cv-5966 (CM), April 2014.

Supplemental Expert Report before the Court of Chancery of the State of Delaware, *Lake Treasure Holdings, Ltd., et al. v. Foundry Hill GP LLC, et al. and Foundry Hill Holdings, LP and CP-1 LLC*, Civil Action No. 6546-VCL, February 2014.

Expert Report before the Court of Chancery of the State of Delaware, *Lake Treasure Holdings, Ltd., et al. v. Foundry Hill GP LLC, et al. and Foundry Hill Holdings, LP and CP-1 LLC*, Civil Action No. 6546-VCL, February 2014.

Expert Report before the United States District Court for the Southern District of New York, *In re: Direxion Securities ETF Trust*, Civil Action No. 1:09-CV-08011-RJH, November 2012.

Expert Rebuttal Report before the United States District Court for the Southern District of New York, *In re: Direxion Securities ETF Trust*, Civil Action No. 1:09-CV-08011-RJH, September 2012.

Declaration before the United States District Court for the Southern District of New York, *In re Direxion Shares ETF Trust*, Civil Action No. 1:09-CV-08011-RJH, August 2012.

Expert Report before the United States District Court for Southern District of New York, *In re: Direxion Securities ETF Trust*, Civil Action No. 1:09-CV-08011-RJH, August 2012.

Patrick E. Conroy

Expert Report on behalf of US Bank National Association; US Bancorp Asset Management, Inc., f/k/a FAF Advisors, v. Woodmen of the World Life Insurance Society in connection with securities lending, July 2012.

Plaintiff's Supplementation to the Expert Witness Designation of Patrick Conroy, PhD, *Goldenson, et al. v. Steffens et al.*, May 2012.

Rebuttal Expert Report in FINRA arbitration on employee retention in the financial services industry, February 2012.

Expert Disclosure before JAMS Endispute, Inc., NY, NY in the matter of *TA Associates, Inc., et al. v. James Gandy, et al.*, 2011.

Declaration before the United States District Court for the District of Arizona in the matter of *Robert Facciola, et al. vs. Greenberg Traurig, LLP, et al.*, 2011.

Expert Report on Behalf of John Hancock Life Insurance Company, TIWAG-Trioler Wasserkraftwerke AG Sellrain Silz Hydroelectric Power Generating Facility, 2011.

Declaration before the United States District Court for the Southern District of New York, in the matter of *Bank of America v. Apollo Enterprise Solutions*, 2010.

Expert Report before the United States District Court for the Eastern District of Pennsylvania, *In re: Herley Industries, Inc. Securities Litigation* in connection with a securities class action, 2009.

Expert Report before the United States District Court for the Eastern District of Pennsylvania, *in the matter of: In re Herley Industries Inc. Securities Litigation* in connection with a class certification, 2009.

Expert Report submitted to the US Department of Labor analyzing cross trading between investment funds falling under ERISA regulations, 2007.

Rebuttal Expert Report before the United States Securities and Exchange Commission, in *the matter of Salvatore F. Sodano,* on issues relating to the regulation of the American Stock Exchange, 2007.

Affidavit before the United States District Court for the Southern District of New York in *United States of America v. David Finnerty* on issues relating to specialist trading on the NYSE, 2006.

Expert Report before United States District Court for the Central District of California in *Stuart Siegel v. Homestore Inc.* on damages associated with failure to register restricted stock, 2005.


## Selected Project Descriptions

Review of high-yield debt trading by ETF-authorized participant and creation/redemption process.

Analysis in damages under Section 10b-5 and 14(a) involving merger of military contractors.

Patrick E. Conroy

Analysis of bank exposure from alleged manipulation of sovereign bond trading in Latin America.

Report on Australian Bank Bill Swap Rate market for ANZ Bank.

Analysis provided to Brazilian regulators on behalf of JBS relating to FX and Securities trading and ADR securities class action.

Retained by the United States Securities and Exchange Commission to provide support for academic expert testimony in the areas of spoofing and layering in Lek Securities matter.

Retained as securities fraud expert on behalf of Don Blankenship in West Virginia criminal trial.

Retained by hedge fund to provide returns analysis for fund investors due to errant computer coding of multi-stage macro investment strategy.

Analysis for Prudential Securities of mutual fund crossboarder securities lending procedures and impact on qualified and non-qualified funds of securities lending recalls.

Analysis of returns impact for bank run mutual fund due change in investment fundamentals involving long/short alleged over exposure to sovereign CDS positions.

Analysis of trade manipulation and unauthorized trading for large European bank involving customer accounts.

Economic damage calculations of Alcoa FCPA regulatory proceeding including presentation of model to the SEC, DOJ, and other regulators.

Analysis of return for F^2 mutual fund based on sector rotation strategy and impact on back testing and advertising materials.

Retained by Mark Cuban to provide analysis and support academic expert witness in SEC insider trading matter.

Quantitative analysis of composition and trading of Direxion leveraged and inverse leveraged ETF.

Analysis of leverage lease and cross-border SILO transactions for John Hancock Insurance Company in IRS proceeding, including trial testimony in US Tax Court.

Analysis of US Bank securities lending program and allegations that fairness algorithms impacted the relative value of the related money market mutual fund.

Securities fraud analysis for Dutch company Royal Imtech under a European Shareholder Group Action in Netherlands. Provided analysis for damages and distribution.

Analysis for Deutsche Bank of cross-boarder ADR trading around when-issued securities.

Quantify potential market impact of PIPE offering investment on behalf of hedge fund joint investors.

Patrick E. Conroy

Analysis of origination and trading practices of CDO, MBS, and RMBS securities for a hedge fund.

Analysis of S&P company ratings for real estate/fixed income broker dealer including presentation on required capital and risk level assumptions.

Consultant to court appointed receiver to assess distribution of assets involving fraudulent trading in small-cap equities and reverse merger IPOs.

Analysis for Allstate Insurance Company to analyze trading, performance, and the methodology for the measurement of portfolio returns for both company and ERISA investment portfolios.

Provide statistical analysis of market impact for hedge fund to capture potential market impact due to trading strategy focused on order display rules and market on close trading.

Calculate the cost of extending the non-registration period of unregistered securities used as merger compensation.

Analysis of hedge fund trading relating to trade allocation around a tender offer and securities lending of certain non-tendered shares.

Analysis for CEO of United Healthcare on litigation involving the financial impact of options backdating.

Provided analysis for a securities exchange relating to alleged patent infringement involving ETFs.

Analyzed the fair value of a merger/tender offer. Provided review of investment banks' valuations methodologies and conclusions.

Analysis of fund family stock lending and related use of lending optimization programming and tax consequences on fund returns.

Conducted analysis for Deutsche Bank dealing with mutual fund market timing and late trading. Worked with the bank, trustees, and regulators to reach a settlement. Provided analysis to Fund Board of Directors, Securities and Exchange Commission, New York Attorney General, and Department of Labor.

Analyzed mutual fund holds for MLIM to review potential conflicts of interest between the IPO underwriting and portfolio managers. Presented results to four different fund boards on alleged conflict of interest between these two groups.

Provided analysis to a Canadian mutual fund AIC on the identification of market timers. Also provided formula on the calculation of damages due to dilution. Consulted with Canadian regulators.

Provided analysis and support to the Independent Fee Consultant appointed by the New York Attorney General for the Bank of America Columbia funds. Assist the IFC in preparing the annual reports on fees, profitability, and economies of scale that are presented to fund Trustees.

Patrick E. Conroy

Analyzed alleged damages Amazon Euro-convertible bonds based on Section 10b-5 securities fraud claims.

Analyzed potential liability in derivative lawsuit involving a large technology company. Created a database to help statistically analyze the predicted outcomes.

Analyzed 10b-5 securities class action damages based on allegations of defendants stuffing the channel and earnings management.

Consultant the US Department of Justice on damages in a lawsuit involving capital reserves and the use of supervisory goodwill, Winstar litigation.


## Publications

"Review of the White House Report Titled, 'The Effects of Conflicted Investment Advice on Retirement Savings'," working paper Dr. Jeremy Berkowitz, Dr. Renzo Comolli, March 2015.

"Insurance Coverage Towers and Predicted Settlements," working paper with Dr. Jordan Milev, February 2012.

"Economic Analysis of Damages under the Foreign Corrupt Practices Act," working paper with Dr. Graeme Hunter, May 2011.

"FCPA Settlements: It's a Small World After All," working paper with Raymund Wong, January 2009.

"Options Backdating: The Statistics of Luck," working paper with Dr. Renzo Comolli, Dr. Branko Jovanovic, and Erik Stettler, March 2007.

"Options Backdating: Accounting, Tax, and Economics," working paper with Paul Hinton and Dr. Thomas Porter, November 2006.

"Options Backdating: A Primer," working paper with Matthew Evans and Dr. Sunil Panikkath, October 2006.

"Price Discovery in Initial Public Offerings and the Role of the Lead Underwriter," with Reena Aggerwal, *Journal of Finance*, December 2000.

"What Explains the Increase in Limit Orders on the NYSE?" working paper with Raymond P.H. Fishe, December 1997.

## Industry Presentations

Practicing Law Institute course, Securities Litigation 2018: Panel presentation on strategies in mediation and settlement, April 2018.

ABA Section of Litigation Annual Conference 2017: TED-style talk, "Choice and Uncertainty—The Economics of Decision Making by Jurors, Judges, Clients, Defendants, and Opposing Counsel," May 2017.

Practicing Law Institute course, Securities Litigation 2017: From Investigation to Trial, Seeking Resolution: Strategies in Mediation and Settlement of Securities Case. Panel presentation on strategies in mediation and settlement, April 2017.

Panel Counsel Presentation, Marsh D&O Emerging Risks and the Impact on Directors and Officers, April 2015.

Practicing Law Institute course, Securities Litigation 2015: From Investigation to Trial. Panel presentation on strategies in mediation and settlement, April 2015.

Panel presentation "Insider Trading, Whistleblowers and Other 2014 Enforcement Priorities," at the Securities Enforcement Forum 2014, hosted by Securities Docket, held in Washington, DC, October 2014.

Practicing Law Institute course, Handling a Securities Case 2013: From Investigation to Trial and Everything in Between. Panel presentation on strategies in mediation and settlement, April 2013.

Presentation at the 2012 NLJ Regulatory Summit, hosted by *The National Law Journal and Legal Times*: "Economic Analysis of Damages under the Foreign Corrupt Practices Act (FCPA)," held in Washington, DC, December 2012.

Panel presentation at the Structured Products Association (SPA) 8th Annual Conference, held in New York City on legal, regulatory, and compliance issues, March 2011.

Panel presentation at the Structured Products Association (SPA) Autumn Expo 2010, held in New York City on legal, regulatory, and compliance issues, "Does the Dodd-Frank Bill Create Vast New Opportunities for the Industry?" October 2010.

Presentation to the Structured Products Association (SPA) on fundamentals of leveraged ETFs and other related structured products, January 2010.

Participation in panel discussion at the Minnesota Chapter of the Federal Bar Association on the use of expert witnesses. The audience included approximately 150 Minneapolis area attorneys and the panel included Judge Ann Montgomery, US District Court, District of Minnesota, October 2009.

Securities and Exchange Commission Historical Society's Online Program: The Best of NERA 2007. Dr. Conroy examined the 2006 criminal trials against New York Stock Exchange specialists, focusing on the design of computer algorithms to identify violations in trading data, and criticism

Patrick E. Conroy

of these algorithms as presented by the defense. With Robert Mackay and Sharon Brown-Hruska, July 2007.

Securities and Exchange Commission Historical Society's Online Program: The Best of NERA 2006. Dr. Conroy discussed the implications of options backdating. With Elaine Buckberg, Faten Sabry, and Theresa Gabaldon, July 2006.

Presentation on behalf of Law Seminars International on securities litigation and admissibility of economics expert testimony, June 2005.

February 2024

**Appendix II**
**Materials Considered**

| No. | Item |
|-----|------|
| **(1)** | **(2)** |

**Legal Filings**

| 1. | Deposition of Edwin E. Garrison, (*Dominik Karnas, et al., on behalf of themselves and all others similarly situated v. Mark Cuban, et al.*, U.S.D.C. Southern District of Florida Miami Division No. 1:22-CV-22538-ALTMAN/Reid), March 21, 2024. |
|----|----|
| 2. | Deposition of Lee Reiners, (*Dominik Karnas, et al., on behalf of themselves and all others similarly situated v. Mark Cuban, et al.*, U.S.D.C. Southern District of Florida Miami Division No. 1:22-CV-22538-ALTMAN/Reid), March 28, 2024. |
| 3. | Deposition of Pierce Robertson, (*Dominik Karnas, et al., on behalf of themselves and all others similarly situated v. Mark Cuban, et al.*, U.S.D.C. Southern District of Florida Miami Division No. 1:22-CV-22538-ALTMAN/Reid), January 26, 2023. |
| 4. | Deposition of Mark Cuban, (*Dominik Karnas, et al., on behalf of themselves and all others similarly situated v. Mark Cuban, et al.*, U.S.D.C. Southern District of Florida Miami Division No. 1:22-CV-22538-ALTMAN/Reid), February 2, 2023. |
| 5. | Deposition of Rachel Jean Gold, (*Dominik Karnas, et al., on behalf of themselves and all others similarly situated v. Mark Cuban, et al.*, U.S.D.C. Southern District of Florida Miami Division No. 1:22-CV-22538-ALTMAN/Reid), January 23, 2023. |
| 6. | Deposition of Stephen Ehrlich, (*In re: Voyager Digital Holdings, Inc. et al., Debtors*, U.S.B.C. Southern District of New York No. 22-10943), February 21, 2023. |
| 7. | Deposition of Todd A. Webb, (*Dominik Karnas, et al., on behalf of themselves and all others similarly situated v. Mark Cuban, et al.*, U.S.D.C. Southern District of Florida Miami Division No. 1:22-CV-22538-ALTMAN/REID), March 21, 2024. |
| 8. | Motion to Dismiss the Amended Complaint, (*Pierce Robertson, Rachel Gold, Sanford Gold, Rahil Sayed, Christopher Ehrentraut, Todd Manganiello, Dan Newsom, William Ayer, Anthony Dorn, Dameco Gates, Marshall Peters, and Edwin Garrison, on behalf of themselves and all others similarly situated v. Mark Cuban and Dallas Basketball Limited, d/b/a Dallas Mavericks*, U.S.D.C. Southern District of Florida Miami Division No. 1:22-cv-22538 Altman/Reid), November 17, 2022. |
| 9. | Plaintiffs' Motion to Certify Nationwide Issue Classes, (*Dominik Karnas, et al., on behalf of themselves and all others similarly situated v. Mark Cuban, et al.*, U.S.D.C. Southern District of Florida Miami Division No. 22-CV-22538-ALTMAN/Reid), March 15, 2024. |
| 10. | Second Amended Class Action Complaint, (*Dominik Karnas, et al., on behalf of themselves and all others similarly situated v. Mark Cuban, et al.*, U.S.D.C. Southern District of Florida Miami Division No. 22-CV-22538-ALTMAN/Reid), June 9, 2023. |

**Legal Documents**

| 11. | "New Jersey Uniform Securities Law," New Jersey Department of Law and Public Safety, February 19, 2020, https://www.njconsumeraffairs.gov/Statutes/New-Jersey-Uniform-Securities-Law.pdf. |
|----|----|
| 12. | SEC v. W.J. Howey Co., 328 U.S. 293 (1946). |

**Webpages**

| 13. | "Introducing the Voyager Interest Program: Earn 3% interest on BTC," Voyager, October 23, 2019, https://web.archive.org/web/20200403222728/https://www.investvoyager.com/blog/3-interest-on-bitcoin/. |
|----|----|
| 14. | "Earn 2% Interest on LTC, BCH, ETH!," Voyager, January 2, 2020, https://web.archive.org/web/20200928181834/https://www.investvoyager.com/blog/interest-ltc-bch-eth/. |

**Appendix II**
**Materials Considered**

| No.<br>(1) | Item<br>(2) |
|---|---|
| 15. | "Voyager's February Interest Rates," Voyager, February 1, 2020, https://web.archive.org/web/20200928193356/https://www.investvoyager.com/blog/voyagers-february-interest-rates/. |
| 16. | "Voyager's October Interest Rates," Voyager, October 1, 2020, https://web.archive.org/web/20201126183853/https://www.investvoyager.com/blog/october-interest-rates/. |
| 17. | "Voyager's November Interest (APR) Rates," Voyager, November 3, 2020, https://web.archive.org/web/20201126173210/https://www.investvoyager.com/blog/voyagers-november-interest-apr-rates/. |
| 18. | "Voyager's December Interest (APR) Rates," Voyager, December 1, 2020, https://web.archive.org/web/20230118132207/https://www.investvoyager.com/blog/voyagers-december-interest-apr-rates/. |
| 19. | "Voyager's January Interest (APR) Rates," Voyager, January 1, 2021, https://web.archive.org/web/20210101151627/https://www.investvoyager.com/blog/voyagers-january-interest-rates/. |
| 20. | "Voyager's February Interest (APR) Rates," Voyager, February 1, 2021, https://web.archive.org/web/20210205203309/https://www.investvoyager.com/blog/voyagers-february-interest-apr-rates/. |
| 21. | "Voyager's March Interest (APR) Rates," Voyager, March 1, 2021, https://web.archive.org/web/20210310204741/https://www.investvoyager.com/blog/voyagers-march-interest-apr-rates/. |
| 22. | "Voyager's April Interest (APR) Rates," Voyager, April 1, 2021, https://web.archive.org/web/20230405153012/https://www.investvoyager.com/blog/voyagers-april-interest-apr-rates/. |
| 23. | "Voyager's May Interest (APR) Rates," Voyager, May 1, 2021, https://web.archive.org/web/20230405083053/https://www.investvoyager.com/blog/voyagers-may-interest-apr-rates/. |
| 24. | "Voyager's June Interest (APR) Rates," Voyager, May 28, 2021, https://web.archive.org/web/20230405021942/https://www.investvoyager.com/blog/voyagers-june-interest-apr-rates/. |
| 25. | "Voyager's July interest (APR) rates," Voyager, July 1, 2021, https://web.archive.org/web/20230405182649/https://www.investvoyager.com/blog/voyagers-july-interest-apr-rates/. |
| 26. | "Earn crypto this September on Voyager," Voyager, September 1, 2021, https://web.archive.org/web/20230131034522/https://www.investvoyager.com/blog/september-annual-percent-rewards/. |
| 27. | "Earn crypto this October on Voyager," Voyager, October 1, 2021, https://web.archive.org/web/20230118151618/https://www.investvoyager.com/blog/october-annual-percent-rewards/. |
| 28. | "Earn crypto this November on Voyager," Voyager, November 2, 2021, https://web.archive.org/web/20230118151623/https://www.investvoyager.com/blog/november-annual-percent-rewards/. |
| 29. | "Earn crypto this December on Voyager," Voyager, December 1, 2021, https://web.archive.org/web/20211211160120/https://www.investvoyager.com/blog/december-rewards/. |
| 30. | "New year, new rewards on Voyager," Voyager, January 1, 2022, https://web.archive.org/web/20220127122429/https://www.investvoyager.com/blog/january-rewards-2022/. |
| 31. | "Stack more than just snow in February," Voyager, February 1, 2022, https://web.archive.org/web/20220207202754/https://www.investvoyager.com/blog/february-rewards-2022/. |

**Appendix II**
**Materials Considered**

| No. | Item |
|-----|------|
| (1) | (2) |
| 32. | "More ways to stack in March," Voyager, March 2, 2022, https://web.archive.org/web/20220303015802/https://www.investvoyager.com/blog/march-rewards-2022/. |
| 33. | "More coins, more ways to earn," Voyager, April 1, 2022, https://web.archive.org/web/20220402173043/https://www.investvoyager.com/blog/april-rewards-2022/. |
| 34. | "May rewards are in," Voyager, May 2, 2022, https://web.archive.org/web/20220506105712/https://www.investvoyager.com/blog/may-rewards-2022/. |
| 35. | "The summer of stacking," Voyager, May 31, 2022, https://web.archive.org/web/20220601050359/https://www.investvoyager.com/blog/june-rewards-2022/. |
| 36. | "Refer-a-Friend Program," Voyager, Various Dates, https://web.archive.org/web/20210207001418/https://rewards.investvoyager.com/refer-a-friend/. |
| 37. | Voyager Promotions, Voyager, Various Dates, https://web.archive.org/web/20211029231930/https://www.investvoyager.com/marketingpromos/. |
| | **Voyager Documents** |
| 38. | Voyager Digital (Canada) Ltd. (formerly UC Resources Ltd.), *Closing of Change of Business*, February 7, 2019. |
| 39. | Voyager Digital (Canada) Ltd., Form 51-102F3 Material Change Report, February 7, 2019. |
| 40. | Voyager Digital (Canada) Ltd. (formerly UC Resources Ltd.), *Condensed Interim Financial Statements - Three and Nine Months Ended March 31, 2019.* |
| 41. | Voyager Digital (Canada) Ltd. (formerly UC Resources Ltd.), *Consolidated Financial Statements - Year Ended June 30, 2019 and for the period from January 12, 2018 (Inception) to June 30, 2018*. |
| 42. | Voyager Digital (Canada) Ltd. (formerly UC Resources Ltd.), *Condensed Interim Consolidated Financial Statements - Three Months Ended September 30, 2019 and 2018*. |
| 43. | Voyager Digital (Canada) Ltd., *Condensed Interim Consolidated Financial Statements - Three and Six Months Ended December 31, 2019 and 2018.* |
| 44. | Voyager Digital (Canada) Ltd., *Condensed Interim Consolidated Financial Statements - Three and Nine Months Ended March 31, 2020 and 2019.* |
| 45. | Voyager Digital Ltd., *Annual Information Form For the Fiscal Year Ended June 30, 2020*, November 1, 2020. |
| 46. | Voyager Digital Ltd. (formerly Voyager Digital (Canada) Ltd.), *Consolidated Financial Statements - Years Ended June 30, 2020 and 2019.* |
| 47. | Voyager Digital Ltd., *Condensed Interim Consolidated Financial Statements - For the Three Months Ended September 30, 2020 and 2019*. |
| 48. | Voyager Digital Ltd., *Condensed Interim Consolidated Financial Statements - For the Three and Six Months Ended December 31, 2020 and 2019.* |
| 49. | Voyager Digital Ltd., *Condensed Interim Consolidated Financial Statements - For the Three and Nine Months Ended March 31, 2021 and 2020.* |
| 50. | Voyager Digital Ltd., *Annual Information Form For the Fiscal Year Ended June 30, 2021*, October 27, 2021. |
| 51. | Voyager Digital Ltd., *Consolidated Financial Statements - June 30, 2021 and 2020.* |
| 52. | Voyager Digital Ltd., *Unaudited Interim Condensed Consolidated Financial Statements - September 30, 2021 and 2020.* |
| 53. | Voyager Digital (Canada) Ltd. (Formerly UC Resources Ltd.), *Condensed Interim Financial Statements - Three and Six Months Ended December 31, 2018*. |
| 54. | Voyager Digital Ltd., *Interim Condensed Consolidated Financial Statements (Unaudited) For the quarter ending December 31, 2021*. |
| 55. | Voyager Digital Ltd., *Interim Condensed Consolidated Financial Statements (Unaudited) For the quarter ending March 31, 2022*. |

**Appendix II**
**Materials Considered**

| No. | Item |
|-----|------|
| (1) | (2) |
| 56. | Voyager Digital, LLC Customer Agreement, January 7, 2022. |
| 57. | Sponsorship Agreement between Voyager Digital Holdings, Inc. and Dallas Basketball Limited, dated October 29, 2021. |

**Social Media Pages**

| No. | Item |
|-----|------|
| 58. | @BaylorAthletics, December 27, 2021, https://x.com/BaylorAthletics/status/1475640142161276928?s=20. |
| 59. | @BreeYahKnE3, October 27, 2021, https://twitter.com/BreeYahKnE3/status/1453479027230998529. |
| 60. | @Bucknell_Bison, December 23, 2021, https://x.com/Bucknell_Bison/status/1474140780814024704?s=20. |
| 61. | @CUBuffs, December 28, 2021, https://x.com/CUBuffs/status/1475950435387150337?s=20. |
| 62. | @DukeATHLETICS, December 23, 2021, https://x.com/DukeATHLETICS/status/1474136069650145284?s=20. |
| 63. | @GamecocksOnline, December 26, 2021, https://x.com/GamecocksOnline/status/1475278255888297985?s=20. |
| 64. | @Gronk, December 20, 2021, https://www.instagram.com/p/CXucLC3MAv0/?utm_source=ig_web_copy_link. |
| 65. | @investvoyager, October 27, 2021 - July 5, 2022, https://twitter.com/investvoyager. |
| 66. | @IUHoosiers, December 24, 2021, https://x.com/IUHoosiers/status/1474425539209437185?s=20. |
| 67. | @KUAthletics, December 28, 2021, https://x.com/KUAthletics/status/1475904385066656633?s=20. |
| 68. | @OakenshieldVGX, October 27, 2021, https://twitter.com/OakenshieldVGX/status/1453539482020585473. |
| 69. | @PCAthletics, December 23, 2021, https://x.com/PCAthletics/status/1474101677338861569?s=20. |
| 70. | @PurdueSports, December 24, 2021, https://x.com/PurdueSports/status/1474424626998657029?s=20. |
| 71. | @RiceAthletics, December 23, 2021, https://x.com/RiceAthletics/status/1474197814775267334?s=20. |
| 72. | @RobGronkowski, November 24, 2021, https://x.com/RobGronkowski/status/1463551128734470146?s=20. |
| 73. | @Seminoles, December 23, 2021, https://x.com/Seminoles/status/1474126259705810944?s=20. |
| 74. | @SHUAthletics, December 23, 2021, https://x.com/SHUAthletics/status/1474153113632268291?s=20. |
| 75. | @Ta11Texan, October 27, 2021, https://twitter.com/Ta11Texan/status/1453469606266474500. |
| 76. | @TigersAthletics, December 24, 2021, https://x.com/TigersAthletics/status/1474425047360147481?s=20. |
| 77. | @UA_Athletics, December 27, 2021, https://x.com/UA_Athletics/status/1475466503671750656?s=20. |
| 78. | @UConnHuskies, December 23, 2021, https://x.com/UConnHuskies/status/1474094522665684993?s=20. |
| 79. | Tweets from advanced searches on Twitter.com. The searches are: "(investvoyager AND get a little, give a little) until:2022-07-05 since:2021-10-01 -filter:replies", "(soccer OR nwsl) (from:investvoyager) until:2022-07-05 since:2021-10-01 -filter:replies", "(cassill OR landon OR landoncassill) (from:investvoyager) until:2022-07-05 since:2021-10-01 -filter:replies", "(gronk OR gronkowski OR robgronkowski) (from:investvoyager) until:2022-07-05 since:2021-10-01 -filter:replies", and "(dallasmavs OR mavs OR cuban OR mavericks OR mavs100) from:investvoyager until:2022-07-05 since:2021-10-27 -filter:replies". |
| 80. | U/foofette, October 29, 2021, https://www.reddit.com/r/Invest_Voyager/comments/qif0bb/signed_up_with_voyager_do_i_need_an_outside_wallet/. |
| 81. | U/stevester90, October 30, 2021, https://www.reddit.com/r/SHIBArmy/comments/qj18za/i_just_did_the_mavs100_voyager_promotion_to/. |

**Data**

| No. | Item |
|-----|------|
| 82. | Artemis Terminal Cryptocurrency Prices. |
| 83. | Mavericks Promotional Codes Data, [Rob-Voyager-00000662.xlsx]. |
| 84. | Plaintiffs' Funding and Trading Data, [VOYAGER000825_CONFIDENTIAL.xlsx], [Rob-Voyager-00000016 (DO NOT EDIT)(2).XLSX], and [Rob-Voyager-00000659.XLSX]. |

**Appendix II**
**Materials Considered**

| No.<br>(1) | Item<br>(2) |
|---|---|
| 85. | Plaintiff Recovery Data, [10_VOYAGER000832_CONFIDENTIAL.xlsx] and [VOYAGER0000833_CONFIDENTIAL.xlsx]. |
| 86. | Yahoo Finance Cryptocurrency Prices. |