UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**CASE NO. 22-CV-22538-ALTMAN/Reid**

Dominik Karnas, *et al.*, on behalf of themselves and
all others similarly situated,

    *Plaintiffs,*

v.

Mark Cuban, Dallas Basketball Limited, d/b/a
Dallas Mavericks, Robert Gronkowski, Victor
Oladipo, and Landon Cassill,

    *Defendants.*

_____/

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT
REPORT AND TESTIMONY OF PROFESSOR LEE REINERS [ECF NO. 253]**

**INTRODUCTION**

Plaintiffs respectfully request the Court deny the Motion to Exclude the Report and Testimony of Professor Reiners (the "Motion") because—despite the fact that the Motion is prematurely filed (as the Court need not engage in this analysis before granting Plaintiffs' motion for class certification)—Professor Reiner's Report will *assist the trier of fact*.

*First,* as evidenced by his 47-page Expert Report and full day of deposition testimony, Professor Reiners is probably the most experienced and knowledgeable cryptocurrency expert in the country. He has published hundreds of articles, reports, and treatises on cryptocurrency, and was asked to testify before Congress on multiple occasions, before ever agreeing to assist in this matter.[1] Defendants do not (because they cannot) contest Professor Reiners' qualifications.

*Second,* Professor Reiners *does not* "definitively say that the Voyager EPAs and VGX are investment contracts or notes;" rather, he simply provides his expert analysis of how the Voyager EPAs and VGX operated, how their features compare to the elements of an investment contract or note, and how the SEC and other courts have treated similar products. Clearly, the Court would benefit from such an independent assessment and would find it helpful in determining whether to certify the class. The sole question at this juncture of the litigation is whether there are "common" facts and issues that can be decided on a class-wide basis (whether for or against the class).

*Third,* Professor Reiners was charged with assessing the Voyager EPAs and VGX, and this assessment was informed by the SAC, the Motion to Dismiss, the CFTC complaint, the NJ Bureau of Securities Complaints against both Ehrlich and Voyager respectively, and other publicly available sources, some prepared by Voyager themselves, such as the VGX Whitepaper.[2]

For these and the reasons explained below, the Court should deny Defendants' Motion.

---

[1] It is unfortunate that this new out-of-town counsel for Defendants displays very aggressive, and at times, unprofessional conduct in this manner. During Professor Reiners' deposition, Mr. Zack responded to Mr. Sachs: "I've never seen conduct like yours before and I've been practicing 50 years." *See* Transcript Excerpts of Lee Reiners' March 28, 2024 Deposition (**Exhibit A**), at 131. There is simply no need to state that Professor Reiners' Report is: "a knock-off legal opinion," that "his methodology is to parrot the role of the Court," that he "betrayed his ignorance," or that "he barely attempts to mask his analysis." Moreover, the reason his "*Certificate of Good Faith*" is **unusual** is because immediately after the completion of Professor Reiners' deposition, Mr. Sachs sent an email to Class Counsel, attached as **Exhibit B**, purporting to satisfy his "Meet and Confer" requirement, but none of these issues were <u>ever discussed</u> during the deposition (on or off the record), as he represented.

[2] Ironically, while they argue these Complaints from two government agencies "are not competent evidence and cannot provide a reliable factual basis," their Motion to Dismiss relies heavily on the existence of the CFTC's complaint to argue why they think EPAs are commodities and not securities.

1

**FACTUAL BACKGROUND**

The sole questions *at this stage* for certification is whether there are common issues and questions that can be answered on a class-wide basis and whether those answers (either for the plaintiff or for defendants) advance this litigation. The central issue in this case is whether Voyager's crypto tokens ("VGX") and the interest-bearing Earn Program Accounts ("EPAs") are unregistered securities. Plaintiffs seek certification of *two* classes, the proposed Security Issue Class[3] and the Solicitation Issue Class.[4] Both will allow the Court to resolve issues that will materially advance this litigation, and the Security Issue in particular will also bear on the Voyager "Track 2" cases pending before this Court. For some reason, Defendants in their Opposition and Motion want to simply ignore the Security Issue Class.

After certifying the Security Issue Class—which Defendants all but *concede* in their Opposition because they only raise arguments as to the proposed Solicitation Issue Class—Plaintiffs will ask this Court to consider the Security Issue on partial Summary Judgment, where Plaintiffs will demonstrate, through numerous conclusive statements by the SEC, as well as other state and federal securities regulators and state and federal courts, that VGX and EPAs are clearly "unregistered securities."

At *that* point, Plaintiffs will proffer the expert testimony of Professor Lee Reiners on how EPAs and VGX have characteristics that lend themselves to meeting the *Howey* and *Reves* tests and are highly analogous to other cryptocurrency offerings and traditional securities subject to regulatory scrutiny by the SEC and analogous state regulators.[5] Plaintiffs previewed Professor Reiners' expert analysis in their certification motion for clarity and for full disclosure, but did not rely on it in support of certification; the Court certainly need not determine whether VGX tokens and EPAs are

---

[3] The proposed Security Class is defined as "All persons or entities in the United States who, from applicable statutes of limitation through July 5, 2022, purchased, repurchased, invested, reinvested, deposited, held, and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens. Excluded from the Class are Defendants and their officers, directors, affiliates, legal representatives, and employees, any customers who make a timely election to be excluded, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff."

[4] The Solicitation Issue seeks to address *at this stage* whether Defendants' conduct amounts to solicitation such that they meet the requirements of statutory sellers under the New Jersey Uniform Securities Law (which applies nationwide as the EPAs and VGX were issued from New Jersey to all class members). Whether any solicitation was "successful" is a step that proceeds after resolving the Solicitation Issue, as explained in Plaintiffs' class certification briefing.

[5] *See, e.g.,* Ex. A, at 78:9-19.

unregistered securities to grant certification. The *sole question* here is whether there are common issues and questions that can be answered on a class-wide basis.

Because Professor Reiners' expert opinion, while certainly helpful to the Court in resolving the Security Issue on summary judgment, is not "critical" to deciding certification,[6] the Court need not engage in a *Daubert* analysis before ruling on Plaintiff's certification motion. Even if this Court considers Defendants' premature *Daubert* challenge, it should be denied. Contrary to Defendants' assertions, Professor Reiners is the preeminent cryptocurrency expert, he reviewed and considered a variety of sources in reaching his opinions, and his factual analysis of the properties of VGX and EPAs provides useful information to the trier of fact. Simply put, Professor Reiners' opinions are admissible because he is extremely qualified to testify competently on the matters set forth in his Expert Report, and his opinions are both reliable and helpful.

## **LEGAL STANDARD**

First, a *Daubert* analysis in connection with a motion for class certification is unnecessary unless the Court first determines that the challenged expert opinion is "critical" to resolving class certification. *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1258 n.7 (11th Cir. 2014) (explaining "there was no need to engage the *Daubert* analysis before resolving the class certification motion" because the court only relied on challenged expert testimony in deciding issues which could not be considered at the certification stage); *In re January 2021 Short Squeeze Trading Litig.*, 2023 WL 9035671, at *37 (S.D. Fla. Nov. 13, 2023) ("Because the Court did not rely on the challenged expert testimony in reaching its determination [on class certification], the Court also does not engage in a *Daubert* analysis.").[7]

---

[6] Notably, Defendants expressly acknowledge that Professor Reiners' Report did not address class certification factors and that his opinion will be offered in connection with a ***future motion for summary judgment***. ECF No. 253, at 2–3.

[7] *See also Las Olas Co. Inc v. Fla. Power & Light Co.*, 2020 WL 9874296, at *8 (Fla. 11th Jud. Cir. Ct. Dec. 14, 2020), *aff'd*, 320 So.3d 751, 2021 WL 2172929 (Fla. 4th DCA May 27, 2021) ("The Court need not rule on Infratech's *Daubert* motion at ***this stage*** because it is immaterial to resolving Plaintiffs' Motion. Because "[t]he issue of eventually quantifying Class members' total damages is immaterial to certifying the liability issue class ***at this stage***, so expert reports on damages issues were "simply *not* 'critical to certification,' nor even necessary") (citing *Coffey v. WCW & Air, Inc.*, 2020 WL 4519023, at *2 (N.D. Fla. Mar. 25, 2020)); *Noel v. MHC Heritage Plantation, LLC*, 2023 WL 2633328, at *2 (S.D. Fla. Feb. 24, 2023), *R&R adopted*, 2023 WL 2631524 (S.D. Fla. Mar. 23, 2023) ("A court must perform a *Daubert* analysis before resolving a class certification motion only if challenged expert testimony is 'critical' to class certification.").

3

If the Court decides it must engage in a *Daubert* analysis, it conducts a three-part inquiry, evaluating, simply, (1) the expert's qualification, (2) the reliability of the proffered opinion, and (3) helpfulness of that opinion. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). Importantly, the court's gatekeeper role "is not intended to supplant the adversary system or the role of the jury." *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001) (quoting *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir.1999)). Indeed, the exclusion of expert testimony "*is the exception rather than the rule.*" *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 850 (11th Cir. 2021) (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments) (emphasis added).

## ARGUMENT

### I.   A *Daubert* Analysis is Unnecessary as Professor Reiners' Opinions are Not "Critical" to Certification.

As explained above, and as Defendants concede, Professor Reiners' opinions preview issues relating to summary judgment on the proposed Security Issue Class. There is no dispute that the Security Issue *can* be decided on a class basis for the proposed Security Issue Class; either the EPAs or VGX are securities, or they are not. Indeed, Defendants proffer their own purported expert who opines to the contrary on a related issue (entirely irrelevant to certification)[8], but does so on a class-wide basis. ECF No. 254-2 ¶¶ 51–53.[9] Because the Court can resolve the certification question without resolving the merits of the Security Issue, there is "no need to engage the *Daubert* analysis" such that the Court can deny Defendants' motion as premature. *Regions Fin. Corp.*, 762 F.3d at 1258 n.7; *In re January 2021 Short Squeeze Trading Litig.*, 2023 WL 9035671, at *37; *Las Olas Co. Inc.*, 2020 WL 9874296, at *8; *Noel*, 2023 WL 2633328, at *2.

---

[8] Namely, Defendants cite the report only for arguments related to causation and damages. But neither causation nor damages are relevant to the Security Issue or the Solicitation Issue (which only asks the Court to determine on a class basis whether Defendants' conduct amounts to "solicitation," not whether it was "successful solicitation" for any particular class member), and they are therefore also irrelevant to the Court's certification determination. *See* ECF No. 254 at 13, 28 (citing Conroy Report at 19–20 for causation-related argument); *id.* at 5, 13, 24 (citing Conroy Report at 8–15 for causation-related argument); *id.* at 24 (citing Conroy Report at 16-17 for causation- and damages-related arguments); *id.* (citing Conroy Report at 16-17 for damages-related arguments).

[9] It must be noted that Plaintiffs did not think it would even be helpful to take the deposition of Defendants' expert. The strength of Professor Reiners' qualifications and accepted methodology, will certainly be made more clear after the Court reviews the opinions offered by Defendants expert, as will be outlined in *Plaintiffs' Reply to Motion for Class Certification*.

4

## II. Defendants Concede Professor Reiners is Qualified.

Defendants do not dispute that Professor Reiners is extremely qualified to render his opinions, nor could they; Professor Reiners is a seasoned academic who (1) spent years supervising large financial institutions during his tenure at the Federal Reserve Bank of New York; (2) is a consultant on cryptocurrency and cryptocurrency regulation for government agencies, regulators, mainstream financial news outlets, and think-tanks around the world, with his expertise having been sought after by U.S. congressional committees to give testimony on these issues; (3) has published numerous academic papers and book chapters regarding cryptocurrency regulation; and (4) has taught courses on Cryptocurrency Law and Policy and FinTech Law and Policy online and as a lecturing fellow at Duke University for years. *See* Reiners Rpt. 1.03–1.08 & Ex. A, at 24:7-25:4, 26:18-27:9, 33:14-35:3. 38:2-38:9, 38:25-44:20.

## III. Professor Reiners' Opinions are Based on Sufficient Facts.

Professor Reiners opines, generally, that in purchasing VGX and/or depositing funds into EPAs, the holders of those tokens and/or accounts: (1) invested money; (2) in a common enterprise, evidenced by horizontal and/or vertical commonality, which exists where (i) investors funds are shared or pooled; and (ii) the investors' fortunes are tied to one another and to the success of the overall venture, respectively; and (3) reasonably expected profits to be derived from Voyager's efforts.[10] ECF No 231-1, Reiners Report, at 6–8, 20–22.

Professor Reiners bases this opinion on facts set forth in his report, including *inter alia*:

- Voyager offered "staking rewards" of 7% to users who held VGX on Voyager, such that VGX purchasers reasonably expected to profit from their purchase of VGX. *Id.* at 21.

- Voyager created and controlled VGX, which Voyager heavily marketed, such that VGX investor fortunes were tied to the success of Voyager. *Id.*

- Voyager would periodically "burn" a certain amount of VGX at times to decrease the supply in circulation, thereby increasing the price, such that any profits to VGX purchasers were derived from Voyager's efforts. *Id.*

- Voyager offered interest rates between 7% and 12% on EPAs, such that account holders reasonably expected to profit from assets deposited into EPAs. *Id.* at 7–8.

- Voyager reserved the right to "pledge, repledge, hypothecate, sell, lend or otherwise transfer" customer digital assets from EPAs and to use those assets' at the customer's own risk, such that EPA customer assets were pooled and their

---

[10] Professor Reiners also opines that EPAs do not resemble any of the exemptions to the presumption that the EPAs are notes, and in turn, securities. *See* ECF No 231-1, Reiners Report, at 9.

5

> fortunes tied to one another and the success of Voyager's lending activities and other operations. *Id.* at 8–9.

Defendants do not dispute the accuracy of these facts (or any in Professor Reiners' report). Defendants argue instead that Professor Reiners' report lacks a "sufficient" factual basis because he purportedly "relies entirely on allegations from complaints" in forming his opinions, notwithstanding the "general rule [that] the factual basis of any expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Schwartzben v. Nat'l Fire & Marine Ins. Co.*, 2023 WL 2931410, at *3 (S.D. Fla. Apr. 13, 2023).[11] "Further, under well settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true." *Id.* (citing *Williams v. Illinois*, 567 U.S. 50, 57 (2012)). Defendants misconstrue these legal principles and mischaracterize Professor Reiners' report to argue that Professor Reiners' opinions should be excluded. Defendants' motion fails as a matter of fact and law.

*First*, while true that Professor Reiners' opinion is "informed by what he read in the Second Amended Complaint and the CFTC Complaint," ECF No. 253 at 12, those are not the exclusive bases for his report. Professor Reiners, whose qualifications are undisputed, *see* Section I, *supra*, cites to his own experience purchasing cryptocurrencies, his research on cryptocurrency platforms, and a number of publicly available sources, including Voyager's website and white papers published by Voyager, which explain how the VGX token is structured to generate returns for their holders, including that:

- The VGX token "boosts your crypto earning potential even higher with 7% staking reward. Plus, you can boost your earnings on other cryptos, get crypto back rewards, and more." ECF No 231-1, Reiners Report, at 21.

- "The White Paper notes that through the 'Voyager Loyalty Program,' 'Voyager customers will be automatically enrolled and will stake and earn VGX and, through this process, increase their Platform reward tier levels, earn VGX rewards, and achieve and maintain other reward benefits as described in the White Paper.'" *Id.*

- "The White Paper also said that Voyager would periodically 'burn' a certain amount of VGX. 'Burning' a cryptocurrency refers to the act of sending a token to an inaccessible address. Wallet addresses used for burning cryptocurrency are called 'burner' or 'eater' addresses. The act of burning effectively removes tokens from the available supply, which decreases the number in circulation." *Id.*

---

[11] Indeed, "[o]nly if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Hinson v. Warren*, 2018 WL 11482815, at *1 (S.D. Fla. Mar. 8, 2018); *see also United States v. Gayden*, 2018 WL 8808058, at *1 (M.D. Fla. June 8, 2018), *aff'd*, 977 F.3d 1146 (11th Cir. 2020) ("Any weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility.").

6

- VGX purchasers provided money consideration (in the form of fiat, including U.S. dollars, or other cryptocurrencies) in exchange for VGX. *Id.*

On the basis of these facts—which Voyager itself admitted and published on its website and in white papers—Professor Reiners opines that:

> VGX purchasers reasonably expected to derive profits from their ownership of VGX. Voyager's marketing of VGX is designed to convince consumers of VGX's profitmaking potential through Voyager 'rewards.' … Investors also expected to profit through Voyager's efforts to reduce VGX supply via burning, thus increasing the price. Voyager created and controlled VGX, therefore VGX investors were depending on, and expecting, Voyager's efforts to increase the price of VGX. *Id.*

Professor Reiners also cites to the Voyager website, its terms of use, and "public statements by [Stephen] Ehrlich" as bases for his opinion that EPA investors likewise were led by Voyager "to expect profits." *Id.* at 7.

In addition, Professor Reiners cites to a Summary Cease and Desist Order, in which the Bureau of Securities for the State of New Jersey made "findings of fact" "based upon documents and information obtained during the [Bureau's] investigation" of Voyager, including that:

- "Voyager offers and sells its Voyager Earn Program Account…. Investors in these accounts ("Earn Program Investors") deposit certain popular cryptocurrencies with Voyager to earn 'up to 12% Rewards.'" *Id.* at ¶ 4.

- "The Voyager Earn Program Account 'Rewards' rates Voyager advertises are well in excess of the rates currently being offered on short-term investment grade fixed income securities, or on bank savings accounts." *Id.*

- "The Voyager Customer Agreement provides that an Earn Program Investor relinquishes control over the deposited cryptocurrency to Voyager and that Voyager is free to use those assets as it sees fit, including commingling the Earn Program Investor's cryptocurrency with those of other Earn Program Investors, investing those pooled assets, and staking them, or lending them to various third parties, including custodians and other financial institutions." *Id.* at ¶ 21.

These and other facts sourced from Voyager's *actual* website, *actual* white papers, *actual* terms of use and other *actual* marketing materials form the bases for Professor Reiners' report.

*Second*, that Professor Reiners references the SAC does not render his report inadmissible, because those references, too, are grounded in actual documents publicly available or produced in this case. Professor Reiners cites to portions of the SAC that *quote* Voyager's own documents, including statements *by Voyager* to the public and to securities regulators that:

- "[U]sers are automatically enrolled in the Voyager Earn Program" and would earn interest if they "[s]imply maintain the required minimum monthly average balance of any of [Voyager's] reward-bearing digital assets to participate." SAC ¶ 142.

7

- "Rewards earned on crypto assets are variable, and reward rates are determined by [V]oyager at its sole discretion." SAC ¶ 149.

Thus, Professor Reiners has relied on Voyager's own documents, terms of use, and other materials prepared by *Voyager*, most often directly, and sometimes as cited in the SAC.[12] Tellingly, Defendants *do not contest* that the materials quoted in Professor Reiners' report are factually correct.[13] They instead misleadingly argue that Professor Reiners only bases his opinions on Plaintiffs' allegations in the SAC because it quotes and attaches *some* of those relevant materials. But the fact that an expert considered a plaintiffs' complaint in forming his or her opinion does not require that the report be excluded under Rule 702. *See, e.g.*, *Elat v. Ngoubene*, 993 F. Supp. 2d 497, 511 (D. Md. 2014) (expert opinion based on sufficient facts where documents considered in addition to complaint).

In short, Professor Reiners' opinions are founded on sufficient facts and data, and Defendants' "challenges to the correctness of the facts underlying those opinions are best addressed on cross-examination." *Schwartzben*, 2023 WL 2931410, at *3. If the Court reaches a *Daubert* analysis, it should conclude Professor Reiners' opinions are admissible under Rule 702 and Defendants' motion to exclude should be denied.

### IV.  The Report Contains Only Permissible Opinions the Court May Consider.

Professor Reiners' opinions will be proffered with Plaintiffs' forthcoming motion for summary judgment on the Security Issue, which, if resolved by the Court, means that only the Court will consider his opinions in ruling on that issue. As stated by the Eleventh Circuit, "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *Guantanamera Cigars Co. v. SMCI Holding, Inc.*, 2022 WL 1160409, at *4 (S.D. Fla. Apr. 20, 2022) (Goodman, M.J.) (quoting *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005)). Under analogous circumstances, courts in this District have held that a *Daubert* analysis is unnecessary before the court considers such evidence, "even though [s]he must determine admissibility at some point," because the concerns that a *jury* might be "exposed to speculative, unreliable expert testimony are "greatly reduced." *Travelers Prop. Cas. Co. of Am. v. Barkley*, 2017 WL 4867012, at *1 (S.D. Fla. June 2,

---

[12] These features distinguish Professor Reiners' Expert Report from those at issue in the caselaw cited by Defendants, where courts excluded expert testimony that relied "primarily," "solely," or "exclusively on allegations from complaints to establish the facts." ECF No. 253 at 7–8.

[13] Even if they did, experts are allowed to "reach different conclusions based on competing versions of the facts. . . . [Rule 702] is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments.

8

2017) (Altonaga, C.J.) (citations omitted) (denying *Daubert* motion and concluding "It is unnecessary for the Court to make an advance ruling excluding . . . [the] expert before hearing his testimony at [a bench] trial.").

All that remains is Defendants' misguided argument that Professor Reiners' report "usurp[s] the role of the Court," claiming that by referencing elements of the *Howey* test he is engaging in legal analysis to reach an "ultimate issue," i.e., whether VGX and EPAs are securities. Defendants are wrong for at least three reasons: (1) an expert *may* testify on an ultimate issue, (2) an expert *may* use legal language to more clearly explain his analysis of the facts, and (3) an expert *may* explain a background legal and regulatory landscape when helpful to the jury in, e.g., situating the facts at hand.

*First*, it is irrelevant to the *Daubert* analysis (1) whether VGX or EPAs' status as securities is an "ultimate issue" and (2) whether Professor Reiners' opinions actually reach a conclusion on this issue. The guiding principle is merely whether the expert's conclusions are sufficiently explained so as to be at least somewhat "helpful" to the jury, a low bar.[14] *See* Fed. R. Evid. 702 advisory committee notes to 2023 amendment (disapproving "appreciably help" standard some courts had applied as "unnecessarily strict" and contrary to language and intent of rule); *In re Trasylol Prod. Liab. Litig.*, 2010 WL 1489793, at *6 (S.D. Fla. Feb. 24, 2010) (emphasis added) ("Only if the expert's opinion is so fundamentally unsupported that it can offer *no* assistance to the jury must such testimony be excluded."); 1 McCormick On Evid. § 12 (8th ed.) ("Evidence is helpful [even] when it [merely] provides a further depth or precision of understanding about subjects that lie well within common experience."); *Fed. R. Evid.* 704 advisory committee notes to 1972 proposed rules (ultimate issue rule unnecessary given helpfulness requirement).[15]

*Second*, and relatedly, Professor Reiners' expert opinion is properly read as an expert factual analysis of the properties of VGX and EPAs and how they compare to the properties of other

---

[14] "An opinion is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704. Indeed, Rule 704 was enacted to "specifically abolish[]" the "so-called 'ultimate issue rule'" because it "was unduly restrictive, difficult of application, and generally served only to deprive the trier of fact of useful information," and "the basis usually assigned for the rule, to prevent the witness from 'usurping the province of the jury,' is aptly characterized as 'empty rhetoric.'" Fed. R. Evid. 704 advisory committee notes to 1972 proposed rules.

[15] *United States v. Frazier*, 387 F.3d 1244, 1265–66 (11th Cir. 2004) is inapposite, as it involved an expert's abject failure to support or clarify, "even after repeated prompting," their conclusion on an "intrinsically probabilistic or quantitative" topic, the frequency that a rapist's hair would be found on their victim. The *Frazier* court also noted the *Daubert* factors do not "apply in every case" and "sometimes other questions may be more useful," *id.* at 1262, as not all may be quantitatively analyzed.

9

cryptocurrencies and instruments that courts have found to be securities, rather than a legal opinion on what the law is. Such technical and specialized knowledge of the features and workings of various types of cryptocurrency is squarely the purview of expert testimony. *See, e.g.*, ECF No. 231-1, Reiners Report ¶¶ 2.01–3.28, 6.28–29, 7.01–7.14 (analyzing properties of EPAs and VGX); *id.* at ¶¶ 4.03, 5.02, 5.08–.09, 5.12, 6.30 (comparing features of Voyager EPAs and similar programs found by the courts or SEC to be securities); Deposition of Lee Reiners 21:12–22 ("[N]owhere in the report, I believe, do I state definitively that these are investment contracts. I say they support the elements of an investment contract….[That means t]hat they share many of the characteristics that the SEC and various courts have found to be determinative of an investment contract."

That Professor Reiners may have contextualized this economic analysis in the backdrop of the *Howey* elements is of no concern. *Cf. Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir. 2001) ("[The expert was] certainly qualified to opine on forensic accounting issues, and as part of that process he was entitled to state reasonable assumptions regarding the [legal] requirements of the applicable contracts in order to put his opinions in context."). In fact, this context *enhanced* Professor Reiners' explanation by making it clearer what features he is comparing. The main worry with an expert using legal terms is that "*absent an adequate definition*, the lay jurors may misunderstand the [expert] witness's answer." 1 McCormick On Evid. § 16 (8th ed.) (emphasis added) (collecting cases).[16] But "it is often convenient or desirable to . . . phrase[ expert analysis] in terms of a legal standard[, and] . . . the danger is minimal

---

[16] The Advisory Committee notes to Rule 704 take this approach, stating as an example that while a bare conclusion that a testator had "capacity" to make a will would be inappropriate if the meaning of this technical term is "inadequately explored," such testimony would be perfectly appropriate if broken down into the legal elements of capacity. *See Fed. R. Evid.* 704 advisory committee notes to 1972 proposed rules; *see also United States v. Duldulao*, 87 F.4th 1239, 1269–70 (11th Cir. 2023) (upholding admittance of expert testimony that defendant violated relevant legal standards when the expert "first gave background testimony about these standards, explaining [how] he derived their meanings," and other elements besides those expert testified to were necessary to convict); McCormick On Evid. § 16 (8th ed.) (collecting cases) ("[If] the definition of the legal term [is] clear to the jury, many jurisdictions accept opinions couched as conclusions on mixed questions of law and fact."); *United States v. Richter*, 796 F.3d 1173, 1196 & n.13 (10th Cir. 2015) (citing Fed. R. Evid. 704 advisory committee notes) ("Witnesses are permitted to testify about how the law applies to a certain set of facts, so long as they provide adequate explanations for their conclusions."); *United States v. Van Dyke*, 14 F.3d 415, 421–22 (8th Cir. 1994) (reversing district court because of refusal to allow expert to "explain or clarify the significance of a provision [in a banking regulation]" as part of testimony because "elaboration …would clearly have assisted the jury in understanding the regulation and defendant's reasons for asserting that he had not violated its provisions," and its absence "in all likelihood rendered [the expert's] testimony meaningless to the jury at best.").

if the expert enables the jury to exercise independent judgment *by clearly specifying the criteria on which the opinion is based. Id.* (emphasis added) (collecting cases).[17]

In line with the purposes of the Rules of Evidence, other courts interpreting the federal and materially similar state rules have allowed expert testimony on whether an instrument supported the elements of the *Howey* test. *See U.S. S.E.C. v. Lowery*, 633 F. Supp. 2d 466, 481–84 (W.D. Mich. 2009) (relying on expert report that concluded partnership interest met the elements of Howey test and was therefore a security to grant plaintiff summary judgment); *People v. Lawrence*, 487 P.3d 1066, 1074 (Colo. App. 2019), *aff'd*, 486 P.3d 269 (Colo. 2021) (upholding admission of expert testimony on whether the contract at issue in the case was a security under *Howey*).

*Third*, inasmuch as Professor Reiners' opinion is read as giving background information on the legal landscape of securities regulation, such general background information is permissible when "when the legal regime is complex and the judge determines that the witness' testimony would be helpful in explaining it to the jury." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011); *see also Bancor Grp. Inc. v. Rodriguez*, 2023 WL 6310233 (S.D. Fla. June 13, 2023) (citing *Offill*, 666 F.3d at 175) (finding complex sanctions regime merited expert testimony), *reconsideration denied*, 2023 WL 6318012 (S.D. Fla. June 29, 2023); *United States v. Lundergan*, 2019 WL 3804239, at *3 (E.D. Ky. Aug. 13, 2019) (second alteration original) ("[E]xpert testimony on [complex] legal issues is permissible 'where [it] would assist in explaining legal concepts, and where such opinions are not inconsistent with the instructions to be given by the Court.'"); Fed. R. Evid. 702 advisory committee notes to 2000

---

[17] Defendant's cases are in fact largely consistent with this interpretation. They excluded testimony that either involved *no* factual analysis, *Apple Inc. v. Corellium, LLC*, 2020 WL 5417197, at *3–5 (S.D. Fla. July 30, 2020) (excluding expert testimony on the policies behind statute, because "the statutes and law say what the statutes and law say, and the jury will be instructed to follow the applicable statutes and law," and the legal standards of statute), *report and recommendation adopted*, 2020 WL 7385752 (S.D. Fla. Dec. 16, 2020); *TOA Trading LLC v. Mullen Auto., Inc.*, 2023 WL 8476462 (S.D. Fla. Nov. 27, 2023) (proponent admitted expert testimony was "solely being offered to educate the jury about the pertinent securities laws"), or made conclusions on the ultimate *legal effect* of defendant's behavior, i.e.*, defendant's liability to plaintiff*, with unclear reasoning, *Matter of Chaves*, 2024 WL 717859, at *4 (S.D. Fla. Feb. 12, 2024) (excluding conclusion that plaintiff was negligent).

But here, Professor Reiners says nothing about the "ultimate legal conclusion" of whether Defendant's promotions of securities renders them liable to plaintiffs as statutory sellers, but only an opinion on the characteristics of what Defendants' were promoting. *See* Deposition of Lee Reiners 21:23–22:24; 74:11–78:20 (report does not express opinion on ultimate question of liability or whether Defendants "offered" or "sold" EPAs and VGX under the Securities Act of 1933). His conclusions are neither "ultimate" nor "legal," let alone both. And even if portions of Reiners' report were problematic, the proper remedy is a limiting instruction or striking of only the offending portion.

11

amendment ("The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles."). Indeed, "[t]he complex concepts involving securities registration . . . and specific regulatory practices make [this] a typical case for allowing expert testimony that arguably states a legal conclusion in order to assist the jury." *Offill*, 666 F.3d at 175; *see also United States v. Bilzerian*, 926 F.2d at 1294–95 (2d Cir. 1991) (upholding admission of expert testimony on "general background information" because "particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."); *United States v. Coffman*, 574 F. App'x 541, 553–54 (6th Cir. 2014) (upholding admission of expert testimony on materiality for securities fraud purposes and usual and customary practices of securities lawyers in securities fraud case against lawyer and client).

*Finally*, if there is any concern on whether a jury may take the expert's framework for factual analysis as an authoritative statement of the law, the Eleventh Circuit has expressly "recognized that an instruction may be used to prevent a jury from placing too much weight on an expert's legal conclusions." *See Maiz v. Virani*, 253 F.3d 641, 667 (11th Cir. 2001); *see also United States v. Fogg*, 652 F.2d 551, 556–57 (5th Cir. 1981) (allowing accountant's legal conclusion in light of Rule 704 and trial court placing opinion "in the proper perspective"); *Lawrence*, 487 P.3d at 1074. And "there is no risk that the jury will be unfairly prejudiced by improper opinions or statements contained in Professor [Reiners' ] written report" if it is not introduced into evidence. *Apple*, 2020 WL 5417197, at *3.[18] Indeed, if this case proceeds past certification on the Security Issue, Plaintiffs intend to resolve this issue through partial summary judgment well before this case reaches a jury.

## **CONCLUSION**

The Court should deny Defendants' Motion to Exclude Expert Report and Testimony.

---

[18] Indeed, Defendants' cases only struck an expert's entire testimony when they found nothing beyond legal opinions, or the rest of the testimony was excludable for other reasons. *See, e.g.*, *Apple*, 2020 WL 5417197, at *3–5 (allowing testimony "regarding industry standards, facts that are relevant to fair use, and related relevant areas," while barring testimony on standard set by and policies behind copyright statute and ultimate conclusions as to parties' liability or nonliability); *Chaves*, 2024 WL 717859 (S.D. Fla. Feb. 12, 2024) ("[T]he wholesale exclusion of [the expert's] testimony is not proper here, especially in light of the fact that this case is proceeding to a bench trial."); *Cordoves v. Miami-Dade Cnty.*, 104 F. Supp. 3d 1350, 1360, 1365 (S.D. Fla. 2015) (emphasis added) (testimony "not helpful because it consists *entirely* of impermissible legal standards"); *Omar v. Babcock*, 177 F. App'x 59, 63 n.5 (11th Cir. 2006) (expert lacked necessary expertise for conclusions on defendant's state of mind); *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1129 (11th Cir. 2018) (opinions on industry standards and norms not admissible because they were not raised in expert report).

Dated: April 24, 2024

Respectfully submitted,

| | |
|---|---|
| **By: /s/ Adam M. Moskowitz** | **By: /s/ David Boies** |
| Adam M. Moskowitz | David Boies |
| Florida Bar No. 984280 | (admitted *pro hac vice*) |
| adam@moskowitz-law.com | Alexander Boies |
| Joseph M. Kaye | (admitted *pro hac vice*) |
| Florida Bar No. 117520 | Brooke Alexander |
| joseph@moskowitz-law.com | (admitted *pro hac vice*) |
| Barbara C. Lewis | **BOIES SCHILLER FLEXNER LLP** |
| barbara@moskowitz-law.com | 333 Main Street |
| Florida Bar No. 118114 | Armonk, NY 10504 |
| **THE MOSKOWITZ LAW FIRM, PLLC** | Phone: (914) 749–8200 |
| 2 Alhambra Plaza, Suite 601 | dboies@bsfllp.com |
| Coral Gables, FL 33134 | aboies@bsfllp.com |
| Telephone: (305) 740-1423 | balexander@bsfllp.com |

*Co-Counsel for Plaintiffs and the Class*

Stephen Neal Zack
Florida Bar No. 145215

**By: /s/ Jose M. Ferrer**
Jose M. Ferrer
Florida Bar No. 173746
Desiree Fernandez
Florida Bar No. 119518
**MARK MIGDAL HAYDEN LLP**
8 SW 8th Street, Suite 1999
Miami, FL 33130
Office: 305-374-0440
jose@markmigdal.com
desiree@markmigdal.com

Tyler Ulrich
Florida Bar No. 94705
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., Suite 2800
Miami, FL 33131
Office: 305-539-8400
szack@bsfllp.com
tulrich@bsfllp.com

*Co-Counsel for Plaintiffs and the Class*

*Co-Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed on April 24, 2024, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

By: */s/ Adam M. Moskowitz*
ADAM M. MOSKOWITZ
Florida Bar No. 984280