# Composite

# Exhibit B

**Subject:** Fwd: Houston Rockets Uniform Sponsorship
**Date:** Tuesday, 7 August 2018 at 15:41:51 Pacific Daylight Time
**From:** Clinton Ehrlich
**To:** Jonathan Kendrick

**Forwarded email below:**

Clinton,

Per our conversation earlier, I had a discussion with Tad Brown (President of the Rockets) and Patrick Fertitta (son of Tilman Fertitta, owner of both the team and also Landry's Inc.).

If Rokit was to become the first ever uniform sponsor of the team (see attached) it would include a business portfolio wide relationship with the franchise, their home venue (the Toyota Center), and Landry's Inc. (http://www.landrysinc.com/default.asp#/page/1).

In addition to your logo on the Rockets uniform, you would receive a comprehensive marketing package, custom built to fit your goals and objectives. We're talking social, digital, appearances by the whole team, use of marks and IP rights for all your products (device, services, spirits, beer, etc.), in-arena exposure, hospitality, and more. The Rokit name would go on the jersey but you could leverage the partnership elements to promote all your products and services…no restrictions.

At the Toyota Center, we could rename different bars and hospitality areas after your spirit brands. We would also of course serve your product at all events including Rockets games, concerts, etc.

Patrick also made it clear that we could push your products at all 600 Landry's owned and operated locations around the world. He even threw out the idea of specialized cocktails at their restaurants promoting the brands.

What about ROK Rewards? Are you still doing that? So much we could do there.

This is a 5 year partnership and the average annual cost of the deal is $14MM…so $70MM over a 5 year spread. Year 1, the deal could be closer to $10MM or $12MM and if we pushed most of the billing for season 1 into 2019, it would only be a couple million in 2018.

If this is realistic, Tad will set-up a call with Tilman for later this week. Just has to be legit as Tilman has not jumped on any calls with me or attended any meetings to date….he is just excited about this one and is obviously very aware of JPD and JK.

This would be insane.

**Jason D. Miller**
Head of Property Sales
Excel Sports Management
1700 Broadway, 29th Floor

**EXHIBIT 1**



# PARTNERSHIP PROPOSAL
### August 13, 2018

In conjunction with the launch of its branded devices and bundle of vital family services, ROKiT will become the first ever jersey partner of the Houston Rockets. The timing could not be more perfect as all eyes will be on the team that finished with the best record in the NBA, had the league MVP in James Harden, and was one half away from advancing to the NBA Finals.

This historic partnership will create instant brand recognition for ROKiT across the globe to over 500 million NBA fans across 218 countries…80 million in the US alone, and the most active social fan base in all of professional sports. Above all else, this partnership with the Houston Rockets will support and align itself with ROKiT's mission to build an unparalleled network of vital communications, health, and security services, and make them as broadly accessible as possible.



THE FOLLOWING TERM SHEET OUTLINES THE ROKIT-ROCKETS JERSEY PARTNERSHIP BENEFITS.

**EXHIBIT 2**



## Table of Contents

Jersey Patch ........................................................................................................................... 3

Partnership Announcement ................................................................................................... 3

    Additional PR support: ....................................................................................................... 3

Toyota Center Brand Showcase ............................................................................................. 3

Global Brand Showcase .......................................................................................................... 4

Designation and Marketing Benefits ..................................................................................... 5

    Marketing Benefits ........................................................................................................... 5

    Designation ........................................................................................................................ 5

Digital ..................................................................................................................................... 5

    Content Curation ............................................................................................................... 5

    Digital Engagement ........................................................................................................... 6

In-Arena .................................................................................................................................. 7

Community .............................................................................................................................. 8

Hospitality .............................................................................................................................. 8

Investment Summary ............................................................................................................. 8

Appendix – Supporting Data ................................................................................................ 10

    NBA .................................................................................................................................. 10

    NBA Globally .................................................................................................................... 10

    Rockets in China .............................................................................................................. 10

    Why the Houston Rockets' Patch? ................................................................................. 11

Rockets Patch – 3rd Party Valuation .................................................................................... 11

    Nielsen ............................................................................................................................. 11

Appendix – The Bogart Lounge ............................................................................................ 13

Appendix – The Bandero Tequila Terrace ............................................................................ 14

Appendix – The ABK Beer Garden ........................................................................................ 15

**EXHIBIT 2**



## Jersey Patch

ROKiT will receive logo placement prominently displayed on all official Rockets game uniforms throughout the term of the agreement including the following standard patch benefits:

- Patch measures approximately 2.5 inches by 2.5 inches
- Patch located on the upper left chest area on each Rockets' team jersey variant
- Camera-visible for all televised games including global, national and regional exposure
- Potential for incremental exposure through branded jerseys sold at the Rockets' team store and merchandise footprints within Toyota Center, as well as online on the team's store, rocketsshop.com

## Partnership Announcement

ROKiT will take center stage on a national and global platform for a co-branded partnership announcement attended by notable ROKiT executives and the Rockets' team and ownership. The Rockets and ROKiT will collaborate on the most effective partnership launch strategy, including:

- Opportunity to host jersey unveiling/partnership launch event at Toyota Center or other mutually-agreed upon location
- Leading up to the partnership launch event or season opener, ROKiT and the Rockets can create an announcement campaign/stunt to garner media attention.
- Media statements from ROKiT and Rockets executive leadership

### Additional PR support:

- Mutually agreed upon PR initiatives including sports endemic and mainstream media coverage
- Coordinated Houston Rockets players engagement on social media welcoming ROKiT to the Rockets family
- Coordinated Fertitta Holdings, Inc. and Landry's Inc. PR support
- Exponential earned media impressions from national social media and press coverage (i.e. Rockets' players social media profiles, local media outlets, sports-industry publications and media outlets, etc.)

## Toyota Center Brand Showcase

- The Bogart Lounge
  - The Bogart Lounge will be located on the floor level and caters to the Toyota Center's most premium guests and clientele. Located just behind the Rockets team bench, this lounge will be open for all events, including Rockets games, concerts, and

**EXHIBIT 2**



more. The space is also ideal to host cocktail receptions, networking events, or parties. The Bogart Lounge can accommodate groups of 50 to 250 and features a full bar with plasma televisions, private restrooms, a plush lounge area, and of course the newest and freshest cocktails using the finest Bogart Spirits.

- o Approximately 6,500 square feet of space

- o For visuals, please see below in Appendix – "The Bogart Lounge"

- The Bandero Tequila Terrace

    - o The Bandero Tequila Terrace will be located on the suite level, just above the East Club & Concourse. This space caters to all suite and premium suite owners and their guests for all Rockets home games and Toyota Center events. The space is an open canvas used for private events, meetings, and cocktail receptions.

    - o Approximately 3,500 square feet of space

    - o For visuals, please see below in Appendix – "The Bandero Tequila Terrace"

- The ABK Beer Garden

    - o The ABK Beer Garden will be located on the upper concourse and open for all Rockets games and ticketed Toyota Center events. The space will be fully customizable to service over 6,500 customers per event. The ABK Beer Garden also includes an adjacent social area where customers will be able to enjoy their favorite ABK offerings.

    - o For visuals, please see below in Appendix – "The ABK Beer Garden"

- Opportunity to explore incremental pop-up bars within Toyota Center for Houston Rockets games and other special events

- Bandero Premium Tequila and Bogart Spirits will be displayed on top of bar at all spirits distribution points throughout the Toyota Center

- ROKiT and Rockets-branded kiosks throughout the Toyota Center that will serve as an interactive fan vehicle for ROKiT to market its devices and bundle of services

## Global Brand Showcase

- Landry's Inc.

    - o Bogart Spirits, Bandero Premium Tequila, and ABK Beer will also be showcased at over 600 dining, hospitality, entertainment, and gaming properties in 36 states and 15 countries.

- Embedded API ROKiT ecommerce experience within the Rockets mobile app which can be accessed globally (300,000+ Rockets app downloads)

**EXHIBIT 2**



---

## Designation and Marketing Benefits

### Marketing Benefits

ROKiT, Bogart Spirits, and Bandero Premium Tequila will have the rights to the Rockets' name and marks in all approved marketing, advertising, internal and press-related communications within the Rockets' 150-mile marketing territory (per NBA rules).

### Designation

- ROKiT will become an "Official Sponsor of the Houston Rockets & Toyota Center", "Official Jersey Partner of the Houston Rockets," and other mutually agreed upon designations

- Bogart Spirits will become an "Official Sponsor of the Houston Rockets & Toyota Center"

  - Opportunity to use "Official Sponsor" designation for Vodka, Rum, Whiskey and/or Gin"

- Bandero Tequila will become an "Official Sponsor of the Houston Rockets & Toyota Center"

- Current and future brands within the portfolio that do not conflict with current or future Rockets partners and/or NBA restrictions may leverage marketing benefits, Rockets intellectual property and designations

NOTE: In addition, the ROKiT brand can digitally leverage the partnership beyond the team's marketing territory in the following ways:

- Digital content and social posts do not have to be gated if content/posts are tied to a major PR initiative such as the partnership launch, patch announcement strategy, press around major partnership pillars (i.e. community relations initiatives, etc.)

- For any Rockets' distributed digital content or social posts, digital content can run on all Rockets-approved social media channels. ROKiT will be able to repost/share on its own channels.

- Digital content does not have to be gated if the content is posted on a dedicated landing page on Rockets.com (i.e. NBA.com/Rockets/ROKiT)

## Digital

### TBD Content Curation

- **ROKiT Sideline Reporters** (*CONCEPT ONLY*): A blogger/vlogger season-long sweepstakes platform where fans who register at rockets.com/rokit are entered to win the once-in-a-lifetime opportunity to be ROKiT's honorary content capturer for a game. At 1-2 games a month, lucky winners will receive behind-the-scenes arena access and a pre-loaded ROKiT device to capture video/photo/editorial content pre/post-game and halftime. This platform will include the following digital extensions:

  - Dedicated landing page to house game-by-game content

**EXHIBIT 2**



- o ROKiT social media tagging in all content shared

- o Monitored ROKiT-branded social media takeovers throughout the season

  - Includes pre-takeover post to generate awareness for takeover and prompt fans to engage for the chance to win prizes.

  - During each takeover, random lucky fans who engage with this content will be selected to win a ROKiT device and co-branded ROKiT-Rockets merchandise.

- o Credentials for ROKiT Sideline Reporters to capture content

- o Opportunity to influence content storylines to serve as a turnkey production house for Rockets and basketball related content

  - NOTE: Upon Rockets approval, ROKiT can repurpose this content nationally/globally for ROKiT-owned channels by un-branding content with Rockets marks.

### Digital Engagement

- Exclusive sponsor of the **"Photo of the Game",** posted immediately after every win, or the following morning across Facebook, Twitter, and Instagram.

  - o In 2017 this post garnered the 2nd highest levels of engagement on Facebook and Twitter, and the 4th highest on Instagram.

  - o 657K average impressions per post / 70K average engagements (i.e. shares, comments, retweets, etc.)

- **"Rockets Gameday Selfies"** (_CONCEPT ONLY_): Millions of selfies are taken every day across the world. ROKiT will own this cultural phenomenon as the presenting partner of the Rockets Gameday Selfies. We will ask fans to submit video and photo content to be shared on all Rockets digitally-owned channels and tagged with ROKiT's brand. Platform extensions include:

  - o ROKiT-branded dedicated landing page to house a collage of the best selfies from each game

  - o One (1) ROKiT-branded Rockets social media post (video or photo) every game featuring the selfie of the game, superimposed onto a ROKiT device

  - o Linked ROKiT call to action to purchase devices and products

  - o Branded "step and repeat" and concourse activation to encourage fans to take and post their selfie

- Year-long social and digital activation calendar to offer highly-frequent visibility across Rockets-owned channels. Calendar will include:

6

**EXHIBIT 2**



    o  Minimum of one (1) short-form video content piece distributed to Rockets fans per month

    o  Two (2) co-branded email communications to the Rockets fan database per month

    o  ROS banner and drop-down advertisements on NBA.com/Rockets

    o  One (1) splash page on NBA.com/Rockets per month

### In-Arena

- Two (2) minutes of camera-visible courtside digital LED package during all non-nationally televised games at Toyota Center

    o  Digital LED package includes: one (1) courtside sign, two (2) baseline/bench signs, two (2) basket stanchions, six (6) endzone Vom LED signs

- Two (2) minutes of in-arena 360° LED messaging during all Rockets home games

    o  Includes 360° LED outer ring and the top ring of the center-hung videoboard

    o  Provides full in-bowl signage takeover during non-nationally televised games

- One (1) videoboard feature during all Rockets home games (i.e. Family Cam, Co-branded Rockets-ROKiT entertainment crew, etc.)

- Presenting Partner of one (1) regular season home game each season (*i.e.* Family Night, Military Appreciation Night, etc.) that includes a co-branded gameday lock-up logo, inclusion in all Rockets' pre-promotion of the game, inclusion in marketing efforts around gameday ticket offers, special concourse activation, enhanced branding, arena-wide giveaways, ingress/egress sampling, etc.

    o  Rockets to provide a giveaway item to a minimum of 3,000 fans (at Rockets cost)

- Presenting Partner of one (1) playoff game per round, with ROKiT brand inclusion on all game marketing elements

    o  Includes fan giveaway to all attendees at Rockets cost (18,000 fans)

    o  Suite Rental for fifteen (15) guests inclusive of an F&B package

- Fan interactive concourse activation (*i.e.* ROKiT Selfies or similar) for fan-generated social media content and promotion of ROKiT devices and services

- Inclusion within rotational concourse "L-Bar" digital signage (200 monitors) for all Toyota Center events

**EXHIBIT 2**



## Community

- **Rockets-ROKiT Day of Service**: ROKiT will become the presenting partner of the Rockets day of service to honor and pay tribute to the men and women that save lives and protect our families and loved ones. Proudly wearing their jerseys with the ROKiT logo, members of the team and front office will be out delivering pizzas, merchandise, and tickets to police stations, fire stations and military bases throughout the Greater Houston Area. We could also give out ROKiT devices. ROKiT will receive name and logo recognition in association with this day of service.

- **Impacting the Underserved:** The Rockets and ROKiT will also collaborate on community initiatives throughout the year in conjunction with Clutch City Foundation that benefit the underserved (*i.e.* clothing drive for victims of Hurricane Harvey, players volunteering at food pantries, etc.)

- All community-based efforts will be captured through video and social media content, sharing impactful stories of how underserved fans and families are being impacted by the partnership between the Rockets and ROKiT…perfect segue to communicate ROKiT's mission.

## Hospitality

- Ticket bank of $25,000 per season (includes regular and post-season with exact location and quantities per game based on ROKiT's needs and Rockets' availability);

- Two (2) suite night rentals each regular season that can be leveraged for ROKiT executives, clients or customers

- One (1) "Fantasy Basketball" event per season for up to 50 people that can be used to host influencers, sweepstakes winners, recipients of community efforts, etc.
    - Includes playing on the Rockets home court with Legend & Player appearance, F&B, gift bags, etc.

- One (1) Rockets team trip per season for up to four (4) guests on team plane

## Investment Summary

Term:   Five (5) years*

Annual Cash Investment:

- 2018-19:      $9,750,000

- 2019-20:      $10,725,000

- 2020-21:      $11,798,000

- 2021-22:      $12,977,000

**EXHIBIT 2**



- 2022-23        $14,275,000

Equity Participation:  Mutually agreed upon equity participation in ROKiT to be discussed.

Playoff Kickers:

- 2nd round: $500,000

- Western Conference Finals & NBA Finals: $1,000,000 each round

*Years 3-5 conditioned upon continued NBA league office sanctioning of jersey patch program.

**EXHIBIT 2**



## Appendix – Supporting Data

**NBA**

- Patch program puts ROKiT in the top 23 media and metropolitan markets in the U.S.
- Patch program offers an ownership position with the most progressive league in sports
- Exposure in all 29 NBA Arenas (Staples Center shared by the LA Lakers and Clippers)
- 80MM+ U.S. NBA fans
- 1.2B+ NBA-related social media followers (league owned accounts, player accounts and team accounts collectively)
- Most digitally and socially-engaged audience in sports
- NBA ratings have seen double-digit growth year-over-year when all other major U.S. sports leagues have seen a decline in ratings and viewership

**NBA Globally**

- Broadcast in 218 countries
- 1B+ unique global TV viewers
- NBA has the most socially-active fan base in professional sports
- 1.2B+ follower across all-NBA related social media accounts
- 450MM+ basketball players globally

**Rockets in China**

- #1 NBA team in fan base size
- #1 most watched NBA Team (Rockets' China viewership is 20% greater than the #2 team's viewership)
- 300MM viewers
- Average 10MM viewers per game on Tencent
- James Harden's jersey is a top 3 selling NBA jersey in China
- 3.5MM Weibo followers (2nd in the NBA)
- Top 2 Broadcasted NBA Team in China (779 home game broadcasts during the 2016-17 season)
- 1st in the NBA in total China-specific broadcasts (2015-16 season)

**EXHIBIT 2**



## Why the Houston Rockets' Patch?

- Significant global and national broadcast exposure
  - o For the 2017-18 regular season, the Rockets had 40 nationally broadcast games
  - o 46MM+ national TV viewers during 2017-18 regular season
  - o 350MM TV viewers globally during 2017-18 regular season
  - o 3.3MM+ radio listeners
- Exponential earned media potential
  - o Rockets are a consistent deep playoff contender
- Upward trending digital engagement and social following
  - o 18.5MM+ social media followers:
    - Facebook – 9.8MM+
    - Twitter – 2.7MM+
    - Instagram – 2.5MM+
    - Weibo – 3.5MM+
  - o Fastest growing social media following in the NBA
  - o 3.5B+ social media impressions
- Personal connection with some of the greatest basketball players in the world tied to the heritage of the Clutch City brand and its rich history of NBA legends
- Rockets' front office is changing the game with league-leading investments in data science through the leadership of Daryl Morey and Mike D'Antoni

## Rockets Patch – 3rd Party Valuation

### Nielsen

- The following valuation only projects the direct TV broadcast value of the jersey patch. It does not capture the incremental value in earned media from broadcast media exposure, direct or earned value from social media/digital exposure or other related national media coverage (i.e. highlight program, shoulder programming, etc.)
- **Methodology:** Nielsen took the average broadcast duration of the patch from other 21 teams they monitor and ran it through the 2017-18 regular season Rockets broadcast reach to create an estimated projection of broadcast direct media value of the patch. NOTE: This does not include the tremendous post-season lift nor does it capture any regular/post-season international value. (The NBA provides 2017-18 international viewership numbers approximately in June for the regular season and in late July/August for regular season +

**EXHIBIT 2**



playoffs.)

- **Estimated Regular Season Domestic + International Projection** based on 2016-17 Rockets regular season: **$22MM**

- **Estimated Round 1 Playoffs** – Domestic + International Projection based on 2016-17 Rockets post-season: **$2.1MM**

Wasserman valuation metrics:

- Time per broadcast: 5-6 minutes per game

- Exposures per game: 145 individual logo exposures

- Patch clarity: 80%

- Earned media impressions from game highlights and other media placements:

  - 15.3B impressions (regular season) = up to $3MM in value

  - Post-season adds up to another $2MM per round

NBA Jersey vs. Soccer Jersey: The soccer jersey logo is larger and appears more clearly, but the NBA jersey patch is nearly 3X more likely to appear on screen per broadcast minute, leading to higher exposure

|  | Exposures per Game | Duration (min/game) | Percent Clarity | Avg. Game Length | Duration Percent |
|---|---|---|---|---|---|
| NBA Jersey Patch | 145 | 5:42 | 80% | 1:42 | 5.3% |
| Soccer Front of Jersey | 64 | 2:33 | 80% | 2:15 | 1.9% |

**NBA vs International Soccer Comparison:** Rakuten received 17B brand impressions 2 weeks post-announcement compared to only 15B post Rakuten's FC Barcelona announcement.

**EXHIBIT 2**



## Appendix – "The Bogart Lounge"

The following images of the Bogart Lounge are for illustration purposes only.





**EXHIBIT 2**



## Appendix – "The Bandero Tequila Terrace"

The following images of the Bandero Tequila Terrace for illustration purposes only.





**EXHIBIT 2**



Appendix – "The ABK Beer Garden"

The following images of the The ABK Beer Garden are for illustration purposes only.





**EXHIBIT 2**

PREPARED FOR

# ROKiT ™

HOUSTON ROCKETS

EXHIBIT 2

# WHAT WE KNOW

- ◐ ROKiT devices and bundled services launching in August 2018
  - ◐ Five ROKiT branded devices come with pharmacy savings, telemedicine, and international calling
  - ◐ More services coming soon
  - ◐ Partnership w/NASA

- ◐ Overall company portfolio includes mega brands and products of tomorrow (Rok Drinks, health & beauty, etc.)

- ◐ Partnership with Los Angeles Chargers offers first foray into the sports marketing space

- ◐ Founded and run by some of the most successful entrepreneurs in history



 | 

2

EXHIBIT 2

# PARTNERSHIP OVERVIEW



In conjunction with the launch of its branded device and bundle of vital family services, ROKiT will become the first ever jersey partner of the Houston Rockets.

This historic partnership will create instant brand recognition for ROKiT across the globe to over 500 million NBA fans across 218 countries…80 million in the US alone, and the most active social fan base in all of professional sports.

Above all else, this partnership with the Houston Rockets will support and align itself with ROKiT's mission to build an unparalleled network of vital communications, health, and security services, and make them as broadly accessible as possible.



**EXHIBIT 2**

# NBA PATCH PROGRAM'S INAUGURAL SEASON



- $350MM in social media value collectively to all 21 patch sponsors

- Most valuable brand signage placement in the NBA

- Patch partners have greater brand preference among NBA fans

- Playoffs are providing multiplying value effect

- 3 top performing patches are: Cavaliers, Warriors and Celtics

- 3x more likely to appear on screen than soccer jersey sponsor logos

 

4

**EXHIBIT 2**

# NBA JERSEY PATCH PROGRAM

- Significant global broadcast exposure

- Exponential earned media potential from a consistent deep playoff contender

- Viral social coverage from the most digitally-engaged athletes and sports fans

- Effective vehicle to get on every NBA court in the country

- Personal connection with some of the greatest basketball players in the world

- Mega partnership announcement strategy

- Closest association to the team and the action



 | 

5

**EXHIBIT 2**

# THE POWER OF THE NBA

**REACHING**
**TOP**
**23**
**NBA MARKETS**

**EXPOSURE IN ALL NBA ARENAS 29**

**80MM+** U.S. NBA FANS 

**1.2 B+ NBA-RELATED** SOCIAL MEDIA FOLLOWERS

**OWNERSHIP POSITION** WITH THE MOST PROGRESSIVE **LEAGUE IN SPORTS**

**MOST** DIGITAL AND SOCIALLY-ENGAGED AUDIENCE



 | 

6


EXHIBIT 2

# WHY THE ROCKETS?

## BEST RECORD IN THE NBA





## HEAVILY INVESTED IN TECHNOLOGY



## BIGGEST GLOBAL FOLLOWING

## POWERFUL PERFORMANCE STORY



## MOST MEDIA VISIBLE NBA TEAM





## ASSOCIATION WITH DYNAMIC PLAYERS

 

7

EXHIBIT 2

# WHY THE ROCKETS?

**3.5B** SOCIAL MEDIA IMPRESSIONS

**3MM+** REGIONAL TV VIEWERS

**46MM+** NATIONAL TV VIEWERS

**17MM** SOCIAL MEDIA FOLLOWERS

**3.3MM+** RADIO LISTENERS

**150+** EVENTS

**#4** MARKET IN THE U.S.

**350MM** AVERAGE TV VIEWERS INTERNATIONALLY (#1 TEAM IN CHINA)

**1.5MM+** TOYOTA CENTER VISITORS ANNUALLY

 

8

**EXHIBIT 2**

# COMPREHENSIVE PARTNERSHIP PROGRAM



**DESIGNATION & MARKETING BENEFITS**

**BRAND SHOWCASE**

**MAKING A DIFFERENCE**

**DIGITAL & SOCIAL**

**HOSPITALITY**

**IN-ARENA DOMINATION**

 

9

EXHIBIT 2



# FIRST EVER PARTNER

ROKiT will be the first ever brand to have their logo
prominently displayed on all Houston Rockets game uniforms



10

**EXHIBIT 2**

# FIRST EVER PARTNER

- Patch measures approximately 2.5 inches by 2.5 inches

- Patch located on the upper left chest area on each Rockets' team jersey variant

- Camera-visible for all televised games including global, national and regional exposure

- Potential for incremental exposure through branded jerseys sold at the Rockets' team store and merchandise footprints within Toyota Center, as well as online on the team's store, rocketsshop.com



11

EXHIBIT 2

# GLOBAL PARTNERSHIP ANNOUNCEMENT





12

EXHIBIT 2

# BRAND SHOWCASE





13

**EXHIBIT 2**

Case 1:23-cv-02589-PKC-TXD Document 37-2 Filed 01/31/23 Page 31 of 73



# BRAND SHOWCASE



14

EXHIBIT 2

# BRAND SHOWCASE



 | HOUSTON ROCKETS

EXHIBIT 2

# BRAND SHOWCASE

ROKiT and Rockets branded kiosks throughout the Toyota Center that will serve as an interactive fan vehicle to market its devices and bundle of services





17

EXHIBIT 2

# BRAND SHOWCASE



EXHIBIT 2

# DESIGNATION & MARKETING BENEFITS

- Official Partner status for ROKiT, Bandero, and Bogart

- All 3 brands will also receive rights to use the Rockets marks

- Opportunity to leverage these benefits for other current and future brands within the portfolio







 

19

**EXHIBIT 2**

# DIGITAL & SOCIAL

- Curated content
- Sponsored posts
- Splash pages
- Advertisements





20

EXHIBIT 2

# IN-ARENA DOMINATION

- 360° LED messaging
- Videoboard exposure
- Takeovers
- In-Arena TV





21

EXHIBIT 2



# MAKING A DIFFERENCE

The Rockets and ROKiT will team up for impactful community initiatives that align with the shared values of both organizations



22

EXHIBIT 2



# HOSPITALITY

- Tickets banks
- Suite nights
- Merchandise
- Meet & Greets
- Trips on team plane



23

EXHIBIT 2



EXHIBIT 2

**Subject:** Thank You!

**Date:** Tuesday, 14 August 2018 at 07:01:49 Pacific Daylight Time

**From:** Jason Miller

**To:** jk@rokstars.com, Clinton Ehrlich

**CC:** Tad Brown, gretchens@rocketball.com

JK & Clinton – I just wanted to thank you both for taking time out of your busy schedules to fly to Houston and spend the day with us. This is going to be a monumental partnership for all three organizations (ROK/ROKiT, the Rockets, and Landry's Inc.). Under separate cover I'm going to introduce Alison to James so they can get the process started on that side of the house, and in the meantime, we're going to get going on the sponsorship agreement.

Attached is the term sheet we reviewed together yesterday, as well as the deck to provide visual support. Please let us know what comments, questions, and/or concerns you have. I am at your disposal to speak through this at any time.

Clinton I'll look forward to our breakfast meeting next Tuesday and JK, I'll let you know by EOD on whether Tuesday or Wednesday works best for dinner at your sushi spot…can't wait for that.

Best of luck with all the announcements this week. What a cool company you're building and what an amazing day yesterday was. Serendipity at it's finest. Safe travels home!

**e**

**Jason D. Miller**
Head of Property Sales
Excel Sports Management
1700 Broadway, 29th Floor
New York, NY 10019
646.798.8953 (o)
617.775.7287 (m)
http://www.excelsm.com

**EXHIBIT 3**

**Subject**: [Disarmed] RE: Introduction
**From**: JKramer@ldry.com
**To**: jmiller@excelsm.com,alison.kennedy@rokstars.com
**Cc**: jk@rokstars.com, cehrlich@rokmobile.com, gretchens@rocketball.com
**Date Sent**: Tuesday, August 14, 2018 9:01:34 AM GMT-07:00
**Date Received**: Tuesday, August 14, 2018 9:04:55 AM GMT-07:00

---

Thank you Jason.  Alison, and I are scheduled for a phone call later this afternoon to review next steps.

I look forward to working with the team,

James

---

**From:** Jason Miller [mailto:jmiller@excelsm.com]
**Sent:** Tuesday, August 14, 2018 9:08 AM
**To:** Alison Kennedy <alison.kennedy@rokstars.com>; OP James Kramer <JKramer@ldry.com>
**Cc:** jk@rokstars.com; Clinton Ehrlich <cehrlich@rokmobile.com>; gretchens@rocketball.com
**Subject:** [EXTERNAL] Introduction

James – thank you so much for your time last night. Based on the next steps Tilman and JK discussed at dinner, I wanted to introduce you to Alison Kennedy, CEO of ROK Drinks. She can work with you to nail down all the details necessary to lock in distribution for the portfolio at all 600+ Fertitta Entertainment locations.

Alison – thanks for all you did to make yesterday so special...copied on this email is James Kramer, VP of Beverage Operations at Fertitta Entertainment.

Will step out of the way for now because this is not my area of expertise, but please let me know how I can be of assistance throughout the process.

Thanks to all!


**Jason D. Miller**
Head of Property Sales
Excel Sports Management
1700 Broadway, 29th Floor
New York, NY 10019
646.798.8953 (o)
617.775.7287 (m)
**MailScanner has detected a possible fraud attempt from "urldefense.proofpoint.com" claiming to be** http://www.excelsm.com

**EXHIBIT 3**

# Exhibit 1

10/19/2020 1:28:17 PM
Marilyn Burgess District Clerk
Harris County
Envelope No: 47307632
By: SALGADO, CAROLINA
Filed: 10/19/2020 1:28:17 PM

Pgs-26

## 2020-66997 / Court: 269

CAUSE NO. _____

8A

| | | |
|---|---|---|
| ROCKET BALL, LTD. D/B/A THE HOUSTON ROCKETS, and CLUTCH CITY SPORTS & ENTERTAINMENT, L.P., | § § § § § | IN THE DISTRICT COURT OF |
| *Petitioners,* | § § | HARRIS COUNTY, TEXAS |
| v. | § § | |
| ROKIT MARKETING INC., | § § | _____ JUDICIAL DISTRICT |
| *Respondent.* | § § | |

## ORDER AND FINAL JUDGMENT

On this day, the Court considered Petitioner Rocket Ball, Ltd. d/b/a The Houston Rockets and Clutch City Sports & Entertainment, L.P.'s Application to Confirm Arbitration Award (the "Application to Confirm"). Having considered the Application to Confirm and all other documents on file, the Court is of the opinion that the Application to Confirm should be GRANTED in all respects. It is therefore:

ORDERED that the arbitration award entered on October 10, 2020 in AAA Case No. 01-20-0001-6852, *Rocket Ball, LTD. d/b/a/ the Houston Rockets, and Clutch City Sports & Entertainment, L.P. v.ROKiT Marketing Inc.*. (the "Award") is confirmed. The Award is attached hereto as Exhibit A and incorporated herein.

This Order and Final Judgment renders the Award enforceable in the same manner as any other judgment or decree of the Court. This Order resolves all claims in this case and is intended to be a final judgment. No grounds exist for vacatur or modification of the Award.

IT IS FURTHER ORDERED that the Rockets are entitled to recover: (i) $11,225,000.00 for money damages as set out in the award; (ii) $442,544.11 for pre-judgment interest as set out in the award; and (iii) $199,582.00 representing the Rockets' reasonable attorneys' fees, costs, and expenses incurred in this Arbitration as set out in the award representing

41157051

1

a total award of $11,867,126.11.

       IT IS FURTHER ORDERED that the Rockets are entitled to recover post-judgment

interest from October 10, 2020 at 5% per year as set out in the award.

       IT IS FURTHER ORDERED that respondent ROKiT Marketing Inc. shall pay all

costs associated with this matter. All relief not expressly granted herein is denied.

       DATED this _____ day of _____, 2020.

Signed:<br>
12/10/2020<br>
3:11 PM<br>
_____<br>
JUDGE PRESIDING

# EXHIBIT A

AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| ROCKET BALL, LTD., D/B/A THE | § | |
| HOUSTON ROCKETS, and CLUTCH CITY | § | |
| SPORTS & ENTERTAINMENT, L.P., | § | |
| | § | |
| *Claimants,* | § | CASE NO. 01-20-0001-6852 |
| | § | |
| v. | § | |
| | § | |
| ROKIT MARKETING INC., | § | |
| | § | |
| *Respondent.* | § | |

### FINAL AWARD

Claimants Rocket Ball, Ltd., d/b/a The Houston Rockets, and Clutch City Sports & Entertainment, L.P (hereafter together the "Rockets") filed their demand for arbitration with the American Arbitration Association ("AAA") on March 4, 2020. Claimants demanded $11,225,000.00 for failure to pay amounts allegedly due and owing pursuant to the Sponsorship Agreement (the "Agreement") between Claimants and Respondent ROKiT Marketing, Inc. ("ROKiT").[1] Respondent does not deny the amount it was obligated to, but did not, pay, but demands an offset in the amount of $2,354,268.00. There being no disputed issues of material fact, this final award is entered on Claimants' Motion for Summary Judgment.

### The Parties

Claimant Rocket Ball, Ltd., d/b/a The Houston Rockets, is a Texas limited partnership with its principal place of business in Houston, Texas. Counsel for Claimants are as follows:

BAKER BOTTS L.L.P.
Michael S. Goldberg
State Bar No. 08075800
Cornelius M. Sweers
State Bar No. 24102551

---

[1] References to the Agreement herein are to Exhibit 1 to the witness statement of Rockets General Counsel Rafael Stone. No discrepancies have been identified among the various versions of the Agreement that have been submitted.

One Shell Plaza
910 Louisiana Street
Houston, Texas 77002-4995
Telephone: (713) 229-1401
Facsimile: (713) 229-2801
michael.goldberg@bakerbotts.com
cory.sweers@bakerbotts.com

Respondent ROKiT Marketing, Inc. is a Delaware corporation, with its principal business

address at 17383 W. Sunset Blvd., Suite A300, Pacific Palisades, California 90272. Respondent

was initially represented by two of its executives, Russell Gillespie and Jonathan Kendrick.

Subsequently, Respondent was represented by

MARTIN, DISIERE, JEFFERSON & WISDOM, LLP
Christopher W. Martin
State Bar No. 13057620
Kyle R. Sears
State Bar No. 17959800
808 Travis, Suite 1100
Houston, Texas 77002
Telephone: (713) 632-1700
Facsimile: (713) 222-0101
martin@mdjwlaw.com
sears@mdjwlaw.com

**The Sponsorship Agreement**

At its heart, the Sponsorship Agreement established Respondent ROKiT Marketing, Inc.

as "the official jersey patch sponsor for the Houston Rockets" (Kendrick ¶ 2)[2] pursuant to

authorization for such patches issued by the National Basketball Association in 2017 (Sheirr ¶ 8).

The Agreement "included, among other things, the placement of a patch displaying the ROKiT

logo on all official Rockets game jerseys, the placement of the patch on jerseys sold at the Rockets'

home arena, the Toyota Center, advertising signage at Toyota Center, and the use of a suite for all

events at Toyota Center (including Rockets home games)." (Sheirr ¶ 16.)

---

[2] Citations in the form (Witness ¶ __) refer to the designated paragraphs of the witness statement named.

The "Initial Term" of the Agreement was for the 2018-19 and 2019-20 National Basketball Association ("NBA") seasons and was to expire on June 30, 2020, with an option for additional years unless previously terminated. (Stone Ex. 1, ¶ 1.) In return, Respondent agreed to pay Claimant a

> Base Contract Price in the aggregate amount of Nine Million Seven Hundred Fifty Thousand Dollars ($9,750,000), which amount shall be due and payable as follows: Fifty Percent (50%) within ten (10) business days of the execution of this Agreement and Fifty Percent (50%) on or before January 15, 2019. For each subsequent Contract Year during the Term, the Base Contract Price shall be determined by increasing the Base Contract Price of the immediately preceding Contract Year by Ten Percent (10%), which amount shall be due and payable in full on or before July 1 of the then applicable Contract Year.

(*Id.*, ¶ 3A(i).). In addition, the Agreement provided for an

> Additional Contract Price in the event and to the extent that Team qualifies to play in the NBA post-season during the first Contract Year [2018-19], Sponsor shall pay an Additional Contract Price *on or before July 1 of the following Contract Year*. In the event and to the extent that Team qualifies to play in the NBA post-season during any subsequent Contract Year following the first Contract Year, Sponsor shall pay an Additional Contract Price in the amount(s) specified above within fifteen (15) days of date of invoice from Team.

(*Id.*, ¶ 3A(ii) (emphasis added).) For the 2018-19 NBA season, the Additional Contract Price for qualifying for the second round of the NBA playoffs was $500,000.00, payable on or before July 1 of the following Contract Year, or July 1, 1019. (*Id.*) Certain of the entitlements other than the placement of uniform patches were excluded from coverage under this Additional Contract Price. (*Id.*)

### The Arbitration Agreement and the Governing Law

Paragraph 4 of the Sponsorship Agreement incorporated the General Terms and Conditions attached to the Agreement as Exhibit D. Paragraph 16 of the General Terms and Conditions specified that the Agreement was to be governed by and construed in accordance with the laws of the State of Texas, without regard to principles of conflicts of laws and that disputes were to be

settled by binding confidential arbitration in Houston, Texas in accordance with the Commercial

Arbitration Rules of the American Arbitration Association:

> **16. Governing Law; Arbitration.** This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to principles of conflicts of laws. Any controversy or claim arising out of or relating to this Agreement or its alleged breach shall be settled by binding confidential arbitration in Houston, Texas in accordance with the Commercial Arbitration Rules of the American Arbitration Association ('AAA'), and judgment on the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The arbitrator shall be selected by mutual agreement of the parties, if possible, and shall be a resident of Houston, Texas. If the parties fail to reach agreement upon the appointment of an arbitrator within thirty (30) days following receipt by one party of the other party's notice of desire to arbitrate, the arbitrator shall be selected from a list or lists of persons submitted by the AAA. The selection process shall be that which is set forth in the AAA Commercial Arbitration Rules then prevailing.

The Sponsorship Agreement further provided in section H(i) as follows: "Suite. Sponsor shall

receive the right to use Suite #335 in the Arena for every Home Game, concert, and family show

at the Arena during the Term (the 'Suite'), which shall be provided to Sponsor in accordance with

and subject to the terms and conditions of CCSE's standard form of Suite License Agreement (the

'Suite Lease'), which is attached hereto as Exhibit E and incorporated herewith as a part of this

Agreement." The right to use Suite #335 was incorporated in the Sponsorship Agreement with no

additional consideration specified for the Lease.

The lease so incorporated as Exhibit E to the Sponsorship Agreement, titled "Toyota Center

Suite Lease," was signed by Clutch City Sports & Entertainment, L.P. as "Landlord" and ROK

Brands as "Tenant" ("The Lease"). The Lease recited the signing of the Sponsorship Agreement,

which, among other things, gave Respondent as Sponsor "the right to use a suite in the Arena."

The Lease included a further attachment titled "Exhibit A – Standard Terms and

Conditions." Exhibit A to the Lease provided that its terms and conditions were to be "deemed

fully incorporated into this Lease." Like the Terms and Conditions to the Agreement, the Terms

4

and Conditions incorporated in the Lease provided for resolution of disputes under Texas law by arbitration before the AAA.

## 17. ARBITRATION.

(a) Resolution by Mutual Agreement. If any dispute, controversy or claim between Landlord and Tenant arises under this Lease, or is related in any way to this Lease or the relationship of the parties hereunder (a 'Dispute or Controversy'), including, but not limited to, a Dispute or Controversy relating to the effectiveness, validity, interpretation, implementation, termination, cancellation or enforcement of this Lease, the parties shall first attempt in good faith to settle and resolve such Dispute or Controversy by mutual agreement in accordance with the terms of this Section 17(a). In the event a Dispute or Controversy arises, either party shall have the right to notify the other party that it has elected to implement the procedures set forth in this Section 17(a). Within fifteen (15) days after delivery of any such notice by one party to the other party regarding a Dispute or Controversy, Landlord and Tenant shall meet at a mutually agreed time and place to attempt, with diligence and in good faith, to resolve and settle the Dispute or Controversy. If a mutual resolution and settlement are not obtained at such meeting, or if no such meeting takes place within the fifteen (15)-day period, then either party may by notice to the other party submit the Dispute or Controversy to arbitration in accordance with the provisions of Section 17(b). Upon the receipt of notice of referral to arbitration hereunder, the receiving party shall be compelled to arbitrate the Dispute or Controversy in accordance with the terms of Section 17(b) without regard to the justiciable character or executory nature of such Dispute or Controversy. Each party hereby agrees that any Dispute or Controversy that is not resolved pursuant to the provisions of this Section 17(a) shall be submitted to binding arbitration hereunder and, if submitted, shall be resolved exclusively and finally through such binding arbitration. This Section 17 constitutes a written agreement by the parties to submit to arbitration any Dispute or Controversy arising after the execution of this Lease within the meaning of Section 171.001 of the Texas Civil Practice and Remedies Code.

(b) Binding Arbitration. Binding arbitration shall be conducted in accordance with the procedures set forth in this Section 17(b). The party seeking arbitration hereunder shall request such arbitration in writing, which writing shall be delivered to the opposing party and shall include a clear statement of the matter(s) in dispute. Except to the extent provided in this Section 17(b), the arbitration shall be conducted in Houston, Texas in accordance with the Commercial Arbitration Rules of the American Arbitration Association by a single arbitrator to be appointed upon the mutual agreement of the parties, within twenty (20) days after the date the written request for arbitration was delivered to the opposing party. In the event the parties are unable to agree on a single arbitrator within the twenty (20)-day period, then either party, on behalf of both parties, may request such appointment by the Administrative Judge of the Harris County (Texas) District Court (the 'Administrative Judge'). In the event of the failure, refusal or

inability of the Administrative Judge to appoint an arbitrator within the next ten
(10)-day period, the party seeking arbitration shall make the parties' request for
appointment of an arbitrator and furnish a copy of the aforesaid description of the
Dispute or Controversy and response (if any) to the American Arbitration
Association in Houston, Texas (the 'Houston AAA'). Each party may, but shall not
be required to, submit to the Houston AAA a list of up to three (3) qualified
individuals as candidates for appointment as the arbitrator. The arbitrator appointed
by the Houston AAA need not be from such lists.  All arbitrators shall be
unaffiliated with the parties (and each of their respective affiliates and their
respective officers, directors, employees and agents), and shall be residents of
Houston, Texas. No arbitrator shall be employed by either party, or have any
material financial dependence upon a party, nor shall any arbitrator have any
financial interest in the Dispute or Controversy. Nothing contained herein shall be
deemed to give the arbitrator appointed hereunder any authority, power or right to
alter, change, amend, modify, waive, add to or delete from any of the provisions of
this Lease. *The costs and expenses of the arbitrator shall be shared equally by the
parties,* and the additional incidental costs of arbitration shall be paid for by the
non-prevailing party in the arbitration; provided, however, that where the final
decision of the arbitrator is not clearly in favor of a party, such incidental costs shall
be shared equally by the parties.

(Lease, Stone Ex. 1, Exh. A, section 17(b) at p. A-10.). (Related provisions were contained in

section 23 of the Standard Terms and Conditions of the Lease:

**(b) Attorneys' Fees.** If Landlord or Tenant defaults in the performance of
any of the terms, covenants, agreements or conditions contained in this Lease and
the non-defaulting party places the enforcement of this Lease, or any part thereof
(including the collection of any Rental due, or to become due, hereunder or
recovery of the occupancy of the Suite) in the hands of an attorney, or files a claim
upon the same, the non-prevailing party, to the extent permitted by applicable law,
shall pay to the prevailing party all reasonable attorneys' fees incurred by the
prevailing party.

**(c) Applicable Law.** This Lease shall be interpreted according to the laws
and decisions of the State of Texas applicable to agreements made and to be
performed therein, without regard to conflict of laws principles. Subject to Section
17 and in no way limiting Section 17, the parties agree that the federal and state
courts in the State of Texas shall have personal jurisdiction over the parties with
respect to, and that each party shall not assert any objection it may have to venue
being proper in such courts with respect to, and that such courts shall be the
exclusive forum for, the resolution of any matter or controversy arising from or
with respect to this Lease. In any action or proceeding commenced in any federal
court in the State of Texas for the purpose of enforcing any arbitration decision,
this Lease or any right granted herein arising heretofore, or any order or decree
predicated thereon, any summons, order to show cause, writ, judgment, decree or
other process, issued by such court, may be delivered to Tenant personally outside

the State of Texas, and when so delivered Tenant shall be subject to the jurisdiction of such court as though the same had been served within the State of Texas. The parties acknowledge that any judgment obtained hereunder may be enforced by any court in any other jurisdiction.

### The Dispute

The Agreement was signed on October 9, 2018 (Sheirr ¶ 15), with the result that 50% of the Base Contract Price of $9,750,000.00 was due within ten business days thereafter and the remaining 50% was due on or before January 15, 2019. It is not disputed that the Base Contract Price for the 2018-19 season was paid and that Claimants provided all of the sponsorship rights due under the contract for the 2018-19 NBA season, including "the contractually required advertising and promotions, the jersey patch, and use of the suite for all events." (Sheirr ¶ 18.)

The Rockets qualified for the second round of the NBA playoffs for the 2018-19 season. Under the Agreement, ROKiT was required to pay the Additional Contract Price of $500,000.00 on or before July 1 of the following Contract Year (July 1, 2019) (Agreement, Stone Ex. 1, ¶ 3(A)(ii)) or within fifteen days of being invoiced by the Rockets. (*Id.*, ¶ 19.)

The Rockets sent ROKiT an invoice for $500,000.00 on May 29, 2019. (*Id.*, ¶ 20 & Ex.1.) It is undisputed that ROKiT did not pay the invoice within 15 days of its receipt and has never paid this invoice. (Sheirr ¶ 24 & Ex.1.)

Under the terms of the Agreement, ROKiT was obligated to pay the Base Contract Price in respect of the 2019-20 NBA season in the amount of $10,725,000.00 by July 1, 2019.[3] It is undisputed that this amount was never paid. (*Id.*, ¶¶ 23-28.)

By letter dated January 17, 2020, Rafael Stone, general counsel of the Rockets "demanded that ROKiT "make payment of the total amount due under the Sponsorship Agreement in the

---

[3] The Base Contract Price for years after the Initial Contract Year was determined by increasing the Base Contract Price of the immediately preceding Contract Year ($9,750,000.00 for the 20192019 year) by Ten Percent (10%), payable in full on or before July 1 of the then applicable Contract Year. (Agreement, Stone Ex. 1, ¶ 3A(i).)

amount of $11,225,000.00"; on behalf of the Rockets, Stone further advised that "failure by ROKiT to make payment would be deemed a default and breach of the Sponsorship Agreement." (Stone ¶ 23 & Ex. 3 at Rockets_000091-92.) Stone further advised Respondent of the Rockets' intent to arbitrate." (Stone ¶ 24 & Ex. 4.) After the Rockets' invoices were sent to Respondent in May 2019, the Rockets repeatedly communicated with Respondent seeking payment of the Base Contract Price for the 2019-20 season and the Additional Contract Price for the 2018-19 season. In response, Respondent's representatives, including CEO Kendrick, acknowledged the demands and promised to pay. (Sheirr ¶¶ 24-26 & Exs. 2, 3.) No payment was received.

On or about March 12, 2020, the NBA cancelled the remainder of the 2019-20 season, including 9 of the Rockets' home games and 9 away games, because of the corona virus pandemic. (Kendrick ¶ 4.) Mr. Kendrick's witness statement does not deny that the amounts above were not paid, but asserts a right to an offset for the 2019-20 season as a result of the cancellation of those games on the grounds that ROKiT "did not receive the full consideration and benefit from the Agreement." (*Id.* ¶ 5.)

### Proceedings

The AAA determined that the arbitration was to be administered under the Large Complex Case Procedures of the Commercial Arbitration Rules as amended and in effect October 1, 2013. Letter, Ingeuneal Gray, Esq. (AAA) to William H. Knull, III, Rocket Ball, Ltd. d/b/a The Houston Rockets, Clutch City Sports & Entertainment, LP, and ROKit Marketing, Inc., May 18, 2020.)

The Parties having failed to agree on the appointment of an arbitrator, the AAA notified the Parties of the appointment of the undersigned as sole arbitrator on May 29, 2020. A preliminary conference call was held on June 10, 2020. Claimants were represented by Messrs. Goldberg and Sweers. Respondent was represented by Mr. Gillespie. At the outset of the conference, the Parties agreed that they had no objections to arbitral jurisdiction, to hearing before a single arbitrator, to

the arbitrator appointed by the AAA or to the site of the arbitration in Houston, Texas. The Parties further confirmed that there were no unsatisfied preconditions to the arbitration proceeding. The arbitration agreement provides that the hearing is to be held in Houston, Texas. The agreement further specifies that it is to be governed by and construed in accordance with laws of the State of Texas, without regard to principles of conflict of laws.

On June 10, 2020, the tribunal held a preliminary conference call. Claimants were represented by Michael S. Goldberg and Cory Sweers of Baker Botts L.L.P. Respondent was represented by Russell Gillespie of ROKit Marketing Inc. Ingeuneal Gray attended on behalf of the AAA. In the course of the conference call, the Parties agreed that they had no objections to arbitral jurisdiction, to hearing before a single arbitrator, to the arbitrator appointed by the AAA or to the site of the arbitration in Houston, Texas. The parties further confirmed that there are no unsatisfied preconditions to the arbitration proceeding.

On June 4, 2020, six days before the initial preliminary conference, Respondent had filed eight counterclaims. Claims 1 through 4 alleged losses resulting from the reaction of the government of China to certain comments allegedly made by the general manager of the Rockets with respect to affairs in Hong Kong; Claim 5 demanded compensatory and punitive damages as a result of "Loss of Rights … as a Result of Games Not Being Played at the Toyota Center"; Claim 6 sought damages for alleged breach of confidentiality obligations; Claim 7 sought damages for breach of alleged non-disparagement obligations; Claim 8 sought damages for alleged loss of business with Landry's. In total, Respondent claimed damages of no less than $95,000,000.00 and further claimed pre- and post-judgment interest, punitive damages with respect to certain of its counterclaims together with attorneys' fees and the dismissal of Claimants' claims.

By June 12, 2020, following an exchange of emails on hearing dates acceptable to both Parties, the Parties agreed that the final evidentiary hearing would take place over four days commencing October 6, 2020 and further agreed that the matter could be ready for hearing by that date despite the relatively short time remaining for pre-hearing procedures notwithstanding the scope of Respondent's counterclaims.

The results of the initial conference were duly recorded in Procedural Order No. 1, dated June 12, 2020. Respondent filed an Answering Statement on June 25, 2020, generally denying Claimant's allegations, asserting thirty-one affirmative defenses and asking that Claimant take nothing as a result of its claims.

Following the entry of Procedural Order No. 1, the Parties negotiated a more detailed scheduling order, which was forwarded to the arbitrator by email dated June 19, 2020 with the representation that the Parties had conferred and agreed on all aspects of the draft. Mr. Gillespie then confirmed that Respondent was in agreement that there were no remaining issues necessitating a further telephone conference. In response to the agreed draft, on June 22, 2020, the arbitrator posed several questions, including whether the draft schedule allowed sufficient time in particular for the substantial pre-hearing information exchange provided for in the draft. The arbitrator requested certain additions on procedural details. Mr. Gillespie subsequently acknowledged that counsel for Claimant had attempted to contact him to discuss the arbitrator's response but advised that he had been unable to respond as a result of a family medical emergency. The scheduled conference to discuss the procedural order was accordingly postponed to allow the Parties to confer.

By email dated July 8, counsel for Claimant advised that Respondent had still not responded to the proposed draft and included the previously exchanged draft proposal in both its

original form and blacklined to show the changes inserted in response to the arbitrator's questions. To the extent that deadlines were changed, they were modestly extended; the original hearing date remained as previously agreed. By email the same day, the arbitrator requested that Respondent advise as to its position on the proposed revisions by the close of the following day. When no response was received, the previously scheduled telephone conference was convened at 9 am CDT on Friday, July 10. Claimant was represented on the call by Messrs. Goldberg and Sweers; no one appeared on behalf of Respondent. On that same day, Mr. Gillespie advised that Respondent had retained counsel to represent it in the arbitration.

On July 10, 2020, the undersigned issued Procedural Order No. 2, which by its terms incorporated the draft scheduling order previously reported as having been agreed by the Parties, but somewhat modified to respond to the arbitrator's requests of June 22. The form of direct witness testimony was changed to written submissions in light of the short schedule and to reduce the scope of otherwise necessary pre-hearing proceedings.

By email dated July 30, 2020, counsel for Claimant advised that agreement had been reached with newly appointed counsel for Respondent to revise certain dates adopted in Procedural Order No. 2, with no change to the hearing date. The revised dates were included in a draft Procedural Order No. 3, which otherwise incorporated the remaining terms of Procedural Order No. 2. On August 3, counsel for Respondent filed the agreed Procedural Order No. 3, signed by counsel for both Parties. The undersigned signed and filed the Agreed Order the same day.

On August 10, 2020, Respondent filed notice of its withdrawal of its counterclaims numbered 1, 2, 3, 4, 6, 7 and 8 as follows:

> 1. Respondent hereby withdraws Claims 1, 2, 3, 4, 6, 7 and 8 as asserted in Respondent ROKiT Marketing Inc's Counterclaim.
>
> 2. Respondent does not withdraw and is retaining Claim 5 as asserted in Respondent ROKiT Marketing Inc's Counterclaim.

3. In connection with Claim 5, Respondent retains its claim for damages, attorneys fees, interest, costs, expenses and such other relief to which it may be entitled as asserted in Respondent ROKiT Marketing Inc's Counterclaim.

By letter dated August 12, 2020, counsel for Claimants reported that

Less than an hour after filing the notice of withdrawal, ROKiT's counsel notified us of ROKiT's intent to re-file in state court its counterclaim relating to purported representations regarding alcohol sales to Landry's Restaurants, though with an affiliate of ROKiT as the proposed plaintiff.

The letter stated that "the Rockets do not take issue with the fact that ROKiT has withdrawn its counterclaims from this arbitration," but that the Rockets explicitly rejected "any suggestion that the withdrawal of counterclaims is without prejudice."[4] Claimants further noted a disagreement with respect to the sufficiency of Respondent's response to a discovery request relating to the calculation of damages on the remaining counterclaim and requested a conference call to address that matter.[5]

Pursuant to the schedule incorporated in Procedural Order No. 3, Claimant submitted written witness statements on August 24, 2020, as follows:

1. Thaddeus "Tad" Brown, Chief Executive Officer of the Rockets;

2. Gretchen Sheirr, Chief Revenue Officer of the Rockets; and

3. Rafael Stone, General Counsel of the Rockets.

On August 25, 2020, Respondent filed the witness statement of Jonathan Kendrick, CEO of ROKiT Marketing, Inc.

---

[4] AAA Rule R-6(a) provides in pertinent part:

A party may at any time prior to the close of the hearing or by the date established by the arbitrator increase or decrease the amount of its claim or counterclaim.

No arbitral ruling on the merits of Respondent's Counterclaims other than Claim 5 or on the preclusive effect, if any, of Respondent's withdrawal of its other counterclaims on subsequent proceedings was requested or issued.

[5] When Counsel for Respondent answered that Respondent intended to supplement the contested discovery response, making a call unnecessary, the call was postponed pending the filing of the supplementary response. By email dated August 13, 2020, Counsel advised that there was no need for a call on the discovery issue.

12

As agreed in Procedural Order No. 2, these statements contain the entire direct examination of these witnesses.

On August 31, 2020, Claimants filed their Motion for Summary Judgment. No rebuttal witness statements were filed by either party by August 31, 2020, as required by Procedural Order No. 3.

On September 11, 2020, the Parties advised that they saw no need for the conference call tentatively scheduled in Procedural Order No. 2 for September 16, 2020, which was therefore cancelled. The Parties subsequently agreed that a brief conference call would be useful, which was convened on September 16, 2020, in which Claimants were again represented by Messrs. Goldberg and Sweers and Respondent by Mr. Sears.

During the September 16 call, counsel agreed that (1) there were no further witnesses to be called; (2) there was no need to cross-examine the witnesses whose written statements had been submitted; (3) all relevant documents had been submitted; (4) there was no dispute as to the amounts due from Respondent or the dates on which those amounts were due; and therefore (5) the only issues remaining are whether Respondent is entitled to an offset against those unpaid amounts under the terms of the contract and governing Texas law and, if so, in what amount, and whether either Party is entitled to recover its attorneys' fees.

It was further agreed that Claimant would submit its claim for attorneys' fees on September 17 and that counsel would seek to agree on the form of the applications for fees.

It was further agreed that a (brief) reasoned award would be required as previously agreed and that the award would be filed not later than 45 days following the attorneys' fees submissions due to be filed on September 17. By exchange of emails dated September 30 and October 1, 2020,

the Parties agreed that no hearing was necessary. The October 6 hearing was accordingly cancelled and the record declared closed on October 1, 2020.

### The Motion for Summary Judgment

Claimants contend that they are entitled to judgment in the full amount of the unpaid Base Contract Price for the 2019-20 NBA season and the Additional Contract Price for qualifying for the second round of the NBA playoffs in the 2018-19 NBA season (in sum $11,225,000.00), without any offset against the amounts due. Respondent, on the other hand, contends in its Tenth Affirmative Defense ("Offset"):

> 10. In the event it is determined that Respondent is liable to Claimants in any amount or manner, which Respondent denies, Respondent is entitled to have Respondent's liability diminished and offset by and [sic] all amounts of money that Claimants owe to Respondents and by all costs, expenses and loss and related items incurred by Respondent and paid by Respondent to Claimants and/or any other third party.

Similarly, Respondent alleged in its fifth counterclaim (Claim 5) that it is entitled to compensatory and punitive damages as a result of "Loss of Rights under the Sponsorship Agreement as a Result of Games Not Being Played at the Toyota Center." Respondent contends that "Claimants did not provide, and Respondent did not receive, the full rights, benefits and value of and full performance and consideration pursuant to the Agreement." (Response of ROKiT Marketing, Inc. to Claimants' Motion for Summary Judgment ("Response"), ¶ 1.) Respondent's Kendrick computed the offset it claimed at $2,354,268.00. (Kendrick ¶ 6.)

Under Texas Law, "the purpose of the summary judgment rule is to provide a method of summarily terminating a case when it clearly appears that only a question of law is involved and there is no genuine issue of fact. *Gaines v. Hamman*, 163 Tex. 618, 626, 358 S.W.2d 557, 563 (1962)." The Supreme Court of Texas established the following standards:

> 1. The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

14

2. In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

3. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Valero Marketing & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (quoting *Gaines v. Hamman*, 163 Tex. 618, 626, 358 S.W.2d 557, 563 (1962). *See also Mann Frankfort Stein & Lipp Advisors. Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

The AAA Commercial Rules provide as follows:

R-33. The arbitrator may allow the filing of and make rulings upon a dispositive motion only if the arbitrator determines that the moving party has shown that the motion is likely to succeed and dispose of or narrow the issues in the case.

Here, the Parties are agreed that they have no need to cross-examine the witnesses who have submitted written statements, that there are no additional witnesses to be heard and that there is no need for a final hearing. The Parties have further agreed on the amounts of the Base Contract Price and the Additional Contract Price under the Sponsorship Agreement, which are in any event clear on the face of the Sponsorship Agreement, and that those amounts have not been paid. It is therefore apparent that, while the Parties disagree vigorously about the conclusions to be drawn from the undisputed facts, there is no dispute as to the facts themselves. The only issue remaining to be decided is whether Respondent is entitled to an offset against the payments otherwise due, together with entitlement to interest and attorneys' fees. As a result, I find that the motion for summary judgment is both likely to succeed and to fully resolve the issues, thus avoiding the time and expense of a hearing.

## The Claim

Claimants contend that the failure to pay the Base Contract Price for the 2019-20 NBA season and the Additional Contract Price as a result of the Rockets' qualifying for the second round of the 2018-19 NBA playoffs constituted material breaches of the Sponsorship Agreement and

15

demand payment of the full $11,225,000.00. As the moving party, Claimants have the burden of proving the absence of a genuine issue of fact material to their right to this recovery.

Respondent does not dispute that it owed but did not pay the Base Contract Price for the 2019-20 season or the Additional Contract Price for the 2018-19 season or that its non-payment constituted material breaches of the Sponsorship Agreement. Because the facts as to the amounts due, offset aside, and Respondent's non-payment, are not disputed, I find, based on the terms of the Sponsorship Agreement, the testimony of the witnesses and the documentary evidence submitted, that Claimants have established that they are entitled to an award in the amount of $11,225,000.00, all of which was due and payable but not paid by Respondent, subject only to resolution of Respondent's Tenth Affirmative Defense (Offset) and fifth Counterclaim (Claim 5).

### Offset

Respondent does not cite to any provision in the Sponsorship Agreement or any alternative agreement entitling Respondent to the offset it claims. Nevertheless, Respondent contends that it is entitled to an offset in the amount of $2,354,268.00 "because Claimants did not provide, and Respondent did not receive, the full rights, benefits and value of and full performance and consideration pursuant to the Agreement"[6] as a result of the cancellation of the remainder of the 2019-20 season by the NBA on March 12, 2020. Mr. Kendrick explained the computation of the amount claimed as follows:

> At a minimum, ROKiT Marketing, Inc. is entitled to an offset in the amount of $2,354,268 against the amount sought to be recovered by Claimants. This minimum amount is calculated by dividing the sponsorship fee for 2019-20 of $10,725,000 by *41 scheduled home games* and multiplying by 9 home games that were cancelled.

(Kendrick ¶ 6) (emphasis added).

---

[6] Response of ROKiT Marketing, Inc. to Claimants' Motion for Summary Judgment ("Response to MSJ") at 1.

Respondent contends that Claimants did not terminate the Agreement or suspend performance as a result of the breaches. (Response at ¶¶ 3-7.) Instead, Respondent argues, Claimants continued to perform the Agreement even after the remainder of the 2019-20 NBA season was cancelled on March 11, 2020. (*Id.*, ¶¶ 8-10.) Respondent further contends that it received no further benefit from the Agreement after that cancellation. (*Id.*, ¶ 13.) In addition, Respondent concedes, home games could not be re-scheduled, and Claimants could not provide Alternative Rights pursuant to paragraph 17 of the Agreement's Terms and Conditions because of the cancellation of the remainder of the schedule. (*Id.*, ¶¶ 16-17.)

Although Respondent has the burden of establishing its affirmative defense of a right to offset as well as its counterclaim on the same ground, the same undisputed facts that establish Claimants' right to recovery are relevant to and dispositive of Respondent's contentions as well.

As summarized above, Claimant's Motion for Summary Judgment established that the cancellation of the remainder of the 2019-20 season on March 12, 2020 occurred long after ROKiT's payments for that season as well as the Additional Contract Price for the 2018-19 season had become due and unpaid, and therefore Respondent had long been in material breach.

Moreover, the Agreement provided no remedy for the cancellation of games, other than an obligation to "negotiate in good faith to agree on alternative rights or benefits of equal value to be provided by Team to Sponsor ('Alternative Rights')."

> 17. **Unavailability**. The parties agree that in the event that for any reason one or more scheduled regular-season games, which cannot be rescheduled during the NBA season in which such game was to be played, is not played at the Arena, the parties shall negotiate in good faith to agree on alternative rights or benefits of equal value to be provided by Team to Sponsor ('Alternative Rights'). If the parties fail to agree Alternative Rights within fourteen (14) days after the initial communication by either party to the other for the purposes of initiating said negotiations, then the parties shall pursue resolution through arbitration under the Commercial Arbitration Rules of the American Arbitration Association (the

17

'Arbitration Rules') by a single arbitrator appointed in accordance with the Arbitration Rules.

(Stone Ex. 1, Agreement Ex. D (Terms & Conditions, ¶ 17.) Claimants further note that the

Agreement expressly disclaimed any guarantee of the number of games to be played.

> 7. **No Guarantee**. The parties understand and agree that nothing in this Agreement shall be deemed a guarantee or other commitment by Team of any minimum number of Rockets games and/or Arena events and/or any minimum attendance numbers; provided that if a specific number is expressly set forth above, then, in that case, such specified number shall relate only to the particular sponsorship element described in the same provision.

(*Id.*, ¶ 7).

Thus, Respondent's Tenth Affirmative Defense and Counterclaim 5 fail for a series of

reasons. First, and dispositively, these contentions are barred by the doctrine of material breach:

because of Respondent's prior material breach, Claimants were under no continuing duty to

perform. *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004)

("… we hold that as a matter of law Driver committed a material breach. Mustang was thereafter

discharged from its duties under the contract").

Respondent's contentions are also precluded by the Agreement. Paragraph 6(a) of the

Terms and Conditions to the Agreement provided that "[i]t shall be an event of default hereunder

"if Sponsor [Respondent] shall fail to pay any sums when due pursuant to this Agreement within

seven (7) days of receipt of written notice from Team that the sum is late ('Late Payment')." It is

undisputed that Respondent failed to pay the sums due despite repeated notices from Claimants

(Sheirr, *passim* & Exs. 1-3). Paragraph 6(b) of the Agreement's Terms and Conditions further

provided that it would be an event of default "if a party shall materially breach this Agreement if

such breach is not cured within thirty (30) days of the receipt of notice thereof" (subject to

extension in the case of a non-monetary breach not subject to cure within 30 days). Section 6(c)

of the Terms and Conditions further provided that in the event of a default "Sponsor [Respondent]

shall be responsible for the entire unpaid portion of the Base Contract Price and Additional Contract Price (if applicable) less any payments made or to be made by any alternative sponsor procured by Team."

In addition, the very grounds stated by Respondent for its Tenth Affirmative Defense and counterclaim, namely the "Loss of Rights under the Sponsorship Agreement *as a Result of Games Not Being Played at the Toyota Center*" (Counterclaim 5)(emphasis added) and Mr. Kendrick's calculation of the amount he claims explicitly assume that ROKiT was entitled to a certain minimum number (41) of Rockets home games. But that assumption is expressly barred by paragraph 7 of the Terms and Conditions, which provided that "nothing in this Agreement shall be deemed a guarantee or other commitment by Team of any minimum number of Rockets games."

Moreover, the only remedy provided by the Terms and Conditions of the Agreement in the case of "unavailability" of games "which cannot be rescheduled during the NBA season in which such game was to be played, was to ... negotiate in good faith to agree on alternative rights or benefits of equal value to be provided by Team to Sponsor ("Alternative Rights"). (Agreement Ex. D § 17.) As Respondent concedes, it was not possible to agree to alternative sponsorship rights of equal value because of the cancellation of the remainder of the 2019-20 NBA season (Response at ¶¶ 17-18), and the Agreement expired by its terms as of June 30, 2020 (Agreement ¶ 1).

For all of the foregoing reasons, I find, based on the testimony of the witnesses, the documents in evidence, and the terms of the Sponsorship Agreement that there is no genuine issue of material fact as to Respondent's Tenth Affirmative Defense or its Counterclaim/Claim 5 demanding an offset, both of which are accordingly denied.

Although Respondent's original Counterclaim 5 included a claim for punitive damages, that claim was not pursued in its opposition to Claimants' Motion for Summary Judgment. Since

punitive damages are not in any event recoverable on a claim for breach of contract, that claim is deemed abandoned and, in any event, denied.

Similarly, Respondent's Affirmative Defenses, other than offset, were not supported by evidence as discussed above or addressed in response to Claimants' Motion for Summary Judgment and were thus abandoned and otherwise denied for the reasons and based on the evidence discussed above. As noted above, Respondent's counterclaims other than Claim 5 (Offset) were withdrawn and are not resolved or otherwise addressed in this Award.

**Interest**

Claimants seek an award of interest as allowed under Texas law. Texas law provides for the recovery of pre- and post-judgment interest at the rate of 5% per year when, as now, the prime rate of interest is less than 5%. TEX. FIN. CODE ANN. § 304.003(c). By statute, all such interest is to be compounded annually. (*Id.,* § 304.006.).

The start date for the computation of interest was not addressed by either Party. The Sponsorship Agreement specified that the Base Contract Price was payable in full on or before July 1 of the "then-applicable Contract Year." (Agreement ¶ 3(A)(i).) For the 2019-20 NBA season, the Base Contract Price was therefore due July 1, 2019. The Additional Contract Price payable because the Rockets qualified for the second round of the 2018-19 playoffs was due on or before July 1 of the following Contract Year, July 1, 2019, or within 15 days of the date Claimants sent an invoice. (*Id.* ¶ 3(A)(ii).). Claimants sent invoices for both Contract Prices on May 29, 2019, noting that payment was due in 15 days. (Sheirr Ex. 1.) Claimants repeatedly demanded payment of the amounts due after submission of the invoices. (*Id.*) For reasons they do not explain, Claimants calculate the interest due beginning December 10, 2019 for the Additional Contract Price for the 2018-19 season and December 28, 2019 for the Base Contract Price for the

20

2019-20 season. Since both dates are six months or more after the due dates specified in the Agreement, I adopt the dates employed by Claimants as more favorable, and more than fair, to Respondent.

Accordingly, Claimants are entitled to recover interest as follows:

a. Pre-judgment interest on $500,000 at 5% per year ($68.49 per day) beginning December 10, 2019 and post-judgment interest on the unpaid principal amount from the date of the award until payment in full at 5% per year, compounded annually.

b. Pre-judgment interest on $10,725,000 at 5% per year ($1,469.18 per day) beginning December 28, 2019 and post-judgment interest on the unpaid principal amount from the date of the award until payment in full at 5% per year, compounded annually.

For all of the foregoing reasons, I conclude that Claimants are entitled to an award in principal amount of $11,225,000, without offset, plus pre- and post-judgment interest on the outstanding balance at the rate of 5%, compounded annually, as set forth above and as provided under Texas law.

### Attorneys' Fees

AAA Rule R-47(d) provides that an arbitral award may include an award of attorneys' fees if all parties have requested such an award or it is authorized by law or the arbitration agreement. In this case, both Parties have sought an award of fees in their pleadings and in submissions related to fees. Section 17(b) of the Lease Standard Terms and Conditions[7] provided:

(b) Binding Arbitration. … The costs and expenses of the arbitrator shall be shared equally by the parties, and the additional incidental costs of arbitration shall be paid for by the non-prevailing party in the arbitration; provided, however, that where the final decision of the arbitrator is not clearly in favor of a party, such incidental costs shall be shared equally by the parties.

Related provisions were contained in section 23 of the Lease Standard Terms and Conditions:

---

[7] As noted above, the Lease, which itself incorporated its Standard Terms and Conditions, was incorporated into the Sponsorship Agreement.

> (b) **Attorneys' Fees.** If Landlord or Tenant defaults in the performance of any of the terms, covenants, agreements or conditions contained in this Lease and the non-defaulting party places the enforcement of this Lease, or any part thereof (including the collection of any Rental due, or to become due, hereunder or recovery of the occupancy of the Suite) in the hands of an attorney, or files a claim upon the same, the non-prevailing party, to the extent permitted by applicable law, shall pay to the prevailing party all reasonable attorneys' fees incurred by the prevailing party.

Finally, section 38.001 of the Texas Business & Commerce Code provides for recovery of reasonable attorneys' fees in a suit based on an oral or written contract. TEX. BUS. & COMM. CODE § 38.001. An award of fees to the prevailing party is therefore warranted if not compelled in this case.

For the reasons stated above, Claimants have succeeded in proving their right to recover the full amount they claimed, while Respondent has failed to establish its right to the offset it claimed either as an affirmative defense or as a counterclaim. Claimants are therefore the prevailing parties and entitled to recover their reasonable attorneys' fees. In accordance with Section 17(b) of the Lease Terms & Conditions, the arbitrator's fee shall be shared equally between the Parties in an amount determined by the AAA pursuant to its Rules. Respondent shall pay the administrative fees of the AAA.

Both parties submitted claims for attorneys' fees, and both agreed that the form of the other's submission was sufficient. Neither disputed the amount of the other's fees. Claimants sought an award of $199,582.39.

## FINAL AWARD

Having considered the testimonial and documentary evidence in this case, the terms of the Sponsorship Agreement, and the submissions and arguments of the Parties, and for the reasons given in this Award, the undersigned ORDERS AND AWARDS as follows:

a. Orders that Respondent pay to Claimants damages in the amount of $11,225,000.00; and

b. Orders that Respondent pay to Claimants Pre-judgment interest on the $500,000.00 Additional Contract Price for the Rockets' qualifying for the second round of the 2018-19 NBA playoffs at the rate of 5% per year ($68.49 per day) beginning December 10, 2019 and post-judgment interest on the outstanding balance at the rate of 5% per year from the date of the award until payment in full, interest to be compounded annually; and

c. Orders that Respondent pay to Claimants Pre-judgment interest on the $10,725,000.00 Base Contract Price for the 2019-20 NBA season at 5% per year ($1,469.18 per day) beginning December 28, 2019 and post-judgment interest on the outstanding balance at the rate of 5% per year from the date of the award until payment in full, interest to be compounded annually; and

d. Orders that Respondent pay to Claimants their attorneys' fees in the amount of $199,582.00; and

e. Orders that the Parties each pay half of the arbitrator's fee of $19,875.00 as determined by the AAA in accordance with its Rules; and

f. Orders that Respondent pay the administrative expenses fixed by the AAA in the amount of $21,122.50; and

g. Denies Respondent's counterclaim and affirmative defenses; and

h. Further orders that all relief not specifically granted herein is denied.

Signed at Houston, Texas, USA.

Signed on October 10, 2020.

William H. Knull, III
Arbitrator

23

# Exhibit 2

### ROK BRANDS – HOUSTON ROCKETS
### SPONSORSHIP AGREEMENT

By entering into this Sponsorship Agreement (the "Agreement"), ROKIT MARKETING INC. agrees to become an official sponsor ("Sponsor") of Rocket Ball, Ltd., d/b/a the Houston Rockets ("Rockets"), and Clutch City Sports & Entertainment, L.P. ("CCSE" and, together with Rockets, "Team") on the following terms:

1.  **TERM:** The term of this Agreement shall commence on the date upon which the Jersey Patch (as defined below) has been approved by the National Basketball Association (the "NBA") (the "Effective Date"), and expire on June 30, 2020 (the "Initial Term"); provided that if the said NBA approval has not been given by October 15, 2018, then this Agreement shall be of no effect and no party shall have any rights or obligations under this Agreement. Following the Initial Term, this Agreement shall automatically continue for the period beginning July 1, 2020, and ending June 30, 2023 (the "Subsequent Term"), unless either party provides the other party written notice of its intention to terminate the Agreement after the Initial Term on or before February 10, 2020 in which case this Agreement will automatically terminate; provided that in the absence of such written notice, this Agreement shall automatically continue (i) until June 30, 2023 or (ii) for so long as the NBA continues its jersey patch program, whichever is earlier. For the purposes of this Agreement, the word "Term" shall mean the Initial Term and, to the extent applicable, the Subsequent Term, and a "Contract Year" shall mean the annual period from July 1 through June 30 during the Term; provided, however, that the first Contract Year shall mean the period from the Effective Date through June 30, 2019.

2.  **SPONSORSHIP DETAIL:** During each Contract Year of the Term, Sponsor will receive the following:

    A.  **Team Jersey.**
        i.   Jersey Patch. Team shall place the logo of Sponsor's ROKiT brand phones on all official Rockets game jerseys (the "Jersey") worn by Rockets players during each official game played by the Rockets during each NBA season of the Term (the "Jersey Patch"). The Jersey Patch will be placed on the left, front strap of the Jersey, opposite the designated Jersey supplier's logo, and shall measure two and one-half inches by two and one-half inches (2.5" x 2.5").
            (1) Approval. The design and final appearance of the Jersey Patch must be submitted to and approved by Team and the NBA before the Jersey or the Jersey Patch may be displayed or announced publicly. The Jersey Patch may not be changed during an NBA season. Any change in the Jersey Patch between seasons is subject to the approval by Team and the NBA, which approval may be withheld in their sole discretion. If a change to the Jersey Patch is approved by Team and the NBA, Sponsor shall pay all costs and expenses associated with any such change, including but not limited to the costs and expenses related to the production of new Team jerseys and the cost of any unsold inventory.
        ii.  Team Apparel. Jerseys incorporating the Jersey Patch shall be available for sale during the Term by Team on the Team's official online store

Accepted and agreed by the undersigned this 9th day of October, 2018.

**ROKIT MARKETING INC.**

By: _____
Name: Jonathan Kendrick
Title:   **Chairman & Founder**

**ROCKET BALL, LTD.**

By: _____
Name: Tad Brown
Title:   **Chief Executive Officer**

Reviewed by Legal: _____

**CLUTCH CITY SPORTS & ENTERTAINMENT, L.P.**

By: _____
Name: Tad Brown
Title:   **Chief Executive Officer**

Reviewed by Legal: _____

17.     **Unavailability.** The parties agree that in the event that for any reason one or more scheduled regular-season games, which cannot be rescheduled during the NBA season in which such game was to be played, is not played at the Arena, the parties shall negotiate in good faith to agree on alternative rights or benefits of equal value to be provided by Team to Sponsor ("Alternative Rights"). If the parties fail to agree Alternative Rights within fourteen (14) days after the initial communication by either party to the other for the purposes of initiating said negotiations, then the parties shall pursue resolution through arbitration under the Commercial Arbitration Rules of the American Arbitration Association (the "Arbitration Rules") by a single arbitrator appointed in accordance with the Arbitration Rules.

18.     **Miscellaneous.**

a.      This Agreement sets forth the final and complete understanding of the parties with respect to the subject matter hereof and supersedes any and all prior discussions and agreements, whether oral or written, between the parties relating to the subject matter hereof. It is further agreed that the rights, interests, understandings, agreements and obligations of the respective parties pertaining to the subject matter of this Agreement may not be amended, modified or supplemented in any respect except by a subsequent written instrument evidencing the express written consent of each of the parties duly executed by the parties. Any terms inconsistent with or additional to the terms set forth in this Agreement that may be included with a purchase order, acknowledgment, invoice, etc. of either party shall not be binding on the other party hereto unless agreed to in writing by the parties.

b.      In case any one or more of the provisions set forth in this Agreement shall for any reason conflict with NBA rules and regulations as they may, from time to time, be entered into, amended or adopted, any such conflict shall not affect any other provision of this Agreement, and this Agreement shall be construed as if such conflicting provision had never been incorporated herein. In case any one or more of the provisions set forth in this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect, any such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been incorporated herein. Team hereby warrants that no provision of this Agreement conflicts with NBA rules and regulations as they presently exist.

c.      Each and every provision of this Agreement shall be construed as though both parties participated equally in the drafting of the same, and any rule of construction that a document shall be construed against the drafting party shall not be applicable to this Agreement.

d.      This Agreement may be executed in counterparts via facsimile or electronic transmissions (including by manual, facsimile or digital signatures), each of which shall be deemed an original and all of which together shall constitute one and the same instrument.