UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**CASE NO. 22-CV-22538-ALTMAN/Reid**

Dominik Karnas, *et al.*, on behalf of themselves and
all others similarly situated,

    *Plaintiffs*,

v.

Mark Cuban, Dallas Basketball Limited, d/b/a
Dallas Mavericks, Robert Gronkowski, Victor
Oladipo, and Landon Cassill,

    *Defendants*.

_____/

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
TO CERTIFY NATIONWIDE ISSUE CLASSES [ECF NO. 254]**

After more than 2 years of hard-fought litigation, Defendants cannot credibly argue any reason why these proceedings[1] would not benefit from having two questions resolved on a class-wide basis under New Jersey law: (1) are Voyager's native crypto tokens ("VGX") or interest-bearing Earn Program Accounts ("EPAs") "unregistered securities" under the New Jersey Uniform Securities Law ("NJUSL") (the "Security Issue"), and (2) did Defendants' conduct amount to "solicitation," such that they may be held liable for participating in sales as statutory sellers under the NJUSL (the "Solicitation Issue"). At this stage, Plaintiffs are certainly not required to demonstrate they will prevail on the merits of these two questions, rather only that the parties can viably present these issues (and defenses) on a classwide basis. Defendants have raised specific defenses that are certainly common to the entire class, such as whether VGX or EPAs are "unregistered securities," whether Defendants' conduct amounted to statutory "solicitation," and whether Defendants' reasonably and justifiably relied on their counsel.

As much as Defendants would like to argue otherwise, Plaintiffs' proposed Solicitation Issue class only seeks to certify whether Defendants' conduct amounts to "solicitation," *not* whether those solicitations may have been "successful," an issue of causation that Plaintiffs *at this stage* do not seek to certify. This is the same path taken by other class plaintiffs under analogous circumstances. *See In re FieldTurf Artificial Turf Mktg. & Sales Pracs. Litig.*, 2023 WL 4551435, at *2–3 (D.N.J. July 13, 2023) (certifying issue classes although individualized inquiry necessary for causation and damages).

Defendants' other main defense to certification is simply not based on actual pleadings or facts. Defendants summarize their main defense to certification as follows, *see* Opp., 1:

> A primary problem with Plaintiffs' proposed class is it is *untethered* to Defendants' *actual role* in this case, which arises *almost entirely from a single press conference on October 27, 2021*.

The "Mavs/Voyager Global Partnership Agreement" ("Partnership Agreement") itself demonstrates this astounding claim Defendants continually parrot to the Court is false.

As explained in detail in Plaintiffs' Motion, ECF No. 231 (Mot.), 5–7, the Partnership Agreement was formed (for which Voyager paid millions of dollars) because Voyager believed the Mavericks and Mr. Cuban would be the "ideal Global Partners." Evidence[2] shows they were all

---

[1] For both the streamlined claims against Defendants Cuban and the Mavericks (Plaintiffs settled with Cassill, Gronkowski, and Oladipo) and against the "Track 2" Voyager Defendants consolidated in the *McCarter & English* matter currently stayed pending the Motion to Dismiss in this matter.

[2] Attached as **Composite Exhibit A** is a redacted transcript of the April 16, 2024 deposition of Billy Phillips, the Dallas Mavericks' Corporate Representative ("Phillips Tr.") and incorporated exhibits, some of which are redacted and some of which Defendants maintain must be filed entirely under seal. Plaintiffs disagree with filing any redacted version of these materials or to otherwise maintaining them under seal. However, pursuant to the Stipulated Protective Order, [ECF No. 65], Plaintiffs have (1)

extremely successful in these promotion endeavors, with the Mavericks and Mark Cuban using their extensive social media and marketing power, involving millions of fans from across the globe, on a daily basis, for more than ten months. Indeed, Voyager was the first "international partner" of the Mavericks, and Mark Cuban himself admitted that he "crushed it" for Voyager. Mot., 5–7. Even with all of the red flags and concerns raised by regulators, the public, their partners, and even the NBA, Defendants never "took their foot off the pedal," even after Voyager was finally forced into bankruptcy by federal regulators for their illegal activity.

The jury will decide if Mark Cuban, and his Dallas Mavericks, made a deliberate decision to promote and market an illegal product, all for great monetary benefit. Indeed, the sponsorship team members alone received ▬▬▬▬▬ in commissions, each, just for signing up Voyager. Phillips Tr. 36:9–37:13. The Mavericks explained they negotiated the Voyager Partnership and "passed it on to . . . the Dallas Mavericks GC [Sekou Lewis]," who "determine[ed] . . . that [the Mavericks] can go forward with this deal," but "discuss[ed] approval of the agreement" with the NBA because, for the Partnership Agreement to proceed, "[t]he NBA had to have 100 percent approval before we could proceed," and "we would not be able to have this contract signed without their approval." *Id.*, 70:1–81:5. But the process caused "frustration" for the Mavericks because of "how long it took" to obtain the approval, because "our job is to try and bring in new sponsors." *Id.*, 77:22–79:5.

Discovery evidences that not only was the Dallas Mavericks/Voyager Digital Global partnership a "great success," a shining example of (in the Mavericks' *own words*) a very successful promotion they were proud to tout, but Voyager could never have reached anywhere near its great heights, without the massive and herculean promotion, marketing and support directly by the Dallas Mavericks and Mark Cuban and their incredible social media influence. As Mr. Phillips explained, the Partnership was "about building a brand" for Voyager, a "new company . . . trying to get their name out," and the Mavericks were a perfect fit because "we're a sports team that has . . . different advertising assets that provide a chance to build brands and to achieve the promotion of a company.

---

filed this redacted brief and exhibits; and (2) will be shortly moving for leave to file the unredacted materials with the Court, which Plaintiffs respectfully submit should be done publicly, for many of the same reasons they raised recently in their Motion for Reconsideration pending before the Court. [ECF No. 269]. Regardless of Defendants' confidentiality designations, this Court has made clear that it has an independent responsibility to determine whether information may properly be sealed in connection with briefing this pretrial motion, and it is up to the designating party to "describe the alleged harm it will suffer from any disclosure with a *particular and specific demonstration of fact*, as distinguished from stereotyped and conclusory statements." ECF No. 258 (quoting *Procaps S.A. v. Patheon Inc.*, 2015 WL 4430955, at *6 (S.D. Fla. July 20, 2015) (Goodman, Mag. J.) (emphasis supplied).

. . . It's a billion-dollar industry." Phillips Tr. 47:2–48:13. He went on to explain the Mavericks "did a great job achieving the goals" of the Partnership. Phillips Tr. 69:3–7.

As to the argument that the Partnership was "entirely from a single press conference," Plaintiffs uncovered a "year-end recap" the Mavericks confirmed they prepared for Voyager, which "recaps all of the Voyager-related activations that happened within the '21/'22 season," Phillips Tr. 267:9–268:2; *id.*, Ex. 85A. In addition to the "single press conference," the Mavericks also provided, for example, throughout the entire season—including the nationally-televised Playoffs: (1) game night sponsorships, including signage, pregame and halftime shows, on-court branding both in person and on TV; (2) Mavs employee education events; (3) TV-visible LED signage; (4) Voyager exposure on Mavs social media;[3] (5) promotions of various Voyager/Mavs promo codes at *31 games* during the season; (6) on-court promotions, like "[(i)] Oct 28, 2021 vs Spurs - $100k Crypto Shootout[; (ii)] Jan 19, 2022 vs Raptors – Crypto Dash[; (iii)] Mar 21, 2022 vs Timberwolves – Skee-Ball[; and (iv)] Apr 10, 2022 vs Spurs – Skee-Ball (Fan Appreciation Night)"; (7) the Mavs and Voyager "Buckets for All" social media campaign, which used Voyager branded social media posts on Mavs social media to highlight the Mavs player with the most assists during regular season games; (8) Mavs.com Web Ads for Voyager to promote the Mavs25 offer beginning April 22, 2022; (9) on court and arena signage exposure during the nationally-televised 2022 Playoffs, where Voyager sponsored 8 home games and had exposure on screen for 11 quarters throughout the first round of the playoffs. Below are just some of the exposure Voyager got from the Mavericks' performance of the Partnership:



---

[3] While Defendants argued they were not allowed to promote Voyager "nationwide," the Mavericks admitted recently that "[t]he internet is uncontrollable. The NBA acknowledges that. So, when you do any type of—in this case, it was a promotion for Mavs 100. It goes out on the internet. We don't restrict that. That's just the promotion of what we do with the internet." Phillips Tr. 54:15–22.





4

As the jury will see in November, Cuban and his Dallas Mavericks vigorously pursued Voyager's partnership while ignoring serious red flags about the illegality of Voyager's products, both before and after signing. The Mavericks kept their massive promotion machine cranking 24 hours a day, 7 days a week,[4] with more energy and more marketing, especially because this was during the COVID pandemic, meaning "[e]ven when the arena was closed, we were able to put signs that covered all the seats, huge signs. So our ROI was returned to the partners," and "social media" allowed the Mavericks to "create different . . . and innovative new inventory" that "helped us quite a bit to keep the revenue for the Dallas Mavericks." Phillips Tr. 101:18–105:5. The Mavericks not only decided not to declare Voyager in "default," so they could terminate the Partnership Agreement, but instead went full speed ahead, continuing to promote the illegal Voyager VGX and EPAs every week, at every Mavericks basketball and video gaming event, utilizing their millions of internet followers to do so. *See id.*, 107:2–7 ("in April of 2021, the Dallas Mavericks had about 4.2 million followers on Facebook, about 2.2 followers on Instagram").

Defendants further acted for their own benefit because "it's two-way street. We're building both brands. . . . So, here, you know, Voyager was doing us a nice favor in helping the Mav's brand" when Ehrlich wore a Mavericks-branded shirt on Fox Business to promote the Partnership Agreement, giving a "great example of our partners enhancing our brand. Mavs' logo on national TV for six minutes." *Id.,* 189:25–191:1.

Thus, it is clear that if the Solicitation Issue makes it to the jury after the Court resolves the Security Issue, there is a very real chance it will find that Defendants did in fact engage in solicitation of the sale of unregistered securities for both their and Voyager's collective financial benefit.

In their opposition, Defendants make irrelevant arguments, distort Plaintiffs' claims, misrepresent the law, and misconstrue the proposed Issue Classes to avoid providing a direct response.[5] Notably, while the opposition focuses on challenging the Solicitation Class (albeit with the

---

[4] Phillips Tr. 91:13–24 (Mavs continued to promote Voyager "[f]rom October, the press conference, until the bankruptcy"); 93:11–14 ("We fulfilled the agreement, and we were not told by any department or organization to stop the assets to be fulfilled."); 96:6–11 (the Mavericks "continue[d] to promote the Voyager brand every day until . . .the end of the season").

[5] Consistent with the irrelevant main thrust of the Opposition, Defendants cite the Expert Report of Patrick Conroy (Ex. 2 to the Opp.) in support of arguments only relevant to causation and damages – neither of which Plaintiffs' have sought certification on as of yet. *See* Opp. at 13, 28 (citing Conroy Report at 19–20 for causation-related proposition that there was no expectation of profit in EPA investments); *id.* at 5, 13, 24 (citing Conroy Report at 8–15 for causation-related proposition that Plaintiffs must ultimately prove "successful" solicitations); *id.* at 24 (citing Conroy Report at 16–17

"successful" solicitation issue Defendants injected into it that Plaintiffs have not sought to certify), it is devoid of argument why this Court should not certify Plaintiffs' proposed Security Issue Class. Defendant's failure to challenge certification of the Security Issue is revealing. As set forth in the Plaintiffs' Motion, securing partial summary judgment on the Security Issue will narrow the scope of litigation—as certain consumer fraud statutes cannot apply to securities and certain statutory claims apply only to securities. Thus, not only will this Court's ruling on the Security Issue have important implications for the claims in this matter and in the Voyager Track 2 consolidated cases, but it also will have substantial persuasive value in other litigations currently pending in this district.

The Security Issue is common across the entire class, is provable on a classwide basis, and is best addressed collectively. Each account that Voyager offered and sold—all of which were invariably classified as EPAs—shared material similarities. Indeed, all are materially identical. The Security Issue, which hinges on either the *Howey* or *Reves* test, rests on the same factors for the Proposed Class Representatives and the Classes: whether the Class invested money in the VGX tokens or EPAs, whether the investors in the VGX tokens and/or EPAs participated in a common enterprise, whether reasonable investors purchased the VGX tokens and/or EPAs with an expectation of profit from owning them, and whether investors reasonably expected profits from the VGX tokens and/or EPAs to be derived from the managerial efforts of Voyager, the issuer. Certification of this class is therefore appropriate and warranted.

Ultimately, Defendants missed their opportunity to challenge the Security Issue Class, and their perfunctory arguments against the Solicitation Issue Class are baseless. This Court should therefore grant Plaintiffs' Motion and certify the proposed Issue Classes.

## ARGUMENT

### I.   New Jersey Law Applies to the Issue Classes.

Defendants' extensive analysis of states' securities laws is a red herring. This Court is not required to conduct any lengthy or onerous choice of law analysis in deciding whether Plaintiffs can certify a nationwide class for its claims. The only issues currently before the court are based on New Jersey's enactment of the Uniform Securities Act, i.e., a "Blue Sky" law. It is well established that, unlike common-law claims, multiple states' Blue Sky laws may simultaneously apply to the same transaction without provoking a conflict of law problem, and plaintiff may claim under any and all of

---

for causation- and damages-related arguments). None of these arguments address either the Security Issue or Solicitation Issue, much less undermine the validity of certifying either as class issues.

6

them. *See, e.g.*, *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1533–36 (M.D. Fla. 1989).[6] This is because "blue sky laws in general serve similar goals [, while] conflicts of laws rules . . . are often developed to facilitate a choice between dissimilar, sometimes competing common law provisions of different states." *Id.* at 1535–36. Blue Sky laws' goals include "prevent[ing the states] from being used as a base of operations for crooks marauding outside the state." *Caspersen as Tr. For Samuel M.W. Caspersen Dynasty Tr. V. Oring*, 441 F. Supp. 3d 23, 41 (D.N.J. 2020).[7] Thus, New Jersey's law can be applied extraterritorially to out-of-state consumers where, as here, Voyager promoted and sold unregistered securities (in the form of EPAs and VGX Tokens) to consumers throughout the country from its headquarters located in Jersey City, New Jersey. *See* N.J. Stat. § 49:3-51(a), (c) (scope of New Jersy Uniform Securities Law includes "persons who sell or offer to sell" where such sales "originate[] from this State," "whether or not either party is then present in this State"). There is "no reason why a conflicts of law problem develops if [another] Blue Sky law provides fewer remedies, lacks an attorneys' fee provision, has a shorter statute of limitations or has a more limited scope." *Lintz v. Carey Manor Ltd.*, 613 F. Supp. 543, 551 (W.D. Va. 1985) (leading case).[8] Defendants' cases, which involve other types of claims, are simply inapposite.[9]

---

[6] *See also, e.g.*, *Hatteras Enterprises Inc. v. Forsythe Cosm. Grp., Ltd.*, 2018 WL 1935984, at *8 (E.D.N.Y. Apr. 23, 2018) (collecting cases); *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, 2012 WL 5351233, at *8 n.13 (Mass. Super. Sept. 28, 2012) (same)

[7] *See also, e.g.*, *Simms Inv. Co. v. E.F. Hutton & Co. Inc.*, 699 F. Supp. 543, 545 (M.D.N.C. 1988) ("Blue Sky laws protect two distinct public policies. First, the laws protect resident purchasers of securities, without regard to the origin of the security. Second, the laws protect legitimate resident issuers by *exposing* illegitimate resident issuers to liability, *without regard to the markets* of the issuer."); *Garland v. Adv. Med. Fund, L.P. II*, 86 F. Supp. 2d 1195, 1204–05 (N.D. Ga. 2000) ("weight of the legal authority indicates that conflicts of law principles are not applicable in cases involving state Blue Sky laws").

[8] Even for cases not involving blue sky laws, this Court has previously found no issue with applying another state's statute extraterritorially when the alleged violations emanated from that state and affected consumers nationwide. *See Fruitstone v. Spartan Race Inc.*, 464 F. Supp. 3d 1268, 1286–87 (S.D. Fla. 2020) (Bloom, J.) (applying Massachusetts consumer protection law where alleged violation emanated from Massachusetts, the state where defendant based its operations, and finding Florida resident had Article III standing to assert those claims on behalf of putative nationwide class).

[9] *See Karhu v. Vital Pharms., Inc.*, 2014 WL 815253, at *7–11 (S.D. Fla. Mar. 3, 2014) (warranty, unjust enrichment, and FDUTPA claims); *Sacred Heart Health Sys. v. Humana Mil. Healthcare Servs. Inc.*, 601 F.3d 1159, 1184 (11th Cir. 2010) (contract claims); *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 722–23 (11th Cir. 1987) (common-law claims involving securities, with no discussion of blue sky laws); *Andrews v. AT&T Co.*, 95 F.3d 1014, 1024 (11th Cir. 1996) (RICO claims implicating disparate state laws); *Morris v. ADT Sec. Servs., Inc.*, 2009 WL 10691165 (S.D. Fla. Sept. 11, 2009) (FDUTPA).

7

Even if a choice of law analysis applies and favors applying the law of each Plaintiff's state, that does not preclude resolving the Solicitation Issue using the class action mechanism. A class may include members claiming under different states' laws if the substantive legal standard is essentially the same; likewise, subclasses may be used if there are only a few variations in substantive standards. *See In re Takata Airbag Prod. Liab. Litig.*, 677 F. Supp. 3d 1311, 1331 (S.D. Fla. 2023) (finding that state laws can be addressed through class action in groups with "materially identical legal standards"); *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 962 F. Supp. 450, 525 (D.N.J. 1997), aff'd, 232 F. App'x 161 (3d Cir. 2007) (finding choice of law issues did not preclude class treatment where the legal "differences fall into a limited number of predictable patterns").

Defendants do not dispute that the issue outlined in the Securities Issue claim is based on a principle of law that is mostly uniform among the states, allowing this Court's analysis to apply nationwide. *See In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 695 (S.D. Fla. 2004) (noting that because "the essential elements of [the plaintiffs'] antitrust claims do not vary significantly from state-to-state, ... they are susceptible to proof using common evidence"); *In re FieldTurf Artificial Turf Mktg. & Sales Pracs. Litig.*, 2023 WL 4551435, at *10 (D.N.J. July 13, 2023).

For the Solicitation Issue, even Defendants only point to three standards across forty-eight states (1) the *Pinter* standard, (2) a privity standard, and (3) the substantial factor test, all of which have overlapping and shared elements.[10] *See* Opp. at 16–17. Defendants greatly exaggerate the difficulties associated with managing the issues on a class basis, including at trial. *In re Takata*, 677 F. Supp. 3d at 1330 (finding a class trial on Plaintiffs' claims to be manageable despite differences in state law).[11]

Simply put, Defendants promoted unregistered Voyager products to consumers across the nation, and the EPAs and VGX Tokens were offered and sold from Voyager's base of operations in

---

[10] Defendants note that in up to ten states, courts disagree as to the exact standard. Still, the substantive elements still fall under one of three standards and this ambiguity does not significantly impact the predominance analysis. Plaintiffs reserve the right to challenge Defendants' classifications of the correct standard for each state if the court does not certify a nationwide class under New Jersey law.

[11] The cases Defendants cite in arguing that the legal differences preclude certification all (1) involve more complex and patch work examples of state-by-state differences and (2) lack a small number of readily available groupings. *See* Opp. at 20; *see, e.g.*, *Humana*, 601 F.3d at 1184 (finding "substantial variations among the six bodies of state law"); *Kirkpatrick*, 827 F.2d at 722-23 ("[T]he differing standards of liability required by the laws of the various states would render class action treatment unmanageable."); *Andrews v. AT&T Co.*, 95 F.3d 1014, 1024 (11th Cir. 1996) (citing the "need to interpret and apply the gaming laws of all fifty states"); *Karhu*, 2014 WL 815253, at *8 (finding that "varied state laws would govern the MMWA claims of class members across the country, imposing different legal requirements and overshadowing the common factual bases of the claims").

8

New Jersey. New Jersey has the most significant relationship to the conduct at issue in this case and therefore the NJSUL applies nationwide in this case. [12]

## II. Defendants Do Not Dispute that the Two Proposed Class Representatives Have Standing.

By failing to challenge standing in their opposition Defendants concede that both Proposed Class Representatives, Mr. Webb and Mr. Garrison, have standing as to both the Solicitation Issue and the Security Issue. *See MY. P.I.I. LLC v. H&R Marine Eng'g, Inc.*, 544 F. Supp. 3d 1334, 1349 (S.D. Fla. 2021) (explaining that arguments not properly presented in a party's brief are deemed waived).

Both Mr. Webb and Mr. Garrison each purchased an EPA offered for sale from Voyager's base of operations in New Jersey after being exposed to some or all of Cuban's and the Mavericks' misrepresentations and omissions regarding the Deceptive Voyager Platform, each sustained damages as a result, and neither has recovered their respective initial investments of fiat currency. Webb Decl. ¶¶ 3, 6; Garrison Decl. ¶¶ 3, 5. Proposed Class Representatives have both suffered an injury in fact that is fairly traceable to Defendants' conduct and that is likely to be redressed by a favorable judicial decision. *See Spokeo*, 578 U.S. at 338. They possess standing, and Defendants do not contend otherwise.

## III. The Class is Ascertainable.

*A. Defendants' arguments related to standing of absent class members misapply and misstate the law.*

Defendants make multiple arguments related to the standing of absent class members. These arguments are irrelevant to the class certification inquiry for the two issue classes presented and have nothing to do with the ascertainability requirements. At the class certification stage, the court need only ensure that the named class members have standing. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264 (11th Cir. 2019) ("[A]ll that Article III requires for the claim to be justiciable is that a named plaintiff have standing."); *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 888 (11th Cir. 2023) ("We start from the basic principle that at the class certification stage only the named plaintiffs need have standing."); *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1304 (N.D. Fla. 2017) ("In addition to the Rule 23 requirements, at least one named plaintiff seeking class certification must have standing."). [13]

---

[12] Defendants' citation to the Rules Enabling Act is unavailing as "both Supreme Court and Eleventh Circuit precedent confirm that class actions and the use of classwide or representative evidence to establish common elements of a claim do not 'abridge, enlarge, or modify' any substantive rights." *In re Takata*, 677 F. Supp. 3d at 1331.

[13] Defendants' arguments about some putative class members' alleged lack of Article III standing, *see* Opp. at 26–29, is nonsensical, given that Plaintiffs need only prove that the Proposed Class Representatives have standing. First, it is irrelevant whether each and every member of the Securities Issue class can demonstrate "solicitation"—because that is not an issue the *Securities* Issue class seeks

As discussed at length in Plaintiffs' Motion, the two Proposed Class Representatives meet all the standing requirements. *See* Mot. at 10–12 (discussing how the named Plaintiffs have adequately alleged (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision").[14] Because both Proposed Class Representatives have standing, Plaintiffs have exceeded the basic requirement that one named plaintiff have standing to pursue the case.

### B. *Plaintiffs can use Voyager's business records to ascertain the class.*

As the Eleventh Circuit has recently held, to be ascertainable the proposed class need only be "adequately defined such that its membership is capable of determination." *Cherry*, 986 F.3d at 1304

---

to certify. *See* Opp. at 26–27. They also claim some class members purchased "non-security" assets (a merits argument, not a certification argument, because *all* class members were *necessarily* EPA purchasers) and that the class is overly broad because some class members may have solicited others to open EPAs, or opened EPAs in another's name. *Id.* at 28. These arguments have nothing to do with ascertainability, nor do they affect whether either of the two issue classes warrant certification. That some class members ultimately may not be successful on their damage claims **does not** defeat certification, where common issues otherwise predominate. *Navelski*, 244 F. Supp. 3d at 1309 (citing *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016) ("[E]ven a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct.")); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) ("a class will often include persons who have not been injured by the defendant's conduct," but that "does not preclude class certification")). Defendants misconstrue *Walewski* as adding a requirement to ascertainability that a class definition not include any uninjured members. *See* Opp. at 26–27 (discussing *Walewski v. Zenimax Media, Inc.*, 502 F. App'x 857 (11th Cir. 2012)). As this Court has previously discussed, "*Walewski* is **not** necessarily a general statement of law that class members with products whose defects have not manifested cannot meet the ascertainability requirement." *Harris v. Nortek Glob. HVAC LLC*, No. 14-CIV-21884, 2016 WL 4543108, at *5 n.5 (S.D. Fla. Jan. 29, 2016) (emphasis added). Defendants' reliance on *Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.* is also unavailing because the concern there was that uninjured class members would be compensated. 481 F. Supp. 3d 1258, 1278 (S.D. Fla. 2020), *aff'd*, 2021 WL 4427772 (11th Cir. Sept. 27, 2021). Here, however, neither of the Issue Classes are seeking a damages verdict, so there is no risk that resolving either issue on the merits means compensating uninjured class members. Finally, it is of no legal consequence that not all holders of EPAs deposited sufficient crypto assets to actually earn interest (or deposited more than necessary for a promotion), *see* Opp. at 29, and therefore "ch[o]se not to accept the full offer of an investment contract." *SEC v. Terraform Labs Pte. Ltd.*, 23-CV-1346 (JSR), 2023 WL 8944860, at *13–14 (S.D.N.Y. Dec. 28, 2023) (citing *Howey*, 328 U.S. at 300).

[14] Defendants' arguments related to the standing of named Plaintiffs who have since been dismissed from the case are unavailing. *See, e.g.*, Opp. at 28 ("For instance, plaintiff Ms. Gold did not open an account in her own name."). Ms. Gold is not one of the two Proposed Class Representatives, and is therefore not required to meet the requirements that only apply to named class members . *See, e.g.*, *Catlin v. Wal-Mart Stores, Inc.*, 123 F. Supp. 3d 1123, 1131 (D. Minn. 2015) ("Odle was dismissed as a named representative for improper venue, but remained a putative class member."). As previously discussed, the Proposed Class Representatives meet Article III's standing requirements.

10

(rejecting any requirement to demonstrate administrative feasibility). In assessing a proposed class's ascertainability, this Circuit looks only to whether membership in each proposed class "turns on [] objective, verifiable criteri[a][.]" *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1370 (11th Cir. 2021). Plaintiffs need not show "precisely how" they will use this criteria to ascertain class members. *Id.* Plaintiffs' Motion provides sufficient detail as to how both classes can be ascertained from Voyager's business records and thus uses "objective, verifiable criteri[a]." *See* Mot. at 13 ("Furthermore, Defendants had their own unique promo codes which were included in certain of their advertisements. Corporate records regarding the identity of individuals who used those promo codes upon sign-up will necessarily show those individuals who most certainly relied upon Defendants advertisements in making their decision to purchase, as both proposed Class Representatives did.").

> C. *The Court Should Not Adopt Defendants' Alternative Proposed Class Definitions.*

Finally, Defendants propose an alternative class definition with substantial revisions. Opp. at 30. Their proposed alternative class is not only nonsensical, it also has no basis in law or the facts of this case. The primary revisions and limitations are directed to issues related to damages, and as discussed at length in Plaintiffs' Motion as well as this Reply, Plaintiffs are not seeking to certify any issues with respect to damages at this time.

## IV. Rule 23(a)'s Requirements are Satisfied.

Defendants do not even address—much less contest—that the numerosity commonality, typicality, and adequacy of representation requirements set forth in Federal Rule of Civil Procedure 23(a) have been satisfied for the Proposed Issue Classes. They have therefore waived any challenge under Rule 23(a). *MY. P.I.I. LLC*, 544 F. Supp. 3d at 1349.

## V. Common Questions of Law and Fact Predominate.

> A. *Leaving questions of causation, damages, and affirmative defenses to individual adjudication does not prevent certifying discrete issues for class resolution.*

Plaintiffs have explicitly omitted from their pending requests for class certification aspects of class members' claims that may require significant individualized proof.[15] Despite this, Defendants still argue that these excluded issues would cause individual questions to predominate. Opp. at 8–15,

---

[15] *See* cmt. to Rule 23 (section (c)(4) "recognizes that an action may be maintained as a class action **as to particular issues only**. For example, in a fraud or similar case the action may retain its 'class' character only through the adjudication of liability to the class; **the members of the class may thereafter be required to come in individually and prove the amounts. . . .**") (emphasis added).

11

22–24. But the asserted need for individualized proof on causation,[16] damages,[17] or affirmative defenses[18] does not preclude certification of discrete classwide issues. *FieldTurf*, 2023 WL 4551435, at *2–3; *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1239-40 (11th Cir. 2016) (individual damages questions and "individual affirmative defenses generally do not defeat predominance"); *see* Mot. at 18–19.[19]

---

[16] E.g. whether the promotions caused class members to purchase the securities or "whether Defendants 'successfully solicited' the investments of each individual Plaintiff." Opp. at 8.

[17] Defendants argue that denial is required because Plaintiffs "proffer no damages formula" to show that "damages are susceptible of measurement across the entire class." Opp. at 23–24. However, Plaintiffs here have no obligation to seek classwide resolution of damages and have chosen not to seek certification on that issue at this time. *Brown*, 817 F.3d at 1239 (". . . *Comcast* did not change the law that a class action can sometimes be maintained notwithstanding the need to prove individual damages."); *see* Mot. at 8–9. Since class actions can be maintained despite the need to prove individual damages, Defendants argue—without evidence—that such individual proof would be "so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable." Opp. at 23 n.34. Plaintiffs have already outlined ways in which the evidence will be conducive to proving damages at trial and such investigation remains ongoing through discovery. Mot. at 17–18.

[18] E.g., Defendants' alleged individualized *in pari delicto* defenses. Opp. at 22–23. But Defendants only cite cases that confirm the Court must use its discretion in analyzing Rule 23 to ensure that individual defenses do not predominate. *See Heaven v. Tr. Co. Bank*, 118 F.3d 735, 739 (11th Cir. 1997) ("We rule only that it is a proper exercise of discretion for the district court to evaluate the nature of the [compulsory] counterclaims and the difficulties they present and to consider the usefulness of breaking the proposed class into subclasses to avoid those difficulties."); *Coastal Neurology, Inc. v. State Farm Mut. Ins. Co.*, 458 F. App'x. 793, 794 (11th Cir. 2012) (affirming the district court's ability to consider individualized defenses without evaluating the degree to which the defenses would predominate); *Boca Raton Com. Hosp. Inc. v. Tenet Healthcare Corp.*, 238 F.R.D. 679, 692–94 (S.D. Fla. 2006) (denying certification due to a likely *unique* defense of unclean hands against the against the named plaintiff).

[19] Defendants also argue that individual issues predominate because proof of causation here alleging looks like proof of reliance on misrepresentations, which Defendants claim is "often enough *alone* to preclude certification." *See* Opp. at 10–11. While there is no "reliance" element under the NJUSL, *see* Mot. at 2 n.7, Defendants, instead, try to make the leap in logic that the "*successful* solicitation" element is similar enough to a reliance requirement to preclude certification of the Solicitation Issue. *See* Opp. at 10 (noting that Section 12 does not contain a "reliance requirement *per se*"). First, Plaintiffs do not seek to resolve on a class basis whether Defendants' solicitations were successful as to the Solicitation Issue class, rather, they only seek to certify the issue of whether what Defendants' did *was* solicitation. Second, unlike the cases Defendants rely on, *see* Opp. at 10–11, Plaintiffs need not allege reliance on misrepresentations, instead Plaintiffs allege only that Defendants solicited the investments for Voyager's or their own financial gain. That is a key distinguishing feature from cases like *In re Jan. 2021 Short Squeeze Trading Litigation*, 2023 WL 9035671, at *36 (S.D. Fla. Nov. 13, 2023). To the extent Defendants' argument is merely restating their position that proof of causation is an individualized issue that predominates, *see* Opp at 8–9, 12–15, courts recognize that such issues can be separated from discrete issues that do lend themselves to classwide resolution. Mot. at 18–19 (collecting cases).

Defendants claim that even after resolving the proposed classwide issues the scope of required individualized proof would cause individual issues to predominate in the aggregate. Opp. at 8 (citing *Verbal v. Tiva Healthcare Inc.*, 2021 WL 9527858, at *7, (S.D. Fla. Aug. 19, 2021)). However, as laid out in the Motion, once the Security Issue and the Solicitation Issue are determined on a classwide basis, there will not be a great deal of individualized proof or outstanding individual legal arguments, and it is even possible that a class resolution may be available at that time. Mot. at 3–4, 9, 18–20. Moreover, these issues can be addressed with straightforward evidentiary showings. As was the case in *Verbal*, "the viability of each [class members'] claim turns on *the same* two [salient] questions": (1) whether VGX tokens and/or Voyager EPAs are securities under the NJUSL and (2) whether Defendants' conduct amounts to solicitation such that they are statutory sellers under the NJUSL. 2021 WL 9527858, at *8–9 (granting motion for class certification).[20] Those common questions predominate despite the presence of the alleged individualized issues.

### B. *Classwide resolution is a superior method of adjudicating the discrete issues for which Plaintiffs have requested certification*

Courts recognize that Rule 23(c)(4) provides that "an action may be brought or maintained as a class action with respect to particular issues." Mot. at 8-9. The proposed Class Representatives seek a narrow certification order certifying the Security Issue and the Solicitation Issue for classwide resolution. This structure allows the case to move forward quickly on deciding these two central issues and in a way that increases the efficiency and fairness for the matter as a whole.

Defendants ignore the benefits of this structure to the case at hand—completely failing to even mention or attempt to address *Fieldturf*, *Navelski*, *Las Olas*, or any of the other case Plaintiffs cite to the Court demonstrating that this exact structure is workable and approved in multiple districts throughout the country—and instead declare that the entire concept for certifying issue classes is disfavored in this District. Opp. at 24. The key questions are whether the shared issues predominate over the individual issues and whether the case as a whole would benefit from the classwide resolution of those issues. The shared Security Issue and the Solicitation Issue are perfect candidates for classwide resolution; that remains true even if the Court takes into consideration the potential for certain issues to require individualized proof.

---

[20] The court's denial of certification in *Marc Irwin Sharfman, M.D. P.A., v. Infucare RX LLC*, 2022 WL 18926792 (M.D. Fla. Nov. 16, 2022) is distinguishable as the plaintiffs' claims were littered with highly individualized questions that went to core issues of liability as opposed to issues that can be segregated like damages. *Id.* at *10–11, *14–20.

13

## CONCLUSION

For the foregoing reasons, the Court should (a) certify the proposed Issue Classes; (b) appoint the proposed Class Representatives to serve as Class Representatives for the proposed Nationwide Issue Classes; and (c) appoint The Moskowitz Law Firm, PLLC and Boies Schiller Flexner LLP, to serve as Co-Lead Class Counsel for the Proposed Issue Classes.

Dated: May 1, 2024                                    Respectfully submitted,

**By:** */s/ Adam M. Moskowitz*
Adam M. Moskowitz
Florida Bar No. 984280
Joseph M. Kaye
Florida Bar No. 117520
Barbara C. Lewis
Florida Bar No. 118114
**THE MOSKOWITZ LAW FIRM, PLLC**
Continental Plaza
3250 Mary Street, Suite 202
Miami, FL 33133
**Mailing Address:**
P.O. Box 653409
Miami, FL 33175
Office: (305) 740-1423
adam@moskowitz-law.com
joseph@moskowitz-law.com
barbara@moskowitz-law.com

*Co-Counsel for Plaintiffs and the Class*

**By:** */s/ David Boies*
David Boies
(Admitted Pro Hac Vice)
**BOIES SCHILLER FLEXNER LLP**
333 Main Street
Armonk, NY 10504
Phone: (914) 749–8200
dboies@bsfllp.com

**By:** */s/ Stephen Neal Zack*
Stephen Neal Zack
Florida Bar No. 145215
**BOIES SCHILLER FLEXNER LLP**
100 SE 2nd St., Suite 2800
Miami, FL 33131
Office: 305-539-8400
szack@bsfllp.com

*Co-Counsel for Plaintiffs and the Class*

**By:** */s/ Jose M. Ferrer*
Jose M. Ferrer
Florida Bar No. 173746
Desiree Fernandez
Florida Bar No. 119518
**MARK MIGDAL HAYDEN LLP**
8 SW 8th Street, Suite 1999
Miami, FL 33130
Office: 305-374-0440
jose@markmigdal.com
desiree@markmigdal.com

*Co-Counsel for Plaintiffs and the Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the forgoing was filed on May 1, 2024, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

By: /s/ *Adam M. Moskowitz*
ADAM M. MOSKOWITZ
Florida Bar No. 984280