# Exhibit A

1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7    SECURITIES AND EXCHANGE                Case No.  23-cv-06003-WHO
     COMMISSION,
8                                           **ORDER DENYING MOTION TO**
                Plaintiff,                  **DISMISS AND SETTING CASE**
9                                           **MANAGEMENT CONFERENCE**
          v.
10                                          Re: Dkt. No. 25
     PAYWARD, INC., et al.,
11
                Defendants.
12

13          The United States Securities and Exchange Commission (the "SEC" or the "Commission")

14   is suing Payward, Inc. and Payward Ventures (d/b/a "Kraken") under Sections 5, 15(a), and

15   17A(b) of the Securities Act, alleging that Kraken acts as a broker, dealer, exchange, and clearing

16   agency with respect to what the SEC refers to as "crypto asset securities" without registering with

17   the SEC.  Kraken does not deny it never registered with the agency, but says that it does not need

18   to because the transactions it enables on its platform do not involve securities and do not fall

19   within the SEC's regulatory purview.  But the SEC has plausibly alleged that at least some of the

20   cryptocurrency transactions that Kraken facilitates on its network constitute investment contracts,

21   and therefore securities, and are accordingly subject to securities laws.  The motion is DENIED.

22                                    **BACKGROUND**

23   **A.      Cryptocurrency Generally**

24           **1.      Assets**

25          A cryptocurrency is a digital, encrypted, and decentralized medium of exchange.

26   Individual units are often referred to as "crypto coins," "crypto assets," "digital assets," or

27   "tokens."  Compl. ¶ 18.  They are traded on electronic platforms like Kraken, operated by the

28   defendants.  They are transferred and secured using "blockchain" technology.  A blockchain or

distributed ledger is a database that is spread across a network of individual computers that records transactions in "theoretically unchangeable, digitally recorded data packages." *Id.* ¶ 19. These data packages are referred to as "blocks." *Id.* Blockchains typically rely on cryptographic techniques to securely record transactions. *Id.* Some crypto assets are "native" to a particular blockchain. *Id.* ¶ 20. This means that they are the blockchain's central asset that is integral to how that blockchain operates. *Id.* Other crypto assets are "non-native," meaning that they are built on top of an existing blockchain. *Id.*

Crypto asset owners usually store critical information on a piece of hardware or software called a "crypto wallet." Crypto wallets can be used to store the public and private "key" associated with a particular crypto asset so that the owner can engage in transactions on the blockchain associated with that asset. *Id.* ¶¶ 21-22. A private key is analogous to a password and provides the ability to transfer a crypto asset, whereas a public key is more akin to a blockchain address and can be freely shared with others. *Id.* Whoever controls the private key to a crypto asset, controls that asset. Crypto wallets are sometimes connected to the internet, but not always.

### 2. Transfer of Assets

Crypto assets may be transferred directly on the relevant blockchain, or they may be transferred through a third-party intermediary. *Id.* ¶ 23. If a transfer is verified and recorded on the relevant blockchain's publicly available ledger, that is known as an "on-chain" transaction. *Id.* ¶ 23.[1] If a transfer occurs *without* being submitted to, verified by, or recorded on a blockchain, that is known as an "off-chain" transaction. *Id.* Crypto asset trading platforms like Kraken's offer a place to engage in "off-chain" transactions. *Id.* ¶¶ 24, 30.

---

[1] Some blockchains use a "consensus mechanism" to verify transactions. *Id.* ¶ 25. A consensus mechanism refers to a protocol used by a blockchain to agree on, for example, which ledger transactions are valid, when, how, and whether to update the blockchain, and whether to compensate certain participants for validating transactions and adding new blocks of cryptocurrency. *Id.* Two common consensus methods are known as "proof of work" and "proof of stake." *Id.* ¶ 27. Proof of work consensus involves a network of computers (known colloquially as "miners") using computational effort to guess the numerical value of a number predetermined by the cryptocurrency network. The first miner who guesses correctly earns the right to update the blockchain with a block of transactions and is rewarded with the blockchain's native cryptocurrency asset. *Id.* In contrast, proof of stake consensus involves selecting "validators" from a network of crypto asset holders who have "staked" a predetermined minimum number of crypto assets. *Id.*

United States District Court
Northern District of California

**B.     Kraken**

Trading platforms like Kraken allow their customers to deposit fiat (legal tender issued and approved by a country) into bank accounts and crypto assets into wallets controlled by the platform, and then to purchase and sell those assets for fiat or other crypto assets. These exchanges may be conducted on- or off-chain. Compl. ¶ 32. If they are conducted on-chain, the intermediary transfers the purchased crypto asset from the seller's account into the buyer's crypto wallet. *Id.* However, if the purchaser has an account with the intermediary and customer assets are stored in collectively in what is referred to as an "omnibus" wallet, then the transactions can happen off-chain, with the platform recording debits and credits for the transaction internally, without having to transfer crypto assets from one blockchain address to another. *Id.* ¶¶ 24, 32. These transactions are confirmed outside of the main blockchain network on other platforms, like Kraken.

In 2013, Kraken launched its "Kraken Trading Platform," which allows Kraken customers to buy and sell crypto assets using an online market. *Id.* ¶ 39. Kraken also provides services for customers to open accounts, deposit funds, enter orders, and trade crypto assets. Through the Kraken Trading platform and other services that Kraken offers, Kraken customers are able to: (1) submit orders for crypto assets and operate a system that attempts to match those orders; (2) open and maintain customer accounts and holding funds and crypto assets that customers have purchased from Kraken or transferred to Kraken; (3) operate "Instant Buy," which is a function where Kraken acts as a counterparty for a customer's request to buy or sell crypto assets; (4) operate the over-the-counter trading desk, which is used to facilitate large crypto asset orders; (5) operate applications that allow Kraken users to access their accounts and place and direct orders; and (6) utilize margin lending for trading in crypto assets.[2] *See* Compl. ¶ 42.

The crypto assets that may be traded on the Kraken Trading Platform and using the Kraken Services may be bought, sold, or exchanged for consideration, including U.S. dollars, other fiat currencies, or other crypto assets. *Id.* ¶ 48. Each unit of a particular crypto asset on the Kraken Trading Platform trades at the same price as another unit of that same crypto asset. *Id.* ¶ 49. They

---

[2] I will refer to these services as the "Kraken Services" throughout this Order.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  are interchangeable. However, Kraken users may buy or sell crypto assets through the Kraken

2  Services at a different price than the contemporaneous price listed on the Kraken Trading

3  Platform. As an example, Kraken could sell a crypto asset through its Instant Buy feature at a

4  different price than the last executed trade or price for which it is currently offered on the Kraken

5  Trading Platform. *Id.* ¶ 51.

6      The crypto assets offered on the Kraken Trading Platform are available for sale to an

7  individual or institution who creates an account with Kraken. *Id.* ¶ 52. Kraken customers can

8  learn about certain crypto assets that they may want to purchase on Kraken's website. Kraken

9  provides information about each crypto asset it makes available for trading, including who created

10 the asset, how it works, its anticipated development, analysis about the future price of the asset,

11 historical information about the price of the asset and any price changes over the past 24 hours and

12 past year, links to purchase the asset on the Kraken Trading Platform or through the Kraken

13 Services, and information promoting the purchase of the asset. *Id.* ¶ 54. Kraken does not limit or

14 restrict the number of assets that a user can purchase. In 2020 and 2021, Kraken earned more than

15 $43 billion in revenue from trading-based transactions, generated in part from fees charged to

16 customers, sales of crypto assets to customers, and proprietary trading. *Id.* ¶ 43. According to the

17 SEC, Kraken does not segregate their customers' crypto assets from its own assets. *Id.* ¶¶ 210-12.

18     **C.**    **Assets Traded on Kraken**

19     The SEC alleges that Kraken, through the Kraken Trading Platform and Kraken Services,

20 made available for trading crypto assets that are offered and sold as investment contracts, and thus

21 as securities. *See* Compl. ¶¶ 58-62. These include, but are not limited to, 11 crypto assets labeled

22 with the following trading symbols: ADA, ALGO, ATOM, FIL, FLOW, ICP, MANA, MATIC,

23 NEAR, OMG, and SOL. Because all the SEC must do is plausibly allege that at least one of these

24 crypto assets is being traded as an investment contract to make its claims feasible, I will focus on

25 its factual allegations regarding two crypto assets: ALGO and SOL.

26     **1.**    **ALGO**

27     "ALGO" is a crypto asset that is the native token of the Algorand blockchain. Compl. ¶

28 239. The Algorand blockchain was created by Silvio Micali, and is promoted by the Algorand

United States District Court
Northern District of California

Foundation Ltd. *Id.* ¶¶ 243-45. The Algorand Foundation is responsible for "protocol governance, token dynamics and supporting grassroots, [and] open-source development on the Algorand ecosystem." *Id.* ¶ 250. Algorand, Inc., is a company that purports to be focused on "layer-1 development of the Algorand Protocol and enabling Enterprise adoption of Algorand blockchain technology." *Id.*

The Algorand blockchain uses a consensus algorithm it calls "pure proof-of-stake," in which each user's ability to influence the choice of a new block is proportional to its stake (i.e., number of tokens) in the system. *Id.* ¶ 239; *see also supra* n.1. To raise capital, the Algorand Foundation conducted an initial ALGO token sale in June 2019, and sold 25 million tokens at $2.40 per token, raising approximately $60 million. *Id.* ¶ 243. Before the token sale, the Algorand Foundation promoted the sale on Twitter and posted a link to its website in the promotion. *Id.* As part of the promotion, the Algorand Foundation advertised a refund policy that allowed those who purchased ALGO tokens to return those tokens to the Algorand Foundation one year after the June 2019 sale at 90% of the original purchase price. *Id.* ¶ 244. It explained the rationale behind this offer:

> "We believe in the underlying value of the Algorand blockchain, the Algo, and the potential of the borderless economy. Our goal is to invest in the growth, sustainability and performance of that economy." *Id.* Also prior to the June 2019 token sale, the CEO of Algorand, Inc., posted a publicly available article stating: "(a) We will be holding our founder's tokens for the long term and will not be selling them. (b) We will use our founder's tokens to participate in consensus and assist in securing the network, though we will never represent more than 49% of the voting. (c) We will use our founder's tokens to support the ecosystem and encourage development."

*Id.* ¶ 252. In August 2019, the Algo Foundation publicly offered ALGO purchasers an early opportunity to exercise the refund opportunity early, and they returned around 20 million tokens to the Algorand Foundation in exchange for a refund that was 85% of the purchase price. *Id.* ¶ 246. Then, in June 2020, ALGO purchasers who did not refund their tokens in August 2019 were publicly offered a second refund window; purchasers returned approximately 5 million ALGO tokens for a refund that was 90% of original purchase price. *Id.* Today, ALGO may be bought, sold, and traded on various crypto asset trading platforms in exchange for fiat currency or certain crypto assets. *Id.* ¶ 248. Kraken is one of those platforms.

Kraken first made ALGO available for buying, selling, and trading on its trading platform in January 2020. *Id.* In February 2022, the Algorand Foundation announced a new section of its website designed to "grow the pipeline of #Algorand developers," called "AlgoHub." *Id.* ¶ 262. Additionally, in a report published in March 2022, the Algorand Foundation publicly stated that it had started a new program to incentivize the "growth of the ecosystem, which is the fundamental need of a maturing blockchain. The program includes a series of loans to help the growth of our DeFi network and to expand the institutional investments in the ecosystem . . . . The Algorand Ecosystem team facilitates the development and growth of the ecosystem and developer pipeline[.]" *Id.* ¶ 260.

In May 2022, the Algorand Foundation publicly stated that it would replace the participation rewards that ALGO holders were entitled to receive with "governance rewards." *Id.* ¶ 258. "Governance" was described as a "decentralized program which allows Algo holders to vote on the future of Algorand," and as "the best way to earn rewards for holding Algo, with [annual percentage yield] of 10.02% - 14.05% seen in previous periods." *Id.* As of September 2022, the Algorand Foundation controls over 3 billion ALGO tokens in wallets that are publicly identified as for "Community and Governance Rewards," "Ecosystem Support," and "Foundation Endowment." *Id.* ¶ 254. Algorand, Inc., and the Algorand Foundation promote the Algorand protocol on Twitter and on their respective websites.

Kraken's website provides investors with analysis about the price of ALGO. It states: "Algorand is a new public blockchain, meaning its technology, while novel, has not yet seen much testing under real-world market conditions . . . . Investors may also see Algorand as a viable part of a cryptocurrency portfolio should they believe that proof-of-stake blockchains, which lower the cost of participating in a blockchain's operation, will ultimately prove more successful in the market." *Id.* ¶ 265.

### 2. SOL

"SOL" is the native token of the Solana blockchain, which was created by Solana Labs, Inc. ("Solana Labs"), a Delaware corporation headquartered in San Francisco, founded in 2018. Compl. ¶ 426. Solana's website states that the Solana blockchain is a network upon which

United States District Court
Northern District of California

United States District Court
Northern District of California

1    decentralized applications ("dApps") can be built and is comprised of a platform that aims to

2    improve blockchain scalability and achieve high transaction speeds. *Id.*

3           To raise capital, between 2018 and 2020, Solana Labs conducted a series of sales to

4    investors. It offered "the sale and issuance of rights to receive Solana Labs, Inc. tokens in the

5    future via a Simple Agreement for Future Tokens (SAFTs)." *Id.* Solana Labs sold approximately

6    8 million SOL and raised approximately $1.76 million in the process. *Id.* ¶ 429. In August 2021,

7    Solana Labs completed another, purportedly private sale of SOL, this time raising $314 million

8    from investors. Each of those investors paid for SOL with fiat currency and was required to sign a

9    purchase agreement. *Id.*

10           In February 2020, Solana Labs began taking steps to make SOL available for trading on

11    crypto asset trading platforms. For example, in a September 17, 2020, Twitter post, Solana Labs

12    stated: "The Solana community in the United States has been eagerly awaiting the chance to trade

13    SOL on a U.S. exchange, and now that day has come. SOL/USDT, SOL/USD, and SOL/BTC

14    pairs are all open for trading on @ftx_us." In another Twitter post later the same day, Solana Labs

15    stated: "@BinanceUS announces Support for SOL, making it the Second US Exchange to list SOL

16    within one day." *Id.*

17           SOL has been available for buying, selling, and trading on the Kraken Trading Platform

18    and through the Kraken Services since approximately June 2021. *Id.* ¶ 430. At various times,

19    Solano Labs publicly stated that it would pool proceeds from its private and public SOL sales in

20    omnibus crypto asset wallets that it controlled and use those proceeds to fund the development,

21    operations, and marketing efforts with respect to the Solana blockchain to attract more users to

22    that blockchain. *Id.* ¶ 435. In connection to a 2021 private SOL sale, Solana Labs stated publicly

23    that it would use investor funds to: (i) hire engineers and support staff to help grow Solana's

24    developer ecosystem; (ii) "accelerate the deployment of market-ready applications focused on

25    onboarding the next billion users into crypto"; (iii) "launch an incubation studio to accelerate the

26    development of decentralized applications and Platforms building on Solana"; and (iv) develop a

27    "venture investing arm" and "trading desk dedicated to the Solana ecosystem." *Id.*

28           Also in public statements, Solana has described its expertise in developing blockchain

United States District Court
Northern District of California

1  networks and described the efforts that it and its founders made and would continue to make to

2  develop the Solana blockchain protocol and attract users to the technology.  *Id.* ¶ 438.  It also

3  promoted its network in other ways, including a Solana podcast, a YouTube channel, and various

4  social media accounts that are linked on its website.  *Id.* ¶ 439.  Solano "burns" (destroys) SOL

5  tokens as part of a "deflationary model" to "reduce the total supply and thereby maintain a healthy

6  SOL price." *Id.* ¶ 441.

7       On its website, Kraken describes SOL's history, team, and development, and provides

8  analysis about the price of SOL.  Its website states: "Solana's comparatively large market cap

9  demonstrates the wider crypto community's belief in the future of the Solana ecosystem," and

10  "[c]rypto market participants that see a longterm prospect in the Solana blockchain may choose to

11  dollar cost average (DCA) in SOL tokens. For those not interested in timing the market or finding

12  the perfect time to buy, dollar cost averaging may be the most effective strategy for accumulating

13  SOL." *Id.* ¶ 444.  Finally, Kraken's website states: "By setting up a recurring buy of SOL, you can

14  accumulate SOL regularly over time. Those that believe in the potential of the Solana blockchain

15  over the long term may choose to simply set up a recurring buy of SOL tokens on a regular basis

16  rather than making a large, one-time purchase of SOL all at once." *Id.* ¶ 445.

17       **D.**     **The SEC and Cryptocurrency**

18       On July 25, 2017, the SEC published the Report of Investigation Pursuant to Section 21(a)

19  of the Exchange Act: The DAO (the "DAO Report").  *Id.* ¶ 37.  The DAO Report advised "those

20  who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take

21  appropriate steps to ensure compliance with U.S. federal securities laws," and found that the

22  offering of crypto assets at issue in the DAO report were securities offerings.  *Id.*  It urged any

23  entity operating as an exchange in crypto securities to register accordingly.  *Id.* ¶ 38.

24       **E.**     **SEC Allegations**

25       The SEC alleges that Kraken operates as a broker-dealer, an exchange, and a clearing

26  agency for transactions in crypto asset securities on its trading platform and through related

27  services.  *See* Compl. ¶¶ 1, 446-52.  The SEC asks this court to: (i) permanently enjoin the

28  defendants from violating Sections 5, 15(a), and 17A of the Exchange Act; (ii) order the

1    defendants to disgorge their "ill-gotten gains," on a joint and several basis, and pay prejudgment

2    interest thereon; (iii) permanently enjoin the defendants from acting as an unregistered exchange,

3    broker, or clearing agency, and (iv) impose civil monetary penalties.  Kraken moves to dismiss the

4    action in its entirety for failure to state a claim.  *See* Motion to Dismiss ("Motion") [Dkt. No. 25].

5                                              **LEGAL STANDARD**

6         Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may dismiss a

7    complaint for failure to state a claim upon which relief may be granted. Dismissal may be based

8    on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a

9    cognizable legal theory." *Godecke v. Kinetic Concepts, Inc.,* 937 F.3d 1201, 1208 (9th Cir. 2019)

10   (cleaned up).  A complaint must plead "sufficient factual matter, accepted as true, to state a claim

11   to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (200) (cleaned up).  A

12   claim is plausible "when the plaintiff pleads factual content that allows the court to draw the

13   reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When evaluating

14   a motion to dismiss, the Court "must presume all factual allegations of the complaint to be true

15   and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of L.A.*, 828

16   F.2d 556, 561 (9th Cir. 1987). "Courts must consider the complaint in its entirety, as well as other

17   sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

18   documents incorporated into the complaint by reference, and matters of which a court may take

19   judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007).

20                                               **DISCUSSION**

21        The central question is this: Has the SEC plausibly alleged that the third-party

22   cryptocurrency assets that are sold, exchanged, and traded on Kraken form the basis of investment

23   contracts such that transactions involving those assets are subject to securities laws?  If the answer

24   is yes, the case may proceed.

25        **A.    Regulation of Securities Markets**

26        Congress enacted the Securities Act of 1933 (the "Securities Act), Pub. L. 73-22, 48 Stat.

27   74, and the Securities Exchange Act of 1934 (the "Exchange Act"), Pub. L. 73-291, 48 Stat. 881,

28   to protect investors in U.S. capital markets by regulating the offer and sale of securities.  The

United States District Court
Northern District of California

Securities Act was meant to "protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce." *Pinter v. Dahl*, 486 U.S. 622, 638, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (collecting cases).[3]  The Exchange Act, one year later, sought to "insure the maintenance of fair and honest markets in [securities] transactions"; it focused on the secondary securities market.  *See* 15 U.S.C. § 78b.  It established the Securities and Exchange Commission (SEC) and gave it broad authority to regulate securities.

Section 2(1) of the Securities Act defines the term "security" to include:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract*, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.  15 U.S.C. § 77b(a)(1) (emphasis added).

The Securities Act defines "security" as including "investment contracts."  *See* 15 U.S.C. § 77b(a)(1).

The Supreme Court has defined an investment contract as "an investment of money in a

---

[3] "Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a), (c), make it unlawful to offer or sell a security in interstate commerce if a registration statement has not been filed as to that security, unless the transaction qualifies for an exemption from registration." *See S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1085 (9th Cir. 2010); 15 U.S.C. §§ 77e(a), (c), (e). The registration requirement arose with the 1933 Securities Act and was designed to be a principal statutory tool for protecting the public. *See Platforms Wireless*, 617 F.3d at 1085.

To establish a Section 5 violation, the plaintiff must point to evidence that: (1) no registration statement was in effect as to the securities; (2) the defendant sold or offered to sell the securities; and (3) the sale or offer was made through interstate commerce. *See S.E.C. v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007) (quoting *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 212 (3d Cir. 2006)). "By its terms, Section 5 of the 1933 Act creates liability for any securities sale for which 'a registration statement is [not] in effect;' it does not limit liability to initial distribution." *See id.*; 15 U.S.C. § 77e(a).

*United States District Court*
*Northern District of California*

common enterprise with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) (*Howey*).[4] This definition has remained largely unchanged since 1946. The SEC alleges that certain crypto assets sold, exchanged, and traded on Kraken fall within the definition of "security" because they are offered and sold as "investment contracts," first by their primary issuers and then by Kraken. Compl. ¶ 1.

Kraken insists that the SEC has not plausibly alleged that these transactions meet the *Howey* test for investment contracts. It argues that the SEC cannot show an ongoing link between the issuer of a crypto asset and a Kraken customer, meaning that even if the primary offerings of the cryptocurrency assets that are later sold, exchanged, or traded on Kraken do constitute investment contracts, when those same assets are later traded on Kraken, they no longer pass the *Howey* test. *See* Kraken Reply ("Reply") [Dkt. No. 69] 8. The SEC responds that controlling authority requires the court to examine the totality of the circumstances and the economic reality surrounding each transaction when it determines whether a transaction qualifies as an investment contract; it contends that the totality of the circumstances as pleaded show that the assets available for transaction on Kraken form the basis of investment contracts and therefore qualify as securities. Oppo. 13-14. It points out that courts around the country have regularly found the sale, exchange, and trade of crypto assets on "secondary markets" to be investment contracts. *Id.*

*Howey* and its progeny require any court considering whether a secondary market transaction constitutes an offer or sale of an investment contract to apply the same analysis that it would if that transaction were to occur on a primary market. The determinative factor does not involve the nature of the platform upon which the asset is transacted, but rather the reasonable expectations of the individual initiating the transaction. That analysis considers the totality of the circumstances and the economic reality of transaction.

---

[4] As I discuss later, *see infra* Section C(4), the Ninth Circuit in *SEC v. Glenn Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973) held that whether something constitutes an investment contract requires courts to consider "whether efforts made by those other than the investor are *undeniably significant ones*, those essential managerial efforts which affect the failure or success of the enterprise." *Id.* at 482. That remains the state of the law today.

11

### B.     The *Howey* Test for Investment Contracts

As discussed, the Exchange Act limits the SEC's jurisdiction to transactions in "securities," which the statute provides includes "investment contracts." 15 U.S.C § 78c(a)(10). Though Congress has never defined "investment contract," the United States Supreme Court interpreted the term to mean "an investment of money in a common enterprise with profits to come solely from the efforts of others." *Howey*, 328 U.S. at 301, 66 S.Ct. 90.  In *Howey*, the Court found that "all the elements of a profit-seeking business are present [where] [t]he investors provide the capital and share in the earnings and profits; the promoters manage, control, and operate the enterprise."  *Id.* at 300, 66 S.Ct. 1100.

The term "investment contract" must be read broadly to address the multitude of money-making schemes that Congress could never have anticipated in 1934 when the Securities Act was passed.  As the Court explained in *Howey*, "investment contract" "embodies a flexible rather than static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek to use the money of others on the promise of profits." *Howey*, 238 U.S. at 299, 66 S.Ct. 1100.  In 1967, the Court added that when courts analyze whether a contract, transaction, or scheme is an investment contract, "form should be disregarded for substance and the emphasis should be on economic reality [and the] totality of circumstances." *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967).

The Ninth Circuit has distilled the *Howey* rule into a three-part test.  To qualify as an investment contract, there must be "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others."  *See Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009) (laying out the elements of the *Howey* test); *Hocking v. Dubois*, 885 F.2d 1449, 1456 (9th Cir. 1989).  As the Ninth Circuit noted in *Hocking*, the first prong has proved "relatively simple" but the second two have "evolved with time." *Hocking*, 885 F.2d at 1455.  The second prong's requirement of a "common enterprise" has been construed by the Ninth Circuit as "demanding either an enterprise common to the investor and the seller, promoter or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality)."  *Id.*  For the third prong, demanding an expectation of profits produced by the

efforts of others, the Ninth Circuit requires that "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.* (citing *SEC v. Glenn Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973)). Application of these principles to the nascent cryptocurrency industry calls for careful examination of each party's understandings and expectations, and analysis of substance rather than form. *See e.g. Securities and Exchange Commission v. Binance Holdings Limited*, 2024 WL 3225974 (D.D.C. Jun. 28, 2024) ("*Binance*"); *SEC v. Telegram Group Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020); *see also SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 321 (S.D.N.Y. 2023) ("*Ripple Labs I*"), *motion to certify appeal denied*, 697 F. Supp. 3d 126 (S.D.N.Y. 2023) ("*Ripple Labs II*").

### 1.    No Formal Contract or Post-Sale Obligations Required

Before considering each element of *Howey*, I will address a baseline dispute the parties have about the degree of contractual formality required for something to qualify as an investment contract.[5] Kraken argues that an investment contract requires "post-sale obligations" from the issuer to the receiver; the SEC insists that it does not. The weight of authority, both recent and well-established, favors the SEC.

The Ninth Circuit's decision in *Hocking v. DoBois* is instructive: "In attempting to determine whether a scheme involves a security, the inquiry is not limited to the contract or other written instrument. 'Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale. Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract

---

[5] For reasons that are not obvious to me, the SEC spends a considerable amount of its opposition arguing that the term "investment contract" does not require a *written* agreement between parties. *See* SEC's Opposition to Defendants' Motion to Dismiss ("Oppo.") [Dkt. No. 60] 7-12. This is odd because Kraken never argues that it does. *See generally*, Motion; *see also* Reply 3. Kraken argues that an investment contract must involve some kind—any kind—of recognizable contract. *See* Motion 10-13. But nowhere that I can find does Kraken seek to import a written agreement requirement onto the definition. Kraken does overly constrain the definition of an investment contract, just not in the way the SEC says it does. I will assess Kraken's argument in support of dismissal independent of the SEC's portrayal of that argument.

United States District Court
Northern District of California

case.'" *Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989) (quoting *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039-40 (10th Cir. 1980) (citations omitted)).

Kraken points out that the Supreme Court drew the definition of "investment contract" from the state "blue sky" laws, and the blue sky cases all involved a contract of some kind. *See* Motion 12. It cites multiple cases for the principle that an investment contract requires some kind of contract. *See e.g.*, *Warfield v. Alaniz*, 569 F.3d 1015, 1018, 1020-24 (9th Cir. 2009); *Hocking*, 885 F.2d at 1458-59; *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1131-33 (9th Cir. 2013). While all these cases involved more traditional contracts than the type that the SEC alleges in this case, that proves little.

Indeed, Kraken's authority contradicts its argument. The Ninth Circuit has explained that in defining the term "investment contract," *Howey* "uses the terms 'contract, transition, or scheme,' … leaving open the possibility that the security is not formed of one neat, tidy certificate, but a general 'scheme' of profit seeking activities." *Hocking*, 885 F.2d at 1457 (internal citations omitted). That principle is well-settled: Investment contracts are not limited to actual contracts. Numerous courts have found that crypto assets were properly alleged to form investment contracts in cases where there was no underlying formal written or oral contract. *See e.g. Patterson v. Jump Trading LLC*, 2024 WL 49055 (N.D. Cal. Jan. 4, 2024) (finding that the plaintiffs had plausibly alleged that crypto assets were offered and sold as investment contracts despite there being no clearly identifiable contract with post-sale obligations between the buyers on the trading platform and the issuer of the tokens, but dismissing the case on other grounds); *Sec. & Exch. Comm'n v. NAC Found., LLC*, 512 F. Supp. 3d 988, 995 (N.D. Cal. 2021) (applying the *Howey* test to crypto assets exchanged on the NAC Foundation blockchain and finding that the SEC had plausibly alleged the defendants' sale of an unregistered security); *SEC v. Terraform*, 684 F. Supp. 3d 170, 194 (S.D.N.Y. 2023) ("*Terraform I*") (where the Hon. Judge Rakoff observed that "by stating that 'transaction[s]' and 'scheme[s]' and not just 'contract[s]' qualify as investment contracts, the Supreme Court made clear in *Howey* that Congress did not intend the term to apply only where the transacting parties had drawn up a technically valid written or oral contract under state law."); *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 178 (D. Conn. 2020) ("[A]n ongoing contractual

*United States District Court*
*Northern District of California*

14

1    obligation is not a necessary requirement for a finding of a common enterprise . . . The contractual

2    language is important to, but not dispositive of, the common enterprise inquiry, and courts

3    regularly consider representations and behavior outside the contract.").

4           Part of Kraken's argument in favor of a stricter understanding of what qualifies as an

5    investment contract may arise from the SECs inconsistent manner of discussing the assets in

6    question.  Sometimes the SEC strays into alleging that the crypto assets themselves—as in, the

7    individual tokens bought, sold, and traded on Kraken's platform—are investment contracts.  *See*

8    Motion 2:25-3:4.  Kraken is correct that other courts have rejected this perspective.  *See e.g.*,

9    *Ripple Labs I*, 682 F. Supp. 3d at 324 (a digital asset "is not in and of itself" an investment

10   contract under *Howey*); *Terraform I*, 684 F. Supp. 3d at 193 (the court need not "restrict its *Howey*

11   analysis to whether the tokens themselves – apart from any of the related various investment

12   protocols – constitute investment contracts").  The SEC confuses its case by referring to the assets

13   at issue as "crypto assets securities" throughout its complaint.  But this is a semantics error that

14   does not obscure the SEC's theory of liability.  The SEC's theory of liability is that Kraken

15   violates federal securities laws by "operating a platform on which crypto assets are offered and

16   sold as investment contracts," and that Kraken customers can buy and sell crypto assets which

17   "*form the basis* of investment contracts covered under U.S. Securities laws."  *See e.g.*, Compl. ¶¶

18   1, 4, 60-61 (emphasis added).  This is a theory that other courts have allowed to advance and is

19   consistent with *Howey*.  The SEC alleges that the circumstances surrounding the sale, purchase, or

20   exchange of crypto assets on Kraken are such that those transactions involve investment contracts.

21   Whether or not that is true will be determined after discovery.

22          In short, the blue sky laws from which *Howey* drew inspiration may have involved more

23   formal contracts, but the Court in *Howey*, the Ninth Circuit in *Hocking*, and numerous courts since

24   have made clear that contractual formalities are not required for something to qualify as an

25   investment contract, and therefore a security.  What counts is the totality of the circumstances

26   surrounding a sale, trade, or exchange, and the expectations of the investor.  Kraken's argument

27   would improperly constrain *Howey*.

28

United States District Court
Northern District of California

**2.** **Secondary Market Transactions on Kraken are Subject to the *Howey* Test**

The parties disagree about the degree to which Kraken's nature as a secondary market for cryptocurrency transactions changes the way the transactions are considered when determining whether the SEC has plausibly alleged that they constitute investment contracts. Ultimately, the resolution is simple: The *Howey* test applies wherever a court seeks to determine whether a transaction involves an investment contract, regardless of whether that transaction is on a primary or secondary market. As the court in *Ripple Labs I* anticipated, "[w]hether a secondary market sale constitutes an offer or sale of an investment contract would depend on the totality of the circumstances and the economic reality of that specific contract, transaction, or scheme." *Ripple Labs I*, at 329, n.16.[6]

The parties' disagreement is understandable. The Ninth Circuit has not provided specific guidance on whether or how secondary-market cryptocurrency transactions should be examined under *Howey*. But as Kraken noted at oral argument and in its papers, the court in *Hocking* did provide general guidance on how to determine whether a secondary market transaction is an investment contract. *See Hocking*, at 1455-56 (where the court considered whether a condominium that plaintiff had purchased from defendant on the secondary market formed the basis of an investment contract and thus constituted a security). Nothing about the nature of cryptocurrency necessitates analysis that departs from this precedent.

*Hocking* does not support Kraken's position as well as it thinks. In *Hocking*, plaintiff purchased a condominium and entered into a rental pool agreement ("RPA") on the secondary market using an agent and brokers, whom he later sued for fraud under securities laws. *See Hocking*, at 1453. The district court entered summary judgment for the defendants, finding that Hocking had not purchased a security. But the Ninth Circuit reversed, finding that issues of fact precluded summary judgment on whether Hocking's purchase constituted an investment contract and thus a security. After comparing the case to *Howey* and considering whether and to what degree Hocking's purchase of the condominium on the secondary market rather than directly from

_____

[6] The court did not have to consider secondary market sales in *Ripple Labs I* but was rather anticipating what a judge in my situation today would have to do.

United States District Court
Northern District of California

1   the developer affected the purchase's status, the court found that there were issues of fact

2   precluding summary judgment concerning whether the transaction constituted an investment

3   contract under *Howey* and remanded the matter to the district court to consider those issues.[7]

4       The defendants in *Hocking* argued that his case failed as a matter of law because the

5   uncontested facts established that he had not purchased a security when he purchased the

6   condominium and entered the associated RPA.  In weighing that argument, the court considered

7   that: (1) Hocking did not purchase the condominium in the initial offering from the developer, but

8   instead on the secondary market; (2) Hocking entered the relevant RPA with an entity

9   disconnected from the developer; and (3) unlike the investors in *Howey*, Hocking could legally

10  terminate his RPA at any time.  But the court found none of these factors precluded as a matter of

11  law Hocking's purchase from qualifying as an investment contract subject to securities laws.

12      The court held, in an en banc opinion, that "[i]n the context of isolated resales, each case

13  requires an analysis of how the [asset in question] was promoted to the investor, including any

14  representations made to the investor, and the nature of the investment and the collateral

15  agreements." *Hocking*, at 1462.  Moreover, "[t]he investor's intentions and expectations

16  communicated to the broker would be relevant in determining what investment package was

17  actually offered." *Id.*  The court's conclusions were entirely based on its application of the *Howey*

18  test.  *See id.* at 1457.  The defendant in *Hocking* attempted to distinguish Hocking's purchase from

19  the investment in *Howey* by arguing that Hocking did not show what defendant argued were

20  "necessary links" between the developer and the real estate agent and broker whom he sued for

21  fraud.  But the Ninth Circuit was unconvinced, noting that Hocking "has not claimed that [those

22  individuals] sold him a security [but instead] [h]e claims that by promoting the . . . condominium

23  'with an emphasis on the economic benefits to be derived from the managerial efforts of third

24  parties designated or arranged for by [defendant],' and by including with the condominium an

25  offer for a rental arrangement . . . [defendant] offered [Hocking] a security." *Id*.  As Kraken noted

26

27  ───────────────

28  [7] The Ninth Circuit's panel decision reversing and remanding the district court's decision was
    withdrawn for rehearing en banc.  The Ninth Circuit's en banc opinion noted that the panel's
    decision "may have written too broadly" on when secondary market sales constitute securities.

17

at oral argument, the court considered what the transaction looked like to the purchaser in the secondary market; it considered what the real estate agent represented to Hocking and what he possibly reasonably believed to be true of his investment as a result of those representations.[8]

In short, binding authority requires the court to evaluate whether an investment contract is formed in a secondary market to consider the features of that secondary market transaction. It does not require that the court ignore anything that happened in a primary market transaction; if a reasonable investor would understand representations made during the primary market transactions to carry forward into the secondary market, then those representations may be considered. What matters are the reasonable expectations of the investor. That a transaction does not involve the asset's primary issuer does not foreclose the possibility that the primary issuer's representations follow the asset through to the secondary market.

At oral argument, Kraken revealed that it has the same general understanding of *Hocking*, but it reaches different conclusions when it applies the rule here. Kraken argues that the SEC fails to plausibly allege that the secondary market transactions on Kraken were investment contracts because it "[does not] analyze the alleged features of the actual transactions on Kraken," and instead focuses on the actions of the primary issuers. But I do not find the allegations to be as sparse as Kraken says they are.

### C. Elements of an Investment Contract

The SEC alleges that Kraken is acting as an unregistered broker, dealer, and exchange by

---

[8] Some courts outside of this circuit have declined to distinguish between primary and secondary market transactions at all. *See e.g. Terraform I*, 684 F. Supp. 3d at 197 (holding that *Howey* makes no distinction between purchasers, and "[t]hat a purchaser bought the coins directly from the defendants, or instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts."). Others have dealt with the issue directly, choosing to apply the *Howey* test and consider the economic reality of secondary market transactions and consider the economic reality surrounding them, *see e.g. Ripple Labs I*, 682 F. Supp. 3d at 329, n. 16 (whether a secondary market sale constitutes an offer or sale of an investment contract would depend on the totality of circumstances and the economic reality of that specific contract, transaction, or scheme[]"); *see Binance*, 2024 WL 3225974, at *19 (agreeing with *Ripple Labs I*).

I align with those courts in the second camp but note that even those courts did not consider the exchange of third-party tokens on secondary platforms, which is at issue in this case. This appears to be the first case where a court has considered that situation.

facilitating transactions in investment contracts without registering with the SEC. Its allegations concern crypto assets that are not issued by Kraken but by other cryptocurrency networks; the third party-issued tokens then form the basis of transactions on Kraken. As discussed, the fact that the transactions in question occurred on a secondary market does not by itself prevent those transactions from involving investment contracts, it simply means that the *Howey* test must be applied to the transactions as they occurred on the secondary market. While the other cited cases did not involve transactions with third-party tokens, those transactions are still subject to the *Howey* test.

### 1. The Crypto Assets Are Not Themselves Investment Contracts

Numerous courts have distinguished between the digital assets and the offers to sell them before engaging in an analysis of whether cryptocurrency transactions constitute investment contracts. The distinction is valuable. Although the way the SEC labels the crypto assets at issue—as "crypto asset securities"—is unclear at best and confusing at worst, I do not understand the SEC to be alleging that the individual cryptocurrency tokens in which Kraken enables transactions are themselves securities. The meat of the SEC's pleadings alleges that during their initial offerings and throughout subsequent transactions on Kraken, those assets were offered as, or sold as, investment contracts. *See e.g.*, Compl. ¶¶ 62-64. This is an acceptable framing, and one that the SEC has repeatedly advanced in other cases.

The court in *Ripple Labs I* makes that point. She said, "*Howey* and its progeny have held that a variety of tangible and intangible assets can serve as the subject of an investment contract . . . . In each of these cases, the subject of the investment contract was a standalone commodity, which was not itself inherently an investment contract. Here, defendants argue that [the crypto asset] does not have the 'character in commerce' of a security and is akin to other 'ordinary assets' like gold, silver, and sugar . . . This argument misses the point because ordinary assets – like gold, silver, and sugar – may be sold as investment contracts, depending on the circumstances of those sales." *Ripple Labs I*, 682 F. Supp. 3d at 324. This is consistent with the Supreme Court's earliest analysis of what constitutes an investment contract; the seminal investment contract case, *Howey*, considered the economic realities surrounding orange groves and investors' expectations

United States District Court
Northern District of California

surrounding them.  Orange groves are no more securities than cryptocurrency tokens are.  But the contracts and expectations surrounding the sale of both may form an investment contract, bringing them within the purview of the Act.  *See Howey*, 328 U.S. 293, 66 S.Ct. 1100.[9]

### 2. "Investment of Money"

An investment contract requires an investment of money in a common enterprise.  *See Howey*, at 293; *see also Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009).  The SEC must first show that "the investor commit[ed] his assets to the enterprise in such a manner as to subject himself to financial loss." *See Warfield*, 569 F.3d at 1021; *see also Patterson v. Jump Trading, LLC*, 2024 WL 49055, at *11 (N.D. Cal. Jan 4, 2024) (citing *Warfield*).  It alleges that investors committed fiat currency or crypto assets for the crypto assets available for purchase, sale, and trade on Kraken's network.  *See* Compl. ¶¶ 229, 243, 270, 284-86, 290, 317-18, 338, 354, 375, 381, 393, 408, 428-29.  This constitutes an investment of money in an enterprise.

Kraken agrees that the *initial* offering of the Kraken-Traded digital assets involve an investment of money.  Motion 16-17.  But it argues that once the asset hits the resale market on Kraken's platform, that investment does not follow the asset, meaning that an asset that may have originally met the first *Howey* prong no longer does upon resale.  Kraken's perspective is too narrow.[10]

The Court in *Howey* said nothing about an investment of money requiring privity between the issuer and the investor, nor has Congress ever drawn such boundaries around what constitutes an investment contract.  It defies common sense to suggest that when someone purchases crypto assets from a reseller or another investor, that person or entity does not understand themselves to be investing money in the asset.  The Ninth Circuit has held that the investment of money in

---

[9] The SEC should be careful going forward to maintain this distinction.  To the extent it tries to argue that the individual tokens that form the basis of transactions on Kraken are investment contracts, or are themselves securities, its argument cannot proceed.

[10] *See e.g. SEC v. Coinbase, Inc.*, 2024 WL 1304037, at *24 (S.D.N.Y. Mar. 27, 2024); *Terraform I*, 684 F. Supp 3d at 197; *In re Ripple Labs, Inc. Litig.*, No. 18-cv-06753-PJH, 2024 WL 3074379 (N.D. Cal. June 20, 2024) (where the Hon. Phyllis Hamilton, at summary judgment in a private securities class action, declined to find that there was no "investment of money" from exchange-based purchasers as a matter of law, basing her conclusion partly on the decisions in *Coinbase* and *Terraform I*).

United States District Court
Northern District of California

1    question does not have to go to the issuer of the would-be investment contract; it can go to a third-

2    party. *See Hocking v. Dubois*, 885 F.2d 1449, 1459 (9th Cir. 1989).[11]

3          Recently, Judge Hamilton refused to find as a matter of law that crypto purchasers on a

4    secondary market had not made an "investment of money" sufficient to satisfy the *Howey* test.

5    *See In re Ripple Labs, Inc. Litigation*, 2024 WL 3074379, at *7 (N.D. Cal. Jun. 20, 2024).

6    Defendants there argued that there was no investment of money from exchange-based purchasers

7    because their money went to the exchange sellers, rather than directly to defendants, who were the

8    primary issuers of the relevant crypto asset. *Id.* But Judge Hamilton noted that other courts had

9    rejected that argument, and defendants cited no caselaw that supported their position. *See id.*

10   (collecting cases).

11         Kraken has failed to point to any case that would support its position on the first *Howey*

12   prong. The SEC has plausibly alleged that Kraken users who purchased assets on Kraken's

13   platform made an "investment of money."[12]

14

15   [11] This makes *Inline Utilities, LLC v. Schreiber*, 2020 WL 4464463 (S.D. Cal. Aug. 4, 2020)
     (*Inline*), a case upon which Kraken relies for its argument that the SEC has not plausibly alleged
16   an "investment of money", inapplicable. The plaintiff in *Inline* alleged that a lump sum payment it
     made to defendants to secure for itself a portion of defendants' future revenue formed the basis of
17   an investment contract, such that defendants' eventual refusal to pay plaintiff the agreed-upon
     portion constituted security fraud. *See Inline*, 2020 WL 4464463, at *2-*3. In dismissing the
18   case, the court found no investment of money under *Howey* for several reasons, none of which are
     applicable here. For example, the court observed that "[w]hile Plaintiff may have invested in
19   Defendants, Defendants' profits seemingly were not dependent upon Plaintiff's investment." *Id.* at
     *3. In contrast, here, the SEC alleges that money purchasers invested in crypto assets directly
20   contributed both to the profits of the assets' issuers and to Kraken's profits. Moreover, plaintiff in
     *Inline* did not allege that defendants "actively invested in [the] profit-sharing contract . . . plaintiff
21   simply gave money to Defendants and, in return, Defendants allegedly agreed to pay Plaintiff a
     fixed percentage of their share [of the contract-generated revenue]." *Id.* Here, it can hardly be
22   argued that purchasing cryptocurrency is not an investment; the cryptocurrency market is volatile,
     and there are no guaranteed returns. The *Inline* court also held that where investors are "several
23   steps removed from an investment in any actual contract or enterprise," the first *Howey* prong is
     not satisfied. *Id.* Kraken seizes upon this language to argue that because the assets at-issue were
24   originally purchased from issuers, not Kraken, the degrees of separation diffuse any investment of
     money that happened at the original transaction. But as the court held in *Hocking*, the investment
25   of money need not go to the issuer of the would-be investment contract; it can go to a third party.
     The critical component is that the investor part with her money.

26   [12] The SEC's allegations in this case are distinguishable from those that the Hon. Amy Berman
     Jackson found implausible in *SEC v. Binance Holdings Limited*, 2024 WL 3225974 (Jun. 28,
27   2024) ("*Binance*"). There, while Judge Jackson allowed several claims to proceed, she did not
     allow a claim alleging that Binance offered and sold BUSD (a token issued on another blockchain,
28   Ethereum) as an investment contract and therefore a security. *See Binance*, at *25. This was

United States District Court
Northern District of California

3. "Common Enterprise"

The closest question is whether the SEC has plausibly alleged that Kraken users invested their money in a "common enterprise" as is required by the second *Howey* prong. Kraken argues that "[w]ithout any connection between the issuers and Kraken customers, the SEC . . . cannot demonstrate a common enterprise." Motion 17:7-10. The SEC responds that Kraken's position reflects a self-serving, narrow interpretation of *Howey* and its progeny. Both parties insist the caselaw is on their side. In truth, this situation is sufficiently novel to render the caselaw instructive only to a point.

The Ninth Circuit defined the term "common enterprise" to mean "one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties." *SEC v. Glenn Turner Enterprises, Inc.*, 474 F.2d 476, 482, n.7 (9th Cir. 1973). A "common enterprise" exists where the investment scheme involves either "strict vertical commonality" or "horizontal commonality." *See Hocking*, 885 F.2d at 1455; *see also Sec. & Exch. Comm'n v. Wahi*, No. 2:22-CV-01009-TL, 2024 WL 896148, at *5 (W.D. Wash. Mar. 1, 2024) (explaining that a common enterprise requires "either an enterprise common to the investor and the seller, promoter or some third party (vertical commonality) or an enterprise common to a group of investors (horizontal commonality).") (citing *Hocking*, 885 F.2d at 1455)).

Vertical commonality may be established by showing " 'that the fortunes of the investors are linked with those of the promoters.'" S.*E.C. v. R.G. Reynolds Enterprises, Inc*., 952 F. 2d 1125, 1130 (9th Cir. 1991) (quoting *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F. 2d 459, 463 (9th Cir. 1985)). "One indicator of vertical commonality, though by no means the only

---

because while the SEC did allege that Binance offered and sold BUSD to investors on its platform, the way BUSD was promoted led potential buyers to believe the proceeds from their purchase would be used exclusively on "profit-generating opportunities" for the benefit of Binance and another company. Judge Jackson observed that there were "[n]o facts alleged to support an inference that this [plan] advanced the fortunes of those who bought the BUSD tokens, *or that they reasonably expected to share in the companies' profits in the form of a return on their investment*." *Id.* The same is not true here, where the SEC has alleged, with respect to many crypto assets offered on Kraken, that those assets' promoters represented to potential investors that they could expect to personally profit from their purchase, often as a result of network development efforts put forth by the promoters and networks themselves. Kraken allegedly republished some of those representations.

indicator, is an arrangement to share profits on a percentage basis between the investor and the seller or promoter." *Id.*

Kraken argues that the SEC has failed to plead facts showing vertical commonality because the Complaint "alleges no relationship . . . between any issuer and purchaser on Kraken," and there are "no plausible allegations that the success of the issuer's enterprise was 'interwoven' or directly correlated with the profits or losses of the buyer, as the Ninth Circuit requires." Motion 18:6-225 (quoting *Brodt v. Bache & Co., Inc*, 595 F.2d 459, at 460-61 (9th Cir. 1978)). I disagree. The Complaint alleges that the fortunes of promoters and investors are linked to the value of the various crypto assets that are sold, exchanged, and traded on Kraken. Compl. ¶¶ 231-32, 242, 246, 252-54. 272, 278, 288, 298, 307, 320, 325-26, 342, 345, 357, 363, 377, 383, 387, 395, 398, 411, 414, 432, 436. This is because the promoters of some crypto assets on Kraken allegedly retain ownership or control over billions of the tokens they promote. *See* Compl. ¶¶ 240, 253 (alleging that the Algorand Foundation, which issues the ALGO token, "controls over 3 billion ALGO tokens in wallets publicly identified as for 'Community and Governance Rewards,' 'Ecosystem Support,' and 'Foundation Endowment'"). The SEC points out that courts in this district have found a common enterprise where the SEC alleged that promoters of a crypto asset held a "significant amount" of the asset they promote, and pooled proceeds to develop a blockchain ecosystem. *See Jump Trading*, 2024 WL 49055, at *1.

Kraken offers the recent decision from the District Court for the District of Columbia, *SEC v. Binance Holdings Limited*, 2024 WL 3225974 (D.D.C. Jun. 28, 2024) as authority disfavoring the SEC's position.[13] There, the court carefully considered, among other things, whether the SEC had plausibly alleged that defendant Binance enabled transactions in investment contracts when it offered its native cryptocurrency, BNB, for sale, exchange, and trade on its platform. Binance moved to dismiss on the grounds that secondary market transactions were not investment contracts under *Howey*, making a very similar argument to the one Kraken advances in this case. *See id.* at *19. The court found the "absence of allegations" on how the assets in question were sold and

---

[13] The parties provided supplemental briefing on *SEC v. Binance*. *See* Dkt. Nos. 88, 89.

what a purchaser in the marketplace would reasonably understand that asset to represent to justify dismissal of the SEC's claims with respect to secondary market transactions. *See id.* It said that the SEC's complaint in *Binance* contained "very little concerning how BNB was actually promoted and sold after the [initial offering]." *Id.*

The *Binance* court followed the approach in *Ripple Labs I* to evaluating secondary market transactions: "Whether a secondary market sale constitutes an offer or sale of an investment contract would depend on the totality of circumstances and the economic reality of that specific contract, transaction, or scheme." *Binance*, at *19 (quoting *Ripple Labs I*, 682 F. Supp. 3d at 329, n.16). The court found the SEC's allegations on secondary market transactions to be scant; it wrote that the SEC's complaint "repeatedly hearken[ed] back to 'the circumstances under which the assets in this case *were* offered and sold' . . . but those do not go so far as to establish its contention that 'BNB *is* offered and sold as an investment contract'." *Id.* at *20. Essentially, the SEC's allegations in *Binance* did not advance much further than the initial coin offering ("ICO"). As the court noted, "[i]t may be that the SEC can establish that sales after the ICO or certain groups of secondary sales meet the criteria of an investment contract," as it did in *Telegram*, 448 F. Supp. 3d 380-81 (finding based upon all of the surrounding facts and circumstances that secondary sales of the crypto currencies at issue were an offering of securities under *Howey* because the crypto currencies were initially sold with the intent that the institutional buyers re-sell them on the secondary market).

The SEC's allegations here are more fulsome than they were in *Binance*. First, the SEC does not lean, as it did in *Binance*, on the "contradictory" allegation that the crypto assets themselves are securities. *Compare Binance*, at *21-*22 (recapping the motion hearing and stating that "[i]nsisting that an asset that was the subject of an alleged investment contract is itself a 'security' as it moves forward in commerce and is bought and sold by private individuals on any number of exchanges, and is used in any number of ways over an indefinite period of time, marks a departure from the *Howey* framework that leaves the Court, the industry, and future buyers and sellers with no clear differentiating principle between tokens in the marketplace that are securities and tokens that aren't"), *with* Compl. ¶ 1 ("[s]ince 2013, Kraken has operated an online trading

United States District Court
Northern District of California

platform through which its customers can buy and sell crypto assets, many of which *form the basis* of investment contracts covered under U.S. securities laws"), *and* Compl. ¶ 14 (alleging that Kraken allows "many of the crypto assets" in question to be "offered, bought and sold as investment contracts"), *and* Compl. ¶ 61 ("[e]ach of the Kraken-Traded Securities was offered and sold *as part of an* investment contract") (emphasis added in each).[14]

The SEC's allegations in *Binance* forced the court to apply the *Howey* test to the crypto assets *themselves*. *See Binance*, at *22. And even then, the court noted that "[i]t may well be, as the government maintains, that the 'common enterprise' is ongoing, since the fortunes of all token holders rise and fall together and that their fortunes are largely tied to those of the company and its platform or 'ecosystem,' but that element alone is not sufficient." *Id.* In *Binance*, unlike here, *see infra* Section C(4), the SEC did not allege that investors had any "expectation of profits" in the form of a return on investment generated by the efforts of others.

Here, the SEC has plausibly alleged vertical commonality between the investors using Kraken to purchase crypto assets and the promoters whose job it is to promote those assets and grow their associated networks. This allegation is sufficient to meet the second *Howey* prong, at least at this stage. Whether it can ultimately prove that commonality remains to be seen.[15]

### 4. "Expectation of Profits Due to Efforts of Others"

The third *Howey* prong requires that the SEC plausibly allege that the investor has been led to expect profits produced by the efforts of others. *Rubera*, 350 F.3d at 1090-91; *Hocking*, 885 F.2d at 1460. Kraken argues that the SEC has failed to meet this standard for three main reasons.

First, it asserts that "binding precedent distinguishes between investing in a business . . . and buying the output of a business." Motion 19; Reply 13:9-19 (comparing the crypto assets on

---

[14] As discussed earlier, the SEC's complaint here does occasionally stray into referring to the crypto assets themselves as securities, and to the extent it does, I do not credit its allegations. But it more consistently asserts that the crypto assets offered for sale, exchange, and trade on Kraken's platform form the bases for investment contracts, because Kraken users invest money into those assets with the expectation of profits due to efforts advertised by the assets' issuers, and rebroadcast by Kraken.

[15] Because the SEC has plausibly alleged vertical commonality between investors and promotors, I do not address whether it has also plausibly alleged horizontal commonality.

Kraken to gold and silver purchased by investors in other cases, where courts found that those investors could not reasonably expect the seller to influence global precious metal markets, so the third *Howey* prong was unmet). This argument comes up short because the Complaint alleges that promoters for the various crypto assets identified by the SEC worked to create the networks or "ecosystems" that would support the value of the digital assets they distributed. *See e.g.* Compl. ¶¶ 238, 263, 297. Kraken says that the Complaint does not allege that the crypto assets in question were dependent upon the efforts of the issuers to remain on the market. Reply 13:16-19. But it points to no caselaw suggesting that the SEC must so allege; the Ninth Circuit requires that the investor have an expectation of profit arising from others' efforts, not that she would have zero expectation of profit but for that effort. *See Glenn*, 474 F.2d at 482 (liberally interpreting the final *Howey* element, which calls for an expectation of profits "solely" from the efforts of others, and adopting a "more realistic test, whether efforts made by those other than the investor are *undeniably significant ones*, those essential managerial efforts which affect the failure or success of the enterprise.") (emphasis added).

Second, Kraken contends that promotional statements alone are insufficient without a "'reference in the contracts to an obligation,' which the SEC concedes is absent here." Reply 14:1-11; Motion 20-21. Again, the caselaw does not support its position. The case it relies upon, *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297 (9th Cir. 1979), where the court considered whether a land sale contract constituted an investment contract, does not say that the third *Howey* prong requires a per se obligation to improve the subject of the would-be investment contract. Rather, the court merely noted the absence of such a contractual obligation, along with other factors, when determining that the promotional statements in that case were insufficient to confer upon the plaintiff a reasonable expectation of profits from the efforts of others. Moreover, *De Luz* is inapposite because the promotional statements that the court considered were vaguer than those the SEC alleges here.[16] *Compare* Compl. ¶¶ 238, 260-63, 297, 438-39 (detailing the

---

[16] Kraken first cited *De Luz* for the idea that an investment contract required post-sale obligations, an argument I already discredited. *See Supra* Section A(1).

specific promises various promoters made about network development, including the Algorand

Foundation's promises about its ALGO token, and Solana's promises about its SOL token), *with*

*De Luz*, 608 F.2d at 1301 (stating that defendant never represented it would "develop, improve, or

manage" parcels of land in which plaintiff invested). Nevertheless, Kraken insists that the fact

that it republished the promotional statements made by the issuers of the cryptocurrency available

for transactions on its platform "does not rescue the Complaint," because none of the statements

create "a contractual obligation by the issuer." Motion 21:23-22:7. They did not have to.

Finally, Kraken compares this case to *Ripple Labs I*, where the court held on summary

judgment that purchasers on digital asset trading platforms (including Kraken) had no reasonable

expectation of profits. It determined that the "economic reality" showed that the third *Howey*

prong was unsatisfied where there was no relationship between the alleged issuer and the

purchasers on digital asset platforms. *Ripple*, 682 F. Supp. 3d at 328-30. It explicitly declined to

address whether secondary market sales of the crypto asset in question constituted offers and sales

of investment contracts because the question was not before her. The court's opinion is carefully

constrained to the facts of the case and predicated on findings from a fully developed record.

Again, "[w]hether a secondary market sale constitutes an offer or sale of an investment contract

would depend on the totality of circumstances and the economic reality of that specific contract,

transaction, or scheme." *Ripple Labs I*, at 329, n.16 (citing *Marine Bank*, 455 U.S. at 560 n.11,

102 S.Ct. 1220; *Telegram*, 448 F. Supp. 3d at 379). As discussed, the way the court foreshadowed

how a court would have to consider secondary market sales of crypto assets is consistent with the

Ninth Circuit's holding in *Hocking*. *See Hocking*, 885 F.2d at 1462 (declining to recognize an

absolute rule about when secondary market transactions involve a security and noting that *Howey*

requires the examination of the "economic reality" of each secondary market transaction,

including analysis of how assets are promoted to investors, and what the investor's intentions and

expectations were when they invested).

The SEC has plausibly alleged that investors in crypto assets offered on Kraken possessed

an expectation of profits from the efforts of others that they derived from the promoters'

representations that Kraken republished and reasserted on its platform. Whether or not the record

1  ultimately supports that allegation will be revealed through discovery.

2      **D.      Major Questions Doctrine**

3      Finally, Kraken, and its numerous amici, insist that the question posed in this case is the

4  kind reserved for Congress, because resolution of the dispute in the SEC's favor would expand its

5  regulatory power.  Other courts have already considered whether similar claims brought by the

6  SEC violate the major questions doctrine and found that they do not.[17]  The same is true here.

7      The major questions doctrine originates from the idea that Congress does not delegate

8  extraordinary powers that transform an agency's authority without making its intent clear.  *See*

9  *West Virginia v. EPA*, 597 U.S. 697, 716, 142 S. Ct. 2587 (2022) (noting that under the major

10  questions doctrine, courts "expect Congress to speak clearly if it wishes to assign to an agency

11  decision of vast economic and political significance").  Put another way, the major questions

12  doctrine requires that in the "extraordinary" case where an agency claims "power to regulate a

13  significant portion of the American economy" that has "vast economic and political significance,"

14  that agency must show it has "clear congressional authorization."  *Util. Air. Regul. Grp.* v. *EPA*,

15  573 U.S. 302, 324, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014) (citations omitted).

16      This is not such a case.  The cryptocurrency industry "falls far short of being a 'portion of

17  the American economy' bearing 'vast economic and political significance.'" *SEC v. Coinbase,*

18  *Inc.*, No. 23 CIV. 4738 (KPF), 2024 WL 1304037, at *13 (S.D.N.Y. Mar. 27, 2024) (quoting

19  *Terraform I*, 684 F. Supp. 3d at 189-91)).  Of the few cases where the Supreme Court has found it

20  proper to invoke the major questions doctrine, each involved a proposed regulation that would

21  have far greater impact on the economy than what the SEC proposes here.  *See e.g.*, *West Virginia*,

22  597 U.S. at 724, 142 S.Ct. 2587 (Clean Power Plan was major because it would empower the

23  Environmental Protection Agency to "substantially restructure the American energy market); *see*

24  *N.C. Coastal Fisheries Reform Grp. V. Capt. Gaston* LLC, 76 F.4th 291 (4th Cir. 2003) (holding

25  an EPA regulation that would impact every commercial or recreational fisherman raised a major

26  question); *Biden v. Nebraska*, 143 S. Ct. 2375, 2373 (2023) (student loan forgiveness program

27  _____

28  [17] The motions for leave to file amicus briefs appearing at Dkt. Nos. 40, 41, 47, 50, 51, 53, and 65 are all GRANTED.  They were interesting if not persuasive.

United States District Court
Northern District of California

1  proposed by President Biden was major insofar as it aimed to forgive approximately $430 billion

2  in debt); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (holding that a

3  newfound regulation of the tobacco industry was a regulatory overreach).  All these cases involved

4  industries with a far stronger foothold in the American economy or political sphere or both than

5  this one does.

6          Moreover, the SEC is not asserting a "transformative expansion in its regulatory authority"

7  or a "highly consequential power beyond what Congress could reasonably be understood to have

8  granted it." *See West Virginia*, 597 U.S. at 724.  While cryptocurrency itself is a relatively novel

9  financial instrument, the principles driving the SEC's attempt to assert regulatory authority over it

10  are not new.

                              **CONCLUSION**

11

12          For the foregoing reasons, the motion is DENIED.  Defendants shall answer the Complaint

13  within 20 days of this Order.  A further Case Management Conference is set for October 15, 2024,

14  at 2 p.m. by video conference.  The Joint Statement, to be filed by October 8, 2024, shall include a

15  proposed case schedule and trial date. The previously set CMC for January 14, 2025, is

16  VACATED.

17          **IT IS SO ORDERED.**

18          Dated: August 23, 2024

19

20  

21  _____
    William H. Orrick
    United States District Judge

22

23

24

25

26

27

28

*United States District Court*
*Northern District of California*