UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 22-22538-CIV-RKA

DOMINIK KARNAS, ET AL.,          .
                                 . Miami, Florida
          Plaintiffs,            .
                                 . May 29, 2024
          v.                     . 3:04 p.m.
                                 .
MARK CUBAN, ET AL.,              .
                                 .
          Defendants.            .
. . . . . . . . . . . . . . . .  .

- - - - -

Transcript of Motion Hearing had

before the Honorable Roy K. Altman,

United States District Judge.

- - - - -

Proceedings recorded by mechanical stenography, transcript
produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305)301-3276

APPEARANCES:

For the Plaintiffs:      Joseph M. Kaye, Esq.
                         Leo A. Wiesinger, Esq.
                         Rejane Passo, Paralegal
                         Adam M. Moskowitz, Esq.
                         The Moskowitz Law Firm
                         P.O. Box 653409
                         Miami, Florida  33175
                               and
                         Stephen N. Zack, Esq.
                         Tyler E. Ulrich, Esq.
                         Boies Schiller Flexner LLP
                         100 SE 2nd Street
                         Suite 2800
                         Miami, Florida 33131
                               and
                         Brooke A. Alexander, Esq.
                         Boies Schiller Flexner LLP
                         333 Main Street
                         Armonk, New York 10504
                               and
                         Jose M. Ferrer, Esq.
                         Desiree E. Fernandez, Esq.
                         Mark, Migdal & Hayden, P.A.
                         80 SW 8th Street
                         Suite 1999
                         Miami, Florida  33131
                               and
                         Howard M. Bushman, Esq.
                         The Moskowitz Law Firm, PLLC
                         Two Alhambra Plaza, Suite 601
                         Coral Gables, FL 33134

```
APPEARANCES (CONTINUED):

For the Defendant      Christopher E. Knight, Esq.
Mark Cuban:            Alexandra L. Tifford, Esq.
                       Fowler White Burnett, P.A.
                       1395 Brickell Avenue
                       14th Floor
                       Miami, Florida  33131-3302
                                and
                       Stephen A. Best, Esq.
                       Rachel O. Wolkinson, Esq.
                       Daniel L. Sachs, Esq.
                       Brown Rudnick LLP
                       601 Thirteenth Street NW
                       Suite 600
                       Washington, DC  20005


For the Defendant      Barry S. Turner, Esq.
Victor Oladipo:        Phang & Feldman, P.A.
                       2 South Biscayne Boulevard
                       One Biscayne Tower
                       Suite 1600
                       Miami, Florida  33131


Court Reporter:        Francine C. Salopek, RMR, CRR
                       Official Court Reporter
                       United States District Court
                       3010 NE 39th Street
                       Fort Lauderdale, Florida 33308
                       (305)301-3276

                        -  -  -  -  -
```

1          **TUESDAY, OCTOBER 15, 2024, 3:08 P.M.**

2          *(The Judge entered the courtroom)*

3          THE COURT:  You ready, Fran?

4          THE COURT REPORTER:  Yes.

5          THE COURT:  All right.  Calling Karnas vs. Cuban,

6     22-CV-22538.

7          Who's here for the plaintiff?

8          MR. MOSKOWITZ:  Good afternoon, Your Honor.  Adam

9     Moskowitz, Joey Kaye, and Howard Bushman from the Moskowitz Law

10    Firm.

11         THE COURT:  Good afternoon.

12         MR. ULRICH:  Good afternoon, Your Honor.  Tyler

13    Ulrich, Steve Zack, and on the Zoom, we have Brooke Alexander

14    from Boies, Schiller & Flexner.

15         THE COURT:  All right.  Good afternoon.

16         MS. ALEXANDER:  Good afternoon, Your Honor.

17         MR. FERRER:  Good afternoon, Your Honor.  Jose Ferrer

18    and Desiree Fernandez on behalf of the plaintiffs.

19         THE COURT:  All right.  Good afternoon.

20         And for those of you on Zoom, I don't know if you were

21    able to see, but I'm late because -- not because we were just

22    having a long lunch, we were in a calendar call and a motions

23    hearing for a trial that's starting on Monday.  And I apologize

24    for that.

25         Who's here for the defense?

1          MR. BEST:  Thank you, Your Honor.  Good afternoon.

2    Stephen Best and Rachel Wolkinson from Brown Rudnick on behalf

3    of defendant Mavericks.

4          THE COURT:  All right.  Good afternoon.

5          MR. KNIGHT:  Good afternoon, Your Honor.  Christopher

6    Knight and Ali Tifford from Fowler White Burnett.

7          THE COURT:  Good afternoon to you all.

8          MR. BEST:  And I apologize.  Dan Sachs is on the

9    video.

10          MR. SACHS:  Good afternoon, Your Honor.

11          THE COURT:  Good afternoon to you, sir.

12          All right.  On May the 13th, we stayed this pending

13    our adjudication of the defendants' motion to dismiss, ECF

14    Number 189, and the plaintiffs' motion for class certification,

15    ECF Number 231.  We've been working on the motion to dismiss,

16    and I wanted the parties to clarify a few outstanding issues.

17          To the plaintiff, the complaint pleads four counts

18    under New Jersey law on behalf of the "nationwide class" and,

19    in the alternative, separate counts under Florida, New Jersey,

20    Virginia, Alabama, Louisiana, California, Connecticut,

21    Tennessee, Oklahoma, Pennsylvania, and Massachusetts law on

22    behalf of each state's respective subclass.

23          So my questions to you are:  First, why should

24    New Jersey law govern the claims of the nationwide class when

25    only one of the class plaintiffs and none -- neither of the

1  remaining defendants are citizens of New Jersey?

2          Who's answering that question?

3          MR. MOSKOWITZ:  I will, Your Honor.

4          Voyager was based in New Jersey.  The decisions about

5  how they treat the securities were made in New Jersey.  And I

6  think our papers set that out, especially our complaint, all

7  the connections to New Jersey, and we believe that the

8  statutory legislative history of the New Jersey statute, which

9  we cite in our motion for class certification, says that it is

10 the desire of New Jersey to apply nationwide when the conduct

11 emanates from New Jersey.

12         THE COURT:  Okay.  If we find that New Jersey law

13 doesn't apply, then we'll have before us essentially 11

14 separate class actions all based on different states.  Why

15 should those cases be in the Southern District of Florida?

16         MR. MOSKOWITZ:  Well, Your Honor, we believe that all

17 of the state statutes are generally the same; there are no

18 major distinctions between each of the state's statutes.

19         THE COURT:  Including Florida's?

20         MR. MOSKOWITZ:  There's some minor distinctions

21 between each of the consumer state statutes and the securities

22 state statutes of each state, but there's nothing major.

23 There's many cases that we cite which groups them together.

24 But we would, of course, respectfully ask that New Jersey apply

25 to everybody.

1          THE COURT:  Does it matter that Voyager isn't a party

2   here?

3          MR. MOSKOWITZ:  We don't believe so, not under the

4   law.  The law says where did the conduct itself emanate?  And

5   here it's an unregistered security, and everything that is

6   discussed about Voyager happened in New Jersey.  That's where

7   the company was based.  That's the state securities agency that

8   was initially responsible for investigating what's going on.

9   That's the state statute -- I'm sorry -- the state agency that

10  prosecuted Voyager.  They're the ones that investigated

11  Voyager.  Most of the conduct here took place in New Jersey.

12         THE COURT:  Even if it's conduct not by a -- by a

13  nonparty to our case?

14         MR. MOSKOWITZ:  Yes.  Yes, Your Honor.

15         And I think if you look at the cases where the

16  New Jersey statute was applied nationwide, the Court focus was

17  on the main conduct.  And the main conduct here was by Voyager,

18  and just by -- they went bankrupt; that's why they're not a

19  defendant here.  It's not for any other reason.  You know, we

20  sued Voyager, but then that part of the case was stayed.  But

21  all of the conduct happened from New Jersey, all of the conduct

22  that is alleged in the motion for class certification.

23         THE COURT:  I think I know the answer to this last

24  question, but to what extent do the various state securities

25  and consumer protection laws differ in their application by the

1    respective state courts?

2          MR. MOSKOWITZ:  I don't think at all, Your Honor.  For

3    example, New Jersey and Florida securities statutes, they're

4    just about identical.  They're not identical every word, but

5    the phrase which we're looking for, which is an agent of a

6    seller which promotes an unregistered security is strictly

7    liable, that language is the same in Florida and the same in

8    New Jersey.  And I haven't found any cases that would interpret

9    that clause that we're looking at any differently for either of

10   those two states.

11         THE COURT:  Your theory of personal jurisdiction is

12   that "the promotions by Cuban and the Mavericks, including

13   myriad social media posts to their millions of followers,

14   nationally televised Mavericks basketball games featuring

15   Voyager promotions, and the televised press conference, were

16   accessible in Florida and were in fact viewed in Florida by

17   Florida residents."  That's your response at ECF Number 195, at

18   page 35.

19         Does this mean that a court in any state where someone

20   simply accessed the broadcast would have personal jurisdiction

21   based only on the fact that it was a national broadcast?

22         MR. MOSKOWITZ:  Possibly not.  But here what we did

23   specifically --

24         THE COURT:  Because don't the courts often say -- and

25   I'm not saying I necessarily agree with it, but it does seem to

```
 1    be widely accepted law that the fact that you say something
 2    that happens to be broadcasted nationally standing alone isn't
 3    sufficient to confer personal jurisdiction in all 50 states,
 4    right?
 5              MR. MOSKOWITZ:  Yes.  But here what we say are Florida
 6    residents -- I don't know the exact number -- 50,000, used the
 7    Mavericks' code to actually buy the Voyager products.  So these
 8    are Florida residents that all heard the announcement, relied
 9    on it, and used the Mavericks' code.  So that's just some of
10    the examples that we use showing the link to Florida.
11              We also have thousands --
12              THE COURT:  But in terms of the purposeful availment
13    element, which is -- which we look at from the perspective of
14    the defendant entering the relevant marketplace, those 50,000
15    Voyager codes, as I understand it, were used because they heard
16    it on the broadcast or saw it on the broadcast, right?
17              MR. MOSKOWITZ:  Yeah.  But when they did the
18    broadcast -- we actually sued Ketchum, who's the public
19    relations company, and they're, like, "This is how we're going
20    to target the big states," and Florida I think was the second
21    largest state to target.  So the plan was --
22              THE COURT:  Target how?
23              MR. MOSKOWITZ:  Let's do a press conference so that we
24    can make sure to target people in Florida by having nationwide
25    broadcasters come to the PR release, let's have Mark send out
```

1   tweets to all of his followers, including those that live in

2   Florida.  I mean, our papers have maybe ten or 11 examples,

3   Your Honor, that I can go back and show you that specifically

4   targeted Florida.

5        And, in fact, the truth is, it worked, because so many

6   people in Florida heard the announcement, watched it on the

7   Internet, watched it, you know, with all the different various

8   media forums, relied on it, and then bought the Voyager stock.

9   I think Florida may be our largest class of state purchasers.

10  I think California and Florida and maybe Illinois are the

11  numbers.  Because we got them from Voyager.  We served Voyager

12  with a subpoena, "Tell us the customers that bought the Voyager

13  product."  I think Florida was the second largest.

14       THE COURT:  Thank you.

15       To the defendant, you've since abandoned your argument

16  that we "lack personal jurisdiction over the out-of-state

17  claims of out-of-state named plaintiffs."  That's your first

18  MTD, ECF Number 41, at page 18, quoting my decision in

19  *Carter vs. Ford*, 2021 WL 1165248, at page 6, from 2021.

20       Is it your position, then, that as long as we have

21  personal jurisdiction over the Florida plaintiffs, then we

22  should exercise personal jurisdiction over all the named

23  plaintiffs?

24       MR. BEST:  Thank you, Your Honor.  First, may I

25  correct some statements?

```
1              THE COURT:  Just answer my question first, and then
2    you can go back to it.
3              MR. BEST:  Yes.
4              The answer is, if you find that there's jurisdiction
5    as a whole under the questions that you asked Mr. Moskowitz
6    before, which is whether or not, A, there was activity that was
7    targeting Florida, or specific activities that availed the
8    defendant to the jurisdiction in Florida, then that would be
9    sufficient under the law.  You wouldn't have to worry about the
10   other defendants.  That's -- that were out of state.
11             THE COURT:  Other plaintiffs, you're saying.
12             MR. BEST:  Excuse me, other plaintiffs, correct.
13             THE COURT:  But you made that argument in your first
14   motion to dismiss.
15             MR. BEST:  Yes.
16             THE COURT:  And then you dropped it in your second
17   motion to dismiss.
18             MR. BEST:  That's correct.
19             THE COURT:  Okay.
20             MR. BEST:  That's correct.
21             So -- and I have to correct some statements.
22             THE COURT:  Go ahead.
23             MR. BEST:  The entire --
24             THE COURT:  Which one are we dealing with now?
25             MR. BEST:  The question that there are 50,000
```

1    Florida --

2                THE COURT:  Ah.

3                MR. BEST:  The entire national class -- and

4    plaintiffs' counsel knows this -- the entire national class of

5    Voyager accountholders that signed up with the Mavericks' code

6    and received a reward, the entire national class is 10,000

7    people.  All right?  So of that, the subset is a few thousand

8    at most that were Florida residents.  So this whole notion that

9    there are 50,000 people that signed up is just inaccurate.

10               THE COURT:  All right.  Understood.

11          What else?

12               MR. BEST:  Second, there is absolutely no evidence --

13   and we're at the motion to dismiss stage, so I would say

14   there's no claims in the complaint that I remember -- it's been

15   a while -- that show that the Mavericks or Mr. Cuban was

16   targeting Florida specifically.  It was a press conference --

17               THE COURT:  That's what I was asking about, whether

18   it's just -- because the cases are legion that say that if you

19   just -- and, again, I'm not saying I think this makes that much

20   sense -- but if you do a national broadcast, and people in

21   California hear it, and they're injured by buying the product,

22   that's just not sufficient for purposeful availment, right?

23               MR. BEST:  Correct.

24               THE COURT:  I mean that's what the cases say.

25               MR. BEST:  Correct.

```
 1              THE COURT:  So that's what I was asking him about.
 2    And he says there are ten things in his complaint that I just
 3    don't remember seeing.
 4              MR. BEST:  Yeah, I don't remember seeing it either.
 5    Let me -- the basic facts are, there was one promotional
 6    statement press conference on October 27th, 2021, that it was
 7    held in Dallas, Texas.  That was the only statement that was
 8    ever made by the Mavericks or Cuban about the Voyager promotion
 9    that's at issue here.
10              Past that, what I know is that there were tweets --
11              THE COURT:  So you're saying that that was about
12    Florida in some way or no?
13              MR. BEST:  Not at all.
14              THE COURT:  Oh.
15              MR. BEST:  It was announcing the Voyager Sponsorship
16    Agreement with the Mavericks.  Florida was never mentioned in
17    that press conference.  I believe -- and correct me if I'm
18    wrong -- and your law clerks will be on top of this -- but the
19    transcript of the press conference was submitted with the
20    complaint.  It's 29 pages.  I've gone through it line by line.
21    Florida's never mentioned.  No --
22              THE COURT:  He's saying that they hired people who
23    were specific experts in targeting the Florida market or
24    something like that?
25              MR. BEST:  Inaccurate.
```

```
1              The market that was targeted was the -- not only --

2    it's even smaller than just Texas -- it's the Dallas NBA market

3    that is in the Dallas area extending down to -- I don't know if

4    it's Austin -- it bleeds into the San Antonio Spurs market.

5    But, remember, we're talking about an NBA team's market.  This

6    has nothing to do with Florida.  It's the Dallas Mavericks

7    market in the area that was of the most --

8              THE COURT:  How is it, then, that -- I mean he says

9    that the plurality of people who sign -- what I interpreted him

10   to say -- the plurality of people who signed up for this thing

11   and used the code were in Florida.  Do you agree with that?

12             MR. BEST:  No.

13             THE COURT:  That's not true either?

14             MR. BEST:  It's not true, and it's not in the

15   complaint for the motion to dismiss stage.  And we've been --

16   we've had the benefit of almost a year's worth of discovery

17   here, and there's been no evidence adduced to that point.

18             THE COURT:  But some people in Florida --

19             MR. BEST:  Without a doubt.

20             THE COURT:  -- some people in Florida signed up for

21   it.  Is that true?

22             MR. BEST:  It is not only true, but the evidence has

23   shown that Voyager then put out on the Internet -- which was

24   then copied by others and put out -- a press -- a statement

25   saying, "Sign up with the Mavs' code, get a hundred dollars of
```

1   free Bitcoin."  It was nationally sent out.  And so

2   nationally -- naturally, there were people in Florida that

3   signed up.

4          THE COURT:  You're saying these people signed up

5   because of what Voyager did, not what the Mavericks did.

6          MR. BEST:  Correct.  There was a Voyager --

7          THE COURT:  But that's not in the complaint, right?

8          MR. BEST:  None of this is in the complaint supporting

9   this.  So I'm now bleeding into essentially summary judgment

10  arguments.  But telling you right now, there is literally

11  nothing in the complaint that talks about this being targeted

12  to anybody in Florida.  Indeed, indeed, Mr. Cuban showed up at

13  a crypto conference, I don't know, a couple weeks or a month

14  later, after the announcement of this press conference, and

15  didn't say word one about the Voyager promotion while he was in

16  Florida.

17         THE COURT:  All right.  Anything else from the

18  defendant?

19         MR. BEST:  No, Your Honor.  Thank you.

20         THE COURT:  Anybody over there?

21         MR. KNIGHT:  No, Your Honor.

22         THE COURT:  Mr. Moskowitz, anything you want to add to

23  that?

24         MR. MOSKOWITZ:  Yeah.  If the Court would like, we're

25  happy to brief it.  I mean they --

1          THE COURT:  No, no, no.  You've got plenty of

2    briefing, and I'm ruling on it.  I just had a few specific

3    questions that I wanted to ask everybody about.

4          MR. MOSKOWITZ:  I correct -- I think the number was

5    5,000 in the first -- in the first 48 hours, 5,000 people

6    quickly signed up and then the code expired.

7          THE COURT:  You're saying the first 48 hours after the

8    Mavericks' press conference?

9          MR. MOSKOWITZ:  Right.

10          THE COURT:  So in other words, not after the Voyager

11    press release or whatever it was that was on the Internet.

12          MR. BEST:  Same time.

13          THE COURT:  It was at the same time.

14          MR. MOSKOWITZ:  Same time.  They did this massive

15    global international partnership.  That's the way they got

16    around the gated.  They weren't just restricted to the area

17    like it used to be around the stadium.  It's an international

18    partnership.  And this was -- we've done a bunch of

19    depositions -- why they were able to use the Internet.

20    Clearly, the Internet they knew was going to reach all around

21    the world.

22          And then after the success of this press conference,

23    we have documents where the Mavericks tout, "Look how great the

24    press conference worked."  Look at the -- and the numbers are

25    in the documents -- I'm sorry, I don't want to miscite

1    anything, but there's hundreds of millions of clicks, because

2    worldwide this was a great press conference and a great

3    statement.  It all worked.  So I just want to make sure that

4    that's clear.  And there's documents --

5         THE COURT:  But the question of what was like

6    purposefully targeting Florida, that's obviously what we're

7    concerned about, right?

8         MR. MOSKOWITZ:  Right.  And they purposely targeted

9    everybody.

10        THE COURT:  You're saying that's all in the complaint.

11        MR. MOSKOWITZ:  I think it is, Your Honor.  It's clear

12   that there was a nationwide target.  In fact, there was an

13   international target.  Because they went through and tried to

14   get national reporters, international reporters, I mean to a

15   tee, to make sure that it had the maximized coverage.  Mark

16   Cuban was to tell all his tweets, he was to tell all his

17   people.  I mean, there's a lot of plans in this marketing

18   campaign to reach as many people as possible, and it was a

19   great success.  And we deposed Mark Cuban on this.  He says, "I

20   crushed it.  I did a great job."  It worked.  It wasn't

21   restricted just to 20 miles.  They got amazing amounts of

22   people as a result of this international press conference.

23        THE COURT:  Why do you say it's limited just to the

24   Dallas area?  What's that about?

25        MR. BEST:  So you had two competing companies doing a

1   press conference with differing goals.

2           So the Dallas Mavericks, under their Sponsorship

3   Agreement, it got paid irrespective of the success of the

4   Voyager promotion.  And so the Mavericks were interested in

5   their marketplace.  And so when Mark Cuban was speaking, he was

6   speaking to *The Dallas Morning News* reporter, right?  And so

7   Voyager, Steve Ehrlich, the CEO of Voyager, was at the same

8   press conference, touting the global --

9           THE COURT:  You're saying they had different

10  incentives.

11          MR. BEST:  Excuse me, different incentives.  That's

12  exactly right.

13          So I'm not debating this idea --

14          THE COURT:  But if they're like -- not conspiring, but

15  cooperating with one another, and one of them has the incentive

16  to go global and the other has the incentive only to go local,

17  does the fact of the global aspirations of one of the partners

18  get imputed to the partnership as a whole?

19          MR. BEST:  I don't know.  I would love to brief that.

20  But I don't think so, particularly if there's no planning

21  beforehand on this issue.

22          THE COURT:  But would the Mavericks have known that

23  global -- Voyager intended for this to be a global marketing

24  campaign?

25          MR. BEST:  Yes.

1          MR. MOSKOWITZ:  Yes.

2          MR. BEST:  Yes, they did.  However --

3          THE COURT:  There's a Judge Altonaga case,

4    *Miller vs. Gizmodo Media*, you may know, 383 F.Supp.3d 1365, at

5    page 1375, a 2019 case, where she collects a bunch of cases

6    from around the country, where she says that "courts have

7    uniformly rejected the argument that a tweet not specifically

8    directed to a forum state is a sufficient minimum contact to

9    confer personal jurisdiction under the due process clause."

10         MR. MOSKOWITZ:  Your Honor, let me just make one thing

11   clear, because this has been in contention for a year.  It's

12   not one press conference; it's eight months of publicity, of

13   marketing.  So every home game that the Mavericks had, it's

14   Voyager, Voyager, Voyager.

15         THE COURT:  At the games.

16         MR. MOSKOWITZ:  At the games.  So we have one

17   document, which is wonderful, it's a summary of this

18   eight months of work.  And it says, We did an incredible job

19   promoting -- and don't take my word for it, read the

20   document -- to the world that Voyager is our partner, so we did

21   it in the games, we did it in the gaming center, the Mavs'

22   gaming center, we did it in all these other --

23         THE COURT:  Isn't that all localized in Dallas?

24         MR. MOSKOWITZ:  No, it's worldwide.  In the press

25   conference, they said, We want players that are international.

```
 1    That's why they went to the Mavs in some part, because Luka and
 2    other people were international players.  So they said they can
 3    appeal to the international market.  So they actually asked
 4    them questions so that they would reach the international
 5    market.  We've briefed this so extensively.
 6             THE COURT:  Who would reach?
 7             MR. MOSKOWITZ:  Voyager said to the Mavs, "We want you
 8    because you have international players, and you will appeal to
 9    the international market.  Forget just the United States.  You
10    will appeal to people in Europe, in Germany where you have
11    players."
12             THE COURT:  So those are all awesome places, but what
13    does it have to do with Florida?
14             MR. MOSKOWITZ:  Because it's the United States.
15    They're focusing all in the world.  So what Judge Altonaga's
16    case is, if it just happened to have landed in Florida, fine.
17    But if you look at the plethora of evidence that we have here,
18    over an eight-month period, the goal was to reach everybody in
19    the United States, and Miami and Florida is a big jurisdiction,
20    I mean it is, and we're happy to brief it again.  It's in the
21    papers.
22             THE COURT:  I don't want any more briefing.  We've
23    already read the briefing.
24             MR. MOSKOWITZ:  The document says, We were successful,
25    we were able to get all these people from across the country.
```

1   And we know that 5,000 in the very first 48 hours signed up

2   immediately who lived in Florida, because they reached the

3   message.

4         I mean, there was -- I don't know the exact number,

5   but millions of people reaching it on the Internet.  You watch

6   the press conference on the Internet.  That's how they had it.

7   So everybody on the Internet is watching it.  People in Florida

8   are watching it.  We have plaintiffs that are from Florida that

9   say, "I saw it in Florida."  So like what Steve said, the

10  Supreme Court says now, there's jurisdiction over those

11  plaintiffs, so you don't look to the other class rep's for

12  jurisdiction.  So that question's over.  We've got jurisdiction

13  over here because you have a plaintiff that's from Florida,

14  that heard it in Florida, was targeted, and he has damages.

15        THE COURT:  Well, what -- only if he was targeted.

16        MR. MOSKOWITZ:  He was targeted.  The way he was able

17  to get it -- and we ask in depositions:  Didn't you think that

18  the Internet's going to reach Florida?  Yes, of course.  It's

19  not gated.  Like in the '40s, they had this gated rule, where

20  they can't intrude on, say, the Houston Rockets' market, right?

21  They have to keep them separate.  Well, now, the way they got

22  around it is they're an international partner, so we can use

23  the Internet.  And we asked their main guy about that, he says,

24  "Yeah, of course we knew it's going to reach everybody."

25  That's why Voyager wanted the Mavericks and Mark so much,

Case 1:22-cv-22538-RKA  Document 316  Entered on FLSD Docket 10/17/2024  Page 22 of 43

22

1    that's why they paid so much, because the Mavericks would be
2    such a good force to market this around the United States.  The
3    Heat and the Mavericks, you know, they were in the finals the
4    two years before, Mark's coming down to the Heat a lot for the
5    games.
6            I mean, our papers have a lot more contact directly to
7    Florida, certainly to at least state jurisdiction at this
8    point, you know, two years after we filed the complaint.
9            THE COURT:  All right.  Thank you very much.
10           MR. MOSKOWITZ:  All respect.  Thank you, Your Honor.
11           MR. BEST:  Just very briefly.
12           First, I like being in here.  I like being before Your
13   Honor.
14           THE COURT:  Well, that's nice of you.
15           MR. BEST:  So please don't take any --
16           THE COURT:  I have to say, I'm a Heat fan.  I don't
17   know if I'm going to get recused as a result of that.
18           MR. BEST:  You can be a Heat fan.
19           THE COURT:  I watched those finals games.
20           MR. BEST:  I wish the Mavericks had won.
21           THE COURT:  Well, one of them they did.
22           MR. BEST:  They did one.  Exactly.
23           So Luka Doncic was never -- was asked, indeed, to do a
24   part of this press conference and declined.  So Luka was never
25   part of this.  I don't know how Luka's name got into it.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(305) 301-3276

```
1              The countries Germany and France were mentioned in the
2     press conference in a question:  Are you going international?
3     And the aspirational answer by not the Mavericks, but by Steve
4     Ehrlich was, "Yes, we're hoping to get to Germany and France in
5     the next year, year and a half."  Nothing about any specific
6     state other than Texas.  Certainly no mention of Florida.
7              Thank you, Your Honor.
8              THE COURT:  All right.  Thank you all very much.
9              Anything else I can help the plaintiffs with?
10             MR. MOSKOWITZ:  No, Your Honor.
11             THE COURT:  Anything I can help the defense with?
12             MR. BEST:  Yes, Your Honor.
13             I think it's important for Your Honor to realize
14    what's happened since we had the stay in May and now.  We
15    reached out to Voyager.  They gave us access to their entire
16    account database.  It is an unwieldy beast, as you can imagine.
17             THE COURT:  I don't even want to imagine.
18             MR. BEST:  We had to literally hire somebody to write
19    code to access it.  So you need to hire a third party to write
20    code just to get answers as to the database.
21             THE COURT:  Where is that now in the bankruptcy
22    proceeding?  What's happening now?
23             MR. BEST:  Good question.  So it is -- the bankruptcy
24    estate is still open, and they're hoping to get --
25             THE COURT:  It's here?  It's here in Miami?
```

```
 1              MR. BEST:  No, it's in New Jersey --
 2              THE COURT:  New Jersey, okay.
 3              MR. BEST:  -- New York or New Jersey.
 4              MS. TIFFORD:  Southern District of New York.
 5              MR. BEST:  Southern District of New York?  Yeah.
 6    Southern District of New York.  The one remaining piece is
 7    whether or not Three Arrows' money's going to come in to get
 8    accountholders as whole as possible.  So there's one big claim
 9    that's worth probably anywhere from 400 million to a billion
10    dollars left that they're waiting on.
11              THE COURT:  Wow.
12              MR. BEST:  Right now it's -- they say that the
13    accountholders have received 70 percent to date of what they
14    lost through -- but I don't know what 70 percent means.  It
15    could be 70 percent of their entire -- say, entire investment
16    or 70 percent of the day that the bankruptcy filing happened,
17    and it could be a higher number.  I can --
18              THE COURT:  So what was your question?  So you had to
19    hire a third party --
20              MR. BEST:  I had to hire a third party.  This isn't
21    really a question; it's a notice to Your Honor.  We've
22    learned -- and I've notified counsel, both Mr. Moskowitz and
23    Mr. Boies, about this.  And I told them that I'm happy to sit
24    down with them and share all the information that we found.
25              Candidly, now knowing what I -- what we've seen, the
```

25

```
1   briefing -- you would be greatly assisted with either a

2   supplemental briefing or a brief hearing on how the account --

3   the Voyager system works before you make class certification.

4           THE COURT:  Okay.  But not on the motion to dismiss,

5   because that's what I'm working on now.

6           MR. BEST:  Correct.  I just wanted to let you know the

7   whole universe has changed since we wrote our motions on class

8   certification.

9           THE COURT:  What do you think about that?

10          MR. MOSKOWITZ:  I don't think it has.  I mean one

11  thing on the side note, Judge, we have other cases together,

12  and we've been getting along extremely well.

13          THE COURT:  Seems like you're getting along great

14  here.

15          MR. MOSKOWITZ:  Right, yeah.  We've really worked

16  together.  And another --

17          THE COURT:  I'd be interested -- I'm sorry to cut you

18  off --

19          MR. MOSKOWITZ:  Yes.

20          THE COURT:  -- just a thought.  I'm working now on the

21  motion to dismiss.  I don't know where that's going to go.  To

22  be honest, I don't know which way it's going to come out.

23  That's why I brought you in.  But assuming the -- if the case

24  does continue, and if there's been a lot that's happened in the

25  last few months that wasn't accessible to you all because -- by
```

1  virtue of the fact that these people went into bankruptcy, and

2  it was a voluminous trove of information, I'd be interested in

3  seeing a new motion for class certification, as opposed to

4  dealing with what may be stale information.  But I'm admittedly

5  speaking only based on what he just said, and you may disagree

6  with that.

7          MR. MOSKOWITZ:  Right.  I don't think any of the

8  documents that Steve is mentioning that he's getting has any

9  involvement with the pending motion for class certification at

10 all.

11         What's also happened is another securities case, the

12 securities case which overlaps our case.  So they had to find

13 people that bought Voyager stock and had Voyager accounts under

14 the federal Securities Act.  That case settled in New York.

15 And the judge had comments about notice.  How we going to find

16 all of the people?  So they revised the claims administrator

17 two weeks ago -- and Steve knows this -- and this week the

18 federal judge granted final approval to that settlement,

19 saying, I can find all of the Voyager people that were affected

20 in going through this route through the bankruptcy.

21         THE COURT:  But is that what you're talking about?

22         MR. MOSKOWITZ:  No, he's talking about something else.

23 He's talking about when Voyager went bankrupt three years ago,

24 he's trying to get information from them on our clients.  And

25 they gave him all their data, but he's saying a lot of it

1    wasn't under a very good searchable term, so he's going to have

2    to rebuild it.

3         What I'm saying is, it's my burden to prove the class

4    certification; it's my job.  We can do it.  Because the pending

5    motion that we have, Your Honor, says we want to certify two

6    issues.  It does not say the typical Rule 23.  It says:  Is

7    Mark Cuban and the Mavericks a statutory seller?  And are these

8    unregistered securities?  That's all we're asking to be

9    certified.  Because if those two questions are certified and

10   the jury decides those two questions, then we can do this case

11   quickly.  Because the motion to dismiss will say, yes, the

12   New Jersey statute says he's liable.

13        And that's just like Judge Moreno's case that came out

14   last month.  They found -- and this is a case that Steve and I

15   have together -- Shaquille O'Neal is a seller under the

16   securities statute because he promoted the product.  Well,

17   clearly here the Mavericks and Mark Cuban promoted Voyager and

18   had a financial interest.  That's not, I don't think, debated.

19   So we think the question for Your Honor of can he be held

20   liable, that's a simple question.  Judge Moreno answered it

21   straight on, yes, he is at this stage.  So we want that to be

22   answered.  And we think if that's answered, like Judge Moreno

23   did, we could settle this case.  We could sit down with Ketchum

24   and McCarter and possibly the NBA, the other defendants that

25   are there, once we know that initial ruling, that we've been

```
1    waiting on for a little while, if that gets ruled upon.  If
2    it's against us, it's against us.  But if it's like
3    Judge Moreno, and we find that he is at least -- falls under
4    the New Jersey statute, we think this case could get settled.
5         THE COURT:  So why do you need the Voyager data trove
6    to answer that question?
7         MR. BEST:  Because what is being left out of the
8    plaintiffs' ask is the key issue of successful -- what
9    constitutes a successful solicitation.  Being -- asking you to
10   opine that there is a securities class of the entire Voyager
11   accountholders before Mr. Cuban or the Mavericks ever even knew
12   about Voyager up until when it went bankruptcy (sic) has no
13   place in this case, unless there is some causal connection to
14   the promotional -- the alleged promotional conduct of the
15   defendants.  And the key question that's not being ask -- the
16   way this is set up is to avoid asking Your Honor to rule on the
17   successful solicitation and getting around the requirements --
18        THE COURT:  Because he just wants me to rule on
19   whether he's a statutory seller.
20        MR. BEST:  Correct.  And so --
21        THE COURT:  But since he's the one who's filed the
22   motion, can't he set the issues that he wants me to decide?
23        MR. BEST:  Absolutely.  All I'm trying to do is help
24   the process across the board, which anybody can decline if they
25   want, to tell you, there may be an ascertainable class now that
```

1   I know all this information.  It's just not what the plaintiffs

2   want.  But Your Honor should hear --

3           THE COURT:  Let me do this then.  I think what makes

4   sense is, let me rule on the motion to dismiss.

5           MR. BEST:  Yes.

6           THE COURT:  And then once I've done that, what may

7   make sense is just to bring you all back in, hear about this

8   issue, and then if you persuade me that I should do a second

9   round of motion for certification, I will.  Have you spoken to

10  Mr. Moskowitz about your view about this?

11          MR. BEST:  Yes.

12          THE COURT:  And you just disagree on it.

13          MR. BEST:  Correct.

14          MR. MOSKOWITZ:  Right, very respectfully.

15          THE COURT:  So why don't we do that?

16          MR. BEST:  We can always go to mediation on these

17  points, at least refine them for Your Honor.

18          THE COURT:  On this separate point of whether there

19  needs to be separate certification briefing?

20          MR. BEST:  Correct.

21          THE COURT:  But what would that even look like?  Let's

22  say he filed -- this is where I'm having trouble -- he's the

23  one who filed the motion.  So are we going to force him to file

24  a different kind of motion?

25          MR. BEST:  No.  It's more refining our motion to --

```
 1              THE COURT:  Your response.
 2              MR. BEST:  Correct, my response.
 3              THE COURT:  So you just want to be able to file a
 4    different response to the motion he already filed.
 5              MR. BEST:  With the new information that I think is
 6    germane to this case.  Essentially, it is almost impossible to
 7    file a response with all the data that we have now within a
 8    tight page limit.  And so I wanted to try to refine the issues
 9    to make it easier for all of us.  I'm happy to go through it
10    either on briefing or in a courtroom setting.  But there are
11    literally a hundred gateways that Your Honor will have to
12    consider to get an ascertainable class.  That's the point.
13              So you have the Mavs -- just indulge me for
14    15 seconds -- you have the -- those Voyager accountholders that
15    received the Mavs' code, right?  That's an ascertainable class.
16    All right?
17              Plaintiffs want everybody after October 27th, which is
18    the press conference, to be part of a class, even if they
19    didn't get the Mavs' code.  And that's -- that is -- the --
20    they put that into their damages class, but they don't leave it
21    in the securities class.  They want these people part of the
22    securities class.  This goes to the issue of whether or not
23    it's a successful solicitation of these people.
24              But once you get to the Mavs' code reward recipients,
25    there's then the question of the investment decision of 10,000
```

```
 1   people and all the various investment decisions they make,
 2   because there's no harmony to any of them.  They did all sorts
 3   of things.  There were 90 tokens to invest in, none of which,
 4   by the way, did Mr. Cuban or the Mavericks promote.  So how --
 5   and at least half of those tokens were not securities, because
 6   they weren't on the earned program account platform.  So they
 7   weren't earning interest.  And it's uncontradicted that they're
 8   not securities.  And so a large number of these accountholders
 9   who received the Mavs' code invested in strategies that were
10   never discussed at any promotional press conference.
11           And so there's all sorts of gateways to go through to
12   determine the class.  And I think I've gotten 90 percent of the
13   way home on the journey --
14           THE COURT:  In the response you've already filed --
15           MR. BEST:  No.
16           THE COURT:  -- or in your head?
17           MR. BEST:  In what would be a new response, or some
18   way to get it at least to the Court to educate the Court as to
19   all these issues.
20           THE COURT:  So all you want, then, really, is to just
21   have leave to file a new response and then give him leave to
22   file a new reply.
23           MR. BEST:  If I'm not successful in --
24           THE COURT:  Well, I don't see you as being -- what I'm
25   struggling with is, how do you get to just, like, dictate to
```

1   him what kind of motion he gets to file?  He could file

2   whatever motion he wants.  I might deny it.

3           MR. BEST:  I'm not dictating at all.  I'm offering him

4   the --

5           THE COURT:  An offramp.

6           MR. BEST:  Offered him -- I offer you the

7   institutional knowledge that we've had --

8           THE COURT:  He doesn't want knowledge.  He wants his

9   motion.  Right?

10          MR. BEST:  Okay.

11          MR. MOSKOWITZ:  Yeah, I would just say one thing in

12  closing.  It's been two years.  They did a motion to dismiss.

13  I think it's reasonable to ask for a ruling on the motion to

14  dismiss before we get to class certification.

15          THE COURT:  We're not talking about that.  We're not

16  even talking about that.  I get that this is the most important

17  thing to you, but I also have 200 cases, so I'm sorry if it's

18  not as quickly as you would have liked.

19          MR. MOSKOWITZ:  No, no.

20          THE COURT:  However, that being said, he's not talking

21  about the motion to dismiss.  We've already said I'm going to

22  rule on the motion to dismiss.  And then he just wants on the

23  motion for class certification, which I'm going to rule on

24  after, he wants to have an opportunity to file a different

25  response than the one he filed before, which he filed at a time

1  when he was behind the veil of ignorance, say, and didn't know

2  all the things he now knows.

3         Was that fair to say?

4         MR. BEST:  Yes.

5         THE COURT:  Yeah.  And he also wants to give you --

6  and he thinks you're wrong in the motion that you filed, and he

7  wants to give you a friendly opportunity to file a different

8  motion.  And I take it you're not going to be amenable to that,

9  right?

10        MR. MOSKOWITZ:  Right.  Because I just --

11        THE COURT:  You disagree with him.  Okay, good.

12        MR. MOSKOWITZ:  I don't want to file that motion that

13  he's saying I shouldn't file.  I'm not filing it.  I'm not

14  seeking to certify the damage class of all people, I'm not

15  doing that, and I haven't done that, I don't want to do that

16  later.  I just want to move this case along.

17        THE COURT:  So we're now just simply on the question

18  of whether while I'm ruling on the motion to dismiss, he should

19  be allowed to file a different response than the one he's

20  filed, and then you can file a different reply to the one that

21  you filed.

22        MR. MOSKOWITZ:  I have no problem --

23        THE COURT:  I don't have any problem with it either.

24        MR. MOSKOWITZ:  He can file whatever he wants, sure.

25        THE COURT:  So how much time do you need for that?

```
1            MR. BEST:  A month?  A couple weeks?
2            THE COURT:  A couple weeks sounds good.
3            MR. BEST:  Perfect.
4            THE COURT:  So today is the 15th.  How about by the
5   end of the month, the 31st?
6            MR. BEST:  Right.
7            THE COURT:  All right?  And then how much time do you
8   need to file your reply, your new reply?
9            MR. MOSKOWITZ:  Same time would be great.
10           THE COURT:  So I gave him 16 days.  I'll give you
11  16 days.  That will put us -- November the 15th you'll file
12  your reply.  Sound good?
13           MR. MOSKOWITZ:  Yes, Your Honor.
14           THE COURT:  Did you want to add something?
15           MR. ULRICH:  May I make one quick point about the
16  personal jurisdiction issue, Your Honor?
17           THE COURT:  Sure.
18           MR. ULRICH:  One other fact that I think is relevant
19  is that the Mavericks played two games in Florida while they
20  were brand ambassadors, promoters for --
21           THE COURT:  When is that?
22           MR. ULRICH:  I'm not sure of the exact dates.
23           THE COURT:  But this was before the October 27th press
24  conference or after?
25           MR. ULRICH:  It was after.  And it's in the complaint.
```

1  And the Florida -- there were -- either the Heat -- I don't

2  know if it was the Heat or the Magic also played in Dallas

3  while there was Voyager promotion in the arena.  And remember,

4  our theory is that -- which Mr. Best was also just

5  discussing -- was that by enrolling in the Voyager platform, by

6  default, they were -- the customers were put into what we argue

7  are securities, because there were these earned accounts.  And

8  so by promoting the Voyager promotion on TV when Florida teams

9  are in the arena being watched in Florida, it's promotion of

10  the -- what we're claiming --

11        THE COURT:  Was it also promoted in the arena?

12        MR. ULRICH:  There was signage for Voyager, the

13  product in arena.

14        THE COURT:  But in the Dallas arena.  Or the Miami

15  arena?

16        MR. ULRICH:  No, no, only in Dallas.

17        THE COURT:  Only in Dallas.

18        MR. ULRICH:  But my point is that it was on TV and the

19  Florida teams were there.  Essentially my point, Your Honor, is

20  that the *Gizmodo* case from Judge Altonaga talking about a

21  nationwide tweet, we're not in the same situation where a

22  nationwide tweet could go to Arkansas or Alaska, no NBA teams

23  there.  This is a targeted audience of NBA fans, and even more

24  so targeted towards the teams that are rivals of the Mavericks

25  where they're coming to play in states where they play,

1   including in Florida, while they were brand ambassadors for

2   Voyager, while Florida teams were playing in Florida, audiences

3   were watching the games in Dallas.  So that I think is also

4   relevant to the personal jurisdiction issue.

5           THE COURT:  And this game was -- this Voyager ad was

6   broadcast on a non-Dallas local channel, is what you're saying?

7           MR. ULRICH:  Well, when there's the signage in the

8   arena, it gets picked up -- the Florida games obviously are --

9   the Heat games are shown in Miami.

10          THE COURT:  I see what you're saying.  You're saying

11  that it's like on the side of the court, so when the guys are

12  dribbling up, you can see it in the background?

13          MR. ULRICH:  Right.

14          THE COURT:  And while I'm watching the game in Miami,

15  on my Sunshine Network or whatever, I would have seen it on the

16  screen.

17          MR. ULRICH:  Right.

18          THE COURT:  So it's not an ad that's like a

19  commercial.

20          MR. ULRICH:  Exactly.  Right.  It's signage in the

21  arena, shown on the TVs, and it indicates there is further

22  evidence of purposeful availment to the Florida audience and

23  the customers here.  That's the only point I wanted to add.

24          THE COURT:  All right.  Thank you very much.

25          Okay.  Anything else I can help the plaintiff with?

1           MR. MOSKOWITZ:  No.  Thank you, Your Honor.

2           THE COURT:  The defendant?

3           MR. BEST:  No, Your Honor.

4           THE COURT:  Okay.  Great to see you all.  Have a good

5   day.

6           MR. BEST:  Thank you very much.

7           THE COURT:  Thanks for coming in.

8           It will be important to know whether the Heat won or

9   lost that game.  That will be important to the ruling.

10          *(Laughter)*

11          *(The Judge exited the courtroom)*

12          *(Proceedings concluded at 3:52 p.m.)*

13                          -  -  -  -  -

14

15

16

17

18                    C E R T I F I C A T E

19       I hereby certify that pursuant to Section 753,

20   Title 28, United States Code, the foregoing is a true and

21   correct transcript from the record of proceedings in the

22   above-entitled matter.

23
        ___/s/Francine C. Salopek_____     _10-17-2024_
24      Francine C. Salopek, RMR-CRR                  Date
        Official Court Reporter
25

MR. BEST: [68]
MR. FERRER: [1]  4/17
MR. KNIGHT: [2]  5/5 15/21
MR. MOSKOWITZ: [42]
MR. SACHS: [1]  5/10
MR. ULRICH: [12]
MS. ALEXANDER: [1]  4/16
MS. TIFFORD: [1]  24/4
THE COURT REPORTER: [1]  4/4
THE COURT: [121]

'
'40s [1]  21/19

/
/s/Francine [1]  37/23

1
10,000 [2]  12/6 30/25
10-17-2024 [1]  37/23
100 [1]  2/7
10504 [1]  2/11
11 [2]  6/13 10/2
1165248 [1]  10/19
1365 [1]  19/4
1375 [1]  19/5
1395 [1]  3/3
13th [1]  5/12
14th [1]  3/4
15 [1]  4/1
15 seconds [1]  30/14
15th [2]  34/4 34/11
16 days [2]  34/10 34/11
1600 [1]  3/11
18 [1]  10/18
189 [1]  5/14
195 [1]  8/17
1999 [1]  2/14

2
20 miles [1]  17/21
200 [1]  32/17
20005 [1]  3/8
2019 [1]  19/5
2021 [2]  10/19 13/6
2021 WL 1165248 [1]  10/19
2024 [3]  1/7 4/1 37/23
22-22538-CIV-RKA [1]  1/4
22-CV-22538 [1]  4/6
22538 [1]  4/6
23 [1]  27/6
231 [1]  5/15
27th [3]  13/6 30/17 34/23
28 [1]  37/20
2800 [1]  2/8
29 [2]  1/7 13/20
2nd [1]  2/7

3
301-3276 [1]  3/15
3010 [1]  3/14
305 [1]  3/15

31st [1]  34/5
3276 [1]  3/15
3302 [1]  3/4
33131 [3]  2/8 2/14 3/12
33131-3302 [1]  3/4
33134 [1]  2/17
33175 [1]  2/5
333 [1]  2/10
33308 [1]  3/15
35 [1]  8/18
383 F.Supp.3d 1365 [1]  19/4
39th [1]  3/14
3:04 [1]  1/8
3:08 [1]  4/1
3:52 [1]  37/12

4
400 million [1]  24/9
41 [1]  10/18
48 hours [3]  16/5 16/7 21/1

5
5,000 [3]  16/5 16/5 21/1
50 [1]  9/3
50,000 [4]  9/6 9/14 11/25 12/9

6
600 [1]  3/8
601 [2]  2/16 3/7
653409 [1]  2/4

7
70 percent [4]  24/13 24/14 24/15
  24/16
753 [1]  37/19

8
80 [1]  2/13
8th [1]  2/13

9
90 [1]  31/3
90 percent [1]  31/12

A
abandoned [1]  10/15
above [1]  37/22
above-entitled [1]  37/22
absolutely [2]  12/12 28/23
accepted [1]  9/1
access [2]  23/15 23/19
accessed [1]  8/20
accessible [2]  8/16 25/25
account [3]  23/16 25/2 31/6
accountholders [6]  12/5 24/8 24/13
  28/11 30/14 31/8
accounts [2]  26/13 35/7
across [2]  20/25 28/24
Act [1]  26/14
actions [1]  6/14
activities [1]  11/7
activity [1]  11/6
ad [2]  36/5 36/18

Adam [2]  2/3 4/8
add [3]  15/22 34/14 36/23
adduced [1]  14/17
adjudication [1]  5/13
administrator [1]  26/16
admittedly [1]  26/4
affected [1]  26/19
afternoon [13]
agency [2]  7/7 7/9
agent [1]  8/5
agree [2]  8/25 14/11
Agreement [2]  13/16 18/3
Ah [1]  12/2
AL [2]  1/6 1/9
Alabama [1]  5/20
Alaska [1]  35/22
Alexander [2]  2/9 4/13
Alexandra [1]  3/2
Alhambra [1]  2/16
Ali [1]  5/6
alleged [2]  7/22 28/14
allowed [1]  33/19
almost [2]  14/16 30/6
alone [1]  9/2
alternative [1]  5/19
Altman [1]  1/14
Altonaga [2]  19/3 35/20
Altonaga's [1]  20/15
amazing [1]  17/21
ambassadors [2]  34/20 36/1
amenable [1]  33/8
amounts [1]  17/21
announcement [3]  9/8 10/6 15/14
announcing [1]  13/15
answer [5]  7/23 11/1 11/4 23/3 28/6
answers [1]  23/20
Antonio [1]  14/4
apologize [2]  4/23 5/8
appeal [3]  20/3 20/8 20/10
APPEARANCES [2]  2/1 3/1
application [1]  7/25
applied [1]  7/16
apply [3]  6/10 6/13 6/24
approval [1]  26/18
area [4]  14/3 14/7 16/16 17/24
arena [8]
argue [1]  35/6
argument [3]  10/15 11/13 19/7
arguments [1]  15/10
Arkansas [1]  35/22
Armonk [1]  2/11
Arrows' [1]  24/7
ascertainable [3]  28/25 30/12 30/15
aspirational [1]  23/3
aspirations [1]  18/17
assisted [1]  25/1
assuming [1]  25/23
audience [2]  35/23 36/22
audiences [1]  36/2
Austin [1]  14/4
availed [1]  11/7
availment [3]  9/12 12/22 36/22
Avenue [1]  3/3

**A**

avoid [1]  28/16
awesome [1]  20/12

**B**

background [1]  36/12
bankrupt [2]  7/18 26/23
bankruptcy [6]  23/21 23/23 24/16
 26/1 26/20 28/12
Barry [1]  3/9
basic [1]  13/5
basketball [1]  8/14
beast [1]  23/16
beforehand [1]  18/21
behind [1]  33/1
believe [4]  6/7 6/16 7/3 13/17
benefit [1]  14/16
billion [1]  24/9
Biscayne [2]  3/10 3/11
Bitcoin [1]  15/1
bleeding [1]  15/9
bleeds [1]  14/4
board [1]  28/24
Boies [4]  2/7 2/10 4/14 24/23
bought [3]  10/8 10/12 26/13
Boulevard [1]  3/10
Box [1]  2/4
brand [2]  34/20 36/1
Brickell [1]  3/3
brief [4]  15/25 18/19 20/20 25/2
briefed [1]  20/5
briefing [7]  16/2 20/22 20/23 25/1
 25/2 29/19 30/10
broadcast [7]  8/20 8/21 9/16 9/16
 9/18 12/20 36/6
broadcasted [1]  9/2
broadcasters [1]  9/25
Brooke [2]  2/9 4/13
Brown [2]  3/7 5/2
bunch [2]  16/18 19/5
burden [1]  27/3
Burnett [2]  3/3 5/6
Bushman [2]  2/15 4/9
buy [1]  9/7
buying [1]  12/21

**C**

calendar [1]  4/22
California [3]  5/20 10/10 12/21
call [1]  4/22
Calling [1]  4/5
campaign [2]  17/18 18/24
Candidly [1]  24/25
Carter [1]  10/19
Carter vs. Ford [1]  10/19
causal [1]  28/13
center [2]  19/21 19/22
CEO [1]  18/7
certification [12]
certified [2]  27/9 27/9
certify [3]  27/5 33/14 37/19
channel [1]  36/6
Christopher [2]  3/2 5/5

cite [2]  6/9 6/23
citizens [1]  6/1
CIV [1]  1/4
claim [1]  24/8
claiming [1]  35/10
claims [4]  5/24 10/17 12/14 26/16
clarify [1]  5/16
class [29]
clause [2]  8/9 19/9
clear [3]  17/4 17/11 19/11
clerks [1]  13/18
clicks [1]  17/1
clients [1]  23/16
closing [1]  32/12
code [13]
codes [1]  9/15
collects [1]  19/5
comments [1]  26/15
commercial [1]  36/19
companies [1]  17/25
company [2]  7/7 9/19
competing [1]  17/25
complaint [12]
computer [1]  1/24
concerned [1]  17/7
concluded [1]  37/12
conduct [9]
confer [2]  9/3 19/9
conference [23]
Connecticut [1]  5/20
connection [1]  28/13
connections [1]  6/7
conspiring [1]  18/14
constitutes [1]  28/9
consumer [2]  6/21 7/25
contact [2]  19/8 22/6
contention [1]  19/11
CONTINUED [1]  3/1
cooperating [1]  18/15
copied [1]  14/24
Coral [1]  2/17
counsel [2]  12/4 24/22
countries [1]  23/1
country [2]  19/6 20/25
counts [2]  5/17 5/19
court [12]
courtroom [3]  4/2 30/10 37/11
courts [3]  8/1 8/24 19/6
coverage [1]  17/15
CRR [3]  3/13 37/24
crushed [1]  17/20
crypto [1]  15/13
CUBAN [14]
customers [3]  10/12 35/6 36/23
cut [1]  25/17
CV [1]  4/6

**D**

Dallas [14]
damage [1]  33/14
damages [2]  21/14 30/20
Dan [1]  5/8
Daniel [1]  3/6

data [3]  26/25 28/5 30/7
database [2]  23/16 23/20
date [2]  24/13 37/24
dates [1]  34/22
DC [1]  3/8
debated [1]  27/18
debating [1]  18/13
decide [1]  28/22
decides [1]  27/10
decision [2]  10/18 30/25
decisions [2]  6/4 31/1
decline [1]  28/24
declined [1]  22/24
default [1]  35/6
defendant [9]
defendants [5]  1/10 6/1 11/10 27/24
 28/15
defendants' [1]  5/13
defense [2]  4/25 23/11
deny [1]  32/2
deposed [1]  17/19
depositions [2]  16/19 21/17
desire [1]  6/10
Desiree [2]  2/12 4/18
determine [1]  31/12
dictate [1]  31/25
dictating [1]  32/3
directed [1]  19/8
directly [1]  22/6
disagree [3]  26/5 29/12 33/11
discovery [1]  14/16
discussed [2]  7/6 31/10
discussing [1]  35/5
dismiss [15]
distinctions [2]  6/18 6/20
DISTRICT [8]
DIVISION [1]  1/3
document [3]  19/17 19/20 20/24
documents [4]  16/23 16/25 17/4 26/8
dollars [2]  14/25 24/10
DOMINIK [1]  1/6
Doncic [2]  22/23
doubt [1]  14/19
dribbling [1]  36/12
dropped [1]  11/16

**E**

earned [2]  31/6 35/7
earning [1]  31/7
easier [1]  30/9
ECF [4]  5/13 5/15 8/17 10/18
educate [1]  31/18
Ehrlich [2]  18/7 23/4
eight [3]  19/12 19/18 20/18
eight months [2]  19/12 19/18
eight-month [1]  20/18
element [1]  9/13
emanate [1]  7/4
emanates [1]  6/11
enrolling [1]  35/5
entitled [1]  37/22
especially [1]  6/6
Esq [15]

**E**

**essentially [4]**  6/13 15/9 30/6 35/19
**estate [1]**  23/24
**ET [2]**  1/6 1/9
**Europe [1]**  20/10
**everybody [7]**  6/25 16/3 17/9 20/18
 21/7 21/24 30/17
**evidence [5]**  12/12 14/17 14/22 20/17
 36/22
**examples [2]**  9/10 10/2
**Excuse [2]**  11/12 18/11
**exercise [1]**  10/22
**exited [1]**  37/11
**experts [1]**  13/23
**expired [1]**  16/6
**extensively [1]**  20/5
**extent [1]**  7/24
**extremely [1]**  25/12

**F**

**F.Supp.3d [1]**  19/4
**fact [8]**
**facts [1]**  13/5
**falls [1]**  28/3
**fan [2]**  22/16 22/18
**fans [1]**  35/23
**featuring [1]**  8/14
**federal [2]**  26/14 26/18
**Feldman [1]**  3/10
**Fernandez [2]**  2/12 4/18
**Ferrer [2]**  2/12 4/17
**file [16]**
**filed [11]**
**filing [2]**  24/16 33/13
**final [1]**  26/18
**finals [2]**  22/3 22/19
**financial [1]**  27/18
**fine [1]**  20/16
**Firm [3]**  2/4 2/16 4/10
**FL [1]**  2/17
**Flexner [3]**  2/7 2/10 4/14
**Floor [1]**  3/4
**FLORIDA [65]**
**Florida's [2]**  6/19 13/21
**focus [1]**  7/16
**focusing [1]**  20/15
**followers [2]**  8/13 10/1
**force [2]**  22/2 29/23
**Ford [1]**  10/19
**foregoing [1]**  37/20
**Forget [1]**  20/9
**Fort [1]**  3/15
**forum [1]**  19/8
**forums [1]**  10/8
**Fowler [2]**  3/3 5/6
**Fran [1]**  4/3
**France [2]**  23/1 23/4
**Francine [3]**  3/13 37/23 37/24
**free [1]**  15/1
**friendly [1]**  33/7

**G**

**Gables [1]**  2/17

**game [4]**  19/13 36/5 36/14 37/9
**games [10]**
**gaming [2]**  19/21 19/22
**gated [3]**  16/16 21/19 21/19
**gateways [2]**  30/11 31/11
**germane [1]**  30/6
**Germany [3]**  20/10 23/1 23/4
**gets [3]**  28/1 32/1 36/8
**Gizmodo [2]**  19/4 35/20
**global [6]**  16/15 18/8 18/16 18/17
 18/23 18/23
**goal [1]**  20/18
**goals [1]**  18/1
**gotten [1]**  31/12
**govern [1]**  5/24
**granted [1]**  26/18
**great [8]**
**greatly [1]**  25/1
**groups [1]**  6/23

**H**

**half [2]**  23/5 31/5
**happy [4]**  15/25 20/20 24/23 30/9
**harmony [1]**  31/2
**Hayden [1]**  2/13
**head [1]**  31/16
**hear [3]**  12/21 29/2 29/7
**heard [4]**  9/8 9/15 10/6 21/14
**hearing [3]**  1/13 4/23 25/2
**Heat [8]**
**help [4]**  23/9 23/11 28/23 36/25
**hereby [1]**  37/19
**higher [1]**  24/17
**hire [4]**  23/18 23/19 24/19 24/20
**hired [1]**  13/22
**history [1]**  6/8
**home [2]**  19/13 31/13
**honest [1]**  25/22
**Honor [35]**
**Honorable [1]**  1/14
**hoping [2]**  23/4 23/24
**hours [3]**  16/5 16/7 21/1
**Houston [1]**  21/20
**Howard [2]**  2/15 4/9
**hundred [2]**  14/25 30/11
**hundreds [1]**  17/1

**I**

**I'd [2]**  25/17 26/2
**I'll [1]**  34/10
**I'm [33]**
**I've [4]**  13/20 24/22 29/6 31/12
**idea [1]**  18/13
**identical [2]**  8/4 8/4
**ignorance [1]**  33/1
**Illinois [1]**  10/10
**imagine [2]**  23/16 23/17
**immediately [1]**  21/2
**impossible [1]**  30/6
**imputed [1]**  18/18
**inaccurate [2]**  12/9 13/25
**incentive [2]**  18/15 18/16
**incentives [2]**  18/10 18/11

**including [4]**  6/19 8/12 10/1 36/1
**incredible [1]**  19/18
**indeed [3]**  15/12 15/12 22/23
**indicates [1]**  36/21
**indulge [1]**  30/13
**information [6]**  24/24 26/2 26/4
 26/24 29/1 30/5
**initial [1]**  27/25
**initially [1]**  7/8
**injured [1]**  12/21
**institutional [1]**  32/7
**intended [1]**  18/23
**interest [2]**  27/18 31/7
**interested [3]**  18/4 25/17 26/2
**international [13]**
**Internet [9]**
**Internet's [1]**  21/18
**intrude [1]**  21/20
**invest [1]**  31/3
**invested [1]**  31/9
**investigated [1]**  7/10
**investigating [1]**  7/8
**investment [3]**  24/15 30/25 31/1
**involvement [1]**  26/9
**irrespective [1]**  18/3
**issue [7]**  13/9 18/21 28/8 29/8 30/22
 34/16 36/4
**issues [5]**  5/16 27/6 28/22 30/8 31/19

**J**

**Jersey [23]**
**job [3]**  17/20 19/18 27/4
**Joey [1]**  4/9
**Jose [2]**  2/12 4/17
**Joseph [1]**  2/2
**journey [1]**  31/13
**judge [13]**
**Judge Altonaga [2]**  19/3 35/20
**Judge Altonaga's [1]**  20/15
**Judge Moreno [3]**  27/20 27/22 28/3
**Judge Moreno's [1]**  27/13
**judgment [1]**  15/9
**jurisdiction [16]**
**jury [1]**  27/10

**K**

**KARNAS [2]**  1/6 4/5
**Karnas vs. Cuban [1]**  4/5
**Kaye [2]**  2/2 4/9
**keep [1]**  21/21
**Ketchum [2]**  9/18 27/23
**key [2]**  28/8 28/15
**Knight [2]**  3/2 5/6
**knowing [1]**  24/25
**knowledge [2]**  32/7 32/8
**knows [3]**  12/4 26/17 33/2

**L**

**lack [1]**  10/16
**landed [1]**  20/16
**language [1]**  8/7
**large [1]**  31/8
**largest [3]**  9/21 10/9 10/13

**L**

late **[1]**  4/21
Lauderdale **[1]**  3/15
Laughter **[1]**  37/10
law **[12]**
laws **[1]**  7/25
learned **[1]**  24/22
leave **[3]**  30/20 31/21 31/21
legion **[1]**  12/18
legislative **[1]**  6/8
Leo **[1]**  2/2
liable **[3]**  8/7 27/12 27/20
liked **[1]**  32/18
limit **[1]**  30/8
limited **[1]**  17/23
link **[1]**  9/10
literally **[3]**  15/10 23/18 30/11
LLP **[3]**  2/7 2/10 3/7
local **[2]**  18/16 36/6
localized **[1]**  19/23
lost **[2]**  24/14 37/9
Louisiana **[1]**  5/20
love **[1]**  18/19
Luka **[3]**  20/1 22/23 22/24
Luka's **[1]**  22/25
lunch **[1]**  4/22

**M**

Magic **[1]**  35/2
main **[4]**  2/10 7/17 7/17 21/23
major **[2]**  6/18 6/22
MARK **[10]**
Mark's **[1]**  22/4
market **[11]**
marketing **[3]**  17/17 18/23 19/13
marketplace **[2]**  9/14 18/5
Massachusetts **[1]**  5/21
massive **[1]**  16/14
matter **[2]**  7/1 37/22
Mavericks **[24]**
Mavericks' **[4]**  9/7 9/9 12/5 16/8
Mavs **[3]**  20/1 20/7 30/13
Mavs' **[6]**  14/25 19/21 30/15 30/19
 30/24 31/9
maximized **[1]**  17/15
McCarter **[1]**  27/24
mean **[11]**
means **[1]**  24/14
mechanical **[1]**  1/24
media **[3]**  8/13 10/8 19/4
mediation **[1]**  29/16
message **[1]**  21/3
MIAMI **[12]**
Migdal **[1]**  2/13
miles **[1]**  17/21
Miller **[1]**  19/4
Miller vs. Gizmodo **[1]**  19/4
million **[1]**  24/9
millions **[3]**  8/13 17/1 21/5
minimum **[1]**  19/8
minor **[1]**  6/20
miscite **[1]**  16/25
Monday **[1]**  4/23

money's **[1]**  24/7
month **[5]**  15/13 20/18 27/14 34/1
 34/5
months **[3]**  19/12 19/18 25/25
Moreno **[3]**  27/20 27/22 28/3
Moreno's **[1]**  27/13
Morning **[1]**  18/6
Moskowitz **[9]**
motion **[35]**
motions **[2]**  4/22 25/7
move **[1]**  33/16
Mr. **[10]**
Mr. Best **[1]**  35/4
Mr. Boies **[1]**  24/23
Mr. Cuban **[4]**  12/15 15/12 28/11
 31/4
Mr. Moskowitz **[4]**  11/5 15/22 24/22
 29/10
MTD **[1]**  10/18
myriad **[1]**  8/13

**N**

name **[1]**  22/25
named **[2]**  10/17 10/22
national **[6]**  8/21 12/3 12/4 12/6
 12/20 17/14
nationally **[4]**  8/14 9/2 15/1 15/2
nationwide **[8]**
NBA **[5]**  14/2 14/5 27/24 35/22 35/23
NE **[1]**  3/14
neither **[1]**  5/25
Network **[1]**  36/15
New Jersey **[22]**
New York **[5]**  24/3 24/4 24/5 24/6
 26/14
News **[1]**  18/6
nice **[1]**  22/14
non **[1]**  36/6
non-Dallas **[1]**  36/6
none **[3]**  5/25 15/8 31/3
nonparty **[1]**  7/13
note **[1]**  25/11
notice **[2]**  24/21 26/15
notified **[1]**  24/22
notion **[1]**  12/8
November **[1]**  34/11
number **[9]**
Number 189 **[1]**  5/14
Number 195 **[1]**  8/17
Number 231 **[1]**  5/15
Number 41 **[1]**  10/18
numbers **[2]**  10/11 16/24
NW **[1]**  3/7

**O**

O'Neal **[1]**  27/15
OCTOBER **[4]**  4/1 13/6 30/17 34/23
October 27th **[3]**  13/6 30/17 34/23
offer **[1]**  32/6
offering **[1]**  32/3
Official **[3]**  3/13 37/24
offramp **[1]**  32/5
Oh **[1]**  13/14

Oklahoma **[1]**  5/21
Oladipo **[1]**  3/10
open **[1]**  23/24
opine **[1]**  28/10
opportunity **[2]**  32/24 33/7
opposed **[1]**  26/3
outstanding **[1]**  5/16
overlaps **[1]**  26/12

**P**

P.A **[3]**  2/13 3/3 3/10
p.m **[3]**  1/8 4/1 37/12
P.O **[1]**  2/4
page **[5]**  8/18 10/18 10/19 19/5 30/8
page 1375 **[1]**  19/5
page 18 **[1]**  10/18
page 35 **[1]**  8/18
page 6 **[1]**  10/19
pages **[1]**  13/20
papers **[4]**  6/6 10/2 20/21 22/6
Paralegal **[1]**  2/3
part **[6]**  7/20 20/1 22/24 22/25 30/18
 30/21
parties **[1]**  5/16
partner **[2]**  19/20 21/22
partners **[1]**  18/17
partnership **[3]**  16/15 16/18 18/18
party **[4]**  7/1 23/19 24/19 24/20
Passo **[1]**  2/3
pending **[3]**  5/12 26/9 27/4
Pennsylvania **[1]**  5/21
people **[29]**
percent **[5]**  24/13 24/14 24/15 24/16
 31/12
Perfect **[1]**  34/3
period **[1]**  20/18
personal **[9]**
perspective **[1]**  9/13
persuade **[1]**  29/8
Phang **[1]**  3/10
phrase **[1]**  8/5
picked **[1]**  36/8
piece **[1]**  24/6
place **[2]**  7/11 28/13
plaintiff **[4]**  4/7 5/17 21/13 36/25
plaintiffs **[14]**
plaintiffs' **[3]**  5/14 12/4 28/8
plan **[1]**  9/21
planning **[1]**  18/20
plans **[1]**  17/17
platform **[2]**  31/6 35/5
play **[2]**  35/25 35/25
played **[2]**  34/19 35/2
players **[4]**  19/25 20/2 20/8 20/11
playing **[1]**  36/2
Plaza **[1]**  2/16
pleads **[1]**  5/17
plenty **[1]**  16/1
plethora **[1]**  20/17
PLLC **[1]**  2/16
plurality **[2]**  14/9 14/10
point **[8]**
points **[1]**  29/17

**P**

position [1]  10/20
posts [1]  8/13
PR [1]  9/25
press [24]
problem [2]  33/22 33/23
proceeding [1]  23/22
proceedings [3]  1/24 37/12 37/21
process [2]  19/9 28/24
produced [1]  1/24
product [4]  10/13 12/21 27/16 35/13
products [1]  9/7
program [1]  31/6
promote [1]  31/4
promoted [3]  27/16 27/17 35/11
promoters [1]  34/20
promotes [1]  8/6
promoting [2]  19/19 35/8
promotion [6]  13/8 15/15 18/4 35/3
 35/8 35/9
promotional [4]  13/5 28/14 28/14
 31/10
promotions [2]  8/12 8/15
prosecuted [1]  7/10
protection [1]  7/25
prove [1]  27/3
public [1]  9/18
publicity [1]  19/12
purchasers [1]  10/9
purposeful [3]  9/12 12/22 36/22
purposefully [1]  17/6
purposely [1]  17/8
pursuant [1]  37/19

**Q**

question [15]
question's [1]  21/12
questions [6]  5/23 11/5 16/3 20/4
 27/9 27/10
quick [1]  34/15
quickly [3]  16/6 27/11 32/14
quoting [1]  10/18

**R**

Rachel [2]  3/6 5/2
reach [7]  16/20 17/18 20/4 20/6
 20/18 21/18 21/24
reached [2]  21/2 23/15
reaching [1]  21/5
read [2]  19/19 20/23
ready [1]  4/3
realize [1]  23/13
rebuild [1]  27/2
received [4]  12/6 24/13 30/15 31/9
recipients [1]  30/24
record [1]  37/21
recorded [1]  1/24
recused [1]  22/17
refine [2]  29/17 30/8
refining [1]  29/25
Rejane [1]  2/3
rejected [1]  19/7
relations [1]  9/19

release [2]  9/25 16/11
relevant [3]  9/14 34/18 36/4
relied [2]  9/8 10/8
remaining [2]  6/1 24/6
remember [5]  12/14 13/3 13/4 14/5
 35/3
rep's [1]  21/11
reply [5]  31/22 33/20 34/8 34/8 34/12
reporter [4]  3/13 3/13 18/6 37/24
reporters [2]  17/14 17/14
requirements [1]  28/17
residents [4]  8/17 9/6 9/8 12/8
respectfully [2]  6/24 29/14
respective [2]  5/22 8/1
response [10]
restricted [2]  16/16 17/21
result [2]  17/22 22/17
revised [1]  26/16
reward [2]  12/6 30/24
rivals [1]  35/24
RKA [1]  1/4
RMR [2]  3/13 37/24
RMR-CRR [1]  37/24
Rockets' [1]  21/20
round [1]  29/9
route [1]  26/20
Roy [1]  1/14
Rudnick [2]  3/7 5/2
rule [7]  21/19 27/6 28/16 28/18 29/4
 32/22 32/23
Rule 23 [1]  27/6
ruled [1]  28/1
ruling [3]  16/2 27/25 32/13 33/18
 37/9

**S**

Sachs [2]  3/6 5/8
Salopek [3]  3/13 37/23 37/24
San [1]  14/4
San Antonio [1]  14/4
saw [2]  9/16 21/9
Schiller [3]  2/7 2/10 4/14
screen [1]  36/16
SE [1]  2/7
searchable [1]  27/1
second [5]  9/20 10/13 11/16 12/12
 29/8
seconds [1]  30/14
Section [1]  37/19
securities [16]
security [2]  7/5 8/6
seeking [1]  33/14
seller [4]  8/6 27/7 27/15 28/19
send [1]  9/25
sense [3]  12/20 29/4 29/7
served [1]  10/11
setting [1]  30/10
settle [1]  27/23
settled [2]  26/14 28/4
settlement [1]  26/18
Shaquille [1]  27/15
share [1]  24/24
shown [3]  14/23 36/9 36/21

sic [1]  28/12
side [2]  25/11 36/11
sign [2]  14/9 14/25
signage [3]  35/12 36/7 36/20
signed [8]
simple [1]  27/20
situation [1]  35/21
smaller [1]  14/2
social [1]  8/13
solicitation [3]  28/9 28/17 30/23
sorts [2]  31/2 31/11
Sound [1]  34/12
sounds [1]  34/2
South [1]  3/10
SOUTHERN [5]  1/2 6/15 24/4 24/5
 24/6
specific [4]  11/7 13/23 16/2 23/5
spoken [1]  29/6
Sponsorship [2]  13/15 18/2
Spurs [1]  14/4
stadium [1]  16/17
stage [3]  12/13 14/15 27/21
stale [1]  26/4
standing [1]  9/2
starting [1]  4/23
state [18]
state's [2]  5/22 6/18
statement [4]  13/6 13/7 14/24 17/3
statements [2]  10/25 11/21
states [13]
statute [6]  6/8 7/9 7/16 27/12 27/16
 28/4
statutes [5]  6/17 6/18 6/21 6/22 8/3
statutory [3]  6/8 27/7 28/19
stay [1]  23/14
stayed [2]  5/12 7/20
stenography [1]  1/24
Stephen [3]  2/6 3/5 5/2
Steve [7]  4/13 18/7 21/9 23/3 26/8
 26/17 27/14
stock [1]  10/8 26/13
straight [1]  27/21
strategies [1]  31/9
Street [5]  2/7 2/10 2/13 3/7 3/14
strictly [1]  8/6
struggling [1]  31/25
subclass [1]  5/22
submitted [1]  13/19
subpoena [1]  10/12
subset [1]  12/7
success [3]  16/22 17/19 18/3
successful [6]  20/24 28/8 28/9 28/17
 30/23 31/23
sued [2]  7/20 9/18
sufficient [4]  9/3 11/9 12/22 19/8
Suite [5]  2/8 2/14 2/16 3/8 3/11
summary [2]  15/9 19/17
Sunshine [1]  36/15
supplemental [1]  25/2
supporting [1]  15/8
Supreme [1]  21/10
SW [1]  2/13
system [1]  25/3

**T**

**take [3]** 19/19 22/15 33/8
**talking [8]**
**talks [1]** 15/11
**target [6]** 9/20 9/21 9/22 9/24 17/12 17/13
**targeted [9]**
**targeting [4]** 11/7 12/16 13/23 17/6
**team's [1]** 14/5
**teams [5]** 35/8 35/19 35/22 35/24 36/2
**tee [1]** 17/15
**televised [2]** 8/14 8/15
**tell [4]** 10/12 17/16 17/16 28/25
**telling [1]** 15/10
**Tennessee [1]** 5/21
**term [1]** 27/1
**terms [1]** 9/12
**Texas [3]** 13/7 14/2 23/6
**Thank [11]**
**Thanks [1]** 37/7
**theory [2]** 8/11 35/4
**think [27]**
**thinks [1]** 33/6
**Thirteenth [1]** 3/7
**thought [1]** 25/20
**thousand [1]** 12/7
**thousands [1]** 9/11
**three years [1]** 26/23
**Tifford [2]** 3/2 5/6
**tight [1]** 30/8
**time [7]** 16/12 16/13 16/14 32/25 33/25 34/7 34/9
**Title [1]** 37/20
**tokens [2]** 31/3 31/5
**top [1]** 13/18
**tout [1]** 16/23
**touting [1]** 18/8
**towards [1]** 35/24
**Tower [1]** 3/11
**transcript [4]** 1/13 1/24 13/19 37/21
**treat [1]** 6/5
**trial [1]** 4/23
**trouble [1]** 29/22
**trove [2]** 26/2 28/5
**true [5]** 14/13 14/14 14/21 14/22 37/20
**truth [1]** 10/5
**TUESDAY [1]** 3/17
**Turner [1]** 3/9
**TV [2]** 35/8 35/18
**TVs [1]** 36/21
**tweet [3]** 19/7 35/11 35/22
**tweets [3]** 10/1 13/10 17/16
**two weeks [1]** 26/17
**two years [3]** 22/4 22/8 32/12
**Tyler [2]** 2/6 4/12
**typical [1]** 27/6

**U**

**Ulrich [2]** 2/6 4/13
**uncontradicted [1]** 31/7
**understand [1]** 9/15

**Understood [1]** 12/10
**uniformly [1]** 19/7
**UNITED [8]**
**universe [1]** 25/7
**unless [1]** 28/13
**unregistered [3]** 7/5 8/6 27/8
**unwieldy [1]** 23/16
**us [7]** 6/13 10/12 23/15 28/2 28/2 30/9 34/11

**V**

**veil [1]** 33/1
**Victor [1]** 3/10
**video [1]** 5/9
**view [1]** 29/10
**viewed [1]** 8/16
**Virginia [1]** 5/20
**virtue [1]** 26/1
**voluminous [1]** 26/2
**Voyager [49]**
**vs. [3]** 4/5 10/19 19/4

**W**

**waiting [2]** 24/10 28/1
**Washington [1]** 3/8
**watch [1]** 21/5
**watched [4]** 10/6 10/7 22/19 35/9
**watching [4]** 21/7 21/8 36/3 36/14
**week [1]** 26/17
**weeks [4]** 15/13 26/17 34/1 34/2
**White [2]** 3/3 5/6
**who's [5]** 4/7 4/25 6/2 9/18 28/21
**widely [1]** 9/1
**Wiesinger [1]** 2/2
**wish [1]** 22/20
**WL [1]** 10/19
**Wolkinson [2]** 3/6 5/2
**won [2]** 22/20 37/8
**wonderful [1]** 19/17
**word [3]** 8/4 15/15 19/19
**words [1]** 16/10
**work [1]** 19/18
**worked [5]** 10/5 16/24 17/3 17/20 25/15
**working [3]** 5/15 25/5 25/20
**works [1]** 25/3
**world [3]** 16/21 19/20 20/15
**worldwide [2]** 17/2 19/24
**worry [1]** 11/9
**worth [2]** 14/16 24/9
**write [2]** 23/18 23/19
**wrong [2]** 13/18 33/6
**wrote [1]** 25/7

**Y**

**year's [1]** 14/16
**York [6]** 2/11 24/3 24/4 24/5 24/6 26/14

**Z**

**Zack [2]** 2/6 4/13
**Zoom [2]** 4/13 4/20