IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No: 1:22-cv-22538 (ALTMAN/REID)

DOMINIK KARNAS, *et al.*,

    Plaintiffs,

    v.

MARK CUBAN, *et al.*,

    Defendants.

**DEFENDANTS MARK CUBAN'S AND DALLAS BASKETBALL LIMITED'S
SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY
NATIONWIDE ISSUE CLASSES, PURSUANT TO FEDERAL RULES 23(a), 23(b)(3),
AND 23(c)(4), AND INCORPORATED MEMORANDUM OF LAW [ECF NO. 231]**

**TABLE OF CONTENTS**

**INTRODUCTION** ............................................................................................................... 1

**FACTUAL BACKGROUND** ............................................................................................. 1

    A. Voyager Offered and Promoted EPAs and VGX Beginning in 2019 ............................... 1

    B. Voyager's Promotional Campaign With the Mavericks Always Centered Around the Voyager Platform as a Whole, Not EPAs, Which Plaintiffs Contest Is a Security ............ 3

    C. Voyager Independently Promoted its Sponsorship of the Mavericks and Associated the MAVS100 Code With its Published Promotion and the Press Conference ...................... 3

    D. The Promotional Statements at the Press Conference Focused on Educating New Users on Cryptocurrency by Starting Slow and Investing Small Amounts Through the Voyager Platform ............................................................................................................................. 4

    E. Plaintiffs' Proposed Issue Classes ................................................................................... 6

    F. Voyager's Data Underscores the Deficiencies in Plaintiffs' Proposed Class .................. 7

**ARGUMENT** ........................................................................................................................ 7

    I. PLAINTIFFS CANNOT ADDRESS THE SUCCESSFUL SOLICITATION ELEMENT WITHOUT AN INDIVIDUALIZED INQUIRY ............................................................. 7

        A. The Data Demonstrates that There Is No Class-Wide Evidence Connecting Defendants' Conduct and Plaintiffs' Investment Decisions ............................................ 7

        B. Plaintiffs' End-Run Around Rule 23 Does Not Work Either ......................................... 13

**CONCLUSION** .................................................................................................................... 14

# INTRODUCTION

Defendants respectfully file this supplemental opposition having received access to Voyager's customer database of account holders' activity and other Voyager-specific data (the "Data"). The Data confirms and elucidates the fundamental problems with Plaintiffs' proposed class definitions: they are untethered to Defendants' conduct, and there is no class-wide evidence connecting Defendants' statements with the putative class members' investment decisions. The Data shows putative class members' only conceivable evidentiary connection to Defendants is by their use of the "MAVS" reward code. Yet, as shown below, most of those in Plaintiffs' proposed class, including most of the named plaintiffs, never used the MAVS code or received a reward. Without individualized discovery as to whether all those that did not use the MAVS code were successfully solicited by Defendants, it is impossible to substantiate a connection between a customer's investment decisions and Defendants' conduct.

Even among MAVS code users, as the Data confirms, individualized discovery is required. Critically, Voyager, *on its own and for its own gain*, broadly disseminated a written, paid promotion at the same time as the October 27, 2021 press conference (the "Press Conference"). Cryptocurrency promoters and news sources recirculated this written promotion for anyone to see. Thus, even for those that used the MAVS code, is not determinable on a class-wide basis whether it was Defendants' statements, Voyager's paid promotion, or other promoter's statements that successfully solicited their purchases.

As set forth below, and in Defendants' Response (ECF No. 254, the "Opp.") to Plaintiffs' Motion for Class Certification (the "Motion"), the Court should deny Plaintiffs' Motion and reject class certification.

## FACTUAL BACKGROUND

**A. Voyager Offered and Promoted EPAs and VGX Beginning in 2019**

Voyager began operating a platform for the depositing and trading of cryptocurrencies in 2019.[1] Users that created an account could transfer tokens they previously owned to Voyager for custody, or they could deposit fiat currency and buy and sell certain cryptocurrencies on Voyager's platform.

Voyager also offered its customers two other products. In November 2019, Voyager began

---

[1] **Ex. A**, Voyager Digital Ltd. Annual Information Form for the Fiscal Year Ended June 30, 2021 at 9 (Oct. 27, 2021) ("Voyager 2021 Annual Report").

1

paying users "rewards"—a monthly in-kind payment as a percentage of certain deposited assets—if certain conditions were met.[2] Each month, Voyager published the terms under which certain assets were eligible to earn rewards through Voyager's rewards-eligible accounts ("Earn Program Account" or "EPA").[3] For example, in June 2021, 34 assets were eligible for rewards that were held for the periods and in the amounts described in the monthly bulletin.[4]

Second, Voyager offered and sold VGX, Voyager's native token, which Voyager accepted as payment for services offered on its platform. Voyager began selling VGX in July 2019.[5] The promotion and sale of EPAs and VGX are at issue in this case.

On June 17, 2019, before it even began selling VGX or offering EPA rewards, Voyager developed advertising and promotional campaigns for its platform and products.[6] Voyager paid celebrities, sports teams, colleges, and others to promote Voyager, its brand, and its products. Also starting in June 2019, Voyager incentivized new customer sign-ups by offering to deposit free funds in new accounts, even offering free funds to simply pass KYC (Know Your Customer) protocols.[7] To earn these free funds, Voyager directed new customers to use "promotional codes" that often corresponded with the names of the promoters. However, it was Voyager, not the promoter, that offered free funds and controlled the terms of the promotion. Generally, Voyager paid its promoters a flat fee for their promotional efforts,[8] and discovery has revealed no evidence that Voyager paid any promoters based on the number of users that signed up under a given promotion, or the amount of assets deposited. The Data reflects that between June 2019 and February 2022, Voyager created approximately ▮ promotional codes, likely entered into advertising agreements with more than ▮ "affiliate" promoters, and oftentimes created

---

[2] Declaration of Harris Label ("Label Decl.") **Ex. 1**.

[3] *See e.g.* **Ex. B**, VOYAGER001020 (reward rates and minimum balances for the tokens eligible for EPA rewards).

[4] **Ex. A**, Voyager 2021 Annual Report at 10.

[5] Label Decl. **Ex. 1**.

[6] Label Decl. **Ex. 2**. In fact, Voyager Data shows that since the platform's inception through its bankruptcy, Voyager created ▮ unique promotional codes. *See id.* These promotional codes were often released hand-in-hand with concurrent third-party commentary and promotion and were generally available on the internet. And during the timeframe in question here—October-November 2021—there were ▮ active promotional codes. *See* Label Decl. **Ex. 3** (summing unique promotional codes used on the Voyager platform in October-November 2021).

[7] *See* Label Decl. **Ex. 2** at 1 (promotion "▮").

[8] *See, e.g.*, ECF No. 155-29 at 284-308 (Voyager Marketing Agreement at § 5 reflecting fixed payments for Mr. Gronkowski's promotion of Voyager); ECF No. 155-29 at 309-333 (Race Team Sponsorship Agreement at § 9 reflecting the same as to Mr. Cassill).

promotions without external promoters for events like ███████████████ ███████████████████████████████, just to name a few.[9] Voyager's records further evidence widespread affiliate promotion from many prominent entities, including: ███████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.[10]

### B. Voyager's Promotional Campaign With the Mavericks Always Centered Around the Voyager Platform as a Whole, Not EPAs, Which Plaintiffs Contest Is a Security

On October 27, 2021, Voyager and Defendant Mavericks announced a multi-year sponsorship agreement whereby Voyager, as a paid sponsor of the Mavericks, received branding placement within the Dallas Mavericks arena and participated in a singular press conference with Mark Cuban acting in his role as the Governor of the Dallas Mavericks. The Mavericks agreed to certain promotional activities pursuant to this agreement. First, Voyager received the right to advertise Voyager's brand at Mavericks home games and in various related campaigns.[11] The agreement describes allocated ad space and "signage" within the Mavericks' arena.[12] The Mavericks also agreed to work with Voyager to conduct community events and create educational content. The brand advertising displayed was limited to branding associated with Voyager's name or Voyager's slogan "Crypto For All."[13] Voyager's advertising did not mention EPAs, VGX, or focus on a securities transaction.[14]

### C. Voyager Independently Promoted its Sponsorship of the Mavericks and Associated the MAVS100 Code With its Published Promotion and the Press Conference

To celebrate this sponsorship, Voyager published on the internet an offer to new customers to earn $100 of free Bitcoin if they signed up for a Voyager account, used the MAVS100 reward code, deposited $100, and made a trade of at least $10.[15] This promotional offer, consistent with

---

[9] *See* Label Decl. **Ex. 2** at 1-3.
[10] *Id.*
[11] *See* ECF No. 155-2 Exhibit 1.
[12] *Id.*
[13] *See, e.g.*, ECF No. 155-21, Plaintiffs' Exhibit 85A at 15.
[14] Indeed, the Sponsorship Agreement expressly stated, "Sponsor ***shall not promote any specific cryptocurrency*** in connection with the Sponsorship Package, the rights provided under this Agreement, or Club." ECF No. 155-2 ¶ 3.03(f) (emphasis added).
[15] Voyager offered to deposit $100 worth of free Bitcoin into any new users' accounts who signed up using the MAVS100 code *and* completed four other steps. **Ex. C**, MAVSCUBAN_00018042. New users had to (1) download Voyager's mobile application (the

3

Voyager's historical campaigns to date, focused on attracting new users to the Voyager platform as a whole. *Critically, Voyager did not require participation in its EPA to qualify for the reward. The trade could be in **any** cryptocurrency offered on the Voyager platform and **was not limited** to an interest-bearing token on Voyager's EPA.*[16]

Voyager's written promotion was done *on its own accord and for its own benefit.* Defendants did not participate in any way with the published giveaway promotion for new users. Defendants never participated in discussions regarding any of the terms of the offer. Defendants did not financially benefit in any way from this written promotional offer. Further, numerous crypto-centric websites recirculated the promotion on the internet countless times.[17]

### D. The Promotional Statements at the Press Conference Focused on Educating New Users on Cryptocurrency by Starting Slow and Investing Small Amounts Through the Voyager Platform

On the same day the Voyager promotion was announced, Voyager and the Mavericks held a Press Conference announcing the Sponsorship Agreement.

The Press Conference lasted approximately a half-hour. It was also live-streamed, and the video was uploaded to YouTube. As of this filing, the posted video has fewer than 1,640 total views.[18] After the Press Conference, Mr. Cuban did not make a single public statement about Voyager in any capacity, online or otherwise. Critically, apart from the MAVS100 code, there is

---

"App"), (2) complete the sign-up process for opening a new account using the MAVS100 code, (3) deposit $100 in cash or cryptocurrency, and (4) make a trade on the App of over $10. *Id.* Under Voyager's terms, the MAVS100 promotion was active only until October 30, 2021, 11:59 PM CT. *Id.*

[16] *See* **Ex. C**, MAVSCUBAN_00018042.

[17] *See, e.g., Opp. at 5 (citing ECF Nos. 254-19 (reddit thread commenting on the MAVS100 code), ECF No. 254-22 (Twitter thread discussing the same)); **Ex. D**, Kevin Helms, *$100 in Free Bitcoin: NBA Team Dallas Mavericks and Voyager Kick Off Partnership With BTC Bonus*, Bitcoin.com News (Oct 29, 2021), *available at* https://news.bitcoin.com/100-in-free-bitcoin-nba-team-dallas-mavericks-voyager-kick-off-partnership-with-btc-bonus/; **Ex. E**, Nick Reyes, *(EXPIRED) $100 Worth of Bitcoin from Voyager & Dallas Mavericks*, Frequent Miler (Oct. 30, 2021), *available at* https://frequentmiler.com/100-worth-of-bitcoin-from-voyager-dallas-mavericks/. Moreover, in the four weeks that preceded and followed the Press Conference Voyager had over ▮ other active advertising and promotional campaigns, including its own proprietary promotional codes like ▮▮▮▮▮▮, and ▮▮▮▮▮▮. For example, in addition to the MAVS100 code, paid promotions under the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ codes were on going as well. as active advertising campaigns with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, among others. *See* Label Decl. **Ex. 3** at 3-4.

[18] *Dallas Mavericks/Voyager Introductory Press Conference*, YouTube (Oct. 28, 2021), *available at* https://www.youtube.com/watch?v=bbQCUOjjMdc.

4

no evidence of any kind reflecting the customers that viewed the Press Conference. That is, nothing in the Data reflects if an individual learned of the MAVS100 code from the Press Conference or from an unrelated website online or by other means in complete ignorance of the Press Conference and the Defendants.

Defendant Mavericks' Press Conference spoke of educating new users on cryptocurrency. The discussion regarding Voyager's promotion was entirely consistent with the terms of the written promotion.[19] Importantly, there were no statements made during the Press Conference which could assist the trier of fact in adducing whether a Voyager investor watched the Press Conference and thus, attributed their investment decision to the Defendants as opposed to seeing Voyager's written promotion on the internet. As will also be shown herein, none of the Defendants' statements amounted to something more than a promotion of the Voyager platform. Evidence clearly shows Defendants refused to promote a specific cryptocurrency.[20]

In the 29-page transcript of the press conference, the Voyager platform including the availability to trade non-interest-bearing tokens was touted.[21] The missive was education to the cryptocurrency novice and to start slow, invest small amounts, learn, and have fun.[22] At no time

---

[19] *See* **Ex. C**, MAVSCUBAN_00018042.

[20] Defendants never promoted VGX. Indeed, Mr. Cuban testified that he and the Mavericks "made sure not to discuss [VGX] tokens" at the Press Conference or in promotional materials, and rejected any request to promote VGX. *See* Opp. at 27 (citing ECF No. 265-27 (Cuban Tr.) at 24:12-20, 156:20-21; ECF No. 265-43 at 2); *see generally* ECF No. 189 (MTD) at 30.

[21] ECF No. 155-1 at 3 ("They [Voyager] have over 65 digital assets on the platform that allow people to tap into the crypto markets . . . ."). A few months before the Press Conference, only 34 of the 65 digital assets (or crypto tokens) were on Voyager's EPA. **Ex. A**, Voyager 2021 Annual Report at 10.

[22] ECF No. 155-1 at 15-16 ("Yeah, let me add to that. You don't have to spend a lot of money in order to learn.· It's not like the stock market where, you know, it's almost impossible, except on a few platforms to spend $10 and get started.· You know, my son -- my now 12-year-old son got me into Dogecoin when it was less than a penny.· And I -- I was like, 'let's do this,' because·it's a cheap way for you to learn how all of this works.· So, while you need to put in $100 to get the $50 [*sic*] bonus in the next two days, if you don't have $100, and you just want to, you know, download the app, and put in $5 and by Shib[a Inu] (phonetic) . . . ."); *id.* at 31-32 ("The fact that you don't have to rush into it and put all your money in it.· So, patience is a big part of it and then experimentation, right?· Be curious, because if you're buying -- what is·[Shiba Inu] (phonetic), like a half a penny or something crazy? . . . So, literally, like, when my son and I first tried it, it was less than a penny, and we spent, I think·$11.· And that gave us a chance to go through everything and spend some time with it.· And so, because there's such a low cost of introduction and, you know, obviously, the people who need the most education, hopeful[ly] are spending the

5

did Defendants advocate to invest more than the minimum amount or trade thousands of dollars. Voyager implicitly acknowledged this in that it did not reward the user for investing more than $100 or executing a trade of more than $10. There were no further rewards for trading, say, $10,000. Finally, Defendants disavowed particular cryptocurrencies such as Dogecoin and Shiba Inu, likening them to a lottery ticket rather than an investment.[23]

It is with this backdrop of promotions and advertising that putative class members opened Voyager accounts, placed trades on Voyager's platform, and bought assets in EPAs, decisions for which Plaintiffs seek to hold Defendants liable.

### E. Plaintiffs' Proposed Issue Classes

On March 15, 2024, Plaintiffs filed their operative motion for class certification. ECF No. 231.[24] Plaintiffs propose two issue classes: a "security" class and a "solicitation" class. *Id*. at 4. Plaintiffs' proposed security class is "[a]ll persons or entities in the United States who, from applicable statutes of limitation through July 5, 2022, purchased, repurchased, invested, reinvested, deposited, held and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens." *Id*. And Plaintiffs' proposed solicitation class is "[a]ll persons or entities in the United States who, from October 27, 2021 through July 5, 2022 purchased, repurchased, invested, reinvested, deposited, held, and/or transferred additional funds to an EPA and/or purchased, repurchased, invested, and/or reinvested in VGX Tokens." *Id*. at 5. This includes effectively all Voyager users since October 27, 2021.

Despite these broad proposed class definitions, Plaintiffs concede that Voyager's promotional codes should be used to define a class of those that Defendants successfully solicited.

---

least amount of money. You know, we -- there's a lot of programs and educational programs that we can do that guide people through the process. And that's really the key, right? And I think that one of the things that need to be mentioned, one of the greatest values of the lower cost crypto isn't so much, 'hey, it could be an investment,' it's more the community. You know, if you get on social media, no matter what it is, TikTok, Twitter, Instagram, everybody's talk -- I don't even know the Shib[a] Inu one, but you know, with Dogecoin, it's like, to the moon. And you know, everybody's got their social profile set up to be a dog. You know, so there's a -- it's a [low] cost entry to fund. And then, being involved in it on social media is also a way that we can expand education.").

[23] *Id*. at 19 ("Yeah, I mean, you're spending your money, always be careful. But the other thing is, look, there's investments, and things like Shib[a] Inu and – or whatever it's called – and Dogecoin, those aren't investments, right? Those – it – this is better than a lottery ticket, but it's a good way to learn.").

[24] Defendants' Opp. describes the procedural posture of this case in further detail.

6

*See* Motion at 13 ("Corporate records regarding the identity of individuals who used those promo codes upon sign-up *will necessarily show those individuals who most certainly* relied upon Defendants advertisements . . . ") (emphasis added). As set forth below, this core assumption of Plaintiffs' proposed class, that promotional codes are an evidentiary connection between Defendants' conduct and Plaintiffs' investment decisions, is false. Voyager's Data refutes this and demonstrates that individualized inquiries are the only way Plaintiffs could factually and constitutionally prove the "successful solicitation" element of their claims.

### F. Voyager's Data Underscores the Deficiencies in Plaintiffs' Proposed Class

Defendants recently obtained Voyager's Data, which reflects the trading records and account information for all ▮▮▮▮▮▮▮ Voyager customers who ever opened an account.[25] The Data includes the date accounts were created, whether a promotional code was used, which assets and in what amounts were bought and sold, profits earned, and the amount of bankruptcy distributions received through late 2023.

For the purposes of this Motion, Undersigned focused on the Data surrounding the fifteen named plaintiffs and several example accounts of Voyager customers who used the MAVS100 code.[26] The Data supports three primary conclusions: (1) the MAVS100 code is the only class-wide evidence reflecting any connection between the Defendants and any putative class member's trades; (2) there is no way to tell from the Data alone if a user utilized the MAVS100 code because of Defendants' statements or because they learned of it and its associated incentives independently through Voyager's publication of the offer or by other means unrelated to Defendants; and (3) even among MAVS100 code users, there is a vast array of disparate investment decisions that has no temporal or substantive connection to Defendants' statements. As set forth below, the Data and these conclusions demonstrate that Plaintiffs' proposed issues classes are not viable, and Plaintiffs' Motion must be denied.

## ARGUMENT

### I. PLAINTIFFS CANNOT ADDRESS THE SUCCESSFUL SOLICITATION ELEMENT WITHOUT AN INDIVIDUALIZED INQUIRY

#### A. The Data Demonstrates that There Is No Class-Wide Evidence Connecting Defendants' Conduct and Plaintiffs' Investment Decisions

Voyager's Data clearly demonstrates that individualized issues regarding the element of

---

[25] Label Decl. **Ex. 4**.
[26] *See* Label Decl. **Exs. 6a-r**.

successful solicitation will predominate (*see* Opp. § I(A)(1)) and invalidates Plaintiffs' proposal to "use Voyager's business records to ascertain the class." ECF No. 276, Reply at 10. Class certification is proper only if "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P 23(b)(3). The essential issue that cannot be resolved without individualized proof is whether Defendants "successfully solicited" putative class members' transactions on Voyager. This factual question—whether each Plaintiff bought rewards-eligible cryptocurrency on Voyager as a result of Defendants' conduct—cannot possibly be addressed with class-wide data.

This issue has three components: there is no class-wide evidence as to (1) who Defendants successfully solicited; and (2) for those individuals, there is also no class-wide evidence as to which of their investment decisions were successfully solicited. In addition, (3) these evidentiary problems are fatal to the proposed classes because Defendants have due process rights to challenge each putative class member's claim.

### 1. There Is No Class-Wide Evidence Showing Who Defendants Successfully Solicited

Class certification should be denied because there is no class-wide evidence demonstrating which customers traded rewards-eligible cryptocurrency on Voyager due to Defendants' successful solicitation. To be part of a "solicitation" class, a customer would need to have bought an unregistered security on Voyager "as a result" of Defendants' solicitation. *See* Opp. at 9. This necessarily means creating a Voyager account shortly after Defendants' promotion, and the Court would need a basis to find that Defendants' conduct was the reason for the plaintiff's action.

First, as to timing, Voyager's Data shows when each putative class member opened a Voyager account and therefore rules out those that did not sign up around October 2021 as a result of Defendants' statements. For example, ***of the fifteen named plaintiffs, only three opened Voyager accounts within a month of Defendants' promotion and only two used the MAVS100 Code.***[27] ***The thirteen other named plaintiffs opened their accounts prior to any alleged conduct by Defendants,***[28] ***and ten of the named plaintiffs engaged in the same conduct alleged by Plaintiffs to be violative of the law—i.e., those individuals successfully solicited others to join and in return received a referral reward from Voyager.***[29] Past this, there is nothing in the Data

---

[27] Label Decl. **Ex. 5**.
[28] *Id*.
[29] *Id*.

8

that can reasonably connect an account holder's trading decisions with Defendants. That is, one cannot look at the Data and say with any certainty that an account holder's specific investment decision can be tied to any promotional statements by Defendants. Voyager's Data confirms, as Plaintiffs seem to recognize,[30] that these named plaintiffs, as well as all those similarly situated, could not be part of this class.

Second, Voyager's Data confirms that there is no class-wide evidence demonstrating the reason a new account was opened. As described above, Voyager had engaged many promoters at the same time, and it has no data that reflect how, or from whom, Voyager acquired its new customers.[31] This is fatal to Plaintiffs' proposed class because resolving this question on an individualized basis would predominate class-wide issues, in violation of Rule 23. *See* Opp. at 8, 10-11.

Plaintiffs propose using the "MAVS" promotional code as a proxy for successful solicitation (Motion at 18), but the Data confirms that this too fails to solve the problem. As an initial matter, use of a MAVS code is not proof of the Mavericks' influence—many users found the MAVS code on the internet and used it simply to receive $100 in free Bitcoin, not because it was associated with the Mavericks.[32] There is also absolutely nothing in the Data to evidence any Plaintiffs' investment decisions made due to Mr. Cuban. Indeed, just the opposite. In fact, the Data shows that, since Voyager's inception, ▇▇▇ Voyager customers used promotional codes *other than* a MAVS code.[33] Further, of the customers who used a MAVS code, ▇▇▇ customers referred others, indicating that they themselves solicited purchases on the Voyager platform and thus are subject to the *in pari delicto* defense.[34]

But even for MAVS code users, Plaintiffs cannot demonstrate factually or legally that the *Defendants* are responsible for users that signed up due to *Voyager's* promotion of its products. Promoters cannot be liable for an issuer's sale of unregistered securities unless "it is fair to say that the buyer 'purchased' the security from him." *See Pinter v. Dahl*, 486 U.S. 622, 647 (1988);

---

[30] *See* Motion at 18 ("Plaintiffs will be able to show readily which purchases were made with which referral codes" by using data from Voyager).

[31] Voyager's Data does not have any indicia of a unique affiliate marketing link that could demonstrate how a customer arrived at Voyager's website. *See generally* Tim Keary, *Affiliate Link*, Techopedia (Jun. 5, 2024), *available at* https://www.techopedia.com/definition/1397/affiliate-link.

[32] *See* n.17, *supra*.

[33] Label Decl. **Ex. 4**.

[34] *See id.*; *see also* Opp. at 22-23.

9

*De Ford v. Koutoulas*, No: 6:22-cv-652, 2023 WL 2709816 (M.D. Fla. Mar. 30, 2023), *recons. denied*, 2023 WL 3584077, at *16 (M.D. Fla. May 22, 2023). There is no serious debate that Defendants' general promotions of Voyager's *brand* does not amount to the *sale* of anything, let alone an unregistered security.[35]

In addition, as to the paid promotions, Defendants lacked operational control over Voyager or any financial incentive or obligation to promote Voyager's EPAs or VGX.[36] Without such an incentive or role, Defendants' actions constitute the mere "urg[ing of] another to make a securities purchase . . . to assist the buyer" or "the giving of gratuitous advice, even strongly or enthusiastically," which falls short of a "solicitation" under Supreme Court precedent. *See Pinter*, 486 U.S. at 647.[37]

Additionally, use of a MAVS code is a poor proxy for successful solicitation because many MAVS code users traded in ways that are inconsistent with the Defendants' statements. Data from three users prove this point. For example, example Customer 1 signed up ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[38] By its own terms, the MAVS code expired on October 30, 2021,[39] and there is no class-wide way to connect users that signed up so far in time from Defendants' statements. Similarly, example Customer 2 signed up ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,[40] cryptocurrencies

---

[35] The brand advertisements never mentioned EPAs or VGX, and thus are far remote from soliciting their sale. *See, e.g.*, ECF No. 155-21, Plaintiffs' Exhibit 85A at 16.

[36] *See* ECF No. 189 at 14.

[37] *See also In re CNL Hotels & Resorts, Inc.*, 2005 WL 2291729, at *5 (M.D. Fla. Sept. 20, 2005) (even a commission may be insufficient, absent other profits, incentives, or promotions); *Rensel v. Centra Tech, Inc.*, No. 17-24500-Civ-Scola, 2019 WL 2085839, at *4, (S.D. Fla. May 13, 2019) ("*Pinter* requires the Court to look at the defendants' relationship with the plaintiff purchaser.").

[38] Label Decl. **Ex. 5**.

[39] **Ex. C**, MAVSCUBAN_00018042. Voyager appears to have unilaterally extended the terms of the MAVS100, and their doing so underscores that Voyager, not Defendants, controlled their promotions, and Defendants should not be liable for sales arising from promotions Voyager controlled.

[40] *See* Label Decl. **Ex. 5** (indicating that Customer 2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Customer 2's trading records indicate ▮▮▮▮. Label. Decl. **Ex. 6q** at 2. While Customer 2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 3.

10

that Mr. Cuban expressly disavowed.[41] The purchase of these assets, despite use of a MAVS code contradicts any assertion that Defendants' statements solicited these purchases. Further, example Customer 3 signed up ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[42] Receipt of a monthly reward is a necessary component of liability because absent the promise of a future, monthly reward payments, the customer has no expectation of profit, and therefore has not purchased a security.[43] Therefore, all three of these customers, despite their use of a MAVS code, cannot be part of the solicitation class because their behavior is demonstrably contrasted with Defendants' promotions.[44] Accordingly, Voyager's Data confirms that Plaintiffs cannot satisfy the successful solicitation element with class-wide proof, and for that reason certification should be denied.

2. **There Is No Class-Wide Evidence Showing Which Investments Defendants Successfully Solicited**

Even for individuals that Defendants could have successfully solicited—for example, those who used a MAVS code—each of their "investment decisions" must be analyzed separately. Settled principles of securities law dictate that where an investor engages in a multi-step purchase involving discretionary "investment decisions" at each stage, each such investment decision is a separate security purchase, for which solicitation liability must be analyzed separately. *See Goodman v. Epstein*, 582 F.2d 388, 414 (7th Cir. 1978) (existence of a "legal alternative" in when

---

[41] *See* ECF No. 254-29 at 19 ("Mr. Cuban: "look, there's investments, and things like Shib[a] Inu and . . . Dogecoin, those aren't investments, right?").

[42] Label. Decl. **Ex. 6r** at 2 (Customer 3's trading records ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *id.* at 3 (Customer 3's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[43] Voyager offered customers the ability to buy and sell various assets on its platform, but only some were eligible to earn monthly rewards—the EPA feature that corresponds with the definition of a security—if certain threshold requirements were met. Customers who purchased only non-rewards-eligible tokens or who failed to meet threshold requirements did not purchase a security from Voyager. No reasonable customer who bought non-rewards-eligible tokens could expect profit premised on Voyager's conduct, as Voyager provided nothing more than custodial services to those customers. *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) (definition of a security requires expectation of profit).

[44] Importantly, many of the named plaintiffs suffer from these problems as well. Only two named plaintiffs used the MAVS promotional code, and eleven of them were existing Voyager customers at the time of the Press Conference. Label Decl. **Ex. 5**. In addition, ten named plaintiffs themselves solicited others' deposits on Voyager, and seven used a referral sign up code, suggesting that a friend, not Defendants, solicited the opening of their Voyager account. *Id.*

11

and how to transact is a distinct "investment decision"); *see also Currie v. Cayman Res. Corp.*, 595 F. Supp. 1364, 1376 (N.D. Ga. 1984) (adopting *Goodman* reasoning). For example, a promoter may successfully solicit a purchase made the day of the solicitation, but the law does not assume that such promotion successfully solicited that same investor's supplemental purchase of the same security three months later.[45] Whether Defendants successfully solicited securities purchases is thus an individualized question requiring unique evidence for each plaintiff *and each investment decision*. This question is such an essential part of determining liability in this case that these individualized questions will predominate, thus defeating certification.

Voyager's Data also allow for analysis of the substance of users' trades, many of which were inconsistent with the terms of the promotion, or otherwise could not subject Defendants to liability. For example, for many users, including seven named plaintiffs, their first or second transactions after the Press Conference was a sale or withdrawal.[46] This trading behavior is inconsistent with the idea of earning rewards on users' crypto assets that Plaintiffs claim the Defendants endorsed. Similarly, many users, including ten named plaintiffs traded in more than ten different cryptocurrencies, including assets that were not eligible for rewards.[47] For example, in the two months after opening his account, ███████ ███████████████████████████ that were not eligible for rewards.[48] Promoter defendants cannot be held liable for solicitations "[beyond] the *immediate sale*,"[49] and these customers made their own independent investment decisions after the Press Conference that are not attributable to statements by Defendants or for which liability cannot attach.

The Data confirms the variety of investment decisions made even among MAVS code

---

[45] *See, e.g.*, named Plaintiff ███████████████████████████████████████. *See* Label Decl. **Ex. 6e** at 2. Plaintiffs offer no explanation for why Defendants' October statements should be presumed to have solicited both purchases even though they are more than five months apart.

[46] Label Decl. **Ex. 6b** at 7; Label Decl. **Ex. 6c** at 2; Label Decl. **Ex. 6d** at 5; Label Decl. **Ex. 6h** at 4; Label Decl. **Ex. 6i** at 9; Label Decl. **Ex. 6m** at 13; Label Decl. **Ex. 6o** at 2.

[47] Label Decl. **Ex. 5**.

[48] Label Decl. **Ex. 6k** at 2-4; **Ex. B**, VOYAGER001020 (listing tokens eligible for rewards, the dates such rewards were offered, and minimum balance requirements

[49] *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 716 (3d Cir. 1996) (*Alito J.*) (emphasis added); *see also CNL*, 2005 WL 2291729, at *4 ("purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a [Section] 12(2) seller.").

users, and for these different trading patterns there is no class-wide evidence concerning whether their investment decisions were "as a result" of Defendants' statements or any of the many other promotions, news, or individualized predilections of each Plaintiff. The Data belies Plaintiffs' suggestion that "there will not be a great deal of individualized proof" (Reply at 13) and proves that individualized issues predominate and certification must be denied.

### 3. Allowing Individual Trials Would Violate Defendants' Due Process Rights

Plaintiffs' apparent proposed solution to this failure of class-wide proof is to allow each putative class member to come forward at a later stage with proof of why Defendants successfully solicited their purchases. But this is precisely what the Rule 23 inquiry seeks to avoid. *See* Opp. at 8-12 (citing *Karhu*, *Brown* and *Short Squeeze*). Plaintiffs may not simply submit affidavits from putative class members with rote statements averring that they opened Voyager EPAs because of Defendants. Indeed, in *Karhu v. Vital Pharmaceuticals, Inc.*, Judge Cohn rejected precisely such a request because to do so would "deprive [defendant] of **its due process rights to challenge the claims of each putative class member**." No. 13–60768–CIV, 2014 WL 815253, at *3 (S.D. Fla. Mar. 3, 2014), *aff'd*, 621 F. App'x 945 (11th Cir. 2015) (emphasis added). Defendants were but two of thousands of people promoting cryptocurrencies in 2021 and their statements were not "of such a nature that it can be presumed that all members of the class relied upon them in deciding to transact." *In re Jan. 2021 Short Squeeze Trading Litig.*, No. 21-2989, 2023 WL 9035671, at *35, (S.D. Fla. Nov. 13, 2023). If such affidavits were permitted, the Court would need to allow Defendants "to contest each affidavit[,] [which] would require a series of mini-trials and defeat the purpose of class-action treatment." *Karhu,* at *3. Moreover, "[u]sing affidavits to determine class membership would also invite fraudulent submissions and could dilute the recovery of genuine class members." *Id.* (citing *Carrera v. Bayer Corp.*, 727 F.3d 300, 305–09 (3d Cir. 2013)).

Plaintiffs have no solution to this problem that does not involve either violating Defendants' due process rights or staging thousands of mini-trials, which defeats the purpose of class certification. Simply put, as in *Karhu*, certification must be denied because Plaintiffs have "not suggested any practical means of verifying class membership through existing evidence." *Id.*

### B. Plaintiffs' End-Run Around Rule 23 Does Not Work Either

Perhaps realizing the absence of class-wide proof, Plaintiffs attempt an end-run around this Rule 23 requirement by "explicitly omitt[ing] from their pending requests for class certification aspects of class members' claims that may require significant individualized proof." Reply (ECF No. 276) at 11. Plaintiffs invite this Court to engage in "piecemeal certification" by certifying only

13

two issue classes and admitting that neither analyzes the issue of a *successful* solicitation. But when the evidence is as individualized as the Data shows, courts in this District have rejected this stratagem, and for good reason. For example, in *O'Neill v. Home Depot U.S.A. Inc.*, the court rejected the plaintiffs' attempt to certify a "single issue when the case as a whole fails to meet the requirements of Rule 23," admonishing such an attempt "as a means for achieving an end run around the (b)(3) predominance requirement." 243 F.R.D. 469, 481 (S.D. Fla. 2006) (citing *Fisher v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 317 (S.D. Ala. 2006)) (rejecting the "end-run" strategy to "shear[]" off individual issues "until only common issues remain."); *see also In re Chiquita Brands Intl.* 331 F.R.D. 675, 687 (S.D. Fla. 2019) (denying issue certification because "prevalence of individual issues" does not support piecemeal certification); *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 422 n. 17 (5th Cir. 1998) ("piecemeal certification . . . distorts certification process and creates unfairness and uncertainty as to what is at stake in the litigation and whether the litigation will actually resolve the dispute")).

Plaintiffs' citation to *In re FieldTurf Artificial Turf Mktg. & Sales Practices Litig.*, 2023 WL 4551435 (D.N.J. July 13, 2023) only underscores the proposed classes' deficiencies and Plaintiffs' inability to prove a successful solicitation on a class-wide basis. *See* Motion at 5 n.12 (citing *Fieldturf* and contending that damages "in this case will be much easier than in most other cases" due to the "Mavericks" and "Cuban" Voyager codes). Although the 2023 *Fieldturf* decision Plaintiffs cite certified two factual issues regarding defects and deception in a products liability case, Plaintiffs omit to mention that a prior decision in *Fieldturf* denied class certification for claims that are actually at issue in this case. In an August 2022 decision, the court in *Fieldturf* analyzed plaintiffs' motion for class certification as to New Jersey consumer fraud act claims under NJ Stat. 56:8-2 and denied class certification because "Plaintiffs' theory of loss is too speculative to satisfy the ascertainable loss prong." *See Fieldturf*, 3:17-md-02779-MAS-TJB (D.N.J. Aug. 18, 2022) (ECF No. 270) at 36-38. Plaintiffs here also bring claims under the same New Jersey consumer fraud act statutes (see ECF No. 186-1 at 136-38 (count 2)), and like in *Fieldturf*, Plaintiffs have not—and cannot—for example, demonstrate that there is class-wide evidence of Plaintiffs' injury as a result of Defendants' conduct.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion and decline to certify any class in this matter.

Case No. 22-CV-22538-ALTMAN/REID

Date: October 31, 2024

Respectfully submitted,

*/s/ Christopher E. Knight*
CHRISTOPHER E. KNIGHT, ESQ.
Fla. Bar No. 607363
Email: cknight@fowler-white.com

ESTHER E. GALICIA, ESQ.
Fla. Bar No. 510459
Email: egalicia@fowler-white.com

ALEXANDRA L. TIFFORD, ESQ.
Fla. Bar No. 0178624
Email: atifford@fowler-white.com

FOWLER WHITE BURNETT, P.A.
Brickell Arch, Fourteenth Floor
1395 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 789-9200
Facsimile: (305) 789-9201

-and-

PAUL C. HUCK, JR., ESQ.
Fla. Bar No. 0968358
Email: paul@lawsonhuckgonzalez.com

**LAWSON HUCK GONZALEZ, PLLC**
334 Minorca Avenue
Coral Gables, Florida 33134
Telephone: (850) 825-4334
Telecopier: (305) 441-8849

-and-

STEPHEN A. BEST, ESQ.
*Pro Hac Vice*
Email: sbest@brownrudnick.com

RACHEL O. WOLKINSON, ESQ.
*Pro Hac Vice*
Email: rwolkinson@brownrudnick.com

DANIEL L. SACHS, ESQ.

*Pro Hac Vice*
Email: dsachs@brownrudnick.com

BROWN RUDNICK LLP
601 Thirteenth Street, N.W.
Suite 600
Washington, DC 20005
Telephone:   (202) 536-1737
Facsimile:    (202) 536-1701

*-and-*

JONATHAN D. WHITE, ESQ.
*Pro Hac Vice*
Email: jwhite@brownrudnick.com

BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone: (212) 209-4903

*Attorneys for Defendants Mark Cuban and Dallas Basketball Limited d/b/a Dallas Mavericks*

16

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 31, 2024, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via the Court's CM/ECF which will send notification of such filing to all attorneys of record.

      /s/ *Christopher E. Knight*
CHRISTOPHER E. KNIGHT, ESQ.
Fla. Bar No. 607363
Email: cknight@fowler-white.com