# EXHIBIT A



**VOYAGER DIGITAL LTD.**

**<u>ANNUAL INFORMATION FORM</u>**

**FOR THE FISCAL YEAR ENDED JUNE 30, 2021**

**October 27, 2021**

**TABLE OF CONTENTS**

GLOSSARY OF DEFINED TERMS ...................................................................................................1

GENERAL ...........................................................................................................................................4

STATEMENT REGARDING FORWARD LOOKING STATEMENTS ..............................................4

CURRENCY AND EXCHANGE RATES ...........................................................................................7

CORPORATE STRUCTURE ..............................................................................................................7

GENERAL DEVELOPMENT OF THE BUSINESS ...........................................................................8

RISK FACTORS ................................................................................................................................20

PRIOR SALES ..................................................................................................................................37

DIVIDENDS ......................................................................................................................................41

DESCRIPTION OF CAPITAL STRUCTURE ..................................................................................41

MARKET FOR SECURITIES ...........................................................................................................42

ESCROWED SECURITIES AND SECURITIES SUBJECT TO CONTRACTUAL RESTRICTION ON TRANSFER .......................................................................................................................................43

DIRECTORS AND OFFICERS .........................................................................................................43

PROMOTERS ....................................................................................................................................50

INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS ......................50

LEGAL PROCEEDINGS ..................................................................................................................50

AUDITORS, TRANSFER AGENT AND REGISTRAR ....................................................................50

MATERIAL CONTRACTS ...............................................................................................................50

EXPERTS ..........................................................................................................................................51

ADDITIONAL INFORMATION .......................................................................................................51

APPENDIX "A" .................................................................................................................................52

## GLOSSARY OF DEFINED TERMS

In this Annual Information Form, the following capitalized words and terms shall have the following meanings:

| | |
|---|---|
| **$** | Unless otherwise indicated, United States dollars. |
| **Account Services Agreement** | Account Services Agreement dated June 3, 2019 between VDH and the MC Bank. |
| **AIF** | This Annual Information Form of the Company for the fiscal year ended June 30, 2020. |
| **Anchorage** | Such term has the meaning ascribed to it under the heading "General Development of the Business - General - Narrative Description of the Business" in this AIF. |
| **API** | Such term has the meaning ascribed to it under the heading "General Development of the Business - General - Narrative Description of the Business" in this AIF. |
| **Audit Committee** | The audit committee of the Board. |
| **BCBCA** | *Business Corporations Act* (British Columbia) including the regulations thereunder, as amended. |
| **BCSC** | British Columbia Securities Commission. |
| **Bitcoin or BTC** | The peer-to-peer payment system and the digital currency of the same name which uses open source cryptography to control the creation and transfer of such digital currency. |
| **Board** | The board of directors of the Company. |
| **CARES Act** | The *Coronavirus Aid, Relief, and Economic Security Act*. |
| **CEO** | Chief Executive Officer. |
| **CFO** | Chief Financial Officer. |
| **Coinify** | Coinify ApS, a wholly owned subsidiary of the Company and, as applicable, its subsidiary companies. |
| **Common Shares or Shares** | Common shares without par value in the capital of the Company. |
| **Computershare** | Computershare Trust Company of Canada. |
| **COVID-19** | The illness caused by the coronavirus disease, also known as the 2019 novel coronavirus. |
| **Crypto Trading Platform** | A centralized or decentralized marketplace that unites and matches buyers and sellers of cryptocurrencies. |
| **Cryptocurrency, crypto asset or crypto** | A digital currency or crypto asset in which transactions are verified and records maintained by a decentralized system using cryptography, rather than by a centralized authority. |
| **CSA** | Canadian Securities Administrators. |
| **CSE** | Canadian Securities Exchange. |

| | |
|---|---|
| **Ethos** | Ethos.io PTE Ltd., a private Singapore-based company. |
| **Ethos IP** | Such term has the meaning ascribed to it under the heading "General Development of the Business - Three Year History" in this AIF. |
| **Exchange Act** | Securities Exchange Act of 1934. |
| **Financial Statements** | Audited consolidated financial statements for the years ended June 30, 2021 and June 30, 2020. |
| **FinCEN** | Financial Crimes Enforcement Network. |
| **FINRA** | Financial Industry Regulatory Authority, Inc. |
| **Fiscal 2019** | The fiscal year of the Company ended June 30, 2019. |
| **Fiscal 2020** | The fiscal year of the Company ended June 30, 2020. |
| **Fiscal 2021** | The fiscal year of the Company ended June 30, 2021. |
| **Fiscal 2022** | The fiscal year of the Company ended June 30, 2022. |
| **Governmental Authority** | Any (i) international, multinational, national, federal, provincial, state, municipal, local or other governmental or public department, central bank, court, arbitral body, commission, board, bureau, agency or instrumentality, domestic or foreign, (ii) subdivision or authority of any of the above, (iii) quasi-governmental or private body exercising any regulatory, expropriation or taxing authority under or for the account of any of the foregoing, or (iv) stock exchange or securities authorities. |
| **IFRS** | The International Financial Reporting Standards. |
| **Insider** | Means, in relation to the Company:<br>(a)    a director or senior officer of the Company;<br><br>(b)    a director or senior officer of a corporation that is an Insider or subsidiary of the Company;<br><br>(c)    a Person that beneficially owns or controls, directly or indirectly, voting shares carrying more than 10% of the voting rights attached to all outstanding voting shares of the Company; or<br><br>(d)    the Company itself if it holds any of its own securities. |
| **IIROC** | Investment Industry Regulatory Organization of Canada. |
| **January 2018 PP** | Such term has the meaning ascribed to it under the heading "General Development of the Business – Three Year History" in this AIF. |
| **MC Bank** | Metropolitan Commercial Bank. |
| **MD&A** | The management discussion and analysis for the year ended June 30, 2021. |
| **person** | Any individual, firm, partnership, joint venture, venture capital fund, association, trust, trustee, executor, administrator, legal personal representative, estate group, body corporate, corporation, unincorporated association or organization, Governmental Authority, syndicate or other entity, whether or not having legal status. |

| | |
|---|---|
| **Platform** | Such term has the meaning ascribed to it under the heading "Description of Business – Three Year History" in this AIF. |
| **PPP** | Paycheck Protection Program. |
| **Promoter** | A person who: |

    (a)    acting alone or in concert with one or more other persons, directly or indirectly, takes the initiative in founding, organizing or substantially reorganizing the business of the Company; or

    (b)    in connection with the founding, organization or substantial reorganization of the business of the Company, directly or indirectly receives, in consideration of services or property or both, 10% or more of a class of the Company's own securities or 10% or more of the proceeds from the sale of a class of the Company's own securities of a particular issue,

but does not include a person who:

    (c)    receives securities or proceeds referred to in paragraph (b) solely

        i)    as underwriting commissions, or

        ii)    in consideration for property, and

    (d)    does not otherwise take part in founding, organizing or substantially reorganizing the business.

| | |
|---|---|
| **Rewards Program** | Such term has the meaning ascribed to it under the heading "General Development of the Business - Three Year History" in this AIF. |
| **RTO** | The reverse takeover transaction completed by the Company on February 6, 2019, whereby the Company acquired all of the shares of VDH from VHI pursuant to the VDH SPA. |
| **SBA** | U.S. Small Business Administration. |
| **SEC** | U.S. Securities and Exchange Commission. |
| **Shareholders** | Holders of Common Shares. |
| **Stock Option Plan** | The stock option plan of the Company. |
| **TSX** | Toronto Stock Exchange. |
| **TSXV** | TSX Venture Exchange. |
| **US Patent Office** | The United States Patent and Trademark Office. |
| **US Subsidiaries** | Such term has the meaning ascribed to it under the heading "Corporate Structure - Intercorporate Relationships" in this AIF. |
| **VDH** | Voyager Digital Holdings, Inc., formerly "CryptoTrading Holdings Inc.", a Delaware corporation and a wholly owned subsidiary of the Company. |
| **VDH SPA** | The share purchase agreement dated June 4, 2018 between the Company and VHI, pursuant to which (i) the Company acquired all of the outstanding shares of VDH, (ii) all of the holders of subscription receipts in VDH became Shareholders of the |

Company, (iii) the Company granted replacement options to the holders of stock options in VDH, and (iv) VDH became a wholly-owned subsidiary of the Company.

| | |
|---|---|
| **VDL** | Voyager Digital, LLC, a Delaware corporation and a wholly owned subsidiary of VDH. |
| **VDN** | Voyager Digital NY, LLC, a Delaware corporation and a wholly owned subsidiary of VDH. |
| **VHI** | VHI Holdings, Inc., formerly the sole shareholder of VDH prior to the RTO. |
| **VIP** | Voyager IP, LLC, a wholly owned Delaware subsidiary of VDH. |
| **Voyager or the Company or us/we/our** | Voyager Digital Ltd. |
| **VYGR** | VYGR Digital Securities, LLC, a California corporation owned 50% by VYGR Holdings, LLC and 50% by Market Rebellion, LLC. |
| **Wallets** | Software and hardware platforms that securely store crypto assets by guarding secure keys used for private access. |

## GENERAL

Reference is made in this AIF to the Financial Statements and MD&A of Voyager for Fiscal 2021, together with the auditor's report thereon. The Financial Statements and MD&A are available for review on the SEDAR website located at www.sedar.com.

All financial information in this AIF for Fiscal 2021 has been prepared in accordance with IFRS.

Unless otherwise noted herein, information in this AIF is presented as at October 1, 2021.

## STATEMENT REGARDING FORWARD LOOKING STATEMENTS

This AIF contains certain forward-looking information and forward-looking statements, as defined in applicable securities laws (collectively referred to herein as "forward-looking statements"). These statements relate to future events or the Company's future performance. All statements other than statements of historical fact are forward-looking statements. Often, but not always, forward-looking statements can be identified by the use of words such as "plans," "expects," "is expected," "budget," "scheduled," "estimates", "continues", "forecasts", "projects", "predicts", "intends", "anticipates" or "believes", or variations of, or the negatives of, such words and phrases, or state that certain actions, events or results "may," "could," "would," "should," "might" or "will" be taken, occur or be achieved. Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results to differ materially from those anticipated in such forward-looking statements. The forward-looking statements in this AIF speak only as of the date of this AIF or as of the date specified in such statement. These forward-looking statements may include, but are not limited to, statements relating to:

- Our expectations regarding our revenue, expenses, operations and future operational and financial performance;
- Our cash flows;
- Popularity of cryptocurrencies;
- Our plans for and timing of geographic expansion or new offerings;
- Our future growth plans;
- Our ability to stay in compliance with laws and regulations or the interpretation or application thereof that currently apply or may become applicable to our business both in the United States and internationally;
- Our expectations with respect to the application of laws and regulations and the interpretation or enforcement thereof and our ability to continue to carry on our business as presently conducted or proposed to be conducted;

- Trends in operating expenses, including technology and development expenses, sales and marketing expenses, and general and administrative expenses, and expectations regarding these expenses as a percentage of revenue;
- The reliability, stability, performance and scalability of our infrastructure and technology;
- Our ability to attract new customers and maintain or develop existing customers;
- Our ability to attract and retain personnel;
- Our expectations with respect to advancement in our technologies;
- Our competitive position and our expectations regarding competition;
- Regulatory developments and the regulatory environments in which we operate; and
- Expected impact of COVID-19 on the Company's future operations and performance.

Forward-looking statements are based on certain assumptions and analysis made by us in light of our experience and perception of historical trends, current conditions and expected future developments and other factors we believe are appropriate. Forward-looking statements are also subject to risks and uncertainties which include:

- Uncertainty that an active trading market for the Shares will be sustained;
- Uncertainty that the Company's funds will be adequate to sustain operations or for further expansion and regarding its ability to obtain required financing;
- Uncertainty regarding maintaining positive cash flow status into the future;
- Risks related to changes in financial accounting and reporting standards;
- Risks related to service on foreign directors and officers;
- Foreign exchange risks;
- Risks related to the ability of the Company to integrate acquired businesses;
- Additional taxation applied to dividends paid to non-residents;
- Regulatory uncertainty and risk, including changes in laws or the interpretation or application or enforcement thereof and the obtaining of regulatory approvals;
- We are subject to an extensive and highly-evolving and uncertain regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations, or regulatory interpretation of such laws and regulations, could adversely affect our brand, reputation, business, operating results, and financial condition;
- In connection with such laws and regulations or regulatory interpretation thereof, a particular crypto asset's or product offering's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty and if we are unable to properly characterize a crypto asset or product offering, we may be subject to regulatory scrutiny, investigations, fines, and other penalties, and our business, operating results, and financial condition may be adversely affected;
- If the Company were determined to be deemed to be an "investment company" under U.S. law or comparable laws, the Company might be required to significantly restructure its businesses or cease operations altogether;
- Risks and costs associated with the Company being required to conduct activities through regulated subsidiaries;
- Risks related to the ability of the Company to obtain all necessary licenses and permits, and related to international expansion;
- Risks related to expanding our marketing and sales;
- Costs imposed on the Company due to financial services businesses being heavily regulated;
- Risks related to the Company ability to establish and maintain compliance, review and reporting systems and attract and retain qualified personnel;
- Risks of operation errors which could cause material reputational and financial harm;
- Risks related to our ability to adapt to rapid technological change;
- Failure to develop and maintain an active and liquid trading market in the Shares;
- Failure to prevent illegal activity from occurring on or through the Company's platforms;
- Litigation and investigation risks;
- Competition in our industry and markets;

- Changes in the value of cryptocurrencies which may affect trading;
- Fraud or security failures which could result in trading by the public;
- Risks related to the crypto assets supported by the Company;
- Risks related to reliance on proprietary and non-proprietary software, data and intellectual property of the Company and third parties;
- Cybersecurity risks and risks related to the security of customer information;
- Hacking of the Platform or digital wallets;
- Loss or destruction of a private key required to access certain cryptocurrencies or crypto assets;
- Risks related to terrorism, geopolitical crisis, pandemics, COVID-19 or other widespread outbreak of an illness or other health issue;
- The future development and growth of crypto is subject to a variety of factors that are difficult to predict and evaluate. If crypto does not grow as we expect, our business, operating results, and financial condition could be adversely affected;
- Uncertainty related to the acceptance and/or widespread use of cryptocurrency;
- Misuse of cryptocurrencies and malicious actors;
- Cryptocurrency is not covered by deposit insurance;
- Our reliance on key personnel, employees and third party providers;
- A significant portion of our revenue is derived from transactions in Bitcoin and Ethereum. If demand for these crypto assets declines and is not replaced by new crypto asset demand, our business, operating results, and financial condition could be adversely affected;
- Our dependence on customer growth, including new customers and growth in the number and value of transactions and deposits;
- Our dependence upon MC Bank pursuant to the Account Services Agreement;
- Risks related to the unavailability of insurance regarding the Company's operations;
- Uncertainty related to limited operating history and fluctuations in quarterly operating results;
- Dividend risk;
- Risks related to continuing development and acceptance of cryptocurrencies, crypto assets and distributed ledger technology;
- Decline in the cryptocurrency market or general economic conditions;
- Risks related to banks declining to provide banking services to companies engaged in cryptocurrency or crypto asset-related businesses;
- Our operating results have and will significantly fluctuate due to the highly volatile nature of crypto;
- Risks associated with custodians of crypto assets;
- Risks associated with a loss in confidence of the marketplace in Crypto Trading Platforms;
- Any significant disruption in our products and services, in our information technology systems, or in any of the blockchain networks we support, could result in a loss of customers or funds and adversely impact our brand and reputation and business, operating results, and financial condition;
- Risks related to its bitcoins being lost, stolen or destroyed;
- Lending risks, counterparty risk and credit risk;
- Technology and infrastructure risks, including their ability to meet surges in demand;
- Market disruptions; and
- Trade errors.

Inherent in forward-looking statements are risks, uncertainties and other factors beyond Voyager's ability to predict or control. Readers are cautioned that the above does not contain an exhaustive list of the factors or assumptions that may affect the forward-looking statements and that the assumptions underlying such statements may prove to be incorrect. Actual results and developments are likely to differ, and may differ materially, from those expressed or implied by the forward-looking statements contained in this AIF.

Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause Voyager's actual results, performance or achievements to be materially different from any of its future results, performance or achievements expressed or implied by forward-looking statements. Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in this document may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements. All forward-looking statements herein are qualified by this cautionary statement. Accordingly, readers should not place undue reliance on forward-looking statements. Readers are cautioned that past performance is not indicative of future performance and current trends in the business and demand for crypto assets may not continue and readers should not put undue reliance on past performance and current trends. The Company undertakes no obligation to update publicly or otherwise revise any forward-looking statements whether as a result of new information or future events or otherwise, except as may be required by law. If the Company does update one or more forward-looking statements, no inference should be drawn that it will make additional updates with respect to those or other forward-looking statements, unless required by law.

## CURRENCY AND EXCHANGE RATES

Unless otherwise specified, all dollar references are to United States dollars.

## CORPORATE STRUCTURE

### Name, Address and Incorporation

Voyager was incorporated pursuant to the BCBCA on June 25, 1993 under the name "392838 B.C. Ltd.". The Company changed its name to "UC Resources Ltd." on October 31, 2001; to Voyager Digital (Canada) Ltd. on February 6, 2019; and to Voyager Digital Ltd. on July 16, 2020.

The registered office of the Company is located at Suite 2900 – 595 Burrard Street, Vancouver, BC, V7X 1J5, Canada and its head office is located at 33 Irving Place, 3rd Floor, New York, New York 10003.

The Company is a reporting issuer in each of the provinces and territories of Canada. The Common Shares are listed under the symbol "VOYG" on the TSX, "VYGVF" on the OTCQB Market, and "UCD2" on the Frankfurt Stock Exchange.

### Intercorporate Relationships

The Company wholly owns Voyager Digital Holdings, Inc., a Delaware corporation, which in turn wholly owns each of Voyager IP, LLC, Voyager Digital, LLC and Voyager Digital NY, LLC, each of which is a Delaware limited liability company, VYGR Holding LLC, a Delaware limited liability company which in turn wholly owns 50% of VYGR Digital Securities, LLC, a California corporation, and VYGR Management LLC, a Delaware limited liability company (collectively, the "**US Subsidiaries**").

The Company also wholly owns LGO SAS, Voyager European Holdings ApS, a Danish holding company of Coinify ApS and its subsidiaries, HTC Trading, Inc., a Cayman Island company, Voyager Digital Brokerage Ltd. (Canada) and Voyager Digital Brokerage Canada Ltd., corporations existing under the federal laws of Canada.

The Company's current corporate structure is as follows:



**Voyager Organizational Chart**

50% ownership with remaining 50% owned by Market Rebellion

## GENERAL DEVELOPMENT OF THE BUSINESS

**Three Year History**

Voyager, through its United States operating subsidiaries, operates as a crypto asset brokerage that provides retail and institutional customers with access to its digital platform to buy and sell crypto assets in one account across multiple centralized marketplaces. Voyager offers customers trade execution, market data, wallet, and custody services through its proprietary platform (the "**Platform**"). Through its subsidiary, Coinify, Voyager provides crypto payment solutions for both consumers and merchants around the globe. Voyager also offers individual custody wallets through Ethos Wallets, available through the Ethos app.

The Platform was launched in the United States in 2019. As of June 30, 2021, the Company had approximately 665,000 funded customer accounts in the United States, holding an aggregate of approximately $2.7 billion in cryptocurrencies and cash on the Platform. For the six months ended June 30, 2021, approximately 89,000 trades involving approximately $72 million of cryptocurrencies and cash were being effected on the Platform on a daily basis. As of June 30, 2021, the Company had 141 full-time employees including management, located in the United States, France and Canada.

In January 2018, the Company completed a non-brokered private placement of 25,950,000 units of the Company at a price of C$0.05 per unit for gross proceeds of C$1,297,500 (the "**January 2018 PP**"). The funds derived from the January 2018 PP were used to pay certain debts of the Company and the costs associated with the acquisition of CryptoTrading Holdings Inc. (now VDH), as further described below, and for general working capital purposes.

Following completion of the January 2018 PP, the Company incorporated CryptoTrading Technologies, Inc. (later known as CryptoTrading Holdings Inc. and now VDH), and certain participants to the January 2018 PP contributed the intellectual property underlying the business of VDH, being the development of a cryptocurrency trading platform using a proprietary execution and routing system.

In Fiscal 2019, the Company completed the development of the basic Platform by:

- *Mobile Application* – Developing the mobile application.

- *Dynamic Smart Router* - Developing the "Dynamic Smart Router" to seek efficient pricing.

- *Custody and Customer Accounts* - Developing the omnibus custody solution, customer accounts and related security features.

The Company received TSXV acceptance to the SEDAR filing of its filing statement dated January 16, 2019, in connection with its change of business and acquisition of VDH. On February 5, 2019, the Company obtained TSXV approval for the change of business, which involved:

- changing its name to Voyager Digital (Canada) Ltd.;
- closing the acquisition of VDH (and thereby its subsidiaries and business) and issuing (i) 18,041,248 Common Shares to the holders of subscription receipts of VDH, and (ii) 4,133,000 stock options in replacement of the stock options outstanding in VDH, each exercisable at a price of $0.30; and
- commencing trading.

On February 13, 2019, the Company launched the Platform as an app on the Apple IOS operating system, enabling customers to buy and sell the first 18 cryptocurrencies supported by the Platform.

On April 17, 2019, the Company completed the listing of the Company's shares on the Frankfurt Stock Exchange.

In May 2019, the Company entered into the Account Services Agreement with MC Bank, whereby MC Bank provides deposit and payment systems for VDL's customers using a custodial "for the benefit of" account. MC Bank acts as agent for VDL and assumes the money services obligations on its behalf, such that VDL does not need to register as a Money Service Business in most states.

In June 2019, the Company entered into agreements to settle $15,625 of debt owed to two creditors by issuing an aggregate of 60,386 Common Shares at a deemed price of C$0.40 per Common Share. After the end of Fiscal 2019, the Company received TSXV approval and issued the Common Shares.

In Fiscal 2020, the Company:

- completed integration of the Ethos software into the Platform to expand the scope and breadth of the product and service that the Company can offer to customers, including allowing customers to have self-storage (their own crypto wallets) within the Ethos Universal Wallet available on the Ethos app;

- increased cryptocurrencies supported by the Platform to 50 crypto assets;

- added additional liquidity providers to VDL to expand the depth of liquidity and quality of execution;

- expanded its customer base from the United States to certain international jurisdictions through the Ethos acquisition; and

- continued to develop and expand the functionality of the Platform.

On July 25, 2019, the Company granted 75,000 options to certain employees, vesting monthly over four years with a one-year cliff at an exercise price of C$0.68, and with an expiry date of up to 10 years from the date of grant.

On July 29, 2019, the Company closed a non-brokered private placement for 3,045,397 units of the Company at a price of C$0.80 per unit for gross proceeds of $1,853,139.  Each unit was comprised of one Common Share and one-half Common Share purchase warrant, with each whole warrant entitling the holder to subscribe for one additional Common Share at a price of C$1.05 for a period of 30 months from the date of issuance. On May 4, 2020, the holders of the 1,522,699 warrants agreed to change the exercise price of the warrants from C$1.05 to C$0.195 per Common Share; provided that if, for any 10 consecutive trading days, the closing price of the Common Shares exceeds C$0.24, the term of the warrants will be accelerated to a 30-day exercise period.

On September 20, 2019, the Common Shares ceased trading on the TSXV as of the close of trading and began trading

- 10 -

on the CSE at the opening of trading on September 23, 2019.

On October 1, 2019, the Company acquired certain of Ethos' assets, including the Ethos Universal Wallet, Ethos Bedrock, certain blockchain technology and related intellectual property (collectively the "**Ethos IP**"), and a percentage of the Ethos tokens held by it for 7,250,000 Common Shares.

In October 2019, the Company issued 7,638,414 warrants to Jump Digital Currencies LLC ("**Jump**") in exchange for $10,000. Each warrant issued entitles Jump, a proprietary cryptocurrency trading firm, to acquire one Common Share for an exercise price of C$0.80 per Share. These warrants expire in August 2022.

On October 7, 2019, the Company granted 1,000,000 options to certain members of the Board, vesting monthly over three years at an exercise price of C$0.56, and with an expiry date of up to 10 years from the date of grant. The Company also issued 300,000 options to certain advisors vesting one year from the grant date at an exercise price of C$0.56 and 1,000,000 options vesting monthly over 3 years at an exercise price of C$0.80 with an expiry date of up to 10 years from the date of grant.

On October 23, 2019, the Company launched its rewards program (the "**Rewards Program**"), which rewards customers with certain monthly pay-in-kind crypto assets held by participating customers in their Voyager account. The Company initially launched its Rewards Program for customers holding Bitcoin, but thereafter extended the Rewards Program periodically to include 34 crypto assets, including Bitcoin, USDC and Ethereum through end of Fiscal 2021.

On October 28, 2019, the Voyager app was released on the Android operating system.

On November 6, 2019, the Company's Shares began trading on the OTCQB Market.

On December 5, 2019, the Company granted 190,000 options to certain employees with 150,000 options vesting immediately at an exercise price of C$0.30 and 40,000 options vesting monthly over four years with a one-year cliff at an exercise price of C$0.30, and with an expiry date of up to 10 years from the date of grant.

On December 6, 2019, the Company closed a first tranche of a private placement with Thrust Capital through the issuance of 743,294 Common Shares at a price of C$0.80 per Share for total proceeds of approximately $450,000.

On January 15, 2020, the Company completed the acquisition of VYGR, following VYGR receiving approval from FINRA for a change in ownership, which solidified VYGR's position as a broker-dealer on the Platform.

On February 5, 2020, the Company granted 300,000 options to certain employees, vesting monthly over three years at an exercise price of C$0.30, and with an expiry date of up to 10 years from the date of grant.

On February 14, 2020, the Company completed a non-brokered private placement to raise $830,814 through the sale and distribution of 4,416,276 Common Shares at a price of C$0.25 per Common Share. The Company also settled outstanding debts through the issuance of 648,484 Common Shares at a deemed price of C$0.25 per share. Philip Eytan and Guy Elliott, directors of the Company, participated in the private placement for a total of 465,780 Shares; and Steve Ehrlich, Philip Eytan, and Gaspard de Dreuzy, directors and/or officers of the Company, participated in the debt settlement for a total of 427,355 Shares.

On March 23, 2020, the Company announced a non-brokered private placement to raise $100,000 through the sale and distribution of 966,180 Common Shares at a price of C$0.15 per Common Share.

On March 27, 2020, the Company acquired Circle Invest, a retail crypto asset business, from Circle Internet Financial, Inc., adding over 40,000 retail accounts to Voyager's customer base, a majority of which were migrated onto the Platform.

On April 16, 2020, the Company granted 1,000,000 options to certain employees, vesting monthly over one year at an exercise price of C$0.19, and with an expiry date of up to 10 years from the date of grant.

On April 21, 2020, the Company settled outstanding debts through the issuance of 300,000 Common Shares at a deemed price of C$0.25 per Common Share.

On April 29, 2020, VDH entered into a $425,000 unsecured loan and promissory note agreement with Signature Bank, pursuant to the PPP under the CARES Act administered by the SBA. Similarly, on May 5, 2020, VDL entered into a $619,400 unsecured PPP loan with BNB Bank pursuant to the PPP. The VDH and VDL PPP loans are scheduled to mature on April 29, 2022 and May 2, 2022, respectively, have an interest rate of 1.00%, and are subject to the terms and conditions applicable to loans administered by the SBA under the CARES Act. The PPP loans may be prepaid by the Company at any time prior to maturity with no prepayment penalties.

On May 1, 2020, the Company granted 80,000 options to certain employees, vesting monthly over four years with a one-year cliff at an exercise price of C$0.30, and with an expiry date of up to 10 years from the date of grant.

On June 1, 2020, the Company granted 40,000 options to certain employees, vesting monthly over four years with a one-year cliff at an exercise price of C$0.30, and with an expiry date of up to 10 years from the date of grant.

On June 11, 2020, the Company issued 515,560 units, at a deemed price of C$0.20 per unit, to settle $75,264 of outstanding payables with certain employees and directors. Each unit is comprised of one Common Share of the Company and one-half share purchase warrant, with each whole warrant entitling the holder to subscribe for one additional Common Share at a price of C$0.30 per Common Share. All of these warrants were executed on August 19, 2020.

On June 15, 2020, the Company completed a private placement for gross proceeds of $2.1 million through the sale and distribution of 14,484,440 units of the Company at a price of C$0.20 per unit. Each unit is comprised of one Common Share and one-half Common Share purchase warrant, with each whole warrant entitling the holder to subscribe for one additional Common Share at a price of C$0.30 per Common Share. On August 19, 2020, all of these warrants were exercised.

In Fiscal 2021, the Company:

- partnered with third party service providers to provide regulatory cost basis processing solutions and provide year-end gain/loss statements to customers; and

- began the process to have its Common Shares listed on the TSX.

On July 15, 2020, the Company entered into a debt settlement agreement with certain employees to settle up to $103,112 of outstanding payables through the issuance of 515,560 Common Shares at a deemed price of C$0.20 per Common Share.

In July 2020, the Company added a 2-Factor Authentication to further enhance its security feature, and extended its deposit, transfer and withdrawal functionality to four of its crypto assets.

On August 14, 2020, the Company (1) granted certain of its directors and officers with an aggregate of 1,750,000 options, exercisable at a price of C$0.90 per Common Share for a period of five years, and (2) settled certain outstanding debts with a related party totaling $31,635 through the issuance of 35,807 Common Shares at a deemed average price of C$0.8835 per Common Share.

On August 31, 2020, Evan Psaropoulos joined the Company as CFO and Michael Legg joined the Company as Chief Communications Officer. The Company granted 250,000 incentive stock options to each executive.

In September 2020, the Company (1) integrated the Fireblocks network into the Voyager operational infrastructure, by bringing liquidity partners and custodians onto one platform; and (2) expanded its crypto asset offering and listed its 50th crypto asset on the Voyager app.

On September 10, 2020, the Company issued 6,266,600 special warrants (the "**September Special Warrants**") for units, at a price of C$0.85 per special warrant, for gross proceeds of $4.0 million. Each September Special Warrant is convertible into one unit of the Company without payment of any additional consideration upon certain conditions being met. Each unit consisted of one Common Share and one-half of one Common Share purchase warrant, with each whole warrant being exercisable to acquire one Common Share at an exercise price of C$1.15 per Share for a term of three years following closing. Due to certain conversion conditions not being met, the holders of the September

- 12 -

Special Warrants were entitled to receive 1.1 units upon the exercise or deemed exercise of the September Special Warrants, resulting in each September Special Warrant being exercisable for 1.1 units. Additionally, in connection with this transaction, the company granted 473,662 compensation warrants, with an exercise price of C$0.85 per unit for a period of three years.

On December 10, 2020, the Company acquired LGO SAS, an Autorité des arches financiers regulated entity based in France and LGO Europe SAS, in exchange for 200,000 Common Shares to be issued upon demand in accordance with the terms of the escrow agreement. In addition, the sellers are entitled to 1,000,000 Common Shares after one-year, contingent upon the Autorité des arches financiers' approval of the Company's license application and change of control.

On December 15, 2020, the Company issued 5,470,676 special warrants (the "**December Special Warrants**") for units, at a price of C$1.50 per special warrant, for gross proceeds of $8.3 million. Each December Special Warrant is convertible into one unit of the Company without payment of any additional consideration upon certain conditions being met. Each unit consisted of one Common Share and one-half Common Share purchase warrant, with each whole warrant being exercisable to acquire one Common Share at an exercise price of C$2.50 per Share for a term of two years following closing. Due to certain conversion conditions not being met, the holders of the December Special Warrants were entitled to receive 1.1 units. In accordance with the terms of the December Special Warrant offering, 547,067 units were issued in April 2021 pursuant to the penalty provision. Additionally, in connection with this transaction, the company granted 387,404 compensation warrants, with an exercise price of $1.50 per unit for a period of two years.

On January 21, 2021, the Company completed a private placement offering of 8,363,637 Common Shares at a price of $5.50 per Common Share, for gross proceeds of $46 million. In exchange for their services, the agent for the offering received a 7% cash commission and compensation warrants entitling it to purchase 585,455 Common Shares at a price of $5.50 per Common Share for a period of 18 months following the closing of the offering.

On February 12, 2021, the Company completed a private placement offering of 7,633,588 Common Shares at a price of $13.10 per Common Share, for gross proceeds of $100 million. In exchange for their services, the agent for the offering received a 7% cash commission.

In February 2021, Daniel Costantino joined the Company as Chief Information and Security Officer and David Brosgol joined the Company as General Counsel. The Company granted 300,000 incentive stock options to each executive.

On April 18, 2021, the Company partnered with Victor Oladipo, two-time NBA All-Star Victor player from Miami Heat, on a referral program that awards the charity of an athlete's choice with crypto assets each time a new account is opened and traded with a special referral code.

In May 2021, Akbar Ladhani joined the Company as Chief Global Data Officer and Pam Kramer joined the Company as Chief Marketing Officer. The Company granted 300,000 incentive stock options to each executive.

On June 1, 2021, Voyager entered into an agreement with NASCAR driver Landon Cassill to be the first primary sponsorship of a NASCAR race car paid fully in a portfolio of cryptocurrency.

On July 20, 2021, the Company partnered with four-time Super Bowl champion Rob Gronkowski to become a brand ambassador for Voyager.

In August 2021, the Company completed a token swap as part of the LGO SAS merger with the Company. The token swap and merger combined the original Voyager token, VGX, with the LGO token. To complete the token swap, the VGX and LGO tokens were converted to a single new token under the ticker VGX.

On August 2, 2021, the Company completed the acquisition of Coinify, a leading cryptocurrency payment platform existing under the laws of Denmark, for 5,100,000 of newly issued Common Shares, which are subject to a lockup agreement, and $15 million in cash (subject to working capital adjustments). Under the share purchase agreement, Voyager retained substantially all current Coinify employees, entering into employment agreements with key members of the management team.

On August 12, 2021, FINRA approved a 50% investment by Market Rebellion, a leading provider of trading education, content, and tools for independent investors, in VYGR to provide brokerage for equities, options, and futures trading through the Platform. Voyager and Market Rebellion intend to jointly operate a broker-dealer focused on providing online brokerage services for equities, options, and futures. VYGR plans to execute equity trades on behalf of Voyager customers, and Market Rebellion intends to introduce its large and active trading community to the capabilities of this new platform.

On August 17, 2021, the Company filed and obtained a receipt for its final short form base shelf prospectus (the "**Base Shelf Prospectus**") with the securities regulatory authorities in each of the provinces and territories of Canada. The Base Shelf Prospectus allows the Company to offer an aggregate total of $300 million Shares, warrants, units, debt securities, and subscription receipts, or any combination thereof, for up to during the 25-month period that the Base Shelf Prospectus is effective.

On September 1, 2021, the Company launched the Voyager Loyalty Program (the "**VLP**"). The VLP gives Voyager token holders a full suite of incentives and rewards. To participate in the VLP, customers must hold a certain number of VGX tokens to unlock various tiers which offer token utility rewards, including VGX staking rewards, earnings reward boost, crypto back rewards, as well as refer-a friend cash back rewards.

On September 7, 2021, the Common Shares commenced trading on the TSX under the trading symbol of "VOYG". Voyager became a "non-venture" upon the effective date of its TSX listing for the purposed of certain Canadian securities laws. Prior to trading on the TSX, the Company's common shares were listed on the CSE where Voyager was considered a "venture issuer" for purposes of certain Canadian securities laws. The Shares remain listed for trading under the symbol "VYGVF" on the OTCQB market and "UCD2" on the Frankfurt Stock Exchange.

On September 29, 2021, Rakesh Gidwani joined the Company as Chief Technology Officer.

On October 1, 2021, Voyager Digital Brokerage Ltd., a wholly owned affiliate of the Company incorporated on October 7, 2020, applied for registration as a restricted dealer in each of the provinces and territories of Canada. Following the approval of such registration by the Ontario Securities Commission, Voyager Digital Brokerage Canada Ltd. intends to seek registration as an investment dealer and become a member of the Investment Industry Regulatory Organization of Canada.

## DESCRIPTION OF BUSINESS

**General - Narrative Description of the Business**

Voyager, through its US Subsidiaries, operates as a crypto asset broker that provides retail and institutional customers with access to its digital platform to buy and sell crypto assets in one account across multiple centralized marketplaces. Voyager offers customers trade execution, market data, wallet, and custody services through the Platform.  Through its subsidiary, Coinify, Voyager provides crypto payment solutions for both consumers and merchants around the globe.

VIP has filed a provisional patent application with the US Patent Office for a "cryptocurrency trading system" that includes a smart order routing system and execution management system for trading crypto assets.  The system according to the application is intended to find the best available trade execution across various Crypto Trading Platforms.  Specifically, the system described allows retail and/or institutional customers to place and route trade orders to one or several Crypto Trading Platforms to efficiently buy or sell cryptocurrency assets.  VIP anticipates filing a utility patent application, based on its provisional patent application, which will be updated to reflect recently added features and functions.

Some of the services offered by the Platform to account holders include:

- quickly open an account; the Company utilizes third party service providers for know-your-customer and anti-money-laundering checks to ensure fast and secure account openings;

- 14 -

- trade "spot" between fiat 60+ crypto assets from a single account (Voyager does not offer leverage, margin or financing of such transactions);

- an opportunity to earn rewards on certain crypto assets held in their account by participating in the Rewards Program[1];

- execution of trade orders across a spectrum of liquidity providers gives customers access to a deep pool of liquidity and offers reliability of trade execution;

- lowering transaction costs by aggregating orders and routing the order flow through the optimal mix of Crypto Trading Platforms and market makers by utilizing Voyager's proprietary smart router technology;

- advanced market data to enable customers to manage and track their crypto asset holdings, including delivering news to keep customers connected to the market, and providing portfolio tools to track performance, balances and transactions; and

- storing crypto assets through multiple storage solutions while putting together the right blend of security and availability, including though Voyager's own self-custody solution, Ethos Bedrock.

The Platform uses a dynamic router and customized algorithms to execute customer orders to one or several Crypto Trading Platforms, market makers or liquidity providers to efficiently buy or sell cryptocurrencies on behalf of its customers. The Platform is configured to (1) quote the average price for a crypto asset in the market, as delivered by a proprietary quoting service that aggregates Voyager's available liquidity and computes a price, and (2) use the smart order routing to search all open liquidity providers to find a better rate than the quoted price.  The Platform configuration provides customers with high quality trade execution (usually defined by the best prices, certainty of execution, reliability of the trading venue, and speed of execution).  The Platform is designed to be a single access point to market data, wallet, and custody services for crypto assets.

Voyager is registered as a Money Services Business pursuant to the Bank Secrecy Act regulations as administered by FinCEN and is licensed to operate as a money transmitter or its equivalent in states where such requirements are applicable[2]. Voyager entered into an Account Services Agreement with MC Bank, whereby MC Bank provides deposit and payment systems for Voyager customers using a custodial "for the benefit of" account. MC Bank is (i) a New York registered bank, overseen by the New York State Department of Financial Services and (ii) listed on the New York Stock Exchange (symbol: MCB).

The Company generates revenue through its primary business activities related to the Platform, comprising of the following sources.

- <u>Transaction Revenue</u>: The majority of Voyager's revenue is derived from providing execution for customer-initiated crypto asset orders to buy or sell crypto assets on the Platform.

- <u>Fees on Crypto Assets Loaned</u>: Voyager also generates some revenue from its lending activities with institutional borrowers. Voyager independently negotiates with each institutional borrower the terms of each unsecured institutional loan agreement, but these lending agreements are generally for a fixed term of less than one year or can be repaid on a demand basis and provide a crypto fee based on the percentage of crypto assets lent and denominated in the related crypto asset.  Voyager selects which and how much of its crypto assets are available for such lending activity.  Further, in the event of bankruptcy or insolvency of an

---

[1] The Rewards Program allows customers to earn in-kind payments of crypto assets for maintaining minimum crypto asset balances of the same type of crypto asset in their account. Rewards earned on crypto assets are variable, and reward rates are determined by Voyager at its sole discretion.  Customers may opt-out of the Rewards Program.

[2] Trading is currently available to all U.S. residents, excluding New York state. Voyager is actively working with NY regulators to obtain a BitLicense to operate in New York and with various regulators to operate internationally.

institutional borrower under a loan, Voyager bears the credit risk of lending crypto assets under the loan.  As of Fiscal 2021, there have been no defaults on loans made by Voyager to institutional borrowers.

For Fiscal 2019, transaction revenue was $0.1 million and there were no fees on crypto assets loaned, while in Fiscal 2020, the Company generated approximately $0.9 million in transaction revenue and approximately $0.3 million in fees on crypto assets loaned, which accounted for 75% and 25% of the Company's overall revenue, respectively. For Fiscal 2021, the Company generated approximately $154 million in transaction revenue and approximately $21 million in fees on crypto assets loaned, which accounted for 88% and 12% of the Company's overall revenue, respectively.

Voyager utilizes the functional authority granted by customers in the user agreement to move, transfer, store, control and rehypothecate crypto assets held in customer accounts.  Voyager prioritizes the use of secure self-custody solutions through the Fireblocks platform and cold storage custody with Anchorage as described below. However, Voyager also seeks to maximize liquidity and efficient trading by holding certain amounts of crypto assets in warm solutions in Company accounts on Crypto Trading Platforms to settle with trading partners or facilitate trading activity on exchanges on behalf of customers. Additionally, Voyager maintains some crypto assets in hot wallets to quickly process customer requested withdrawals and transfers.  Finally, Voyager uses its functional authority to enter into lending agreements with institutional borrowers and other similar revenue generating agreements with institutions. The Company's custody strategy is designed to maximize liquidity and efficient trading, by making those assets readily available to deploy in customer-requested trades. The Company constantly monitors its cash and the balances it maintains with crypto asset exchanges and institutional borrowers against deposits and withdrawals requested by customers and, where the Company believes it to be necessary, will monetize crypto assets into fiat currency.

The Company manages crypto assets held internally through the Fireblocks platform. Fireblocks, based in the United States and Israel, provides a multi-party computation ("**MPC**") solution to store, manage and transfer crypto assets between the Company's wallets, Crypto Trading Platforms, market makers, institutional borrowers and other counterparties. Through MPC technology, private keys are distributed across multiple locations to ensure security is not concentrated to a single device at any point in time. The Company also utilizes the Fireblocks network as a settlement layer to transact and settle with pre-approved counterparties or entities. The Fireblocks network utilizes secure enclave technology and data-in-motion encryption to prevent traditional vulnerabilities associated with authenticating wallet addresses. As such, the Company settles with counterparties or entities without the risk of losing funds due to deposit address attacks or errors.

Fireblocks is SOC 2 Type II certified for 2021 and undergoes a SOC 2 review on an annual basis. The Company reviews the Fireblocks SOC 2 report to ensure they maintain a secure technology infrastructure and that their systems are designed and operating effectively. Additionally, the Company reviews its own complementary customer entity controls in conjunction with the Fireblocks controls to ensure that applicable trust services criteria can be met. Fireblocks maintains an insurance policy which has coverage for technology, cyber, and professional liability and is rated "A" by A.M. Best based on the strength of the policy and has had no known security breaches or incidents. The Company is not aware of any other limitations on Fireblocks' insurance.

The Company also custodies customer crypto assets with Anchorage Digital Bank N.A. ("**Anchorage**"), a federally chartered crypto asset bank regulated by the Office of the Comptroller of the Currency. Anchorage stores private keys in geographically distributed data centers throughout the United States, using hardware security modules. Anchorage maintains a crime insurance policy to cover losses from events like theft, destruction of property, and compromised key generation or transaction processes and has had no known security breaches or incidents. The Company is not aware of any other limitations on Anchorage's insurance. The Company is not aware of any other limitations on Anchorage's insurance.

The Company prioritizes using Anchorage or Fireblocks' secure self-custody, but to maintain liquidity for trade execution, the Company also connects to and maintains crypto asset balances with several Crypto Trading Platforms. These trading partners are domiciled across multiple geographies including the United States, Cayman Islands, and Hong Kong.  They generally hold insurance that would protect against theft or loss of client assets. However, the Company cannot ensure that the limits of any such insurance policies will be available to the Company or, if available, sufficient to make the Company whole for any of its balance that are stolen or lost from such a platform. The Company does not maintain any insurance coverage over its customers' assets.

Insurance policies held by the Company's custodians are between the applicable custodian and the insurer, and accordingly the custodians' clients are not generally named payees on such policies. The Company is not always able to obtain and review copies of the insurance policies of its custodians. The Company cannot ensure that the limits of any such insurance policies will be available to the Company or, if available, sufficient to make the Company whole for any of its balance that are stolen or lost from such a custodian.

The Company has a due diligence program for all trading partners and conducts security reviews. Additionally, the Company assesses security, reputation, liquidity levels in applicable crypto assets, capitalization, management, internal control practices and operational risks in its determination of utilizing any trading partner, including holding in person meetings. Once onboarded, each trading partner is monitored on an ongoing basis to ensure they maintain compliance with required legal and regulatory standings. The Company also operates certain IT security protocols to ensure privileged and secure access to application programming interface ("**API**") connections with all trading platforms. These procedures are in place to maintain approval processes for the movement of crypto assets held with trading partners.

At present, the Company generally expects that, of its customer assets, approximately 20-50% will be held in Company accounts on Crypto Trading Platforms to facilitate liquidity and efficient trading, approximately 30-50% will be either self-custodied through the Fireblocks platform or held in storage with Anchorage, approximately 15-30% will be held by institutional borrowers through lending agreements, and approximately 1% will be held internally in "hot" wallets. However, the Company reserves the right to change the above noted allocations from time to time as it sees fit. As of Fiscal 2021, the Company had less than 5% of assets held in cold storage.

The Company is not aware of any security breaches or other similar incidents involving self-custodied assets or customer assets held with any third-party custodians, Crypto Trading Platforms or institutional borrowers or anything that would affect its ability to obtain an unqualified audit opinion in respect of its audited financial statements. None of the third-party custodians, Crypto Trading Platforms, or institutional borrowers holding Voyager's crypto assets is a "Canadian financial institution" (as defined in NI 45-106) or, other than Anchorage, a foreign equivalent, a related party of the Company, and none provide services to the Company other than custody, trade execution, and borrowing transactions. Neither Fireblocks nor Anchorage have appointed sub-custodians to hold customer assets, though the Company understands that certain of the Crypto Trading Platforms on which the Company maintains balances may from time to time employ sub-custodians. In the event of bankruptcy or insolvency of third-party Crypto Trading Platforms, custodians or institutional borrowers, the Company expects that it would be treated as an unsecured creditor.

The Company also from time to time makes strategic investments in venture-stage companies across the digital asset, cryptocurrency and blockchain technology, as well as other relevant, sectors. The Company generally invests in companies that are customers, vendors or suppliers of the Company or that the Company believes may be strategically important to the future business of the Company. From time to time, members of executive management (including members of the Board) may have existing positions with or may also participate in or otherwise hold such investments. In such circumstances, the Company may seek independent Board approval or ratification of its participation in such transactions that also involve such investments. As of the date of this AIF, such investments are not, either individually or in the aggregate, material to the operations of the Company.

**Specialized Skill and Knowledge**

The Company's success is largely dependent on the performance of its management and key employees, as well as directors, many of whom have specialized experience relating to the Company's industry, products, regulatory environment, customers and business. The Company believes that it has adequate personnel with the specialized skills and knowledge to successfully carry out the Company's business and operations. See "Risk Factors - Risks Related to the Company's Business" in this AIF for the risks in connection with the Company's reliance on key personnel for its continued success.

**Competition and Market Participants**

In the cryptocurrency industry, there exist multiple Crypto Trading Platforms offering online trading and wallets and multiple online/mobile players providing components of the cryptocurrency ecosystem. The largest US Crypto Trading Platforms are Coinbase, Kraken, Bittrex and Binance (US). Their models offer platforms that only send trades singularly to their wholly owned Crypto Trading Platforms with little or no information available on the platform. Voyager's agency Crypto Trading Platform uses smart order routing to search multiple Crypto Trading Platforms,

market makers and liquidity providers to strategically fill customer orders often at better prices than those offered by such Crypto Trading Platforms directly.

The competitive landscape also includes traditional payment and online brokers such as Robinhood, Sofi Invest, Square, and most recently Paypal, which announced a basic cryptocurrency offering. The Voyager Platform supports self-directed trading of more than 60 crypto assets, with the ability for customers to transfer certain of their crypto assets to their own wallet or custody with Voyager.

**Intangible Properties**

As described above under the heading "Description of Business General – Narrative Description of the Business", VIP holds a provisional patent application with the US Patent Office for the development of the Platform. In addition, the Company has over 20 key domain names, including "investvoyager.ca", "voyagerdigital.com" and "vygrdigital.com", which expire in 2021, with several of them renewing automatically. The Company also has a trademark application filed in the United States.

**Cycles**

The Company's business is not cyclical or seasonal.

**Economic Dependence**

The Company is dependent upon MC Bank pursuant to the Account Services Agreement in order for VDL to carry on its business in the majority of states in the United States. VDH entered into the Account Services Agreement with MC Bank, pursuant to which MC Bank provides deposit and payment systems for VDL's customers using a custodial "for the benefit of" account. MC Bank receives fees for wire transactions and account transactions, subject to a minimum $10,000 monthly fee. See "General Development of the Business - Three Year History" and "Risk Factors - Risks Related to the Company's Business - Arrangement with Metropolitan Commercial Bank" in this AIF for further information.

**U.S. Regulatory Matters**

The Company has considered whether it is required to register, in any capacity, under the relevant securities, commodity futures or derivatives legislation of the United States and specifically whether the Company is an "investment company" under the laws of the United States.

Registration as either a broker or dealer under Section 3(a)(4)(A) of the Exchange Act or as an investment company under the Investment Company Act of 1940 turns, as an initial matter, on whether or not the Company supports, custody's, intermediates, or facilitates, in any fashion, transactions involving "securities" as defined in section 2(a)(1) of the Securities Act of 1933. As further described below, the Company has taken reasonable measures to ensure that it does not support, custody, intermediate, or facilitate any transactions or activities with respect to any product that constitutes a "security". Accordingly, the Company has, after obtaining legal advice, determined that it is not required to be registered in any capacity under applicable U.S. securities laws.

For the avoidance of doubt, due to the fact that the Company does not support or facilitate securities on its Platform, the Company is not required to register as a broker-dealer or exchange with the SEC as indicated above. The Company's conclusion that it is not required to be so registered under U.S. securities laws is based on the due diligence and risk-based analysis it performs on all digital assets supported, or proposed for inclusion, on its platform. The Company performs ongoing due diligence and risk-based analysis to ensure that supported digital assets do not constitute securities under U.S. securities laws.

In particular, the Company performs internal due diligence reviews of all supported digital assets, as well as digital assets that have been proposed for inclusion on the Company's platform to determine the likely regulatory treatment of such digital asset, these procedures may include:

1. **Industry Review**. The Company's operations team (comprised of product, business development, technology, internal and/or external legal, compliance, finance and marketing personnel) will review the digital asset's functional purpose, its competitive position in the industry, the digital asset exchanges on

which it is supported, and its liquidity across markets, including digital asset exchanges, market makers and OTC desks. The Company will also seek information from the digital asset's sponsor (such as the issuer, associated foundation or affiliates thereof).

2.  **Technological Review**. The Company's technology team will, to the extent feasible, review the technology underlying the digital asset, including seeking to ensure that the digital asset functions as described in its white paper.

3.  **Legal Review**. Given the ongoing development of the law with respect to whether particular digital assets qualify as securities under U.S. securities laws, obtaining a formal legal opinion form external counsel as to the likely regulatory treatment of a particular digital asset may not feasible, and the Company will generally not seek to obtain such a legal opinion. Notwithstanding the foregoing, in an effort to determine the likely regulatory treatment of a digital asset, the Company will (i) seek to engage with legal counsel to the digital asset issuer or associated foundation, and (ii) when appropriate, work with U.S. securities counsel to apply applicable U.S. laws and regulations to the digital asset to determine whether it is reasonably likely to be deemed a security under the existing U.S. laws.

4.  **Audit Committee**. Assuming that, after undertaking the above steps, the Company's operations team recommends that the Company support the applicable digital asset, it will summarize its findings for the Company's Audit Committee or such other committee as may be formed for this purpose, for their review and to confirm satisfactory compliance with the above noted procedures.

5.  **Ongoing Monitoring**. The Company will on a consistent basis monitor all relevant formal or informal guidance provided by the SEC (and other applicable regulators) with respect to the regulatory treatment of digital assets generally, and the digital assets supported by the Company, specifically. In the event that the Company (i) determines that any of the digital assets it supports have been removed for regulatory reasons from any digital asset exchanges, market makers or OTC desks, (ii) becomes aware that any of its key competitors announced that, for regulatory reasons, it would no longer support digital assets listed on the Platform, or (iii) becomes aware of any information, including adverse media, regulatory disclosures, filings, statements, or other communications that would materially alter the regulatory treatment of a particular digital asset, then the Company will undertake a further review and determination focusing on steps 3 and 4 above. The Company will provide quarterly updates to the board of directors as to any material developments in the treatment of digital assets or legal developments in the process to be applied to the determination of whether a digital asset is a security.

6.  **Removal of Digital Assets**. In the event that the Company's operations team, with the advice of the Company's general counsel and U.S. securities counsel (as necessary), determines that a particular digital asset likely will be deemed a security under U.S. securities laws, it will advise the Audit Committee or such other committee as may be formed for this purpose that the digital asset should be removed from the Platform, and will also make determinations regarding the date on which trading should cease and whether such digital assets then held by clients must be removed from the platform in order to ensure an orderly wind down of such digital asset.

The above noted procedures may be subject to change based on, among other things, changes in laws, regulations or the interpretation thereof or changes in industry practices.

The Company has also considered whether it is subject to additional registration requirements pursuant to the Commodity Exchange Act ("**CEA**"). Specifically, Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "**Dodd-Frank Act**") provides the Commodity Futures Trading Commission ("**CFTC**"), among other things, authority over any agreement, contract, or transaction in any commodity that is entered into or offered to a retail customer on a leveraged, margined or financed basis (a "**Retail Commodity Transaction**"). The CFTC has provided guidance that certain digital assets, including but not limited to Bitcoin and Ethereum, are commodities. Retail Commodity Transactions must generally be conducted on or subject to the rules of a board of trade that has been designated or registered by the CFTC as a contract market or derivatives transaction execution facility. Further, all persons that accept orders for Retail Commodity Transactions as well as accept funds in connection therewith, must generally register with the CFTC as a futures commission merchant ("**FCM**").

The Company's platform currently only facilitates 'spot' transactions in digital assets. The Company does not provide any digital asset transactions on a leveraged, margined, or financed basis. Spot transactions are not considered Retail Commodity Transactions, and therefore the Company is not subject to the registration and CFTC oversight considerations outlined above.

The Company's conclusion that it is not subject to the aforementioned additional CFTC oversight and registration provisions is based upon (a) the plain language of the CEA, (b) the Company's ongoing review and analysis of relevant CFTC guidance, (c) review and evaluation of legal advice provided by outside, qualified legal counsel, as well as (d) ongoing analysis of its operational and business activities.

Notwithstanding these due diligence efforts, the Company recognizes that the legal regime surrounding digital assets in the U.S. is still evolving. Digital assets are a relatively new asset class, and the SEC and CFTC have not developed definitive and comprehensive regulatory regimes targeted specifically to digital assets. Rather, the SEC has communicated to industry participants that it will apply existing securities laws, including the Howey Test, a four-part test developed by the U.S. Supreme Court to determine whether a particular "investment contract" is a security, to digital assets.

Given that the Howey Test is almost 75 years old, was not designed with digital assets in mind, and its application is fact-based, it is possible that the SEC could come to a different conclusion than the Company in respect of a particular digital asset. In addition, it is possible that the SEC, CFTC, or other state or federal regulator could publish additional regulatory guidance that dramatically or substantially alters the Company's regulatory obligations, or that the U.S. implements a comprehensive regulatory regime in respect of digital asset businesses. In either case, those developments could result in the Company being required to become registered, removing certain digital assets from its platform, or being required to cease certain of its operations. See "*The Company's performance will be highly dependent on the future regulatory environment in the United States and elsewhere, which is challenging and unpredictable.*" and the other risk factors under "Risk Factors".

### Employees

As of Fiscal 2021 year-end, the Company had 141 full-time employees, including management, located in the United States, Canada and France, of which over 60% were dedicated to customer support, engineering/technology and marketing roles.

### Foreign Operations

The Company is substantially dependent on foreign operations as all of the Company's operating subsidiaries are in the United States. See "Corporate Structure - Intercorporate Relationships" and "General Development of the Business - Three Year History" in this AIF for further information.

The Company intends to expand its business to include Canadians. In order to effect such an expansion, the Company has applied to the CSA for exemptive relief from certain prospectus and registration requirements it believes are necessary to operate its business in Canada. In addition, either directly or through one or more affiliates, the Company intends to apply for registration with the CSA as a "restricted dealer" and to CSA and IIROC for registration as an investment dealer and a member of IIROC, in each case in accordance with the guidance set out by CSA and IIROC from time to time, including Joint CSA/IIROC Staff Notice 21-329 – *Guidance for Crypto-Asset Trading Platforms: Compliance with Regulatory Requirements* as it may relate to those.

On August 2, 2021, the Company completed the acquisition of Coinify, a leading cryptocurrency payment platform with a global customer base in over 150 countries. The acquisition accelerates Voyager's international expansion, and provides Voyager with an established and effective gateway to the crypto payment industry through its virtual currency payment platform available in Europe, Asia, North America and South America.

On October 13, 2021, the Company secured final approval to begin onboarding customers in France and the European Union through its wholly owned subsidiary, LGO Europe SAS, following a standard review by the Autorité des marchés financiers (AMF) and the Autorité de contrôle prudentiel et de résolution (ACPR).

### Reorganizations

The Company completed the RTO in February 2019 upon closing its change of business and acquiring all of the shares of VDH.  See "General Development of the Business - Three Year History".

**New Products**

The Company is developing a debit card through MC Bank. The debit card has been designed internally, and FiCentive, Inc., a subsidiary of Usio Inc. is the program manager. The components required for the finished product have not yet been finalized.

RISK FACTORS

The following discussion summarizes the principal risk factors that apply to the Company's business and that may have a material adverse effect on the Company's business and financial condition and results of operations, or the trading price of the Common Shares. Due to the nature of Voyager's business, the legal and economic climate in which it operates and its present stage of development and proposed operations, the Company is subject to significant risks.

The risks and uncertainties outlined below are not the only ones facing the Company. Additional risks and uncertainties not currently known to the Company, or that the Company currently deems immaterial, may also impair the operations of the Company.  If any such risks actually occur, the financial condition, liquidity and results of operations of the Company could be materially adversely affected and the ability of the Company to implement its growth plans could be adversely affected.

An investment in the Company's Shares is speculative and will be subject to material risks, and investors should not invest in securities of the Company unless they can afford to lose their entire investment.

*Market Risk for Securities.*

There can be no assurance that an active trading market for the Shares will be sustained.  The market price for the Shares may be subject to wide fluctuations. Factors such as government regulation, cryptocurrency price fluctuations, share price movements of peer companies and competitors, as well as overall market movements, may have a significant impact on the market price of the Company's securities.  The stock market has from time to time experienced extreme price and volume fluctuations, which have often been unrelated to the operating performance of particular companies.

*Additional Funding Requirements.*

Further expansion of the Company's business, in the United States, Canada and internationally, may require additional capital; and the ongoing costs of operations may not generate positive cash flow for the near or long term.  Although the Company believes it has adequate funds to operate for the next 12 months, there is no assurance that such funds will be adequate or that it will be successful in obtaining the required financing for these or other purposes, including for general working capital.  The Company's ability to secure any required financing to sustain operations may depend in part upon prevailing capital market conditions and business success.  There can be no assurance that the Company will be successful in its efforts to secure any additional financing or additional financing on terms satisfactory to management.  If additional financing is raised by issuance of additional Shares from treasury, control may change and Shareholders may suffer dilution.  If adequate funds are not available, or are not available on acceptable terms, the Company may be required to scale back its business plan or cease operating.

*Negative Cash Flow from Operations.*

The Company had negative operating cash flow for Fiscal 2020. Although the Company had positive operating cash flow for Fiscal 2021 and anticipates it will have positive cash flow from operating activities in future periods, the Company cannot guarantee that it will attain or maintain positive cash flow status into the future.

The Company launched its iOS mobile app in February 2019 in the Apple store and later launched the Android version in October 2019. The growth in the trading platform is driven by the increase in funded accounts on the Platform. Additionally, the Company has more recently significantly strengthened its liquidity position in Fiscal 2021 to support the significant increase in revenues and corresponding spend in new customer acquisition costs to drive growth in

funded accounts.

In Fiscal 2021, the Company had approximately 652,000 new funded accounts added, as compared with approximately 13,000 new funded accounts added in Fiscal 2020. Increased interest in personal finance and investing, a positive market environment, especially in the U.S., encouraged an unprecedented number of first-time retail customers to download the Company's app and begin trading on the Platform.

***Changes in, or the development of guidance relating to, accounting standards governing the preparation of the Company's financial statements and future events could have a material impact on the Company's financial condition, results of operations, cash flows and other financial data.***

From time to time, regulators change the financial accounting and reporting standards governing the preparation of the Company's financial statements or the interpretation of those standards. These changes are difficult to predict and can materially impact how the Company records and reports its financial condition, results of operations, cash flows and other financial data. In some cases, the Company may be required to apply a new or revised standard retroactively or to apply an existing standard differently, also retroactively, in each case potentially resulting in the restatement of prior period financial statements and related disclosures. Additionally, the Company accounting policies and methods are fundamental to how it records and reports its financial condition and results of operations. The preparation of financial statements in conformity with IFRS requires management to make estimates based upon assumptions about future economic and market conditions which affect reported amounts and related disclosures in our financial statements. If subsequent events occur that are materially different than the assumptions and estimates we used, its reported financial condition, results of operation and cash flows may be materially negatively impacted.

In addition, the accounting for, and audit standards relating to, crypto assets remain subject to further guidance. To the extent that such guidance imposes obligations on audit firms that they are not able to meet with respect to the review of crypto assets, the Company could have difficulty in obtaining an audit opinion, filing audited financial statements in a timely manner or obtaining an unqualified opinion.

***Service on Foreign Directors and Officers.***

The Company is a corporation formed under the laws of British Columbia, Canada; however its principal place of business is in the United States. Most of the Company's directors and officers, the Company's auditors, and the majority of the Company's assets, are located in the United States.

It may be difficult for customers in the United States to effect service of process within the United States upon those directors who are not residents of the United States or to enforce against them judgments of the United States courts based upon civil liability under the United States federal securities laws or the securities laws of any state within the United States. There is doubt as to the enforceability in Canada against the Company or against any of its non-United States directors, in original actions or in actions for enforcement of judgments of United States courts of liabilities based solely upon the United States federal securities laws or securities laws of any state within the United States.

Similarly, it may be difficult for customers in Canada to effect service of process within Canada upon those directors, officers and experts who are residents of the United States, or to enforce against them judgments of the Canadian courts based upon civil liability under Canadian securities laws. There is doubt as to the enforceability in the United States against any of the Company's non-Canadian directors, in original actions or in actions for enforcement of judgments of Canadian courts of liabilities based solely upon Canadian law.

***Foreign Exchange Risk.***

The Company is a corporation formed under the laws of British Columbia, Canada, and certain expenses are incurred and fund raising undertaken in Canadian dollars. Most of its expenses and fund raising is done in Canadian dollars. Most of the expenses and revenues of the Company's subsidiaries are denominated in United States dollars. As a result, the Company is subject to foreign exchange risks relating to the relative value of the United States dollar as compared to the Canadian dollar. A decline in the United States dollar would result in a decrease in the real value of the Company's revenues and adversely impact financial performance.

***Integration of Acquired Businesses.***

The Company may from time to time merge with or acquire other companies or businesses both locally and globally. The integration of the operations and financial systems of any such companies or businesses may require substantial time and resources from the Company's personnel, in particular where such companies or businesses operate under different regulatory regimes or prepare their financial records in accordance with accounting regimes other than IFRS. To the extent that any such companies or businesses are in a net operating loss position at the time of acquisition, it may have a negative impact on the Company's overall financial position.

***Additional Taxation May Apply to Dividends Paid to Non-Residents.***

Any dividends paid (or deemed for tax purposes to be paid) on Shares to a non-resident of Canada will be subject to Canadian withholding tax at a rate of 25% unless the rate is reduced under the provisions of an applicable double taxation treaty. Where a non-resident is a United States resident entitled to benefits of the Canada – United States Income Tax Convention (1980) and is the beneficial recipient of the dividends, then the rate of Canadian withholding tax is generally reduced to 15%.

***Foreign Exchange Risk to Non-Resident Shareholders***.

Any future dividends may be declared in Canadian dollars and converted to foreign denominated currencies at the spot exchange rate at the time of payment.  As a consequence, customers are subject to foreign exchange risk.  To the extent that the Canadian dollar strengthens with respect to their currency, the amount of the dividend will be reduced when converted to their home currency.

## Legal and Regulatory Risks of Businesses Based on Cryptocurrencies and Crypto Assets

***The regulation of cryptocurrencies and crypto assets continues to evolve in every jurisdiction, and governmental, regulatory and other changes or actions may restrict the use of cryptocurrencies and crypto assets, the operation of distributed ledger technologies that support such cryptocurrencies and platforms that facilitate the trading of such assets and provide certain services in connection with such assets.***

As cryptocurrencies and crypto assets have grown in popularity and in market size, governments, regulators and self-regulators (including law enforcement and national security agencies) around the world are examining the operations of crypto asset issuers, customers and platforms. To the extent that any Canadian, U.S. or other government or quasi-governmental agency imposes additional substantial regulation on any part of the cryptocurrency industry in general, the issuance of crypto assets, and trading and ownership of and transactions involving the purchase and sale or pledge of such assets, may be adversely affected, which could adversely affect the Company's businesses and investments. The effect of any future regulatory change on crypto asset issuers and participants in general is impossible to predict, but such change could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

The legal status of cryptocurrency and crypto assets varies substantially from jurisdiction to jurisdiction and is still undefined and changing in many of them. Likewise, various government agencies, departments, and courts have classified and continue to classify cryptocurrencies and crypto assets differently. Changes in laws, regulations, policies and practices could have an adverse effect on the Company, its strategies, business and investments. For example, regulatory agencies could shut down or restrict the use of Crypto Trading Platforms using cryptocurrencies, crypto assets or blockchain-based technologies, providing certain services with respect to the foregoing, or otherwise limit the use of cryptocurrencies. This, and any other changes in laws, regulations, policies and practices, could lead to a loss of any investment made by or in the Company, and may trigger regulatory action by securities or other regulators, and result in a material impact to the Company's business operations and revenue streams. Furthermore, various jurisdictions may, in the near future, adopt laws, regulations or directives that affect cryptocurrencies, the related markets and Crypto Trading Platforms and the ability to use, trade and hold cryptocurrencies. Such laws, regulations or directives may conflict with one another and may negatively affect the acceptance of cryptocurrencies by customers, merchants and service providers and may therefore impede the growth or sustainability of the bitcoin economy in Canada, the United States, the European Union, China, Japan, Russia or other locations and globally, or otherwise negatively affect the value of cryptocurrencies. Although there continues to be uncertainty about the full impact of these and other regulatory changes, the Company may become subject to a more complex regulatory framework in the near future and incur additional costs to comply with new requirements as well as to monitor for compliance with any new requirements in the future.

***The Company's performance will be highly dependent on the future regulatory environment in the United States and elsewhere, which is challenging and unpredictable.***

The Company is headquartered in the United States and currently accepts only U.S. customers on the Platform. Therefore, although the Company intends to extend its operations and customer bases to other countries, it is likely that the ability to conduct business in the United States and with U.S. customers will remain critical to the Company's results and prospects.

For businesses that involve cryptocurrencies or other crypto assets, the regulatory environment in the United States has been mixed. Notwithstanding that U.S. legislators and regulators generally express support for innovation in financial markets and products, they have arguably not moved quickly to clarify the status of cryptocurrencies and other crypto assets (and associated financial services) under U.S. laws, especially securities, commodities, banking and money-transmitter laws, or to accommodate proposals for new businesses or offerings. In recent years, the SEC has taken noteworthy actions to, among other things, sanction many issuers of digital tokens, reject applications for crypto-related exchange-traded funds and suggest that bitcoin and other crypto assets are not suitable holdings for traditional investment funds. It is impossible to predict what directions U.S. regulation might take in the future, which depend among other things on agency priorities and budgets, agency personnel turnover and appointments following presidential elections, legislation, judicial decisions, public perception, and economic conditions. There can be no assurance that U.S. regulation will advance in a way that is favorable for the Company.

Furthermore, in comparison to traditional securities or commodities markets, U.S. law and regulation remains thinly developed with respect to financial services provided to the cryptocurrency and crypto asset markets. Although recent years have seen some guidance emerge with respect to the question of whether a crypto asset constitutes a security for certain purposes under U.S. law, there remains little or no clear legal authority or established practice with respect to the application to crypto assets of concepts like fungibility, settlement, trade execution and reporting, collateralization, rehypothecation, custody, repo, margin, restricted securities, short sales, bankruptcy and insolvency and many others. Some or all of these concepts may be needed for crypto-related marketplaces to continue to grow, mature and attract institutional participants; there can be no assurances that rules and practices for such concepts will develop in the United States in a manner that is timely, clear, favorable to the Company or compatible with other jurisdictions' regimes. Furthermore, to the extent the Company offers any of these financial services, emerging regulation or enforcement activity may have a material impact on the Company's ability to continue providing such service thereby affecting the Company's revenues and profitability as well as its reputation and resources.

More recently, the SEC and state securities regulators have expressed their position that certain lines of cryptocurrency businesses, including "interest programs" and "staking" may involve the offering and sale of securities. While no new legislation has been passed or regulatory guidance published, regulators have expressed their position by issuing subpoenas and "Wells Notices" indicating an intention to commence regulatory enforcement proceedings. There is a risk that the SEC or state securities regulators could challenge the Rewards Program through such actions, which could be determined regardless of whether the regulators' positions have been established as correct in law. If litigation was threatened by a securities regulator or the Company were otherwise required to terminate its Rewards Program, it could have a materially negative affect on the Company's ability to attract customers and successfully operate its business.

In the event that the Company accepts customers from jurisdictions other than the U.S., it will be required to comply with applicable regulatory requirements in those jurisdictions which could be as onerous or more onerous than those of the U.S.

***A particular crypto asset's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty and if the Company is unable to properly characterize a crypto asset, the Company may be subject to regulatory scrutiny, investigations, fines, and other penalties, which may adversely affect the Company's business, operating results, and financial condition.***

The SEC and its staff have taken the position that certain crypto assets fall within the definition of a "security" under the U.S. federal securities laws. The legal test for determining whether any given crypto asset is a security is a highly complex, fact-driven analysis that evolves over time, and the outcome is difficult to predict. The SEC generally does not provide advance guidance or confirmation on the status of any particular crypto asset as a security. Furthermore, the SEC's views in this area have evolved over time and it is difficult to predict the direction or timing of any

- 24 -

continuing evolution. It is also possible that a change in the governing administration or the appointment of new SEC commissioners could substantially impact the views of the SEC and its staff. Public statements by senior officials at the SEC indicate that the SEC does not intend to take the position that Bitcoin or Ethereum are securities (in their current form). Bitcoin and Ethereum are the only crypto assets as to which senior officials at the SEC have publicly expressed such a view. Moreover, such statements are not official policy statements by the SEC and reflect only the speakers' views, which are not binding on the SEC or any other agency or court and cannot be generalized to any other crypto asset. With respect to all other crypto assets, there is currently no certainty under the applicable legal test that such assets are not securities, notwithstanding the conclusions the Company may draw based on its risk-based assessment regarding the likelihood that a particular crypto asset could be deemed a "security" under applicable laws. Similarly, though the SEC's Strategic Hub for Innovation and Financial Technology published a framework for analyzing whether any given crypto asset is a security in April 2019, this framework is also not a rule, regulation or statement of the SEC and is not binding on the SEC.

Several foreign jurisdictions have taken a broad-based approach to classifying crypto assets as "securities," while other foreign jurisdictions, such as Switzerland, Malta, and Singapore, have adopted a narrower approach. As a result, certain crypto assets may be deemed to be a "security" under the laws of some jurisdictions but not others. Various foreign jurisdictions may, in the future, adopt additional laws, regulations, or directives that affect the characterization of crypto assets as "securities."

The classification of a crypto asset as a security under applicable law has wide-ranging implications for the regulatory obligations that flow from the offer, sale, trading, and settlement of such crypto assets. For example, a crypto asset that is a security in the United States may generally only be offered or sold in the United States pursuant to a registration statement filed with the SEC or in an offering that qualifies for an exemption from registration. Persons that effect transactions in crypto assets that are securities in the United States may be subject to registration with the SEC as a "broker" or "dealer." Platforms that bring together purchasers and sellers to trade crypto assets that are securities in the United States are generally subject to registration as national securities exchanges, or must qualify for an exemption, such as by being operated by a registered broker-dealer as an alternative trading system, in compliance with rules for alternative trading systems. Persons facilitating clearing and settlement of securities may be subject to registration with the SEC as a clearing agency. Foreign jurisdictions may have similar licensing, registration, and qualification requirements.

A determination by the SEC, a foreign regulatory authority, or a court that an asset that the Company currently supports for trading on the Platform constitutes a security may also result in the Company determining that it is advisable to remove assets from the Platform that have similar characteristics to the asset that was determined to be a security. In addition, the Company could be subject to judicial or administrative sanctions for failing to offer or sell the crypto asset in compliance with the registration requirements, or for acting as a broker, dealer, or national securities exchange without appropriate registration. Such an action could result in injunctions, cease and desist orders, as well as civil monetary penalties, fines, and disgorgement, criminal liability, and reputational harm. Customers that traded such supported crypto asset on the Company's platform and suffered trading losses could also seek to rescind a transaction that the Company facilitated as the basis that it was conducted in violation of applicable law, which could subject the Company to significant liability. The Company may also be required to cease facilitating transactions in the supported crypto asset other than via any licensed subsidiaries, which could negatively impact the business, operating results, and financial condition. Furthermore, if the Company removes any asset from trading on Platform, such decision may be unpopular with customers and may reduce the Company's ability to attract and retain customers, especially if such assets remain traded on unregulated Crypto Trading Platforms, which includes many of the Company's competitors.

Further, if Bitcoin, Ethereum, or any other supported crypto asset is deemed to be a security under any U.S. federal, state, or foreign jurisdiction, or in a proceeding in a court of law or otherwise, it may have adverse consequences for such supported crypto asset and would have a material and adverse effect on the Company and its business and prospectus. For instance, all offerings in such supported crypto asset would have to be registered with the SEC or other foreign authority, or conducted in accordance with an exemption from registration, which could severely limit its liquidity, usability and transactability. Moreover, the networks and platforms such as the Company's on which such supported crypto assets are utilized may be required to be regulated as securities intermediaries, and subject to applicable rules, which could effectively render the network impracticable for its existing purposes. Further, it could draw negative publicity and a decline in the general acceptance of the crypto asset. Also, it may make it difficult for such supported crypto asset to be traded, cleared, and custodied as compared to other crypto asset that are not considered to be securities.

***The Company will be required to avoid "investment company" status under U.S. law or comparable laws in other jurisdictions.***

In general, under the *U.S. Investment Company Act of 1940*, a company that has many U.S. securityholders and conducts businesses relating to securities could, depending on complex factors relating to its activities and holdings of investment securities, be deemed to be an "investment company." Investment company status is broadly incompatible with the Company's business plans (and with its status as a non-U.S. issuer). If the Company were determined to be deemed to be an investment company, the Company might be required to significantly restructure its businesses or cease operations altogether.

The Company intends that its current and future activities not cause the Company to be deemed to be an investment company. To the extent that the Company and its subsidiaries hold and transact in cryptocurrencies that do not constitute securities, the Company believes that such holdings and transactions will not cause the Company to be deemed to be an investment company. Furthermore, to the extent that holding and transacting security tokens or security derivatives takes place in broker-dealer subsidiaries of the Company, the Company believes that such holdings and transactions could qualify for an *Investment Company Act* exception and therefore likewise not cause the Company to be deemed to be an investment company. There is currently little or no guidance or legal authority, however, with respect to the application of *Investment Company Act* principles and tests to crypto-related businesses, and there can be no assurance that such guidance or authority, if forthcoming, would be favorable to the Company. The Company could face a similar situation in other, non-U.S. jurisdictions.

***In the United States and in other jurisdictions, the Company may be required to, or may choose to, conduct certain activities through regulated subsidiaries. This will increase the direct and indirect costs of the Company's compliance with law and regulation and is not guaranteed to be successful as a business matter.***

Some of the Company's current and planned activities, such as with respect to digital tokens that constitute securities under U.S. law, may need to be conducted through an entity that holds certain regulatory registrations or qualifications or meets other standards. As one prominent example, in the United States, a business of acting as a broker or dealer in securities must generally be conducted by an entity that is registered with the SEC as a broker-dealer and is a member of FINRA. In addition, several U.S. states have adopted some level of licensing and regulation of crypto-related businesses, including businesses that generally do not implicate the U.S. federal securities, commodities or banking laws. For example, New York State's primary financial regulator in 2015 promulgated a "BitLicense" regime for so-called "virtual currency business activities," which include a wide range of crypto-related activities, including custody and dealing, if they involve New York State or a resident of New York State.

The Company's philosophy has been to prepare for cryptocurrencies and crypto assets to exist within a progressively more complex regulatory landscape. The Company currently has a subsidiary, VYGR Digital Securities, LLC, that is a member of FINRA and of the U.S. National Futures Association and is authorized to conduct certain activities in securities and commodities. The Company and its subsidiaries also hold money-transmitter or similar licenses in almost all U.S. states. To the extent that the Company launches an asset-management business—and depending in significant part on future legal interpretations and the development of the regulatory landscape in the United States and elsewhere—the Company could, for example, be required to have a subsidiary that is registered as an investment adviser with the SEC or one or more U.S. states, or as a commodity trading advisor or commodity pool operator with the U.S. Commodity Futures Trading Commission.

In general, holding regulatory registrations and qualifications may enable the Company to conduct lawfully certain activities, particularly client- or customer-facing ones, in certain jurisdictions, such as the United States, that the Company believes will be profitable or otherwise desirable in the context of the Company's business plan. On the other hand, regulated businesses typically have much higher costs of compliance, including recordkeeping, auditing and training; must comply with customer protection rules and business practice codes that may be constraining, and with valuation and accounting policies that may be difficult to adapt and apply to crypto assets; may be regularly examined by organizations such as FINRA; and may have to meet regulatory capital or similar requirements beyond what the Company would otherwise view as optimal. For example, broker-dealers are generally subject to regulatory capital requirements promulgated by the applicable regulatory and exchange authorities in the United States or in other jurisdictions where they operate, and the failure to maintain required regulatory capital may lead to suspension or revocation of a broker-dealer registration and suspension or expulsion by a regulatory body.

At the same time, regulatory registrations and qualifications typically provide no assurance that the Company will ultimately be permitted to conduct any particular business or activity; such permission typically remains subject to broad regulatory discretion to approve, deny or condition based upon sometimes nebulous concepts of customer protection or market integrity. This factor could be particularly problematic in the case of novel markets and products, including not only existing cryptocurrencies and other crypto assets but also new and innovative assets or technologies hoped to be developed in the future.

If, overall, the various direct and indirect legal and compliance costs referred to in the foregoing are greater than the net business or product access provided by qualification under applicable regulatory regimes, it is likely to, among other things, materially and adversely affect the Company's reputation, financial condition, trading execution and asset value and the value of any investment in the Company.

**Risks Related to the Company's Business**

***Permits and licenses.***

Certain operations of VDH require licenses and permits from various governmental authorities in the United States and elsewhere.  Presently, to operate as a crypto broker supporting a Crypto Trading Platform in each state of the United States, VDH requires individual state approval to transmit money (fiat and digital).  State applications may require significant surety bonds be posted, which may require additional funds be raised by the Company.  Should VDH seek to expand its business model to include additional regulated products or services, there will be significant federal and state regulations to be complied with.  There can be no assurance that VDH will be able to obtain all necessary licenses and permits that may be required, including money transmitter licenses in the United States.  Furthermore, failure or delays in obtaining necessary approvals for licenses and permits could have a materially adverse effect on the Company's financial condition and results of operations. As VDH seeks to expand its business outside of the United States, it will need to comply with the laws and regulations of each jurisdiction in which it carries on such business.  There is no assurance that VDH will be able to comply with the laws and regulations of each jurisdiction in which it seeks to expand.

***Financial services businesses, including the Company's, are heavily regulated, which imposes costs on the Company in many ways.***

Financial services businesses, including businesses that invest or trade in financial assets (or enable others to do so), are heavily regulated in virtually every developed jurisdiction in the world. This regulation is often costly to comply with for a number of reasons, from costs of a compliance infrastructure to explicit margin or regulatory capital charges; extraordinarily technical, subject to interpretive uncertainty or both; and subject to unpredictable, potentially material change upon the exercise of discretion by a range of legislative, executive, judicial, multinational, self-regulatory and other bodies. As only a few examples, holding or transmitting funds, and trading, brokering or operating certain trading platforms with respect to transactions in securities and commodity interests, are activities that are generally subject to extensive and complex regulation. Alternatively, exemptions from such regulation, when they are available, are often themselves complex and technical and may cause a company to avoid otherwise desirable and profitable business activities as well as to bear increased compliance costs.

All of the foregoing is true for businesses that transact only in traditional, well understood instruments such as fiat currencies and listed equity securities. In other words, operating a financial services or financial technology business typically involves a significant amount of regulatory costs, risks and uncertainty even before introducing the additional complications of cryptocurrencies and other crypto assets. These factors, individually and together, may, among other things, materially and adversely affect the Company's reputation, financial condition, trading execution and asset value and the value of any investment in the Company.

***The Company's compliance and risk management programs may not be effective and may result in outcomes that could materially and adversely affect the Company's reputation, financial condition and operating results, among other things.***

The Company's ability to comply with applicable laws and rules is largely dependent on the establishment and maintenance of compliance, review and reporting systems, as well as the ability to attract and retain qualified compliance and other risk management personnel. The Company cannot provide any assurance that its compliance

policies and procedures will always be effective or that the Company will always be successful in monitoring or evaluating its risks. In the case of alleged non-compliance with applicable laws or regulations, the Company could be subject to investigations and judicial or administrative proceedings that may result in substantial penalties or civil lawsuits, including by customers, for damages, restitution or other remedies, which could be significant. Any of these outcomes, individually or together, may among other things, materially and adversely affect the Company's reputation, financial condition, trading execution, and asset value and the value of any investment in the Company.

***Operational risks, such as misconduct and errors of employees or entities with which the Company does business, are difficult to detect and deter and could cause material reputational and financial harm to the Company.***

The Company's employees and agents could engage in misconduct, which may include conducting and concealing unauthorized activities or improper use or unauthorized disclosure of confidential information. It is not always possible to deter misconduct by employees or others, and the precautions that the Company takes to prevent and detect this activity may not be effective in all cases. The Company could be at risk, for example, that its employees could engage in prohibited personal trading of a cryptocurrency or crypto asset supported by one of the Company's platforms, which could lead to actions such as trading suspensions, fines and costs or other regulatory actions, which, in each case, could have a material and adverse effect on the Company.

Furthermore, the Company's employees could make errors in recording or executing transactions for clients, customers or counterparties, which would likely result in additional and potentially material costs to the Company.

***The Company may fail to anticipate or adapt to technology innovations in a timely manner, or at all.***

The blockchain and telecommunications markets are experiencing rapid technological changes. Failure to anticipate technological innovations or adapt to such innovations in a timely manner, or at all, may result in the Company's products becoming obsolete at sudden and unpredictable intervals. To maintain the relevancy of the Company's products, the Company has actively invested in product planning and research and development. The process of developing and marketing new products is inherently complex and involves significant uncertainties. There are a number of risks, including the following:

    a.    the Company's product planning efforts may fail in resulting in the development or commercialization of new technologies or ideas;

    b.    the Company's research and development efforts may fail to translate new product plans into commercially feasible products;

    c.    the Company's new technologies or new products may not be well received by consumers;

    d.    the Company may not have adequate funding and resources necessary for continual investments in product planning and research and development;

    e.    the Company's products may become obsolete due to rapid advancements in technology and changes in consumer preferences; and

    f.    the Company's newly developed technologies may not be protected as proprietary intellectual property rights.

Any failure to anticipate the next-generation technology roadmap or changes in customer preferences or to timely develop new or enhanced products in response could result in decreased revenue and market share. In particular, the Company may experience difficulties with product design, product development, marketing or certification, which could result in excessive research and development expenses and capital expenditure, delays or prevent the Company's introduction of new or enhanced products. Furthermore, the Company's research and development efforts may not yield the expected results, or may prove to be futile due to the lack of market demand.

***An active and liquid trading market in the Common Shares may fail to develop.***

There can be no assurance that an active and liquid trading market in the Common Shares will develop or, if such a

market develops, whether it will be maintained. Furthermore, market-makers in the Common Shares, if any, will be under no obligation to make a market for the Common Shares and will have the ability to discontinue any market-making activities undertaken by them at any time. The Company cannot predict the effect on the market price of the Common Shares if a liquid and active trading market fails to develop or to be maintained. In the absence of an active trading market, relatively small sales may result in a significant negative effect on the price of the Common Shares, increasing volatility.

***There are material risks and uncertainties associated with the Company's anti-money-laundering ("AML"), "know your customer" ("KYC") and other protocols to detect and deter illegal activity on the Company's platforms.***

The Company seeks to implement and maintain anti-money-laundering, "know your customer" and other policies and procedures that are consistent with applicable U.S. and non-U.S. law and regulation and with financial services industry best practices. Nonetheless, the Company may not be able to prevent illegal activity from occurring on or through its platforms, including the unauthorized use of a validly opened account.

The use of cryptocurrencies or other crypto assets for illegal purposes on or through the Company's platforms, or allegations or investigations with respect to potential such use, could result in significant legal and financial exposure to the Company and damage to the Company's reputation. Similarly, failure to meet applicable AML/KYC legal and regulatory requirements could result in regulatory fines, sanctions or restrictions, which in each case could materially and adversely affect the Company's reputation, financial condition, trading execution, and asset value and the value of any investment in the Company.

Furthermore, the Company will use and rely on third-party service providers to complete key aspects of AML/KYC screenings. Although the Company will perform due diligence on such providers, there can be no assurance that in all events such providers will detect all potential illegal activity or comply with all aspects of applicable law and regulation. If such a provider were to fail to perform to agreed standards or maintain full compliance, it could have a material and adverse effect on the Company's business and operations.

***Financial services companies face substantial litigation and investigation risks.***

As an enterprise whose material planned business lines include financial services, the Company will depend to a significant extent on its relationships with its clients and its reputation for integrity and high caliber professional services. As a result, if a client is not satisfied with the Company's services or if there are allegations of improper conduct by private litigants or regulators, whether the ultimate outcome is favorable or unfavorable to the Company, or if there is negative publicity and press speculation about the Company, whether or not valid, that may harm the Company's reputation and may be more damaging to the Company's businesses than to businesses in other non-financial industries.

Furthermore, any regulatory investigation or examination to which the Company becomes subject could result in significant fines or penalties and could result in consent decrees or other regulatory directives that limit the way the Company conducts its business or that require a third-party monitor to assist in overseeing compliance. Any litigation to which the Company becomes party may result in onerous or unfavorable judgments that may not be reversed upon appeal or in payments of substantial monetary damages or fines, or the Company may decide to settle lawsuits on similarly unfavorable terms. Responding to regulatory investigations and lawsuits of the nature described above is costly and time-consuming to management, can generate negative publicity and could materially and adversely affect the Company.

***Competition from other cryptocurrency companies.***

The Company competes with other cryptocurrency and distributed ledger technology businesses and other potential financial vehicles.  Market and financial conditions, and other conditions beyond the Company's control, may make it more attractive for customers to invest in other financial vehicles, or to invest in cryptocurrencies directly which could adversely impact the Company's business.

***Changes in the value of cryptocurrencies may affect trading.***

The markets for cryptocurrencies have experienced much larger fluctuations than other markets, and there can be no

assurances that volatile swings in price will slow in the future.  In the event that the price of cryptocurrency declines, the value of an investment in the Company will likely decline.  Several factors may affect the price and volatility of cryptocurrency, which include, but are not limited to: (i) global cryptocurrency demand, depending on the acceptance of cryptocurrency by retail merchants and commercial businesses; (ii) the perception that the use and holding of cryptocurrency is safe and secure, and the related lack of or inconsistency in regulatory restrictions, particularly across various jurisdictions; (iii) conversely, heightened regulatory measures restricting the use of cryptocurrency as a form of payment or the purchase of cryptocurrency; (iv) customers' expectations with respect to the rate of inflation; (v) interest rates; (vi) currency exchange rates, including exchange rates between cryptocurrency and fiat currency; (vii) fiat currency withdrawal and deposit policies on Crypto Trading Platforms and liquidity on such Crypto Trading Platforms; (viii) interruption of services or failures of major Crypto Trading Platforms; (ix) general governmental monetary policies, including trade restrictions, currency revaluations; (x) global or regional political, economic or financial events and situations, including increased threat or terrorist activities; and/or (xi) self-fulfilling expectations of changes in the cryptocurrency market.  As well, momentum pricing is typically associated with assets whose valuation, as determined by the investing public, accounts for anticipated future appreciation in value. Momentum pricing of cryptocurrency may result in speculation regarding future appreciation in the value of cryptocurrency. As a result, changing customer confidence could adversely affect an investment in the Company.

***Crypto Trading Platforms and other trading venues are relatively new and, in most cases, largely unregulated and may therefore be more exposed to fraud and failure.***

To the extent that Crypto Trading Platforms or other trading venues are involved in fraud or experience security failures or other operational issues, this could result in a reduction in trading by the public.

Cryptocurrency market prices depend, directly or indirectly, on the prices set on Crypto Trading Platforms and other trading venues, which are new and, in most cases, largely unregulated as compared to established, regulated exchanges for securities, derivatives and other currencies.  For example, during the past few years, a number of BTC Crypto Trading Platforms have been closed due to fraud, business failure or security breaches.  In many of these instances, the customers of the closed BTC Crypto Trading Platforms were not compensated or made whole for the partial or complete losses of their account balances in such BTC Crypto Trading Platforms.  While smaller Crypto Trading Platforms are less likely to have the infrastructure and capitalization that provide larger Crypto Trading Platforms with additional stability, larger Crypto Trading Platforms may be more likely to be appealing targets for hackers and "malware" (i.e., software used or programmed by attackers to disrupt computer operation, gather sensitive information or gain access to private computer systems) and may be more likely to be targets of regulatory enforcement action.

***Risks related to the crypto assets supported by the Company.***

The Company's operations and financial condition may also be impacted by the operations and financial condition of the projects underlying the crypto assets supported for trading by the Company. Many such projects have limited operating histories and may not be able to sustain their current trajectory, and many are led by key individuals whose departure from the project could have a material adverse effect. In addition, many such projects utilize rapidly developing technology that may be susceptible to security breaches or fraudulent activities. To the extent that any such events occur, trading in such crypto assets, or crypto assets generally, on the Platform could be reduced, which could have a negative impact on the financial condition of the Company and the value of its securities.

***The Company's use of proprietary and non-proprietary software, data and intellectual property may be subject to substantial risk.***

The Company's investment strategy may rely heavily on the use of proprietary and non-proprietary software, data and intellectual property of the Company and third parties in the crypto asset sector. The reliance on this technology and data is subject to a number of important risks. First, the operation of any element of the cryptocurrencies or crypto assets network or any other electronic platform may be severely and adversely affected by the malfunction of its technology and the technology of third parties. For example, an unforeseen software or hardware malfunction could occur as a result of a virus or other outside force, or as result of a design flaw in the design and operation of the network or platform. Furthermore, if the Company's software, hardware, data or other intellectual property is found to infringe on the rights of any third party, the underlying value of the assets of the Company could be materially and adversely affected. The Company also depends for effective distribution of its software products on "app store" platforms, which, if they were disrupted or discontinued for any reason, or if their terms of use or other features were

developed in a manner adverse to the Company, could materially and adversely affect the Company.

Third parties may assert intellectual property claims relating to the holding and transfer of cryptocurrency and their source code, or claims against any of VIP's patents or intellectual property rights associated with the Platform. Regardless of the merit of any intellectual property claim or other legal action, any threatened action that reduces confidence in the cryptocurrency network's long-term viability or the ability of end-users to hold and transfer cryptocurrency may adversely affect an investment in the Company. As a result, an intellectual property claim could adversely affect the business and affairs of the Company.

***Cybersecurity breaches and other systems and technology problems may materially and adversely affect the Company.***

The information and technology systems used by the Company and other service providers may be vulnerable to damage or interruption from, among other things: computer viruses; network failures; computer and telecommunication failures; infiltration by unauthorized persons; security breaches; usage errors by their respective professionals; power outages; terrorism; and catastrophic events such as fires, tornadoes, floods, hurricanes and earthquakes. If these systems are compromised, become inoperable for extended periods of time or cease to function properly, the Company or a service provider may have to make a significant investment to fix or replace them. The failure of these systems or of disaster recovery plans for any reason could cause significant interruptions in operations and result in a failure to maintain the security, confidentiality or privacy of sensitive data, including personal information relating to customers (and the beneficial owners of customers). Such a failure could harm the Company's reputation, subject it to legal claims and otherwise materially and adversely affect the Company.

***Crypto Trading Platforms and digital wallets may be hacked.***

VDL's Platform or digital wallets may be hacked. Access to VDL's coins, maintained in a hosted online wallet, could also be restricted by cybercrime (such as a denial of service attack). Any of these events may adversely affect the operations of VDL and, consequently, its business and profitability.

***The loss or destruction of a private key required to access certain cryptocurrencies or crypto assets may be irreversible. The Company's loss of access to its private keys or its experience of a data loss relating to its cryptocurrency or crypto asset investments could adversely affect the Company.***

Certain cryptocurrencies and crypto assets are controllable only by the possessor of both the unique public key and private key relating to the local or online digital wallet in which that cryptocurrency or crypto asset is held. Private keys typically must be safeguarded and kept private to prevent a third party from accessing the relevant cryptocurrencies and crypto assets held in the wallet. If a private key is lost, destroyed or otherwise compromised and no backup of the private key is accessible, the Company will be unable to access the cryptocurrencies and crypto assets held in the wallet. Any loss of private keys relating to digital wallets used to store the Company's cryptocurrencies and crypto assets could materially and adversely affect the Company's trading execution.

***Pandemics and COVID-19.***

The Company cautions that current global uncertainty with respect to the spread of COVID-19 and its effect on the broader global economy may have a significant negative effect on the Company. While the precise impact of the COVID-19 virus on the Company remains unknown, rapid spread of COVID-19 may have a material adverse effect on global economic activity, and can result in volatility and disruption to global supply chains, operations, mobility of people and the financial markets, which could affect interest rates, credit ratings, credit risk, inflation, business, financial conditions, results of operations and other factors relevant to the Company.

***The further development and acceptance of the cryptographic and algorithmic protocols governing the issuance of and transactions in cryptocurrencies is subject to a variety of factors that are difficult to evaluate.***

The use of cryptocurrencies to, among other things, buy and sell goods and services and complete other transactions, is part of a new and rapidly evolving industry that employs crypto assets based upon a computer-generated mathematical and/or cryptographic protocol. The growth of this industry in general, and the use of cryptocurrencies in particular, is subject to a high degree of uncertainty, and the slowing, or stopping of the development or acceptance

of developing protocols may adversely affect the Company's operations. The factors affecting the further development of the industry, include, but are not limited to:

• Continued worldwide growth in the adoption and use of cryptocurrencies;

• Governmental and quasi-governmental regulation of cryptocurrencies and their use, or restrictions on or regulation of access to and operation of the network or similar cryptocurrency systems;

• Changes in consumer demographics and public tastes and preferences;

• The maintenance and development of the open-source software protocol of the network;

• The availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies;

• General economic conditions and the regulatory environment relating to crypto assets; and

• Negative consumer sentiment and perception of cryptocurrencies generally.

***Acceptance and/or widespread use of cryptocurrency is uncertain.***

Currently, there is relatively small use of cryptocurrencies in the retail and commercial marketplace in comparison to relatively large use by speculators, thus contributing to price volatility that could adversely affect the Company's operations, investment strategies, and profitability.

As relatively new products and technologies, cryptocurrency has not been widely adopted as a means of payment for goods and services by major retail and commercial outlets. Conversely, a significant portion of cryptocurrency demand is generated by speculators and customers seeking to profit from the short-term or long-term holding of cryptocurrencies.

The relative lack of acceptance of cryptocurrencies in the retail and commercial marketplace limits the ability of end-users to use them to pay for goods and services. A lack of expansion by cryptocurrencies into retail and commercial markets, or a contraction of such use, may result in increased volatility or a reduction in their market prices, either of which could adversely impact the Company's business.

***Misuse of cryptocurrencies and malicious actors.***

Since the existence of cryptocurrencies, there have been attempts to use them for speculation or malicious purposes. Although lawmakers increasingly regulate the use and applications of cryptocurrencies, and software is being developed to curtail speculative and malicious activities, there can be no assurances that those measures will sufficiently deter those and other illicit activities in the future. Advances in technology, such as quantum computing, could lead to a malicious actor or botnet (a voluntary or hacked collection of computers controlled by networked software coordinating the actions of the computers) being able to alter the blockchain on which cryptocurrency transactions rely. In such circumstances, the malicious actor or botnet could control, exclude or modify the ordering of transactions, or generate new cryptocurrency or transactions using such control. The malicious actor or botnet could double spend its own cryptocurrency and prevent the confirmation of other customers' transactions for so long as it maintains control. Such changes could adversely affect an investment in the Company.

***Cryptocurrency is not covered by deposit insurance.***

Transactions using cryptocurrency are not covered by deposit insurance, unlike banks and credit unions that provide guarantees or safeguards.

***Management experience and dependence on key personnel, employees and third party providers.***

The Company's success is currently largely dependent on the performance of its directors and officers. The management team has specialized expertise within the cryptocurrency industry. The experience of these individuals is a factor which will contribute to the Company's continued success and growth. The Company is currently relying on its board members and executive officers, as well as independent consultants, for most aspects of the Company's business. The amount of time and expertise expended on the Company's affairs by each of its management team and

the directors will vary according to the Company's needs.  The loss of any of these individuals could have a material detrimental impact on the Company's business.  The Company does not intend to acquire any key man insurance policies for any of its current executives, and therefore there is a risk that the death or departure of any key member of management, a director, or employee or consultant could have a material adverse effect on the Company's future. Investors who are not prepared to rely on the Company's management team and Board should not invest in the Company's securities.

*Arrangement with Metropolitan Commercial Bank.*

The Company is dependent upon the MC Bank pursuant to the Account Services Agreement in order for VDL to carry on its business in the majority of states in the United States.  The MC Bank acts as agent for VDL and assumes the money services obligations on behalf of VDL.  However, should the Account Services Agreement be terminated for any reason, VDL may be unable to carry on business in most states of the United States unless its current applications were accepted or an alternative service arrangement could be arranged.

*Uninsured or Uninsurable Risks.*

The Company intends to insure its operations in accordance with technology industry practice.  However, given the novelty of the business, such insurance may not be available, uneconomical for the Company, or the nature or level may be insufficient to provide adequate insurance cover. The Company may become subject to liability for hazards against which it cannot insure or against which it may elect not to insure because of high premium costs or for other reasons.  The payment of any such liabilities would reduce or eliminate the funds available for operations.  Payments of liabilities for which the Company does not carry insurance may have a material adverse effect on its financial position.

*Limited operating history.*

VDH has a relatively limited history of operations in the cryptocurrency sector.  VDH will be subject to many risks common to start-up enterprises and its viability must be viewed against the background of the risks, expenses and problems frequently encountered by companies in the early stages of development in new and rapidly evolving markets such as the cryptocurrency market. This includes, without limitation, under-capitalization, cash shortages, limitations with respect to personnel, and lack of revenues and/or other resources (financial or otherwise). The Company does not generate material revenue from operations, and there is no assurance that VDH will develop its business profitably, and the likelihood of success of the Company must be considered in light of VDH's early stage of operations.  There is no assurance that the Company will be successful in achieving a return on Shareholders' investment.

*Investment Risk.*

There is no assurance that any of the strategic investments made by the Company will generate positive returns, and the Company may lose the entirety of such investments.  The companies in which the Company invests are expected to be at an early-stage of development and may not achieve their business objectives. Each of the companies in which the Company invests will be subject to their own particular risks, as well as those risks applicable to companies operating in the digital asset, cryptocurrency and blockchain technology sector. Certain of such industry risks are described under the headings "Legal and Regulatory Risks of Businesses Based on Cryptocurrencies and Crypto Assets" and "Investment, Operational and Other Risks of Holding and Otherwise Transacting in Cryptocurrencies and Crypto assets" in this AIF. In addition, the directors and officers of the Company may be directors, officers, or shareholders of one or more companies in which the Company may invest from time to time.

*Dividend Risk.*

The Company has not paid dividends in the past and does not anticipate paying dividends in the near future. The Company expects to retain earnings to finance further growth and, where appropriate, retire debt.

**<u>Investment, Operational and Other Risks of Holding and Otherwise Transacting in Cryptocurrencies and Crypto assets</u>**

***The continuing development and acceptance of cryptocurrencies, crypto assets and distributed ledger technology are subject to a variety of risks.***

Cryptocurrencies, such as bitcoin, and the other types of crypto assets in which the Company will invest and trade involve a new and rapidly evolving industry of which blockchain technology is a prominent, but not unique, part. The growth of the cryptocurrency industry in general, and distributed ledger technology that supports such cryptocurrencies in particular, is subject to a high degree of uncertainty. The factors affecting the further development of the cryptocurrency industry, as well as distributed ledger technology, include: continued worldwide growth in the adoption and use of cryptocurrencies; government and quasi-government regulation of crypto assets and their use, or restrictions on or regulation of access to and operation of applicable distributed ledger technology or systems that facilitate their issuance and secondary trading; the maintenance and development of the open-source software protocol of certain blockchain networks used to support cryptocurrencies; changes in consumer demographics and public tastes and preferences; the availability and popularity of other forms or methods of buying and selling goods and services, including new means of using fiat currencies; and general economic conditions and the regulatory environment relating to cryptocurrencies.

The Company's planned business and operations includes the collection of fees from issuers of new cryptocurrencies to offer the ability for the Company's customers to interact (buy, sell, trade) with such new cryptocurrency on the Company's platform. The Company may be exposed to increased business and litigation risk as a result. For example, the Company may be subject to claims from its customers who may have relied on the Company to conduct, or have a process to conduct, due diligence on new cryptocurrencies listed on the Company's platform. In addition, a reduction in the adoption of cryptocurrency may result in the Company's inability to generate revenue from the listing of new cryptocurrencies.

***A decline in the adoption and use of cryptocurrencies would materially and adversely affect the performance of the Company.***

Because cryptocurrency is a relatively new asset class and a technological innovation, it is subject to a high degree of uncertainty. As a related but separate issue from that of the regulatory environment, the adoption, growth and longevity of any cryptocurrency will require growth in its usage and in the blockchain for various applications. A lack of expansion in use of cryptocurrencies and blockchain technologies would adversely affect the financial performance of the Company. In addition, there is no assurance that any cryptocurrency or cryptocurrencies generally will maintain their value over the long term. The value of any cryptocurrency is subject to risks related to its use. Even if growth in the use of any cryptocurrency or of cryptocurrencies generally occurs in the near or medium term, there is no assurance that such use will continue to grow over the long term. A contraction in use of any cryptocurrency or cryptocurrencies generally may result in increased volatility or a reduction in prices, which would materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

***Banks may decline to provide banking services, or may cut off banking services, to companies engaged in cryptocurrency or crypto asset-related businesses, including the Company.***

A number of companies that provide cryptocurrency or crypto asset-related services have been unable to find banks that are willing to provide them with bank accounts and banking services. Similarly, a number of such companies have had their existing bank accounts closed by their banks. Banks may refuse to provide bank accounts and other banking services to cryptocurrency or crypto asset-related companies, including the Company, for a number of reasons, such as perceived compliance risks or costs. The Company's inability to procure or keep banking services would have a material and adverse effect on the Company. Similarly, continued general banking difficulties may decrease the utility or value of cryptocurrencies and crypto assets or harm public perception of those assets. Any of these occurrences could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company. While VDH has established an omnibus account with a third party, federally regulated bank in the United States, there is no assurance that it will be able to maintain such account, and its inability to do so could have a negative impact on its business.

***The prices of cryptocurrencies and crypto assets are extraordinarily and unprecedentedly volatile.***

A significant portion of demand for cryptocurrencies and other crypto assets is generated by speculators and customers seeking to profit from the short-term or long-term holding of these cryptocurrencies or crypto assets. Speculation regarding future appreciation in the value of a cryptocurrency or crypto asset may inflate and make more volatile the

price of that cryptocurrency or crypto asset. Conversely, only a limited number of cryptocurrencies, including bitcoin, have recently become sometimes accepted as a means of payment for some goods and services, and use of cryptocurrencies by consumers to pay at retail and commercial outlets remains very limited. A lack of expansion by cryptocurrencies into retail and commercial markets, or a contraction of such limited use as has developed to date, may result in increased volatility or a reduction in the value of that cryptocurrency or cryptocurrencies generally, either of which could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

Several factors affect the price and the volatility of cryptocurrencies, including global cryptocurrency demand depending on the acceptance of cryptocurrency by retail merchants and commercial businesses; customers' expectations with respect to the rate of inflation; interest rates; currency exchange rates, including exchange rates between cryptocurrency and fiat currency; fiat currency withdrawal and deposit policies on Crypto Trading Platforms and liquidity on such Crypto Trading Platforms; interruption of services or failures of major Crypto Trading Platforms; large investment and trading activities in cryptocurrency; monetary policies of governments, trade restrictions and currency de- and revaluations; regulatory measures restricting the use of cryptocurrency as a form of payment or the purchase of cryptocurrency; global and regional political, economic and financial events and situations, including increased threat of terrorist activities; and hacking of Crypto Trading Platforms or custodians.

Fluctuation in the prices of cryptocurrencies may significantly affect the Company's results of operations and financial condition; in particular, a significant drop in bitcoin price may have a material adverse effect on the Company's results of operations. The recent market uncertainty over the global outbreak of COVID-19 caused a drastic drop in the price of bitcoin in March 2020. The Company's business and results of operations may be materially and adversely affected by the global market uncertainties in the near term. More broadly, cryptocurrencies are subject to supply and demand forces based upon, among other things, the desirability of alternative, decentralized means of buying and selling goods and services. It is unclear how such supply and demand will be affected by geopolitical events; political or economic crises could motivate large-scale sales or purchases of cryptocurrencies and crypto assets either globally or in particular markets.

The prices of cryptocurrencies have fluctuated significantly in the past few years, which resulted in a corresponding fluctuation in the Company's results of operations. The Company expects that the prices of cryptocurrencies may continue to fluctuate in the future, and as such, the Company would expect to continue to experience a significant corresponding fluctuation in the Company's results of operations.

***There are material risks and uncertainties associated with custodians of crypto assets.***

The Company may use one or more custodians (or third-party "wallet providers") to hold crypto assets that it holds on behalf of itself or of clients, customers and counterparties. Such custodians may or may not be subject to regulation by U.S. state or federal or non-U.S. governmental agencies or other regulatory or self-regulatory organizations. The Company could have a high concentration of its crypto assets in one location or with one custodian, which may be prone to losses arising out of hacking, loss of passwords, compromised access credentials, malware or cyberattacks. Custodians may not indemnify the Company against any losses of crypto assets. Crypto assets held by certain custodians may be transferred into "cold storage" or "deep storage," in which case there could be a delay in retrieving such crypto assets. The Company may also incur costs related to the third-party custody and storage of its crypto assets. Any security breach, incurred cost or loss of crypto assets associated with the use of a custodian could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

Furthermore, there is, and is likely to continue to be, uncertainty as to how U.S. and non-U.S. laws will be applied with respect to custody of cryptocurrencies and other crypto assets held on behalf of clients. For example, U.S.-regulated investment advisers may be required to keep client "funds and securities" with a "qualified custodian"; there remain numerous questions about how to interpret and apply this rule, and how to identify a "qualified custodian" of, crypto assets, which are obviously kept in a different way from the traditional securities with respect to which such rules were written. The uncertainty and potential difficulties associated with this question and related questions could materially and adversely affect the Company's ability to develop and launch an asset management business.

The Company from time to time, may include a small amount of its own assets with the segregated assets of clients to facilitate efficient trading. In so doing, the Company is exposed to trade, settlement, market and counterparty risk,

which may expose the Company to financial loss.

The Company's assets deposited with third party custodians and Crypto Trading Platforms are generally held in one account for each type of digital currency for each custodian/Crypto Trading Platform. The assets are segregated from those of other customers of those custodians and Crypto Trading Platforms but are not then further segregated on a Company client level. Accordingly, any losses of the type described herein could affect customers on a pro rata basis. The Company may also incur costs related to the third-party custody and storage of its crypto assets. Any security breach, incurred cost or loss of crypto assets associated with the use of a custodian could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

***The unregulated nature and lack of transparency surrounding the operations of Crypto Trading Platforms may cause the marketplace to lose confidence in such Crypto Trading Platforms.***

Crypto Trading Platforms on which cryptocurrencies and other crypto assets trade are relatively new and, in some cases, unregulated. Furthermore, while some Crypto Trading Platforms provide information regarding their ownership structure, management teams, corporate practices and regulatory compliance, many other Crypto Trading Platforms do not. As a result, the marketplace may lose confidence in these Crypto Trading Platforms, including prominent Crypto Trading Platforms that handle a significant volume of trading in these assets. In recent years, there have been a number of Crypto Trading Platforms that have closed because of fraud, business failure or security breaches. Additionally, larger cryptocurrency and crypto asset Crypto Trading Platforms have been targets for hackers and malware and may be targets of regulatory enforcement actions. A lack of stability in these Crypto Trading Platforms and the temporary or permanent closure of such Crypto Trading Platforms may reduce confidence in the crypto asset marketplace in general and result in greater volatility in the price of crypto assets. These potential consequences could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

The Company relies on partnerships with third party Crypto Trading Platforms to fill customers' trade orders. The dependence of the Company on third party Crypto Trading Platforms to fulfill such orders may present material risks. For example, a third party Crypto Trading Platform may not return cryptocurrency deposited by the Company to execute a specific order, or such Crypto Trading Platforms may become insolvent prior to processing the Company's applicable withdrawal. The Company is also exposed to the inherent risks faced by such third party Crypto Trading Platforms for fraudulent activity, liquidity, regulatory and other operational and business risks.

***It is possible that actors could manipulate the blockchain networks and smart contract technology upon which cryptocurrencies and crypto assets rely.***

If a malicious actor is able to hack or otherwise exert unilateral control over a particular blockchain network, or the cryptocurrencies or crypto assets on such a network, that actor could attempt to divert assets from that blockchain or otherwise prevent the confirmation of transactions recorded in that cryptocurrency or crypto asset on that blockchain. Such an event could materially and adversely affect the Company's trading execution, the value of its assets and the value of any investment in the Company.

***The Company may not have adequate sources of recovery if its bitcoins are lost, stolen or destroyed.***

If the Company's bitcoins or other cryptocurrency or other crypto assets are lost, stolen or destroyed under circumstances rendering a party liable to the Company, the responsible party may not have the financial resources sufficient to satisfy the Company's claims, which could lead to a material and adverse effect on the Company.

***Lending of cryptocurrencies or other crypto assets may be especially risky.***

The Company may lend crypto assets to third parties, including affiliates. On termination of the loan, the borrower is required to return the crypto assets to the Company; any gains or loss in the market price during the loan would inure to the Company. In the event of the bankruptcy of the borrower, the Company could experience delays in recovering its crypto assets. In addition, to the extent that the value of the crypto assets increases during the term of the loan, the value of the crypto assets may exceed the value of collateral provided to the Company, exposing the Company to credit risks with respect to the borrower and potentially exposing the Company to a loss of the difference between the value of the crypto assets and the value of the collateral. If a borrower defaults under its obligations with respect to a loan of crypto assets, including by failing to deliver additional collateral when required or by failing to return the

- 36 -

crypto assets upon the termination of the loan, the Company may expend significant resources and incur significant expenses in connection with efforts to enforce the loan agreement, which may ultimately be unsuccessful.

The crypto assets that are loaned to third parties by the Company include crypto assets deposited by customers of the Platform, which may be withdrawn by a customer at any time. The Company is exposed to a potentially significant liquidity risk if, for example, the aggregate withdrawals by customers exceed the quantum of uncommitted cryptocurrency available to the Company to satisfy such withdrawal requests. A similar risk applies with respect to individual reserves of each type of cryptocurrency should the withdrawals of such type of cryptocurrency exceed the Company's available reserves.

***The Company's trading orders may not be timely executed.***

The Company's trading execution depends on the ability to establish and maintain an overall market position in a combination of financial instruments. The Company's trading orders may not be executed in a timely and efficient manner because of various circumstances, including, for example, trading volume surges or systems failures attributable to the Company or its counterparties, brokers, dealers, agents or other service providers. In such an event, the Company might only be able to acquire or dispose of some, but not all, of the components of its positions, or if the overall positions were to need adjustments, the Company might not be able to make such adjustments. As a result, the Company would not be able to achieve its desired market position, which may result in a loss. In addition, the Company can be expected to rely heavily on electronic execution systems (and may rely on new systems and technology in the future), which may be subject to certain systemic limitations or mistakes, causing the interruption of trading orders made by the Company.

***Unexpected market disruptions may cause major losses for the Company.***

The Company may incur major losses in the event of disrupted markets and other extraordinary events in which market behavior diverges significantly from historically recognized patterns. The risk of loss in such events may be compounded by the fact that in disrupted markets, many positions become illiquid, making it difficult or impossible to close out positions against which markets are moving. Market disruptions caused by unexpected political, military and terrorist events may from time to time cause dramatic losses for the Company. Any such disruptions and events may have a material and adverse effect on the Company's trading execution and on any investment in the Company.

***The Company may make, or otherwise be subject to, trade errors.***

Errors may occur with respect to trades executed on behalf of the Company. Trade errors can result from a variety of situations, including, for example, when the wrong investment is purchased or sold or when the wrong quantity is purchased or sold. Trade errors frequently result in losses, which could be material. To the extent that an error is caused by a third party, the Company may seek to recover any losses associated with the error, although there may be contractual limitations on any third party's liability with respect to such error.

- 37 -

## PRIOR SALES

During Fiscal 2021, the Company issued the following securities exercisable into Common Shares:

| Date of Issuance | Number of Securities Issued or Granted | Type of Security | Exercise Price Per Security |
|---|---|---|---|
| July 7, 2020 | 100,000[1] | Options | C$0.85 |
| July 15, 2020 | 7,242,220[2] | Warrants | $0.30 |
| July 28, 2020 | 200,000[3] | Options | C$0.94 |
| August 11, 2020 | 250,000[4] | Options | C$0.85 |
| August 11, 2020 | 35,000[3] | Options | C$0.85 |
| August 14, 2020 | 1,750,000[5] | Options | C$0.90 |
| August 20, 2020 | 150,000[1] | Options | C$0.90 |
| August 24, 2020 | 35,000[6] | Options | C$0.94 |
| August 28, 2020 | 60,000[7] | Options | C$0.94 |
| August 31, 2020 | 250,000[4] | Options | C$0.89 |
| September 10, 2020 | 3,133,300[8] | Warrants | C$1.15 |
| September 10, 2020 | 473,662[9] | Compensation Warrants | C$0.85 |
| October 1, 2020 | 250,000[4] | Options | C$0.75 |
| October 29, 2020 | 150,000[4] | Options | C$0.72 |
| November 2, 2020 | 35,000[4] | Options | C$1.05 |
| November 23, 2020 | 635,000[4] | Options | C$1.10 |
| November 23, 2020 | 55,000[1] | Options | C$1.10 |
| November 23, 2020 | 140,000[10] | Options | C$1.10 |
| December 15, 2020 | 2,735,338[11] | Warrants | C$2.50 |
| December 15, 2020 | 387,404[12] | Compensation Warrants | C$1.50 |
| January 1, 2021 | 35,000[4] | Options | C$4.96 |
| January 11, 2021 | 35,000[4] | Options | C$5.80 |
| January 11, 2021 | 313,300[13] | Warrants | $1.15 |
| January 16, 2021 | 75,000[4] | Options | C$7.59 |
| January 18, 2021 | 35,000[4] | Options | C$8.14 |
| January 19, 2021 | 10,000[4] | Options | C$8.39 |

| January 20, 2021 | 80,000[4] | Options | C$7.66 |
|---|---|---|---|
| January 21, 2021 | 25,000[4] | Options | C$7.07 |
| January 21, 2021 | 585,455[14] | Compensation Warrants | $5.50 |
| January 22, 2021 | 50,000[4] | Options | C$6.84 |
| January 27, 2021 | 300,000[15] | Options | C$5.80 |
| January 28, 2021 | 40,000[4] | Options | C$6.90 |
| January 29, 2021 | 100,000[4] | Options | C$8.26 |
| February 2, 2021 | 10,000[4] | Options | C$11.24 |
| February 10, 2021 | 80,000[4] | Options | C$16.65 |
| February 13, 2021 | 30,000[4] | Options | C$19.73 |
| February 15, 2021 | 500,000[16] | Options | C$17.59 |
| February 16, 2021 | 300,000[17] | Options | C$16.65 |
| February 19, 2021 | 60,000[17] | Options | C$18.91 |
| February 26, 2021 | 10,000[17] | Options | C$19.63 |
| February 28, 2021 | 60,000[18] | Options | $15.40 |
| March 5, 2021 | 40,000[17] | Options | C$17.70 |
| March 8, 2021 | 20,000[17] | Options | C$18.24 |
| March 16, 2021 | 30,000[17] | Options | C$25.51 |
| March 17, 2021 | 5,000[17] | Options | C$28.94 |
| March 18, 2021 | 40,000[17] | Options | C$27.85 |
| March 22, 2021 | 50,000[17] | Options | C$31.00 |
| March 25, 2021 | 50,000[17] | Options | C$27.50 |
| March 26, 2021 | 25,000[17] | Options | C$28.89 |
| March 29, 2021 | 100,000[17] | Options | C$32.11 |
| March 29, 2021 | 75,000[19] | Options | C$32.11 |
| March 30, 2021 | 50,000[17] | Options | C$30.40 |
| April 6, 2021 | 5,000[17] | Options | C$34.50 |
| April 16, 2021 | 273,533[20] | Warrants | $2.50 |
| April 19, 2021 | 30,000[17] | Options | C$24.10 |

| | | | |
|---|---|---|---|
| April 20, 2021 | 5,000[17] | Options | C$21.34 |
| April 21, 2021 | 10,000[17] | Options | C$24.99 |
| April 22, 2021 | 25,000[17] | Options | C$22.18 |
| April 23, 2021 | 20,000[17] | Options | C$23.07 |
| April 27, 2021 | 45,000[17] | Options | C$25.25 |
| April 29, 2021 | 25,000[17] | Options | C$23.09 |
| April 29, 2021 | 300,000[19] | Options | C$23.09 |
| May 4, 2021 | 5,000[17] | Options | C$27.02 |
| May 6, 2021 | 25,000[17] | Options | C$26.00 |
| May 7, 2021 | 5,000[17] | Options | C$25.53 |
| May 10, 2021 | 10,000[17] | Options | C$24.13 |
| May 11, 2021 | 20,000[17] | Options | C$24.18 |
| May 13, 2021 | 5,000[17] | Options | C$19.80 |
| May 19, 2021 | 60,000[17] | Options | C$20.08 |
| May 19, 2021 | 300,000[19] | Options | C$20.08 |
| May 21, 2021 | 120,000[21] | Options | C$20.23 |
| May 21, 2021 | 30,000[19] | Options | C$20.23 |
| May 24, 2021 | 10,000[17] | Options | C$23.10 |
| May 25, 2021 | 15,000[17] | Options | C$23.10 |
| May 26, 2021 | 10,000[17] | Options | C$24.43 |
| May 28, 2021 | 10,000[17] | Options | C$23.35 |
| June 1, 2021 | 10,000[17] | Options | C$23.47 |
| June 14, 2021 | 10,000[17] | Options | C$20.58 |
| June 18, 2021 | 30,000[17] | Options | C$19.72 |
| June 23, 2021 | 5,000[17] | Options | C$19.10 |
| June 25, 2021 | 10,000[17] | Options | C$19.55 |
| June 26, 2021 | 10,000[17] | Options | C$19.55 |
| June 28, 2021 | 25,000[17] | Options | C$19.74 |
| June 29, 2021 | 25,000[17] | Options | C$20.56 |

Notes:

(1) Granted to certain employees, with an expiry date of up to 10 years from the date of grant. These options will vest monthly over one year.

(2) Issued in connection with a private placement of 14,484,440 units of the Company at a price of $0.20 per unit, for gross proceeds to the Company of $2,896,888. Each unit was comprised of one Share and one-half Share purchase warrant, with each whole warrant entitling the holder to subscribe for one additional Share at a price of $0.30 per Share for a period of 24 months from the date of issuance, with an option to accelerate the warrant expiry date in the event that the closing trading price of the Shares on the CSE is $0.30 or greater for 10 consecutive trading days. On August 19, 2020, all of the warrants that were subject to the acceleration option were exercised.

(3) Granted to certain employees, with an expiry date of up to 10 years from the date of grant. These options will vest monthly over three years.

(4) Granted to certain employees, with an expiry date of up to 10 years from the date of grant. These options will vest over four years with 25% on a one-year cliff and monthly thereafter for 36 months.

(5) Granted to certain board of directors, with an expiry date of up to 5 years from the date of grant. These options will vest immediately.

(6) Granted to certain employees, with an expiry date of up to 10 years from the date of grant. These options will vest over 31 months with 25% on a one-year cliff and monthly thereafter for 30 months.

(7) Granted to certain consultants, with an expiry date of up to 3 years from the date of grant. These options will vest over four years with 25% on a one-year cliff and monthly thereafter for 36 months.

(8) Issued in connection with the September Special Warrant offering for aggregate gross proceeds to the Company of approximately $4.0 million. Each September Special Warrant was convertible into one unit of the Company, which consisted of one Share and one-half Share purchase warrant, with each warrant being exercisable to acquire one Share at an exercise price of C$1.15 for a term of three years.

(9) Granted in connection with the September Special Warrant offering referenced in note 8 above. The compensation warrants have an exercise price of C$0.85 per unit for a period of three years.

(10) Granted to certain consultants, with an expiry date of up to 10 years from the date of grant. These options will vest monthly over 2 years.

(11) Issued in connection with the December Special Warrant offering for aggregate gross proceeds to the Company of $8,050,014. Each December Special Warrant was convertible into one unit of the Company, which consisted of one Share and one-half Share purchase warrant, with each warrant being exercisable to acquire one Share at an exercise price of C$2.50 for a term of two years.

(12) Granted in connection with the December Special Warrant offering referenced in note 11 above. The compensation warrants have an exercise price of C$1.50 per unit for a period of two years.

(13) Pursuant to the September Special Warrant offering referenced in note 8 above, in the event the conversion conditions were not met by December 9, 2020, the holders of the September Special Warrants were entitled to receive 1.1 units upon the exercise or deemed exercise of the September Special Warrants, resulting in each special warrant being exercisable for 1.1 units. In accordance with the terms of the September Special Warrant offering, 626,600 units were issued in January 2021 pursuant to the penalty provision.

(14) Granted in connection with a private placement offering of 8,363,637 Shares for gross proceeds to the Company of approximately $46.0 million. The agent for the offering received compensation warrants entitling it to purchase 585,455 Shares at a price of $5.50 per Share for a period of 18 months following closing of the offering.

(15) Granted to certain employees, with an expiry date of up to 10 years from the date of grant. These options will vest with 25% on date of grant and monthly thereafter for 36 months.

(16) Granted to certain consultants or the Board, with an expiry date of up to 1 year from the date of grant. These options will be fully vested on date of grant.

(17) Granted to certain employees, with an expiry date of up to 5 years from the date of grant. These options will vest over four

years with 25% on a one-year cliff and monthly thereafter for 36 months.

(18) Granted to certain consultants, with an expiry date of up to 2 years from the date of grant. These options will vest monthly over 24 periods with 25% vested on grant date.

(19) Granted to certain employees, with an expiry date of up to 5 years from the date of grant. These options will vest with 25% on date of grant and monthly thereafter for 36 months.

(20) Pursuant to the December Special Warrant offering referenced in note 11 above, in the event the conversion conditions were not met by March 15, 2021, the holders of the December Special Warrants were entitled to receive 1.1 units upon the exercise or deemed exercise of the December Special Warrants, resulting in each December Special Warrant being exercisable for 1.1 units. In accordance with the terms of the December Special Warrant offering, 547,067 units were issued in April 2021 pursuant to the penalty provision.

(21) Granted to certain employees, with an expiry date of up to 5 years from the date of grant. These options will vest with 10% on date of grant and monthly thereafter for 36 months.

## DIVIDENDS

There are no restrictions in the Company's corporate articles on its ability to pay dividends. However, (i) the Company has never paid a dividend nor made a distribution on any of its securities, (ii) the Company has no history of income or sources of funds from which to pay dividends, and (iii) the Company does not anticipate paying dividends in the near future.

The payment of future dividends, if any, by the Company will be at the sole discretion of the Board. In this regard, the Company expects it will retain any earnings to finance further growth of the Company.

## DESCRIPTION OF CAPITAL STRUCTURE

### Common Shares

The Company is authorized to issue an unlimited number of Common Shares, of which there are 161,763,432 issued and outstanding as of the date of this AIF.

Each holder of a Common Share is entitled to: (i) one vote at all meetings of Shareholders; (ii) a pro rata share of any dividends or other distributions declared payable by the Board; and (iii) a pro rata share of any distribution of the Company's assets on any winding up or dissolution of the Company. There are no pre-emptive rights; conversion or exchange rights; redemption, retraction, purchase for cancellation or surrender provisions; sinking or purchase fund provisions; provisions permitting or restricting the issuance of additional securities; or any other material restrictions or provisions requiring a security holder to contribute additional capital, which are applicable to the Common Shares.

The Company may, if authorized by its directors, purchase, redeem or otherwise acquire any of its issued and outstanding Shares at such price and upon such terms as determined by the Board.

### Warrants

As of the date of this AIF, the Company has 5,299,109 Common Share purchase warrants outstanding, exercisable to purchase Common Shares prior to the applicable exercise date. See "General Development of the Business - Three Year History" and "Prior Sales" in this AIF for further information regarding the Company's issuances of warrants.

### Options

As of the date of this AIF, the Company has 11,914,437 options outstanding under the Stock Option Plan.

The Stock Option Plan is a 10% rolling stock option plan, which provides that the Board may from time to time, in its discretion, grant to directors, officers, employees, technical consultants and other participants to the Company, non-transferrable stock options to purchase Common Shares, provided that the number of Common Shares reserved for issuance will not exceed 10% of the Company's issued and outstanding Common Shares. Such options will be exercisable for a period of up to 10 years from the date of grant.

- 42 -

In addition, the number of Common Shares which may be issuable under the Stock Option Plan within a one-year period: (i) to any one individual shall not exceed 5% of the issued and outstanding Common Shares; and (ii) to a consultant or an employee performing investor relations activities, shall not exceed 1% of the issued and outstanding Common Shares.

As of the date of this AIF, 4,261,906 options remain available for grant under the Stock Option Plan.

## MARKET FOR SECURITIES

**Trading Price and Volume**

The Common Shares are listed and posted for trading on (i) the TSX under the symbol "VOYG"; (ii) the OTCQB Market under the symbol "VYGVF"; and (iii) the Frankfurt Stock Exchange under the symbol "UCD2". The Common Shares were listed and posted for trading on the CSE under the symbol VYGR until September 6, 2021.

The following table sets out the price range and aggregate volumes traded or quoted on the CSE on a monthly basis for each of the months listed below.

| Date | High | Low | Average Daily Volume |
|---|---|---|---|
| September 2020 | 1.00 | 0.65 | 70,721 |
| October 2020 | 0.96 | 0.63 | 80,567 |
| November 2020 | 1.83 | 0.97 | 217,440 |
| December 2020 | 5.73 | 1.52 | 502,609 |
| January 2021 | 9.49 | 4.16 | 563,932 |
| February 2021 | 21.07 | 8.35 | 1,103,873 |
| March 2021 | 33.48 | 13.74 | 985,466 |
| April 2021 | 37.95 | 19.12 | 820,464 |
| May 2021 | 30.29 | 18.36 | 485,564 |
| June 2021 | 24.80 | 17.33 | 384,085 |
| July 2021 | 21.19 | 12.80 | 467,587 |
| August 2021 | 22.22 | 16.91 | 299,577 |
| September 1-3, 2021 | 19.99 | 18.56 | 258,001 |

Notes:

(1)     The Shares ceased trading on the CSE on September 6, 2021, making September 2021 a partial month.

The following table sets out the price range and aggregate volumes traded or quoted on the TSX on a monthly basis for each of the months listed below.

| Date | High | Low | Average Daily Volume |
|---|---|---|---|
| September 7-30, 2021 | 20.28 | 12.11 | 310,104 |

(1)    The Shares started trading on the TSX on September 7, 2021, making September 2021 a partial month.

**ESCROWED SECURITIES AND SECURITIES SUBJECT TO CONTRACTUAL RESTRICTION ON TRANSFER**

The following table summarizes details of the Company's securities of each class held, to the Company's knowledge, in escrow or that were subject to a contractual restriction on transfer as of the Fiscal 2021 year end:

| Designation of Class | Number of securities held in escrow or that are subject to a contractual restriction on transfer | Percentage of class |
|---|---|---|
| Common Shares | 4,763,484[1] | 3.04%[2] |

Note:

(1)  Subject to an escrow agreement dated January 31, 2019, among the Company, Computershare and various Shareholders. The depository for the Shares held in escrow is Computershare. Such Shares are expected to be released from escrow on February 11, 2022.

(2)  Based on 156,522,803 Common Shares issued and outstanding as of June 30, 2021.

**DIRECTORS AND OFFICERS**

**Shareholdings of Directors and Executive Officers**

To the knowledge of the Company, as at the date of this AIF, the directors and executive officers of the Company as a group beneficially own, directly or indirectly, or exercise control or direction over an aggregate of 10,629,302 Shares, representing approximately 6.6% of the issued and outstanding Shares on that date.

**Non-Executive Directors**

The following table sets out the name, city, state/province and country of residence of each of the Company's non-executive directors as at the date of this AIF. The table also sets out the principal occupation of each non-executive director of the Company for the five preceding years.

| Name, province or state and country of residence | Tenure with the Company | Principal occupation during the past five years |
|---|---|---|
| **Philip Eytan** New York, USA[1] | Non-Executive Chairman & Director (February 6, 2019 to present) [2] | Founding investor in Livestream, and Socure; and an early investor in Uber. In 2014, he co-founded Pager, where he is currently its Chief Strategy Officer and a director. |
| **Krisztián Tóth** Ontario, Canada | Director (February 16, 2021 to present) [2] | Partner at Fasken Martineau DuMoulin LLP. |
| **Glenn Stevens**[1] New Jersey, USA | Director (May 20, 2021 to present) [2] | Former Managing Director and Chief Executive Officer at Gain Capital Inc. In August 2020, he joined StoneX where he is currently its Chief Executive Officer, Retail Division. |
| **Jennifer Ackart**[1] Florida, USA | Director (May 20, 2021 to present) [2] | Former Chief Accounting Officer and Senior VP & Controller at Raymond James Financial Inc, from 1994 to 2020. She also previously served as the Chief Financial Officer at Raymond James and Associates, Inc. from March 2019 to September 2020. |

Notes:

- 44 -

(1)      Member of the Audit Committee.

(2)      The current term of each director will continue until the next annual and general meeting of the Shareholders.

**Biographies**

The following are brief profiles of the non-executive directors of the Company.

*Philip Eytan, Non-Executive Chairman and Director*

Mr. Eytan started his career at Morgan Stanley in 2000 as an analyst in Telecom M&A. From 2002 to 2007, he helped manage a large distressed debt book at Cerberus Capital Management. After leaving Cerberus, Mr. Eytan started his own hedge fund. Mr. Eytan has been an avid tech investor since 2007. He was a founding investor in Livestream (sold to IAC in 2017); a founding investor in Socure (cyber fraud prevention company); and an early investor in Uber. In 2014 Mr. Eytan co-founded Pager, a digital health startup at which he is currently the Chief Strategy Officer and a director. Mr. Eytan holds a Bachelor and Masters degree in Finance and Management from HEC Geneva (University of Geneva). In his capacities as Chairman and a director of the Company, Mr. Eytan will devote approximately 25% of his working time to the Company's business.

*Krisztián Tóth, Director*

Krisztián Tóth is an experienced M&A lawyer and partner at the law firm of Fasken Martineau DuMoulin LLP, which is a leading international business law and litigation firm with eight offices with more than 700 lawyers across Canada and in the UK and South Africa. Krisztián began his career at Fasken in 2002, and eventually became a partner of the firm in 2009. He currently focuses on mergers and acquisitions and corporate finance with an emphasis on international and cross-border transactions, proxy contests and other contested matters, public and private financings, securities regulations and corporate governance. He has been recognized by the Canadian Legal Lexpert Directory for his mining experience and the IFLR1000 for his capital markets work. Krisztián is also currently the Chairman of Pasofino Gold Limited (TSX-V:VEIN), which is developing gold projects in Canada and West Africa; a director of Trillium Gold Mines Inc. (TSX-V:TGM), which is developing gold projects in Canada; a director of Leviathan Gold Ltd (TSX-V:LVX), which is developing gold projects in Australia; and a director of DeFi Technologies Inc. (NEO: DEFI), which is a digital asset investment firm.

*Glenn Stevens, Director*

Glenn Stevens is currently CEO of the Gain Retail Division at StoneX Group, Inc. (Nasdaq: SNEX). He is a financial industry veteran with more than 30 years experience in financial markets focusing on trading and foreign exchange (FX) products. Prior to StoneX, Glenn was a Founder and CEO of GAIN Capital and for over twenty years built a business offering retail traders the ability to trade various financial products in all the major regulated financial markets globally. Gain Capital was a NYSE listed Company purchased in August 2020 by StoneX. Previously, Glenn was Managing Director and head of FX North American sales and trading at NatWest Bank. He served as a member of NatWest's North American Management Committee. He held various other senior roles for large financial institutions including Bank of America (Merrill Lynch) and Bankers Trust. Glenn is the Senior Adviser to New City Kids, a non-profit serving school aged children in various locations around New Jersey and Michigan. He received his BS in Business from Bucknell University and his MBA from Columbia University.

*Jennifer Ackart, Director*

Jennifer Ackart is a qualified financial expert with over 30 years of experience. She has expertise in financial reporting, compensation, finance transformation, M&A, investor relations, and public company filings and offerings. She spent the last 25 years in the C-suite at Raymond James Financial, Inc. (NYSE: RJF), a Fortune 500 financial services firm, where she served as the Chief Accounting Officer, CFO of Raymond James and Associates (a regulated full service broker-dealer and the primary operating entity), and board member of Raymond James Limited, the Canadian broker-dealer. Jennifer began her career with over seven years at Price Waterhouse serving clients in a wide variety of industries and was then the controller of HSW Engineering, Inc. She is a CPA and earned her BBA in Accounting from the College of William and Mary. She serves on the United Way Suncoast Cabinet and the Advisory Board for the USF School of Accountancy, is a member of AICPA and Women Executive Leadership (WEL), completed the Deloitte CFO Academy, and holds her Series 99 license (brokerage operations) and CGMA designation.

**Executive Officers**

The following table sets out the name, city, state/province and country of residence, and position with the Company of each of the Company's executive officers as at the date of this AIF. The table also sets out the principal occupation of each executive officer of the Company for the five preceding years.

| Name, province or state and country of residence | Tenure with the Company | Principal occupation during the past five years |
|---|---|---|
| **Stephen Ehrlich** Connecticut, USA | CEO & Director (January 25, 2018 to present) | Chief Executive Officer of the Company and its US subsidiaries. Formerly, (i) CEO of Tradier, Inc.; (ii) CEO of Lightspeed Financial, LLC; (iii) CEO of ETRADE Professional Trading, LLC; and (iv) Director of Brokerage, ETRADE Financial, Inc. |
| **Evan Psaropoulos** New York, USA | Chief Financial Officer | Chief Financial Officer of the Company and certain subsidiaries. Formerly, CFO of Global Debt Registry and Director of LeEco North America. |
| **Gerard Hanshe** New York, USA | Chief Operating Officer | Chief Operating Officer of the Company and its US subsidiaries. Formerly, (i) Director of Product Management Garden City Group; (ii) Principal Attorney at Hanshe Law, PLLC; and (iii) Vice President of Corporate Cash Management at Deutsche Bank. |
| **Lewis Bateman** Ontario, Canada | Chief International Officer | Chief International Officer of the Company and its US subsidiaries. Formerly, (i) Chief Business Officer of Coinsquare; (ii) CEO of CoinCapital Investment Management; and (iii) founder & CEO of Sphere Investment Management. |
| **Daniel Costantino** Pennsylvania, USA | Chief Information Security Officer | Chief Information Security Officer of the Company and its US subsidiaries. Formerly, Associate Chief Information officer and Chief Information Security Officer at Penn Medicine University of Pennsylvania Health System; and Director of Security Consulting Services at Layer 8 Security, LLC. |
| **David Brosgol** New York, USA | General Counsel | General Counsel and Secretary of the Company and General Counsel of its US subsidiaries. Previously, (i) an Advisor at Anchor Labs, Inc.; (ii) a Founder, Board Member, General Counsel and Chief Compliance Officer at Digital Asset Custody Company, Inc.; and (iii) General Counsel and Managing Director at Maverick Capital. |
| **Pam Kramer** California, USA | Chief Marketing Officer | Chief Marketing Officer of the Company and its US subsidiaries. Formerly, a self-employed Principal/Marketing Consultant and the Chief Marketing Officer at Cadence13. |
| **Rakesh Gidwani** New Jersey, USA | Chief Technology Officer | Chief Technology Officer at the Company and its US subsidiaries. Formerly, the Senior Vice President of Engineering at Two Sigma Investments. |

**Biographies**

The following are brief profiles of the executive officers of the Company.

***Stephen Ehrlich, CEO & Director***

Mr. Ehrlich is currently Chief Executive Officer of the Company and the US Subsidiaries.

Mr. Ehrlich's last position was as CEO of Tradier, Inc., a Charlotte, North Carolina based financial technology firm. Prior to Tradier, Inc, Mr. Ehrlich was a founder and the CEO of Lightspeed Financial, LLC – a US based retail broker-dealer. Mr. Ehrlich was responsible for eight major acquisitions for Lightspeed over a seven-year period. Previously, Mr. Ehrlich was CEO of E*TRADE Professional Trading LLC, the professional trading arm of E*TRADE FINANCIAL which was purchased by Lightspeed in July 2006. Prior to his executive position, Mr. Ehrlich was a Vice President at E*TRADE responsible for brokerage strategy. Mr. Ehrlich was also responsible for the planning and execution of three major business acquisitions for E*TRADE FINANCIAL including E*TRADE Canada, the Dempsey/GVRC market-making business, and the Tradescape professional trading business. Mr. Ehrlich graduated from Franklin & Marshall College with a Bachelor's degree in Accounting. He holds a CPA and is a member of the AICPA and New York State Society of Certified Public Accountants. Mr. Ehrlich also holds certain licenses with FINRA. In his capacities as CEO and a director of the Company, Mr. Ehrlich will spend 100% of his working time on the Company's business.

*Evan Psaropoulos, CFO*

As Chief Financial Officer, Mr. Psaropoulos leads the finance, accounting and treasury functions for the Company. Mr. Psaropoulos joined Voyager in September 2020, bringing more than 20 years of experience across a diverse background including finance, strategy, investment banking, and accounting. Mr. Psaropoulos began his career in public accounting at PricewaterhouseCoopers LLP where he was a Manager in the audit practice. He then transitioned to investment banking, performing M&A and corporate finance advisory at Credit Suisse in the Technology, Media and Telecom Group, where he was a Vice President. Mr. Psaropoulos has also held several senior finance leadership roles across both public and private companies. Mr. Psaropoulos earned his B.S.B.A. in Accountancy from John Carroll University and M.B.A. from Cornell University at the Johnson Graduate School of Management. Mr. Psaropoulos is also a CPA.

*Gerard Hanshe, COO*

As the Chief Operating Officer of the Company and the US Subsidiaries, Mr. Hanshe is responsible for overseeing the customer experience, the business process and strategy, and treasury and trading operations teams, and works closely on coordinating their work with the product, engineering, data analysis, finance and marketing teams. Mr. Hanshe joined Voyager as product manager shortly after its founding and led the team's efforts in building the system and processes to support its product launch in early 2019. Later that year, he was promoted to Chief Operating Officer and has since been charged with leading the team as it expands its reach geographically, through strategic partnerships and acquisitions and with additional product feature releases. Prior to joining Voyager, Mr. Hanshe had experience as a practicing attorney, product manager, data and business analyst for a large public legal services firm, professional equities and options trader and the registered principal of a direct access equities broker. He earned his Juris Doctorate from St. John's University School of Law and his BBA in Finance and MBA in IT Management from Hofstra University. With his diverse experience and education, Mr. Hanshe brings to Voyager a multi-faceted approach to managing the organization's operations, analyzing issues and handling challenges with a measured and practical approach to operations management.

*Lewis Bateman, Chief International Officer*

As the Chief International Officer, Mr. Bateman is the executive leader for the Company's Canadian, European and Cayman based subsidiaries, and heads all the Voyager strategic corporate acquisitions and international expansion. During his career, Bateman has strategically structured and implemented business groups and acted as a regulatory lead. He holds over two decades of direct financial services experience with senior executive positions at traditional capital market firms and crypto asset management companies. Before establishing two asset management firms as CEO, he was Vice President of ETF Operations & Business Development at First Asset (CI Financial) and Managing Director, Business Development & Executive Vice President Institutional Sales at Horizons ETFs Management Inc. He held senior roles with the Toronto Stock Exchange (TMX), where he was responsible for introducing new global participants to the Canadian marketplace, as well as providing coverage to large domestic and international accounts and Structured Products Providers. He also has experience as a sales equity trader for Merrill Lynch (Midland Walwyn) in Edmonton, Calgary, Toronto and New York. Lewis holds a degree from the University of Toronto - Bachelor of Arts (B.A.) Field Of Study Economics and Political Science.

*Daniel Constantino, Chief Information Security Officer*

As the Chief Information Security Officer, Mr. Costantino leads all technical and administrative cybersecurity programs for Voyager. Mr. Costantino joined Voyager in 2021, bringing more than fifteen years of industry experience to the business with a mission focused on the protection of assets and enablement of safe customer trading. During his career, Mr. Costantino developed and led a number of industry-recognized and award-winning cybersecurity programs and teams. A highly decorated United States Marine, Mr. Costantino served in both combat and humanitarian operations, responsible for the scalability, resilience, and security of mission-critical infrastructure. Mr. Costantino transitioned from the military into consulting, where he partnered with some of the largest organizations in the U.S. to advise on the development of highly secure environments and sustainable technology and cybersecurity programs. In his most recent role as the Chief Information Security Officer and Associate CIO of Penn Medicine, he led the IT Infrastructure and Information Security departments, supporting one of the United States' largest and most recognized academic medical centers, including the complete development and staffing of a 24/7 security operations center (SOC) and a highly mature governance, risk, and compliance program. Mr. Costantino received an Executive Master of Business Administration from the Jack Welch Management Institute and a Bachelor of Science from the American Military University. He holds the Certified Information Systems Security Professional (CISSP), Certified Information Security Manager (CISM), and Certified Ethical Hacker (C|EH) designations.

*David Brosgol, General Counsel*

As the General Counsel, Mr. Brosgol is responsible for the legal and compliance functions of Voyager. He is a financial services professional with over 25 years of experience and has been deeply involved in crypto assets since 2017, when he was among the founders of Digital Asset Custody Company (DACC). DACC was a pioneer in the crypto asset space that sought to become industry standard for institutional custody of crypto assets. DACC was acquired by Bakkt (a subsidiary of the Intercontinental Exchange) in April 2019. In his role as General Counsel and Chief Compliance Officer at DACC, Mr. Brosgol was responsible for the management of the regulatory build, recruitment, and development of the management and operations team and preparation and advancement of service offerings and corresponding customer documentation. Since the sale, he has been an adviser and project manager to several companies in crypto asset financial services, notably Anchor Labs and BlockTower Capital. Earlier in his career, Mr. Brosgol held senior legal positions at asset managers and broker dealers, most recently as General Counsel of Maverick Capital and, prior to that, General Counsel and Managing Director of Solus Alternative Asset Management. Mr. Brosgol graduated Phi Beta Kappa and with Honors in Economics from Trinity College in Connecticut. He also holds an MA in Philosophy from University of Essex in Colchester, England, and a JD from the University of Virginia School of Law. Mr. Brosgol is admitted to the New York State Bar.

*Pam Kramer, Chief Marketing Officer*

As Chief Marketing Officer, Ms. Kramer oversees the brand, advertising, marketing, social media, customer insights and more. She is a Silicon Valley marketing and product veteran, with a career focused on working with leading innovators that go from nowhere to mainstream. Ms. Kramer spent nine years at E*TRADE, rising to become E*TRADE's Chief Product Officer and then Chief Marketing Officer. After E*TRADE, Ms. Kramer became CMO and General Manager of MarketTools/Zoomerang (now part of SurveyMonkey). She then moved on to become LendingClub's first CMO, creating their brand identity and building out their marketing operations. She then co-led a start up from 2012-2014 with an innovative video app called Lightt that predated Vine, Instagram video, and Snapchat. Most recently, Ms. Kramer focused on growing the leading premium podcast network, Cadence13, to over 1.5 billion downloads/year. She has an M.A. in East Asian Studies from Cornell University and a B.A. in English Literature and Political Science from the University at Buffalo. She currently serves on the boards of several non-profits, including the Bay Area Ridge Trail and is an advisor to Just Human Productions.

*Rakesh Gidwani, Chief Technology Officer*

As Chief Technology Officer, Rakesh leads the evolution of the Platform and systems as the Company continues its plans for international expansion. Previously, Rakesh served as Senior Vice President of Engineering at Two Sigma Investments, a technology and data-driven financial services company applying artificial intelligence, machine learning, and distributed computing to investing. He led the engineering strategy, planning, and technical program management for Two Sigma Investment Management. Rakesh has experience building and scaling high-calibre teams in hyper-growth environments. Over his career, he successfully led engineering teams to deliver eCommerce solutions,

high-performance trading systems, financial compliance and risk management systems, and customer-facing websites.

**Audit Committee**

The Audit Committee consists of individuals who are "financially literate" within the meaning of National Instrument 52-110 — *Audit Committees*. The Company's Audit Committee is comprised of Philip Eytan, Glenn Stevens and Jennifer Ackart. Glenn Stevens and Jennifer Ackart are "independent" within the meaning of National Instrument 52-110 — *Audit Committees*. Philip Eytan is not "independent" within the meaning of National Instrument 52-110 — *Audit Committees*. Each member of the Audit Committee has an understanding of the accounting principles used to prepare financial statements and varied experience as to the general application of such accounting principles, as well as an understanding of the internal controls and procedures necessary for financial reporting. For additional details regarding the relevant education and experience of each member of the Audit Committee, see the relevant biographical experiences for each member under the heading "Directors and Officers" in this AIF.

The Board has adopted a written charter for the Audit Committee which sets out the Audit Committee's role of providing oversight of the Company's financial management and of the design and implementation of an effective system of internal financial controls as well as to review and report to the Board on the integrity of the financial statements of the Company, its subsidiaries and associated companies. This includes helping directors meet their responsibilities, facilitating better communication between directors and the external auditor, enhancing the independence of the external auditor, increasing the credibility and objectivity of financial reports and strengthening the role of the directors by facilitating in-depth discussions among directors, management and the external auditor.

The mandate of the Audit Committee is set out in the written charter of the Audit Committee. A copy of the Audit Committee charter is included as Appendix "A" hereto.

*Reliance on Certain Exemptions*

At no time since the commencement of the Company's most recently completed financial year has the Company relied on the exemptions in Section 2.4 of National Instrument 52-110 — *Audit Committees* (*De Minimis Non-audit Services*) or an exemption from National Instrument 52-110 — *Audit Committees*, in whole or in part, granted under Part 8 of National Instrument 52-110 — *Audit Committees* (*Exemption*). As a venture issuer as at June 30, 2021, the Company relied on the exemption under section 6.1 of NI 52-110 — *Audit Committees*.

*Audit Committee Oversight*

At no time since the commencement of the Company's most recently completed financial year was a recommendation of the Audit Committee to nominate or compensate an external auditor not adopted by the Board.

*Pre-Approval Policies and Procedures*

The Audit Committee has adopted specific policies and procedures for the engagement of non-audit services as set out in the Audit Committee charter of the Company. The full text of the Company's Audit Committee charter is disclosed in Appendix "A" to this AIF.

*External Auditor Service Fees*

The aggregate fees recognized by the Company in each of the last two fiscal years for audit, tax and related accounting fees are as follows:

| Fiscal Year | Audit Fees | Audit-Related Fees[1] | Tax Fees[2] | All Other Fees[3] | Total |
|---|---|---|---|---|---|
| 2021 | $833,805 | nil | $98,138 | $175,703 | $1,107,646, |
| 2020 | $398696 | nil | nil | $185,389 | $584,085 |

Notes:

(1)   Fees charged for assurance and related services reasonably related to the performance of an audit, and not included under "Audit Fees".

(2)   Fees charged for tax compliance, tax advice and tax planning services.

(3)   Fees for services other than disclosed in any other column.

**Cease Trade Orders, Bankruptcies, Penalties or Sanctions**

*Cease Trade Orders or Bankruptcies*

Stephen Ehrlich was subject to a management cease trade order related to the Company's financial statements. The Company announced on October 30, 2019 that it had applied for and received a management cease trade order effective at the opening of October 30, 2019, in anticipation that the Company would not meet the filing deadline for its annual audited financial statements, management discussion and analysis and executive certificates for the fiscal year ended June 30, 2019. The management cease trade order affected only the Insiders of the Company, and remained in effect until December 29, 2019.

Other than as described above, to the knowledge of the Company, no director or executive officer of the Company is, or within 10 years prior to the date hereof has been, a director, chief executive officer or chief financial officer of any company (including the Company) that, (i) was subject to a cease trade order, an order similar to a cease trade order or an order that denied the relevant company access to any exemption under securities legislation, that was in effect for a period of more than 30 consecutive days, that was issued while the director or executive officer was acting in the capacity as director, chief executive officer or chief financial officer; or (ii) was subject to a cease trade order, an order similar to a cease trade order or an order that denied the relevant company access to any exemption under securities legislation, that was in effect for a period of more than 30 consecutive days, that was issued after the director or executive officer ceased to be a director, chief executive officer or chief financial officer and which resulted from an event that occurred while that person was acting in their capacity as director, chief executive officer or chief financial officer.

To the knowledge of the Company, no director or executive officer of the Company, or a Shareholder holding a sufficient number of securities of the Company to materially affect control of the Company, is, or within 10 years prior to the date hereof has been, a director or executive officer of any company (including the Company) that, while that person was acting in that capacity, or within a year of that person ceasing to act in that capacity, became bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency or was subject to or instituted any proceedings, arrangement or compromise with creditors or had a receiver, receiver manager or trustee appointed to hold its assets.

*Penalties or Sanctions*

To the knowledge of the Company, none of the directors, executive officers, or a Shareholder holding a sufficient number of securities of the Company to affect materially the control of the Company has been subject to any penalties or sanctions imposed by a court relating to securities legislation or by any securities regulatory authority or has entered into a settlement agreement with a securities regulatory authority; or has been subject to any other penalties or sanctions imposed by a court or regulatory body or self-regulatory authority that would be likely to be considered important to a reasonable investor making an investment decision.

*Personal Bankruptcies*

None of the directors, officers, Insiders or Promoters of the Company or a Shareholder holding a sufficient number of securities of the Company to affect materially the control of the Company is, or within the 10 years before the date of this AIF, has been declared bankrupt, made a proposal under any legislation relating to bankruptcy or insolvency, or has been subject to or instituted any proceedings, arrangement or compromise with creditors, or had a receiver, receiver manager or trustee appointed to hold their assets.

**Conflicts of Interest**

There may from time to time be potential conflicts of interest to which some of the directors, officers, Insiders and Promoters of the Company will be subject in connection with the operations of the Company. Some of the individuals who are directors or officers of the Company are also directors and/or officers of other reporting and non-reporting issuers and may be shareholders of companies in which the Company makes strategic investments, and therefore it is

possible that a conflict may arise between their duties to the Company and their duties as a director or officer of such other companies, or their interests as shareholders of such investee companies. Conflicts, if any, will be subject to the procedures and remedies provided under applicable laws. In particular, in the event that such a conflict of interest arises at a meeting of the Company's directors, a director who has such a conflict will abstain from voting for or against the approval of such participation or such terms, unless otherwise permitted by applicable laws. In accordance with applicable laws, the directors of the Company are required to act honestly, in good faith and in the best interests of the Company.

Krisztián Tóth, a director of the Company, is a Partner at Fasken Martineau DuMoulin LLP, which acts as Canadian legal counsel to the Company. Brandi Reynolds, Chief Compliance Officer of the Company and is also the Managing Director of the Bates Group, LLC, which, in October 2021, acquired CorCom, LLC, a consulting company that was founded by Ms. Reynolds. Through Ms. Reynolds, the Bates Group, LLC provides a variety of day-to-day outsourced compliance support, regulatory state money transmitter license acquisition and maintenance support, compliance training programs and related consulting services to the Company. Although the Company is not currently aware of any, there may be circumstances in which such dual roles may place Mr. Toth or Ms. Reynolds into a conflict of interest.

Other than as disclosed above and otherwise in this AIF, to the best of the Company's knowledge, there are no known existing or potential conflicts of interest among the Company, its Promoters, directors and officers or other members of management of the Company or of any proposed Promoter, director, officer or other member of management as a result of their outside business interests.

## PROMOTERS

Stephen Ehrlich may be considered to be a Promoter of the Company. He beneficially holds 3,943,269 Shares (representing approximately 5.13% of the current issued and outstanding Shares), and 2,900,000 incentive stock options under the Stock Option Plan. The Company acquired VDH from Mr. Ehrlich in February 2019 (see under the heading "Interest of Management and Others in Material Transactions" below). No other assets have been acquired or are to be acquired by the Company from Mr. Ehrlich.

## INTEREST OF MANAGEMENT AND OTHERS IN MATERIAL TRANSACTIONS

Mr. Ehrlich, the Company's CEO, was the beneficial owner of all of the shares of VDH prior to the acquisition by the Company of VDH pursuant to the VDH SPA, as a result of his ownership and control of VHI (see "General Development of the Business - Three Year History" in this AIF). In consideration therefor, Mr. Ehrlich received the sum of $100, and received Shares in the capital of the Company upon it settling all of the VDH subscription receipts then outstanding.

Other than as disclosed above, no director or executive officer of the Company, or any person who has direct or indirect beneficial ownership of, or who exercises control or direction over, more than 10% of the Company's outstanding Shares, nor any associate or affiliate of any of such persons or companies, has had any interest in any transaction within the three years most recently completed financial years or during the current financial year, or in any proposed transaction, that has materially affected or will materially affect the Company.

## LEGAL PROCEEDINGS

As of the date of this AIF, to the knowledge of the Company, the Company is not a party to any material legal proceedings. No legal proceedings are contemplated by the Company, and the Company is not aware of any material legal proceedings being contemplated against it.

## AUDITORS, TRANSFER AGENT AND REGISTRAR

The auditors of the Company and its subsidiaries are Marcum LLP, Accountants, located at 750 Third Avenue, 11th Floor, New York, New York 10017.

The Company's register and transfer agent is Computershare, located at 510 Burrard Street, 3rd Floor, Vancouver, British Columbia V6C 3B9.

- 51 -

## MATERIAL CONTRACTS

Voyager has not entered into any material contracts, outside of the ordinary course of business, prior to the date hereof, other than the:

(a)     Stock Option Plan;

(b)     Escrow agreement dated January 31, 2019 among the Company, Computershare and various Shareholders regarding 4,763,484 Shares (as of the date of this AIF);

(c)     Account Services Agreement;

(d)     Agreement dated March 6, 2019 between, among others, the Company and Ethos, pursuant to which the Company acquired the Ethos IP, as amended on March 28, 2019, July 31, 2019 and September 30, 2019;

(e)     Definitive agreement dated January 29, 2020 between the Company and Circle Internet Financial, Inc., pursuant to which the Company acquired Circle Invest, the retail crypto asset business of Circle; and

(f)     Coinify SPA dated August 1, 2021 between the Company and Coinify ApS, pursuant to which the Company acquired 100% of the share capital of Coinify ApS.

## EXPERTS

**Names of Experts**

The following are persons or companies whose profession or business gives authority to a statement made in this AIF as having prepared or certified a part of that document or report described in this AIF:

Marcum LLP is the external auditor of the Company and reported on the Financial Statements, which are filed on SEDAR.

To the knowledge of management of the Company, as of the date hereof, no expert, nor any associate or affiliate of such person has any beneficial interest, direct or indirect, in the securities or property of the Company or of an associate or affiliate of any of them, and no such person is or is expected to be elected, appointed or employed as a director, officer or employee of the Company or of an associate or affiliate thereof.

**Interests of Experts**

There is no interest, direct or indirect, in any securities or property of Voyager, or of an associate or affiliate of Voyager, received or to be received by an expert.

## ADDITIONAL INFORMATION

Additional information relating to the Company, including financial information in the Financial Statements and MD&A, is available on SEDAR at www.sedar.com. Additional information, including directors' and officers' remuneration and indebtedness, the principal Shareholders, and securities authorized for issuance under equity compensation plans, if applicable, is contained in the Company's most recently filed management information circular available on SEDAR at www.sedar.com.

**APPENDIX "A"**

**AUDIT COMMITTEE CHARTER**

**(*SEE ATTACHED*)**

## VOYAGER DIGITAL LTD.
(the "Company")

## AUDIT COMMITTEE CHARTER

The Audit Committee (the "Committee") is a committee of the board of directors (the "Board") of the Company. The role of the Committee is to provide oversight of the Company's financial management and of the design and implementation of an effective system of internal financial controls as well as to review and report to the Board on the integrity of the financial statements of the Company, its subsidiaries and associated companies. This includes helping directors meet their responsibilities, facilitating better communication between directors and the external auditor, enhancing the independence of the external auditor, increasing the credibility and objectivity of financial reports and strengthening the role of the directors by facilitating in-depth discussions among directors, management and the external auditor.

Management is responsible for establishing and maintaining those controls, procedures and processes and the Committee is appointed by the Board to review and monitor them. The Company's external auditor is ultimately accountable to the Board and the Committee as representatives of the Company's shareholders.

**Duties and Responsibilities**

*External Auditor*

(a)     To recommend to the Board, for shareholder approval, an external auditor to examine the Company's accounts, controls and financial statements on the basis that the external auditor is accountable to the Board and the Committee as representatives of the shareholders of the Company.

(b)     To oversee the work of the external auditor engaged for the purpose of preparing or issuing an auditor's report or performing other audit, review or attest services for the Company, including the resolution of disagreements between management and the external auditor regarding financial reporting.

(c)     To evaluate the audit services provided by the external auditor, pre-approve all audit fees and recommend to the Board, if necessary, the replacement of the external auditor.

(d)     To pre-approve any non-audit services to be provided to the Company by the external auditor and the fees for those services.

(e)     To obtain and review, at least annually, a written report by the external auditor setting out the auditor's internal quality-control procedures, any material issues raised by the auditor's internal quality-control reviews and the steps taken to resolve those issues.

(f)     To review and approve the Company's hiring policies regarding partners, employees and former partners and employees of the present and former external auditor of the Company. The Committee has adopted the following guidelines regarding the hiring of any partner, employee, reviewing tax professional or other person providing audit assurance to the external auditor of the Company on any aspect of its certification of the Company's financial statements:

(i)     no member of the audit team that is auditing a business of the Company can be hired into that business or into a position to which that business reports for a period of three years after the audit;

(ii)     no former partner or employee of the external auditor may be made an officer of the Company or any of its subsidiaries for three years following the end of the individual's association with the external auditor;

(iii)     the Chief Financial Officer ("CFO") must approve all office hires from the external auditor; and

(iv)     the CFO must report annually to the Committee on any hires within these guidelines during the preceding year.

(g)     To review, at least annually, the relationships between the Company and the external auditor in order to establish the independence of the external auditor.

*Financial Information and Reporting*

(a)     To review the Company's annual audited financial statements with the Chief Executive Officer ("**CEO**") and CFO and then the full Board. The Committee will review the interim financial statements with the CEO and CFO.

(b)     To review and discuss with management and the external auditor, as appropriate:

(i)      the annual audited financial statements and the interim financial statements, including the accompanying management discussion and analysis; and

(ii)     earnings guidance and other releases containing information taken from the Company's financial statements prior to their release.

(c)     To review the quality and not just the acceptability of the Company's financial reporting and accounting standards and principles and any proposed material changes to them or their application.

(d)     To review with the CFO any earnings guidance to be issued by the Company and any news release containing financial information taken from the Company's financial statements prior to the release of the financial statements to the public. In addition, the CFO must review with the Committee the substance of any presentations to analysts or rating agencies that contain a change in strategy or outlook.

*Oversight*

(a)     To review the internal audit staff functions, including:

(i)      the purpose, authority and organizational reporting lines;

(ii)     the annual audit plan, budget and staffing; and

(iii)    the appointment and compensation of the controller, if any.

(b)     To review, with the CFO and others, as appropriate, the Company's internal system of audit controls and the results of internal audits.

(c)     To review and monitor the Company's major financial risks and risk management policies and the steps taken by management to mitigate those risks.

(d)     To meet at least annually with management (including the CFO), the internal audit staff, and the external auditor in separate executive sessions and review issues and matters of concern respecting audits and financial reporting.

(e)     In connection with its review of the annual audited financial statements and interim financial statements, the Committee will also review the process for the CEO and CFO certifications (if required by law or regulation) with respect to the financial statements and the Company's disclosure and internal controls, including any material deficiencies or changes in those controls.

**Membership**

(a)     The Committee shall consist solely of three or more members of the Board, the majority of which the Board has determined has no material relationship with the Company and is otherwise "unrelated" or "independent" as required under applicable securities rules or applicable stock exchange rules.

(b)     Any member may be removed from office or replaced at any time by the Board and shall cease to be a member upon ceasing to be a director. Each member of the Committee shall hold office until the close of the next annual meeting of shareholders of the Company or until the member ceases to be a director, resigns or is replaced, whichever first occurs.

(c)     The members of the Committee shall be entitled to receive such remuneration for acting as members of the Committee as the Board may from time to time determine.

(d)     All members of the Committee must be "financially literate" (i.e., have the ability to read and understand a set of financial statements such as a balance sheet, an income statement and a cash flow statement).

**Procedures**

(a)     The Board shall appoint one of the directors elected to the Committee as the Chair of the Committee (the "**Chair**"). In the absence of the appointed Chair from any meeting of the Committee, the members shall elect a Chair from those in attendance to act as Chair of the meeting.

(b)     The Chair will appoint a secretary (the "**Secretary**") who will keep minutes of all meetings. The Secretary does not have to be a member of the Committee or a director and can be changed by simple notice from the Chair.

(c)     No business may be transacted by the Committee except at a meeting of its members at which a quorum of the Committee is present or by resolution in writing signed by all the members of the Committee. A majority of the members of the Committee shall constitute a quorum, provided that if the number of members of the Committee is an even number, one-half of the number of members plus one shall constitute a quorum, and provided that a majority of the members must be "independent" or "unrelated".

(d)     The Committee will meet as many times as is necessary to carry out its responsibilities.  Any member of the Committee or the external auditor may call meetings.

(e)     The time and place of the meetings of the Committee, the calling of meetings and the procedure in all respects of such meetings shall be determined by the Committee, unless otherwise provided for in the articles of the Company or otherwise determined by resolution of the Board.

(f)     The Committee shall have the resources and authority necessary to discharge its duties and responsibilities, including the authority to select, retain, terminate, and approve the fees and other retention terms (including termination) of special counsel, advisors or other experts or consultants, as it deems appropriate.

(g)     The Committee shall have access to any and all books and records of the Company necessary for the execution of the Committee's obligations and shall discuss with the CEO or the CFO such records and other matters considered appropriate.

(h)     The Committee has the authority to communicate directly with the internal and external auditors.

**Reports**

(a)     The Committee shall produce the following reports and provide them to the Board:

(i)     an annual performance evaluation of the Committee, which evaluation must compare the performance of the Committee with the requirements of this Charter. The performance evaluation should also recommend to the Board any improvements to this Charter deemed necessary or desirable by the Committee.  The performance evaluation by the Committee shall be conducted in such manner as the Committee deems appropriate. The report to the Board may take the form of an oral report by the Chair or any other member of the Committee designated by the Committee to make this report.

(ii)    a summary of the actions taken at each Committee meeting, which shall be presented to the Board at the next Board meeting.