UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**CASE NO. 22-CV-22538-ALTMAN/Reid**

Dominik Karnas, *et al.*, on behalf of themselves and
all others similarly situated,

    *Plaintiffs,*

v.

Mark Cuban, Dallas Basketball Limited, d/b/a
Dallas Mavericks, Robert Gronkowski, Victor
Oladipo, and Landon Cassill,

    *Defendants.*

_____/

**PLAINTIFFS' REPLY TO
DEFENDANTS' SUPPLEMENTAL OPPOSITION [ECF NO. 323] TO PLAINTIFFS'
MOTION TO CERTIFY NATIONWIDE ISSUE CLASSES [ECF NO. 254]**

i

Plaintiffs are very pleased that Defendants requested, and the Court granted, their request to file their latest Supplemental Opposition [ECF No. 323] ("Supp.") to Plaintiffs' pending Motion to Certify Two Issue Classes [ECF No. 231] ("Motion to Certify"), as it enabled Plaintiffs to now take sworn testimony of Defendants' latest proffered expert, Harris Label of AlixPartners,[1] and to file this brief supplemental reply.

As explained in detail below, Mr. Label's sworn testimony unequivocally supports this Court now: (1) denying the pending Defendants' Motion to Dismiss, filed October 27, 2023 ([ECF No. 189], and (2) granting the Motion to Certify just the two proposed common "questions," namely: (a) should every Voyager token and Earn Account be considered "unregistered securities" under the applicable New Jersey statute, and (b) were Non-Settling Defendants, Mark Cuban and the Dallas Mavericks, "sellers" under the same New Jersey statutes. This was a similar analysis recently provided by Judge Moreno in denying the motion to dismiss in *Harper v. O'Neal*, No. 23-21912-CIV, 2024 WL 3845444 (S.D. Fla. Aug. 16, 2024).[2] Moreover, these issues are similar to those Judge Shipp granted final approval to on December 11, 2024, where he concluded that analogous New Jersey consumer protection statutes could form the basis for a nationwide class of customers where the defendant company was based in New Jersey. *See In re: FieldTurf*, Case No. 3:17-md-02779-MAS-TJB, ECF No. 377 (D.N.J. Dec. 13, 2024).

Defendants' proffered expert just definitively confirmed that all Parties in this litigation now have access to Voyager's ▮▮▮▮ Database, which contains a detailed record of all Voyager customer transactions("Voyager Data"), which allows users to: (1) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and (2) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Defendants' Supplemental Opposition [ECF No. 323] ("Supp.") is largely irrelevant to the Security and Solicitation Issue Classes that Plaintiffs have asked the Court to certify. Instead of arguing that these clear issues are not appropriate for certification, Defendants continue their quixotical march into arguing against certification of a damages class that is not yet before the Court. In so doing, Defendants have actually armed Plaintiffs with additional evidence as to why not only is it practical to

---

[1] In an abundance of caution, Plaintiffs file a redacted version of this brief and will move in accordance with the Protective Order [ECF No. 65] to file the unredacted version under seal, along with the copy of Mr. Label's deposition transcript, which will be attached as **Exhibit A** thereto ("Label Tr.").

[2] Similar rulings in this matter on these same issues will greatly advance this litigation.

1

certify the Securities and Solicitation Issue Classes, but also why subsequent phases of this litigation are likely easier to resolve than previously anticipated.

Plaintiffs deposed Defendants' latest proffered expert, Harris Label, on December 4, 2024. Defendants retained Mr. Harris to act as an "interpreter," translating their requested search terms into queries to glean information from the Voyager Data. Mr. Label, an experienced data analyst, performed a perfunctory analysis, without discretion and completely at the direction of Defendants' counsel, based on improper queries and search criteria (formulated by defense counsel) which unsurprisingly yielded inaccurate and out-of-context results that do not support Defendants' arguments opposing certification of the issue classes.

What Plaintiffs were able to learn from Mr. Label's deposition, however, is that  . Label Tr., 30:18–31:13. Label Tr. 32:8–23.

That being said, the analysis that Mr. Label performed for Defendants remains completely irrelevant to the Plaintiffs' motion for class certification, the motion that is actually pending before the Court, as it deals with subject matter that is not at issue in resolving either the Security Issue or the Solicitation Issue on a class-wide basis.

The Security Issue involves determining whether Voyager's native crypto tokens ("VGX") or interest-bearing Earn Program Accounts ("EPAs") are "unregistered securities" under the New Jersey Uniform Securities Law ("NJUSL"). Defendants have never raised any argument against certifying the Security Issue and any they could have raised after this latest attempt are now certainly waived. The Voyager Data that Defendants raise as the centerpiece of their Supplement details exactly how many Voyager customers opened an EPA—the sole type of account that Voyager offered—and purchased VGX. *See* Supp., 7 ("Defendants recently obtained Voyager's Data, which reflects the trading records and account information for all ▮ Voyager customers who ever opened an account.").

Similarly, the Solicitation Issue focuses on whether Defendants' conduct amounted to "solicitation," such that they may be held liable for participating in sales as statutory sellers under the NJUSL. Courts around the country, including this Court most recently in *Harper v. O'Neal*, No. 23-

21912-CIV, 2024 WL 3845444 (S.D. Fla. Aug. 16, 2024), have concluded that celebrity promoters can be liable for soliciting sales of crypto asset securities, even without an official position within the issuing company. Determining whether Defendants' conduct rose to the level of solicitation on a class basis is the same path taken by other class plaintiffs under analogous circumstances. *See In re FieldTurf Artificial Turf Mktg. & Sales Pracs. Litig.*, 2023 WL 4551435, at *2–3, 10 (D.N.J. July 13, 2023) (certifying issue classes although individualized inquiry necessary for causation and damages, reasoning that "resolution of the proposed issue classes will allow for one trial with a single, preclusive determination regarding [defendant's] conduct, rather than repeated trials regarding the same evidence of the alleged defect and deception").[3]

Rather than address either of these issues, Defendants instead attack strawmen they have imagined. For example, Defendants seek to artificially narrow the class using criteria irrelevant to the question at hand. Rather than focusing on all holders of EPAs, which Plaintiffs argue was the only Voyager account type offered, Defendants reduce the number of EPA holders to only those who (1) opened a Voyager EPA between October 27, 2021 and October 30, 2021, (2) used the MAVS100 promotional code (ignoring the others), (3) funded their EPA with sufficient funds, then (4) made a trade sufficient to earn $100 in free bitcoin, (5) did not give a referral code to others, (6) thereafter invested assets that earned interest, and (7) actually earned interest. This overly-narrow recharacterization of the Security Issue ignores that the Court's analysis as to whether EPAs are securities should focus on the scheme as a whole, not on individual transactions or specific returns. *Sec. & Exch. Comm'n v. Genesis Glob. Capital, LLC*, No. 23-CV-00287, 2024 WL 1116877, *14 (S.D.N.Y. Mar. 13, 2024); *see also SEC v. Terraform Labs Pte. Ltd.*, 23-CV-1346 (JSR), 2023 WL 8944860, at *13–14 (S.D.N.Y. Dec. 28, 2023) ("As the Supreme Court has held, it is of no legal consequence that not all holders of UST deposited tokens in the Anchor Protocol, and thus that some holders 'ch[o]se not to accept the full offer of an investment contract.'") (citing *Howey*, 328 U.S. at 300).

As another example, Defendants repeatedly argue that the Solicitation Issue cannot be certified because there may be individual questions of causation or damages. But Defendants' conduct was not particularized to any individual class member, and their uniform conduct is all that the Solicitation Issue Plaintiffs seek to certify is concerned with. *See In re FieldTurf Artificial Turf Mktg. & Sales Pracs. Litig.*, 2023 WL 4551435, at *2–3, 10 (D.N.J. July 13, 2023) (certifying issue classes although

---

[3] Rather than attempt to argue any issues with Judge Shipp's method of granting issue certification in *FieldTurf* in the same way Plaintiffs urge the Court should do here, Defendants point to Judge Shipp's preceding denial of certification of a full class certification under Rule 23(b)(3).

3

individualized inquiry necessary for causation and damages, reasoning that "resolution of the proposed issue classes will allow for one trial with a single, preclusive determination regarding [defendant's] conduct, rather than repeated trials regarding the same evidence of the alleged defect and deception").

As Defendants' Supplemental Opposition still does not raise any argument sufficient to explain why either the Security Issue or the Solicitation Issue should be certified as Plaintiffs request, the Court should reject their arguments and grant Plaintiffs' motion, allowing this litigation to proceed towards resolving these issues on their merits for all affected parties.

## ARGUMENT

### I. Defendants Continue to Misconstrue Plaintiffs' Proposed Issue Classes

Defendants' Supplemental Opposition relies on irrelevant arguments that distract from the two core issues Plaintiffs seek to certify, namely: (1) whether Voyager's native crypto tokens ("VGX") or interest-bearing EPAs constitute "unregistered securities" under the New Jersey Uniform Securities Law (the "Security Issue"), and (2) whether Defendants' conduct constitutes "solicitation," such that they could be held liable as statutory sellers (the "Solicitation Issue"). At this stage, Plaintiffs need only demonstrate that these issues are suitable for class-wide resolution—not that they will prevail on the merits.

Notably, Defendants do not challenge the adequacy of Voyager's Data to identify the individuals and entities comprising these classes. The Voyager Data contains detailed information about the transactions and accounts of all customers during the relevant time period. Thus, Defendants' arguments about purported evidentiary obstacles to certification are entirely misplaced because Plaintiffs are not seeking to certify a class of individuals whom Defendants "successfully solicited." Rather, Plaintiffs simply seek certification of issues, the answers to which could only ever be answered the same way for every Voyager customer: one issue encompasses either the account that every Voyager necessarily had (because it was the only one offered) or Voyager's only native token, while the other issue encompasses Defendants' uniform, generalized conduct. Both of these issues will require Plaintiffs to advance uniform, class-wide proof to prevail, not individualized inquiries, as Defendants claim.

#### A. The Security Class is Ascertainable and Meets Rule 23 Requirements

Defendants distort the facts to obscure the critical fact that ***every single account Voyager offered to customers was an EPA***. Indeed, whether Voyager's VGX tokens and interest-bearing EPAs qualify as unregistered securities lies at the heart of this case. Notably, the New Jersey Bureau of Securities has already concluded that the Voyager EPA qualifies as a security.

4

As detailed in Plaintiffs' Motion, courts across the nation have concluded that similar interest-bearing programs are securities. For instance, in *Sec. & Exch. Comm'n v. Genesis Glob. Capital, LLC*, No. 23-CV-00287, 2024 WL 1116877, (S.D.N.Y. Mar. 13, 2024), the court determined that the SEC sufficiently alleged that the Gemini Earn program constituted securities under both the *Howey* and *Reves* tests. *Id.* at *1. The Gemini Earn program—where customers could earn interest from defendants' lending activities if they held eligible crypto assets in their Gemini accounts—is nearly identical in all meaningful respects to the Voyager's interest-bearing EPAs at issue in this case. Gemini customers—including U.S. retail investors—could tender crypto assets to Genesis and Genesis promised to pay interest on those assets. To earn interest in Gemini Earn, investors had to hold eligible crypto assets with Gemini as identified by Gemini in its published list of specified crypto assets and corresponding interest rates. Genesis, in turn, determined which crypto assets (and in what amounts) were eligible to be invested. Like Gemini Earn, Voyager's EPAs promised interest on crypto assets held in Voyager accounts and Voyager controlled the terms of eligibility and investment.

The court in *Genesis* explained that, in determining whether the Defendants offered and sold unregistered securities through the entire Gemini Earn program, the analysis should focus on the scheme as a whole, not on individual transactions or specific returns. *Id.* at *14. The same holds true here. Defendants' emphasis on "individualized proof" of specific transactions and "qualifying" assets is a red herring. The relevant inquiry concerns the EPA itself—every EPA had this uniform interest-bearing feature. As Plaintiffs explain in their Reply, the fact that some EPA holders did not earn interest or fully utilize promotional offers is immaterial. *Terraform Labs Pte. Ltd.*, 2023 WL 8944860, at *13–14. Thus, regardless of the Defendants' characterization of the Voyager Data, all ███ Voyager customers would be class members of the Security Issue Class because each of them purchased from Voyager an EPA, which Plaintiffs assert is a security and which Defendants assert is not.

### B. The Solicitation Class is Ascertainable and Satisfies Rule 23

Defendants also misstate the applicable law as it relates to solicitation. As this Court has recognized, solicitation "need not be 'personal' or 'targeted' to trigger liability." *Harper*, 2024 WL 3845444, at *4 (quoting *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1346 (11th Cir. 2022)). Defendants actively promoted EPAs by touting interest rates between 7% and 12% exclusively available to Voyager EPA account holders. Defendants' arguments relating to Voyager's engagement of other promoters in no way undermine their wrongdoing. Simply put, Section 12 of the Securities Act makes a person who solicits the purchase of an unregistered security liable for using "any means" of

"communication in interstate commerce." 15 U.S.C. § 77e(a)(1). Defendants' extensive promotional efforts are sufficient to subject them to liability.

Plaintiffs' proposed Solicitation Issue class only seeks certification concerning the question of whether Defendants' conduct constitutes "solicitation." Plaintiffs are not asking the Court to certify the issue of causation or whether such solicitations were "successful," to the extent there even is such a requirement under the NJUSL. Plaintiffs are not required to seek certification of the issue of causation at this time, and Defendants' claim that Plaintiffs are attempting an "end run" around Rule 23(b)(3)'s predominance requirement is entirely unfounded.

Defendants' arguments in their Opposition and Supplement are demonstrably irrelevant when viewed in the context of MDL No. 2779, *In re FieldTurf Artificial Turf Mktg. & Sales Practices Litigation*, pending in the United States District Court for the District of New Jersey. In *FieldTurf*, the plaintiffs filed their *first* Motion for Class Certification, Appointment of Counsel, and Appointment of Class Representatives ("First Motion for Class Certification"), seeking a Rule 23(b)(3) certification for four types of claims: fraudulent concealment, statutory consumer fraud, implied warranty, and unjust enrichment. *See* First Motion for Class Certification, *Fieldturf*, 3:17-md-02779-MAS-TJB (D. N.J.) (ECF 211) at 22-24. In an August 18, 2022 opinion, the *FieldTurf* court denied the First Motion for Class Certification ("First Opinion"), concluding that individual issues predominated for determining both causation and measure of damages. *See* First Opinion, *Fieldturf*, 3:17-md-02779-MAS-TJB (D. N.J.) (ECF 270) at 45-46 ("Primary among the Court's concerns are the difficulties in establishing (1) damages, (2) causation, and (3) where relevant, manifestation.").

The plaintiffs filed their Renewed Motion for Class Certification later that year on October 5, 2022. *Fieldturf*, 3:17-md-02779-MAS-TJB (D. N.J.) (ECF 274). The Renewed Motion for Class Certification sought certification of only two Rule 23(c)(4) issue classes for the same four types of claims as in the first. *See* Renewed Motion for Class Certification, *Fieldturf*, 3:17-md-02779-MAS-TJB (D. N.J.) (ECF 274-1) at 1 ("This case presents the ideal scenario for certifying the Classes as defined in the original Motion for Class Certification under Rules 23(a), 23(b)(3), and now 23(c)(4)…with respect to the Defect and Deception Issues…"). Those two issue classes, termed the Defect Issue (i.e., was the product defective) and the Deception Issue (i.e., did defendant know of the defect and conceal it from customers), were isolated by the court in the First Opinion as subject to class-wide proof. *See* First Opinion, *Fieldturf*, 3:17-md-02779-MAS-TJB (D. N.J.) (ECF 270) at 26, 31 (stating for defect that "…the Court finds that Plaintiffs have met their burden of demonstrating that the question of whether Duraspine is inherently defective is subject to class-wide proof" and for deception that

6

"common issues predominate and that Plaintiffs may establish reliance through common evidence because FieldTurf omitted Duraspine's defects."). By doing so, the plaintiffs avoided the individualized issues which were not fit for class-wide proof and isolated the issues that predominated over individual questions and could be resolved on a class-wide basis, thereby advancing the litigation for all class members. The court granted the Renewed Motion for Class Certification and certified the Defect Issue and Deception Issue, finding that they satisfied Rule 23(a) (as they had previously) but also that they now met the Rule 23(b) predominance and superiority requirements (as well as the Third Circuit's *Gates* multi-factor test). *See In re: Fieldturf*, No. CV172779MASTJB, 2023 WL 4551435 (D.N.J. July 13, 2023).

Perhaps just as important was the effect that the Rule 23(c)(4) issue class certification had on the efficiency of the FieldTurf MDL. After these issues were certified, the Parties began briefing summary judgment motions and preparing for trial on the Defect and Deception Issues. By March 4, 2024, the *FieldTurf* parties announced they reached a nationwide class action settlement of all claims. [ECF 352]. The issue class certification did not result in "staging thousands of mini-trials." *See* Supp., 13. Instead, the court's certification resulted in simplifying the issues in dispute, allowing the parties to better understand their positions in the litigation, the risks attendant thereto, and to globally resolve them accordingly. *See In re: Fieldturf*, 2023 WL 4551435, *9 ("Finally, the Court is not concerned about management difficulties that may arise as a result of certifying these two discrete issues while leaving other aspects of liability and damages to individual adjudication. *See Chiang v. Veneman*, 385 F.3d 256, 267 (3d Cir. 2004) ("[C]ourts commonly use Rule 23(c)(4) to certify some elements of liability for class determination, while leaving other elements to individual adjudication-or, perhaps more realistically, settlement.")). And even without settlement, litigating simplified mini-trials which target narrower and fewer issues is more efficient than litigating full-trials. *See* Advisory Committee's 1966 Notes on Fed. Rule Civ. Proc. 23, 28 U.S.C. App., p. 141 ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.").

On December 11, 2024, the *FieldTurf* court held the final fairness hearing and granted final approval to the parties' nationwide class action settlement. *See In re: FieldTurf*, Case No. 3:17-md-02779-MAS-TJB, ECF No. 377 (D.N.J. Dec. 13, 2024).

Defendants' flawed attempts to distinguish *FieldTurf* epitomizes their misunderstanding of the concept of Rule 23(c)(4) issue class certification. *See* Supplemental Opposition at 14. Defendants are

7

correct that the First Opinion denied class certification of the New Jersey Consumer Fraud Act ("NJCFA") class in *FieldTurf*, but it is irrelevant here, to the Plaintiff's Motion to Certify Nationwide **Issue Classes,** because that decision was not for an **issue class**. Besides, when subsequently granting certification of the issue classes, the *FieldTurf* court held in the Renewed Motion Order that the Defect and Deception Issues materially advanced liability determinations for the state consumer protections law claims due to the existence of class-wide evidence, and specifically as to the NJCFA that the Defect and Deception issues materially advanced determinations that "FieldTurf engaged in 'unlawful conduct,' as required by the New Jersey Consumer Fraud Act…" even though the court had denied the class certification in the First Opinion. *Fieldturf*, 3:17-md-02779-MAS-TJB (D. N.J.) (ECF 285) at 15. The purpose of a Rule 23(c)(4) certification is not to necessarily certify a class for the whole claim, but to certify for specific issues which may provide a class-wide determination for single or multiple elements of that claim. So, Defendants' *FieldTurf* example is in fact illustrative of Plaintiffs' arguments throughout their briefs— Plaintiffs are taking the expeditious route directly to Rule 23(c)(4) issue certification. Issue class certification for the Security Class and the Solicitation Class will result in narrow certification with respect to particular issues common to the entire class, foregoing those where individual issues predominate, while allowing the parties to hold a trial for the elements of claims that are common to the whole class even though some may be better suited for individualized trials.

Finally, Defendants' reliance on *O'Neill v. The Home Depot U.S.A., Inc.*, 243 F.R.D. 469 (S.D. Fla. 2006) is misplaced. In *O'Neill*, the Plaintiff asserted highly individualized claims which centered on alleged violations by Home Depot employees of the company's written policies. The Court denied certification where the class definition was overly broad in relation to the issues raised in the complaint. The court likewise declined to certify the proposed "claim" that the damages waiver at issue was a worthless product—an issue that was not presented in the operative complaint—explaining that "[i]t is not the Court's role to amend the pleading for the Plaintiff to articulate a claim that could meet the requirements of Rule 23 where the causes of action as presented do not." *Id.* at 481. In other words, the Plaintiff in *O'Neill* could not demonstrate predominance with respect to any of the causes of action, and therefore the Court declined to certify a single issue for class treatment.

Here, Plaintiffs' claims align directly with their class definitions, and the evidence supporting Defendants' liability for marketing and selling unregistered securities is common to the entire class. Defendants' participation in Voyager's scheme to sell unregistered securities is evident from common evidence demonstrating their material assistance in marketing EPAs and VGX to the Proposed Class Representatives and the Class. This evidence would remain the same regardless of class size or

8

composition. Further, the EPAs and VGX are materially identical and a Court could easily conclude that they are all securities based on the *Howey* test.

## II. The Policies Behind the NJUSL Supports Certification of Plaintiffs' Proposed Issue Classes.

Even if true (it is not), Defendants' assertion that individualized discovery is required, even for MAVS and ████ code users, to determine whether Defendants' statements "successfully" solicited each class members' purchase does not disprove the predominance of common issues here. Defendants' insistence that there must be class-wide evidence beyond the MAVS100 code connecting their statements with the putative class members' investment decisions cuts against the plain language and policies behind the NJUSL.

As explained in Plaintiffs' memorandum of law in support of their motion to certify the nationwide issue classes, the NJUSL applies nationwide in this instance as Voyager issued every EPA and VGX token offered or sold to Plaintiffs and the Class directly from their base of operations in New Jersey. Doc. 231 at 2-4. Under the NJUSL, every agent that promotes an offeror's unregistered security is jointly and severally liable for the full measure of a purchaser's damages. N.J.S.A. 49:3-60 ("It is unlawful for any security to be offered or sold in this State unless . . . [t]he security is registered under this act"); N.J.S.A. 49:3-71(d) ("every . . . agent who materially aids in the sale or conduct [is] also liable jointly and severally with and to the same extent as the seller or investment adviser"). There is no reliance defense to a promoter's joint and several liability under the NJUSL. The only defense to NJUSL promoter liability for the sale of unregistered securities is showing that the alleged promoter did not know, or in the exercise of reasonable care could not have known, that they were promoting the sale of unregistered securities. N.J.S.A. 49:3-71(d).

Applying the NJUSL's plain language here, it is clear that if Plaintiffs prevail on both issues presented by the proposed classes, Defendants will be jointly and severally liable to the same extent as Voyager for the full measure of Plaintiffs' and the Class's damages. *See* N.J.S.A. 49:3-71(d). Consequently, each class member's individual investment rationale with respect to VGX tokens and EPAs is irrelevant because "irrespective of the individual issues which may arise, the focus of the litigation concerns the alleged common course of unfair conduct embodied in [Voyager's] scheme" to market and sell unregistered securities. *See Larsen v. Union Bank, N.A. (In re Checking Account Overdraft Litig., MDL No. 2036)*, 275 F.R.D. 666, 676 (S.D. Fla. 2011).

At its core, Defendants' supplemental brief raises a reliance argument. *See* Doc. 323 at 10 (arguing that the class should not be certified because "there is no class-wide evidence" as to "who

9

Defendants successfully solicited," thus Defendants due process rights to challenge each putative class member's claim is infringed). But, as explained in Plaintiff's opening class certification brief, the plain language of the NJUSL contains no reliance element, so the resolution of both issues presented by Plaintiffs will apply the same as to every class member, making these issues appropriate for class resolution. Doc. 231 at 3 n.7 (citing SAC ¶ 190).

Indeed, the NJUSL's drafters "rejected any 'requirement that the buyer prove reliance . . . .'" *Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1197 (N.J. 2000) (quoting Louis Loss, *Commentary on the Uniform Securities Act* 148 (1976) (explaining that "the very purpose of [a statutory securities-fraud action] is to afford the victims of securities fraud ... a remedy without the formidable task of proving common law fraud")). Accordingly, class-wide evidence showing any putative class member relied exclusively on Defendants' promotions in deciding to invest in VGX and/or EPAs is not required for this Court to certify the nationwide issue classes. *See id.*[4] Hence, the resolution of 1) whether VGX tokens and/or Voyager EPAs are securities under the NJUSL and 2) whether Defendants' conduct amounts to solicitation such that they are statutory sellers under the NJUSL will materially advance this litigation regardless of the extent to which Plaintiffs relied on Defendants' promotions. Doc. 231 at 4.

Even if there was a "reliance" element as the Defendants argue, the *FieldTurf* court already explained exactly why certification of the Security and Solicitation Issues here would not infringe on any due process rights Defendants may have: "[a]s long [FieldTurf] is given the opportunity to challenge each [C]lass member's claim to recovery during the damages phase, [FieldTurf's] due process rights are protected." *In re FieldTurf Artificial Turf Mktg. & Sales Practices Litig.*, No. CV172779MASTJB, 2023 WL 4551435, at *10 (D.N.J. July 13, 2023) (quoting *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 671 (7th Cir. 2015) and explaining that defendant "would be able to challenge causation (and relatedly,

---

[4] In the analogous context of the 1933 Securities Act's section 12, the Eleventh Circuit ruled that any spokesperson who promoted a crypto Ponzi scheme had engaged in "solicitation" of securities by "urg[ing] people to buy [crypto tokens] in online videos," even if the offering's promoters did not directly target particular purchasers. *See Wildes v. BitConnect Int'l PLC*, 25 F.4th at 1346. The NJUSL should be interpreted at least as broadly as section 12 of the Securities Act because the NJUSL applies to "every . . . agent who materially aids in the sale or conduct[,]" who is held "liable jointly and severally with and to the same extent as the seller or investment adviser." Doc. 231 at 4 n.10. To the extent that there is any need to impose any sort of limitation on which Voyager transactions would qualify for a subsequent damages phase of this litigation, the only logical limitation would be for transactions that occurred on or after the first public solicitation Defendants made, which here would be October 27, 2021 through the date of Voyager's bankruptcy on July 5, 2022. The Voyager Data is more than detailed enough to allow Plaintiffs to ascertain the dollarized amount of class damages incurred in this period and to attribute those damages to the Voyager customers who would be entitled to them, utilizing objective means.

manifestation) individually," while "resolution of the proposed issue classes will allow for one trial with a single, preclusive determination regarding FieldTurf's conduct, rather than repeated trials regarding the same evidence of the alleged defect and deception"). In a scenario where Plaintiffs prevail on the Security and Solicitation Issues on a class-wide basis and a damages phase is then structured through individual trials (which is by no means the only option for proceeding), "the remaining individual trials will largely focus on causation and damages—which will be presented to and decided by a jury—and will thus not create indivisible remedies that would make relief as to one claimant determinative of the claims of others." *In re FieldTurf Artificial Turf Mktg. & Sales Practices Litig.*, No. CV172779MASTJB, 2023 WL 4551435, at *10 (D.N.J. July 13, 2023).

Ultimately, Defendants are free to bring contribution claims against Voyager and any other promoters of the VGA tokens and EPAs, to the extent they are unhappy with being held jointly and severally liable for materially aiding the sale of unregistered securities. *See* N.J.S.A. 49:3-71(d) ("There is contribution as in cases of contract among the several persons so liable[.]") But Defendants' discontent with the NJUSL's plain text is no barrier to certifying the nationwide issue classes.

### III. Harris Label's Analysis is Based on Defendants' Erroneous Assumptions and is Irrelevant to Plaintiffs' Motion.

Mr. Label's deposition demonstrates that the Defendants cherrypicked the Voyager Data by using their invented search criteria to produce narrow, contrived results that purportedly limit the number of class members who might ultimately be entitled to recover damages for Defendants' misconduct. As explained throughout Plaintiffs' briefing, this inquiry is simply not at issue at this stage of the litigation. Further, the facts ascertained from Mr. Label's deposition make clear that the results of the analysis is entirely Defendant-driven and did not produce reliable results for the arguments that they claim it supports.



For instance, ███████████████████████████████████████████████████████████████ Label Tr., 8:22–9:2. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Label Tr., 23:11–24:15. ████████████████████████████████████████████. Label Tr., 54:7–9.

Defendants have zeroed in on the "MAVS" promotional codes as the "only conceivable evidentiary connection to Defendants" for determining whether Defendants solicited class members. *See* Supplemental Opposition at 1. As just explained above, this is false. Defendants are merely attempting to redirect the Court's attention towards this red herring, obfuscating the issue class

11

definitions in the process. For purposes of this Rule 23(c)(4) issue class certification, the corporate records certainly demonstrate ascertainability and the promotional codes, including the MAVS codes, do demonstrate just one method of direct, class-wide evidence of solicitation; but the MAVS codes are certainly not the only evidence.

The Voyager Data simply demonstrates that Plaintiffs' proposed classes *can* be ascertained; the Security Class and Solicitation Class definitions do not limit the classes to only MAVS code users. *See* Plaintiffs' Motion to Certify Nationwide Issue Classes at 5–6. The promo codes just signify "those individuals who most certainly relied upon Defendants advertisements in making their decision to purchase," which is just evidence of the nature of Defendants' promotions as solicitations to purchase unregistered securities, generally. Plaintiffs' Motion to Certify Nationwide Issue Classes at 14. Limiting the class to only MAVS code users would give class members who were solicited by Defendants but did not use their promo code no remedy. Furthermore, limiting the class to only MAVS code users within the timeframe Defendants propose eliminates not only those that did not use the code but also excludes the Defendants' other solicitations, such as the season long TV-visible signage and social media posts. *See* Plaintiffs' Motion to Certify Nationwide Issue Classes at 7.

Label's deposition ███████████████. *See* Label Deposition Transcript at 52:5-20 ("███████████████"). During the deposition, ███████████████. Label Tr., 36:25-37:7.

Defendants also included ███████████████. *See* Label Tr., 41:16-19 ("███████████████"). The partnership and solicitations did not abruptly end three days after the October 27th press conference. *See* Supplemental Opposition at 3 ("On October 27, 2021, Voyager and Defendant Mavericks announced a multi-year sponsorship agreement… First, Voyager received

the right to advertise Voyager's brand at Mavericks home games and in various related campaigns. The agreement describes allocated ad space and "signage" within the Mavericks' arena. The Mavericks also agreed to work with Voyager to conduct community events and create educational content.").

Defendants unilaterally selected October 30, 2021 as the end date for user sign ups because the MAVS100 code "expired on October 30, 2021," but this arbitrary distinction ignores that not only was the October 27, 2021 Press Release republished ad nauseum for months following its release, but Defendants were still soliciting users, who used or attempted to use that or other Mavericks promotional codes whether they were expired or not. Supp., 10; Label Tr., 41:24-42:3 ("Q████████████████████████████████████████████████████████████████████████████████████████████████████"); Label Tr., 42:22-25 ("████████████████████████████████████████████████████████████████████████████████████████████████████").

Moreover, Defendants removed MAVS code users who did not receive a "reward" for their promotional code. ████████████████████████████████████████████████████████████████████████████████████████████████████ (*see* Label Tr., 30-31, 39), whether a reward was obtained is irrelevant, as "it is of no legal consequence" that some "'ch[o]se not to accept the full offer of an investment contract.'" *Terraform Labs Pte. Ltd.*, 2023 WL 8944860, at *13–14 (citing *Howey*, 328 U.S. at 300).

When limited to Defendants' incorrect three-day period and by other arbitrary parameters, Defendants' interpretation of this limited subset of MAVS code-related Voyager data does not capture the total amount of Voyager users guaranteed to have been directly solicited by Defendants.

At the same time, the Voyager Data as a whole is comprehensive enough, and searchable to such a granular degree, that once Plaintiffs are able to proceed into a damages phase of this litigation, they will be able to ████████████████████████████████████████████████████████████████████████████████████████████████████. Label Tr., 30:18–31:13. ████████████████████████████████████████████████████████████. Label Tr. 32:8–23.

## CONCLUSION

For the foregoing reasons, the Court should (a) certify the proposed Issue Classes; (b) appoint the proposed Class Representatives to serve as Class Representatives for the proposed Nationwide Issue Classes; and (c) appoint The Moskowitz Law Firm, PLLC and Boies Schiller Flexner LLP, to serve as Co-Lead Class Counsel for the Proposed Issue Classes.

13

Dated: December 17, 2024                              Respectfully submitted,

| | |
|---|---|
| **By:** */s/ Adam M. Moskowitz* | **By:** */s/ David Boies* |
| Adam M. Moskowitz | David Boies |
| Florida Bar No. 984280 | (Admitted Pro Hac Vice) |
| Joseph M. Kaye | **BOIES SCHILLER FLEXNER LLP** |
| Florida Bar No. 117520 | 333 Main Street |
| Barbara C. Lewis | Armonk, NY 10504 |
| Florida Bar No. 118114 | Phone: (914) 749–8200 |
| **THE MOSKOWITZ LAW FIRM, PLLC** | dboies@bsfllp.com |
| Continental Plaza | |
| 3250 Mary Street, Suite 202 | |
| Miami, FL 33133 | **By:** */s/ Stephen Neal Zack* |
| **Mailing Address:** | Stephen Neal Zack |
| P.O. Box 653409 | Florida Bar No. 145215 |
| Miami, FL 33175 | **BOIES SCHILLER FLEXNER LLP** |
| Office: (305) 740-1423 | 100 SE 2nd St., Suite 2800 |
| adam@moskowitz-law.com | Miami, FL 33131 |
| joseph@moskowitz-law.com | Office: 305-539-8400 |
| barbara@moskowitz-law.com | szack@bsfllp.com |
| | |
| *Co-Counsel for Plaintiffs and the Class* | *Co-Counsel for Plaintiffs and the Class* |

**By:** */s/ Jose M. Ferrer*
Jose M. Ferrer
Florida Bar No. 173746
Desiree Fernandez
Florida Bar No. 119518
**MARK MIGDAL HAYDEN LLP**
8 SW 8th Street, Suite 1999
Miami, FL 33130
Office: 305-374-0440
jose@markmigdal.com
desiree@markmigdal.com

*Co-Counsel for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed on December 17, 2024, via the Court's CM/ECF system, which will send notification of such filing to all attorneys of record.

By: */s/ Adam M. Moskowitz*
ADAM M. MOSKOWITZ
Florida Bar No. 984280