## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 22-cv-22538-ALTMAN/Reid

**DOMINIK KARNAS**, *et al., on behalf of*
*themselves and all other similarly situated,*

     *Plaintiffs,*

*v.*

**MARK CUBAN**, *et al.,*

     *Defendants.*

_____/

### ORDER

Users of a failed cryptocurrency platform sued the platform's promotional partners, alleging violations of state securities and consumer-fraud statutes. The Defendants now move to dismiss the complaint, arguing—among other things—that the Plaintiffs fail to establish personal jurisdiction. After careful review, we agree and **GRANT** the motion.

### THE FACTS

#### I.     Background

Voyager Digital, LLC ("Voyager") "operated a cryptocurrency investing application for iOS and Android mobile devices." Second Amended Complaint ("SAC") [ECF No. 155] ¶ 119. That application—the "Voyager Platform"—allowed users to access "more than a dozen different cryptocurrency exchanges and . . . trade more than 50 cryptocurrencies." *Id.* ¶ 122. Launched in October 2019, Voyager positioned itself as "a single access point to research, manage, trade, and secure cryptocurrencies for novice and sophisticated investors." *Id.* ¶ 126. Voyager underwent "rapid growth in 2021 and 2022," accumulating "more than $5 billion in assets under management and over 3.5 million investors." *Id.* ¶¶ 119, 187.

Our Plaintiffs share a darker tale. In their view, the Voyager Platform "was based upon false representations and other deceptive conduct . . . specifically designed to take advantage of unsophisticated investors." *Id.* ¶ 124. As relevant here, the SAC identifies four main examples of this illegal conduct. *First*, it alleges that Voyager "secretly charged exorbitant commissions on each trade," despite "prominently and consistently" claiming to be "100% Commission-Free." *Id.* ¶¶ 121, 128; *see also id.* ¶ 135 (alleging that those "hidden commissions on every trade . . . exceed[ed] the disclosed fees and commissions charged by . . . competitors"). *Second*, the SAC claims that Voyager "represent[ed] to the public on its website that it [wa]s 'publicly traded, licensed, and regulated,'" but failed to disclose that only its *parent* company, not Voyager itself, was a publicly traded entity—and only in Canada. *Id.* ¶ 137. *Third*, the SAC avers that Voyager offered "interest-bearing cryptocurrency accounts"—called "Earned Program Accounts" ("EPAs")—which functioned as "securities," but which were "neither licensed nor regulated by state or federal securities regulators." *Id.* ¶¶ 20, 151;[1] *see also id.* ¶ 152 (alleging that users lacked "material information" about "the business and financial condition of Voyager, the fees charged, the extent of Voyager's profits, and specific and detailed risks of the investment"). *Fourth*, according to the SAC, Voyager represented that its "own native crypto tokens" (called "VGX tokens") "were tradeable on secondary exchanges, including the world's largest crypto exchange, Binance," leading "users to believe they could expect to profit off of VGX." *Id.* ¶ 155; *see also id.* ¶ 3 (alleging that VGX tokens were "unregistered securities").

---

[1] According to the SAC, customers who signed up for the Voyager Platform were "automatically enrolled in the Voyager Earn Program" and earned interest on those accounts if they maintained a "required minimum monthly average balance of any . . . reward-bearing digital assets to participate." SAC ¶ 142 (cleaned up). Voyager would then "pool[ ]" the cryptocurrencies held in the EPAs "to fund its various income generating activities, including lending operations, proprietary trading, cryptocurrency staking, and investments in other cryptocurrency trading platforms." *Id.* ¶ 141. The rates of return associated with EPAs were largely "dependent on Voyager's use and investment of . . . assets" deposited in the accounts. *Id.* ¶¶ 145–46.

To attract users, Voyager engaged in an "extremely aggressive promotion and advertising campaign via influencers and celebrities." *Id.* ¶ 121. It inked endorsement deals with professional athletes, including Rob Gronkowski, Victor Oladipo, and Landon Cassill. *See id.* ¶¶ 249–60, 272–80, 286–92. And, in October 2021, it signed a "five-year exclusive, integrated partnership" with the Dallas Mavericks—a professional basketball team in Dallas, Texas—under which it paid the team "more than $25 million" for help "open[ing] accounts" and "encourag[ing] people to use it." *Id.* ¶¶ 13, 201. According to the SAC, Mark Cuban, the "team owner," "took an active, personal role in managing the Voyager/Mavericks negotiations." *Id.* ¶ 40. On October 27, 2021, for instance, Voyager, Cuban, and the Mavericks held a press conference in Dallas that livestreamed—via mavs.com—to "3,700 viewers." *Id.* ¶ 208; *see also id.* ¶ 211 n.46 (linking a YouTube recording of the press conference); Motion to Dismiss SAC ("MTD") [ECF No. 155] at 2 ("The video was posted to YouTube, where certain Florida plaintiffs allegedly saw the video."). At that event, Cuban offered the following assessment of Voyager:

> You don't have to spend a lot of money in order to learn. It's not like the stock market where it's almost impossible, except on a few platforms, to spend $10 and get started . . . . I gotta add, I am a customer and I've been a customer for several months now, I like to use it, it's easy, it's cheap, it's fast, and the pricing is actually really good, so we find it as a perfect fit for our Mavs fans and reaching Mavs fans of all ages . . . . And, of course, the Mavs being a leader[,] I think we are going to extend this far deeper than just Mavs fans, I think Voyager is going to be a leader amongst sports fans and crypto fans around the country . . . . [I]mmediately I was earning more when I went over to Voyager . . . . [W]ith Voyager, the pricing has been far, far better, so if you're paying attention and want to get the best price, Voyager is a great platform for it . . . . I'm not here trying to sell you it's 100% risk free, but it's as close to risk free as you're going to get in the crypto universe. And so just the ability to make that much more on your savings as an individual and as a business is a huge opportunity.

*Id.* ¶¶ 209, 211, 213, 215.

"[S]hortly after the press conference," the Mavericks ran a promotion that offered $100 in Bitcoin to anyone "who downloaded the Voyager app" using the reward code "MAVS100." *Id.* ¶ 223. "Within just the first 48 hours after the promotions by Cuban and the Mavericks," the SAC maintains,

Voyager tallied "over 75,000" downloads, and "more than 5,300 Voyager accounts were created by people specifically in Florida using a MAVS coupon code." *Id.* ¶ 240. Indeed, the SAC claims that "Florida had among the most redemptions of the code compared to other states." *Ibid.*; *see also ibid.* ("Voyager previously confirmed that they made more sales and profits in the state of Florida, than in most other states.").

On October 27, 2021, Cuban issued a press release in which he said that "we believe our partnership with Voyager will allow Mavs and NBA fans to learn more about Voyager and how they can earn more from Voyager's platform than from traditional financial applications." *Id.* ¶ 226 (cleaned up). On October 28, 2021, "Voyager was the presenting sponsor of the Mavericks game . . . against the San Antonio Spurs." *Id.* ¶ 224. "As part of that sponsorship, Voyager received . . . Mavs100 promotions, LED Scorer's Table Signage, TV-visible LED signage in all televised games, a halftime presentation, and a Voyager $100k Crypto Shootout." *Ibid.* "In early 2022, while the Mavericks were under contract to promote Voyager, Cuban also travelled to Miami to attend cryptocurrency conferences" at which, the Plaintiffs claim, he "tout[ed] Voyager or otherwise work[ed] to further Voyager's partnership goals." *Id.* ¶ 242.

On January 15, 2022, "viewers could see a TV-visible LED 360 Voyager advertisement during a home game against the Orlando Magic that was streamed in Texas, Florida, and across the country . . . [for] 1 hour, 33 minutes, and 42 seconds." *Id.* ¶ 228. And, on March 21, 2022, "at a home game against the Minnesota Timberwolves, the Mavericks hosted Voyager 'Skee-Ball,' during which every participant received a 'Mavericks x Voyager' t-shirt." *Id.* ¶ 230. As of June 2022, the SAC claims, "Voyager signage at the Maverick's American Airlines Arena . . . appeared in 376 posts on Maverick's social media," garnering "19 million total impressions and 939k total engagements." *Id.* ¶ 229.

## II.    Procedural History

In March 2022, the New Jersey Bureau of Securities "entered a Cease and Desist Order against Voyager, finding that the Earn Program is not exempt from registration under the law." *Id.* ¶ 184.[2] "[A]s a result," the SAC maintains, "Voyager's stock price tanked by 25% in a day and . . . over 80% for the year." *Ibid.* In July 2022, Voyager declared bankruptcy. *See id.* ¶ 185.

In August 2022, our Plaintiffs—individuals[3] who lost money investing through Voyager—sued Cuban and the Mavericks (the "Defendants"), along with Gronkowski, Oladipo, and Cassill, alleging that they invested in reliance on "misrepresentations and omissions" about the Voyager Platform. *See* Complaint [ECF No. 1]. Our Plaintiffs first amended their complaint in October 2022. *See* Amended Complaint [ECF No. 34]. And they filed the SAC, the now-operative complaint, in June 2023, bringing claims—individually and on behalf of a putative nationwide class of consumers—under the New Jersey Uniform Securities Law (Count I), *see id.* ¶¶ 343–49; the New Jersey Consumer Fraud Act (Count II), *id.* ¶¶ 350–58; the New Jersey Declaratory Judgment Act (Count III), *id.* ¶¶ 359–66; and New Jersey common law (Count IV), *see id.* ¶¶ 367–74. In the alternative, each named Plaintiff alleges—on behalf of statewide subclasses of consumers—violations of certain securities and consumer-protection statutes. *See id.* ¶¶ 343–74 (New Jersey Subclass); *id.* ¶¶ 375–93 (Florida Subclass); *id.* ¶¶ 394–408 (Louisiana Subclass); *id.* ¶¶ 409–24 (Alabama Subclass); *id.* ¶¶ 425–38 (Virginia Subclass); *id.* ¶¶ 439–51 (California Subclass); *id.* ¶¶ 452–67 (Pennsylvania Subclass); *id.* ¶¶ 468–83 (Tennessee Subclass); *id.* ¶¶ 484–95 (Oklahoma Subclass); *id.* ¶¶ 496–511 (Massachusetts Subclass); *id.* ¶¶ 512–26 (Connecticut Subclass).

---

[2] That same month, six *other* state attorneys general—in Alabama, Kentucky, Oklahoma, Texas, Vermont, and Washington—"found that Voyager was violating their state laws . . . and that the EPAs are an unregistered security." SAC ¶ 184.

[3] The sixteen individuals bringing the SAC are citizens of Alabama, California, Connecticut, Florida, Georgia, Louisiana, Massachusetts, New Jersey, Oklahoma, Pennsylvania, Tennessee, and Virginia. *See* SAC ¶¶ 66, 72, 75, 78, 81, 84, 87, 90, 93, 96, 99, 102, 105, 108, 111.

Following jurisdictional discovery, the Defendants moved to dismiss the SAC. *See generally* MTD. Among other things, that MTD argued that "the Voyager EPAs are not securities," and that, in any event, the "Defendants' limited discussion of Voyager is plainly insufficient to make them 'sellers' of the EPAs or VGX or to support secondary liability"; that the Plaintiffs "fail to state claims for violations of the[ ] [Consumer Fraud] statutes"; that "Cuban and the Mavs cannot be held liable for [the] sale of a token that they declined even to promote, much less sell"; that the civil-conspiracy claim to violate the New Jersey Consumer Fraud Act "fails"; that the claim under the New Jersey Declaratory Judgments Act is "defective"; that the SAC amounts to a "shotgun pleading[ ]"; that "Voyager is a necessary third party under Rule 19"; and that the Plaintiffs "fail to meet the requirements of both Florida's long-arm statute and the Due Process Clause." *Id.* at 6, 22, 30, 31, 32, 33 (quotation marks omitted). In November 2023, our Plaintiffs filed their Response in Opposition to the MTD ("Response") [ECF No. 195]. And, in December 2023, the Defendants filed their Reply to the Response ("Reply") [ECF No. 200].

In March 2024, our Plaintiffs settled their claims against Gronkowski, Oladipo, and Cassill. *See* Joint Motion to Stay Case [ECF No. 226] at 1. Cuban and the Mavericks are thus the only remaining Defendants in this case.

## THE LAW

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). "But if a defendant challenges personal jurisdiction in a Rule 12(b)(2) motion to dismiss, Federal Rule of Civil Procedure 12(i) affords the district court discretion on how to proceed." *N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, 124 F.4th 1322, 1333 (11th Cir. 2025) (cleaned up). "The district court has two options: (1) hold an evidentiary hearing before trial to make factual findings about personal

jurisdiction or (2) decide the motion to dismiss under a prima facie standard without an evidentiary hearing." *Ibid.* (cleaned up). "[I]f the district court does not hold an evidentiary hearing," it simply reviews whether the plaintiff satisfies the prima facie requirement, which is a purely legal question." *Ibid.* (cleaned up). Still, "the district court must construe all reasonable factual inferences in favor of the plaintiff." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (cleaned up).

"To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Megladon, Inc. v. Vill. of Pinecrest*, 661 F. Supp. 3d 1214, 1221 (S.D. Fla. 2023) (Altman, J.) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "In deciding a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, but legal conclusions without adequate factual support are entitled to no assumption of truth." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (cleaned up).

## ANALYSIS

The Defendants offer a long list of arguments for dismissal. *See* MTD at 1–2. But "courts should address issues relating to personal jurisdiction before reaching the merits of a plaintiff's claims." *Republic of Pan. v. BCCI Hldgs. (Lux.) S.A.*, 119 F.3d 935, 940 (11th Cir. 1997). We thus begin— and end—there.

"The Supreme Court has recognized two types of personal jurisdiction: general jurisdiction . . . and specific jurisdiction." *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1228 (11th Cir. 2023). "General jurisdiction lies in the forum where the defendant is domiciled or fairly regarded as at home." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 12 (2025) (cleaned up). "A court in such a forum

may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different State." *Ibid.* (cleaned up). "Specific jurisdiction is different: It covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021). "To exercise specific jurisdiction, the defendant must have 'purposefully availed' itself of the privilege of conducting activities—that is, purposefully establishing contacts—in the forum state and there must be a sufficient nexus between those contacts and the litigation." *Jekyll Island-State Park Auth. v. Polygroup Macau Ltd.*, 140 F.4th 1304, 1317 (11th Cir. 2025) (quotation marks omitted).

"[A] federal court generally undertakes a two-step analysis to determine whether there is personal jurisdiction over a nonresident defendant." *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1272 (11th Cir. 2022). *First*, we "determine whether the plaintiff has alleged sufficient facts to subject the defendant to the forum state's long-arm statute." *Ibid. Second*, we "decide whether the exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment." *Ibid.* Here, our Plaintiff attempts to establish specific jurisdiction over the Defendants through three provisions of Florida's long-arm statute: *first*, under FLA. STAT. § 48.193(1)(a)(1), which covers "any cause of action arising from . . . carrying on a business or business venture in this state"; *second*, under FLA. STAT. § 48.193(1)(a)(2), which encompasses "tortious act[s]" committed "within" Florida; and *third*, under FLA. STAT. § 48.193(1)(a)(6), which extends to acts that "[c]aus[e] injury to persons or property within this state." We address each of these arguments in turn.

## I.        Subsections (1)(a)(1) and (1)(a)(6)

The Defendants argue that we can "easily dispense" with the Plaintiffs' attempts to establish personal jurisdiction under Subsections (1)(a)(1) and (1)(a)(6). MTD at 33. And our Plaintiffs now appear to agree, limiting their Response *only* to Subsection (1)(a)(2). *See* Resp. at 31 (invoking only Subsection (1)(a)(2)). The Plaintiffs have thus forfeited any arguments they might have made for

personal jurisdiction under Subsections (1)(a)(1) and (1)(a)(6). *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (cleaned up)). In any event, we agree that the Plaintiffs *couldn't* establish our personal jurisdiction under those two subsections of the Florida long-arm statute.

We'll start with Subsection (1)(a)(6), which allows plaintiffs to establish personal jurisdiction over "any cause of action arising from . . . [c]ausing injury . . . within this state . . . if . . . the defendant was engaged in solicitation or service activities within this state; or . . . [p]roducts, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state." FLA. STAT. § 48.193(1)(a)(6). Our Plaintiffs claim to have sustained *monetary* damages. *See* SAC ¶ 356 ("Defendants' unconscionable commercial practices, deceptive acts, and misrepresentations caused damages to Plaintiffs in the amount of their lost investments."). But "Florida's Supreme Court has held that economic injury, unaccompanied by physical injury or property damage, is insufficient to subject a non-resident defendant to personal jurisdiction under § 48.193(1)(a)[6]." *Courboin v. Scott*, 596 F. App'x 729, 734 (11th Cir. 2014); *see also Prunty v. Arnold & Itkin LLP*, 753 F. App'x 731, 735–36 (11th Cir. 2018) ("[J]urisdiction is not proper under § 48.193(1)(a)(6) because [the plaintiff] has alleged only economic injuries."). So, Subsection (1)(a)(6) cannot confer personal jurisdiction here.

The Plaintiffs' reliance on Subsection (1)(a)(1) fares no better. That subsection allows plaintiffs to establish personal jurisdiction over "any cause of action arising from . . . [o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." FLA. STAT. § 48.193(1)(a)(1). "In order to establish that a defendant is 'carrying on business' for the purposes of the long-arm statute, the activities of the defendant must be considered collectively and show a general course of business activity in the state for pecuniary benefit." *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). "[F]actors relevant to

9

whether a plaintiff has shown a defendant's general course of business activity[ ] includ[e]: (1) the presence and operation of an office in Florida, (2) the possession and maintenance of a license to do business in Florida, (3) the number of Florida clients served, and (4) the percentage of overall revenue gleaned from Florida clients." *Melgarejo v. Pycsa Pan., S.A.*, 537 F. App'x 852, 860 (11th Cir. 2013) (quotation marks omitted).

Here, our Plaintiffs fail to demonstrate that the Defendants "carry[ ] on a business or business venture in Florida" within the meaning of Subsection (1)(a)(1). The SAC notes that Cuban is a Texas resident and that the Mavericks—"a Texas limited partnership"—have their "home stadium . . . in Dallas." SAC ¶¶ 114–15. It "is silent as to whether [the Defendants] ha[ve] any agents or offices in Florida." *Hart Agric. Corp. v. Kea Invs. Ltd.*, 2023 WL 155208, at *4 (11th Cir. Jan. 11, 2023). And while the SAC details connections between the Defendants and Florida, it comes nowhere close to establishing "a direct affiliation, nexus, or substantial connection . . . between the basis for the cause of action and the business activity." *Doe (V.H.) v. Hyatt Hotels Corp.*, 2024 WL 3859882, at *1 (11th Cir. Aug. 19, 2024) (quotation marks omitted); *see also ibid.* ("Florida courts have interpreted the specific jurisdiction under Florida Statute § 48.193(1)(a)(1) to require 'connexity,' or 'a causal connection between the defendant's activities in Florida and the plaintiff's cause of action.'").

The SAC points out that Cuban owns "two condominiums on Miami Beach and travel[s] to Florida either for personal reasons or for Mavericks away games in Miami and Orlando multiple times per year." SAC ¶ 114. But it doesn't connect this lawsuit to those Florida trips. Had the SAC alleged that Cuban "visited Florida for the specific purpose" of conducting *business*, there's still "nothing in the record linking those business operations with [the] cause of action in this case." *Melgarejo*, 537 F. App'x at 860–61. And even if the SAC alleged such links, "occasional and insignificant business operations" don't fulfill Subsection (1)(a)(1). *Id.* at 860; *see also Doe (V.H.)*, 2024 WL 3859882, at *2 ("While they have officers who live in and work from Florida, it cannot be said that this amounts to

operating or managing the hotel from Florida. So any negligence in operation or management functions that caused Appellants' injury is not directly affiliated to their limited presence in Florida.").

Nor can our Plaintiffs show that the Mavericks "carry on" business in Florida. The SAC notes that the team "played at least two games in Florida while they were Brand Ambassadors for Voyager," that an executive boasted of having "fans everywhere," including "in Florida," and that "viewers could see a TV-visible LED 360 Voyager advertisement during a home game against the Orlando Magic that was streamed in . . . Florida" for "1 hour, 33 minutes, and 42 seconds." SAC ¶¶ 115, 228 (quotation marks omitted). It also identifies "367 posts on Mavericks' social media" containing "Voyager signage at the Mavericks' American Airlines Center." *Id.* ¶ 229. But "electronic communications from out-of-state offices into Florida do not establish conducting business in Florida." *Prunty*, 753 F. App'x at 735 (cleaned up); *see also Westwind Limousine, Inc. v. Shorter*, 932 So. 2d 571, 575 n.7 (Fla. Dist. Ct. App. 2006) ("[M]erely posting a passive website does not constitute either the solicitation of business in Florida or the transaction of business in Florida for purposes of a jurisdictional due process analysis." (cleaned up)). No one disputes that the Mavericks "had no Florida business license." *Melgarejo*, 537 F. App'x at 860. And the mere fact that the team played games in Florida is "irrelevant": Those games didn't feature Voyager promotions and so lack "the connexity requirement conferring jurisdiction." *Banco de los Trabajadores v. Cortez Moreno*, 237 So. 3d 1127, 1137 (Fla. Dist. Ct. App. 2018). Our Plaintiffs thus cannot rely on Subsection (1)(a)(1).

## II.     Subsection (1)(a)(2)

Having abandoned Subsections (1)(a)(1) and (1)(a)(6), our Plaintiffs now offer two theories under which (they say) the Defendants committed torts in Florida within the meaning of Subsection (1)(a)(2), which allows plaintiffs to establish personal jurisdiction over "any cause of action arising from . . . [c]ommitting a tortious act within this state." FLA. STAT. § 48.193(1)(a)(1). *First*, they argue that the SAC sets forth "allegations that a Florida resident suffered injuries from violations of Florida's

Deceptive and Unfair Trade Practices Act ('FDUTPA')." Resp. at 31 (emphasis omitted). *Second*, they contend that the Defendants participated in a civil conspiracy and had co-conspirators—namely, "Oladipo and Gronkowski"—who "committed acts in Florida in furtherance of the conspiracy." *Id.* at 33. We consider each argument in turn.

### a.  Intentional-Tort Theory

Our Plaintiffs' first theory of personal jurisdiction is that the Defendants "intentionally availed themselves of the Florida consumer market through the targeted promotion, marketing, and sale of Voyager's EPAs in Florida, which constitutes committing a tortious act within the state of Florida." SAC ¶ 63; *see also ibid.* ("Defendants have also marketed and participated and/or assisted in the sale of Voyager's unregistered securities to consumers in Florida."). "In Florida, before a court addresses the question of whether specific jurisdiction exists under the long-arm statute, the court must determine whether the allegations of the complaint state a cause of action." *PVD Windows, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 808 (11th Cir. 2010) (quotation marks omitted). But, assuming without deciding that the Plaintiffs state a viable cause of action under FDUTPA,[4] they still fail to overcome the federal due-process standard. *See Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008) ("If *both* Florida law *and* the United States Constitution permit, the federal district court may exercise jurisdiction over the nonresident defendant." (emphases added)).

The Due Process Clause limits "a state's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (cleaned up). In considering whether a federal court's exercise of specific jurisdiction over a non-resident defendant comports with due process, we examine "(1) whether the plaintiff's claims 'arise out of or relate to' at least one of the

---

[4] "The three elements of a consumer claim under FDUTPA are: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1097 (11th Cir. 2021) (quotation marks omitted).

defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013).

If nothing else, the Plaintiffs cannot clear the purposeful-availment prong. That inquiry has "two applicable tests: the effects test and the minimum contacts test." *Del Valle*, 56 F.4th at 1275. "Under the effects test, a nonresident defendant's single tortious act can establish purposeful availment without regard to whether the defendant had any other contacts with the forum state." *Id.* at 1276. And under the minimum-contacts test, personal jurisdiction is proper when a "nonresident defendant has certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *SkyHop Techs.*, 58 F.4th at 1228 (cleaned up). Applied here, neither test confers personal jurisdiction over the Defendants.

### i.   The Effects Test

"Stated in its broadest construction, the effects test requires a showing that the defendant (1) committed an intentional tort (2) that was directly aimed at the forum, (3) causing an injury within the forum that the defendant should have reasonably anticipated." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1221 n.28 (11th Cir. 2009); *see also Calder v. Jones*, 465 U.S. 783, 789 (1984) (explaining that the effects test asks whether a state "is the focal point both of the story and of the harm suffered"). That second element proves fatal to our Plaintiffs because we cannot say that the Defendants "committed . . . intentional torts *specifically aimed* at a Florida resident." *Licciardello*, 544 F.3d at 1287 (emphasis added).

The Plaintiffs argue that the SAC satisfies Subsection (1)(a)(2) because it "identifies multiple instances in which Cuban and the Mavericks made false and misleading statements regarding the

Voyager Platform to induce investors—both in Florida and across the nation." Resp. at 32. Specifically, they point to their allegations regarding the "myriad social media posts to . . . millions of followers, nationally-televised Mavericks basketball games featuring Voyager promotions, and the televised press conference," all of which "were accessible in Florida and in fact viewed in Florida by Florida residents." *Ibid.* And they maintain that the "targeted impact" of those "efforts is further demonstrated by the fact that Florida had among the most redemptions of the Mavericks code compared to other states." *Ibid.* (cleaned up). But that theory defies recent Eleventh Circuit guidance on how courts should navigate personal-jurisdiction inquiries in the "unique context" of "social media and internet-based activities." *Moore v. Cecil*, 109 F.4th 1352, 1363 (11th Cir. 2024).

To determine whether a defendant "directly aimed" digital activity at a forum, the Eleventh Circuit has explained, courts "must look to the defendant's focus, purpose, and/or intent in posting the information." *Ibid.* (quotation marks omitted). "[W]here the out-of-state defendant deliberately directs his posting at the plaintiff or at an audience in the forum state," the "'directly aimed at the forum' prong of the *Calder* effects test is satisfied." *Id.* at 1364. But, "where there is no evidence that the defendants posted the . . . information hoping to reach the forum state or an audience in the forum state *specifically*, then the *Calder* effects test is not satisfied." *Ibid.* (emphasis added).

We've been given no such evidence of *specific* Florida targeting here. The SAC alleges that the Defendants reached Florida customers through "*national* promotions," which they "knew and intended would reach people in Florida and nationwide." SAC ¶ 237 (emphasis added). But "[m]ere knowledge that the effects of the defendant's conduct would be felt in the forum state, without more, is insufficient." *Moore*, 109 F.4th at 1363–64. And rather than allege that the Defendants made Florida *the* "focal point" of their promotional campaign, *id.* at 1364, the SAC makes plain that the Defendants aimed to capture "the entire United States" and even an "international" audience, SAC ¶ 237. So, while the SAC alleges that the Defendants targeted "Mavericks fans who live in Florida," it frames

that targeting as a mere byproduct of a broader effort to reach "NBA fans" writ large. *Id.* ¶ 237. We thus see no evidence that the Defendants took aim at a Florida audience *specifically* "as opposed to . . . a national audience generally." *Moore*, 109 F.4th at 1364.[5]

Our holding today comports with the way in which at least five other circuits—the First, Third, Fifth, Sixth, and Eighth Circuits—approach *Calder*'s effects test in the age of digital harms. *See, e.g., Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 125 (1st Cir. 2022) ("Nothing in the record indicates that CarData . . . sought to serve Massachusetts residents in particular" as opposed to "North America." (quotation marks omitted)); *Hasson v. FullStory, Inc.*, 114 F.4th 181, 190–91 (3d Cir. 2024) ("[The Plaintiff] neither alleged that Papa Johns' website advertises a product or service bearing any special significance to Pennsylvania, nor that it features Pennsylvania-centric content. Indeed, pizza has national appeal. So Papa Johns did not expressly aim its Session Replay Code at Pennsylvania by operating a website that was accessible in the forum."); *Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 787 (5th Cir. 2021) ("Plaintiffs contend that [the] interactive website targets the entire United States, and so it necessarily targets Louisiana. But we have previously rejected this 'greater includes the lesser' theory."); *Blessing v. Chandrasekhar*, 988 F.3d 889, 906 (6th Cir. 2021) ("There is no evidence that the defendants posted the tweets hoping to reach Kentucky specifically as opposed to their Twitter followers generally."); *Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 954 (8th Cir.

---

[5] Our Plaintiffs don't argue that advertisements visible during *one* home game against the Orlando Magic alter this calculus. *See* SAC ¶ 228. But any such argument would fail for the same reason. That game appeared on national television, and the SAC says nothing to suggest the Defendants purchased airtime on local Florida broadcasts or otherwise sought Florida-specific attention. "[T]he alleged harm here was felt across the United States" *generally*, so the fact that information was "accessible and accessed in Florida" cannot justify the exercise of personal jurisdiction in Florida. *McCall v. Zotos*, 2023 WL 3946827, at *4–5 (11th Cir. June 12, 2023).

2022) ("Zazzle's website is nationally accessible, and nowhere does BASIC allege that Zazzle specifically targeted Missouri consumers or the Missouri market.").[6]

In sum, the "effects test [is] met when [a] tort is *expressly aimed* at a specific individual in the forum whose effects were suffered in the forum." *ECB USA, Inc. v. Savencia Cheese USA, LLC*, 148 F.4th 1332, 1342 (11th Cir. 2025) (cleaned up). And that's not the case here. The record before us makes clear that the Defendants targeted NBA fans throughout the country, not in Florida. Floridians might've glimpsed Voyager signage while watching a national television broadcast or scrolling through social media. But any such harms bear only a "tangential connection" to Florida. *Micro Fin. Advisors, Inc. v. Coloumb*, 2023 WL 7156898, at *4 (11th Cir. Oct. 31, 2023). Since we cannot say that Florida functioned as the focal point of the harm, the Plaintiffs' reliance on the effects test fails here.

### ii.  The Minimum-Contacts Test[7]

"The Due Process Clause of the Fourteenth Amendment protects a party from being subject to the binding judgment of a forum with which it has established no meaningful contacts, ties, or

---

[6] The Ninth Circuit has held that "sales of *physical* products into a forum via an interactive website can be sufficient to establish that a defendant expressly aimed its conduct at the forum." *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1094 (9th Cir. 2023). But that holding was "narrow," requiring that such sales "occur as part of the defendant's regular course of business" and that a defendant wield "some level of control over the ultimate distribution of its products." *Id.* at 1094, 1095. Plus, in the context of *non-physical* products, like the products at issue here, the Ninth Circuit appears more closely aligned with the First, Third, Fifth, Sixth, Eighth, and Eleventh Circuits. *See Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 981 (9th Cir. 2021) ("That [the plaintiff] may have addressed much of its advertising to an international or Australian audience does not alter the jurisdictional effect of marketing targeted specifically at the United States, the relevant forum.").

[7] Some circuits have suggested that the minimum-contacts test "is better suited for contract cases," whereas the effects test—with its focus on "purposeful direction," as opposed to "purposeful availment"—is more appropriate in "tort cases." *Doe v. Deutsche Lufthansa*, 157 F.4th 1103, 1111 (9th Cir. 2025). That view treats the minimum-contacts test as "contracts-oriented." *Licciardello*, 544 F.3d at 1286. But the Eleventh Circuit has held that the effects test "does not supplant the traditional minimum contacts test for purposeful availment applicable in contract and tort cases alike." *Louis Vuitton*, 736 F.3d at 1357; *see also SkyHop Techs*, 58 F.4th at 1230 ("[E]ither test suffices."). Plus, "questions of jurisdictional due process are immune to solution by checklist, a[s] each case must be decided on its own facts." *Oldfield*, 558 F.3d at 1222 (quotation marks omitted); *see also Deutsche*

relations." *Del Valle*, 56 F.4th at 1274 (quotation marks omitted). This requirement demands that "a State's assertion of personal jurisdiction over a nonresident defendant be predicated on 'minimum contacts' between the defendant and the State." *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984). "Under the minimum contacts test for purposeful availment, we assess the nonresident defendant's contacts with the forum state and ask whether those contacts: (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Louis Vuitton*, 736 F.3d at 1357. In so doing, we "identify all contacts between a nonresident defendant and a forum state and ask whether, individually or collectively, those contacts satisfy these criteria." *Ibid.*

"The ubiquity of internet commerce creates a myriad of jurisdictional questions." *Herbal Brands*, 72 F.4th at 1096. But "[a] number of circuits have addressed personal jurisdiction in the internet context, considering whether, when, and how such peculiarly non-territorial activities as web site hosting, internet posting, and mass emailing can constitute or give rise to contacts that properly support jurisdiction." *Shrader v. Biddinger*, 633 F.3d 1235, 1240 (10th Cir. 2011). And the Eleventh Circuit has joined that chorus, making clear that "[p]osting information on the internet is not sufficient by itself to subject that person to personal jurisdiction in each State in which the information is accessed." *McCall*, 2023 WL 3946827, at *4 (cleaned up). "Otherwise, a person placing information on the Internet would be subject to personal jurisdiction in every State." *Ibid.* (cleaned up).

---

*Lufthansa*, 157 F.4th at 1111 ("[T]his is not a rigid rule."); *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1089 (9th Cir. 2023) ("Although the distinction between purposeful availment and direction is often a useful and appropriate doctrinal table-setting device, there's no need to adhere to this iron-clad doctrinal dichotomy in every case." (cleaned up)). We'll therefore subject the Plaintiffs' claims to both tests.

Purposeful availment thus requires "contacts with the forum that were [the defendant's] own choice and not random, isolated, or fortuitous," and "those contacts must show that the defendant deliberately reached out beyond its home." *SkyHop Techs*, 58 F.4th at 1230 (quotation marks omitted). In the internet context, the Eleventh Circuit has thus rejected the suggestion that "the mere operation of an interactive website alone gives rise to purposeful availment *anywhere* the website can be accessed." *Louis Vuitton*, 736 F.3d at 1357. Instead, it has demanded "other contacts with Florida" and evidence that "the cause of action . . . derives directly from those contacts." *Id.* at 1358 (emphasis omitted). Practically speaking, this other-contacts evidence resembles the intent element of the effects test. *See, e.g.*, *Del Valle*, 56 F.4th at 1276 ("[W]e do not have to choose one test over the other with respect to purposeful availment."). So, the Eleventh Circuit has found that digital promotions constitute purposeful availment when, for instance, they involve "banner ads directed at Florida residents, follow-up direct emails sent to Florida residents," and "SEO efforts intended to maximize performance on search engine results pages to purposefully solicit business from Florida residents." *Id.* at 1276–77.

The SAC alleges no such targeting. The "376 posts on Mavericks' social media," racking up "19 million total impressions," were accessible to *all* social-media users, and the SAC doesn't suggest that the Defendants tried driving traffic to Floridians. SAC ¶ 229. The broadcasts showing Voyager signage were on "nationally televised NBA games," not local Florida networks.[8] *Id.* ¶ 237. The press

---

[8] Our Plaintiffs might've argued that *any* advertising during the Magic game—even on national television—constituted an attempt to corral Florida viewers, akin to how the defendant in *Del Valle* tried building Floridian traction through banner ads, direct emails, and SEO investments. *See* 56 F.4th at 1276. But the Response doesn't even *mention* that game. Not that the argument would've prevailed anyway. Absent from the SAC is *any* allegation that the Defendants took steps to solicit Floridian interest. And, as we'll discuss below, undifferentiated digital advertising doesn't satisfy the minimum-contacts test. Technologies evolve, but our baseline remains the same: "[M]erely advertising in [mediums] of national circulation that are read in the forum state is not a significant contact for jurisdictional purposes," lest "a business that advertised in a national [medium] . . . be subject to

conference took place in Dallas, "livestreamed on mavs.com," made no mention of Florida, and aimed instead to "enabl[e] both parties to reach a wider, *global* audience." *Id.* ¶¶ 208, 240 (emphasis added). And the "MAVS coupon code" was offered not just to Floridians, but to *all* "individuals who downloaded the Voyager app to invest during a certain time." *Id.* ¶¶ 223, 240. Such activities thus marked an effort to cast a wide—indeed *global*—net. *See, e.g.*, ¶ 237 ("The Sponsorship Agreement itself contemplated and permitted *international* promotions." (emphasis added)); ¶ 16 ("The Voyager/Mavericks Global Partnership was the very first 'International Partnership' in NBA history."); ¶ 41 ("The media strategy contemplated providing feeds to national broadcasters like CNBC, without any restrictions on covering the events in Florida and nationwide.").

What's more, the SAC fails to allege "other contacts with Florida" that are capable of transforming the "mere operation of an interactive website" into purposeful availment. *Louis Vuitton*, 736 F.3d at 1357–58. That Floridians created Voyager accounts using MAVs coupons doesn't provide those "other contacts" because "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285; *see also Aviation One of Fla., Inc. v. Airborne Ins. Consultants (PTY), Ltd*, 722 F. App'x 870, 880 (11th Cir. 2018) ("Nor is mere injury to a forum resident a sufficient connection to the forum." (quotation marks omitted)). No Voyager product was available for sale or delivery through the Defendants' website or social media. *See* Reply at 14 ("[I]t is undisputed the Mavs and Cuban did *not* sell their products into the forum."); *Louis Vuitton*, 738 F.3d at 1358 (holding that the defendant had purposefully availed himself of Florida markets by "selling and distributing infringing goods through his website to Florida consumers"). And the only other purported tie between the Defendants and Florida is the allegation that Cuban "travelled to Miami to attend cryptocurrency conferences, during which . . . he also engaged in touting Voyager or otherwise working to further

---

jurisdiction in virtually every state." *Lawson Cattle & Equip., Inc. v. Pasture Renovators LLC*, 139 F. App'x 140, 143 (11th Cir. 2005) (quotation marks omitted).

Voyager's partnership goals." SAC ¶ 242. But "jurisdictional discovery contradicted this claim,"[9] and our Plaintiffs don't argue otherwise. MTD at 35 n.38. In any event, basing personal jurisdiction on isolated contact subverts the purposeful-availment requirement, which shields defendants from being "haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

In sum, we cannot find that the Plaintiffs satisfy the minimum-contacts test. The SAC fails to allege that the Defendants specifically courted Florida customers or markets. The sole jurisdictional hook on which the Plaintiffs rely is a nationwide campaign. But such campaigns haven't been enough for earlier technologies. *See, e.g.*, *Henriquez v. El Pais Q'Hubocali.com*, 500 F. App'x 824, 829 (11th Cir. 2012) ("The fact that . . . an advertisement . . . is viewable in [the forum state] . . . does not, by itself, mean that the website owner had any contact with [the forum state]."). We see no reason why they should be enough now.

"Our Fourteenth Amendment personal jurisdiction standards" ensure "not only fairness, but also the orderly administration of the laws." *Fuld*, 606 U.S. at 14 (quotation marks omitted); *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 169 (2023) (Barrett, J., dissenting) ("The Due Process Clause protects more than the rights of defendants—it also protects interstate federalism."). Exerting our power here would imperil those values. If digital streaming alone sufficed for personal jurisdiction, then a federal court's reach would have no end. The Supreme Court hasn't allowed breakthroughs in advertising—be it through magazines, radio, television, or the internet—to "herald[ ] the eventual

---

[9] "In reality," the Defendants clarify, "Cuban attended a crypto conference in Miami and discussed cryptocurrency during an impromptu interview with the mayor of Miami. He never mentioned Voyager during either." MTD at 35 n.38 (citations omitted). The Plaintiffs never dispute this clarification.

demise of all restrictions on the personal jurisdiction of state courts." *Hanson v. Denckla*, 357 U.S. 235, 251 (1958). Nor do we.

### b. Conspiracy Theory

In the alternative, our Plaintiffs offer a second theory of personal jurisdiction. "Even if Cuban and the Mavericks had no connection to Florida," our Plaintiffs insist, "they would still be subject to this court's jurisdiction as alleged co-conspirators" because the SAC claims that the Defendants "were part of a conspiracy to promote the Voyager Platform and that the co-conspirators defendants, Oladipo and Gronkowski, committed acts in Florida in furtherance of the conspiracy." Resp. at 33. Deeming this theory a "Hail-Mary," the Defendants parry that the Plaintiffs "fail to allege conspiracy with Rule 9(b) particularity" because the SAC doesn't "sufficiently allege that any Defendant intended to commit an unlawful act." Reply at 10, 15 n.27 (quotation marks omitted). In our view, though, this theory fails for more fundamental reasons.

Conspiracy jurisdiction "presently exists in . . . maddeningly inconsistent—but increasingly popular—forms." Naomi Price & Jason Jarvis, *Conspiracy Jurisdiction*, 76 STAN. L. REV. 403, 413 (2024). That's because the doctrine stands in tension with the Supreme Court's admonition that "[e]ach defendant's contacts with the forum State must be assessed *individually*." *Keeton*, 465 U.S. at 781 n.13 (emphasis added); *see also Walden*, 571 U.S. at 284 ("We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("[U]nilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."); *Hanson*, 357 U.S at 253 (1958) ("The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum

State."); *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 384 (1953) (deeming a conspiracy theory of venue "frivolous albeit ingenious").

And the circuits' splintering in their approaches to this doctrine throws this tension into even sharper relief. The Fifth Circuit, for instance, has not yet endorsed *any* version of conspiracy jurisdiction. *See Delta Brands Inc. v. Danieli Corp.*, 99 F. App'x 1, 6 (5th Cir. 2004) ("To establish its prima facie case of specific personal jurisdiction, Delta was required to demonstrate that SSAB individually, and not as part of the conspiracy, had minimum contacts with Texas."); *Rusesabagina v. GainJet Aviation, S.A.*, 2025 WL 2674549, at *4 (5th Cir. Sep. 18, 2025) ("[W]e have neither adopted nor foreclosed [this doctrine]."). The Second Circuit, in stark contrast, embraces a robust conspiracy jurisdiction, one that *doesn't* "require a relationship of control, direction, or supervision" between a defendant and his co-conspirator. *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC* ("*Schwab II*"), 22 F.4th 103, 125 (2d Cir. 2021). And the Seventh Circuit—like others—straddles a line of ambivalence, declining to foreclose conspiracy jurisdiction but suggesting that "the theory may not be valid," at least in certain states. *Smith v. Jefferson Cnty. Bd. of Educ.*, 378 F. App'x 582, 585 (7th Cir. 2010); *see also id.* at 586 (deeming the doctrine "marginal at best"); *Chirila v. Conforte*, 47 F. App'x 838, 842 (9th Cir. 2002) ("There is a great deal of doubt surrounding the legitimacy of this conspiracy theory of personal jurisdiction."); *LaSala v. Marfin Popular Bank Pub. Co.*, 410 F. App'x 474, 478 (3d Cir. 2011) ("[W]e predict the New Jersey Supreme Court would decline to adopt such a theory of personal jurisdiction.").

The Eleventh Circuit falls somewhere along that spectrum. It's made clear that it recognizes the existence of conspiracy jurisdiction. *See, e.g.*, *Mazer*, 556 F.3d at 1281–82 (noting that "Florida courts have held that the state's long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy"). But it has applied the doctrine only a handful of times—and has never gone as far as the

Second Circuit.[10] The upshot here, though, is that, *even if* we apply the Second Circuit's conception of conspiracy jurisdiction, our Plaintiffs *still* fail to establish personal jurisdiction here for two reasons.

    *First*, the SAC doesn't sufficiently allege an agreement among the Defendants, Oladipo, and Gronkowski. In analyzing "the co-conspirator theory of jurisdiction within Florida's long-arm statute," we begin with a "threshold question"—"whether the allegations of the complaint state a cause of action for conspiracy." *ECB*, 148 F.4th at 1344 (quotation marks omitted). And, under Florida law, pleading a civil conspiracy requires alleging "(a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997).[11] The SAC falters at the first step.

---

[10] The Eleventh Circuit has provided only high-level summaries of the doctrine. *See, e.g.*, *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1217 (11th Cir. 1999) ("At least one court in Florida has adopted . . . [a] test governing personal jurisdiction over a non-resident conspirator."); *J & M Assocs., Inc. v. Romero*, 488 F. App'x 373, 375 (11th Cir. 2012) ("Alabama courts have adopted the conspiracy theory of personal jurisdiction."); *Mazer*, 556 F.3d at 1281–82 ("Florida courts have held that the state's long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida."); *ECB*, 148 F.4th at 1345 ("Florida law demands more than general statements to satisfy its long-arm statute: a court will decline to apply the co-conspirator theory to extend jurisdiction over nonresidents if the plaintiff fails to plead with specificity any facts supporting the existence of the conspiracy and provides nothing more than vague and conclusory allegations regarding a conspiracy involving the defendants." (quotation marks omitted)).

[11] Count III alleges a conspiracy to violate the New Jersey Consumer Fraud Act. *See* SAC ¶¶ 367–74. But since the "reach of the Florida long-arm statute is a question of Florida law," *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990), the "state law of the forum controls," *Walker v. Newgent*, 583 F.2d 163, 166 (5th Cir. 1978). Plus, neither side identifies an outcome-determinative conflict between Florida and New Jersey conspiracy law, so we can "simply apply the law of the forum state." *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 (11th Cir. 1995) (cleaned up). In any event, the Plaintiffs' treatment of the jurisdictional issue rests on Florida law, *see* Resp. at 3, and "a party may, through its briefing (or otherwise), waive its choice-of-law arguments implicitly," *Goodnight v. Bos. Sci. Corp.*, 548 F. Supp. 3d 1325, 1335–36 (S.D. Fla. 2020) (Altman, J.). So, we'll apply Florida law to evaluate whether the Plaintiffs have established the existence of a conspiracy.

Our Plaintiffs allege that *Voyager* entered into agreements with the Defendants, with Oladipo, and with Gronkowski. *See, e.g.*, SAC ¶ 269 ("Victor Oladipo partnered with Voyager . . . pursuant to a written agreement."); *id.* ¶ 201 ("Under the October 29, 2021 Agreement, Voyager would pay the Mavericks between $4 million and $5 million per year from 2021 to 2026."); *id.* ¶ 244 ("Gronkowski entered two marketing agreements to promote Voyager."). But nowhere over its 166 pages does the SAC allege that *our Defendants* had any relationship (much less an agreement) with Oladipo or Gronkowski. Instead, the SAC appears to rely on the assumption that the Defendants' partnership *with Voyager* somehow made them partners with everyone else who was *separately* in business with Voyager. But that assumption—hinging as it does on several degrees of removal—cannot establish personal jurisdiction here. Alleging that Voyager entered into one partnership with the Defendants, one partnership with Oladipo, and one partnership with Gronkowski doesn't itself merge those *separate* relationships into an agreement that unites *all* the parties.

If we squint, we can find only three statements that are even capable of being construed in a way that connects our Defendants with Oladipo and Gronkowski. *See id.* ¶ 371 ("Voyager entered into one or more agreements with Defendants . . . to induce Plaintiffs and consumers to invest."); *id.* ¶ 191 ("Every single public-facing announcement or press release concerning Defendants' relationships with Voyager described Defendants as 'partners' of Voyager, and all the announcements referred to Defendants' 'partnerships' with Voyager."); *id.* ¶ 341 ("Voyager . . . reached agreement with each Defendant to provide spokesperson and promotional services from the state of New Jersey."). But these bare-bones descriptions lump all the parties into a single entity without establishing *any* coordinated action. *See Parisi v. Kingston*, 314 So. 3d 656, 662 (Fla. Dist. Ct. App. 2021) (finding allegations "not sufficiently clear and specific as to the existence of a civil conspiracy" because "[t]he pleading vaguely ties the events together by alleging, in conclusory fashion, that the circumstances unfolded pursuant to an agreement" (cleaned up)). "To allege a conspiracy, a plaintiff must make

particularized allegations that are more than vague or conclusory." *Albra v. City of Ft. Lauderdale*, 232 F. App'x 885, 891 (11th Cir. 2007) (quotation marks omitted). Our Plaintiffs haven't done that here.

*Second*, the Plaintiffs press a conspiracy-jurisdiction theory that stretches well beyond the outer limits of the doctrine. "The courts of appeals that have examined the issue more thoroughly have determined that . . . the appropriate test for alleging a conspiracy theory of jurisdiction" requires claiming that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Charles Schwab Corp. v. Bank of Am. Corp.* ("*Schwab I*"), 883 F.3d 68, 86–87 (2d Cir. 2018); *see also Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013) ("To succeed on this theory, the plaintiffs would have to make a plausible claim (1) that a conspiracy existed; (2) that the four bank defendants participated in the conspiracy; and (3) that a coconspirator's activities in furtherance of the conspiracy had sufficient contacts with Virginia to subject that conspirator to jurisdiction in Virginia."); *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1070 (10th Cir. 2007) ("[A] co-conspirator's presence within the forum might reasonably create the 'minimum contacts' with the forum necessary to exercise jurisdiction over another co-conspirator if the conspiracy is directed towards the forum, or substantial steps in furtherance of the conspiracy are taken in the forum."); *FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1096 (D.C. Cir. 2008) ("For conspiracy jurisdiction . . . the plaintiff must allege (1) the existence of a civil conspiracy, (2) the defendant's participation in the conspiracy, and (3) an overt act by a co-conspirator within the forum, subject to the long-arm statute, and in furtherance of the conspiracy." (cleaned up)).

As the Second Circuit envisions it, this test "*serves* the purposeful availment requirement, rather than supplants it." *Schwab II*, 22 F.4th at 125. That's because a "conspiracy theory could not get off the ground if a defendant were altogether blindsided by its co-conspirator's contacts with the forum." *Ibid.*; *see also Hart v. Salois*, 605 F. App'x 694, 700 (10th Cir. 2015) ("[W]e have cautioned that to hold

that one co-conspirator's *presence* in the forum creates jurisdiction over other co-conspirators threatens to confuse the standards applicable to personal jurisdiction and those applicable to liability." (cleaned up)). Even under the Second Circuit's framework, then, plaintiffs relying on conspiracy jurisdiction cannot *entirely* disregard the requirements of the Due Process Clause.

That's the rub here. Even if we read the SAC as plausibly alleging an agreement among the Defendants, Oladipo, and Gronkowski, nothing in the SAC details activity on the part of the so-called co-conspirators that left the Defendants to "reasonably anticipate being haled into court [in Florida]." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Never mind that the SAC doesn't allege that Oladipo or Gronkowski acted on behalf of (or directed) Cuban and the Mavericks. The SAC suffers from a more basic defect: It *never* alleges that the Defendants interacted with Oladipo and Gronkowski, discussed Oladipo and Gronkowski with Voyager, or even knew that Oladipo and Gronkowski ever partnered with Voyager. *Cf. In re Platinum & Palladium Antitrust Litig.*, 61 F.4th at 242, 270–71 (2d Cir. 2023) ("The plaintiffs allege not only a common motive but also numerous interfirm communications," including "chat rooms, instant messages, phone calls, proprietary trading venues and platforms, and e-mails to coordinate among themselves." (cleaned up)).

Invoking conspiracy jurisdiction here might make more sense if this suit were against Voyager. But it's not. Cuban and the Mavericks are our sole defendants. And the Plaintiffs don't argue that Voyager is the relevant co-conspirator here. *See* Resp. at 33 ("Plaintiffs have sufficiently alleged that Cuban and the Mavericks were part of a conspiracy to promote the Voyager Platform and that the co-conspirators defendants, *Oladipo and Gronkowski*, committed acts in furtherance of the conspiracy." (emphasis added)). Instead, the SAC makes clear that Voyager forged *independent* relationships with Oladipo and Gronkowski. *See, e.g.*, SAC ¶ 14 (referring to "the Mavericks/Voyager Global Partnership"); *id.* ¶ 267 (same for "[t]he Voyager/Gronkowski partnership"); *id.* ¶ 285 (same for "[t]he Voyager/Oladipo partnership"). It *never* suggests that those relationships intersected with the

Defendants' unrelated dealings with Voyager. And to the extent the SAC alleges the existence of an *agency* relationship, it *either* isolates the Defendants from Oladipo and Gronkowski, *see, e.g.*, ¶ 391 ("Voyager held out Defendants as possessing sufficient authority to sell securities when, it publicly collaborated or partnered with Cuban, for instance, in a way that sanctioned Cuban to discuss selling Voyager investments and related cryptocurrencies."); *id.* ¶ 392 ("Voyager acknowledged its agency relationship with Defendants and their roles as agents . . . when Voyager Tweeted, for instance, that 'it could not be more excited to partner with the Dallas Mavericks.'"), *or* relies on vague and conclusory claims, *see, e.g.*, *id.* ¶ 6 ("Voyager's founder . . . contracted with world-famous celebrities and athletes to enlist them as Voyager's agents to solicit and promote Voyager's unregistered securities."); *id.* ¶ 148 ("Both Voyager and Defendants, acting as agents and/or partners of Voyager, prominently touted that cryptocurrency holdings on Voyager would earn rates of return up to 9% or more.").[12]

---

[12] As we previewed above, the Eleventh Circuit hasn't sketched out the full contours of conspiracy jurisdiction. So, while we may not be writing on a blank slate, we're also not bound by some muscular vision of that doctrine. We thus take the opportunity to respectfully disagree with the Second Circuit's wholesale rejection of the principle that "a defendant must control a co-conspirator before its purposeful availment is imputed to the defendant." *Schwab II*, 22 F.4th at 125 (emphasis omitted).

"Conspiracy jurisdiction seems to have expanded beyond its more limited roots." *In re Platinum*, 61 F.4th at 272 (Menashi, J.). "[E]arly cases" upholding the doctrine "generally did so on the theory that . . . nonresident defendants exercised sufficient direction and control over their in-state coconspirators to give rise to a principal-agent relationship." Alex Carver, Note, *Rethinking Conspiracy Jurisdiction in Light of Stream of Commerce and Effects-Based Jurisdictional Principles*, 71 VAND. L. REV. 1333, 1340–41 (2018); *see also Giusti v. Pyrotechnic Indus.*, 156 F.2d 351, 354 (9th Cir. 1946) ("The California members of the conspiracy were agents of Triumph in the conspiracy's attempt to destroy appellant's business."); *Intercontinental Leasing, Inc. v. Anderson*, 410 F.2d 303, 305 (10th Cir. 1969) ("The activities of the partnership in Kansas satisfy the minimum-contacts test."); *Stauffacher v. Bennett*, 969 F.2d 455, 460 (7th Cir. 1992) (Posner, J.) ("While alleging a broad conspiracy, the [plaintiffs] have never claimed that Livesey was an agent of the conspiracy." (emphasis omitted)); Ann Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis*, 52 FORDHAM L. REV. 234, 245 (1983) (explaining that courts employing conspiracy jurisdiction considered "whether the conventional attributes of agency [wer]e present"). Today, those principles still animate the doctrine. Case in point: Even in jettisoning a control requirement, the Second Circuit still invoked agency law. *See Schwab I*, 22 F.4th at 122 ("Much like an agent who operates on behalf of,

Our Plaintiffs thus misapprehend the scope of the conspiracy-jurisdiction doctrine. Not all circuits agree on how far the doctrine should be pushed—and how many otherwise-unviable claims the doctrine can revive. But all agree with Judge Friendly that, at a minimum, "the mere presence of one conspirator . . . does not confer personal jurisdiction over another alleged conspirator." *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1343 (2d Cir. 1972). And that's the issue at the heart of our Plaintiffs' theory: The SAC fails to plausibly allege that the Defendants should've been on notice that they could be haled into Florida's courts on the basis of contacts generated by Oladipo and Gronkowski. Our Plaintiffs ask that we empty conspiracy jurisdiction of all traces of due process.

---

and for the benefit of, its principal, a co-conspirator who undertakes action in furtherance of the conspiracy essentially operates on behalf of, and for the benefit of, each member of the conspiracy.").

Tethering the doctrine to agency principles prevents conspiracy jurisdiction from swallowing the due-process values that are enshrined in the personal-jurisdiction inquiry. And it allows courts to stay within the parameters carved out by the Supreme Court, which has recognized that "[a]gency relationships . . . may be relevant to the existence of *specific* jurisdiction." *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014); *see also ibid.* ("[A] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there."); *Ford Motor*, 592 U.S. at 382 (Gorsuch, J., concurring in the judgment) (noting that, "[w]hen a company 'purposefully availed' itself of the benefits of another State's market in the 1940s, it often involved sending in agents"); *Asahi Metal Indus. Co. v. Superior Ct. of Ca. Solano Cnty.*, 480 U.S. 102, 112 (1987) ("Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example . . . [by] marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."); *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 318 (1945) ("[A]lthough the commission of some single or occasional acts of the corporate agent in a state sufficient to impose an obligation or liability on the corporation has not been thought to confer upon the state authority to enforce it, other such acts, because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit." (citations omitted)).

In sum, there are compelling reasons to reexamine the viability of the conspiracy-jurisdiction doctrine. And perhaps the Supreme Court will do just that. For now, though, we note only that the Eleventh Circuit has never adopted the Second Circuit's control-less version of the doctrine. Courts within our Circuit should thus apply the doctrine in accordance with history and precedent, which require importing agency principles. Accordingly, since "[a]n essential element of agency is the principal's right to control the agent's actions," we humbly submit that conspiracy jurisdiction should demand *some* level of control. *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) (quotation marks omitted).

We decline that invitation. Because mutual relationships cannot automatically impute the requisite contacts, we find that our Plaintiffs fail to establish a conspiracy-based theory of jurisdiction here.

CONCLUSION

After careful review, therefore, we hereby **ORDER** and **ADJUDGE** as follows:

1. The Defendants' Motion to Dismiss [ECF No. 155] is **GRANTED**. This case is **DISMISSED without prejudice** and without leave to amend.[13]

2. This case shall remain **CLOSED**. All deadlines are **TERMINATED** and any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in the Southern District of Florida on December 26, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

---

[13] Our Plaintiffs haven't moved for leave to file a third amended complaint. *See Long v. Satz*, 181 F.3d 1275, 1279–80 (11th Cir. 1999) ("Failure to properly request leave to amend, when [a plaintiff] had adequate opportunity and time to do so, precludes the . . . argument . . . that the district court abused its discretion by denying her leave to amend her complaint."). And, given that the parties have already conducted extensive jurisdictional discovery, we don't see how a new pleading would cure the jurisdictional defects we've identified here. *See Wade v. Daniels*, 36 F.4th 1318, 1329 (11th Cir. 2022) ("[A] district court can deny leave to amend the complaint when amendment would be futile."). Since we lack personal jurisdiction over the Defendants, we won't be proceeding further with this case.